1  Michele Ballard Miller (SBN 104198)
   Kerry McInerney Freeman (SBN 184764)
2  Lisa C. Hamasaki (SBN 197628)
   MILLER LAW GROUP
3  A Professional Corporation
   60 E. Sir Francis Drake Blvd., Ste. 302
4  Larkspur, CA 94939
   Tel. (415) 464-4300
5  Fax (415) 464-4336

6  Attorneys for Defendants CHEVRON INTERNATIONAL
   EXPLORATION AND PRODUCTION (formerly known
7  as CHEVRONTEXACO OVERSEAS PETROLEUM and
   improperly sued as CHEVRONTEXACO OVERSEAS
8  PETROLEUM PACIFIC COMPANY) AND CHEVRON
   CORPORATION (formerly known as CHEVRONTEXACO
9  CORPORATION)

10                 UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12

13  KIRAN PANDE,                          Case No. 04-5107 CW

14          Plaintiff,

15  v.                                    **MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT OF
16                                        DEFENDANTS' MOTION FOR SUMMARY
                                          JUDGMENT OR, ALTERNATIVELY,
17  CHEVRON CORPORATION (f/k/a            PARTIAL SUMMARY JUDGMENT**
    CHEVRONTEXACO CORPORATION), a
18  Delaware corporation, and CHEVRON     Date:    January 5, 2007
    INTERNATIONAL EXPLORATION and         Time:    10:00 a.m.
19  PRODUCTION (f/k/a CHEVRONTEXACO       Courtroom: 2
    OVERSEAS PETROLEUM COMPANY), a
20  division of Chevron U.S.A. Inc.       Complaint filed: December 2, 2004

21                                        Trial Date: April 16, 2007
            Defendants.
22                                        Honorable Claudia Wilken

23

24

25

26

27

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1

**TABLE OF CONTENTS**

2   I.  INTRODUCTION ................................................................................................. 1

3   II. STATEMENT OF ISSUES TO BE DECIDED ................................................... 1

4   III. STATEMENT OF FACTS .................................................................................. 3

5        A.  Pande's Tenure In The Strategic Planning Group ................................. 3

        B.  Pande's Transfer To The Southern Africa Strategic Business Unit ................. 7

6   IV. LEGAL ANALYSIS ......................................................................................... 11

7        A.  PANDE CANNOT ESTABLISH A VIOLATION OF EITHER FMLA OR CFRA [First

8            and Second Causes of Action] ................................................................. 11

9            1.  Pande's Termination Did Not Violate Either FMLA Or CFRA .................... 11

10           2.  Defendants' Policies Are Consistent With FMLA/CFRA ............................ 14

11       B.  PANDE CANNOT ESTABLISH UNLAWFUL DISCRIMINATION OR

         RETALIATION [Third, Fourth and Fifth Causes of Action] ................................ 15

12           1.  Claims Arising During Pande's Tenure In Mitchell's Planning Group.

13               [September 2000 - December 6, 2002] ................................................... 15

14           2.  Claims Arising During Pande's Tenure In SASBU With Jack Dunn.

15               [December 7, 2002 - December 31, 2003] ............................................. 17

16       C.  COP DID NOT VIOLATE PANDE'S PRIVACY IN HER MEDICAL INFORMATION

17       [Seventh and Eighth Causes of Action] ......................................................... 22

             1.  Pande Cannot Establish A Violation Of The CMIA ................................. 22

18           2.  Plaintiff Was Not "Compelled" To Waive Her Right To Privacy As A

19               Condition of Continued Employment ....................................................... 23

20           3.  Pande's Constitutional Privacy Claim Also Fails As A Matter Of Law ....... 24

21  V.  CONCLUSION ................................................................................................ 25

22

23

24

25

26

27

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
Case No. 04-5107 CW

25

# TABLE OF AUTHORITIES

**Cases**

*Bradley v. Harcourt, Brace and Company,* 104 F.3d 267 (9th Cir. 1996) .................. 17, 18, 19
*Etter v. Veriflo,* 67 Cal.App.4th 457 (1998) ........................................................................ 19
*Flait v. North American Watch Corp.* 3 Cal.App.4th 467 (1992) ........................................ 21
*Furnco Construction Corp. v. Waters,* 438 U.S. 567 (1977) .............................................. 17
*Guthrey v. State of California,* 63 Cal. App. 4th 1108 (1998) ............................................ 21
*Guz v. Bechtel,* 24 Cal.4th 317 (2000) .............................................................................. 17
*Heller v. Norcal Mutual Ins. Co.,* 8 Cal.4th 30 (1994) ...................................................... 22
*Hill v. NCAA,* 7 Cal.4th 1 (1994) ....................................................................................... 25
*Horn v. Cushman and Wakefield,* 72 Cal.App.4th 798 (1991) ............................... 17, 18, 19
*Lyle v. Warner Brothers Television Productions,* 38 Cal.4th 265 (2006) ............................ 20
*Martin v. Lockheed Missiles and Space Co., Inc.,* 29 Cal.App.4th 1718 (1994) .................. 16
*McDonnell Douglas v. Green,* 411 U.S. 792 (1973) ........................................................... 17
*Morgan v. The Regents of the University of California,* 88 Cal.App.4th 52 (2000) ............... 16
*Nisendorf v. Levi Strauss and Co.,* 143 Cal.App.4th 509 (2006) ........................................ 12
*Pettus v. Cole,* 49 Cal.App.4th 402 (1996) ................................................................. 22, 25
*Price Waterhouse v. Hopkins,* 409 U.S. 228 (1989) .......................................................... 19
*Pugh v. See's Candies, Inc.,* 203 Cal.App.3d 743 (1988) .................................................. 13
*St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993) ............................................... 17, 18
*Texas Dept. of Community Affairs v. Burdine,* 460 U.S. 248 (1981) .................................. 18
*Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972 (8th Cir. 2005) .................... 12
*Tomlinson v. Qualcomm, Inc.,* 97 Cal.App.4th 934 (2002) ............................................... 12
*Vasquez v. County of Los Angeles,* 349 F.3d 634 (9th Cir. 2003) ...................................... 20
*Yanowitz v. L'Oreal USA, Inc.,* 36 Cal.4th 1028 (2005) .................................................... 21
*Yashenko v. Harrah's NC Casino Company, LLC,* 446 F.3d 541 (4th Cir. 2006) ................ 12

**Statutes and Regulations**
2 Cal. Code Regs. §7297.2(c)(1) ........................................................................................ 12
29 C.F.R. §825.207(d)(1) ................................................................................................... 14
29 C.F.R. §825.216(a) ....................................................................................................... 12
29 U.S.C. §2614(a)(3)(B) ................................................................................................... 12
Cal. Civ. Code § 56 ........................................................................................................... 22
California Civil Code § 56.05(j) ........................................................................................... 22
California Civil Code §56.20(b)(3) ....................................................................................... 23
California Civil Code §56.20(c) ........................................................................................... 24

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

## I.    **INTRODUCTION**

In mid-2003, Defendants[1] announced that the entire Southern African Strategic Business Unit ("SASBU") would relocate to Houston, Texas.    COP offered all SASBU employees – including Plaintiff Kiran Pande ("Pande") – positions in Houston and encouraged everyone to move.    Employees who elected not to relocate were not guaranteed positions elsewhere.    Pande refused to move, was unable to find another position and, in keeping with the deadline imposed, was terminated effective December 31, 2003.    Despite these facts, Pande suspects that her gender or national origin had something to do with her termination.    Pande apparently believes that relocating the entire SASBU Group was simply a ruse to cover up unlawful discrimination against her.

