**EXHIBIT A**

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    KIRAN PANDE,

5              Plaintiff,

6        vs.                          No. 04-5107 CW

7    CHEVRON CORPORATION (f/k/a
     ChevronTexaco Corporation) and
8    CHEVRON INTERNATIONAL EXPLORATION
     & PRODUCTION (f/k/a ChevronTexaco
9    Overseas Petroleum), a division
     of Chevron U.S.A. Inc.,

10
              Defendants.
11   _____/

12

13

14

15          DEPOSITION OF KIRAN PANDE

16               VOLUME II

17             March 21, 2006

18

19

20       PATRICIA CALLAHAN & ASSOCIATES, INC.
            Certified Shorthand Reporters
             Oakland, California  510-835-3993
21        San Francisco, California  415-788-3993
          Castro Valley, California  510-885-2371

22
            Facsimile 510-247-9775
23              WeReport@aol.com

24   Reported by:
     LaRelle M. Fagundes
25   CSR No. 9762

PATRICIA  CALLAHAN  &  ASSOCIATES

1   overseas assignments, multiple overseas

2   assignments, over the years.

3   Q.      Did you ever tell any of your sponsors that

4   there are overseas assignments you would not be

5   interested in, in other words, because of the

6   location?

7   A.      As I had testified to yesterday, I had

8   indicated that my preference on overseas

9   assignments, in particular, you know, four-year

10  residential assignments, there were areas that I

11  preferred and areas that I did not prefer.  But

12  I -- we have a form that we fill out where we

13  indicate levels of interest in different areas, and

14  there may have been some areas where I indicated no

15  interest.  But for most areas, I indicated some

16  interest and in particular for short-term

17  assignments.

18          MS. MILLER:         Why don't we just

19  mark this next in order.

20                  (DEFENDANTS' EXHIBIT NO. 2

21                  WAS MARKED FOR IDENTIFICATION.)

22          MS. MILLER:         Q.  What we marked as

23  Exhibit 2 is a document that's called a "High Level

24  Date-Event Chronology."

25          Is this the chronology you were mentioning

1    yesterday?

2    A.        Yes; that's correct.

3    Q.        Okay.

4              Were there any documents attached to this

5    chronology?

6    A.        No.   This was the document that I was

7    mentioning yesterday.

8    Q.        Can you take a look at the second page.

9    Example area says, "Around May 28th."

10   A.        Yes.

11   Q.        Okay.

12             As I understand it yesterday, when you

13   prepared this chronology, you said some of it was

14   from memory and some of it was from notes that you

15   had?

16   A.        Yes.

17   Q.        Just taking a look at this entry, is this

18   based on your memory, or is it based on a note that

19   you were looking at -- a note that you had made of

20   this discussion?

21   A.        When I prepared this chronology?

22   Q.        Uh-huh.

23   A.        It was based on my memory.

24   Q.        Okay.

25             When did you prepare this chronology?

1    A.    I believe I prepared it in December of

2    2003.

3    Q.    When you prepared it, did you have the

4    notebooks or notepads, pieces of paper in front of

5    you?

6    A.    Yes, I believe so.

7    Q.    And what was the purpose of preparing this

8    document?

9    A.    The purpose of preparing this document was

10   to provide a high-level chronology to assist in

11   describing my claims to find legal representation.

12   Q.    Let me just -- in December of 1988, you

13   began working for Chevron Oil Field Research

14   Company in La Habra, California, correct?

15   A.    Yes; that's true.

16   Q.    And La Habra is in Southern California,

17   correct?

18   A.    Yes; that's correct.

19   Q.    Prior to that, were you employed?

20   A.    Prior to...?

21   Q.    Joining Chevron.

22   A.    Prior to joining Chevron?  Yes, I was.

23   Q.    Where were you employed?

24   A.    I worked as a graduate student at Stanford

25   University, and I also had worked several summer

1    Q.      Okay.

2    A.      I believe it was around seven.

3    Q.      Were all of the -- how many staff analysts

4    were there?

5    A.      I don't know.

6    Q.      Were there any other staff analysts other

7    than you?

8    A.      I believe so.  I'm just not sure what all

9    of the job titles were in the group, whether there

10   were all staff analysts or -- so I just don't know

11   for sure.

12   Q.      So can you give me sort of the names of the

13   other seven employees that you can recall?

14   A.      There was Brian Putt, P-u-t-t; Kevin Regan,

15   R-e-g-a-n; Matt, double T, Palmer, P-a-l-m-e-r;

16   Dan Wallem, W-a-l-l-e-m; Kemal, K-e-m-a-l, Ambarci,

17   A-m-b-a-r-c-i; and Iris Owens.

18   Q.      Did you say Iris?

19   A.      I-r-i-s.

20   Q.      Okay.

21           Did all seven of you report directly to

22   Rex Mitchell?

23   A.      Yes.

24   Q.      And it was your understanding when you

25   moved to San Ramon that it was to be an assignment

PATRICIA CALLAHAN & ASSOCIATES

1    for approximately 16 months, correct?

2    A.       That's correct.

3    Q.       Okay.

4            The business planning group, those are

5    generally assignments of shorter duration than

6    other jobs, correct?

7    A.       That's correct.  I think the business

8    planning positions generally run two to three

9    years, whereas many of the overseas assignments,

10   for example, typically have a duration of four

11   years.

12   Q.       Is business planning seen as a

13   developmental position?

14   A.       Yes.

15   Q.       The intent is to give employees exposure to

16   business planning and for career development

17   purposes.  Then they could move into another

18   position afterwards, correct?

19   A.       I believe so.

20   Q.       During the time that you were in this

21   position, did any of these six people that you've

22   mentioned move out of the group and others joined?

23   A.       I believe that nobody formally left the

24   position or joined the group until around the time

25   of the Chevron/Texaco merger.

PATRICIA  CALLAHAN  &  ASSOCIATES

1   set the pay scale at 24?

2   A.      No, I do not.

3   Q.      Did you tell Rex Mitchell that you thought

4   you should be promoted in October of 2001?

5   A.      I believe I had a conversation with

6   Rex Mitchell in September of 2001 where he

7   discussed this position, and I asked him whether it

8   would be offered as a promotion.

9   Q.      What did he say?

10  A.      He said that during the merger selection

11  process, that the Texaco managers representing the

12  Texaco employees were trying to promote many of

13  their employees in the process of job selection,

14  and there had been a decision made in terms of

15  ground rules that there would be no promotions of

16  any kind for anybody during the job selection

17  process.

18  Q.      So would that mean, for example, if

19  somebody had been at a grade 21, but they were

20  selected to fill a grade 22 position, after the

21  merger, they would still be a grade 21, correct?

22  A.      Can you repeat the question?

23  Q.      I'll rephrase it.

24          In other words, nobody -- there were no

25  promotions given even when the employee was

1    selected for a higher grade position during the

2    decisions that were made for who would fill what

3    position after the merger?

4    A.      I don't know.

5    Q.      In fact, the person who was being

6    considered for the portfolio analyst position at

7    the PDC in September was a male employee from

8    Texaco, correct?

9            MR. LEBOWITZ:        Objection.  Vague,

10   assumes facts.  Also calls for speculation.

11           THE WITNESS:        Can you repeat the

12   question, please?

13           (Record read by the reporter as follows:

14           "Q.  In fact, the person who was being

15                considered for the portfolio analyst

16                position at the PDC in September was

17                a male employee from Texaco,

18                correct?")

19           THE WITNESS:        I don't know that

20   definitively.

21           MS. MILLER:         Q.  Do you know who

22   Anthony Kenck is, K-e-n-c-k?

23   A.      Yes, I do.

24   Q.      Do you understand that that was the person

25   that Texaco was pushing for the portfolio analyst

1    position?

2    A.      At what time?

3    Q.      In October of 2001.

4    A.      Can you repeat the question, please?

5            (Record read by the reporter as follows:

6            "Q.  Do you understand that that was the

7                 person that Texaco was pushing for the

8                 portfolio analyst position?")

9            THE WITNESS:        At some point, I

10   inferred that Tony Kenck was the Texaco candidate

11   that Rex had talked about, but Rex had never used

12   his name or said anything about his gender.

13           MS. MILLER:            Q.  But you did know

14   that there was a Texaco employee vying or being

15   considered for the same position that you were

16   selected, correct?

17   A.      Yes.

18   Q.      Do you know if Rex Mitchell played any part

19   in the decision to select you for portfolio

20   analyst?

21   A.      He said that he did.

22   Q.      Did you tell Rex Mitchell that you were

23   unhappy about the fact that this position would not

24   be a promotion for you?

25   A.      I don't believe I used those words, that I

PATRICIA CALLAHAN & ASSOCIATES

1    A.        I don't remember.

2    Q.        But it was announced -- you do remember

3    that it was announced that it would be eliminated

4    effective the date of the merger at some period of

5    time before the merger?

6    A.        I don't remember.  I believe that there was

7    an announcement about the change in policy

8    regarding the ICE program or housing allowances,

9    but I don't remember the details of that

10   announcement.

11   Q.        Do you know who made the decision to move

12   you into the portfolio analyst position?

13   A.        Well, I believe that Rex Mitchell strongly

14   advocated for me to be selected for that position

15   during the merger selection process.

16   Q.        Did you see that position as a good

17   opportunity or a bad opportunity for your career

18   development?

19   A.        I saw it as a position that had a lot of

20   interesting components to it and could be a very

21   interesting position.

22   Q.        So it would potentially be a good

23   opportunity?

24   A.        Yes.  I mean, in terms of, I think, any

25   position where there are elements where you have a

1    learning curve opportunity and there are a lot of

2    challenging roles and responsibilities that are

3    part of that position or any position would be a

4    good career development opportunity.

5    Q.        Do you recall meeting with Rex Mitchell

6    around the end of September 2001 to discuss this

7    new position?

8    A.        Yes, I do.

9    Q.        And at that time, did you discuss -- or did

10   you tell him that you were interested in a

11   promotion?

12           MR. LEBOWITZ:            Objection.  Asked and

13   answered.

14           THE WITNESS:            I believe the

15   discussion was Rex indicated that he was sorry that

16   he couldn't offer the position to me as a

17   promotion, but he considered it a higher level

18   position with more responsibility than other

19   positions, than the planning analyst position in

20   his group.

21           MS. MILLER:            Q.  Did he also tell

22   you that all promotion recommendations after the

23   merger would be evaluated at the spring PDC?

24   A.        No, he did not.

25   Q.        You said before that Rex Mitchell treated

1    Q.      Okay.

2            But in this particular year, you did not

3    meet with Rex Mitchell until the beginning of April

4    of 2002, correct?

5    A.      That's correct.

6    Q.      Is that just due to the fact that you were

7    both busy?

8    A.      It was -- we met in April of 2002 after

9    Jay Johnson asked us to sit down to do a PMP.  And

10   the reason that we didn't do it earlier is likely

11   that we were both busy.  And I'd never took the

12   initiative to go and try and schedule a -- I

13   certainly had not filled out the form, and I did

14   not try and schedule an appointment with Rex to

15   discuss it.

16   Q.      But did you fill out the form in April?

17   A.      I filled out the form, I believe, in late

18   March of 2002.

19   Q.      Is there a particular reason why you

20   delayed until late March to fill out the form?

21   A.      Well, I was very busy with the

22   responsibilities in my new job.  And Bob Dorrough,

23   who had been the price forecasting analyst, had --

24   he was leaving, I believe, at the end of February

25   of 2002.  He was actually retiring from the

1   you went to see Jay Johnson?

2   A.        I believe I wrote it down when I scheduled

3   the meeting with Jay Johnson.  I believe Iris sent

4   out a meeting notice to both of us.  I believe it

5   was in my calendar.

6   Q.        Okay.

7             And when you said you reported the

8   harassment, did you tell Jay Johnson that you

9   thought that you were being harassed by

10  Rex Mitchell because of your gender?

11  A.        On March 4th of 2002?

12  Q.        Yes.

13  A.        I did not say that it was because of my

14  gender.

15  Q.        Did you tell Jay Johnson that you thought

16  you were being harassed by Rex Mitchell because of

17  your race or national origin?

