**EXHIBIT B**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

KIRAN PANDE,                          )
                                      )
            Plaintiff,                )
                                      )
       vs.                            ) Case No. 04-5107 CW
                                      )
CHEVRON CORPORATION(f/k/a    )
Chevron Texaco Corporation/, a)
Delaware corporation, et al., )
                                      )
            Defendants.               )
_____ )


DEPOSITION OF ZUWA OMOREGIE

Thursday, April 6, 2006


CERTIFIED COPY


REPORTED BY: DENISE A. FORD, CSR 7525 (380011)


LEGALINK
A WORDWAVE COMPANY

LegaLink San Francisco          tel (415) 357-4300    www.legalink.com
575 Market Street, 11th Floor   tel (800) 869-9132
San Francisco, CA 94105         fax (415) 357-4901

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

ZUWA OMOREGIE  April 6, 2006

1

2

3                                --oOo--

4          BE IT REMEMBERED that pursuant to Notice and on

5    Thursday, April 6, 2006 commencing at 2:00 p.m. thereof,

6    at the Law Offices of McGUINN, HILLSMAN & PALEFSKY, 535

7    Pacific Avenue, San Francisco, California 94133, before

8    me, Denise A. Ford, a Certified Shorthand Reporter,

9    personally appeared

10                        ZUWA OMOREGIE

11   called as a witness herein, who, having been first duly

12   sworn, was examined and testified as follows:

13                              --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

                                                              4

ZUWA OMOREGIE  April 6, 2006

1    of questioning.

2            You can answer.

3                THE WITNESS:   Yes.

4                MR. LEBOWITZ:   Q.   And when did you speak

5    with Mr. Dunn about Kiran Pande's application?

6            A.    Sometime before the selection meeting, so

7    late 2003.

8            Q.    Did you speak with Mr. Dunn in person or

9    on the phone?

10           A.    In person.

11           Q.    Where did you meet with him?

12           A.    In his office.

13           Q.    And how long did you speak about Ms. Pande

14   with Mr. Dunn?

15           A.    I don't recall.

16           Q.    Was it an hour?

17           A.    I don't recall.

18           Q.    You don't have any recollection?

19           A.    No.

20           Q.    And what did Mr. Dunn say about Ms. Pande?

21           A.    Just overall feedback on her.

22           Q.    I would like you to be as specific as

23   possible and to whatever extent your memory has of the

24   conversation, just relate to me what it is that Jack

25   Dunn said about Ms. Pande.

                                                            25

ZUWA OMOREGIE  April 6, 2006

1      A.    I don't recall his words, but what he said

2  was she has strong technical skills, that she couldn't

3  move or didn't want to move to Houston when the team was

4  being moved to Houston, and that her performance on the

5  job suffered when the Houston move was announced, but

6  also that there was a job in Houston if she wanted to

7  move.  She still would have been -- the job was there in

8  Houston for her.

9      Q.    Anything else that Mr. Dunn said about

10  Ms. Pande during this conversation?

11      A.    No.

12      Q.    At the time you had this conversation with

13  Mr. Dunn, did you know whether or not Ms. Pande was out

14  on a medical leave?

15      A.    I believe I did.

16      Q.    Did you and Mr. Dunn speak about that at

17  all?

18      A.    I don't recall how I heard, but I knew,

19  yes.

20      Q.    Regardless of how you first learned, did

21  you and Mr. Dunn have any conversation that in any way

22  referenced the fact that Ms. Pande was on medical leave?

23      A.    Not that I can recall.

24      Q.    Did you ask Mr. Dunn for any detail on

25  what he meant when he said that Ms. Pande's performance

26

1                    **CERTIFICATE OF REPORTER**

2

3        I, DENISE A. FORD, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth, and nothing but the truth in the

7   within-entitled cause;

8        That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13       I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the event of

16  this cause, and that I am not related to any of the

17  parties thereto.

18

19            DATED:   April 18, 2006.

20

21

22       _____

         DENISE A. FORD, CSR No. 7525
23

24

25

**EXHIBIT C**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

KIRAN PANDE,                    )
                               )
              Plaintiff,        )
                               )
VS.                            )  Case No. 04-5107 CW
                               )
                               )
CHEVRON CORPORATION (f/k/a     )
CHEVRONTEXACO CORPORATION), a  )
Delaware corporation, CHEVRON  )
INTERNATIONAL EXPLORATION &    )
PRODUCTION (f/k/a              )
CHEVRONTEXACO OVERSEAS         )
PETROLEUM COMPANY), a division )
of Chevron U.S.A. Inc.,        )
                               )
              Defendants.       )

**********************************************

ORAL AND VIDEOTAPED DEPOSITION OF
KATHY MABE
OCTOBER 18, 2006

**********************************************

ORAL AND VIDEOTAPED DEPOSITION of KATHY MABE, produced as
a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on OCTOBER 18, 2006, from 2:02 p.m. to 3:41 p.m., before
Lorri Lucas, CSR in and for the State of Texas, reported
by machine shorthand, at the offices of Bayou City
Reporting, 1135 East 11th Street, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.



1135 East 11th Street • Houston, TX 77009
Phone: (713) 861-8589 • Toll Free: (888) 577-5048 • Fax: (713) 861-1729 • Email: bcrdepo@sbcglobal.net

Deposition of Kathy Mabe

Page 20

1      Q     So there weren't any problems with the work

2   that she handed to you?

3      A     No.

4      Q     And did you work with any of -- through this

5   process where you took over this part of the project from

6   Ms. Pande and -- and in that -- that immediate time

7   frame, did you have an opportunity to interact with the

8   people who were Ms. Pande's peers on the project?

9      A     Yes.

10     Q     And did any of those peers express to you any

11  negative opinions of Ms. Pande in any way?

12     A     No.

13     Q     Did any of them express positive sentiments

14  about Ms. Pande in any way?

15     A     I don't remember anybody saying something

16  specific about -- about Kiran.

17     Q     But there were certainly no complaints.  Is

18  that right?

19     A     No complaints.

20     Q     How did you first learn that Ms. Pande was

21  going to be taking a medical leave?

22     A     From Kiran.

23     Q     In what context did she tell you that she was

24  going to be taking a medical leave?

25     A     She told me after we had had a meeting and Jack

1    Dunn, you know, referred to the fact that she was not

2    going to be here and so I -- after the meeting or on

3    break, I went and asked her and she told me.

4        Q    This meeting where Jack Dunn referred to the

5    fact that Ms. Pande was not going to be there, describe

6    for me the -- the context of that meeting.  What kind of

7    meeting was it?

8        A    It was a meeting.  We were -- we were forming a

9    plan of action.  We had -- there had been a subsurface

10   peer review of the Tambua land and the project and they

11   had received red lights.  So there was -- we were putting

12   together an action plan on what needed to be done to have

13   a meeting in January where -- where we were going to try

14   to turn some of the red lights to yellow and green.

15       Q    All right.  You've used a lot of terminology.

16   Let's go back and define some of this.  You had a peer

17   review.  Can you describe what that peer review was, the

18   process?

19       A    In -- in Chevron, we have a -- a process called

20   "chip dip," which is C-P-D-E-P, and don't ask me what

21   that stands for.  And there's -- it's broken up into five

22   phases and you -- to get through the phase gates, you --

23   you have to do certain things, and to get from phase 2 to

24   phase 3, you have to have a subsurface peer review.  And

25   the RAM team, which is another acronym, is -- they --

Page 24

1    now I think there's like six or seven different groups.

2    I do remember they got red on decision quality and they

3    got red on the -- I think they got red -- I mean, they

4    could have gotten yellow but I think they got red on

5    the -- the reservoir modeling but I don't remember

6    exactly.

7         Q    So let's go back to where we started, which was

8    the meeting you were having and talking about, as I

9    understand, and correct me, please, if I -- if I

10   misunderstand what you've told me, that the meeting was

11   called to strategize about how to fix the red lights for

12   when the RAM team came back in January of 2004 for the

13   next review.  Is that right?  Was that the purpose of the

14   meeting?

15        A    It was to plan for that 2000 -- the January

16   meeting, and you never really fix the red lights.  You --

17   it's -- it's more about, you know -- once you get the red

18   lights, the red lights are there but there was some hope

19   that you might fix some if you, you know, had another --

20   a follow-up meeting and got green and yellow lights.

21        Q    And where was the meeting held?

22        A    It was in the San Ramon facility.

23        Q    How many people were physically at the

24   San Ramon facility for this meeting?

25        A    I don't know the exact number.  You know, I

Deposition of Kathy Mabe

Page 25

1   would guess, you know, probably about ten.

2       Q    And were there also people who attended by

3   speaker phone?

4       A    Yes.

5       Q    Do you know where the other folks were

6   physically located who attended by a phone?

7       A    In -- in Bellaire.

8       Q    Where is that?

9       A    In -- it's -- it's in Houston.

10      Q    Okay.

11      A    But it's its own city.

12      Q    And do you know how many people were attending

13  by phone from Bellaire?

