Michele Ballard Miller (SBN 104198)
Kerry McInerney Freeman (SBN 184764)
Lisa C. Hamasaki (SBN 197628)
MILLER LAW GROUP
A Professional Corporation
60 E. Sir Francis Drake Blvd., Ste. 302
Larkspur, CA 94939
Tel. (415) 464-4300
Fax (415) 464-4336

Attorneys for Defendants CHEVRON CORPORATION (f/k/a CHEVRONTEXACO CORPORATION), a Delaware corporation, and CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a CHEVRONTEXACO OVERSEAS PETROLEUM COMPANY), a division of Chevron U.S.A. Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRAN PANDE,<br><br>          Plaintiff,<br><br>v.<br><br>CHEVRON CORPORATION (f/k/a CHEVRONTEXACO CORPORATION), a Delaware corporation, and CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a CHEVRONTEXACO OVERSEAS PETROLEUM COMPANY), a division of Chevron U.S.A. Inc.,<br><br>          Defendants. | Case No. 04-5107 CW<br><br>**DECLARATION OF JAMES JOHNSON IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Date:      January 5, 2007<br>Time:     10:00 a.m.<br>Courtroom: 2<br><br>Complaint filed: December 2, 2004<br><br>Trial Date: April 16, 2007<br><br>Honorable Claudia Wilken |

I, JAMES JOHNSON, declare:

1.      I began working with Chevron and various Chevron-related entities in 1981. From approximately February 2002 until March 2003, I was the General Manager of

---

1
**DECLARATION OF JAMES JOHNSON IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**
**Case No. 04-5107 CW**

Business Development and Planning for Chevron Overseas Petroleum ("COP").[1] As the General Manager of Business Development and Planning for COP, my primary responsibilities included oversight of the Business Development and Planning function and the Opportunity Assessment group. I have personal knowledge of the matters set forth herein, except those stated on information and belief. If called as a witness, I could competently testify thereto.

2. When I started as the General Manager of Business Development and Planning, both Rex Mitchell and Kiran Pande were already working in that unit. Mr. Mitchell was the Manager for Business and Strategic Planning for COP and Ms. Pande was a portfolio analyst in the same group. Ms. Pande reported directly to Rex Mitchell and Mr. Mitchell reported to me. Accordingly, I had some supervisory authority over Ms. Pande, as I was her second level supervisor.

3. In early March 2002, Ms. Pande approached me and indicated that she was having problems with her supervisor, Rex Mitchell. At the time, she advised she was ranked a "2" in performance and believed she should have been designated a "1" (top level performance). Accordingly I met with Ms. Pande at which time she raised several concerns about Mr. Mitchell.

4. Taking her complaints seriously, I immediately began to investigate the matter. I met with Mr. Mitchell and addressed Ms. Pande's concerns and allegations and got his side of the story. During my initial discussion with Mr. Mitchell, he informed me that Ms. Pande had been having performance issues and notified me that there was significant documentation to support his position.

---

[1] "COP" has had various names over the years including ChevronTexaco Overseas Petroleum, and now, Chevron International Exploration and Production Company. For ease of reference, however, I will refer to this entity as "COP" throughout my declaration.

5. In an effort to resolve any issues between Ms. Pande and Mr. Mitchell, I scheduled a meeting with both Ms. Pande and Mr. Mitchell so that we could discuss the situation and hopefully put it behind us. During the meeting, Mr. Mitchell explained his position and had documents supporting his position that Ms. Pande's performance and attitude had deteriorated significantly since the Chevron-Texaco merger in late 2001. Mr. Mitchell provided specific examples of missed deadlines and other performance problems on the part of Ms. Pande. During the meeting, Ms. Pande refused to take responsibility for any of the issues raised. Instead, she was defensive and attempted to make excuses for each issue raised by Mr. Mitchell. Nonetheless, we continued to discuss the issues and the working relationship between Mr. Mitchell and Ms. Pande, and by the end of that meeting, I believed that we were on a path to resolution. Specifically, at the end of that meeting we agreed on a plan for moving forward – Mr. Mitchell and Ms. Pande would close out Ms. Pande's 2001 performance evaluation (known as a "PMP") and would begin the 2002 PMP process. At that time, I did not understand Ms. Pande's complaints to involve allegations of harassment or discrimination.

