John A. McGuinn, Esq. SBN 36047
Noah D. Lebowitz, Esq. SBN 194982
McGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202

Attorneys for Plaintiff
KIRAN PANDE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

KIRAN PANDE,

Plaintiff,

vs.

CHEVRON CORPORATION (f/k/a CHEVRONTEXACO CORPORATION), a Delaware corporation, CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a CHEVRONTEXACO OVERSEAS PETROLEUM COMPANY), a division of Chevron U.S.A. Inc,

Defendants.

NO. 04-5107 CW

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

Date: January 5, 2007
Time: 10:00 a.m.
Crtrm: 2

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . 1

II. CHEVRON CANNOT MEET ITS BURDEN ON THIS MOTION BECAUSE THE DECLARATIONS OF PREVIOUSLY UNDISCLOSED WITNESSES MUST BE STRICKEN UNDER F.R.Civ.P. 26(a) & 37(c) . . . . . 1

III. STATEMENT OF FACTS . . . . . 1

A. KIRAN PANDE . . . . . 1

B. 1988-2001 – PANDE'S EMPLOYMENT HISTORY WITH CHEVRON . . . . 2

C. 2001-2002 – PANDE'S CAREER PATH HALTED BY REX MITCHELL . . . 3

D. SPRING 2002 – PANDE SEEKS ASSISTANCE FROM CHEVRON'S OMBUDS . . . . . 3

E. APRIL 2002 – MITCHELL'S CONDUCT CONTINUES . . . . . 4

F. APRIL 2002 – PANDE AND THOMPSON SEEK REMEDIAL ACTION FROM CHEVRON OMBUDS . . . . . 4

G. SUMMER-FALL 2002 – MITCHELL'S RETALIATION CONTINUES . . . . . 6

H. APRIL 2003 – MITCHELL'S RETALIATORY INFLUENCE CONTINUES TO AFFECT PANDE EVEN AFTER SHE HAS LEFT HIS GROUP . . . . . 7

I. SPRING-SUMMER 2003 – CHEVRON ANNOUNCES SASBU'S MOVE TO HOUSTON . . . . . 7

J. OCTOBER 2003 – DUNN OFFERS PANDE WORK IN SAN RAMON THROUGH 2004 . . . . . 7

K. OCTOBER 2003 – PANDE LEARNS OF NEED FOR MEDICAL LEAVE . . 8

L. OCTOBER 30, 2003 – PANDE TELLS DUNN ABOUT MEDICAL LEAVE . 8

M. NOVEMBER 4, 2003 – DUNN BLOWS UP AT PANDE BECAUSE OF HER IMPENDING MEDICAL LEAVE . . . . . 9

N. NOVEMBER 7, 2003 – PANDE REQUESTS VACATION CARRYOVER INTO 2004 . . . . . 10

O. NOVEMBER 17, 2003 – DUNN NOTIFIES PANDE ABOUT HER TERMINATION WHILE SHE IS ON MEDICAL LEAVE . . . . . . . . . . . . . . . 10

P. DECEMBER 8, 2003 – PANDE FILES DFEH COMPLAINT . . . . . . . . . . . 11

Q. DECEMBER 8, 2003 – PANDE OBJECTS TO HER TERMINATION . . . . 11

R. DECEMBER 2003 – DUNN SCUTTLES PANDE'S LAST CHANCE AT MAINTAINING HER EMPLOYMENT WITH CHEVRON . . . . . . . . . . . . . . 11

IV. THE NINTH CIRCUIT HAS SET A HIGH STANDARD FOR THE GRANTING OF SUMMARY JUDGMENT IN EMPLOYMENT DISCRIMINATION CASES . . . . . . 13

V. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. CONTEXT MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B. PANDE HAS RAISED A TRIABLE ISSUE OF FACT THAT HER FAMILY MEDICAL LEAVE WAS A NEGATIVE FACTOR IN HER CONTINUED EMPLOYMENT WITH CHEVRON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1. Pande Has Raised a Triable Issue of Fact that Her Exercise of FMLA/CFRA Rights Was A Negative Factor in Chevron's Decision to Terminate Her and Chevron's Denial of the ETC Job . . . . . . . . . . 15

a. Pande Never Voluntarily Resigned . . . . . . . . . . . . . . . . . . . 16

b. Pande Was Offered Employment with Chevron in San Ramon through 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

c. After His November 4, 2003 Tirade Against Pande, Dunn Negatively Influenced Pande's Candidacy for the ETC Jobs 17

C. BY TERMINATING PANDE'S EMPLOYMENT, CHEVRON ALSO VIOLATED THE FMLA AND CFRA BECAUSE IT DID NOT GRANT HER THE FULL EXTENT OF LEAVE FOR WHICH SHE WAS ELIGIBLE . . . . . . . . . . . . . 18

D. CHEVRON VIOLATED PANDE'S FMLA/CFRA RIGHTS TO CONFIDENTIALITY AND PRIVACY IN HER MEDICAL RECORDS . . . . 19

E. PANDE HAS RAISED A TRIABLE ISSUE OF FACT AS TO THE VARIOUS ADVERSE EMPLOYMENT ACTS ATTRIBUTABLE TO MITCHELL . . . . 21

1. Pande Has Raised a Triable Issue of Fact as to Her Claims of Gender and Race/National Origin Discrimination . . . . . . . . . . . . . . . . . . . . 21

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

2. Pande Has Raised a Triable Issue of Fact as to Her Claim for Retaliation . . . . . 23

3. Mitchell's Conduct Constitutes a Continuing Violation . . . . . 24

VI. CONCLUSION . . . . . 25

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) . . . . . . . . . . 1

*Ash v. Tyson Foods, Inc.*,
546 U.S. ___, 126 S. Ct. 1195 (2006) . . . . . . . . . . 13

*Bachelder v. America West Airlines, Inc.*,
259 F.3d 1112 (9th Cir. 2001) . . . . . . . . . . 15, 16

*Brown v. Puget Sound Electric Apprenticeship & Training Trust*,
732 F.2d 726 (9th Cir. 1984) . . . . . . . . . . 17

*Burlington Northern & Santa Fe Railway Co. v. White*,
548 U.S.___, 126 S. Ct. 2405 (2006) . . . . . . . . . . 14

*Celotex Corp. v. Catrett*,
477 U.S. 317 . . . . . . . . . . 1

*Liu v. Amway Corp.*,
347 F.3d 1125 (9th Cir. 2003) . . . . . . . . . . 15, 18

*Lujan v. Waters*,
813 F.2d 1051 (10th Cir. 1987) . . . . . . . . . . 18

*McGinest v GTE Serv. Corp*
360 F.3d 1103, 1124 (9th Cir. 2004) . . . . . . . . . . 13, 22

*Paz v. Wauconda Healthcare & Rehabilitation Ctr., LLC*,
464 F.3d 659 (7th Cir. 2006) . . . . . . . . . . 17

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) . . . . . . . . . . 13, 17, 22

*Saffa v. Oklahoma Oncology, Inc.*,
405 F. Supp. 2d 1280 (N.D. Okla. 2005) . . . . . . . . . . 14

*Wilsey v. Evans*,
2006 U.S. Dist. LEXIS 67891 (N.D. Cal. 2006) . . . . . . . . . . 1

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

## STATE CASES

*Caldwell v. Paramount Unified Sch. District*, 41 Cal. App. 4th 189 (1995) . . . . . . . . . . 22

*Guz v. Bechtel National Corp.*, 24 Cal. 4th 317 (2000) . . . . . . . . . . 21, 22

