# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KIRAN PANDE,

       Plaintiff,

    vs.

CHEVRON CORPORATION (f/k/a
ChevronTexaco Corporation) and
CHEVRON INTERNATIONAL EXPLORATION
& PRODUCTION (f/k/a ChevronTexaco
Overseas Petroleum), a division
of Chevron U.S.A. Inc.,

       Defendants.

_____/

No. 04-5107 CW

COPY

DEPOSITION OF KIRAN PANDE

VOLUME I

March 20, 2006

PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  510-835-3993
San Francisco, California  415-788-3993
Castro Valley, California  510-885-2371

Facsimile 510-247-9775
WeReport@aol.com

Reported by:
LaRelle M. Fagundes
CSR No. 9762


EXHIBIT ___D___

1  We're skipping.  I might not care what tone of

2  voice he used.  I just want to know what he said

3  first.  That's all.

4      MR. LEBOWITZ:      As far as I can tell,

5  she's trying to answer your question, and you're

6  not letting her.

7      MS. MILLER:      No.  I want to know

8  what he said.  That's all.  Then we can talk about

9  how he said it or why he said it or when he said

10 it.  I just want to know what he said first.

11     THE WITNESS:      So he in that -- on

12 the November 4th meeting, he said, you know,

13 "So" -- you know, "So you're going on medical

14 leave."  You know, "I want to know how this work is

15 going to get done.  I want to know how it's going

16 to get done.  You're just going to go off on

17 medical leave.  How is this going to get done?  How

18 is this going to get done?"

19     And several people tried to interrupt,

20 interject, and he said, "I want to know what she

21 has to say.  I don't want to hear what any of you

22 have to say.  I want to hear what she has to say.

23 What does she have to say?  What does she have to

24 say?"

25     MS. MILLER:      Q.  And that, what he

CERTIFICATE

I, the undersigned, he Certified Shorthand Reporter, State of California, hereby certify that the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me, he disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is he full, complete and true record of said testimony; and that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed this 3rd day of April, 2006.

LARELLE M. FAGUNDES, CSR 9762

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4    KIRAN PANDE,

5              Plaintiff,

6         vs.                        No. 04-5107 CW

7    CHEVRON CORPORATION (f/k/a
     ChevronTexaco Corporation) and        COPY
8    CHEVRON INTERNATIONAL EXPLORATION
     & PRODUCTION (f/k/a ChevronTexaco
9    Overseas Petroleum), a division
     of Chevron U.S.A. Inc.,
10
               Defendants.
11   _____/

12

13

14

15            DEPOSITION OF KIRAN PANDE

16                 VOLUME II

17               March 21, 2006

18

19

          PATRICIA CALLAHAN & ASSOCIATES, INC.
20             Certified Shorthand Reporters
            Oakland, California   510-835-3993
21        San Francisco, California   415-788-3993
          Castro Valley, California   510-885-2371
22

               Facsimile 510-247-9775
23                WeReport@aol.com

24   Reported by:
     LaRelle M. Fagundes
25   CSR No. 9762

              PATRICIA CALLAHAN & ASSOCIATES

1    set the pay scale at 24?

2    A.      No, I do not.

3    Q.      Did you tell Rex Mitchell that you thought

4    you should be promoted in October of 2001?

5    A.      I believe I had a conversation with

6    Rex Mitchell in September of 2001 where he

7    discussed this position, and I asked him whether it

8    would be offered as a promotion.

9    Q.      What did he say?

10   A.      He said that during the merger selection

11   process, that the Texaco managers representing the

12   Texaco employees were trying to promote many of

13   their employees in the process of job selection,

14   and there had been a decision made in terms of

15   ground rules that there would be no promotions of

16   any kind for anybody during the job selection

17   process.

18   Q.      So would that mean, for example, if

19   somebody had been at a grade 21, but they were

20   selected to fill a grade 22 position, after the

21   merger, they would still be a grade 21, correct?

22   A.      Can you repeat the question?

23   Q.      I'll rephrase it.

24           In other words, nobody -- there were no

25   promotions given even when the employee was

1    was unhappy.

2    Q.      Did Rex Mitchell say to you that if you

3    developed as he anticipated you would, he would

4    support you for a promotion at the next PDC in the

5    spring of 2004?

6    A.      No, he did not.

7    Q.      Did he promise you a promotion?

8    A.      Yes, he did.

9    Q.      And the promotion would be to change the --

10   well, what did you consider a promotion?  Would

11   that have been to a different position or just to

12   change the pay scale?  How did you define

13   promotion?

14   A.      Well, I mean, the promotion would be from

15   the current pay scale group of 24 to 25.

16   Q.      So that was what you were considering.  So

17   you said -- did Rex Mitchell promise you that at

18   the next PDC, he would make sure the PDC changed

19   the pay scale from 24 to 25?

20   A.      Can you repeat the question, please?

21           (Record read by the reporter as follows:

22           "Q.  So that was what you were considering.

23               So you said -- did Rex Mitchell

24               promise you that at the next PDC, he

25               would make sure the PDC changed the

1           pay scale from 24 to 25?")

2           THE WITNESS:           No.  He simply said

3    that "I'm going to get you promoted at the next

4    PDC."  In fact, I'm not even sure he said PDC.  I

5    think he said, you know, at the next -- you know,

6    at the next salary action.  And generally salary

7    and promotion actions were done uniformly on April

8    1st of the year.

9           MS. MILLER:           All right.

10   Q.      Those are salary actions.  Those are merit

11   increases, but the actual promotion or changing

12   jobs are done at the PDC, which meets in the spring

13   and fall of each year, right?

14          MR. LEBOWITZ:          Objection.  Calls for

15   speculation.

16          THE WITNESS:           I don't know.

17          MS. MILLER:            Okay.

18   Q.      The other change with the merger was that

19   the housing allowance, THCA housing allowance, was

20   eliminated effective of the date of the merger,

21   correct?

22   A.      Is that the question about what the general

23   policy was on when the house allowance would be

24   eliminated?

25   Q.      Right, for everybody who had a housing

1    Q.        Okay.

2          But in this particular year, you did not

3    meet with Rex Mitchell until the beginning of April

4    of 2002, correct?

5    A.        That's correct.

6    Q.        Is that just due to the fact that you were

7    both busy?

8    A.        It was -- we met in April of 2002 after

9    Jay Johnson asked us to sit down to do a PMP.  And

10   the reason that we didn't do it earlier is likely

11   that we were both busy.  And I'd never took the

12   initiative to go and try and schedule a -- I

13   certainly had not filled out the form, and I did

14   not try and schedule an appointment with Rex to

15   discuss it.

16   Q.        But did you fill out the form in April?

17   A.        I filled out the form, I believe, in late

18   March of 2002.

19   Q.        Is there a particular reason why you

20   delayed until late March to fill out the form?

21   A.        Well, I was very busy with the

22   responsibilities in my new job.  And Bob Dorrough,

23   who had been the price forecasting analyst, had --

24   he was leaving, I believe, at the end of February

25   of 2002.  He was actually retiring from the

1    Q.       Right.

2    A.       I don't know if that's -- you know, I mean,

3    that's his statement.  So, you know, I think, you

4    know, his -- what he is saying is that he thinks

5    it's more time consuming than what he originally

6    anticipated because of bringing in recruits from

7    the Texaco operations.  And he had shared with me

8    that his anticipation, I believe, on the portfolio

9    analyst job description, the price forecasting

10   aspects were listed in about 15 percent and so that

11   was what his, perhaps, anticipation was.

12           My understanding, however, in working with

13   Bob Dorrough, was that the activity level required

14   for the price forecasting work was cyclical, and at

15   certain times of the year, it was essentially a

16   hundred percent commitment.  So Bob had juggled the

17   price forecasting work with decision analysis and

18   opportunity assessment work in the group that he

19   had been in previously.

20   Q.       So do you know where it says Section 8,

21   what the percentage is?  I mean, in other words,

22   this is the first time this rating system is on the

23   PMP.  Do you know what the percentages mean?

24   A.       Well, when you say "the percentages," do

25   you mean the 10 percent, 2/3rds, 0 to 25 percent on

1    the form?

2    Q.       Right.

3    A.       Well, the percentages mean that 2/3rds of

4    the employees would fall in box 2.  And 0 to 25

5    percent of the employees would fall within box 1.

6    And 0 to 10 percent would fall within box 3.  I

7    believe that's what they mean.

8    Q.       Okay.

9             Do you know of the other employees that Rex

10   Mitchell rated for 2001, do you know if any were

11   rated one?

12   A.       Yes, I believe that most of the men, if not

13   all of the men, in the group were rated one.

14   Q.       How do you know that?  Or do you just

15   believe that?

16   A.       I had asked Dan Wallem what his rating was,

17   and he told me that he was ranked exceptional.  And

18   I had asked Kemal Ambarci what his rating was, and

19   he said he was ranked exceptional.  And I had not

20   asked Matt Palmer, but I had believed that his

21   rating was likely also exceptional.

22   Q.       Was anybody rated a three?

23   A.       I don't know.

24   Q.       So this 2/3rds, 0 to 25 percent, to your

25   understanding, that was not followed?  At least 90

```
 1    to, you know, performance accomplishments in 2001.

 2    I had had a discussion, you know, about Rex's

 3    behavior towards me also in 2002.

 4    Q.      Okay.

 5            But when you take a look at your comments,

 6    what you're talking about is an incident that

 7    occurred in the fourth quarter, correct?  Let me

 8    rephrase that.

 9            After the merger, the group was under a lot

10    of pressure; isn't that true?

11    A.      I mean, the planning group had a lot of

12    work to do after the merger, because the merger was

13    consummated in October of 2001, and the normal

14    business planning cycle is a longer cycle, and so

15    we had to -- we were -- your question was whether

16    we were busy?

17            MR. LEBOWITZ:          Pressure.

18            THE WITNESS:           Pressure?

19            MS. MILLER:            Q.  Under a lot of

20    pressure.

21    A.      Yes.  I mean, there was a lot of pressure.

22    We were very busy.  There was a lot to accomplish.

23    Q.      And you said you informed Rex that you

24    considered his behavior harassment.

25            Did you elaborate on that?  In other words,
```

1    you didn't write it down, but did you just tell him

2    you thought it was harassment?

3    A.      Yes.

4    Q.      Did you tell him it was harassment because

5    of your sex?

6    A.      No, I didn't say that.  I just used the

7    word "harassment."

8    Q.      Okay.

9            Did Rex apologize?

10   A.      Yes, he did.

11   Q.      When you met with Rex on April 1st, 2002,

12   did you tell him at that time that you had expected

13   to be rated in the exceptional category?

14   A.      No, I don't believe so.  When I met with

15   him on April 1st of 2002 to discuss this document,

16   I did not -- I don't believe I said anything about

17   what my expectations were for a rating.

18   Q.      Did Rex Mitchell explain to you why he had

19   rated you fully meets performance expectations?

