# EXHIBIT E



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

KIRAN PANDE,                          )
                                      )
                Plaintiff,            )
                                      )
VS.                                   )  Case No. 04-5107 CW
                                      )
                                      )
CHEVRON CORPORATION (f/k/a            )
CHEVRONTEXACO CORPORATION), a )
Delaware corporation, CHEVRON )
INTERNATIONAL EXPLORATION &    )
PRODUCTION (f/k/a               )
CHEVRONTEXACO OVERSEAS          )
PETROLEUM COMPANY), a division)
of Chevron U.S.A. Inc.,        )
                                      )
                Defendants.           )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL AND VIDEOTAPED DEPOSITION OF
JACK DUNN
OCTOBER 19, 2006

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL AND VIDEOTAPED DEPOSITION of JACK DUNN, produced as
a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on OCTOBER 19, 2006, from 9:09 a.m. to 12:50 p.m., before
Lorri Lucas, CSR in and for the State of Texas, reported
by machine shorthand, at the offices of Bayou City
Reporting, 1135 East 11th Street, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.



**Bayou City Reporting inc.**

EXHIBIT ___E___

1135 East 11th Street • Houston, TX 77009
Phone: (713) 861-8589 • Toll Free: (888) 577-5048 • Fax: (713) 861-1729 • Email: bcrdepo@sbcglobal.net

Deposition of Jack Dunn

1      A      Performance management process, I think.

2      Q      When, during the year, does -- does the PMP

3   process typically occur?

4      A      Typically have two meetings, one midyear and

5   one towards the end of the year.  And one -- the

6   end-of-the-year one you may also plan -- you talk about

7   closeout of the -- that year's performance and opening of

8   the subsequent year's performance.

9      Q      And do you recall going through the PMP process

10   in the spring of 2003 with Ms. Pande?

11      A      No.

12      Q      Do you recall doing any PMP process with

13   Ms. Pande at all?

14      A      We probably did but I don't remember.

15      Q      At what point are raises considered, if any?

16      A      The raise is considered in the evaluation

17   process, usually occurs in the first quarter of the

18   following year, you know, the year following the year of

19   performance, and it is analyzed.

20      Q      And do you recall, in the first quarter of

21   2003, having conversations with Ms. Pande about potential

22   raises?

23      A      No.  That would have been inappropriate because

24   the raise in early 2003 would have been related to her

25   performance prior to her coming on my team, so that

Deposition of Jack Dunn

Page 22

1    wouldn't be my -- my call.

2        Q    So who would Ms. Pande speak to about a

3    potential raise at that point?

4        A    Her supervisor prior to joining our team.  As

5    you mentioned, she joined our team in December, so her

6    performance would be related to that -- what is it?  2002

7    performance would be related to who she was working for

8    in 2002.

9        Q    So it would have been appropriate in the first

10   quarter of 2003 for Ms. Pande to speak with Rex Mitchell

11   about any potential raises she would be eligible for?  Is

12   that your testimony?

13       A    No.  The -- the performance -- you're talking

14   about the raise or performance?

15       Q    Raise.  I apologize.  I'm -- let me --

16       A    So --

17       Q    Let me reask the question.  So I understand

18   what you're telling me is that it would have been

19   appropriate for Ms. Pande to speak with Rex Mitchell

20   during the first quarter of 2003 about any potential

21   raise.

22       A    No.

23       Q    Who would she speak to about potential raises?

24       A    I don't -- the raise is usually presented to

25   you by your current supervisor.

Deposition of Jack Dunn

1    Q    Did you present any raise to Ms. Pande in the

2    first quarter of 2003?

3    A    I presented salary action to all the employees

4    working for me at the time that they came out, which

5    is -- the salary actions come out April 1st, I think.  Is

6    that right?  Yeah, April 1st.  So usually in March we

7    get -- we get the information and we pass it out.  So

8    that's likely -- I don't recall specifically but that is

9    likely what -- what would have happened.  I would have

10   gotten the information on Kiran and I would have

11   presented it to her.  That's -- that's the usual process.

12   Q    And from whom do you get the information?

13   A    It's just sent down from the -- my supervisor,

14   usually.  Or you can download it from our -- it's called

15   MDT, Manager's Desktop.  So that the data would be

16   available and then our -- our pay system.  See, it's

17   just -- all it is is the -- what your -- what your

18   current salary is, what your new -- revised salary is.

19   That's basically all.  It's just a -- just a data sheet.

20   Q    And typically who would decide what sort of

21   raises members of your group would be eligible for?

22               MS. MILLER:  I'm going to object.  The

23   question's ambiguous.

24   A    Yeah.  Can you be specific?

25   Q    (BY MR. LEBOWITZ)  Well, in a typical year --

Deposition of Jack Dunn

Page 24

1      A     Put it this way.

2      Q     I'm sorry.

3      A     If you work -- if -- the people that decide the

4  raises are the supervisors of the employee during the

5  calendar year.  So if somebody worked for me during a

6  calendar year, I would decide their raise, and if I --

7  they worked for me for half the year, I would be -- I

8  would give the input to their current -- their -- you

9  know, their -- the person that had them for the second

10 half of the year.

11     Q     And so for someone in Ms. Pande's situation,

12 for instance, who worked for Rex Mitchell for ten or 11

13 months of the year 2002 and you for one month, maybe, a

14 little more, in 2000 --

15     A     It doesn't --

16     Q     Let me --

17     A     Okay.

18     Q     -- finish the question.  In approximately the

19 end of 2002.  Then in the first quarter of 2003 when the

20 salary actions would come out, did you have any input

21 in -- in her situation?

22     A     Okay.  So let's start with the first part of

23 that question, which was:  How long did she work for me

24 in 2002?

25     Q     (Moving head up and down)

Deposition of Jack Dunn

1          MR. LEBOWITZ:  Just hand it to the court

2    reporter.

3              (Exhibit 2 marked)

4      Q    (BY MR. LEBOWITZ)  Mr. Dunn, you've just been

5    handed what's been marked Exhibit 2 for this deposition.

6    It is a printout of an e-mail from you to Mark Krolow

7    with a cc to Kelly Hartshorn on the date of January 7th,

8    2000 -- January 27th, 2003.  Will you review the e-mail

9    and let me know when you're ready to proceed?

10     A    Okay.

11         MS. MILLER:  Just -- the document's marked

12   confidential.  I think it's subject to a protective

13   order.

14         MR. LEBOWITZ:  Okay.

15         MS. MILLER:  Which I think limits its

16   ability to be -- I don't mind -- we marked it

17   confidential.  If you're not objecting, we don't mind

18   to -- we don't object to having this attached as an

19   exhibit to this deposition.

20         MR. LEBOWITZ:  Okay.  I -- doesn't matter

21   to me.

22         MS. MILLER:  Well, it violates the

23   protective order but --

24         MR. LEBOWITZ:  It doesn't violate the

25   protective order.  If you want it to be sealed, you can

Deposition of Jack Dunn

1    A    There are not -- there are not quotation marks

2    here.  So this is -- no.  The answer's no.

3    Q    Did you ask Kelly Hartshorn to describe what

4    the behavioral issues were?

5    A    No.

6    Q    Were you curious as to what the behavioral

7    issues were?

8    A    No.  As I mentioned, "From what I've seen,

9    she'll be a good addition to our group."  I -- I thought

10   highly of Kiran.  I had good conversation with her.  We

11   described the job as shown in this E -- this Exhibit 1.

12   She -- and I thought she was going to be a great addition

13   to our group.

14   Q    And just to clarify the meaning of the last

15   sentence here, says, "We discussed the possibility of a

16   small merit raise," et cetera.  And that is -- is that

17   you and Ms. Hartshorn describing what you anticipated the

18   action being or -- or what was it?

19   A    I think I've answered that question but it

20   wasn't clear.  At this time, those decisions were not

21   finalized, this decision being a decision that their

22   former organization would make on what merit raise she

23   would get.  And they -- I was paraphrasing, if you will,

24   what I heard from her, which was this is what they were

25   thinking about.

