# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

KIRAN PANDE,   )
              )
      Plaintiff,   )
              )
   vs.        )   NO. 04-5107 CW
              )
CHEVRON CORPORATION, et al.,   )
              )
      Defendants.   )
              )
              )

---oOo---

DEPOSITION OF JALALEDDIN AFIFI

Thursday, August 10, 2006

---oOo---

*Certified Copy*

REPORTED BY: LISA P. GALLI, CSR NO. 12351

**EXHIBIT    F**

PROFESSIONAL REPORTING SERVICES (800) 261-4814

1  changes to your testimony if you wish.
2            But please understand this is my one chance to
3  speak to you prior to trial, and this is my one chance
4  to understand what your testimony would be at trial.
5  And so if you do change your testimony after the fact, I
6  will comment to the jury that you have changed your
7  testimony and therefore you shouldn't be believed; do
8  you understand that?
9       A.   Yes.
10      Q.   Is there any reason why we cannot go forward
11 with your deposition today?
12      A.   No.
13      Q.   Have you ingested anything in, say, the past
14 24 hours that would in any way impair your memory or
15 ability to recall events?
16      A.   Not that I know of.
17      Q.   Who was your current employer?
18      A.   Chevron.
19      Q.   And what is your title?
20      A.   CSOC advisor and planning analyst.
21      Q.   What was the first?
22      A.   C-S-O-C.
23      Q.   Advisor?
24      A.   And planning analyst.
25      Q.   What does C-S-O-C stand for?

DEPOSITION OF JALALEDDIN AFIFI                           7

```
 1       A.   Captain Stewardship Organizational
 2  Capabilities.
 3       Q.   And for what division of Chevron are you
 4  working?
 5       A.   Chevron International.
 6       Q.   Is there an abbreviation that goes with that
 7  group?
 8       A.   C-I-E-P.
 9       Q.   And is -- did this group have a different name
10  in the recent years?
11       A.   It could have been Chevron Texaco Overseas
12  Petroleum.
13       Q.   So it was CTOP?
14       A.   Yes.
15       Q.   And how long have you been in the CSOC advisor
16  and planning position?
17       A.   Six weeks.
18       Q.   And prior to this job, what was your position
19  with Chevron?
20       A.   I was working for another part of the company.
21       Q.   And what was that?
22       A.   Project Resources Company.
23       Q.   What was your title?
24       A.   Asset consultant.
25       Q.   How long did you hold that job?
```

1   A.   About 16 months.

2   Q.   And immediately prior to the Project Resources
3   Company job, what was your position with Chevron?

4   A.   I was in the Energy Technology Company.

5   Q.   Is that known as ETC?

6   A.   Correct.

7   Q.   What was your job title there?

8   A.   Petroleum engineer.

9   Q.   Who was your direct supervisor when you were
10  the petroleum engineer in ETC?

11  A.   Dr. Zuwa Omoregie.

12  Q.   When did you first start working as the
13  petroleum engineer with ETC?

14  A.   I believe it was around first of February,
15  '04.

16  Q.   And prior to this ETC job, what job were you
17  employed with at Chevron?

18  A.   I was in a group called the Congo group.

19  Q.   And is that part of the Southern African
20  Strategic Business Unit?

21  A.   Correct.

22  Q.   Otherwise known as SASBU?

23  A.   Yes.

24  Q.   And how long were you in the Congo Group with
25  SASBU?

```
 1    A.  I believe about three and a half years.
 2    Q.  Who was your supervisor in the Congo Group?
 3    A.  I had two.
 4    Q.  Okay.  Who were they?
 5    A.  The last one was Fernando Gaggino.
 6    Q.  How long do you spell that last name?
 7    A.  G-A -- G-A-G-G-I-N-O.
 8    Q.  And before Mr. Gaggino?
 9    A.  Dan McKay.
10    Q.  Dan McKay?
11    A.  Dan McKay.
12    Q.  And where, physically, within Chevron's
13  company were you actually located when you worked with
14  SASBU?
15        MS. HAMASAKI:  Object on the grounds it's
16  vague.
17        Are you calling for a city or a building or
18  what?
19        MR. LEBOWITZ:  City is good enough.
20    Q.  How about a city?
21    A.  San Ramon.
22    Q.  And the ETC job with Zuma Omoregie, what city
23  were you working in for Chevron at that point?
24    A.  San Ramon.
25    Q.  And today you still work in San Ramon?
```

```
 1        A.    Yes.
 2        Q.    Are you what is considered an "ICE employee"?
 3        A.    I am.
 4              Well, yes and no.  ICE doesn't exist anymore,
 5   I don't think, but I'm an international employee.
 6        Q.    What does that mean that you're an
 7   international employee?
 8        A.    It means my home of record is outside of the
 9   U.S.
10        Q.    And what is your home of record, as far as
11   Chevron is concerned?
12        A.    United Kingdom.
13        Q.    And how long, all told, have you worked for
14   Chevron?
15        A.    About 17 years.
16        Q.    When did you first meet Kiran Pande?
17        A.    In the early '90s, I think.
18        Q.    How is it that you came to know Ms. Pande?
19        A.    We both worked on a project, on the same
20   project, for a few weeks.
21        Q.    Do you remember what project that was?
22        A.    It was the Bombay High project.
23        Q.    What were your respective job titles, at that
24   time, if you can recall?
25        A.    You mean functional job titles?
```

