# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

KIRAN PANDE,                              )
                                         )
            Plaintiff,                    )
                                         )
        vs.                               )    NO. 04-5107 CW
                                         )
CHEVRON CORPORATION (f/k/a               )
CHEVRONTEXACO CORPORATION), a            )
Delaware corporation, CHEVRON            )
INTERNATIONAL EXPLORATION &              )
PRODUCTION (f/k/a                        )
CHEVRONTEXACO OVERSEAS                   )
PETROLEUM COMPANY), a division           )
of Chevron U.S.A. Inc.,                  )
                                         )
            Defendants.                   )
                                         )
                                         )
_____      )

---oOo---

DEPOSITION OF ROBERT BURKES

Thursday, August 24, 2006

---oOo---

*Certified Copy*

**EXHIBIT** _G_

REPORTED BY:  LISA P. GALLI, CSR NO. 12351

1    Houston.

2        Q.    Did Ms. Pande describe to you what she meant

3    by "unreasonable pressure" or give you examples of what

4    Mr. Dunn was doing that she interpreted as unreasonable

5    pressure?

6        A.    No.  Not that I recall.

7        Q.    Any other complaints that you heard from

8    Ms. Pande about Mr. Dunn?

9        A.    Yeah.  The time that she came into my office,

10   I think it was a break at the meeting that one of the

11   Block 14 groups was having.

12       Q.    Is this in the middle of the conference call

13   in early November 2003?

14       A.    Yes.

15       Q.    And when Ms. Pande came into your office, how

16   did she appear to you?

17       A.    She was crying or sniffling.  She had been

18   crying.

19       Q.    Prior to this moment where she came into your

20   office, had you ever seen Ms. Pande cry at work?

21       A.    No.

22       Q.    And did she tell you what was going on?

23       A.    In general terms, yes.

24       Q.    What did she say?

25       A.    She mentioned that Jack had wanted her to

1    complete some tasks that he described for some Block 14

2    work, and she explained that she would be going out on

3    medical leave, and he made some -- some -- some rude and

4    derogatory remarks at that time.

5        Q.    Did she tell you what those rude and

6    derogatory remarks were?

7        A.    No.

8        Q.    Did she tell you anything else in these

9    conversations?

10       A.    Yeah.   That -- that Jack was very mad and

11   angry.

12       Q.    What did you say in response to anything that

13   Ms. Pande was telling you?

14       A.    Well, I just expressed my sympathy for her

15   undergoing such an experience.

16       Q.    Did you give her any advice?

17       A.    I can't recall.

18       Q.    Do you recall anything else that Ms. Pande

19   said during this conversation?

20       A.    That's -- that's, basically, what I can recall

21   in my statement that there might be some -- a bit more,

22   but I can't remember right now.

23       Q.    And how long in total was Ms. Pande in your

24   office on this occasion?

25       A.    I don't remember exactly.

1                  STATE OF CALIFORNIA    )    ss.

2            I, the undersigned, a Certified Shorthand

3   Reporter of the State of California, hereby certify that

4   the witness in the foregoing deposition was by me duly

5   sworn to testify to the truth, the whole truth, and

6   nothing but the truth in the within-entitled cause; the

7   said deposition was taken at the time and place therein

8   stated; that the testimony of said witness was reported

9   by me, a Certified Shorthand Reporter and a

10  disinterested person, and was thereafter transcribed

11  under my direction into typewriting; that the foregoing

12  is a full, complete and true record of said testimony;

13  and that the witness was given an opportunity to read

14  and, if necessary, correct said deposition and to

15  subscribe the same.

16          I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  action.

21          IN WITNESS WHEREOF, I have hereunto set my

22  hand this 11th day of September , 2006.

23

24                                          
                                    CERTIFIED SHORTHAND REPORTER

25

# MERCURY INVESTIGATIONS

Email: mercury@mercuryinvestigations.com
License No.: PI 012115
349 Fifteenth Street
Oakland, CA 94612
Phone: (510) 268-9810
Fax: (510) 268-9806

