# EXHIBIT J

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

```
KIRAN PANDE,                           )
                                       )
             Plaintiff,                )
                                       )
VS.                                    ) Case No. 04-5107 CW
                                       )
                                       )
CHEVRON CORPORATION (f/k/a             )
CHEVRONTEXACO CORPORATION), a          )
Delaware corporation, CHEVRON          )
INTERNATIONAL EXPLORATION &            )
PRODUCTION (f/k/a                      )
CHEVRONTEXACO OVERSEAS                 )
PETROLEUM COMPANY), a division         )
of Chevron U.S.A. Inc.,                )
                                       )
             Defendants.               )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
KATHY MABE
OCTOBER 18, 2006

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of KATHY MABE, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on OCTOBER 18, 2006, from 2:02 p.m. to 3:41 p.m., before Lorri Lucas, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Bayou City Reporting, 1135 East 11th Street, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



**Bayou City Reporting inc.**

EXHIBIT ___J___

1135 East 11th Street • Houston, TX 77009
Phone: (713) 861-8589 • Toll Free: (888) 577-5048 • Fax: (713) 861-1729 • Email: bcrdepo@sbcglobal.net

1      MS. MILLER: I'm only pointing out that I
2 think it's ambiguous as to a particular word. If she
3 doesn't understand -- if she understands it, I'm sure
4 she'll answer.
5      Q    (BY MR. LEBOWITZ) Did you talk to Mark Krolow
6 after this meeting about Mr. Dunn's conduct?
7      A    Yes.
8      Q    Why did you go to speak to Mr. Krolow?
9      A    I felt that Jack should be counseled on not
10 speaking loudly to people in meetings.
11     Q    In what form did you communicate with
12 Mr. Krolow? Did you speak with him on person, on the
13 phone, or he --
14     A    On the phone.
15     Q    And what specifically did you tell Mr. Krolow?
16     A    I told him that I felt Jack was -- that his
17 voice, his tone of voice, was -- was too loud and that I
18 felt that Kiran was a very soft-spoken person and not
19 confront -- confrontational at all and that I -- you
20 know, I've gotten into arguments with Jack before and,
21 you know, I raise my voice, too, and it doesn't bother
22 me. But I could see that it bothered Kiran and I felt
23 like he should be counseled on how to interact with --
24 with -- with people to do a better job.
25     Q    Did you tell Mr. Krolow that Mr. Dunn had been

1  confrontational towards Ms. Pande during this meeting?
2      A    I don't know if I used the word
3  "confrontational." I don't remember. It's been so long,
4  I don't remember the exact word.
5      Q    Do you have any recollection of what word you
6  used to describe Mr. Dunn's interaction with Ms. Pande
7  during this meeting in your conversation with Mr. Krolow?
8      A    I remember using, you know, "loud voice." I
9  don't remember if I used the word "confrontational."
10     Q    Did you use the word "yell"? Did you describe
11 to Mr. Krolow that Mr. Dunn was yelling at Ms. Pande
12 during the meeting?
13     A    I don't remember using the word "yell."
14     Q    And why did you go to Mr. Krolow to make -- to
15 express your feelings about Mr. Dunn's conduct?
16     A    Because I felt like that he -- he should be
17 aware of his conduct and I left it up to him as to what
18 he wanted to do about it. I just felt like he should be
19 aware.
20     Q    Mr. Krolow was Mr. Dunn's supervisor at the
21 time?
22     A    Yes.
23     Q    In this conver-- well, did you have any more
24 conversations with Mr. Krolow about Mr. Dunn's conduct
25 during this meeting other than the one telephone

1    conversation you've described to me?

2    A    No.

3    Q    Did you -- in this telephone conversation with

4    Mr. Krolow, did you talk to him about any other instances

5    where Mr. Dunn was acting in a way that you felt he

6    needed to be counseled?

7    A    No.

8    Q    So the sole purpose of this call to Mr. Krolow

9    was to relate to Mr. Krolow that -- your opinion that

10   Mr. Dunn should be counseled based on his -- his

11   interactions with Ms. Pande during this -- this meeting.

12   Is that correct?

13   A    Can you re--

14   Q    Sure.

15   A    Say that again?  It was a long question.

16   Q    I understand.  So the sole purpose of the

17   meeting -- of the conversation you had with Mr. Krolow

18   was to tell him your opinion that Mr. Dunn should be

19   counseled because of Mr. Dunn's interactions with

20   Ms. Pande during this one meeting.  Is that correct?

21            MS. MILLER:  I'm going to object.  The

22   question mischaracterizes her testimony.

