# EXHIBIT M

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

KIRAN PANDE,                                )
                                            )
                        Plaintiff,          )
                                            )
            vs.                             ) No. 04-5107 CW
                                            )
CHEVRON CORPORATION (f/k/a                  )
CHEVRONTEXACO CORPORATION), a               )
Delaware corporation, CHEVRON              )
INTERNATIONAL EXPLORATION &                 )
PRODUCTION (f/k/a CHEVRONTEXACO             )
OVERSEAS PETROLEUM COMPANY), a              )
division of Chevron U.S.A. Inc.,            )
                                            )
                        Defendants.         )
                                            )
_____     )


---oOo---


DEPOSITION OF GARY YAMASHITA

Tuesday, November 7, 2006

---oOo---


*Certified Copy*


REPORTED BY:  CANDI LEON, CSR NO. 6364

EXHIBIT ___M___

PROFESSIONAL REPORTING SERVICES (800) 261-4814

1    expect to be here more than an hour or two today.

2         A.   Okay.

3         Q.   But if you need a break for any reason, please

4    let me know.  The only restriction we have on that is if

5    I've -- if there's a question pending, meaning if I've

6    asked you a question, I'll need you to answer the question

7    before we actually take a break.

8         A.   Okay.

9         Q.   Is there any reason why we cannot go forward with

10   your deposition here today?

11        A.   No, not that I know of.

12        Q.   Have you ingested anything in, say, the past 24

13   or 48 hours that would impair your memory or your ability

14   to recall events?

15        A.   No.

16        Q.   Who is your current employer?

17        A.   Chevron Corporation.

18        Q.   What is your title?

19        A.   Manager, office of -- Global Office of Ombuds.

20             MS. MILLER:  That's okay.

21             THE WITNESS:  I think I have a card here.

22             MR. LEBOWITZ:  Q.  Okay.  Thanks.

23             How long have you held that position?

24        A.   Since October of 1997.

25        Q.   Prior to that, for whom did you work?

1          A.    Chevron Corporation.

2          Q.    In what position?

3          A.    The immediate prior position was in the

4     information technology company -- I'm sorry.  The

5     immediate prior position was in the audit department.

6              Wait a minute.  Let me think through this a

7     second here.

8          Q.    That's okay.

9          A.    It was the IT company, information technology

10    company.  Prior to that was audit.

11         Q.    How long, in total, have you been with Chevron?

12         A.    A little over 25 years.

13             (Ms. Pande enters the conference room.)

14             MS. PANDE:  Hi.  Sorry.

15             MR. LEBOWITZ:  That's okay.  Come in.

16         Q.    Describe for me, please, what is the Global

17    Office of Ombuds?

18         A.    Essentially we're an office with four ombuds --

19             Is that what you're asking about?

20         Q.    Yeah.

21         A.    -- one analyst and a general manager.

22             And the general manager has two groups under her.

23    One is the ombuds group, and the other is the diversity

24    group.  And I'm not sure how many are in the diversity

25    group.

1   it's been more than one in a given year and certainly less

2   than ten in a given year.

3          MR. LEBOWITZ:  Q.  And is that consistent since

4   1997?

5      A.  As far as I can recall, yeah.

6      Q.  So is it fair to say that the complaints that you

7   received from Ms. Pande were not the first complaints you

8   received regarding harassment or retaliation?

9      A.  I would say that's true.

10     Q.  Now, you say your process is off the record.  In

11  2002, were there any company policies, to your knowledge,

12  that informed employees that the process with the ombuds

13  was off the record?

14     A.  Were there any policies?

15     Q.  Yes.

16     A.  How do we define "policies"?  I mean, if you say,

17  was it known, was it publicized, et cetera, the answer

18  would be yes.  But I don't ever recall reading a document

19  that said policy No. such-and-such says the ombuds is off

20  the record.

