John A. McGuinn, Esq. SBN 36047
Noah D. Lebowitz, Esq. SBN 194982
McGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202

Attorneys for Plaintiff
KIRAN PANDE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRAN PANDE,<br><br>Plaintiff,<br><br>vs.<br><br>CHEVRON CORPORATION (f/k/a CHEVRONTEXACO CORPORATION), a Delaware corporation, CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a CHEVRONTEXACO OVERSEAS PETROLEUM COMPANY), a division of Chevron U.S.A. Inc,<br><br>Defendants. | NO.   04-5107 CW<br><br>DECLARATION OF KIRAN PANDE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT<br><br>Date: January 5, 2007<br>Time: 10:00 a.m.<br>Crtrm: 2 |

I, KIRAN PANDE, declare:

1. I am the plaintiff in this case. The following is based upon my personal knowledge and if called, I could testify competently thereto.

2. I was born in India in 1962 and immigrated to the United States in 1964. I became a U.S. citizen in or about 1971. I have worked as a petroleum engineer for major oil companies for the better part of 22 years. I earned a Bachelor of Science degree in Chemical Engineering from the University of California-Berkeley in 1983, a Masters

Degree in Petroleum Engineering from Stanford University in 1985, a Doctorate in Petroleum Engineering from Stanford in 1989, and a Masters of Business Administration from UC Berkeley Haas School of Business in 2000. I also have an appointment as a Consulting Professor at Stanford University since 2003. I have also published papers and presented papers at industry conferences in the U.S. and Europe and am considered an expert in the field.

3.  In late 1988, I began my career with Chevron as a research engineer in the Chevron Oil Field Research Company ("COFRC"), based in La Habra, California. COFRC became part of Exploration Production Technology Company ("EPTC") in 1992 following the reorganization of Chevron's technology companies. While in COFRC and EPTC, I consistently earned high praise from my supervisors for my job knowledge, problem solving ability, teamwork, creativity, and initiative. My supervisors regularly described me as "an outstanding employee" and as doing "an excellent job." In or about October 1992, I was promoted to Grade Level 23 as a Senior Research Engineer. My supervisors recommended a transfer from the technology company to a Chevron operating company to provide me with business and operations exposure and experience. My supervisors also recommended providing me with development opportunities to gain supervisory experience.

4.  In January 1995, I was transferred from EPTC in La Habra to Chevron Overseas Petroleum, Inc. ("COPI") in San Ramon, California. At the time, EPTC management told me that any time I wanted to come back to EPTC there would be a place for me. In particular, Tom McMillen (a Division Manager, grade level 27 in 1995) made that statement to me. That sentiment was also repeated to me over the years, including by Kelly Hartshorn in the Fall of 2002.

5.  Throughout the next several years, I worked on a broad range of projects for COPI, including an overseas assignment in Europe and Africa. In April 1997, I was promoted to Grade Level 24 with the title Advisor, Petroleum Engineering. In 2000, my supervisors recommended that I be given an opportunity to gain commercial and business

experience in the Commercial, Planning, or Corporate Finance groups. I have reviewed what is attached hereto as **Exhibit A** and can attest that it is a true and correct copy of my PMP form from 2000 which covers the calendar year 1999 work performance. At page 6 [Bates 27], my supervisors write: "Kiran is a valued member of the TEPS engineering team and she is a technical resource for others in the group as well as peers in other SBU's. . . . She clearly has very good business skills to complement her technical abilities. Her career interests would be better served if she were given an opportunity to work in a Commercial, Planning or Corp. Finance assignment. She would be available for reassignment to a suitable challenging position in mid-late 2nd quarter." The supervisors who contributed to this statement were Jean Camy, David Kennedy, and Mary Cao.

6.  Following through on the suggestion in my 1999 PMP, in September 2000, I was transferred to COPI's Planning Group. In this position, I reported to Rex Mitchell ("Mitchell").

7.  In October 2001, shortly after the mega-corporate merger which created ChevronTexaco Corporation, I was selected for a new position of Portfolio Analyst in the Planning Group, still reporting to Mitchell. At the time, Mitchell told me that he considered this position to be a higher level than the Planning Analyst positions in the group and promised to promote me to Grade 25.

8.  In late 2001, however, I began to suffer harassment and discrimination based on my gender and race/national origin at the hands of Mitchell. In early March 2002, I complained to Mitchell's supervisor, James Johnson ("Johnson"), about Mitchell's conduct. I told Johnson that I felt unfairly singled out by Mitchell in his conduct towards me and that Mitchell was overburdening me with work.

9.  In that March meeting with Johnson, I told him that Iris Owens had told me that Mitchell referred to a group of people of Indian origin as "towel heads."

10. Johnson did nothing to investigate my complaints. Instead, he told me that I had three choices: (1) leave the company, (2) leave the group, or (3) stay for 12 to 18 months and get along with Mitchell. Johnson then scheduled a meeting with Mitchell and

DECLARATION OF KIRAN PANDE IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                                3

me to give me an opportunity to tell them which of Johnson's three options I was choosing. Johnson's entire focus in response to my complaints was to make excuses for Mitchell, saying he was under a lot of stress and that Johnson really needed Mitchell to get the work done.

11. In September 2002, I received an email from Victoria Thompson. Thompson was forwarding me an email thread between herself and Tim Magner. By reading that email thread, I now had definite proof of what I had suspected – that Mitchell was continuing to bad-mouth me and that it was costing me job opportunities. I had not even posted for the job in Magner's group, and before seeing this email I had no knowledge that I was even being considered for this position. Of course, this type of behind the scenes, word-of-mouth consideration is how you advance at Chevron and how you come to enjoy the many opportunities that the company has to offer. As I had done previously, I complained to Gary Yamashita ("Yamashita") about Mitchell's behavior.

