John A. McGuinn, Esq. SBN 36047
Noah D. Lebowitz, Esq. SBN 194982
McGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202

Attorneys for Plaintiff
KIRAN PANDE

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRAN PANDE,<br><br>Plaintiff,<br><br>vs.<br><br>CHEVRON CORPORATION (f/k/a CHEVRONTEXACO CORPORATION), a Delaware corporation, CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a CHEVRONTEXACO OVERSEAS PETROLEUM COMPANY), a division of Chevron U.S.A. Inc,<br><br>Defendants. | NO.   04-5107 CW<br><br>**DECLARATION OF VICTORIA THOMPSON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** |

I, VICTORIA THOMPSON, declare:

1. I was employed by Chevron Corporation since approximately February 1981 until April 2006. The following is based on my personal knowledge, and if called, could testify competently thereto.

2. In the timeframe of late 2001 through 2002, I was working as the Reserves Analyst in ChevronTexaco Overseas Petroleum, Inc., aka CTOP. Beginning in November 2001 through April 2002, my direct supervisor in CTOP was Rex Mitchell ("Mitchell").

During this same time period, Kiran Pande ("Pande") was also being supervised by Mitchell.

3. In February 2002, Mitchell requested that I provide him with a written copy of my 2001 performance management (PMP) forms that were completed with my prior supervisor. I responded back with the forms as completed through August 2001, as that was when the last performance management discussion with my former supervisor had occurred. At that time, my supervisor was Tom Schull ("Schull"). Subsequent to my August 2001 discussion with Schull, he moved into another position which was unrelated to my job function and he no longer supervised me. In the interim (August 2001 to November 2001) period before being reassigned to Mitchell, I had no assigned supervisor.

4. In April 2002, I received an email from Mitchell containing a copy of my finalized 2001 performance review, as completed by Mitchell. Mitchell's email also requested that we schedule a meeting to discuss my 2001 review and performance goals for 2002. I learned via this email that Mitchell had given me an "average" ranking for my performance in 2001 and that my salary treatment which became effective on April 1 had been based upon Mitchell's evaluation. Until this time, Mitchell and I had no discussions relating to my job. And as my new supervisor, I was aware that Mitchell was unfamiliar with my duties. I was also aware that Mitchell had not looked at or reviewed my work products for the year and had no justification for the "average" ranking. Based on the work that I performed for the company that year, in combination with my experience of prior years receiving higher rankings and salary treatments from other supervisors, I believed that Mitchell's ranking was unsupportable.

5. During our April meeting to discuss my "average" 2001 performance ranking and 2002 PMP, Mitchell became verbally aggressive and belligerent, attacking me for a work-related suggestion I was making. He would not stop his attack until I finally put up my hands in a surrender pose and told him that he was absolutely correct in the assertions he was making.

6. Because of Mitchell's overly aggressive conduct towards me and because I

felt that Mitchell's evaluation of my performance had no foundation, I decided to try to use Chevron's Ombuds process to register a complaint and get some sort of relief. So, I met with Chevron Ombuds, Gary Yamashita ("Yamashita") in April 2002 to discuss my issues with Mitchell.

7. Through discussions I was having with Pande at about the same time, I learned that she too was having problems with Mitchell. Because we both had similar complaints about Mitchell, we decided to jointly go to Yamashita. Yamashita agreed to set up a meeting between Pande, myself, and Mitchell's supervisors, Jay Johnson ("Johnson"). Yamashita led us to believe that he would act as our advocate at the meeting and help us explain to Johnson the nature of our complaints about Mitchell.

8. Prior to the planned meeting with Johnson, Yamashita asked us to put together "bullet points" for the meeting. Pande and I came up with the bullet points, as suggested by Yamashita. I have reviewed what is attached hereto as Exhibit A and can attest that it is a true and correct copy of the bullet points Pande and I created and submitted to Yamashita prior to our meeting with Johnson. The overall goal of the bullet points was to provide talking points for explaining how both Pande and I believed that Mitchell was treating us – the only two women under his supervision. Yamashita told us to carefully consider our bullet points as they might be "too confrontational." We did not believe they were overly confrontational – registering a complaint at Chevron is always somewhat confrontational – and did not change them.

9. Prior to the planned meeting with Johnson, we also discussed with Yamashita the possibility of filing a complaint with Chevron's "STEPS" process. STEPS is advertised by Chevron as an informal dispute resolution procedure open to employees who wished to have complaints about workplace conduct investigated. Yamashita dissuaded us from using STEPS. He told us that the people involved in the process are incompetent and that we would not be happy with the results. The message I heard from Yamashita was that taking our complaint to STEPS would be hard, long and likely futile and useless. Based on these comments from Yamashita, we decided to confine our

DECLARATION OF VICTORIA THOMPSON IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT         3

complaints to the Ombuds process.

