Michele Ballard Miller (SBN 104198)
Kerry McInerney Freeman (SBN 184764)
Lisa C. Hamasaki (SBN 197628)
MILLER LAW GROUP
A Professional Corporation
60 E. Sir Francis Drake Blvd., Ste. 302
Larkspur, CA 94939
Tel. (415) 464-4300
Fax (415) 464-4336

Attorneys for Defendants CHEVRON INTERNATIONAL EXPLORATION AND PRODUCTION (formerly known as CHEVRONTEXACO OVERSEAS PETROLEUM and improperly sued as CHEVRONTEXACO OVERSEAS PETROLEUM PACIFIC COMPANY) AND CHEVRON CORPORATION (formerly known as CHEVRONTEXACO CORPORATION)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KIRAN PANDE,

Plaintiff,

v.

CHEVRON CORPORATION (f/k/a CHEVRONTEXACO CORPORATION), a Delaware corporation, and CHEVRON INTERNATIONAL EXPLORATION and PRODUCTION (f/k/a CHEVRONTEXACO OVERSEAS PETROLEUM COMPANY), a division of Chevron U.S.A. Inc.

Defendants.

Case No. 04-5107 CW

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

Date: January 5, 2007
Time: 10:00 a.m.
Courtroom: 2

Complaint filed: December 2, 2004

Trial Date: April 16, 2007

Honorable Claudia Wilken

## TABLE OF CONTENTS

**I. INTRODUCTION** .......... 1
**II. LEGAL ANALYSIS** .......... 1
**A. There is no Triable Issue on Pande's Discrimination or Retaliation Claims [Third, Fourth and Fifth Causes of Action]** .......... 1
**1. Pande Cannot Avoid the Statute of Limitations** .......... 1
**2. Pande Has No Evidence of Discriminatory Animus** .......... 3
**3. Pande's Retaliation Claim has no Merit** .......... 8
**B. There is No Triable Issue of Fact on Pande's FMLA/CFRA Claims [First and Second Causes of Action]** .......... 8
**IV. CONCLUSION** .......... 15

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

# TABLE OF AUTHORITIES

## Cases

*Blackie v. State of Me.,* 75 F.2d 716 (1st Cir 1996) ........ 9
*Carmen v. San Francisco Unified School District*, 237 F.3d 1026 (9th Cir. 2001) ........ 6
*Flait v. North American Watch Corp*. 3 Cal.App.4th 467, 476 (1992) ........ 8
Guz *v. Bechtel Nat'l, Inc.,* 24 Cal. 4th 317 (2000) ........ 3
*Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215 (1999) ........ 6
*Hazen Paper Co. v. Biggins,* 507 U.S. 604(1993) ........ 6
*Martin v. Lockheed Missiles and Space Co., Inc.,* 29 Cal.App.4th 1718 (1994) ........ 2
*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ........ 2
*National Steel Corp. v. Golden Eagles Ins. Corp*., 121 F.3d 496 (9th Cir. 1997) ........ 3
*Palucki v. Sears Roebuck & Co*, 879 F.2d 1568 (7th Cir 1989) ........ 6
*Peterson v. Hewlett-Packard Co.,* 358 F.3d 599 (9th Cir. 2004) ........ 6
*Richards v. CH2M Hill, Inc.,* 26 Cal.4th 798 (2001) ........ 1
*Steckl v. Motorola, Inc*., 703 F.2d 392 (9th Cir. 1981) ........ 3
*Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028 (2005) ........ 8, 9

## Other Authorities

2 California Code of Regulations § 7297.0(a)(2) ........ 14
29 Code of Federal Regulations § 825.207(a)(1) ........ 15
29 Code of Federal Regulations § 825.306 ........ 14
29 Code of Federal Regulations 825.309 ........ 14

## I. INTRODUCTION

Defendants have produced specific facts showing that Pande's gender and national origin had nothing to do with any decision affecting her employment. The facts also demonstrate that her FMLA/CFRA leave did not impact the decisions she now questions. In response, Pande demands that all evidence that contradicts her version of events be stricken[1] and that she be allowed to proceed to trial. However, after distilling her Opposition and multi-page declaration, Pande has no evidence to support her claims. As such, summary judgment should be granted.

