Michele Ballard Miller (SBN 104198)
Kerry McInerney Freeman (SBN 184764)
Lisa C. Hamasaki (SBN 197628)
MILLER LAW GROUP
A Professional Corporation
60 E. Sir Francis Drake Blvd., Ste. 302
Larkspur, CA 94939
Tel. (415) 464-4300
Fax (415) 464-4336

Attorneys for Defendants CHEVRON
CORPORATION (f/k/a CHEVRONTEXACO
CORPORATION), a Delaware corporation,
and CHEVRON INTERNATIONAL
EXPLORATION & PRODUCTION (f/k/a
CHEVRONTEXACO OVERSEAS PETROLEUM
COMPANY), a division of Chevron U.S.A. Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRAN PANDE, | Case No. 04-5107 CW |
| Plaintiff, | **SUPPLEMENTAL DECLARATION OF MICHELE BALLARD MILLER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** |
| v. | |
| CHEVRON CORPORATION (f/k/a CHEVRONTEXACO CORPORATION), a Delaware corporation, and CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a CHEVRONTEXACO OVERSEAS PETROLEUM COMPANY), a division of Chevron U.S.A. Inc., | Date:     January 5, 2007<br>Time:     10:00 a.m.<br>Courtroom: 2 |
| | Complaint filed: December 2, 2004 |
| Defendants. | Trial Date: April 16, 2007 |
| | Honorable Claudia Wilken |

I, MICHELE BALLARD MILLER, declare:

1.      I am an attorney at law licensed to practice before the Courts of the State of California and before this Court. I am a partner in the law firm of MILLER LAW GROUP, Professional Corporation, and am the attorney of record for Defendants

1

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  CHEVRON CORPORATION (formerly known as CHEVRONTEXACO CORPORATION),

2  a Delaware corporation, and CHEVRON INTERNATIONAL EXPLORATION AND

3  PRODUCTION COMPANY, a division of Chevron U.S.A. Inc., (formerly known as

4  CHEVRONTEXACO OVERSEAS PETROLEUM) ("Defendants") in the above-captioned

5  matter. I am also lead trial counsel for Defendants in this case.

6

7          2.    I have personal knowledge of the matters set forth herein, except

8  those stated on information and belief. If called as a witness I could competently testify

9  thereto.

10

11          3.    The parties to this action exchanged Initial Disclosures on December

12  9, 2005, pursuant to Court Order.  A true and correct copy of the Plaintiff's Initial

13  Disclosures are attached and incorporated as Exhibit A.    A true and correct copy of

14  Defendants' Initial Disclosures are attached and incorporated as Exhibit B.

15

16          4.    Subsequent to the exchange of Initial Disclosures, the parties

17  engaged in significant discovery including both written discovery and depositions.

18  Pursuant to the Court's Order Re Scheduling Order, dated July 7, 2006, the completion of

19  fact discovery was to occur on October 30, 2006. Due to scheduling issues, however, the

20  parties agreed to permit further fact discovery, including both depositions and the

21  production of documents, to occur after October 30, 2006.

22

23          5.    In November 2006, Plaintiff's counsel took the depositions of Taryn

24  Shawstad, Paul Vita, and Gary Yamashita.  Defense counsel took approximately one

25  additional hour of Plaintiff's deposition on November 27, 2006.  Plaintiff's deposition was

26  limited to questions relating to the 400+ pages of documents which Plaintiff produced to

27  Defendant, by way of a supplemental production, on or about October 27, 2006.

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1         6.    There remains one additional fact witness deposition to be taken in

2   this matter – the deposition of Ms. Sylvia Benzler.  Defendants timely subpoened Ms.

3   Benzler to produce documents and to appear for deposition.  However, at the request of

4   the witness and Plaintiff's counsel, both the document production and the deposition were

5   postponed.  The parties are currently in the process of scheduling a date and time for

6   both the production of Ms. Benzler's documents and her deposition.    Accordingly,

7   notwithstanding the October 30, 2006 deadline, fact discovery is ongoing.

8

9         7.    Two days after the deposition of Taryn Shawstad and the completion

10  of Plaintiff's deposition, and upon careful analysis of the information learned through the

11  course of discovery, Defendants' decided to supplement their initial disclosures.  A true

12  and correct copy of Defendants' Supplemental Initial Disclosures is attached and

13  incorporated as Exhibit C.  None of the individuals listed in these Supplemental Initial

14  Disclosures can come as any surprise to Plaintiff as all such individuals (or categories of

15  individuals) were referenced or mentioned through the course of fact discovery.

16

17        8.    In fact, Plaintiff has already deposed four of the individuals named in

18  Defendants' Supplemental Initial Disclosures: Rex Mitchell, Zuwa Omoregie, Kathy Mabe

19  and Tayo Feyijimi.

20

21        9.    Additionally, and by way of example only, many of the individuals (or

22  categories of individuals) were also expressly referenced in Plaintiff Kiran Pande's

23  Response to Defendant Chevron International Exploration and Production Company's

24  Interrogatories Set, One which Plaintiff served on or about October 10, 2006.  A true and

25  correct copy of Plaintiff's Interrogatory Responses are attached and incorporated as

26  Exhibit D.    The only individual (or category) who was neither deposed nor mentioned in

27  Plaintiff's Interrogatory responses is Renata Renneke.    Numerous documents were

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  produced by Defendants however, which mentioned Ms. Renneke and indicated her
2  position within Chevron.

4        10.    I conducted the deposition of Plaintiff, Kiran Pande over the course of
5  four days, March 20, 21, 22 and November 27, 2006.  The deposition was transcribed by
6  a certified Shorthand Reporter.    True and correct copies of excerpted portions of
7  Plaintiff's deposition transcripts as well as the exhibits to those transcripts are attached
8  and incorporated as Exhibit E.  The excerpted portions of the deposition transcripts and
9  the exhibits accurately reflect the testimony given at the deposition.

11       11.    On August 10, 2006, Plaintiff's counsel, Noah Lebowitz, took the
12  deposition of Jalaleddin Afifi.  Lisa Hamasaki, an associate in my office was present for
13  that deposition on behalf of Defendants.   The deposition was transcribed by a certified
14  Shorthand Reporter.   True and correct copies of excerpted portions of Mr. Afifi's
15  deposition transcript as well as the exhibits to that transcript are attached and
16  incorporated as Exhibit F.  The excerpted portions of the deposition transcript and the
17  exhibits accurately reflect the testimony given at the deposition.

19       12.    On August 24, 2006, Plaintiff's counsel, Noah Lebowitz, took the
20  depositions of Graham Housen and Robert Burkes.  Lisa Hamasaki, an associate in my
21  office was present for those depositions on behalf of Defendants.  The depositions were
22  transcribed by a certified Shorthand Reporter.   True and correct copies of excerpted
23  portions of Mr. Housen's and Mr. Burkes' deposition transcripts as well as the exhibits to
24  that transcript are attached and incorporated as Exhibits G and H, respectively.   The
25  excerpted portions of the deposition transcripts and the exhibits accurately reflect the
26  testimony given at those depositions.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1          13.  On October 18, 2006, Plaintiff's counsel, Noah Lebowitz, took the

2  deposition of Kathy Mabe.  I was present during that deposition on behalf of Defendants.

3  The deposition was transcribed by a certified Shorthand Reporter.  True and correct

4  copies of excerpted portions of Ms. Mabe's deposition transcript as well as the exhibits to

5  that transcript are attached and incorporated as Exhibit I.  The excerpted portions of the

6  deposition transcript and the exhibits accurately reflect the testimony given at the

7  deposition.

8

9          14.  On October 19, 2006, Plaintiff's counsel, Noah Lebowitz, took the

10  deposition of Jack Dunn.  I was present during that deposition on behalf of Defendants.

11  The deposition was transcribed by a certified Shorthand Reporter.  True and correct

12  copies of excerpted portions of Mr. Dunn's deposition transcript as well as the exhibits to

13  that transcript are attached and incorporated as Exhibit J.  The excerpted portions of the

14  deposition transcript and the exhibits accurately reflect the testimony given at the

15  deposition.

16

17          15.  On October 30, 2006, Plaintiff's counsel, Noah Lebowitz, took the

18  deposition of Rex Mitchell.  I was present during that deposition on behalf of Defendants.

19  The deposition was transcribed by a certified Shorthand Reporter.  True and correct

20  copies of excerpted portions of Mr. Mitchell's deposition transcript as well as the exhibits

21  to that transcript are attached and incorporated as Exhibit K.  The excerpted portions of

22  the deposition transcript and the exhibits accurately reflect the testimony given at the

23  deposition.

24

25          16.  On April 6, 2006, Plaintiff's counsel, Noah Lebowitz, took the

26  deposition of Zuwa Omoregie.  I was present during that deposition on behalf of

27  Defendants. The deposition was transcribed by a certified Shorthand Reporter.  True and

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

SUPPLEMENTAL DECLARATION OF MICHELE BALLARD MILLER IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
Case No. 04-5107 CW

1  correct copies of excerpted portions of Mr. Omoregie's deposition transcript as well as the

2  exhibits to that transcript are attached and incorporated as Exhibit L.  The excerpted

3  portions of the deposition transcript and the exhibits accurately reflect the testimony given

4  at the deposition.

5

6          I declare under penalty of perjury under the laws of the United States of

7  America that the foregoing is true and correct.  Executed on this 22nd day of December,

8  2006 in Larkspur, California.

9

10                                                    _____/S/_____

11                                                    Michele Ballard Miller

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUPPLEMENTAL DECLARATION OF MICHELE BALLARD MILLER IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
Case No. 04-5107 CW**

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

**EXHIBIT A**

1  John A. McGuinn, Esq. (SBN 36047)
   Noah D. Lebowitz, Esq. (SBN 194982)
2  McGUINN, HILLSMAN & PALEFSKY
   535 Pacific Avenue
3  San Francisco, CA  94133
4  Telephone:   415/421-9292
   Facsimile:   415/403-0202
5
   Attorneys for Plaintiff
6  KIRAN PANDE
7
8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
11  KIRAN PANDE,                    )    Case No. 04-5107 CW
                                    )
12              Plaintiff,          )    **PLAINTIFF KIRAN PANDE'S INITIAL**
13                                  )    **DISCLOSURES**
    vs.                             )
14                                  )
15  CHEVRON CORPORATION (f/k/a      )
    CHEVRONTEXACO CORPORATION),     )
16  a Delaware corporation, CHEVRON )
    INTERNATIONAL EXPLORATION &     )
17  PRODUCTION (f/k/a               )
    CHEVRONTEXACO OVERSEAS          )
18  PETROLEUM COMPANY), a division of )
19  Chevron U.S.A. Inc.,            )
                                    )
20              Defendants.         )
                                    )
21  _____)
22
23      Plaintiff Kiran Pande makes the following disclosures pursuant to FRCivP 26.
24  Plaintiff's disclosures herein are subject to ongoing discovery and investigation.  Plaintiff
25  reserves the right to supplement this disclosure as new information is uncovered, or in
26  response to formal discovery demands.  Furthermore, Plaintiff reserves the right to not
27
28  disclose information that is subject to any applicable privilege, the work product

1 | doctrine, or the right to privacy.

2 | **A.    WITNESSES**

3 | Plaintiff identifies the following individuals as having information that is relevant

4 | to this case.  On information and belief, the scope of the testimony of each of these

5 | individuals is described below.

6 |

7 | 1.    **Kiran Pande**
        May be contacted through counsel.

8 | Ms. Pande will provide factual basis for all of the allegations made in her

9 | complaint.

10 |

11 | 2.    **Rex Mitchell**
         Currently employed by Defendants

12 |

13 | Mr. Mitchell will provide information regarding the time period in which he acted

14 | as Ms. Pande's supervisor.  His testimony will include Ms. Pande's complaints about

15 | discriminatory, harassing, and retaliatory conduct by Mr. Mitchell.  His testimony will

16 | also include information about Mr. Mitchell's efforts to sully Ms. Pande's name

17 | throughout the company which led to truncated career options for Ms. Pande.  Mr.

18 | Mitchell will also testify about Ms. Pande's transfer to her final position with the

19 | company.

20 |

21 | 3.    **James "Jay" Johnson**
         Currently employed by Defendants.

22 |

23 | Mr. Johnson will testify about Ms. Pande's complaints of discrimination,

24 | harassment, and retaliation which she suffered at the hands of Mr. Mitchell.  Mr.

25 | Johnson will also testify about what investigation, if any, was undertaken to look into

26 | Ms. Pande's complaints.

27 | ///

28 |

1

2

      4.   **Gary Yamashita**
           Currently employed by Defendants.

3

4

5

6

7

8

9

10

Mr. Yamashita will testify about the complaints lodged by both Ms. Pande and Victoria Thompson alleging discrimination, harassment, and retaliation at the hands of Mr. Mitchell. Mr. Yamashita will testify about the Defendants' policies and practices regarding lodging complaints for unlawful employment practices and policies and practices regarding the investigation of such complaints. Mr. Yamashita will testify about whether or not said policies and practices were followed in regard to Ms. Pande's and Ms. Thompson's complaints against Mr. Mitchell.

11

12

      5.   **Jack Dunn**
           Currently employed by Defendants

13

14

15

16

17

18

19

20

21

22

Mr. Dunn will testify about Ms. Pande's job performance while he was Ms. Pande's supervisor. Mr. Dunn will testify about the group's move to Houston and the details of who in the group moved, who was re-employed in different positions, and who, if anyone, ended their employment involuntarily as a result of declining the move to Houston. He will also testify about the decision to place Ms. Pande in his group as well as the decision to declare Ms. Pande "voluntarily resigned." Mr. Dunn will also testify about his conduct vis-a-vis Ms. Pande's FMLA/CFRA leave. Mr. Dunn will also testify about his pledge to Ms. Pande that she could continue working for his group in San Ramon for the foreseeable future, going forward into 2004.

23

24

      6.   **Zuwa Omeregie**
           Currently employed by Defendants

25

26

27

On information and belief, Mr. Omeregie was the "sponsor" for several of the open jobs to which Ms. Pande applied in late 2004, but did not get. Mr. Omeregie will testify about all aspects of the selection process for those jobs.

28

///

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

PLAINTIFF KIRAN PANDE'S INITIAL DISCLOSURES             3

7.    **Taryn Shawstad**
      Currently employed by Defendants

Ms. Shawstad will testify about the Defendants' Human Resources interactions with Ms. Pande regarding the move to Houston, Ms. Pande's FMLA inquiries, and the determination that Ms. Pande "voluntarily resigned" her position with the Defendants. Ms. Shawstad will also testify about various Human Resources policies and practices which are relevant to this case.

8.    **Victoria Thompson**
      Currently employed by Defendants

Ms. Thompson will testify about the internal complaints of gender discrimination she lodged with the Defendants about Mr. Mitchell. She will also testify about her knowledge of Ms. Pande's similar complaints and their joint session with Mr. Yamashita and others regarding their complaints. Ms. Thompson will further testify about Ms. Pande's job performance and abilities. Ms. Thomson will also testify about Mr. Mitchell's efforts to curtail Ms. Pande's ability to transfer within Chevron to different positions.

9.    **Alizera Moshiri**
      Currently employed by Defendants

Mr. Moshiri will testify about Ms. Pande's reaction to learning of Mr. Mitchell's efforts to curtail her ability to transfer within Chevron and her request to him for assistance.

10.   **Tim Magner**

      Currently employed by Defendants

Mr. Magner will testify about Mr. Mitchell's efforts to curtail Ms. Pande's ability to transfer within Chevron.

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

PLAINTIFF KIRAN PANDE'S INITIAL DISCLOSURES                                        4

11.   **Brian Smith**
      Currently employed by Defendants

Mr. Smith was Ms. Pande's PDC sponsor for part of 2003.  Mr. Smith  will testify about his conversation with Ms. Pande confirming for her that she could move back to EPTC if she desired.

12.   **Tom McMillen**
      Currently employed by Defendants

Mr. McMillen will testify about his experience working as Ms. Pande's supervisor and her job performance in his group.  He will also testify about his statements to Ms. Pande along the lines that she could always return to his group if she desired.  Mr. McMillen will also testify to the fact that Ms. Pande was on the succession plan for his position in EPTC.

13.   **Graham Housen**
      Currently employed by Defendants

Mr. Housen was a co-worker of Ms. Pande's in Mr. Dunn's group.  He will testify about his decisions regarding the move to Houston and his subsequent reemployment in a different position within Chevron.  He will also testify about his personal perceptions regarding Ms. Pande's job-related abilities.

14.   **Jalal Afifi**
      Currently employed by Defendants

Mr. Afifi was a coworker of Ms. Pande who similarly turned down the offer to move to Houston.  He will testify about his decisions regarding the move to Houston and his subsequent reemployment in a different position with the Defendants.  He will also testify about his personal perceptions regarding Ms. Pande's job-related abilities.

///

PLAINTIFF KIRAN PANDE'S INITIAL DISCLOSURES                                            5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15.    **Bob Burkes**
Currently employed by Defendants

Mr. Burkes was a coworker of Ms. Pande who similarly turned down the offer to move to Houston.  He will testify about his decisions regarding the move to Houston and his subsequent reemployment in a different position within Chevron.  He will also testify about his personal perceptions regarding Ms. Pande's job-related abilities.

16.    **Randy Smith**
Current contact information unknown

Mr. Smith was a coworker of Ms. Pande who similarly turned down the offer to move to Houston.  Mr. Smith will testify that he received a severance package of four weeks per year of service, plus enhancements.

17.    **Gordon Seto**
Currently employed by Defendants

Mr. Seto was a coworker of Ms. Pande who similarly turned down the offer to move to Houston.  Mr. Seto will testify that, in or about April 2004, he was selected for continued employment with the Defendants.

18.    **Steve Zalan**
Currently employed by Defendants

Mr. Zalan was a coworker of Ms. Pande who similarly turned down the offer to move to Houston.  Mr. Zalan will testify that, despite turning down the offer and not securing a permanent position with the Defendants, he has been allowed to continue working for the Defendants in San Ramon.

19.    **Mike Clark**
Currently employed by Defendants

Mr. Clark was a coworker of Ms. Pande who similarly turned down the offer to move to Houston.  Mr. Clark will testify that, in or about January 2004, he was placed in

PLAINTIFF KIRAN PANDE'S INITIAL DISCLOSURES                                                    6

1   an ongoing position with the Defendants.

2       20.   **Paul Vita**
3           Currently employed by Defendants

4       Mr. Vita was Ms. Pande's sponsor near the end of her employment with the

5   Defendants. Mr. Vita will testify about Ms. Pande's efforts to find continuing

6   employment with the Defendants and the responses thereto.

7       21.   **Kelly Hartshorn**
8           Currently employed by Defendants

9       Ms. Hartshorn was Plaintiff's PDC representative in 2002 and has knowledge

10   regarding Plaintiff's past performance and Mr. McMillen's statement that she could

11   always have a position in his group.

12

13       22.   **Kathy Mabe**
           Currently employed by Defendants

14       Ms. Mabe attended the November 4, 2003 telephone conference and reported to

15   Jeff Shalleberger about Mr. Dunn's inappropriate behavior towards Ms. Pande. Ms.
16
17   Mabe will also testify about her direct conversation with Mr. Dunn about his comments

18   in the November 4 conference call.

19       23.   **James Swartz**
20           Currently employed by Defendants

21       Mr. Swartz attended the November 4, 2003 telephone conference and will testify

22   about Mr. Dunn's inappropriate conduct towards Ms. Pande.

23       24.   **Roger Severson**
           Currently employed by Defendants
24

25       Mr. Severson attended the November 4, 2003 telephone conference and will

26   testify about Mr. Dunn's inappropriate conduct towards Ms. Pande.

27   ///

28

25.    **Tayo Feyijimi**
Currently employed by Defendants

Mr. Feyijimi attended the November 4, 2003 telephone conference and will testify about Mr. Dunn's inappropriate conduct towards Ms. Pande. Mr. Feijimi will also testify about Ms. Pande's work performance. He will also testify about Mr. Dunn's gleeful reaction after telling Ms. Pande on November 17, 2003 that she was being terminated.

26.    **Jason Ewles**
Currently employed by Defendants

Mr. Ewles attended the November 4, 2003 telephone conference and will testify about Mr. Dunn's inappropriate conduct towards Ms. Pande. Mr. Ewles will also testify about Mr. Dunn's conduct after November 4 regarding Ms. Pande's work load.

27.    **Dale Beeson**
Currently employed by Defendants

Mr. Beeson attended the November 4, 2003 telephone conference and will testify about Mr. Dunn's inappropriate conduct towards Ms. Pande. Mr. Beeson will also testify about Mr. Dunn's attempts to obtain detailed information about Ms. Pande's medical condition.

28.    **Robert Koches**
Currently employed by Defendants

Mr. Koches attended the November 4, 2003 telephone conference and will testify about Mr. Dunn's inappropriate conduct towards Ms. Pande.

29.    **Michael Clark**
Currently employed by Defendants.

Mr. Clark attended the November 4, 2003 telephone conference and will testify about Mr. Dunn's inappropriate conduct towards Ms. Pande.

///

30.    **Jennifer Gilroy**
       Currently employed by Defendants

Ms. Gilroy attended the November 4, 2003 telephone conference and will testify about Mr. Dunn's inappropriate conduct towards Ms. Pande.

31.    **Carlos Martins**
       Direccao de Producao
       Departmento de Reservatorios
       Edificio DH Rua 4 de Fevereiro nr 214
       P.O. Box 1316
       Luanda, Angola

Mr. Martins attended part of the November 4, 2003 telephone conference and will testify about Mr. Dunn's inappropriate conduct towards Ms. Pande. Mr. Martins will also testify about his experience with Ms. Pande as his mentor during his assignment with the Defendants.

32.    **Lupe Dejong**
       Currently employed by Defendants

Ms. Dejong will testify about Mr. Dunn offering Ms. Pande continued work in the business unit in San Ramon through 2004.

33.    **John Fryters**
       Currently employed by Defendants

Mr. Fryters will testify regarding Mr. Dunn's temper, throwing of objects in anger, and willingness to lie about work product.

34.    **Mark Moon**
       Currently employed by Defendants

Mr. Moon will testify regarding Mr. Dunn's temper and his unethical work practices.

35.    **David McKay**
       Currently employed by Defendants

Mr. McKay will testify about his experience working with Ms. Pande and her work

1    performance.  He will also testify about Mr. Dunn's inappropriate actions towards Ms.

2    Pande and his differential treatment of Ms. Pande.

3        36.    **Mark Krolow**
4                Currently employed by Defendants

5        Mr. Krolow will testify about reports he received about Mr. Dunn's inappropriate

6    behavior towards Ms. Pande during the November 4 telephone conference.  He will

7    also testify about what investigation, if any, he undertook as a result of learning of such

8    reports.

9

10        37.    **UnumProvident claims agents/case representatives**
                Agents of Defendants, exact address unknown to Plaintiff

11

12       Members of UnumProvident who, as agents for Defendants, handled Ms.

13    Pande's FMLA file and short term disability file.  These yet unidentified individuals will

14    testify about policies and practices in regard to making applications for FMLA leave and

15    short term disability.  They will also testify specifically about Ms. Pande's file maintained

16    by UnumProvident and the processes by which that file was created and maintained.

17       38.    **Person Most Knowledgeable re: Contract with UnumProvident to be**
18              **Defendants' agents for fulfilling Defendants' obligations under**
                **FMLA/CFRA**
19

20       Corporate designee will testify about the agency agreement between Defendants

21    and UnumProvident through which Defendants' FMLA/CFRA compliance obligations

22    were to be handled by UnumProvident.

