**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8           FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   KIRAN PANDE,                        No. C 04-5107 CW

11           Plaintiff,

                                         ORDER GRANTING IN
12       v.                              PART DEFENDANTS'
                                         MOTION FOR
13   CHEVRON CORPORATION (f/k/a          SUMMARY JUDGMENT
     CHEVRONTEXACO CORPORATION), a       AND DENYING IT IN
14   Delaware corporation, and CHEVRON   PART
     INTERNATIONAL EXPLORATION AND
15   PRODUCTION (f/k/a CHEVRONTEXACO
     OVERSEAS PETROLEUM COMPANY), a
16   division of Chevron U.S.A. Inc.,

17           Defendants.

18   _____/

19

20       Defendants Chevron Corporation (f/k/a ChevronTexaco

21   Corporation) and Chevron International Exploration & Production

22   (f/k/a ChevronTexaco Overseas Petroleum Company), a division of

23   Chevron U.S.A. Inc., (collectively Defendants) move for summary

24   judgment, arguing that there are no triable issues as to any

25   material fact and, therefore, they are entitled to judgment as a

26   matter of law.  Plaintiff Kiran Pande opposes the motion.  The

27   matter was heard on January 5, 2007.  Having considered all of the

28

papers filed by the parties, the evidence cited therein and oral argument, the Court grants Defendants' motion in part and denies it in part.

BACKGROUND

Plaintiff is an American citizen who was born in India, immigrating to the United States when she was two years old.  In 1988, Plaintiff was hired as a research engineer in the Chevron Oil Field Research Company.  In 1995, Plaintiff was transferred to Chevron Overseas Petroleum, Inc.,[1] located in San Ramon, California.  Plaintiff received numerous promotions.  Her evaluation for 1999 stated that she was a valued member of the engineering team.  It noted, "She has very good business skills to compliment her technical ability.  Her career interests would be better served if she were given an opportunity to work in a Commercial, Planning or Corp. Finance assignment."  Pande Dec., Ex. A.

In the fall of 2000, Rex Mitchell, the manager of Chevron Overseas Petroleum's Business and Strategic Planning group, hired Plaintiff to work in his group.  Earlier in the year, he had interviewed Plaintiff for an open position and, although he had not selected her for that position, he was impressed with her.  Thus, when another position opened in his group, he sought her out and offered her a position as a business analyst.  Mr. Mitchell states that his group is demanding and that Plaintiff was assigned to this

---

[1]After the merger with Texaco, Chevron Overseas Petroleum, Inc. became ChevronTexaco Overseas Petroleum Company, which is now Defendant Chevron International Exploration and Production.

United States District Court
For the Northern District of California

group because she, like other employees in the group, is well-educated, very intelligent and high-achieving.

In October, 2001, shortly after the merger with Texaco, Mr. Mitchell selected Plaintiff to fill a vacant Portfolio Analysis position.  Plaintiff states that Mr. Mitchell told her that he considered the Portfolio Analysis position to be a higher level than her position at the time and he promised to promote her a grade.  According to Mr. Mitchell, however, he did not commit to promoting Plaintiff.  Mr. Mitchell states that, while he considered the Portfolio Analyst position to be the most analytically demanding position in his group, he explained to Plaintiff that, in part due to the merger with Texaco, accepting this position would not come with a promotion; all promotion recommendations would be evaluated in the spring of 2002.  He explained that, if Plaintiff developed in the Portfolio Analyst position as expected, she stood a good chance of earning a promotion in the spring.

Plaintiff claims that soon after she became the Portfolio Analyst, Mr. Mitchell began to harass and discriminate against her based on her gender and national origin.  Mr. Mitchell admits that he criticized Plaintiff, but contends it was based, not on her gender or national origin, but rather on her lackluster performance.  He states that, after she expressed her unhappiness about not being promoted, Plaintiff's performance declined.  She failed to complete several assignments, creating additional work for her co-workers.

