1  Michele Ballard Miller (SBN 104198)
   Kerry McInerney Freeman (SBN 184764)
2  Lisa C. Hamasaki (SBN 197628)
   MILLER LAW GROUP
3  A Professional Corporation
   60 E. Sir Francis Drake Blvd., Ste. 302
4  Larkspur, CA 94939
   Tel. (415) 464-4300
5  Fax (415) 464-4336

6  Attorneys for Defendants CHEVRON INTERNATIONAL
   EXPLORATION AND PRODUCTION (formerly known
7  as CHEVRONTEXACO OVERSEAS PETROLEUM and
   improperly sued as CHEVRONTEXACO OVERSEAS
8  PETROLEUM PACIFIC COMPANY) AND CHEVRON
   CORPORATION (formerly known as CHEVRONTEXACO
9  CORPORATION)

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13  KIRAN PANDE,                          Case No. C 04-5107 CW

14          Plaintiff,
                                          **DEFENDANTS' TRIAL BRIEF**
15  v.
                                          Trial Date:      October 9, 2007
16                                        Time:            8:30 a.m.
                                          Place:           Courtroom:  2
17  CHEVRON CORPORATION (f/k/a            Pre-Trial Conf.:  May 22, 2007
   CHEVRONTEXACO CORPORATION), a
18  Delaware corporation, and CHEVRON     Complaint filed:  December 2, 2004
   INTERNATIONAL EXPLORATION and
19  PRODUCTION (f/k/a CHEVRONTEXACO        Honorable Claudia Wilken
   OVERSEAS PETROLEUM COMPANY), a
20  division of Chevron U.S.A. Inc.

21          Defendants.

22

23

24

25

26

27

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

# TABLE OF CONTENTS

**I  PRELIMINARY STATEMENT** ..................................................................................1

**II  STATEMENT OF FACTS** ......................................................................................2

    **A.  Pande's Tenure In The Strategic Planning Group** ......................................2

    **B.  Pande's Transfer To The Southern Africa Strategic Business Unit** ..................4

**III  PROCEDURAL HISTORY** ...................................................................................8

**IV  LEGAL ANALYSIS** ...........................................................................................9

    **A.  PANDE CANNOT ESTABLISH A VIOLATION OF EITHER FMLA OR CFRA [First and Second Causes of Action]** ..................................................................9

        **1.  Pande's Termination Did Not Violate Either FMLA Or CFRA** .......................9

        **2.  Pande Suffered No Harm Because She Could Not Return To Work Prior To Expiration of Her FMLA/CFRA Leave.** ............................................................13

    **B.  PANDE CANNOT ESTABLISH UNLAWFUL DISCRIMINATION OR RETALIATION [Third, Fourth and Fifth Causes of Action]**....................................15

        **1.  Claims Arising During Pande's Tenure In Mitchell's Planning Group [September 2000 - December 6, 2002]** ...........................................................15

            **a.  Pande Cannot Avoid the Statute of Limitations** ..................................15

            **b.  Pande Has No Evidence of Discriminatory Animus** ..............................18

    **C.  DAMAGES**...................................................................................................24

        **1.  Plaintiff has Failed to Mitigate Her Damages** ...............................................24

        **2.  Plaintiff Cannot Recover Damages Under FMLA/CFRA Because She Was Unable to Return to Work at the Conclusion of her 12-week Entitlement**.......25

        **3.  Plaintiff Cannot Prove that she is Entitled to Punitive Damages** ................25

**V  CONCLUSION** ..................................................................................................25

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

# TABLE OF AUTHORITIES

## Cases

*Bradley v. Harcourt, Brace and Company,* 104 F.3d 267 (9th Cir. 1996) ..............................2

*Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775 (6th Cir. 1998) ............14

*Colburn v. Parker Hannifi/Nichols Portland Div.*, 429 F.3d 325 (1st Cir. 2005) ...................14

*Etter v. Veriflo Corp*, 67 Cal. App. 4th 457 (1998) ...............................................................22

*Flait v. North American Watch Corp.* 3 Cal. App. 4th 467 (1992) .........................................23

*Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982) ....................................................................24

*Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317 (2000) .................................................................18

*Hazen Paper Co. v. Biggins,* 507 U.S. 604 (1993) ...............................................................21

*Hill v. Underwood Memorial Hospital, et al*, 365 F. Supp. 2d 602 (D.N.J. 2005) .................14

*Horn v. Cushman and Wakefield Western, Inc.,* 72 Cal. App. 4th 798 (1999) .....................22

*Kelso v. Corning Cable Systems Int'l Corp.*, 224 F. Supp. 2d 1052 (W.D.N.C. 2002).........14

*Kolstad v. American Dental Assn.*, 527 U.S. 526 (1999).......................................................25

*Martin v. Lockheed Missiles and Space Co., Inc.,* 29 Cal. App. 4th 1718 (1994)..........16, 17

*Morgan v. The Regents of the University of California,* 88 Cal. App. 4th 52 (2000) .............16

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)...................................16

*National Steel Corp. v. Golden Eagles Ins. Corp.*, 121 F.3d 496 (9th Cir. 1997) ...............18

*Nisendorf v. Levi Strauss and Co.,* 143 Cal. App. 4th 509 (2006)........................................10

*Price Waterhouse v. Hopkins,* 409 U.S. 228 (1989).............................................................22

*Pugh v. See's Candies, Inc.,* 203 Cal. App. 3d 743 (1988) ..................................................14

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002)...............................................13

*Richards v. CH2M Hill, Inc.,* 26 Cal.4th 798 (2001)..............................................................16

*Steckl v. Motorola, Inc.*, 703 F.2d 392 (9th Cir. 1981).........................................................18

*Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972 (8th Cir. 2005) ....................10

*Tomlinson v. Qualcomm, Inc.,* 97 Cal. App. 4th 934 (2002)..................................................10

*Vasquez v. County of Los Angeles,* 349 F.3d 634 (9th Cir. 2003) ........................................22

*Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028 (2005) ........................................................23

*Yashenko v. Harrah's NC Casino Company, LLC*, 446 F.3d 541 (4th Cir. 2006)................10

## Rules and Regulations

2 Cal. Code Regs. §7297.2(c)(1) ...........................................................................................10

29 C.F.R. §825.216(a) ...........................................................................................................10

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

**DEFENDANTS' TRIAL BRIEF**
**Case No. C 04-5107 CW**

29 U.S.C. § 2617 ............................................................................................................. 13

29 U.S.C. §2614(a)(3)(B) ............................................................................................... 10

Cal. Constitution Art. 1, Section 1 .................................................................................. 9

