1   KEKER & VAN NEST, LLP
    SUSAN J. HARRIMAN - #111703
2   CHRISTA M. ANDERSON - #184325
    710 Sansome Street
3   San Francisco, CA  94111-1704
    Telephone:  (415) 391-5400
4   Facsimile:  (415) 397-7188

5   Attorneys for Plaintiff
    KIRAN PANDE

6

7

8

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11

12

13  KIRAN PANDE,                          Case No. 04-5107 CW

14                          Plaintiff,    **PLAINTIFF KIRAN PANDE'S**
                                          **MEMORANDUM OF POINTS AND**
15          v.                            **AUTHORITIES IN OPPOSITION TO**
                                          **CHEVRON'S MOTIONS IN LIMINE**
16  CHEVRON CORPORATION (f/k/a
    CHEVRONTEXACO CORPORATION), a
17  Delaware corporation,                 Pretrial Conference Date:  May 22, 2007
    CHEVRON INTERNATIONAL                 Time:  2:00 pm
18  EXPLORATION & PRODUCTION (f/k/a
    CHEVRONTEXACO OVERSEAS
19  PETROLEUM COMPANY),                   Date Comp. Filed:   December 2, 2004
    a division of Chevron U.S.A., Inc.,   Trial Date: October 9, 2007
20
                            Defendants.
21                                        **REDACTED VERSION**

22

23

24

25

26

27

28

          PLAINTIFF KIRAN PANDE'S  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
                    CHEVRON'S MOTIONS IN LIMINE -- CASE NO. 04-5107 CW

# TABLE OF CONTENTS

**Page**

I.    OPPOSITION TO MOTION IN LIMINE NO. I TO EXCLUDE
TESTIMONY AND EVIDENCE SUGGESTING PLAINTIFF IS ENTITLED
TO RELIEF ON HER FMLA AND CFRA CLAIMS......................................................1

LEGAL ANALYSIS..................................................................................................1

    1.    Chevron Interfered With Pande's Rights Under The FMLA and
Caused Her Damage. ....................................................................................2

    2.    Chevron is Equitably Estopped From Interfering With Pande's
FMLA Rights ................................................................................................5

    3.    Pande's FMLA and CFRA Claims Also Survive Because of
Chevron's Termination of Her Group Health Coverage...............................6

II.   OPPOSITION TO MOTION IN LIMINE NO. II TO EXCLUDE
MAGNER'S "CAREER KILLER" E-MAILS ............................................................7

LEGAL ANALYSIS..................................................................................................7

    1.    The career killer e-mail is relevant and probative. ......................................7

    2.    The career killer e-mail is non-hearsay not offered for its truth...................8

    3.    The career killer e-mail fits within exceptions to the hearsay
rule. ..............................................................................................................8

III.  OPPOSITION TO MOTION IN LIMINE NO. III TO EXCLUDE
EVIDENCE OF REX MITCHELL'S ALLEGEDLY DISCRIMINATORY
COMMENTS AND REFERENCE TO VICTORIA THOMPSON'S
CONFLICTS WITH MITCHELL .............................................................................10

IV.   OPPOSITION TO MOTION IN LIMINE NO. IV TO EXCLUDE
CHARACTER EVIDENCE REGARDING MR. DUNN AND MR.
MITCHELL .............................................................................................................12

V.    OPPOSITION TO MOTION IN LIMINE NO. V REGARDING
PLAINTIFF'S WITHDRAWN EMOTIONAL DISTRESS CLAIMS AND
HER EMOTIONAL HEALTH..................................................................................13

LEGAL ANALYSIS................................................................................................13

VI.   OPPOSITION TO MOTION IN LIMINE VI TO EXCLUDE EVIDENCE
REGARDING PLAINTIFF'S OCTOBER 30 AND NOVEMBER 4, 2003
MEETINGS WITH JACK DUNN ...........................................................................14

LEGAL ANALYSIS................................................................................................14

VII.  CONCLUSION.......................................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

Adams v. Ameritech Services,
231 F.3d 414 (7th Cir. 2000) ...................................................................................12

In re: Air Crash Disaster,
86 F.3d 498 (6th Cir. 1996) .......................................................................................7

Bachelder v. America West Airlines, Inc.,
259 F.3d 1112 (9th Cir. 2001) ...................................................................................2

Bergene v. Salt River Project Agricultural Improvement & Power District,
272 F.3d 1136 (9th Cir. 2001) ...................................................................................8

Colburn v. Parker Hannifin/Nichols Portland Division,
429 F.3d 325 (1st Cir. 2005) .....................................................................................5

Glass v. Phila. Electric Co.,
34 F.3d 188 (3d Cir. 1994) ..............................................................................11, 13

Godwin v. Hunt Wesson, Inc.,
150 F.3d 1217 (9th Cir. 1998) ...................................................................................9

Heyne v. Caruso,
69 F.3d 1475 (9th Cir. 1995) ...........................................................................10, 12

Hill v. Underwood Memorial Hospital,
365 F. Supp. 2d 602 (D. N.J. 2005) ..........................................................................3

Kelso v. Corning Cable Systems, International,
224 F. Supp. 2d 1052 (W.D. N.C. 2002) ...................................................................3

Kosakow v. New Rochelle Radiology Associates,
274 F.3d 706 (2d. Cir. 2001) .................................................................................1, 5