Pande's suspicion not only defies common sense but, not surprisingly, lacks any evidentiary support.    Pande's unsupported belief that she *might* be the victim of harassment, discrimination, retaliation or any other speculative claims she asserts, does not entitle her to proceed to trial.    Nor does Pande's mistaken belief that she was "immune" from termination because she was on a medical leave compel trial.    Rather, to withstand summary judgment, Pande must produce competent evidence to support her claims.    This she cannot do.    Absent such evidence, COP is entitled to summary judgment as a matter of law.

## II.    **STATEMENT OF ISSUES TO BE DECIDED**

*As to Pande's Violation of the Family Medical Leave Act ("FMLA") and California Family Rights Act ("CFRA") Claims*:  (1) Was Pande denied any leave and/or protections to

---

[1]    Defendant Chevron Corporation is the ultimate parent of non-party Chevron U.S.A., Inc. Defendant Chevron International Exploration and Production Company is a division of Chevron U.S.A. Inc., and was formerly known as Chevron Overseas Petroleum ("COP"). For convenience, Chevron International Exploration & Production Company will be referred to as "COP" throughout this Memorandum.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

which she was entitled under the FMLA/CFRA?; (2) Was Plaintiff's employment terminated in violation of the FMLA/CFRA?; and (3) Did Defendants' FMLA/CFRA and leave policies violate the FMLA/CFRA? As set forth below, the answer to each of these issues is "no." Defendants are entitled to summary judgment on Pande's *first and second causes of action*.

*As to Pande's Gender and Race/National Origin Discrimination Claims:* (1) Has Pande produced sufficient evidence to raise a legitimate inference of discrimination?; (2) Can Pande establish a triable issue of material fact as to her discrimination claims?; (3) Are Pande's allegations relating to alleged conduct predating December 7, 2002 timely? As set forth below, the answer to each of these issues is "no." Defendants are entitled to summary judgment on Pande's *third and fourth causes of action*.

*As to Pande's Retaliation Claim*: (1) Is Pande's retaliation claim timely?; (2) Can Pande establish a triable issue of fact as to her retaliation claim?; (3) Can Pande establish a causal connection between any alleged protected activity and any adverse employment action? As set forth below, the answer to each of these issues is "no." Defendants are entitled to summary judgment on Pande's *fifth cause of action*.

*As to Pande's Wrongful Termination in Violation of Public Policy Claim*: (1) Can Pande show that any conduct of Defendants violated a substantial public policy of the State of California?; (2) Can Pande establish a triable issue of fact as to her public policy claim? As set forth below, the answer to each of these issues is "no." Defendants are entitled to summary judgment on Pande's *sixth cause of action*.

*As to Pande's Violation of the California Confidentiality of Medical Information Act ("CMIA") and Right to Privacy under the California Constitution Claims:* (1) Can Pande show any conduct of Defendants violated her right to privacy under the CMIA or the California

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

Constitution?; (2) Can Pande establish a triable issue of fact as to her claims for violation of the CMIA and her constitutional right to privacy? As set forth below, the answer to each of these issues is "no." Defendants are entitled to summary judgment on Pande's *seventh and eighth causes of action.*

## III.    STATEMENT OF FACTS

### A.    Pande's Tenure In The Strategic Planning Group.

In the fall of 2000, Rex Mitchell, the manager of Business and Strategic Planning, recruited Pande for his Group.[2] (Mitchell 13:3-14:4)[3]  Mitchell had interviewed Pande for an opening earlier in the year and was "very impressed." (Mitchell 14:4-14)  At the time, Pande was finishing her MBA and Mitchell did not think she would have the time to devote to the Group.  However, when there was another opening in his Group, Mitchell "sought her out for the opportunity." (*Id.*)  Rather than post the job, Mitchell took his decision to the fall PDC.[4] (Mitchell 17:23-18:6)  Although two other candidates were "short listed" for the position, Mitchell's representations as to why he thought Pande would be "ideal" swayed the PDC. (Mitchell 19:10-20:20)  Pande was offered the business analyst position and began in her new role "within six to eight" weeks of the PDC.  (Mitchell 21:18-23)

---

[2]  Pande began her employment with Chevron Oil Research Company in 1988.  (Pande 158:18-160:18, Exh. 2) The relevant time period in this action is 2000 through 2003. (Second Amended Complaint ("SAC"))  During all of this time, Pande was employed by COP.

[3] The deposition pages cited herein are attached as exhibits to the Declaration of Michele Miller.

[4]  Personnel Development Committees ("PDCs") meet in the Spring and the Fall to select personnel for open positions.  (Mitchell Dec. ¶3)  The merger selections were made during the Fall 2001 PDC.  Thus, although it was a position in Mitchell's Group, his decision still had to be approved by the Business and Commercial PDC.  (Mitchell 28:1-29:6)  And, to compound matters, the Texaco representatives on the PDC had a strong opinion that one of their employees – a male – should be selected for the position.  Mitchell had to, and successfully did, advocate for Pande.  (Mitchell 26:15-29:12; Mitchell Dec. ¶5; Pande 227:24-228:21; 236:11-15)  During all of this time, Pande was employed by COP.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

The planning function in COP is important and demanding.  It draws on talented Chevron employees to provide information that will enable management to make key decisions that impact Chevron's future.  In COP, the planning efforts drive the allocation of several billion dollars of capital expenditure annually.   Just as Chevron places high demands on the planning function, the managers of the planning groups throughout the operating companies also place high demands on their employees.  These individuals have been selected into the planning function because they are perceived as being able to meet the demands.  Pande would not have been assigned to the Planning Group if she was not extremely intelligent and well-educated.   The same is true of the others in the Group.  (Mitchell Dec. ¶2)  Pande was competing with individuals similar to her – well-educated, very intelligent and high achieving.

Pande's first few months in Planning were very strong – Mitchell thought she showed great promise as an analyst.  (Mitchell Dec. ¶5)  His favorable opinion increased during the summer of 2001 due to the assistance Pande provided the group's Portfolio Analyst, Brian Putt, as he worked with his counterparts at Texaco on the merger of their portfolios.  (Mitchell 25:11-22; Mitchell Dec. ¶5)   Pande's work in aggregating numerous data files impressed Mitchell – he felt she "was showing strong aptitude toward [detailed] portfolio work." (Mitchell 25:25-26:11)   Thus, when Brian Putt moved to a new role following the merger, Mitchell selected Pande for the now vacant Portfolio Analyst position. (Mitchell 22:19-24; Mitchell Dec. ¶5)

Mitchell viewed Pande's placement as an opportunity for advancement – he regarded the Portfolio Analyst position as being the most analytically demanding position in the group and he felt Pande had tremendous potential to shine in this key planning position.  (Mitchell 85:22-86:10 and Exh. 6)  Mitchell was surprised that Pande "wasn't very excited about it because it wasn't coming with a promotion." (Mitchell 29:23-30:14)  Mitchell explained that

1   as part of the merger selection process, the PDC decided that there would be no "career

2   ladder" promotions.[5]   (Mitchell 33:3-17; Pande 226:3-17)   Rather, each employee would

3   retain his or her current grade level and all promotion decisions would be deferred until the

4   spring PDC.  (Mitchell 30:11-24)  Mitchell told Pande that *if she developed in the Portfolio*

5   *Analyst position as expected*, she "stood a very good chance of earning a promotion in the

6   spring" and that he was "prepared to take the nomination forward" to the PDC.  (Mitchell

7   31:15-32:8)

8

9   Unfortunately, Pande did not live up to her potential.   After expressing her

10  unhappiness over not being promoted, Pande's performance declined.   To Mitchell, she

11  seemed noticeably less engaged in the work of the Planning Group. (Mitchell 85:22-90:13

12  and Exh. 6) When she failed to complete several assignments, Mitchell grew concerned –

13  he was upset not only because Pande's inaction created additional work for her coworkers,

14  but also because it put the Group's credibility with its client base at risk.[6] (*Id.*; Mitchell Dec.