18  A.        On March 4th of 2002?

19  Q.        Whenever the meeting was in March.

20  A.        Okay.  No.

21  Q.        So after your meeting with Jay Johnson, it

22  came to your attention that Jay had spoken to

23  Rex Mitchell, correct?

24  A.        Well, during the meeting with Jay Johnson,

25  he indicated that he had already spoken to

1    specific examples.  And I also mentioned that I had

2    heard from Iris Owens that he was treating her in

3    an abusive manner.

4              MS. MILLER:          Mark this next in

5    order.

6                             (DEFENDANTS' EXHIBIT NO. 11

7                             WAS MARKED FOR IDENTIFICATION.)

8              MS. MILLER:          Q.  Take a look at

9    Exhibit 11.

10             Sometime prior -- the week prior to April

11   23rd, you, Vicki Thompson and Gary Yamashita met to

12   discuss your concerns about the work group,

13   correct?

14   A.        That's correct.

15   Q.        Okay.

16             And then after that meeting, you and Vicki

17   put together a list of bullet points for a meeting

18   that was scheduled for the week of April 23rd,

19   correct?

20   A.        Yes; that's correct.

21   Q.        Okay.

22             Who was going to be at that meeting on

23   the -- actually, it would have been on the 25th of

24   April?

25   A.        That meeting was scheduled where Gary would

1    go in and talk to James Johnson and for -- first,

2    and then Vicki and I would come in and join them.

3    So the four participants in total would be

4    Gary Yamashita, James Johnson and Vicki Thompson

5    and myself.

6    Q.      If you take a look at these bullet points,

7    the first one is, "CTOP planning constitutes a

8    hostile work environment that does not foster

9    productivity or respect amongst the work group."

10          Do you see that?

11   A.      Yes, I see that.

12   Q.      Okay.

13          And that's -- when you talk about hostile

14   work environment, did you tell Gary Yamashita that

15   you thought that the hostile work environment was

16   based upon gender, or was it something that

17   affected the entire work group?

18   A.      We told Gary that it was based on gender.

19   Q.      You didn't write that here, though, did

20   you?

21          MR. LEBOWITZ:            Objection.  Assumes

22   facts.

23          MS. MILLER:            Q.  Well, it says it

24   doesn't foster a spirit of inclusion of all team

25   members.

PATRICIA CALLAHAN & ASSOCIATES

1    Stan Walker retiring from the company.

2    Q.    Well, when the four of you met on April

3    25th, did you discuss each of these bullet points?

4    A.    When the four of us met, as I mentioned,

5    Gary and Jay Johnson met prior to Vicki and I

6    coming in to meet, and when Vicki and I came in to

7    meet with Jay, we didn't end up going through this

8    bullet point list.

9    Q.    You did not?

10    A.    That was the way that Jay conducted the

11    conversation.

12    Q.    Okay.

13         What did you discuss?

14    A.    Jay spent most of the conversation

15    rebutting my concerns about Rex's treatment of me

16    and Rex's evaluation of my performance.  And it

17    wasn't until the very end of the conversation or a

18    very long discussion where Jay Johnson focused

19    specifically on me that he turned to address Vicki.

20    So he didn't address us.  Although Vicki was

21    sitting at the table, he separated our concerns and

22    addressed them separately.

23    Q.    Okay.

24         And did you tell Jay Johnson at this

25    meeting that you thought you'd been treated

1    unfairly by Rex Mitchell?

2    A.        I told Jay Johnson that I thought that

3    Rex Mitchell had treated me differently because I

4    was a woman and a minority and that Rex had a habit

5    of making disparaging comments about women and

6    minorities.  And I went through several examples

7    where Rex had made disparaging comments about women

8    and minorities.

9    Q.        You didn't write any of these comments, or

10   is that in any of these bullet points, or am I

11   missing it?  I don't think so.

12          MR. LEBOWITZ:        Is that a question?

13          MS. MILLER:        No.  I'm just trying

14   to see where that came up.

15          MR. LEBOWITZ:        She just testified to

16   that.  Are you asking a question, or are you just

17   making a comment to yourself?

18          MS. MILLER:        I'm just reading it.

19   Just trying to see if it's in here anywhere.

20          MR. LEBOWITZ:        It's not a transcript

21   of the meeting.  So use it for what you want.

22          MS. MILLER:        Q.  Well, I would

23   presume, then, in anticipation of this meeting that

24   you and Vicki sat down and wrote down the things

25   that were important to you, right?  And certainly

1    totally incompetent and that Pat knew exactly what

2    Rex thought of her and that, you know, that Pat

3    Yearington knew that Rex thought that she was

4    totally incompetent.

5         And another example was Janet Neuville, who

6    was the general manager or vice president of CTOP's

7    HSC function, health, safety and environment, where

8    he had made comments saying that Peter Robertson

9    knows that Janet Neuville is completely incompetent

10   to do her job.

11   Q.      Other than these comments, have you ever

12   heard Rex Harrison (sic) make any other disparaging

13   remarks against women who are minorities?

14   A.      Well, one of the other disparaging remarks

15   that Rex had made to Iris Owens where Iris Owens

16   had complained to me about Rex's behavior was his

17   reference to the people that provide the airport

18   shuttle services as towel heads.

19   Q.      Rex called them that?

20   A.      Yes.

21   Q.      Did Rex Mitchell ever use any disparaging

22   remarks to you?

23   A.      Yes.  As I've testified earlier, his tone

24   of voice, his treatment of me.

25   Q.      We're back on the same page.  I'm asking

PATRICIA CALLAHAN & ASSOCIATES

1  you what did he say to you.  Did he ever say

2  anything?  I know the tone of voice.  We went

3  through that yesterday.  I understand that.  Might

4  be that he didn't say anything, but the manner or

5  the tone led you to believe that.  That's fine.

6          All I'm asking is, did he ever say anything

7  like these five remarks to you?

8  A.      So you're asking me whether he made -- he

9  ever called me a towel head directly?

10  Q.      Yes.

11  A.      No, he did not.

12  Q.      Did you ever hear him call anyone a towel

13  head?

14  A.      No, I did not.

15  Q.      Okay.

16          Did he ever make any similar comments to

17  the ones that you just related to me about gender

18  directly to you?

19          MR. LEBOWITZ:        You mean about you or

20  to you, right?

21          MS. MILLER:          No.

22  Q.      I mean directly to you, anything about you.

23  A.      Can you repeat the question, please?

24          (Record read by the reporter as follows:

25          "Q.  Did he ever make any similar comments

PATRICIA CALLAHAN & ASSOCIATES

1    was offered at the same level, as a lateral.

2    Q.      Are promotions determined at PDC meetings,

3    or do you not know?

4    A.      I don't want to speculate, so.... I don't

5    know what the exact process is for determining

6    promotions.

7    Q.      Okay.

8            Do you know why you were selected for the

9    Block 14 position?

10   A.      I wasn't at the PDC meeting, so I don't

11   know why I was selected for the Block 14 position.

12   Q.      Did anybody ever -- did Kelly talk to you

13   afterward and explain to you why that position was

14   viewed as a good fit for your skills and

15   development?

16   A.      Kelly talked to me afterwards and indicated

17   that Jack Dunn, who was a good friend of hers and

18   was the job owner for that position, was very happy

19   to see someone of my caliber as a candidate for

20   that position, because they had posted it several

21   times and had not been able to attract anybody of

22   my caliber to that position.

23   Q.      Well, were you -- did Kelly tell you why

24   the PDC thought this would be a good position for

25   you?

```
1    A.        No, she did not.

2    Q.        Okay.

3              Were you told that it would be viewed as a

4    good development position because of the

5    possibility for a leadership role in the project?

6    A.        By who?

7    Q.        By Kelly or even Jack Dunn.

8    A.        Can you just restate the question, please?

9              (Record read by the reporter as follows:

10             "Q.  Were you told that it would be viewed

11                  as a good development position because

12                  of the possibility for a leadership

13                  role in the project?")

14             THE WITNESS:          No.  In fact,

15   Jack Dunn and I had a long conversation about the

16   position, and he indicated that, you know, he knew

17   that, you know, this position, the job title,

18   simulation engineer, was going back to do the kind

19   of study work that I had done in La Habra, you

20   know, back in '92, you know, two or three years

21   into my career.  And he talked about how the -- he

22   had a very large team, and it was a flat

23   organization, so he did not believe in having

24   subteam leaders reporting to him, so there were no

25   formal leadership positions in the team.  But he
```

```
 1   said, "You would be the senior petroleum engineer
 2   working on the S3 assets, because the other
 3   petroleum engineer is relatively new to the
 4   company."
 5           MS. MILLER:              Q.  Did he also say
 6   that it would be -- it's one of the best assets the
 7   company has, and it would be a high-profile project
 8   as they move the asset through the pipeline to
 9   project sanction, so this should be a real
10   opportunity for growth from a professional
11   standpoint for someone who comes in and performs
12   well?
13           MR. LEBOWITZ:            Objection.  Compound.
14           MS. MILLER:              Q.  Did he object --
15   or Kelly Hartshorn tell you that?
16           MR. LEBOWITZ:            Same objection.
17           THE WITNESS:             Can you restate the
18   question, please?
19           (Record read by the reporter as follows:
20           "Q.  Did he also say that it would be --
21                it's one of the best assets the
22                company has, and it would be a
23                high-profile project as they move the
24                asset through the pipeline to project
25                sanction, so this should be a real
```

PATRICIA CALLAHAN & ASSOCIATES

1   Q.      Right.

2           And you were informed on Friday, October

3   11th by Kelly Hartshorn that you were being -- you

4   had been selected for a position in the South

5   African business group, correct?

6   A.      I was informed at some time, and you're

7   asking me if it was specifically October 11th?

8   Q.      It was in October, though, right?

9   A.      Likely, yes.  It was after the petroleum

10  engineering PDC meeting.

11  Q.      So within a month of you sending this

12  e-mail, you were offered a position -- or you were

13  selected for a position in the South African

14  Business Unit, correct?

15  A.      So you're saying within a month of this

16  e-mail?

17  Q.      Yes.

18  A.      Yes.

19  Q.      Okay.

20          Who is Rene Dautel?

21  A.      Rene Dautel.

22  Q.      Okay.

23  A.      D-a-u-t-e-l.

24          He is the manager of one of the corporate

25  groups.  I think it's the M&A group, the mergers

CERTIFICATE

1

2          I, the undersigned, a Certified Shorthand

3     Reporter, State of California, hereby certify that

4     the witness in the foregoing deposition was by me

5     first duly sworn to testify to the truth, the whole

6     truth, and nothing but the truth in the

7     within-entitled cause; that said deposition was

8     taken at the time and place therein stated; that

9     the testimony of said witness was reported by me, a

10    disinterested person, and was thereafter

11    transcribed under my direction into typewriting;

12    that the foregoing is a full, complete and true

13    record of said testimony; and that the witness was

14    given an opportunity to read and, if necessary,

15    correct said deposition and to subscribe the same.

16         I further certify that I am not of counsel

17    or attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any

19    way interested in the outcome of the cause named in

20    said caption.

21         Executed this 4th day of April, 2006.

22

23

24    LARELLE M. FAGUNDES, CSR 9762

25

PATRICIA CALLAHAN & ASSOCIATES

311

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   KIRAN PANDE,

5              Plaintiff,

6       vs.                        No. 04-5107 CW

7   CHEVRON CORPORATION (f/k/a
    ChevronTexaco Corporation) and
8   CHEVRON INTERNATIONAL EXPLORATION
    & PRODUCTION (f/k/a ChevronTexaco
9   Overseas Petroleum), a division
    of Chevron U.S.A. Inc.,

10

               Defendants.
11  _____/



12

13

14

15            DEPOSITION OF KIRAN PANDE

16                 VOLUME III

17                March 22, 2006

18

19

20      PATRICIA CALLAHAN & ASSOCIATES, INC.
            Certified Shorthand Reporters
         Oakland, California  510-835-3993
21      San Francisco, California  415-788-3993
        Castro Valley, California  510-885-2371

22

            Facsimile 510-247-9775
23              WeReport@aol.com

24  Reported by:
    LaRelle M. Fagundes
25  CSR No. 9762

            PATRICIA CALLAHAN & ASSOCIATES

1   conversation I had with Jack Dunn.

2   Q.      Did you tell her that he had said that you

3   were in a -- his belief that you were in a

4   must-move situation?