14      A    I don't know the exact number but I would say

15  there was probably about four or five people.

16      Q    And were there any folks on the phone from

17  Angola?

18      A    I don't remember.

19      Q    There could have been; you just don't recall?

20      A    I don't remember them being on the phone from

21  Angola but there could have been.

22      Q    Please describe for me everything you recall

23  Jack Dunn saying in regard to Ms. Pande's medical leave

24  during this meeting.

25      A    Nothing.

Deposition of Kathy Mabe

1      Q    You don't -- Jack -- you don't recall Jack Dunn

2  saying anything about Ms. Pande's medical leave?

3      A    No.

4      Q    What did he say in regard to Ms. Dunn --

5  Ms. Pande taking a leave?

6      A    He didn't mention her taking a leave.

7      Q    I thought earlier you said that that's -- this

8  meeting -- something that Jack Dunn said at this meeting

9  sparked you to ask Ms. Pande why she was going out on

10 leave or have a discussion with Ms. Pande about her

11 taking a leave.

12     A    He just said that she wasn't going to be here

13 to do the work.

14     Q    That's all he said?

15     A    Um-hmm.  (Moving head up and down)  Yes.

16     Q    Do you recall how Ms. Pande reacted to

17 Mr. Dunn's statements?

18     A    She was very quiet, very quiet.

19     Q    How many times did Mr. Dunn refer to

20 Ms. Pande's taking a leave during this meeting?

21            MS. MILLER:  I'm going to object,

22 mischaracterizes this testimony.  I think she

23 specifically said he never made such a reference.

24            MR. LEBOWITZ:  Okay.  You can stop with

25 the speaking objections, please, and we'll stick to the

Deposition of Kathy Mabe

Page 27

1   objections as to form.  She can answer the questions if

2   she likes.

3               MS. MILLER:  No.  I'm not going to let

4   her.  This is the "When did you stop beating your wife

5   question."  You need to listen.  She said she -- he never

6   said anything like that.

7               MR. LEBOWITZ:  Counsel, we're -- we're in

8   federal court here where your objections are supposed to

9   be restricted to objections to form.  If you have an

10  objection, you can say, "Object to form."  Otherwise, I

11  would request that you stop the speaking objections.

12      Q    (BY MR. LEBOWITZ)  Can you answer the question,

13  please?

14      A    What was the question?

15              MR. LEBOWITZ:  Can you read back the

16  actual question?

17              (Discussion off the record

18              from 2:37 to 2:38)

19              VIDEOGRAPHER:  We are on the record at

20  2:38.

21      Q    (BY MR. LEBOWITZ)  Can you describe for me, in

22  as much detail as possible, precisely what Jack Dunn said

23  in regard to Ms. Pande not going to be -- not going to be

24  here to do the work?

25      A    I mean, it was pretty much just that.  I mean,

Page 28

1    we -- what we were doing is coming up with lists of

2    things that needed to be done, actions for this January

3    meeting.  And so when we got to things that were

4    reservoir simulation, which is the things that Kiran --

5    Kiran would have been doing for Tambua, he -- he would

6    say, "You're not going to be here.  Who's going to do

7    that work?"

8        Q    And how many times did he say that during this

9    meeting?

10       A    I don't remember.

11       Q    Was it more than once?

12       A    Yes.

13       Q    Was -- describe for me his tone of voice when

14   saying these words to Ms. Pande.

15       A    It was loud.

16       Q    Was he yelling at her?

17       A    I wouldn't use the term "yelling."  It was just

18   a loud voice.

19       Q    Was it louder than Mr. Dunn's normal speaking

20   voice?

21       A    Yes.

22       Q    Did you interpret Mr. Dunn's conduct in this

23   meeting as inappropriate?

24            MS. MILLER:  I'm going to object to the

25   word "inappropriate" as ambiguous.

Deposition of Kathy Mabe

1              UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

2

3    KIRAN PANDE,                    )

                                     )

4                   Plaintiff,       )

                                     )

5    VS.                             )  Case No. 04-5107 CW

                                     )

6                                    )

     CHEVRON CORPORATION (f/k/a      )

7    CHEVRONTEXACO CORPORATION), a  )

     Delaware corporation, CHEVRON  )

8    INTERNATIONAL EXPLORATION &    )

     PRODUCTION (f/k/a               )

9    CHEVRONTEXACO OVERSEAS          )

     PETROLEUM COMPANY), a division)

10   of Chevron U.S.A. Inc.,         )

                                     )

11                  Defendants.      )

12              REPORTER'S CERTIFICATION

                DEPOSITION OF KATHY MABE

13                  OCTOBER 18, 2006

14       I, Lorri Lucas, Certified Shorthand Reporter in and

15   for the State of Texas, hereby certify to the following:

16       That the witness, KATHY MABE, was duly sworn by the

17   officer and that the transcript of the oral deposition is

18   a true record of the testimony given by the witness;

19       That the deposition transcript was submitted on

20   _____ to the witness or to the attorney for

21   the witness for examination, signature and return to

22   me by _____;

23       That pursuant to information given to the deposition

24   officer at the time said testimony was taken, the

25   following includes counsel for all parties of record:

Deposition of Kathy Mabe

Page 68

1      Mr. Noah D. Lebowitz, Attorney for Plaintiff

2      Ms. Michelle Ballard Miller, Attorney for Defendants

3      That a copy of this certificate was served on all

4  parties shown herein.

5      I further certify that I am neither counsel for,

6  related to, nor employed by any of the parties or

7  attorneys in the action in which this proceeding was

8  taken, and further that I am not financially or otherwise

9  interested in the outcome of the action.

10     Certified to by me this 6th day of November, 2006.

11

12

13

14

15     _Lorri Lucas_
       _____

      LORRI LUCAS, RMR, Texas CSR 5317

16     Expiration Date:  12/31/07

      Bayou City Reporting, Inc.

17     Firm Registration No. 295

      1135 East 11th Street

18     Houston, Texas   77009

      (713) 861-8589

19

20

21

22

23

24

25

**EXHIBIT D**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

KIRAN PANDE,                          )
                                      )
            Plaintiff,                )
                                      )
VS.                                   )  Case No. 04-5107 CW
                                      )
                                      )
CHEVRON CORPORATION (f/k/a            )
CHEVRONTEXACO CORPORATION), a         )
Delaware corporation, CHEVRON         )
INTERNATIONAL EXPLORATION &           )
PRODUCTION (f/k/a                     )
CHEVRONTEXACO OVERSEAS                )
PETROLEUM COMPANY), a division        )
of Chevron U.S.A. Inc.,               )
                                      )
            Defendants.               )

*************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
JACK DUNN
OCTOBER 19, 2006

*************************************************

ORAL AND VIDEOTAPED DEPOSITION of JACK DUNN, produced as
a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on OCTOBER 19, 2006, from 9:09 a.m. to 12:50 p.m., before
Lorri Lucas, CSR in and for the State of Texas, reported
by machine shorthand, at the offices of Bayou City
Reporting, 1135 East 11th Street, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.



**Bayou City Reporting inc.**

1135 East 11th Street • Houston, TX 77009
Phone: (713) 861-8589 • Toll Free: (888) 577-5048 • Fax: (713) 861-1729 • Email: bcrdepo@sbcglobal.net

Deposition of Jack Dunn

Page 12

1          Q      Were you consulted in any way regarding the

2     possibility of Kiran Pande coming to or being offered

3     this position in your group?

4          A      What do you mean by "consulted"?

5          Q      At any point, did someone -- did anybody come

6     to you and say, "We're considering placing Kiran Pande in

7     this petroleum engineer position in your group"?

8          A      No.

9          Q      Did anyone, during the 2002 PDC process, come

10    and ask you about what the -- what you were looking for

11    in a candidate for that job?

12         A      I don't remember but it's possible.

13         Q      Did you have any role in placing Ms. Pande in

14    your group?

15         A      Role?

16         Q      Yes.

17         A      I talked to Kiran after she was placed.  I

18    spoke with her about the job, if that's what you mean by

19    "role."

20         Q      Well, I'm trying to figure out -- if that's

21    your first contact in regard to Ms. Pande's being placed

22    in the job, then -- then sure, but if there's any

23    prior -- what I'm trying to figure out is if anyone, for

24    instance, Kelly Hartshorn, came and spoke with you and

25    said, for instance, "We're considering placing Kiran

Deposition of Jack Dunn

Page 13

1    Pande in this slot in your group that's open during the

2    PDC" --

3        A    So --

4        Q    -- to get your input on whether or not that's a

5    good idea, bad idea, what you're looking for.

6        A    So let's -- so could you be more specific?  You

7    mentioned "for instance" several times.  Could you be

8    more specific?

9        Q    Well, that -- those are simply examples to try

10   and explain to you what I'm looking for when I say

11   "role."