6. At some point in April 2002, I was provided a copy of Ms. Pande's 2001 PMP which included a long section purportedly written by Ms. Pande. Within that section, there was an indication that Ms. Pande viewed Mr. Mitchell's conduct towards her as harassment. At no time, however, did Ms. Pande ever indicate to me that she felt that she had been sexually harassed by Mr. Mitchell.

7. Every allegation that Ms. Pande made I took very seriously and investigated. Indeed, after receiving Ms. Pande's 2001 PMP, I recall spending hours meeting with Ms. Pande, Mr. Mitchell and anyone else who Ms. Pande raised as a potential witness or as someone with potential knowledge of the issues she raised.

8. At some point in April 2002, I was also advised that Ms. Pande had raised issues concerning her rapport with Mr. Mitchell to the ombuds office. I spoke with an individual in the ombuds office on several occasions about Ms. Pande's claims. Notwithstanding the fact that I was aware that the office of the ombuds was involved in Ms. Pande's claims, I took the lead in investigating Ms. Pande's allegations in an attempt to resolve any ongoing issues.

9. Around that same time, I recall that Vicki Thompson, a reserves analyst in the business and planning unit, joined Ms. Pande in her communications to the office of the ombuds. Ms. Thompson also had issues pertaining to her supervision by Mr. Mitchell. When I investigated the issues raised by Ms. Thompson, I did not find any evidence that she was ever discriminated against or harassed by Mr. Mitchell. However, I did determine that given her position and job responsibilities, it made better business sense to have Ms. Thompson report to Kelly Hartshorn, another supervisor in the unit who was responsible for opportunity assessment. Simply put, Ms. Thompson's function as a reserves analyst fit better within Ms. Hartshorn's group and Ms. Hartshorn's area of expertise. The same, however, could not be said about Kiran Pande's function. Accordingly, I arranged to have Ms. Thompson report directly to Ms. Hartshorn. It was my understanding that the move resolved any issues relating to Ms. Thompson.

10. I believe that I first informed Ms. Thompson of the decision to move her into Ms. Hartshorn's group during a meeting that I had with Mr. Yamashita, from the office of the ombuds, Ms. Pande, and Ms. Thompson.

11. I did not offer to move Ms. Pande into Ms. Hartshorn's group because Ms. Pande's position and business function fit within Mr. Mitchell's area of expertise, not Ms. Hartshorn's. Additionally, as stated previously, despite looking into these issues thoroughly,

I never found any substantiation of Ms. Pande's allegations, and never found anything to suggest that Mr. Mitchell unlawfully harassed or discriminated either Ms. Pande or Ms. Thompson.

12. Indeed, at Ms. Pande's prompting, I spoke with several potential witnesses including Iris Owens (the group's administrator) as well as Kemal Ambarci (a business analyst in the group). Neither of these individuals confirmed any of Ms. Pande's claims.

13. Ms. Pande told me that Rex Mitchell had discriminated against Iris Owens. When I spoke with Ms. Owens, however, she told me that she did not feel that Mr. Mitchell discriminated against her. Ms. Owens did indicate that she was upset by the way that Mr. Mitchell spoke to her regarding her organization of the business unit's files, claiming that he was very abrupt and abrasive, but did not indicate that this conduct was harassing or discriminatory. Following my conversation with Ms. Owens, I spoke with Mr. Mitchell about his demeanor and indicated that he should try to be more aware of how others perceived him. It was my impression that Mr. Mitchell was receptive to this counseling.

14. I also spoke with Mr. Kemal Anbarci because Ms. Pande mentioned him as another example of someone who Rex Mitchell discriminated against. My recollection from my discussion with Mr. Anbarci, is that he did not confirm Ms. Pande's allegations.

15. In short, despite speaking to numerous individuals and conducting a thorough investigation, I found nothing to suggest that Mr. Mitchell ever discriminated against or harassed Ms. Pande or anyone else.

1  I declare under penalty of perjury under the laws of the United States of
2  America that the foregoing is true and correct. Executed on this 29 day of November, 2006
3  in Perth, Australia.

*[signature]*
_____
James Johnson