*Lyle v. Warner Brothers Television Productions*, 38 Cal. 4th 264 (2006) . . . . . . . . . . 14

*Yanowitz v. L'Oreal*, 36 Cal. 4th 1028 (2005) . . . . . . . . . . 14, 22, 23, 24, 25

## FEDERAL STATUTES

29 U.S.C. § 2615 *et seq.* . . . . . . . . . . 1, 15

29 C.F.R. § 825.161(a) . . . . . . . . . . 19

29 C.F.R. § 825.306 . . . . . . . . . . 20

29 C.F.R. § 825.308(b)(1) . . . . . . . . . . 19

## STATE STATUTES

Cal Gov Code § 12900 *et seq.* . . . . . . . . . . 1

Cal. Gov. Code §12945.2 . . . . . . . . . . 1, 15

2 CCR § 7297.2(c)(1) . . . . . . . . . . 19

## OTHER AUTHORITIES

*Moore's Fed. Prac.*, § 56.13[1] . . . . . . . . . . 1

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

## I. INTRODUCTION

Plaintiff Kiran Pande ("Pande") has developed a record replete with facts which – when, as they must, are construed in her favor – would permit a reasonable jury to find in her favor on the following claims:[1] (1) Violations of the Family Medical Leave Act ("FMLA") (29 USC § 2615 *et seq.*), and California Family Rights Act ("CFRA") (Cal. Gov. Code § 12945.2) as follows: (a) Wrongful termination; (b) Violation of medical privacy rights; (c) Failure to grant full extent of leave; (2) Violations of the Fair Employment and Housing Act (Cal. Gov. Code § 12900 *et seq.*) as follows: (a) Gender discrimination by Rex Mitchell; (b) Race/National Origin discrimination by Rex Mitchell;(c) Retaliation by Rex Mitchell; and (3) Wrongful Termination in Violation of Public Policy, incorporating the above violations.

## II. CHEVRON CANNOT MEET ITS BURDEN ON THIS MOTION BECAUSE THE DECLARATIONS OF PREVIOUSLY UNDISCLOSED WITNESSES MUST BE STRICKEN UNDER F.R.Civ.P. 26(a) & 37(c)

Chevron "bears the initial responsibility of informing the district court of the basis of that motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323. This burden is not met by a mere assertion. 11 *Moore's Fed. Prac.*, § 56.13[1] (Matthew Bender 3rd ed.) "If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied." *Wilsey v. Evans*, 2006 U.S. Dist. LEXIS 67891, *4-5 (N.D. Cal. 2006); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970). As set forth in the accompanying Objection to Witnesses, the declarations of eight of the fifteen witnesses must be stricken. Without the offending declarations, Chevron's motion is reduced to a mere assertion and should be denied.

## III. STATEMENT OF FACTS

### A. KIRAN PANDE

Pande was born in India in 1962 and immigrated to the United States in 1964.

[1] Pursuant to Local Rule 7-3, Pande states that she does not oppose this motion insofar as her Second Amended Complaint can be construed to allege gender discrimination and race/national origin discrimination for actions taken by John (aka Jack) Dunn and insofar as it addresses her Seventh and Eighth Cause of Action, and consents to dismissal of those claims.

Pande Decl. ¶ 2. Pande became a U.S. citizen in or about 1971. *Id.* Pande is a petroleum engineer who has worked for major oil companies for the better part of 22 years. *Id.* She earned a Bachelor of Science degree in Chemical Engineering from the University of California-Berkeley in 1983, a Masters Degree in Petroleum Engineering from Stanford University in 1985, a Doctorate in Petroleum Engineering from Stanford in 1989, an a Masters of Business Administration from UC Berkeley Haas School of Business in 2000. *Id.* In addition, Pande has maintained an appointment as a Consulting Professor at Stanford University since 2003. *Id.* Pande has also published papers and presented papers at conferences in the U.S. and Europe and is considered an expert in the field. *Id.*

**B. 1988-2001 – PANDE'S EMPLOYMENT HISTORY WITH CHEVRON**

In late 1988, Pande was hired by Chevron Corporation as a research engineer in the Chevron Oil Field Research Company ("COFRC"). Answer to Second Amended Complaint ("Answer") ¶ 9. COFRC became part of Exploration Production Technology Company ("EPTC") in 1992. *Id.* While in COFRC and EPTC, Pande consistently earned high praise from her supervisors for her job knowledge, problem solving ability, teamwork, creativity, and initiative. *Id.* Pande's supervisors regularly described Pande as "an outstanding employee" and as doing "an excellent job." *Id.* In or about October 1992, Pande was promoted to Grade Level 23 as a Senior Research Engineer. *Id.*

In January 1995, Pande was transferred from EPTC in La Habra to Chevron Overseas Petroleum, Inc. ("COPI") in San Ramon, California. Answer ¶ 10. At the time of her transfer, EPTC management told her that any time she wanted to come back to EPTC there would be a place for her. Pande Decl. ¶ 4. Throughout the next several years, Pande worked on a broad range of projects for COPI, including an overseas assignment in Europe and Africa. Answer ¶ 10. In April 1997, Pande was promoted to Grade Level 24 with the title Advisor, Petroleum Engineering. *Id.* Pande's supervisors recommended that she be given an opportunity to gain commercial and business experience in the

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

Commercial, Planning, or Corporate Finance groups. Pande Decl. ¶ 5 & Exh. A.[2]

**C. 2001-2002 – PANDE'S CAREER PATH HALTED BY REX MITCHELL**

In September 2000, Pande was transferred to COPI's Planning Group. *Id.*; Answer ¶ 11. In this position, Pande directly reported to Rex Mitchell ("Mitchell"). Answer ¶ 11. In October 2001, shortly after the mega-corporate merger which created ChevronTexaco Corporation, Pande became the Portfolio Analyst in the Planning Group. Answer ¶ 12. At the time, Mitchell promised to promote Pande to Grade 25. Pande Decl. ¶ 7.

Soon thereafter, however, Pande's longstanding history of ascension in the company was abruptly interrupted by Mitchell's conduct towards her. In particular, she began to suffer harassment and discrimination based on her gender and race/national origin at the hands of Mitchell. *Id.* ¶ 8. In March 2002, Pande complained to Mitchell's supervisor, James Johnson ("Johnson"), about Mitchell's conduct. Answer ¶ 13. Pande told Johnson that she felt unfairly singled out by Mitchell in his conduct towards her and that Mitchell was overburdening her with work. Pande Decl. ¶ 8. Pande also told Johnson that she had learned about a recent occasion where Mitchell referred to a group of people of East Indian origin as "towel heads." Answer ¶ 13; *but see* Johnson Decl. ¶ 5

Johnson did nothing to investigate Pande's complaints. Pande Decl. ¶ 10. Instead, he told Pande that she had three choices: (1) leave the company, (2) leave the group, or (3) stay for 12 to 18 months and get along with Mitchell. Pande Depo 268:25-269:6.[3]

**D. SPRING 2002 – PANDE SEEKS ASSISTANCE FROM CHEVRON'S OMBUDS**

Previously, Chevron disseminated information to its employees that the company

---

[2] This document is Pande's performance review for the year 1999. The supervisor comments in the document incorporate comments from Jean Camy, among others. If the Court does not strike Mr. Camy's declaration, it should look with a critical eye to what Camy states in comparison with the all-around glowing comments reflected in this 1999 performance review, including positive comments about Pande's communication skills and commitment to teamwork. *Compare* Camy Decl. ¶ 2 *with* Pande Decl. Exh. A [pp. 24, 27.]