20   A.      No, because he didn't give me my

21   performance rating at that meeting on April 1st,

22   2002.

23   Q.      When did you get the performance rating?

24   A.      I received -- I received the form with the

25   performance rating sometime after our meeting on

1    April 1st of 2002.  In early April, but I don't

2    remember the exact date.

3    Q.    You received this form with the performance

4    rating of a two before you went to the ombuds,

5    correct?

6    A.    No; that's not correct.

7    Q.    So it wasn't early in April of 2002.  You

8    went to the ombuds on -- in the third week of

9    April, shortly before you filled out your employee

10   comments; isn't that right?

11   A.    I believe I actually first met with the

12   ombuds person in March of 2002.

13   Q.    And by March of 2002, Rex Mitchell had

14   expressed some concern about your performance to

15   you; isn't that right?

16   A.    Yes.  He -- after I complained to

17   Jay Johnson about Rex's behavior that I considered

18   to be harassing conduct, and I believe I met with

19   Jay in early March of 2002, approximately March 4th

20   of 2002, Jay informed me that once he -- he had

21   asked Iris why I was -- I had scheduled time on

22   Jay's calendar.  And Iris said that "Kiran wanted

23   to talk to you about Rex."  And Jay indicated that

24   prior to my meeting with Jay on -- that was

25   scheduled for Monday, I believe, March 4th, that he

1  prior to 2002 is really broad. So at different

2  times in my career, I had been told I was on the

3  high potential list. And in 2001 -- in early 2002,

4  actually, I think, February of 2002, Rex had said

5  he needed to put together some potential -- next

6  assignments or development assignments. And he had

7  told me that I was high potential. Whether he told

8  me that I was on a high potential list or not

9  specifically, I don't remember.

10  Q.    Well, during the time -- anytime that you

11  were at COPI from 1995 on, did anybody inform you

12  you were on a high potential list?

13  A.    I don't remember specifically being told by

14  anyone that I was on a high potential list in COPI,

15  but I had been told by supervisors that I was

16  considered high potential.

17  Q.    Ln April of 2002, you went to the

18  ombudsperson at Chevron, correct?

19  A.    I spoke to an ombudsperson in April of

20  2002, but I believe I first contacted him in March

21  of 2002.

22  Q.    Did you contact him after your meeting with

23  Jay Johnson?

24  A.    Yes.

25  Q.    At that meeting, did Jay Johnson tell

1    you -- the meeting that you had with Jay Johnson in

2    March, did he tell you you had three choices, that

3    you could either leave the company, leave the group

4    or stay in the group and work with Rex?

5    A.       That's correct.  That's what he told me my

6    three choices were.

7    Q.       Did you tell him at that time that you were

8    looking for positions outside of the group?

9    A.       No.

10   Q.       At that point, had you posted for other

11   positions outside of the group?

12   A.       There was a position with Dynegy in Houston

13   that I posted for, but I don't recall what the

14   timing of that position was, whether it was before

15   March of 2002 or after March of 2002.

16   Q.       Okay.

17            Do you recall if you posted for that post

18   before you spoke to Jay Johnson?

19   A.       Well, I just told you I don't recall

20   whether it was before or after.

21   Q.       Okay.

22            Now, why did you go to the ombudsperson?

23   A.       I went to the ombudsperson because

24   Vicki Thompson had encouraged me to go and talk to

25   the ombudsperson after I described to her the

1    meeting that I had with Jay.

2    Q.    Did you understand the complaint that you

3    would make to the ombudsperson would be

4    confidential?

5    A.    Yes.  Gary explained that the

6    ombudsperson -- in fact, I believe he had a

7    brochure that he showed me -- provided

8    confidentiality.

9    Q.    The first time that you -- well, when you

10   went to the ombudsperson, did you go with Vicki, or

11   did you go by yourself the first time you spoke

12   with him?

13   A.    I believe the first time I spoke to the

14   ombudsperson, Gary Yamashita, I went by myself.

15   Q.    So you met with him first in person, or was

16   it a telephone call?

17   A.    Well, I met with him in person, but I

18   believe I called him by telephone to set up the

19   appointment.

20   Q.    So you met with him in person the first

21   time, and then you came back again with

22   Vicki Thompson?

23   A.    So you're asking whether Vicki and I met

24   with Gary Yamashita together after I had initially

25   met with Gary?

1    Q.    Right.

2    A.    Yes.

3    Q.    Okay.

4          And did you provide Gary any documents?

5    A.    And the time frame that you're asking is at

6    my first meeting?

7    Q.    In your first meeting.

8    A.    Okay.

9          I don't believe I provided him any

10   documents at the first meeting.

11   Q.    When you went back with Vicki, did you

12   provide documents to Gary?

13   A.    I don't remember whether in the meeting

14   with Vicki we -- or I provided him documents.

15   Q.    Do you recall the first time you met with

16   Gary what you told him about why you were coming to

17   see him? ,

18   A.    I told him that I was coming to see him

19   because my supervisor was behaving in an abusive

20   and hostile manner towards me.

21   Q.    Did you tell him it was -- he was acting

22   that way toward you or to everybody in the work

23   group?

24   A.    Well, I told him that he was acting that

25   way towards me, and then I talked about some

1   specific examples.  And I also mentioned that I had

2   heard from Iris Owens that he was treating her in

3   an abusive manner.

4          MS. MILLER:            Mark this next in

5   order.

6                         (DEFENDANTS' EXHIBIT NO. 11

7                          WAS MARKED FOR IDENTIFICATION.)

8          MS. MILLER:            Q.  Take a look at

9   Exhibit 11.

10          Sometime prior -- the week prior to April

11  23rd, you, Vicki Thompson and Gary Yamashita met to

12  discuss your concerns about the work group,

13  correct?

14  A.     That's correct.

15  Q.     Okay.

16          And then after that meeting, you and Vicki

17  put together a list of bullet points for a meeting

18  that was scheduled for the week of April 23rd,

19  correct?

20  A.     Yes; that's correct.

21  Q.     Okay.

22          Who was going to be at that meeting on

23  the -- actually, it would have been on the 25th of

24  April?

25  A.     That meeting was scheduled where Gary would

```
 1    go in and talk to James Johnson and for -- first,

 2    and then Vicki and I would come in and join them.

 3    So the four participants in total would be

 4    Gary Yamashita, James Johnson and Vicki Thompson

 5    and myself.

 6    Q.      If you take a look at these bullet points,

 7    the first one is, "CTOP planning constitutes a

 8    hostile work environment that does not foster

 9    productivity or respect amongst the work group."

10            Do you see that?

11    A.      Yes, I see that.

12    Q.      Okay.

13            And that's -- when you talk about hostile

14    work environment, did you tell Gary Yamashita that

15    you thought that the hostile work environment was

16    based upon gender, or was it something that

17    affected the entire work group?

18    A.      We told Gary that it was based on gender.

19    Q.      You didn't write that here, though, did

20    you?

21            MR. LEBOWITZ:          Objection. Assumes

22    facts.

23            MS. MILLER:          Q. Well, it says it

24    doesn't foster a spirit of inclusion of all team

25    members.
```

1    Stan Walker retiring from the company.

2    Q.      Well, when the four of you met on April

3    25th, did you discuss each of these bullet points?

4    A.      When the four of us met, as I mentioned,

5    Gary and Jay Johnson met prior to Vicki and I

6    coming in to meet, and when Vicki and I came in to

7    meet with Jay, we didn't end up going through this

8    bullet point list.

9    Q.      You did not?

10   A.      That was the way that Jay conducted the

11   conversation.

12   Q.      Okay.

13           What did you discuss?

14   A.      Jay spent most of the conversation

15   rebutting my concerns about Rex's treatment of me

16   and Rex's evaluation of my performance.  And it

17   wasn't until the very end of the conversation or a

18   very long discussion where Jay Johnson focused

19   specifically on me that he turned to address Vicki.

20   So he didn't address us.  Although Vicki was

21   sitting at the table, he separated our concerns and

22   addressed them separately.

23   Q.      Okay.

24           And did you tell Jay Johnson at this

25   meeting that you thought you'd been treated

1    unfairly by Rex Mitchell?

2    A.      I told Jay Johnson that I thought that

3    Rex Mitchell had treated me differently because I

4    was a woman and a minority and that Rex had a habit

5    of making disparaging comments about women and

6    minorities.  And I went through several examples

7    where Rex had made disparaging comments about women

8    and minorities.

9    Q.      You didn't write any of these comments, or

10    is that in any of these bullet points, or am I

11    missing it?  I don't think so.

12           MR. LEBOWITZ:      Is that a question?

13           MS. MILLER:         No.  I'm just trying

14    to see where that came up.

15           MR. LEBOWITZ:      She just testified to

16    that.  Are you asking a question, or are you just

17    making a comment to yourself?

18           MS. MILLER:         I'm just reading it.

19    Just trying to see if it's in here anywhere.

20           MR. LEBOWITZ:      It's not a transcript

21    of the meeting.  So use it for what you want.

22           MS. MILLER:         Q.  Well, I would

23    presume, then, in anticipation of this meeting that

24    you and Vicki sat down and wrote down the things

25    that were important to you, right?  And certainly

1    yes.

2    Q.      You weren't successful in any of the

3    business -- I guess the BD PDC positions that you

4    nominated for, correct?

5    A.      I was not selected for any of those

6    positions.

7    Q.      Okay.

8            And you were notified that you had been

9    selected for the Block 14 position by

10   Kelly Hartshorn, correct?

11   A.      That is correct.

12   Q.      And when you met with her to discuss the

13   position, at that time, you asked her about a

14   promotion, correct?

15   A.      Actually, before she even did the

16   nominations, I had indicated to her that I did not

17   want to be placed on the slate for that position

18   unless it was a promotion.

19   Q.      Okay.

20           Was it a promotion?

21   A.      Can you just clarify that?

22   Q.      Well, was the position you were offered in

23   Block 14 a promotion from the portfolio analyst

24   position?

25   A.      The position that I was offered in Block 14

1    was offered at the same level, as a lateral.

2    Q.      Are promotions determined at PDC meetings,

3    or do you not know?

4    A.      I don't want to speculate, so....  I don't

5    know what the exact process is for determining

6    promotions.

7    Q.      Okay.

8            Do you know why you were selected for the

9    Block 14 position?

10   A.      I wasn't at the PDC meeting, so I don't

11   know why I was selected for the Block 14 position.

12   Q.      Did anybody ever -- did Kelly talk to you

13   afterward and explain to you why that position was

14   viewed as a good fit for your skills and

15   development?

16   A.      Kelly talked to me afterwards and indicated

17   that Jack Dunn, who was a good friend of hers and

18   was the job owner for that position, was very happy

19   to see someone of my caliber as a candidate for

20   that position, because they had posted it several

21   times and had not been able to attract anybody of

22   my caliber to that position.

23   Q.      Well, were you -- did Kelly tell you why

24   the PDC thought this would be a good position for

25   you?