Deposition of Jack Dunn

Page 52

1    instance, give a -- a job reference for one of the jobs

2    she was posting for, would you have given her a positive

3    reference?

4              MS. MILLER:  I'm going to object.  It

5    calls for speculation.

6         Q    (BY MR. LEBOWITZ)  You can answer the question.

7         A    I would have -- I would have honestly told them

8    my evaluation of her performance.

9         Q    And as of this time frame, the time that the --

10   say from the time that Ms. Pande declined the offer to

11   move to Houston and the formal fall of 2003 PDC, what was

12   your honest opinion of Ms. Pande's performance?

13        A    Oh, she did a fantastic job for the first six

14   months of the year, from -- up until the middle part of

15   the year, very hard worker, very bright, intelligent, and

16   as the year went on, she became less focused.  But very

17   capable.

18        Q    And what do you mean by "less focused"?

19        A    "Less focused" is self-explanatory.

20        Q    Give me any -- can you give me any examples of

21   where you believe Ms. Pande was demonstrating that she

22   was less focused?

23        A    She wasn't -- she wasn't as diligent about

24   getting her -- her key job responsibilities completed

25   as -- as the year progressed.

Deposition of Jack Dunn

Page 53

1    Q    Can you give me any example of any key job

2    responsibility that she was not performing up to what you

3    mean?

4    A    She was responsible for reservoir simulation

5    and I saw a falloff of that work.

6    Q    Any other key job responsibilities you felt she

7    was not performing --

8    A    She was responsible --

9    Q    -- as diligently as she should have?

10    A    She was responsible for the work plan, the

11    petroleum engineering side of the work plan, and she

12    wasn't very engaged in seeing that it was achieved for

13    somebody of her Group 24 being paid, you know, over

14    $110,000 a year.  But in the -- as you pointed out in

15    that e-mail, in a -- in an informal leadership role.

16    Q    Can you give me an example of what you mean by

17    being not very engaged?

18    A    No.

19    Q    Any other key job responsibilities you felt she

20    was not being as diligent as she should have been?

21    A    Not at this time.

22    Q    When did you first form the opinion that

23    Ms. Pande was not -- or was -- there was a falloff in

24    her -- the amount of reservoir simulation work that she

25    was doing?

Deposition of Jack Dunn

Page 68

1    happened.   I've supervised many people over the years.

2         Q    Do you know when it was that Ms. Pande herself

3    learned that she would need to take a medical leave of

4    absence?

5         A    No.

6              (Exhibit 6 marked)

7         Q    (BY MR. LEBOWITZ)  Okay, Mr. Dunn.  You've just

8    been handed what's been marked Exhibit 6 for this

9    deposition.  This is a progress note or a status note,

10   whatever you want to call it, that we received in

11   discovery in this case and it's produced as part of

12   UnumProvident's file related to Ms. Pande.  Take a minute

13   and review the substance of the note.

14        A    Okay.

15        Q    In the note, it says -- it relates a call

16   received by a representative at UnumProvident from Martha

17   Martinez and the substance of the note is "Martha got a

18   call from her supervisor," referencing Ms. Pande, "and he

19   did -- he had not received a notice from" -- or "he had

20   received" -- excuse me -- "a notice from FMLA unit.

21   Supervisor was concerned because he did not know if she

22   was taking time off for herself or another reason.

23   Employee had not discussed absence from work."  Reading

24   this sentence, does that refresh your recollection as to

25   any more of the substance of your conversation with

1   Ms. Martinez?

2       A    I suppose, yes.

3       Q    So after reading this note, do you now recall

4   that you asked Ms. Martinez whether or not Ms. Pande was

5   taking time off for herself or for someone else?

6       A    Yeah.  My -- this -- this seems logical.  My --

7   my concern was:  Is she okay?

8       Q    So -- but to answer the question, do you now

9   recall that you asked Ms. Martinez whether or not

10  Ms. Pande was taking a leave related to her own medical

11  condition or whether she -- her leave was related to

12  someone else's medical condition?

13      A    I don't recall that but this is probably

14  accurate.  Kiran had elderly parents and maybe you can

15  take a family leave to care for sick parents, so that was

16  a -- that was a possibility, and I was concerned for her,

17  the welfare of employees working for me, are they okay,

18  people taking a leave, so -- are they okay.

19                  (Exhibit 7 marked)

20      Q    (BY MR. LEBOWITZ)  You've just been handed

21  what's been marked as Exhibit 7 for this deposition,

22  which is an e-mail thread which begins with, I believe,

23  the same e-mail that we referenced before in an earlier

24  exhibit, your original notice from Ms. Corrigan of

25  Ms. Pande's leave, but it has a -- a different e-mail on

Deposition of Jack Dunn

Page 70

1    top, which is now from you to Ms. Pande on October 29th

2    at 12:26 p.m.  Do you recall sending this e-mail to

3    Ms. Pande?

4         A    I don't recall it but it's -- it seems

5    accurate.  It's in line with what I had said.

6         Q    So you say, quote, "What's up?  I came by to

7    discuss but you were not around.  Please drop by to fill

8    me in today or tomorrow."  So that's a reference to what

9    you've testified to earlier where you went by her office

10   after you --

11        A    Correct.

12        Q    -- received the original notice?

13        A    Exactly.

14        Q    And did Ms. Pande drop by that day or the next

15   day to fill you in?

16        A    I don't recall.

17        Q    Did you have a discussion with Ms. Pande

18   sometime around October 29th, 2003 regarding her medical

19   leave?

20        A    I don't remember.

21        Q    Did you have any discussion with her about her

22   medical leave prior to her taking a medical leave?

23        A    Yes.

24        Q    When did you have -- or how many discussions

25   did you have?

Deposition of Jack Dunn

Page 71

1       A     I don't know.

2       Q     Was it more than one?

3       A     Not that I recall.

4       Q     When was the first discussion you had with her

5    about her medical leave?

6       A     Presumably after October 29th.

7       Q     Understanding that it was after October 29th,

8    can you narrow it down for us in any way as to when it

9    was that you had this conversation?

10      A     Between October 29th and her departure from the

11    company at the end of the year.

12      Q     And did you have that conversation in person or

13    on the telephone?

14      A     I don't -- don't recall.  But she was at the

15    office before her leave and I guess the leave was on the

16    11th, if you will.

17      Q     The 10th.

18      A     Yeah.  So there's two weeks between then.

19    Presumably she came by and talked to me in reference to

20    my e-mail requesting her to.

21      Q     Sitting here today, do you have any

22    recollection of having an in-person conversation with

23    Ms. Pande about her medical leave?

24      A     Yes.

25      Q     Where did that conversation take place?

1      A      In the office.

2      Q      Whose -- anybody in particular's office?

3      A      I don't remember.

4      Q      Was anybody else present for that conversation?

5      A      No.

6      Q      Please tell me everything you recall from that

7   conversation.

8      A      I -- you know, I sent the e-mail, "What's up?

9   I came by to discuss and you're not around.  Please drop

10  by and fill me in today or tomorrow."  She came in.  I

11  said, "Are you okay?  Are you -- are you all right?  How

12  are you, you know, showing" -- you know, my first concern

13  is the welfare of the employee, their -- their -- and

14  then the other issue was the leave and being out of the

15  office, whether it be vacation or any other reason,

16  "Any -- any idea on how long you'll be gone?"  That's the

17  nature of the conversation.

18     Q      Please tell me, as much specific -- in as much

19  specifics as you can, what was said by you and by her

20  during this conversation.

21     A      That's -- that was my recollection.  I just --

22  what I just said.

23     Q      Did you learn during this conversation that

24  the -- the reason for the medical leave was related to

25  Ms. Pande's own medical condition as opposed to the

1    jobs through the PDC process.  How I -- how I found that

2    out, I don't -- I don't know.  It was either an e-mail or

3    a call or whatever.  Typically the supervisor would call

4    and tell you what the outcome of the PDC for the people

5    reporting to you was, this person got that job, this

6    person got that job, this person got that job, and then

7    you would notify the employee.

8         Q    And do you recall getting any such call

9    regarding the 2003 PDCs for anybody in your group?