DEPOSITION OF JALALEDDIN AFIFI                                11

```
 1      Q.    Going back to Rex Mitchell for a minute.
              Did Ms. Pande ever tell you that she had made
 3   a formal complaint about Rex Mitchell?
 4      A.    Yes.
 5      Q.    What did she tell you in that regard?
 6      A.    She told me that she had talked to Rex's
 7   manager about the issues she had with Rex.
 8      Q.    Anything else she told you about making
 9   complains about Rex?
10      A.    I think she had told me he had taken Rex's
11   side.
12      Q.    And do you know Jay Johnson?
13      A.    I have never met with him, but he was the
14   manager.
15      Q.    Have you ever heard of anyone, other than
16   Ms. Pande, complain about Jay Johnson?
17      A.    No.
18      Q.    When was the last conversation you had with
19   Ms. Pande where she made comments to you about Jack
20   Dunn?
21      A.    I can't remember when exactly it was.
22      Q.    Do you remember what time of year it was?
23      A.    I'm just guessing, fall of '03, fall or winter
24   of '03.
25      Q.    So I mentioned the announcement of the move of
```

DEPOSITION OF JALALEDDIN AFIFI                              29

```
 1   SASBU from San Ramon to Houston; did you accept that
 2   move?
 3       A.   No.
 4       Q.   Did you formally decline that move?
 5       A.   Yes.
 6       Q.   And what was your understanding as to what
 7   would happen to your job when you declined to move to
 8   Houston?
 9       A.   You mean my job or my position?
10       Q.   What would happen to your status with Chevron.
11       A.   It could be terminated.
12       Q.   And what does that mean, "could be
13   terminated"?
14       A.   It means if you don't find a job within a
15   specified period of time, then you're laid off.
16       Q.   And what was the specified period of time that
17   you understood as a result of the announcement of the
18   move?
19            MS. HAMASAKI:  Object to the extent it calls
20   for speculation whether you're talking to him or
21   everybody.
22            You can answer, if you understand.
23            THE WITNESS:  There were different time
24   periods for different groups.
25            MR. LEBOWITZ:  Q.  I understand.  I'm only
```

DEPOSITION OF JALALEDDIN AFIFI                                30

```
 1       Q.   And just to be clear, these approximately ten
 2  jobs were all located in San Ramon?
 3       A.   No.  They were all located in California,
 4  mostly in the Bay Area.
 5       Q.   And when was it that your group within SASBU
 6  actually moved from San Ramon to Houston?
 7       A.   31st of December, '03, I think.
 8       Q.   And as of that date, did you have a new job
 9  within Chevron?
10       A.   My job -- the answer is yes and no.
11       Q.   Can you explain that, please?
12       A.   My job continued another month, but I did not
13  have a new job.
14       Q.   So if I understand correctly, your SASBU job
15  continued for another month in San Ramon?
16       A.   Not just mine.  It was two or three of us.
17       Q.   So two to three --
18       A.   There was no urgency for us to go to Houston.
19       Q.   So two to three SASBU members remained behind
20  in San Ramon and continued to work for SASBU after the
21  group moved officially to Houston?
22       A.   All within the Congo Group; it's a big
23  distinction.
24       Q.   I understand.
25       A.   Actually, it was two people.  Another person
```

DEPOSITION OF JALALEDDIN AFIFI                                32

```
 1   got a new job altogether, so it was two people.
 2       Q.   Do you need a break?  I saw you cringe in pain
 3   there.
 4       A.   Yes.
 5                      (Short break.)
 6
 7           MR. LEBOWITZ:  Q.  Okay.  Who were the folks
 8   in the Congo Group who remained behind in San Ramon
 9   after the group moved to Houston?
10       A.   Myself and Steve Zalan.
11       Q.   And what was Mr. Zalan's position at the time?
12       A.   He is an earth scientist.
13       Q.   And is it a fact that Mr. Zalan declined to
14   move to Houston?
15           MS. HAMASAKI:  Objection.  Calls for
16   speculation.
17           THE WITNESS:  He did decline.
18           MR. LEBOWITZ:  Q.  And how long did you
19   continue to work for SASBU in San Ramon after the group
20   officially moved to Houston?
21       A.   Just about a month.
22       Q.   And what happened at the end of that month?
23       A.   I started a new job.
24       Q.   That's when you started the ETC position?
25       A.   Yes.
```

```
1        STATE OF CALIFORNIA    )    ss.

2        I, the undersigned, a Certified Shorthand

3   Reporter of the State of California, hereby certify that

4   the witness in the foregoing deposition was by me duly

5   sworn to testify to the truth, the whole truth, and

6   nothing but the truth in the within-entitled cause; the

7   said deposition was taken at the time and place therein

8   stated; that the testimony of said witness was reported

9   by me, a Certified Shorthand Reporter and a

10  disinterested person, and was thereafter transcribed

11  under my direction into typewriting; that the foregoing

12  is a full, complete and true record of said testimony;

13  and that the witness was given an opportunity to read

14  and, if necessary, correct said deposition and to

15  subscribe the same.

16       I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  action.

21       IN WITNESS WHEREOF, I have hereunto set my

22  hand this 31st day of August, 2006.
```

_____
CERTIFIED SHORTHAND REPORTER