RE:   KIRAN PANDE v. CHEVRON/TEXACO

## EXECUTED DECLARATION OF ROBERT BURKES

**ROBERT BURKES**

Residence:       8845 Skyline Blvd.
                 Oakland, CA 94611

Telephone:       510-530-3323 (residence)
California ID:   C5779168





CONFIDENTIAL

1256

## DECLARATION OF ROBERT BURKES

1. I Robert Burkes declare that:

2. My date of birth I August 24, 1949. I am Caucasian male.

3. I am currently employed by ChevronTexaco, Inc hereinafter, "CT" and have continuous service with CT since 1977. I started with the Gulf Oil Company before it was merged into Chevron. My initial job was Process Engineer and I worked mostly on chemical plant and refinery designs. In 1983 I transferred to the Gulf Oil Exploration and Production Company and became involved in offshore oil production facilities as a Senior Process Engineer. Since that time, offshore oil production facilities have been my specialty. At the present time, I am involved in the planning of facilities that are required for oil and gas production. "Facilities" refer to the hardware that is above the ground, such as pumps, pipelines, offshore platforms, gas processing plants, oil and gas separation, and dehydration, to name a few operations that I am involved with. As a Facilities Engineer, I have had different responsibilities at different times. I have been in project management and involved with project engineers. I am currently involved with Conceptual Field Development Planning and Cost Estimating and my job title is Facilities Advisor, which is like a consultant. This

DATED: __1/21/2005__                    _____

                                         ROBERT BURKES

1257

has been my job title since approximately 2000. Before that I was working on an offshore development project where I was a Facilities Team Leader, which started in 1998 and ended in 2000. I have been working out of CT's facilities in San Ramon, California since approximately 1991.

4. In approximately 1994, I met Kiran Pande as a co-worker at CT. From 1991 to 1995 I worked in the new ventures business unit for Chevron Overseas Petroleum Incorporated, hereinafter, "COPI." When I worked in COPI, I was doing conceptual field development planning for new opportunities and new ventures and cost estimating for oil and gas production facilities. In 1994 when I met Kiran, we began working on a project together on the same team. The project was a potential new venture that CT was pursuing at the time. The name of the team that Kiran and I were a part of was called Bombay High Development Offshore Oil Development, hereinafter, "BH." On that team I worked with Kiran for approximately 8 months from 1994 through the first half of 1995. I did not work again with Kiran until approximately 2000 when I was a Facilities Advisor. I then worked with Kiran until approximately the Fall of 2003. From 1995 to 1998 I was the head of a small group of facilities engineers in CT's oil production facility in Papua, New Guinea.

5. When Kiran and I were part of the BH team, Kiran was a petroleum engineer involved in reservoir simulation and reservoir engineering and

DATED: 1/21/2005 _____    _____

ROBERT BURKES

Page 2 of 22

1258

production forecasting.  At that time, Kiran's job was basically predicting how much oil might be produced under certain circumstances or in a certain area.  I was the person who handled the production facilities part of the job.  When Kiran and I worked on BH, I would see her just about every day and was well aware of Kiran's work product.  The size of the BH team varied, usually between 5 and 10 people.  I saw Kiran interact with the geologist Michael Clark who is still working for CT.  The boss and the head of the BH team was Stan Walker who has since retired.  James Bates was another engineer on the project who was coordinating the technical assistance that was being provided by Chevron Petroleum Technology Company, hereinafter, "CPTC."

6.  When Kiran and I were on the BH team, there was a computer room where special computers were set up to do the simulation work that Kiran was doing. Since the facilities work is dependent on the production forecast that is developed, I would go by the special computer room a couple of times a day where Kiran worked.  Some of the time Kiran and I would sit down and talk about a particular issue and at other times I would be briefly in and out of that room. Kiran and I were both involved in the BH project about 40 or more hours a week. Just about everyday I would see Kiran anywhere from a few minutes to maybe a half an hour.  Kiran and I were both involved in team meetings together that

DATED:  1/2/2005                                    Robert Burkes

                                                         ROBERT BURKES

might last for several hours. The team meetings were held at least once a week or more. In the time I worked with Kiran on the BH team, I would rate her work product very high. On the BH team, Kiran was one of the key members of the team and was highly regarded for the work that she did. Kiran was a very effective team member, meaning that she was always ready with her part of the project. I also saw Kiran's work product because I needed it for the work that I was doing.