23   Q    (BY MR. LEBOWITZ)  Is that correct?

24   A    Yeah.  I don't know if that's correct.  That's

25   a very long way of putting --

part of the phone conversation talking about Jack Dunn and another part of the conversation talking about something completely unrelated to Jack Dunn. Is that what you're telling me?

A   Correct.

Q   Okay.

A   I don't remember.

Q   Okay. And what did Mr. Krolow respond to you when you told him your opinion about Mr. Dunn?

A   He told me that he was glad that I let him know and that -- that he would deal with it. And I also asked him for it to be in confidence and he told me that he would not tell, you know, anyone as -- you know, as far as Jack, he wouldn't go and tell Jack or other people in the group.

Q   And why were you concerned that it should be held in confidence?

A   Because Jack is my supervisor.

Q   And why were you concerned if Jack learned about your conversation with Mr. Krolow?

A   Because I did not want him to have negative feelings about me. I -- I didn't know Jack very well at that point, so I didn't want him to have negative feelings about me and I felt like I would be -- you know, that he didn't need to know.

Page 40

1  minimum and keep your objections to form, please.
2       Q    (BY MR. LEBOWITZ)  Did you ever tell anybody
3  that you felt that you were going -- you potentially
4  would be retaliated against by Mr. Dunn if he learned
5  that you had expressed your opinions to Mr. Krolow?
6       A    I would not use the term "retaliated," no.
7       Q    Would you use another word that is similar to
8  "retaliated"?
9       A    This is not a "yes" or "no" answer.  It would
10 just be like you -- it's not a fear of retaliation.  It's
11 a -- it's more about not -- I mean, it would be just like
12 if you criticized someone but you wouldn't want to
13 criticize them to their face because you wouldn't want to
14 hurt their feelings, you wouldn't want them to not feel
15 the same way about you.  It's more like that.  It wasn't
16 like I thought Jack was going to hurt me in any way.  It
17 was more about a comfort of working with someone.  If
18 you -- it's just like if you're a supervisor and you
19 correct some -- a lot of people don't like to correct
20 other people because then, you know, it comes with a
21 different relationship.  So it was more like that.  I
22 didn't want to -- I knew that I was going to be working
23 for Jack and I didn't want to ruin my relationship with
24 him.
25      Q    Did you ever express to anyone else other than

1  Mr. Krolow your concerns about Jack Dunn's conduct on
2  this one day in this one meeting?
3       A    Yes.
4       Q    Who was that?
5       A    My mother.
6       Q    Anybody else?
7       A    Roger Severson.
8       Q    Anybody else?
9       A    I'm sure I did. I don't remember everyone I
10 ever talked to about it. I -- I don't remember. I'm
11 sure if -- I probably talked to other people about it but
12 it would be people close to me.
13      Q    How about Jeff Shellaberger?
14      A    Oh, yes. Jeff Shellaberger.
15      Q    And what was Mr. Shellaberger's position at the
16 time you talked to him about Mr. Dunn?
17      A    He was Krolow's manager.
18      Q    Did you speak to Mr. Shellaberger before or
19 after you spoke with Mr. Krolow?
20      A    Before.
21      Q    And -- or how did you speak to
22 Mr. Shellaberger? In person, on the phone, or by e-mail?
23      A    Phone.
24      Q    Did you call him or did he call you?
25      A    I don't remember.

1   Q   Did you -- or why did you communicate with
2   Mr. Shellaberger about Mr. Dunn's conduct at this
3   meeting?
4   A   I told him the same thing I told Mark Krolow.
5   Q   And what did -- well, I guess my question was
6   more why.  Why did you go to Mr. Shellaberger?
7   A   Because I worked with Jeff before and I didn't
8   Mark, so I felt comfortable just telling him.
9   Q   And --
10  A   And he asked me to --
11  Q   I'm sorry.
12  A   He asked me to tell Mark Krolow.
13  Q   Did he have -- did Mr. Shellaberger have any
14  other -- any other response to your concerns?
15  A   He thanked me and he -- and pretty much just
16  told me, you know, that "Would it be okay for Mark to
17  call you and you tell him exactly what you told me?"
18  And -- and so I pretty much had the same conversation
19  with Jeff that I did with Mark.  I just repeated what I
20  had told him about the behavior.
21  Q   How soon after the meeting did you call or did
22  you speak with Mr. Shellaberger?
23  A   I don't remember the exact timing.  It was
24  definitely within a month.