21     Q.  Okay.

22         Make this Exhibit 1, please.

23         (Marked Plaintiff's Exhibit 1)

24         MR. LEBOWITZ:  Q.  Okay.  Mr. Yamashita, we've

25  just handed you what's been marked as Exhibit 1 for this

```
 1   deposition --

 2        A.   Um-hum.

 3        Q.   -- which is a six-page document entitled,

 4   "Guideline 420, Harassment in the Workplace," a Chevron

 5   corporate policy.

 6             Can you please look through this document and let

 7   me know when you're ready to proceed.

 8        A.   Okay.

 9        Q.   Have you ever seen this policy before?

10        A.   I'm sure I have, yes.

11        Q.   If you'll flip to the last page, the very last

12   thing in the document says, "Effective October 2001,

13   Replaces November 2000 (for legacy Chevron)."

14        A.   Um-hum.

15        Q.   What does that -- what do these two items

16   indicate to you about this policy?

17        A.   That it was an update of a former policy for

18   Chevron.

19        Q.   So the policy we've marked as Exhibit 1 is the

20   policy that was in effect as of October 2001 for Chevron

21   employees?

22        A.   Yes.

23        Q.   If you'll look to page 3 of the document -- well,

24   actually, we might as well go back to page 2 to make sure

25   we have a complete understanding of the section.
```

1          MS. MILLER:  No, he didn't, because I didn't read

2    the whole document, and I read very fast.

3          THE WITNESS:  What was the question?

4          MR. LEBOWITZ:  Q.  The question is, is there

5    anywhere in this document that we've marked as Exhibit 1

6    for this deposition that informs the reader that a

7    complaint made to the ombuds will be considered off the

8    record?

9          A.  I don't see anything in the document.

10         Q.  Okay.  And if you look back at page 3 again,

11   under -- again, that same section with the little "b,"

12   after the bullet points, the document states that

13   complaints to EAP will be held confidential.  Do you read

14   that?

15         A.  Yes.

16         Q.  Now, section c, little "c," on the same page 3

17   lists again in bullet format actions that should be taken

18   upon receipt of a complaint.  Did you read those bullet

19   points today?

20         A.  I glanced through them.

21         MS. MILLER:  Is there a question pending?

22         MR. LEBOWITZ:  I asked him to read them.  He said

23   he glanced through them.  I asked him to read them.

24         THE WITNESS:  Okay.

25         MR. LEBOWITZ:  Q.  When Ms. Pande came to you

1  with her complaints, did you take any of the steps

2  outlined in the bullet points under section c?

3      A.   No.

4      Q.   Why not?

5      A.   Because I didn't believe that was my role.

6      Q.   When was it that you first met with Ms. Pande?

7      A.   I don't remember.

8      Q.   Do you remember that it was 2002?

9      A.   I didn't know that until I was told that.

10     Q.   Okay.  Prior to coming here today for this

11  deposition, did you review any documents that refreshed

12  your recollection as to the events regarding Ms. Pande?

13     A.   I saw a document that showed some bullet points

14  on a meeting that was held.

15     Q.   Any other documents that you reviewed?

16     A.   I was shown a copy of this document, which I did

17  not read at the time.

18     Q.   Any other documents?

19     A.   I don't think so.  I think those are the only two

20  that I can recall right now.

21     Q.   What were the -- well, sorry.  I'll start over

22  again.

23          The document showing the bullet points --

24     A.   Um-hum.

25     Q.   -- had you seen that document before?

1    Q.   So now that your recollection has been refreshed,

2    to the extent it has, by those bullet points, what is your

3    recollection as to the substance of the complaints being

4    lodged by Ms. Pande and Ms. Thompson?

5         MS. MILLER:   I'm going to object.   It presumes he

6    has a recollection.   He says that he read the document,

7    and that's -- that's the sum and substance of his

8    recollection.

9         Do you want to show him the document?

10        MR. LEBOWITZ:   I'm asking him a question.

11    Q.   Now that you've had your recollection refreshed

12   by reviewing that document, do you have any sort of

13   recollection as to the substance of the complaints being

14   lodged by Ms. Pande and Ms. Thompson?