12. I began working in SASBU for Jack Dunn on Monday, December 9, 2002. The position of Simulation Engineer was a step backwards in my career and I did not want the job. However, I was told that I was in a "must move" situation and this was the only job I was being offered. Again, I raised my complaints to Yamashita. In the Spring of 2003, Jean Camy stopped by my office and laughed at me because I was now stuck back in a simulation job after having spent the effort to get an MBA and work in the Planning Group. Camy told me that I had wasted my time if all I was going to do was simulation after all that. Camy was ridiculing me because I was stuck back doing the same work I had done 10 years earlier.

13. In April 2003, Dunn told me that I was not receiving a merit pay increase for that year. This decision, he said, was based upon feedback regarding my performance in the calendar year 2002 while I worked in Mitchell's group.

14. Throughout the Fall of 2003, I attempted to find another job within Chevron. I applied for several openings and actively networked within the company. I was fully qualified for each job to which I applied. However, I was not offered any such job. I was,

DECLARATION OF KIRAN PANDE IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                                       4

however, subsequently offered continued employment by Dunn to work on projects for SASBU while remaining in San Ramon. This project work would last at least through the end of 2004.

15. In mid-October 2003, I determined (in consult with my physician) that I needed surgery and would have to take a medical leave from work. So, I consulted Chevron's human resources internal web site. It was made very clear to me that the DMP required me to file for short-term disability coverage if I was going to be absent from work for more than five consecutive days for a medical-related reason. The information also instructed me that to comply with the DMP's requirements for applying for all leave, including both short-term disability and FMLA/CFRA, I must communicate with UnumProvident and provide them with all requested documentation. I subsequently contacted UnumProvident and was told to sign and submit the medical records waivers which I had downloaded from Chevron's internal web site. I followed these directions and, pursuant to the DMP, submitted waivers of my right to confidentiality in my medical records. At no time was I told that there was a separate "FMLA Unit". Instead, I was told that UnumProvident would evaluate my claims and let me know the outcome. Any time spoke with UnumProvident representatives, I spoke with the same person and was never told to call a separate FMLA Unit with my concerns.

16. I have reviewed what is attached hereto as **Exhibit B** and can attest that they are true and correct copies of the medical records release forms I was required to sign by Chevron's DMP. Chevron imposed its across-the-board policy and only certified my leave for a period of 30 days, thereafter requiring me to re-certify my eligibility for leave. I have reviewed what is attached hereto as **Exhibit C** and can attest that it is a true and correct copy of my letter from UnumProvident notifying me of my approval for both short term disability coverage and Family Medical Leave.

17. I then informed Dunn that I was applying to take a medical leave. Dunn reacted by asking me what was medically wrong with me. I consider my medical information very private and did not feel comfortable talking to Dunn about my specific

DECLARATION OF KIRAN PANDE IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT                                5

condition, so I did not tell him. Dunn, however, persisted in his questioning asking about my condition and my symptoms, including asking me if I had cancer and began talking about cancer treatments and how cancer treatments such as chemotherapy could require a long period of time. Dunn even mentioned that another employee in SASBU had had cancer and he knew it took a long time for treatment. Dunn's insistence on learning my medical condition was very stressful for me. I called both Yamashita and UnumProvident and told them that I was very distressed by Dunn's behavior.

18. At the November 4, 2003 conference call where Dunn berated me for at least 30 minutes about my medical leave and how I was going to get my work done, I was extremely distraught. I attended Dunn's deposition where he testified (in an attempt to minimize my reaction to his conduct) that the entire group – including myself – went out to lunch after the meeting. However, I did not go to any such lunch.

19. I was never contacted by anyone at Chevron regarding Dunn's conduct on November 4, 2003, thus, I believe that there was no investigation into Dunn's improper comments and harassing conduct during the November 4 conference call.

20. On November 7, 2003, pursuant to company policy, I wrote an email to Dunn asking for approval to carry over my unused vacation into 2004. Because I had accepted Dunn's offer to continue working on SASBU projects from San Ramon through 2004, I had assumed that there would be no problem with this request. Dunn replied by email saying "Let's discuss". Dunn followed up this email reply with a voicemail message on that same date. His message said that he wanted to talk to me about the carryover request because in general 28 days was more than typically seen, so he wanted to talk with me about and also to talk with me about how my medical leave was going. At no time did Dunn say anything to me to indicate that it would be inappropriate to carry over vacation into 2004 because my employment was set to end on December 31. In fact, until the November 17 telephone call I received from Dunn while I was on medical leave, nobody from the company had ever told me that my employment was going to end nor that it would end on December 31.

21.  On December 8, 2003, I filed my original administrative complaint with the California Department of Fair Employment and Housing. I have reviewed what is attached hereto as **Exhibit D** and can attest that it is a true and correct copy of the DFEH complaint I filed naming ChevronTexaco as the offending party. I also simultaneously filed identical complaints naming all the defendants named in my civil complaint in this case. On January 7, 2004, I filed an amended complaint providing greater detail on the facts in my initial complaint, naming all the same parties as the original complaint. I have reviewed what is attached hereto as **Exhibit E** and can attest that it is a true and correct copy of my amended DFEH complaint which I filed naming ChevronTexaco as the offending party.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge. Executed this 15th day of December, 2006 at Walnut Creek, California

_____/s/_____
Kiran Pande