10. Prior to the meeting, Yamashita told me that there had been other complaints about Mitchell and that Mitchell "had left carnage wherever he had been."

11. In late April 2002, we had the meeting with Johnson. The meeting took place at Johnson's office. Yamashita went in first to speak with Johnson alone. After a short while, Pande and I were invited in to join the meeting. We gave Johnson a copy of the bullet points. We also raised our fear of retaliation from Mitchell. Pande and I discussed that we felt that there was an imbalance in the criteria being used to rank people for salary treatment. Pande and I said that we did not believe that we were being treated fairly and that there was not uniform criteria being employed to evaluate employees.

12. In addition to bullet points, Pande specifically raised a complaint about Mitchell's racial slur involving people of East Indian descent, like Pande. In particular, Pande relayed a conversation she had with Iris Owen ("Owens"), who was Mitchell's administrative assistant at the time. Owens had asked Mitchell if he wanted her to make arrangements for him to have a taxi or limo service to or from the airport for his upcoming air travel. In response, Mitchell made an angry comment to the effect that he did not want to use them, and referred to the drivers as "towel heads".

13. Instead of responding to Pande's various complaints about Mitchell, Johnson redirected the discussion to Pande's work performance over the past year. Johnson did not give any sort of substantive reply to Pande's complaints. At one point Johnson even laughed about one of my complaints. Johnson also told us, referring to Mitchell: "the poor guy is under stress and overworked." Johnson then effectively turned the meeting into a confrontation about Pande's performance. I felt very uncomfortable at this point because I did not feel it was appropriate for Johnson to be discussing Pande's performance with me in the room. The entire experience was quite humiliating for Pande.

14. All the while that Johnson was attacking Pande about her performance, Yamashita did nothing. He did not speak up. He did not try to redirect the conversation to

DECLARATION OF VICTORIA THOMPSON IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

4

the substance of our complaints. Really, Yamashita was nothing more than a fly on the wall during this meeting.

16.     During the meeting both Pande and I requested that we be given another supervisor instead of Mitchell. In response, Johnson told me that my request would be granted, but then told Pande that hers would not and that she would have to remain with Mitchell as her supervisor. Pande attempted to justify her request by explaining why it would also make business sense to have her moved to another group that also reports to Johnson. Johnson emphatically said no, he would not entertain any such request from her.

16.     During the meeting, Johnson also took Pande to task for writing so much in her PMP form. He said that putting so much detail and information into the PMP form would be indicative to someone reading her file later on that there was a problem. Pande explained that the only reason she did that was to try to show Mitchell support for her belief that she should receive a higher rating and salary treatment. Johnson was not swayed by Pande's explanation and said that by writing this "whole litany", showed that she had a problem.

17.     In all, Johnson spent about 10% of the meeting addressing my concerns, and the remainder attacking Pande over accusations about her performance.

18.     At no time during the meeting did Johnson indicate that there would be any sort of investigation into our complaints. At no time after the meeting did I learn that there was any sort of investigation into our complaints. As far as I am aware, Mitchell received no counseling or discipline for his behavior towards Pande or me.

19.     In late September 2002, I received an email from Tim Magner. In that email, Magner asked: "What is the problem between Rex and Kiran Pandy [sic]? We were considering her for a position that will open up in Fernando Gaggino's group, and Rex told him things like 'she's not a team player', 'she pouts', etc. Real career killers." I then forwarded the email to Pande to show her that Mitchell's attitude towards her was affecting her career path at Chevron. I have reviewed what is attached hereto as Exhibit B and can

DECLARATION OF VICTORIA THOMPSON IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

5

attest that it is a true and correct copy of the email thread described above. In subsequent communications with Tim Magner ("Magner") about this email, I learned that the idea had been discussed to propose an exchange of Pande for an employee named Sarah Saltzer ("Saltzer"). Specifically, the idea was that Pande would move to Magner's group and Saltzer would move into Mitchell's group. However, after the folks in Magner's group learned of Mitchell's comments, the idea was dropped and Pande was no longer considered for the position.

20. Based on my 25 years of employment with Chevron, including going through the process of transferring amongst several of Chevron's companies, I can very comfortably state that word-of-mouth between supervisors is a very important aspect of the career development of professionals at Chevron. As soon as one supervisor starts saying bad things about you, you can essentially forget about your career path. As Magner acknowledged in his email (Exhibit B), subjective comments like "she's not a team player" are, in his words, "Real career killers" at Chevron. Based on my experiences at Chevron, I completely agree with Magner's characterizations.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge. Executed this 15th day of December, 2006 at Gold River, California

*Victoria Thompson*
Victoria Thompson

DECLARATION OF VICTORIA THOMPSON IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

6