## II. LEGAL ANALYSIS

### A. There is no Triable Issue on Pande's Discrimination or Retaliation Claims.

[Third, Fourth and Fifth Causes of Action]

#### 1. Pande Cannot Avoid the Statute of Limitations.

Pande concedes that Dunn harbored no discriminatory animus toward her. (Opp. fn. 1) Instead, she paints Mitchell the villain, asserting that the "continuing violation" doctrine does not bar her claims. While this doctrine may operate to extend the statute of limitations in certain situations, it does not apply here.

In *Richards v. CH2M Hill, Inc.,* 26 Cal.4th 798 (2001) the Court set forth the following three-part test to determine if the continuing violation doctrine applies: (1) the employer's actions are sufficiently similar in kind to the unlawful conduct within the limitations period; (2) the actions have occurred with reasonable frequency; and (3) the employer's actions have not acquired a "degree of permanence." *Id.* at 823. In these instances, the statute of limitations does not begin to run until either of the following occurs: (1) the course of

[1] Pande makes much of Defendant's Supplemental Initial Disclosures, although it is unclear why. She does not claim surprise – and could not claim surprise since she was aware of these witnesses, identified them in her initial disclosures, and even deposed several. Rather, Pande seems to argue a "technical foul" – asking the Court to preclude relevant evidence simply because Defendants filed a supplemental disclosure, an action that is not even required. For the reasons set forth in Defendants' Response to Plaintiff's Objections to Declarations, Pande's indignation should be ignored and the evidence considered.



MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation; or (2) the employee is on notice that further efforts to end the unlawful conduct will be in vain. *See also National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Pande cannot meet this test. First, Mitchell's alleged conduct – discrimination and harassment based on her gender and national origin – has nothing whatsoever to do with the conduct she attributes to Dunn – interference with her FMLA/CFRA rights. Indeed, Pande even admits that Dunn's actions cannot be construed as gender or national origin discrimination. (Opp. fn. 1) As such, she cannot show that Mitchell's conduct was similar to the later SASBU conduct. Even if it were, the situation had clearly acquired a "degree of permanence" sufficient to trigger the statute of limitations running before December 9, 2002, the date Pande claims. In October 2002, Pande was notified that she had been selected for the Block 14 SASBU position. (Pande 304:2-10)[2] When Pande was not selected for a Strategic Planning position, she accepted the SASBU position. Her last day in Planning – and the last day she reported to Mitchell – was December 6, 2002. (Dunn 17:8-11; *see* Pande 347:12-348:11) Pande filed her Charge of Discrimination on December 8, 2003, one year and two days after the last day she worked for Mitchell. Pande's complaints, based on conduct that occurred more than one year before she filed her DFEH Complaint, are barred as a matter of law.[3] *Martin v. Lockheed Missiles and Space Co., Inc.,* 29 Cal.App.4th 1718, 1724 (1994).

Pande claims that "[f]rom March through December 2002" she attempted to find another job within the company. This is true – the last position she applied for was in

---

[2] Excerpts to cited deposition transcripts, to the extent they were not attached to Defendants' moving papers, are attached as exhibits to the Supplemental Declaration of Michele Ballard Miller.

[3] In order to create the illusion that her claims are timely, Pande asserts that Mitchell's last "act" of discrimination occurred on December 8 – a Sunday. However, Pande had already left the department by that time and there is no evidence that Mitchell even saw Pande that weekend, much less did anything that could remotely be considered discriminatory.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

Strategic Planning.[4] However, Pande was told on December 3, 2002 that she had not been selected for that position and accepted the SASBU job that same day. (Pande Dec. Exh. E) The situation had clearly reached a degree of permanence by that date. Pande's failure to act within one year of that event bars her discrimination claim as a matter of law. Nothing Pande says in her Opposition compels a different conclusion.