23       39.    **Person Most Knowledgeable re: pay rates, elements of**
                **compensation, elements of benefits, etc which would have been**
24              **earned by Ms. Pande had she remained employed by Defendants.**

25       Corporate designee will testify about the elements of Ms. Pande's compensation

26    package during her employment and what the elements would have been had she

27    continued with her employment with the Defendants.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

40.    **Sheri Task, MD**
Bay Valley Medical Group, Inc.
27212 Calaroga Avenue
Hayward, CA 94545
(510)785-5000

Dr. Task will testify about Ms. Pande's medical condition.

41.    **Juliana Wong, MD**
319 Diablo Road
Danville, CA 94526
(925) 314-0260

Dr. Wong will testify about Ms. Pande's medical condition.

**B.    DOCUMENTS**

At this time, Plaintiff has identified the following categories of documents upon

which she intends to rely in pursuing her claims:

1.    Performance Reviews & Related Documents:

Bates Nos. 01-32, 805-867; 1219-1222

2.    Chevron Policies and Procedures:

Bates Nos. 33-36, 462-709, 713-723, 909-919, 946-1018, 1066-1146,

1279-1414

3.    Chevron Organizational Charts & Related Documents:

Bates Nos. 37-81, 905-909

4.    Internal Job Applications & Related Documents:

Bates Nos. 82-461; 869-873; 900-904; 1207-1218

5.    Correspondence Related to Job Termination & Related Documents:

Bates Nos. 710-712, 724-797, 799-804, 1147-1148; 1201-1206

6.    Medical Leave Related Documents:

Bates Nos. 798, 892-899; 1156-1166, 1178-1197

///

7.    Administrative & Internal Complaints:

Bates Nos. 920-945; 1223

8.    Personnel File:

Bates Nos. 1019-1065

9.    Damages Related Information:

Bates Nos. 1149-1155, 1415-1431

10.    Signed Witness Statements:

Bates Nos. 1248-1278

C.    DAMAGES

Plaintiff suffered damages as a result of the various adverse actions taken by various managing agents of the Defendants. The elements of her damages, with some relevant calculation regarding certain elements, are as follows:

1.    **Compensatory Damages**

a.    **Lost Earnings**

Plaintiff's compensation package at the time of her termination was as follows:

| | |
|---|---|
| Salary | $111,600.00 |
| Annual Bonus | $ 10,573.81 |
| Housing Mortgage Interest Buydown | $ 5,460.36 |
| Profit Sharing Savings Plan Company Contribution | $ 8,928.48 |
| Subtotal 1 | $136,562.65 |
| Company Paid Health Insurance | $ 4,052.28 |
| Sub Total 2 | $140,614.93 |
| Pension Plan Contributions (? $20,000/yr) | $ unknown |

The period of loss is January 1, 2004 to the present. With known figures, that amount comes approximately $280,000. Final figures, including valuation of lost value to retirement and benefit plan(s) is subject to continuing discovery and expert valuation.

///

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133
(415) 421-9292

PLAINTIFF KIRAN PANDE'S INITIAL DISCLOSURES    12

### b.    Future Wage Loss

Plaintiff has begun working as an independent contractor as part of her own consulting business.  The relative recency of this development does not allow for any way to accurately calculate ongoing wage and compensation differentials.  Those figures are subject to ongoing discovery and expert valuation.

### 2.    Emotional Distress

Plaintiff has suffered significant emotional distress as a result of the Defendants' actions.  The amount of such damages is currently not subject to calculation, but a matter for the finder of fact to assess after hearing relevant evidence.

### 3.    Liquidated Damages

Plaintiff is entitled to liquidated damages under the Family Medical Leave Act. The parameters of such an award is set by statute.

### 4.    Punitive Damages

Plaintiff is entitled to an award of punitive damages.  The financial status of the Defendants is currently unknown to Plaintiff and is the subject of ongoing discovery and potentially expert valuation.

### 5.    Attorneys' Fees & Costs

Several of the causes of action alleged by Plaintiff provide for the recovery of attorneys' fees and costs.  At the appropriate time, Plaintiff will make an application for recovery of such fees and costs based on approved billing rates and actual costs incurred.

I hereby certify that to the best of my knowledge, information and belief, formed after an inquiry which was reasonable under the circumstances, this disclosure is complete and correct as of the date indicated below.

1  Dated: December 9, 2005

McGUINN, HILLSMAN & PALEFSKY
Attorneys for Plaintiff

By: _____
                Noah D. Lebowitz

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF KIRAN PANDE'S INITIAL DISCLOSURES                                    14

1

## **PROOF OF SERVICE**

2  | CASE NAME:        *Pande v. Chevron Corp., et al.*
3  | CASE NO.:         C-04-5107-CW
   | COURT:            United States District Court, Northern District of California

4

5  I am employed in the City and County of San Francisco, California; I am over the age of eighteen years and not a party to the within action; my business address is 535 Pacific Avenue, San Francisco, California 94133.  On the date last written below, I served the following documents:

6

7

### **PLAINTIFF'S INITIAL DISCLOSURES**

8

9  on the parties, through their attorneys of record, by placing true copies thereof in sealed envelopes addressed as shown below for service as designated below:

10  (A)    By First Class Mail - I caused each such envelope, with first-class postage thereon
11  fully prepaid, to be deposited in a recognized place of deposit of the U. S. mail in San Francisco, California, for collection and mailing to the office of the addressee on the date
12  shown herein following ordinary business practices.

13  (B)    By Personal Service - I caused each such envelope to be personally delivered to
14  the office of the addressee by a member of the staff of this law firm on the date last written below.

15
16  (C)    By Federal Express - I caused each such envelope to be delivered to the Federal Express Corporation at San Francisco, California, with whom we have a direct billing
17  account, to be delivered to the office of the addressee on the next business day.

18  (D)    By Facsimile - I caused a copy of this document to be faxed to the parties noted at the fax numbers stated below.  Attached hereto is a verification of reception.

19

| Type of Service | Addressee | Party |
|---|---|---|
20 |  |  |  |
21 | B | Michelle Ballard Miller, Esq. | Defendants |
   |  | Kerry McInerney Freeman, Esq. |  |
22 |  | Miller Law Group |  |
   |  | 60 East Sir Francis Drake Blvd., Suite 302 |  |
23 |  | Larkspur, CA 94939 |  |

24      I declare under penalty of perjury that the foregoing is true and correct.  Executed
25  this 9th day of December, 2005, at San Francisco, California.

26

27                                      Teresa Tunney

28

PLAINTIFF KIRAN PANDE'S INITIAL DISCLOSURES                                      15

**EXHIBIT B**

1 | Michele Ballard Miller (SBN 104198)
Kerry McInerney Freeman (184764)
2 | MILLER LAW GROUP
A Professional Corporation
3 | 60 E. Sir Francis Drake Blvd., Ste. 302
Larkspur, CA 94939
4 | Tel. (415) 464-4300
Fax (415) 464-4336
5

6 | Attorneys for Defendants CHEVRON
CORPORATION (f/k/a ChevronTexaco
Corporation) and CHEVRON INTERNATIONAL
7 | EXPLORATION & PRODUCTION
(f/k/a ChevronTexaco Overseas Petroleum),
8 | a division of Chevron U.S.A. Inc.

9

10

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA

13

| KIRAN PANDE, | Case No. 04-5107 CW |
|---|---|
| Plaintiff, | **DEFENDANTS' INITIAL DISCLOSURES** |
| v. | |
| CHEVRON CORPORATION (f/k/a ChevronTexaco Corporation) and CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a ChevronTexaco Overseas Petroleum), a division of Chevron U.S.A. Inc. | Complaint filed:    December 2, 2004 |
| Defendants. | |

23    Defendants CHEVRON CORPORATION (f/k/a ChevronTexaco Corporation)

24 | and CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a ChevronTexaco

25 | Overseas Petroleum), a division of Chevron U.S.A. Inc. ("Defendants") make this initial

26 | disclosure, identifying witnesses and disclosing unprivileged documents which it may use to

27 | support its claims or defenses, unless solely for impeachment, pursuant to Federal Rule of

28 | Civil Procedure 26(a).

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

## DISCLOSURE OF WITNESSES

1.     Kiran Pande, Plaintiff.  Ms. Pande has knowledge regarding her employment and/or prospective employment with Defendants.

2.     Jack Dunn, Manager of New Field Development in CTOP's South Africa SBU, Angola Block 14, and Ms. Pande's supervisor while Ms. Pande was employed as a Simulation Engineer in Block 14.   Mr. Dunn has information regarding Ms. Pande's performance and conduct while he supervised her, as well as her decision to decline the Company's offer to transfer her to Houston with the rest of her department.

3.     Kelly Hartshorn, a CTOP employee responsible for "Opportunity Assessment" while Ms. Pande was searching for positions within the Company.   Ms. Hartshorn has knowledge regarding Ms. Pande's search.

4.     Taryn Shawstad, Human Resources General Manager during (at least) Ms. Pande's last two positions with the Company.  Ms. Shawstad has information regarding human resources issues that arose during Ms. Pande's employment, including issues surrounding the end of Ms. Pande's employment and Ms. Pande's efforts to find an alternative position.

5.     Individuals involved in the selection decision for position number 50048079, analyst with the Corporate Strategic Planning Department:  Corla Davis, Rene Dautel and Des King.

6.     Individuals involved in the selection decision for position number 50076677, Market Screening Consultant in London for CTBD:   Sam Laidlaw, Steven Lambert, Richard Mew and Patrick Taylor.

7.     Individuals involved in the selection decision for position number 50076683, Technical Support Manager in London for CTBD:  Rene Dautel, Kelly Hartshorn, Sam Laidlaw, James Lejeune, Taryn Shawstad and Jim Simpson.

**DEFENDANTS' INITIAL DISCLOSURES**
Case No. C 04 4606 MMC

1    8.    Individuals involved in the decision not to fill position number 50076685,

2  Petroleum Engineer in London for CTBD:   George Alameda, Carlos Aguilera, Roger

3  Benedict, Mike Birchfield, Mike Carroll, Clement Chou, Chris Cox, Gerry Flaherty, Gary

4  Greaser, Buster Hines, Neil Jones,    Mike Koch, Miran Kozeljh, Sam Laidlaw, Bob

5  McElrath, Tim Miller, Tim Nagy, TV Viswanathan, Dave Wagner and Les Wood

6    9.    Individuals involved in the selection decision for position number 50076782,

7  Reservoir Engineer-1 in London for CTOP:   George Alameda, Carlos Aguilera, Roger

8  Benedict, Mike Birchfield, Mike Carroll, Clement Chou, Chris Cox, Gerry Flaherty, Gary

9  Greaser, Buster Hines, Neil Jones, Mike Koch, Miran Kozeljh, Bob McElrath, Tim Miller,

10  Tim Nagy, TV Viswanathan, Dave Wagner and Les Wood.

11    10.   Individuals involved in the selection decision for position number 50076782 ,

12  Reservoir Engineer-2 in London for CTOP:   George Alameda, Carlos Aguilra, Roger

13  Benedict, Mike Birchfield, Mike Carroll, Clement Chou, Chris Cox, Gerry Flaherty, Gary

14  Greaser, Buster Hines, Neil Jones, Mike Koch, Miran Kozeljh, Bob McElrath, Tim Miller,

15  Tim Nagy, TV Viswanathan, Dave Wagner and Les Wood.

16    11.   Individuals involved in the decision not to fill position number 50076940,

17  Business Unit Advisor for CTOP in San Ramon:  Jim Blackwell.

18    12.   Individuals involved in the selection decision for position number 50076974,

19  International Business Unit Manager for EMC in San Ramon:  Peter Kump, John Ladd,

20  Kerry Linn, Charles E. Morris, Norm Szydlowski and Alan Vance.

21    13.   Individuals involved in the selection decision for position number 50077210,

22  Strategic & Business Planning Manager for ETC/EPTC in Houston:  James Bates, Bruce

23  Johnson, Cary Mrzowski, Fred Nelson and Chuck Taylor.

24    14.   Individuals involved in the selection decision for position number 50077211,

25  Knowledge Management and Technical Training Manager for EPTC in Houston and/or

26  San Ramon:  James Bates, Bruce Johnson, Cary Mrzowski, Fred Nelson, Mark Puckett,

27  Brian Smith and TV Viswanathan.

28

2

**DEFENDANTS' INITIAL DISCLOSURES**
Case No. C 04 4606 MMC

1    15.    Individuals involved in the selection decision for position number 50077441,

2 Focus Area Manager-Reservoir Management for EPTC in Houston and/or San Ramon:

3 Paul Allinson, James Bates, Bruce Johnson, Janeen Judah, Dave Koning, Kevin Lacy,

4 Mark Puckett, Joseph Naylor and Linda Raedeke,

5    16.    Individuals involved in the selection decision for position number 50077444,

6 Business Planning Coordinator for ETC in San Ramon:  June Gidman, Janeen Judah,

7 Cary Mrozowski, Bruce Reynolds, Carole Rock and Nicola Woods.

8    17.    Individuals involved in the selection decision for position number 50077445/

9 50077446(1), Business Planning Coordinator for ETC in Houston:  June Gidman, Janeen

10 Judah, Cary Mrozowski, Bruce Reynolds, Carole Rock and Nicola Woods.

11    18.    Individuals    involved    in    the    selection    decision    for    position    number

12 50077446(2), Business Development Coordinator for ETC/EPTC in San Ramon or

13 Richmond:  Bruce Reynolds.

14    19.    Individuals involved in the selection decision for position number 50077447,

15 Business Development Coordinator for ETC in Houston:  June Gidman, Janeen Judah,

16 Cary Mrozowski, Bruce Reynolds, Carole Rock and Nicola Woods.

17    20.    Individuals involved in the selection decision for position number 50077718,

18 Senior/Staff Business Analyst for CTGG in San Ramon: Joe Naylor.

19    21.    Individuals involved in the selection decision for position number 50077721,

20 Business Planning Analyst for CTGG in San Ramon: Joe Naylor.

21    22.    Individuals involved in the selection decision for position number 50077873,

22 Petroleum Engineer (Reservoir Asset Management Consultant) for EPTC in Houston:

23 James Bates, Andrew Latham, Ian Partridge, T. Viswanathan and Paul Vita.

24

25    With the exception of Plaintiff, the aforementioned individuals should be

26 contacted through Defendants' counsel, Kerry McInerney Freeman, Miller Law Group,

27 Wood Island Center, 60 E. Sir Francis Drake Blvd., Suite 302, Larkspur, CA 94939, (415)

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1 | 464-4300.

2

3 | ## IDENTIFICATION OF DOCUMENTS

4

5 |     1.     Non-privileged personnel documents maintained by Defendant regarding

6 | Plaintiff Kiran Pande.

7 |     2.     Non-privileged documents regarding Ms. Pande's decision to turn down the

8 | Company's offer to transfer with her unit to Houston.

9 |     3.     Non-privileged documents regarding the selection processes for positions

10 | sought by Ms. Pande.

11

12 |     All non-privileged documents identified in this Initial Disclosure that are

13 | within the custody and control of Defendant are being produced herewith, or have already

14 | been produced to Plaintiff (Bates Nos. Chevron/Pande 00001-06520).

15

16 |     I certify that to the best of my knowledge, information and belief, formed after

17 | an inquiry that is reasonable under the circumstances, that this disclosure is complete and

18 | correct as of the time it is made.

19 | / / /

20 | / / /

21 | / / /

22 | / / /

23 | / / /

24 | / / /

25 | / / /

26 | / / /

27 | / / /

28 | / / /

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1 | Dated:  December 9, 2005

MILLER LAW GROUP
Professional Corporation

By: _____

Kerry McInerney Freeman
Attorneys for Defendants
CHEVRON CORPORATION (f/k/a
ChevronTexaco Corporation) and
CHEVRON INTERNATIONAL
EXPLORATION & PRODUCTION (f/k/a
ChevronTexaco Overseas Petroleum), a
division of Chevron U.S.A. Inc.

Z:\Chevron\Pande\Discovery\06

**DEFENDANTS' INITIAL DISCLOSURES**
Case No. C 04 4606 MMC

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1

## PROOF OF SERVICE

2

I, Tracy Wilson, declare that I am employed at Miller Law Group, A Professional Corporation, whose address is 60 E. Sir Francis Drake Blvd., Suite 302, Larkspur, California 94939; I am over the age of eighteen (18) years and am not a party to this action. On the below date, by the method noted below, I served the following document(s):

3

4

**DEFENDANTS' INITIAL DISCLOSURES and Documents
Bates Numbered CHEVRON/PANDE 3016-3018 and 3037- 06520**

5

6

on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope addressed as follows:

7

8          Noah Lebowitz, Esq.              Attorney for Plaintiff: KIRAN PANDE
           McGuinn, Hillsman & Palefsky

9          535 Pacific Avenue
           San Francisco, CA 94133

10         Tel: (415) 421-9292
           Fax: (415) 403-0202

11

12    ⊠    **BY MAIL:**  By placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the ordinary course of business for collection and mailing on this date at Miller Law Group, 60 E. Sir Francis Drake Blvd., Larkspur, California. I declare that I am readily familiar with the business practice of Miller Law Group for collection and processing of correspondence for mailing with the United States Postal Service and that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business.

13

14

15

16    ☐    **BY HAND DELIVERY:**  By placing the document(s) listed above in a sealed envelope(s) and by causing personal delivery of the envelope(s) to the person(s) at the address(es) set forth above.

17

18    ☐    **BY FACSIMILE:** I served the foregoing documents on the interested party/parties in this action by facsimile transmission from fax number 415-464-4336 and the transmission was reported as completed without error before 5:00 p.m. to the office(s) with the aforementioned fax number(s). I attached to this proof of service the transmission report that was properly issued by the transmitting facsimile machine maintained by Miller Law Group, 60 E. Sir Francis Drake Blvd., Larkspur, California.

19

20

21

22

23    ⊠    [Federal] I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

24

Executed on December 9, 2005 at Larkspur, California.

25

26                                        _____
                                          Tracy Wilson

27

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

**EXHIBIT C**

1 │ Michele Ballard Miller (SBN 104198)
Kerry McInerney Freeman (SBN 184764)
2 │ Lisa C. Hamasaki (SBN 197628)
MILLER LAW GROUP
3 │ A Professional Corporation
60 E. Sir Francis Drake Blvd., Ste. 302
4 │ Larkspur, CA 94939
Tel. (415) 464-4300
5 │ Fax (415) 464-4336

6 │ Attorneys for Defendants CHEVRON
CORPORATION (f/k/a ChevronTexaco
7 │ Corporation) and CHEVRON INTERNATIONAL
EXPLORATION & PRODUCTION
8 │ (f/k/a ChevronTexaco Overseas Petroleum),
a division of Chevron U.S.A. Inc.

9 │

10 │ UNITED STATES DISTRICT COURT

11 │ NORTHERN DISTRICT OF CALIFORNIA

12 │

13 │ KIRAN PANDE,                                    Case No. 04-5107 CW

14 │          Plaintiff,

15 │                                                 **DEFENDANTS' SUPPLEMENTAL INITIAL DISCLOSURES**

16 │ v.

17 │ CHEVRON CORPORATION (f/k/a
ChevronTexaco Corporation) and CHEVRON      Complaint filed:    December 2, 2004
18 │ INTERNATIONAL EXPLORATION &
PRODUCTION (f/k/a ChevronTexaco
19 │ Overseas Petroleum), a division of Chevron
U.S.A. Inc.
20 │

21 │          Defendants.

22 │

23 │          Defendants CHEVRON CORPORATION (f/k/a ChevronTexaco Corporation)

24 │ and CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a ChevronTexaco

25 │ Overseas Petroleum), a division of Chevron U.S.A. Inc. ("Defendants") hereby supplement

26 │ their initial disclosures exchanged on December 9, 2005 and identify the following additional

27 │ witnesses which they may use to support their claims or defenses, unless solely for

28 │ impeachment, pursuant to Federal Rule of Civil Procedure 26(a).

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1

## DISCLOSURE OF WITNESSES

2

3          1.     UnumProvident Claims Agents and/or Case Representatives.

4   Members of UnumProvident who worked on Plaintiff's FMLA and/or short term disability

5   claims or who have knowledge of same, and/or knowledge pertaining to the Defendants'

6   Disability Management Program in effect during the fall and winter of 2003, including but

7   not limited to Natalie Kern, Norma Contreras, Brian Taylor and Kathy Richardson.  Such

8   individuals may have information relating to Plaintiff's file maintained by UnumProvident

9   and Plaintiff's request for leave made in or about October 2003.  Such individuals may

10  also have information about Defendants' policies and practices relating to leave and

11  disability benefits administration.   The address of UnumProvident is 1 Fountain Square,

12  Chattanooga, Tennessee 37402.

13

14          2.     James ("Jay") Johnson, Director of Business Development and

15  Planning for CTOP from approximately February 2002 until March 2003, and Rex

16  Mitchell's supervisor during that period of time.   Mr. Johnson has information regarding

17  Plaintiff's performance and conduct while employed in Business Development and

18  Planning, including issues relating to Plaintiff's allegations concerning her relationship and

19  treatment by Mr. Rex Mitchell and the investigation of same.   Mr. Johnson also has

20  information regarding Plaintiff's efforts to find alternate positions in 2002.

21

22          3.     Rex Mitchell, the Manager of Business and Strategic Planning for

23  CTOP and Plaintiff's supervisor during her employment in that group.   Mr. Mitchell has

24  information regarding Plaintiff's performance and conduct while employed in the Business

25  Development and Planning Group.

26

27

28

**DEFENDANTS' SUPPLEMENTAL INITIAL DISCLOSURES**
Case No. C 04 4606 MMC

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1          4.      Tayo Feyijimi, Petroleum Engineer, Plot 14, New Field Development

2  for CTOP's South African Strategic Business Unit from February 2002 through the SASBU

3  transfer to Houston, Texas.   Mr. Feyijimi has knowledge concerning Ms. Pande's job

4  performance and conduct while employed by SASBU in or about 2002 to late 2003.   Mr.

5  Feyijimi also has information relating to Ms. Pande's rapport with her former supervisor,

6  Jack Dunn, and information relating to Mr. Dunn's performance and conduct.

7

8          5.      Kathy Mabe, employed CTOP's South Africa Strategic Business Unit

9  in Block 14 Angola from 2000 until after the Houston relocation in December 2003.   Ms.

10  Mabe has information concerning Ms. Pande's job performance and conduct while

11  employed by SASBU.   Ms. Mabe also has information relating to Ms. Pande's rapport with

12  her former supervisor, Jack Dunn, and information relating to Mr. Dunn's performance and

13  conduct.

14

15          6.      Renata Renneke, Advisor Disability Management, Health and Medical

16  Services, Chevron Corporation.   Ms. Renneke has information concerning the Defendants'

17  Disability Management Program and applicable leave policies and practices in place

18  during 2003 as well as information relating to Plaintiff's request for leave and short term

19  disability benefits.

20

21          7.      Iris Owens, Administrator in Business Development and Planning in

22  or about 2002.   Ms. Owens has information concerning Ms. Pande's performance and

23  conduct while employed in the Business Development and Planning Group and about

24  Plaintiff's allegations and assertions regarding Mr. Rex Mitchell.

25

26          8.      Brian Smith, Petroleum Engineering Sponsor in 2002 through late

27  2003.   Mr. Smith has information concerning Ms. Pande's job performance, about her job

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  history, and about her efforts to find employment positions within Chevron in and about
2  2002 and 2003.

4       9.    Jean Pierre Camy, Technical Manager for Chevron Business
5  Development, Inc.  Mr. Camy has information concerning Ms. Pande's job performance
6  and conduct in and about 1998 and 1999 and about her subsequent efforts to find
7  employment positions with Chevron in and about 2003 and early 2004.

9       10.    Zuwa Omoregie, Team leader, Petroleum Engineering Consulting
10 Services in Chevron's Energy Technology Company.  Mr. Omoregie has information
11 concerning Ms. Pande's performance and conduct and her efforts to find employment
12 positions with Chevron in and about 2003 and early 2004.