In March, 2002, Plaintiff complained to Mr. Mitchell's supervisor, James Johnson, telling him that she felt unfairly

3

**United States District Court**
For the Northern District of California

singled out by Mr. Mitchell and that Mr. Mitchell was over-burdening her with work.  In her declaration, she states that, at that same meeting in March, she told Mr. Johnson that a co-worker told her that Mr. Mitchell referred to people of Indian origin as "towel heads."[2]  In her deposition, however, Plaintiff stated that, during her first meeting with Mr. Johnson, she did not tell him that Mr. Mitchell was harassing her based on her gender and race or national origin.  According to Plaintiff, Mr. Johnson did nothing to investigate her complaints.  Instead, he told her that she had three choices: (1) leave the company; (2) leave the group; or (3) stay for twelve to eighteen months and get along with Mr. Mitchell.

According to Mr. Johnson, Plaintiff informed him in early March, 2002, that she was having problems with her supervisor, Mr. Mitchell, largely because he ranked her a "2" on her review, when she thought she should have been ranked a "1."  A "2" ranking indicates that the employee "Fully Meets Performance Expectations"; a "1" ranking indicates "Exceptional Performance."  Mr. Johnson contends that it was not until the following month, in late April, that he learned that Plaintiff's complaint related to her gender and national origin.

Mr. Johnson states that he took all of Plaintiff's complaints seriously and investigated Plaintiff's allegations; he spent hours

---

[2]The co-worker denies stating that she overheard Mr. Mitchell refer to people of Indian origin as "towel heads."  She states that she has never heard him make any kind of racial slur or comment reflecting negatively on any individual's racial or ethnic background, nor has she heard him make any negative comments about women.

**United States District Court**
For the Northern District of California

meeting with Plaintiff, Mr. Mitchell and anyone else whom Plaintiff identified as a potential witness or someone with potential knowledge of the issues she raised. But he never found anything to suggest that Mr. Mitchell discriminated against Plaintiff or anyone else. He informed Plaintiff of the results of his investigation and urged her to move past her disagreements with Mr. Mitchell and make a success of her remaining time in his group.

In the spring of 2002, after reporting Mr. Mitchell's conduct to Mr. Johnson, Plaintiff filed a formal complaint alleging discrimination and harassment by Mr. Mitchell. She filed it with Gary Yamashita, the Ombuds individual designated to hear complaints concerning workplace harassment and discrimination. In her complaint, Plaintiff also alleged that Mr. Johnson refused to investigate her earlier complaint of discrimination and harassment.

In April, 2002, Plaintiff met with Mr. Mitchell to discuss her annual performance review. She told him that his behavior towards her was inappropriate and constituted harassment. He apologized and attributed his behavior to stress and informed her that she was not being promoted. Plaintiff contends that she and the only other woman in his group were ranked lower than the men in the group and received lower raises and merit increases than all the men in the group. This contention, however, is based on hearsay. Mr. Mitchell states that several male employees who worked under him in the group were also ranked as "2"s during this time period and that persons in his group who obtained the lowest pay increases were male employees, not Plaintiff and the only other female employee. His statement is not hearsay, nor is it based on hearsay evidence.

5

**United States District Court**
For the Northern District of California

That same month, Mr. Yamashita held a meeting with Plaintiff, Mr. Johnson and the other female employee, who also filed a complaint against Mr. Mitchell.  Although the meeting was supposed to be investigatory, Plaintiff states that it turned into an attack by Mr. Johnson on her performance.  According to the other female employee, Mr. Yamashita did not redirect the conversation to the women's complaints against Mr. Mitchell.  Plaintiff expressed her concern about Mr. Mitchell's use of an ethnic slur to refer to East Indians, but those concerns were essentially ignored.  Plaintiff claims that Mr. Yamashita did not properly investigate her complaint.  Instead, he met with Mr. Mitchell and, when Mr. Mitchell denied any wrongdoing, Mr. Yamashita ended his investigation.

After meeting with Mr. Yamashita, Plaintiff states that Mr. Mitchell excluded her from work-related meetings.  He isolated her from the work group and, according to Plaintiff, impeded her ability to advance within the company.  She learned that Mr. Mitchell had been saying negative things about her.  An e-mail a co-worker forwarded to Plaintiff, written by another co-worker, asked:

> What is the problem between Rex and Kiran Pandy [sic]?  We were considering her for a position that will open up in Fernando Gaggino's group, and Rex told him things like "she's not a team player", "she pouts", etc.  Real career killers.

Thompson Dec., Ex. B.