California Confidentiality of Medical Information Act (Cal. Civ. Code § 56)................... 9

California Fair Employment and Housing Act (Gov. Code § 12900 *et seq.*) ................. 8

California Family Rights Act (Cal. Gov. Code § 12945.1) .............................................. 8

Family Medical Leave Act (29 U.S.C. § 2615 *et seq.*)................................................... 8

Fed. R. Evid. 801 ........................................................................................................... 20

Fed. R. Evid. 802 ........................................................................................................... 20

Fed. R. Evid. 803 ........................................................................................................... 20

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

**DEFENDANTS' TRIAL BRIEF**
**Case No. C 04-5107 CW**

# I     PRELIMINARY STATEMENT

This action arises out of Plaintiff Kiran Pande's ("Pande") employment with Defendants[1]. In mid-2003, Defendants announced that their entire Southern African Strategic Business Unit ("SASBU") would relocate to Houston, Texas. COP offered all SASBU employees – including Pande – positions in Houston and encouraged everyone to move. Employees who elected not to relocate were not guaranteed positions elsewhere. Pande refused to move, was unable to find another position and, in keeping with the deadline imposed, was terminated effective December 31, 2003. Despite these facts, Pande claims that her request for a medical leave was the "real" reason she was terminated. Pande will not be able to establish this claim at trial.

Pande further alleges that her former supervisor, Rex Mitchell, discriminated against her on the basis of gender and race/national origin and that she suffered retaliation for complaining of Mitchell's alleged conduct. Not only does Pande lack any admissible evidence of such discriminatory or retaliatory animus, but all such claims are time barred as a matter of law. Finally, Pande's remaining claim for wrongful termination in violation of public policy fails as well.

---

[1]     Defendant Chevron Corporation is the parent of non-party Chevron U.S.A., Inc. Pande has presented no evidence to suggest that she was employed by Chevron Corporation. Defendant Chevron International Exploration and Production Company is a division of Chevron U.S.A. Inc., and was formerly known as Chevron Overseas Petroleum ("COP"). For convenience, Chevron International Exploration & Production Company will be referred to as "COP" throughout this Brief.

**DEFENDANTS' TRIAL BRIEF**
**Case No. C 04-5107 CW**

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1

## II    STATEMENT OF FACTS

2

3

**A.    Pande's Tenure In The Strategic Planning Group.**

4

5    In the fall of 2000, Rex Mitchell, the manager of Business and Strategic

6 Planning ("Planning"), recruited Pande for his Group.[2]  Although two other candidates were

7 "short listed" for the position, Mitchell's representations about Pande's ideal credentials

8 swayed the Personnel Development Committee (the "PDC").[3]  Mitchell offered Pande the

9 business analyst position and she began her new role within six to eight weeks of the PDC.

10

11    Pande's first few months in Planning were very strong – Mitchell thought she

12 showed great promise as an analyst.  His favorable opinion increased during the summer of

13 2001, prior to the merger of Chevron Texaco.  Mitchell was very impressed by the

14 assistance Pande provided the group's Portfolio Analyst, Brian Putt, as he worked with his

15 counterparts at Texaco on the merger of their portfolios.  Thus, when Brian Putt moved to a

16 new role following the merger, Mitchell selected Pande for the now vacant Portfolio Analyst

17 position.

18

19    Mitchell viewed Pande's placement as an opportunity for advancement – he

20 regarded the Portfolio Analyst position as being the most analytically demanding position in

21 the group and he felt Pande had tremendous potential to shine in this key planning position.

22 However, Pande was less than enthusiastic about the opportunity, believing the position

23

24    [2]    Pande began her employment with Chevron Oil Research Company in 1988.  The relevant time period in this action is 2000 through 2003.  During all of this time, Pande was employed by COP.

25

26    [3]    Mitchell met Pande earlier that year, when she was considered for another position in Mitchell's group.  While she was not selected at that time, Mitchell sought her out when another

27 position opened up six months later.  This fact alone dispels any inference of discrimination.  *Bradley v. Harcourt, Brace and Company,* 104 F.3d 267, 270-71 (9th Cir. 1996) ("where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within

28 a short period of time, a strong inference arises that there was no discriminatory motive.").

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

should have come with a promotion.  Her reaction surprised Mitchell.  Mitchell explained that as part of the merger selection process, the PDC decided that there would be no "career ladder" promotions.  Rather, each employee would retain his or her current grade level and all promotion decisions would be deferred until the spring PDC.  Evidence at trial will show that Mitchell told Pande that *if she developed in the Portfolio Analyst position as expected*, she "stood a very good chance of earning a promotion in the spring" and that he was "prepared to take the nomination forward" to the PDC.

Unfortunately, Pande did not live up to her potential.  As the evidence at trial will show, after expressing her unhappiness over not being promoted, Pande's performance declined.  To Mitchell, she was visibly less engaged in the work of the Planning Group.  When she failed to complete several assignments, Mitchell grew concerned – he was upset not only because Pande's inaction created additional work for her coworkers, but also because it put the Group's credibility with its client base at risk.  Mitchell understandably voiced his dissatisfaction; criticism that noticeably offended Pande.

The tension between Mitchell and Pande came to a head in March 2002 during the performance review process.  Apparently disgruntled by a review that did not meet *her* expectations, Pande complained to Mitchell's supervisor, James ("Jay") Johnson, about Mitchell's treatment of her.  Specifically, Pande complained that she had been ranked a "2" ("Fully Meets Performance Expectations") when she thought she should be ranked a "1" ("Exceptional.")  Johnson met with Mitchell, who informed him that Pande had been having performance issues.  In an effort to resolve the dispute, Johnson scheduled a meeting with both Pande and Mitchell.  Despite their differences, by the end of that meeting Mitchell and Pande had agreed on a plan for moving forward – they would close out the 2001 performance review ("PMP") and begin the 2002 PMP process.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1    Mitchell and Pande met on April 1, 2002 to discuss her PMP.  Mitchell told

2  Pande why she had received a "Fully Meets Performance Expectations" rating.  Pande, who

3  "expected to be rated in the exceptional category," responded with a two page, single

4  spaced diatribe, criticizing Mitchell for not adequately recognizing her contributions and

5  otherwise taking issue with the PMP.  Although Pande stated that she considered Mitchell's

6  behavior "harassment," it was not until a meeting on April 25 that Johnson learned that her

7  harassment complaint related to her "gender and minority status."