Liu v. Amway Corporation,
347 F.3d 1125 (9th Cir. 2003) .........................................................................2, 3, 14

Obrey v. Johnson,
400 F.3d 691 (9th Cir. 2005) ............................................................................10, 11

Ragsdale v. Wolverine World Wide,
535 U.S. 81 (2002) .........................................................................................2, 3, 6

Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc.,
425 F.3d 67 (1st Cir. 2005) .......................................................................................8

Sea-Land Serv., Inc. v. Lozen International, LLC,
285 F.3d 808 (9th Cir. 2002) .....................................................................................9

ii

# TABLE OF AUTHORITIES
(cont'd)

Page(s)

Swirsky v. Carey,
376 F.3d 841 (9th Cir. 2004) .............................................................8

## FEDERAL STATUTES

26 U.S.C. §2614(c) .............................................................1, 6

29 C.F.R. ¶ 825.220(c) .............................................................2

29 U.S.C. ¶ 2601 et seq. .............................................................2

Fed. R. Evid. 401 .............................................................13

Fed. R. Evid. 801(c) .............................................................8, 10

Fed. R. Evid. 803(1) .............................................................8, 9

iii

395495.01

PLAINTIFF KIRAN PANDE'S  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
CHEVRON'S MOTIONS IN LIMINE -- CASE NO. 04-5107 CW

## I.    OPPOSITION TO MOTION IN LIMINE NO. I TO EXCLUDE TESTIMONY AND EVIDENCE SUGGESTING PLAINTIFF IS ENTITLED TO RELIEF ON HER FMLA AND CFRA CLAIMS

Having terminated plaintiff's Kiran Pande's employment only five days into her federally and state protected medical leave, Chevron seeks to exploit its illegal termination of Pande by claiming that Pande is not entitled to any relief under FMLA and CFRA[1] because she could not have returned to work within 12 weeks.  Unlike the cases that Chevron cites in its motion, here, Chevron interfered with Pande's rights under the FMLA, and Chevron's interference caused Pande to lose compensation and benefits, including her group health care plan.  Whether Pande could have returned to work within 12 weeks is today a matter of speculation because Chevron ensured that she did not have that option.

From 2001, Pande worked at Chevron while suffering from chronic anemia.  Declaration of Kiran Pande ("Pande Decl."), ¶ 3.  Pande might have chosen to do so again before her elective surgery – had she still had that option.  Instead, though, Jack Dunn, Pande's supervisor at Chevron, chastised Pande for requesting medical leave; Chevron terminated her just days into that leave and cancelled all of her benefits; and, Chevron failed to place Pande in another position (one of the many to which she applied after declining the transfer to Houston).  These facts equitably estop Chevron from denying Pande her FMLA protection.  See <u>Kosakow v. New Rochelle Radiology Associates</u>, 274 F.3d 706, 725 (2d. Cir. 2001).  In addition, Chevron denied Pande her group health benefits in violation of 26 U.S.C. §2614(c), which also entitles her to FMLA relief.

For these reasons, and as more fully explained below, the Court should not countenance Chevron's attempt to re-write history after having predetermined the course of that history and should deny this Motion in Limine.

---

[1] Pande agrees with Chevron that the same standards apply to CFRA and FMLA claims. Defendants' Motions in Limine, p.3, n.4.  Thereafter, Pande does not separately analyze her CFRA claim.

1

## LEGAL ANALYSIS

1.    **Chevron Interfered With Pande's Rights Under The FMLA and Caused Her Damage.**

The FMLA guarantees qualifying employees 12 weeks of unpaid leave each year. 29 U.S.C. ¶ 2601 et seq. To protect the employee, the FMLA prohibits interference with the exercise of the employee's right to take that leave. Id. at ¶ 2615(a)(1). The implementing regulations for the FMLA interpret "interference" as "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Liu v. Amway Corporation, 347 F.3d 1125, 1133 (9th Cir. 2003) (quoting 29 C.F.R. ¶ 825.220(c)). According to the Ninth Circuit, in order for Pande to prevail on her FMLA claim, she "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her." Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1125 (9th Cir. 2001).

In Ragsdale v. Wolverine World Wide, 535 U.S. 81 (2002), plaintiff Ragsdale had Hodgkin's disease, and her treatment involved surgery and months of radiation therapy. Id. at 84. Wolverine terminated Ragsdale's employment after she refused to return to work seven months after her leave began. Id. at 85. She brought suit, relying on a Secretary of Labor regulation, which provided that, if an employer did not designate leave as FMLA leave, the leave did not count against the employee's FMLA entitlement. Id. at 85. The United States Supreme Court struck down the Secretary of Labor's regulation, holding that it was invalid because it altered the FMLA's statutory framework. Id. at 96. In that context, the Court noted that, "[t]o prevail under the cause of action set out in § 2617 of the FMLA, an employee must prove, as a threshold matter, that the employer violated § 2615 by interfering with, restraining or denying his or her exercise of FMLA rights." Id. at 89. The Court further commented that section 2617 provides no relief unless the employee has lost compensation and benefits "by reason of the violation" or sustained other losses "as a direct result of the violation." Id. In discussing the notice regulations, the Court commented that Ragsdale's medical condition had rendered her unable to work for substantially longer than the FMLA 12-week period, a fact that Ragsdale did

2

1    not dispute in her petition for certiorari. Id. at 90. Given those circumstances, Ragsdale had no

2    claim under the FMLA.