15  ¶¶5-6)   Mitchell understandably voiced his dissatisfaction, and Pande was noticeably

16  offended by Mitchell's criticism.

17

18  The tension between Mitchell and Pande came to a head in March 2002 during the

19  performance review process.   Apparently disgruntled by a review that did not meet *her*

20  ─────────────

21  [5] A career ladder position is one that is a multi-grade position.  For example, the grade range for
    Portfolio Analyst was 23-25.  Pande was a grade 24.  A promotion would have moved her to grade

22  25.  (Mitchell 31:3-14, 34:9-14)  However, the ground rules established during the merger prohibited
    such promotions.   The reasons were simple – the PDCs were selecting employees that were

23  unknown to at least one side – the Chevron representatives did not know the Texaco employees
    and the Texaco representatives did not know the Chevron employees.  Rather than arguing about

24  promotions for "essentially unknown" employees, it was agreed that employees "selected for
    positions would come over into the new company at their grade level" and promotions would be

25  evaluated in the spring. (Mitchell 33:3-17) This policy affected all employees, not just Pande.

26  [6] For example in the fourth quarter of 2001, Mitchell asked Pande to support a team that was
    studying the combined Chevron/Texaco portfolios.  (Mitchell 39:13-44:19)  After Pande ignored

27  several requests from the team, Mitchell assigned another analyst to the project.  (*Id.*) There were
    several other instances when Pande's performance did not meet Mitchell's expectations.  (Mitchell

28  52:8-53:5 and Exhs. 1A-1E)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

expectations, Pande complained to Mitchell's supervisor, James ("Jay") Johnson, about Mitchell's treatment of her.   Specifically, Pande complained that she had been ranked a "2" when she thought she should be ranked a "1."[7]   (Johnson Dec. ¶3)   Johnson met with Mitchell, who informed him that Pande had been having performance issues. (Johnson Dec. ¶4)   In an effort to resolve the dispute, Johnson scheduled a meeting with both Pande and Mitchell.  (Johnson Dec. ¶5)  Despite their differences, by the end of that meeting Mitchell and Pande had agreed on a plan for moving forward – they would close out the 2001 PMP and begin the 2002 PMP process.  (Mitchell 56:12-58:13; Johnson Dec. ¶5)

Mitchell and Pande met on April 1, 2002 to discuss the PMP.   (Pande 243:2-5) Although Mitchell gave Pande a rating of "Fully Meets Performance Expectations," Pande was unhappy – she had "expected to be rated in the exceptional category." (Mitchell Exh. 5) Pande responded with a two page, single spaced diatribe, criticizing Mitchell for not adequately recognizing her contributions and otherwise taking issue with the PMP. Although Pande stated again that she considered Mitchell's behavior "harassment," it was not until a meeting on April 25 that Johnson learned that her complaint related to her "gender and minority status."  (Pande 272:16-273:5, 277:24-278:8 and Exh. 10)

Johnson took immediate action – he spent hours meeting with Pande, Mitchell and anyone else Pande identified as a potential witness.  (Johnson Dec. ¶7)  Despite his efforts, Johnson was unable to find anyone to substantiate Pande's allegations.  (Johnson Dec. ¶¶10-15)  Pande was informed of this result and was urged to move past her disagreements with Mitchell and make a success of her remaining time in Planning.

---

[7]  As explained on the performance review ("PMP") form, a "2" ranking indicates that the employee "Fully Meets Performance Expectations" whereas a "1" corresponds to "Exceptional Performance." The vast majority of all employees receive a "2" ranking.  In fact, the "1" designation is limited to the top 25% of all employees ranked.   (Mitchell Dec. ¶7; Mitchell Exh. 5) This ranking was the "harassment" Pande reported – she did not say Mitchell was harassing her because of her gender, race or national origin.  (Pande 260:7-20)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

**B.    Pande's Transfer To The Southern Africa Strategic Business Unit.**

After almost two years in the COP Planning Group – the typical length of time the planning group retains employees – Pande was identified as a candidate to move at the Fall PDC.  (Pande 184:24-185:14; Mitchell 105:16-24; Mitchell Dec. ¶3)  She applied for two positions in late 2002, one in the Project Resources Company ("PRC") and another in Strategic Planning.  (Hines Dec. ¶2; King Dec. ¶¶2-3) For reasons unrelated to any alleged conflict between Pande and Mitchell, and notwithstanding Mitchell's advocacy on behalf of Pande, she was not selected for either position.[8]  (*Id.*; Mitchell 110:4-112:6; *see also* Smith Dec. ¶ 2; Hartshorn Dec. ¶¶3-4)  Instead, she was selected at the Fall PDC for a Petroleum Engineer position in the Southern Africa Strategic Business Unit ("SASBU").  (Dunn 10:15-11:4; Smith Dec. ¶3; Hartshorn Dec. ¶¶3-4)

In October 2002, Pande was notified that she had been selected for a position in the Block 14 Group at SASBU's San Ramon offices, under the supervision of Jack Dunn.[9] (Pande 304:2-10)  Nonetheless, Pande preferred to stay in planning, and on November 26, 2002, she interviewed for the Strategic Planning position.  After being notified on December 3, 2002 that she had not been selected for the position, Pande left COP Planning on December 6, 2002 for her new SASBU position.  (Dunn 17:8-11; *see* Pande 347:12-348:11) For the first half of 2003, Pande performed quite well in her new position.  Her supervisor, Jack Dunn, was very pleased, believing Pande to be an asset to the group.  (Dunn Dec. ¶2)

---

[8]  Two employees in Mitchell's group applied for the position in Strategic Planning.  The job owner had not originally "short-listed" Pande as a top candidate, believing the other employee had stronger qualifications.  Mitchell urged him to consider both as each "brought different skills for the job."  Although Pande was interviewed, neither she nor the other planning group employee was ultimately selected.  (Mitchell 110: 4-112:19; *see also* King Dec. ¶¶2-3)

[9]  John "Jack" Dunn never spoke to Mitchell about Pande prior to her selection or prior to her acceptance of the position in his Group. (Dunn 16:20-17:3)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

The "honeymoon" ended, however, when COP management announced in May 2003 its decision to consolidate its SASBU U.S. based operations in Houston, Texas.[10]

The SASBU employees were informed of this decision in late May 2003 and provided information relating to the move, including a timeline. (Pande 358:20-362:7 and Exhs. 16-18; Dunn Dec. ¶3 and Exh. A) Specifically, the employees were told that the move would occur in two phases – Block 0 would move in August and Block 14 by the end of the year. (Pande 361:14-362:24 and Exh. 18) Employees would receive formal "offers" to relocate the week of June 2 and would have one week to either accept or decline the offer. (Pande 359:11-361:2 and Exh. 17) If an employee did not move to Houston, they were informed they either would have to find another position within the Company or their employment would terminate.[11] (Dunn Dec. ¶3 and Exh. A)

Pande received her relocation offer package on June 2, 2003. (Pande 363:8-16 and Exh. 19) In that package was a Fixed Duration Assignment agreement for Pande to sign, indicating whether she accepted or declined the offer. (*Id.*) Pande did not accept the offer to relocate (Pande 367:7-17), and was informed that her employment would end in December 2003 unless she was successful in finding another position within the Company – there was, however, "no guarantee that such alternative employment will be found." (Pande 363:8-16 and Exh. 19; *see also* 361:14-362:7 and Exh. 18)

---

[10] Pande apparently believes that this decision was made before she joined SASBU. This is simply not the case – the decision to move SASBU was not made until the Spring of 2003. (Dunn 17:12-18:6, 26:14-27:9)