5   A.      I may have or I may not have.  I can't

6   remember sitting here right now.

7   Q.      Did you tell Kelly -- you did not tell

8   Kelly Hartshorn, did you, that Jack Dunn said that

9   if you did not accept the job, he'd make sure you

10  never got another job in petroleum engineering?

11  A.      No, I did not tell her that.

12  Q.      In fact, what you did tell her is based

13  upon her high personal recommendation on working

14  with Jack, that that was an important factor in

15  your decision, correct?

16  A.      Yes; that's correct.  That's what I

17  communicated to her, you know, in the e-mail on

18  December 4th.

19  Q.      And you thought that she had done a

20  marvelous job in managing the various you called

21  them stakeholders for the positions that you were

22  interested in, correct?

23  A.      As I've -- you know, as the e-mail shows,

24  you know, I was thanking her for her efforts in

25  doing that, yes, and I thought she had done a good

1    job at that.

2    Q.      You also told her that you'd come work for

3    her in a heartbeat if the opportunity ever arose,

4    correct?

5    A.      That's correct.

6    Q.      Okay.

7            And you also told her that you had made the

8    decision to accept the PE offer, correct?

9    A.      Yes, I told her that I was going to be

10   accepting the petroleum engineering position in

11   Block 14.

12   Q.      And you did not tell her that you thought

13   you did not have a choice, correct?

14   A.      No, I did not tell her that when I accepted

15   the job.

16   Q.      You also did not tell her that Jack Dunn

17   told you that if you didn't accept the job, you

18   would not -- he would make sure that you never

19   worked in the PE?

20   A.      No, I did not tell her that.

21   Q.      Okay.

22           Prior to your conversation with Jack Dunn,

23   had Jack Dunn spoken to Rex Mitchell about your

24   performance?

25   A.      I don't know.

1    unit, the headquartered organization stayed.

2    Q.       No.    What I'm talking about is

3    ChevronTexaco Overseas Petroleum.  I'm talking

4    about the whole organization.

5         Isn't it true that a low percentage of

6    positions for CTOP were actually based in

7    San Ramon?

8         MR. LEBOWITZ:            Objection.  Vague.

9    Calls for speculation.

10        MS. MILLER:            Q.   If you know.

11   A.    I don't know what exact -- you know, what

12   exactly were all of the CTOP positions in 2002 or

13   2001.  But, you know, certainly after the merger

14   where many of the large business units that were in

15   San Ramon had moved to Houston in late 2001, there

16   were certainly a lot fewer than there had been

17   historically, but I really cannot give you, you

18   know, percentages.

19        MS. MILLER:            Okay.

20                        (DEFENDANTS' EXHIBIT NO. 16

21                        WAS MARKED FOR IDENTIFICATION.)

22        MS. MILLER:            Q.   Why don't you

23   take a look at Exhibit 16.

24        Okay?

25   A.    Okay.

1    Q.        As of May 2003, you became aware that the

2    Southern Africa business unit was definitely going

3    to be consolidated to Houston, correct?

4    A.        That's correct.  So this Exhibit 16 is an

5    e-mail that's dated May 13th, and I believe that's

6    when it was officially announced.

7    Q.        Okay.

8             And once you received this e-mail, you also

9    checked the -- well, let me rephrase that.

10            Never mind.

11                         (DEFENDANTS' EXHIBIT NO. 17

12                         WAS MARKED FOR IDENTIFICATION.)

13            MS. MILLER:             Q.  Have you reviewed

14    Exhibit 17?

15    A.        Yes, I have.

16    Q.        Exhibit 17 was a document that was given to

17    all San Ramon Southern Africa business unit

18    employees, correct?

19    A.        Yes, I believe so; that's correct.

20    Q.        Okay.

21            And you received a copy of this sometime

22    around May 20th, 2003, correct?

23    A.        Sometime around -- around there.  I think,

24    in fact, when this was sent out, that I was

25    overseas, but I'm not sure.  But around that time.

1    Q.      Okay.

2            And you actually did miss the town hall

3    meeting, correct?

4    A.      That's correct.  I wasn't at the town hall

5    meeting.  I believe, like, on here, it says the

6    town hall meeting was on May 22nd.  And I think I

7    was overseas at the time on a business trip.

8    Q.      When you reviewed this communication

9    timeline, which is Exhibit 17, you understood that

10   offers to move would be extended to employees on

11   June 2nd, 2003, correct?

12   A.      Yes; that's correct.

13   Q.      And you also knew that there would be a

14   brown bag, question-and-answer lunch for both

15   employees and spouses on June 4th, 2003, correct?

16   A.      Yes; that's correct.

17   Q.      Did you attend that brown bag luncheon?

18   A.      No, I did not.

19   Q.      And you also knew that on June 9th, 2003,

20   all offer, acceptances or declines to move were to

21   be returned to the company, correct?

22   A.      That's what is listed on this paper; that's

23   correct.

24   Q.      Was that your understanding, that the

25   offers and acceptances or declines were due on June

1    9, 2003?

2    A.        That's correct.

3    Q.        Okay.

4              And you also understood that the phase one

5    group move would be on July 15th, 2003?

6              MR. LEBOWITZ:              Objection.

7    Misstates.  It's vague.  Assumes facts.

8              MS. MILLER:              Q.  Well, the move to

9    Houston was phased in, correct?

10    A.        Are you saying was the move to Houston done

11    in phases?

12    Q.        Yes.

13    A.        Yes; that's correct.

14                        (DEFENDANTS' EXHIBIT NO. 18

15                        WAS MARKED FOR IDENTIFICATION.)

16              MS. MILLER:              Q.  Have you reviewed

17    Exhibit 18?

18    A.        Yes, I have.

19    Q.        Okay.

20              Exhibit 18 is the power point that was

21    presented at the town hall meeting on May 22nd,

22    2003, correct?

23    A.        I presume it was the power point that was

24    presented.  I wasn't at that meeting.

25    Q.        Right.

1      But you did receive a copy of the power

2  point, correct?

3  A.      Yes, that's correct, all of this exhibit.

4  Q.      Did you receive a copy of the power point

5  when you returned from your business trip?

6  A.      Yes.  At some point after I returned from

7  my business trip, I received this.

8  Q.      If you take a look at page five, you see

9  the move to Houston was going to be in two stages,

10  correct?

11  A.      Yes, that's what it says on that page.

12  Q.      And Block 0 BF were to report to Houston on

13  August 1st, correct?

14  A.      That's what it says.

15  Q.      And information to those employees in phase

16  one would be distributed by July 15th, according to

17  Exhibit 17, correct?

18  A.      Yes; that's correct.

19  Q.      And the second stage of the move would

20  occur on January 1, when Block 14 and Congo/DRC

21  were to report in Houston, correct?

22  A.      Yes, it says the move was in two stages

23  with stage one being August 1st and stage two being

24  January 1st.

25  Q.      All right.

1         And the information on the phase two group

2    move, according to Exhibit 17, was to be

3    distributed to employees on December 15th, correct?

4    A.       That's what it says on Exhibit 17; that's

5    correct.

6              MS. MILLER:           Mark this next in

7    order.

8                        (DEFENDANTS' EXHIBIT NO. 19

9                        WAS MARKED FOR IDENTIFICATION.)

10             MS. MILLER:           Q.   Exhibit 19 is the

11   offer that you received to relocate to Houston,

12   correct?

13   A.       That's correct.

14   Q.       And attached to the cover letter is the

15   actual fixed duration assignment offer, correct?

16   A.       Yes; that's correct.

17   Q.       And the anticipated assignment start date

18   was June 1st, 2004, correct?

19   A.       That's correct.

20   Q.       And that start date coincides with when the

21   Block 14 group was to commence working in Houston,

22   correct?

23   A.       That's correct.

24                       (DEFENDANTS' EXHIBIT NO. 20

25                       WAS MARKED FOR IDENTIFICATION.)

```
 1   A.      I don't remember if it was the Web site
 2   where the SASBU Q&A was or whether it was a written
 3   document, but I looked at something that talked
 4   about -- that was a SASBU Q&A.  I can't recollect
 5   if it was specifically on a Web site or whether it
 6   was on a physical document.
 7   Q.      Did you return the fixed duration
 8   assignment offer by the deadline of June 9th, 2003?
 9   A.      No, I didn't return the fixed duration
10   offer by the deadline, because the offer letter
11   itself indicated that by not returning it within
12   that seven-day time period, it would be deemed a
13   nonacceptance.
14   Q.      So by not returning it, you were indicating
15   you were not accepting the offer to relocate to
16   Houston, correct?
17   A.      That's correct.
18   Q.      Why did you decide not to move to Houston?
19   A.      Well, there were multiple factors in my
20   decision not to accept this move to Houston.  Some
21   of them were personal related to wanting to try and
22   stay in the Bay Area, if possible, due to family
23   reasons.  And some of it was professional.  And
24   some of it was based on interactions that I had had
25   with Jack Dunn, you know, prior to having the
```

PATRICIA CALLAHAN & ASSOCIATES

1    posted for a position in August of 2003. I'm

2    saying I'm not sure if that's the exact date.

3         But I had had conversations with Brian

4    Smith at the end of June and July of 2003 where we

5    had discussed, you know, positions that might be

6    coming up and expressed an interest in certain

7    positions. And I did post for positions, you know,

8    after that as well.

9         But if you're asking specifically about

10   August, I likely did. But if you're asking if

11   that's the first time I posted for a position, I

12   don't know if that's the very first time.

13        MS. MILLER:          Can we mark the next

14   in order, please.

15                     (DEFENDANTS' EXHIBIT NO. 23

16                     WAS MARKED FOR IDENTIFICATION.)

17        MS. MILLER:          Q.  Prior to

18   September 1st, 2003, you applied for a manager of

19   technical support position that was located in

20   London, correct?

21   A.      Yes, I believe so.

22   Q.      Okay.

23        Do you know who else applied for this

24   position?

25   A.      Are you asking me for names of people that

PATRICIA CALLAHAN & ASSOCIATES

1    applied for this position?

2    Q.      Yes.

3            Do you know who else applied for the

4    position?

5    A.      Are you asking whether I know -- I knew at

6    that time who else had applied for that position or

7    now?

8    Q.      How about at that time?

9    A.      At that time?

10   Q.      All right.

11           Do you know who was selected for the

12   position?

13   A.      Do I know who was selected for the

14   position?  I don't know for a fact who was selected

15   by the PDC for that position.

16   Q.      Do you know who made the selection

17   decision?

18   A.      I do not know who made the selection

19   decision.

20   Q.      Do you know if Jack Dunn participated in

21   the selection decision?

22           MR. LEBOWITZ:        Objection.  Vague.

23           THE WITNESS:        I do not know if

24   Jack Dunn participated in the selection decision.

25           MS. MILLER:        Q.  Do you know what

1    the qualifications were of the person who was

2    selected for the position?

3    A.        As I testified earlier, I don't know for

4    certain who was selected for the position, and so I

5    can't know what their qualifications were.

6    Q.        This was a salary grade 26 position.

7    Correct?  Actually, it was posted as a 26 or 27

8    salary grade level, correct?

9    A.        I don't recall exactly what grade level it

10   was posted as, but if you're saying it was 26, 27,

11   that could very well be the case.

12   Q.        Okay.

13             And in this response to you September 12,

14   Jack says there were -- "Apparently there were 31

15   applicants, 12 in grades 26 or 27."

16             Do you have any reason to believe that's

17   not correct?

18   A.        I don't have any reason to believe that

19   that's not correct.

20   Q.        Did you tell Jack Dunn in August of 2003

21   that you had reconsidered and you were willing to

22   relocate out of the Bay Area?

23             MR. LEBOWITZ:           Objection.  Assumes

24   facts.  Misstates testimony.