12       A    Okay.

13       Q    So the question, again, is:  Prior to the

14   conversation which you've already testified to, prior to

15   that point, did you have any role of the placement of

16   Ms. Pande into the slot?

17       A    No.  Not that I recall.

18       Q    And when you spoke to Ms. Pande in this

19   conversation you've just referred to, was that in person?

20       A    Yes.  On the phone.

21       Q    And at -- during that telephone conversation,

22   do you know whether or not Ms. Pande had accepted the job

23   offer?

24       A    My recollection is she had not.

25       Q    And did you call her or did she call you?

Deposition of Jack Dunn

Page 14

1          A      I think I called her but I'm not sure.

2          Q      What was the purpose of speaking with Ms. Pande

3    on that day?

4          A      Kelly Hartshorn called me and told me that

5    Kiran had been selected and they wanted me to call her

6    and tell her about the job.

7          Q      And prior to speaking with Ms. Pande on this

8    particular call, did you -- did you come to know anything

9    about Ms. Pande's history with Chevron?

10         A      Well, I knew Kiran.  You know, I -- I do recall

11   meeting her at a -- when I was in a previous position

12   with project resources facilitating meetings and Kiran

13   was in that meeting on the work team and remember --

14   remember her from that experience.  So that's -- that's

15   my recollection of working with her.  Before that, it was

16   very -- you know, it was a cordial relationship and I

17   remember thinking she was bright and capable.

18         Q      Prior to speaking with Ms. Pande on this

19   occasion that we're talking about, did you review any of

20   her job history, her CV --

21         A      No.

22         Q      -- or anything like that?

23         A      No.  My -- you know, at that point, my -- I had

24   a positive experience with Kiran, although limited, based

25   on that meeting or couple meetings -- I can't remember --

Deposition of Jack Dunn

Page 15

1   and it was a -- it was a positive experience and I -- I

2   thought she'd be good for the job and I tried to talk to

3   her about why I thought she would be a good addition to

4   our team.

5       Q    And can you describe for me Ms. Pande's

6   attitude during this phone call?

7                MS. MILLER:  Object, ambiguous.

8       Q    (BY MR. LEBOWITZ)  You can still answer the

9   question.

10      A    No.  It's ambiguous.

11      Q    Well, if you don't understand the question, you

12  can tell me.  Counsel's objections --

13      A    I don't really recall.  Attitude, I -- you

14  know, I -- I -- no, I -- can you restate the question?

15      Q    Sure.  Did -- did Ms. Pande seem or appear

16  interested in the job when you spoke with her?

17      A    Yes.

18      Q    And what kind of questions did Ms. Pande ask

19  during the -- this conversation?

20      A    I don't recall specifically.

21      Q    Do you recall Ms. Pande asking any -- or

22  inquiring about potentials for -- potential for

23  promotion?

24      A    No.

25      Q    Did you talk anything about future or anything

Deposition of Jack Dunn

Page 16

1  as far as future jobs after this position?

2       A    No.

3       Q    Did you communicate to Ms. Pande how long you

4  thought a person in this position should stay in the

5  position?

6       A    No.  Not that I recall.

7       Q    Did you have an opinion at that time as to how

8  long a person taking this slot should remain in the

9  position?

10      A    No.

11      Q    How did the call end?

12      A    I don't recall.

13      Q    Did -- was there -- strike that.

14            Did Ms. Pande communicate to you anything

15  about her decision by the end of this telephone call?

16      A    I -- I really don't remember.

17      Q    How did you learn that Ms. Pande had actually

18  accepted the offer?

19      A    I don't remember.

20      Q    Prior to Ms. Pande accepting this offer to work

21  in your group, did you speak with her prior supervisor,

22  Rex Mitchell?

23      A    No.

24      Q    So at least by the time that Ms. Pande accepted

25  the offer to come work in your group, is it your

Deposition of Jack Dunn

Page 17

1    testimony that you had no conversations with Rex Mitchell

2    about Ms. Pande?

3         A    Yes, it is.

4         Q    So --

5         A    She thinks it's cold.

6         Q    Yeah.

7         A    I don't think it's that cold.

8         Q    So approximately December of 2002 or so is when

9    Ms. Pande actually started working in the -- in the slot

10   in your group?

11        A    Yes.

12        Q    Now, as of the moment that -- or as of the --

13   the time period that Ms. Pande started working in your

14   group, did you have any belief that the company was going

15   to move your group to Houston?

16        A    No.

17        Q    Had there been any talk in the company that you

18   learned -- that you knew of at the time of the potential

19   for your group moving to Houston?

20        A    You know, the -- they wanted to move my group

21   to Houston at the Chevron-Texaco merger, which was

22   several years or a year prior, and that was rejected.

23   But the business unit had wanted to move us to Houston

24   previously.  So that -- that was always -- that was

25   always something that was a possibility and continues to

Deposition of Jack Dunn

Page 18

1    this day for many people that are in the Bay Area.

2         Q    In your initial conversation --

3         A    But to be clear --

4         Q    I'm sorry.

5         A    -- there was no specific revisiting of that

6    decision not to move us up -- up -- at that time.

7         Q    During your initial conversation with

8    Ms. Pande, did you and Ms. Pande speak in any way about

9    the possibility that the business unit would be moved to

10   Houston?

11        A    Not that I recall.

12        Q    What project was Ms. Pande assigned to when she

13   began working in your group?

14        A    Tombua/Landana.

15        Q    And is that the same project she worked on

16   throughout the -- her entire tenure in your group?

17        A    Yes.

18        Q    And what were Ms. Pande's general job duties in

19   regard to this project?

20        A    Reservoir simulation.

21        Q    What does that mean?

22        A    You take a model and you run it through a

23   reservoir simulator, which is a -- a tool that talks

24   about fluid flow in a reservoir that looks at the --

25   predicates the fluid flow in the reservoir and the

Deposition of Jack Dunn

Page 26

1      Q     After you gave her the raise or after you

2    informed Ms. Pande of what her raise was going to be, did

3    you and her have any conversations about the amount of

4    that raise?

5      A     I don't remember.  We may have.  You know, once

6    again, any raise that she got at that time was something

7    she would, you know, likely -- I'm not going to speculate

8    but it's all related to -- had nothing to do with my --

9    you know, with me or any -- it wasn't -- I had nothing to

10   do with that -- that raise per se.  So I'm just -- I'm

11   just reporting the situation and any clarification on the

12   raise would have to come from the people that -- that

13   made the assessment.

14     Q     When did you first learn that the business unit

15   was being moved to Houston?

16     A     We had a meeting, a town hall, in late May or

17   so and I probably knew about it several weeks before

18   that, maybe a month before that, at least the concept or

19   that they wanted to revisit the old decision.

20     Q     And who, if you know, made the ultimate

21   decision to -- to move the business unit?

22     A     The business unit manager.

23     Q     Who is that?

24     A     John Gass.  I mean, I don't really know but

25   presumably the M -- they call them MD.  The managing

Deposition of Jack Dunn

1    director is the decision maker for the business unit.

2    But I don't really know.

3        Q    Were you consulted in any way during the

4    decision-making process?

5        A    You'll have to be more specific.

6        Q    Were you asked for any input as far as your

7    opinion as to whether or not the business unit should be

8    moved to Houston?

9        A    Not that I recall.

10                Can I get a glass of water?

11                MR. LEBOWITZ:  Sure.  Why don't we go off

12    the record for a couple minutes.

13                VIDEOGRAPHER:  We're off the record at

14    9:43.

15                (Discussion off the record

16                from 9:43 to 9:45)

17                VIDEOGRAPHER:  We are back on the record

18    at 9:45.

19        Q    (BY MR. LEBOWITZ)  Mr. Dunn, do you recall

20    speaking with Kelly Hartshorn in October of 2002 about

21    what you were looking for in the -- in a candidate for

22    the job that Kiran Pande was filling?

23                MS. MILLER:  I object.  It's been asked

24    and answered.

25        A    Yeah.

Deposition of Jack Dunn

Page 48

1    testimony.

2        Q    (BY MR. LEBOWITZ)  And was Ms. Pande offered a

3    position to continue with the business unit in Houston?

4        A    Yes.

5        Q    Was it the same position that she was working

6    in in San Ramon?

7        A    Yes.

8        Q    And what was Ms. Pande's response to that

9    offer?

10       A    She -- we had a week to sign the offer and it

11   was stated in the offer if you did not respond, it was

12   deemed a rejection, and she didn't sign the offer, so it

13   was deemed a rejection.

14       Q    And employees who rejected the -- the offer to

15   move to Houston, at least employees from your business

16   group, were they then given an opportunity to search for

17   other jobs within the company?

18       A    Yes.

19       Q    And, to your knowledge, from -- well, before --

20   let me strike that.

21            The PDC process generally is in what time

22   of year?

23       A    We have two:  One in the spring and one in the

24   fall.

25       Q    And so the -- the first PDC that came about

Deposition of Jack Dunn

Page 49

1    after the announced move to Houston for your business

2    group was the fall of 2003?  Is that correct?