[3] All deposition excerpts are attached as exhibits to the Declaration of Noah D. Lebowitz ("Lebowitz Decl."), submitted concurrently herewith.

maintained a written policy which asserted that the company strongly forbade workplace harassment and discrimination and that all complaints alleging such conduct would be taken seriously. Answer ¶ 14. To that end, Chevron had in place a designated person, a so-called Ombuds, as a purportedly neutral party to hear all such complaints. *Id.* In 2002, the Ombuds responsible for Pande's group was Gary Yamashita ("Yamashita"). *Id.*

In the Spring of 2002, Pande decided to file a formal complaint with Yamashita. *Id.* ¶ 15; Pande Depo 268:17-24. Pande alleged discrimination and harassment and refusal by Johnson to investigate her earlier complaint of discrimination and harassment. Answer ¶ 15; Yamashita Depo 28:11-17; Pande Depo 269:22-270:1, 271:15-272:3.

**E. APRIL 2002 – MITCHELL'S CONDUCT CONTINUES**

On April 1, 2002, Pande met with Mitchell to discuss her annual performance review. Answer ¶ 16; Pande Depo 243:1-5. During this meeting with Mitchell, Pande told him that she felt his behavior towards her was inappropriate and constituted harassment. Pande Depo 249:23-250:3; *see also* Answer ¶ 16. Mitchell attempted to minimize his behavior, attributing it to stress. Answer ¶ 16. Mitchell also failed to promote Pande to Grade 25 as he had promised in 2001. *Id.*; Pande Depo 226:3-17, 229:7-230:8. After that April 1 meeting, Mitchell informed Pande for the first time that he was ranking her as "average." Pande Depo 245:20-246:7; 250:18-251:2 & Exh. 10.[4]

Pande and the only other female in the group, Victoria Thompson ("Thompson"), were ranked lower than the men in the group and received lower raises and merit increases than the men in the group. Pande Depo 246:9-21; Thompson Decl. ¶ 4.

**F. APRIL 2002 – PANDE AND THOMPSON SEEK REMEDIAL ACTION FROM CHEVRON OMBUDS**

Thompson joined Pande and filed her own complaint with Yamashita alleging

[4] This timing demonstrates that Johnson's declaration (if not stricken) is materially false. In that declaration, Johnson states that Pande came to him "[i]n early March 2002" and informed him that she complained about Mitchell's ranking of her. Johnson Decl. ¶ 3. This is not possible because Pande did not even know about her ranking until after her April 1 meeting with Mitchell. Pande Depo 245:20-246:7; 250:18-251:2 & Exh. 10.

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

harassment and discrimination by Mitchell. Answer ¶ 17; Pande Depo 270:20-271:2; Thompson Decl. ¶¶ 6-7. According to Chevron's internal human resources policies in force at the time, a designated avenue for pursuing a complaint of harassment was to speak with the Ombuds. Yamashita Depo 22:21-23:22 & Exh. 1. Yamashita suggested a joint meeting with Yamashita, Johnson, Pande, and Thompson to discuss the complaints. Answer ¶ 17; Thompson Decl. ¶ 7. Prior to that meeting, at Yamashita's request, Pande and Thompson submitted a list of "bullet points" which they wished Yamashita to address during the investigation. Answer ¶ 18; Pande Depo 272:10-20; Thompson ¶ 8 & Exh. A.

On April 24, 2002, Yamashita held what was supposed to be an investigatory meeting. Answer ¶ 19; Thompson Decl. ¶ 11; Pande Depo 272:22-273:5. Yamashita first met alone with Johnson. Answer ¶ 19; Thompson Decl. ¶ 11; Pande Depo 272:22-273:5. Then, together, they met with Pande and Thompson. Answer ¶ 19; Thompson Decl. ¶ 11; Pande Depo 272:22-273:5. During that meeting, both Pande's and Thompson's complaints were given no credence by Johnson. Thompson Decl. ¶ 11-18; Pande Depo 277:2-22. In fact, the meeting turned into an attack on Pande's performance, whereby Johnson levied false accusations about Pande's performance. Answer ¶ 19; Thompson Decl. ¶ 11-18. Pande Depo 277:2-22. Pande specifically expressed her concern about Mitchell's use of racial and ethnic slurs to refer to people of her ethnic background, but received no feedback or assurances of remedial action. Answer ¶ 19; Thompson Decl. ¶ 11-18; Pande Depo 277:24-278:8.

Even though Pande and Thompson followed company policy by lodging their complaints with the Ombuds, Yamashita did nothing to follow through on an investigation or do anything outlined in the policy as far as investigating the allegations. Yamashita Depo 25:16-26:5 & Exh. 1. The extent of Yamashita's investigation was to meet with Mitchell and ask him if he agreed with any of Pande's accusations. Yamashita Depo 36:11-19. When Mitchell denied any wrongdoing, that was the end of Yamashita's inquiry. *Id.* This was so even though Yamashita recognized that Pande was not satisfied with the outcome of the process he initiated. *Id.* 31:3-5, 32:5-13.

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

Yamashita never advised Pande to file any sort of complaint with management, human resources, or any administrative agency. Yamashita Depo 33:9-34:3. He even dissuaded Pande and Thompson from pursuing their complaint through the company's internal resolution process, the so-called STEPS process. Thompson Decl. ¶ 9.

### G. SUMMER-FALL 2002 – MITCHELL'S RETALIATION CONTINUES

Shortly after the meeting with Yamashita, Pande began to feel retaliation from Mitchell, including, *inter alia*, being deliberately excluded from work-related meetings. Pande again complained to Johnson to no avail. Pande Depo. 514:25-515:1, 517:12-519:24. Throughout the next several months, Mitchell continued to isolate Pande from the work group and impede her ability to perform and advance within the company. In late September 2002, Pande learned that Mitchell had been saying negative things about her abilities to managers and employees in other departments. In particular, Pande received an email from Thompson where Thompson was asked the following question:

> What is the problem between Rex and Kiran Pandy [sic]? We were considering her for a position that will open up in Fernando Gaggino's group, and Rex told him things like "she's not a team player", "she pouts", etc. <u>Real career killers</u>.

Thompson Decl. ¶ 19, Exh. B (emphasis added). As it turns out, Pande was being considered for a position in the Congo group. *Id.* However, after Magner's group learned of Mitchell's comments, Pande was no longer considered for the position. *Id.*

From March through December 2002, Pande attempted to find another job within the company. However, on December 9, 2002 Pande was forced to take a less desirable job as Simulation Engineer in the Southern Africa Strategic Business Unit ("SASBU"), one which is considered a step down on the career path at Chevron for petroleum engineers like Pande. Answer ¶ 23; Pande Depo 297:8-18, 299:3-300:4.[5] In fact, Chevron had not been able to fill this position for several months because they could not find an

---

[5] In the Spring of 2003, Jean Camy stopped by Pande's office and laughed at her for the fact that she was now stuck back in a simulation job after having spent the effot to get an MBA and work in the Planning Group. Pande Decl. ¶ 12.

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

experienced engineer willing to take this position. Pande Depo 298:12-22.

**H. APRIL 2003 – MITCHELL'S RETALIATORY INFLUENCE CONTINUES TO AFFECT PANDE EVEN AFTER SHE HAS LEFT HIS GROUP**

In April 2003, Pande was told by her new supervisor, Jack Dunn ("Dunn"), that she was not receiving a merit pay increase. Pande Decl. ¶ 13. Never before in her entire career at Chevron had Pande not received a merit pay increase. *Id.* This decision was made by Mitchell. Dunn Depo 21:15-22:8, 23:25-24:10, 38:14-25, 32:3-10 & Exh. 2.