1    A.        No, she did not.

2    Q.        Okay.

3              Were you told that it would be viewed as a

4    good development position because of the

5    possibility for a leadership role in the project?

6    A.        By who?

7    Q.        By Kelly or even Jack Dunn.

8    A.        Can you just restate the question, please?

9              (Record read by the reporter as follows:

10             "Q.   Were you told that it would be viewed

11                   as a good development position because

12                   of the possibility for a leadership

13                   role in the project?")

14             THE WITNESS:           No.  In fact,

15   Jack Dunn and I had a long conversation about the

16   position, and he indicated that, you know, he knew

17   that, you know, this position, the job title,

18   simulation engineer, was going back to do the kind

19   of study work that I had done in La Habra, you

20   know, back in '92, you know, two or three years

21   into my career.  And he talked about how the -- he

22   had a very large team, and it was a flat

23   organization, so he did not believe in having

24   subteam leaders reporting to him, so there were no

25   formal leadership positions in the team.  But he

 1    said, "You would be the senior petroleum engineer

 2    working on the S3 assets, because the other

 3    petroleum engineer is relatively new to the

 4    company."

 5          MS. MILLER:          Q.  Did he also say

 6    that it would be -- it's one of the best assets the

 7    company has, and it would be a high-profile project

 8    as they move the asset through the pipeline to

 9    project sanction, so this should be a real

10    opportunity for growth from a professional

11    standpoint for someone who comes in and performs

12    well?

13          MR. LEBOWITZ:          Objection.  Compound.

14          MS. MILLER:          Q.  Did he object --

15    or Kelly Hartshorn tell you that?

16          MR. LEBOWITZ:          Same objection.

17          THE WITNESS:          Can you restate the

18    question, please?

19          (Record read by the reporter as follows:

20          "Q.  Did he also say that it would be --

21                it's one of the best assets the

22                company has, and it would be a

23                high-profile project as they move the

24                asset through the pipeline to project

25                sanction, so this should be a real

CERTIFICATE

1

2      I, the undersigned, a Certified Shorthand

3   Reporter, State of California, hereby certify that

4   the witness in the foregoing deposition was by me

5   first duly sworn to testify to the truth, the whole

6   truth, and nothing but the truth in the

7   within-entitled cause; that said deposition was

8   taken at the time and place therein stated; that

9   the testimony of said witness was reported by me, a

10  disinterested person, and was thereafter

11  transcribed under my direction into typewriting;

12  that the foregoing is a full, complete and true

13  record of said testimony; and that the witness was

14  given an opportunity to read and, if necessary,

15  correct said deposition and to subscribe the same.

16      I further certify that I am not of counsel

17  or attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any

19  way interested in the outcome of the cause named in

20  said caption.

21      Executed this 4th day of April, 2006.

22

23      _LaRelle M. Fagundes_____

24      LARELLE M. FAGUNDES, CSR 9762

25

PATRICIA CALLAHAN & ASSOCIATES

1                   UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4       KIRAN PANDE,

5                    Plaintiff,

6            vs.                         No. 04-5107 CW

7       CHEVRON CORPORATION (f/k/a             COPY
        ChevronTexaco Corporation) and
8       CHEVRON INTERNATIONAL EXPLORATION
        & PRODUCTION (f/k/a ChevronTexaco
9       Overseas Petroleum), a division
        of Chevron U.S.A. Inc.,
10
                     Defendants.
11      _____/

12

13

14

15              DEPOSITION OF KIRAN PANDE

16                     VOLUME III

17                  March 22, 2006

18

19
             PATRICIA CALLAHAN & ASSOCIATES, INC.
20              Certified Shorthand Reporters
             Oakland, California   510-835-3993
21        San Francisco, California  415-788-3993
          Castro Valley, California  510-885-2371
22
                Facsimile 510-247-9775
23                 WeReport@aol.com

24      Reported by:
        LaRelle M. Fagundes
25      CSR No. 9762

1    Luanda, Houston and San Ramon, correct?  On

2    November 4th, sorry.

3    A.        That's correct.

4    Q.        And the individuals -- were all of the

5    individuals on that call part of the Southern

6    Africa business unit, if you remember?

7    A.        Yes, I believe they were.

8    Q.        I think you said yesterday that during that

9    telephone call Jack repeatedly asked you how you

10   were going to get the work done given your

11   impending leave; is that right?

12   A.        That's correct.

13   Q.        And I presume from what you've described

14   previously that he grew increasingly agitated and

15   kept repeating that phrase to you?

16   A.        It appeared to me that he wasn't interested

17   in an answer to that question.  He kept saying --

18   he didn't ask the question in a way of, "Okay, you

19   know, you're going on medical leave.  Let's talk

20   about how we're going to handle the transition of

21   work."  His whole tone of voice, his expression,

22   his tone, his threatening manner was accusatory,

23   very hostile.  And when -- he kept repeating, "How

24   are you going to get this work done?  How are you

25   going to get this work done?"  And he was actually

1    not even giving me time to answer that question,

2    and he was essentially just yelling at me.  So it

3    wasn't a normal, professional, business environment

4    conversation.

5    Q.        You and Jack Dunn were both in San Ramon

6    during this call?

7    A.        Yes.  We were both in the same conference

8    room.

9    Q.        Okay.

10            Who else was in that conference room?

11   A.        Kathy Mabe was in the conference room; Tayo

12   Feyijimi; Dale Beeson; Carlos, I believe the last

13   name is Martins, M-a-r-t-i-n-s; and Mike Clark was

14   in that meeting for parts of the meeting, but he

15   wasn't there for the whole time; Jack and myself.

16            Your question was as to who was in the room

17   in San Ramon; is that correct?

18   Q.        Right.

19   A.        And I believe that's -- I believe that's

20   it, although I may have missed someone.

21   Q.        Can you take a look at Exhibit 2 for a

22   moment.

23            Do you see what you wrote about the

24   November 4th telephone call?

25   A.        Yes, I see that.

1    A.       That's correct.

2    Q.       Okay.

3             And in that conversation, he told you that

4    you were receiving a letter from human resources

5    about the end date of your employment, correct?

6    A.       Actually, he told me that a letter had

7    already been mailed out from human resources by

8    registered mail, and he read me the contents of the

9    letter.

10   Q.       Okay.

11                           (DEFENDANTS' EXHIBIT NO. 32

12                           WAS MARKED FOR IDENTIFICATION.)

13            MS. MILLER:           Q.   Is Exhibit 32 the

14   letter that Jack read to you?

15   A.       Much of the content sounds familiar, but I

16   don't know, you know, word for word if that was the

17   exact letter that he read.

18   Q.       Did you have any discussion with

19   Taryn Shawstad about this November 18th letter

20   after you received it?

21   A.       I had a -- I replied to Taryn Shawstad with

22   the letter.

23   Q.       And you disagreed with the termination

24   of -- of the characterization of your employment

25   termination as voluntary, correct?

PATRICIA CALLAHAN & ASSOCIATES

```
 1    A.      Are you asking about the contents of the

 2    letter that I sent to Taryn Shawstad?

 3    Q.      No.

 4            You disagreed with the characterization of

 5    your termination as voluntary, correct?

 6    A.      I disagreed with the company informing me

 7    that I had voluntarily resigned from the company;

 8    that's correct.

 9                        (DEFENDANTS' EXHIBIT NO. 33

10                        WAS MARKED FOR IDENTIFICATION.)

11            MS. MILLER:          Q.  Is this the

12    response that you were referring to to

13    Ms. Shawstad?

14    A.      Yes, it is.

15    Q.      Okay.  I have a few questions.

16            You said you were shocked to receive your

17    letter in the mail while I was on the company

18    approved short-term disability due to medical

19    reasons associated with my own serious health

20    condition.

21            Did you think that your employment could

22    not be terminated while you were on a medical

23    leave?

24    A.      It was my understanding that FMLA and CFRA

25    were designed to protect your employment while
```

1   you're on medical leave.

2   Q.      But was it your understanding that you

3   could not be terminated while you were on a leave?

4   A.      It was my understanding that I could not be

5   terminated while I was on a FMLA and CFRA protected

6   leave, medical leave.

7   Q.      What offer had you received prior to

8   November 11th, 2004, to continue work in San Ramon?

9   It says, "Before I went on medical disability, I

10  was offered and accepted to continue to work

11  through 2004."  What job were you offered?

12  A.      I was offered to continue working on

13  projects and to provide decision analysis support

14  to the projects.

15  Q.      Was there a particular job, a position or a

16  title that you were offered?

17  A.      No, I wasn't offered a -- this wasn't a --

18  there wasn't a title associated with the work that

19  was described to me.

20  Q.      And I think I asked you before, you didn't

21  receive a fixed duration assignment offer from

22  anyone that would have been for a position in 2004;

23  is that right?

24  A.      That's correct.

25  Q.      Okay.

1    And at what salary grade was this -- or was

2    it a position that you were offered?

3    A.    I was offered to continue to work on the

4    project through 2004.  There was no discussion of

5    salary grade.

6    Q.    Was there a position of a -- there was a

7    discussion of the position, because your position

8    had moved to Houston.  So what position were you

9    going to be in?

10    A.    There was not discussion of a job title or

11    a position.  There was discussion of work that was

12    offered to me to do through 2004.

13    Q.    And that was a position -- or a discussion

14    you had with Jack Dunn, right?

15    A.    That's correct.

16    Q.    You didn't have any discussions with anyone

17    else about work through 2004; is that right?

18    A.    That's correct.

19    Q.    You say on the second page that "and the

20    reporting of Mr. John Dunn's harassing conduct to

21    CTOP management."

22    You didn't make any complaints about

23    Jack Dunn's harassing conduct to CTOP management

24    prior to December 8th, 2003, did you?

25    A.    I discussed Jack Dunn's harassing conduct

1    to time.

2         MS. MILLER:          Q.    At any time prior

3    to December 1st, 2003.

4    A.      Can you just please state the whole

5    question again?

6    Q.      Do you know if Jack Dunn was aware of the

7    complaint you say you made to Gary Yamashita at any

8    time prior to December 1st, 2003, presumably

9    complained somewhere between November 5th and the

10   end of December, yes or no?  You said shortly

11   after.  You had a conference call November 4th.

12   You said you complained shortly after.  Do you know

13   if Jack Dunn was aware that you had spoken to

14   Gary Yamashita about the November 4th conference

15   call?

16   A.      I don't know whether Jack Dunn was aware.

17   Q.      Do you know if he ever became aware of the

18   conversation you had with Gary Yamashita about the

19   November 4th conference call?

20   A.      I don't know.

21   Q.      Was the work you were supposed to do after

22   December 31st, 2003, on the project the same work

23   you had been doing, or was it different work?