10        A    Not specifically but, I mean, it would have

11   been a part of the process.

12        Q    So do you have any recollection of how it was

13   you learned that Ms. Pande was not placed in any sort of

14   job through the PDC?

15        A.   Not specifically, no.

16        Q    At any point in 2003, did you tell Ms. Pande

17   that she could remain in San Ramon after December of 2003

18   to continue working on the projects in your group?

19        A    No, I did not.

20        Q    Did you ever in any way indicate to Ms. Pande

21   that she could continue working for your group while --

22   and remain in San Ramon after the end of 2003?

23        A    No.  Explicitly, I was explicit with all the

24   employees that our group was going to be moving to

25   Houston on or about the second week in December.  I think

Deposition of Jack Dunn

Page 77

1    it was December 13th or so.  We were packing up then and

2    that was the end of our group's work in -- in -- in

3    San Ramon.  Because a lot of people wanted extensions

4    that -- there's a number of people that didn't want to

5    move.  So I was very clear on that.  I'm referring to

6    people reporting to me.

7         Q    Do you recall having a -- a meeting on

8    November 4th, 2003 with the folks in your group,

9    including Ms. Pande?

10        A    Yes.

11        Q    What was the purpose of that meeting?

12        A    We were discussing the work plans with the

13   group.

14        Q    And who attended that meeting?

15        A    The work team.

16        Q    How many people in total attended the meeting?

17        A    I don't recall.

18        Q    And where did the meeting take place?

19        A    One of our conference rooms on the floor we

20   were -- where we worked.

21        Q    In addition to people attending in person, were

22   there also people attending by telephone?

23        A    Yes.

24        Q    And where were those people located?

25        A    Houston.

Deposition of Jack Dunn

Page 78

1      Q    How many people were in Houston that attended

2  the phone call -- the conference?

3      A    Whoever was part of the new team that was in

4  Houston.  We were transitioning to Houston and we -- we

5  had added some people to -- to the team that were taking

6  over jobs for people that weren't going to Houston.  I

7  don't recall specifically.  There may have been a couple.

8      Q    Was there anyone from Angola on the phone or

9  who was located --

10     A    No.

11     Q    -- in Angola when they attended the meeting?

12     A    Not -- not that I recall.  It's possible.  The

13 time was that if it was late, it would have -- it

14 wouldn't have been them but if it was in our morning,

15 it's possible.

16          MR. LEBOWITZ:  The tape is going to end,

17 so why don't we go ahead and just take a regular

18 five-minute break, anyway.

19          VIDEOGRAPHER:  The time is 11:19 and we're

20 off the record.

21          (Recess from 11:19 to 11:32)

22          VIDEOGRAPHER:  The time is 11:32 and we

23 are back on the record.

24     Q    (BY MR. LEBOWITZ)  Okay.  Mr. Dunn, when we

25 took a break, we were talking about the November 4th,

Deposition of Jack Dunn

Page 79

1    2003 meeting.  How long did the meeting last until?

2         A    I don't recall.

3         Q    More than an hour?

4         A    Perhaps.

5         Q    At any time in the meeting, did you speak to

6    Ms. Pande in an elevated tone of voice?

7         A    I did raise my voice at that meeting.

8         Q    Um-hmm.

9         A    Not at her necessarily but just in general

10   because of the demands on us at that time and pressure we

11   were under to get things done in the middle of our move.

12        Q    And at any time in this meeting, did you

13   reference Ms. Pande's upcoming leave of absence?

14        A    No.  Not that I recall specifically, although I

15   was -- I was asking Kiran to try to talk about the

16   responsibility she had and what her plans were for -- for

17   those.

18        Q    Did you in any way during this meeting make any

19   statements regarding the fact that Ms. Pande was not

20   going to be around because of a leave?

21        A    No.  Not that I recall but I -- my recollection

22   at that point she -- that she had -- you know, I

23   didn't -- no.

24        Q    Did you make any statements or make any --

25   direct any comments towards Ms. Pande during this meeting

1    and I was interested in what she was doing to transition

2    her work given that -- and we already had the backfill

3    for her position, Jason Ewles, effective November 1st.

4    So he was coming in, he was taking over her

5    responsibilities because she rejected the move to

6    Houston, and so I was interested in what's our transition

7    plan to get stuff off of Kiran's plate and onto his, not

8    related to -- you know, just related to the new guy

9    showing up to take over her responsibilities.

10        Q    At any point during this meeting on

11   November 3rd -- November 4th, 2003, did you reference the

12   fact that Ms. Pande was taking a medical leave of

13   absence?

14        A    Not that I recall.

15        Q    At any point during the period -- during the

16   time in the meeting where you were discussing this

17   transition of work from Ms. Pande to others, did you

18   speak in an elevated tone of voice?

19        A    That -- that meeting was -- it was a stressful

20   time and I did raise my voice because we were moving, we

21   had lots of work to do, a lot of pressure, a big

22   transition of a lot of people on and off the team, and --

23   and I -- and I -- and I did raise my voice.

24        Q    Okay.  I understand that generally but my

25   question was a little bit more specific than that, which

Page 82

1    is:  When speaking in regard to Ms. Pande specifically

2    and the transitioning of her work to others, did you

3    speak in an elevated tone of voice?

4        A    I don't recall speaking specifically to her any

5    way different than anyone else.  I do -- I -- as I

6    mentioned, I did -- I did speak in an elevated voice due

7    to the pressure we were under and my -- you know, my --

8    my -- my responsibility to make sure that the work

9    program was completed as supervisor.

10       Q    Do you recall pointing your finger at Ms. Pande

11   while you were speaking with her in an elevated tone of

12   voice during this meeting?

13       A    No, I don't.

14       Q    Do you recall pointing your finger at anyone

15   during this meeting?

16       A    No.

17       Q    Do you recall Ms. Pande being upset at how the

18   meeting was proceeding?

19       A    My recollection was that she was saying very

20   little at the meeting about the work that she had under

21   her responsibility and the reason for the ele-- my

22   elevated voice was that she was not giving the team any

23   response to the things that she was supposed to be doing.

24       Q    Do you recall Ms. Pande's reaction to you --

25   you speaking to her in that elevated tone of voice?

Deposition of Jack Dunn

Page 83

1        A     No.

2        Q     Prior to this meeting on November 4th, 2003,

3    had you ever spoken in such a manner to Ms. Pande?

4        A     What manner?

5        Q     An elevated tone of voice.

6        A     I do recall a meeting when I asked Kiran to

7    take ownership over the work plan in -- in July and I --

8    and she said, "Are you asking me or telling me?"  And I

9    said in a calm voice, "I'm asking you."  But not -- you

10   know, not that I recall, although -- not that I recall.

11   I didn't speak in an elevated tone of voice.

12       Q     On any point during the day of November 4th,

13   2003, did you come to learn that Ms. Pande had been

14   brought to tears by your conduct in the meeting?

15       A     Pardon?

16       Q     At any point in the -- on the day, not just in

17   the meeting but at any point during the day of

18   November 4th, 2003, did you come to learn that Ms. Pande

19   had been brought to tears as a result of the way you

20   interacted with her at the meeting?

21       A     No.  As I recall, we had the meeting.

22   Afterwards we had a team lunch and Kiran attended.  She

23   sat -- she was there.  I was there.

24       Q     There were breaks taken during the meeting.  Is

25   that correct?

1       A    I don't recall.

2       Q    It could have been; you just don't remember?

3       A    I don't -- I don't -- you know, this is one

4   meeting three years ago.  I don't remember how many

5   breaks we took in, you know, meetings.  It's -- just

6   don't remember.

7       Q    At some point after November 4th, 2003, did you

8   learn from any source that -- that someone in -- who

9   attended the meeting had expressed concerns to your

10  supervisor, Mark Krolow, about your conduct at the

11  meeting?

12      A    No.  I don't recall that.

13      Q    Did Mark Krolow ever speak with you in regards

14  to your conduct at the November 4th, 2003 meeting?

15      A    No.  I don't recall anything like that.

16      Q    Did you ever have any conversations with Jeff

17  Shellaberger regarding your conduct at the November 4th,

18  2003 meeting?