7. When Kiran and I worked together from 2000 to 2004, we worked for an operation that was called the Southern African Strategic Business Unit, hereinafter, "SASBU," which was located at CT's facilities in San Ramon, CA. At SASBU, there were two different groups, one was New Projects, which I was in, and the other group was Block 14 group, which Kiran was in. While working at SASBU, my boss was Randy Dahlman and Kiran's boss was Jack Dunn. At SASBU because Kiran and I worked in different groups, I interacted with her as a colleague and friend. Kiran's work at SASBU was involved in oil operations in a different area than I was involved with. Although, SASBU was responsible for offshore oil development in Cabinda, Angola, I was involved with Block 0 projects and Kiran was involved in Block 14 projects. The Blocks refer to subdivisions of

DATED: 1/21/2005 _____                    _____ Robert Burkes

ROBERT BURKES

Page 4 of 22

1260

offshore Angola and were the two areas where CT was the operator for exploration and oil development projects. When Kiran and I both worked at SASBU, I never heard any complaints or anything negative about her or her work at any time from anyone.

8. David McKay, a CT colleague told me on several occasions that Kiran Pande was one of the people that could put together a very effective oil reservoir simulation. David told me this in regard to the period when Kiran was working with one of CT's partners TOTAL (a French oil company) around 1997 or 1998. This was while I was working in Papua New Guinea and Kiran was working a fair amount of time in France. David commented on Kiran's work as stated above when she was involved with TOTAL.

9. It is my understanding when Kiran completed her work with TOTAL, she transferred to the COPI Planning Group in San Ramon, California. Subsequently after Kiran left the Planning Group, in approximately 2003, Kiran told me that she had some severe problems concerning harassment at that time with her manager, Rex Mitchell. Kiran told me that she tried to go through company channels to resolve these complaints she had with Rex but nothing was ever followed up on and her issues were never really resolved. When Kiran told me

DATED: 1/21/2005

ROBERT BURKES

Page 5 of 22

1261

about her complaints about Rex, she shared with me her frustration in not receiving fair treatment by management regarding any resolution to her complaints. Kiran told me that in her opinion Rex had exhibited behaviors which were objectionable and which were totally against CT policy. Kiran further relayed to me that Rex had not received any type of reprimand or discipline for his objectionable behavior. Kiran said that the whole issue of her complaints about Rex were basically shushed up and were not properly investigated or dealt with.

10.  Sometime in the early part of 2002 when Chevron merged with Texaco to form CT, rumors started circulating at CT that the SASBU group was going to move from San Ramon, California to Houston, Texas. It is my understanding that the reason for the SASBU move to Houston had to do with the merger of Chevron into CT. It was my understanding that once the merger happened, there were merger integration teams that met to look at where the work was being conducted. The merger integration teams made some decisions to consolidate SASBU to one location rather than having part of the SASBU in San Ramon and part in Houston. It was my understanding that management made a recommendation to consolidate the SASBU work that was being done in San Ramon with what the Texaco people were doing in Houston. Sometime in the

DATED:___1/21/2005___                          Robert Burkes

ROBERT BURKES

Page 6 of 22

1262

first half of 2002, CT management decided not to make the move to Houston, but told us in SASBU that we would probably hear more about a move to Houston later. In May of 2003, Mark Dando, the manager of SASBU in San Ramon sent an email to everyone in the San Ramon SASBU group. The email stated words to the effect that, "We are looking at the possibility of moving to Houston and we will let you know once we complete our study and make our decision."

11. In June of 2003 there was a town hall meeting, hereinafter, "THE MEETING," of the SASBU employees. THE MEETING was held at CT. The SASBU managers that attended that meeting were Mark Dando, Jack Dunn, Randy Dahlman and Eric Davidson who is responsible for the exploration group. Personnel from the Human Resources department also attended THE MEETING. There were also people at THE MEETING who had information about moving, moving benefits, and how the company would work with you in the process of selling your home. At THE MEETING, Mark Dando told everyone that there was a job for everybody in the SASBU group in Houston and that he hoped we would all move to Houston. Mark Dando also made a Power Point presentation as he spoke to the group. Not counting the bosses or Human Resource people, there were about 60 to 70 people in attendance at THE MEETING.