25  Q   Was it closer, maybe within a couple days or --

1  I know you put it within a month.  Is there any closer
2  time you can get it to?
3      A   It probably was within two weeks.  I don't
4  remember the exact time.
5      Q   And so at the time you called -- or you spoke
6  with Mr. Shellaberger, were you aware that the leave that
7  Ms. -- Mr. Dunn was talking about was a medical leave?
8      A   Yes.
9      Q   And did you relate to Mr. Shellaberger that
10 what Mr. Dunn was commenting on in a meeting was
11 Ms. Pande's medical leave?
12         MS. MILLER:  I'm going to object.  It
13 mischaracterizes her testimony.
14     A   I don't remember.
15     Q   (BY MR. LEBOWITZ)  Tell me everything you can
16 recall as to what you told Mr. Shellaberger that Mr. Dunn
17 did during the meeting that you felt he needed counseling
18 for.
19     A   The -- the tone of his voice and he also
20 pointed his finger at her, at Kiran.  That -- that was
21 the main thing are those two things.
22     Q   Did you tell Mr. Shellaberger the substance of
23 what Mr. Dunn was saying when he was -- had an elevated
24 tone of voice and pointing his finger at Ms. Pande?
25     A   He -- he never said anything that was -- I

Page 44

1  mean, he -- he didn't use bad language. It was really
2  the tone of his voice and -- I mean, he never made a
3  reference to her leave of absence. He just said that he
4  would -- she would not be there to do the work.
5      Q   No. I understand that. My question -- I
6  understand that's your testimony that that's what
7  Mr. Dunn said. My question, though, is: When you were
8  speaking to Mr. Shellaberger --
9      A   Right.
10     Q   -- did you relate to Mr. Shellaberger the
11 substance of Mr. Dunn's comments? For instance, did you
12 say to Mr. Shellaberger that Mr. Dunn was using an
13 elevated tone of voice, pointing his finger, and
14 commenting to -- saying things to the effect of
15 "Ms. Pande is not going to be here"?
16     A   I don't remember if I -- it wasn't that he
17 was -- I mean, it really had nothing to do with what came
18 out of his mouth. It was -- it was his tone of voice
19 that bothered -- that concerned me. So that was the
20 behavior that I felt like should be corrected, that -- I
21 just believe that when you're in a meeting that you
22 shouldn't -- you know, you're in the office environment,
23 you shouldn't, you know -- I think people raise their
24 voice all the time but when it bothers someone, that's
25 when you shouldn't.

```
 1   the other whether anybody talked to Mr. Dunn about -- in
 2   any way related to your expressions that he needed to be
 3   counseled?
 4        A    No.
 5        Q    And have you ever spoken directly with Mr. Dunn
 6   about his conduct at this meeting?
 7        A    No.
 8        Q    What conversation did you have with Roger
 9   Severson about -- in relation to this meeting?
10        A    I -- I knew that Roger was on the phone and
11   when I talked to Jeff, I told him that, you know, he
12   should get another person's opinion, you know, don't --
13   don't just count on me but why doesn't -- why doesn't he
14   talk to someone else.  And I said, you know, Roger was on
15   the phone and he can -- he could ask him about the
16   meeting.  And so Roger actually came to me and -- and
17   said that he had also talked and I don't remember if he
18   talked to Jeff or if he talked to -- I think he talked to
19   Mark Krolow but I'm not sure.
20        Q    So Roger Severson came to you and said that he
21   had -- correct me if I'm misunderstanding, but that he
22   had been called by either Mr. Krolow or Mr. Shellaberger?
23        A    I think that's how it happened.
24        Q    And when Mr. Severson came to you, did it
25   appear that he knew that you had also spoken with them?
```

```
 1    A    I think he approached me more questioning.
 2    Q    "Had they called you, too," kind of thing?
 3    A    That -- yes.
 4    Q    Okay.  And describe for me what -- what you can
 5  recall from your conversation with Mr. Severson.
 6    A    I just remember, you know, that he felt the
 7  same as -- as I did, that his tone of voice was too loud
 8  and...
 9    Q    Anything else you can remember from your
10  conversation with Mr. Severson?
11    A    No.
12    Q    Any other Chevron employees you can recall
13  talking to about Mr. Dunn's conduct during this meeting?
14    A    Teyo.
15    Q    Teyo Feyijimi?
16    A    Yes.
17    Q    And what was that conversation?
18    A    We -- we just felt -- both of -- we just
19  discussed the same as Roger and I, that his tone of voice
20  was -- was too loud.