15    A.   I would say, based on that document, it was based

16   on discrimination and, I think, harassment, but I don't

17   recall.

18    Q.   How was it that you first learned of Ms. Pande's

19   complaints?

20    A.   She came to me, but I don't remember when.

21    Q.   Did you have an appointment with her?

22    A.   I assume.   I don't know.

23    Q.   Did she come to you by herself the first time?

24    A.   I can't recall.

25    Q.   Was Victoria Thompson with her the first time she

1        Q.    Do you recall the tone of the meeting?

2        A.    No.

3        Q.    Do you recall the result of the meeting?

4        A.    I don't think the parties were satisfied with the

5    outcome.

6        Q.    And what is it that leads you to that belief?

7        A.    I guess it's because we're here right now.

8              MS. MILLER:  No, he's asking you what you thought

9    in 2002, not today; although, that's a good surmise.

10             What he's asking you is, if you remember the

11   meeting at all, do you remember what the outcome was at

12   the end of that meeting in 2002?

13             THE WITNESS:  I would use the same response

14   because I know I saw Ms. Pande after that, so the issues

15   must have continued.

16             MR. LEBOWITZ:  Q.  When you say you saw Ms. Pande

17   after that, you mean passing by in the hallway, or you

18   actually had another meeting with her?

19       A.    I'm sure we had another meeting.

20             MS. MILLER:  No.  He's asking you if you did have

21   another meeting.

22             THE WITNESS:  Yeah, we did have another meeting.

23             MS. MILLER:  Okay.  Then you just need to -- when

24   you respond, it's a "yes" or a "no" or "I don't remember."

25   But when you say, "I'm sure," it's not sure -- I mean, I

1    don't know whether you're saying you remember it or

2    whether you're just guessing.

3            THE WITNESS:  All right.  We did have another

4    meeting.

5            MR. LEBOWITZ:  Q.  How long after the group

6    meeting was your next individual meeting with Ms. Pande?

7        A.   I don't know.

8        Q.   And what was discussed in this next individual

9    meeting you had with Ms. Pande?

10       A.   I don't know the specifics.

11       Q.   But you recall coming away with the impression

12   that Ms. Pande was not satisfied with the process?

13       A.   Yes.

14           MS. MILLER:  I'm going to object.  That

15   mischaracterizes his testimony.  That's what he said in

16   response to the first group meeting.

17           MR. LEBOWITZ:  Q.  Did you meet with Ms. Pande

18   any more times other than this one time after the group

19   meeting?

20       A.   Yes.

21       Q.   How many more times?

22       A.   I don't know.

23       Q.   And what was the topic of the next individual

24   meeting?

25       A.   I don't know.

1    Q.   How long in time after the group meeting was this

2   second individual meeting with Ms. Pande?

3    A.   I couldn't answer that.  I don't know.

4    Q.   Were there any more individual meetings that you

5   had with Ms. Pande after the group meeting other than the

6   two that we've just talked about?

7    A.   I don't know.

8    Q.   Did you ever advise -- strike that.

9        In 2002, did you ever advise Ms. Pande to file a

10  formal complaint with human resources?

11   A.   I don't recall.

12   Q.   In 2002, did you ever advise Ms. Pande to lodge a

13  complaint with anyone above Jay Johnson?

14   A.   I don't recall that either.

15   Q.   In 2002, did you ever advise Ms. Pande to file an

16  administrative complaint with the California Department of

17  Fair Employment and Housing?

18   A.   No, not that I recall.

19   Q.   In 2002, did you ever advise Ms. Pande to file a

20  formal administrative complaint with the U.S. Equal

21  Employment Opportunity Commission?

22   A.   No, not that I recall.

23   Q.   At any time in 2002, did you advise Ms. Pande to

24  initiate the STEPS process at Chevron?

25   A.   I can give you a generic answer to that.  I can't

1    answer that specifically.