**2. Pande Has No Evidence of Discriminatory Animus.**

Even if the statute of limitations did not bar her claims (which is not the case), Pande still could not avoid summary judgment as she had not produced "specific, substantial" evidence to support her discrimination allegations. *Steckl v. Motorola, Inc*., 703 F.2d 392, 393 (9th Cir. 1981); Guz *v. Bechtel Nat'l, Inc.,* 24 Cal. 4th 317, 356 (2000). Indeed, she has no evidence whatsoever that her gender or national origin was a motivating factor in any of the employment actions cited in her Opposition. (Opp. 22:20-25) Rather, all she offers is her own conclusory allegations devoid of any factual support. Such "evidence" is insufficient to defeat summary judgment. *National Steel Corp. v. Golden Eagles Ins. Corp*., 121 F.3d 496, 502 (9th Cir. 1997) ("[a] plaintiff's belief that a defendant acted from an unlawful motive, without evidence to support that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive.") To be cognizable on summary judgment, evidence must be competent. "It is not enough for a witness to tell all she knows; she must know all she tells." *Id*. Pande has not met this burden. Indeed, the "evidence" she offers to prove that the following acts demonstrate adverse treatment by Mitchell, falls far short of what is required:

**a. Receiving a rating of "Average" in April 2002.** First, Pande did not receive an "Average" rating – rather, Mitchell rated her as "Fully Meets Performance Expectations." (Pande Exh. 10) Second, the vast majority of employees receive this rating. (Mitchell Dec. ¶8) Indeed, others in Mitchell's Planning Group – both men and women – received this

---

4 Although Pande would like the Court to believe that Mitchell somehow adversely affected her selection for this position (thereby allowing her to extend the last act needed to trigger the limitations period), the evidence is squarely contrary. (*See* Open. Memo. at 7:3-12, fn. 8)

3

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
Case No. 04-5107 CW

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

same rating. (Supp. Mitchell Dec. ¶2) Pande's unhappiness over her rating – she had "expected to be rated in the exceptional category" – does not create a triable issue. (Mitchell Exh. 5)

**b. Receiving a lower salary increase in April 2002.** Pande presented no evidence to support this claim, only her bald assertion that women – Thompson and herself – received lower salary increases than similarly situated men. Her lack of evidence is not surprising since that honor belonged to a man. (Supp. Mitchell Dec. ¶3)

**c. Mitchell's failure to promote her.** Pande continually asserts that Mitchell "promised" her a promotion in the Spring of 2002. Mitchell, however, testified that he told Pande that *if she developed in the Portfolio Analyst position as expected*, she "stood a very good chance of earning a promotion in the spring" and that he was "prepared to take the nomination forward" to the PDC. (Mitchell 31:15-32:8) Even Pande must concede that her promotion was not guaranteed – she still had to perform her job in a satisfactory manner. Surely she did not think that she would be promoted even if she stopped doing her work, or worse, stole from the Company. Of course not. Thus, the issue is not whether she was promised a promotion, but whether Mitchell's assertion that her performance declined in the months leading up to the Spring PDC was the reason she did not receive a "career ladder" promotion.

When asked about this at his deposition, Mitchell testified that Pande seemed less engaged in work after she was not promoted in the Fall of 2001. (Mitchell 85:22-90:13 and Exh. 6) Mitchell had kept copies of emails about a number of assignments where her performance had not met his expectations. (Mitchell 52:8-53:25 and Exhs. 1a-1e) These emails relate to performance issues in January and February of 2002, long before the Spring PDC was held. This evidence, which corroborates Mitchell's disappointment over Pande's lackluster performance, clearly demonstrates that legitimate business reasons – not gender or national origin – were the reasons Pande did not get the a "career ladder" promotion she so desired.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

4

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
Case No. 04-5107 CW

**d. Repeated negative performance-related comments by Mitchell, thwarting her ability to attain career goals.** Pande asserts that Mitchell somehow impeded her ability to move ahead. This argument fails for a number of reasons. First, the only evidence she cites of Mitchell's alleged attempts to block her career is a single incident involving a position in "the Congo group." (Opp. 14:24-15:3) Pande claims she was considered for this position but not selected. However, neither Pande nor her Declarant Vicki Thompson know why she was not selected – they simply presume it was due to purportedly "career killer" comments made by Mitchell. (Opp. 6:12-19) Pande's argument fails for several reasons.