14       With the exceptions of the individuals listed in item number 1, above, the
15 aforementioned individuals should be contacted through Defendants' counsel, Lisa C.
16 Hamasaki, Miller Law Group, Wood Island Center, 60 E. Sir Francis Drake Blvd., Suite
17 302, Larkspur, CA 94939, (415) 464-4300.

19       I certify that to the best of my knowledge, information and belief, formed after
20 an inquiry that is reasonable under the circumstances, that this disclosure is complete and
21 correct as of the time it is made.

23 Dated:  November 29, 2006            MILLER LAW GROUP
                                       Professional Corporation

25                                     By: _____
26                                         Lisa C. Hamasaki
27                                         Attorneys for Defendants

28

**DEFENDANTS' SUPPLEMENTAL INITIAL DISCLOSURES**
Case No. C 04 4606 MMC

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

## PROOF OF SERVICE

I, Tracy Wilson, declare that I am employed at Miller Law Group, A Professional Corporation, whose address is 60 E. Sir Francis Drake Blvd., Suite 302, Larkspur, California 94939; I am over the age of eighteen (18) years and am not a party to this action. On the below date, by the method noted below, I served the following document(s):

### DEFENDANTS' SUPPLEMENTAL INITIAL DISCLOSURES

on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope addressed as follows:

Noah Lebowitz, Esq.                              Attorney for Plaintiff: KIRAN PANDE
McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA  94133
Tel:  (415) 421-9292
Fax:  (415) 403-0202

☒    **BY MAIL:**  By placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the ordinary course of business for collection and mailing on this date at Miller Law Group, 60 E. Sir Francis Drake Blvd., Larkspur, California. I declare that I am readily familiar with the business practice of Miller Law Group for collection and processing of correspondence for mailing with the United States Postal Service and that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business.

☐    **BY HAND DELIVERY:**  By placing the document(s) listed above in a sealed envelope(s) and by causing personal delivery of the envelope(s) to the person(s) at the address(es) set forth above.

☐    **BY FACSIMILE:** I served the foregoing documents on the interested party/parties in this action by facsimile transmission from fax number 415-464-4336 and the transmission was reported as completed without error before 5:00 p.m. to the office(s) with the aforementioned fax number(s). I attached to this proof of service the transmission report that was properly issued by the transmitting facsimile machine maintained by Miller Law Group, 60 E. Sir Francis Drake Blvd., Larkspur, California.

☒    [Federal] I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 29, 2006 at Larkspur, California.

_____
Tracy Wilson

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

**EXHIBIT D**

1  John A. McGuinn, Esq. (SBN 36047)
   Noah D. Lebowitz, Esq. (SBN 194982)
2  McGUINN, HILLSMAN & PALEFSKY
   535 Pacific Avenue
3  San Francisco, CA 94133
   Telephone:   415/421-9292
4  Facsimile:   415/403-0202
5
   Attorneys for Plaintiff
6  KIRAN PANDE
7
8              UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
10
11 KIRAN PANDE,                        )   Case No. 04-5107 CW
                                       )
12              Plaintiff,             )   **PLAINTIFF KIRAN PANDE'S**
                                       )   **RESPONSE TO DEFENDANT**
13 vs.                                 )   **CHEVRON INTERNATIONAL**
                                       )   **EXPLORATION AND PRODUCTION**
14 CHEVRON CORPORATION (f/k/a          )   **COMPANY'S INTERROGATORIES,**
15 CHEVRONTEXACO CORPORATION),         )   **SET ONE**
   a Delaware corporation, CHEVRON     )
16 INTERNATIONAL EXPLORATION &         )
   PRODUCTION (f/k/a                    )
17 CHEVRONTEXACO OVERSEAS              )
   PETROLEUM COMPANY), a division of   )
18 Chevron U.S.A. Inc.,                )
                                       )
19              Defendants.            )
20 _____     )

21   PROPOUNDING PARTY:          Defendant, CHEVRON
                                 INTERNATIONAL EXPLORATION AND
22                               PRODUCTION COMPANY (formerly
                                 known as CHEVRONTEXACO
23                               OVERSEAS PETROLEUM and
                                 improperly sued as CHEVRONTEXACO
24                               OVERSEAS PETROLEUM PACIFIC
25                               COMPANY)
26
     RESPONDING PARTY:           Plaintiff, KIRAN PANDE
27
     SET NUMBER:                 ONE
28

**INTERROGATORY NO. 1:**

State all facts supporting YOUR contention that YOUR exercising YOUR rights under the Family Medical Leave Act/California Family Rights Act was a motivating factor in DEFENDANTS' decision to terminate YOUR employment.

**RESPONSE TO INTERROGATORY NO. 1:**

See DFEH complaint for additional information and supporting facts.

Around late May to early June 2003, prior to handing out the offers to relocate to Houston, TX, John Dunn ("Dunn") assured Kiran Pande("Pande") and others that his first priority after the move offers were made would be to help employees that declined the relocation to find jobs within ChevronTexaco.  It is virtually impossible to obtain another job in ChevronTexaco without the strong support of your current supervisor. Dunn asked Pande to tell him of her decision regarding the relocation offer in advance of extending the relocation offer.  Pande informed Dunn that she could not provide a decision before she received the relocation offer.  Dunn indicated that he thought Pande was going to decline the relocation and he wanted to get an early start on finding her another job in ChevronTexaco.  Dunn indicated that he would of course be delighted if Pande accepted the relocation offer since Pande was a strong performer, she had hit the ground running upon joining his group, people on the team looked up to her, and Pande and her work were so readily accepted by TOTAL, one of the most difficult joint venture partners for Dunn in getting partner approval of operator recommendations.  Dunn told Pande that TOTAL viewed her as one of their own since she had previously worked for ELF.

After Pande declined the relocation offer, Pande asked Dunn for help in locating another position.  Pande specifically asked Dunn to contact Rene Dautel to inquire

1   about any upcoming positions in the Corporate Mergers and Acquisition group.  Dunn

2   told Pande that he was going to hold off because of all the upcoming project

3   deliverables and that he needed her continued support to the Block 14 project.  Dunn

4   assured Pande that there was plenty of work on the Block 14 project and that he

5   needed her continued participation on the Tombua-Landana (S3) project.  Dunn

6   indicated that he wanted to wait and see what happened with the PDC meetings in the

7   
8   fall of 2003 before pursuing discussions with Rene Dautel.

9       On several occasions in 2003, Dunn had expressed frustration with the level of

10  support he was receiving from the CTOP decision analysis group.  Around October 10,

11  2003, Dunn, in a conversation with Pande, reiterated his frustration with the level of

12  support he was receiving on the decision analysis work on the S3 project from the

13  
14  CTOP internal service group managed by Brian Putt.  Dunn expressed frustration that

15  Putt would prioritize new ventures evaluation work and requests from George Kirkland

16  over the Block 14 project work – "a real project" - as opposed to a hypothetical new

17  venture opportunity.  Dunn also expressed his sentiment that Brian Putt was a technical

18  geek and was incapable of managing a consulting group and that Dunn was not happy

19  at how Putt had changed the consultant assigned to the S3 project multiple times

20  
21  already.  Dunn also expressed frustration over the support that he was receiving from

22  Larry Brusher, the Decision Analysis consultant, and commented that Brusher was very

23  ill and Dunn wasn't comfortable relying on Brusher to provide the level of support that

24  Dunn required.  Dunn then asked Pande whether she would be willing to take on the

25  decision analysis work for the project through 2004.  Pande responded that she would

26  be happy to take on that role and she was interested in doing whatever she could to

27  
28  make the project a success.  Pande also told Dunn that she had a strong interest in

1   decision analysis work.  Dunn thanked her for agreeing to continue to support the S3

2   project.

3          On or about October 29, 2003, Pande discussed with Dunn her need for a

4   medical leave.  Dunn responded by inappropriately questioning her as to the nature of

5   her illness and the reason she needed a medical leave.  Dunn asked her about cancer

6   and talked about chemotherapy treatments being very time consuming and that Dunn

7   knew people that had chemotherapy could be off work for several months.  Pande told

8   Dunn that she preferred to keep her health issues private and did not want to discuss

9   her illness with Dunn.  Dunn was upset that Pande would not discuss her medical

10  illness with him.  Dunn continued to quiz Pande and continued making references to

11  cancer and chemotherapy and asked Pande if she had symptoms for a long period of

12  time.  Pande re-iterated to Dunn that she preferred to keep her health issues private

13  and did not care to discuss her illness with Dunn.  Dunn asked Pande the duration of

14  her medical leave and Pande told him that she did not know at this time as she had

15  upcoming doctor's appointments and tests but it was likely to be several weeks.  Dunn

16  was upset by Pande's responses to his queries.  Dunn showed no interest in discussing

17  the work that Pande was doing or the need to develop a transition plan.  Dunn did not

18  raise any issues about managing the work in Pande's absence.  Dunn did not express

19  any concern for Pande's well being.  Dunn never expressed to Pande that her job would

20  be terminating on December 31, 2003.

21          On November 4, 2003, during a group meeting / international conference call

22  with about twelve participants in San Ramon, CA, Houston, TX, and Luanda, Angola.

23  Dunn verbally attacked Pande in retaliation for requesting a medical leave and Dunn

24  engaged in verbally abusive and harassing conduct.  Dunn repeatedly called into

GUINN, HILLSMAN
& PALEFSKY
35 Pacific Avenue
Francisco, CA 94133
(415) 421-9292

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE                4

1   question Pande's intent to take a medical leave. Dunn repeatedly asked Pande how

2   she was planning to get her work done when she was going on medical leave. Since

3   Pande had not discussed her medical leave with anybody else except for one colleague

4   who she collaborated with closely, Pande was shocked. Dunn spent over 30 minutes

5   berating Pande in front of her colleagues and repeatedly demanded Pande tell him how

6

7   she planned to accomplish all the deliverables that we have in front of us to be ready

8   for the next meeting with the RAM team (internal ChevronTexaco audit team) in late

9   January 2004. However, Dunn made it clear that he was not interested in a

10  constructive discussion of how Pande could help the team to transition the work while

11  she was on medical leave. Several team members repeatedly tried to intervene but

12  Dunn repeatedly cut them off and stated "I want her to tell me how she plans to get all

13

14  her work done". Dunn made it clear that his expectation was that Pande had to

15  continue working in preparation for the meeting in late January 2004 and forego her

16  medical leave. Dunn continued to badger and berate Pande. Pande finally told Dunn

17  that she had no intention of discussing her private medical conditions on a conference

18  call with twenty people. It was clear to Pande that Dunn was pressuring her to forego

19  the medical leave which would start on November 10, 2003. At no time during this

20  meeting did Dunn tell Pande or the other participants of the meeting that Pande's

21  employment would be terminated on December 31, 2003. In fact, Dunn kept referring

22  to deliverables for late January 2004 that Pande needed to complete. Dunn did not

23  express any concern for Pande's well being. In fact, even with knowledge that Pande

24  had a serious medical condition, Dunn was intent on putting an enormous amount of

25  pressure and stress on Pande to force her to forego the medical leave that would start

26

27  on November 10, 2003. Later in the meeting he exploded at Pande on another issue.

28

1 | Again Dunn interrupted team-mates when they tried to defend Pande's work and told

2 | them that "he wanted to hear from her and not from them".  Dunn also made references

3 | at this meeting to dancing around issues and pulling the covers over the RAM team.

4 |
5 | Dunn had previously told Pande and others to "don't be honest with the RAM team" in

6 | late June prior to an internal audit of the technical basis of the project.  Dunn never

7 | expressed during this meeting that Pande's job would be terminating on December 31,

8 | 2003.  Instead, Dunn was berating Pande to explain how she was going to finish her

9 | work in preparation for a meeting in late January 2004 with the RAM team.

10 |     Shortly after the November 4, 2003 group meeting / conference call, Kathy Mabe

11 | made an internal complaint to Jeff Shellebarger (CTOP, SASBU General Manager in

12 |
13 | Angola, a direct report of James Blackwell, Managing Director for SASBU) for Dunn's

14 | harassing conduct and inappropriate behavior towards her team-mate Kiran Pande.

15 | Mabe's complaint was in keeping with ChevronTexaco training on harassment

16 | prevention and reporting which taught employees that it was their responsibility to report

17 | harassment and inappropriate behavior especially if they witnessed it being inflicted on

18 | a co-worker.   Tayo Feyijimi also complained directly to Dunn about his conduct towards

19 |
20 | Pande and told Dunn that he needed to apologize to Kiran Pande for his behavior

21 | towards her during the meeting.

22 |     After Mabe's complaint, Mark Krolow contacted Roger Severson who had

23 | attended the November 4, 2003 conference call.  Severson confirmed Mabe's

24 | complaint and reinforced that Dunn's behavior was completely inappropriate.  Mark

25 | Krolow never contacted Pande to inquire about Dunn's behavior or about her well being

26 |
27 | after being verbally attacked by Dunn for planning to take a medical leave.  Jeff

28 | Shellebarger never contacted Pande regarding Mabe's complaint or Pande's well being.

cGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
i Francisco, CA 94133
(415) 434 9393

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE                    6

1    James Blackwell never contacted Pande regarding Mabe's complaint or Pande's well

2    being. Pande had worked with Blackwell when creating presentation materials for Peter

3    Robertson in 2001 and on CTOP technology management from 2001 – 2002. Human

4
     Resources never contacted Pande about conducting an investigation into Dunn's
5
     conduct. Internal ChevronTexaco training indicated that an investigation was required
6
7    and that a normal part of the investigation is to talk to all witnesses, the person that has

8    been harassed, and the harasser. The internal training enacts a demonstration of an

9    investigation and iterates the importance of communicating to the person who has been

10   harassed and the harasser the results of the investigation and actions taken as a result

11
     of the investigation. The training video also had a personal assurance from the CEO,
12
13   David O'Reilly that a person would not be retaliated against for reporting harassment or

14   being the victim of harassment. Mabe indicated to Pande that she had never been

15   contacted by Human Resources about her complaint. Feyijimi indicated to Pande that

16   he had never been contacted by Krolow regarding Dunn's behavior during the meeting.

17   Instead Krolow communicated to the group members in Houston who had only recently

18
     joined the team, that he was aware of what happened and that it would not happen
19
20   again. Pande never heard of any disciplinary action taken against Dunn. In fact, Dunn

21   continued in management and holds an important management position with the

22   company as the Manager of Strategic Planning at ETC (Chevron's Technology

23   Company).

24        On November 6, 2003, Pande worked with Kathy Mabe, Tayo Feyijimi, and

25   Jason Ewles (by phone) on a forward plan to transition her on-going work. Pande put

26
     together a transition document and provided her home phone number and encouraged
27
28   Mabe and Ewles to contact her with any questions. Pande e-mailed the transition

1   document to the work team. Dunn replied to this e-mail and stated concern that Jason

2   Ewles did not have the experience to take over the work that Pande was performing

3   and asked other team members to help out. Dunn did not state that he was planning to

4   terminate Pande's employment on December 31, 2003 in this e-mail.

5       On November 7, 2003, in response to a vacation carry-over request, Dunn sent

6   Pande an e-mail saying he wanted to discuss her request. Dunn followed up with a

7   voice mail indicating that he wanted to discuss the request because 28 days was a

8   large number of days to carry over to 2004 and he would prefer that Pande use more of

9   that vacation in 2003. Dunn did not state in his e-mail or voice-mail that he was

10  planning to terminate Pande's employment on December 31, 2003.

11      During the week of November 10, 2003, Jason Ewles requested permission from

12  Dunn to come to San Ramon to work on the project because he needed help from

13  Kathy Mabe and other team members to learn how to do the work. Dunn replied that

14  Jason Ewles did not need to come to San Ramon because this was Kiran Pande's work

15  and she had to come back and work on the project and finish her work. Ewles was

16  shocked at Dunn's response and replied that he thought Kiran Pande was ill and

17  wouldn't be at work. Dunn replied that this is Kiran's responsibility and she has to come

18  finish it.

19      On November 17, 2003 around 2:00 p.m. Pande sent Dunn an e-mail to let him

20  know that she was still ill and would not be at work. On November 17, 2003 around

21  3:00 p.m. Dunn called Pande at home and told her that he was calling to notify her that

22  she would be receiving a registered letter from Taryn Shawstad at her home address

23  informing her that she would be terminated on December 31st, 2003. Dunn indicated

24  that the letter had been mailed out on Friday, November 14th. Pande informed Dunn

1  that she had not received such a letter.  Dunn proceeded to read the following contents

2  of the letter: "On June 2nd you turned down employment with ChevronTexaco in

3  Houston and this constitutes a resignation from the company.  Since you have

4  voluntarily resigned from the company, you are not eligible for severance benefits,

5  redeployment, outplacement services etc.  Your termination date is set as December

6  31st, 2003."  Further, Dunn informed Pande that they thought there may be issues

7  around FMLA and they wanted to be sure they were "kosher" under that, "honoring the

8  situation".  Dunn said that an employment lawyer was brought in to validate this

9  approach and the employment lawyer viewed this as a valid approach since they could

10  say the timing of this goes back to June and hence, they do not consider that they are

11  notifying Pande on the FMLA time frame.  Dunn said he asked how they could write this

12  based on FMLA but Human Resources and the employment lawyer viewed that FMLA

13  didn't apply since the case is based on notification on June 2nd letter.  Dunn said they

14  questioned him about what verbal agreement he had with Pande on the termination

15  date.  Dunn said that Block 14 was moving on December 12th.  Further Jason is here.

16  We have got your backfill.  He's in place.  We are closing up shop on Block 14 on

17  December 31st and hence that should be the last day.  Dunn said they kicked around

18  using December 12th instead of the end of year.  Dunn then stated that he thought he

19  had discussed this with Pande but didn't know what her recollection was.    Dunn said

20  he thought it was important to bring closure to this situation.  Dunn stated that he wasn't

21  sure what the status of the jobs that Pande had applied for and whether Pande was still

22  waiting to hear on job selections.  Dunn said he had forwarded the e-mail notifications

23  he had received since he wasn't sure if Pande was receiving the same notifications.

24  Pande replied that there were jobs that she had applied for that she had not been

IcGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
n Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

9

1  notified about yet. Pande asked when the process was started for terminating her

2  employment and whether it was triggered by her request for medical leave. Dunn

3  replied that it started a week or so ago but that he had also sent an e-mail note earlier

4  to HR about how we are going to go about notifying Kiran and others and he had sent

5  this note prior to Pande's request for FMLA. Dunn said he had started that mainly

6  because he thought there was a 6-week period required for notification. Dunn said he

7  called Fiona Young (HR contact) to make sure we are being consistent and brought in

8  HR and an employment lawyer to come up with the approach to get around the FMLA

9  timing. Dunn said he recommended a date of end of year for termination. Dunn said:

10  "In simple terms, I thought it was fair to you to let you know about "useful work" timing.

11  FMLA may complicate things in some respects." Dunn further stated: "I know you

12  would have liked to have held onto your benefits but it looks like they are going to

13  expire with your termination". Dunn then said that "he wanted to apologize for his

14  behavior and being hard on you at the meeting we had". Dunn said "I felt bad

15  afterwards". Pande replied: "Apology accepted". Dunn then started again about how

16  he wanted to apologize for his behavior. Pande replied: "Apology accepted." Pande

17  asked Dunn whether he was also terminating Mike Clark. Dunn became very testy and

18  replied that he was not terminating Mike Clark and would not discuss Mike Clark's

19  situation with Pande. Dunn said: "it sounds like you are trying to take my deposition".

20  The e-mail note referred to by Dunn on the November 17, 2003 telephone

21  termination has not been produced by Chevron in response to document discovery

22  requests.

23  Pande spoke to Tayo Feyijimi around 4:30 p.m. on November 17, 2003 after

24  Dunn's telephone termination. Pande told Feyijimi that Dunn had called to terminate

GUINN, HILLSMAN
& PALEFSKY
35 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

10

1  her and had claimed that she had voluntarily resigned. Feyijimi told Pande that Dunn

2  had talked to him a short while ago and that Dunn was smiling and was very ecstatic

3  and happy and informed Feyijimi that Pande had agreed to leave the company and that

4

5  Dunn had apologized to Pande and Pande had accepted his apology. Feyijimi told

6  Pande that he was very surprised by Dunn's announcement that Pande had agreed to

7  leave the company since Feyijimi thought Pande would be returning to work after her

8  medical leave.

9      A letter dated November 18, 2003 from Taryn Shawstad (CTOP General

10 Manager of Human Resources) was mailed to Pande. This letter stated: "On June 2,

11 2003 you received a letter offering you continued employment with ChevronTexaco

12 Overseas Petroleum in Houston, Texas. You did not accept this offer and by turning

13

14 down this job, you have, in effect, resigned from the company. Based on your voluntary

15 resignation you are not eligible for a severance package, redeployment, or

16 outplacement services. At the time you chose not accept the relocation offer you were

17 informed that as long as there was useful work for you, that your employment with the

18 company could continue until year end 2003. As you know, the SABU Block 14 New

19 Field Development group will officially relocate to Houston effective December 12. With

20 the move of your current work unit, continued useful work will no longer be available for

21 you within CTOP. If you are not selected for another ChevronTexaco position, your last

22 day of employment will be Wednesday, December 31, 2003. You will be paid out for

23 any unused 2003 vacation. Please contact the HR Service Center at 1-888-TALK2HR

24 (1-888-825-5247) to obtain your benefits paperwork."

25

26     The termination phone call by Dunn on November 17, 2003 and the termination

27 letter dated November 18, 2003 were the first time that Human Resources or

28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

11

1   ChevronTexaco management informed Pande that the company considered her to

2   have voluntarily resigned, let alone in June, five months prior.

3       ChevronTexaco's Guideline 342 defines "resignation" as an employee who

4   "voluntarily terminates". The Houston move offer does not say failure to agree to

5   relocation is a "resignation", rather failure to agree is deemed "non-acceptance". The

6   document says that if the offer is declined the Sponsor will look for "alternative work"

7   and if that can't be found, employees may be eligible for separation payment under the

8   surplus employee program and will be advised of their eligibility "at the time of

9   termination". That statement and ChevronTexaco's policies regarding moves over 50

10  miles does not equate a failure to relocate to a voluntary resignation or voluntary

11  termination. Historically severance packages have included opportunities for employee

12  redeployment and outplacement services and a severance payment. It is a fact that

13  ChevronTexaco had always offered a severance package for employees that declined a

14  relocation of over 50 miles. ChevronTexaco aggressively advertised its redeployment

15  program to employees and prospective employees as a symbol of ChevronTexaco's

16  commitment to manage workforce changes and ensure that ChevronTexaco is able to

17  retain employees whose jobs are affected by reorganizations or relocations. Kenneth

18  Derr (Chevron CEO) and other senior Chevron managers touted the success of the

19  company's severance programs and redeployment program in matching open jobs with

20  surplus people. ChevronTexaco's employment policy (Guideline 300) prioritizes filling

21  job openings with surplus employees prior to filling jobs with other internal candidates.

22  An article in 1996, refers to an 80% success rate of placing employees in other

23  Chevron jobs through the company's redeployment program. The complete article

24  follows:

:GUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          12

1

2    **"Chevron Corp.: New Skills Equal New Opportunities**

3    Chevron USA had bright, qualified employees—in all the wrong places. Some Chevron
4    units had too many; others too few. Instead of laying off here and hiring there, the
     company trained employees to take jobs outside their specialties or in other Chevron
5    companies.

6    **By Gillian Flynn**

7

8    It's a slippery, scary workplace world out there. Job categories, entire occupations, can

9

10   slide into extinction in the time it takes to make your morning coffee. The best self-
11
     defense against a moribund career: skills, and lots of them.
12
13   Enter San Francisco-based Chevron Corp., a company succeeding in the unstable

14   slicks of the oil industry. We all know the embattled state of the trade as a whole—in

15   the past five years, repeated restructurings and downsizings have kept most oil

16   companies from regaining firm footing. Chevron itself hasn't been impervious to the
17
     turbulence. But it has handled it laudably, always with an eye for avoiding layoffs. It has
18
19   done so by building on that basic idea: The more skills employees have, the safer they

20   are.