Because positions in Mr. Mitchell's group were short-term positions, lasting less than two years, Plaintiff had to find a new position.  She applied for two positions in late 2002: one in the

6

Project Resources Company and another in the Strategic Planning division. She was not selected for either position. Instead, she claims, she was forced to take a less desirable job as a Simulation Engineer in the Southern Africa Strategic Business Unit.

Jack Dunn was Plaintiff's supervisor in the Southern Africa Strategic Business Unit. Although she was no longer under Mr. Mitchell's supervision, Mr. Mitchell had input into whether she would receive a merit pay increase. In April, 2003, Mr. Dunn informed Plaintiff that she was not receiving a merit pay increase. This was the first time since she began working at Chevron that she did not receive a merit pay increase.

At first, Mr. Dunn was pleased with Plaintiff's work, finding that she was an asset to the group. In the spring of 2003, however, Mr. Dunn's opinion of Plaintiff's performance changed after it was announced that the Southern Africa Strategic Business Unit was being transferred from San Ramon to Houston, Texas. Employees, such as Plaintiff, were offered the opportunity to relocate to Houston. If an employee declined the offer to work in Houston, he or she had to find a new position. Employees were informed that there was no guarantee that alterative employment would be found.

In June, 2003, Plaintiff received her relocation offer package; she did not accept the offer. Rather, she applied for several openings for positions which would allow her to remain in San Ramon. She did not get any of the jobs for which she applied. She states, however, that Mr. Dunn offered her continued work in San Ramon on a project which would last through most of 2004 and

7

United States District Court
For the Northern District of California

that she agreed to work on the project.  Mr. Dunn denies offering her continued work.

According to Mr. Dunn, after learning that her job was being transferred to Texas, Plaintiff was less focused on her work. Another employee also testified that, after the move to Houston was announced, he saw a reduction in Plaintiff's commitment levels and her work effort.

In October, 2003, Plaintiff, in consultation with her physician, decided that she needed surgery, requiring her to take a medical leave.  She filled out all the required paperwork, including medical release forms.  Plaintiff states that she notified Mr. Dunn that she requested a leave of absence beginning on November 10, 2003.  According to Plaintiff, Mr. Dunn asked what was wrong with her.  When Plaintiff refused to tell him, Mr. Dunn continued to ask her questions about her condition and symptoms, including asking if she had cancer and discussing cancer treatments.  Plaintiff contacted human resources regarding Mr. Dunn's questioning and was assured that Mr. Dunn would be given no private information about Plaintiff.

Mr. Dunn denies ever asking Plaintiff, or anyone else, about Plaintiff's medical condition.  According to Mr. Dunn, after he received an email that Plaintiff was taking a leave, he went to Plaintiff's office to find out how long she was going to be out. When he could not find Plaintiff, he called the number on the email to find out the expected duration of the leave and to see if Plaintiff was alright; he did not ask about specifics.

8

Shortly after learning that Plaintiff was taking medical leave, Mr. Dunn met with his group to discuss its progress in preparing for the upcoming move and the group's upcoming review. According to Plaintiff, at this meeting, Mr. Dunn started yelling at her in front of all her co-workers. He shouted that Plaintiff was going on medical leave and that he wanted to know how her work was going to get done. Plaintiff states that his behavior made her cry. Another co-worker complained to Mr. Dunn's supervisor about Mr. Dunn's behavior during the meeting, stating that Mr. Dunn was speaking too loudly and pointing his finger at Plaintiff, and it clearly upset Plaintiff. Mr. Dunn admits to raising his voice during the meeting, but he denies it was directed only at Plaintiff. He also denies mentioning that Plaintiff was going on medical leave; he only stated that Plaintiff was not going to be there and inquired into what plans she had made to transition her work to another employee.

On November 7, 2003, Plaintiff emailed Mr. Dunn to request that her twenty-eight unused vacation days be carried over to 2004. Mr. Dunn responded, "Let's discuss." Although they never did discuss it, Mr. Dunn states that his concern was that it was not customary to carry over that many vacation days.

Three days later, Plaintiff began her medical leave as scheduled. Shortly thereafter, Mr. Dunn called Plaintiff to let her know that human resources would be sending her a letter confirming the effective date of her termination. Plaintiff received the letter, which stated that, by turning down the offer to work in Houston, she had, in effect, resigned from the company.