8

9    As the evidence at trial will show, Johnson took immediate action in response

10  to Pande's concerns.  He spent hours meeting with Pande, Mitchell and anyone else Pande

11  identified as a potential witness.  Despite his efforts, Johnson was unable to find anyone to

12  substantiate Pande's allegations.  He urged Pande to move past her disagreements with

13  Mitchell and make a success of her remaining time in Planning.

14

15  **B.    Pande's Transfer To The Southern Africa Strategic Business Unit.**

16

17    After almost two years in the COP Planning Group – the typical length of time

18  the Planning group retains employees – Pande was identified as a candidate to move at the

19  Fall PDC.  She applied for two positions in late 2002, one in the Project Resources

20  Company ("PRC") and another in Strategic Planning.  The evidence will show that for

21  reasons unrelated to any alleged conflict between Pande and Mitchell, and notwithstanding

22  Mitchell's advocacy on behalf of Pande, she was not selected for either position.[4]  Instead,

23

24

---

25  [4]    As the testimony of both Rex Mitchell and Desmond King will show, Pande and another
26  employee in Mitchell's group, Kemal Anbarci, applied for the position in Strategic Planning.
    Desmond King, the job owner, did not originally "short-list" Pande as a top candidate, believing the
27  other employee had stronger qualifications.  Mitchell, however, urged King to consider both as each
    "brought different skills for the job."  Although Pande was interviewed, neither she nor the other
28  planning group employee was ultimately selected for the position.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1 the PDC selected Pande for a Petroleum Engineer position in the Southern Africa Strategic

2 Business Unit ("SASBU").

3

4     In October 2002, Pande received notice that she had been selected for a

5 position in the Block 14 Group at SASBU's San Ramon offices, under the supervision of

6 Jack Dunn.[5]  Nonetheless, Pande preferred to stay in Planning, and on November 26, 2002,

7 she interviewed for the Strategic Planning position.  After being notified on December 3,

8 2002 that she had not been selected for the position, Pande left COP Planning on

9 December 6, 2002 for her new SASBU position.

10

11     For the first half of 2003, Pande performed quite well in her new position.  Her

12 supervisor, Jack Dunn, was very pleased, believing Pande to be an asset to the group.  The

13 "honeymoon" ended, however, when COP management announced in May 2003 its

14 decision to consolidate its U.S.-based SASBU operations in Houston, Texas.[6]

15

16     In late May 2003, the SASBU employees were informed of the relocation

17 decision and provided information relating to the move, including a timeline.  The employees

18 were told that the move would occur in two phases – Block 0 would move in August and

19 Block 14 by the end of the year.  The employees learned further that they would receive

20 formal "offers" to relocate the week of June 2 and would have one week to either accept or

21

22

23

24

---

25 [5]    John "Jack" Dunn never spoke to Mitchell about Pande prior to her selection or prior to her
acceptance of the position in his Group.

26

27 [6]    Pande apparently believes that this decision was made before she joined SASBU.  This is
simply not the case.  As the evidence at trial will demonstrate, the decision to move SASBU was not
made until the Spring of 2003.

28

**DEFENDANTS' TRIAL BRIEF**
**Case No. C 04-5107 CW**

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  decline the offer.  If an employee did not move to Houston, they either would have to find

2  another position within the Company or their employment would terminate.[7]

3

4  Pande received her relocation offer package on June 2, 2003, which contained

5  a Fixed Duration Assignment agreement for Pande to sign, indicating whether she accepted

6  or declined the offer.  Pande did not accept the offer to relocate, and was informed her that

7  her employment would end in December 2003 unless she was successful in finding another

8  position within the Company – there was, however, "no guarantee that such alternative

9  employment will be found."

10

11  The evidence at trial will demonstrate that Pande apparently took her

12  impending termination to heart as she began posting for other positions,[8] letting her SASBU

13  work slide.  Dunn and another co-worker noted that Pande appeared less focused after

14  COP management announced the move to Houston.

15

16  Pande's waning commitment created a number of problems for the Group,

17  particularly given the poor results they received on a project review during the summer of

18  2003.  The Group was under the gun to improve its performance when the review team

19  returned in early 2004.  The focus throughout the fall was to develop an action plan to

20  correct the prior deficiencies noted in the July review and "turn some red lights to yellow and

21  green" at the next review.

22  _____

23  [7]    The job relocation document provided to Pande contained clear and unequivocal language to that effect.  Employees who chose to decline the relocation offer were asked to sign the following

24  statement: "I do not accept this assignment.  I understand that the Company might not place me in another assignment and that I may be subject to termination of employment…."

25  [8]    COP posts vacant jobs on its intra-company website. Dunn told his employees that, in light of

26  the impending move to Houston, they had his permission to post for jobs.  Pande, as well as other SASBU employees, were informed that they should work with the sponsor, or a Personnel

27  Development Representative ("PDR"), to find alternative employment if they declined the move to Houston.  Pande posted but was not selected for a number of positions.  Neither Dunn nor Mitchell

28  was on the selection panel for any of those positions and no one on the PDC contacted either about Pande's candidacy.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

DEFENDANTS' TRIAL BRIEF
Case No. C 04-5107 CW

Given her expertise in petroleum engineering and reservoir simulation, Dunn asked Pande to take a leadership position on this project.  She was given the task of putting together the work plan and doing the reservoir simulation associated with the project.  Dunn thought she "wasn't very engaged in seeing that it was achieved."  His frustration increased as the Group got closer to the next review – there did not seem to be any ownership of the work plan or any set timetable as to when the various "milestones and deliverables" would be achieved.

On Wednesday, October 29, Dunn received notice of Pande's request for a leave of absence beginning November 10, 2003.[9]  The following Tuesday, the Group met to discuss its progress in preparation for the upcoming review.  Dunn will admit that he raised his voice at that meeting – the Group was under a lot of pressure to "get things done" with the move only a few weeks away.  "It was a stressful time … we were moving, we had lots of work to do, a lot of pressure, a big transition of a lot of people…"  Dunn was also concerned because Pande had a number of tasks assigned to her and he wanted to know what plans she had made for a transition since "she was not going to be there."[10]

Pande began her leave as scheduled on Monday, November 10.  Dunn spoke with Pande later that week to let her know that Human Resources would be sending her a

[9]    Although Pande believes Dunn asked about her specific medical condition, there is no evidence to support her belief.  According to Dunn, after he received an email from UnumProvident, the Company's disability benefits administrator, he walked down to Pande's office to see how long she was going to be out.  Since Pande was not there, he called the number on the email to find out the expected duration of the leave and to see if Pande was alright.  Dunn never asked about specifics.