3        Following Ragsdale, the district court in New Jersey in Hill v. Underwood Memorial

4    Hospital, 365 F. Supp. 2d 602 (D. N.J. 2005), granted the Hospital's motion for summary

5    judgment on Hill's FMLA claim because Hill no longer had any available FMLA leave at the

6    time that she was terminated. The court in Hill specifically noted that "this is not a case where

7    an employee has some flexibility with regard to when she takes FMLA leave." Id. at 610 n.17.

8    In a letter dated October 30, 2000, the hospital had advised Hill that she had exhausted her 12-

9    week entitlement of FMLA leave as of October 25, 2000 and advised that she must return to

10    work by November 21, 2000. On June 13, 2001, the Hospital terminated Hill's employment.

11    The Court therefore found that her termination did not constitute interference with her rights

12    under the FMLA. Id. at 610.[2]

13        Chevron of course does not (because it cannot) dispute for purposes of this motion that

14    Pande's taking of FMLA-protected leave constituted a negative factor in the decision to

15    terminate her. See Liu, 347 F.3d at 1137 ("the proximity in time between the leave and her

16    termination also provides supporting evidence of a connection between the two events").

17    Instead, Chevron claims that "there is no question that Pande would not – and could not – have

18    returned to work prior to expiration of her FMLA-CFRA entitlement. Thus, she cannot argue

19    that she was damaged or prejudiced as a result of any alleged violation of those laws."

20    Defendants' Motion in Limine, p. 4. That claim is true only because Chevron terminated Pande

21    – a clear act of interference that violates section 2615(a).

22        Unlike Hill or Ragsdale, Pande had some control over her medical decisions. For years

23    she had suffered from anemia caused by [

24

25    [2] Chevron also relies on Kelso v. Corning Cable Systems, Int'l, 224 F. Supp. 2d 1052, 1056
     (W.D. N.C. 2002), but "the only cognizable violation of FMLA" in that case concerned the
26    notice provided to plaintiff regarding his FMLA leave. No such issue is present here. Chevron
     also cited Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 327 (1st Cir. 2005), a
27    case that dealt with retaliation rather than interference ("We hold that a claim for retaliatory
     discharge from employment is not extinguished by a finding that the plaintiff was unable to
28    return to work at the expiration of his 12-week period of FMLA leave.")

3

1          ]  In the Fall of 2003, she was severely anemic and in

2  enormous discomfort [                        ] Pande Decl., ¶ 6.  Immediately upon being

3  placed on leave, Pande received [

4     ] Id., ¶¶ 7-9.  [                        ] Pande was able to stop the

5  enormous discomfort that she had been suffering in the months prior to her leave.  Id., ¶ 10.  She

6  still continued to suffer from anemia and continued to receive [           ] up to the time

7  that she eventually underwent surgery.  Pande was scheduled for surgery at various points in

8  time, including early February of 2004 (Miller Decl., Exh. C), and eventually, her surgery took

9  place on March 15, 2004.  Pande Decl., ¶ 11.  The delay allowed Pande to co-teach a class in

10  Petroleum Engineering at Stanford University during the Winter quarter of 2004.  Id., ¶ 10.

11        Pande remained on disability while awaiting her surgery for two reasons:  (1) because of

12  her anemia and (2) because of the stress that she was suffering from and trying to avoid.  See

13  Miller Decl., Exh. C ("no strenuous exertion or stress"); Pande Decl., ¶ 10.  Pande, though, had

14  been suffering from anemia for two-and-a-half years before she took her medical leave.  Despite

15  severe anemia, she returned to work immediately after a blood transfusion in 2001.  Pande Decl.,

16  ¶¶ 3-4.  In 2003, however, Chevron ensured that Pande could not return to work within 12 weeks

17  by terminating her.  Had Chevron acted legally, Pande might have returned to work prior to her

18  elective surgery.  She had endured enormous discomfort for months without complaining to

19  anyone about her medical problems.  With [                        ] and without

20  fear of added stress, Pande very well might have been able to do more than just co-teach at

21  Stanford.  Or, Pande might have accelerated the date of her surgery.  She had been given the

22  option of immediate surgery with its attendant increased risk of a blood transfusion during

23  surgery.  Pande Decl., ¶ 7.  That option might have been more palatable if Chevron offered her a

24  new position that needed her services immediately.  Pande, however, never had the luxury of

25  making either of those choices because Chevron terminated her employment only days into her

26  protected leave.

27        Chevron cannot be permitted to take advantage of its own interference with Pande's

28  rights.  Pande lost her job and benefits because of Chevron's acts and thus has viable claims

4

PLAINTIFF KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CHEVRON'S MOTIONS IN LIMINE -- CASE NO. 04-5107 CW

1   under the FMLA and CFRA.