[11] The job relocation document provided to Pande contained clear and unequivocal language to that effect. Employees who chose to decline the relocation offer were asked to sign the following statement: "I do not accept this assignment. I understand that the Company might not place me in another assignment and that I may be subject to termination of employment…." (Pande 363:6-16 and Exh. 19) The documentation also stated that termination dates were not open to negotiation, rather, they were "set according to management's judgment based on the company's business needs." (Dunn Dec. ¶3 and Exh. A)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1      Pande apparently took her impending termination to heart as she began posting for

2  other positions,[12] letting her SASBU work slide.  (Dunn Dec. ¶4)  To Dunn, Pande appeared

3  less focused – "she wasn't as diligent about getting her key job responsibilities completed

4  as the year progressed."  (Dunn 52:9-25)  "She was responsible for reservoir simulation and

5  I saw a falloff of that work."  (Dunn 53:1-5)  Dunn was not the only person who thought

6  Pande had lost interest – her co-worker Tayo Feyijimi testified that, after the move to

7  Houston was announced, he also saw a reduction in her "work effort and commitment to the

8  project."  (Feyijimi 15:6-16:15)

9

10     Pande's waning commitment created a number of problems for the Group,

11  particularly given the poor results they received on a project review during the summer of

12  2003.  The Group was under the gun to improve its performance when the review team

13  returned in early 2004.  The focus throughout the fall was to develop an action plan to

14  correct the prior deficiencies noted in the July review and "turn some red lights to yellow and

15  green" at the next review.  (Mabe 21:4-14)

16

17     Given her expertise in petroleum engineering and reservoir simulation, Dunn asked

18  Pande to take a leadership position on this project.  She was given the task of putting

19  together the work plan and doing the reservoir simulation associated with the project.  Dunn

20  thought she "wasn't very engaged in seeing that it was achieved."  (Dunn 53:6-15, 54:24-

21  55:11)  His frustration increased as the Group got closer to the next review – there did not

22  seem to be any ownership of the work plan or any set timetable as to when the various

23  "milestones and deliverables" would be achieved.  (Dunn 54:24-55:11)

24  _____

25  [12]  COP posts vacant jobs on its intra-company website. Dunn told his employees that, in light of the
    impending move to Houston, they had his permission to post for jobs.  (Dunn 49:4-19)  Pande, as

26  well as other SASBU employees, were informed that they should work with the sponsor, the PDR, to
    find alternative employment if they declined the move to Houston.  (*See* Dunn Dec. ¶3 and Exh. A)

27  Pande posted, but was not selected for a number of positions.  Neither Dunn nor Mitchell was on the
    selection panel for any of those positions and no one on the PDC contacted either about Pande's

28  candidacy.  (Dunn 50:13-51:10, 57:25-58:7; Dunn Dec. ¶4; Mitchell Dec. ¶8**)**

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

On Wednesday, October 29, Dunn was notified that Pande had requested a leave of absence beginning November 10, 2003.[13]  (Dunn 61:24-62:3 and Exh. 5)  The following Tuesday, the Group met to discuss its progress in preparation for the upcoming review. (Dunn 77:7-15; Mabe 24:7-20)  Dunn admits that he raised his voice at that meeting – the Group was under a lot of pressure to "get things done" with the move only a few weeks away. (Dunn 79:5-11)  "It was a stressful time … we were moving, we had lots of work to do, a lot of pressure, a big transition of a lot of people…"  (Dunn 81:15-23)  Dunn was also concerned because Pande had a number of tasks assigned to her and he wanted to know what plans she had made for a transition since "she was not going to be there." [14]  (Dunn 79:24-81:9; Mabe 25:22-26:13, 27:21-28:7)

Pande began her leave as scheduled on Monday November 10.  Dunn spoke with Pande later that week to let her know that Human Resources would be sending her a letter confirming the effective date of her termination.  (Dunn 101:5-102:22 and Exh. 12)   In a letter dated November 18, Taryn Shawstad, General Manager of Human Resources, confirmed that Block 14 was moving effective December 12 and that Pande's last day of employment would be December 31, 2003, unless she found another position.  (Shawstad 34:13-35:8 and Exh. 8)  On December 8, Pande responded to Shawstad, claiming unlawful termination since she never "voluntarily" resigned her employment.  (Shawstad 38:17-39:8

---

[13] Although Pande believes Dunn asked about her medical condition, there is no evidence to support her belief.   According to Dunn, after he received an email from UnumProvident, the Company's disability benefits administrator, he walked down to Pande's office to see how long she was going to be out.  (Dunn 62:1-10)  Since Pande was not there, he called the number on the email to find out the expected duration of the leave and to see if Pande was alright.  Dunn never asked about specifics. (Dunn 62:1-63:18)

[14] Apparently, Pande was upset by Dunn's conduct.  Pande's co-worker, Kathy Mabe, who was at the meeting, testified that she saw Pande crying during a break.  Dunn was unaware that Pande had been brought to tears.  Nonetheless, he had raised his voice and after the meeting, apologized for his behavior.  (Dunn 83:2-23, 85:13-86:1) Although Pande claims that Dunn discussed her medical leave at that meeting, Dunn denies making any such comment.  (Dunn 81:10-14)  Mabe, who was present at the meeting, confirmed that Dunn did not mention Pande's leave.  Rather, what she recalled was Dunn saying Pande was "not going to be there to do the work." (Mabe 25:22-26:13, 27:21-28:7)  Mabe, surprised by his comment, asked Pande about it – Pande told her she was taking a medical leave.  (Mabe 20:20-21:3)

1    and Exh. 4)  Pande viewed Shawstad's letter as "yet another instance of unlawful conduct"

2    by the Company, commencing with the "gender and racial discrimination and harassment

3    perpetrated by Mr. Rex Mitchell." (*Id.*)  She also claimed that she was subjected to

4    "harassing conduct" while in Dunn's Group, "especially since I disclosed my need to a

5    leave." (*Id.*)  Finally, Pande claimed that she had been offered and had accepted work in

6    San Ramon through 2004. (*Id.*)  An investigation into Pande's claims was done and, on

7    December 16, Shawstad responded to Pande, reiterating the Company's position, the lack

8    of work for her in San Ramon and the established termination date. (Shawstad 23:20-

9    26:10, 54:4-19, 60:17-62:25 and Exh. 5)  Consistent with its stated process, Pande's

10    employment was terminated on December 31, 2003. (Shawstad Exh. 5; Pande 445:11-17

11    and Exh. 32)

## IV.    LEGAL ANALYSIS

### A.    PANDE CANNOT ESTABLISH A VIOLATION OF EITHER FMLA OR CFRA
####    [First and Second Causes of Action]

17    Pande alleges that Defendants unlawfully violated both the Family Medical Leave Act

18    ("FMLA") and California's Family Rights Act ("CFRA") by failing to grant her the full extent of

19    her eligible leave and by terminating her employment while on leave (SAC ¶¶36-45).  She

20    also alleges that the Defendants' policies and practices relating to determining an

21    employee's FMLA/CFRA eligibility are unlawful.  *Id.*  Neither allegation has any merit.

### 1.    Pande's Termination Did Not Violate Either FMLA Or CFRA.

25    Pande's FMLA/CFRA claims are predicated on her erroneous belief that she could

26    not be terminated while on a protected medical leave.  (SAC ¶¶36-55; Pande 447:2-6)

27    However, neither statute provides such immunity.  On the contrary, both make clear that

28    employees are not entitled to "job security" simply because they are on leave. 29 U.S.C.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  §2614(a)(3)(B); 2 Cal. Code Regs. §7297.2(c)(1).  "An employee has no greater right to

2  reinstatement or to other benefits and conditions of employment than if the employee had

3  been continuously employed during the FMLA [or CFRA] leave period."   29 C.F.R.