25             THE WITNESS:           For the Block 14

PATRICIA CALLAHAN & ASSOCIATES

1      Do you recall applying for positions in
2  Houston in September of 2003?
3  A.      I may have, but I don't recall specifically
4  what position you're referring to.
5  Q.      The EPTC positions that you were interested
6  in, were they located in Houston?
7  A.      Can you be more specific about which EPTC
8  positions, because I applied to multiple ones.
9  Q.      Well, of any of the ones that you applied
10  to in the fall of September of 2003 were they
11  located in Houston?
12  A.      Unless, you know, you can refresh my
13  memory, you know, with a specific position.  There
14  were EPTC positions that were posted that I applied
15  for, and many of them had dual locations where you
16  could be posted either in Houston or in the Bay
17  Area, because EPTC had offices in all three
18  locations.
19  Q.      Did you apply for a manager of strategic
20  business planning in Houston in September of 2003?
21  A.      Yes, I applied for the manager of strategic
22  planning for EPTC or ETC.
23  Q.      You were not selected for the position,
24  correct?
25  A.      Yes, correct.

PATRICIA CALLAHAN & ASSOCIATES

1   Q.     Do you know who was selected for the

2   position?

3   A.     I don't know who was selected for the

4   position.

5   Q.     Do you know who made the selection

6   decision?

7   A.     I don't know who made the selection

8   decision.

9   Q.     Do you know if Jack Dunn played any role in

10  that selection or decision?

11         MR. LEBOWITZ:          Objection.  Vague.

12         You can answer.

13         THE WITNESS:          I don't know.

14         MS. MILLER:           Let's mark this next

15  in order.

16                        (DEFENDANTS' EXHIBIT NO. 24

17                        WAS MARKED FOR IDENTIFICATION.)

18         MS. MILLER:           Q.  Exhibit 24 is a

19  series of e-mails between you, Taryn Shawstad and

20  Fiona Young.

21         Take a look at the one at the bottom of the

22  first page continuing on to the second that's dated

23  October 16th.

24         Do you see that?  The top of the -- the

25  header is on one page and continues on to the

1    second page.

2    A.        Yes, I see that.

3    Q.        All right.

4              So it's an e-mail that you sent

5    Taryn Shawstad on October 16th, 2003, correct?

6    A.        That's correct.

7    Q.        And in that, you tell Taryn that you turned

8    down SASBU offer to move to Houston, correct?

9    A.        That's correct.

10   Q.        And you also tell her that, at least as of

11   October 16th, 2003, you had applied for several

12   jobs through the PDC process, but if you were not

13   selected for any of them, then I will likely be

14   forced to leave the company.

15             Do you see that?

16   A.        Yes, I see that.

17   Q.        Okay.

18             You also tell her that the SASBU offer

19   letter has a start date of January 1st for the job

20   in Houston.

21             Do you see that?

22   A.        I see that.

23   Q.        And then you ask her, "is it possible to

24   use vacation, for example, to extend the severance

25   date into 2004 to ensure that severance benefits

1    are paid out in 2004."

2            Do you see that?

3    A.        I see that.

4    Q.        Does that help refresh your recollection

5    that you understood that December 31st, 2003, would

6    be your last day with the company if you were not

7    selected for another position?

8    A.        No, that is not my recollection.  My

9    understanding at the time that I wrote this e-mail

10   and at the time that I turned down the offer to

11   move to Houston was that, as was customary practice

12   at Chevron, one oftentimes was allowed to continue

13   working on a project as long as there was work that

14   was useful that the employee could do.  And

15   oftentimes a specified specific date would be an

16   estimate and not an absolute drop-dead date.

17            And, in fact, Cary Mrozowski had called me

18   to ask me whether I had received a termination

19   date.  And I had said no.  And Cary Mrozowski, who

20   was, I believe, in a role where he was head of

21   redeployment, because Chevron had a longstanding

22   policy towards trying to retain their workforce,

23   and he was in a position where he helped with

24   redeployment of employees due to changes and moves

25   and restructuring, et cetera.  And we had a

1    Q.        Did you ask Tom McMillen to find out why

2    you were not selected for any of the business

3    development positions in London?

4    A.        I believe I asked Tom McMillen whether he

5    could find out what happened with these slates.

6    And I'm not sure at the time of that conversation

7    whether I knew for sure whether I was selected or

8    not for those slates.  But I did ask Tom, you know,

9    for any feedback on, you know, whether I was

10   selected or not.

11   Q.        How many positions in London did you apply

12   for, do you recall?

13   A.        I applied for a couple of positions in

14   London.  So there are at least two positions, the

15   petroleum engineering and reservoir engineering

16   jobs that were part of the business development

17   group.  And there were a couple of other jobs that

18   were part of that business development group.  And

19   if you're asking me the exact number, I don't know

20   the exact number, but it's probably, you know,

21   somewhere between four or five, six.  I'm not sure.

22   Q.        You applied for a market screening

23   consultant, which was a grade 25, 26, at the end of

24   August.

25          Do you remember that?  It was based in

```
 1    London.

 2    A.      Yes, I remember that.

 3    Q.      Do you know who was offered the position?

 4    A.      I don't know who was offered the position.

 5    Q.      Do you know who was selected?

 6    A.      Is that the same question or --

 7    Q.      Yeah.

 8    A.      I just said I don't know.

 9    Q.      Okay.

10            Do you know who made the selection

11    decision?

12    A.      I don't know who made the selection

13    decision.

14    Q.      Do you have any reason to believe that

15    Jack Dunn played any role in that selection

16    decision for the position in London?

17            MR. LEBOWITZ:        Objection.  Vague.

18            THE WITNESS:        I don't know what

19    role Jack played in the selection decision.

20            MS. MILLER:        Q.  Do you think he

21    played a role in the selection decision?

22            MR. LEBOWITZ:        Objection.  Vague.

23            THE WITNESS:        I don't know for a

24    fact what role he played in the selection decision,

25    but my understanding based on the application
```

1    process and the information that's put into the

2    application process, is that it's fairly normal for

3    the supervisor to be contacted when an employee in

4    their group applies for a position.

5            MS. MILLER:            Q.   Do you know if

6    Jack Dunn was contacted for any of the positions

7    that you applied for in London in the

8    August/September 2003 time frame?

9    A.       I don't know.

10   Q.       You also applied for a reservoir engineer

11   position for CTOP in London.

12           Do you recall that?

13   A.       Well, I think those were the two positions

14   that you were just referring in Exhibit 26.

15   Q.       Right.   There was a reservoir engineer one

16   and a reservoir engineer two both for CTOP in

17   London, right, two engineering positions?

18   A.       I believe so.

19   Q.       Do you know who was selected for either

20   position?

21   A.       I think I heard who was selected for those

22   positions, but I can't remember what the names are

23   right now.

24   Q.       Do you know who made the selection decision

25   for either position?

1    A.      I don't know who made the selection

2    decision.

3    Q.      Do you know what the qualifications were of

4    the individuals who were selected?

5    A.      I don't know the qualifications.

6    Q.      Do you know if Jack Dunn played any role in

7    that selection process?

8              MR. LEBOWITZ:          Objection.  Vague.

9              THE WITNESS:          As I indicated

10   previously with regards to the same question for

11   another position in London, I don't know

12   specifically what Jack Dunn's role was, but my

13   understanding is that it's a common practice to

14   contact the supervisor when people post for

15   positions.

16             MS. MILLER:          Q.  Do you know if

17   Jack Dunn was, in fact, contacted for any of those

18   positions?

19   A.      I don't know.

20   Q.      Do you know if Jack Dunn said anything that

21   adversely impacted your ability to be selected for

22   either position?

23             MR. LEBOWITZ:          Objection.  Vague as

24   to time.

25             THE WITNESS:          If the question is

PATRICIA CALLAHAN & ASSOCIATES

1    when -- if he was contacted with regards to these

2    positions, whether he said anything, I don't know,

3    that adversely impacted the selection.   I don't

4    know.

5            MS. MILLER:              Q.   I'm not sure.

6    Did I ask you about the manager of technical

7    support for CTBD in London?

8    A.      You asked about --

9    Q.      I asked about the two CTOP positions.

10           MR. LEBOWITZ:            Let's assume you

11   didn't.  You can ask the same questions.

12           MS. MILLER:              Okay.

13   Q.      There was also a petroleum engineer for

14   CTBD in London that you applied for in September of

15   2003.

16           Do you know who was selected for either one

17   of those positions?

18   A.      So you just said petroleum engineering

19   positions.  When you say either one of those,

20   what --

21   Q.      Or a manager of technical support.  They

22   were both CTBD positions based in London.

23   A.      Do I know right now who was selected?

24   Q.      Yeah.

25   A.      I don't know.

PATRICIA CALLAHAN & ASSOCIATES

1    Q.      Did you know then who was selected?  Do you
2    remember?
3    A.      And by "then," you're saying what time
4    frame?
5    Q.      When the selection was made, did you know
6    who had been selected, or did you just know you had
7    not been selected?
8    A.      Well, when you're not selected, you receive
9    typically an e-mail from the automated system
10   saying you weren't selected, but that e-mail
11   doesn't say who was selected.  And as I said
12   before, I think, I may have heard who was selected.
13   But at the time that I was not selected, I did not
14   know, you know, who they selected.
15   Q.      Do you know who made the selection
16   decisions for either of the CTBD jobs that were
17   based in London?
18   A.      No, I do not.
19   Q.      Do you know if any of the individuals on
20   the selection committee spoke to Jack Dunn during
21   the selection process?
22   A.      No, I do not know whether they spoke to
23   Jack Dunn.  But as I said before, my understanding
24   is that that's standard procedure, because on the
25   job posting process, part of the job application

1    lists people to contact and also who your

2    supervisor is.

3    Q.      Do you know on any of the five London jobs

4    that we've discussed, do you know if anyone on any

5    of those selection committees spoke to Jay Johnson

6    or Rex Mitchell?

7    A.      So your question is whether anybody on

8    those selection committees talked to Jay Johnson

9    and Rex Mitchell?

10   Q.      Correct.

11   A.      Ever?

12   Q.      No, during the selection process.

13   A.      During the selection process?

14   Q.      Mm-hmm.

15   A.      I have no way of knowing that.

16                       (DEFENDANTS' EXHIBIT NO. 27

17                        WAS MARKED FOR IDENTIFICATION.)

18           MS. MILLER:          Q.   Do you recognize

19   Exhibit 27?

20   A.      Yes.

21   Q.      This is an e-mail that you sent to

22   Antoinette McClung with a cc to Brian Smith, in

23   October of 2003, which you attach your application

24   for senior staff business analyst position in the

25   Global Gas Group.

1    A.      So are you talking about my specific

2    medical condition or that the leave was related to

3    medical issues?

4    Q.      The specifics of the medical condition.

5    A.      My understanding was that UnumProvident

6    would not -- was not supposed to release

7    information about my private medical situation to

8    Jack Dunn or to my supervisor.

9    Q.      Did you know if UnumProvident ever told

10   Jack Dunn the specific nature of your medical

11   condition?

12   A.      I do not know that.

13   Q.      Do you have any -- never mind.

14          At the time that you requested this leave

15   of absence, your doctor had stated that you would

16   be out till at least May of 2004, correct?

17          MR. LEBOWITZ:          Objection.  Vague.

18          THE WITNESS:          So you're asking on

19   October 28th of 2004, whether my doctor had stated

20   that?

21          MS. MILLER:          Q.  If you know, how

22   long was the leave that your doctor was requesting

23   for you?

24   A.      I believe that the paperwork that my doctor

25   filled out indicated that it could take up to April

1   or May of 2004.

2   Q.      Aside from UnumProvident, do you know if

3   Jack Dunn ever found out from anyone the exact

4   nature of your medical condition that required the

5   leave?

6   A.      I do not know whether he did or not.

7   Q.      In this conversation on October 29th, was

8   Jack Dunn yelling at you?

9   A.      No, he was not yelling at me.

10  Q.      Was that an in-person or

11  on-the-telephone -- I'm sorry, I didn't ask that --

12  conversation?

13  A.      This conversation was in his office.

14  Q.      So he had not yet moved to Houston, right?

15  A.      Pardon?

16  Q.      He had not yet moved to Houston?

17  A.      "He"?

18  Q.      Yeah, Jack Dunn.

19  A.      That's correct.

20  Q.      Was anybody else present at this meeting

21  between you and Jack Dunn?

22  A.      No, this was just Jack Dunn and myself.

23          MR. LEBOWITZ:      Can we take a break

24  whenever you --

25          MS. MILLER:        Oh, sure.

PATRICIA CALLAHAN & ASSOCIATES

1          MR. LEBOWITZ:              Would now be a good

2     time?