3        A    Correct.

4        Q    So between the time that Ms. Pande -- you

5    learned of Ms. Pande's rejection of the offer to move to

6    Houston and the fall PDC, were you aware whether or not

7    Ms. Pande was actively searching for another job in the

8    company?

9        A    She may have been.  I mean, she started to post

10   for jobs and I don't know when she started.

11       Q    And what does it mean to post for jobs?

12       A    We have an open system in the company where

13   open -- vacant jobs are stuck on our -- our Web and

14   anybody who's interested in taking a different position

15   can look on the -- on the Web for what's available that's

16   suitable for their experience and background and they can

17   post for it with their supervisor's permission.  And I

18   told everybody, Kiran and others in my group, that

19   they -- they could -- that they could post.

20       Q    How many folks in your group rejected to move

21   to Houston?

22       A    I don't recall exactly.

23       Q    Was it more than just Ms. Pande?

24       A    I'm -- I'm not sure.

25       Q    Do you recall anybody else who rejected the

Deposition of Jack Dunn

Page 50

1    move to Houston or declined the move to Houston?

2          A     I believe Mike Clark did.

3          Q     Anybody else that you can recall?

4          A     Not that I recall.

5          Q     Did Jalal Afifi work in your group?

6          A     No.

7          Q     How about Graham Houser?

8          A     No.

9          Q     Robert Burks, did he work in your group?

10         A     No.

11         Q     What was Mike Clark's position in your group?

12         A     He's a geologist.

13         Q     In the normal process when a -- based on your

14   experience, when an employee who is under your

15   supervision posts for a job in another group, do you

16   typically have any communication with the supervisor in

17   the job for which the employee has posted?

18         A     Typically, no.

19         Q     Why not?

20         A     It's handled by the PDC process.

21         Q     Well, I'm talking about in between PDCs when

22   somebody posts for a job, for instance, the time frame

23   between the summer of '03 when folks were given the offer

24   to move to Houston --

25         A     Um-hmm.

Deposition of Jack Dunn

Page 51

1      Q     -- and the fall PDC of 2003.  If people

2   independently post for jobs, isn't that process handled

3   outside the PDC process?

4      A     No.  The PDC process is still used but is not

5   handled in a group meeting.  It's handled more by the --

6   the PDC rep.  So he -- he facilitates the process.

7      Q     And in that process, it's your experience that

8   you are not typically contacted by the potential new

9   supervisor?

10     A     That's correct.

11     Q     Have you ever sought out the potential new

12  supervisor of one of the folks in your group to, for

13  instance, give a positive recommendation?

14     A     Usually if an employee is posting, then they

15  can put who they want as their -- their references, and

16  if they ask me to call that -- you know, if they ask me

17  to call or talk to somebody on their behalf, I'll --

18  I'll -- I'm happy to do that.

19     Q     And during the time frame of the latter -- or

20  the middle of 2003, again, this time frame between the

21  announcement of the move to Houston and the formal fall

22  PDC, did Ms. Pande ask you to contact any -- or give a

23  positive reference to any potential new position?

24     A     Not that I recall.

25     Q     If Ms. Pande had asked you to do so, to, for

Deposition of Jack Dunn

Page 52

1    instance, give a -- a job reference for one of the jobs

2    she was posting for, would you have given her a positive

3    reference?

4              MS. MILLER:  I'm going to object.  It

5    calls for speculation.

6         Q    (BY MR. LEBOWITZ)  You can answer the question.

7         A    I would have -- I would have honestly told them

8    my evaluation of her performance.

9         Q    And as of this time frame, the time that the --

10   say from the time that Ms. Pande declined the offer to

11   move to Houston and the formal fall of 2003 PDC, what was

12   your honest opinion of Ms. Pande's performance?

13        A    Oh, she did a fantastic job for the first six

14   months of the year, from -- up until the middle part of

15   the year, very hard worker, very bright, intelligent, and

16   as the year went on, she became less focused.  But very

17   capable.

18        Q    And what do you mean by "less focused"?

19        A    "Less focused" is self-explanatory.

20        Q    Give me any -- can you give me any examples of

21   where you believe Ms. Pande was demonstrating that she

22   was less focused?

23        A    She wasn't -- she wasn't as diligent about

24   getting her -- her key job responsibilities completed

25   as -- as the year progressed.

Deposition of Jack Dunn

Page 53

1      Q     Can you give me any example of any key job

2   responsibility that she was not performing up to what you

3   mean?

4      A     She was responsible for reservoir simulation

5   and I saw a falloff of that work.

6      Q     Any other key job responsibilities you felt she

7   was not performing --

8      A     She was responsible --

9      Q     -- as diligently as she should have?

10     A     She was responsible for the work plan, the

11  petroleum engineering side of the work plan, and she

12  wasn't very engaged in seeing that it was achieved for

13  somebody of her Group 24 being paid, you know, over

14  $110,000 a year.  But in the -- as you pointed out in

15  that e-mail, in a -- in an informal leadership role.

16     Q     Can you give me an example of what you mean by

17  being not very engaged?

18     A     No.

19     Q     Any other key job responsibilities you felt she

20  was not being as diligent as she should have been?

21     A     Not at this time.

22     Q     When did you first form the opinion that

23  Ms. Pande was not -- or was -- there was a falloff in

24  her -- the amount of reservoir simulation work that she

25  was doing?

Deposition of Jack Dunn

Page 54

1      A    I don't know.  It's hard to know sequentially

2  what happened, you know, two, three years later, two or

3  three years later.

4      Q    And when was it that you formed the opinion

5  that Ms. Pande was not very engaged in achieving a work

6  plan?

7      A    I didn't form an opinion.  I'm talking about

8  observation of what -- as I mentioned, saw her become

9  less focused towards the second half of the year.  I

10  don't know when -- you know, it was a gradual -- gradual

11  set of observations.

12      Q    And when did the observations begin?

13      A    Second half of the year.

14      Q    Is that after June of 2003?

15      A    That would be the second half of the year, yes.

16      Q    Did you ever speak with Ms. Pande about your

17  concern that there was a falloff in her work related to

18  the reservoir simulation?

19              MS. MILLER:  I'm going to object.  The

20  question mischaracterizes his testimony.  I don't think

21  he ever said it was a concern.  He said it was his

22  personal opinion.

23              THE WITNESS:  Yeah.

24      Q    (BY MR. LEBOWITZ)  Did you ever speak with

25  Ms. Pande about your opinion that you -- that there was a

Deposition of Jack Dunn

Page 55

1 falloff in her work related to reservoir simulation?

2   A  We spoke about the -- about her -- her key job

3 responsibilities of working and -- owning and -- and

4 going -- and making sure that the work plan for the

5 Tambua Field be executed.  She was given the task to put

6 together a work plan for the group on that.  That was

7 part of her responsibilities and, of course, to do the

8 reservoir simulation associated with the work there.  And

9 we had team meetings where we talked about in a group

10 setting where -- where we were going and how we were in

11 terms of our milestones and deliverables.

12   Q  Did you ever have any one-on-one meetings

13 where you had -- where this topic came up?

14   A  Not that I recall.

15   Q  And in any of these team meeting settings, did

16 you specifically express to Ms. Pande that you felt that

17 she -- her focus was waning?

18   A  Not that I recall.

19   Q  In any of these team meetings that you've just

20 referenced, did you express an opinion that the work plan

21 was behind schedule?

22   A  Not that I recall but it's possible.

23   Q  Who else attended these group meetings?

24   A  The team.

25   Q  Who was the team?

Deposition of Jack Dunn

Page 57

1    sitting here today whether you did or not?

2         A    A specific e-mail?

3         Q    Not necessarily the substance of a specific

4    e-mail but whether you did, in fact, author such an

5    e-mail.

6         A    Such an e-mail?

7         Q    Yes.

8         A    That's a vague question.  Could you be more

9    specific?

10        Q    In -- do you recall, sitting here today,

11   whether or not you actually authored an e-mail in the

12   second half of 2003 which summarized any of the team

13   meetings we've been talking about or reported what

14   happened in these team meetings?

15        A    I'm sure I've written, yes.  I mean, as a

16   supervisor, you would -- you would write e-mails that

17   either responded to or reported on the outcome of

18   meetings based on the agreements and work plans related

19   to those and I'm sure I did write some.  I'm sure I

20   responded to some.  I don't have any specific one.  I

21   don't know what you're referring to, so I don't have

22   any -- but certainly -- it's certainly -- certainly would

23   have written -- written e-mails during that time frame,

24   like we all do.

25        Q    So the -- the PDC that took place in the fall

Deposition of Jack Dunn

Page 58

1    of 2003, to your knowledge, was Ms. Pande offered any job

2    as a result of the PDC?

3        A    Not to my knowledge but she could have been.

4        Q    Were you consulted in any way by anybody

5    connected with the PDC regarding Ms. Pande's candidacy

6    for any job?