**I. SPRING-SUMMER 2003 – CHEVRON ANNOUNCES SASBU'S MOVE TO HOUSTON**

In the Spring of 2003, Chevron announced that SASBU was being transferred from San Ramon to Houston, Texas. Answer ¶ 25. Most employees were offered the opportunity to relocate to Houston with their current position. *Id.* Failure to agree to the relocation offer would indicate a non-acceptance and the employee would have the option of looking for another job internally. *Id.* Dunn assured Pande and others in the group that his first priority would be to help employees that declined the relocation to find jobs within Chevron. *Id.* Pande indicated non-acceptance of the relocation offer. *Id.* ¶ 26. Some other employees within Pande's business unit also declined to relocate. *Id.*

Throughout the remainder of 2003, Pande attempted to find another job within Chevron. *Id.* ¶ 27. She applied for several openings and actively networked within the company for a transfer. *Id.* Pande was fully qualified for each of the jobs to which she applied. Pande Decl ¶ 14. Pande did not get any of the jobs. Answer ¶ 27.

**J. OCTOBER 2003 – DUNN OFFERS PANDE WORK IN SAN RAMON THROUGH 2004**

Pande's business unit was scheduled to formally commence work in Houston on January 5, 2004. Answer ¶ 29. In October 2003, Dunn offered Pande continued work in San Ramon on a project which would last through at least most of 2004. Pande Depo 447:7-14, 446:9-14 & Exh. 33; *see also* Lebowitz Decl. Exh. N [DeJong Decl. ¶ 11.] Pande agreed to work on the project. Pande Depo 447:7-448:12, 450:21-25. Dunn denies that he made the offer. Dunn Depo 76:16-77:6, 105:15-106:4 & Exh. 13.

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

**K. OCTOBER 2003 – PANDE LEARNS OF NEED FOR MEDICAL LEAVE**

In mid-October 2003, Pande determined (in consult with her physician) that she needed to take a medical leave to have required surgery. Pande Decl. ¶ 15. Pande researched company policy (the Disability Management Program) and, on or about October 29, 2003, filed all the required paperwork. Answer ¶ 30.

Part of that policy requires that all employees who are or will be absent from work for more than five days due to medical condition must file for short term disability through Chevron's disability policy carrier, UnumProvident. *Id.* The Disability Management Program also requires employees to fill out overly broad medical release forms. Pande Decl. ¶ 16 & Exh. B. Despite having sufficient information to certify Pande for an extended medical leave, Chevron imposed its across-the-board policy and only certified Pande's leave for a period of 30 days, thereafter requiring Pande to re-certify her eligibility for leave. *Id.* Exh. C.

**L. OCTOBER 30, 2003 – PANDE TELLS DUNN ABOUT MEDICAL LEAVE**

On October 30, 2003, Pande informed Dunn that she was applying to take a medical leave. Answer ¶ 31. Dunn reacted by asking what was medically wrong with her. *Id.* Pande considers her medical information very private and did not feel comfortable talking to Dunn about her specific condition, so she did not tell him. Pande Decl. ¶ 17. Dunn, however, persisted in his questioning asking about her condition and her symptoms, including asking Pande if she had cancer and unilaterally discussing cancer treatments. *Id.*; *but see* Dunn Depo 86:8-87:5.

Dunn's testimony on this issue is all over the map. First, he testified that he does not remember asking Pande about her medical condition; then he denied asking her about cancer. Dunn Depo 86:8-87:5. Dunn does confirm, though, that he did have a conversation with Pande about her medical leave. *Id.* 70:21-72:22. He also confirms that he called Chevron human resources to find out if Pande's leave was for her own medical condition or to care for someone else's condition. *Id.* 68:15-69:18 & Exh. 6. He also does not contradict emails which show that Pande was so distraught with Dunn's prying

questions that she contacted Chevron human resources to seek guidance and gain assurances that no private information would be given to Dunn. Dunn Depo 87:8-89:7 & Exh. 8. Later, Dunn testified that he disagreed with the statement he was pushing Pande for information about her medical condition. *Id.* 92:25-93:6.

### M. NOVEMBER 4, 2003 – DUNN BLOWS UP AT PANDE BECAUSE OF HER IMPENDING MEDICAL LEAVE

Dunn was incensed about Pande's request for medical leave. On or about November 4, 2003, on an international conference call attended by approximately 10 of Pande's coworkers (some in person and some by phone), Dunn went on a tirade. Dunn Depo 77:7-79:4. He directly confronted Pande about her medical leave and berated her for an extended period of time about the fact that she was taking the leave. Pande Depo 80:11-18. Pande described Dunn's conduct this way:

> So he in that -- on the November 4th meeting, he said, you know, "So" -- you know, "So you're going on medical leave." You know, "I want to know how this work is going to get done. I want to know how it's going to get done. You're just going to go off on medical leave. How is this going to get done? How is this going to get done?"
>
> * * *
>
> It appeared to me that he wasn't interested in an answer to that question. He kept saying -- he didn't ask the question in a way of, "Okay, you know, you're going on medical leave. Let's talk about how we're going to handle the transition of work." His whole tone of voice, his expression, his tone, his threatening manner was accusatory, very hostile. And when -- he kept repeating, "How are you going to get this work done? How are you going to get this work done?" And he was actually not even giving me time to answer that question, and he was essentially just yelling at me. So it wasn't a normal, professional, business environment conversation.

Pande Depo 80:11-18, 433:16-434:4. This conduct by Dunn was extreme and sent Pande into tears. Mabe Depo 49:20-50:11; Burkes Depo 33:7-34:15.

Other employees on the call – most of whom had no previous knowledge about Pande's medical leave – attempted to intervene, but Dunn cut them off demanding to know how Pande was going to get all her work done. Pande Depo 80:19-24.

While Dunn admitted to generally raising his voice during the meeting, he denied it

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

was directed towards Pande. Dunn Depo 79:5-11, 81:15-82:9. He also denied pointing his finger at Pande while yelling at her. *Id.* 82:10-16. Other attendees at the meeting, on the other hand, testified that Dunn did so. Mabe Depo 43:15-21; Feyijimi Depo 31:1-20. Dunn also denied that his conduct caused any trauma to Pande, instead tersely testifying that Pande said very little as to how her work was going to get done while she was gone. Dunn Depo 82:17-83:1. He also falsely testified that Pande attended a group lunch immediately after the meeting; she did not. Dunn Depo 83:16-23; Pande Decl. ¶ 18.

Pande's coworkers were so outraged by Dunn's conduct that at least one coworker made an internal complaint against Dunn for his conduct on the conference call. Mabe Depo 30:5-32:2, 36:8-25, 40:25-44:25, 47:8-49:4. Pande was never contacted by anyone at Chevron regarding Dunn's comments, thus, she believes that there was no investigation into Dunn's improper comments and harassing conduct during the November 4 conference call. Pande Decl. ¶ 19. Furthermore, Pande herself reported Dunn's harassing conduct to Taryn Shawstad, General Manager of Human Resources, in a letter dated December 8, 2003. Pande Depo 446:9-14 & Exh. 33. Dunn also was never contacted by any supervisor or any member of human resources about his conduct during the November 4 call. Dunn Depo 84:7-23. In fact, the first time Dunn learned of Pande's objections to his conduct on November 4 was when he read the administrative complaint filed by Pande. *Id.* 86:2-7, 84:24-85:7; Pande Decl. ¶ 21, Exh. D,E.