24   A.      It was a combination of the same work I had

25   been doing and different work.

```
 1   Q.      When you spoke to Jack Dunn on November

 2   17th at about 3:30 in the afternoon, didn't you

 3   tell him at that time that you could not be fired

 4   because you were on a leave?

 5   A.      No, I did not tell him that.

 6   Q.      Did you tell him that because you were on a

 7   FMLA leave that your employment could not be

 8   terminated?

 9   A.      No, I did not tell him that.  In fact, the

10   conversation was more around Jack's -- basically it

11   was a conversation where Jack was telling me about

12   this letter and how they had consulted -- he had

13   consulted with an employment lawyer and that Jack

14   was concerned about whether it was kosher or not to

15   terminate me on FMLA and that that might complicate

16   things.  And I asked him a number -- a couple of

17   questions, and he responded that "It sounds like

18   you're trying to take my deposition."

19   Q.      When did you speak to Gary Yamashita about

20   Jack Dunn?

21           MR. LEBOWITZ:        Objection.  Asked and

22   answered.

23           THE WITNESS:        I spoke to

24   Gary Yamashita on several occasions about

25   Jack Dunn.
```

1    positions in question?

2    A.      Well, I don't have the position description

3    and the qualification sheet for that to be able to

4    answer what were the specific qualifications

5    listed.

6    Q.      Do you know what Jalal Affifi or

7    Graham Housen's employment background was at

8    Chevron?

9    A.      I have a general idea of what their

10   employment background was at Chevron.

11   Q.      Okay.

12           And on what facts do you base your belief

13   that you were more qualified than either

14   Jalal Affifi or Graham Housen for the positions in

15   question?

16   A.      The positions in question specifically

17   focused on evaluating new opportunities.  And I had

18   spent several years and had worked on several new

19   venture evaluations.  Also that position -- those

20   positions were going to be supporting the portfolio

21   and business development efforts, that the

22   corporation had to change the portfolios.  And a

23   combination of business planning and portfolio

24   experience with the technical petroleum engineering

25   and reservoir engineering were some of the reasons

1    that I believed I was more qualified for those

2    positions.

3    Q.    Did either individual have a background in

4    evaluating new opportunities?

5    A.    I don't know whether either individual had

6    a very significant background in evaluating new

7    opportunities.

8    Q.    Did you have a discussion with

9    Zuwa Omoregie at any time after the selection for

10   these two positions were made?

11   A.    Yes.

12   Q.    When?

13   A.    I've had multiple conversations with Zuwa.

14   I had some conversations with Zuwa at a research

15   workshop at Stanford in May of 2005.  And I had at

16   least one telephone conversation with Zuwa around

17   that time period.

18   Q.    Did you have a conversation with him in

19   early 2004 as to why you were not selected for

20   either position?

21   A.    No, I don't believe so.

22   Q.    Did he ever tell you why you were not

23   selected for either position?

24   A.    No, I don't believe so.

25   Q.    Did he ever say anything to you that led

CERTIFICATE

1       I, the undersigned, a Certified Shorthand

2  Reporter, State of California, hereby certify that

3  the witness in the foregoing deposition was by me

4  first duly sworn to testify to the truth, the whole

5  truth, and nothing but the truth in the

6  within-entitled cause; that said deposition was

7  taken at the time and place therein stated; that

8  the testimony of said witness was reported by me, a

9  disinterested person, and was thereafter

10  transcribed under my direction into typewriting;

11  that the foregoing is a full, complete and true

12  record of said testimony; and that the witness was

13  given an opportunity to read and, if necessary,

14  correct said deposition and to subscribe the same.

15       I further certify that I am not of counsel

16  or attorney for either or any of the parties in the

17  foregoing deposition and caption named, nor in any

18  way interested in the outcome of the cause named in

19  said caption.

20       Executed this 5th day of April, 2006.

21  

22  *LaRelle M Fagundes*

23  LARELLE M. FAGUNDES, CSR 9762

PATRICIA CALLAHAN & ASSOCIATES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

KIRAN PANDE,                     )
                                 )
          Plaintiff,             )
                                 )
     vs.                         ) Case No. 04-5107 CW
                                 )
CHEVRON CORPORATION, et al.,     )
                                 )
          Defendants.            )
_____  )

DEPOSITION OF KIRAN PANDE

Monday, November 27, 2006

VOLUME IV

CERTIFIED COPY

REPORTED BY: DENISE A. FORD, CSR 7525 (38835)


**LEGALINK®**

**A MERRILL
COMMUNICATIONS
COMPANY**

575 Market St                tel (415) 357-4300      www.merrillcorp.com
11th Floor                   tel (800) 869-9132
San Francisco, CA 94105      fax (415) 357-4301

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

 1          A.    I believe I do.  I think this was somebody

 2     that had contacted me that I knew or he had been given

 3     my contact information from someone at the Berkeley --

 4     through a connection at the Berkeley business school

 5     program that was looking for a job, and I had pointed

 6     him to talk to him about his background and pointed him

 7     to the Chevron website where it has job postings, and

 8     also the external website has other information on it as

 9     well.

10          Q.    Did the remaining notes on this have

11     anything to do with your allegations in this case?

12          A.    The remaining notes look like they are

13     notes related to phone calls related to pricing, pricing

14     crude oils.

15     (Whereupon Exhibit 42 was marked for identification.)

16          Q.    This is an e-mail I presume you got from

17     Rex Mitchell regarding the relocation policy and the

18     time off for house hunting in the Bay Area, correct?

19          A.    That's correct.

20     (Whereupon Exhibit 43 was marked for identification.)

21          Q.    Do you know what Exhibit 43 is?

22          A.    Exhibit 43 is a printout regarding a

23     conference call that was part of our strategic planning

24     process in May of 2002.

25          Q.    And is there any reason you kept this

514

1    particular e-mail?

2          A.    Yes.   This was an e-mail that I had shown

3    to Jay Johnson as an example of Rex excluding me from

4    meetings.

5          Q.    And I notice that -- is this the actual

6    invitation to attend the conference call that was sent

7    by Iris Owens, correct?

8          A.    No, it was sent by Rex Mitchell.

9          Q.    I am looking at the one that is 6:19 p.m.

10         Do you see that the first one is from -- the

11   first e-mail is from Jay Johnson to Iris Owens, correct,

12   the last page?

13         A.    This one here, that's correct, from Jay

14   Johnson to Iris Owens, May.

15         Q.    That's to set up a conference call.

16         It says, "Iris, we need to set up a two-hour

17   bridge for five ports at 8:30 tomorrow a.m."

18         Correct?

19         A.    That's correct.

20         Q.    Participants from San Ramon would be Rex

21   and me and anyone else Rex feels should be part of the

22   call.

23         A.    That's what it says.

24         Q.    Do you know who Rex told Iris Owens should

25   be part of the call?

515

1    Connelly if he could forward me a copy of the meeting

2    invitation since I never received it.

3          Q.    Did you ask Rex Mitchell why you were not

4    included?

5          A.    No, I discussed it shortly thereafter with

6    James Johnson.

7          Q.    Why didn't you ask Rex Mitchell?

8          A.    Why didn't I ask Rex Mitchell?

9          Q.    Yes.

10         A.    Rex Mitchell wasn't really even talking to

11   me at that point.

12         Q.    As we sit here today, do you know why you

13   were not included in this conference call?

14         A.    I believe it was retaliation by Rex

15   Mitchell.  This was a very important conference call.  I

16   was integrally involved in the strategic planning

17   process and the product.

18         Q.    Do you -- other than your belief, do you

19   have any facts that would support your belief that this

20   was in retaliation?

21         A.    Well, this occurred after we reported Rex

22   Mitchell.

23         Q.    So prior to this, you had never been not

24   included on a conference call that included -- to talk

25   about the strategic plan?

517

1          A.    Well, this was a conference call that

2     involved everybody in the group, so I don't know whether

3     Rex had not included me in other meeting invitations.

4     This was one that I was made aware of.

5          Q.    Do you know if there was a business reason

6     why you were not included in this conference call?

7          A.    No, there was no business reason.    In

8     fact, when I presented this to James Johnson, he

9     indicated that I should have been included in this call.

10          Q.    And other than this one call, are you

11     aware of any other calls or meetings that occurred that

12     were set up by Rex Mitchell in which you were not

13     invited after May 8, 2002?

14          A.    I believe that there were several meetings

15     where he met with the other planners and didn't invite

16     me after May 8 of 2002.    Kemal Anbarci made the comment

17     to me in I believe it was July of 2002 that he thought I

18     had been transferred out of the group because he hadn't

19     seen my name on meeting notices.

20          Q.    Are you aware of other meetings that

21     occurred after May 8, 2002 in which you were the only

22     individual from the group that was not invited?

23          A.    I believe there were meetings that

24     occurred.

25          Q.    I know you believe there were meetings.

518

1    What I am asking you is, as we sit here today, do you

2    know for a fact whether there were meetings in which the

3    entire group was invited and you were not?

4         A.    Well, there were -- I saw the rest of the

5    group meeting with Rex where I wasn't invited to those

6    meetings.  I don't have any more e-mails like this where

7    there is written documentation that I wasn't invited.

8         Q.    Can you tell me any particular meeting,

9    meeting date or time or a conference call in which you

10   were not invited but the rest of your group was?

11        A.    I don't have specific dates or specific

12   meetings, but Kemal Anbarci, who is in the planning

13   group, told me that he was aware that Vicki had been

14   transferred out, even though there had never been an

15   announcement that she had been transferred out.  He had

16   assumed that I was working for Kelly Hartshorn because

17   he hadn't seen me on any of the meeting notices.

18        Q.    Do you know why you were not invited to

19   this particular conference call?

20        A.    I believe it was retaliation by Rex

21   Mitchell.

22        Q.    I know you believe it was retaliation.

23        Do you know of any other reason?

24        A.    There would be no other reason.

25   (Whereupon Exhibit 44 was marked for identification.)