19      A    No.  I don't recall anything of that sort.

20      Q    Did you ever speak with anyone from human

21  resources regarding your conduct at the November 4th,

22  2003 meeting?

23      A    No.  I don't recall anything of that sort.

24      Q    When was the first time that you learned that

25  Ms. Pande had a complaint about how you acted at the

Page 85

1    November 4th, 2003 meeting?

2        A    At the -- there is a thick series of

3    chronological papers that were sent in with her -- what's

4    it called?  Her complaint or something with the State.

5    It talked about, referenced -- referenced point-by-point

6    issues and that's when I first saw this issue of the

7    November 4th meeting.

8        Q    So I believe what you're referencing -- and

9    correct me if I'm wrong -- is -- is the -- the

10    administrative complaint that Ms. Pande filed with the

11    California Department of Fair Employment and Housing?

12        A    That's probably -- probably it.

13        Q    Okay.  And it's your testimony that that --

14    reading that document is the first time you learned of

15    any issue that Ms. Pande had with your conduct at the

16    November 4th, 2003 meeting?

17        A    Yeah.  I guess so.  I mean, I -- as I

18    mentioned, I did raise my voice and I talked to Kiran on

19    the phone in November time frame and I apologized for

20    raising my voice and she accepted my apology.  So I

21    figured it was over at that point.  I said, "I'm sorry

22    for raising my voice," and she said, "I accept your

23    apology."  That was -- that was just like if I had an

24    argument with my spouse and we got a little bit in a

25    disagreement.  I would apologize and she would accept my

Deposition of Jack Dunn

Page 86

1    apology.  Assume it's -- it's over.

2        Q    Okay.  So the -- the question was:  Reading

3    that -- the document that listed the November 4th, 2003

4    meeting, was that the first time that you became aware

5    that Ms. Pande had an issue with how you conducted

6    yourself at that meeting?

7        A    I believe so.

8        Q    At any point while Ms. Pande was still working,

9    actively working, in your group -- when I say "actively

10   working," I mean actually being present at the work site

11   and working -- did you ask her what her actual medical

12   condition was?

13       A    Not that I recall.

14       Q    Did you ever, at this -- when Ms. Pande was

15   still actively at work, ask her whether or not she had

16   cancer?

17       A    No.

18       Q    During this time period when Ms. Pande remained

19   actively at work prior to her leave, did you ever relate

20   to Ms. Pande any comments whatsoever related -- regarding

21   cancer and its treatments?

22       A    No.  Not that I recall.  You know, I -- my

23   concern was around her well-being, is she okay, as I

24   mentioned.  That was all our conversations related to,

25   really, was "I hope you're okay.  Is there anything I can

Page 87

1    do?"  That was -- that was the nature of my discussions

2    with her on that and my -- you know, my -- my inquiries

3    with UnumProvident, "I hope she's okay" and "Is there

4    anything I can do to help you?"  Welfare for people that

5    work for you.

6                  MR. LEBOWITZ:  Will you mark this?

7                  (Exhibit 8 marked)

8         Q    (BY MR. LEBOWITZ)  Okay, Mr. Dunn.  You've just

9    been handed what's been marked as Exhibit 8 for this

10   deposition, which is another one of the progress notes

11   from the UnumProvident file related to Ms. Pande.  Take a

12   minute and review it and let me know when you're ready to

13   proceed.

14        A    Okay.

15        Q    Okay.  First of all, have you ever seen this

16   document before?

17        A    No.

18        Q    Reading the second sentence of the -- of the

19   note here, it says, "Employee's manager has been pushing

20   her for info, and employee does not want manager to know

21   anything."  Reading that, does that refresh your

22   recollection as to whether or not you had been asking

23   Ms. Pande details of her medical condition?

24        A    No, it doesn't.  And this, to me, refers to,

25   you know, what's -- as I basically previously testified

1    or mentioned was, how is she and how is -- and any idea

2    in how long she's going to be out given the -- the work

3    needs.

4         Q    Well, let's read that sentence in conjunction

5    with the first sentence, which as I read, it says,

6    "Employee is concerned that manager might receive med --

7    med info, advised no," and then the sentence that we just

8    read as well.  Now, does that -- reading those two

9    sentences in conjunction where Ms. Pande is con-- is

10   relating concerns about her manager receiving medical

11   info, does that in any way refresh your recollection as

12   to whether or not you were actually asking Ms. Pande for

13   details about her medical information?

14        A    This -- these are not my comments, of course.

15   These are the employee, meaning Kiran's, comments.  So

16   no.  This is -- she was -- she was concerned.  This is --

17   no.  No.  This was -- this isn't related to -- to me.

18   It's related to her.

19        Q    Well, it's -- it's --

20        A    Her perceptions.

21        Q    It's her perceptions of what you were asking,

22   so --

23        A    Correct.

24        Q    Can you think of any reason why Ms. Pande would

25   believe you were asking about her medical condition?

Deposition of Jack Dunn

Page 89

1    A    No, I cannot.  In fact, I think this is an

2  inaccurate perception.  I had no interest in unders-- in

3  knowing anything about one's medical condition.  My -- my

4  inquiries were purely related to how long they were going

5  to be out just like if you were out on vacation and what

6  are we going to do to transition someone's work to

7  someone else.

8    Q    Did Ms. Pande ever tell you that she didn't

9  want to discuss her actual medical condition?

10    A    I wouldn't have expected her to.

11    Q    My question is simply:  Did she ask -- did she

12  say that to you or anything along those lines?

13    A    Not that I recall.  There wouldn't be a need

14  for that.  It's inappropriate.

15    Q    So you agree it would be inappropriate for you,

16  as a supervisor, to ask Ms. Pande what her medical

17  condition was?

18    A    As I mentioned, my interests are around making

19  sure that the employees are okay.  So when I ever -- in

20  questions I ask to employees when they're in a medical

21  condition, whether it's Kiran or elsewhere, is "I hope

22  you're okay.  Is there anything we can do?"

23    Q    And when you just said it would be

24  inappropriate, what did you mean by that?

25    A    I don't have any specifics.

1    Kern's representation of a phone call.

2                MR. LEBOWITZ:  From Ms. Pande.

3                MS. MILLER:  To another person.

4                THE WITNESS:  Right.

5       Q    (BY MR. LEBOWITZ)  Well, understanding --

6    reading this in context, which specifically says, "the

7    employee has called in to UnumProvident," the employee

8    being Ms. Pande --

9       A    Correct.

10      Q    -- and "stating," so the employee, Ms. Pande,

11   stating that "she is concerned about confidentiality and

12   dis-- and is distraught because her manager/supervisor

13   keeps pushing and pressuring her for information about

14   her leave, which is causing her additional emotional

15   distress."  That representation about Ms. Pande's

16   interpretation of her interactions with you, do you

17   believe that to be inaccurate?

18                MS. MILLER:  I'm going to object.

19   Question's ambiguous.

20      A    Yeah.  I agree.  I have no response.  That's --

21      Q    (BY MR. LEBOWITZ)  You don't understand that at

22   all?

23      A    Could you -- I -- I don't understand the

24   question.

25      Q    Okay.  So Ms. Pande's stating -- Ms. Pande's

1    stating that she is concerned about her confidentiality

2    and is distraught because her manager/supervisor keeps

3    pushing and pressuring her for information.  Do you

4    disagree that you were pushing and pressuring her for

5    information?

6         A    Yes.

7                   (Exhibit 10 marked)

8         Q    (BY MR. LEBOWITZ)  I've just handed you what's

9    been marked Exhibit 10 for this deposition.  Can you

10   describe for me what this document is?

11        A    This is a request to carry over vacation from

12   2003 to 2004.

13        Q    A request from Ms. Pande to you?

14        A    Yes.

15        Q    And it was communicated to you on November 7th,

16   2003, this request?

17        A    Looks that way.

18        Q    And what is a vacation carryover at Chevron?

19        A    It's when, for business reasons, you are unable

20   to take all your vacation in the year.  You can request

21   to have it rolled over into the next year.