DATED:_____1/21/2005_____    _____Robert Burkes_____

                                                                            ROBERT BURKES

1263

12.   After THE MEETING, a human resources form, essentially a job offer, hereinafter, "THE FORM," was passed out to all the employees.  There were two places to sign on THE FORM, one was next to the "Yes, I will accept the job offer in Houston" and the other place was, "No, I will not accept the job offer in Houston."  So by accepting the job offer in Houston, you were saying that you agreed to move to Houston.  If you did not accept the job offer in Houston, then you signed at the place, "No, I do not accept the job offer in Houston."  If you signed "no" to the Houston job offer then THE FORM stated words to the effect that "I understand that there may not be other jobs available to me and but that I will have the opportunity to look for other jobs at CT."  After THE MEETING, I asked Mark Dando privately if we had to sign THE FORM.  Mark then told me that I did not have to sign THE FORM but if I did not sign THE FORM, my response to the question about wanting to move to Houston would be considered a "no."  I did not sign the form.  It was my understanding that for any SASBU people who did not want to go to Houston and did not want to find another job there was no other alternative to choose such as a severance package.  In fact, Mark Dando said at THE MEETING that "there would be no guarantee that a severance package would be available for people who did not want to move to Houston and who did not find another job at CT."  This was also stated in the reading material that was given to the group at THE MEETING.

DATED: _1/21/2005_                                    _Robert Burkes_

                                                        ROBERT BURKES

Page 8 of 22

1264

13. On the one hand the CT management made the statement very clearly that they could not guarantee the availability of the severance package. However, I and the other employees that were impacted by the move to Houston knew that CT had always given severance packages to employees under these circumstances, such as the SASBU move to Houston. My colleagues and I knew that employees in a different division that were being asked to move to Houston were being offered severance packages in the case where they did not accept a job in Houston and did not find another job at CT. To my knowledge, the divisions that were offered the severance package were the Energy Technology Company, hereinafter, "ETC " [also known as the Chevron Texaco Energy Technology Company] and the Chevron Information Technology Company, hereinafter, "CITC," groups. I became aware that these groups were being offered severance packages because a female colleague, hereinafter, "THE COLLEAGUE" in the ETC group that was being asked to move to Houston shared with me in July or August of 2003 the contents of severance package she was offered. I don't want to say THE COLLEAGUE'S name that was offered a severance package because I want to protect her privacy.

14. It was my understanding in 2003, that CT had what they called the Surplus Employee Severance Program, hereinafter, "SESP." THE COLLEAGUE

DATED: 1/21/2005

ROBERT BURKES

Page 9 of 22

1265

showed me that CT offered her participation in the SESP. The SESP had several features, but for me the most notable feature was that if you accepted the program then you would agree to not take any sort of legal action against CT. My understanding was that if you made that agreement you would get severance pay which would be equal to two weeks per year of service up to a maximum of one year's salary. In addition, you would also get redeployment benefits where you can work with a professional counselor who will help you market yourself on the outside. It was my understanding that the professional counselor used for the redeployment of an employee was outsourced. When I saw the severance package that was offered to THE COLLEAGUE, I found it extremely unfair that CT would treat employees in such a manner as to offer one group a severance package and other groups no guarantee of a severance package. Even though ETC and CITC were not part of the SASBU group, they were still a part of CT Corporation and it did not make sense to me that CT would treat each group so differently regarding severance packages. I was so upset by this unfair treatment that in October or early November of 2003, I made an oral complaint, hereinafter "THE SEVERANCE PACKAGE COMPLAINT," to CT's Ombuds person Gary Yamashita, about the fact that some groups were offered a severance package, and some were not

DATED: 1/21/2005

ROBERT BURKES

Page 10 of 22

1266

15.  Gary's initial response to THE SEVERANCE PACKAGE COMPLAINT was total shock.  Gary also said he was disappointed that CT would treat employees that way.  However, subsequently Gary told me words to the effect that, "They [CT] have checked it out and they [CT] know it is legal."  When I first contacted Gary, he told that me that he might make a few notes to himself to remind him to do this or that, but he does not keep files regarding complaints. Even though I emailed Gary some information regarding THE SEVERANCE PACKAGE COMPLAINT, Gary told me that he would not keep a file regarding my complaint.