21    Q    And describe for me how it was that you and
22  Mr. Feyijimi started talking about this topic.
23    A    It was right after.  It was like the week of
24  the -- the incident and Teyo and I are really good
25  friends and we were both -- we were both friends with
```

```
 1   Kiran and -- and so we were concerned about Kiran leaving
 2   and her medical condition.  And so just in the
 3   conversation, we talked -- you know, we just discussed
 4   it.
 5       Q    And what did Mr. Feyijimi say about his
 6   impressions of Mr. Dunn's conduct during the meeting?
 7       A    We just agree -- you know, similar, that his
 8   tone of voice was too loud.
 9       Q    You said you and Mr. Feyijimi talked about your
10   concern for Ms. Pande in relation to her medical
11   condition.  At the time you had this conversation with
12   Mr. Feyijimi, did you have an understanding as to what
13   Ms. Pande's medical condition was?
14       A    No.
15       Q    But you knew that she was -- that the purpose
16   of her leave was somehow medically-related?
17       A    Yes.
18       Q    And you got that information from Ms. Pande?
19       A    Yes.
20       Q    Describe for me that conversation you had with
21   Ms. Pande where you first learned that the leave that she
22   was taking was medically-related.
23       A    It was on a break from that -- from the meeting
24   that we've been talking about and I went back into her
25   room and she was crying and, if I remember correctly, I
```

1  put my arms around her and, you know -- you know, asked
2  her what was wrong and, you know, what -- you know, what
3  was going on and -- and she told me that she had given
4  notice that she was going on a medical leave.
5      Q    What else did she say in this conversation?
6      A    It wasn't a very long conversation because we
7  were just on break and I don't remember what else she
8  said but she was just explaining that she was going on
9  medical leave and, you know, I just -- I just told her to
10 take care of herself and, you know, don't worry about all
11 the work that we were going to have to do.
12     Q    And so at the -- at the moment you -- well,
13 strike that.
14          After this conversation you had with
15 Ms. Pande, did you both go back to the meeting?
16     A    I went back to the meeting.  I don't remember
17 if Kiran did.
18     Q    But -- so as of the -- the moment of this
19 conversation you had with Ms. Pande, did you, for lack of
20 a better term, put two and two together and understand
21 that what Mr. Dunn was referring to when he said that
22 Kiran was not going to be here was related to her medical
23 leave?
24     A    When he said, "You are -- you are not going to
25 be here to do the work," yes, I then knew that she wasn't

```
1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
2
3  KIRAN PANDE,                    )
                                   )
4              Plaintiff,          )
                                   )
5  VS.                             ) Case No. 04-5107 CW
                                   )
6                                  )
   CHEVRON CORPORATION (f/k/a      )
7  CHEVRONTEXACO CORPORATION), a   )
   Delaware corporation, CHEVRON   )
8  INTERNATIONAL EXPLORATION &     )
   PRODUCTION (f/k/a               )
9  CHEVRONTEXACO OVERSEAS          )
   PETROLEUM COMPANY), a division  )
10 of Chevron U.S.A. Inc.,         )
                                   )
11             Defendants.         )
12             REPORTER'S CERTIFICATION
               DEPOSITION OF KATHY MABE
13             OCTOBER 18, 2006
14     I, Lorri Lucas, Certified Shorthand Reporter in and
15 for the State of Texas, hereby certify to the following:
16     That the witness, KATHY MABE, was duly sworn by the
17 officer and that the transcript of the oral deposition is
18 a true record of the testimony given by the witness;
19     That the deposition transcript was submitted on
20 _____ to the witness or to the attorney for
21 the witness for examination, signature and return to
22 me by _____;
23     That pursuant to information given to the deposition
24 officer at the time said testimony was taken, the
25 following includes counsel for all parties of record:
```

1  Mr. Noah D. Lebowitz, Attorney for Plaintiff
2  Ms. Michelle Ballard Miller, Attorney for Defendants
3  That a copy of this certificate was served on all
4  parties shown herein.
5  I further certify that I am neither counsel for,
6  related to, nor employed by any of the parties or
7  attorneys in the action in which this proceeding was
8  taken, and further that I am not financially or otherwise
9  interested in the outcome of the action.
10  Certified to by me this 6th day of November, 2006.

*Lorri Lucas* (signature)

LORRI LUCAS, RMR, Texas CSR 5317
Expiration Date:  12/31/07
Bayou City Reporting, Inc.
Firm Registration No. 295
1135 East 11th Street
Houston, Texas   77009
(713) 861-8589