2         Q.    Well, first, if you can -- for a specific answer?

3         A.    The answer is, I don't remember.

4         Q.    And what is your generic answer?

5         A.    The generic answer is, one of the things I do is

6    talk to the employee about options.  And one of the

7    options I recommend -- always bring up, or usually -- I

8    think I always bring up is STEPS.  So we talk about

9    different things the person could do.

10        Q.    Do you recall what the outcome of Ms. Thompson's

11   complaint was in 2002?

12        A.    No.

13        Q.    Do you recall that as part of the process in

14   which you were involved in 2002, Ms. Thompson was moved

15   from being under one supervisor to being under another

16   supervisor?

17        A.    I remember that she was transferred.

18        Q.    And do you remember that she was transferred as

19   part of the process in which you were involved?

20        A.    I don't know if I was part of that or it just

21   happened by the time.  I don't know.

22        Q.    Do you recall that Ms. Pande asked for the same

23   treatment, that is, to be transferred?

24        A.    Yes.

25        Q.    Do you recall the response to that request?

1    Q.   What was the purpose of your meeting with

2  Mr. Mitchell?

3    A.   I assume it was to help resolve the issue with

4  Rex and Kiran.

5    Q.   Sitting here today, do you have a specific

6  recollection of that being the purpose?

7    A.   No, I don't, but that's the only purpose it would

8  have been.

9    Q.   And where did you meet with Mr. Mitchell?

10    A.   Perhaps my office.  I don't --

11    Q.   How did Mr. Mitchell respond to whatever it was

12  that you were telling him?

13    A.   As I recall -- I don't recall specifics, but I

14  don't recall anything that raised a red flag for me.

15    Q.   What kind of thing would raise a red flag for

16  you?

17    A.   If he admitted he was wrong or if he said he'll

18  change something or do something different.  None of that

19  came out.

20    Q.   Do you remember telling Ms. Pande that you found

21  Mr. Mitchell convincing?

22    A.   I don't recall that statement.

23    Q.   Do you recall saying anything to that effect to

24  Ms. Pande?

25    A.   I believe it was something along those lines.

1    unless -- he already said -- he already testified about

2    harassment and discrimination.

3            MR. LEBOWITZ:  You don't need to testify for him,

4    please.

5            MS. MILLER:  Well, then, come up with something

6    other than human behaviors.

7            MR. LEBOWITZ:  Q.  Have you ever taken a class

8    that in any way titled itself or called itself a class on

9    human behaviors?

10   A.    College.

11   Q.    Okay.  What courses?

12   A.    I don't know specifically, but I'm sure I took

13   classes in getting my degree and education.

14   Q.    So you have a degree in education?

15   A.    No.  While I was getting my education.

16   Q.    I'm sorry.  What is your degree?

17   A.    My bachelor's is in mathematics.  My master's is

18   an MBA.  My doctorate is finance.

19           MS. MILLER:  Do you want to take a break?  We've

20   been going about an hour.

21           MR. LEBOWITZ:  That's fine.

22           (Whereupon a short break was taken.)

23           MR. LEBOWITZ:  Q.  In 2002, when Ms. Pande came

24   to you with her complaints, do you recall her telling you

25   about complaints she had heard about Rex Mitchell from

DEPOSITION OF GARY YAMASHITA                    38

1  someone named Iris Owens?

2      A.   I didn't remember the name until someone

3  mentioned it yesterday, but I do recall that, yes.

4      Q.   What do you recall about what Ms. Pande told you

5  in regard to Ms. Owens?

6      A.   I don't remember the exact words, but it was

7  along the lines that Iris was making some sort of

8  reservation for Rex, I believe, in Houston and asked him

9  if he wanted a rental car or he was going to take a taxi;

10  and the response was that "Why would I want to take a taxi

11  and ride with a towel-head," or something along those

12  lines.  I don't know exact words.

13      Q.   And what was your response to Ms. Pande when she

14  related the story to you?

15      A.   I was shocked, surprised that anyone would say

16  something like that.

17      Q.   Did you raise this particular item with Jay

18  Johnson at any time during this process in 2002?

19      A.   I don't recall if I did or didn't.

20      Q.   Did you ever speak directly with Ms. Owens about

21  this issue?