First, the "evidence" offered by Pande is pure hearsay and inadmissible. (*See* Fed. R. Evid. 801-803; *see also* Objections to Thompson Dec.) Neither Pande nor Thompson ever heard the comments attributed to Mitchell. Indeed, neither did Tim Magner, the individual who used the phrase "career killer." Magner's knowledge appears based on a conversation he was not privy to and it is unclear how Magner learned of the conversation between Mitchell and Fernando Gaggino. (Thompson Dec. Exh. B) Mitchell, on the other hand, does recall the conversation. He testified that in the late summer of 2002, he received a call from Gaggino asking about Pande's availability. Gaggino had an employee he felt would benefit from a rotation in planning and wanted to know if Mitchell would consider a "swap." Mitchell thought the SASBU position would be a good fit with Pande's technical skills as it was a petroleum engineering position in the Congo group. In addition, since it was a team lead position, Mitchell thought it would it would benefit Pande as it would give her supervisory experience. (Mitchell 104:9-109:5) Mitchell recalls telling Gaggino that although he had some concerns about recent performance lapses, he thought Pande "needed a change of scenery." (Mitchell 108:6-14) Mitchell asked Pande about the position – she said she was not interested.[5] (Mitchell 108:25-109:11) Kelly Hartshorn, the

[5] Although this "swap" did not work out, Gaggino's employee, Sarah Salzer (female), did subsequently move to Mitchell's group. (Mitchell 109:23-25) Once again, hardly what you would expect if Mitchell intentionally "blocked" the advancement of females.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

Personnel Development Representative for SASBU, corroborates Mitchell's version of events, stating that Pande also told her she was not interested. (Supp. Hartshorn Dec. ¶3)

In short, neither Thompson's declaration nor Pande's interpretation of the Magner email constitutes the requisite "evidence" to defeat summary judgment. *See, e.g., Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028 (9th Cir. 2001) (In affirming summary judgment for the employer, the Court determined that the lower court had correctly concluded that there was no evidence in the employee's deposition or anywhere else in the summary judgment papers of any basis in personal knowledge for the plaintiff's subjective belief about the defendant's motive. Thus, the district court was correct in determining that there was no genuine issue of material fact.) Conclusory declarations, unsupported by evidentiary facts or other admissible evidence, do not create triable issues.[6]

Even if Mitchell had made such comments, which he denies, absent some evidence that his comments adversely influenced the selection process, Pande's irritation alone does not create a triable issue warranting trial. *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610-611 (1993) ("whatever the employer's decision-making process, a disparate treatment claim cannot succeed unless [discrimination] actually played a role in that process and had a determinative influence on the outcome.") Pande simply has no evidence to support either this allegation or her sweeping claim that "word-of-mouth" adversely affected her career.

Finally, this "evidence" – even if admissible – demonstrates that Pande's failure to be selected for the Congo job was not the adverse action she now claims. Indeed, the facts Pande conveniently forgets to mention are telling. As Pande is well aware, there is no "Congo group." Rather, the "Congo group" is part of SASBU, the very same business unit that offered her a position one month later. (Pande Exh. 13) If Mitchell truly "had it in for

---

[6] See *Palucki v. Sears Roebuck & Co*, 879 F.2d 1568, 1572 (7th Cir 1989) (holding plaintiff's "gut feeling" that defendant wanted to discharge plaintiff because of his age did not create a triable issue on defendant's intent to discriminate based on age); *Peterson v. Hewlett-Packard Co.,* 358 F.3d 599, 603 (9th Cir. 2004) (same); *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 225 (1999) (speculation is not substantial responsive evidence sufficient to defeat motion for summary judgment).

her," as Pande now claims, he surely would have also sabotaged this selection. Contrary to Pande's assertion, the fact that SASBU offered her the same position, albeit on a different oil field, *after* Mitchell's alleged "career killer" comments shows that these comments, to the extent they were made at all, had no "negative impact on her career opportunities within Chevron." (Opp. 15:1-3)

**e. Being forced to take a career step backwards into the SASBU position**. Pande's attempt to manufacture some adverse employment action when none exists is remarkable. First, she complains about not being offered the SASBU petroleum engineering job in Gaggino's Congo group, claiming it would have been a step up in her "desired career path goals." At the same time, however, she asserts that same SASBU position offered two months later, albeit on the Nigerian fields, was "a step down on the career path." (Opp. 6:22-24) She cannot have it both ways. If the Congo SASBU position was a "plum" assignment, then Pande cannot complain that a similar position in Block 14 was a "career step backwards."