21
     Through a special program instituted in 1992, Chevron has rematched employees with
22
     jobs internally, encouraging job-hopping from company to company. The matches don't
23
24   have to be perfect—skills training smooths the rough edges. Employees who can't find

25   another Chevron job are still offered opportunities to develop more marketable skills for

26   job-hunting on the outside. The effort has protected hundreds upon hundreds of

27   workers from the unemployment lines—and saved Chevron millions of dollars in

28

cGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
1 Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          13

1 | severance payments.

2

3 | **To be so unlucky: Chevron just has too many high performers.**

4 | Since the late '80s, the oil industry has been beleaguered indeed. Many divisions at

5 | Chevron found themselves serving up severance packages and outplacement

6 | programs. It wasn't that the employees weren't great; the company just had to slim

7 | down to stay alive.

8

9 | In 1992, the corporation began to ask itself if this was the only way. The company as a

10 | whole wasn't undergoing a downsizing; different divisions within the company were.

11 | Often, while one operating company was cutting its headcount, another was

12 | aggressively recruiting to keep up with demand.

13

14 | Houston-based Chevron Production Co. was one of the first to come up with the idea:

15 | mixing and matching employees from one unit with another. "The process was based

16 | on the premise that these are highly skilled, bright people, and should we not think of

17 | using those skills in other operating companies," says Sam Fortune, manager of human

18 | resources for the Gulf of Mexico business unit, Chevron Production Co.

19

20 | For instance, in production operations, a large number of employees are petroleum

21 | engineers with college degrees. Chevron's refineries have traditionally recruited

22 | chemical engineers. But with some training and assistance, couldn't a petroleum

23 | engineer fill the void? If it could work, it would be a winning situation all the way around:

24 | An over-staffed company would cut headcount without layoffs, an understaffed

25 | company would hire an employee already familiar with Chevron operations and the

26 | employee would hold onto his or her job.

27

28

GUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

14

1   Companies within Chevron were categorized as either supply (needing to cut

2   headcount) or demand (needing to staff up). Within every operating company,

3   redeployment coordinators were identified. Both demand and supply organizations had

4   coordinators—high-level individuals who would negotiate matches.

5

6   The demand companies remained skeptical at first, on two counts. One: They were

7   concerned about how far employees should try to stretch—would they try to jump entire

8   job categories unqualified? Two: They were a little suspicious that "surplus" employees

9   might be low performers who supply companies simply wanted to get rid of.

10

11  Chevron responded from the top level. The company made it clear that it was going to

12  at least try this plan. To ensure its use, HR set up a job bank—demand organizations

13  were required to first post their jobs in the database before they hired outside the

14  company. To further alleviate any doubts, the company ruled that if relocation was

15  involved, the supply company would pay for it—for both exempt and nonexempt

16  workers. Chevron was ready to start its grand experiment, and an experiment it was.

17  Says Fortune: "I have to admit, initially it was all theory. We just put the theory into

18  practice and crossed our fingers."

19

20

21  **Employees identify skills they have, train for those they lack.**

22  While most demand companies originally searched for technical matches, many found

23  they were swayed equally by an employee's "softer" skills: the ability to work in teams,

24  to solve problems, to lead people. Field operators from production headed to refineries

25  to train as board operators. Former techies were jumping into marketing positions

26  whereas before only those with business degrees were hired. "Companies found that

27  what was more important than the degree in many cases was the type of individual and

1   the dimensions of their behavior," says Fortune. "They could actually be trained without

2   a lot of effort to fit into a marketing environment."

3

4   Part of the redeployment coordinator's job was to help identify as many skill areas as

5   possible. Coordinators received reports from employees' former supervisors and

6   interviewed the employees to find out what kind of job they wanted and were suited for.

7

8   Jim Brady, manager of Elk Hills oil field in Bakersfield, California, found himself as the

9   redeployment coordinator for the entire western business unit when more than 150

10  people were "surplused." He spent nearly 70% of his time for six months functioning as

11  a coordinator. He says an important part of the program was this self-assessment

12  process—identifying everything an employee had going for him or her. "The first thing

13  we tried to tell employees was that they weren't being cut off because they weren't

14  good," says Brady. "We told them, 'You've got skills that someone's going to want. All

15  you have to do is identify those skills and find out what the other organizations need.'"

16

17  Of those that entered the redeployment and training program, Brady estimates that

18  80% found another job within the company. Those who weren't redeployed often were

19  partly culpable—they were too rigid in their job interests or relocation destinations. "But

20  people who truly, actively worked with the system, almost all of them were placed," says

21  Brady.

22

23  Whenever possible, surplused employees were immediately released from their job

24  duties so they could spend the full six-month grace period looking for an intracompany

25  job. This allowed them to be free both for meetings with coordinators and interviews

26  with interested demand organizations. For the period of highest intensity, May 1992 to

27

28

1   May 1993, 1,050 individuals were redeployed, spanning job categories as broad as

2   geologists, engineers, technicians, pilots, secretaries, information-systems specialists,

3   offshore oil-platform workers and even more.

4

5   Some supply companies assisted employees in enhancing their marketability by

6   offering their own training. For instance, one unit realized its employees were short on

7   computer competencies, skills many demand companies were recruiting for. It hired

8   Manpower Inc., the staffing firm, to teach onsite classes in computer-software programs

9   such as WordPerfect and Lotus. During a six-week period, more than 200 training

10  sessions were offered. Of the trainees taking all four courses, more than 85% found

11  jobs.

12

13  Most often, however, training was handled by the demand organization. Take the case

14  of Dave Reeves, a redeployee whose background was in health and environmental

15  resources. He hired on at the El Segundo, California, refinery for a position as a

16  reliability analyst. Not a perfect fit, but he met the refinery's basic criteria: a suitable

17  technical background, good communication and problem-solving skills. However, he still

18  required some training. "His background wasn't a refinery background," says his

19  supervisor, Brian Garber, lead fixed-equipment analyst. "There were many processes

20  here he wouldn't understand."

21

22

23  So Reeves underwent several weeks of education: process training (on how the

24  refinery operates), reliability-candidate training (covering basic job skills and

25  expectations) and incident training (instruction on identifying causes of system

26  malfunctions) as well as safety, all conducted in the refinery by trainers or by Garber.

27

28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          17

Garber says the time and cost of training was a worthwhile trade-off. Reeves was up and running quickly—both because he was familiar with Chevron and because he had a high-achieving personality. "Dave was making big, big changes around here in the first year," says Garber. "We had training in place that helped him get a good foot on the ground, but his progress was accelerated by his work ethics."

Despite success stories like Dave Reeves, redeployment wasn't a complete success—not all employees were good fits. But most demand organizations will tell you that the good ones more than made up for the poor ones. Sue Nutter, section supervisor for the environmental operations unit at El Segundo refinery, also supervises a redeployee. Roger Hahn came to the refinery from a production area, but glided through the training and readily applied it. He became such an asset to the division, Nutter actually created a new job for him, upped his pay and gave him supervisory responsibilities. "He was such a pleasant surprise," she says. "I have absolutely no complaints. We made out like bandits." Would she do it again? "If I could identify a good-fit candidate like Roger, I would definitely do it again."

Chevron even provided training opportunities for employees who weren't vying for a job within the company. An educational assistance program reimbursed 75% of tuition, books and fees—even for up to two years after termination—to employees taking courses that would enhance their opportunities for finding a job outside the company. Employees with bachelors' degrees who wanted to become teachers were reimbursed the cost of obtaining their teaching certificates.

Chevron's generous training and education efforts helped employees acquire marketable skills—which landed them jobs inside and outside of the company. Just as

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE                    18

1   human resources had hypothesized early on, it was a winning situation all around.

2   Demand companies have been extremely satisfied overall, says Fortune. "They've seen

3   the benefits of getting an employee who knows the company, who has a track record

4   and can bring quicker success than bringing in a new hire and starting fresh," he says.

5

6   Employees also have been satisfied. Some of Brady's redeployees have contacted him

7   several years after their transfer to tell him how thankful they were for the process. In

8   general, the workforce rests easier knowing that the redeployment option exists if ever

9   they're surplused. Many check the job base regularly anyway, just to see what skills are

10  in demand or to identify opportunities for job enrichment.

11

12  Chevron, as a company, has benefitted in a variety of ways. For one thing, its workforce

13  is more highly skilled as a result of the redeployment process. The effort also saved the

14  company approximately $25 million in severance costs alone, and earned it kudos in

15  the U.S. Department of Labor's *Guide to Responsible Restructuring*.

16

17  For organizations interested in a similar approach, having a variety of businesses

18  running on different cycles as Chevron does is a definite plus. But Fortune believes the

19  effort can work for most companies: "The biggest step rather than the size of the

20  company is committing to at least making an effort to try it. You need top management

21  support—saying, 'Before we let these people go, do we have needs elsewhere they can

22  fill?'"

23

24  Today's job market is all about skills—how many do you have and what can you do with

25  them? Chevron's answer to that question in 1996: Lots."

26

27  *Personnel Journal, June 1996, Vol. 75, No. 6, pp. 77-79.*

28

:GUINN, HILLSMAN
& PALEFSKY
i35 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          19

1    ChevronTexaco Corporation had a severance program in place that applied to

2    relocations over 50 miles.  In 2003, as was done consistently in past years, many

3    ChevronTexaco employees were informed of their eligibility for severance benefits

4    including eligibility for consideration for jobs throughout the company through the

5    redeployment program.   ChevronTexaco and CTOP offered a severance package to

6    many employees in 2003 as they had done in past years.  Redeployment benefits as

7    part of the severance package were instrumental in placing many of those employees

8    with alternative work at ChevronTexaco.  The importance and success of the long-

9    standing (instituted around 1992) redeployment program in retaining employees was

10   touted frequently by Chevron and ChevronTexaco to employees, prospective

11   employees, shareholders, and the investment community.  An indication of that

12   continued commitment was evidenced by ChevronTexaco creating a new position, filled

13   by Cary Mrozowski, aimed at increasing the effectiveness of the corporation wide

14   redeployment process in the 2002 – 2003 time frame.

15        Chevron sent an e-mail to SASBU employees on May 13, 2003 that SASBU was

16   working with Human Resources and the Sponsor group's to finalize the move and PDC

17   policies.  ChevronTexaco e-mails and documents on the move policy told employees

18   that the same policies would be applied to all groups affected by the SASBU move

19   including people working in EPTC and CITC providing support to SASBU activities.  All

20   people working for EPTC and CITC were offered a severance package while they

21   worked with their Sponsor to locate alternative work.  The information packet dated May

22   22, 2003, presented by SASBU on the move stated: "For those employees who decline

23   the offer, their Sponsor will work with them to find alternative employment: For US$

24   Employees, if no alternative employment can be found, employees may be eligible for a

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          20

1    separation payment under the surplus employee program in place and will be advised

2    of their eligibility at the time of termination. For expatriate employees, if no alternative

3    employment can be found, employees will be repatriated to their home country, and

4
     may become eligible for severance under any plan in effect for their payroll if no
5
     alternative employment can be found for them." Jalal Afifi stated that he was indeed
6
7    offered a UK severance program in 2004. There is no statement in the information

8    packet of May 22, 2003, or the job offer itself, that claims voluntary resignation or

9    voluntary termination if the relocation offer is declined. Furthermore, all CTOP

10   employees that turned down the relocation to Houston were placed in other jobs in

11
     2004 or beyond. Employees that had been not been offered a position in Houston were
12
     all allowed to continue working in San Ramon until they were placed in other jobs in
13
14   2004 and beyond. The only employee whose job was relocated to Houston to be

15   terminated was Pande.

16          In late June to early July 2003, Brian Smith, the CTOP Petroleum Engineering

17   Sponsor told Pande that CTOP had applied for the corporations' severance package

18   and that Pande would be eligible for that severance package if she was not placed in
19
     another job since her job was moving over 50 miles. Brian Smith further informed
20
21   Pande that he could place her back at EPTC but wanted to wait and see how things

22   shook out with the upcoming PDC meetings. Brian Smith told Pande that he wanted

23   her to be aware that if Pande turned down an EPTC job in San Ramon that she would

24   not be eligible for the severance package because the EPTC job is within the 50 mile

25   limit. Brian Smith also made the comment that he would like to find some way to retain
26
     Pande since CTOP had so few women engineers.
27
28          During the Fall 2002 PDC meetings, Kelly Hartshorn had placed Pande's name

1   on a job slate for the Project Resources Company (PRC). In order to be placed on the

2   job slate, PRC required a guarantee from another Chevron company that at the end of

3   the PRC assignment that the company would guarantee that they would take the

4   candidate back to their organization. A high level EPTC manager, Tom McMillen, told

5   the PDC that EPTC would provide that guarantee for Pande. Kelly Hartshorn, John

6   Dunn, James Johnson, Brian Smith, and the PDC committee members all knew of

7   McMillen's guarantee that Pande could be placed back at EPTC at any time. EPTC

8   had many groups where Pande could have worked that provided services to CTOP and

9   CTNAU including a simulation consulting group based in San Ramon. It was not

10  uncommon for CTOP employees to be transferred to EPTC for temporary or special

11  assignments. Dunn never contacted EPTC to request that Pande be placed back at

12  EPTC. In fact, Dunn provided extremely negative feedback on EPTC positions that

13  Pande applied for to ensure that Pande would not be selected for EPTC jobs through

14  the job selection process. ChevronTexaco had a severe shortage of people with the

15  skill sets to perform simulation work. Dunn could easily have helped Pande to find

16  alternative work at ChevronTexaco since Pande's skill sets were in such high demand.

17  ChevronTexaco external job postings in 2004-2006 indicate that they continue to have

18  a significant shortage of engineers with skill sets to perform simulation work.

19          Cary Mrozowski called Pande on October 15, 2003 telling her that she was one

20  of the people on his radar screen as redeployment coordinator and asked her whether

21  she had been given a severance date. Pande told Cary Mrozowski that she had not

22  been given a severance date but that she wanted to understand the severance

23  package provisions in terms of tax implications. Cary Mrozowski suggested that Pande

24  contact Human Resources to ask about the policy since that was beyond his scope of

cGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
1 Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE                    22

1  knowledge.

2       Pande sent an e-mail to Taryn Shawstad on October 16, 2003 asking about the

3  policy and how severance benefits are paid out if the severance date is in 2004.  Fiona

4  Young replied to that e-mail on October 21, 2003 indicating that Young had not been

5  advised that Pande had been declared surplus by the company and hence Pande was

6  not currently eligible for any form of severance payment.  Fiona Young did not tell

7  Pande that the company considered that she had voluntarily resigned in June 2003 and

8  hence was not eligible for severance benefits.  Fiona Young confirmed that no

9  severance date had been set since she had not been advised that Pande had been

10  declared surplus by the company.  Fiona Young did not inform Pande in this e-mail that

11  Pande would be terminated on December 31, 2003.

12       Pande responded to Taryn Shawstad's termination letter on December 8, 2003.

13  Shawstad responded to Pande's letter on December 16, 2003.  On Pande's behalf,

14  Martin Kresse responded to Shawstad's letter on December 22, 2003.

15       On December 11, 2003, Paul Vita the new CTOP Petroleum Engineering

16  Sponsor left a voice-mail asking Pande to apply for two EPTC positions in San Ramon

17  that had just been posted.  Upon returning Paul Vita's phone-call, Pande learned that

18  Paul Vita was not even aware that CTOP was in the process of terminating Pande's

19  employment.  This confirms that Dunn, Dunn's management, and Human Resources

20  did not consult with the Sponsor as to his ongoing efforts to find alternative

21  employment.  Vita told Pande that she should still apply for the positions and that as

22  long as she was on the slate before she was terminated, she would still be considered

23  for the positions and could have her employment reinstated retroactively if she was in

24  fact terminated before the selections were made.

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          23

1    Zuwa Omeregie testified as to Dunn's extremely negative comments on Pande's

2    performance in the job selection process.  Dunn never expressed concerns about

3    Pande's performance verbally or in writing to Pande until the November 4th conference

4    call where Dunn harassed Pande for her request for medical leave.  At that meeting

5    Dunn disparaged Pande's work performance even though Pande's co-workers

6    supported Pande's approach to the project work.  In fact, Dunn had sent an e-mail on

7    

8    October 10, 2003 indicating that he knew that delays on the F-1 simulation modeling

9    were not Pande's fault.  Dunn had assured Pande in June 2003, prior to handing out

10   the offers to relocate, that his first priority would be to help employees that declined the

11   relocation to find jobs within ChevronTexaco.  Again, it is virtually impossible to obtain

12   another job in ChevronTexaco without the strong support of your current supervisor.

13   ChevronTexaco's decision to terminate Pande after she started her medical leave was

14   a result of Dunn being reported for harassment, and retaliation by Dunn and others for

15   

16   Pande's complaints to management.  Dunn ensured that Pande was not selected for

17   any jobs through his extremely negative input about Pande's performance.

18   Dunn's input on Pande's performance is in stark contrast to Pande's

19   performance in 2003 and to Dunn's comments to Pande on her performance in 2003

20   during the year.  Dunn never voiced any concerns about Pande's performance until

21   after Pande requested medical leave.  Dunn's actions to terminate Pande only occurred

22   after Pande exercised her right to take a FMLA/CFRA protected medical leave and after

23   Dunn's harassing conduct was reported to management.  According to Dunn himself,

24   HR, and the employment lawyer that Dunn worked with used the pretext of voluntary

25   

26   resignation to claim that there was a pre-determined termination date for Pande that

27   was independent of her request to take medical leave.  ChevronTexaco also claimed

28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE        24

1    that because of voluntary resignation Pande was no longer eligible for severance

2    benefits including redeployment in contrast to what Brian Smith, the Petroleum

3    Engineering Sponsor, had told Pande around late June to early July 2003. Brian Smith

4    sent Pande an e-mail on November 27, 2003 asking Pande whether she had received

5    an end date yet. A person that voluntarily resigns sets their own end-date, however,

6    the company sets an end-date when they choose to terminate an employee

7    involuntarily. Shawstad's letter dated December 16, 2003 fictionalized Dunn's offer of

8    continued work on the S3, Tombua-Landana project through 2004 that Pande had

9    accepted in early October 2003 prior to her request for a medical leave. Dunn's input to

10   Omoregie on job selection included Dunn's claim that Pande still had a job with his

11   group in Houston. Dunn did not inform Pande on the November 17th termination phone

12   call that there was still a job for Pande in his group in Houston.

13   **INTERROGATORY NO. 2:**

14       IDENTIFY all PERSONS with information or knowledge supporting YOUR

15   contention that YOUR exercising YOUR rights under the Family Medical Leave

16   Act/California Family Rights Act was a motivating factor in DEFENDANTS' decision to

17   terminate YOUR employment.

18   **RESPONSE TO INTERROGATORY NO. 2:**

19       John Dunn

20       Mark Krolow

21       John Bailey

22       Jeff Shellebarger

23       James Blackwell

24       David Kennedy

cGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
1 Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

25

1    Jean Camy

2    George Kirkland

3    Peter Robertson

4    Taryn Shawstad

5    Fiona Young

6    David Cover

7    Kathy Mabe

8    Tayo Feyijimi

9    Dale Beeson

10   Carlos Brito Martins

11   Mike Clark

12   Bob Koches

13   Roger Severson

14   Jason Ewles

15   Jennifer Gilroy

16   James Swartz

17   Gary Yamashita

18   Kelly Hartshorn

19   Peter Hartshorn

20   Paul Vita

21   Brian Smith

22   George Alameda

23   Ian Partridge

24   Cary Mrozowski

:GUINN, HILLSMAN
& PALEFSKY
35 Pacific Avenue
Franclsco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          26

1    Zuwa Omoregie

2    UNUM Provident Representatives

3    **INTERROGATORY NO. 3:**

4
5    State all facts supporting YOUR contention that YOUR gender was a motivating

6    factor in DEFENDANTS' adverse decisions related to YOUR compensation, job

7    assignment, and termination.

8    **RESPONSE TO INTERROGATORY NO. 3:**

9    ChevronTexaco management treated Pande less favorably because of her

10   gender with respect to compensation, promotion, job assignment, job classification and

11   grade level, job selection, and termination.  ChevronTexaco management treated

12   Pande less favorably because of her gender in support of career development goals

13   and career progression and in support of job nominations and job selection.

14

15   ChevronTexaco management treated Pande less favorably because of her gender in

16   providing career advancement and training opportunities and mentorship and coaching.

17   Rex Mitchell ("Mitchell"), James Johnson ("Johnson"), and Dunn treated Pande less

18   favorably because of her gender in project assignments, providing resources and

19   support to carry out her work, evaluation of her work and performance, and assessment

20   of skills, potential, leadership potential, and classification as a high potential employee.

21

22   The DFEH complaint, PMP documents (including 2001 PMP), e-mail (4/23/2002)

23   to Ombuds, Gary Yamashita, with bullet point list of concerns relating to harassment,

24   retaliation, and discrimination provide additional details supporting the fact that gender

25   was a motivating factor in ChevronTexaco's adverse decisions related to Pande's

26   compensation, job assignment, and termination.

27
28   Pande was qualified for a wide range and very large number of jobs at

lcGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
n Francisco, CA 94133

1   ChevronTexaco based on her work experience, work performance, education and

2   training.  Pande's case complaint, curriculum vitae (CV), and Performance

3   Management Process (PMP) documents detail Pande's qualifications, skills,

4   experience, and excellent work performance history.

5

6       ChevronTexaco openly and widely promoted itself (ChevronTexaco Way) as a

7   company that valued diversity and was committed to increasing diversity including

8   visible diversity at all levels.   In spite of ChevronTexaco's proclamations about

9   diversity, ChevronTexaco and especially CTOP noticeably lacked women, minorities,

10  and minority women in management and job selection committees.  ChevronTexaco

11  often used managed moves as a tool for career development.  CTOP used the

12  Personnel Development Committees (PDC), the ICE program, and managed moves in

13  a preferential manner to promote the career development and progression of male

14  employees.

15

16      The PDC process operated as a good old boy network, with the same small

17  group of managers who are rotated around available management positions, holding

18  discussions on job selections for ChevronTexaco jobs located in the U.S. and all over

19  the world, with no accountability for their selections or actions.  The PDC process did

20  not rely on facts or supporting evidence or adequate follow through on information that

21  may contradict discriminatory or retaliatory remarks made by managers in the good old

22  boy network during confidential job selection discussions.  The confidential discussions

23  on job selection made it impossible for a job candidate to respond to disparaging

24  remarks, mischaracterizations, and outright falsehoods.  The PDC committees and job

25  selection committees lacked adequate process and diversity to challenge remarks and

26  good old boy behaviors and prevent discriminatory and retaliatory conduct.  The job

27

28

cGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
1 Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE                    28

1    selection process was supposed to include feedback to applicants on why they were

2    not selected to assist the applicant with career development.  Pande very rarely

3    received feedback directly from the job selection process.

4         ChevronTexaco and especially CTOP had a culture where men in management

5    operate under the belief that women employees are out to file claims of harassment

6    and discrimination.  This culture leads to labeling and branding of women who make

7    complaints and blacklisting from job selection.  In or around 1999 – 2000, David

8    Kennedy told Pande that he had been afraid of being transferred to a domestic

9    assignment in the U.S. because he had heard from a large number of his male

10   colleagues while working internationally that women were out to sue the company by

11   claiming sexual harassment or discrimination.  David Kennedy further said that he had

12   been afraid to have women employees report to him and had been concerned when he

13   saw that there were several women in the group that he would be managing when he

14   transferred to San Ramon from an international location.