United States District Court
For the Northern District of California

1  If she was not selected for another company position, her last day

2  of employment would be December 31, 2003.

3      On December 8, 2003, Plaintiff sent a letter to the human

4  resources department, contending that she never voluntarily

5  resigned her employment.  She stated that she was never told that,

6  if she did not accept the relocation offer, her employment with the

7  company would continue only until year-end 2003.  She also stated

8  that, before she went on medical disability, she was offered work

9  through 2004 and planned to return to work.  In the letter,

10  Plaintiff further disclosed that she was subject to harassment by

11  Mr. Mitchell and while in Mr. Dunn's group.

12      That same day, Plaintiff also filed an administrative

13  complaint with the California Department of Fair Employment and

14  Housing.  The complaint stated that Plaintiff experienced on-going

15  retaliation for reporting harassment and discrimination based on

16  race, gender and national origin as well as harassment and

17  retaliation for requesting medical leave protected under the Family

18  Medical Leave Act (FMLA) and California's Family Rights Act (CFRA).

19      In December, while Plaintiff was still on medical leave, Paul

20  Vita contacted Plaintiff about two job openings for petroleum

21  engineers with Chevron's Energy Technology Company; both positions

22  were located in San Ramon and the supervisor of those jobs was Zuwa

23  Omoregie.  Plaintiff met the job requirements to be considered for

24  these two openings and applied for the jobs.  As part of the

25  selection process, Mr. Omoregie asked Mr. Dunn about Plaintiff.

26  Mr. Dunn responded that Plaintiff had strong technical skills and

27  was very bright and capable.  He noted, however, that her job

28                                  10

United States District Court
For the Northern District of California

performance had suffered during the last half of the year, after it was announced that the division was relocating to Houston. Nonetheless, there was a job in Houston waiting for Plaintiff if she wanted to move.  Mr. Omoregie also learned that Plaintiff's former supervisors, Jean Camy and David Kennedy, rated her poorly in terms of teamwork.  Mr. Camy, who was on the selection team for the two open positions, stated that, given his experiences working with Plaintiff and her negative attitude, he would not work with her again.  Plaintiff was not selected for either position.

On December 31, 2003, Plaintiff's employment was terminated.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

**United States District Court**
For the Northern District of California

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods.  <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Id.</u>

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  <u>Bhan</u>, 929

F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. <u>Nissan</u>, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial. <u>Id.</u> at 1107.

DISCUSSION

Plaintiff brings eight causes of action against Defendants. Her first two causes of action allege that Defendants violated the FMLA and CFRA. Her third, fourth and fifth causes of action claim that Defendants, in violation of California's Fair Employment and Housing Act (FEHA), discriminated against her based on her gender and race or national origin and retaliated against her. Plaintiff's sixth cause of action is for wrongful termination in violation of public policy. Her seventh cause of action is for violation of her right to privacy under the California Constitution; her last cause of action alleges that Defendants violated the California Confidentiality of Medical Information Act. Defendants contend that all these causes of action fail as a matter of law because Plaintiff cannot establish a triable issue of material fact. Plaintiff disagrees, arguing that a reasonable jury

13

United States District Court
For the Northern District of California

could find in her favor with respect to her claims under the FMLA

and CFRA, her claims under FEHA, based on discrimination and

retaliation by Mr. Mitchell, and her claim for wrongful termination

in violation of public policy.  She does not, however, oppose

Defendants' motion to the extent it attacks her allegations that

Mr. Dunn discriminated against her based on her gender and race or

national origin.  She consents to dismissal of her seventh and

eighth causes of action.

I.   FMLA and CFRA Claims

Plaintiff contends that she was terminated, in part, because

she took medical leave.  She further claims that Defendants'

policies violate the FMLA and CFRA.  Defendants argue that summary

judgment should be granted in their favor on all of Plaintiff's

claims arising under the FMLA and the CFRA.