[10]    Apparently, Pande was upset by Dunn's conduct.  Pande's co-worker, Kathy Mabe, who was at the meeting, will testify that she saw Pande crying during a break.  Dunn was unaware that Pande had been brought to tears.  Nonetheless, he had raised his voice and after the meeting, apologized for his behavior.  Although Pande claims that Dunn discussed her medical leave at that meeting, Dunn denies making any such comment.  Further, Mabe, who was present at the meeting, will confirm that Dunn did not mention Pande's leave.  Rather, what she recalls was Dunn saying Pande was "not going to be there to do the work."  Mabe, surprised by his comment, asked Pande about it – Pande told her she was taking a medical leave.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1 letter confirming the effective date of her termination.  In a letter dated November 18, Taryn

2 Shawstad, General Manager of Human Resources, confirmed that Block 14 was moving

3 effective December 12 and that Pande's last day of employment would be December 31,

4 2003, unless she found another position.

5

6          On December 8, Pande responded to Shawstad, claiming unlawful termination

7 since she never "voluntarily" resigned her employment.  Pande viewed Shawstad's letter as

8 "yet another instance of unlawful conduct" by the Company, commencing with the "gender

9 and racial discrimination and harassment perpetrated by Mr. Rex Mitchell."  She also

10 claimed that she was subjected to "harassing conduct" while in Dunn's Group, "especially

11 since I disclosed my need to a leave."  Finally, Pande claimed that she had been offered

12 and had accepted work in San Ramon through 2004.  COP investigated Pande's claims

13 and, on December 16, Shawstad responded to Pande, reiterating the Company's position,

14 the lack of work for her in San Ramon and the established termination date.[11]   Consistent

15 with its stated process, Defendants terminated Pande's employment on December 31,

16 2003.

17

18 **III     PROCEDURAL HISTORY**

19

20          Pande's second amended complaint alleged eight legal theories for recovery:

21 Violation of the Family Medical Leave Act (29 U.S.C. § 2615 *et seq.*), Violation of California

22 Family Rights Act (Cal. Gov. Code § 12945.1 *et seq.*), Gender Discrimination in Violation of

23 the California Fair Employment and Housing Act ("FEHA") (Gov. Code § 12900 *et seq.*),

24 Race and National Origin Discrimination in Violation of FEHA, Retaliation in Violation of

25 FEHA, Wrongful Termination in Violation of Public Policy, Violation of Right to Privacy (Cal.

26

27 _____

28 [11]     Evidence at trial will show that Dunn did not offer Pande work for her to complete in 2004, as she alleges.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1    Constitution Art. 1, Section 1) and Violation of California Confidentiality of Medical
2    Information Act (Cal. Civ. Code § 56 *et seq.*).

3

4            On January 17, 2007, the Court granted Defendants' motion for summary
5    judgment in part and denied it in part.  Specifically, the Court granted Defendants' motion as
6    to those sections of Pande's first and second causes of action that alleged Defendants'
7    policies were not consistent with FMLA and CFRA, as well as Pande's seventh and eighth
8    causes of action.  Further, Pande, through her current attorneys, has stated that she does
9    not intend to pursue any claim for emotional distress damages.  Thus, Pande's claim under
10   FMLA/CFRA that Dunn interfered with her ability to find another new position because she
11   took leave, which ultimately led to her termination, still remains.  In addition, her claim that
12   Mitchell discriminated and retaliated against her in violation of FEHA, and her wrongful
13   termination claim are still viable.

14

15                        **IV    LEGAL ANALYSIS**

16

17   **A.    PANDE CANNOT ESTABLISH A VIOLATION OF EITHER FMLA OR CFRA**
                  **[First and Second Causes of Action]**
18

19           Pande alleges that Defendants unlawfully violated both the Family Medical
20   Leave Act ("FMLA") and California's Family Rights Act ("CFRA") by failing to grant her the
21   full extent of her eligible leave and by terminating her employment while on leave. SAC at
22   ¶¶ 40, 53. This claim has no merit.

23

24           **1.    Pande's Termination Did Not Violate Either FMLA Or CFRA.**

25

26           Pande predicates her FMLA/CFRA claims on the erroneous belief that she
27   could not be terminated while on a protected medical leave.  However, neither statute
28   provides such immunity.  On the contrary, both make clear that employees are not entitled

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

to "job security" simply because they are on leave. 29 U.S.C. §2614(a)(3)(B); 2 Cal. Code Regs. §7297.2(c)(1).   "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA [or CFRA] leave period." 29 C.F.R. §825.216(a); 2 Cal. Code Regs. §7297.2(c)(1). Thus, when, as here, an employee is terminated for business reasons unrelated to leave status, neither statute is implicated.

The courts are in accord.[12] *Yashenko v. Harrah's NC Casino Company, LLC*, 446 F.3d 541 (4th Cir. 2006) is instructive.   In that case, Harrah's reorganized and eliminated Yashenko's position while he was out on an approved FMLA leave.  Although invited to apply for available positions, Yashenko failed to do so, alleging that he was medically unable to do so during his leave.   Yashenko sued when he failed to obtain another position and his employment was terminated.  The Fourth Circuit Court of Appeals rejected Yashenko's claim that Harrah's actions interfered with his FMLA rights. "We join our sister circuits in concluding that the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave." *Id.* at 547.  The Court also rejected the notion that requiring Yashenko to apply or interview for positions while on FMLA leave somehow violated the Act.  *Id.* at 550.

The evidence at trial will show that Pande's termination had nothing whatsoever to do with her leave.   The timing alone dispels any such inference.   The decision to relocate the SASBU Group to Houston was made in the Spring of 2003 – *five*

---

[12]    See, e.g., *Tomlinson v. Qualcomm, Inc.,* 97 Cal. App. 4th 934, 939-43 (2002) (the court held that CFRA does not immunize employees from layoff as part of a company-wide workforce reduction while on a CFRA-protected leave); *Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972, 979 (8th Cir. 2005) ("[a]s long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."); *Nisendorf v. Levi Strauss and Co.,* 143 Cal. App. 4th 509, 519 (2006) ("even though [the plaintiff] took CFRA leave, [she] had no greater protection against her employment being terminated for reasons not related to her CFRA request than any other employee.")