2   **2.    Chevron is Equitably Estopped From Interfering With Pande's FMLA Rights**

3

4   In <u>Kosakow</u>, 274 F.3d 706, the court applied the doctrine of equitable estoppel to prevent

5   New Rochelle from contesting Kosakow's eligibility under the FMLA, commenting: "[N]othing

6   prevents a court from exercising its equitable powers to estop a party from raising a particular

7   claim or defense." <u>Id.</u> at 724. As the Second Circuit explained, the doctrine of equitable

8   estoppel is properly invoked "where the enforcement of the rights of one party would work an

9   injustice upon the other party due to the latter's justifiable reliance upon the former's words or

10  conduct." <u>Id.</u> at 725. Under federal law, a party may be estopped from pursuing a claim or

11  defense where: (1) the party to be estopped makes a representation of fact to the other party with

12  reason to believe that the other party will rely upon it; (2) and the other party reasonably relies

13  upon it; (3) to her detriment. <u>Id.</u>

14  In <u>Kosakow</u>, the plaintiff knew that she would require surgery two months prior to the

15  scheduled date of her operation. She argued that, had her employer informed her that she needed

16  to accumulate 1,250 hours of work in order to have her leave protected by the FMLA, she would

17  have made sure to work the necessary hours. The court agreed, finding that, "where a party has a

18  legal duty to speak, silence can constitute an affirmative 'misrepresentation'." 274 F.3d at 725.

19  By remaining silent when Kosakow announced her plan to take medical leave, New Rochelle

20  effectively misled her into believing that she was protected by the FMLA. <u>Id.</u> at 726-7. The

21  court noted that Kosakow's operation was not an emergency, but rather was long-planned and

22  could have been rescheduled. <u>Id.</u> at 727.

23  Here, Chevron claims that its termination of Pande was legal because she could not have

24  returned to work within 12 weeks. But, had Chevron informed Pande that she had to return

25  within 12 weeks or risk termination, she had several options available to her. She could have

26  had surgery and run the increased risk of a blood transfusion during that surgery. She also could

27  have chosen to work with anemia, a choice that she previously had made, and delayed her

28  surgery. Pande relied on Chevron's approval of her FMLA leave and its silence when she began

5

1   her leave. Chevron did not tell her that it would terminate her days into that leave and then

2   claim, after the fact, that she could not have returned to work within 12 weeks. Under these

3   circumstances, Chevron is equitably estopped from using the 12 weeks' requirement as an

4   excuse for its illegal actions.

5        **3.    Pande's FMLA and CFRA Claims Also Survive Because of Chevron's**
            **Termination of Her Group Health Coverage.**

6

7       During the mandatory 12 weeks' leave, "the employer must maintain the employee's

8   group health coverage." <u>Ragsdale</u>, 535 U.S. at 86; <u>see also</u> 26 U.S.C. § 2614(c). Under section

9   2615, it is unlawful for any employer "to interfere with, restrain, or deny" the exercise of rights

10   under the FMLA. Section 2617(a)(3) in turn describes the liability an employer faces who

11   violates section 2615.

12       Chevron terminated Pande's group health coverage on December 31, 2003, prior to the

13   expiration of her 12 weeks' leave. Pande Decl., ¶ 12 and Exh. A. Chevron did so despite

14   acknowledging on October 29, 2003, that it was required to continue Pande's health care

15   coverage while she was on FMLA-protected absence. Miller Decl. Exh. B, p.2. Pande has

16   suffered losses based on the COBRA costs that she had to pay. <u>Id.</u>, Exh. B. Chevron thus has

17   violated the FMLA on its face. The statutory framework makes plain that Chevron, <u>at a</u>

18   <u>minimum</u>, owes Pande the amount of her health care benefits that it denied her, plus interest,

19   plus liquidated damages, plus attorneys' fees, plus expert witness fees, plus other costs.

20       Accordingly, the Court should deny Chevron's Motion in Limine I to exclude plaintiff's

21   damages under the FMLA or CFRA.

22

23

24

25

26

27

28

6

PLAINTIFF KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
CHEVRON'S MOTIONS IN LIMINE -- CASE NO. 04-5107 CW

395495.01

1

2      **II.    OPPOSITION TO MOTION IN LIMINE NO. II TO EXCLUDE MAGNER'S**
            **"CAREER KILLER" E-MAILS**
3

4            Chevron moves to preclude Pande from introducing any evidence relating to the e-mail

5      correspondence between Tim Magner and Victoria Thompson, dated September 20, 2002, which

6      described Mitchell's retaliation against Pande for having accused him of discrimination.

7      Chevron has three evidentiary bases for its motion in limine: 1) relevancy; 2) hearsay; and 3) its

8      probative value is substantially outweighed by the danger of undue prejudice.

9            As discussed below, the e-mail is obviously relevant since it proves Pande's claim of

10     retaliation. In fact, it is so probative on that point that Chevron fears it will cause undue

11     prejudice. The e-mail also appears to be hearsay but, as discussed below, each layer of hearsay

12     comes within an exception to the hearsay rule. Therefore, the Court should deny the motion in

13     limine.

14                                **LEGAL ANALYSIS**

15         **1.      The career killer e-mail is relevant and probative.**

16           "The truth may hurt, but Rule 403 does not make it inadmissible on that account." In re:

17     Air Crash Disaster, 86 F.3d 498, 538 (6th Cir. 1996).

18           On September 24, 2002, Ms. Pande sought Ali Moshiri's guidance and assistance in light

19     of Mitchell's bad-mouthing her and sabotaging her future job opportunities at Chevron. She

20     forwarded to Mr. Moshiri Tim Magner's e-mail describing Mitchell's retaliation against her. See

21     trial exhibit 25, attached hereto. Chevron tries to downplay the relevance of Magner's e-mail by

22     claiming that Pande never posted for the position to which Magner refers. Pande didn't post for

23     that position, though, because of Mitchell's having made his remarks. In fact, Pande sought

24     more than 20 positions that she did not receive. Her retaliation claim alleges that, after

25     complaining that Mitchell had discriminated against her, Mitchell bad-mouthed her and

26     sabotaged her job opportunities – exactly what the e-mail proves, thereby making plain the

27     relevance and probative value of the e-mail. That evidence is indeed harmful to Chevron's case,

28     but that fact does not make it inadmissible.