4  §825.216(a); 2 Cal. Code Regs. §7297.2(c)(1). Thus, when, as here, an employee is

5  terminated for business reasons unrelated to leave status, neither statute is implicated.

6

7      The courts are in accord.[15]  *Yashenko v. Harrah's NC Casino Company, LLC*, 446

8  F.3d 541 (4th Cir. 2006) is instructive.  In that case, Harrah's reorganized and eliminated

9  Yashenko's position while he was out on an approved FMLA leave.  Although invited to

10 apply for available positions, Yashenko failed to do so, alleging that he was medically

11 unable to do so during his leave.  Yashenko sued when he failed to obtain another position

12 and his employment was terminated.   The Fourth Circuit Court of Appeals rejected

13 Yashenko's claim that Harrah's actions interfered with his FMLA rights. "We join our sister

14 circuits in concluding that the FMLA does not require an employee to be restored to his prior

15 job after FMLA leave if he would have been discharged had he not taken leave." *Id.* at 547.

16 The Court also rejected the notion that requiring Yashenko to apply or interview for positions

17 while on FMLA leave somehow violated the Act.  *Id.* at 550.

18

19     Here, even a cursory review of the facts demonstrates that Pande's termination had

20 nothing whatsoever to do with her leave.  The timing alone dispels any such inference.  The

21 decision to relocate the SASBU Group to Houston was made in the Spring of 2003 – *five*

22 *months before Pande requested leave.*  In May, all SASBU employees, including Pande,

23

24 [15] See, e.g., *Tomlinson v. Qualcomm, Inc.,* 97 Cal.App.4th 934, 939-43 (2002) (the court held that
   CFRA does not immunize employees from layoff as part of a company-wide workforce reduction
25 while on a CFRA-protected leave); *Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972,
   979 (8th Cir. 2005) ("[a]s long as an employer can show a lawful reason, i.e., a reason unrelated to
26 an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her
   position, the employer will be justified to interfere with an employee's FMLA leave rights."); *Nisendorf*
27 *v. Levi Strauss and Co.,* 143 Cal.App.4th 509, 519 (2006) ("even though [the plaintiff] took CFRA
   leave, [she] had no greater protection against her employment being terminated for reasons not
28 related to her CFRA request than any other employee.")

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1   were told the relocation would occur on or before January 1, 2004.  (Pande 359:1-363:16

2   and Exhs. 17-19)  Employees were also told that if they did not relocate, their employment

3   would terminate unless they were able to find other positions within the Company. Pande

4   refused to relocate.  (Pande 363:6-16, 367:7-17 and Exh. 19)  This took place long before

5   Pande ever requested, much less took, the leave in question.

6

7       Pande's feigned ignorance about her impending termination and her attempt to

8   somehow connect it to her leave must be rejected.  Indeed, her own actions doom her

9   argument.  On October 16, Pande sent Shawstad an email, inquiring about severance

10  benefits.  In that email, Pande states that she had turned down the relocation offer and if

11  she is not successful in finding another position "will likely be forced to leave the Company."

12  She goes on to ask whether vacation could be used to extend the severance date into 2004

13  since the SASBU move would be completed by January 1.  (Pande 405:16-407:3 and Exh.

14  24)  In other words, recognizing that her last day of work would be in 2003, Pande would

15  like her payout pushed into 2004 due to "tax implications."  This is hardly the request one

16  would expect from someone who claims to be shocked by her December 31 termination.

17

18      It also demonstrates why, as a matter of law, Pande's first and second causes of

19  action have no merit.  This inquiry, made before Pande ever requested leave, conclusively

20  demonstrates what COP has maintained throughout this litigation – the decision to

21  terminate was made long before Pande requested leave.  No jury could conclude otherwise.

22  COP is entitled to judgment on Pande's first and second causes of action as a matter of

23  law.[16]

24

25

---

26  [16]   Pande's sixth cause of action for wrongful termination in violation of public policy simply
    incorporates allegations from Pande's first through fifth causes of action.  Accordingly, it fails for the
27  reasons set forth in sections IV.A and IV.B of this Memorandum – the burden of proof is the same
    whether a claim for discrimination arises as a statutory claim or as a tort claim for violation of public
28  policy.  *Pugh v. See's Candies, Inc.,* 203 Cal.App.3d 743, 752 (1988).

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1

2

    **2.**    **Defendants' Policies Are Consistent With FMLA/CFRA.**

3

    In addition to arguing that her termination violated the FMLA/CFRA, Pande also

4 alleges that Defendants' policies and practices violate FMLA/CFRA – specifically the privacy

5 provisions of the laws.  These claims are red herrings.  Even taking Plaintiff's allegations as

6 true – which they are not – Pande has not and cannot show that Defendants' FMLA/CFRA

7 policies or practices in any way interfered with her FMLA/CFRA rights.  To the contrary, it is

8 undisputed that Pande was granted FMLA/CFRA leave and remained on leave up until her

9 termination on December 31, 2003.  (Pande 445:18-447:6 and Exh. 33)  Hence any claim of

10 interference is unsupportable.[17]   Her claims should be dismissed on this basis alone.

11

12

    Pande's claims also fail because the undisputed evidence shows that Defendants'

13 FMLA/CFRA policies and practices comply with those laws.  As Brian Taylor, Manager for

14 UnumProvident's[18] FMLA Unit, explains, UnumProvident is organized into separate units,

15 and medical information obtained by the units administering private disability benefits (e.g.,

16 STD and LTD) is not shared with the FMLA Unit. (Taylor Dec. ¶¶1-7; *see also* Richardson

17 Dec. ¶5)  Even if UnumProvident's STD Unit obtained significant medical information for

18 purposes of assessing Pande's entitlement to STD benefits,[19] such information was not

19 used to assess Pande's eligibility for FMLA/CFRA leave.  (*Id.*)  In fact, in this instance, no

20 medical information or health care certification was ever required or reviewed for purposes

21

M‍ILLER L‍AW G‍ROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

22

---

[17]  Pande's testimony that she remained on disability and unable to work through mid-May 2004
23 (Pande 467:20-469:11, 470:16-471:14) further belies the validity of her FMLA/CFRA claims.  Given
these admissions, Pande's inability to work would have substantially outlasted any FMLA/CFRA
24 entitlement, even had Pande remained employed.

[18]  UnumProvident is Chevron's Disability Management Program Administrator. (Taylor Dec. ¶2)
25

[19]   The regulations explicitly recognize an employer's right to impose more stringent requirements
26 upon an employee for purposes of assessing eligibility for a temporary disability plan.  They state: "If
the requirements to qualify for payments pursuant to the employer's temporary disability plan are
27 more stringent than those of FMLA, the employee must meet the more stringent requirements of the
plan, or may choose not to meet the requirements of the plan and instead receive no payments from
28 the plan and use unpaid FMLA leave...." 29 C.F.R. §825.207(d)(1).

14

of assessing Pande's eligibility for FMLA/CFRA leave.  (Taylor Dec. ¶¶4-7)  Accordingly, her FMLA/CFRA claims fail for this reason as well.

## B.    PANDE CANNOT ESTABLISH UNLAWFUL DISCRIMINATION OR RETALIATION [Third, Fourth and Fifth Causes of Action]

Pande alleges that her gender and race/national origin adversely impacted decisions relating to her compensation, job assignment and termination.  (SAC ¶¶57-58, 63-64) She also claims that she complained about these decisions as well as conduct she perceived as harassment by Mitchell and that COP did nothing – it neither investigated her complaints nor took action to stop the alleged conduct.  (SAC ¶¶59, 65)  Finally, Pande asserts she was retaliated against based on the complaints she made about Mitchell.  (SAC ¶¶68-72)  None of these three claims have any merit.