3          MS. MILLER:              Yeah.

4          (Recess taken from 2:23 to 2:38.)

5          MS. MILLER:              Q.  Do you have any

6     reason to believe that UnumProvident shared any

7     confidential medical information with any of the

8     decision-makers for the positions that you were

9     considered for during the last four months of 2003?

10    A.      I don't have any reason to believe that

11    UnumProvident shared information with the

12    decision-makers, I think was the question.

13    Q.      Do you know if any of the decision-makers

14    for the positions that you applied for between June

15    2003 and the end of December of 2003 were aware of

16    the prior complaint that you had made about

17    Rex Mitchell?

18    A.      Can you please reread the question?

19          (Record read by the reporter as follows:

20          "Q.  Do you know if any of the

21              decision-makers for the positions that

22              you applied for between June 2003 and

23              the end of December of 2003 were

24              aware of the prior complaint that you

25              had made about Rex Mitchell?")

1    reorganizing the building that we were in to, I

2    think, enable another group to move in there.  But

3    there's plenty of office space in San Ramon.

4              So nobody told me specifically where my

5    office would be or where I would be working.  But,

6    as you know, this e-mail, you know, indicates they

7    were arranging for temporary office space in UNIX

8    access in San Ramon.

9    Q.       Right.

10             Until the end of the year, correct?

11   A.       That's what the e-mail says, yes.

12   Q.       What was the pack up?  That was the move of

13   Block 14, right?

14   A.       I mean, I assume that's what it is.  The

15   packing up of offices.

16                            (DEFENDANTS' EXHIBIT NO. 30

17                            WAS MARKED FOR IDENTIFICATION.)

18             MS. MILLER:              Q.  Do you recognize

19   Exhibit 30?

20   A.       Yes, I do.

21   Q.       In early November of 2003, you had a

22   conversation with Andy Latham about an opening for

23   a focus area manager position to be based in

24   Houston, correct?

25   A.       I had a conversation with him about a

1    position.  I'm not -- it wasn't the focus area

2    manager position.  It was a different position.  It

3    was a -- I believe it was a position on the RAM

4    team, the Reservoir Asset Management Team.

5    Q.       So you didn't speak with Andy about his

6    preference for filling this position in Houston

7    because the focus area manager will be based in

8    Houston.  You're saying it was for a different

9    position, but it worked with the focus area

10   manager; is that right?

11   A.       I believe your question was whether I

12   discussed the focus area manager position with

13   Andy.  And my response was that I had discussed I

14   believe it was the RAM team position with Andy.

15   Q.       And you asked Andy whether or not that

16   position could be based in San Ramon, but with

17   travel to Houston and international locations as

18   needed, right?

19   A.       I asked him about whether there was

20   flexibility in applying for the position with two

21   scenarios.  One would be the commitment to travel

22   extensively to Houston and international locations

23   or a temporary domestic assignment based in

24   Houston.

25   Q.       Do you know if the position that you

1    discussed with Andy was ultimately changed to be

2    based in San Ramon?

3    A.        No, I did not know that.

4    Q.        Do you know if you were considered for the

5    position?

6    A.        I didn't hear you.  I'm sorry.

7    Q.        Did you know if you were considered for the

8    position?

9    A.        Whether I was consider for the position?

10   Q.        Yes.

11   A.        I believe I was considered for the

12   position.

13   Q.        Okay.

14             Did you tell Paul Vita that you were

15   willing to be considered for the position even if

16   it was based in Houston?

17   A.        That's what this e-mail says, that I wanted

18   to find out about flexibility of being considered

19   of doing this position either based out of

20   San Ramon, traveling extensively to Houston and

21   international locations.  Because the RAM positions

22   are review teams where they travel all over the

23   world, not just -- it's not just Houston, to

24   perform their work.  And there is extensive travel

25   in those positions.  Or the option of doing this

1    position in Houston, based in Houston, moving to

2    Houston on a temporary domestic assignment.

3        Q.      What's a temporary domestic short-term

4    duration assignment?  A TDA, is that a short-term

5    domestic assignment?

6        A.      You're asking does TDA stand for --

7        Q.      Temporary domestic assignment -- or

8    temporary short-term, right?

9        A.      You're asking what are the guidelines for a

10   temporary domestic assignment?

11       Q.      What were you referring to?  Were you

12   referring to being in Houston for some point, but

13   then the job moving you back to San Ramon, correct?

14       A.      No, that's not what I was referring to.

15       Q.      Do you know if you were considered for the

16   position?

17           MR. LEBOWITZ:          Objection.  Asked and

18   answered.

19           THE WITNESS:           As I think I

20   answered, I believe I was considered for the

21   position.

22           MS. MILLER:            Q.  Do you know who

23   was selected for the position?

24       A.      I believe that I heard that George Alameda

25   was selected for the position, and he was my -- he

1    was the SASBU representative on the PE PDC for

2    SASBU for petroleum sharing position.

3    Q.    Do you know who made the decision to select

4    George Alameda?

5    A.    I don't know.

6    Q.    Do you know if anyone on the selection

7    committee spoke to Jack Dunn during the selection

8    process about you?

9    A.    I don't know whether anyone spoke to him as

10   part of the RAM selection process.

11   Q.    Do you know why George Alameda was selected

12   for the position instead of you?

13   A.    I don't know why George Alameda was

14   selected for the position.

15                          (DEFENDANTS' EXHIBIT NO. 31

16                          WAS MARKED FOR IDENTIFICATION.)

17            MS. MILLER:        Q.  Do you recognize

18   Exhibit 31?

19   A.    Yes, I do.

20   Q.    This is an e-mail that you received from

21   Jack Dunn on November 19th, 2003, correct?

22   A.    That's correct.

23   Q.    Okay.

24         And prior to receiving this e-mail, you and

25   Jack Dunn had had a phone conversation, correct?

1    A.       That's correct.

2    Q.       Okay.

3          And in that conversation, he told you that

4    you were receiving a letter from human resources

5    about the end date of your employment, correct?

6    A.       Actually, he told me that a letter had

7    already been mailed out from human resources by

8    registered mail, and he read me the contents of the

9    letter.

10   Q.       Okay.

11                    (DEFENDANTS' EXHIBIT NO. 32

12                    WAS MARKED FOR IDENTIFICATION.)

13          MS. MILLER:          Q.  Is Exhibit 32 the

14   letter that Jack read to you?

15   A.       Much of the content sounds familiar, but I

16   don't know, you know, word for word if that was the

17   exact letter that he read.

18   Q.       Did you have any discussion with

19   Taryn Shawstad about this November 18th letter

20   after you received it?

21   A.       I had a -- I replied to Taryn Shawstad with

22   the letter.

23   Q.       And you disagreed with the termination

24   of -- of the characterization of your employment

25   termination as voluntary, correct?

1    A.      Are you asking about the contents of the

2    letter that I sent to Taryn Shawstad?

3    Q.      No.

4            You disagreed with the characterization of

5    your termination as voluntary, correct?

6    A.      I disagreed with the company informing me

7    that I had voluntarily resigned from the company;

8    that's correct.

9                        (DEFENDANTS' EXHIBIT NO. 33

10                       WAS MARKED FOR IDENTIFICATION.)

11           MS. MILLER:              Q.  Is this the

12   response that you were referring to to

13   Ms. Shawstad?

14   A.      Yes, it is.

15   Q.      Okay.  I have a few questions.

16           You said you were shocked to receive your

17   letter in the mail while I was on the company

18   approved short-term disability due to medical

19   reasons associated with my own serious health

20   condition.

21           Did you think that your employment could

22   not be terminated while you were on a medical

23   leave?

24   A.       It was my understanding that FMLA and CFRA

25   were designed to protect your employment while

1    you're on medical leave.

2    Q.      But was it your understanding that you

3    could not be terminated while you were on a leave?

4    A.      It was my understanding that I could not be

5    terminated while I was on a FMLA and CFRA protected

6    leave, medical leave.

7    Q.      What offer had you received prior to

8    November 11th, 2004, to continue work in San Ramon?

9    It says, "Before I went on medical disability, I

10   was offered and accepted to continue to work

11   through 2004."  What job were you offered?

12   A.      I was offered to continue working on

13   projects and to provide decision analysis support

14   to the projects.

15   Q.      Was there a particular job, a position or a

16   title that you were offered?

17   A.      No, I wasn't offered a -- this wasn't a --

18   there wasn't a title associated with the work that

19   was described to me.

20   Q.      And I think I asked you before, you didn't

21   receive a fixed duration assignment offer from

22   anyone that would have been for a position in 2004;

23   is that right?

24   A.      That's correct.

25   Q.      Okay.

1  conversation you had with Gary Yamashita after the

2  meeting you had with Gary Yamashita, Vicki Thompson

3  and Jay Johnson.

4  A.      So you're -- can you restate that last

5  question?

6  Q.      Well, if you take a look at Exhibit 2,

7  which is your chronology, there are no notes of any

8  conversations you had with Gary Yamashita about

9  Jack Dunn; isn't that right?

10  A.      That's correct.  On this Exhibit 2, this

11  high-level date event chronology, I don't see any

12  references to conversations with Gary Yamashita

13  about Jack Dunn.

14                      (DEFENDANTS' EXHIBIT NO. 34

15                      WAS MARKED FOR IDENTIFICATION.)

16          MS. MILLER:          Q.   Do you recognize

17  Exhibit 34?

18  A.      Yes, I do.

19  Q.      This is a charge of a complaint of

20  discrimination that you filed with the Department

21  of Fair Employment and Housing on October -- that

22  you signed on December 8th, 2003.

23          Do you see that?

24  A.      This was filed on December 8th, 2003;

25  that's correct.

1    Q.        And did you sign it on or about December

2    8th, 2003, also?

3    A.        Yes, I believe so.

4    Q.        I didn't attach all of the charges of

5    discrimination, but you actually filed one against

6    ChevronTexaco Overseas Petroleum and some other

7    Chevron entities, as well as Rex Mitchell, Jack

8    Dunn and Jay Johnson, correct?

9    A.        That's correct.

10    Q.        Do you think that Rex Mitchell fired you

11    because of your -- do you think that Rex Mitchell

12    played any part in or made the decision to fire

13    you?

14            MR. LEBOWITZ:        Objection.  Compound.

15    Vague.

16            THE WITNESS:        I believe that the

17    discrimination and harassment and retaliation that

18    I suffered under Rex Mitchell was a motivating

19    factor for why I received a letter telling me that

20    I had been -- that I voluntarily resigned from the

21    company.

22            MS. MILLER:        Q.  Do you have any

23    facts that would support the claim that you

24    received that letter as a result of any conduct by

25    Rex Mitchell?

1    Q.      And in December 2003, you became aware of

2    two positions that were open for posting in ETC,

3    correct?

4    A.      That's correct.

5    Q.      Okay.

6            And you applied -- did you apply for both

7    of those positions?

8    A.      Yes, I believe I did.

9    Q.      Were the selections for either position

10   made before your employment was terminated?

11           MR. LEBOWITZ:         Objection.  Calls for

12   speculation.

13           MS. MILLER:         Q.  If you know.

14   A.      I don't know for a fact.

15           MS. MILLER:         Mark this next in

16   order.  Mark this at the same time.

17                   (DEFENDANTS' EXHIBITS NO. 36 AND 37

18                   WERE MARKED FOR IDENTIFICATION.)

19           MS. MILLER:         Q.  Do you recognize

20   Exhibits 36 and 37?

21   A.      Yes, I do.

22   Q.      Okay.

23           And at the last few weeks of December of

24   2003 you became aware of two positions in

25   Zuwa Omoregie's group; is that right?

1   A.      That's correct.   Those were the positions

2   at ETC that were discussed on Exhibit 35.

3   Q.      Right.

4           And I think I asked you before, but you

5   don't know when those positions were filled,

6   correct?

7   A.      I don't know when those positions were

8   filled.

9   Q.      Do you know if you were considered for

10  either position?

11  A.      I received a voice mail from Paul Vita in

12  late January of 2004 informing me that I was not

13  selected for either position.

14  Q.      Do you know who was selected?

15  A.      I believe that Jalal Affifi was selected

16  for one of the positions and Graham Housen was

17  selected for the other position.