7        A    No.  Not that I recall.

8                    (Exhibit 4 marked)

9        Q    (BY MR. LEBOWITZ)  Mr. Dunn, you've just been

10   handed what's been marked as Exhibit 4 for this

11   deposition, which is an e-mail -- the printout of an

12   e-mail thread of back-and-forth e-mails between yourself

13   and Ms. Pande.  If you can take a minute and review the

14   e-mails and let me know when you're ready to proceed.

15       A    Okay.

16       Q    Okay.  The -- the first e-mail in the thread

17   is -- is from Ms. Pande to you on October 9th of 2003

18   where she is asking, as I read it, for essentially your

19   consent that she attend a -- what she refers to as a DA

20   modeling course.

21       A    Right.

22       Q    First of all, what is a DA modeling course?

23       A    Decision analysis.

24       Q    And what is the function of decision analysis?

25       A    It's to do -- look at various alternatives and

Deposition of Jack Dunn

Page 61

1   presumably we were behind based on the comment "With the

2   fairly extensive delays."

3        Q     The F-1 simulation modeling, was that something

4   that Ms. Pande was responsible for?

5        A     Yes.

6        Q     It was something that all the folks on her team

7   were responsible for?

8        A     She had a joint responsibility for that with --

9   with -- her -- her role was to do the simulation modeling

10   and, as I mentioned, simulation is a joint -- a joint --

11   it's a -- the engineer works with the geologist to get it

12   done.

13        Q     And skip down to the second-to-last line where

14   it says, "I know the delays are not your fault."  When

15   you said that to Ms. Pande, were you being honest?

16        A     What do you mean?

17        Q     Did you actually think they were her fault but

18   just wrote that you believe they were not her fault?

19        A     No.  It was a -- as I mentioned, this was a --

20   I probably should have said, "entirely your fault."  I

21   mean, it was a joint -- as I mentioned, it was a joint

22   responsibility between Kiran and -- and the other people

23   on her team.

24        Q     And when did you first learn that Ms. Pande was

25   going to take a medical leave of absence?

Deposition of Jack Dunn

Page 62

1      A     I received an e-mail from UnumProvident at some

2  point in October, I believe.  That was my first knowledge

3  of it.

4      Q     And what did you do, if anything, in response

5  to receiving that e-mail?

6      A     I walked down to Kiran's office to see if I

7  could -- she could let me know how long she was going to

8  be out and, when she wasn't there, I called the number on

9  the e-mail to get any information on how long she was

10  going to be absent.

11      Q     And did you speak to anybody when you made that

12  phone call?

13      A     Yes.  I spoke to the person that was in that

14  e-mail.  There's a number to call, Chevron number, and I

15  called -- I called that person.

16      Q     And was that Martha Martinez?

17      A     If it's shown in the e-mail, I could confirm

18  who it was but it was a number that said 925-842,

19  et cetera, and I called the number.  I think it says

20  something along the lines of "If you have any questions

21  about this, please call this person," and so that's what

22  I did, since Kiran wasn't around to ask her about her

23  absence, how long she would be out, or just to get

24  clarification on her being on leave.

25      Q     And what did you learn from your telephone

1    conversation?

2        A    The -- I learned that she was -- she was going

3    to be out starting the date that was referenced on that

4    and they didn't know how long -- there was a -- a date

5    that was stated initially.  I can't remember what that

6    date was and that's what I learned.  She'd be out for

7    some period of time.  I don't -- I think it was -- I

8    don't recall.  I'm sure it's somewhere in there.

9        Q    And did you ask the person on the other end of

10   the phone why Ms. Pande was going on leave?

11       A    Not that I recall.

12       Q    Did you ask the person on the other end of the

13   phone what Ms. Pande's medical condition was?

14       A    No,  Not that I recall.  My interest was

15   around, you know, how long she was going to be gone, so

16   to speak.  In other words, if you're taking a vacation,

17   how many weeks are you going to be gone, since Kiran

18   hadn't -- hadn't mentioned it to me.

19                  (Exhibit 5 marked)

20       Q    (BY MR. LEBOWITZ)  Mr. Dunn, I've just handed

21   you what's been marked Exhibit 5 to this deposition.

22   It's a three-page document of an e-mail thread.  The

23   first e-mail is addressed from an Elizabeth Corrigan with

24   a unumprovident.com e-mail address to you and others on

25   October 29th, 2003.  Do you see that e-mail?

Deposition of Jack Dunn

Page 77

1    it was December 13th or so.  We were packing up then and

2    that was the end of our group's work in -- in -- in

3    San Ramon.  Because a lot of people wanted extensions

4    that -- there's a number of people that didn't want to

5    move.  So I was very clear on that.  I'm referring to

6    people reporting to me.

7         Q    Do you recall having a -- a meeting on

8    November 4th, 2003 with the folks in your group,

9    including Ms. Pande?

10        A    Yes.

11        Q    What was the purpose of that meeting?

12        A    We were discussing the work plans with the

13   group.

14        Q    And who attended that meeting?

15        A    The work team.

16        Q    How many people in total attended the meeting?

17        A    I don't recall.

18        Q    And where did the meeting take place?

19        A    One of our conference rooms on the floor we

20   were -- where we worked.

21        Q    In addition to people attending in person, were

22   there also people attending by telephone?

23        A    Yes.

24        Q    And where were those people located?

25        A    Houston.

Deposition of Jack Dunn

Page 79

1    2003 meeting.   How long did the meeting last until?

2         A    I don't recall.

3         Q    More than an hour?

4         A    Perhaps.

5         Q    At any time in the meeting, did you speak to

6    Ms. Pande in an elevated tone of voice?

7         A    I did raise my voice at that meeting.

8         Q    Um-hmm.

9         A    Not at her necessarily but just in general

10   because of the demands on us at that time and pressure we

11   were under to get things done in the middle of our move.

12        Q    And at any time in this meeting, did you

13   reference Ms. Pande's upcoming leave of absence?

14        A    No.   Not that I recall specifically, although I

15   was -- I was asking Kiran to try to talk about the

16   responsibility she had and what her plans were for -- for

17   those.

18        Q    Did you in any way during this meeting make any

19   statements regarding the fact that Ms. Pande was not

20   going to be around because of a leave?

21        A    No.   Not that I recall but I -- my recollection

22   at that point she -- that she had -- you know, I

23   didn't -- no.

24        Q    Did you make any statements or make any --

25   direct any comments towards Ms. Pande during this meeting

Page 80

1    along the lines of asking her how her work was going to

2    get done over the next couple of months?

3        A    As I recall, we were talking about how to --

4    how various, let's say, obligations were going to be

5    completed and my recollection was that I -- Kiran had a

6    bunch of things that were assigned her responsibility and

7    I was aware at that time myself, you know, as you've

8    showed in these UnumProvident documents, that she was

9    going to be taking a leave of indeterminate length.  So I

10   was of interest in terms of understanding how we were

11   going to get her responsibilities completed and how

12   the -- how we were going to hand those off just like you

13   would if someone was taking a vacation.  You would try

14   and understand how you were going to cover for that

15   person while they were on vacation.

16       Q    Please tell us, in as much detail as possible,

17   what precise words you used in expressing the sentiments

18   you just expressed.

19       A    I don't recall any specifics.  It was several

20   years ago.

21       Q    Did you in any way state to either Ms. Pande or

22   the participants at the meeting that Ms. Pande was taking

23   a leave of absence?

24       A    I -- not that I recall.  I believe the issue

25   was -- you know, I was aware that she was taking a leave

Page 81

1    and I was interested in what she was doing to transition

2    her work given that -- and we already had the backfill

3    for her position, Jason Ewles, effective November 1st.

4    So he was coming in, he was taking over her

5    responsibilities because she rejected the move to

6    Houston, and so I was interested in what's our transition

7    plan to get stuff off of Kiran's plate and onto his, not

8    related to -- you know, just related to the new guy

9    showing up to take over her responsibilities.

10        Q    At any point during this meeting on

11   November 3rd -- November 4th, 2003, did you reference the

12   fact that Ms. Pande was taking a medical leave of

13   absence?

14        A    Not that I recall.

15        Q    At any point during the period -- during the

16   time in the meeting where you were discussing this

17   transition of work from Ms. Pande to others, did you

18   speak in an elevated tone of voice?

19        A    That -- that meeting was -- it was a stressful

20   time and I did raise my voice because we were moving, we

21   had lots of work to do, a lot of pressure, a big

22   transition of a lot of people on and off the team, and --

23   and I -- and I -- and I did raise my voice.

24        Q    Okay.  I understand that generally but my

25   question was a little bit more specific than that, which

Deposition of Jack Dunn

Page 83

1      A    No.

2      Q    Prior to this meeting on November 4th, 2003,

3    had you ever spoken in such a manner to Ms. Pande?