### N. NOVEMBER 7, 2003 – PANDE REQUESTS VACATION CARRYOVER INTO 2004

On November 7, Pande sent an email to Dunn asking that her unused vacation be carried over to 2004. Dunn Depo 93:8-95:16 & Exh. 10. Dunn responded "let's discuss." *Id.* The reason why Dunn responded "let's discuss" was because, in his words, "It's not customary to take 28 days." Dunn Depo 94:22-23. At no time did Dunn say anything to Pande indicate that it would be inappropriate to carry over vacation into 2004 because her employment was set to end on December 31. Pande Decl. 20.

### O. NOVEMBER 17, 2003 – DUNN NOTIFIES PANDE ABOUT HER TERMINATION WHILE SHE IS ON MEDICAL LEAVE

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

Pande commenced her medical leave on November 10, 2003. Answer ¶ 34. On November 17, 2003 Dunn called Pande at home to tell her that she was being terminated effective December 31, 2003. *Id.* Dunn also told Pande that he had consulted with an "employment lawyer" to affirm that it was "kosher" to terminate Pande while she was on FMLA leave. Pande Depo 451:1-18; *but see* Dunn Depo 103:3-9. Dunn told Pande that her FMLA status did not protect her because the company considered her to have voluntarily resigned in June. *Id.* This was the first time that anyone had informed Pande that the company considered her to have resigned at all, let alone five months prior. Pande Depo 446:4-8. Shortly thereafter, Pande received a letter from Chevron's Human Resources department informing her that the company considered her to have voluntarily resigned in June. Pande Depo 445:11-17 & Exh. 32.

**P. DECEMBER 8, 2003 – PANDE FILES DFEH COMPLAINT**

On December 8, 2003, Pande filed her administrative complaint against all defendants with the California Department of Fair Employment and Housing ("DFEH"). Answer ¶ 35. The original filing was within one year of her reassignment out of Mitchell's group to Dunn's group in SASBU. *Id.* ¶ 23. On January 7, 2004, Pande filed an amended complaint providing greater factual detail for her complaint. Pande Decl. ¶ 21, Exh. E.

**Q. DECEMBER 8, 2003 – PANDE OBJECTS TO HER TERMINATION**

On December 8, 2003, Pande wrote a letter to Chevron's Human Resources department in response to the company's termination letter. Pande Depo 446:9-14 & Exh. 33. In that letter, Pande explained that she was offered employment through 2004 prior to notifying Dunn of her medical leave, and that the only thing that changed between that offer and the termination letter was that Pande, in fact, took her medical leave. *Id.*

**R. DECEMBER 2003 – DUNN SCUTTLES PANDE'S LAST CHANCE AT MAINTAINING HER EMPLOYMENT WITH CHEVRON**

While Pande was on medical leave in December 2003, she was contacted by her Sponsor, Paul Vita ("Vita"), about two openings in ETC (formerly known as EPTC). Vita Depo 14:2-5. The two openings were for petroleum engineers, and were owned by Zuwa

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

Omeregie. Omoregie Depo 15:15-16:24, 35:15-36:3 & Exhs. 1, 2; Vita Depo 18:12-14. The two jobs were based in San Ramon, with an expected duration of three to four years. Omoregie Depo 20:13-23. The jobs were filled from the same pool of candidates who were all considered simultaneously for the openings. *Id.* 36:4-37:7. Pande met the requirements to be considered for these openings. Pande Depo 464:12-465:2. Also, Vita assured Pande that she could be considered for these positions even though she had now been officially notified of her termination date. Pande Depo Exh. 37; Vita Depo 27:8-28:2.

As part of the selection process, Omoregie had a meeting with Dunn to discuss Pande's candidacy. Omoregie Depo 24:19-25:3; Dunn Depo 110:11-25. Omoregie recalled Dunn's comments as follows:

> I don't recall his words, but what he said was she has strong technical skills, that she couldn't move or didn't want to move to Houston when the team was being moved to Houston, and that her performance on the job suffered when the Houston move was announced, but also that there was a job in Houston if she wanted to move. She still would have been -- the job was there in Houston for her.

Omoregie Depo 26:1-8. Dunn's recollection is in accord:

> Yeah. He -- he asked about Kiran's performance and I said she was bright, very capable, she did a great job for the first half of the year, and as the year went on, she became less focused.

Dunn Depo 112:25-113:3. Dunn made these comments even though he cannot explain a single concrete example of where she supposedly lost such focus or underperformed in her job. *Id.* 52:9-53:21. Based on Dunn's comments, Omoregie came away with the idea that Pande was one of the lowest performing members of Dunn's team. Omoregie Depo 27:16-23. Omoregie communicated Dunn's comments to the selection committee during the selection process. Omoregie Depo 27:24-28:1; Vita Depo 28:17-30:16.

Ultimately, the two openings in Omoregie's group were given to two employees from SASBU, Graham Housen ("Housen") and Jalal Afifi ("Afifi"). Omoregie Depo 37:25-38:19. Afifi had also turned down the move to Houston. Afifi Depo 29:25-30:5. Though he was informed that his move date was December 31, he actually stayed on in San Ramon and continued his work for SASBU even after that date and before receiving the

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

offer to work in Omoregie's group. *Id.* 32:5-13, 33:18-25. Housen had actually accepted the move to Houston and had already begun his work in Houston prior to accepting the offer from Omoregie's group. Housen Depo 19:7-9, 22:19-21. Housen was permitted to take the job in Omoregie's despite Chevron's policy that all employees who accepted the move to Houston were expected to remain there for at least 18 months. Answer ¶ 28.

## IV. THE NINTH CIRCUIT HAS SET A HIGH STANDARD FOR THE GRANTING OF SUMMARY JUDGMENT IN EMPLOYMENT DISCRIMINATION CASES

The Supreme Court and the Ninth Circuit have articulated an exacting standard for granting defense-initiated summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149-54 (2000). In addition, "The Ninth Circuit 'has set a high standard for the granting of summary judgment in employment discrimination cases.' Very little evidence is required to survive summary judgment in such a case 'because the ultimate question is one that can only be resolved through a "searching inquiry"--one that is most appropriately conducted by the factfinder, upon a full record. *Wilsey*, 2006 U.S. Dist. LEXIS 67891 at *5-6 (ND Cal 2006) (quoting *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996).) The Ninth Circuit recently stated that "very little [] evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004).

## V. ARGUMENT

### A. CONTEXT MATTERS

Both the Supreme Court of California and U.S. Supreme Court are in accord that, "context matters." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S.___, 126 S.Ct. 2405, 2415 (2006) (holding "Context matters."); *Ash v. Tyson Foods, Inc.* 546 U.S. ___, 126 S.Ct. 1195 (2006) (holding that a supervisor's use of the term "boy" can be evidence of discriminatory intent in the appropriate context); *Lyle v. Warner Bros. Television Productions*, 38 Cal.4th 264 (2006) (holding that, in the context of the "creative"

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

setting of the "Friends" writers' room, extreme and objectively offensive sexual language did not create a hostile environment); *Yanowitz v. L'Oreal*, 36 Cal.4th 1028, 1052-55 (2005) (holding that whether a course of conduct arises to an actionable "adverse employment action" must be analyzed in light of "the unique circumstances of the affected employee as well as the workplace context of the claim."); *see also Saffa v. Oklahoma Oncology, Inc.* 405 F.Supp.2d 1280, 1289-90 (N.D. Okla. 2005) ("To tell someone to get their 'ass back in the truck' is one thing. To refer to the posterior portions of a woman's anatomy as a 'great ass' is quite another.")