LegaLink, A Merrill Communications Company   (800) 869-9132

# Annual Performance Management - PMP-2001

 **Chevron**

| Section 1 - Employee Information | | | |
|---|---|---|---|
| Name<br>Kiran Pande | Chevron Email ID<br>KKPA | Position<br>Planning/Portfolio Analyst | Salary Group<br>24 |
| Company<br>COPI/CTOP | Department<br>Business Planning | | Location<br>San Ramon. CA |
| Time in Present Position<br>1.5 years | Period Covered<br>From:  Jan 1, 2001     To:    December 31, 2001 | | |

| Section 2a - Performance Agreements | Section 2b - Results |
|---|---|
| Include the metrics by which results will be measured. | What was accomplished?  Explain any variations from what was expected. |
| 1.  Summary of key results.<br>Description of specific deliverables documented below.<br><br>• Planning contact for Latin America, Southern Africa, and Indonesia SBUs. | • Partnered with SBUs to meet deliverables associated with business plan and presentation of acquisition and new opportunities for CTOP management review.<br>• Received excellent feedback from Beth Liptak and Danny Chancellor on my role in assisting the SBUs as their CTOP planning contact. |
| • Support COPI President with various communication venues. | • Developed a clear and consistent message for Peter Robertson's communications to CTOP employees on merger integration. Critical alignment of message around people, partnership, and performance was achieved to enable consistent message across CT leadership team through cascaded deployment process.<br>• Received excellent feedback from PJR on all presentations.<br>• Developed materials to support communications to market.  A critical part of supporting this communication involved understanding the basis for delivering on our production growth targets in 2001 and the basis for establishing production growth targets for the merged company.<br>• Received excellent feedback from PJR and Pierre Breber on materials prepared to support external communications with security analysts. |
| • Backfill portfolio analyst role for COPI.  Assist CLEAN team with developing combined view of total ChevronTexaco world-wide portfolio of assets. | • Worked closely with all SBUs to develop an updated view of the COPI portfolio as input to the CLEAN team.<br>• Key results of this work:<br>(1) Enabled CTOP management to have a clear view of the combined upstream portfolio of assets of CT on Day 1.<br>(2) Enabled CTOP management with quantitative basis for discussions with SPC on expectations for performance of the upstream segment of the merged company.<br>(3) Enabled detailed analysis of basis for production growth for Day 1 + 45 message to market.<br>(4) Enabled SBUs to understand their combined portfolio of assets<br>(5) Enabled SBUs and CTOP HQ to have a solid quantitative basis to develop business plan with an unusually compressed business plan cycle time due to merger. |

**EXHIBIT** 18<br>10<br>Pande 3-21-06

GO-1426-2001 (10-25-00)

**Notes:**
• Information on this form will be used as input into decisions about pay, selection and promotion.
• Employees and supervisors should each keep an electronic copy of the completed form for three years.

CHEVRON/PANDE02992

| 2. Planning Contact | 2 man-months total effort over the year. |
|---|---|
| • Key planning contact for Latin America and Southern Africa SBUs.<br>• Back-fill Kevin Regan's planning analyst role for Indonesia SBU (Jan – Nov).<br>• Serve as first point of contact for business unit personnel for business plan activities. | • Developed a strong partnership with SBU and FFAR contacts:<br>(1) Latin America SBU (Beth Liptak, David Hyams), Jan-Dec.<br>(2) Southern Africa SBU (Danny Chancellor and Mark Waterson). Planning contact from Jan -Nov with assistance from Bob Johns.<br>(3) Indonesia SBU (Kevin Connelly and Ruskampto Soeripto). Assumed responsibilities for Indonesia SBU, in addition to LABU and SABU, after Kevin Regan was assigned to 2010 study in Jan.<br>• Worked closely with each SBU to keep abreast of current activities, status of major projects, and production and CAPEX variances.<br>• Provided guidance, assistance, and advice to SBU personnel.<br>• Participated in LABU Argentine Gas Study Review Mtg. (May 25)<br>• LABU Acquisition Evaluation Assistance (Project Andes) (June 8 – June 21). Assisted BU personnel (Mark Strider and Alberto Carnicero) and Erwin Durrer with evaluation of sensitivity of ROCE to purchase price and characterized impact of this opportunity on COPI level metrics. Reviewed and provided suggestions on BU proposal for Andes purchase. Reviewed basis for using El Trapial as analog in technical evaluation.<br>• LABU CSJ Equity Purchase – IFC Shares (Apr 26 – July 3). Assisted BU (Alberto Carnicero) and Erwin Durrer with analysis of potential acquisition of IFC shares by CSJ. Evaluated impact of acquisition on COPI level performance metrics.<br>• LABU Scoping Notice for Ecuador Core Fields (September). Provided input to BU personnel on presentation material and attended BU presentation of opportunity to PJR. Worked closely with BU personnel (Dan Hamer and Carlos Garibaldi) on drafting scoping notice of Ecuador Core Fields for SPC discussions to ensure that concerns raised by PJR and Cedric Lavington were adequately addressed. Received positive feedback from Dan Hamer indicating that my participation had helped the SBU considerably in developing the final product. |
| 3. Support COPI President<br>Support COPI President: assist COPI President with preparation for key meetings (employee town-halls, analyst meetings, leadership meetings, management committee meetings, merger integration communications). | 2 man-months total effort over the year.<br>Developed content, slides, supporting material and speaker notes, and met with Peter Robertson (PJR) to incorporate his input into the following presentations. PJR was very appreciative of these efforts and provided positive feedback on each of the presentations.<br>1. Dresdner Analyst Meeting Jan 12<br>2. Security Analyst Meeting Feb 5 (with Jon Mauer & Pierre Breber)<br>3. PJR May 1 COPI San Ramon Town-hall<br>4. PJR Del Lago Offsite Leadership Meeting May 17<br>5. PJR July 3 COPI San Ramon Town-hall<br>6. PJR July Management Committee Presentation<br>7. PJR Woodlands July 31 Leadership Offsite<br>8. PJR Woodlands July 31 Breakout Session (w/ Kemal Anbarci)<br>9. PJR August 13 Europe Town-hall<br>10. PJR Day 1 Web-Cast Oct 10 (w/ Dan Wallem, David Quady, Marty Schultz, Dennis Fischer) |

**Notes:**
• Information on this form will be used as input into decisions about pay, selection and promotion.
• Employees and supervisors should each keep an electronic copy of the completed form for three years.

GO-1426-2001 (10-25-00)

CHEVRON/PANDE02993

4. Portfolio modeling
- Back-fill portfolio analyst role with Bria... utt's assignment to the Upstream Strategic Model CLEAN Team (SMCT).
- No pre-defined performance metrics.
- Filled critical business needs on COPI portfolio as they arose throughout the year.
- Maintained, updated, and modified COPI/CTOP portfolio tool to enable roll-up and analysis of SBU submissions and characterization of the upstream international portfolio of assets.

4 man-months total effort over the year.

- Updated portfolio to provide input to SMCT and COPI management with updated view of COPI projects. Developed and issued guidelines for SBU planners project data update. Constructed individual SBU level portfolio analyzers and issued these analyzers with the most recent SBU level data from the BP submission. Coordinated request for data, performed quality control on data submissions, consolidated all SBU data into COPI level portfolio analyzer tool, and performed analysis on changes relative to BP submission. Coordinated and fielded questions for all SBUs (Asia-South, Australasia, China, Eurasia, Indonesia, Latin America , Mid-Africa, Nigeria, Southern Africa, Bahrain, Qatar, Kuwait. (January 1 – March 10)
- Updated COPI portfolio model to include Bangladesh acquisition by Thailand SBU (with Brian Putt and Erwin Durrer). (April)
- Developed and issued portfolio template update instructions to COPI SBUs in July. Incorporated input from Brian Putt (SMCT) and Bob Otis (ECT) and worked with Jeff Reich to modify analyzer to incorporate additional line items of data as required by CLEAN team (mostly exploration expense detail). Constructed 10 individual SBU level analyzers and created additional summary capabilities in tool to provide basis of comparison with Financial Forecast Template and previous BP submission (capability requested by Larry Neal – Nigeria SBU and Kevin Connelly – Indonesia SBU). Fielded questions and performed quality control on data submissions for all 10 SBUs. Consolidated all SBU data into COPI level portfolio analyzer, and performed analysis to summarize major changes relative to business plan submission and spring update. Extraordinary effort was required to develop the basis for COPI's submission to the SMCT and provide the SMCT adequate time to put together a world-wide upstream view of the combined Chevron and Texaco portfolio prior to the close of the merger. The work requirements varied significantly from expectations. With the exception of Dan Wallem (Thailand, China, and MENA SBUs), the other planning analysts did not adequately review or quality control the data submissions from their business units. Hence, I had to spend numerous hours corresponding with Nigeria, Australasia, Eurasia, and Europe SBUs (in addition to my own SBUs – Latin America, Southern Africa, Indonesia) by phone and e-mail to work out data issues prior to submission of consolidated COPI data set to CLEAN team. I worked 18-hour days including all weekends the entire month of September in order to deliver a quality product to the CLEAN team. Successfully met deadline for submission of COPI data to SMCT.
- Summarized major differences in production and capital in revised portfolio submission for Peter Robertson prior to releasing COPI data to SMCT. Summary information (data and graphs) was used by PJR as supporting information for dialog with each of his MDs on COPI production and opportunities to close gap. PJR also used this information in discussions of production growth targets with the Chairman and Vice-Chairman. (mid-September)
- Fixed Australasia portfolio analyzer for SBU (Oct 31).
- Pulled together summary information on heavy oil assets in CTOP portfolio for use by TREX Heavy Oil Platform – Jai Choi (Dec).
- Extracted summary information on Indonesia and Angola assets from SAM model for Craig Isom and Ken Weber to assist with asset appraisals for Danish and Canadian tax purposes. (December)
- Extracted summary information and specific project templates for UK and Angola assets for Erwin Durrer (December).
- Extracted summary information and specific project templates for Ian Dunn on China SBU projects (December).
- Extracted summary information and specific project templates for Keith Auyeung on gas projects in the Asia region (December).
- Extracted and sent portfolio templates on UK assets to Pierre Breber to support message to the market (mid-Nov)

GO-1426-2001 (10-25-00)

Notes:
- Information on this form will be used as input into decisions about pay, selection and promotion.
- Employees and supervisors should each keep an electronic copy of the completed form for three years.

CHEVRON/PANDE02994

**5a.  COPI Business Plan Activities**

- Support COPI business planning activities.
- No pre-defined performance metrics or discussion of specific tasks.
- Performed various roles as needed to fill critical business needs.

- Assumed primary responsibility for COPI business plan guidelines. Developed and issued COPI/CTOP business plan guidelines. Worked closely with Corp contact (Keith Auyeung) and FFAR contact (Mark Waterson) to coordinate BP guidelines.
  (1) COPI Phase 1 guidelines issued July 6,
  (2) COPI Phase 2 guidelines issued August 22,
  (3) CTOP Update to Phase 2 guidelines issued October 21
  (4) Fielded questions from all 10 CTOP SBUs on guidelines/calendar,
  (5) 1 man-month total effort.

- Participated in preparation of CTOP business plan (Oct – mid-Dec).
  (1) Reviewed and consolidated LABU Att. 1V and SBU summary. Worked closely with Beth Liptak and David Hyams through multiple versions of performance template. Discussed LABU "bolt-together" versus Oct MD meeting data and need to understand variances between plans with LABU.
  (2) Participated in team meeting on Saturday, Nov 10 to discuss setting earnings stretch targets for SBUs,
  (3) Wrote "New Opportunities" section of CTOP executive summary (with input from Kelly Hartshorn and Erwin Durrer) (Nov – Dec),
  (4) Constructed "New Opportunities Matrix" Chart (Dec),
  (5) Performed analysis using portfolio model to evaluate various approaches to meet 10% capital reduction and wrote "10% Reduced Capital Scenario Implications" section (Nov - Dec),
  (6) Constructed "Capital Program Summary Table" with project economics and key project execution milestones based on analysis of project economics from portfolio model and consolidating input from correspondence with all 10 CTOP SBUs (Nov - Dec),
  (7) Worked with David Hyams on formatting of C&E tables (Nov),
  (8) Coordinated formatting and review of all 10 SBUs executive summary sections to ensure consistency across SBUs (Nov),
  (9) Coordinated Hyperion training and access for all planning analysts (with Mark Waterson) (Nov),
  (10) Participated in Corp review of upstream business plans (Dec 12).
  (11) Provided input to RJM on expected sensitivity of production to additional 400 $MM CAPEX reduction for Corp request (Dec 18).
  (12) 1.5 man-month total effort.