22        Q    And what are the criteria, if there are any,

23   for deciding whether or not someone will be allowed to

24   carry over their vacation?

25        A    The business operating reason required to --

1    for vacation carryover, indicate if you are requesting

2    postponement of the one-week vacation taken in your 15th,

3    20th, 25th anniversary year.  So those are the -- those

4    are the -- those are the reasons or either a business

5    operating reason or a -- if you -- if you fall in one of

6    those years, you can take it -- you can take it, anyway.

7        Q    And whose decision is it as to whether or not

8    to allow the carryover?

9        A    Typically there's -- it says, "Authorized

10   Management Approval Signature," so it's a manager that's

11   authorized to approve sort of thing, usually the

12   supervisor.

13       Q    Okay.  And in this particular situation, were

14   you authorized to approve or deny this request?

15       A    I believe so.

16       Q    And you responded, if you look at the top

17   e-mail on November 7th, by saying, "Let's discuss."

18       A    Correct.

19       Q    Did you actually have a discussion about this

20   request?

21       A    Not that I recall.

22       Q    And why did you respond "Let's discuss"?

23       A    It's not customary to take 28 days.  It's

24   customary to take a few days or a week or -- 28 days

25   is -- is not customary and so that was the idea, "Let's

Deposition of Jack Dunn

Page 95

1    talk about why -- why -- why all of your vacation." And

2    the work schedule that did not incorporate any time for

3    vacation, you know, it was Kiran's responsibility to

4    define the work schedule, so unders-- you know, she -- it

5    would be logical for her to actually put her vacation in

6    there. All work schedules are -- are -- are set up to

7    incorporate vacation. Vacation is a necessary part of

8    working.

9        Q    And so when you said, "Let's discuss," these

10   were the issues that you were wanting to discuss with

11   Ms. Pande?

12       A    Presumably. I don't -- I don't recall

13   specifically but that would be -- that would be why I

14   would discuss it rather than just approve it offhand.

15   I've never received a 28-day request for carryover. This

16   was the only one I ever recall.

17       Q    And did you ever approve any vacation carryover

18   request for Ms. Pande for this --

19       A    This was -- in the end, she was paid for this

20   carryover, yes.

21       Q    Well, she was paid for it but is that -- is

22   that what you mean? You approved it by having her paid

23   for it?

24       A    The -- this was approved.

25       Q    By whom?

Deposition of Jack Dunn

Page 102

1          A      Correct.

2          Q      So based on reading that, would it be accurate

3     to -- to state that your conversation with Ms. Pande was

4     sometime prior to November 19th?

5          A      Well, which conversation?

6          Q      The conversation you're referring to in this --

7          A      That -- yeah.  That would be correct.

8          Q      Okay.  And that conversation you're referring

9     to in this e-mail is the conversation where you notified

10    Ms. Pande of her last day of work.  Is that correct?

11         A      I notify her that she's going to be getting a

12    letter from HR.

13         Q      And the letter from HR was going to say what?

14         A      I told her, "You'll get it from HR and you can

15    read it."  She actually wanted a -- she said, "Can you

16    read it to me or send it to me or tell me what it says?"

17    And I said, "No.  You should -- you should read it and

18    then get back to HR, Sheree Lomax."

19         Q      So is it your testimony that you did not, in

20    fact, read the substance of the letter to Ms. Pande

21    during that conversation?

22         A      That's correct.

23         Q      Is this the same conversation where you

24    apologized for your conduct your -- on November 4th?

25         A      I don't recall.  I -- I know I -- I don't know.

Deposition of Jack Dunn

Page 103

1    I don't know if I talked to her once or twice or -- I

2    don't know.

3         Q    And in either this telephone conversation or

4    any other telephone conversation you had with Ms. Pande,

5    did you ever tell her anything along the lines of the

6    fact that Chevron or you had consulted with an employment

7    attorney to determine whether or not ending her

8    employment while she was on medical leave was okay?

9         A    Not that I recall, no.

10        Q    Did you ever make any reference -- excuse me --

11   in any conversation you had with Ms. Pande to the fact

12   that -- that the decision to end her employment while she

13   was on medical leave had been cleared by any attorney?

14        A    Not that I recall.  This was all being handled

15   by HR.  They were making decisions on how we -- how we

16   proceeded.

17        Q    So as of November -- middle of November of

18   2003, did you have any knowledge as to whether or not the

19   decision to end Ms. Pande's employment with the company

20   had been cleared by any attorney?

21        A    Would you restate the question?

22        Q    As of the middle of November 2003 --

23        A    Correct.

24        Q    -- did you have any knowledge one way or the

25   other as to whether or not Ms. -- the decision to end

Deposition of Jack Dunn

Page 105

1    is a December 8, 2003 letter from Ms. Pande to Taryn

2    Shawstad in human resources at Chevron Texaco.  You can

3    take a minute and look at this document.  And first a

4    general question.  Just by looking at it, do you know

5    whether or not you've ever seen this document before?

6         A    Let me read the document and then I'll -- then

7    I'll comment.

8         Q    Sure.

9         A    Okay.

10        Q    Okay.  In the first page of this -- well, let

11   me ask you the question I asked you before, which is:

12   Have you ever seen this letter before?

13        A    I don't think so.  I don't recall ever seeing

14   it.

15        Q    On the first page near the bottom, there's a

16   sentence that starts with "Before."  Do you see that?

17   Right below the --

18        A    Yes.

19        Q    -- blocked text.  Ms. Pande in this letter

20   says, quote, "Before I went on medical disability, I was

21   offered and accepted to continue to work through 2004,"

22   unquote.  Do you know what she's referring to there?

23        A    No.

24        Q    Did you offer her any work to continue through

25   2004?

Deposition of Jack Dunn

Page 106

```
 1        A     Absolutely not.

 2        Q     Do you know of anybody else who offered

 3   Ms. Pande work to continue through 2004?

 4        A     No.  Do you?

 5        Q     Do you know of anybody -- of any project that

 6   Ms. Pande could have been working on or had in her mind

 7   as to what would be continuing for her to work on in --

 8   through 2004?

 9              MS. MILLER:  Object.

10        A     Yeah.

11              MS. MILLER:  That calls for speculation.

12        A     I don't know what she had -- I don't know what

13   she had in her mind.

14        Q     (BY MR. LEBOWITZ)  Did you have any

15   conversations with Ms. Shawstad in December of 2003

16   regarding Ms. Pande?

17        A     Probably.

18        Q     Do you recall the substance of any such

19   conversation?

20        A     When the -- about the time when the letter was

21   sent to Kiran, they said they would handle it.

22        Q     That was the extent of your conversation with

23   Ms. Shawstad?

24        A     Yes.

25              (Exhibit 14 marked)
```

1      Q     (BY MR. LEBOWITZ)  You've just been handed

2    what's been marked Exhibit 14 for this deposition.  It's

3    a letter to Ms. Pande dated December 16th, 2003 from

4    Ms. Shawstad.  If you'd take a minute and read the letter

5    and let me know when you're ready to proceed.

6          A     Okay.

7          Q     If you go down to the -- well, first of all,

8    have you ever seen this letter before?

9          A     I don't believe so.

10         Q     And this is a letter -- at least reading the

11   letter, it purports to respond to Ms. Pande's letter --

12         A     Correct.

13         Q     -- of December 8th, which we've marked as

14   Exhibit 13 in this deposition.

15         A     Right.

16         Q     And if you go down to the third paragraph in

17   this letter, Exhibit 14, the second sentence says --

18   second and third sentence, say, "Additionally, you are

19   mistaken in your assertion that you were offered the

20   opportunity to continue working in San Ramon through

21   2004.  No such offer was extended."

22         A     That's correct.

23         Q     How, if you know, did Ms. Shawstad attain this

24   information?

25         A     The -- the letter was sent -- the -- the

Deposition of Jack Dunn

Page 108

1    November 19th -- was that the date -- letter was sent

2    from HR.  Then Kiran sent this letter back to HR, which

3    they didn't share with me and I didn't have a need to

4    see.  She called me and asked about -- you know, asked --

5    asked about some of the allegations in this letter and I

6    gave her my response.