16.  Instead of pursuing THE SEVERANCE PACKAGE COMPLAINT with Gary, I decided to look for another job at CT through the Personal Development Committee, hereinafter, "PDC" meetings.  About twice a year CT has PDC meetings where managers of various divisions get together and discuss job openings in their group.  The managers that need jobs to be filled bring all the open positions that they have.  At the same time the resumes of the CT people who need to find jobs are brought to the PDC meetings.  It is my understanding that only very senior managers are allowed to attend the PDC meetings.  I then went to Gary and told him that CT had job vacancies and also project jobs available.  For example when CT has a project job, typically CT does a first round

DATED: 1/21/2005

_Robert Burkes_

ROBERT BURKES

Page 11 of 22

1267

of engineering in one location and the second round of engineering which can be in a second location. Finally CT will construct for example an offshore facility somewhere in Asia or typically in Korea. After the project is constructed the whole thing is transported to the oil field, for example say Southern Africa, where it is installed. Basically an employee can be moving around the world as these projects are developed. So I told Gary that I was quite happy to go onto a project and follow it as it moved around from location to location and then to the place where the installation would be done. I then told Gary that I was not willing to pick up and move my place of residence to Houston, but that I would accept extensive travel to work on a project. Gary then told me that working on a project showed CT some flexibility on my part. Gary then advised me to put together a letter, hereinafter, "THE LETTER," explaining my willingness to follow a project. Gary also advised me that I should say in the letter that the company could really save some money by doing that as opposed to paying me to sell my house and move to Houston. After meeting with Gary, I wrote THE LETTER.

17. In late November of 2003, I submitted THE LETTER to CT. A few days after I submitted THE LETTER, Roy Krzywosinski, a manger in Angola responded to THE LETTER. In his response, Roy basically said, "No. Thank you for your thoughts but we are going to move and concentrate everybody in Houston and we will hope you will join us."

DATED: ___1/21/200_____          *Robert Burkes*

ROBERT BURKES

Page 12 of 22

1268

18. Sometime in October 2003, around the same time I submitted THE LETTER I received another job offer via email to go to Houston, hereinafter, "THE SECOND HOUSTON OFFER." THE FORM that was given to me in THE MEETING was offered to me a second time which I understood to mean that I was being given a second chance to consider moving to Houston. Roy Krzwoninski, the SASBU Manager Major Capital Project generated THE SECOND HOUSTON OFFER to me. In SECOND HOUSTON OFFER email, I was basically being told that, "This is it. This is your job offer. If you don't take it there will be no severance package for you and you will be terminated early next year." In January of 2004 I received a letter in the mail at home from CT that basically said, "You did not accept our last offer. If you have not found a job, you will be terminated as of February 6, 2004." However, in late January of 2004, I found a job that was posted on CT's website. The job I found was going into the Energy Technology Company of CT. When I applied for this job, I campaigned for it by talking to the supervisor for the new job and talking to the various customers that the ETC group worked for. I gave the supervisor for the new job a skill set resume consisting of one page. It was approximately two months from the time I submitted THE LETTER to the time I found another job at CT in late January of 2004.

DATED: __1/21/2005__                    Robert Burkes

ROBERT BURKES

Page 13 of 22

1269

19.  It was my understanding that the move to Houston was done in phases. The first group moved in August of 2003 and then the second and last group left for Houston in December of 2003.  If I had moved to Houston, I would have been in the second group.  My understanding was that the time schedule for each group's move to Houston was based upon the availability of the remodeled offices in Houston, the work each group was doing and what time the disruption of moving would have the least impact on the group's work.  During the fall of 2003, I was on a project team that was very busy.  It was determined that if the project my team was working on was moved in the fall of 2003, the project would have been delayed.  It is my understanding that the group I was working with at SASBU did not actually move to Houston until February 2004 even though the initial plan was for the group to move in December of 2003.  It was my understanding that Kiran Pande was working in the SASBU Block 14 group that moved to Houston in December of 2003.

20.  At THE MEETING, a lot my colleagues and I felt very intimidated.  There was not much discussion at THE MEETING.  At THE MEETING, employees with additional questions were encouraged to talk to Fiona Young, a Human Resource person.  When I raised the severance plan package to Fiona, Fiona told me words to the effect that "don't assume you will be offered severance".

DATED: 1/21/2005

ROBERT BURKES

Page 14 of 22

1270

Even when Roy responded "No," to THE LETTER, Roy told me words to the effect that "by virtue of your turning down this job offer [SECOND HOUSTON OFFER] you would not be considered to be eligible for the Surplus Employee Severance Program." I was never told that I would not get the severance package, but that I would not be considered to be eligible. It seemed as if the choice of words were deliberately confusing and that CT wanted to retain the option to offer severance packages if they so decide. It was my and several colleagues' understanding that CT was playing a game because CT really wanted the SASBU employees to move to Houston because CT is shorthanded in facility engineers and petroleum engineers. On projects that I have been involved in, my group has struggled to get petroleum engineers. When I first worked on the SASBU project, our first petroleum engineer, a Canadian, transferred to CT's facilities in Winnipeg, Canada. Sharon Unser, a petroleum engineer then replaced the Canadian who transferred. Sharon Unser resigned in July of 2004 and it was my understanding that she did not like the way she had been treated by CT. I believe that Susan Unser worked for CT for approximately 15 years prior to her resignation. To my knowledge, Susan Unser's position has not been replaced as of today, because there are not enough petroleum engineers working at CT. In addition, I have heard Chris Riccobono, my former