22      A.   I did, yes.

23      Q.   And when did you speak with her?

24      A.   I don't remember when.

25      Q.   And what did she tell you?

DEPOSITION OF GARY YAMASHITA                    39

1      A.   As I recall, she confirmed it, but she didn't
2   want anything done with it.
3      Q.   Did she tell you why not?
4      A.   Something along the lines of wanting her job.
5      Q.   I don't understand that.
6      A.   She was afraid that would jeopardize her job if
7   she raised the issue.
8      Q.   Did you do anything to try and assure her that
9   her job would not be jeopardized if she made a complaint?
10      A.   Yes, I did.
11      Q.   And -- so, do I understand from your testimony
12   that despite your assurances, Ms. Owens still did not make
13   a complaint?
14      A.   I don't know if she did or didn't.
15      Q.   But she did not make that complaint to you?   Is
16   that what you're saying?
17      A.   She -- I'm not -- I'm off the record, so I tried
18   to get her to raise it with appropriate persons, which
19   would have been Jay or someone in HR.   And whether she did
20   or didn't, I don't know.
21      Q.   But, in any event, you did not in any way
22   initiate anything with HR or upper management in regard to
23   Ms. Owens's statement; is that correct?
24      A.   No, I did not.
25      Q.   Okay.  When you spoke with Rex Mitchell in the

DEPOSITION OF GARY YAMASHITA                           40

1               STATE OF CALIFORNIA   )    ss.

2                             )

3       I, the undersigned, a Certified Shorthand

4  Reporter of the State of California, hereby certify that

5  the witness in the foregoing deposition was by me duly

6  sworn to testify to the truth, the whole truth, and

7  nothing but the truth in the within entitled cause; that

8  said deposition was taken at the time and place therein

9  stated; that testimony of said witness was reported by me,

10  a Certified Shorthand Reporter and a disinterested person,

11  and was thereafter transcribed under my direction into

12  typewriting; that the foregoing is a full, complete and

13  true record of said testimony; and that the witness was

14  given an opportunity to read and, if necessary, correct

15  said deposition and to subscribe the same.

16       I further certify I am not of counsel or attorney

17  for either or any parties in the foregoing deposition and

18  caption named, nor in any way interested in the outcome of

19  the cause named in said action.

20       IN WITNESS WHEREOF, I have hereunto set my hand

21  this _14th_ day of _November_____, 2006.

22

23

24                 _____
                  CERTIFIED SHORTHAND REPORTER

25

# Guideline 420
# Harassment in the Workplace

## I.    GENERAL

Corporate Policy 202 – Harassment in the Workplace and Human Resources Manual 300 - Employment provide for all employees a working environment free of harassment based on age, disability, national origin, race, religion, gender, sex, sexual orientation, veteran status or other basis prohibited by federal, state, or local laws or regulations.

All employees are to conduct themselves in a manner to ensure that they comply with the provisions of the company's policy to maintain a working environment free of harassment. Harassment of any kind is prohibited and will not be tolerated.

Managers, Supervisors, and Human Resources staff at all levels are responsible for assuring compliance with this guideline, relevant laws and regulations, and are accountable for assuring that employees, contractors, vendors, customers, or applicants are neither the proponents nor the objects of harassment.  Company representatives will conduct an immediate and appropriate investigation of complaints.  Managers and Supervisors will take appropriate corrective action upon completion of the investigation and evaluation of results. Any Manager or Supervisor who knows of harassment or inappropriate behavior is responsible to assure that appropriate corrective action is taken.

In cases where the harassment complaint becomes a part of a represented or non-represented employee grievance process, respective Operating Company (OpCo) HR Business Partners and Human Resources/North America Shared Services - Employee Relations (NASS-ER) should be consulted upon notice of the grievance. Due to the need for specialized expertise to manage harassment complaints effectively, all harassment complaints should receive prompt and confidential treatment by a representative of Human Resources.  Human Resources will have trained investigators available for counsel, and where appropriate, trained investigators will coordinate the efforts of an investigation team.