Rather than address (much less explain) her lack of evidence or the fatal defects in her case, Pande argues "context matters," as if this grave pronouncement could somehow magically transform her otherwise meritless claim into one requiring judicial review.[7] While it is important to consider the context in determining whether an employment action was, in fact, adverse, it is equally important that events not be taken *out of context* in order to

[7] Pande would like the Court to believe that Mitchell failed to promote her because, when she met with him on April 1, she complained for the first time about harassment. There are two problems with this argument. First, the PDC had already met – it meets in March. The promotion discussion had therefore already occurred. Second, when Pande met with Mitchell she never identified the alleged harassment to be based on either her gender or her national origin. (Pande 272:16-273:5,277:24-278:8 and Exh. 10) And, when she did, Johnson did a thorough investigation of the allegations. (Johnson Dec. ¶¶6-15) Simply because Pande does not know Johnson did does not mean that no investigation was done. (Opp. 3:17) Pande's attempts to discredit Yamashita should also be rejected. As previously stated, the relevant policy provides several avenues for an employee to raise complaints of discrimination and harassment. That does not mean, however, that each recipient must conduct its own investigation. Rather, one individual can lead the investigation. The fact that Johnson instead of Yamashita directed the investigation does not equate to Pande's complaints being ignored.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

create the illusion of adversity. As shown above, when the actions Pande complains of are viewed in proper context, it becomes readily apparent why summary judgment should be granted.

**3. Pande's Retaliation Claim has no Merit.**

To the extent that Pande's retaliation claim is predicated on Mitchell's conduct, it is also barred by the statute of limitations. Even if Pande can avoid this jurisdictional preclusion, which she cannot, Pande still could not establish retaliation – there is simply no causal connection between her complaints about Mitchell and any adverse employment action. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1044 (2005); *Flait v. North American Watch Corp.*, 3 Cal.App.4th 467, 476 (1992). Despite Pande's unsupported reference to the "multitude of adverse employment actions" she purportedly suffered after she complained in the spring of 2002, the evidence paints a different picture. In the fall of 2002, after almost two years in the Planning Group – the typical length of time the planning group retains employees – Pande applied for two positions. (Hines Dec. ¶2; King Dec. ¶¶2-3) For reasons unrelated to any alleged conflict between Pande and Mitchell, and notwithstanding Mitchell's advocacy on her behalf, Pande was not selected for either position. (*Id.*; Mitchell 110:4-112:6; *see also* Smith Dec. ¶2; Supp. Hartshorn Dec. ¶¶3-4) She was, however, selected for the SASBU position – it is undisputed that Mitchell had nothing to do with this selection. (Dunn 16:20-17:3) Pande simply has no evidence of retaliation.

**B. There is No Triable Issue of Fact on Pande's FMLA/CFRA Claims.**
[First and Second Causes of Action]

Pande asserts that summary judgment should be denied because she has shown that her decision to take protected leave "was taken into account in the adverse decisions leading to her termination." (Opp. 15:21-23) This argument is compelling only if one ignores a key fact – *Pande did not suffer any "adverse decisions" between the time she*

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

8
REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
Case No. 04-5107 CW

*requested her leave on October 29 and her December 31 termination.* A brief review of the relevant dates confirms this fact.

- **October 16**: Pande inquires about severance benefits since she turned down relocation and may have to leave the Company by the end of the year if she does not find another position. (Pande 405:16-407:3 and Exh. 24)
- **October 21**: Pande is informed that she is not eligible for severance benefits. (*Id.)*
- **October 29**: Pande requests a leave, beginning on November 10. (Pande Dec. Exh. B; Taylor Dec. Exh. A)
- **November 7:** Pande's last day at work prior to beginning leave the following Monday. (*Id.*)

Only **ten days elapsed** between the time Pande requested a leave and her last day at work. Even Pande cannot point to any event during that time that could remotely be deemed "adverse." While Pande makes much of the notorious November 4 team meeting, wherein Dunn allegedly yelled at her, this incident does nothing to bolster her claim.