15        In or around early 2001, Mitchell told Pande that he had needed to bring a

16   woman into his group to fulfill his diversity action plan and hence his decision to bring

17   Pande into his group.

18        In or about June – July 2003, Dunn told Pande that he personally had more

19   limited opportunities for career advancement in the company since he was a white male

20   and the company was only promoting women and minorities to achieve diversity targets

21   and that Pande had better career advance opportunities than Dunn since Pande was a

22   minority woman.  Dunn also told Pande that he had less job security with the company

23   because he could be fired for making inappropriate or racist remarks.  Pande

24   responded to Dunn's comment by reminding him that no action was taken against

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE                    29

1  Mitchell for making racist remarks.  Dunn responded that Pande had a point.

2      In or around June 2003, Dunn told Pande that Mike Clark was "a good hand" and

3  "one of the boys" and "we are going to take care of him".  Dunn at the same time

4  threatened Pande's employment telling Pande that he was in sole control of her

5  employment situation and that Mark Krolow would follow Dunn's recommendations".

6

7      In or around November 2003, Tayo Feyijimi told Pande that Mike Clark had told

8  Feyijimi that Clark had been told that Mark Krolow was going to take care of finding him

9  another job in the company.  On November 4, 2003, Clark told Pande that Dunn and

10  Krolow had told him that they were going to take care of Clark and for him not to worry.

11

12      Mitchell –  Pande's supervisor –  told Pande around October 31, 2001 that he

13  viewed her as the top performer, most talented, and highest potential employee in his

14  group.  In spite of Mitchell's statements, Mitchell ranked Pande lower than male

15  employees and gave Pande a lower raise, failed to promote Pande in 2002 as he had

16  promised in September 2001.  Furthermore, Mitchell had told Pande in 2001 that she

17  was a high potential employee for the Business Development and Commercial PDC

18  and had told Pande that he needed to put recommendations on career development on

19  the forms for the PDC.  Mitchell sent Kemal Anbarci and Matt Palmer an e-mail around

20  June 3, 2002 requesting information for filling out the form for high potential employees.

21  Mitchell did not send Pande a form for high potential employees indicating that Mitchell

22  had removed Pande from the Business Development and Commercial PDC high

23  potential list in 2002.

24

25      Victoria Thompson and Pande presented the Ombuds, Gary Yamashita, a bullet

26  point list of concerns for discussion with James Johnson on April 24, 2002:

27  **CTOP Planning constitutes a hostile work environment that does not foster**

28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE                    30

1    productivity or respect amongst the work group

2    -- Adversarial approach

3    -- Power and intimidation tactics utilized

4    -- Openly slanderous of management, peer group, and team members

5    -- Does not foster a spirit of inclusion of all team members

6    

7    Performance evaluations are preferential (biased?)

8    -- Not grounded with customer feedback

9    -- Not based upon work product

10   -- Not driven by an even distribution of work load amongst the team

11   

12   Unfair yardsticks are used for performance criteria

13   -- Trivialization and lack of interest/support of work processes not directly

14   related to supervisor's skill-set and/or knowledge-base

15   -- Scope of positions not relative to salary grade

16   -- Personnel issues handled on an ad hoc basis rather than uniformly

17   

18   Retaliatory measures are of immediate concern

19   -- Retaliation already in evidence

20   -- Guilt by association?

21   -- Seeking insulation from further retaliation

22   

23   

24       On April 24th, 2002, Victoria Thompson and Pande met with the Ombuds, Gary

25   Yamashita, and Johnson to discuss concerns of harassment, retaliation, and

26   discrimination at the hands of Mitchell. During this meeting, Pande raised concerns

27   about Mitchell's treatment of women and minorities including Melody Meyers, Jeanette

28   

cGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
1 Francisco, CA 94133

1    Newville, and Ali Moshiri. Pande also told Johnson about Mitchell's use of a racist slur

2    that targeted Pande's ethnic background. Pande also complained about Mitchell's

3    intentionally and selectively assigning secretarial/administrative work to Pande.

4    Johnson told Pande that Mitchell had told Johnson that Mitchell assigned secretarial

5    work to Pande because he didn't trust Pande with critical work.

6

7        A direct result of Pande's complaints of harassment and gender and race based

8    discrimination was Pande's forced transfer to a less desirable job which offered

9    considerably reduced opportunities for advancement and career development.

10   Johnson threatened Pande with termination if she did not accept the simulation

11   engineer position. Dunn told Pande that she was in a "must move" position and

12   threatened Pande with blacklisting her from future petroleum engineering job selections

13   if she turned down the offer to work for Dunn as a simulation engineer. Johnson and

14   Dunn's threats, the continued hostile work environment working for Mitchell, Mitchell's

15

16   retaliatory conduct, Johnson's continued refusals to investigate Pande's complaints or

17   take action against Mitchell for retaliatory conduct, left Pande with no viable alternative

18   other than to capitulate and accept a much less desirable job that knocked Pande off a

19   business development-commercial, and management career development track. The

20   fact that Pande's new job as a simulation engineer was evidence that Pande had been

21   sidelined and blacklisted was reinforced by comments from Ian Partridge and Jean

22

23   Camy in 2003. In 2003, Jean Camy stopped by Pande's office and made belittling

24   comments and laughed at Pande about Pande's assignment as a simulation engineer

25   and remarked that Pande had wasted her time doing an MBA if she was going to go

26   back to doing simulation work after working in the Planning group. Partridge

27   commented to Pande about her new assignment doing simulation work as being a

28

1   backward step after working in the Planning group.  In October 2002 while discussing

2   the job in Dunn's group, Dunn told Pande that it must be tough for her to "go back to the

3   bench" doing simulation work after working in the Planning group and being on that

4   career path.  Dunn told Pande that his project would benefit greatly from Pande's

5   expertise and skills and with getting approvals from their joint venture partner, TOTAL

6   because of Pande's experience working with ELF in Pau, France.  Dunn told Pande that

7   he would support Pande in posting for other jobs within a year if Pande did not want to

8   continue in the simulation engineer role because he recognized it was not what Pande

9   wanted to do.

10  

11      In June 2003, after Pande's presentation at a partner's meeting, Dunn remarked

12  to Pande in the presence of Dale Beeson that Pande should be manager of the S3

13  project instead of Dunn since TOTAL respected her and accepted her work and

14  recommendations so easily.  Beeson commented to Pande later that he thought Dunn

15  sounded jealous of Pande and the ease with which TOTAL accepted Pande's work.

16  Dunn's comments about Pande's performance in job selection discussions were in

17  stark contrast to Dunn's comment that Pande should be manager of the S3 project

18  instead of Dunn.

19  

20      Dunn provided Pande with less resources to perform tasks than similarly situated

21  male employees (e.g. Mike Clark).   Pande had asked Dunn several times for additional

22  resources to enable meeting multiple deliverables with practically simultaneous

23  deadlines.  Dunn promised Pande additional resources from EPTC or a consultant.

24  Dunn never followed through on this promise to provide additional resources.  Pande

25  suggested using a ChevronTexaco employee (Annemette Ditlevsen) returning from an

26  educational leave of absence in 2003.  Dunn promised to contact Ditlevsen and inquire

27  

28  

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

33

as to her interest and availability to assist Pande with project work. Dunn never

communicated to Pande the result of his discussions with Ditlevsen. Pande learned

independently from Ditlevsen that Dunn informed Ditlevsen that there was "no useful

work" for her to perform in Dunn's group.

Mitchell provided Pande less resources and support to perform her work than

male employees who had performed the many roles and responsibilities in her new

position. In addition, Mitchell intentionally burdened Pande with secretarial and

administrative work because of his discriminatory behavior. Mitchell and Dunn provided

less support with pursuing career development goals through development

assignments and training than to male employees. Mitchell, Johnson, and Dunn

provided less support to Pande in job posting/selection process than to male

employees. Mitchell recommended Pande post for a job in September 2002 that made

no sense from a career development/career path perspective. Mitchell did not propose

this job to white male employees in his group.

**INTERROGATORY NO. 4:**

IDENTIFY all PERSONS with information or knowledge support YOUR

contention that YOUR gender was a motivating factor in DEFENDANTS' adverse

decision related to YOUR compensation, job assignment, and termination.

**RESPONSE TO INTERROGATORY NO. 4:**

Victoria Thompson

Iris Owens

Jerelyn Kendricks

Ali Moshiri

Brian Smith

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

34

1    Paul Vita

2    Rex Mitchell

3    James Johnson

4    Clement Chou

5

6    Michael Clark

7    Mark Krolow

8    Jeff Shellebarger

9    James Blackwell

10   George Kirkland

11

12   Gary Yamashita

13   John F. Dunn

14   Taryn Shawstad

15   David Kennedy

16   Kelly Hartshorn

17   Tim Magner

18

19   Fernando Gaggino

20   Annemette Ditlevsen

21   Nicola Woods

22   Alan Nunns

23   **INTERROGATORY NO. 5:**

24       State all facts supporting YOUR contention that YOUR race/national origin was a

25   motivating factor in DEFENDANTS' adverse decisions related to YOUR compensation,

26   job assignment, and termination.

27   **RESPONSE TO INTERROGATORY NO. 5:**

28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE                35

The DFEH complaint, PMP documents (including 2001 PMP), e-mail (4/23/2002) to Ombuds, Gary Yamashita, with bullet point list of concerns relating to harassment, retaliation, and discrimination, and response to Interrogatory No. 3 provide additional details supporting the fact that race/national origin was a motivating factor in ChevronTexaco's adverse decisions related to Pande's compensation, job assignment, and termination.

ChevronTexaco management treated Pande less favorably because of her gender and race/national origin with respect to compensation, promotion, job assignment, job classification and grade level, job selection, and termination. ChevronTexaco management treated Pande less favorably because of her gender and race/national origin in support of career development goals and career progression and in support of job nominations and job selection. ChevronTexaco management treated Pande less favorably because of her gender and race/national origin in providing career advancement and training opportunities and mentorship and coaching. Mitchell, Johnson, and Dunn treated Pande less favorably because of her gender and race/national origin in project assignments, providing resources and support to carry out her work, evaluation of her work and performance, and assessment of skills, potential, leadership potential, and classification as a high potential employee.

Pande was qualified for a wide range and very large number of jobs at ChevronTexaco based on her work experience, work performance, education and training. Pande's case complaint, curriculum vitae (CV), and Performance Management Process (PMP) documents detail Pande's qualifications, skills, experience, and excellent work performance history.

ChevronTexaco openly and widely promoted itself (ChevronTexaco Way) as a

1   company that valued diversity and was committed to increasing diversity including

2   visible diversity at all levels.   In spite of ChevronTexaco's proclamations about

3   diversity, ChevronTexaco and especially CTOP noticeably lacked women, minorities,

4   minority women, and minority men in management and job selection committees.

5   ChevronTexaco often used managed moves as a tool for career development.  CTOP

6   used the Personnel Development Committees (PDC), the ICE program, and managed

7   moves in a preferential manner to promote the career development and progression of

8   white male employees.

9

10        The PDC process operated as a good old boy network (mostly white male), with

11  the same small group of managers who are rotated around available management

12  positions, holding discussions on job selections for ChevronTexaco jobs located in the

13  U.S. and all over the world, with no accountability for their selections or actions.  The

14  PDC process did not rely on facts or supporting evidence or adequate follow through on

15  information that may contradict discriminatory or retaliatory remarks made by managers

16  in the good old boy network during confidential job selection discussions.  The

17  confidential discussions on job selection made it impossible for a job candidate to

18  respond to disparaging remarks, mischaracterizations, and outright falsehoods.  The

19  PDC committees and job selection committees lacked adequate process and diversity

20  to challenge remarks and good old boy behaviors and prevent discriminatory and

21  retaliatory conduct.  The job selection process was supposed to include feedback to

22  applicants on why they were not selected to assist the applicant with career

23  development.  Pande very rarely received feedback directly from the job selection

24  process.

25        In or about June – July 2003, John Dunn told Pande that he had more limited

1  opportunities for career advancement in the company since he was a white male and

2  the company was only promoting women and minorities to achieve diversity targets and

3  that Pande had better career advance opportunities than Dunn since Pande was a

4  minority woman. Dunn also told Pande that he had less job security with the company

5  because he could be fired for making inappropriate or racist remarks. Pande

6  responded to Dunn's comment by reminding him that no action was taken against Rex

7  Mitchell for making racist remarks. Dunn responded that Pande had a point.

8

9  In or around June 2003, Dunn told Pande that Mike Clark was "a good hand" and

10 "one of the boys" and "we are going to take care of him". Dunn at the same time

11 threatened Pande's employment telling Pande that he was in sole control of her

12 employment situation and that Mark Krolow would follow Dunn's recommendations".

13

14 In or around October - November 2003, Tayo Feyijimi told Pande that Mike Clark

15 had told Feyijimi that Clark had been told that Mark Krolow was going to take care of

16 finding him another job in the company. On November 4, 2003, Clark told Pande that

17 Dunn and Krolow had told him that they were going to take care of and for him not to

18 worry.

19

20 Mitchell – Pande's supervisor – told Pande around October 31, 2001 that he

21 viewed her as the top performer, most talented, and highest potential employee in his

22 group. In spite of Mitchell's statements, Mitchell ranked Pande lower than white male

23 employees and gave Pande a lower raise, failed to promote Pande in 2002 as he had

24 promised in September 2001. Furthermore, Mitchell had told Pande in 2001 that she

25 was a high potential employee for the Business Development and Commercial PDC

26 and had told Pande that he needed to put recommendations on career development on

27 the forms for the PDC. Mitchell sent Kemal Anbarci and Matt Palmer an e-mail around

28

1    June 3, 2002 requesting information for filling out the form for high potential employees.

2    Mitchell did not send Pande a form for high potential employees indicating that Mitchell

3    had removed Pande from the Business Development and Commercial PDC high

4    potential list in 2002.

5

6    On April 24th, 2002, Victoria Thompson and Pande met with the Ombuds, Gary

7    Yamashita, and Johnson to discuss concerns of harassment, retaliation, and

8    discrimination at the hands of Mitchell. During this meeting, Pande raised concerns

9    about Mitchell's treatment of women and minorities including Melody Meyers, Jeanette

10   Newville, and Ali Moshiri.  Pande also told Johnson about Mitchell's use of a racist slur

11   that targeted Pande's ethnic background.  Pande also complained about Mitchell's

12   intentionally assigning secretarial/administrative work to Pande.  Johnson told Pande

13   that Mitchell had told Johnson that he did so because he didn't trust Pande with critical

14   work.

15

16   A direct result of Pande's complaints of harassment and gender and race based

17   discrimination was Pande's forced transfer to a less desirable job which offered

18   considerably reduced opportunities for advancement and career development.

19

20   Dunn provided Pande with less resources to perform tasks than similarly situated

21   white male employees (e.g. Mike Clark).  Pande had asked Dunn several times for

22   additional resources to enable meeting multiple deliverables with practically

23   simultaneous deadlines.  Dunn promised Pande additional resources from EPTC or a

24   consultant.  Dunn never followed through on this promise to provide additional

25   resources.  Pande suggested using a ChevronTexaco employee (Annemette Ditlevsen)

26   returning from an educational leave of absence in 2003.  Dunn promised to contact

27   Ditlevsen and inquire as to her interest and availability to assist Pande with project

28

1   work. Dunn never communicated to Pande the result of his discussions with Ditlevsen.

2   Pande learned independently from Ditlevsen that Dunn informed Ditlevsen that there

3   was "no useful work" for her to perform in his group.

4        Mitchell provided Pande less resources and support to perform her work than

5   white male employees who had performed the many roles and responsibilities in her

6   new position. In addition, Mitchell intentionally burdened Pande with secretarial and

7   administrative work because of his discriminatory behavior. Mitchell and Dunn provided

8   less support with pursuing career development goals through development

9   assignments and training than to male employees. Mitchell, Johnson, and Dunn

10   provided less support to Pande in job posting/selection process than to male

11   employees. Mitchell recommended Pande post for a job in September 2002 that made

12   no sense from a career development/career path perspective. Mitchell did not propose

13   this job to white male employees in his group.

14        Dunn told Pande that he didn't understand why Pande was spending time

15   mentoring an Angolan national employee, Carlos Brito Martins, because Carlos was

16   Angolan and who could Carlos complain to if he was dissatisfied with the training he

17   received during his development assignment at Chevron.

18        Dunn's attitude towards Carlos Brito Martins based on his race/national origin

19   mirrored Dunn's attitude toward Pande. Dunn was aware that Pande's previous

20   complaints about harassing conduct, discrimination, and retaliation had been ignored

21   by management. Dunn told Pande that he was in sole control of her employment

22   situation and that Krolow would follow Dunn's recommendations.

23        Iris Owens complained to Johnson and Yamashita about Mitchell's racist

24   statements. Mitchell made disparaging remarks about women and minorities including

cGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
1 Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

40

1   Melody Meyers, Jeanette Newville, and Ali Moshiri.  Pande had complained to Johnson

2   about Mitchell's racist attitude.

3   **INTERROGATORY NO. 6:**

4       IDENTIFY all PERSONS with information or knowledge supporting YOUR

5   contention that YOUR race/national origin was a motivating factor in DEFENDANTS'

6

7   adverse decisions related to YOUR compensation, job assignment, and termination.

8   **RESPONSE TO INTERROGATORY NO. 6:**

9       Victoria Thompson

10      Iris Owens

11      Jerelyn Kendricks

12      Ali Moshiri

13

14      Brian Smith

15      Paul Vita

16      Rex Mitchell

17      James Johnson

18      Clement Chou

19      Mark Krolow

20

21      Jeff Shellebarger

22      James Blackwell

23      George Kirkland

24      Gary Yamashita

25      John F. Dunn

26

27      Taryn Shawstad

28      David Kennedy

cGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          41

1    Kelly Hartshorn

2    Tim Magner

3    Fernando Gaggino

4    Nicola Woods

5

6    **INTERROGATORY NO. 7:**

7    State all facts supporting YOUR contention that YOUR complaints about

8    discrimination and harassment by Rex Mitchell were motivating factors in

9    DEFENDANTS' adverse decisions related to YOUR compensation, job assignment,

10    and termination.

11    **RESPONSE TO INTERROGATORY NO. 7:**

12    See responses to Interrogatories 1,3, and 5.

13    As described in the DFEH complaint, on March 4th, 2002, Pande complained to

14    Johnson about Mitchell's abusive behavior and harassing conduct towards her. On or

15    about February 27th or February 28th, 20002, Iris Owens made an appointment for

16    Pande on Johnson's calendar to meet with Johnson on March 4th, 2002. Prior to

17    meeting with Pande, Johnson learned from Iris Owens that Pande's March 4th

18    appointment had to do with Mitchell's harassing conduct. At the time, Owens had

19    already made several complaints to Johnson about Mitchell's abusive behavior and

20    harassing conduct towards Owens. Johnson told Pande that he had met with Mitchell

21    on March 1st before his meeting with Pande to understand from Mitchell why Pande had

22    made an appointment to see Johnson. Johnson indicated that Mitchell had told

23    Johnson that Pande was a poor performer and that there were significant performance

24    issues. Pande told Johnson that Mitchell had never discussed performance problems

25    with her. Pande told Johnson of a meeting with Mitchell in October 2001 where Mitchell

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          42

1  told Pande that everyone in the group had complained about Pande to Mitchell. Upon

2  challenging Mitchell for specific information on the complaints, Mitchell changed his

3  claim and told Pande that James Blackwell had said "what the hell's the matter with

4
   Kiran". Pande told Mitchell that Blackwell was not part of the planning group and further
5
   she had only seen Blackwell once in the hallway since returning from Houston and that
6
7  he and she had said hello to each other.

8      Pande challenged Mitchell as to why Blackwell would make that comment to

9  Mitchell based on that one interaction with Pande where they said hello to each other.

10 Mitchell then backed off that claim and claimed that Brian Putt had told Mitchell "What

11 the hell's the matter with Kiran" while working with Mitchell and Pande in Houston.

12
   Pande again challenged Mitchell and told him that Putt and Pande had worked closely
13
   in Houston on the CLEAN team work including eating meals together, working late
14
15 hours together, attending a baseball game together, and that Putt had never said

16 anything of that nature to Pande. Upon challenging Mitchell further, Mitchell appeared

17 to back away from all of his claims that people in the group or Blackwell or Putt had

18 complained about Pande to Mitchell. Mitchell then told Pande that he had gotten

19
   twisted off with her for not showing him appropriate gratitude for being selected for the
20
21 premier position in his group. Johnson replied to this example as a legitimate

22 performance issue for Pande rather than as an example of Mitchell making false

23 statements and disparaging remarks. Pande told Johnson that it was an example of

24 Mitchell making false statements about Pande and backing off of those statements

25 when challenged by Pande.

26      Johnson defended Mitchell's behavior. Johnson informed Pande that she had

27
   three choices: Pande could leave the company, Pande could leave the group, or Pande
28

IcGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
n Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          43

1    could stay for 12 – 18 months and get along with Mitchell.  Johnson treated Pande as

2    the target of the problem and was only interested in information that corroborated that

3    view-point.  Johnson showed no interest in following up on information from other

4    sources on Pande's performance unless that source could provide a negative viewpoint

5    of Pande.  Johnson showed no concern for Mitchell's pattern of abusive conduct

6

7    towards the female employees in his group.

8         Owens and Thompson had also complained to Johnson of Mitchell's harassing

9    conduct and discriminatory behavior.  Johnson reassigned Owens to report to Johnson

10    directly.  Johnson reassigned Thompson to report to Kelly Hartshorn.  However,

11    Johnson refused to reassign Pande to report to Hartshorn.  Hence, Pande had to

12    continue to live with Mitchell's harassing, discriminatory and retaliatory conduct.

13

14         E-mail correspondence between Johnson, Mitchell, and Kennedy in September

15    2002 is further evidence of retaliatory behavior and CTOP's culture of white male

16    managers in the good old boy network protecting each other when one of their own is

17    confronted with complaints about their discriminatory and harassing conduct.

18    Kennedy's comments in his e-mails are not supported by verbal discussions with Pande

19    when Pande reported to Kennedy or by Kennedy's written documentation of Pande's

20

21    performance in PMP documents.  Kennedy had never told Pande that he had concerns

22    about Pande's work performance.  Kennedy had one conversation with Pande in 2000

23    where Kennedy wanted Pande to be aware that some of her co-workers had

24    commented on her arriving to work later than others.  This conversation occurred about

25    7 – 8 p.m. in Pande's office.  Kennedy told Pande that he himself did not have a

26    problem with Pande's work hours and he recognized that Pande compensated by

27    working late and that he recognized that Pande preferred to work late hours but that he

28

1    would appreciate it if Pande could come in earlier to appease people in the group that

2    had remarked on Pande coming in later than others.

3    Kennedy told Pande that he recognized that Pande did not have any significant

4    project work since Kennedy had not brought in any new projects into the group for

5

6    some time.  Kennedy told Pande that Kennedy had told Tim Maloney that Maloney

7    could spend his time at work doing his school work related to a certificate program on e-

8    commerce that Maloney was working on through UC Extension.  Kennedy suggested

9    Pande take advantage of her time at work to do her MBA work when there was no

10   project work, similar to what he had suggested to Maloney.  Kennedy also said he

11   would make an effort to find some special projects for Pande to work on that would

12   enable Pande to apply her interest in technology and e-commerce to Chevron's benefit

13   similar to what he had done for Maloney.

14

15   To Pande's knowledge, Maloney never worked on any petroleum engineering

16   project work while he worked in Kennedy's group.  Mary Cao had commented that

17   Kennedy and Maloney had a special relationship from previous overseas assignments

18   and that Cao thought Kennedy had created special projects for Maloney to provide him

19   visibility and career advancement opportunities.