As the Ninth Circuit explains, "The FMLA provides job security

and leave entitlements for employees who need to take absences from

work for personal medical reasons, to care for their newborn

babies, or to care for family members with serious illnesses."  Liu

v. Amway Corp., 347 F.3d 1125, 1132 (9th Cir. 2003).[3]  It entitles

qualifying employees to take unpaid leave for up to twelve weeks

each year.  An employer violates the FMLA by impermissibly using an

employee's FMLA leave as a factor in the decision to terminate the

employee.  Id. at 1135.  Nonetheless, when an employee is

terminated for business reasons unrelated to leave status, the FMLA

[3]Because the "CFRA adopts the language of the FMLA and
California state courts have held that the same standards apply,"
Liu, 347 F.3d at 1132, n.4, the Court analyzes Plaintiff's FMLA and
CFRA claims together, often only referring to the FMLA.

14

**United States District Court**
For the Northern District of California

is not implicated.  See 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.").

    A.  Termination

    Plaintiff argues that she presents evidence that her medical leave was a factor in Defendants' decision to terminate her employment, noting that such can be proven through either direct or circumstantial evidence.  See Liu, 347 F.3d at 1136.  She points to the offer to continue working in San Ramon through 2004 that Mr. Dunn allegedly made before he learned that she was taking medical leave, an offer revoked after she took the leave.  Plaintiff points out that she asked Mr. Dunn about using her vacation time for 2003 in 2004, suggesting that she planned to continue working in her position throughout 2004.  She also notes that he yelled at her at a meeting, in front of co-workers, after he learned she was taking medical leave.

    Defendants emphasize that Mr. Dunn denies that he ever made such an offer and that there is no paperwork to support this alleged offer.  They point out that Plaintiff's own actions suggest that Mr. Dunn never offered to extend her position.  For example, she continued to look for other positions; and, before she went on medical leave, she sent an email to human resources inquiring about severance benefits and stating that if she was not successful in finding another position she would likely be forced to leave the company.  Although these actions cast doubt on Plaintiff's claim that she was offered a position, the Court finds that there is a

15

triable issue of fact as to whether the medical leave taken by Plaintiff was a factor in her termination. A reasonable jury could find Plaintiff credible, believe that Mr. Dunn offered to extend her position and conclude that he then revoked that offer because Plaintiff requested and took medical leave.

Plaintiff also contends that, after Mr. Dunn learned that Plaintiff was taking medical leave, he adversely affected her ability to find another job. She points to the negative comments he made to Mr. Omoregie about her performance, which hindered her chances of being hired for the engineer positions. Defendants argue that there is no evidence that Mr. Dunn's evaluation of Plaintiff had any effect on her not being hired. They contend that Plaintiff was not hired because of comments by Mr. Camy, who told the selection committee that, given his experiences working with Plaintiff and her negative attitude, he would not work with her again. Although this evidence supports Defendants' argument that Mr. Dunn's negative comments were inconsequential, the Court finds that there is a triable issue of material fact as to whether Mr. Dunn impermissibly considered the medical leave taken by Plaintiff in evaluating Plaintiff and as to whether his evaluation caused Plaintiff not to be hired for the two open positions, resulting in her ultimate termination.

Defendants argue that, regardless, they should be granted summary judgment because Plaintiff was terminated solely because of a business decision to relocate her position and that she would have been terminated even if she had not been on medical leave. The decision to relocate Plaintiff's group to Houston was made

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

months before Plaintiff requested medical leave.  Plaintiff was offered a position in Houston, but, as noted above, Plaintiff refused to relocate and rejected the offer.  Employees were warned that, if they did not relocate, they had to find another position within the company or risk being terminated.  Plaintiff attacks Defendants' argument that her termination was the result of a business decision, contending that this is an affirmative defense, which Defendants failed to plead and, therefore, cannot now prove. This contention is without merit.  Defendants point to their fourth affirmative defense entitled "Good Faith/Legitimate Business Reasons."  Nonetheless, the Court finds, as discussed above, that a disputed issue of material fact remains as to whether the medical leave taken by Plaintiff was an impermissible factor in her inability to obtain a new position which, in turn, led to her termination.  A jury, not this Court, must determine whether Plaintiff was terminated solely because of a business decision to relocate her position to Houston, Texas or whether the medical leave was a factor in her termination.