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

DEFENDANTS' TRIAL BRIEF
Case No. C 04-5107 CW

1  *months before Pande requested leave.*  In May, all SASBU employees, including Pande,

2  were told the relocation would occur on or before December 31, 2003.  Employees were

3  also told that if they did not relocate, their employment would terminate unless they were

4  able to find other positions within the Company.  Pande refused to relocate.  Notice of the

5  relocation, information concerning the consequence for not accepting the offer to move, and

6  Pande's refusal to relocate all took place long before Pande ever requested, much less

7  took, the leave in question.[13]

8

9  Pande's own actions, as the evidence at trial will show, doom her argument

10  that her leave impacted the Defendants' decision to terminate her employment.  On October

11  16, Pande sent Shawstad an email, inquiring about severance benefits.  In that email,

12  Pande states that she had turned down the relocation offer and if she is not successful in

13  finding another position "will likely be forced to leave the Company."  She goes on to ask

14  whether vacation could be used to extend the severance date into 2004 since the SASBU

15  move would be completed by January 1.  This is hardly the request one would expect from

16  someone who claims to be shocked by her December 31 termination, or someone who had

17

18

19

20

21

22

23

24  [13]    Pande's argument that she did not understand the relocation documents she received in May
25  2003, is simply incredible and will not persuade a jury.  Pande is a highly educated woman with a
    variety of advanced degrees.  The documents she now claims were "hopelessly vague" contained
26  express language indicating that if an employee did not move to Houston, he would have to find
    another position within the Company or employment would terminate.  There was no guarantee that
27  alternative employment within the Company would be found.  Pande clearly understood the process
    as outlined in the relocation documents as she echoes the language in an October 16 email to
28  Human Resources.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

**DEFENDANTS' TRIAL BRIEF**
**Case No. C 04-5107 CW**

1  allegedly accepted an offer to work for Dunn in 2004 as Plaintiff also attempts to assert. [14]  It

2  also demonstrates why Pande's FMLA/CFRA cause of action has no merit.  This inquiry,

3  made before Pande ever requested leave, conclusively demonstrates what COP has

4  maintained throughout this litigation – the decision to terminate was made long before

5  Pande requested leave.  No jury could conclude otherwise.

6

7           Apparently recognizing she will not be able to show that Defendants

8  terminated her because of the leave, Pande will likely claim that after Dunn learned of her

9  leave, he "negatively influenced" her candidacy for two positions she applied for.  Once

10  again, Pande has no evidence to support this assertion.  Indeed, while she can make

11  unsupported assertions, she can not point to any evidence that would lead anyone, much

12  less a jury, to conclude that Dunn's comments concerning her job performance was the

13  reason she was not selected for either position.  To the contrary, the evidence will show that

14  another of Pande's former supervisors, Jean Camy, was part of the selection committee for

15  those postings and that, based upon his experiences working with Pande years earlier, he

16  indicated in no uncertain terms that he did not think she was the best choice for those

17  positions.

18

19

20

21

---

22  [14]    Pande claims that Dunn "promised" her a position in San Ramon through 2004 and
presumably reneged on this promise after she requested leave.  This argument must fail for two
23  reasons.  First, Dunn denies ever making such a promise and Pande can offer no proof to the
contrary, merely her own unsupported insistence.  Second, and most telling, Pande's own actions
24  speak otherwise.  Pande posted for a number of positions after the Houston relocation was
announced.  As the fall progressed, she obviously became concerned about her impending
25  termination and on October 16, sent an email to Human Resources, inquiring about severance
benefits.  If, as she now claims, she had accepted Dunn's "promise" of continued employment, why
26  would she express concern about the need to find another position or face termination once the
SASBU relocation was complete?  Why would she be concerned about severance benefits if she
27  had a "promise" of continued employment?  The answer is obvious – Dunn never made such a
promise nor reneged on such a promise once Pande made known her need for a leave.  There is
28  simply no credible evidence to support this allegation.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

In short, Pande has no evidence that Dunn adversely affected either the continuation of her employment or her ability to find another job after she announced her need for leave.

### 2.    Pande Suffered No Harm Because She Could Not Return To Work Prior To Expiration of Her FMLA/CFRA Leave.

Even if Pande can demonstrate that Defendants terminated her employment because of her request for medical leave, which she cannot, to recover any damages she must also show that she was prejudiced by Defendants' violation.   *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).   An aggrieved employee may only recover for actual harm suffered.   As explained by the United States Supreme Court in *Ragsdale*:

> The employer is liable only for compensation and benefits lost "by reason of the violation," [29 U.S.C.] § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment reinstatement, and promotion, § 2617(a)(1)(B).  The remedy is tailored to the harm suffered. *Id.*

Where an employee does not suffer damages as a result of the employer's violation of those statutes, the employee may not recover on her FMLA/CFRA claim.

In this case, it is undisputed that Pande began an FMLA/CFRA leave on November 10, 2003.   Accordingly, any 12-week leave entitlement ended no later than February 2, 2004.   The evidence shows that Pande was not able to return to work at that time.   First, Pande's doctor stated in a note to the Company that Pande could be out until May 2004 and would not even undergo surgery until sometime in February 2004.   In fact, Pande did not undergo surgery until March 2004.   Pande also admitted under oath that she was not able to return to gainful employment until mid-May, 2004.   In other words, ***there is***

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1    ***no question that Pande would not – and could not – have returned to work prior to***
2    ***expiration of her FMLA/CFRA entitlement.***

3

4    Plaintiff will not be able to show at trial that she was damaged or prejudiced as
5    a result of any alleged violation of those laws.  *See Hill v. Underwood Memorial Hospital, et*
6    *al*, 365 F. Supp. 2d 602, 610 (D.N.J. 2005) (plaintiff could not recover under the FMLA
7    where the evidence showed that she "still would not or could not, have returned to work
8    within [the FMLA] twelve week period."); *Kelso v. Corning Cable Systems Int'l Corp.*, 224 F.
9    Supp. 2d 1052, 1057 (W.D.N.C. 2002) (even if the employer made an error in calculating
10   FMLA benefits, the plaintiff suffered no loss because his FMLA leave was uncompensated
11   and he was unable to return to work when his FMLA leave should have ended); *Cehrs v.*
12   *Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 784-85 (6th Cir. 1998) (employee
13   could not state an FMLA claim because she was unable to return to work within the period
14   provided by the FMLA); *Colburn v. Parker Hannifi/Nichols Portland Div.*, 429 F.3d 325, 332
15   (1st Cir. 2005) (plaintiff could not recover on an FMLA interference claim because the
16   employer was under no obligation to reinstate him since he was not able to return to work
17   until after the expiration of his FMLA leave).