                                        7

**2.    The career killer e-mail is non-hearsay not offered for its truth**

Out-of-court statements not offered "to prove the truth of the matter asserted" are not hearsay. Fed. R. Evid. 801(c); <u>Swirsky v. Carey</u>, 376 F.3d 841, 852 (9th Cir. 2004). In <u>Bergene v. Salt River Project Agricultural Improvement & Power District</u>, 272 F.3d 1136, 1142 (9th Cir. 2001), a Title VII gender discrimination and retaliation action, the Ninth Circuit reversed the district court's exclusion of the plaintiff's testimony that a former supervisor made a retaliatory threat to her. The court found that the statement was not hearsay, because whether the supervisor's statement was true or not, "[t]he making of the [statement] alone" was evidence of pretext. <u>Id.</u>

Here, Mitchell's comments to Gaggino, Gaggino's repetition of those statements to Magner, and the emails from Magner and Thompson are all relevant as non-hearsay. Pande does not offer Mitchell's retaliatory comments for their truth; to the contrary, she contends that they were in fact false. She instead offers Mitchell's comments to show that he retaliated against her by saying them. The spreading of Mitchell's comments among Chevron employees is similarly relevant to show the resulting negative impact on other Chevron actors' perceptions of Pande and attitudes towards her. Those negative perceptions, and their spread to others, show how Mitchell's retaliation negatively affected Pande's career. See <u>Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc.</u>, 425 F.3d 67, 76-77 (1st Cir. 2005) (finding statements in report offered to justify employer's claimed discriminatory actions were non-hearsay because they were offered to prove employer's belief that plaintiff was guilty of misconduct, not the misconduct itself).

**3.    The career killer e-mail fits within exceptions to the hearsay rule.**

Even if the Court concludes that the any portions of the statements are hearsay, all of the statements fall within hearsay exceptions. Pursuant to Federal Rule of Evidence 805, hearsay included within hearsay is not excluded "if each part of the combined statements conforms with an exception to the hearsay rule." Under Rule 803(1), the hearsay rule does not exclude "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." Fed. R. Evid. 803(1). A statement is not hearsay if it "is offered against a party" and "is by the party's agent or servant concerning

8

1   a matter within the scope of the agency or employment." Id., 801(d)(2)(D); Sea-Land Serv., Inc.

2   v. Lozen Int'l, LLC, 285 F.3d 808, 821-22 (9th Cir. 2002) (reversing district court's exclusion as

3   hearsay of internal company email forwarded to opposing party by a second company

4   employee); Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (finding

5   admissible as party admission a statement made by one employee to another about a third

6   employee's discriminatory statement, despite factual dispute about second employee's role in

7   alleged discriminatory employment action).

8        Here, Tim Magner was considering Pande for a position in Fernando Gaggino's group.

9   As part of Magner's job duties in evaluating Pande, Magner learned that Mitchell had described

10  Pande as "not a team player." Mitchell's statements -- that Pande pouted and was not a team

11  player – are statements by a Chevron manager about a person he supervised – and thus party

12  admissions. Magner's statement, which characterized Mitchell's comments as "real career

13  killers," fits within Rules 803(1) and 801(d)(2)(D).[3]

14       Each comment in Magner's e-mail fits within an exception to the hearsay rule. In

15  addition, Magner's statement is relevant to show that comments like "she's not a team player" or

16  "she pouts" are considered career killers at Chevron. Thus, when similar comments were made

17  to other groups considering Pande for a position, Magner's admission proves that those

18  comments, although somewhat innocuous on their face, were viewed at Chevron as career

19  killers. At a minimum then, the e-mail is admissible for the purpose of interpreting the phrase,

20  "she's not a team player."

21       For all these reasons, the Court should deny Chevron's motion in limine No. II to exclude

22  evidence of the "real career killers" e-mail.

23

24

25

26

---

27  [3] The content of Thompson's e-mail may or may not be hearsay, but Pande seeks only to

28  introduce Thompson's action of forwarding Magner's e-mail, not Thompson's e-mail itself.
    Thompson's forwarding of an e-mail is not an out-of-court statement and therefore does not fall
    within the ambit of the hearsay rules.

9

1

2    **III.    OPPOSITION TO MOTION IN LIMINE NO. III TO EXCLUDE EVIDENCE OF
REX MITCHELL'S ALLEGEDLY DISCRIMINATORY COMMENTS AND
3        REFERENCE TO VICTORIA THOMPSON'S CONFLICTS WITH MITCHELL**

4        In its third motion in limine, Chevron seeks to preclude Pande from introducing evidence

5    regarding the complaints that she made about Rex Mitchell. Pande's complaints, however,

6    triggered Mitchell's retaliatory actions. In order for the jury to understand why Mitchell was

7    retaliating against her, the jury needs to hear what she had said about him. Accordingly, the

8    testimony is relevant and is not being introduced for the truth of the matter asserted, but rather

9    for showing that Pande accused Mitchell of making these statements.