### 1.    Claims Arising During Pande's Tenure In Mitchell's Planning Group. [September 2000 – December 6, 2002]

Pande's complaints about Mitchell begin with his "failure" to promote her in October 2001, when she was selected for the Portfolio Analyst position during the Chevron/Texaco merger.  (SAC ¶12)    Their relationship deteriorated in the following months, such that Pande complained to Mitchell's supervisor Jay Johnson.  (SAC ¶13)  She also complained to Gary Yamashita, the Omsbud responsible for the Group.  (SAC ¶14)  As a result of her complaints, Pande believes she received a lower raise and merit increase than males in the group.  (SAC ¶17) Pande also asserts that she was "deliberately" excluded from work meetings, isolated from the group and otherwise impeded "in her ability to perform and advance within the company."  (SAC ¶21)  Finally, she suspects that Mitchell said negative things about her which impacted her ability to find a job at the Fall 2002 PDC.  As a result, she claims was "forced" to take a "less desirable" SASBU job in December 2002.  (SAC ¶¶21-23)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

Pande's pre-December 2002 claims are barred by as a matter of law.  Filing an administrative complaint within one year of the alleged unlawful conduct is a prerequisite to bringing a civil action for damages under California's Fair Employment and Housing Act ("FEHA").  *Morgan v. The Regents of the University of California,* 88 Cal.App.4th 52, 63 (2000) (citations omitted). Failure to satisfy this requirement is a jurisdictional defect, warranting summary judgment.  *Martin v. Lockheed Missiles and Space Co., Inc.,* 29 Cal.App.4th 1718, 1724 (1994).  Pande's complaints about Mitchell's conduct – conduct that occurred more than one year before Pande filed her DFEH Complaints on December 7, 2003 – are barred as a matter of law.  (*See* Pande 455:14-456:9 and Exh. 34) [20]

Defendant anticipates that Pande will argue that her claims are viable due to the "continuing violation" doctrine.  This argument gets her nowhere – there is no relation between the unlawful conduct Pande claims to have been subjected to by Mitchell and the conduct that she complains of within the statutory period, when she was working in a completely different business unit, reporting to a different manager.  Any efforts to stretch back and tie in remote treatment by Mitchell with incidents occurring within the statutory period must fail.  *See Morgan,* 88 Cal.App.4th at 65-66 (remote actions by different decision-makers do not demonstrate a "continuing violation"). This result is further substantiated by the fact that Pande claims to have known and complained of unlawful treatment by Mitchell as it was occurring.  *Id.* at 65 ("a continuing violation claim will likely fail if the plaintiff knew, or through the exercise of reasonable diligence would have known, [he] was being discriminated against at the time the earlier events occurred." (citation omitted)).

In short, Pande's claims for conduct that occurred while she worked in Planning under Rex Mitchell are barred as a matter of law.  Neither artful pleading nor wishful thinking will avoid this jurisdictional preclusion.

---

[20] Indeed, Pande's fifth cause of action is based entirely on conduct pre-dating December 7, 2002 as Pande alleges that Defendants retaliated against her for complaining about conduct by Rex Mitchell. (SAC ¶¶68-72)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

**2.    Claims Arising During Pande's Tenure In SASBU With Jack Dunn.**
**[December 7, 2002 – December 31, 2003]**

Remarkably, Pande claims that she experienced the same discrimination (gender and race/national origin) and harassment while working in SASBU.  This time, however, the alleged "unfairness" arises from the decision to relocate SASBU to Houston.  Although Pande does not quibble with the decision itself, she seems to believe that unlawful discrimination was behind her failure to find another position and subsequent termination.

In order to establish this claim, Pande has the initial burden of producing sufficient evidence to raise a legitimate inference of discrimination.  *McDonnell Douglas v. Green*, 411 U.S. 792, 802-03 (1973); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-07 (1993)[21] Assuming Pande can establish a *prima facie* case (which she cannot), the burden then shifts to COP to articulate a legitimate nondiscriminatory reason for its actions.  *Id.*  This burden of "articulation" is not one of persuasion – COP's stated reasons are presumptively valid.   *McDonnell Douglas,* 411 U.S. at 805.   Thus, COP need only show that the challenged decisions were based on legitimate business reasons unrelated to Pande's gender or race/national origin.  See *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577-79 (1977).

Even a cursory review of the facts reveals that gender and race/national origin had nothing to do with the December 31, 2003 termination of Pande's employment.  Rather, it was Pande's refusal to relocate to Houston that resulted in her termination.  Although Pande posted but was not selected for a number of jobs prior to December, her nonselection was not due to her gender or race/national origin.  Rather, when compared to other candidates,

---

[21]  California courts (and courts interpreting California laws) look to pertinent federal precedent when applying California's disparate treatment employment discrimination statutes.  *Guz v. Bechtel,* 24 Cal.4th 317, 355 (2000); *see also Horn v. Cushman and Wakefield,* 72 Cal.App.4th 798, 805-07 (1991); *Bradley v. Harcourt, Brace and Company,* 104 F.3d 267, 269-70 (9th Cir. 1996).

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  she was not viewed as the most qualified.  *(See e.g.,* Vance Dec. ¶¶2-3; Smith Dec. ¶¶5-7;

2  Bates Dec. ¶¶2-4; Naylor Dec. ¶¶2-3)

4  Although Pande was understandably upset by the selection process and felt she was

5  more qualified than the successful candidates, neither hurt feelings nor her subjective

6  beliefs regarding her qualifications create a triable issue of fact warranting trial.  *See Horn,*

7  72 Cal.App.4[th] at 816 ("an employee's subjective personal judgments of his or her

8  competence alone do not raise a genuine issue of material fact.")  Nor does Pande's

9  disagreement with the selection decisions warrant trial – COP is not required to prove it

10 made a wise or even the best business decision.  *Texas Dept. of Community Affairs v.*

11 *Burdine,* 460 U.S. 248, 258 (1981).  To meet its burden COP need only show that the

12 decisions in question were based upon factors other than gender or race/national origin.  *Id.*

13 at 257; *see also St. Mary's Honor Center,* 509 U.S. at 509-10.  This it has clearly done.

15 Thus, in order to avoid summary judgment Pande must produce *substantial* evidence

16 that COP's proffered reasons – Pande's refusal to relocate to Houston with SASBU and that

17 she was not the best qualified individual for the other positions for which she applied – were

18 pretexual and that the real reason Pande was terminated was her gender or race/national

19 origin.  *St. Mary's Honor Center*, 509 U.S. at 507-11.  It is Pande's burden to show "*both*

20 that the reason [given by the employer] was false, *and* that the discrimination was the real

21 reason."  *Id.* at 515; *Bradley,* 104 F.3d at 270.  This she cannot do.