18  Q.      Do you know who made the selection

19  decision?

20  A.      I don't know who made the selection

21  decision.

22  Q.      Do you know if Jack Dunn provided any input

23  to the selection team as to your performance?

24  A.      My understanding from a conversation with

25  Zuwa Omoregie was that it was standard process as

1  part of the selection committees' process to talk

2  to the supervisors of each of the people that

3  applied for the position.

4  Q.     Do you know if Jack Dunn was spoken to

5  about your application for either of those

6  positions?

7  A.     I don't know for a fact whether he was

8  spoken to about these applications.  But, as I said

9  before, Zuwa had indicated that it was standard

10  practice for them to talk to the supervisors.

11  Q.     Do you know if Rex Mitchell provided any

12  assessment of your performance to the selection

13  team for either of these two positions?

14  A.     I don't know.

15  Q.     Do you know why Jalal Affifi and

16  Graham Housen were selected for the positions?

17  A.     No, I don't know.

18  Q.     Do you know if they were more qualified

19  than -- let me rephrase it.

20        Do you believe they were less qualified

21  than you for either of the two positions in

22  question?

23  A.     Yes, I believe they were less qualified

24  than me.

25  Q.     What were the qualifications for the

1    that I believed I was more qualified for those

2    positions.

3    Q.    Did either individual have a background in

4    evaluating new opportunities?

5    A.    I don't know whether either individual had

6    a very significant background in evaluating new

7    opportunities.

8    Q.    Did you have a discussion with

9    Zuwa Omoregie at any time after the selection for

10    these two positions were made?

11    A.    Yes.

12    Q.    When?

13    A.    I've had multiple conversations with Zuwa.

14    I had some conversations with Zuwa at a research

15    workshop at Stanford in May of 2005.  And I had at

16    least one telephone conversation with Zuwa around

17    that time period.

18    Q.    Did you have a conversation with him in

19    early 2004 as to why you were not selected for

20    either position?

21    A.    No, I don't believe so.

22    Q.    Did he ever tell you why you were not

23    selected for either position?

24    A.    No, I don't believe so.

25    Q.    Did he ever say anything to you that led

1   you to believe that either Jack Dunn or

2   Rex Mitchell somehow influenced the selection team

3   during that process?

4   A.      Yes, I did.

5   Q.      When was that conversation?

6   A.      I believe it was around the May or June

7   2005 time frame.

8   Q.      So more than a year after the selection

9   process; is that right?  I just want to make sure

10  we're on the right year.

11  A.      2005; that's correct.

12  Q.      What did Zuwa say to you that led you to

13  believe that either Rex Mitchell or Jack Dunn

14  somehow influenced the selection team against your

15  detriment?

16  A.      I had a discussion with Zuwa about the job

17  selection process and he indicated that he had been

18  contacted by Chevron legal and that he could not

19  discuss it in detail.  And I asked him about not

20  the details but what's the standard practice as

21  part of the job selection process.  And he

22  described part of that standard practice as

23  including discussions with the candidates'

24  supervisors as input to the job selection process.

25  Q.      And based upon that, you reached the

1  conclusion that Rex Mitchell and Jack Dunn had

2  provided input to the selection team; is that

3  right?

4  A.    Based on what Zuwa said, that it was

5  standard practice to talk to the employee's

6  supervisor, I reached the conclusion that it would

7  have been standard practice for him to talk to

8  Jack Dunn; however, at that time, Rex Mitchell was

9  not my supervisor.

10 Q.    Did Zuwa Omoregie ever tell you or indicate

11 in any way that Jack Dunn had provided an

12 unfavorable reference to you during this selection

13 process?

14 A.    No.  As I stated, Zuwa indicated that

15 Chevron legal had contacted him and he could not

16 discuss the specifics or details of the selection

17 process.

18 Q.    How long were you on disability in 2004?

19     MR. LEBOWITZ:        Objection.  Vague.

20     MS. MILLER:        Q.  Your doctor's

21 note indicated that you would be out of work until

22 May '04.

23     Is that when you were able to return to

24 work, or did it last a shorter duration or longer?

25     MR. LEBOWITZ:        Objection.  Vague.

PATRICIA CALLAHAN & ASSOCIATES

1          THE WITNESS:           I believe the date

2     that the disability benefits terminated was around

3     middle of May of 2004.  However, there were

4     complications to my medical treatment and recovery

5     as a result of the stress that this whole situation

6     with Jack Dunn and the wrongful termination put me

7     through.  And if it hadn't been for that, I would

8     have been able to return to work earlier.

9          MS. MILLER:           Q.  When did these

10    complications end that then allowed you to return

11    to work or be able to work?

12    A.     I was able to -- as I said, my disability

13    ended in around the middle of May of 2004.

14    Q.     Okay.

15          But it says there were complications as a

16    result of the stress due to the situation.

17          Did those complications result in your

18    being unable to work after the middle of May 2004?

19    In other words, was your disability extended as a

20    result of these complications?

21          MR. LEBOWITZ:           Objection.  Vague.

22          THE WITNESS:           I don't understand

23    exactly what you're asking, please.

24          MS. MILLER:           Q.  Well, you say

25    your disability benefits ended mid May of 2004.

1          At that point in time, were you able to

2    return to work?

3    A.      Yes.

4    Q.      Okay.

5          So the complications as a result of the

6    stress due to the situation, that's not something

7    that happened after May of 2004, correct?

8    A.      The complications in terms of my treatment

9    and recovery related to my medical problem didn't

10   occur after May of 2004.

11   Q.      Okay.

12   A.      I'm not sure exactly what you're asking

13   again.

14   Q.      In November, your doctor estimates that you

15   would not be able to return to work until May of

16   2004.

17          MR. LEBOWITZ:          Objection.  Assumes

18   facts.

19          MS. MILLER:          Let's mark this next

20   in order.

21                      (DEFENDANTS' EXHIBIT NO. 38

22                      WAS MARKED FOR IDENTIFICATION.)

23          MS. MILLER:          Q.  Have you seen

24   Exhibit 38 before today?

25   A.      Yes, I have.

PATRICIA CALLAHAN & ASSOCIATES

1    Q.        Okay.

2            This was a form that was filled out for

3    UnumProvident in November of 2003, correct?

4    A.        That's correct.

5    Q.        You see where it says -- in the middle,

6    under "other conditions," it says, "Has patient

7    been released to work in his/her own occupation?

8    No.  In any occupation?  No.  If not, when should

9    the patient be able to return to work.  May 2004."

10            Do you see that?

11   A.        I'm looking for it.

12            MR. LEBOWITZ:          It's here.

13            THE WITNESS:          Okay.

14            Yes, I do see that.

15            MS. MILLER:          Okay.

16   Q.        So going back to my initial question where

17   you said there were complications as a result of

18   the stress due to the situation, your doctor in

19   November anticipates that you're going to be unable

20   to work until May of 2004.

21            The question was, did these complications

22   prolong your return to work to a date after May of

23   2004?

24            MR. LEBOWITZ:          Objection.  Asked and

25   answered.

1          THE WITNESS:          The complications

2    prolonged my ability to return to work in May of

3    2004 and before that as well.

4          MS. MILLER:          Okay.

5    Q.    So when were you able to return to work?

6    A.    My disability benefits ended in middle of

7    May of 2004.

8    Q.    Okay.

9          At that point in time, were you able to

10   return to work?  Well, were you released at that

11   point from your doctor to return to work?

12   A.    I was able to return to work around mid May

13   of 2004.

14   Q.    Okay.

15         Did you register with any headhunters or

16   employment search firms to try to find employment

17   at any time after May of 2004?

18   A.    Yes, I did.

19   Q.    With what firms or entities did you

20   register with?

21   A.    I registered with several different

22   entities.  I also registered with the State of

23   California entity, the service.

24   Q.    What I was asking -- I know you registered

25   with several different entities.

<u>CERTIFICATE</u>

1

2      I, the undersigned, a Certified Shorthand

3  Reporter, State of California, hereby certify that

4  the witness in the foregoing deposition was by me

5  first duly sworn to testify to the truth, the whole

6  truth, and nothing but the truth in the

7  within-entitled cause; that said deposition was

8  taken at the time and place therein stated; that

9  the testimony of said witness was reported by me, a

10  disinterested person, and was thereafter

11  transcribed under my direction into typewriting;

12  that the foregoing is a full, complete and true

13  record of said testimony; and that the witness was

14  given an opportunity to read and, if necessary,

15  correct said deposition and to subscribe the same.

16      I further certify that I am not of counsel

17  or attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any

19  way interested in the outcome of the cause named in

20  said caption.

21      Executed this 5th day of April, 2006.

22

23      _Larelle M. Fagundes_

24      LARELLE M. FAGUNDES, CSR 9762

25

PATRICIA CALLAHAN & ASSOCIATES

**From:** Pande, Kiran (Kiran.Pande) [IMCEAEX-_O=CHEVRON_OU=MSSITE01_CN=RECIPIENTS_CN=KKPA@mssite01.ion.chevron.com]

**Sent:** Wednesday, December 04, 2002 11:06 AM

**To:** Hartshorn, Kelly (KGHA)

**Subject:** RE: Kiran K. Pande - CTOP JOB OFFER

Kelly,
Thanks for your note. I just dropped off my acceptance of the offer to Brian Smith.
I appreciate all your efforts around this (and your good humor and patience) in helping enable the option of applying for the Corp job and managing the interface with the various stakeholders. I think you did a marvelous job. Kemal and I have talked about this several times and we both realize that we have been indeed fortunate to have you as our PDR. I would come work for you in a heartbeat, if the opportunity ever arose!

Please don't worry about the handling of telling me the outcome of the Corp job and proceeding with the PE offer. I thought you handled it just fine and appreciate the expediency in moving forward.

Your opinion of the SASBU job and in particular your high personal recommendation on working with Jack were important factors in my decision. I have a lot of respect for your opinion and your integrity, so I am sure this will work out just fine. I also know that I will be able to make some good contributions and hopefully help this company create some more value and improve our competitiveness.

I hope you have a good trip back. I'll touch base with you when you are back in the office.
Kiran

P.s. I too was surprised I didn't make the short-short-short list ... but if Kemal and I didn't make the list ... it means they can't go wrong with whoever they choose for the job ... because the remaining candidates must be really terrific.

-----Original Message-----
**From:** Hartshorn, Kelly (KGHA)
**Sent:** Tuesday, December 03, 2002 5:17 PM
**To:** Pande, Kiran (Kiran.Pande)
**Subject:** RE: Kiran K. Pande - CTOP JOB OFFER

Thanks Kiran – yes, I actually changed the offer date on your offer letter to match what you had suggested on the phone message, so the Dec 9th date is the final one. Brian had suggested the 16th originally just because we are already at the 3rd... but no need to wait, and I agree it will be nice to be "in the job" at least a week or more before heading out for vacations etc. So hopefully that works out for all involved. Brian has concurred with the Dec 9th date as well.

I'll talk to you more about the planning job when I get back if we don't catch up via phone. Des had said he planned to contact you about it, but I guess he hasn't done that yet. I don't think he had asked Rex to say anything, I just didn't know whether or not he had been in touch with Des... so likely you will get contacted officially by Des (I am surprised he hasn't done so already, but they do seem to be AWFULLY slow about getting around to these things!). From what he told me, you had made the short list (obviously from the interview), but then post-interviews, they had narrowed it down further, and you were not on their final short-short-short list. I probably should have confirmed that Des had officially notified you of their decision, but it is tough to keep it all straight from a few thousand miles away – apologies if it worked a little less smoothly than it should have. In any case, since we had been stringing the SASBU group along for such a long time, I felt it was necessary to push forward on that front.

EXHIBIT 14

Pande 3-22-06

CHEVRON/PANDE03715

Good luck with the job – I truly believe it will be a good opportunity for you to further solidify a very strong
reputation – and I know you'll be a key support to a very important asset for CVX. Let me know how things are
going once you have settled into the job...

Talk to you soon.
Kelly

**Kelly G. Hartshorn**
Opportunity Assessment
ChevronTexaco Overseas Petroleum
Tel.   (925) 842-0513
Fax   (925) 842-0580
email  kgha@chevrontexaco.com

-----Original Message-----
**From:** Pande, Kiran (Kiran.Pande)
**Sent:** Tuesday, December 03, 2002 2:25 PM
**To:** Hartshorn, Kelly (KGHA)
**Subject:** RE: Kiran K. Pande - CTOP JOB OFFER

Kelly,
I appreciate your letting me know the outcome of the Corp Planning job - it's nice to have that process finally
concluded.