4      A    What manner?

5      Q    An elevated tone of voice.

6      A    I do recall a meeting when I asked Kiran to

7    take ownership over the work plan in -- in July and I --

8    and she said, "Are you asking me or telling me?" And I

9    said in a calm voice, "I'm asking you." But not -- you

10   know, not that I recall, although -- not that I recall.

11   I didn't speak in an elevated tone of voice.

12     Q    On any point during the day of November 4th,

13   2003, did you come to learn that Ms. Pande had been

14   brought to tears by your conduct in the meeting?

15     A    Pardon?

16     Q    At any point in the -- on the day, not just in

17   the meeting but at any point during the day of

18   November 4th, 2003, did you come to learn that Ms. Pande

19   had been brought to tears as a result of the way you

20   interacted with her at the meeting?

21     A    No.  As I recall, we had the meeting.

22   Afterwards we had a team lunch and Kiran attended.  She

23   sat -- she was there.  I was there.

24     Q    There were breaks taken during the meeting.  Is

25   that correct?

Page 85

1    November 4th, 2003 meeting?

2         A    At the -- there is a thick series of

3    chronological papers that were sent in with her -- what's

4    it called?  Her complaint or something with the State.

5    It talked about, referenced -- referenced point-by-point

6    issues and that's when I first saw this issue of the

7    November 4th meeting.

8         Q    So I believe what you're referencing -- and

9    correct me if I'm wrong -- is -- is the -- the

10   administrative complaint that Ms. Pande filed with the

11   California Department of Fair Employment and Housing?

12        A    That's probably -- probably it.

13        Q    Okay.  And it's your testimony that that --

14   reading that document is the first time you learned of

15   any issue that Ms. Pande had with your conduct at the

16   November 4th, 2003 meeting?

17        A    Yeah.  I guess so.  I mean, I -- as I

18   mentioned, I did raise my voice and I talked to Kiran on

19   the phone in November time frame and I apologized for

20   raising my voice and she accepted my apology.  So I

21   figured it was over at that point.  I said, "I'm sorry

22   for raising my voice," and she said, "I accept your

23   apology."  That was -- that was just like if I had an

24   argument with my spouse and we got a little bit in a

25   disagreement.  I would apologize and she would accept my

Deposition of Jack Dunn

Page 86

1    apology.  Assume it's -- it's over.

2         Q    Okay.  So the -- the question was:  Reading

3    that -- the document that listed the November 4th, 2003

4    meeting, was that the first time that you became aware

5    that Ms. Pande had an issue with how you conducted

6    yourself at that meeting?

7         A    I believe so.

8         Q    At any point while Ms. Pande was still working,

9    actively working, in your group -- when I say "actively

10   working," I mean actually being present at the work site

11   and working -- did you ask her what her actual medical

12   condition was?

13        A    Not that I recall.

14        Q    Did you ever, at this -- when Ms. Pande was

15   still actively at work, ask her whether or not she had

16   cancer?

17        A    No.

18        Q    During this time period when Ms. Pande remained

19   actively at work prior to her leave, did you ever relate

20   to Ms. Pande any comments whatsoever related -- regarding

21   cancer and its treatments?

22        A    No.  Not that I recall.  You know, I -- my

23   concern was around her well-being, is she okay, as I

24   mentioned.  That was all our conversations related to,

25   really, was "I hope you're okay.  Is there anything I can

Page 101

1    e-mail that's reflected in Exhibit 11, as of that date,

2    had you had any conversations informing Ms. Pande that --

3    what her last day of work would be?

4        A    I don't know as of that date.

5        Q    At some point, you did have a telephone

6    conversation with Ms. Pande informing her what her

7    official last day of work --

8        A    That's correct.

9        Q    -- was going to be.  Is that correct?

10       A    That's correct.

11       Q    Do you remember what date that telephone

12   conversation took place?

13       A    No, I don't.  But it was the date of the e-mail

14   that I also sent on the same day.

15       Q    Okay.

16       A    Or the day after.  Around -- at or around that

17   time.

18            (Exhibit 12 marked)

19       Q    (BY MR. LEBOWITZ)  You've been handed what's

20   been marked as Exhibit 12 for this deposition.  It's an

21   e-mail from you to Ms. Pande dated November 19th, 2003.

22   Is this the e-mail you were just referring to?

23       A    Yes.

24       Q    In the first sentence, you say, "Hi Kiran.

25   Nice to talk to you the other day."

Deposition of Jack Dunn

Page 102

1     A    Correct.

2     Q    So based on reading that, would it be accurate

3  to -- to state that your conversation with Ms. Pande was

4  sometime prior to November 19th?

5     A    Well, which conversation?

6     Q    The conversation you're referring to in this --

7     A    That -- yeah.  That would be correct.

8     Q    Okay.  And that conversation you're referring

9  to in this e-mail is the conversation where you notified

10  Ms. Pande of her last day of work.  Is that correct?

11     A    I notify her that she's going to be getting a

12  letter from HR.

13     Q    And the letter from HR was going to say what?

14     A    I told her, "You'll get it from HR and you can

15  read it."  She actually wanted a -- she said, "Can you

16  read it to me or send it to me or tell me what it says?"

17  And I said, "No.  You should -- you should read it and

18  then get back to HR, Sheree Lomax."

19     Q    So is it your testimony that you did not, in

20  fact, read the substance of the letter to Ms. Pande

21  during that conversation?

22     A    That's correct.

23     Q    Is this the same conversation where you

24  apologized for your conduct your -- on November 4th?

25     A    I don't recall.  I -- I know I -- I don't know.

Deposition of Jack Dunn

Page 111

1       Q      And what was the purpose of Mr. Omoregie
2    meeting with you?
3                    MS. MILLER:   I'm going to object.   It
4    calls for speculation.
5                    THE WITNESS:   Yeah.
6       Q      (BY MR. LEBOWITZ)   Did Mr. Omoregie tell you
7    why he wanted to meet with you?
8       A      I met with him.   I don't recall -- I met with
9    him.
10      Q      Do you know why you met with him?
11      A      No.   Do you?
12      Q      I know what Mr. Omoregie said but I'm curious.
13   You were at the meeting.   You don't -- you don't know
14   why?
15      A      Could you be more specific?
16      Q      What conversation did you have with
17   Mr. Omoregie at this meeting?
18      A      Could you even be more specific than that?
19      Q      Do you have any recollection of any
20   conversation you had with Mr. Omoregie at this meeting?
21      A      At which meeting?
22      Q      The meeting we're talk -- did you have more
23   than one meeting with Mr. Omoregie in December of 2003?
24      A      No.   I -- I met with him once.
25      Q      Okay.

Deposition of Jack Dunn

Page 112

1      A    It was about Kiran posting for that -- for a

2  job he had.

3      Q    And how long did your meeting last?

4      A    It was short.

5      Q    Five minutes, ten minutes, 20 minutes?  Can you

6  give me any idea?

7      A    Yeah.  I would suppose something around

8  those -- that time frame.  Short.

9      Q    Less than a half an hour?

10     A    I would think so.  That's my recollection.

11     Q    Where did the meeting take place?

12     A    His office, as I recall.

13     Q    How is it that you were alerted that

14  Mr. Omoregie wanted to meet with you?

15     A    I don't recall.

16     Q    Where was Mr. Omoregie's office in relation to

17  yours at the time?

18     A    He was down -- I was on the second floor, he

19  was on the first floor of building C.

20     Q    And please tell me everything you can recall

21  about that conversation.

22     A    Can you be more specific?

23     Q    Do you recall anything that happened at the

24  conversation?

25     A    Yeah.  He -- he asked about Kiran's performance

Deposition of Jack Dunn

Page 113

1    and I said she was bright, very capable, she did a great

2    job for the first half of the year, and as the year went

3    on, she became less focused.

4         Q    Anything else that you said to Mr. Omoregie at

5    this meeting?

6         A    That's the gist of it.  That's all I recall.

7         Q    Did you explain what you meant when you said

8    that she became less focused as the year went on?

9         A    Not that I recall.  I was giving my honest

10   feedback about her performance in -- in request to his

11   posting of a job.

12        Q    Do you know what job it was that was being

13   posted?

14        A    I -- I believe he had a petroleum engineering

15   position.

16        Q    And when you said that Ms. Pande was bright and

17   capable, would you explain what you meant by that?

18        A    That's self-explanatory.

19        Q    Did you provide Mr. Omoregie with any other

20   details as to what you meant by "bright and very

21   capable"?