In analyzing Pande's claims of discrimination and retaliation, then, it is paramount that the Court view her claims through the lense of the context of the realities of the work environment at Chevron. Chevron is a worldwide institution made up of untold numbers of "companies", each of which focus on varying geographical regions and varying aspects of Chevron's business. It is a company which is constantly expanding, absorbing business ventures of all sizes, including other global companies like Texaco. It is a place where professional employees spend entire careers. One need only look to the witnesses deposed in this case – including the plaintiff, herself – to see that professional employees spend decades with Chevron, moving from job to job and Chevron company to Chevron company every few years. Yamashita Depo 8:16-9:12; Omoregie Depo 8:13-9:24; Housen Depo 7:8-12; Afifi Depo 7:17-11:15; Burkes Depo Exh. 1, ¶ 1; Vita Depo 9:16-23.

Perhaps the most important aspect of Chevron's work environment which must be considered in this case is the significant role that word-of-mouth plays in a particular employee's prospects for achieving desired career path positions. It cannot be minimized. Indeed, it is just as important as core competencies. In such an environment, it is the subjective comments which make all the difference. The Court need only look to the communications between Thompson and Magner as an example. As the email thread, and Thompson's sworn declaration explain, in late 2002, Pande was being considered for a position in the Congo group. Thompson Decl. ¶ 19-20 & Exh. B. Pande had not even posted for that job, and before seeing this email had no knowledge that she was even

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

being considered for this position. Pande Decl. ¶ 11. What the evidence shows, however, is that Mitchell's subjective comments about Pande had a direct negative impact on her career opportunities within Chevron. Thompson Decl. ¶ 19-20 & Exh B.

We are extremely fortunate to have such unassailable evidence of this workplace context at Chevron. These are typically the types of things which all employees "know" but cannot "prove." Here, we have unsolicited, uncontradicted confirmation of the realities of this workplace; realities which set the backdrop for all of Pande' claims and form a lense through which this entire motion must be viewed.

**B. PANDE HAS RAISED A TRIABLE ISSUE OF FACT THAT HER FAMILY MEDICAL LEAVE WAS A NEGATIVE FACTOR IN HER CONTINUED EMPLOYMENT WITH CHEVRON[6]**

Both the FMLA and CFRA prohibit an employer from taking any sort of adverse action against an employee because of their exercise of rights under the acts. 29 U.S.C. § 2615(a); Cal. Gov. Code § 12945.2(*l*). In the Ninth Circuit, these claims are analyzed together because the substantive rights are essentially identical. *Liu v. Amway Corp.*, 347 F.3d 1125, 1132 n.4 (9th Cir. 2003). As the Ninth Circuit has explained, an employer violates the acts by using an employee's exercise of protected family leave as a factor in its adverse employment decisions. *Id.* at 1135 (citing *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124-25 (9th Cir. 2001) and 29 C.F.R. § 8250220(c)). A plaintiff may prove her claim by either direct or circumstantial evidence, and need not resort to the familiar *McDonnell Douglas* burden-shifting framework. *Id.* at 1136 (citing *Bachelder*, 259 F.3d at 1125). Thus, Pande can survive summary judgment by raising a triable issue that the fact she took protected leave was taken into account in adverse decisions leading to her termination. *Id.*

**1. Pande Has Raised a Triable Issue of Fact that Her Exercise of FMLA/CFRA Rights Was A Negative Factor in Chevron's Decision to Terminate Her and Chevron's Denial of the ETC Job.**

---

[6] As Chevron notes, the same standard used for these claims (and her retaliation claim) applies with equal force in regard to Pande's claim for Wrongful Termination in Violation of Public Policy (Sixth Cause of Action).

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

**a. Pande Never Voluntarily Resigned**

Chevron's entire defense to this case is based upon the false notion that Pande voluntarily resigned from the company. Nothing could be further from the truth. While Pande, indeed, declined the offer to move to Houston with SASBU, she did not intend, nor was she ever told, that the effect of such a decision was to voluntarily resign six months in advance. As Pande and others testified, the documentation and information from Chevron management was purposefully and hopelessly vague in regard to what would happen to employees who were unsuccessful in finding a new position by the time their business unit actually moved out of San Ramon. Evidence also shows that these supposed "drop dead" move dates were actually quite flexible. For instance SASBU employees such as Afifi, Burkes, and others were permitted to remain in San Ramon after their units had officially moved to Houston. Construing such evidence in Pande's favor, it is reasonable to infer that Pande received adverse treatment different from anyone else in SASBU, and Chevron's stated reason for terminating Pande's employment should be disbelieved.

**b. Pande Was Offered Employment with Chevron in San Ramon Through 2004**

Even if the Court were to believe, *arguendo*, that the effect of Pande's decision to decline the move to Houston in June was to voluntarily resign in December, that decision was nullified by Dunn's offer to keep Pande on in SASBU, in San Ramon, at least through 2004. The offer, which was made in October, pre-dated Pande's notifying Dunn of her need for medical leave. Chevron has attempted to make much of the fact that Pande was never given a formal written job offer for this assignment. However, as she testified, the offer was to continue on projects in her same group, SASBU, so there would be no need for a formal job offer. Also, others who declined the move were allowed flexibility in their work assignments which allowed them to remain in San Ramon even after their groups had moved to Houston.[7] Pande was the only one in SASBU who was deemed to have

---

[7] The record on this question is in dispute. Dunn testified that he did not make the offer to Pande. Pande testified that he did. She also produced evidence of her contemporaneous state of mind wherein she told Chevron human resources about Dunn's

voluntarily resigned. Lebowitz Decl. Exh. N [DeJong Decl. ¶ 13]

When Pande notified Chevron that she objected to the decision to terminate her because she had been offered continued employment, it was Dunn upon whom Chevron relied to deny Pande's statement. Dunn Depo 106:25-110:5 & Exh. 14. However, Pande has raised a triable issue that Dunn harbored animus against Pande for taking her medical leave right when the unit was packing up and leaving for Houston. *See e.g.* Dunn Depo 81:15-82:9 (attributing his conduct at the November 4 conference call to it being "a stressful time" and being under a lot of "pressure"), *see also id.* Exh. 4 (October 10 email noting how problems will be "compounded" if Pande leaves the group early).

Moreover, evidence that a defendant has lied about a material fact (*e.g.*, the reason for the adverse employment action), is sufficient to deny summary judgment without anything more. *Reeves,* 530 U.S. at 147 [citations omitted]; *accord, Paz v. Wauconda Healthcare & Rehabilitation Ctr., LLC*, 464 F.3d 659, 665 (7th Cir. 2006)

**c. After His November 4, 2003 Tirade Against Pande, Dunn Negatively Influenced Pande's Candidacy for the ETC Jobs**[8]

Pande has shown that Dunn harbored animus towards her in regard to her medical leave (*supra*, § III.M). The evidence shows that – after Pande informed Dunn of her need for leave, and after his November 4 tirade – Dunn made subjective, negative comments about Pande to Omoregie. Dunn was unable to support those comments with facts at his deposition, and documentary evidence tends to show Dunn held the opposite opinion of

---

offer. Also, Pande's November 7 request for vacation carryover into 2004 tends to show that she expected to continue working at Chevron beyond December 31. Finally, Pande has submitted the declaration of Guadalupe DeJong which lends weight to Pande's testimony. At minimum, then, there is a factual dispute on this material issue which can only be sorted by a jury.