- Preparation of presentation material for Leadership Team Meetings.
  (1) COPI March MDs Meeting (Rio).  Assisted with mtg prep.
  (2) CTOP October MDs meeting (London).  Performed analysis of CTOP portfolio and developed slides for "Major Capital Projects Portfolio" presentation.  Developed power point slide for discussion of forward CTOP planning calendar with key dates and deliverables.  2 man-weeks effort with short cycle time (mid-Oct).

- Update and customize CTOP overview presentation to advance Chevron image as "Partner of Choice" with key partners:
  (1) RJM Jan. meeting with Saudi Aramco on macro-economic outlook,
  (2) China business development meetings with Daqing Mgmt (Feb),
  (3) Angola Petroleum Minister (July with Dan Wallem),
  (4) Nigeria SBU visitors (Jan with Dan Wallem),
  (5) Indonesia SBU Planning representative (June with Dan Wallem)
  (6) 2 man-weeks total effort.

- Global upstream activity and competitive positioning (Project Express, coordinated by Stan Walker).  July 19 – Aug 1.
  (1) Prepare dialog boxes for July 29 C & T leadership meeting on competitive positioning in various regions and business segments.
  (2) Primary responsibility for reviewing, editing, and supplying Chevron's perspective on (1) Heavy Oil Business Segment PFC writeup, (2) Latin America Region WoodMac writeup.
  (3) Project team received positive feedback for product meeting objectives with short deadline by Tom Schull and Stan Walker.
    2 man-weeks total effort.

**Notes:**
- Information on this form will be used as input into decisions about pay, selection and promotion
- Employees and supervisors should each keep an electronic copy of the completed form for three years.

GO-1426-2001 (10-25-00)

CHEVRON/PANDE02995

**5b. COPI Business Plan Activities**

- Support COPI business planning activities, continued.
- No pre-defined performance metrics or discussion of specific tasks.

Performed various roles as needed to fill critical business needs.

Primary responsibility for understanding production outlook and reasons for production gap (operational and OPEC). Communicated closely with SBUs (Jan – Oct) to understand evolving outlook and operational factors that may impact production. Main products from this work were:

(1) April 11 Letter to Vice-Chairman from PJR explaining impact of OPEC Quota cuts on COPI Production. Described likely impact on Venezuala production, Nigeria SBU production, Indonesia production. Coordinated communication with SBUs on this issue.

(2) May 15 Letter to Vice-Chairman from PJR explaining COPI production outlook and steps COPI was taking to close the production gap relative to objective.

(3) July 17 Letter to Vice-Chairman from PJR explaining COPI YTD production for 1Q01, 2Q01, and 1H01, variances from objective, and production growth over 2000.

(4) September 24 Letter to Vice-Chairman from PJR explaining COPI YTD production, variance relative to objective, and actions to close production gap.

(5) Provided detailed analysis to Investor Relations Group (Pierre Breber) to support 1Q and 2Q earnings conference calls with analysts. Received very positive feedback from Craig Isom (FFAR) on the clarity of the analysis.

(6) Provided adjustment templates to CLEAN team to reflect revised COPI outlook for LABU, SABU, Indonesia, and Nigeria production (June).

(7) 1.5 man-months of effort involved over the year.

- Coordinated CAPEX outlook update to provide PJR with an understanding of how COPI was managing it's gray shape capital reduction held at a COPI HQ level in the 2001-2003 BP. Provided each SBU with the C&E spend YTD relative to full year objective. (June 7).

- Analyzed historical CAPEX spend by SBU relative to objective for RJM discussion with MDs on capital reduction for 2002 BP (Nov).

- China SBU CACT AGIP Equity Interest Acquistion Evaluation Support. Worked with Erwin Durrer, Frank O'Connell, and John Lyle to evaluate purchase price impact on ROCE. Verified production profile and reserves basis of proposal based on portfolio data. (June 29 – Aug 30).

- Asset Swap Evaluation Support. Provided support on CACT AGIP shares and Kitina AGIP shares swap evaluation. Verified production profile and reserves basis for Kitina asset. Reviewed ongoing simulation study on Kitina with Congo technical team (Dan Maclean). Obtained advice on pooling tests and application of pooling tests to asset swaps from Jim Boessnecker and Jim Lawrence. Summarized pooling tests application for this transaction for RJM and participated in discussions with PJR, John Gass, and RJM. (August).

- Nkossa Energy Africa Equity Acquisition Evaluation Support. Verified SBU proposal basis (production profile, reserves, and project NPV and IRR based on proposed purchase price) based on analyzing SAM template data for Nkossa asset. (October 12).

- Administrative tasks (2 man-weeks effort):

(1) Coordinate GIL2 deployment for Planning Group (Oct 25-Dec 31). Survey of current equipment, GIL2 hardware preferences. And GIL2 software requirements for 10 people.

(2) Develop allocation proposal on trade publications (Nov 13–Dec 21) for input to Jeff Gustavson (with Iris Owens).

**Notes:**
- Information on this form will be used as input into decisions about pay, selection and promotion.
- Employees and supervisors should each keep an electronic copy of the completed form for three years.

CHEVRON/PANDE02996

| 6. Technology Investment Direction | 9 man-months total over a year. |
|---|---|
| • Assist COPI management and Technology Steering Team (TST) with managing COPI HQ technology investments. | • Researched the technology programs and value added fit for COPI of CPTC Integrated programs: IP-4B, IP-5B, IP-6B, IP-7B, IP-32B, IP-41B, IP-42B, IP-56B, IP-59B, IP-62B, IP-63B, IP-64B. |
| | • Influenced allocation of 5.1$MM CTOP HQ funding to gaps in funding of CPTC IP programs by working closely with CTOP HQ account representative (Ed Sauve). |
| | • Participated in TST meetings (Feb 8 and Nov 8) and provided support to Nahum Schneidermann and Stan Walker in developing presentation materials and historical perspective on COPI technology funding of CXTCs. Feedback from Cary Mrozowski and Nahum Schneidermann on TST indicated that my input had a significant impact on funding allocations. |
| | • DRB member for TD-15 (Reservoir Simulation Research and Tools), SR-106 (New Reservoir Simulation Technologies). Attended two DRB meetings. Feedback from Wen Chen and Tom McMillen on my participation on DRB has been very positive. |
| | • Attended 16 presentations of CXTC research programs and reviews of simulation studies of COPI assets to keep abreast of technology. |
| 7. Merger Integration | • Drafted template and request for information and coordinated correspondence with all COPI SBUs to obtain "rules of thumb" sensitivity factors to estimate changes in earnings and ROCE resulting from changes to factors such as oil price, OPEX, production, and CAPEX. Consolidated input to provide basis for sensitivity calculations to Merger Integration Team. (Jan 31 – Feb 9) (with Rick Rager CNAEP) |
| • Support Merger Integration Activities. | |
| • No pre-defined performance metrics. | • Key COPI HQ contact with IMO. Responded to multiple requests from Penny Cortez on merger integration updates for COPI. |
| | • LABU and Indonesia SBU merger integration representative. Interfaced with Peter Hartshorn of merger integration team to understand basis for merger synergy targets for Indonesia SBU. Fielded questions from LABU on merger synergies. |
| 8. Upstream Strategic Model CLEAN Team | 3 man-weeks effort. Effort involved working through 3 consecutive weekends and routinely working 14 -hour days. |
| • Participate in Upstream Strategic Model CLEAN Team. | • Participated in upstream CLEAN team activities in Houston for two weeks (Sept 23 -- Oct 6). |
| • No pre-defined performance metrics. | • Decomposed 50 MB Excel (SAM) WW upstream portfolio model into ten individual CTOP SBU level models. SBU models were re-dimensioned to reduce size of model (7 MB) to enable SBU representatives on CLEAN team to access their individual data sets. |
| • Filled critical business needs on SMCT to prepare for meeting with SBU representatives in final week prior to merger. | • Analyzed and characterized the production (growth) of each SBU from both Chevron legacy and Texaco legacy assets (Oct 12). |
| | • Analyzed and characterized the combined C&T portfolio of major capital projects capital spending and economic results (DPI&NPV). |
| | • Put together briefing books (with Kevin Zamudio) for ten SBUs to provide SBU representatives with both quantitative and qualitative data on their SBUs assets. Consolidated qualitative descriptions of assets from both Chevron legacy and Texaco legacy resources. |
| | • Assisted Brian Putt with running workshop for SBU representatives on CLEAN team. Helped teach SBU representatives how to use SAM portfolio analyzer, how to view and understand the combined data set of Chevron and Texaco legacy assets, and how to change the data to reflect a consolidated view of assets. |
| | • Reviewed business plan guidelines and calendar with Chevron and Texaco SBU representatives on CLEAN team. |
| | • Provided support to Brian Putt for final report-out to joint exploration and upstream CLEAN teams. |
| | • Disseminated briefing book materials to FFAR analysts post-merge. |

Notes:
• Information on this form will be used as input into decisions about pay, selection and promotion.
• Employees and supervisors should each keep an electronic copy of the completed form for three years.

GO-1426-2001 (10-25-00)

CHEVRON/PANDE02997

**9. Price Forecasting**

- Began process of transitioning price forecasting responsibilities in mid-October with Bob Dorrough's pending retirement.
- Responsibilities include developing CTOP commodity price forecasts in accordance with Corporate price guidance.
- Responsibility for building and maintaining pricing models to provide price forecasts for all hydrocarbon products in ChevronTexaco's International upstream portfolio.