7         Q    "She" being Ms. Shawstad.

8         A    Correct.  Or her assistant.  I can't recall.

9    It basically said, "Kiran said this.  Kiran said that.

10   Is that correct?  Is that not correct?"  And I told them

11   the facts, which are reported here accurately.

12        Q    So the information that Ms. Shawstad used to

13   write this letter, at least this sentence that I've

14   quoted from the letter, is from you?

15        A    Which letter -- which sentence?

16        Q    The sentence that I just quoted to you.

17        A    Could you --

18        Q    Starting with "additionally" and ending with

19   "extended."

20        A    Okay.  So I have to look at that again.  Where

21   is that?

22        Q    Third paragraph, second sentence.

23        A    "Additionally, you are mistaken in your

24   assertion that you were offered the opportunity to

25   continue working in San Ramon through 2004.  No such

1    offer was extended."  Okay.  Could you state your

2    question?

3        Q    So the question is:  The information -- that

4    information that Ms. Shawstad used to write this sentence

5    came from you.

6                MS. MILLER:  I'm going to object.

7        Q    (BY MR. LEBOWITZ)  Is that correct?

8        A    I don't know.

9                MS. MILLER:  Calls for speculation.

10       A    Yeah.  I don't know.

11       Q    (BY MR. LEBOWITZ)  Is that one of the questions

12   that Ms. Shawstad or her assistant asked you when they

13   called you about Ms. Pande's letter --

14       A    They --

15       Q    -- as to whether or not you had offered her any

16   employment continuing through 2004 in San Ramon?

17       A    I believe so.  Yeah, they asked me that.

18       Q    Okay.

19       A    And I said accurately no.  As I mentioned

20   previously, it was very explicit at the time of our

21   announcement of our move that we were moving at the end

22   of the year and -- and that would be -- you know, that

23   would be as long as people would be allowed to work for

24   our group in San Ramon, in my group.  Nobody's offered

25   employment extended beyond -- do you have a letter

1    offering you employment for another year?  Nobody has

2    a -- an offer for an extended period of time.  I don't,

3    either.

4         Q .   Anything else you want to add to your answer?

5         A    No.

6         Q    Now, at some point near the end of 2003, did

7    you learn that Ms. Pande had applied for open positions

8    in the ETC group?

9         A    I don't recall specifically.  She -- she

10   applied for a lot of different jobs.

11        Q    Do you recall having a meeting with Zuwa

12   Omoregie regarding Ms. Pande's application for jobs in

13   the ETC group?

14        A    I did speak with Zuwa.

15        Q    When was that?

16        A    I don't recall.  Sometime in the fourth

17   quarter.

18        Q    Was it before or after Ms. Pande went on leave?

19        A    I don't recall.  It was around the time that he

20   had his job posted.

21        Q    If I told you that Mr. Omoregie has testified

22   that his meeting with you occurred sometime in December

23   of 2003, would you have any reason to dispute that or

24   doubt that?

25        A    No.  No.

1      A    It was about Kiran posting for that -- for a

2  job he had.

3      Q    And how long did your meeting last?

4      A    It was short.

5      Q    Five minutes, ten minutes, 20 minutes?  Can you

6  give me any idea?

7      A    Yeah.  I would suppose something around

8  those -- that time frame.  Short.

9      Q    Less than a half an hour?

10     A    I would think so.  That's my recollection.

11     Q    Where did the meeting take place?

12     A    His office, as I recall.

13     Q    How is it that you were alerted that

14  Mr. Omoregie wanted to meet with you?

15     A    I don't recall.

16     Q    Where was Mr. Omoregie's office in relation to

17  yours at the time?

18     A    He was down -- I was on the second floor, he

19  was on the first floor of building C.

20     Q    And please tell me everything you can recall

21  about that conversation.

22     A    Can you be more specific?

23     Q    Do you recall anything that happened at the

24  conversation?

25     A    Yeah.  He -- he asked about Kiran's performance

Deposition of Jack Dunn

Page 113

1    and I said she was bright, very capable, she did a great

2    job for the first half of the year, and as the year went

3    on, she became less focused.

4        Q    Anything else that you said to Mr. Omoregie at

5    this meeting?

6        A    That's the gist of it.  That's all I recall.

7        Q    Did you explain what you meant when you said

8    that she became less focused as the year went on?

9        A    Not that I recall.  I was giving my honest

10   feedback about her performance in -- in request to his

11   posting of a job.

12       Q    Do you know what job it was that was being

13   posted?

14       A    I -- I believe he had a petroleum engineering

15   position.

16       Q    And when you said that Ms. Pande was bright and

17   capable, would you explain what you meant by that?

18       A    That's self-explanatory.

19       Q    Did you provide Mr. Omoregie with any other

20   details as to what you meant by "bright and very

21   capable"?

22       A    You're talking about three years ago now?  Is

23   that right?  Three and a half?  Two and a half?  Let's

24   see.  This would have been -- so I don't recall a short

25   conversation I had three years ago, two-and-a-half years

CONFIDENTIAL

| | |
|---|---|
| **From:** | Dunn, Jack (JFDU) [JFDU@mssite01.ion.chevron.com] |
| **Sent:** | Monday, January 27, 2003 6:04 PM |
| **To:** | Krolow, Mark (MRKR) |
| **Cc:** | Hartshorn, Kelly (KGHA) |
| **Subject:** | Karin Pande 2002 performance |
| **Importance:** | High |
| **Sensitivity:** | Confidential |

Kelly Hartshorn came by to let me know that Karin was ranked in our "2" category on the 3X1 and in the C2 on the 3X3 matrix for 2002. The C designation was basically for limited mobility and some behavioral issues Karin has had toward the end of the year. We discussed the possibility of a small merit raise (.5-1%?) for 2002 as she is currently at 98.5% CO for grade 24.

Kelly wanted to point out that she should be re-evaluated against her peers on the 3X3 next year, as they have a limited pool to compare her against in the CTOP planning group. Let Kelly or I know if you would like to discuss further. From what I have seen so far, she will be a good addition to our group,

**John F. (Jack) Dunn,** Manager Block 14 New Field Development

**ChevronTexaco Overseas Petroleum**
Southern Africa Business Unit
6001 Bollinger Canyon Road, San Ramon, CA 94583
Tel 925 842 1940 Fax 925 842 2836 Mobile 925 895 8217

mailto:jfdu@chevrontexaco.com


Dunn
EXHIBIT NO. 2

CHEVRON/PANDE03711

**Unknown**

From:               Dunn, Jack (JFDU)
Sent:               Friday, October 10, 2003 3:21 PM
To:                 Pande, Kiran (Kiran.Pande)
Subject:            RE: DA Modeling Course

I still think it would be better to wait and see what your next job is. If you get a job that involves DA and you think you are going to be doing that, then you could schedule it.

With the fairly extensive delays we have had in the F-1 simulation modeling following the RAM review I would like to focus on that. If you still need the upside and downside models we can continue with testing horizontal wells in the F-1 and begin to optimize well placement. I know the delays are not your fault but we are starting to get crunched up with your departure and move. If you get another job and they want you to move soon the problem will be compounded.

**John F. (Jack) Dunn,** Manager Block 14 New Field Development
ChevronTexaco Overseas Petroleum - Southern Africa Business Unit
Tel 925 842 1940 Fax 925 842 2836 Mobile 925 899 0471

-----Original Message-----
**From:**      Pande, Kiran (Kiran.Pande)
**Sent:**      Thursday, October 09, 2003 6:04 PM
**To:**        Dunn, Jack (JFDU)
**Subject:**   RE: DA Modeling Course

DA modeling is listed as an important skill for the positions that I am interested in (London Corp Bus Dev Group). As you know DA and risk analysis and uncertainty management are core aspects of capital stewardship. It may be a couple more weeks before the PDC process shakes out so I would prefer not to pass up this opportunity. This course is not offered very often. I have done very limited training this year due to the intense work schedule around the workshops/RAM meetings through July. I thought there was a general philosophy around two weeks of training per year on average for CVX. What do you think?