DATED: 1/21/2005

ROBERT BURKES

Page 15 of 22

1271

boss and team leader, say over the past year how he has struggled to fill petroleum engineering and facility engineering jobs.

21. My colleagues and I felt that CT really did not want to lose any engineers or geologists as a result of their decision to move the group to Houston because there was a shortage of these skills. CT needed our skills and wanted us to continue to work in Houston. The move to Houston was to streamline the business. SASBU is responsible for operations in Angola. Houston is two time zones closer to Angola than San Ramon, so that gives the company more time during the day for SASBU to converse with the people in the Angola operation. It is my understanding that CT needed us and the company did not want to mention anything about any severance packages. The company did not want to provide an incentive for the SASBU people to think there was any other option other than to move to Houston or risk being terminated. At THE MEETING, Mark Dando told the group that, "We want you to move to Houston. We are not going to offer severance packages because we want you to move to Houston." Also the package of information that was handed out at THE MEETING, said basically that, "We don't want to provide any incentive for people that would not want to move to Houston." To my knowledge, this is why CT, through Mark Dando, Chris and the Human Resource people were misleading employees as to the availability of a severance package, by saying that CT could not guarantee

DATED: 1/21/2005                                    _Robert Burkes_

                                                    ROBERT BURKES

Page 16 of 22

1272

anyone who did not move to Houston a severance package or that we would not be considered to be eligible for a severance package. I felt that CT was misleading me and other employees by not honestly answering my questions regarding the severance package availability because CT never unequivocally said that we would not get a severance package if we did not move to Houston. The severance package issue was discussed in THE MEETING, and in addition I raised the severance package question with Mark Dando, Chris and the Human Resource people afterwards.

22. To my knowledge as many as 10 people did not move with the SASBU group to Houston and 8 that I remember are: Gordon Seto, Natalie Talbert, Tom Millette, Jalal Afifi, Graham Housen, Mike Clark, Steve Zalan, and Kiran Pande. To my knowledge Kiran Pande was the only person who was terminated from CT because she did not move to Houston and was not offered another position at CT. All of the people I mentioned above are still working for CT. Sometime in approximately November of 2003, while Kiran Pande was out on medical leave, she told me that she was terminated from CT. It was my understanding that Kiran told me about her termination within a few days of her receiving her termination letter.

23. It is my understanding based upon how it has happened in the past at CT, that when an employee is asked to move more than 50 miles, if the

DATED: 1/21/2005                           Robert Burkes

                                    ROBERT BURKES

Page 17 of 22

1273

employee chooses not to make the move, they are offered a severance package. It is my understanding that those words are contained in the text of a severance package that is offered to an employee who decides not to move when asked by CT. However, at that time, there was nowhere that I could find in writing that says that CT will offer the severance package to everybody who is asked to move more than 50 miles. Basically what CT does is they have a severance package, but they retain the right to determine if you are eligible for the severance package or not.

24. After I turned down the move to Houston, my work situation remained normal in that I was still given work to do and I continued to do my work as I always had in the past. I felt that if I continued to be a good employee and do a good job that CT would treat me fairly and I would receive another position at CT. When I turned down the move the Houston, none of the managers or anybody mistreated me and I continued to work as hard as I did in the past. In fact I was still allowed to continue to work in San Ramon for SASBU even after the main work group had moved to Houston in August 1, 2003. After I transferred to the ETC group in January of 2004, I was no longer working for SASBU but SASBU still needed me. So even though I was working for ETC, I continued doing the same job I had done previously for SASBU from San Ramon for all of March and

DATED: 1/21/2005

ROBERT BURKES

Page 18 of 22

1274

through the end of April 2004. I then became interim project manager for SASBU because Mark Klimowitcz resigned and I was asked to take his place until another manager could be found. When I took the interim manager job, I told CT that I would not permanently relocate to Houston but that I would stay a week or two and come back to my home to the Bay Area every other weekend. That job lasted until August of 2004 when Jay Morris was hired to be a Project Manager for SASBU.