## II.    GUIDELINES

## 1.    Definitions

a.    The term harassment refers to any unwelcome or unsolicited physical, verbal or sexual conduct, either explicit or implicit, which by its nature has the effect or is calculated to:

- interfere with an individual's work performance or result in creating an intimidating, hostile or offensive work environment,



**611**

- result in a change in some condition or term of employment, or

- result in an economic detriment to the employee or applicant.

b. Some examples of what may be considered harassment, depending on the facts and circumstance, include:

- Verbal harassment, e.g., offensive jokes, slurs, name calling, display or distribution of objectionable cartoons, photographs, computer screen images, calendars, or similar written or graphic items.

- Physical harassment, e.g., hitting, pushing or other aggressive physical conduct, or threats to take such action.

- Sexual harassment, e.g., unwelcome or unsolicited sexual advances or innuendoes, requests for sexual favors, or other verbal or physical conduct of a sexual nature.

## 2.   Training

Managers and Supervisors will inform all employees of our policy to provide an environment free of all types of harassment and will encourage employees to report any observations of possible forms of harassment. Managers and Supervisors are responsible for assuring employees that they will not be retaliated against for bringing such matters to the attention of management, opposing harassment, or participating in the investigation of a complaint.

Managers and Supervisors will maintain ongoing efforts to provide educational and preventive measures and alert all employees of their responsibility to support a work environment free of harassment. Such preventive measures may include, but are not limited to, awareness training, new hire orientation training, reaffirmation letters, and periodic discussions in staff and employee meetings.

Local Human Resources Business Partners and North America Shared Services - Employee Relations will provide assistance and counsel regarding training options or other preventive measures to provide a workplace free of harassment.

## 3.   Complaint Procedures

Information about an employee, who believes that he or she has been a victim of harassment, may come from several avenues:

a. The immediate supervisor is the preferred option,

**612**

b.  If the employee is uncomfortable discussing the complaint with his or her immediate supervisor, he or she may consult:

- The next level of management
- His or her Human Resources Business Partner
- The Ombuds
- The company Hotline (1-800-284-3015)
- An Employee Assistance Program (EAP) advisor.

A prompt investigation of harassment complaints will be conducted, regardless of complaint option selected, except that EAP will abide by professional rules governing confidentiality.

c.  The following actions should be taken to the extent possible upon receipt of the complaint, including anonymous complaints, or management's knowledge of harassment whether or not a complaint was made:

- Carefully document the complaint.

- Document the alleged behavior and resolution desired by the complainant.
    1)  Complainants desired resolution may aid the review process, but may not dictate final resolution.
    2)  Complainant requests not to investigate can not be honored.

- Request, but do not require the complainant to complete a written statement describing the incident.

- Advise the complainant that an immediate investigation will be conducted.

- Notify local Human Resources Business Partner (HRBP) to secure advice and to determine whether any immediate steps are needed to alleviate the situation for the complainant. NASS-ER should be advised as soon as possible by management or local HR upon receipt of a complaint that cannot be readily resolved. NASS-ER will, where appropriate, coordinate an appropriate investigation.  Generally, two or more persons will be assigned to an investigation team.

    The HRBP or NASS-ER contact and the appropriate Supervisor or Manager will determine the nature of an investigation needed to resolve the complaint. Occasionally a minor complaint can be resolved by confronting the person charged with the harassment and, if confirmed, admonishing that individual to cease the behavior.  In such, cases, further investigation may not be needed, however the matter should be documented for further reference should additional

**613**

action be required at a later date.

- The complainant's concerns and any proposed immediate steps should be submitted to the appropriate parties for review. The reviewing parties will be determined based on how the report was received. At a minimum, the appropriate management level and local Human Resources should be advised.