Indeed, when put in context, it is clear that Dunn's conduct had nothing to do with Pande's leave but everything to do with the frustration he felt at his Group's preparation for the upcoming project review. There did not seem to be any ownership of the work plan or any set timetable as to when the various "milestones and deliverables" would be achieved. (Dunn 54:24-55:11) When the Group met on November 4 to discuss its progress, Dunn raised his voice – "it was a stressful time." (Dunn 81:15-23) Pande simply lacks any evidence linking Dunn's November 4 conduct – as inappropriate as it may have been – with her request to take a leave. Even if there were some connection – which there is not – this single event would not create a triable issue warranting trial. "Workplaces are rarely idyllic retreats." *Blackie v. State of Me.,* 75 F.2d 716, 725 (1st Cir 1996). "Minor or relatively trivial adverse actions or conduct" that "do no more than anger or upset an employee" are not actionable. *Yanowitz,* 36 Cal.4th at 1054. While there is no requirement that an employer's "retaliatory acts constitute one swift blow," to be actionable the acts complained of must be sufficient collectively to establish prohibited retaliation. Here, whether considered individually or collectively, the acts Pande complains of do not support such a conclusion.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

First, Pande cites to her termination. However, to the extent Pande believes she was terminated because of Dunn's displeasure over her need for FMLA/CFRA leave, the facts are squarely contrary. Pande, along with all other affected employees, were told in May 2003 (five months before she requested leave) of the decision to relocate SASBU to Houston. Employees were also told that if they did not accept the offer to move to Houston, they would have to find another position within the Company or their employment would terminate. (Pande 358:20-362:7 and Exhs. 16-18; Dunn Dec. ¶3 and Exh. A) Pande did not accept the offer to relocate (Pande 367:7-17), and was informed that her employment would end unless she was successful in finding another position within the Company – there was, however, "no guarantee that such alternative employment will be found." (Pande 363:8-16 and Exh. 19; *see also* 361:14-362:7 and Exh. 18) It was Pande's decision not to relocate and her inability to find another position that led to her termination – her request for protected leave had nothing to do with it.

Apparently recognizing she cannot show Dunn terminated her because of the leave, Pande switches gears. In a last ditch effort to link Dunn to an adverse action, Pande claims that he "negatively influenced" her candidacy for two ETC positions in Zuwa Omoregie's group. Once again, Pande has no evidence to support this assertion. Indeed, while she makes many unsupported assertions in her Opposition, she does not point to any facts that would lead anyone, much less a jury, to conclude that Dunn's comments were the reason she was not selected for either position. On the contrary, the comments purportedly made by Dunn were entirely consistent, if not less severe, than the opinions of Ms. Pande's coworker Tayo Feyijimi. Omoregie recalls Dunn saying that while Pande had strong technical skills, her performance had suffered after the Houston announcement. (Omoregie 25:3-26:11) Feyijimi testified that following the announcement, he saw a marked reduction in Pande's work effort and her commitment to the project – noting that she would come into work late and just "wasn't around." (Feyijimi 15:6-16:15) In any event, Dunn's comments were not the reason Pande was not selected. Omoregie also spoke to Jean Camy and

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

David Kennedy, former supervisors of Pande, who both rated her poorly in terms of teamwork. (Omoregie 37:8-24) Camy's declaration makes clear that he would not work with Pande and was influential in the selection decision. (Camy Dec. ¶¶ 2-7)

In short, Pande has no evidence that Dunn adversely affected either the continuation of her employment or her ability to find another job after she announced her need for leave. As even Pande grudgingly concedes, she has no facts to support her claim that Dunn harbored any ill will based on her taking a leave. (Pande 398:17-400:19, 404:19-405:13, 414:11-420:15; 440:21-444:14; 461:23-463:17, 465:22-467:17) Rather than address (much less explain) this hole in her case, Pande raises a number of irrelevant points – none of which should give this Court any pause.

For example, Pande claims that Dunn "promised" her a position in San Ramon through 2004 and presumably reneged on this promise after she requested leave. This argument fails for two reasons. First, Dunn denies ever making such a promise and Pande offers no proof to the contrary, merely her own unsupported insistence. Second, and most telling, Pande's own actions speak otherwise. Pande posted for a number of positions after the Houston relocation was announced. As the fall progressed, she obviously became concerned about her impending termination and on October 16, sent an email to Human Resources, inquiring about severance benefits. In that email, Pande states that she had turned down the relocation offer and if she is not successful in finding another position she "will likely be forced to leave the Company."[8] If, as she now claims, she had accepted Dunn "promise" of continued employment, why would she express concern about the need to find another position or face termination once the SASBU relocation was complete? Why would she be concerned about severance benefits if she had a "promise" of continued employment? The answer is obvious – Dunn never made such a promise nor reneged on such a promise once Pande made known her need for a leave.