20

21   A few weeks after this discussion with Kennedy, Kennedy asked Pande to work

22   on a special project with CITC.  Pande received a commendation from the CITC project

23   leader for her contributions to the NetReady project in mid-2000.  Kennedy told Pande

24   that Kennedy and Maloney had had discussions with Guy Hollingsworth about

25   technology and e-commerce and that Kennedy viewed Hollingsworth as a

26   "Neanderthal" with regards to his attitude and knowledge of technology and that

27

28   Kennedy and Maloney were trying to "educate" Hollingsworth.

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133

1    In late 2000, after joining the planning group, Pande phoned Kennedy to ask

2    about whether she had been classified as a high potential employee at the recent

3    Petroleum Engineering PDC meetings to classify employees using a new

4    process/system to define high potential employees.  Kennedy told Pande that he had

5    not classified any employee in his group as high potential including Pande.  Kennedy

6    told Pande that he was asked by Tom McMillen during the classification meeting about

7    why Pande was not classified as high potential since she had been in the past.

8    Kennedy told Pande that he told McMillen that he did not think Pande's attitude justified

9    placement in the high potential box although she was certainly a strong performer.

10   Kennedy told Pande that he had no issues with her performance and considered her a

11   strong performer but was concerned about Pande's attitude.  Pande responded to

12   Kennedy that she thought his characterization of her attitude was unfair and she

13   thought the group in general had morale problems due to Kennedy not bringing

14   adequate project work into the group.  Kennedy acknowledged that he was partially

15   responsible in that sense for the morale in the group.   Pande thanked Kennedy for

16   providing her this feedback.  Kennedy never complained to Pande about her effort and

17   commitment, her teamwork, or "Chevron Way behaviors".

18   Kennedy had an opportunity to provide comments on Pande's PMP document in

19   early 2001 but did not respond to Pande's e-mail requesting his input.  If Kennedy had

20   made similar characterizations in Pande's PMP document, to Kennedy's e-mails to

21   Mitchell, Pande would have had an opportunity to respond to Kennedy's

22   characterizations as part of the PMP process.  Kennedy's approach to resorting to

23   confidential e-mails with mischaracterizations  of Pande's performance outside of the

24   PMP process was clearly a demonstration of poor Chevron Way behaviors by Kennedy.

lcGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
n Francisco. CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          46

1   Mitchell's response to Kennedy claiming "the same problems" with Pande, and

2   Kennedy's e-mail response are consistent with the good old boy network protecting

3   each other.  Kennedy's response to Mitchell's e-mail contains mischaracterizations,

4   dramatically biased representation of Pande's performance and behavior, and outright

5   falsehoods.  Johnson's response to Mitchell's e-mail on September 12, 2002 is again

6   evidence of the good old boy network in action.  Johnson, Mitchell, and Kennedy

7   demonstrated a lack of ChevronTexaco Way behaviors by not notifying Pande of this e-

8   mail correspondence or providing Pande an opportunity to discuss with Kennedy his

9   characterizations or discuss Mitchell's behavior towards her and other women in the

10  group with Kennedy.

11          David Kennedy's input on job selections as evidenced by Zuwa Omoregie's

12  testimony largely centered on Mitchell's claims that Pande's attitude changed for the

13  worse when Pande did not get a promotion and ranking that she expected.  Kennedy

14  never mentioned Pande being upset about not being promoted while working for

15  Kennedy in his e-mail correspondence to Mitchell or PMP documents of Pande's

16  performance.  Dunn was also aware of Pande's complaints against Mitchell, and Dunn's

17  feedback to Omoregie on job selection were tailored to support a pattern of behavior

18  claimed by Mitchell and Kennedy.  Pande believes that Dunn used Pande's previous

19  complaints against Mitchell as a defense when Dunn was reported for harassing

20  conduct towards Pande.  Dunn never discussed performance issues with Pande in line

21  with his statements to Omoregie, nor did Dunn document the performance issues he

22  claimed using the company's performance documentation process to support his

23  statements to Omoregie on job selection.

24          Pande believes that Dunn, Kennedy, Camy and others collaborated to ensure

1   that Pande was not selected for the EPTC jobs in Zuwa Omoregie's group as well as

2   other jobs that Pande had applied for.  Kennedy and Camy's input to the job selection

3   process was in stark contrast to previous verbal feedback and written feedback in PMP

4   documents that Pande received for work performed from late 1997 – September 2000

5   when Camy and Kennedy supervised the Engineering Services Group at CTOP.  The

6   consistent theme of negative feedback on Pande's performance from Dunn, Kennedy,

7   and Camy were designed to ensure that Pande's termination from the company was

8   permanent.

9

10  **INTERROGATORY NO. 8:**

11       IDENTIFY all PERSONS with information or knowledge supporting YOUR

12  contention that YOUR complaints about discrimination and harassment by rex Mitchell

13  were motivating factors in DEFENDANTS' adverse decisions related to YOUR

14  compensation, job assignment, and termination.

15

16  **RESPONSE TO INTERROGATORY NO. 8:**

17       Victoria Thompson

18       Iris Owens

19       Jerelyn Kendricks

20       Brian Smith

21       Paul Vita

22       Rex Mitchell

23       James Johnson

24       Clement Chou

25       Mark Krolow

26

27       Jeff Shellebarger

28

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
n Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

1     James Blackwell

2     George Kirkland

3     Gary Yamashita

4     John F. Dunn

5

6     Taryn Shawstad

7     David Kennedy

8     Kelly Hartshorn

9     Tim Magner

10    Fernando Gaggino

11    Zuwa Omoregie

12

13  **INTERROGATORY NO. 9:**

14     State all facts supporting YOUR contention that DEFENDANTS failed to

15  appropriately investigate YOUR complaints of harassment and discrimination.

16  **RESPONSE TO INTERROGATORY NO. 9:**

17     See responses to Interrogatories 1, 3, 5, 7, and DFEH complaint.

18     The Ombuds, Gary Yamashita, told Pande after the April 24th meeting with

19

20  Johnson, Yamashita, Pande, and Thompson, that Yamashita was surprised that

21  Johnson had not initiated an investigation at the meeting with Thompson and Pande

22  since Johnson was legally required to do so once complaints are made with respect to

23  legally protected rights.  Yamashita stated that he thought Johnson was making a big

24  mistake by not allowing Pande to move to Kelly Hartshorn's group along with Victoria

25  Thompson.  At the April 24th meeting, Johnson requested that Yamashita talk to Mitchell

26  to get Mitchell's side of the story.

27

28     Yamashita told Pande that he had talked to Mitchell and Mitchell had read from a

1 | two page document and Mitchell sounded very convincing although Yamashita thought

2 | Mitchell was lying to him.

3 |      Pande requested to review the document that Mitchell had read from.

4 |

5 | Yamashita told Pande that Mitchell had read the document to him and told him it was

6 | confidential.  Pande asked Yamashita for specifics from that document and Yamashita

7 | told Pande that he could not remember any specifics but that Mitchell sounded

8 | convincing even though Yamashita believed Mitchell was lying to him.

9 |      Johnson's failure to provide Pande with the e-mails that Mitchell had read from

10 | during the March 14th meeting even after Pande requested an opportunity to respond to

11 |

12 | Mitchell's allegations with respect to those e-mails.  Pande continued to request those

13 | e-mails but Johnson did not produce those e-mails to Pande until June 21st.  By June

14 | 21st, Pande concluded it was futile to respond to Mitchell's allegations in those e-mails

15 | since Johnson had made it clear by his comments and behavior at the March 14th

16 | meeting and during subsequent meetings and discussions with Pande that Johnson

17 | was not interested in Pande's response to Mitchell's allegations or in investigating

18 | Pande's complaints about Mitchell.

19 |      Johnson stated in mid-May 2002 that "he needed Mitchell right now" and that he

20 |

21 | wanted to wait until after the Strategic Update to deal with Rex.  By the end of the

22 | strategic update, Johnson had developed a close relationship with Mitchell evidenced

23 | by Mitchell addressing Johnson as "Chief" and Johnson inviting Mitchell to participate in

24 | golfing outings with him.  Johnson continued to refuse to investigate Pande's

25 | complaints of harassment, discrimination, and retaliation after the Strategic Update was

26 | complete.  Pande discussed Johnson's refusal to investigate to the EAP counselor,

27 | Jerelyn Kendricks.  Jerelyn Kendricks told Pande that Johnson was required to conduct

28 |

IcGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
n Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          50

1    an investigation according to ChevronTexaco policy. Pande complained to Johnson

2    about Mitchell's disparaging remarks to Fernando Gaggino. Pande asked Johnson

3    whether Johnson had discussed Mitchell's remarks with Gaggino. Johnson admitted

4    that he had not talked to Gaggino. Johnson further stated that it wouldn't make sense

5    for Mitchell to make disparaging remarks when Mitchell was trying to get Pande

6    transferred out of his group.

7

8    Johnson refused to investigate Pande's complaints and Pande's complaints of

9    ongoing retaliatory conduct by Mitchell. Pande and Thompson were never contacted by

10    Human Resources or an investigator to discuss their complaints about Mitchell.

11    Shortly after the November 4, 2003 group meeting / conference call, Kathy Mabe

12    made an internal complaint to Jeff Shellebarger (CTOP, SASBU General Manager in

13    Angola) for Dunn's harassing conduct and inappropriate behavior towards her team-

14    mate Kiran Pande. Mabe's complaint was in keeping with ChevronTexaco training on

15    harassment prevention and reporting which taught employees that it was their

16    responsibility to report harassment and inappropriate behavior especially if they

17    witnessed it being inflicted on a co-worker. Tayo Feyijimi also complained directly to

18    Dunn about his conduct towards Pande and told John Dunn that he needed to

19    apologize to Kiran Pande for his behavior towards her during the meeting.

20

21    After Mabe's complaint, Mark Krolow contacted Roger Severson who had

22    attended the November 4, 2003 conference call. Severson confirmed Mabe's

23    complaint and reinforced that Dunn's behavior was completely inappropriate. Mark

24    Krolow never contacted Pande to inquire about Dunn's behavior or about her well being

25    after being verbally attacked by Dunn for planning to take a medical leave. Jeff

26    Shellebarger never contacted Pande regarding Mabe's complaint. Human Resources

27

28

GUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          51

never contacted Pande about conducting an investigation into Dunn's conduct.  Internal ChevronTexaco training indicated that an investigation was required and that a normal part of the investigation is to talk to all witnesses, the person that has been harassed, and the harasser.  The internal training talks gives a demonstration of an investigation and iterates the importance of communicating to the person who has been harassed and the harasser the results of the investigation and actions taken as a result of the investigation.  The training video also had a personal assurance from the CEO, David O'Reilly that a person would not be retaliated against for reporting harassment or being the victim of harassment.  Mabe indicated to Pande that she had never been contacted by Human Resources about her complaint.  Instead Krolow communicated to the group members in Houston who had only recently joined the team, that he was aware of what happened and that it would not happen again.  Pande never heard of any disciplinary action taken against Dunn.

Shawstad failed to initiate an investigation after Pande requested the STEPS process be implemented in her letter to Shawstad.  Pande was never contacted by an investigator to discuss her complaints about Dunn's harassing and discriminatory conduct.

## INTERROGATORY NO. 10:

IDENTIFY all PERSONS with information or knowledge supporting YOUR contention that DEFENDANTS failed to appropriately investigate YOUR complaints of harassment and discrimination.

## RESPONSE TO INTERROGATORY NO. 10:

Victoria Thompson

Iris Owens

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

52

1    Jerelyn Kendricks

2    Rex Mitchell

3    James Johnson

4    Clement Chou

5    Mark Krolow

6    Jeff Shellebarger

7    James Blackwell

8    George Kirkland

9    Gary Yamashita

10    John F. Dunn

11    Taryn Shawstad

12    David Kennedy

13    Kelly Hartshorn

14

15

16    **INTERROGATORY NO. 11:**

17    State all facts supporting YOUR contention that DEFENDANTS failed to take any

18    action to prevent harassment and discrimination.

19    **RESPONSE TO INTERROGATORY NO. 11:**

20    See responses to Interrogatory Nos. 1, 3, 5, 7, and 9.

21

22    Mitchell continued his retaliatory and discriminatory conduct in evaluation of job

23    performance, excluding Pande from meetings, assignment of work to Pande, assisting

24    Pande in her career development and progression, suggesting job opportunities to

25    Pande that he was not suggesting to the white men in his group, providing negative

26    feedback even when it was not solicited by the job owner, offering Pande consideration

27    for jobs in Houston when Pande had indicated that she would prefer to work overseas

28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

53

1  and would only consider Houston jobs that offered considerable career growth potential,

2  lying to Pande about her eligibility for relocation benefits.  If Johnson had taken

3  appropriate action, Mitchell would not have continued his retaliatory and discriminatory

4  conduct.  Johnson continued to defend Mitchell's conduct and refused to accept

5

6  Pande's complaints of Mitchell's harassing, discriminatory, and retaliatory conduct.

7        Pande never learned of any investigation, disciplinary action, or action taken

8  against Dunn to prevent him from retaliatory and discriminatory conduct.  Dunn's input

9  to Omoregie on job selection is evidence of ChevronTexaco's failure to take action to

10  prevent Dunn from retaliation and discriminatory conduct.

11  **INTERROGATORY NO. 12:**

12

13        IDENTIFY all PERSONS with information or knowledge supporting YOUR

14  contention that DEFENDANTS failed to take any action to prevent harassment and

15  discrimination.

16  **RESPONSE TO INTERROGATORY NO. 12:**

17        Victoria Thompson

18        Iris Owens

19

20        Jerelyn Kendricks

21        Rex Mitchell

22        James Johnson

23        Clement Chou

24        Mark Krolow

25        Jeff Shellebarger

26        James Blackwell

27

28        George Kirkland

:GUINN, HILLSMAN
& PALEFSKY
35 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          54

1   Gary Yamashita

2   John F. Dunn

3   Taryn Shawstad

4   David Kennedy

5   Kelly Hartshorn

6   Kathy Mabe

7   Tayo Feyijimi

8   Roger Severson

9

## INTERROGATORY NO. 13:

State all facts supporting YOUR contention that DEFENDANTS failed to take appropriate remedial action for offenses against YOU.

## RESPONSE TO INTERROGATORY NO. 13:

See responses to Interrogatory Nos. 1, 3, 5, 7, 9 and 11.

CTOP management, Human Resources, or the Ombuds never informed Pande that they were taking remedial action against Mitchell, Dunn, or Johnson. Johnson was promoted to Managing Director of Australasia in 2004. Mitchell received a transfer to Canada as Vice-President of Finance and recently was promoted to the position of Chief Compliance Officer synonymous with "Chief Ethics Officer" for Chevron Corporation. Dunn continued as team leader of the Block 14 group and was later made Strategic Planning Manager at ETC. Mabe and Feyijimi told Pande that Dunn had been removed from his position as team leader of the S3 project in 2004 after management determined that Dunn was not performing to expectations as a team leader for the project. Dunn was not terminated for lack of performance, but allowed to continue to remain employed in the business unit until his management could transfer him out.

1  Dunn was eventually transferred to ETC and is currently the Strategic Planning

2  Manager at ETC.

3        If Chevron had taken appropriate remedial action then Pande would not have

4  been forced to transfer to a less desirable position in late 2002 and Pande would not

5  have been terminated in 2003.  If Chevron had taken appropriate remedial action then

6  Dunn would not have retaliated against Pande for his being reported for harassment as

7

8  a result of his inappropriate conduct in response to her request for medical leave.

9  **INTERROGATORY NO. 14:**

10       IDENTIFY all PERSONS with information or knowledge supporting YOUR

11  contention that DEFENDANTS failed to take appropriate remedial action for offenses

12

13  against YOU.

14  **RESPONSE TO INTERROGATORY NO. 14:**

15       Victoria Thompson

16       Iris Owens

17       Jerelyn Kendricks

18       Rex Mitchell

19       James Johnson

20

21       Clement Chou

22       Mark Krolow

23       Jeff Shellebarger

24       James Blackwell

25       George Kirkland

26

27       Gary Yamashita

28       John Dunn

GUINN, HILLSMAN
& PALEFSKY
35 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

1  Taryn Shawstad

2  David Kennedy

3  Kelly Hartshorn

4  Kathy Mabe

5  Tayo Feyijimi

7  Roger Severson

8  **INTERROGATORY NO. 15:**

9  State the first date after January 1, 2004 that YOU received any income from

10 any source other than DEFENDANTS.

11 **RESPONSE TO INTERROGATORY NO. 15:**

13 Plaintiff objects to this interrogatory to the extent it is irrelevant in that it seeks

14 information rendered strictly inadmissible under the collateral source rule.  Without

15 waiving such objections, Plaintiff responds as follows:

16 Disability income received from 1/1/2004.

17 Income received from Stanford University in 2/2004.

18 **INTERROGATORY NO. 16:**

20 State the total income YOU received from the date identified in YOUR answer to

21 Interrogatory No. 15 through the present.

22 **RESPONSE TO INTERROGATORY NO. 16:**

23 Plaintiff objects to this interrogatory to the extent it is irrelevant in that it seeks

24 information rendered strictly inadmissible under the collateral source rule.  Without

25 waiving such objections, Plaintiff responds as follows:

27 $195,203.80 (excludes income earned in 2003 and paid out in 2004 and 1998 stock

28 option exercised in 2004)

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
n Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE        57

## INTERROGATORY NO. 17:

IDENTIFY all PERSONS from whom YOU have received income from January 1, 2004 through the present.

## RESPONSE TO INTERROGATORY NO. 17:

Plaintiff objects to this interrogatory to the extent it is irrelevant in that it seeks information rendered strictly inadmissible under the collateral source rule. Without waiving such objections, Plaintiff responds as follows:

ChevronTexaco payout of bonus from employment in 2003, paid out in 2004

ChevronTexaco exercise of stock options issued in 1998 in 2004

Disability Income

UNUM Life Insurance

State of California Unemployment

Stanford University

Landmark Graphics Company

SGF Global

## INTERROGATORY NO. 18:

For every PERSON identified in YOUR answer to Interrogatory No. 17, please describe the income YOU received by stating the exact amount of income, the date of date ranges in which YOU received such income, and the reasons YOU received such income.

## RESPONSE TO INTERROGATORY NO. 18:

Plaintiff objects to this interrogatory to the extent it is irrelevant in that it seeks information rendered strictly inadmissible under the collateral source rule. Without waiving such objections, Plaintiff responds as follows:

GUINN, HILLSMAN
& PALEFSKY
35 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

58

1  ChevronTexaco payout of bonus from employment in 2003, paid out in 2004,

2  $10,573.81

3  ChevronTexaco exercise of stock options issued in 1998 in 2004, $3,159.37

4
   Disability Income, (1/1/2004 – 5/15/2004) $11,610.00
5
   UNUM Life Insurance, (2004), $74.09
6
7  State of California Unemployment Compensation, (2004), $10,660

8  Stanford University (2004 – 2006) Consulting professor position, $6000.

9  Landmark Graphics Company (7/26/05 – 8/10/06) Consulting services, $84,151.63

10 SGF Global (11/25/05 – 9/1/06) Consulting Services, $82,708.10

11 **INTERROGATORY NO. 19:**

12
13         Please describe any and all economic damages YOU claim YOU suffered as a

14 result of any act by DEFENDANTS by stating each type of said economic damage and

15 the amount of each damage.

16 **RESPONSE TO INTERROGATORY NO. 19:**

17         Plaintiff objects to this interrogatory to the extent that it seeks expert testimony

18
19 and opinion in advance of the statutory deadlines for the discovery of such testimony

20 and opinion.  Without waiving such objection, and with the express reservation of right

21 to amend such answer with expert opinion testimony at the designated time, Plaintiff

22 responds as follows:

23 Lost salary and annual bonus due to failure to promote and lower raise in 2002.

24 Lost salary and annual bonus due to lower raise in 2003.

25 Lost salary and annual bonus due to termination on 12/31/2003.

26
   Lost profit sharing savings match by company (8% in 401K) due to termination on
27
   12/31/2003.
28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE        **59**

1  Loss of housing mortgage paydown with termination on 12/31/2003, ($24,450)

2  Loss of pension benefits.

3  **INTERROGATORY NO. 20:**

4
5      If YOU attribute any physical, mental or emotional injuries to DEFENDANTS'

6  conduct, IDENTIFY each injury YOU attribute to DEFENDANTS' conduct.

7  **RESPONSE TO INTERROGATORY NO. 20:**

8  Plaintiff objects to this interrogatory to the extent that it seeks expert testimony and

9  opinion in advance of the statutory deadlines for the discovery of such testimony and

10  opinion.  Without waiving such objection, and with the express reservation of right to

11  amend such answer with expert opinion testimony at the designated time, Plaintiff

12  responds as follows:

13

14      Significant mental and emotional distress incurred from late 2001 – current time.

15  Injuries include severe stress, depression, grief, severe insomnia, difficulty eating,

16  anxiety, nervousness, fear, and heart palpitations.

17      Physical injuries include exacerbating severe anemia due to stress and as yet

18  unknown affects of stress on cardiovascular system and susceptibility to cancer in the

19  future.

20

21  **INTERROGATORY NO. 21:**

22      If YOU have received any consultation or examination from a HEALTH CARE

23  PROVIDER for any injury that YOU attribute to DEFENDANTS' conduct, IDENTIFY

24  each and every HEALTH CARE PROVIDER YOU have seen.

25  **RESPONSE TO INTERROGATORY NO. 21:**

26
27      Dr. Sylvia Benzler

28      Dr. Inna Articshev

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
in Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          60

Dr. Sheri Task

**INTERROGATORY NO. 22:**

If YOU have receive any consultation or examination from a HEALTH CARE

PROVIDER, as described in Interrogatory No. 21, state the date of each consultation or

examination by each and every HEALTH CARE PROVIDER YOU have seen.

**RESPONSE TO INTERROGATORY NO. 22:**

Sylvia Benzler (2002 – 2004, multiple appointments)

Inna Artishev (2003, appointment in late 2003)

Sheri Task (2003 – 2004, multiple appointments for treatment including

discussion of impact of stress on recovery)

**INTERROGATORY NO. 23:**

If YOU have any damages YOU claim YOU suffered as a result of any act by

DEFENDANTS not addressed by Interrogatory Nos. 19-22 above, please describe such

damages by stating each type of damage and the amount of such damage.

**RESPONSE TO INTERROGATORY NO. 23:**

Plaintiff objects to this interrogatory to the extent that it seeks expert testimony

and opinion in advance of the statutory deadlines for the discovery of such testimony

and opinion. Without waiving such objection, and with the express reservation of right

to amend such answer with expert opinion testimony at the designated time, Plaintiff

responds as follows:

Plaintiff is entitled to statutory damages in the form of liquidated damages under

the Family Medical Leave Act. The amount of such damages cannot be fixed at this

point in time and will only be determined by the Court after verdict. Plaintiff is also

entitled to a recovery of punitive damages. The amount of such damages cannot be

GUINN, HILLSMAN
& PALEFSKY
35 Pacific Avenue
Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE          61

1  fixed at this point in time and will only be determined by the trier of fact. Plaintiff is

2  further entitled to a recovery of her reasonable attorneys fees, and costs (including

3  expert costs under the FMLA), the amount of which cannot be fixed at this point in time

4  and will only be determined by the Court after verdict.

5

6  **INTERROGATORY NO. 24:**

7  Describe in detail all efforts YOU made to obtain employment, whether part-time

8  or full-time, whether in an employee or independent contractor status, since January 1,

9  2006.

10  **RESPONSE TO INTERROGATORY NO. 24:**

11  Chevron is the only major oil and gas company in the Bay Area and Chevron

12  representatives have made it clear that they do not want Pande to work at Chevron in

13  any capacity. Pande has been exploring and researching job openings and assessing

14  the viability of changing careers to obtain full-time employment based in the Bay Area.