B.  Defendants' policies

Plaintiff claims that Defendants violated the FMLA and CFRA by implementing an across-the-board policy of certifying leave only in thirty-day increments.  A FMLA regulation, for example, provides, "If the minimum duration of the period of incapacity specified on a certification furnished by the health care provider is more than 30 days, the employer may not request re-certification until that minimum duration has passed unless one of the conditions set forth in paragraph (c)(1), (2) or (3) of this section is met."  29 C.F.R.

17

§ 825.308(b)(1).  To support this claim, she cites a letter sent to her from UnumProvident, Defendants' Disability Management Program Administrator.  Merely citing this letter, however, does not support Plaintiff's claim that Defendants' policy violates the FMLA and CFRA.

The letter provides, in part, "You may be required to provide periodic medical re-certification of the serious health condition if you request an extension of your absence or as otherwise permitted by law" and "during your protected absence, you will be required to furnish the FMLA Unit at UnumProvident with periodic reports once every thirty days of your status and intent to return to work."  Pande Dec., Ex. B.  As Defendants point out, there is nothing contrary to the law in these provisions.  It is not illegal to require an employee to provide updates on his or her status and intent to return to work.  The FMLA specifically provides, "An employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work."  29 C.F.R. § 825.309(a).  Plaintiff's claim that Defendants' policy contained in the letter violates the FMLA and CFRA is without merit.

Plaintiff further claims that Defendants' policies violated her rights, under the FMLA and CFRA, to confidentiality and privacy in her medical records.  Defendants acknowledge that the FMLA and CFRA limit the amount and type of information that an employer can require for purposes of determining FMLA and CFRA eligibility.  But, as they note, an employer can require more information for purposes of assessing eligibility for temporary disability

18

benefits.  Here, the information sought and releases Plaintiff

signed were for disability benefits, not FMLA and CFRA eligibility.

Plaintiff has provided no evidence to show that Defendants violated

any privacy provision in the FMLA or the CFRA.

C.  Summary

Because there are disputed issues of material fact, the Court

denies summary judgment in Defendants' favor as to part of

Plaintiff's FMLA and CFRA claims: Plaintiff's claims that she was

denied new positions and terminated because she took a medical

leave.  However, the Court grants summary judgment in Defendants'

favor as to Plaintiff's claims that Defendants' policies are

inconsistent with the FMLA and CFRA and that Defendants violated

Plaintiff's right to confidentiality and privacy in her medical

records.

II.  FEHA Claims

As Plaintiff makes clear in her opposition, she contends that

Mr. Mitchell discriminated against her on the basis of her gender

and race or national origin and then retaliated against her after

she reported the discrimination.  Defendants argue that these

claims are time-barred and, therefore, the Court should grant

summary judgment in their favor on all of Plaintiff's claims

arising under the FEHA.[4]

---

[4]In their reply, Defendants, for the first time, argue that
Plaintiff has no evidence of discriminatory animus and, therefore,
her discrimination claims fail on the merits as a matter of law.
As recognized in this district, "It is well settled that new
arguments cannot be made for the first time in reply."  Contratto
v. Ethicon, Inc., 227 F.R.D. 304, 309 (N.D. Cal. 2005).  Thus, the
Court does not consider these arguments.  The Court pointed out at
the hearing, however, that Plaintiff's discrimination claims are

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Under the FEHA, a complainant must file an administrative charge within one year of the alleged unlawful act.  <u>See</u> Cal. Govt. Code § 12960.  Here, Plaintiff filed her Charge of Discrimination on December 8, 2003.  The last day she worked under Mr. Mitchell's supervision, however, was December 6, 2002, one year and two days before she filed her complaint.  Defendants contend that, therefore, her claims are barred as a matter of law.  Plaintiff responds that her claims based on Mr. Mitchell's actions are saved by the continuing violation doctrine.  She contends that his adverse actions continued into 2003, when she was denied a merit pay increase based, in part, on his evaluation of her performance. Defendants acknowledge that the continuing violation doctrine can operate to extend the statute of limitations in FEHA cases, but they argue that the doctrine does not apply here.

The California Supreme Court instructs that the continuing violation doctrine applies when "the employer's unlawful actions are (1) sufficiently similar in kind -- recognizing . . . that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence." <u>Yanowitz v. L'Oreal USA, Inc.</u>, 36 Cal. 4th 1028, 1059 (2005) (quoting <u>Richards v. CH2M Hill, Inc.</u>, 26 Cal. 4th 798, 823 (2001)).