18

19   In sum, the evidence at trial will conclusively prove that the decision to
20   terminate Pande's employment was not related in any way to her taking protected leave.
21   Further, since Pande is not entitled to damages under the FMLA/CFRA, her claim must
22   fail.[15]

23

24

25

26

27   [15]    Pande's sixth cause of action for wrongful termination in violation of public policy simply
incorporates allegations from Pande's first through fifth causes of action.  Accordingly, it fails – the
28   burden of proof is the same whether a claim for discrimination arises as a statutory claim or as a tort
claim for violation of public policy.  *Pugh v. See's Candies, Inc.,* 203 Cal. App. 3d 743, 752 (1988).

**B.    PANDE CANNOT ESTABLISH UNLAWFUL DISCRIMINATION OR RETALIATION**
**[Third, Fourth and Fifth Causes of Action]**

Pande alleges that her gender and race/national origin adversely impacted decisions relating to her compensation, job assignment and termination.  She also claims that she complained about these decisions as well as conduct she perceived as harassment by Mitchell and that COP did nothing – it neither investigated her complaints nor took action to stop the alleged conduct.  Finally, Pande asserts she was retaliated against based on the complaints she made about Mitchell.  The evidence at trial will not support these claims.

**1.    Claims Arising During Pande's Tenure In Mitchell's Planning Group.**
**[September 2000 – December 6, 2002]**

**a.    Pande Cannot Avoid the Statute of Limitations.**

Pande's complaints about Mitchell begin with his "failure" to promote her in October 2001, when she was selected for the Portfolio Analyst position during the Chevron/Texaco merger.  Their relationship deteriorated in the following months, such that Pande complained to Mitchell's supervisor Jay Johnson.  She also complained to Gary Yamashita, the Omsbud responsible for the Group.  As a result of her complaints, Pande believes she received a lower raise and merit increase than males in the group.  Pande also asserts that she was "deliberately" excluded from work meetings, isolated from the group and otherwise impeded "in her ability to perform and advance within the company."  Finally, she suspects that Mitchell said negative things about her which impacted her ability to find a job at the Fall 2002 PDC.  As a result, she claims was "forced" to take a "less desirable" SASBU job in December 2002.

Pande's pre-December 2002 claims are barred by as a matter of law.  Filing an administrative complaint within one year of the alleged unlawful conduct is a prerequisite to bringing a civil action for damages under California's Fair Employment and Housing Act

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

("FEHA").    *Morgan v. The Regents of the University of California,* 88 Cal. App. 4th 52, 63 (2000) (citations omitted). Failure to satisfy this requirement is a jurisdictional defect.    *Martin v. Lockheed Missiles and Space Co., Inc.,* 29 Cal. App. 4th 1718, 1724 (1994).    Pande's complaints about Mitchell's conduct – conduct that occurred more than one year before Pande filed her DFEH Complaints on December 8, 2003 – are barred as a matter of law.

Reliance by Pande on the "continuing violation" doctrine does not save her claims.    While this doctrine may operate to extend the statute of limitations in certain situations, it does not apply here.  In *Richards v. CH2M Hill, Inc.,* 26 Cal.4th 798 (2001) the Court set forth the following three-part test to determine if the continuing violation doctrine applies:  (1) the employer's actions are sufficiently similar in kind to the unlawful conduct within the limitations period; (2) the actions have occurred with reasonable frequency; and (3) the employer's actions have not acquired a "degree of permanence."  *Id.* at 823.  In these instances, the statute of limitations does not begin to run until either of the following occurs: (1) the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation; or (2) the employee is on notice that further efforts to end the unlawful conduct will be in vain. *See also National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Pande cannot meet this test. First, Mitchell's alleged conduct – discrimination and harassment based on her gender and national origin – has nothing whatsoever to do with the conduct she attributes to Dunn – interference with her FMLA/CFRA rights.  Indeed, Pande even admits that Dunn's actions cannot be construed as gender or national origin discrimination.  As such, she cannot show that Mitchell's conduct was similar to the later SASBU conduct.

Even if it were, the situation had clearly acquired a "degree of permanence" sufficient to trigger the statute of limitations running before December 8, 2002.  In October

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

2002, Pande was notified that she had been selected for the Block 14 SASBU position. When Pande was not selected for a Strategic Planning position, she accepted the SASBU position. Her last day in Planning – and the last day she reported to Mitchell – was December 6, 2002. Pande filed her Charge of Discrimination on December 8, 2003, one year and two days after the last day she worked for Mitchell. Pande's complaints, based on conduct that occurred more than one year before she filed her DFEH Complaint, are barred as a matter of law. *Martin,* 29 Cal. App. 4th at 1724.

Further, Pande claims that "[f]rom March through December 2002" she attempted to find another job within the Company. This is true – the last position she applied for was in Strategic Planning.[16] However, Pande was told on December 3, 2002 that she had not been selected for that position and accepted the SASBU job that same day. The situation had clearly reached a degree of permanence by that date. Pande's failure to act within one year of that event bars her discrimination claim as a matter of law. Nothing Pande can say at trial compels a different conclusion.

Pande's claim that the merit increase she received in April 2003 brings her claim within the statutory time period also has no merit. Although she suspects Mitchell had something to do with this increase, she has no evidence to support her claim. Absent such evidence, this 2003 merit increase provides no link to the prior events.

In short, Pande's claims for conduct that occurred while she worked in Planning under Rex Mitchell are barred as a matter of law. Neither artful pleading nor wishful thinking will avoid this jurisdictional preclusion.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

---

[16]    Although Pande would like the Court to believe that Mitchell somehow adversely affected her selection for this position (thereby allowing her to extend the last act needed to trigger the limitations period), the evidence is squarely contrary.

1          **b.    Pande Has No Evidence of Discriminatory Animus.**

2

3          Even if the statute of limitations did not bar her claims (which is not the case),

4    Pande still can not meet her burden of persuasion at trial as she can not present "specific,

5    substantial" evidence to support her discrimination allegation.  *Steckl v. Motorola, Inc.*, 703

6    F.2d 392, 393 (9th Cir. 1981); *Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317, 356 (2000).  Indeed,

7    she has no evidence whatsoever that her gender or national origin was a motivating factor

8    in any of the adverse employment actions allegedly taken by Mitchell.  Rather, all she will

9    offer is her own conclusory allegations devoid of any factual support or rely on inadmissible

10   hearsay.  Such "evidence" is insufficient to meet her burden.  *National Steel Corp. v. Golden*

11   *Eagles Ins. Corp.*, 121 F.3d 496, 502 (9th Cir. 1997) ("[a] plaintiff's belief that a defendant

12   acted from an unlawful motive, without evidence to support that belief, is no more than

13   speculation or unfounded accusation about whether the defendant really did act from an

14   unlawful motive.")  The "Acts" Pande complains of are as follows:

15

16          **i.    Receiving a rating of "Average" in April 2002.**  First, Pande did not

17   receive an "Average" rating – rather, Mitchell rated her as "Fully Meets Performance

18   Expectations."  Second, the vast majority of employees receive this rating.  Indeed, others

19   in Mitchell's Planning Group – both men and women – received this same rating.  Pande's

20   unhappiness over her rating – she had "expected to be rated in the exceptional category" –

21   does not establish evidence of discriminatory animus.