10                               **LEGAL ANALYSIS**

11        Hearsay is a statement offered in evidence to prove the truth of the matter asserted. Fed.

12   R. Evid. 801(c). Although Pande expects Mitchell to deny making the racist and sexist

13   comments that she accused him of making, whether or not he made those comments is beside the

14   point. Pande's claim for retaliation is based on the fact that she complained that Mitchell made

15   those remarks. She did so in a meeting with Victoria Thompson, Jay Johnson, Mitchell's

16   supervisor, and Gary Yamashita, a Chevron Ombuds. During that meeting, Pande and

17   Thompson described Mitchell's racist and sexist behavior and expressed their fears of his

18   retaliation, and Pande raised complaints about Mitchell's racist and sexist comments. As a result

19   of Pande's complaints, Mitchell did as she feared and engaged in a campaign that lasted a couple

20   of years, doing all that he could to sabotage Pande's future at Chevron. Accordingly, the jury

21   has a right to hear the comments that motivated Mitchell to retaliate against Pande. Since

22   Victoria Thompson and Pande met together with Jay Johnson to complain about Mitchell,

23   Thompson's comments are relevant to give the jury a complete picture of what occurred at the

24   meeting with Johnson. See Obrey v. Johnson, 400 F.3d 691, 697 (9th Cir. 2005) (holding district

25   court erred by excluding as irrelevant offered testimony of plaintiff's co-worker about

26   discriminatory comments by shipyard officials); Heyne v. Caruso, 69 F.3d 1475, 1479-80 (9th

27   Cir. 1995) (finding co-workers' testimony about sexual harassment by supervisor relevant and

28   probative circumstantial evidence of general hostility to women, to show motive and intent to

                                           10

PLAINTIFF KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
CHEVRON'S MOTIONS IN LIMINE -- CASE NO. 04-5107 CW

1  discriminate); <u>Glass v. Phila. Elec. Co.</u>, 34 F.3d 188, 189 (3d Cir. 1994) (reversing trial verdict

2  where court barred discrimination plaintiff from telling his side of the story, but admitted

3  employer's opposing evidence).  Disputes about the proper "inferences to be drawn from these

4  comments should be resolved by a jury."  <u>Obrey</u>, 400 F.3d at 697 n.4.

5      For these reasons, the Court should admit the statements, not for the truth of the matter

6  asserted, but to prove that they led to Mitchell's retaliatory conduct against Pande.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

1

2      **IV.     OPPOSITION TO MOTION IN LIMINE NO. IV TO EXCLUDE CHARACTER
          EVIDENCE REGARDING MR. DUNN AND MR. MITCHELL**

3

4              Pande does not intend to violate Federal Rule of Evidence 404(a) and thus will not

5      introduce character evidence for the purpose of proving that Dunn or Mitchell acted in

6      conformity therewith on a particular occasion.  Chevron's motion in limine, however, is so vague

       that it seems to seek to bar character evidence beyond the confines of Rule 404(a).  Character

7      evidence is admissible under Rules 607 and 608, and Chevron characterizes as "character

8      evidence" the way that Mitchell or Dunn behaved towards Pande's co-workers.  That testimony,

9      should it prove relevant, is not character evidence.  For example, Mitchell's actions towards

10     Thompson led Thompson to join the meeting with Pande in which Pande and Thompson

11     complained to Jay Johnson and Gary Yamashita about Mitchell.  In order for the jury to

12     understand why Thompson was at that meeting, Thompson may explain the basis for her own

13     complaints against Mitchell.  Thompson's description of how Mitchell acted in his dealings with

14     her is not "character evidence."  It is rather her firsthand account of Mitchell's actions that led

15     her to join Pande in lodging a complaint against him.  See Heyne, 69 F.3d at 1479-80 (holding

16     co-workers' similar complaints admissible to show discriminatory motive and intent, and

17     vacating jury verdict based on improper exclusion).

18             In fact, Chevron is seeking to exclude evidence on grounds of relevancy, not because it's

19     character evidence.  The purpose of a motion in limine is not, however, to make relevancy

20     determinations without context, particularly when the general subject (complaints against

21     Mitchell or Dunn) is patently relevant.  See Adams v. Ameritech Servs., 231 F.3d 414, 428 (7th

22     Cir. 2000) (the balancing process contemplated by Rule 403 "is best undertaken at the trial

23     itself.")  Accordingly, the Court  simply should deny motion in limine no. IV.

24

25

26

27

28

1

2   **V.     OPPOSITION TO MOTION IN LIMINE NO. V REGARDING PLAINTIFF'S**

3   **WITHDRAWN EMOTIONAL DISTRESS CLAIMS AND HER EMOTIONAL HEALTH**

4       Chevron tries to parlay Pande's withdrawal of her claims for <u>damages</u> stemming from her

5   emotional distress into an attempt to keep out all evidence of the emotional distress that she

6   suffered at their hands. Pande's emotional distress, however, relates directly to her medical

7   leave and her claim for punitive damages. Accordingly, the Court should deny plaintiff's motion

8   in limine to exclude evidence regarding her emotional distress.