23 In her Complaint and at her deposition Pande set forth all of the "evidence" she

24 believes shows intentional discrimination.  None of it is sufficient to avoid summary

25 judgment.  For example, Pande suspects that Dunn was behind her failure to secure

26 another position prior to December 31, 2003.  In other words, according to Pande, Dunn

27 had decided that she "had to go" (presumably because of her gender or national/origin) and

that he purposely sabotaged her attempts to find a position.  Nothing could be further from the truth.  Indeed, as even Pande grudgingly concedes, she has no factual to support her claims.  (Pande 398:17-400:19, 404:19-405:13, 414:11-420:15; 440:21-444:14; 461:23-463:17, 465:22-467:17)

Dunn was the individual who approved Pande's selection into his Group in late 2002, and, in fact, was pleased to have her.  (Dunn 12:13-15:4; Dunn Dec. ¶2)  He called Pande after her selection to tell her about the position, to assure her that she would be the senior engineer working on the S3 assets, and to encourage her to accept the SASBU job.  (Pande 298:12-300:4; Dunn 12:13-19, 13:21-15:4)  Given this, it is highly improbable that Dunn suddenly developed an aversion to women and to people of color once the SASBU move was announced.  Clearly, any downgrade in his assessment of Pande's performance was due to her response to the move, not a sudden revelation by Dunn that he actually disliked women of color.  *Bradley,* 104 F.3d at 270-71 ("where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive."); *Horn,* 72 Cal.App.4th at 809.  Despite Pande's suspicions to the contrary, Dunn did not suddenly become a misogynist or a racist.[22]

---

[22] Pande has the same suspicions about Mitchell, citing two racially charged comments he purportedly made sometime prior to December 2002. Specifically, Pande claims that Mitchell, when told another employee, Ali Moshiri, may be out of a job, said to her "now he can go and sell carpets." The other comment, which Pande never heard, was about "towel heads."  Pande admits that both these comments were made prior to April 2002, when she complained to Johnson.  To the extent either comment was made – Mitchell denies saying either – they are time barred. (Mitchell 62:6-63:16; Mitchell Dec. ¶10) (Iris Owens, a co-worker who Pande claims told her about the "towel head" comment also denies ever hearing Mitchell say this comment.  Owens Dec. ¶¶2-3)  Even if viable, which they were not – Mitchell played no role in Pande's failure to find another position in 2003 or her subsequent termination.  *Price Waterhouse v. Hopkins,* 409 U.S. 228 (1989) ("[s]tatements by decision-makers unrelated to the decisional process itself" cannot suffice to satisfy the plaintiff's burden of providing intentional discrimination) (concurring opinion); *Horn,* 72 Cal.App.4th at 809-10.  As such, despite their seductively inflammatory appeal, these comments are not probative of any issue – they do not establish discrimination or harassment.  *Etter v. Veriflo Corp,* 67 Cal.App.4th 457, 465-66 (1998) (although "[r]acial slurs have no place in the work environment or in any environment, … the law does not exhibit 'zero tolerance' for offensive words and conduct … [r]ather, the law requires the plaintiff to meet a threshold standard of severity or pervasiveness); *Vasquez v.* continued

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

Nor did Dunn have anything to do with the selection decisions in question.   After the SASBU move was announced, Dunn told all his subordinates, including Pande, that they were free to post for positions.  (Dunn 48:14-49:19)  He also said he would be willing to provide references or call anyone on their behalf.  (Dunn 51:11-24) Pande never asked him to call any job owners or provide references for any of the positions she posted for.  (Dunn 51:11-24)  And, no one from the Fall PDC ever contacted or spoke to Dunn.  (Dunn 57:25-58:7)  Despite Pande' s suspicions to the contrary, Dunn had nothing to do with her failure to be selected for any position.[23]

At best, all Pande can show is that Dunn raised his voice during the November 4 meeting, which caused her to cry.  This conduct, in and of itself, is simply insufficient to create a triable issue warranting trial.  The law does not operate as a "general civility code." *Lyle v. Warner Brothers Television Productions,* 38 Cal.4th 265, 295 (2006).  While Dunn might have been short with Pande, his irritation was not due to her gender or national origin.  On the contrary, as the evidence clearly shows, the Group was under increased pressure to meet its deadlines as the move approached.   As Dunn grew more demanding and less patient, Pande became more suspicious, interpreting everything as harassment.   However, as anyone who has ever worked in an office knows, personality conflicts do arise, particularly in demanding jobs. "Does that mean that these festering disputes in the workplace should find their way into the courts for resolution?  Absolutely not."  *Guthrey v.*

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

*County of Los Angeles,* 349 F.3d 634, 642-644 (9th Cir. 2003) (two race-based comments over more than one year insufficient to constitute hostile work environment.)

[23] Pande also applied for two positions in late December 2003.  She was not selected for either, primarily because Jean Camy, one of the decision-makers, said in no uncertain terms that he would not work with her again.  (Camy Dec. ¶¶2-5)  As either of the individuals selected would have substantial interaction with Camy's group, his opinion held sway. Zuwa Omoregie, the position owner, recalled Dunn indicating Pande had "strong technical skills, that she couldn't move or didn't want to move to Houston when the team was being moved to Houston, and that her performance on the job suffered when the Houston move was announced, but also that there was a job in Houston if she wanted to move." (Omoregie 25:22-26:7; Dunn 111:19-113:11)  While such comments are clearly not suspect, it is immaterial since Pande never filed an underlying charge of discrimination about this selection.  As such, the Court has no jurisdiction to consider it. (see discussion, *supra*, section IV.B.1)

20

*State of California,* 63 Cal. App. 4th 1108, 1110 (1998).  Pande simply lacks any evidence linking Dunn's November 4 conduct – as inappropriate as it may have been – with her gender or race/national origin.

In short, because the "evidence" offered by Pande fails to give rise to an inference of discrimination, she can neither establish a *prima facie* case of discrimination nor prove that COP's proffered reasons are pretextual.   Accordingly, summary judgment on Pande's second and third causes of action should be granted.

### 3.    Pande's Retaliation Claims.

First, as previously pointed out in footnote 20, Pande's retaliation claims are time barred.  Even if they were not, which is not the case, Pande cannot establish her claims – there is simply no causal connection between her complaints about Mitchell and her December 31 termination.  *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1044 (2005); *Flait v. North American Watch Corp.* 3 Cal.App.4th 467, 476 (1992).[24]  To the contrary, the undisputed facts show that Pande's termination and failure to obtain alternate positions were caused by her refusal to relocate, her unwillingness to leave the Bay Area, and in one instance, her interactions with a selection committee member which pre-dated her work with Mitchell.  (Smith Dec. ¶¶3-5; Hartshorn Dec. ¶¶3-4; Hines Dec. ¶2; King Dec. ¶¶2-3; Camy Dec. ¶¶2-7; Vance Dec. ¶¶5-7; Smith Dec. ¶¶5-7; Bates Dec. ¶¶2-4; Naylor Dec. ¶¶2-3); Mitchell 110:4-112:6) Pande's fifth cause of action for retaliation must be dismissed.

---

[24] To establish a *prima facie* case of retaliation under the FEHA, the plaintiff must show (1) she was engaged in a protected activity; (2) the employer subjected her to an adverse employment action; and (3) there was a causal link between the protected activity and the employer's action.  *Flait,* 3 Cal.App.4th at 476.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  **C.    COP DID NOT VIOLATE PANDE'S PRIVACY IN HER MEDICAL INFORMATION**
2  **[Seventh and Eighth Causes of Action]**

3      Pande asserts that COP violated the California Medical Information Act ("CMIA")

4  (Cal. Civ. Code §§ 56 *et seq.*) and her constitutional right to privacy on two identical – but

5  equally flawed – bases:  Pande claims that (1) a "full waiver" of her right to privacy in her

6  medical records was a "prerequisite" to applying for short-term disability benefits, and that

7  (2) COP's short-term disability policy "compelled" Pande to waive her right to privacy as "a

8  condition of maintaining employment."  (SAC ¶¶80, 86)  Neither claim has any merit.

9

10      **1.    Pande Cannot Establish A Violation Of The CMIA.**

11

12      The thrust of the CMIA is to prohibit disclosure of medical information by a health

13  care provider without written authorization from the patient.[25]  *Heller v. Norcal Mutual Ins.*

14  *Co.,* 8 Cal.4th 30, 38 (1994); *Pettus v. Cole,* 49 Cal.App.4th 402, 425-26 (1996); Cal. Civ.

15  Code §§ 56 *et seq.*  As to an *employer's* obligations under the Act, section 56.20 of the

16  CMIA prohibits an employer from using or disclosing medical information pertaining to its

17  employees without a signed authorization *except* as follows:  "(3) The information may be

18  used only for the purpose of administering and maintaining employee benefit plans,

19  including . . . plans providing short-term and long-term disability income, workers'

20  compensation, and for determining eligibility for paid and unpaid leave from work for medical

21  reasons."