I did want to clarify the start date with you (it says Dec 9th on the offer letter) and that is also my preference (since
I will be doing a walkthrough on my house on Dec 16th and then doing my move-in (ugggh! - unpacking all those
boxes) - and I plan to take some vacation around Christmas. On your phone message you had mentioned Dec
16th as a start date. Can we clarify that the start date will be Dec 9th (as per the offer letter)?

Kiran

-----Original Message-----
**From:** Hartshorn, Kelly (KGHA)
**Sent:** Tuesday, December 03, 2002 2:17 PM
**To:** Pande, Kiran (Kiran.Pande)
**Cc:** Dunn, Jack (JFDU); Alameda, George (GAlameda); Olson, Debi (CATT); Smith, Brian (SMIB); Mitchell, Rex (RJMI)
**Subject:** FW: Kiran K. Pande - CTOP JOB OFFER

Kiran:

I had hoped to extend this offer to you in person, but unfortunately travel schedules got in the way. In any case,
congratulations on your selection for the Angola Block 14 job -- I know it will be a good opportunity for you!

As indicated, please sign the offer letter and fax to the telephone number at the bottom of the form. I'd appreciate
a short note of confirmation once you have faxed it over. If you have any questions on details of the offer, please
leave me a voice mail, or contact Brian Smith or Debi Olson.

Good Luck!
Kelly

**Kelly G. Hartshorn**
Opportunity Assessment
ChevronTexaco Overseas Petroleum

Tel.    (925) 842-0513
Fax    (925) 842-0580
email  kgha@chevrontexaco.com

-----Original Message-----
**From:** Smith, Brian (SMIB)
**Sent:** Thursday, October 10, 2002 12:45 PM
**To:** Hartshorn, Kelly (KGHA)
**Cc:** Dunn, Jack (JFDU); Alameda, George (GAlameda); Olson, Debi (CATT); Smith, Brian (SMIB)
**Subject:** FW: Kiran K. Pande - CTOP JOB OFFER

Kelly here is Kiran's job offer please advise when she receives it

**Brian Smith**
**CTOP PE Sponsor**
**842 1116**
**cell number if urgent 895 3695**


<< File: Pande_K_K_FDA_Nov 2002.doc >>

## Unknown

| | |
|---|---|
| **From:** | Dejong, Guadalupe (LDejong) |
| **Sent:** | Tuesday, May 13, 2003 4:24 PM |
| **To:** | Unser, Sharon (SLUN); Hobbet, Randall D (RHobbet); Vieira, Otilia [Sonangol]; Abbott, Barry (bjabbott); Benjamin Sloan; Bill Wood; Bob Burkes; Bob Scamman; Bradley, Arthur (AABR); C Burnside; Carpenter, Danielle L; Charles Mchugh; Charles Smith; Chris Turner; Correira, Maria A. (mcbj); Dale Beeson; David Dalley; David Mckay; Devarnonie Naidoo; Doug Goff; Edwin Saa; Erik Davidsen; Fernando Gaggino; Feroci, Marina (Marina.Feroci); Gordon Seto; Graham Housen; Green, Walter (VerneyGreen); Jack Dunn; Jalal Afifi; Janet Murphy; Jennifer Ferrari; Jim Frank; Jim Wadowsky; Joey Legaspi; John Fryters; John Moore; Joseph Ponthier; Joy Roth; Justin Mbala; Kathleen Mabe; Ken Knutson; Koches, Robert (ROKO); Larry Littlefield; Lupe Dejong; Mark Dando; Mark Moon; Martins, Carlos [Sonangol]; McKay, Peggy (pacl); Michael Clark; Mpanzu, Antonio (NMPN); Murray, Gordon (Gordon.Murray) (Gordon.Murray); Natalie Talbert; NEWMAN, VICKI (VickiNewman); Pande, Kiran (Kiran.Pande); Pete Chimney; Peter Brown; Phalanger, Jinghan (JPhalanger); Randy Dahlman; Rassi, Claudia [clrs]; Rick Davis; Ricky Lamb; Robert Minck; Robinson, Adrian J (Adrian.Robinson); Rogerio Marite; Salomao, Augusto (GSLM); Sanae Kelly; Scharnell, Rob (RobScharnell); Severson, Roger (RHSE); Stephen Vasicek; Stephen Zalan; Steve Newton; Sundar Sundararaman; Susan Hennigh; Tayo Feyijimi; Teresa Stevens; Thomas Humphrey; Tim Winter; Tom Millette; Unser, Sharon (SLUN); Van-Deste, Ricardo (RicardoVan-Deste) (RicardoVan-Deste); Vieira, Felisberto [Sonangol] |
| **Cc:** | Young, Fiona (fyou); Cornelius, Sandy (sanc); Nelson, Kenneth (kjnelson); Breunig, Peter A. (peter.breunig); Krolow, Mark (MRKR); Puckett, Mark (MarkPuckett); Kirkland, George (glkirkland); Shawstad, Taryn (tary); Allison, Michael (MJAL); Lifa, Jonathan (JLIFA); Magner, Tim (TMagner); Major, Ana F; Mitro, Tom (TMMI); Paiva, Fernando (FPAI); Partridge, Ian (IPAR); Rana, Daniel (DPRA); Scharnell, Rob (RobScharnell); Shreder, Lisa A; Simpson, Steve R (stsi); Faria, Sandra (SNFR); Bielitz, Susan M; Marron, Julissa (jlss) (JulissaMarron) |
| **Subject:** | SASBU San Ramon Relocation to Houston |

SASBU Employees,

As many of you are aware, we have been looking at options for consolidating the SASBU's U.S. based organization in one location for some time. The decision has now been made to relocate SASBU's San Ramon organization to Houston. We are actively working with Human Resources and the Sponsor's groups to finalize the move and PDC policies. We intend to hold a town hall in San Ramon on May 22nd to discuss the move and related issues with employees. We are setting up a number of support mechanisms for the move including a common email site for questions that can be answered by managers, Human Resources, and the PDR's to address employee questions.

I understand the anxiety and uncertainty that changes like this create for those employees and their families who are affected. We will endeavour to provide information to you just as quickly as we can. In the meantime, I appreciate your patience, and all of your efforts to keep our many projects progressing with a minimum of disruption. Most importantly, in circumstances such as this it is critical that all of us maintain our focus on working safely and incident free. Thanks.

John Gass



EXHIBIT 16
Pande 3-22-06

1

1208

## SASBU Houston Relocation Communication Timeline

| | |
|---|---|
| John Gass email communication to employees advising of move | 13 May |
| Employee communication to include:<br>➢ Date, Time & Location of Town Hall | 20 May |
| Town Hall<br><br>Information to be provided at Town Hall:<br>➢ "Welcome to Houston" Relocation Information<br>➢ SASBU Houston Move Web Site Address<br>➢ SASBU Houston Move FAQ's Email Address | 22 May |
| Employee communication to include:<br>➢ List of important dates<br>➢ Overview of offer to move process<br>➢ Reminder and location of dedicated SASBU Houston Move email<br>➢ Invite and details of Houston Relocation Q & A's Brown Bag session | 23 May |
| Employee communication to include:<br>➢ List of important dates<br>➢ Overview of offer to move process<br>➢ Reminder and location of dedicated SASBU Houston Move email and website<br>➢ Invite and details of Houston Relocation Q & A's Brown Bag session | 28 May |
| Offers to Move extended to employees | 2 June |
| Surplus Notification forwarded to employees not receiving an offer | 2 June |
| Brown Bag – Houston Relocation Q & A's<br>➢ Employees & Spouses | 4 June |
| Employee communication to include:<br>➢ Reminder that offer acceptances/declines due on 9 June | 5 June |
| Offer acceptances/declines due | 9 June |
| Employee communication to include:<br>➢ Information on Phase 1 Group Move | 15 July |
| Employee communication to include:<br>➢ Information on Phase 2 Group Move | 15 December |

May 20, 2003                                   1



728

# Houston Move

## May 22, 2003



EXHIBIT 4
18
Pande 3-22-06

736

# Agenda

- Rationale for move
- Planning/Logistics/Timeline
- Move policy

2

737

# Business Case for Move

- **Consolidated workforce in Houston**
  - Increased interaction between VC, MCP and RM within SASBU
  - Larger staff pool to draw from and easier to move people between projects and BU's
  - Co-location with the above and other major CTOP groups for best practice sharing/lessons learned
  - Significant decrease in flying between San Ramon and Houston lowers costs and increases productive work hours
  - Decreases complexity of SASBU by one work location

- **Two time zones and one plane flight closer to Luanda**
  - Increased and easier interaction with management, technical staff and partners in Luanda
  - Increased utilization of Houston Express, lower cost airfares and less overall travel time

- **Move Pay Out in 2-3 years**

738

3

# Key Activities

- Final move approval & Announcement
- Alternative selected for Houston Offices
  - Bellaire Annex 2 & 5
  - Will optimize all SASBU space in BAX and BOB to the extent possible to maximize team dynamics
- May 5th - Met with CTOP HR/PDC's, EPTC & UTC
- HR/Sponsor's finalizing move policy and PDC processes
- May 22nd – Townhall Meeting with employees - EPTC and UTC doing same
- Formally communicated to Sonangol
- Developing final terms/approvals for offers and issue
- Refine move details and implement

# Move Plans

- Move in 2 Stages

    - Block 0 VC report on August 1

    - Block 14 & Congo/DRC report on January 1

- Simultaneous job relocation offers to SASBU EE's

    - Offers week of June 2nd

    - 7 day acceptance window

    - EPTC/UTC to assess who needs to move to support SASBU

- Utilize full-time SASBU Move Coor. (Mike Wischmeyer), HR support person
  (Shirley Wampler from CABGOC) & Relocation Company Move Coor.
  (SIRVA)

740

5

# SASBU Move Timeline

| | Target Date | Jan '03 | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan '04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Frame/Evaluate Move Opportunity** | | | | | | | | | | | | | | |
| - Develop Houston Options | | █ | █ | █ | | | | | | | | | | |
| - Assess economic impact | | █ | █ | █ | █ | | | | | | | | | |
| - Select best option | | | | | █ | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **Develop/Communicate Move Plan** | | | | | | | | | | | | | | |
| - SASBU Framing Session | | | | | | █ | | | | | | | | |
| - SASBU Move Approved | May 13 | | | | | █ | | | | | | | | |
| - Communicate Status to EE's | May 13 | | | | | █ | | | | | | | | |
| - Townhall Meeting | May 22 | | | | | █ | | | | | | | | |
| - Dedicated SASBU HR Person in SR | May 15 | | | | | █ | █ | | | | | | | |
| - Dedicated SASBU Move Coor on board | May 13 | | | | | █ | █ | █ | █ | █ | █ | █ | █ | |
| - Generate Relocation Offer Pkg's | | | | | | █ | | | | | | | | |
| - Make offers | June 2 | | | | | █ | █ | | | | | | | |
| - Responses Due | June 9 | | | | | | █ | | | | | | | |
| - Finalize BAX 2 Plans | May 31 | | | | | █ | █ | | | | | | | |
| - Finalize BAX 5 Plans | June 30 | | | | | █ | █ | | | | | | | |
| | | | | | | | | | | | | | | |
| **BAX Modifications** | | | | | | | | | | | | | | |
| - BAX 2 | Jul 31 | | | | | | █ | █ | | | | | | |
| - BAX 5 | Dec 15 | | | | | | █ | █ | █ | █ | █ | █ | █ | |
| | | | | | | | | | | | | | | |
| **July/August Moves** | Aug 1 | | | | | | | █ | █ | | | | | |
| | | | | | | | | | | | | | | |
| **Dec/January Moves** | Jan 1 | | | | | | | | | | | | █ | █ |

741

6

# Timeline – Major Highlights

- Week commencing June 2 – Offer to move extended to SASBU employees

- Week commencing June 9 – Acceptances/Declines Due

- Week commencing August 1 – Block 0 start work in Houston

- Week commencing January 1 – Block 14, Congo & DRC start work in Houston

7

# Offer to Move Process

- Positions being relocated to Houston "As Is"

- No positions will be opened

- No selection process will be necessary

- Offers generated by Sponsor group and extended by your supervisor

- All offers to be extended at the same time

- Employees will have one week to accept/decline the offer to move

- Failure to return the "Offer to Move" within the time frame means decline of offer.