22        A    You're talking about three years ago now?  Is

23   that right?  Three and a half?  Two and a half?  Let's

24   see.  This would have been -- so I don't recall a short

25   conversation I had three years ago, two-and-a-half years

Deposition of Jack Dunn

Page 123

1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
2

3    KIRAN PANDE,                    )
                                     )
4                    Plaintiff,      )
                                     )
5    VS.                             ) Case No. 04-5107 CW
                                     )
6                                    )
     CHEVRON CORPORATION (f/k/a      )
7    CHEVRONTEXACO CORPORATION), a   )
     Delaware corporation, CHEVRON   )
8    INTERNATIONAL EXPLORATION &     )
     PRODUCTION (f/k/a               )
9    CHEVRONTEXACO OVERSEAS          )
     PETROLEUM COMPANY), a division  )
10   of Chevron U.S.A. Inc.,         )
                                     )
11                   Defendants.     )
12               REPORTER'S CERTIFICATION
                 DEPOSITION OF JACK DUNN
13                 OCTOBER 19, 2006
14       I, Lorri Lucas, Certified Shorthand Reporter in and
15   for the State of Texas, hereby certify to the following:
16       That the witness, JACK DUNN, was duly sworn by the
17   officer and that the transcript of the oral deposition is
18   a true record of the testimony given by the witness;
19       That the deposition transcript was submitted on
20   _____ to the witness or to the attorney for
21   the witness for examination, signature and return to
22   me by _____;
23       That pursuant to information given to the deposition
24   officer at the time said testimony was taken, the
25   following includes counsel for all parties of record:

Deposition of Jack Dunn

Page 124

1          Mr. Noah D. Lebowitz, Attorney for Plaintiff

2          Ms. Michelle Ballard Miller, Attorney for Defendants

3          That a copy of this certificate was served on all

4     parties shown herein.

5          I further certify that I am neither counsel for,

6     related to, nor employed by any of the parties or

7     attorneys in the action in which this proceeding was

8     taken, and further that I am not financially or otherwise

9     interested in the outcome of the action.

10         Certified to by me this 6th day of November, 2006.

11

12

13

14

15                    _Lorri Lucas_____

                  LORRI LUCAS, RMR, Texas CSR 5317

16                Expiration Date:  12/31/07

                  Bayou City Reporting, Inc.

17                Firm Registration No. 295

                  1135 East 11th Street

18                Houston, Texas  77009

                  (713) 861-8589

19

20

21

22

23

24

25

## Unknown

**From:** Dunn, Jack (JFDU)
**Sent:** Wednesday, November 19, 2003 12:00 PM
**To:** Pande, Kiran (Kiran.Pande)
**Cc:** Lomax, Sheree (ShereeLomax)
**Subject:** End employment date

Hi Kiran. Nice to talk to you the other day and good to hear you are getting better. Our thoughts are with you.

I wanted to follow up and let you know the letter we discussed is being mailed registered mail to your home address today. You may call Sheree Lomax at 842-1840 if you want to discuss further.

I trust the December 31, 2003 end-employment date aligns with discussions and communications we have had over the last 6 month on the planned December 12, 2003 Houston relocation of our work group, your decline of the offer to move effective June 9, 2003, and back filling of the position you vacated by Jason Ewles effective November 1, 2003.

As I mentioned, if there is anything I can do to assist you on a personal level to help you get through this transition let me know,

John F. (Jack) Dunn, Manager Block 14 New Field Development
ChevronTexaco Overseas Petroleum - Southern Africa Business Unit
Tel 925 842 1940 Fax 925 842 2836 Mobile 925 899 0471



Dunn
EXHIBIT NO. 12

**1205**

1

7195 Lamar Loop
Castro Valley, CA 94552

December 8, 2003
In regards to: "Voluntary Termination Letter, Dated 11-18-03"

Ms. Taryn L. Shawstad
General Manager, Human Resources
ChevronTexaco Overseas Petroleum
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324

Subject: Unlawful Termination

Dear Ms. Shawstad:

This letter is in response to the contents and claims of ChevronTexaco's letter titled
"Voluntary Termination" dated November 18, 2003 (attachment 1). I was shocked to
receive your letter in the mail on November 22, 2003 while I am on a company approved
short term disability due to medical reasons associated with my own serious health
condition. As you are aware, UnumProvident, the administrator of ChevronTexaco's
Disability Management Program, issued a letter on November 18, 2003 informing me and
the company that my absence from my employment due to medical reasons is eligible for
protection under FMLA and CFRA and my disability date was determined to be
November 10, 2003.

Your letter states ChevronTexaco's claim that I have voluntarily resigned from the
company. I would like to state unequivocally that I have never offered "Voluntary
Resignation" from ChevronTexaco as you contend in your letter. I have not voluntarily
resigned from ChevronTexaco nor have I agreed to a voluntary termination as your letter
contends. Furthermore, the following statement is false:

> "At the time you chose not accept the relocation offer you were informed that as
> long as there was useful work for you, that your employment with the company
> could continue until year end 2003."

Before I went on medical disability, I was offered and accepted to continue to work
through 2004. It is my present intention to complete that assignment when I return to
work from disability.

I believe that this statement that I have "voluntarily terminated" my employment is yet
another instance of unlawful conduct by ChevronTexaco commencing with the gender
and racial discrimination and harassment perpetrated by Mr. Rex Mitchell when I was in
his group. ChevronTexaco's attitude towards these issues, at least as to me, was
demonstrated by its failure to investigate Mr. Mitchell's conduct when I complained of it
and, more telling, the instruction to me that I could either leave the company, leave the

Dunn
XHIBIT NO. 13

1202

↲

group, or live with Mr. Mitchell. My repeated complaints about on-going retaliation were met with similar instructions. As a result of Mr. Mitchell's conduct and my complaint I received an unfair performance evaluation and salary treatment, I was denied a promotion that was promised to me, I was repeatedly slandered, denied a merit component in my salary treatment in April of this year, and then I was transferred to Mr. John Dunn's group that was destined for Houston.

Since I have been in Mr. John Dunn's group, and especially since I disclosed my need for a leave due to medical reasons I have been subjected to harassing conduct. Other employees have not only witnessed this conduct, but they have complained to Mr. Dunn and CTOP management about it. Notwithstanding, the unlawful conduct towards me continues, as demonstrated by this termination letter. As noted above, before I knew that I would need a leave for medical reasons I was offered, and I accepted, work through 2004 in San Ramon. According to the information ChevronTexaco promulgated, because I did not agree to relocate to Houston I was eligible for this work. Now ChevronTexaco contends that I have voluntarily terminated my employment. The only change that is apparent is my need for medical leave and the reporting of Mr. John Dunn's harassing conduct to CTOP management.

As I approach my 15 year service anniversary with ChevronTexaco on December 19, 2003, I am completely shocked that ChevronTexaco would choose to unlawfully terminate me in this manner while I am on a company approved disability leave and contending with my own serious illness. If under these circumstances the STEPS process is applicable, then I request it be implemented.

Sincerely,

*Kiran K. Pande*

Kiran K. Pande


Attachment 1: ChevronTexaco Letter from Taryn Shawstad, General Manager – Human Resources, CTOP, Titled "Voluntary Termination", Dated 11-18-03


cc:    Mr. Peter Robertson, Vice-Chairman
       Mr. George Kirkland, Corporate Vice-President and
                           President ChevronTexaco Overseas Petroleum Inc. (CTOP)
       Mr. James Blackwell, Managing Director, Southern Africa Business Unit, CTOP


**1203**

# CONFIDENTIAL

**From:** ▉▉▉▉▉▉

**Sent:** ▉▉▉▉▉▉

**To:** ▉▉▉▉▉▉

**Subject:** FW: Kiran Pande, PERNR #10769

---

**From:** Corp - Integrated Disability Management (corpidm) [mailto:corpidm@mssite01.ion.chevron.com]
**Sent:** Wednesday, October 29, 2003 3:23 PM
**To:** Dunn, Jack (JFDU)
**Subject:** RE: Kiran Pande, PERNR #10769

Jack,

Thank you so much for your inquiry regarding the status Kiran Pande's request for leave.

Here is the information UnumProvident has to date: She called them to request a leave for her own health condition on 10/28/03. She indicated her last date of work being Nov. 7, 2003. Her leave will start 11/10/03. Her return to work date is unknown at this time pending review of her medical records.

As stated under the Status Absence of Request section on below notice, her STD and FMLA leaves are conditionally approved while in pending status and no disciplinary or employment action regarding her absence should be taken.

I have included a link to our DM Web site addressing her reporting responsibility under the DM program for your reference.

http://hr2.chevrontexaco.com/disabilitymanagement/13_Employees.asp#Keep

I hope the above answers your questions. If you have further concerns, please do not hesitate to contact us again. Thank you.