[8] Contrary to Chevron's contention, Pande was not required to file another administrative complaint to cover the continued effects of Dunn's discriminatory behavior. *Brown v. Puget Sound Elec. Apprenticeship & Training Trust*, 732 F.2d 726, 729-30 (9th Cir. 1984). Even if she were so required, it would have no effect on Pande's FMLA claim which has no exhaustion requirement.

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

Pande as late as October 10, 2003. *See* Dunn Depo Exh. 4 (telling Pande "I know the delays are not your fault . . ."). Dunn's December 2003 comments to Omoregie were made in the context of Omoregie's investigation into Pande's suitability for either of the two openings in ETC. Omoregie testified that he relayed Dunn's comments to the selection committee during the selection process and that they had a negative impact on her candidacy.

These types of subjective comments regarding an employee's performance are commonly used to mask discriminatory animus. As the Ninth Circuit warned in these types of situations, "careful analysis of possible impermissible motivations is warranted because such evaluations are particularly 'susceptible of abuse and more likely to mask pretext.'" *Liu*, 347 F.3d at 1136-37 (citations omitted). Dunn's comments to Omoregie that Pande lacked focus or enthusiasm for the job are precisely the types of comments which courts have found ripe for masking discriminatory intent. *See id.* (citing *Lujan v. Waters*, 813 F.2d 1051, 1057 (10th Cir. 1987)). If Pande had been offered either of the ETC jobs, she would have maintained her employment with Chevron, even though she had already been notified of the decision to terminate her on December 31. *See* Pande Depo Exh. 37; Vita Depo 27:8-28:2.

Ultimately, a reasonable jury could find that Dunn's negative comments to Omoregie were a factor in the decision to not offer her either of the ETC jobs.

**C. BY TERMINATING PANDE'S EMPLOYMENT, CHEVRON ALSO VIOLATED THE FMLA AND CFRA BECAUSE IT DID NOT GRANT HER THE FULL EXTENT OF LEAVE FOR WHICH SHE WAS ELIGIBLE**

It is undisputed that Pande was qualified for protected medical leave and that she was granted that leave, which began on November 10, 2003. It is also undisputed that her last day of official employment with Chevron was December 31, 2003, less than 12 work-weeks after her leave began. Thus, it is undisputed that Pande was not granted the entire leave for which she was eligible. The only remaining question is whether or not Chevron can prevail on any of the affirmative defenses available to it. As with all affirmative

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

defenses, it must be pled and proved by the defense.

In its motion, Chevron attempts to rely on the affirmative defense that Pande's termination was a result of an unrelated business decision made some five months earlier. *Def's P&A* 11:23-13:23. However, Chevron's argument has no merit because it is based upon an affirmative defense which has not been pled, therefore, cannot now be proved. California law explicitly states that Chevron's arguments amount to an affirmative defense.

(c) Permissible defenses.

(1) Employment Would Have Ceased

> An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the CFRA leave period. <u>An employer has the burden of proving, by a preponderance of the evidence</u>, that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny reinstatement.

2 CCR § 7297.2(c)(1) (emphasis added); *accord* 29 CFR § 825.161(a). In its moving papers, Chevron relies on this section for its core authority for articulating this defense. However, <u>Chevron never pled this defense</u>. *See* Answer ¶¶ 100-116. Accordingly, Chevron cannot prevail.

Chevron also violated the FMLA/CFRA by implementing its across-the-board policy of only certifying leave in 30-day increments. As shown in the approval letter sent to Pande, this was the company's policy. Pande Decl. Exh. C. Such a policy does not comply with the law. *See* 29 CFR § 825.308(b)(1); 2 CCR § 7297.4(b)(1).

**D. CHEVRON VIOLATED PANDE'S FMLA/CFRA RIGHTS TO CONFIDENTIALITY AND PRIVACY IN HER MEDICAL RECORDS**

When Congress and the California Legislature enacted the FMLA and CFRA, they made sure that employees retained their right to privacy in medical records. 29 CFR § 825.306; 2 CCR § 7297.0(a)(2). Chevron's policies, in their application to her in this case, violated these protections.

At core of these claims is how Chevron administers its FMLA/CFRA obligations. For whatever reason, Chevron has delegated its obligations under the FMLA/CFRA to

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

UnumProvident. UnumProvident also administers Chevron's short-term and long-term disability insurance plans. Chevron employees are informed as to their various rights as they relate to any need for a medical-related leave of absence via the company's Disability Management Program ("DMP").

When Pande first learned that she would need to take a medical leave of absence in October 2003, she consulted Chevron's human resources internal web site. It was made very clear to Pande on that site that the DMP required her to file for short-term disability coverage if she was going to be absent from work for more than five consecutive days for a medical-related reason. The information also instructed Pande that to comply with the DMP's requirements for applying for all leave, including both short-term disability and FMLA/CFRA, she must communicate with UnumProvident and provide them with all requested documentation. Pande subsquently contacted UnumProvident and was told to sign and submit the medical records waivers which she had downloaded from Chevron's internal web site. Pande followed these directions and, pursuant to the DMP, submitted waivers of her right to confidentiality in her medical records. At no time was she told that there was a separate "FMLA Unit". Instead, she was told that UnumProvident would evaluate her claims and let her know the outcome. UnumProvident then wrote Pande telling her that her applications for both short term disability and FMLA leave were approved. Any time Pande had questions about her leave or status, she would call UnumProvident. She always spoke with the same person and was never told to call a separate FMLA Unit with her concerns. Pande Decl. ¶¶ 15-16.

The problem here, is that under short-term disability plans, an insurance company is permitted to engage in an extensive evaluation of an applicant's medical records to evaluate whether or not they qualify for coverage, and the extent of that coverage. That same latitude is not permitted in regard to the FMLA/CFRA or statutory rights to privacy. However, in order to comply with Chevron's policies and qualify for her leave, Pande was required to execute the far broader waiver of medical records and allow UnumProvident to obtain all such records. Because UnumProvident stands in Chevron's shoes for purposes

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

of administering Chevron's FMLA/CFRA obligations, this overly broad medical waiver is a violation of Pande's rights under those statutes.

Moreover, to the extent that the Court does not strike the declarations filed by Chevron in support of this motion, they merely confirm that UnumProvident's policy and practice violate the FMLA/CFRA. As both Richardson and Taylor confirm, UnumProvident relies exclusively on the medical records obtained through the short-term disability evaluation which requires a vastly overbroad release of medical records in comparison with FMLA/CFRA requirements. The fact that Taylor admits that the purported FMLA Unit does not even review documents shows without question that Chevron, through its designated agent, UnumProvident, has violated the FMLA and CFRA.

**E. PANDE HAS RAISED A TRIABLE ISSUE OF FACT AS TO THE VARIOUS ADVERSE EMPLOYMENT ACTS ATTRIBUTABLE TO MITCHELL**

**1. Pande Has Raised a Triable Issue of Fact as to Her Claims of Gender and Race/National Origin Discrimination**

Under the burden-shifting framework associated with claims of discrimination based on circumstantial evidence, a plaintiff must demonstrate that (1) she was a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) some other circumstance suggests discriminatory motive. *Guz v. Bechtel Nat.'l Corp.*, 24 Cal.4th 317, 355 (2000) [citations omitted]. The "other circumstance" is the flexible element, and can be met any number of ways. If the defendant articulates a non-discriminatory reason, then the plaintiff has the task of showing a triable issue that the defendant's stated reasons is a pretext for its unlawful motive. *Id.* at 356, 360.