- Reviewed raw data plates for Texaco assets submitted to CLEAN team to obtain Texaco pricing basis for Texaco projects. Provided this data to Bob Dorrough to enable a basis for providing a price forecast for Texaco assets for CTOP business plan price forecast (Oct 24).
- Assisted Bob Dorrough in developing two revised business plan price forecasts (Nov 8 and Dec 20) to reflect changes in Corporate WTI forecast.
- Worked closely with Bob Dorrough to understand work processes, methodology, tools, resources, and network of contacts in Trading, Shipping, SBU asset teams, and CRTC as part of transition to assume price forecasting roles & responsibilities with Bob's nearing retirement (originally end-Jan, extended to end-Feb).
- Obtained access to PAWS pricing data-base and learned to use it.
- Learned how to use and update LL-652 pricing model.
- Learned the theoretical basis for the Boscan PCP model. Modified Boscan PCP model (with Bob's help) and delivered the full-year 2001 model to LABU at year-end.
- Learned how to use the Real-Regression model developed by Bob Dorrough. Updated the Real-Regression model with GNP deflator data to enable conversion of all real price data to a common constant 2002$ price basis for running regressions.
- Learned how to use, modify, and update the Regression-Based-Forecast excel model.
- Assumed responsibility for provided LL-652 finance analyst with monthly pricing information for billing PDVSA (with M. Owens).
- Assumed responsibility for providing Boscan PCP information on a mid-month and end of month basis to Boscan finance analyst for billing PDVSA (with Monty Owens).
- Kept abreast of e-mail communications between Bob Dorrough and BU and trading contacts to obtain required data to update price forecast for strategic planning cycle. Significant correspondence involved to collect data for crudes of Texaco legacy assets.

| Section 3a – Development Goal (In current job) | Section 3b – Results |
|---|---|
| | |

**Section 4 – Interim Progress Reviews**

| Planned Review Date | Comments |
|---|---|
| | |

**Section 5 – Dynamic Leader 360 Feedback** (Required for supervisors every two years)

| Date of Feedback: | Quintile: | Low ☐5 ☐4 ☐3 ☐2 ☐1 High | 360 Action Plan: Progress Made? ☐ Yes ☐ No |
|---|---|---|---|

**Section 6 – Diversity**

Diversity Agreement: Progress Made? ☐ Yes ☐ No

**Section 7 – Performance Feedback to Employee** (To be completed by supervisor. Take into account the Chevron Way values, principle and results)

In 2002, Kiran carried an intensive workload compensating for other staff members who were assigned full time to merger integration work or special projects. Through the first nine months of the year, Kiran handled Planning liaison responsibilities with her assigned SBUs, while taking on increased work responsibilities for COPI's Portfolio analysis. Kiran coordinated a mid-year update of the legacy Chevron long-term portfolio that was critical input to support the Upstream Clean Team (merger integration effort). Kiran played a key role in helping with the deployment of the business plan consolidation work done within the Clean Team to the newly merged SBUs, which was critical to developing CTOP's 2002 business plans for our newly merged entities. During the fourth quarter, Kiran was internally reassigned to take on responsibility for developing CTOP's crude price forecasts and has made good progress in learning this new role. This new responsibility has been more consuming of Kiran than originally anticipated, largely due to the added complexity of introducing many new crude types brought into the portfolio from legacy Texaco operations that were unfamiliar to us.

**Section 8 – Performance Rating** (To be completed by supervisor)

| Falls Short of Performance Expectations | Fully Meets Performance Expectations | Exceptional Performance |
|---|---|---|
| 3 => ☐ (0-10%) | 2 => ☒ (~two-thirds of employees) | 1 => ☐ (0-25%) |
| Performance Plan Required? ☐ Yes ☐ No | | |

**Section 9 – Employee Comments**

Notes:

- Information on this form will be used as input into decisions about pay, selection and promotion.
- Employees and supervisors should each keep an electronic copy of the completed form for three years.

GO-1426-2001 (10-25-00)

CHEVRON/PANDE02998

The performance rating of 2 is inconsistent with verbal feedback I received from Rex Mitchell throughout 2001 and during our April 1, 2002 PMP discussion. Rex specifically told me that I was the top performer in the planning group on Sept 27 and Oct 31, 2001. Rex also informed me on Oct 31, 2001 that he had "loaded me up more than anyone else in the group". During the merger selection process, Rex told me that he had chosen me for the "portfolio analyst" position, a newly created position in the planning group, because he viewed me as the strongest performer and the most capable person in the group. Rex also indicated that there had been stiff competition during the selection process for this position and he had to fight hard with Texaco representatives in the selection process who were pushing a Texaco candidate. Rex indicated that he was able to prevail in selecting me for this position because he viewed the position as critical and he couldn't afford to bring someone into that position that would need to climb a steep learning curve to perform the job. He said that he thought I had already demonstrated that I could perform the primary responsibility around portfolio modeling based on my performance in 2001 in back-filling that role. On Sept. 27, 2001, Rex indicated that he viewed the portfolio analyst position as a higher level position than the planning analyst positions in his group. He said that he was frustrated because he could not offer it to me as a promotion through the merger selection process because this would open up the window for Texaco representatives to promote Texaco candidates during the merger selection process. He indicated that the ground rules during the selection process precluded any promotions. He specifically told me that he would promote me to grade level 25 in the next pay/promotion cycle in April 2002.

I requested a job description for the portfolio analyst position and received the position description on November 14, 2001. The position lists price forecasting as a key job responsibility with only a 15% time allocation. Previous to moving this key CTOP function into the newly created "portfolio analyst" position, Bob Dorrough performed this critical function as his primary job responsibility. Bob indicated to me that this function historically had required 100% time commitment from mid-November – late March as this was the period during which a major update to the pricing model was performed each year in line with the Corporate strategic planning cycle. I view the price forecasting function as a critical CTOP function as the forecast for each CTOP crude is developed to be consistent with the Corporate WTI forecast and enables CTOP management to have an internally consistent basis for comparing CTOP projects across the portfolio of assets. I have been surprised at the lack of management support for this critical function. A significant part of our PMP discussion on April 1, 2002 involved an effort on my part to educate Rex about the price forecasting function. Rex indicated that he had underestimated the work involved in this function as he viewed the work as a mechanical exercise. Prior to the merger, this position reported to the manager of the opportunity assessment group who had a technical background and a good basis for understanding the technical work involved in performing this function.

During our 2001 PMP discussion on April 1, 2002, Rex said that my PMP form documented an impressive list of accomplishments in 2001 and that he did not dispute anything that I had documented and that he could vividly remember each assignment. He agreed that Dan Wallem and I had handled the bulk of presentations to support Peter Robertson. Rex said that he recognized that there was an extraordinary work effort required to deliver results to the Upstream Strategic Model CLEAN team because the other planning analysts had not adequately reviewed their business unit submissions. I was extended a job offer on October 31, 2001 for the portfolio analyst position and assigned several new responsibilities. Rex requested that I also continue to execute the planning analyst responsibilities for Latin America SBU through the end of the business planning process. Rex indicated that he knew I was overloaded but that the Texaco person assigned the planning analyst responsibility would not be able to come up to speed rapidly enough to contribute to the business plan. He also said that the Texaco planning analyst assigned to that role would not be moving to San Ramon to perform those responsibilities until after the completion of the business plan. As documented in Box 2 of this form, I performed the planning analyst role for Southern Africa and Indonesia SBUs from Jan 1 – Nov 1. I performed the planning analyst role for Latin America SBU from Jan 1 – Dec 15. The supervisor comment in section 7 that I handled my planning responsibilities with my SBUs for the first nine months is inaccurate and should read for 11 months of the year for Indonesia and Southern Africa SBUs and 12.5 months of the year for Latin America SBU. The major role that I played in the CTOP business plan during the 4th quarter is captured in Box 5 of the PMP document although Rex has not highlighted it in his comments. However, Rex did acknowledge my contributions to the business plan during the 4th quarter as being significant and critical during our verbal discussion.

During our PMP discussion on April 1, 2002, Rex admitted that he had behaved inappropriately several times in his interactions with me over the past several months. He attributed his behavior to stress related to a meeting he had with the IMO in the 4th quarter that had not proceeded well and his frustration that Peter Robertson had requested that he re-work the business plan to determine whether CTOP could improve it's 2002 earnings outlook. Rex said that he had been upset because he didn't feel that I had demonstrated gratitude for being offered the premier position in his group. I informed Rex that I considered his behavior harassment. Rex said that somehow he had gotten "twisted-off" with me.

The performance rating I received for 2001 from Rex Mitchell does not make me feel that my contributions in 2001 were adequately valued. Based upon business partner and customer feedback on my performance, and feedback I had received from Rex Mitchell on his view of my performance relative to other planning analysts in our work group, I expected to be rated in the exceptional category. The feedback provided by my supervisor on this form does not provide me any insights into what would have been required to achieve a higher performance rating or any suggestions for improving my performance. The feedback does not provide any suggestions to further develop my skills to promote career growth.

**Notes:**
- Information on this form will be used as input into decisions about pay, selection and promotion.
- Employees and supervisors should each keep an electronic copy of the completed form for three years.

GO-1426-2001 (10-25-00)

CHEVRON/PANDE02999

**Continuation of Employee Comments:**

I successfully performed multiple roles simultaneously, met critical deadlines, developed high-quality work products, and received excellent feedback from business partners and customers:

(1) Executed primary assigned job responsibilities as a planning analyst for Southern Africa and Latin America SBUs (Box 2),
(2) Back-filled planning analyst responsibilities for Indonesia SBU (Box 2),
(3) Performed analysis and developed content for numerous presentations in support of Peter Robertson (Box 3)
(4) Back-filled portfolio modeling responsibility (Box 4),
(5) Participated fully in development of business plan and many other planning group acitivities (Box 5),
(6) Influenced management of CTOP technology investments (Box 6),
(7) Supported merger integration work (Box 7),
(8) Participated in upstream strategic model CLEAN team (Box 8),
(9) Commenced transition process to assume CTOP price-forecasting responsibilities (Box 9).

The work that I performed in 2001 had significant business impact:

1. Enabled SBUs, CTOP, and Corporate management to have a clear view of the combined upstream portfolio of the merged company on Day 1,
2. Enabled CTOP President to explain outlook of production performance throughout 2001 and actions to close the gap on production growth objectives to Vice-Chairman,
3. Enabled CTOP management to provide Investor Relations a view of the growth prospects for the upstream segment of the merged company and craft a message to the market for the Day 1 + 45 meeting with security analysts,
4. Enabled CTOP President to communicate a clear, concise, and consistent message around people, partnership, and performance during the merger integration process and through the launch of Day 1 communications and cascaded engagement meetings to deploy the CT Way,
5. Enabled CTOP to develop a business plan within a very compressed time period post-merger,
6. Enabled CTOP to better understand and manage CTOP HQ technology investments,
7. Enabled a smooth transition of the critical CTOP price forecasting function to ensure ability to meet pending 1st quarter 2002 deadlines to develop and deploy price forecasts for all CTOP crudes for the Strategic Update.

I invested about 19 man-months of work to accomplish the results documented in this PMP. The effort involved was distributed approximately:

1. First quarter 2001 – 3.5 man-months
2. Second quarter 2001 – 4.5 man-months
3. Third quarter 2001 – 6 man-months
4. Fourth quarter 2001 – 5 man-months

Prior to this assignment, I spent 12 years in various technical roles as an engineer in COPI and CPTC. I am highly regarded for my technical expertise within the engineering community in COPI, CPTC, and more broadly in industry and academic circles. Ali Moshiri who was my supervisor from 1995 – 1997 had highlighted my ability to take on new and complex tasks as a key strength and had encouraged me to broaden my breadth of experience by considering a planning assignment. I have developed an extensive network within the business planning community across all CTOP SBUs, CTNAU planning, EPTC planning, Corp planning, and CTOP FFAR group. My network in the CTOP planning community transcended my individual SBUs since much of the work I performed in 2001 involved supporting all 10 SBUs. Reflecting on my accomplishments in 2001, I consider the development of positive relationships and partnerships in the process of performing my work as a significant asset for future assignments that complements the extensive network I have already developed within the technical community. I enjoyed the opportunity to work with CTOP president Peter Robertson, with the finance function (FFAR group), and to play a critical role in the merger integration work and business planning process for CTOP. I particularly enjoyed the opportunity to experience up close and personal the commitment to the ChevronTexaco Way demonstrated by CTOP president Peter Robertson. It was a pleasure to work with Peter on presentation materials to help communicate the importance of integrating the principles embodied in the ChevronTexaco Way in the essence of how we work together to accomplish ChevronTexaco's goals. I look forward to continuing to make significant contributions to ChevronTexaco.