-----Original Message-----
**From:**      Dunn, Jack (JFDU)
**Sent:**      Thursday, October 09, 2003 4:04 PM
**To:**        Pande, Kiran (Kiran.Pande)
**Subject:**   RE: DA Modeling Course

My preference would be for you to see what your next job is and tailor your training to that opportunity. Do you see yourself doing DA modeling?

**John F. (Jack) Dunn,** Manager Block 14 New Field Development
ChevronTexaco Overseas Petroleum - Southern Africa Business Unit
Tel 925 842 1940 Fax 925 842 2836 Mobile 925 899 0471

-----Original Message-----
**From:**      Pande, Kiran (Kiran.Pande)
**Sent:**      Thursday, October 09, 2003 3:41 PM
**To:**        Dunn, Jack (JFDU)
**Subject:**   DA Modeling Course

Jack,
I would like to sign up for the next DA modeling course offered the week of Oct 27th in Houston.
I wanted to make sure this was okay with you before committing to it.
Can you let me know?
- Thanks,
Kiran

Dunn
EXHIBIT NO. 4

1214

1

Claim Document
--------------------------------------------------------------------------------
          Type: Received call

       Subject: PC from ER

      Priority: No

        Status: Completed

         Notes:


10/29/03 04:12

Inbound from Martha Martinez,

Martha got a call from her supervisor and he had received a notice from
FMLA unit. Suprvr was concerned because he did not know if she was taking
time off for herself or another reason and EE had not discussed absense from
work. I advised new claim and future date of 11/07/03


        Created By: Kern, Natalie
      Created Date: 10/29/2003 - 16:17:27
       Create Site: Chattanooga

      Completed By: Kern, Natalie
    Completed Date: 10/29/2003 - 16:17:27
     Complete Site: Chattanooga

--------------------------------------------------------------------------------

Dunn

EXHIBIT NO. 6

Claim Document

--------------------------------------------------------------------------------

            Type: Note To File

         Subject: FMLA Update

        Priority: No

          Status: Completed

           Notes:


  EE ci concerned that mgr might receive med info, adv'd
no. EE's mgr has been pushing her for info, and ee does not want mgr to
know anything. EE was adv'd mgr will be updtd on approval dates
only.


      Created By: Corrigan, Elizabeth
    Created Date: 11/06/2003 - 15:34:53
     Create Site: Chattanooga

    Completed By: Kern, Natalie
  Completed Date: 11/06/2003 - 15:39:59
   Complete Site: Chattanooga

--------------------------------------------------------------------------------

Dunn

EXHIBIT NO. 8

Claimant Name: KIRAN K PANDE    Claim #: 987540

Page 1 of 2

## Unknown

**From:**   Dunn, Jack (JFDU)
**Sent:**   Friday, November 07, 2003 10:16 AM
**To:**     Pande, Kiran (Kiran.Pande)
**Cc:**     Horna, Giannina F. (gifh)
**Subject:** RE: 2003Vacat_carryover_.doc

Let's discuss.

**John F. (Jack) Dunn,** Manager Block 14 New Field Development
ChevronTexaco Overseas Petroleum - Southern Africa Business Unit
Tel 925 842 1940 Fax 925 842 2836 Mobile 925 899 0471

-----Original Message-----
**From:** Pande, Kiran (Kiran.Pande)
**Sent:** Friday, November 07, 2003 6:53 AM
**To:** Dunn, Jack (JFDU)
**Cc:** Horna, Giannina F. (gifh)
**Subject:** RE: 2003Vacat_carryover_.doc

word doc attached
-----Original Message-----
**From:** Pande, Kiran (Kiran.Pande)
**Sent:** Friday, November 07, 2003 6:50 AM
**To:** Dunn, Jack (JFDU)
**Cc:** Horna, Giannina F. (gifh)
**Subject:** 2003Vacat_carryover_.doc

Jack,
Please find attached my request for vacation carryover.
- Kiran

---

### CTOP 2003 to 2004 VACATION CARRY-OVER
### AND WORK SCHEDULE CHANGE REQUEST
#### U.S.-Based Personnel (U.S.-Dollar Only)

(Please Print Clearly)
Employee Name:

| Pande | Kiran | K |
|-------|-------|---|
| (Last) | (First) | (MI) |

Staff/SBU/Location: SASBU/San Ramon

---

### *Vacation Carry-Over*

**Remaining 2003 vacation not taken in 2003:**      28        Carry-Over Days*
***Include any days of 2003 vacation that overlaps into 2004, i.e., vacation starts on 12/29/03 and
you return on 1/4/04, record two carry-over days (1/2/04 and 1/3/04). (Your vacation on-line
balance is shown in hours. Divide by 9 if on 9/80, 8 if on traditional schedule. Round up for
number of remaining days.)**

5/4/2004

Dunn
**EXHIBIT NO.** 10     1215

From: ___2003_____ (Yr) To: ____2004_____ (Yr)

Explain business operating reasons requiring vacation carry-over or indicate if you are requesting postponement of one week of vacation to take in your 15th, 20th, 25th, etc., (increments of five) anniversary year:

The work schedule of the Block 14 S3 project did not incorporate any time for vacation. I had wanted to take a couple weeks of vacation in the Spring and also in the Fall but was unable to schedule this vacation due to aggresssive time schedules on this project. Hence, I will need to carryover all my 2003 vacation and also 10 days of vacation carried over to 2003 from 2002.

---

## _Schedule Change_  (U.S. locations only)

Changing from (check one):          _____ 9/80 to Traditional

                                    _____ Traditional to 9/80_____A Team _____B Team

                                             _____ Team Change (A to B)

                                    _____ Team Change (B to A)

---

Requested by: _____Kiran Pande_____          Date:
____11/7/2003_____
                    (Employee)


_____          Date:
_____
Authorized Management Approval Signature

Original or Fax:      Giannina Horna, B1008, Fax 925-842-1300

cc:                   Employee

*(This form is not intended to cover changes from part-time to full-time or full-time to part-time. These changes are covered under a different process. Please contact your HR Counselor if you need further information.)*

1216

7195 Lamar Loop
Castro Valley, CA 94552

December 8, 2003
In regards to: "Voluntary Termination Letter, Dated 11-18-03"

Ms. Taryn L. Shawstad
General Manager, Human Resources
ChevronTexaco Overseas Petroleum
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324

Subject: Unlawful Termination

Dear Ms. Shawstad:

This letter is in response to the contents and claims of ChevronTexaco's letter titled "Voluntary Termination" dated November 18, 2003 (attachment 1). I was shocked to receive your letter in the mail on November 22, 2003 while I am on a company approved short term disability due to medical reasons associated with my own serious health condition. As you are aware, UnumProvident, the administrator of ChevronTexaco's Disability Management Program, issued a letter on November 18, 2003 informing me and the company that my absence from my employment due to medical reasons is eligible for protection under FMLA and CFRA and my disability date was determined to be November 10, 2003.

Your letter states ChevronTexaco's claim that I have voluntarily resigned from the company. I would like to state unequivocally that I have _never_ offered "Voluntary Resignation" from ChevronTexaco as you contend in your letter. I have not voluntarily resigned from ChevronTexaco nor have I agreed to a voluntary termination as your letter contends. Furthermore, the following statement is false:

> "At the time you chose not accept the relocation offer you were informed that as long as there was useful work for you, that your employment with the company could continue until year end 2003."

Before I went on medical disability, I was offered and accepted to continue to work through 2004. It is my present intention to complete that assignment when I return to work from disability.

I believe that this statement that I have "voluntarily terminated" my employment is yet another instance of unlawful conduct by ChevronTexaco commencing with the gender and racial discrimination and harassment perpetrated by Mr. Rex Mitchell when I was in his group. ChevronTexaco's attitude towards these issues, at least as to me, was demonstrated by its failure to investigate Mr. Mitchell's conduct when I complained of it and, more telling, the instruction to me that I could either leave the company, leave the

Dunn
XHIBIT NO. 13

1202

group, or live with Mr. Mitchell. My repeated complaints about on-going retaliation were met with similar instructions. As a result of Mr. Mitchell's conduct and my complaint I received an unfair performance evaluation and salary treatment, I was denied a promotion that was promised to me, I was repeatedly slandered, denied a merit component in my salary treatment in April of this year, and then I was transferred to Mr. John Dunn's group that was destined for Houston.