25. To my knowledge, none of the SASBU people who did not want to relocate to Houston, received new job assignments from the October 2003 PDC meeting, even though they submitted their resumes at the October 2003 PDC meeting. When I asked Gary Yamashita about a week after the PDC meeting occurred if I, Kiran and the other people who did not accept the move to Houston were being blacklisted at the October 2003 PDC meeting, Gary would not admit to it but he would not deny it either. It was around the time of the October 2003 PDC meetings that Kiran complained to me on multiple occasions that her boss Jack Dunn was browbeating and badgering her to move to Houston. On another occasion around the fall of 2003, Kiran came into my office during a break in a meeting she was having with Jack Dunn and other people. When Kiran came into my office, she was in tears. Kiran told me that Jack had made rude and

DATED: 1/21/2005

_Robert Burkes_

ROBERT BURKES

Page 19 of 22

1275

derogatory comments about her in front of other people in the meeting. As I recall the issue, it was Jack's insistence that Kiran complete a certain job assignment even though Kiran had explained that she would be going on Medical Leave. At the time Kiran was articulate but she was definitely emotionally upset with tears coming down her cheek, but in no way hysterical. I also could tell that Kiran was upset because her voice was choking as she spoke to me. After spending about 10 minutes in my office, Kiran left and returned to the meeting.

26. A few weeks after the October 2003 PDC meeting I emailed Fred Van Etten, the Personnel Development Sponsor and the organizer of the PDC meeting. In the email I asked Fred how many unfilled jobs there were. Fred then emailed me a list of over 100 unfilled jobs. I went through that list and saw that there were 30 or 31 jobs that were jobs that I could be a reasonable candidate for. Some of the jobs I had even performed in the past.

27. My immediate supervisor, Chris Riccobono supported me when I applied for the position at ETC in San Ramon. Chris told me in August or September 2003 that he asked other managers if they had any positions for me. It is my understanding that Chris was actively looking for another job for me at CT up until I got the position at ETC in January 2004. Typically, when you apply for a job at CT you are given a self-assessment form. In that self-assessment form

DATED: 1/21/2005

ROBERT BURKES

Page 20 of 22

1276

the various dimensions of the job are listed and you are asked to provide what you think you could contribute to that particular dimension or how you have had some experience with that particular dimension. On the self-assessment form there is a column for you fill out and next to that is a column for your boss to fill out. Your boss basically comments on your comments. It is my understanding that if your boss does not have positive comments on the form, you would not be considered for the job you are applying for.

28. Based upon my past work with Kiran and the current workload at ETC, I felt that Kiran could have been given a temporary job in ETC. My current boss is Zuwa Omoregie. Zuwa's group is Asset Evaluation and Operation Support and I know that there is plenty of work in Zuwa's group that Kiran could contribute to. There is no doubt that ETC could use Kiran's job skills because CT is short of petroleum engineers. I know of that shortage first hand by not being able to fill petroleum engineer positions in ETC. Currently I know that Jalal Afifi will be leaving my current group at the end of this year and my group is looking for a person to fill his position as a petroleum engineer.

29. I have always known Kiran to be an extremely professional woman while working at CT. Kiran could be direct in a meeting. If somebody would say something that she did not agree with, Kiran would always respond and say

DATED: 1/21/2005

ROBERT BURKES

Page 21 of 22

1277

something to the effect that "I see it differently and let me explain how I see it." I always observed that Kiran was unfailingly polite and business-like in her job, and highly regarded by her colleagues.

30. I have never been a part of any CT investigation regarding Kiran, Rex Mitchell, Jack Dunn, harassment issues and/or discrimination issues. No one at CT has ever talked to me about Kiran and/or Kiran's work performance and work product. To my knowledge, I never heard of any investigation taking place at CT regarding Kiran's complaints about Rex Mitchell or about any other complaints.

31. I have read this foregoing Declaration. I have personal knowledge of the matters stated herein, and if called as a witness I would competently testify to such matters under oath.

32. I have given this twenty-two page Declaration to Private Investigator Anne Vode of my own free will, without promise of reward or with force of any kind. I have had the chance to read and revise this Declaration.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed at ___Oakland___ California on __1/21__ 2005.

_____
ROBERT BURKES

Page 22 of 22

1278