- Counsel on investigations may be sought from Law Department personnel when Human Resources deems if appropriate. As well, Corporate Security is available as a resource.

d.  Should the initial complaint be received by a member of the Health & Medical Services Staff/Human Resources or an Employee Assistance Program counselor, the complainant should be advised that ChevronTexaco has a policy against harassment and will promptly investigate all such complaints. If requested, a copy of this guideline, "Harassment in the Workplace", should be given to the complainant.

Health & Medical Services/Human Resources should also refer the complainant to an EAP Advisor. The confidential nature of the counseling provided by the EAP Advisor should be maintained. The EAP Advisor should discuss several options with the employee which may include:

- Encourage the employee to submit his or her complaint to a company representative as outlined in Section 3 of this guideline. The Advisor may also discuss the options and concerns about reporting the complaint to a supervisor or local Human Resources, etc.

- Seek the permission to speak on behalf of the employee to local Human Resources or North America Shared Services – Employee Relations.

- If the employee still does not wish to have the complaint reported, the EAP counselor will counsel with the employee to assist the employee in managing the circumstances to eliminate the harassment.

e.  If Corporate Security receives the initial harassment complaint or a direct referral from management, Corporate Security will assure that local Human Resources is advised in a timely manner.

## 4.  Resolutions and Discipline

Each Manager or Supervisor will **take prompt** and appropriate corrective action after consulting with the HR Business Partner and/or NASS-ER.

**614**

a. Based on preliminary assessment, interim action for the investigation will be determined on a case by case basis. Such action may include:

- Leave without pay of the parties accused pending results of the investigation, where indicated by preliminary information.

- Leave with pay of parties involved during the investigation, where appropriate.

- Temporary reassignment of the parties involved during the investigation.

- Other actions where appropriate.

  Care should be taken to avoid the appearance of taking adverse action against the alleged victim or person reporting the complaint.

b. Appropriate disciplinary action for harassment should be decided on a case by case basis. It is recognized that the precise disciplinary measures used will depend on the total circumstances surrounding the incident, which will rarely, if ever, be the same for separate incidents. There may be instances where discharge is deemed appropriate for a first offense. Discipline and corrective actions may include, but not be limited to any of the following items:

- Verbal warning (documented)
- A written warning
- Suspension
- Mandatory awareness training
- Transfer to a non-supervisory capacity
- Demotion
- Probation
- Termination
- Transfer (new work unit or new work location)

c. The resolution of a harassment complaint also involves communicating the completion of the investigation and its general conclusion to local Human Resources and NASS-ER. Both complainant and accused should be advised regarding the complaint's resolution and the nature of disciplinary and corrective actions taken. However, specific information regarding the findings of the investigation are confidential and should not be disclosed. Other corrective actions, outside of the specific disciplinary action, may be warranted depending upon the nature of the complaint. Human Resources may be involved in the following:

**615**

- Providing education, guidance and direction to other members of the management team

- Providing appropriate feedback regarding the results of the investigation

- Conducting work unit or business unit sexual harassment awareness training

  Employee Assistance Program Advisors are available to determine whether any individuals involved in a sexual harassment situation would benefit from psychological counseling. EAP Advisors provide immediate, crisis oriented counseling and make referrals to specialized treatment resources and consultants within the community. Areas for consideration may include, but are not limited to, the following:

- Complainant evaluation and referral

- Accused evaluation and referral

- Recommendation of counseling specialists to work with organizational units, and consultation to management on psychological issues related to a sexual harassment situation.

## 5. Counsel

Counsel on this guideline may be obtained from the Employment Compliance or Employee Relations units of Human Resources/North America Shared Services or, as appropriate, the local HR Business Partner.

## III. FURTHER GUIDANCE AND REFERENCES

Corporate Policy 200 – Employment
Corporate Policy 202 – Harassment in the Workplace
Corporate Policy 570 – Security of Personnel and Assets

Human Resources Manual Guideline 340 – Discipline
Human Resources Manual Guideline 344 – Steps to Employee Problem Solution Process
Human Resources Manual Guideline 400 - Equal Employment Opportunity

Effective October 2001
Replaces November 2000 (for legacy Chevron)

**616**