8 Pande also makes much of Dunn's response "let's discuss" to her inquires regarding vacation carryover, so it could be paid out in 2004. Dunn's response adds nothing to Pande's claims.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

Pande's other arguments are similarly unpersuasive. Arguing semantics – whether her employment should be deemed voluntarily or involuntarily – does not create a triable issue. On the contrary, the issue is whether Pande's protected leave was a motivating factor in her termination. Given the timing of the relocation decision – months before Pande ever requested leave – it is clear that Pande's resulting termination, however it is characterized – is unrelated. Similarly, Pande's argument that she did not understand the relocation documents she received in May 2003, is simply incredible. Pande is a highly educated woman with a variety of advanced degrees. (Opp. 2:1-9) The documents she now complains were "hopelessly vague" contained express language indicating that if an employee did not move to Houston, he would have to find another position within the Company or employment would terminate.[9] (Dunn Dec. ¶3 and Exh. A) There was no guarantee that alternative employment within the Company would be found. (*Id.)* Pande clearly understood the process as outlined in the relocation documents as she echoes the language in her October 16 email, stating if she is not successful in finding another position she "will likely be forced to leave the Company." (Pande Exh. 24)

Pande also takes issue with the fact that "other SASBU employees" were allowed to remain in San Ramon after their units officially moved to Houston. (Opp. 16:9-11) She refers to Jalal Affifi and Bob Burkes,[10] arguing that a jury could reasonably infer that she received adverse treatment and therefore the Company's reason for terminating her employment should be disregarded. (Opp. 16:9-14) In other words, Pande believes that

---

[9] The job relocation document provided to Pande contained clear and unequivocal language to that effect. Employees who chose to decline the relocation offer were asked to sign the following statement: "I do not accept this assignment. I understand that the Company might not place me in another assignment and that I may be subject to termination of employment…." (Pande 363:6-16 and Exh. 19) The documentation also stated that termination dates were not open to negotiation, rather, they were "set according to management's judgment based on the company's business needs" and that "There is no guarantee that […] alternative employment will be found." (Dunn Dec. ¶3 and Exh. A)

[10] Once again, Pande cites to unnamed "others" who were also allowed to work in San Ramon after their units moved to Houston. (Opp. 16:9-14) Without any clue as to who these "others" might be, this puffery can be safely ignored.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

but for her request for a leave, she could have remained in San Ramon after her unit – Block 14 – moved to Houston. Not only is this pure speculation, but Pande conveniently forgets to mention that neither Afifi nor Burkes worked in Block 14. (Afifi 9:16-10:21; Burkes 8:4-14) It is undisputed that no one in Block 14 remained in Houston after December 31, 2003. (Dunn Dec. ¶5) While Pande might think it unfair, what happened to SASBU employees in other workgroups simply has no bearing on whether Pande was treated differently than other Block 14 employees.

Pande's remaining arguments are similarly unpersuasive. For example, she claims that Defendant did not grant her "the full extent of the leave for which she was eligible," but concedes that neither FMLA nor CFRA provide immunity from termination. (Opp. 18:21-19:20) She then inexplicably asserts that Chevron cannot argue her employment was terminated for business reasons unrelated to leave status since it never pled this defense. (Opp. 18:21-19:16) Given the express language in Defendant's fourth affirmative defense,[11] it is difficult to see how Pande can make such an argument in good faith. Pande also argues that Defendant violated both statutes by implementing an "across-the-board policy of only certifying leave in 30-day increments." (Opp. 19:17-18) In support of her claim, Pande cites to a letter she received from UnumProvident which states: "You may be required to provide periodic medical re-certification of the serious health condition if you request an extension of your absence or as otherwise permitted by law" and "during your protected absence, you will be required to furnish the FMLA Unit at UnumProvident with periodic reports once every 30 days of your status and intent to return to work…" (Pande Dec. Exh. B) The letter makes no reference to the duration of leave or the period of certification, and

[11] Defendants' Answer To Second Amended Complaint (filed on 12/20/2005), Affirmative Defense No. 4 - (Good Faith/Legitimate Business Reasons) states: "Defendants allege that all actions and conduct by Defendants about which Plaintiff complains would have been taken regardless of any wrongful conduct or motive alleged, and that all actions by Defendants about which Plaintiff complains were in good faith for just, fair, privileged, justified, non-harassing, non-discriminatory, substantial and legitimate business reasons, based on all relevant facts and circumstances known by Defendants at the time it acted."

therefore provides no support for Pande's imagined 30-day "across-the-board" policy. Pande has presented no evidence that such a policy exists for FMLA/CFRA leaves. (*See* also Objections to Evidence cited in Plaintiff's Memorandum ¶27; Objections to Pande Declaration ¶¶40-43) This is hardly surprising because Defendants have no such policy.