15

16  Pande continues to regularly review job postings on industry job boards:

17  TIG First Source

18  Reservoir People

19  Collarini and Associates

20  WorldWideWorker

21  Earthworks-jobs.com

22  Nesoverseas.com

23  Opc.co.uk

24

25  Spegcs.org

26  Rigzone.com

27  Expatengineer.net

28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

62

1    Oilcareers.com

2    OilandGasJobsOnline.com

3    Leveridgesystems.com

4    MNAGlobal.com

5    Energyplacement.com

6

7    Collarini.com

8    Explorationist.com

9    Pipermorgan-aei.com

10   Knowledge-reservoir.com

11   Oilexec.kenexa.com

12

13   Amoss.com

14   Miscojobs.com

15   Pmjobs.net

16   Oilfieldprofessionals.com

17   Deltongroup.com

18   Michelle Floriano (executive recruiter)

19   Oilfieldprofessionals.com

20

21   BayAreaCareers.com

22   CalJobs.ca.gov

23   CareerBuilders.com

24   Craigslist.org

25   Dice.com

26   Jobvertise.com

27   Directemployers.com

28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

1 | Fedworld.gov

2 | Hotjobs.yahoo.com

3 | InsideBayArea.com

4 |
5 | Monster.com

6 | Trivalleyjobs.com

7 | Eastbayworks.com

8 | JobHuntersBible.com

9 | QuintCareers.com

10 | ResumeMagic.com

11 |
12 | Individual company web sites

13 | Pande has continued in her position as a Consulting Professor at Stanford

14 | University. Pande has performed consulting work with Landmark Graphics Company

15 | and SGF Global. Pande has networked extensively to try and broaden her client base

16 | and obtain additional consulting work. Pande has had discussions with AERA Energy,

17 | PDVSA, PEMEX, Halliburton Mexico, Landmark Graphics Company, Berry Petroleum,

18 | Marathon, Anadarko, British Petroleum, ExxonMobil, Shell, and many other companies.

19 | Pande has submitted job applications in response to posted jobs including:

20 |
21 | Shell Technology Ventures

22 | Reservoir Economist, Major Oil and Gas Company

23 | Reservoir Engineer, Petronas Carigali

24 | Deepwater Development Asset Coordinator, Petrobras Americas Inc.

25 | Reservoir Engineer, Petrobras Americas Inc.

26 | Reservoir Engineer, Repsol YPF

27 |
28 | Manager, Reservoir Engineering, El Paso

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
n Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

64

1   Senior Reservoir Engineer, Cripps Sears & Partners

2   Reservoir Engineer, Occidental Oil and Gas Company

3   Reservoir Engineer, Worldwide Worker

4   Petroleum Engineer, International Oil and Gas Company

5
6   Senior Reservoir Engineer, International E&P Company

7   Reservoir Engineer Consultant, Oil Company

8   Head – Strategic Planning, Reliance Industries Limited OCF

9   Head – Technology, Reliance Industries Limited OCF

10  Expert Reservoir Engineer – ENI International Resources Limited

11  Brazil Project for Reservoir/Petroleum Engineer – Independent Oil Company

12

13

14  Dated: October 11, 2006                     McGUINN, HILLSMAN & PALEFSKY
                                                Attorneys for Plaintiff
15

16
                                        By:
17                                              Noah D. Lebowitz

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE                    65

## PROOF OF SERVICE

CASE NAME:    *Pande v. Chevron Texaco*
CASE NO.:      04-5107 CW
COURT:         U.S. District Court, Northern District of California

I am employed in the City and County of San Francisco, California; I am over the age of eighteen years and not a party to the within action; my business address is 535 Pacific Avenue, San Francisco, California 94133. On the date last written below, I served the following documents:

**PLAINTIFF'S RESPONSE TO DEFENDANT'S INTERROGATORIES, SET ONE**

on the parties, through their attorneys of record, by placing true copies thereof in sealed envelopes addressed as shown below for service as designated below:

(A)    <u>By First Class Mail</u> - I caused each such envelope, with first-class postage thereon fully prepaid, to be deposited in a recognized place of deposit of the U. S. mail in San Francisco, California, for collection and mailing to the office of the addressee on the date shown herein following ordinary business practices.

(B)    <u>By Personal Service</u> - I caused each such envelope to be delivered to a courier employed by Special T Delivery Service, with whom we have a direct billing account, who personally delivered each such envelope to the office of the addressee.

(C)    <u>By Federal Express</u> - I caused each such envelope to be delivered to the Federal Express Corporation at San Francisco, California, with whom we have a direct billing account, to be delivered to the office of the addressee on the next business day.

(D)    <u>By Facsimile</u> - I caused a copy of this document to be faxed to the parties noted at the fax numbers stated below. Attached hereto is a verification of reception.

| Type of Service | Addressee | Party |
| --- | --- | --- |
| A | Michelle Ballard Miller, Esq.<br>Miller Law Group<br>60 East Sir Francis Drake Blvd., Suite 302<br>Larkspur, CA 94939 | Defendants |

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of October, 2006, at San Francisco, California.

*Teresa McLoughlin*
Teresa McLoughlin

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
n Francisco, CA 94133

PLAINTIFF'S KIRAN PANDE'S RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL
EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES, SET ONE

66

1

2

3                                    <u>**VERIFICATION**</u>

4          I am the plaintiff in the above-captioned matter.  I am familiar with the contents of

5    the foregoing **RESPONSE TO DEFENDANT CHEVRON INTERNATIONAL**

6    **EXPLORATION AND PRODUCTION COMPANY'S INTERROGATORIES**.  The

7
     information supplied therein is based on my own personal knowledge and/or has been
8
     supplied by my attorneys or other agents and is therefore provided as required by law.
9
10   The information contained in the foregoing document is true, except as to the matters

11   which were provided by my attorneys or other agents, and, as to those matters, I am

12   informed and believe that they are true.

13

14         Executed on _October  10_____, 2006, at Castro Valley, California.

15

16

17                                                _K̄ K. P̃ꭒ_____

18                                                    Kiran Pande

19

20

21

22

23

24

25

26

27

28

McGUINN, HILLSMAN
& PALEFSKY
535 Pacific Avenue
an Francisco, CA 94133
(415) 421-9292

**EXHIBIT E**

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    KIRAN PANDE,

5              Plaintiff,

6         vs.                        No. 04-5107 CW

7    CHEVRON CORPORATION (f/k/a
     ChevronTexaco Corporation) and         COPY
8    CHEVRON INTERNATIONAL EXPLORATION
     & PRODUCTION (f/k/a ChevronTexaco
9    Overseas Petroleum), a division
     of Chevron U.S.A. Inc.,

10

11              Defendants.
     _____/

12

13

14

15            DEPOSITION OF KIRAN PANDE

16                  VOLUME III

17               March 22, 2006

18

19

20       PATRICIA CALLAHAN & ASSOCIATES, INC.
            Certified Shorthand Reporters
           Oakland, California   510-835-3993
21        San Francisco, California  415-788-3993
          Castro Valley, California  510-885-2371

22

23            Facsimile 510-247-9775
                WeReport@aol.com

24   Reported by:
     LaRelle M. Fagundes
25   CSR No. 9762

**Unknown**

| | |
|---|---|
| **From:** | Pande, Kiran (Kiran.Pande) |
| **Sent:** | Tuesday, October 21, 2003 1:40 PM |
| **To:** | Young, Fiona (fyou) |
| **Cc:** | Shawstad, Taryn (tary) |
| **Subject:** | RE: Severance Package |

Fiona,
Thanks for the information and your prompt reply. I am still actively pursuing opportunites within CT and am hopeful that I will be able to find an appropriate job within CT. However, it is still useful to understand the policy.
Regards,
Kiran

-----Original Message-----
| | |
|---|---|
| **From:** | Young, Fiona (fyou) |
| **Sent:** | Tuesday, October 21, 2003 1:36 PM |
| **To:** | Pande, Kiran (Kiran.Pande) |
| **Cc:** | Shawstad, Taryn (tary) |
| **Subject:** | RE: Severance Package |

Kiran,

At this time I have not been advised that you have been declared surplus by the company. As a result you are not currently eligible for any form of severance payment.

Any individual who is eligible for a severance payment is given options as to how they want their associated severance payment made. Details of these options are included in the material sent to these individuals when they are declared surplus by the company. These include splitting the payment into two, delaying the payment for a period of time or having it paid immediately.

Please let me know if you have other questions

**Fiona Young**
**HR - CTOP and PRC**
CTN 842 1840 (1-925-842-1840)
e-mail: fyou@chevrontexaco.com

-----Original Message-----
| | |
|---|---|
| **From:** | Shawstad, Taryn (tary) |
| **Sent:** | Tuesday, October 21, 2003 12:34 PM |
| **To:** | Young, Fiona (fyou) |
| **Cc:** | Pande, Kiran (Kiran.Pande) |
| **Subject:** | FW: Severance Package |

Fiona: Since you've been handling the SASBU office move please respond to Kiran. Thanks,

Taryn

**Taryn Shawstad, General Manager-HR**

**ChevronTexaco**
ChevronTexaco Overseas Petroleum, Human Resources
6001 Bollinger Canyon Road, San Ramon, CA 94583
Tel 1-925-842-1391 Fax 1-925-842-1300



-----Original Message-----
| | |
|---|---|
| **From:** | Pande, Kiran (Kiran.Pande) |
| **Sent:** | Thursday, October 16, 2003 11:45 AM |

1

1212

**To:**        Shawstad, Taryn  (tary)
**Subject:**    Severance Package

Taryn,

As you probably know, I have turned down the SASBU offer to move to Houston.  I have applied for several jobs through the PDC process but if I am not selected for any of them, then I will likely be forced to leave the company.  The SASBU offer letter had a start date of Jan 1st for the job in Houston.  Do you know if it is possible to use vacation, for example, to extend the severance date into 2004 to ensure that severance benefits are paid out in 2004?  Obviously, the tax implications are much more favorable if the payout could be moved into 2004.

I spoke with Cary Mrozowski about this yesterday and he indicated that it would be best to check with you on this.

I would appreciate any information or guidance you can share with me on this issue.

Regards,
Kiran

2

1213

<pre>
 1                    CERTIFICATE

 2          I, the undersigned, a Certified Shorthand

 3     Reporter, State of California, hereby certify that

 4     the witness in the foregoing deposition was by me

 5     first duly sworn to testify to the truth, the whole

 6     truth, and nothing but the truth in the

 7     within-entitled cause; that said deposition was

 8     taken at the time and place therein stated; that

 9     the testimony of said witness was reported by me, a

10     disinterested person, and was thereafter

11     transcribed under my direction into typewriting;

12     that the foregoing is a full, complete and true

13     record of said testimony; and that the witness was

14     given an opportunity to read and, if necessary,

15     correct said deposition and to subscribe the same.

16          I further certify that I am not of counsel

17     or attorney for either or any of the parties in the

18     foregoing deposition and caption named, nor in any

19     way interested in the outcome of the cause named in

20     said caption.

21          Executed this 5th day of April, 2006.

22

23

24          LARELLE M. FAGUNDES, CSR 9762

25
</pre>

**EXHIBIT F**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

KIRAN PANDE,                          )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )    NO. 04-5107 CW
                                      )
CHEVRON CORPORATION, et al.,          )
                                      )
            Defendants.               )
                                      )
_____)

---oOo---

DEPOSITION OF JALALEDDIN AFIFI

Thursday, August 10, 2006

---oOo---

*Certified Copy*

REPORTED BY:  LISA P. GALLI, CSR NO. 12351

1       A.    About 16 months.

2       Q.    And immediately prior to the Project Resources

3   Company job, what was your position with Chevron?

4       A.    I was in the Energy Technology Company.

5       Q.    Is that known as ETC?

6       A.    Correct.

7       Q.    What was your job title there?

8       A.    Petroleum engineer.

9       Q.    Who was your direct supervisor when you were

10  the petroleum engineer in ETC?

11      A.    Dr. Zuwa Omoregie.

12      Q.    When did you first start working as the

13  petroleum engineer with ETC?

14      A.    I believe it was around first of February,

15  '04.

16      Q.    And prior to this ETC job, what job were you

17  employed with at Chevron?

18      A.    I was in a group called the Congo group.

19      Q.    And is that part of the Southern African

20  Strategic Business Unit?

21      A.    Correct.

22      Q.    Otherwise known as SASBU?

23      A.    Yes.

24      Q.    And how long were you in the Congo Group with

25  SASBU?

1     A.   I believe about three and a half years.

2     Q.   Who was your supervisor in the Congo Group?

3     A.   I had two.

4     Q.   Okay.  Who were they?

5     A.   The last one was Fernando Gaggino.

6     Q.   How long do you spell that last name?

7     A.   G-A -- G-A-G-G-I-N-O.

8     Q.   And before Mr. Gaggino?

9     A.   Dan McKay.

10     Q.   Dan McKay?

11     A.   Dan McKay.

12     Q.   And where, physically, within Chevron's

13 company were you actually located when you worked with

14 SASBU?

15          MS. HAMASAKI:  Object on the grounds it's

16 vague.

17          Are you calling for a city or a building or

18 what?

19          MR. LEBOWITZ:  City is good enough.

20     Q.   How about a city?

21     A.   San Ramon.

22     Q.   And the ETC job with Zuma Omoregie, what city

23 were you working in for Chevron at that point?

24     A.   San Ramon.

25     Q.   And today you still work in San Ramon?

1          STATE OF CALIFORNIA    )    ss.

2          I, the undersigned, a Certified Shorthand

3     Reporter of the State of California, hereby certify that

4     the witness in the foregoing deposition was by me duly

5     sworn to testify to the truth, the whole truth, and

6     nothing but the truth in the within-entitled cause; the

7     said deposition was taken at the time and place therein

8     stated; that the testimony of said witness was reported

9     by me, a Certified Shorthand Reporter and a

10    disinterested person, and was thereafter transcribed

11    under my direction into typewriting; that the foregoing

12    is a full, complete and true record of said testimony;

13    and that the witness was given an opportunity to read

14    and, if necessary, correct said deposition and to

15    subscribe the same.

16          I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    action.

21          IN WITNESS WHEREOF, I have hereunto set my

22    hand this 31st day of August              , 2006.

23

24                        _____
                          CERTIFIED SHORTHAND REPORTER
25

**EXHIBIT G**

DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

KIRAN PANDE,                          )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )    NO. 04-5107CW
                                      )
CHEVRON CORPORATION (f/k/a            )
CHEVRONTEXACO CORPORATION), a         )
Delaware corporation, CHEVRON         )
INTERNATIONAL EXPLORATION &           )
PRODUCTION (k/k/a                     )
CHEVRONTEXACO OVERSEAS                 )
PETROLEUM COMPANY), a division        )
of Chevron U.S.A., Inc.,              )
                                      )
            Defendants.               )
                                      )
_____)


---o0o---

DEPOSITION OF GRAHAM HOUSEN

Thursday, August 24, 2006

---o0o---

*Certified Copy*


REPORTED BY:  LISA P. GALLI, CSR NO. 12351

1    don't --

2         Q.    So it could still be integrated; you just

3    don't know?

4         A.    I just don't know.

5         Q.    And what is your current job with Chevron?

6         A.    Petroleum engineer in Chevron International.

7         Q.    Is there an acronym for your group?

8         A.    It's the reservoir management group.

9         Q.    And have you worked as a petroleum engineer

10   throughout your career with Chevron?

11        A.    Yes, the entire time.

12        Q.    And where is your office based?  What town is

13   your office in right now?

14        A.    San Ramon.

15        Q.    And how long have you worked in San Ramon in

16   what capacity you have worked?

17        A.    Fourteen years.

18        Q.    Was there a time when you worked for the

19   Southern African Strategic Business Unit?

20        A.    Yes.

21        Q.    When was that?

22        A.    Early 2000 to early 2004.

23        Q.    And what group within SASBU did you work?

24        A.    The Block 0, new field development group.

25        Q.    And Block 0 refers to the oil field off

1    Angola?

2        A.    One of the geographical areas off of Angola,

3    yes.

4        Q.    And what position did you hold within SASBU?

5        A.    Petroleum engineer, new field development.

6        Q.    And who was your supervisor at SASBU?

7        A.    Randy Dahlman, and then that transitioned to

8    Chris Riccobono in 2003.

9        Q.    What part of 2003 was the transition?

10       A.    I believe it was June 2003.

11       Q.    At some point -- let me ask you this way:

12   About when was it that you learned that there was a

13   possibility that SASBU would be moving from San Ramon to

14   Houston?

15       A.    I believe it was in the early months of 2003,

16   like January/February.

17       Q.    And how did you learn about that?

18       A.    I believe it was through informal information

19   from my supervisor.

20       Q.    And what were you told?

21       A.    They were -- I believe they told us that they

22   were studying it, studying the possibility.

23       Q.    And did you learn this information in a group

24   setting or a one-on-one setting?

25       A.    I don't recall.

1              STATE OF CALIFORNIA    )    ss.

2         I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, hereby certify that

4    the witness in the foregoing deposition was by me duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth in the within-entitled cause; the

7    said deposition was taken at the time and place therein

8    stated; that the testimony of said witness was reported

9    by me, a Certified Shorthand Reporter and a

10   disinterested person, and was thereafter transcribed

11   under my direction into typewriting; that the foregoing

12   is a full, complete and true record of said testimony;

13   and that the witness was given an opportunity to read

14   and, if necessary, correct said deposition and to

15   subscribe the same.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   action.

21        IN WITNESS WHEREOF, I have hereunto set my

22   hand this 11th day of September , 2006.

23

24                        _____
                          CERTIFIED SHORTHAND REPORTER

25

**EXHIBIT H**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

KIRAN PANDE,                          )
                                      )
           Plaintiff,                 )
                                      )
      vs.                             )    NO. 04-5107 CW
                                      )
CHEVRON CORPORATION (f/k/a            )
CHEVRONTEXACO CORPORATION), a         )
Delaware corporation, CHEVRON         )
INTERNATIONAL EXPLORATION &           )
PRODUCTION (f/k/a                     )
CHEVRONTEXACO OVERSEAS                 )
PETROLEUM COMPANY), a division        )
of Chevron U.S.A. Inc.,               )
                                      )
           Defendants.                )
                                      )
_____)


---oOo---


DEPOSITION OF ROBERT BURKES

Thursday, August 24, 2006

---oOo---


*Certified Copy*


REPORTED BY:  LISA P. GALLI, CSR NO. 12351

1    Q.   Otherwise known as SASBU; is that correct?

2    A.   That's correct.

3    Q.   And how long did you work in SASBU?

4    A.   I worked in SASBU from approximately

5    August 2000 until February 2004.

6    Q.   And what group within SASBU did you work for

7    during that time?

8    A.   I believe it was called the new projects

9    group, Block 0, new projects group.

10   Q.   Who was your supervisor during this time

11   period?

12   A.   Randy Dahlman was my supervisor for the last

13   two years.  And another gentlemen was my supervisor for

14   the first two years.

15   Q.   Was Chris Riccobono ever your supervisor?

16   A.   Yes.  I'm sorry.  Yes Chris Riccobono was my

17   supervisor, let's see, probably April -- no, Chris came

18   in July 2003.

19   Q.   When did you first meet Kiran Pande?

20   A.   It was either 1993 or early 1994.

21   Q.   And how is that you came to meet Ms. Pande?

22   A.   Because we were working on the same project

23   together.

24   Q.   Is that the Bombay High project?

25   A.   It was.

```
 1              STATE OF CALIFORNIA    )    ss.

 2              I, the undersigned, a Certified Shorthand

 3    Reporter of the State of California, hereby certify that

 4    the witness in the foregoing deposition was by me duly

 5    sworn to testify to the truth, the whole truth, and

 6    nothing but the truth in the within-entitled cause; the

 7    said deposition was taken at the time and place therein

 8    stated; that the testimony of said witness was reported

 9    by me, a Certified Shorthand Reporter and a

10    disinterested person, and was thereafter transcribed

11    under my direction into typewriting; that the foregoing

12    is a full, complete and true record of said testimony;

13    and that the witness was given an opportunity to read

14    and, if necessary, correct said deposition and to

15    subscribe the same.

16              I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    action.

21              IN WITNESS WHEREOF, I have hereunto set my

22    hand this 11th day of September, 2006.

23

24              _____
                CERTIFIED SHORTHAND REPORTER
25
```

**EXHIBIT I**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

KIRAN PANDE,                          )
                                      )
              Plaintiff,              )
                                      )
VS.                                   )  Case No. 04-5107 CW
                                      )
                                      )
CHEVRON CORPORATION (f/k/a            )
CHEVRONTEXACO CORPORATION), a         )
Delaware corporation, CHEVRON         )
INTERNATIONAL EXPLORATION &           )
PRODUCTION (f/k/a                     )
CHEVRONTEXACO OVERSEAS                 )
PETROLEUM COMPANY), a division)
of Chevron U.S.A. Inc.,               )
                                      )
              Defendants.      )

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
KATHY MABE
OCTOBER 18, 2006

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION of KATHY MABE, produced as
a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on OCTOBER 18, 2006, from 2:02 p.m. to 3:41 p.m., before
Lorri Lucas, CSR in and for the State of Texas, reported
by machine shorthand, at the offices of Bayou City
Reporting, 1135 East 11th Street, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.



**Bayou City Reporting inc.**

1135 East 11th Street • Houston, TX 77009
Phone: (713) 861-8589 • Toll Free: (888) 577-5048 • Fax: (713) 861-1729 • Email: bcrdepo@sbcglobal.net

Deposition of Kathy Mabe

Page 21

1    Dunn, you know, referred to the fact that she was not

2    going to be here and so I -- after the meeting or on

3    break, I went and asked her and she told me.

4         Q    This meeting where Jack Dunn referred to the

5    fact that Ms. Pande was not going to be there, describe

6    for me the -- the context of that meeting.  What kind of

7    meeting was it?

8         A    It was a meeting.  We were -- we were forming a

9    plan of action.  We had -- there had been a subsurface

10   peer review of the Tambua land and the project and they

11   had received red lights.  So there was -- we were putting

12   together an action plan on what needed to be done to have

13   a meeting in January where -- where we were going to try

14   to turn some of the red lights to yellow and green.

15        Q    All right.  You've used a lot of terminology.

16   Let's go back and define some of this.  You had a peer

17   review.  Can you describe what that peer review was, the

18   process?

19        A    In -- in Chevron, we have a -- a process called

20   "chip dip," which is C-P-D-E-P, and don't ask me what

21   that stands for.  And there's -- it's broken up into five

22   phases and you -- to get through the phase gates, you --

23   you have to do certain things, and to get from phase 2 to

24   phase 3, you have to have a subsurface peer review.  And

25   the RAM team, which is another acronym, is -- they --

Deposition of Kathy Mabe

Page 25

1    would guess, you know, probably about ten.

2         Q    And were there also people who attended by

3    speaker phone?

4         A    Yes.

5         Q    Do you know where the other folks were

6    physically located who attended by a phone?

7         A    In -- in Bellaire.

8         Q    Where is that?

9         A    In -- it's -- it's in Houston.

10        Q    Okay.

11        A    But it's its own city.

12        Q    And do you know how many people were attending

13   by phone from Bellaire?

14        A    I don't know the exact number but I would say

15   there was probably about four or five people.

16        Q    And were there any folks on the phone from

17   Angola?

18        A    I don't remember.

19        Q    There could have been; you just don't recall?

20        A    I don't remember them being on the phone from

21   Angola but there could have been.

22        Q    Please describe for me everything you recall

23   Jack Dunn saying in regard to Ms. Pande's medical leave

24   during this meeting.

25        A    Nothing.

Deposition of Kathy Mabe

Page 26

```
 1        Q     You don't -- Jack -- you don't recall Jack Dunn
 2   saying anything about Ms. Pande's medical leave?
 3        A     No.
 4        Q     What did he say in regard to Ms. Dunn --
 5   Ms. Pande taking a leave?
 6        A     He didn't mention her taking a leave.
 7        Q     I thought earlier you said that that's -- this
 8   meeting -- something that Jack Dunn said at this meeting
 9   sparked you to ask Ms. Pande why she was going out on
10   leave or have a discussion with Ms. Pande about her
11   taking a leave.
12        A     He just said that she wasn't going to be here
13   to do the work.
14        Q     That's all he said?
15        A     Um-hmm.  (Moving head up and down)  Yes.
16        Q     Do you recall how Ms. Pande reacted to
17   Mr. Dunn's statements?
18        A     She was very quiet, very quiet.
19        Q     How many times did Mr. Dunn refer to
20   Ms. Pande's taking a leave during this meeting?
21              MS. MILLER:  I'm going to object,
22   mischaracterizes this testimony.  I think she
23   specifically said he never made such a reference.
24              MR. LEBOWITZ:  Okay.  You can stop with
25   the speaking objections, please, and we'll stick to the
```

Page 27

1    objections as to form.  She can answer the questions if

2    she likes.

3                 MS. MILLER:  No.  I'm not going to let

4    her.  This is the "When did you stop beating your wife

5    question."  You need to listen.  She said she -- he never

6    said anything like that.

7                 MR. LEBOWITZ:  Counsel, we're -- we're in

8    federal court here where your objections are supposed to

9    be restricted to objections to form.  If you have an

10    objection, you can say, "Object to form."  Otherwise, I

11    would request that you stop the speaking objections.

12        Q    (BY MR. LEBOWITZ)  Can you answer the question,

13    please?

14        A    What was the question?

15                 MR. LEBOWITZ:  Can you read back the

16    actual question?

17                 (Discussion off the record

18                 from 2:37 to 2:38)

19                 VIDEOGRAPHER:  We are on the record at

20    2:38.

21        Q    (BY MR. LEBOWITZ)  Can you describe for me, in

22    as much detail as possible, precisely what Jack Dunn said

23    in regard to Ms. Pande not going to be -- not going to be

24    here to do the work?

25        A    I mean, it was pretty much just that.  I mean,

Deposition of Kathy Mabe

Page 28

```
 1   we -- what we were doing is coming up with lists of

 2   things that needed to be done, actions for this January

 3   meeting.  And so when we got to things that were

 4   reservoir simulation, which is the things that Kiran --

 5   Kiran would have been doing for Tambua, he -- he would

 6   say, "You're not going to be here.  Who's going to do

 7   that work?"

 8        Q     And how many times did he say that during this

 9   meeting?

10        A     I don't remember.

11        Q     Was it more than once?

12        A     Yes.

13        Q     Was -- describe for me his tone of voice when

14   saying these words to Ms. Pande.

15        A     It was loud.

16        Q     Was he yelling at her?

17        A     I wouldn't use the term "yelling."  It was just

18   a loud voice.

19        Q     Was it louder than Mr. Dunn's normal speaking

20   voice?

21        A     Yes.

22        Q     Did you interpret Mr. Dunn's conduct in this

23   meeting as inappropriate?

24              MS. MILLER:  I'm going to object to the

25   word "inappropriate" as ambiguous.
```

Page 67

1            UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA

2

3    KIRAN PANDE,                    )
                                     )
4              Plaintiff,            )
                                     )
5    VS.                             )  Case No. 04-5107 CW
                                     )
6                                    )
     CHEVRON CORPORATION (f/k/a      )
7    CHEVRONTEXACO CORPORATION), a   )
     Delaware corporation, CHEVRON   )
8    INTERNATIONAL EXPLORATION &     )
     PRODUCTION (f/k/a               )
9    CHEVRONTEXACO OVERSEAS          )
     PETROLEUM COMPANY), a division  )
10   of Chevron U.S.A. Inc.,         )
                                     )
11             Defendants.           )

12                  REPORTER'S CERTIFICATION
                 DEPOSITION OF KATHY MABE
13                   OCTOBER 18, 2006

14        I, Lorri Lucas, Certified Shorthand Reporter in and

15   for the State of Texas, hereby certify to the following:

16        That the witness, KATHY MABE, was duly sworn by the

17   officer and that the transcript of the oral deposition is

18   a true record of the testimony given by the witness;

19        That the deposition transcript was submitted on

20   _____ to the witness or to the attorney for

21   the witness for examination, signature and return to

22   me by _____;

23        That pursuant to information given to the deposition

24   officer at the time said testimony was taken, the

25   following includes counsel for all parties of record:

Deposition of Kathy Mabe

Page 68

1          Mr. Noah D. Lebowitz, Attorney for Plaintiff

2          Ms. Michelle Ballard Miller, Attorney for Defendants

3          That a copy of this certificate was served on all

4     parties shown herein.

5          I further certify that I am neither counsel for,

6     related to, nor employed by any of the parties or

7     attorneys in the action in which this proceeding was

8     taken, and further that I am not financially or otherwise

9     interested in the outcome of the action.

10          Certified to by me this 6th day of November, 2006.

11

12

13

14

15     _____

          *Lorri Lucas*

16     LORRI LUCAS, RMR, Texas CSR 5317

          Expiration Date:  12/31/07

          Bayou City Reporting, Inc.

17     Firm Registration No. 295

          1135 East 11th Street

18     Houston, Texas   77009

          (713) 861-8589

19

20

21

22

23

24

25

**EXHIBIT J**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

KIRAN PANDE,                        )
                                    )
            Plaintiff,              )
                                    )
VS.                                 )  Case No. 04-5107 CW
                                    )
                                    )
CHEVRON CORPORATION (f/k/a          )
CHEVRONTEXACO CORPORATION), a       )
Delaware corporation, CHEVRON       )
INTERNATIONAL EXPLORATION &         )
PRODUCTION (f/k/a                   )
CHEVRONTEXACO OVERSEAS              )
PETROLEUM COMPANY), a division)
of Chevron U.S.A. Inc.,             )
                                    )
            Defendants.             )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
JACK DUNN
OCTOBER 19, 2006

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of JACK DUNN, produced as
a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on OCTOBER 19, 2006, from 9:09 a.m. to 12:50 p.m., before
Lorri Lucas, CSR in and for the State of Texas, reported
by machine shorthand, at the offices of Bayou City
Reporting, 1135 East 11th Street, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.



Bayou
City
Reporting
inc.

1135 East 11th Street • Houston, TX 77009
Phone: (713) 861-8589 • Toll Free: (888) 577-5048 • Fax: (713) 861-1729 • Email: bcrdepo@sbcglobal.net

Deposition of Jack Dunn

Page 88

1    or mentioned was, how is she and how is -- and any idea

2    in how long she's going to be out given the -- the work

3    needs.

4        Q    Well, let's read that sentence in conjunction

5    with the first sentence, which as I read, it says,

6    "Employee is concerned that manager might receive med --

7    med info, advised no," and then the sentence that we just

8    read as well.  Now, does that -- reading those two

9    sentences in conjunction where Ms. Pande is con-- is

10   relating concerns about her manager receiving medical

11   info, does that in any way refresh your recollection as

12   to whether or not you were actually asking Ms. Pande for

13   details about her medical information?

14       A    This -- these are not my comments, of course.

15   These are the employee, meaning Kiran's, comments.  So

16   no.  This is -- she was -- she was concerned.  This is --

17   no.  No.  This was -- this isn't related to -- to me.

18   It's related to her.

19       Q    Well, it's -- it's --

20       A    Her perceptions.

21       Q    It's her perceptions of what you were asking,

22   so --

23       A    Correct.

24       Q    Can you think of any reason why Ms. Pande would

25   believe you were asking about her medical condition?

Deposition of Jack Dunn

1      A      No, I cannot.  In fact, I think this is an

2   inaccurate perception.  I had no interest in unders-- in

3   knowing anything about one's medical condition.  My -- my

4   inquiries were purely related to how long they were going

5   to be out just like if you were out on vacation and what

6   are we going to do to transition someone's work to

7   someone else.

8      Q      Did Ms. Pande ever tell you that she didn't

9   want to discuss her actual medical condition?

10     A      I wouldn't have expected her to.

11     Q      My question is simply:  Did she ask -- did she

12  say that to you or anything along those lines?

13     A      Not that I recall.  There wouldn't be a need

14  for that.  It's inappropriate.

15     Q      So you agree it would be inappropriate for you,

16  as a supervisor, to ask Ms. Pande what her medical

17  condition was?

18     A      As I mentioned, my interests are around making

19  sure that the employees are okay.  So when I ever -- in

20  questions I ask to employees when they're in a medical

21  condition, whether it's Kiran or elsewhere, is "I hope

22  you're okay.  Is there anything we can do?"

23     Q      And when you just said it would be

24  inappropriate, what did you mean by that?

25     A      I don't have any specifics.

Bayou City Reporting, Inc.  713 861-8589

Deposition of Jack Dunn

Page 123

1                UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA

2

3    KIRAN PANDE,                    )
                                     )
4                 Plaintiff,         )
                                     )
5    VS.                             ) Case No. 04-5107 CW
                                     )
6                                    )
     CHEVRON CORPORATION (f/k/a      )
7    CHEVRONTEXACO CORPORATION), a   )
     Delaware corporation, CHEVRON   )
8    INTERNATIONAL EXPLORATION &     )
     PRODUCTION (f/k/a               )
9    CHEVRONTEXACO OVERSEAS          )
     PETROLEUM COMPANY), a division  )
10   of Chevron U.S.A. Inc.,         )
                                     )
11                Defendants.        )

12                REPORTER'S CERTIFICATION

                  DEPOSITION OF JACK DUNN

13                   OCTOBER 19, 2006

14        I, Lorri Lucas, Certified Shorthand Reporter in and

15   for the State of Texas, hereby certify to the following:

16        That the witness, JACK DUNN, was duly sworn by the

17   officer and that the transcript of the oral deposition is

18   a true record of the testimony given by the witness;

19        That the deposition transcript was submitted on

20   _____ to the witness or to the attorney for

21   the witness for examination, signature and return to

22   me by _____;

23        That pursuant to information given to the deposition

24   officer at the time said testimony was taken, the

25   following includes counsel for all parties of record:

Deposition of Jack Dunn

Page 124

1      Mr. Noah D. Lebowitz, Attorney for Plaintiff

2      Ms. Michelle Ballard Miller, Attorney for Defendants

3      That a copy of this certificate was served on all

4 parties shown herein.

5      I further certify that I am neither counsel for,

6 related to, nor employed by any of the parties or

7 attorneys in the action in which this proceeding was

8 taken, and further that I am not financially or otherwise

9 interested in the outcome of the action.

10      Certified to by me this 6th day of November, 2006.

11

12

13

14

15                    *Lorri Lucas*

       LORRI LUCAS, RMR, Texas CSR 5317

16     Expiration Date:  12/31/07

       Bayou City Reporting, Inc.

17     Firm Registration No. 295

       1135 East 11th Street

18     Houston, Texas  77009

       (713) 861-8589

19

20

21

22

23

24

25

**EXHIBIT K**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

KIRAN PANDE,                    )
                               )
            Plaintiff,          )
                               )
        vs.                     ) Case No. 04-5107 CW
                               )
CHEVRON CORPORATION, et al.,    )
                               )
            Defendants.         )    CERTIFIED COPY
                               )
_____)


DEPOSITION OF REX MITCHELL

Monday, October 30, 2006


REPORTED BY: DENISE A. FORD, CSR 7525 (387693)


 **LEGALINK**®

**A MERRILL COMMUNICATIONS COMPANY**

575 Market St
11th Floor
San Francisco, CA 94105

tel (415) 357-4300
tel (800) 869-9132
fax (415) 357-4301

www.merrillcorp.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

REX MITCHELL    October 30, 2006

1    concluded, did you have an understanding that Ms. Pande

2    was making reference to the fact that she felt she was

3    being treated differently by you because she is a woman?

4         A.    No.

5         Q.    As of the end of your meeting with

6    Mr. Yamashita, did you understand that Ms. Pande had

7    characterized your behavior as harassing?

8         A.    I don't recall that.

9         Q.    What happened next after you met with

10   Mr. Yamashita as far as the ombuds process?

11        A.    That was the last I heard of it.  I had

12   the one conversation with Gary, and that was the last

13   conversation or anything that I had ever seen from the

14   ombuds office.

15        Q.    Did you ever learn that there was a

16   subsequent meeting between Mr. Yamashita, Jay Johnson,

17   Kiran Pande and Vicky Thompson?

18        A.    No.

19        Q.    Prior to me asking you that question, had

20   you ever heard of that meeting occurring?

21        A.    I don't recall that I have heard of it

22   before.

23        Q.    Did you ever speak with Jay Johnson about

24   anything in regards to Gary Yamashita or the ombuds

25   process?

104

LegaLink, A Merrill Communications Company   (800) 869-9132

REX MITCHELL    October 30, 2006

1    A.    I think I had told him that I had been

2 asked to meet with the ombudsman in response to the PMP,

3 and he encouraged me to go and talk to him and see if we

4 could get this situation resolved.

5    Q.    As of the time you had the one-on-one

6 meeting with Mr. Yamashita, did he tell you that he had

7 previously met with anybody other than Ms. Pande?

8    A.    He told me he talked with Kiran prior to

9 our meeting and he wanted to talk with me.

10    Q.    Did Mr. Yamashita tell you that he had

11 spoken with Jay Johnson prior to meeting with you?

12    A.    No.

13    Q.    Did Jay Johnson ever tell you that he had

14 met with Gary prior to you meeting with him?

15    A.    I don't recall if he did or didn't.

16    Q.    At some point in 2002 did you come to the

17 conclusion it would be better for Ms. Pande to look for

18 a position in a different group at Chevron?

19    A.    I think Jay and I had talked leading up to

20 the fall PDC.  It was coming up on a couple of years in

21 the group, which is typically about the normal length of

22 the assignment that folks have in business planning.  I

23 think we both felt it was probably appropriate to try

24 and move Kiran in that time frame.

25    Q.    Did you approach Ms. Pande and ask her if

105

1    she wanted to move?

2         A.    I think I recall asking her about one

3    position that was offered in terms of seeking her

4    interest in the job.

5         Q.    Is that after the PDCs that you had that

6    conversation?

7         A.    I think my recollection is it occurred

8    sometime midsummer or so, mid to late summer.

9         Q.    What job position was that?

10         A.    It was a position in a South African

11    business unit working for Fernando Giggino on something

12    in the Congo.  I don't recall specifically the job

13    title.

14         Q.    And so your recollection is that you went

15    to speak with Ms. Pande about this job opening?

16         A.    That's my recollection.  I thought that I

17    had asked her about her interest in something like that.

18         Q.    And how did you learn -- well, help me

19    understand the process.

20         Is this a job opening you learned of and thought

21    Ms. Pande would be good for, or is it something she was

22    doing on her own and you were trying to help out what

23    was going on?

24         A.    Fernando called me about an employee he

25    had in his group that he felt could benefit from the

1    rotation in the business planning group.  At the time he

2    asked me about Kiran's availability as a potential swap

3    candidate for this employee.  So I followed up with him

4    and said let's get together and talk a little bit more

5    about the job and your employee's qualifications and

6    capability.

7         Q.    Who was that other person?

8         A.    Sarah Salzer, S-a-l-z-e-r.

9         Q.    What position did she hold?

10        A.    Again, I don't specifically know the job

11   title.  It was a technical position, petroleum

12   engineering position of some kind within Fernando's

13   group.

14        Q.    That was within the Southern African

15   business unit?

16        A.    Right.

17        Q.    So you and Mr. Giggino, did you actually

18   get together and talk about this?

19        A.    Right.  We talked for 45 minutes or so

20   about both candidates and the jobs and opportunities,

21   that kind of thing.

22        Q.    What did you tell Mr. Giggino about

23   Ms. Pande?

24        A.    I told him -- my recollection is I thought

25   she was probably ready for a move.  It was a technical

107

REX MITCHELL    October 30, 2006

1   position that was in line with her certainly technical

2   capabilities and prior experience.  It was a team lead

3   position, as I recall, and I thought she could benefit

4   from having supervisory experience in a team lead

5   position as well.

6        Q.    Did you tell Mr. Giggino any of your

7   impressions about Ms. Pande and her attitude?

8        A.    My recollection is I think I described

9   that I was concerned about some recent performance

10  lapses that Kiran had had in the group, but overall I

11  really felt she needed a change of scenery and could

12  probably benefit from the opportunity there.  He felt

13  likewise, that his candidate would be a good fit for my

14  group as well.

15       Q.    Did you explain in any detail what you

16  meant by "recent performance lapses"?

17       A.    Not really, no, I didn't get into any

18  details.

19       Q.    Did you say anything that referenced

20  Ms. Pande's attitude?

21       A.    I don't recall that I did.

22       Q.    Did you and Mr. Giggino have any written

23  correspondence about this conceived transaction?

24       A.    No, we did not.

25       Q.    And whatever happened with the whole idea?

108

REX MITCHELL    October 30, 2006

1      A.    My recollection is I think I asked Kiran

2    about the position, and she wasn't interested in it.  I

3    went back to Fernando and said I don't think this is

4    going to work.  Kiran is really not interested in your

5    job.

6      Q.    Did Ms. Pande tell you any specifics about

7    why she was not interested in the job?

8      A.    I don't recall anything specific other

9    than I think she viewed that she wanted to sort of track

10    her career more towards business and commercial rather

11    than back in a technical discipline.

12      Q.    Did you facilitate any kind of discussion

13    between Ms. Pande and Mr. Giggino about more details

14    about the position?

15      A.    I don't recall that I did or not.  I think

16    I suggested that if she wanted to learn more about the

17    job that she talk to him, but I don't have a specific

18    recollection that she did or not.

19      Q.    Did she take any time to think about the

20    proposal, or did she just say no right away?

21      A.    I don't have a recollection how quickly

22    she said she wasn't interested.

23      Q.    Did Ms. Salzer ever come work in your

24    group?

25      A.    She did.

109

REX MITCHELL    October 30, 2006

1    Q.    And was that as a result of the PDC or

2    some other process?

3    A.    As a result of the PDC process.

4    Q.    So once this opportunity went by, did you

5    do anything else to try and assist Ms. Pande to find

6    another job in the company prior to the fall of 2002

7    PDC?

8    A.    I am not sure it was prior to the fall

9    PDC.  We were trying to -- I was working with Desmond

10   King in corporate planning.  There was a job in

11   corporate planning that Kiran was interested in.  I

12   thought we held something open for a period of time to

13   let her post for that position.  Again, I don't recall

14   whether it was just prior to, at the same time or

15   shortly thereafter the PDC meeting.

16   Q.    Sometime in the latter half of 2002?

17   A.    It was definitely latter half of 2002.

18   Q.    How did this potential opening come up?

19   Was this something that Mr. King came and told

20   you or you sought him out?

21   A.    It was a posted job.  It was available for

22   open posting.

23   Q.    Something you saw?

24   A.    I think -- I had two employees in the

25   group that were interested in the job.  I was aware of

110

REX MITCHELL    October 30, 2006

1    it.  Des King called me to make me aware that was an
2    opening in his shop.
3        Q.   Did you suggest to Mr. King that Ms. Pande
4    would be a good candidate for it?
5        A.   I suggested that he talk to both
6    candidates that had posted to his job.
7        Q.   One of whom was Ms. Pande?
8        A.   Yes.
9        Q.   Who was the other?
10       A.   Kemal Anbarci.
11       Q.   Did you talk to Mr. King about Ms. Pande
12   in any more detail other than you should take a look at
13   her?
14       A.   I encouraged her to shortlist both of them
15   because originally they did not shortlist Kiran as a top
16   candidate on paper.  He felt Kemal had the stronger
17   qualifications.  I urged him to talk to both of them.  I
18   really felt they brought different skills to the job.
19       Q.   To your knowledge, did Mr. King actually
20   talk to Ms. Pande?
21       A.   Yes, I believe he did.
22       Q.   Did you express to Mr. King any of your
23   concerns about Ms. Pande's performance in your group?
24       A.   No.
25       Q.   Did you express to Mr. King any of your

111

REX MITCHELL    October 30, 2006

1    feelings about Ms. Pande's attitude at work?

2        A.    No.

3        Q.    Did you say anything in your own mind that

4    you would characterize as a less than positive

5    statement?

6        A.    No.

7        Q.    Did you ever talk to Ms. Pande about this

8    job?

9        A.    I believe we spoke about it, about the

10    opening.  I think I had to endorse her posting for the

11    position.  I think I did speak to her about the job.  It

12    was a lengthy period of time that they were delaying

13    their interviewing process, and I think that resulted in

14    holding open another opportunity for Kiran for some

15    period of time.

16        Q.    Who ultimately got the job with Mr. King?

17        A.    He didn't select either one of my

18    employees for the role.  I am not sure who he brought

19    in.  Someone from outside of our group.

20        Q.    So what do you mean when you say there was

21    another job that was being held open?

22        A.    There was a position -- my recollection is

23    there was a position that Kiran was selected for out of

24    the fall PDC process in the petroleum engineering arena.

25    That job -- she had been selected for the job but

112

1    CERTIFICATE OF REPORTER

2        I, DENISE A. FORD, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause;

7        That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time and

9    place therein stated, and that the testimony of the said

10    witness was thereafter reduced to typewriting, by

11    computer, under my direction and supervision;

12        That before completion of the deposition,

13    review of the transcript [X] was [ ] was not requested.

14    If requested, any changes made by the deponent (and

15    provided to the reporter) during the period allowed are

16    appended hereto.

17        I further certify that I am not of counsel or

18    attorney for either or any of the parties to the said

19    deposition, nor in any way interested in the event of

20    this cause, and that I am not related to any of the

21    parties thereto.

22    DATED: _____11/10/06_____

23

24    _____

25    DENISE A. FORD, CSR No. 7525

**EXHIBIT L**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

KIRAN PANDE,                          )
                                      )
          Plaintiff,                  )
                                      )
     vs.                              ) Case No. 04-5107 CW
                                      )
CHEVRON CORPORATION(f/k/a             )
Chevron Texaco Corporation/, a)
Delaware corporation, et al., )
                                      )
          Defendants.                 )
_____ )


DEPOSITION OF ZUWA OMOREGIE

Thursday, April 6, 2006



CERTIFIED COPY


REPORTED BY: DENISE A. FORD, CSR 7525 (380011)



LEGALINK®
A WORDWAVE COMPANY

LegaLink San Francisco                tel (415) 357-4300     www.legalink.com
575 Market Street, 11th Floor         tel (800) 869-9132
San Francisco, CA 94105               fax (415) 357-4301

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

```
1    San Ramon or Houston as the potential location, it is to
2    be more convenient for the applicants?
3          A.    Yes.
4          Q.    So the applicant would work or the ones
5    that got the job could work from either San Ramon or
6    Houston?
7          A.    Yes.
8          Q.    At any point did you learn or hear of any
9    reputation regarding Ms. Pande on the topic of teamwork?
10         A.    Yes.  That was some of the comments I just
11   mentioned earlier about from her former supervisors.
12         Q.    So from Jean Camy and Dave Kennedy?
13         A.    Yes.
14         Q.    And how would you characterize those
15   comments regarding teamwork?
16         A.    They were poor ratings.
17         Q.    And did you consider -- strike that.
18         Did the committee consider teamwork to be an
19   important aspect of both of these jobs?
20         A.    Yes.
21         Q.    And do you recall how Ms. Pande was
22   actually rated in regards to teamwork in the selection
23   committee process?
24         A.    Below the selected candidates.
25         Q.    So who were the two selected candidates
```

37

1              **CERTIFICATE OF REPORTER**

2

3         I, DENISE A. FORD, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth, and nothing but the truth in the

7    within-entitled cause;

8         That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13        I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the event of

16   this cause, and that I am not related to any of the

17   parties thereto.

18

19             DATED:  April 18, 2006.

20

21

22             _____
               DENISE A. FORD, CSR No. 7525
23

24

25