In <u>Richards</u>, the California Supreme Court explained that, when

based on hearsay evidence.  Unless Plaintiff identifies a relevant hearsay exception, which she was unable to do at the hearing, that evidence would not be admissible at trial.

an employer engages in a continuing course of unlawful conduct under the FEHA and this course of conduct does not constitute a constructive discharge,

> the statute of limitations begins to run, not necessarily when the employee first believes that his or her rights may have been violated, but rather, _either_ when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, _or_ when the employee is on notice that further efforts to end the unlawful conduct will be in vain.

26 Cal. 4th at 823 (emphasis in original).  The California Supreme Court recognized that a strict approach to the statute of limitations could encourage early litigation.  Id. at 819. Therefore, it instructed that, to minimize the filing of unripe lawsuits and to promote the conciliatory resolution of claims, the FEHA statute of limitations should be interpreted liberally to allow employers and employees an opportunity to resolve disputes informally.  Id.

Applying those factors and interpreting the FEHA statute of limitations liberally, the Court finds that the continuing violations doctrine may apply here.  As noted above, Plaintiff presents evidence that Mr. Mitchell's alleged discrimination continued in 2003, when she was denied her merit pay bonus based, at least in part, on his evaluation of her performance.  Mr. Dunn stated that the raise, or lack thereof, "in early 2003 would have been related to her performance prior to her coming on my team." Dunn Dep., 21:24-25.  A trier of fact could find that, it is at that point, within the statute of limitations, that Mr. Mitchell's allegedly discriminatory conduct against Plaintiff ended and the statute of limitations began to run.  Thus, Plaintiff's claims for

21

discrimination may not be time-barred.

Nor is Plaintiff's retaliation claim under FEHA time-barred as a matter of law. As discussed above, Plaintiff provides evidence that Mr. Mitchell continued to retaliate against her after December 6, 2002. Although she no longer worked under him, Mr. Mitchell allegedly influenced whether Plaintiff would receive a merit pay bonus in April, 2003. She did not.

The Court denies summary judgment in favor of Defendants on Plaintiff's discrimination and retaliation claims, finding that they are not time-barred as a matter of law and, therefore, there are triable issues of fact concerning Plaintiff's FEHA claims.

III. Wrongful Termination Claim

Defendants argue that Plaintiff's sixth cause of action for wrongful termination in violation of public policy fails as a matter of law because her other claims fail. The Court, however, has found that there are triable issues of fact as to Plaintiff's FEHA claims and part of her claims brought under the FMLA and CFRA. Therefore, the Court finds that there is also a triable issue of fact as to Plaintiff's claim for wrongful termination and denies Defendants' motion for summary judgment on this ground.

CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Docket No. 35) is GRANTED IN PART and DENIED IN PART.[5]

---

[5]Both parties submitted objections to the other parties' evidence. To the extent that the Court relied upon evidence to which there is an objection, the parties' objections are overruled. To the extent that the Court did not rely on such evidence, the parties' objections are overruled as moot. The Court has not relied on any inadmissible evidence in deciding this motion.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Specifically, the Court GRANTS summary judgment in Defendants'

2    favor as to Plaintiff's claims that Defendants' policies are

3    inconsistent with the FMLA and CFRA and that Defendants violated

4    Plaintiff's right to confidentiality and privacy in her medical

5    records, but DENIES summary judgment as to Plaintiff's claims,

6    under the FMLA and CRFA, that she was denied new positions and

7    terminated because she took medical leave.  The Court DENIES

8    summary judgment as to Plaintiff's discrimination and retaliation

9    claims under FEHA.  The Court also DENIES summary judgment on

10   Plaintiff's wrongful termination claim, but GRANTS summary judgment

11   in favor of Defendants as to Plaintiff's seventh and eighth causes

12   of action for violation of her right to privacy under the

13   California Constitution and violation of the California

14   Confidentiality of Medical Information Act.

15        IT IS SO ORDERED.

16

17   Dated: 1/17/07                    _____

18                                     CLAUDIA WILKEN
                                       United States District Judge

19

20

21

22

23

24

25

26

27

28                                23