22

23          **ii.    Receiving a lower salary increase in April 2002.**  Pande cannot

24   present any evidence to support this claim, only her bald assertion that women –

25   Thompson and herself – received lower salary increases than similarly situated men.  Her

26   lack of evidence is not surprising since the trial evidence will show that the honor belonged

27   to a man.

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

iii.    **Mitchell's failure to promote her.**  Pande continually asserts that Mitchell "promised" her a promotion in the Spring of 2002.  Mitchell, however, will testify that he told Pande that *if she developed in the Portfolio Analyst position as expected*, she "stood a very good chance of earning a promotion in the spring" and that he was "prepared to take the nomination forward" to the PDC.  Even Pande must concede that her promotion was not guaranteed – she still had to perform her job in a satisfactory manner.  Surely she did not think that she would be promoted even if she stopped doing her work, or worse, stole from the Company.  Of course not.  Thus, the issue is not whether she was promised a promotion, but whether Mitchell's assertion that her performance declined in the months leading up to the Spring PDC was the reason she did not receive a "career ladder" promotion.

The evidence at trial will show that Mitchell thought that Pande seemed less engaged in work after she was not promoted in the Fall of 2001.  Mitchell will present copies of emails about a number of assignments where her performance had not met his expectations.  These emails relate to performance issues in January and February of 2002, long before the Spring PDC was held.  This evidence, which corroborates Mitchell's disappointment over Pande's lackluster performance, clearly demonstrates that legitimate business reasons – not gender or national origin – were the reasons Pande did not get the a "career ladder" promotion she so desired. [17]

iv.    **Repeated negative performance-related comments by Mitchell, thwarting her ability to attain career goals.**  Pande asserts that Mitchell somehow impeded her ability to move ahead.  This argument fails for a number of reasons.  First, the

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

---

[17]    Pande will likely tell the jury that Mitchell failed to promote her because, when she met with him on April 1, she complained for the first time about harassment.  There are two problems with this argument.  First, the PDC had already met – it meets in March.  The promotion discussion had therefore already occurred.  Second, when Pande met with Mitchell she never identified the alleged harassment to be based on either her gender or her national origin.  And, when she did, Johnson did a thorough investigation of the allegations.

only evidence she cites of Mitchell's alleged attempts to block her career is a single incident involving a position in "the Congo group." Pande claims she was considered for this position but not selected. However, neither Pande nor her witness Vicki Thompson knows why she was not selected – they simply presume it was due to purportedly "career killer" comments made by Mitchell. Pande's argument fails for several reasons.

First, the "evidence" offered by Pande is pure hearsay and inadmissible. (*See* Fed. R. Evid. 801-803) Neither Pande nor Thompson ever heard the comments attributed to Mitchell. Indeed, neither did Tim Magner, the individual who used the phrase "career killer." Magner's knowledge appears based on a conversation he was not privy to and it is unclear how Magner learned of the conversation between Mitchell and Fernando Gaggino.

Mitchell, on the other hand, does recall the conversation. To the extent the Court allows testimony on this issue (which it should not) Mitchell will testify that in the late summer of 2002, he received a call from Gaggino asking about Pande's availability. Gaggino had an employee he felt would benefit from a rotation in planning and wanted to know if Mitchell would consider a "swap." Mitchell thought the SASBU position would be a good fit with Pande's technical skills as it was a petroleum engineering position in the Congo group. In addition, since it was a team lead position, Mitchell thought it would it would benefit Pande as it would give her supervisory experience. Mitchell recalls telling Gaggino that although he had some concerns about recent performance lapses, he thought Pande "needed a change of scenery." Mitchell asked Pande about the position – she said she was not interested. Kelly Hartshorn, the Personnel Development Representative for SASBU, will corroborate Mitchell's version of events, stating that Pande also told her she

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

DEFENDANTS' TRIAL BRIEF
Case No. C 04-5107 CW

was not interested.  Pande's unsupported and inaccurate interpretation of this event does not constitute the requisite "evidence" to prove discriminatory animus.[18]

Finally, this "evidence" – even if admissible – demonstrates that Pande's failure to be selected for the Congo job was not the adverse action she now claims. Indeed, the facts Pande conveniently forgets to mention are telling.  As Pande is well aware, there is no "Congo group."  Rather, the "Congo group" is part of SASBU, the very same business unit that offered her a position one month later.  If Mitchell truly "had it in for her," as Pande now claims, he surely would have also sabotaged this selection.  Contrary to Pande's assertion, the fact that SASBU offered her the same position, albeit on a different oil field, *after* Mitchell's alleged "career killer" comments shows that these comments, to the extent they were made at all, had no "negative impact on her career opportunities within Chevron."

**v.    Being forced to take a career step backwards into the SASBU position**.  Pande's attempt to manufacture some adverse employment action when none exists is remarkable.  First, she complains about not being offered the SASBU petroleum engineering job in Gaggino's Congo group, claiming it would have been a step up in her "desired career path goals."  At the same time, however, she asserts that same SASBU position offered two months later, albeit on the Nigerian fields, was "a step down on the career path."  She cannot have it both ways.  If the Congo SASBU position was a "plum" assignment, then Pande cannot complain that a similar position in Block 14 was a "career step backwards."

_____

[18]    Even if Mitchell had made such comments, which he denies, absent some evidence that his comments adversely influenced the selection process, Pande's irritation alone does not demonstrate a motivating factor.  *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610-611 (1993) ("whatever the employer's decision-making process, a disparate treatment claim cannot succeed unless [discrimination] actually played a role in that process and had a determinative influence on the outcome.")  Pande simply has no evidence to support either this allegation or her sweeping claim that "word-of-mouth" adversely affected her career.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1    Pande attempts to portray Mitchell as biased are similarly flawed.    Her

2    "evidence" is also inadmissible.  For example, Pande claims that Mitchell, when told another

3    employee, Ali Moshiri, may be out of a job, said to her "now he can go and sell carpets."

4    The other comment, which Pande never heard, was about "towel heads."    Pande admits

5    that both these comments were made prior to April 2002, when she complained to Johnson.

6    To the extent either comment was made – Mitchell denies saying either – they are time

7    barred and inadmissible hearsay. (Iris Owens, a co-worker who Pande claims told her about

8    the "towel head" comment also denies ever hearing Mitchell say this comment).  Even if

9    viable and admissible which they were not – Mitchell played no role in Pande's failure to find

10    another position in 2003 or her subsequent termination.  *Price Waterhouse v. Hopkins,* 409

11    U.S. 228 (1989) ("[s]tatements by decision-makers unrelated to the decisional process itself"

12    cannot suffice to satisfy the plaintiff's burden of providing intentional discrimination)

13    (concurring opinion); *Horn v. Cushman and Wakefield Western, Inc.,* 72 Cal. App. 4th 798,

14    809-10 (1999).  As such, despite their seductively inflammatory appeal, these comments are

15    not probative of any issue – they do not establish discrimination or harassment.  *Etter v.*

16    *Veriflo Corp*, 67 Cal. App. 4th 457, 465-66 (1998) (although "[r]acial slurs have no place in

17    the work environment or in any environment, … the law does not exhibit 'zero tolerance' for

18    offensive words and conduct … [r]ather, the law requires the plaintiff to meet a threshold

19    standard of severity or pervasiveness); *Vasquez v. County of Los Angeles,* 349 F.3d 634,

20    642-644 (9th Cir. 2003) (two race-based comments over more than one year insufficient to

21    constitute hostile work environment.)

22

23    **vii.    Receiving no merit increase in April 2003.**  Here again, Pande's

24    claims and suspicions are meritless.  First, as explained previously and as the evidence at

25    trial will show, Pande did receive a salary increase in April 2003 – albeit not in the amount

26    that she desired.  More importantly, although Pande suspects Mitchell had something to do

27    with this salary action, she has no evidence to support her beliefs.  Pande cannot show

28

1  Mitchell's involvement in her April 2003 salary action, much less that gender, race or

2  national origin played a role in any such determination.

4  In short, the evidence at trial will reveal that neither Pande's gender nor race

5  played any part in Mitchell's decisions.  Nor can Pande show that she actually suffered an

6  adverse employment action, much less establish her gender and national origin influenced

7  the actions she complains of.  Thus, her claims must fail.

9  **3.   Pande's Retaliation Claims.**

11  First, as previously pointed out in footnote 16, Pande's retaliation claims are

12  time barred.  Even if they were not, which is not the case, Pande cannot establish her

13  claims – there is simply no causal connection between her complaints about Mitchell and

14  her December 31 termination.  *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1044

15  (2005); *Flait v. North American Watch Corp.* 3 Cal. App. 4th 467, 476 (1992).[19]  To the

16  contrary, evidence at trial will show that Pande's termination and failure to obtain alternate

17  positions were caused by her refusal to relocate, her unwillingness to leave the Bay Area,

18  and in one instance, her interactions with a selection committee member which pre-dated

19  her work with Mitchell. Pande simply has no evidence of retaliation.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

---

[19]   To establish a *prima facie* case of retaliation under the FEHA, the plaintiff must show (1) she was engaged in a protected activity; (2) the employer subjected her to an adverse employment action; and (3) there was a causal link between the protected activity and the employer's action. *Flait,* 3 Cal. App. 4th at 476.

**DEFENDANTS' TRIAL BRIEF**
**Case No. C 04-5107 CW**

1

**C.    DAMAGES.**

2

3

**1.    Plaintiff has Failed to Mitigate Her Damages.**

4

5    Plaintiff had a statutory duty to use reasonable and diligent efforts to secure

6    suitable employment in order to mitigate her damages. *Ford Motor Co. v. EEOC*, 458 U.S.

219, 231 (1982).

7

8    Notwithstanding this requirement, the evidence at trial will show that the labor

9    market in Pande's field has been excellent from the summer of 2004 to the present that

10   there have been, and continue to be available postings comparable to Pande's last position

11   with COP. The evidence will also show that Pande is (and was) a highly qualified candidate

12   for the numerous positions available.  Pande has a Ph.D. in petroleum engineering from

13   Stanford University, an MBA from UC Berkeley, HAAS School, and an impressive career in

14   reservoir engineering, with a specialty in reservoir simulation engineering.  With Pande's

15   willingness to accept employment anywhere in the world (other than Libya, Saudi Arabia

16   and Nigeria,) the evidence will show that Pande would have found comparable employment

17   had she diligently searched.[20]  In fact, Defendants' expert will testify that he has spoken to a

18   recruiter who has indicated that he could have placed Pande in a comparable job at any

19   point between June 2004 and the present, and that he currently knows of a number of open

20   positions for which Pande is qualified such that she could be immediately placed into that

21   job.  Given these circumstances, even if liability is found – Pande's economic recovery

22   would be barred by her failure to mitigate.

23

24

25

26

27

28   [20]    Pande admitted in her deposition that she gave up her search to find comparable
employment in order to start her own consulting business.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  **2.    Plaintiff Cannot Recover Damages Under FMLA/CFRA Because She Was Unable to Return to Work at the Conclusion of her 12-week Entitlement.**

2

3      As discussed at length above, given the fact that Pande could not have

4  returned to work prior to the expiration of her 12 week leave entitlement, she cannot recover

5  lost earnings, wages or compensation under FMLA or CFRA.  (*See* Section V(A)(2) above.)

6

7  **3.    Plaintiff Cannot Prove that she is Entitled to Punitive Damages.**

8

9      Finally, even if Plaintiff can prove liability – which she cannot – she cannot

10  meet the requisite burden to prove that punitive damages should be awarded.  Pande has

11  no evidence suggesting that Defendants' conduct was malicious or in reckless disregard of

12  Plaintiff's rights.  *See Kolstad v. American Dental Assn.*, 527 U.S. 526, 538 (1999).  To the

13  contrary, the evidence will show that Defendants acted appropriately with respect to Pande

14  in all respects.

15

16  **V  CONCLUSION**

17

18      Plaintiff will not be able to establish any of her claims at trial and, even if she

19  could, her damages are minimal.

20

21  Dated:  May 8, 2007                    MILLER LAW GROUP
                                         A Professional Corporation

22

23                                        By: _____/S/_____

24                                           Michele Ballard Miller
                                            Attorneys for Defendants CHEVRON
25                                           CORPORATION (f/k/a ChevronTexaco
                                            Corporation) and CHEVRON
26                                           INTERNATIONAL EXPLORATION &
                                            PRODUCTION (f/k/a ChevronTexaco
27                                           Overseas Petroleum), a division of
                                            Chevron U.S.A. Inc.

28