9                           **LEGAL ANALYSIS**

10      Claiming a lack of relevance, Chevron seeks to exclude evidence of Pande's emotional

11  distress, "including stress she incurred, as well as the impact that emotional stress may have

12  played in her physical well-being, recovery from surgery, and speed of her recovery." Chevron's

13  Motion in Limine, p. 17. Yet, Chevron also claims that Pande could not have returned to work

14  within twelve weeks. Pande did not return to work prior to her surgery based in part on the stress

15  that she suffered and feared that she would endure. Pande Decl., ¶ 10. Having caused Pande's

16  emotional distress, which in turn played a role in the length of her recovery, Chevron has no

17  right to present a lopsided view of this case to the jury. Pande's emotional distress is relevant to

18  showing that she could have returned to work within twelve weeks but for Chevron's actions.

19  Fed. R. Evid. 401 (defining relevant evidence as that which has "any tendency to make the

20  existence of any fact . . . of consequence . . .more probable or less probable"); Advisory Comm.

21  Notes to Fed. R. Evid. 401 (rejecting more stringent relevance standard as unworkable, because

22  many items of evidence often must be joined together to prove a position: "[a] brick is not a

23  wall"); <u>Glass v. Phila. Elec. Co.</u>, 34 F.3d 188, 194-95 (3d Cir. 1994) (reversing trial verdict

24  where court improperly prohibited discrimination plaintiff from presenting his side of the story

25  by introducing testimony that discrimination had negatively affected his job performance;

26  testimony was relevant to show that poor job performance, which employer claimed justified its

27  actions, was itself caused by employer's illegal discrimination).

28      In addition, Pande will testify about the meeting she had with Jack Dunn in which he

13

1  berated her for taking her FMLA-protected leave.  Her emotional reaction to that meeting, which

2  was witnessed by other employees, supports her version of what occurred at that meeting and

3  undercut's Dunn's version.  Chevron's actions also prove that Chevron acted with a callous

4  disregard for Pande's rights.  The jury is entitled to hear about Pande's suffering at Chevron's

5  hands in determining whether punitive damages are warranted.

6      For all these reasons, the Court should deny Chevron's motion in limine to exclude

7  evidence regarding plaintiff's withdrawal of emotional distress claims and her emotional health.

8  **VI.    OPPOSITION TO MOTION IN LIMINE VI TO EXCLUDE EVIDENCE
        REGARDING PLAINTIFF'S OCTOBER 30 AND NOVEMBER 4, 2003**

9  **MEETINGS WITH JACK DUNN**

10     Chevron seeks to exclude the evidence proving that it interfered with Pande's FMLA

11 rights.  Since relevant evidence is admissible, this motion in limine is patently frivolous and

12 should be denied.

13                          **LEGAL ANALYSIS**

14     Elevating wishful thinking over legal analysis, Chevron claims that Dunn's October 30

15 and November 4 meetings had nothing to do with Pande's ultimate termination.  Au contraire.

16 On October 30, 2003, Dunn grilled Pande about the reasons for her medical leave.  Then, on

17 November 4, 2003, Dunn chastised Pande in front of several colleagues for taking a federally

18 and state-protected medical leave.  Dunn's actions constituted an interference with Pande's rights

19 under the FMLA.  Liu, 347 F.3d at 1133 (Interference includes "not only refusing to authorize

20 FMLA leave, but discouraging an employee from using such leave.").  Moreover, Dunn's

21 reaction to Pande's FMLA leave on October 30 and November 4 foretold his actions just days

22 later when he terminated her employment at the start of her medical leave.  Thus, the Court

23 should deny Chevron's motion in limine No.VI.

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

14

PLAINTIFF KIRAN PANDE'S  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
CHEVRON'S MOTIONS IN LIMINE -- CASE NO. 04-5107 CW

# VII.    CONCLUSION

For all the foregoing reasons, the Court should deny all of Chevron's motions in limine.

Dated: May 15, 2007                                    KEKER & VAN NEST, LLP


                                                       By:    /s/ Susan J. Harriman
                                                             SUSAN J. HARRIMAN
                                                             CHRISTA M. ANDERSON
                                                             Attorneys for Plaintiff
                                                             KIRAN PANDE

PLAINTIFF KIRAN PANDE'S  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
CHEVRON'S MOTIONS IN LIMINE -- CASE NO. 04-5107 CW

395495.01

EXHIBIT 25

π PLAINTIFF

United States District Court
Northern District of California

Case No.    C 04-5107 CW
Case Title  Pande v. Chevron Corp.
Exhibit No.  25
Date Entered _____
                    Richard W. Wieking, Clerk
By: _____, Deputy Clerk

**Unknown**

| | |
|---|---|
| **From:** | Pande, Kiran (Kiran.Pande) |
| **Sent:** | Tuesday, September 24, 2002 3:33 AM |
| **To:** | Moshiri, Alireza (AMOS) |
| **Subject:** | FW: Questions |

Ali,

I am concerned about the fact that Rex continues to bad-mouth me and sabotage future job opportunities. An example is shown below where Rex has bad-mouthed me to the Southern Africa SBU - in Tim Magner's words his comments are "Real career killers". I have never met Tim, and did not apply for a position in his group but apparently he asked Fernando to contact Rex about me to decide on whether to offer me a position in his group. Rex's negative comments regarding me, to a person I have never met, apparently left such an impression that Tim felt compelled to ask others about me. This is only one example. Rene Dautel had indicated strong interest in my joining his M&A group in March. I suspect after discussions with Rex his view has changed so that now Rene doesn't return e-mails or phone calls I have placed with him. I have applied for a couple jobs in the upcoming PDC including a position in the International Gas group (Audie Setters). Ordinarily I think my reputation and history of strong performance speaks for itself. It is obvious that Rex is intent on doing damage to my reputation, and since he is my current manager, any position I apply for he will continue to make disparaging remarks about me. It is obvious that Rex is attempting to portray a negative view of both myself personally and my work and that this has seriously damaged my career and prospects for other positions. In addition, positions that are not on the PE side will rely solely on his recommendation since the folks in that side of the business do not know me personally. I am certain that Rex's intent is to reduce my career prospects at ChevronTexaco using his power and influence in attempts to force me to leave the company.

I have had discussions with Jay Johnson about Rex's abusive verbal behavior, and Rex's racist comments, and hostile attitude towards women and minorities. In fact Rex's comments about me are in the same vein as his disparaging comments about Melody Meyers. Rex is completely uninhibited in attacking women and minorities verbally. I can only assume that this lack of inhibition is reinforced by CT culture since he remains in a sensitive and high level management position in spite of displaying non CT Way behavior on a routine basis. Unfortunately, Jay appears to have dismissed these concerns since Rex has countered by saying that I am a poor performer. I had asked Jay to have my position reassigned to Kelly Hartshorn since the portfolio analyst position involves price forecasting, competitor analysis, and portfolio modeling - these activities have very little interaction with the planning function on a day to day basis. I have always been a top performer in any group in which I have worked, so Rex's assessment of my performance is at odds with 12 years of previous performance ratings. I have always been given feedback on the team-work dimension as a strong suit so Rex's description below is extremely damaging. It's hard to imagine any hiring manager hiring someone into their organization who has been described by their current supervisor in such negative terms. I have never had a manager at Chevron whose actions reflect such a lack of integrity and ethics. Rex's ability to mask his behavior and his strong upward focus appears to have given him Carte Blanche to continue to harrass me without any concern for ChevronTexaco's anti-harrassment policies. I really regret my decision to take an assignment in the planning group. I never imagined that a grade level 27 manager at CTOP headquarters would behave in such an unethical manner and display such dis-regard for the ChevronTexaco Way. I have tried the official channels by lodging a complaint with Jay and the Ombuds. Unfortunately, the Ombuds has very limited real power and although he has told me that he does not trust Rex to tell the truth, he really has not been able to do anything beyond being supportive. The Ombuds also told me that Rex had a bad reputation in the accounting function and has a reputation for creating problems in any group he has supervised. His advice has been to try and leave the group to minimize Rex's influence on my career. Unfortunately, at my grade level that is easier said than done.

I know that this is not your problem and I feel badly about bringing this issue to you. However, I feel like I am left with very limited options if I want to try and stay at ChevronTexaco other than to have previous managers I have worked for present a different viewpoint on my performance based on their direct experience. Given the fact that Rex is intent on sabotaging any future job opportunities within ChevronTexaco, I feel I need someone to speak up for me and present a different viewpoint. Would it be possible for you to talk to Jay Johnson and Audie Setters about your opinion on my abilities and performance? Rex had claimed that I did not work with my SBU (LABU) last year (4th quarter 2001) on the business plan. If you talk to Beth Liptak, she can tell you that I did indeed work closely with her as the CTOP HQ planning contact. Another example of Rex being untruthful.

I would appreciate any guidance or assistance you can provide.
Kiran



**EXHIBIT** LF
13
Pande 3-21-06

1217

-----Original Message-----
**From:**          Thompson, Vicki (VLTH)
**Sent:**          Friday, September 20, 2002 9:12 AM
**To:**            Pande, Kiran (Kiran.Pande)
**Subject:**       FW: Questions

It looks like Rex is indeed saying some rather bad things about you....

-----Original Message-----
**From:**          Magner, Tim (TMagner)
**Sent:**          Friday, September 20, 2002 8:23 AM
**To:**            Thompson, Vicki (VLTH)
**Subject:**       RE: Questions

Yes, it is Sarah's job. She very much wants to get into Business Planning.

Isn't it time they moved Rex on?

-----Original Message-----
**From:**          Thompson, Vicki (VLTH)
**Sent:**          Friday, September 20, 2002 4:22 PM
**To:**            Magner, Tim (TMagner)
**Subject:**       RE: Questions

Incidentally, is this opening in Fernando's group, Sarah Saltzer's position? I noted that she interviewed recently with Rex. I do hope that she refrains from accepting a position in the group – as she will definitely regret it.

-----Original Message-----
**From:**          Magner, Tim (TMagner)
**Sent:**          Friday, September 20, 2002 7:58 AM
**To:**            Thompson, Vicki (VLTH)
**Subject:**       Questions

Question #1
I see the SASBU RAC meeting is scheduled to run 5 November through 8 November. Do you really think we'll meet on the Friday?

Question #2
What is the problem between Rex and Kiran Pandy? We were considering her for a position that will open up in Fernando Gaggino's group, and Rex told him things like "she's not a team player", "she pouts", etc. Real career killers.

2

1218