22

23      Here, Pande concedes, that in order to secure short-term disability ("STD") benefits,

24  she filed the appropriate paperwork for her claim with UnumProvident. (SAC ¶30;

25  Richardson Dec. ¶2)  Pande executed authorizations that expressly confirmed the medical

26  information released was to be used only in connection with the handling of Pande's

27  ―――――――――――――

28  [25]  COP is Pande's employer – ***not*** her health care provider. Cal. Civ. Code § 56.05(j). Pande has not sued her health care providers for improper use and disclosure of her medical information.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  disability claim.[26]  (Richardson Dec. ¶3 and Exhs. A, B).  Even so, Pande's authorization

2  was not even needed, as Pande's medical information was released to UnumProvident in

3  connection with her disability claim, and for no other purpose.  (Richardson Dec. ¶4)  Cal.

4  Civ. Code §56.20(b)(3).  Without evidence that her medical information was improperly used

5  or disclosed, Pande's claim is pure speculation.[27]  Trial on this claim is not warranted.

6

7        **2.    Plaintiff Was Not "Compelled" To Waive Her Right To Privacy As A**
         **Condition of Continued Employment.**

8

9        Pande's complains that she was "compelled" to authorize release of her medical

10  information or face termination is ludicrous, at best.    Employees are not forced to apply for

11  STD benefits.  (Richardson Dec. ¶6)  Rather, employees are encouraged to apply for such

12  benefits in order to receive pay for their time away from work, but if employees so elect, they

13  can forego STD benefits and, if eligible, use accrued vacation time or take unpaid leave

14  pursuant to the FMLA or applicable state law.  (*Id.*)  Pande can point to no evidence that

15

16  [26]   COP offers short-term disability benefits to employees who anticipate requiring a medical leave

17  of more than five days. (Renneke Dec. ¶2 and Exh. A)  Pande apparently decided to apply for such
    benefits, as she executed a "Short-Term Disability Authorization for Release of Medical and Other

18  Information," on or about October 21, 2003 and submitted it to UnumProvident.  (SAC ¶30;
    Richardson Dec. ¶3 and Exh. A)  This authorization stated that the medical information "related to

19  [Pande's] current disability claim" will be used "for the sole purpose of verifying, evaluating, or
    negotiating [Pande's] claim for disability benefits or services." (*Id.*)  The authorization also provided

20  that "I understand that in signing this authorization, any information obtained by UnumProvident
    Corporation . . . will be used exclusively for the evaluation and administration of my current claim for

21  disability benefits or services." (*Id.*)  Pande executed a second UnumProvident "Authorization,"
    dated October 21, 2003, stating that "I understand that any information UnumProvident obtains

22  pursuant to this authorization will be used for evaluating and administering my claim(s) for benefits. .
    . ." (Richardson Dec. ¶3 and Exh. B)

23  [27]   Pande's claims are not even based on facts – just her suspicion that her medical information was

24  shared with her supervisor, Jack Dunn. Pande acknowledges that it was her understanding that
    UnumProvident was not supposed to release information about her private medical situation to her

25  supervisor (Jack Dunn) and she has no knowledge of whether UnumProvident ever did tell Dunn the
    specific nature of her medical condition.  (Pande 428:4-12)  Plaintiff further testified that she has no

26  knowledge of whether Dunn ever did find out the exact nature of her medical condition (Pande
    429:2-6) and that she has no reason to believe that UnumProvident shared any confidential medical

27  information with any decision-makers for any positions she posted for after her leave. (Pande 430:5-
    12)  There is simply no evidence that Pande's medical information was treated improperly and

28  UnumProvident's STD file does not reflect any such unauthorized disclosure. (Richardson Dec. ¶4)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

she was "compelled" to apply for disability benefits or to waive her privacy.  On the contrary, Pande executed two authorizations for release of her medical information to UnumProvident without objection or complaint.[28]

Pande's "coercion" claim is a red herring – her employment terminated based on her decision not to relocate to Houston with her Group.  The events that led to this outcome commenced in May 2003, long before she requested leave.  Indeed, Pande's employment would have terminated as scheduled *regardless of whether or not she applied for STD benefits* and filled out the authorization form she now finds so objectionable.  Pande's claim simply makes no sense.

### 3.     Pande's Constitutional Privacy Claim Also Fails As A Matter Of Law.

Mirroring her CMIA claim, Pande asserts the same two flawed bases for her tag-along constitutional right of privacy claim.[29]    Despite the new and improved label, this privacy claim fails for similar reasons.   The California Supreme Court has determined that to state a claim for violation of the California constitutional right of privacy, a plaintiff must show that (1) defendant engaged in conduct that violated plaintiff's privacy interests; (2) plaintiff had a reasonable expectation of privacy as to the interests invaded; (3) the invasion was serious; and (4) the invasion caused plaintiff to suffer injury, damage, loss or harm.  *Hill*

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

---

[28]   The CMIA anticipated an employee's possible reticence to authorize release of private medical information when seeking disability benefits. Cal. Civ. Code §56.20(c). Echoing the statute, the "Authorization" Plaintiff executed provided:  "NOTE:  Federal law requires that we obtain this authorization from you.  You are not required to sign the authorization, but if you do not, UnumProvident may not be able to evaluate or administer your claim(s)." The authorization also stated "I understand if I do not sign this authorization or if I alter its contents in any way, UnumProvident may not be able to evaluate or administer my claim(s) and this may be the basis for denying my claim(s)."  (Richardson Dec. ¶3 and Exh. B)

[29]   As discussed above, Pande claims that her right of privacy under Article I, Section 1, of California Constitution was violated because (1) a "full waiver" of her right to privacy in her medical records was a "pre-requisite" for applying for short-term disability benefits, and that (2) COP's STD policy "compelled" Pande to waive her right to privacy as "a condition of maintaining employment."  (SAC ¶86)

*v. NCAA,* 7 Cal.4th 1, 32-37 (1994).  The courts have recognized that "not every act which has some impact on personal privacy will give rise to a cause of action for violation of the state constitutional right of privacy." *Pettus,* 49 Cal. App. 4th at 439.

Pande cannot establish *any* of the required prima facie elements of her claim.[30] Pande has no evidence – apart from her sheer speculation – that COP violated her privacy interest in her medical information.  Nor can she point to any evidence that her private medical information was improperly used or disclosed.  (*See* Richardson Dec. ¶5)  The facts show that Pande's termination was unrelated to her application for, or acceptance of, disability benefits.  In short, there are *no facts* – much less any triable facts – to support any required element of Pande's constitutional privacy claim.  Accordingly, Pande's claim fails as a matter of law.

## V.    <u>CONCLUSION</u>

Pande cannot connect the dots between any protected status or actions and her separation from employment.  As such, Pande should not be allowed to proceed to trial. Absent a triable issue on any of her claims, Defendants are entitled to summary judgment as a matter of law.

Dated:  December 1, 2006                                   MILLER LAW GROUP
                                                                          A Professional Corporation


                                                                          By: _____/S/_____
                                                                                Michele Ballard Miller
                                                                                Attorneys for Defendants

---

[30]  Even if a Pande could establish a *prima facie* case – which she cannot do – "[a] defendant may prevail in a state constitutional privacy case by negating any of the three elements . . . or by pleading and proving, as an affirmative defense, that the invasion of privacy is justified because it substantively furthers one or more countervailing interests."  *Hill,* 7 Cal. 4th at 40.  Where, as here, the privacy violation is alleged against a private entity, the defendant is required only to establish that it had a "legitimate" or "important" interest in the information.  *Id.,* at 57.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

25

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
Case No. 04-5107 CW