743

8

# If Offer Declined

- SASBU values and appreciates its employees and the skill sets they bring to the job
- It is the SASBU's desire that each of you will accept the offer to relocate to Houston
- For those employees who decline the offer, their Sponsor will work with them to find alternative employment
  - For US $ employees, if no alternative employment can be found, employees may be eligible for a separation payment under the surplus employee program in place and will be advised of their eligibility at the time of termination
  - For expatriate employees, if no alternative employment can be found, employees will be repatriated to their home country, and may become eligible for severance under any plan in effect for their payroll if no alternative employment can be found for them

744

9

# Relocation

## US Dollar Employees

- Eligible for the appropriate US Domestic Relocation Program Benefits

- Participation in the Home Selling and Home Finding portion of the Relocation Program is mandatory to receive certain relocation benefits

- **Important** – You must submit the GO-1394 (Relocation Enrollment Form) prior to initiating any move related expenses

- Each employee will be assigned an Relocation Counselor to assist them with all aspects of their move, e.g., expense reimbursement, questions, information on Houston, policy interpretation/clarification, etc.

745

10

# Relocation

## Expatriate Employees

- Eligible for Expatriate Relocation Program Benefits
- Must submit a GO-1405 (Request for Movement of Household Goods & Personal Effects) prior to initiating any move related expenses
- Each employee will work with the HR Expatriate Counselor to assist them with all aspects of their move, e.g., expense reimbursement, questions, information on Houston, policy interpretation/clarification, etc.

746

11

# Resources

- *Name of website to be announced* – For information on Houston, FAQ's, Contact Names and Numbers, Relocation Policy, etc.

- SASBUHM@ChevronTexaco.com - Dedicated email address to send general questions related to this move.

- http://hr.chevrontexaco.com/northamerica/us/programs-policies/relocation/ - For information on the US $ Relocation Policy

- US $ Relocation Policy Administrator - SIRVA
  - Andrew Horvath, 1-800-531-3840, ext. 5273, andrew.horvath@sirva.com

- For information on the Relocation Policy for Expatriates, contact one of the following HR Expatriate Counselors:
  Expatriate Counselors –
  - San Ramon - Paula Perez, CTN 842-3170, plar@chevrontexaco.com
  - Houston - Debby Konvicka, CTN 752-3974, DKonvicka@chevrontexaco.com

- To Update your Medical & Dental Benefits contact the:
  - HR Service Center – 1-888-TALK2HR or
  - HR Benefits Connection Website – https://www2.benefitsweb.com/chevrontexaco.html

- EAP – 1-800-860-8205

12

ChevronTexaco Overseas Petroleum
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324
P.O. Box 6046
San Ramon, CA 94583-0746

Mark A. Dando
Value Creation Manager
Block 0 New Ventures
Tel 925-842-3780
Fax 925-842-2836
dmaa@chevrontexaco.com

June 2, 2003

# ChevronTexaco

**Subject:  SASBU Houston Relocation Offer**

Dear Kiran:

I am pleased to extend the attached offer to relocate to Houston.

As you know, the decision was made to consolidate the SASBU's U.S. based organization in Houston, Texas. We believe that this consolidation will promote greater interaction between the Value Creation, Major Capital Projects and Reservoir Management teams; increase the benefits resulting from co-location with other CTOP SBU's; and decrease the costs associated with travel, working in multiple time zones and associated down time.

The SASBU values and appreciates the diverse skill sets that our employees bring to the job. We realize that any time of change is unsettling, but we are excited about the opportunities afforded by this move and hope that each one of you will accept the offer to relocate to Houston.

Please return the signed FDA to the fax number indicated on it within seven (7) days of receipt indicating that you accept or decline the offer. Please remember that failure to return the signed FDA within the seven day time frame period will indicate a non-acceptance. For any questions concerning this offer, please refer to your supervisor.

Sincerely,

Mark Dando

cc:     J. F. Dunn

Attachments





726

**ChevronTexaco**
CTOP

## Fixed Duration Assignment Offer

| | | |
|---|---|---|
| To: | Kiran K. Pande | SAP #  00010769 |
| Point of Origin: | San Ramon, CA | |

Contingent upon work/residence permit clearances (where required) and upon Company medical clearance, you are offered the following Fixed Duration Assignment pursuant to a request from the Host Organization:

| | | | |
|---|---|---|---|
| Job Title | Petroleum Engineer Block 14 | Location | Houston, USA |
| Salary Grade | 24 | Base Salary  US $111,600  *Per Year* | Comp. Obj.  99.02%  *Per Year* |

Host Organization/SBU/Function/Type     CTOP / S. Africa / PE / Reservoir Simulation

Anticipated Assignment Start Date   January 1, 2004     Assignment Type   Dom     and Length   3 years

| | Name | E-Mail | Phone No. | Fax No. | Intercompany Location |
|---|---|---|---|---|---|
| Sponsor | B. A. Smith | smib | 842-1116 | (732) 352-6753 | B1224/ChvPrk |
| Supervisor(s) | J. F. Dunn | JFDU | 842-1940 | (925) 842-0125 | C2160/ChvPrk |
| Int'l Upstream PDR(s) | G. K. Alameda | GKAL | 345-1101 | | Luanda, Angola |
| HR Counselor | F. M. Young | fyou | 842-1840 | | Chvpk B1000 |

The attached details cover the compensation, relocation and other policies and programs that currently apply to this position and location. Though the Company expects that your assignment will continue as described, unforeseen circumstances or a change in business conditions or policies and programs may result in a modification of the assignment or its duration in accordance with the services agreement between the Company and the Host Organization.

In cooperation with your Home Organization management, you and the Sponsor assigned to you are responsible for monitoring the progress of your assignment and coordinating the development of a next assignment. You should contact your Sponsor at any time to discuss issues relating to your assignment and career. It is particularly important that you make your Sponsor aware of any personal circumstances that may have an effect on this or your next assignment.

You should advise your HR Counselor of your departure date (date you board the plane to start your assignment), since that becomes your actual assignment effective date and begins your over-base allowance and premium.

Signed: _____     Date:  May 28, 2003     *A. Cornelius*
            For and on behalf of ChevronTexaco Overseas Petroleum                                    VP & Head Sponsor - CTOP

I accept this assignment.

Signed: _____     Date: _____
                        Employee

I do not accept this assignment. I understand that the Company might not place me in another assignment and that I may be subject to termination of employment. My eligibility for severance benefits shall be determined by the provisions of any applicable published severance program that may be in effect.

Signed: _____     Date: _____
                        Employee

The completed form should be faxed to Sponsor Group at (732) 352-6753, within one week of receiving this offer.

Special Instructions:

727

ChevronTexaco Overseas Petroleum  Tarya Shawstad
6001 Bollinger Canyon Road  General Manager
San Ramon, CA 94583-2324  Human Resources
P.O. Box 6046
San Ramon, CA 94583-0746
Tel 925 842 1391
Fax 925 842 1300
tary@chevrontexaco.com

# ChevronTexaco

November 18, 2003

Kiran K. Pande
7195 Lamar Loop
Castro Valley, CA 94552

Subject: Voluntary Termination

Kiran:

On June 2, 2003 you received a letter offering you continued employment with ChevronTexaco Overseas Petroleum in Houston, Texas. You did not accept this offer and by turning down this job, you have, in effect, resigned from the company. Based on your voluntary resignation you are not eligible for a severance package, redeployment or outplacement services.

At the time you chose not accept the relocation offer you were informed that as long as there was useful work for you, that your employment with the company could continue until year end 2003. As you know, the SABU Block 14 New Field Development group will officially relocate to Houston effective December 12. With the move of your current work unit, continued useful work will no longer be available for you within CTOP. If you are not selected for another ChevronTexaco position, your last day of employment will be Wednesday, December 31, 2003. You will be paid out for any unused 2003 vacation. Please contact the HR Service Center at 1 888-TALK2HR (1-888-825-5247) to obtain your benefits paperwork.

Sincerely,

*T.L. Shawstad*

T.L. Shawstad

EXHIBIT LF
32
Pande 3-22-06

1201

7195 Lamar Loop
Castro Valley, CA 94552

December 8, 2003
In regards to: "Voluntary Termination Letter, Dated 11-18-03"

Ms. Taryn L. Shawstad
General Manager, Human Resources
ChevronTexaco Overseas Petroleum
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324



Subject: Unlawful Termination

Dear Ms. Shawstad:

This letter is in response to the contents and claims of ChevronTexaco's letter titled
"Voluntary Termination" dated November 18, 2003 (attachment 1). I was shocked to
receive your letter in the mail on November 22, 2003 while I am on a company approved
short term disability due to medical reasons associated with my own serious health
condition. As you are aware, UnumProvident, the administrator of ChevronTexaco's
Disability Management Program, issued a letter on November 18, 2003 informing me and
the company that my absence from my employment due to medical reasons is eligible for
protection under FMLA and CFRA and my disability date was determined to be
November 10, 2003.

Your letter states ChevronTexaco's claim that I have voluntarily resigned from the
company. I would like to state unequivocally that I have never offered "Voluntary
Resignation" from ChevronTexaco as you contend in your letter. I have not voluntarily
resigned from ChevronTexaco nor have I agreed to a voluntary termination as your letter
contends. Furthermore, the following statement is false:

> "At the time you chose not accept the relocation offer you were informed that as
> long as there was useful work for you, that your employment with the company
> could continue until year end 2003."

Before I went on medical disability, I was offered and accepted to continue to work
through 2004. It is my present intention to complete that assignment when I return to
work from disability.

I believe that this statement that I have "voluntarily terminated" my employment is yet
another instance of unlawful conduct by ChevronTexaco commencing with the gender
and racial discrimination and harassment perpetrated by Mr. Rex Mitchell when I was in
his group. ChevronTexaco's attitude towards these issues, at least as to me, was
demonstrated by its failure to investigate Mr. Mitchell's conduct when I complained of it
and, more telling, the instruction to me that I could either leave the company, leave the

802

group, or live with Mr. Mitchell. My repeated complaints about on-going retaliation were met with similar instructions. As a result of Mr. Mitchell's conduct and my complaint I received an unfair performance evaluation and salary treatment, I was denied a promotion that was promised to me, I was repeatedly slandered, denied a merit component in my salary treatment in April of this year, and then I was transferred to Mr. John Dunn's group that was destined for Houston.

Since I have been in Mr. John Dunn's group, and especially since I disclosed my need for a leave due to medical reasons I have been subjected to harassing conduct. Other employees have not only witnessed this conduct, but they have complained to Mr. Dunn and CTOP management about it. Notwithstanding, the unlawful conduct towards me continues, as demonstrated by this termination letter. As noted above, before I knew that I would need a leave for medical reasons I was offered, and I accepted, work through 2004 in San Ramon. According to the information ChevronTexaco promulgated, because I did not agree to relocate to Houston I was eligible for this work. Now ChevronTexaco contends that I have voluntarily terminated my employment. The only change that is apparent is my need for medical leave and the reporting of Mr. John Dunn's harassing conduct to CTOP management.

As I approach my 15 year service anniversary with ChevronTexaco on December 19, 2003, I am completely shocked that ChevronTexaco would choose to unlawfully terminate me in this manner while I am on a company approved disability leave and contending with my own serious illness. If under these circumstances the STEPS process is applicable, then I request it be implemented.

Sincerely,

*Kiran K. Pande*

Kiran K. Pande

Attachment 1: ChevronTexaco Letter from Taryn Shawstad, General Manager – Human Resources, CTOP, Titled "Voluntary Termination", Dated 11-18-03

---

cc:   Mr. Peter Robertson, Vice-Chairman
      Mr. George Kirkland, Corporate Vice-President and
                President ChevronTexaco Overseas Petroleum Inc. (CTOP)
      Mr. James Blackwell, Managing Director, Southern Africa Business Unit, CTOP

**803**