**Martha J. Martinez**
Office Assistant/Coordinator

**ChevronTexaco Corporation**
Health and Medical Services/Disability Management
6001 Bollinger Canyon Road, Room E1048
San Ramon, CA 94583-2324
Tel 925 842-3026 Fax 925 842-3242

mailto:MarthaMartinez@chevrontexaco.com

Disability Management Website = http://hr2.chevrontexaco.com/disabilitymanagement/

-----Original Message-----



Dunn
EXHIBIT NO. 5

Message

**CONFIDENTIAL**

**From:** Dunn, Jack (JFDU)
**Sent:** Wednesday, October 29, 2003 10:53 AM
**To:** Corp - Integrated Disability Management (corpidm)
**Subject:** FW: Kiran Pande, PERNR #10769

**John F. (Jack) Dunn,** Manager Block 14 New Field Development
ChevronTexaco Overseas Petroleum - Southern Africa Business Unit
Tel 925 842 1940 Fax 925 842 2836 Mobile 925 899 0471
-----Original Message-----
**From:** Corrigan, Elizabeth A [mailto:EACorrigan@unumprovident.com]
**Sent:** Wednesday, October 29, 2003 9:03 AM
**To:** Dunn, Jack (JFDU)
**Cc:** Horna, Giannina F. (gifh)
**Subject:** Kiran Pande, PERNR #10769

**NOTE: Please do not "Reply" to this email.**

**We're unable to respond to your email requests, but for more information about this absence, please call the HR Service Center at 1-888-TALK2HR (1-888-825-5247). For an absence that is FMLA-related only, select option 5 and then option 4. For an absence that's related to a disability, or both a disability and FMLA, select option 5 and then option 3.**

The information checked below applies to the employee referenced above who has reported an absence through UnumProvident. This information is being sent to you as a supervisor or time administrator, since you're responsible to accurately code an employee's time in SAP HR. Please use this information to code the employee's time appropriately.

Please note that the absence dates indicated are the calendar days, including work and nonwork days, that the absence is expected to last. It is your responsibility to access the employee's work schedule and use these blocks of time to identify what work days in the system should be coded as qualifying for STD, FMLA, or both based on the information in this email. If you are unsure which specific SAP code to use, contact your TA or TA Helpline. Ultimately, it is the supervisor's responsibility to make the final decision about whether to pay STD benefits or approve FMLA time, based on these advice-to-pay notices. (Remember: UnumProvident does not have access to SAP HR.) Any changes to the dates or status of this absence will be communicated to you via subsequent emails.

**Time administrator: Please forward this email to the employee's HR Business Partner and your local medical clinic or local medical resource (if applicable).**

**Absence Request Summary:**

__X___ The above-referenced employee has requested an absence beginning on 11/10/03 with a projected return-to-work date of unknown. This absence is expected to be:

__X___ a full, continuous absence;

Upon return, the employee is expected to work on the following schedule*:

             __X___ at this time, the return-to-work schedule is unknown.

             *If there are issues with this planned return-to-work schedule, or if you need more information

CHEVRON/PANDE03656

**CONFIDENTIAL**

about this absence, please contact UnumProvident via the HR Service Center at the numbers
above. You can also contact the Disability Management group via email at
corpidm@chevrontexaco.com <<mailto:corpidm@chevrontexaco.com>>, or call them at CTN
842-3026 (1-925-842-3026).

<u>**Status of Absence Request:**</u>

__X___ The status of the absence for protection under FMLA or related state law is:

        __X___ pending; (Please note: All pending leaves are conditionally approved. No disciplinary or
        employment action regarding the absence should be taken while the absence is pending.)

__X___ The status of the absence for Short-Term Disability (STD) Plan benefits is:

    __X___ pending;

Please keep in mind that employees may be eligible for other benefits under ChevronTexaco's Family Leave or
another leave of absence. For information about ChevronTexaco's leaves, please refer to the summary plan
descriptions (SPDs), which are available on the intranet on the North America home page at
<https://hr.chevrontexaco.com/northamerica>, via the Internet at <http://hr2.chevrontexaco.com/plansummaries>,
or by contacting the HR Service Center at 1-888-TALK2HR (1-888-825-5247) and selecting option 2.

For details about the disability management process and supervisors' and time administrators roles and
responsibilities, please refer to the Disability Management Web site at
<<http://hr2.chevrontexaco.com/disabilitymanagement>>. Select "What Are My Responsibilities?".

Thank you,
UnumProvident

CHEVRON/PANDE03657

**EXHIBIT E**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

KIRAN PANDE,                          )  CASE NO. 04-5107 CW
                                      )
              Plaintiff(s),           )
                                      )
VS.                                   )
                                      )
CHEVRON CORPORATION (f/k/a            )
CHEVRONTEXACO CORPORATION),           )
a Delaware corporation,               )
CHEVRON INTERNATIONAL                 )
EXPLORATION & PRODUCTION,             )
(f/k/a CHEVRONTEXACO                   )
OVERSEAS PETROLEUM COMPANY),          )
a division of Chevron U.S.A.          )
Inc.,                                 )
                                      )
              Defendant(s).           )

**************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
TAYO FEYIJIMI
OCTOBER 26, 2006
**************************************************

        ORAL AND VIDEOTAPED DEPOSITION of TAYO FEYIJIMI,
produced as a witness at the instance of the Plaintiff,
and duly sworn, was taken in the above-styled and
numbered cause on the 26th of October, 2006, from
3:01 p.m. to 4:10 p.m., via telephone, before Wendy J.
Lege', CSR in and for the State of Texas, reported by
machine shorthand, at the offices of Bayou City
Reporting, Inc., 1135 East 11th Street, Houston, Texas
77009, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
herein.



**Bayou City Reporting inc.**

1135 East 11th Street • Houston, TX 77009
Phone: (713) 861-8589 • Toll Free: (888) 577-5048 • Fax: (713) 861-1729 • Email: bcrdepo@sbcglobal.net

Deposition of Tayo Feyijimi

Page 15

1    A.    As far as I observed.

2    Q.    Okay.   During the entire year of -- based

3    on --

4            MR. LEBOWITZ:   Strike that.   Let me start

5    again.

6    Q.    (BY MR. LEBOWITZ)   Based on your interactions

7    with Ms. Pande in the workplace during the year of

8    2003, did you form an opinion as to her work abilities?

9            MS. HAMASAKI:   I'm going to object on the

10   ground that it's vague.

11   A.    Yes, I did.

12   Q.    (BY MR. LEBOWITZ)   And what was that opinion?

13   A.    I think at the start of the year, initially

14   during the early part of 2003, Mrs. -- Ms. Pande was --

15   I mean, it was pretty obvious it was really busy and

16   she was putting in a lot of hours, but towards the

17   latter part of the year I saw a reduction in generally

18   her work effort and her commitment to the project.

19   Q.    When you say latter part of the year, can you

20   be more specific?

21   A.    Well, on or around -- or basically once --

22   some time during 2003 the move to Houston was announced

23   and basically progressively after the announcement of

24   the move to Houston, I saw a reduction in basically her

25   commitment levels and her work efforts.

Deposition of Tayo Feyijimi

1    Q.   Can you be specific or give me any examples of

2    what you mean by a reduction in her commitment to the

3    project?

4    A.   Basically progressively after the announcement

5    of the move to Houston, it became increasing difficult

6    getting ahold of Kiran, Ms. Pande.  She would come in

7    to work later than she had in the past.  You know, most

8    of the time she would have her office door shut; so if

9    you went through, she was either on the phone or many a

10   time she just wasn't around, you know, we just wouldn't

11   be able to find her and people would basically, you

12   know, go looking for her in her office and couldn't

13   find her and then they'd come to me and ask about where

14   Kiran was.  I mean, she just wasn't as present as she

15   had been during the early part of the year.

16   Q.   Did you ever express this opinion to anyone?

17         MS. HAMASAKI:  I'm going to object to the

18   extent it calls for attorney/client privilege.

19         You can answer as long as you're not

20   disclosing --

21         THE COURT REPORTER:  Can you repeat that?

22         MR. LEBOWITZ:  Yeah.  Let me ask it --

23   let me narrow it down a little bit.

24         THE COURT REPORTER:  I need to hear the

25   objection again.

Deposition of Tayo Feyijimi

Page 46

1  THE STATE OF TEXAS

2

3        I, WENDY J. LEGE', the undersigned Certified
Shorthand Reporter, in the State of Texas, do hereby

4  certify that the facts as stated by me in the caption
hereto are true; that the above and foregoing answers

5  of the witness,

        TAYO FEYIJIMI,

6  stated in the caption hereto, to the deposition as
indicated, were made before me by the said witness

7  after being duly cautioned and sworn to testify the
truth, the whole truth and nothing but the truth, and

8  the same were thereafter reduced to typewriting under
my direction; that the above and foregoing deposition

9  as set forth is a full, true, and correct transcript of
the proceedings had at the time of taking said

10  deposition.

        I further certify that I was neither attorney

11  nor counsel for, or related to, nor employed by any of
the parties to the action in which this deposition is

12  taken, and further that I am not a relative or employee
of any counsel employed by the parties hereto, or

13  financially interested in this action.

        GIVEN UNDER MY HAND AND SEAL OF OFFICE this

14  _____ day of _____, 2006

15

16  _____
    WENDY J. LEGE', CSR

17  Certificate No.:  3744
    Expiration Date:  12-31-06

18  BAYOU CITY REPORTING, INC.
    Firm No.: 295

19  1135 East 11th Street
    Houston, Texas  77009

20  713.861.8589

21

22

23

24

25