In order to show a triable issue on pretext, a plaintiff need only point to some evidence in the record that infers some unlawful motivation was behind the adverse action. *Id.* at 362 [adopting *Reeves v. Sanderson,* 530 U.S. 133]. In essence, the two most current cases from the California and U.S. Supreme Court – *Guz* and *Reeves v. Sanderson* – teach that there must be some evidence, somewhere in the record, that could permit a jury to infer discriminatory animus. *Guz,* 24 Cal.4th at 362. In *Guz*, the

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

Court found fatal the fact that the plaintiff, himself, admitted that the employer had a legitimate reason to terminate him. *Id.* at 363-64. Pande makes no such admission here.

Finally, as noted above, in the Ninth Circuit, "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder." *McGinest*, 360 F.3d at 1124 [citations omitted; ellipses in original]. Ultimately, the plaintiff need only raise an <u>inference</u> that "the employer's discriminatory intent was <u>a motivating factor</u> in the adverse employment decision." *Caldwell v. Paramount Unified Sch. Dist.*, 41 Cal.App.4th 189, 205 (1995). "Whether the defendant was in fact motivated by discrimination is of course for the finder of fact to decide." *Reeves,* 530 U.S. at 154 [Ginsburg, J. concurring].

It is undisputed in this case that Pande was a member of two protected classes based on her gender and East Indian origin. It is further undisputed that she was qualified for her job in the Planning group under Mitchell. The Supreme Court of California has defined "adverse employment action" as "adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the antidiscrimination provisions of sections 12940(a) and 12940(h)." *Yanowitz*, 36 Cal.4th at 1054-55. That Court also explained that "the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." *Id.* at 1052.

As set forth above (§ III.C-R), Pande suffered adverse employment actions in the form of (1) receiving a rating of "average" in April 2002; (2) receiving a lower salary increase in April 2002; (3) Mitchell's failure to promote her;(4) repeated negative performance-related comments by Mitchell, thwarting Pande's ability to attain career goals; and (5) being forced to take a career step backwards into the SASBU position. In the context of this workplace, all of these actions show a course of conduct by Mitchell "that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion." *Yanowitz*, 36 Cal.4th at 1054-55.

The record further shows that Mitchell's purportedly objective reasons for the

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

actions he took in regard to Pande are actually pretextual. First, Mitchell's flat denial of making any statements showing animus towards people of East Indian descent is contradicted not only by Pande, but by Yamashita, and by Chevron in its Answer (*supra* § III.C). Moreover, Iris Owens' denial of her involvement in relaying the comment to Pande should be disregarded. Aside from the fact that she is still employed by Chevron and dependent upon the company for continued employment, Yamashita testified that (1) he confirmed with Owens that Mitchell had made the "towel heads" comment, and (2) Owens was reluctant to come forward with the comment because she feared retaliation – even in the face of assurances from Yamashita that she would be protected from such retaliation. Yamashita Depo 38:23-40:24. Secondly, Pande's testimony in combination with Thompson's declaration raise a triable issue as to Mitchell's treatment of women under his supervision. Finally, as with Dunn's comments described above, Mitchell relies exclusively on "soft" subjective comments about Pande's performance as justification for her negative job actions. The record raises a triable issue as to Pande's claims of gender and race/national origin discrimination against Chevron in regard to Mitchell's conduct.

**2. Pande Has Raised a Triable Issue of Fact as to Her Claim for Retaliation**

The FEHA prohibits employers from retaliating against employees for objecting to acts which are unlawful under the FEHA. Cal. Gov. Code § 12940(h). "[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Yanowitz,* 36 Cal.4th at 1042 (citations omitted).

> [A]n employee's conduct may constitute protected activity for purposes of the antiretaliation provision of the FEHA not only when the employee opposes conduct that ultimately is determined to be unlawfully discriminatory under the FEHA, but also when the employee opposes conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA. It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA.

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

*Id.* at 1043 (citations omitted).

Here, it cannot be reasonably disputed that Pande objected to Mitchell's treatment of her as harassment and discrimination based on her gender and national origin. *See supra* § III.C-F. Pande complained directly to Mitchell, to Mitchell's supervisor, and Chevron's Ombuds office. Each one of these actions constitute "protected activity" under the FEHA, for which she cannot be retaliated against. The multitude of adverse employment actions set forth above, apply with equal force to the retaliation cause of action and are linked in time and substance to Pande's protected activity. Importantly, "there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries." *Yanowitz*, 36 Cal.4th at 1055.

**3. Mitchell's Conduct Constitutes a Continuing Violation**

The California Supreme Court has articulated a very liberal interpretation and application of the so-called "continuing violations" doctrine under the FEHA. As that Court explained, "in order to minimize the filing of unripe lawsuits and to promote the conciliatory resolution of claims, the FEHA statute of limitations should be interpreted liberally to allow employers and employees an opportunity to resolve disputes informally." *Yanowitz*, 36 Cal.4th at 1057 (citations omitted). This policy should apply with special consideration in this case. Indeed, Pande's actions show that she was desperately trying to keep her job with Chevron and that she was trying every avenue which would maintain her integrity at the workplace and yet still solve her ongoing disputes with Mitchell. As explained above, Chevron is a workplace where employees rely heavily on word-of-mouth for career path opportunities. Moving up means moving around to various Chevron companies. Once negative subjective comments begin to circulate about an employee, avenues for favorable assignments vanish. As Tim Magner put it, such comments are "Real career killers." Thompson Decl. ¶ 19-20, Exh. B.

In order to prevail on a continuing violations argument, Pande must demonstrate that the acts of which she complains are "(1) sufficiently similar in kind--recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA 94133
415/421-9292

harassment or failures to reasonably accommodate disability, may take a number of different forms [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence." *Yanowitz,* 36 Cal.4th at 1059 (citations omitted). Pande began complaining about Mitchell's conduct towards her in early March 2002 when she raised the issue with Johnson. The first material adverse action that Pande experienced after raising the objections was her adverse review and attendant lower salary action. In response to these acts, Pande attempted to resolve the issue internally and allow Chevron's resolution policies to take effect. She continued to raise issues with Chevron's Ombduds throughout 2002, and even in regard to her placement in SASBU in the late Fall of 2002. Mitchell's conduct all took the form of publishing to folks within Chevron subjectively negative comments about Pande, including that she had lost focus, was not a team player, and that she has an attitude problem. These comments were consistently articulated by Mitchell throughout 2002. Finally, Mitchell's retaliatory frame of mind took its final toll on Pande in April 2003 when she did not receive a merit pay increase. Even though Pande had transferred to SASBU four months earlier, it was Mitchell who evaluated Pande's performance in 2002 and was responsible for the determination that she receive no merit increase for 2003 (*supra* III.E).

Pande filed her original DFEH complaint on December 8, 2003. Answer ¶ 35. Thus, the relevant question is whether Pande can show that Mitchell's conduct continued up to or passed December 8, 2002. Mitchell's conduct, all part of the same pattern of behavior, linked to the same protected activity, reached well into 2003. At minimum, it pervaded Pande's work life up through when she began at SASBU, December 9, 2002.

## VI. CONCLUSION

Based on the foregoing, Pande respectfully requests that – with the exception of the portions not opposed by this opposition – the motion be denied.

Dated: December 15, 2006

McGUINN, HILLSMAN & PALEFSKY
Attorneys for Plaintiff Kiran Pande

by: ___________/s/_______________
NOAH D. LEBOWITZ