**Section 10 – Employee, Supervisor and Next Higher Level Review**

| Kiran Pande | K/C P | 4-22-02 | Rex Mitchell | | | Jay Johnson | | |
|---|---|---|---|---|---|---|---|---|
| Employee | Initial | Date | Supervisor | Initial | Date | Next Higher Level | Initial | Date |

GO-1426-2001 (10-25-00)

Notes:
• Information on this form will be used as input into decisions about pay, selection and promotion.
• Employees and supervisors should each keep an electronic copy of the completed form for three years.

CHEVRON/PANDE03000

ChevronTexaco Overseas Petroleum
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324
P.O. Box 6046
San Ramon, CA 94583-0746
Tel  925 842 1391
Fax 925 842 1300
tary@chevrontexaco.com

Taryn Shawstad
General Manager
Human Resources

# ChevronTexaco

November 18, 2003

Kiran K. Pande
7195 Lamar Loop
Castro Valley,  CA 94552

Subject: Voluntary Termination

Kiran:

On June 2, 2003 you received a letter offering you continued employment with ChevronTexaco Overseas Petroleum in Houston, Texas.  You did not accept this offer and by turning down this job, you have, in effect, resigned from the company.  Based on your voluntary resignation you are not eligible for a severance package, redeployment or outplacement services.

At the time you chose not accept the relocation offer you were informed that as long as there was useful work for you, that your employment with the company could continue until year end 2003. As you know, the SABU Block 14 New Field Development group will officially relocate to Houston effective December 12.  With the move of your current work unit, continued useful work will no longer be available for you within CTOP.  If you are not selected for another ChevronTexaco position, your last day of employment will be Wednesday, December 31, 2003.  You will be paid out for any unused 2003 vacation.  Please contact the HR Service Center at 1 888-TALK2HR (1-888-825-5247) to obtain your benefits paperwork.

Sincerely,

*T.L. Shawstad*

T.L. Shawstad

EXHIBIT LF
32
Pande 3-22-06

1201

7195 Lamar Loop
Castro Valley, CA 94552

December 8, 2003
In regards to: "Voluntary Termination Letter, Dated 11-18-03"

Ms. Taryn L. Shawstad
General Manager, Human Resources
ChevronTexaco Overseas Petroleum
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324



Subject: Unlawful Termination

Dear Ms. Shawstad:

This letter is in response to the contents and claims of ChevronTexaco's letter titled "Voluntary Termination" dated November 18, 2003 (attachment 1). I was shocked to receive your letter in the mail on November 22, 2003 while I am on a company approved short term disability due to medical reasons associated with my own serious health condition. As you are aware, UnumProvident, the administrator of ChevronTexaco's Disability Management Program, issued a letter on November 18, 2003 informing me and the company that my absence from my employment due to medical reasons is eligible for protection under FMLA and CFRA and my disability date was determined to be November 10, 2003.

Your letter states ChevronTexaco's claim that I have voluntarily resigned from the company. I would like to state unequivocally that I have never offered "Voluntary Resignation" from ChevronTexaco as you contend in your letter. I have not voluntarily resigned from ChevronTexaco nor have I agreed to a voluntary termination as your letter contends. Furthermore, the following statement is false:

> "At the time you chose not accept the relocation offer you were informed that as long as there was useful work for you, that your employment with the company could continue until year end 2003."

~~Before I went on medical disability, I was offered and accepted to continue to work~~ through 2004. It is my present intention to complete that assignment when I return to work from disability.

I believe that this statement that I have "voluntarily terminated" my employment is yet another instance of unlawful conduct by ChevronTexaco commencing with the gender and racial discrimination and harassment perpetrated by Mr. Rex Mitchell when I was in his group. ChevronTexaco's attitude towards these issues, at least as to me, was demonstrated by its failure to investigate Mr. Mitchell's conduct when I complained of it and, more telling, the instruction to me that I could either leave the company, leave the

802

group, or live with Mr. Mitchell. My repeated complaints about on-going retaliation were met with similar instructions. As a result of Mr. Mitchell's conduct and my complaint I received an unfair performance evaluation and salary treatment, I was denied a promotion that was promised to me, I was repeatedly slandered, denied a merit component in my salary treatment in April of this year, and then I was transferred to Mr. John Dunn's group that was destined for Houston.

Since I have been in Mr. John Dunn's group, and especially since I disclosed my need for a leave due to medical reasons I have been subjected to harassing conduct. Other employees have not only witnessed this conduct, but they have complained to Mr. Dunn and CTOP management about it. Notwithstanding, the unlawful conduct towards me continues, as demonstrated by this termination letter. As noted above, before I knew that I would need a leave for medical reasons I was offered, and I accepted, work through 2004 in San Ramon. According to the information ChevronTexaco promulgated, because I did not agree to relocate to Houston I was eligible for this work. Now ChevronTexaco contends that I have voluntarily terminated my employment. The only change that is apparent is my need for medical leave and the reporting of Mr. John Dunn's harassing conduct to CTOP management.

As I approach my 15 year service anniversary with ChevronTexaco on December 19, 2003, I am completely shocked that ChevronTexaco would choose to unlawfully terminate me in this manner while I am on a company approved disability leave and contending with my own serious illness. If under these circumstances the STEPS process is applicable, then I request it be implemented.

Sincerely,

*Kiran K. Pande*

Kiran K. Pande


Attachment 1: ChevronTexaco Letter from Taryn Shawstad, General Manager – Human
Resources, CTOP, Titled "Voluntary Termination", Dated 11-18-03

---

cc:     Mr. Peter Robertson, Vice-Chairman
        Mr. George Kirkland, Corporate Vice-President and
                        President ChevronTexaco Overseas Petroleum Inc. (CTOP)
        Mr. James Blackwell, Managing Director, Southern Africa Business Unit, CTOP


803

http://us.f504.mail.yahoo.com/ym/ShowLetter?box=Inbox&MsgId=...

Print - Close Window

# YAHOO!® MAIL

**Date:**    Tue, 30 Dec 2003 10:56:58 -0800 (PST)

**From:**    "Kiran Pande" <kkpande@yahoo.com>

**Subject:**    RE: Application for Position in Zuwa's group

**To:**    "McMillen, Thomas (TomMcmillen)" <TomMcmillen@chevrontexaco.com>

Tom,

Thanks for your note. I appreciate your support and concern.

A brief update. I spoke with both Zuwa and Paul Vita yesterday. Paul was unaware that I was being terminated on 12/31. Paul indicated that I could still be considered for the position in Zuwa's group since I was on the slate prior to being terminated. He indicated that if I was selected for the position, that they would retroactively reinstate me. He indicated that he had another situation that he was working that was similar and that was the counsel he had received from HR.

I talked to Zuwa as well and let him know Paul's thoughts on eligibility with my situation. Zuwa is on a business trip the week of Jan 5th in San Diego and he said that he would be calling Dave Wagner that week to set up the selection committee and they would likely meet the week of January 12th to make the candidate selections. I told Zuwa that I was still keenly interested in the position. I also talked to Zuwa about my situation and he is aware of what is going. I told Zuwa that I am currently on a medical leave and that Jack Dunn was reported for harassment by someone in the Block 14 group. This apparently occurred after a team meeting we had on November 4th where Jack was openly and excessively verbally abusive towards me. There were about 13 people at this meeting. I was not even aware that his behavior had been reported since I had started my medical leave soon after. I only became aware of it after I talked to a couple people from the group after Jack called to terminate me.

I would still like to continue my employment with CT and I think Zuwa's group would be a good fit. I appreciate your continued support and concern.

I hope you are feeling better and that you enjoy the rest of your holidays.
Thanks again for your support!
Regards,
Kiran

**"McMillen, Thomas (TomMcmillen)"** <TomMcmillen@chevrontexaco.com> wrote:

Kiran

Sorry to hear that your story continues on the track it is on. I'll see what I can find out from Zuwa, but I can't offer too much hope at this point. I'm not sure that he is in the office right now, but I know all the managers are off until after the new year, and our HR manager is



EXHIBIT LF
37
Pande 8-22-06

83

1/26/2005 11:44 AM

also off on vacation now, too. This is the first time I've looked at email since well before Christmas due to a combination of being sick and getting a new computer at home.

Best wishes to you. I'll be travelling for the next week and away from email, but I'll see what I can get started.

Tom

-----Original Message-----
**From:** Kiran Pande [mailto:kkpande@yahoo.com]
**Sent:** Friday, December 26, 2003 6:37 PM
**To:** McMillen, Thomas (TomMcmillen)
**Subject:** Application for Position in Zuwa's group

Tom,

I hope you are enjoying the holidays.

Paul Vita asked me to apply to the position in Zuwa's group. I submitted my application on 12/23/03 the cutoff date. However, now the close date has been extended to 1/7/04. Unfortunately, CTOP seems determined to terminate me on 12/31/03 even though they have received a letter from me and my attorney informing them that this is unlawful. If they continue with their unlawful actions and terminate me, then it is not clear what impact that will have on my candidacy for this position.

I learned a couple days after talking to Jack on the 17th what really precipitated this action. Jack's harrassing conduct was reported to high level SABU management independently (unknown to me). The combination of my requesting a FMLA protected medical leave and Jack Dunn's harrassing conduct being reported to CTOP management are the only two factors that changed and resulted in CTOP's unlawful actions.

I know you are on vacation and not back in the office till January. However, do you think there is any possibility that ETC could accelerate the job selection for the ETC job in Zuwa's group? I will likely be on medical leave for several more weeks as I continue with my treatment plan to recover my health.

You can contact me at 925-465-0003 or kkpande@yahoo.com

Regards,
Kiran

Do you Yahoo!?
Yahoo! Photos - Get your photo on the big screen in Times Square

Do you Yahoo!?
Find out what made the Top Yahoo! Searches of 2003

84

1   CERTIFICATE OF REPORTER

2

3       I, DENISE A. FORD, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth and nothing but the truth in the

7   within-entitled cause;

8       That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time

10  and place therein stated, and that the testimony of the

11  said witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13      I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the event of

16  this cause, and that I am not related to any of the

17  parties thereto.

18

19      DATED: _____11/28/06_____

20

21      _____

22      DENISE A. FORD, CSR No. 7525

23

24

25