Since I have been in Mr. John Dunn's group, and especially since I disclosed my need for a leave due to medical reasons I have been subjected to harassing conduct. Other employees have not only witnessed this conduct, but they have complained to Mr. Dunn and CTOP management about it. Notwithstanding, the unlawful conduct towards me continues, as demonstrated by this termination letter. As noted above, before I knew that I would need a leave for medical reasons I was offered, and I accepted, work through 2004 in San Ramon. According to the information ChevronTexaco promulgated, because I did not agree to relocate to Houston I was eligible for this work. Now ChevronTexaco contends that I have voluntarily terminated my employment. The only change that is apparent is my need for medical leave and the reporting of Mr. John Dunn's harassing conduct to CTOP management.

As I approach my 15 year service anniversary with ChevronTexaco on December 19, 2003, I am completely shocked that ChevronTexaco would choose to unlawfully terminate me in this manner while I am on a company approved disability leave and contending with my own serious illness. If under these circumstances the STEPS process is applicable, then I request it be implemented.

Sincerely,

*Kiran K. Pande*

Kiran K. Pande


Attachment 1: ChevronTexaco Letter from Taryn Shawstad, General Manager – Human Resources, CTOP, Titled "Voluntary Termination", Dated 11-18-03

cc:    Mr. Peter Robertson, Vice-Chairman
       Mr. George Kirkland, Corporate Vice-President and
                     President ChevronTexaco Overseas Petroleum Inc. (CTOP)
          Mr. James Blackwell, Managing Director, Southern Africa Business Unit, CTOP

ChevronTexaco Overseas Petroleum    General Manager
6001 Bollinger Canyon Road          Human Resources
San Ramon, CA 94583-2324
Tel  925 842 1391
Fax 925 842 1300

## ChevronTexaco

December 16, 2003

Kiran K. Pande
7195 Lamar Loop
Castro Valley, CA 94551

Subject: Voluntary Termination

Dear Kiran:

This letter is in response to the concerns you raised in your letter of December 8, 2003 regarding the confirmation of your employment termination date.

The November 22 letter should not have been a shock as you had been previously informed of the pending termination date via verbal discussions with your supervisor, Jack Dunn.  You had requested information regarding possible severance benefits in regards to year end termination in an email sent to me on October 21.  At that time, the Sr. Business Partner responded on my behalf to let you know that there was not a severance plan in effect that applied to you because you declined the offered position in Houston you had not been deemed "surplus" by the company.  ChevronTexaco Overseas Petroleum established the need for your assigned business unit to move to Houston earlier this year and as noted in your offer letter and the attached fixed duration assignment sheet if you declined the relocation offer, your employment was subject to termination at the time the unit moved to Houston.  Your group moved on December 10, 2003 and there is no ongoing work remaining in San Ramon.

The date set for your termination was established prior to your leave of absence and is not connected in any way to this leave or any complaints you have made concerning discrimination you feel you have been subjected to.  Additionally, you are mistaken in your assertion that you were offered the opportunity to continue working in San Ramon through 2004.  No such offer was extended.

We have received copies of your filing with the State and will be in touch with your regarding the Steps mediation.

Per my November 22 letter, your employment termination date has been established for December 31, 2003.  Please contact the HR Service Center at 1-888-TALK2HR (1-888-825-5247) to obtain your benefits paperwork.

Sincerely,

*T. L. Shawstad*

T. L. Shawstad

Dunn

EXHIBIT NO. 14

1204

1                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

2

3      KIRAN PANDE,                      )

                                         )

4                    Plaintiff,          )

                                         )

5      VS.                               ) Case No. 04-5107 CW

                                         )

6                                        )

       CHEVRON CORPORATION (f/k/a        )

7      CHEVRONTEXACO CORPORATION), a )

       Delaware corporation, CHEVRON )

8      INTERNATIONAL EXPLORATION &       )

       PRODUCTION (f/k/a                 )

9      CHEVRONTEXACO OVERSEAS            )

       PETROLEUM COMPANY), a division)

10     of Chevron U.S.A. Inc.,           )

                                         )

11                   Defendants.         )

12                    REPORTER'S CERTIFICATION

                     DEPOSITION OF JACK DUNN

13                     OCTOBER 19, 2006

14          I, Lorri Lucas, Certified Shorthand Reporter in and

15     for the State of Texas, hereby certify to the following:

16          That the witness, JACK DUNN, was duly sworn by the

17     officer and that the transcript of the oral deposition is

18     a true record of the testimony given by the witness;

19          That the deposition transcript was submitted on

20     _____ to the witness or to the attorney for

21     the witness for examination, signature and return to

22     me by _____;

23          That pursuant to information given to the deposition

24     officer at the time said testimony was taken, the

25     following includes counsel for all parties of record:

Deposition of Jack Dunn

Page 124

1          Mr. Noah D. Lebowitz, Attorney for Plaintiff

2          Ms. Michelle Ballard Miller, Attorney for Defendants

3          That a copy of this certificate was served on all

4     parties shown herein.

5          I further certify that I am neither counsel for,

6     related to, nor employed by any of the parties or

7     attorneys in the action in which this proceeding was

8     taken, and further that I am not financially or otherwise

9     interested in the outcome of the action.

10         Certified to by me this 6th day of November, 2006.

11

12

13

14

15          *Lorri Lucas*

            LORRI LUCAS, RMR, Texas CSR 5317

16          Expiration Date:  12/31/07

            Bayou City Reporting, Inc.

17          Firm Registration No. 295

            1135 East 11th Street

18          Houston, Texas   77009

            (713) 861-8589

19

20

21

22

23

24

25

Deposition of Jack Dunn

Page 123

1                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

2

3      KIRAN PANDE,                    )

                                       )

4                    Plaintiff,        )

                                       )

5      VS.                             )  Case No. 04-5107 CW

                                       )

6                                      )

       CHEVRON CORPORATION (f/k/a      )

7      CHEVRONTEXACO CORPORATION), a   )

       Delaware corporation, CHEVRON  )

8      INTERNATIONAL EXPLORATION &     )

       PRODUCTION (f/k/a               )

9      CHEVRONTEXACO OVERSEAS          )

       PETROLEUM COMPANY), a division  )

10     of Chevron U.S.A. Inc.,         )

                                       )

11                   Defendants.       )

12                    REPORTER'S CERTIFICATION

                    DEPOSITION OF JACK DUNN

13                     OCTOBER 19, 2006

14          I, Lorri Lucas, Certified Shorthand Reporter in and

15     for the State of Texas, hereby certify to the following:

16          That the witness, JACK DUNN, was duly sworn by the

17     officer and that the transcript of the oral deposition is

18     a true record of the testimony given by the witness;

19          That the deposition transcript was submitted on

20     _____ to the witness or to the attorney for

21     the witness for examination, signature and return to

22     me by _____;

23          That pursuant to information given to the deposition

24     officer at the time said testimony was taken, the

25     following includes counsel for all parties of record:

1    Mr. Noah D. Lebowitz, Attorney for Plaintiff

2    Ms. Michelle Ballard Miller, Attorney for Defendants

3    That a copy of this certificate was served on all

4    parties shown herein.

5    I further certify that I am neither counsel for,

6    related to, nor employed by any of the parties or

7    attorneys in the action in which this proceeding was

8    taken, and further that I am not financially or otherwise

9    interested in the outcome of the action.

10    Certified to by me this 6th day of November, 2006.

11

12

13

14

15    _Lorri Lucas_

        LORRI LUCAS, RMR, Texas CSR 5317

16      Expiration Date:  12/31/07

        Bayou City Reporting, Inc.

17      Firm Registration No. 295

        1135 East 11th Street

18      Houston, Texas   77009

        (713) 861-8589

19

20

21

22

23

24

25