In addition to her claims about this non-existent "across-the-board" policy, Pande appears to argue that the language in this letter violates the FMLA/CFRA re-certification provisions. Again this is false. The provision which addresses "re-certification" requires only "periodic medical re-certification … as permitted by law." It therefore cannot support Pande's claim that it is somehow inconsistent with the law. Further, the language about "periodic reports once every 30 days" has nothing to do with medical reports or medical certifications – rather it requires that *the employee* (not his or her health care provider) update UnumProvident on his or her status and intent to return to work. Not only is this legally permissible, but it actually mirrors the FMLA regulations which expressly provide that "[a]n employer may require an employee on FMLA to report periodically on the employee's status and intent to return to work." 29 C.F.R. 825.309.[12] Pande's claims have no merit.

Finally, Pande complains that she was required to execute a broad "waiver of her medical records" in order to be approved for leave. (Opp. 20:24-28) Once again, Pande seems confused as to the underlying paperwork. The release she objects to was a release in order to obtain short term disability (STD) benefits.[13] Although the FMLA and CFRA do limit the amount and type of information that an employer can require for purposes of

[12] Pande's confusion might stem from her reliance on provisions of the FMLA that are not implicated by this language. These sections 29 C.F.R. § 825.306 and 2 C.C.R. § 7297.0(a)(2) address "certifications" from **a health care provider**, not periodic updates by an employee. Simply put, they contemplate medical certifications, not status updates from the employee.

[13] The letter clearly states "If you have a disability claim approved for the same period of time as your [X] FMLA [X] CFRA [ ] PDLL absence, you will not be required to furnish additional medical certification about your serious health condition. If your disability claim is not approved, you will be required to provide medical certification…" (Pande Dec. Exhibit B) Further, Defendants' Disability Management Program does contain a release used for purposes of determining FMLA/CFRA eligibility (Renneke Dec. Exh. A at page CHEVRON/PANDE 06870). Since Pande was not required to furnish any medical information for FMLA/CFRA purposes she did not execute this form.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

determining FMLA/CFRA eligibility, the regulations also make clear and Pande admits, that an employer can require more information for purposes of assessing eligibility for a temporary disability benefits. 29 C.F.R. § 825.207(a)(1). As such, the information and the releases were lawful. Pande simply cannot show Defendant violated the privacy provisions in either FMLA or CFRA. While Pande may have been miffed that she was not informed about the inner workings of UnumProvident, her hurt feelings do not create a triable issue warranting trial. Here, it is undisputed that the FMLA Unit does not review any medical documentation for purposes of assessing FMLA/CFRA eligibility where STD has been approved by the STD Unit. (Opp. 21:8-10; *see also* Pande Dec. Exh. B; Taylor Dec. ¶¶ 5-6 and Exh. A) Rather, the only thing that is considered for purposes of determining FMLA/CFRA eligibility is the "fact" that UnumProvident approved STD benefits. (Taylor Dec. ¶¶ 5-6 and Exh. A) If no medical certification or documentation is requested or reviewed for purposes of determining FMLA/CFRA eligibility, there can be no invasion of privacy and no violation of these laws. Pande's argument to the contrary is absurd.

In short, nothing Pande has stated in her Opposition compels trial on her first and second causes of action.[14] No jury could conclude otherwise.

## IV. CONCLUSION

Pande's Opposition does nothing to connect the dots between any protected status or actions and any adverse action. As such, Defendants are entitled to summary judgment as a matter of law.

Dated: December 22, 2006

MILLER LAW GROUP
A Professional Corporation

By: /S/
Michele Ballard Miller
Attorneys for Defendants

[14] As set forth previously, and acknowledged in Pande's Opposition (Opp. fn. 6), the burden of proof is the same whether a claim for discrimination arises as a statutory claim or as a tort claim. Accordingly, for the reasons set forth herein, Pande's Sixth Cause of Action for wrongful termination also fails as a matter of law.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA