**EXHIBIT A**

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4     KIRAN PANDE,

5               Plaintiff,

6          vs.                          No. 04-5107 CW

7     CHEVRON CORPORATION (f/k/a
      ChevronTexaco Corporation) and
8     CHEVRON INTERNATIONAL EXPLORATION
      & PRODUCTION (f/k/a ChevronTexaco
9     Overseas Petroleum), a division
      of Chevron U.S.A. Inc.,

10

11               Defendants.
      _____/

12

13

14

15              DEPOSITION OF KIRAN PANDE

16                    VOLUME III

17                  March 22, 2006

18

19

          PATRICIA CALLAHAN & ASSOCIATES, INC.
20            Certified Shorthand Reporters
          Oakland, California  510-835-3993
21       San Francisco, California  415-788-3993
         Castro Valley, California  510-885-2371

22

              Facsimile 510-247-9775
23                WeReport@aol.com

24    Reported by:
      LaRelle M. Fagundes
25    CSR No. 9762

1    unit, the headquartered organization stayed.

2    Q.    No.    What I'm talking about is

3    ChevronTexaco Overseas Petroleum.    I'm talking

4    about the whole organization.

5        Isn't it true that a low percentage of

6    positions for CTOP were actually based in

7    San Ramon?

8        MR. LEBOWITZ:        Objection.    Vague.

9    Calls for speculation.

10        MS. MILLER:        Q.    If you know.

11    A.    I don't know what exact -- you know, what

12    exactly were all of the CTOP positions in 2002 or

13    2001.    But, you know, certainly after the merger

14    where many of the large business units that were in

15    San Ramon had moved to Houston in late 2001, there

16    were certainly a lot fewer than there had been

17    historically, but I really cannot give you, you

18    know, percentages.

19        MS. MILLER:        Okay.

20            (DEFENDANTS' EXHIBIT NO. 16

21            WAS MARKED FOR IDENTIFICATION.)

22        MS. MILLER:        Q.    Why don't you

23    take a look at Exhibit 16.

24        Okay?

25    A.    Okay.

1   Q.      As of May 2003, you became aware that the

2   Southern Africa business unit was definitely going

3   to be consolidated to Houston, correct?

4   A.      That's correct.  So this Exhibit 16 is an

5   e-mail that's dated May 13th, and I believe that's

6   when it was officially announced.

7   Q.      Okay.

8           And once you received this e-mail, you also

9   checked the -- well, let me rephrase that.

10          Never mind.

11                      (DEFENDANTS' EXHIBIT NO. 17

12                      WAS MARKED FOR IDENTIFICATION.)

13          MS. MILLER:         Q.  Have you reviewed

14  Exhibit 17?

15  A.      Yes, I have.

16  Q.      Exhibit 17 was a document that was given to

17  all San Ramon Southern Africa business unit

18  employees, correct?

19  A.      Yes, I believe so; that's correct.

20  Q.      Okay.

21          And you received a copy of this sometime

22  around May 20th, 2003, correct?

23  A.      Sometime around -- around there.  I think,

24  in fact, when this was sent out, that I was

25  overseas, but I'm not sure.  But around that time.

1    Q.      Okay.

2            And you actually did miss the town hall

3    meeting, correct?

4    A.      That's correct.  I wasn't at the town hall

5    meeting.  I believe, like, on here, it says the

6    town hall meeting was on May 22nd.  And I think I

7    was overseas at the time on a business trip.

8    Q.      When you reviewed this communication

9    timeline, which is Exhibit 17, you understood that

10   offers to move would be extended to employees on

11   June 2nd, 2003, correct?

12   A.      Yes; that's correct.

13   Q.      And you also knew that there would be a

14   brown bag, question-and-answer lunch for both

15   employees and spouses on June 4th, 2003, correct?

16   A.      Yes; that's correct.

17   Q.      Did you attend that brown bag luncheon?

18   A.      No, I did not.

19   Q.      And you also knew that on June 9th, 2003,

20   all offer, acceptances or declines to move were to

21   be returned to the company, correct?

22   A.      That's what is listed on this paper; that's

23   correct.

24   Q.      Was that your understanding, that the

25   offers and acceptances or declines were due on June

1    9, 2003?

2    A.    That's correct.

3    Q.    Okay.

4          And you also understood that the phase one

5    group move would be on July 15th, 2003?

6          MR. LEBOWITZ:        Objection.

7    Misstates.  It's vague.  Assumes facts.

8          MS. MILLER:        Q.  Well, the move to

9    Houston was phased in, correct?

10   A.    Are you saying was the move to Houston done

11   in phases?

12   Q.    Yes.

13   A.    Yes; that's correct.

14                    (DEFENDANTS' EXHIBIT NO. 18

15                    WAS MARKED FOR IDENTIFICATION.)

16         MS. MILLER:        Q.  Have you reviewed

17   Exhibit 18?

18   A.    Yes, I have.

19   Q.    Okay.

20         Exhibit 18 is the power point that was

21   presented at the town hall meeting on May 22nd,

22   2003, correct?

23   A.    I presume it was the power point that was

24   presented.  I wasn't at that meeting.

25   Q.    Right.

1      But you did receive a copy of the power

2  point, correct?

3  A.      Yes, that's correct, all of this exhibit.

4  Q.      Did you receive a copy of the power point

5  when you returned from your business trip?

6  A.      Yes.  At some point after I returned from

7  my business trip, I received this.

8  Q.      If you take a look at page five, you see

9  the move to Houston was going to be in two stages,

10  correct?

11  A.      Yes, that's what it says on that page.

12  Q.      And Block 0 BF were to report to Houston on

13  August 1st, correct?

14  A.      That's what it says.

15  Q.      And information to those employees in phase

16  one would be distributed by July 15th, according to

17  Exhibit 17, correct?

18  A.      Yes; that's correct.

19  Q.      And the second stage of the move would

20  occur on January 1, when Block 14 and Congo/DRC

21  were to report in Houston, correct?

22  A.      Yes, it says the move was in two stages

23  with stage one being August 1st and stage two being

24  January 1st.

25  Q.      All right.

1    Q.      Do you know who was selected for the

2    position?

3    A.      I don't know who was selected for the

4    position.

5    Q.      Do you know who made the selection

6    decision?

7    A.      I don't know who made the selection

8    decision.

9    Q.      Do you know if Jack Dunn played any role in

10    that selection or decision?

11          MR. LEBOWITZ:          Objection.  Vague.

12          You can answer.

13          THE WITNESS:          I don't know.

14          MS. MILLER:          Let's mark this next

15    in order.

16                    (DEFENDANTS' EXHIBIT NO. 24

17                    WAS MARKED FOR IDENTIFICATION.)

18          MS. MILLER:          Q.  Exhibit 24 is a

19    series of e-mails between you, Taryn Shawstad and

20    Fiona Young.

21          Take a look at the one at the bottom of the

22    first page continuing on to the second that's dated

23    October 16th.

24          Do you see that?  The top of the -- the

25    header is on one page and continues on to the

1    second page.

2    A.        Yes, I see that.

3    Q.        All right.

4              So it's an e-mail that you sent

5    Taryn Shawstad on October 16th, 2003, correct?

6    A.        That's correct.

7    Q.        And in that, you tell Taryn that you turned

8    down SASBU offer to move to Houston, correct?

9    A.        That's correct.

10   Q.        And you also tell her that, at least as of

11   October 16th, 2003, you had applied for several

12   jobs through the PDC process, but if you were not

13   selected for any of them, then I will likely be

14   forced to leave the company.

15             Do you see that?

16   A.        Yes, I see that.

17   Q.        Okay.

18             You also tell her that the SASBU offer

19   letter has a start date of January 1st for the job

20   in Houston.

21             Do you see that?

22   A.        I see that.

23   Q.        And then you ask her, "is it possible to

24   use vacation, for example, to extend the severance

25   date into 2004 to ensure that severance benefits

1      are paid out in 2004."

2              Do you see that?

3      A.      I see that.

4      Q.      Does that help refresh your recollection

5      that you understood that December 31st, 2003, would

6      be your last day with the company if you were not

7      selected for another position?

8      A.      No, that is not my recollection.  My

9      understanding at the time that I wrote this e-mail

10     and at the time that I turned down the offer to

11     move to Houston was that, as was customary practice

12     at Chevron, one oftentimes was allowed to continue

13     working on a project as long as there was work that

14     was useful that the employee could do.  And

15     oftentimes a specified specific date would be an

16     estimate and not an absolute drop-dead date.

17             And, in fact, Cary Mrozowski had called me

18     to ask me whether I had received a termination

19     date.  And I had said no.  And Cary Mrozowski, who

20     was, I believe, in a role where he was head of

21     redeployment, because Chevron had a longstanding

22     policy towards trying to retain their workforce,

23     and he was in a position where he helped with

24     redeployment of employees due to changes and moves

25     and restructuring, et cetera.  And we had a

492

<u>CERTIFICATE</u>

1

2        I, the undersigned, a Certified Shorthand

3  Reporter, State of California, hereby certify that

4  the witness in the foregoing deposition was by me

5  first duly sworn to testify to the truth, the whole

6  truth, and nothing but the truth in the

7  within-entitled cause; that said deposition was

8  taken at the time and place therein stated; that

9  the testimony of said witness was reported by me, a

10 disinterested person, and was thereafter

11 transcribed under my direction into typewriting;

12 that the foregoing is a full, complete and true

13 record of said testimony; and that the witness was

14 given an opportunity to read and, if necessary,

15 correct said deposition and to subscribe the same.

16        I further certify that I am not of counsel

17 or attorney for either or any of the parties in the

18 foregoing deposition and caption named, nor in any

19 way interested in the outcome of the cause named in

20 said caption.

21        Executed this 5th day of April, 2006.

22

23        _____

24        LARELLE M. FAGUNDES, CSR 9762

25

## Unknown

| | |
|---|---|
| **From:** | Dejong, Guadalupe (LDejong) |
| **Sent:** | Tuesday, May 13, 2003 4:24 PM |
| **To:** | Unser, Sharon (SLUN); Hobbet, Randall D (RHobbet); Vieira, Otilia [Sonangol]; Abbott, Barry (bjabbott); Benjamin Sloan; Bill Wood; Bob Burkes; Bob Scamman; Bradley, Arthur (AABR); C Burnside; Carpenter, Danielle L; Charles Mchugh; Charles Smith; Chris Turner; Correira, Maria A. (mcbj); Dale Beeson; David Dalley; David Mckay; Devamonie Naidoo; Doug Goff; Edwin Saa; Erik Davidsen; Fernando Gaggino; Feroci, Marina (Marina.Feroci); Gordon Seto; Graham Housen; Green, Walter (VerneyGreen); Jack Dunn; Jalal Afifi; Janet Murphy; Jennifer Ferrari; Jim Frank; Jim Wadowsky; Joey Legaspi; John Fryters; John Moore; Joseph Ponthier; Joy Roth; Justin Mbala; Kathleen Mabe; Ken Knutson; Koches, Robert (ROKO); Larry Littlefield; Lupe Dejong; Mark Dando; Mark Moon; Martins, Carlos [Sonangol]; McKay, Peggy (pacl); Michael Clark; Mpanzu, Antonio (NMPN); Murray, Gordon (Gordon.Murray) (Gordon.Murray); Natalie Talbert; NEWMAN, VICKI (VickiNewman); Pande, Kiran (Kiran.Pande); Pete Chimney; Peter Brown; Phalanger, Jinghan (JPhalanger); Randy Dahlman; Rassi, Claudia [clrs]; Rick Davis; Ricky Lamb; Robert Minck; Robinson, Adrian J (Adrian.Robinson); Rogerio Marite; Salomao, Augusto (GSLM); Sanae Kelly; Scharnell, Rob (RobScharnell); Severson, Roger (RHSE); Stephen Vasicek; Stephen Zalan; Steve Newton; Sundar Sundararaman; Susan Hennigh; Tayo Feyijimi; Teresa Stevens; Thomas Humphrey; Tim Winter; Tom Millette; Unser, Sharon (SLUN); Van-Deste, Ricardo (RicardoVan-Deste) (RicardoVan-Deste); Vieira, Felisberto [Sonangol] |
| **Cc:** | Young, Fiona (fyou); Cornelius, Sandy (sanc); Nelson, Kenneth (kjnelson); Breunig, Peter A. (peter.breunig); Krolow, Mark (MRKR); Puckett, Mark (MarkPuckett); Kirkland, George (glkirkland); Shawstad, Taryn (tary); Allison, Michael (MJAL); Lifa, Jonathan (JLIFA); Magner, Tim (TMagner); Major, Ana F; Mitro, Tom (TMMI); Paiva, Fernando (FPAI); Partridge, Ian (IPAR); Rana, Daniel (DPRA); Scharnell, Rob (RobScharnell); Shreder, Lisa A; Simpson, Steve R (stsi); Faria, Sandra (SNFR); Bielitz, Susan M; Marron, Julissa (jlss) (JulissaMarron) |
| **Subject:** | SASBU San Ramon Relocation to Houston |

SASBU Employees,

As many of you are aware, we have been looking at options for consolidating the SASBU's U.S. based organization in one location for some time. The decision has now been made to relocate SASBU's San Ramon organization to Houston. We are actively working with Human Resources and the Sponsor's groups to finalize the move and PDC policies. We intend to hold a town hall in San Ramon on May 22nd to discuss the move and related issues with employees. We are setting up a number of support mechanisms for the move including a common email site for questions that can be answered by managers, Human Resources, and the PDR's to address employee questions.

I understand the anxiety and uncertainty that changes like this create for those employees and their families who are affected. We will endeavour to provide information to you just as quickly as we can. In the meantime, I appreciate your patience, and all of your efforts to keep our many projects progressing with a minimum of disruption. Most importantly, in circumstances such as this it is critical that all of us maintain our focus on working safely and incident free. Thanks.

John Gass



## SASBU Houston Relocation Communication Timeline

| | |
|---|---|
| John Gass email communication to employees advising of move | 13 May |
| Employee communication to include:<br>   ➢ Date, Time & Location of Town Hall | 20 May |
| Town Hall<br><br>Information to be provided at Town Hall:<br>   ➢ "Welcome to Houston" Relocation Information<br>   ➢ SASBU Houston Move Web Site Address<br>   ➢ SASBU Houston Move FAQ's Email Address | 22 May |
| Employee communication to include:<br>   ➢ List of important dates<br>   ➢ Overview of offer to move process<br>   ➢ Reminder and location of dedicated SASBU Houston Move email<br>   ➢ Invite and details of Houston Relocation Q & A's Brown Bag session | 23 May |
| Employee communication to include:<br>   ➢ List of important dates<br>   ➢ Overview of offer to move process<br>   ➢ Reminder and location of dedicated SASBU Houston Move email and website<br>   ➢ Invite and details of Houston Relocation Q & A's Brown Bag session | 28 May |
| Offers to Move extended to employees | 2 June |
| Surplus Notification forwarded to employees not receiving an offer | 2 June |
| Brown Bag – Houston Relocation Q & A's<br>   ➢ Employees & Spouses | 4 June |
| Employee communication to include:<br>   ➢ Reminder that offer acceptances/declines due on 9 June | 5 June |
| Offer acceptances/declines due | 9 June |
| Employee communication to include:<br>   ➢ Information on Phase 1 Group Move | 15 July |
| Employee communication to include:<br>   ➢ Information on Phase 2 Group Move | 15 December |

May 20, 2003                              1



728



# Houston Move

May 22, 2003

EXHIBIT

tabbies®

736

# Agenda

- Rationale for move

- Planning/Logistics/Timeline

- Move policy

737

# Business Case for Move

- **Consolidated workforce in Houston**
  - Increased interaction between VC, MCP and RM within SASBU
  - Larger staff pool to draw from and easier to move people between projects and BU's
  - Co-location with the above and other major CTOP groups for best practice sharing/lessons learned
  - Significant decrease in flying between San Ramon and Houston lowers costs and increases productive work hours
  - Decreases complexity of SASBU by one work location

- **Two time zones and one plane flight closer to Luanda**
  - Increased and easier interaction with management, technical staff and partners in Luanda
  - Increased utilization of Houston Express, lower cost airfares and less overall travel time

- **Move Pay Out in 2-3 years**

738

# Key Activities

- Final move approval & Announcement
- Alternative selected for Houston Offices
  - Bellaire Annex 2 & 5
  - Will optimize all SASBU space in BAX and BOB to the extent possible to maximize team dynamics
- May 5th - Met with CTOP HR/PDC's, EPTC & UTC
- HR/Sponsor's finalizing move policy and PDC processes
- May 22nd – Townhall Meeting with employees - EPTC and UTC doing same
- Formally communicated to Sonangol
- Developing final terms/approvals for offers and issue
- Refine move details and implement

# Move Plans

- Move in 2 Stages

  □ Block 0 VC report on August 1

  □ Block 14 & Congo/DRC report on January 1

- Simultaneous job relocation offers to SASBU EE's

  □ Offers week of June 2nd

  □ 7 day acceptance window

  □ EPTC/UTC to assess who needs to move to support SASBU

- Utilize full-time SASBU Move Coor. (Mike Wischmeyer), HR support person (Shirley Wampler from CABGOC) & Relocation Company Move Coor. (SIRVA)

5

# SASBU Move Timeline



| | Target Date | Jan '03 | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan '04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Frame/Evaluate Move Opportunity** | | | | | | | | | | | | | | |
| - Develop Houston Options | | | | | | | | | | | | | | |
| - Assess economic impact | | | | | | | | | | | | | | |
| - Select best option | | | | | | | | | | | | | | |
| **Develop/Communicate Move Plan** | | | | | | | | | | | | | | |
| - SASBU Framing Session | May 13 | | | | | | | | | | | | | |
| - SASBU Move Approved | May 13 | | | | | | | | | | | | | |
| - Communicate Status to EE's | May 22 | | | | | | | | | | | | | |
| - Townhall Meeting | May 15 | | | | | | | | | | | | | |
| - Dedicated SASBU HR Person in SR | May 13 | | | | | | | | | | | | | |
| - Dedicated SASBU Move Coor on board | | | | | | | | | | | | | | |
| - Generate Relocation Offer Pkg's | | | | | | | | | | | | | | |
| - Make offers | June 2 | | | | | | | | | | | | | |
| - Responses Due | June 9 | | | | | | | | | | | | | |
| - Finalize BAX 2 Plans | May 31 | | | | | | | | | | | | | |
| - Finalize BAX 5 Plans | June 30 | | | | | | | | | | | | | |
| **BAX Modifications** | | | | | | | | | | | | | | |
| - BAX 2 | Jul 31 | | | | | | | | | | | | | |
| - BAX 5 | Dec 15 | | | | | | | | | | | | | |
| **July/August Moves** | Aug 1 | | | | | | | | | | | | | |
| **Dec/January Moves** | Jan 1 | | | | | | | | | | | | | |

741

# Timeline – Major Highlights

- Week commencing June 2 – Offer to move extended to SASBU employees

- Week commencing June 9 – Acceptances/Declines Due

- Week commencing August 1 – Block 0 start work in Houston

- Week commencing January 1 – Block 14, Congo & DRC start work in Houston

# Offer to Move Process

- Positions being relocated to Houston "As Is"

- No positions will be opened

- No selection process will be necessary

- Offers generated by Sponsor group and extended by your supervisor

- All offers to be extended at the same time

- Employees will have one week to accept/decline the offer to move

- Failure to return the "Offer to Move" within the time frame means decline of offer.

743

# If Offer Declined

- SASBU values and appreciates its employees and the skill sets they bring to the job

- It is the SASBU's desire that each of you will accept the offer to relocate to Houston

- For those employees who decline the offer, their Sponsor will work with them to find alternative employment

  □ For US $ employees, if no alternative employment can be found, employees may be eligible for a separation payment under the surplus employee program in place and will be advised of their eligibility at the time of termination

  □ For expatriate employees, if no alternative employment can be found, employees will be repatriated to their home country, and may become eligible for severance under any plan in effect for their payroll if no alternative employment can be found for them

9

741

# Relocation

## US Dollar Employees

- Eligible for the appropriate US Domestic Relocation Program Benefits

- Participation in the Home Selling and Home Finding portion of the Relocation Program is mandatory to receive certain relocation benefits

- **Important** – You must submit the GO-1394 (Relocation Enrollment Form) prior to initiating any move related expenses

- Each employee will be assigned an Relocation Counselor to assist them with all aspects of their move, e.g., expense reimbursement, questions, information on Houston, policy interpretation/clarification, etc.

10

745

# Relocation

## Expatriate Employees

- Eligible for Expatriate Relocation Program Benefits

- Must submit a GO-1405 (Request for Movement of Household Goods & Personal Effects) prior to initiating any move related expenses

- Each employee will work with the HR Expatriate Counselor to assist them with all aspects of their move, e.g., expense reimbursement, questions, information on Houston, policy interpretation/clarification, etc.

11

746

# Resources

- *Name of website to be announced* – For information on Houston, FAQ's, Contact Names and Numbers, Relocation Policy, etc.

- SASBUHM@ChevronTexaco.com - Dedicated email address to send general questions related to this move.

- http://hr.chevrontexaco.com/northamerica/us/programs-policies/relocation/ - For information on the US $ Relocation Policy

- US $ Relocation Policy Administrator - SIRVA
  - Andrew Horvath, 1-800-531-3840, ext. 5273, andrew.horvath@sirva.com

- For information on the Relocation Policy for Expatriates, contact one of the following HR Expatriate Counselors:
  - Expatriate Counselors –
    - San Ramon - Paula Perez, CTN 842-3170, pllar@chevrontexaco.com
    - Houston - Debby Konvicka, CTN 752-3974, DKonvicka@chevrontexaco.com

- To Update your Medical & Dental Benefits contact the:
  - HR Service Center - 1-888-TALK2HR or
  - HR Benefits Connection Website – https://www2.benefitsweb.com/chevrontexaco.html

- EAP – 1-800-860-8205

12

747

## Unknown

| | |
|---|---|
| **From:** | Pande, Kiran (Kiran.Pande) |
| **Sent:** | Tuesday, October 21, 2003 1:40 PM |
| **To:** | Young, Fiona (fyou) |
| **Cc:** | Shawstad, Taryn (tary) |
| **Subject:** | RE: Severance Package |

Fiona,
Thanks for the information and your prompt reply. I am still actively pursuing opportunites within CT and am hopeful that I will be able to find an appropriate job within CT. However, it is still useful to understand the policy.
Regards,
Kiran

-----Original Message-----
| | |
|---|---|
| **From:** | Young, Fiona (fyou) |
| **Sent:** | Tuesday, October 21, 2003 1:36 PM |
| **To:** | Pande, Kiran (Kiran.Pande) |
| **Cc:** | Shawstad, Taryn (tary) |
| **Subject:** | RE: Severance Package |

Kiran,

At this time I have not been advised that you have been declared surplus by the company. As a result you are not currently eligible for any form of severance payment.

Any individual who is eligible for a severance payment is given options as to how they want their associated severance payment made. Details of these options are included in the material sent to these individuals when they are declared surplus by the company. These include splitting the payment into two, delaying the payment for a period of time or having it paid immediately.

Please let me know if you have other questions

**Fiona Young**
HR - CTOP and PRC
CTN 842 1840 (1-925-842-1840)
e-mail: fyou@chevrontexaco.com

-----Original Message-----
| | |
|---|---|
| **From:** | Shawstad, Taryn (tary) |
| **Sent:** | Tuesday, October 21, 2003 12:34 PM |
| **To:** | Young, Fiona (fyou) |
| **Cc:** | Pande, Kiran (Kiran.Pande) |
| **Subject:** | FW: Severance Package |

Fiona: Since you've been handling the SASBU office move please respond to Kiran. Thanks,

Taryn

**Taryn Shawstad, General Manager-HR**

**ChevronTexaco**
ChevronTexaco Overseas Petroleum, Human Resources
6001 Bollinger Canyon Road, San Ramon, CA 94583
Tel 1-925-842-1391 Fax 1-925-842-1300



-----Original Message-----
| | |
|---|---|
| **From:** | Pande, Kiran (Kiran.Pande) |
| **Sent:** | Thursday, October 16, 2003 11:45 AM |

1

**To:**        Shawstad, Taryn  (tary)
**Subject:**   Severance Package

Taryn,
As you probably know, I have turned down the SASBU offer to move to Houston.  I have applied for several jobs through the PDC process but if I am not selected for any of them, then I will likely be forced to leave the company.  The SASBU offer letter had a start date of Jan 1st for the job in Houston.  Do you know if it is possible to use vacation, for example, to extend the severance date into 2004 to ensure that severance benefits are paid out in 2004?  Obviously, the tax implications are much more favorable if the payout could be moved into 2004.

I spoke with Cary Mrozowski about this yesterday and he indicated that it would be best to check with you on this.

I would appreciate any information or guidance you can share with me on this issue.

Regards,
Kiran

1213

**EXHIBIT B**

041.Pande MSJ Hearing Transcript.txt


UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

| | | |
|---|---|---|
| KIRAN PANDE, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. C 04-5107CW |
| | ) | |
| CHEVRON TEXACO CORPORATION | ) | |
| A DELAWARE CORPORATION, | ) | PAGES 1 - 29 |
| ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| | ) | FRIDAY, JANUARY 5, 2007 |



TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:           MCGUINN, HILLSMAN & PALEFSKY
                         535 PACIFIC AVENUE
                         SAN FRANCISCO, CALIFORNIA   94133
                    BY:  NOAH D. LEBOWITZ, ATTORNEY AT LAW




FOR DEFENDANTS:          MILLER LAW GROUP
                         WOOD ISLAND CENTER
                         60 E. SIR FRANCIS DRAKE BOULEVARD
                         SUITE 302
                         LARKSPUR, CALIFORNIA   94939
                    BY:  LISA C. HAMASAKI,
                         MICHELE BALLARD MILLER,
                         ATTORNEYS AT LAW


REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258

                                                                  2

1    FRIDAY, JANUARY 5, 2007                    10:09 A.M.

2               P R O C E E D I N G S

3          THE CLERK:  CALLING THE MATTER OF PANDE VERSUS

4    CHEVRON, CIVIL ACTION NO. C04-5107.

5          COUNSEL, PLEASE COME FORWARD, STATE YOUR APPEARANCES

041.Pande MSJ Hearing Transcript.txt

22  TO JAMES JOHNSON IN MARCH OF '02, AND THEN WENT TO GARY

23  YAMASHITA SOON THEREAFTER, AND THAT CONTINUED THROUGH THE END OF

24  APRIL.

25          AND THEN AS THINGS PROGRESSED THROUGH THE SUMMER, SHE

                                                              11

1  ALSO WENT BACK TO MR. YAMASHITA AND CONTINUED TO KEEP HIM

2  INFORMED AS TO WHAT THINGS WERE GOING ON.

3          AND IT WAS MR. MITCHELL'S CONDUCT THAT STARTED AFTER

4  THAT MARCH 2002 INTERACTION WITH JAMES JOHNSON THAT MAKES UP THE

5  RETALIATION CLAIM GOING INTO -- INCLUDING THE -- THE

6  BAD-MOUTHING AND THE EVIDENCE THAT WE HAVE ABOUT THE CONGO GROUP

7  AND GOING INTO 2003 WHEN WE TALK ABOUT THE -- AGAIN, THE MERIT

8  INCREASE.  AND IS ALL PART OF THE SAME COURSE OF CONDUCT.

9          THE COURT:  WELL, IF YOU COULD JUST BULLET-POINT FOR

10  ME THE DATES OF WHAT YOU ARE CALLING YOUR ADVERSE EMPLOYMENT

11  ACTIONS THAT CONSTITUTE YOUR RETALIATION.

12          MR. LEBOWITZ:  THE FIRST ADVERSE EMPLOYMENT ACTION

13  WAS IN -- WAS IN APRIL OF 2002, WHICH WAS THE -- THE NEGATIVE

14  RANKING, AND, THEREFORE, THE NEGATIVE SALARY ACTION THAT WENT

15  ALONG WITH IT.

16          THE FALL OF 2002, SEPTEMBER, OCTOBER TIME FRAME WHERE

17  WE'RE TALKING ABOUT -- AT LEAST THAT WE KNOW OF.  THAT'S WHEN WE

18  KNOW IT HAPPENED.  WE DON'T KNOW WHEN IT HAPPENED IN BETWEEN

19  THERE, BUT THERE WAS THE NEGATIVE COMMENTS THAT MR. MITCHELL

20  MADE TO THE FOLKS AT THE CONGO GROUP ABOUT --

21          THE COURT:  YEAH, WELL, THERE AGAIN, YOU HAVE A

22  HEARSAY PROBLEM.  YOU DON'T HAVE ANYONE WHO HEARD HIM SAY THAT

23  WHO IS GOING TO SAY THAT HE SAID IT.  YOU'VE GOT TRIPLE HEARSAY.

24  BUT ANYWAY, GO ON.  WHAT ELSE?

25          MR. LEBOWITZ:  AND THEN WE HAVE --

                                                              12

1          THE COURT:  RULES OF EVIDENCE, THEY'RE THERE, AND YOU

2  CAN'T GET IN EVIDENCE --

041.Pande MSJ Hearing Transcript.txt

3                   (SIMULTANEOUS COLLOQUY.)

4           THE COURT:  -- TRIPLE HEARSAY.

5           MR. LEBOWITZ:  SO WE'VE GOT THE FALL TIME FRAME,

6    WE'VE GOT THE CONGO GROUP.  AND, AGAIN, THIS IS EVIDENCE.

7           THE COURT:  I'M JUST ASKING FOR BULLET POINTS.

8    NOW -- CONGO GROUP, THAT'S NO. 2.  WHAT'S NO. 3?

9           MR. LEBOWITZ:  NO. 3 IS THE -- IS PUSHING HER INTO

10   THE NEGATIVE -- WHAT WE DRAW FROM THAT IS THE FACT THAT SHE

11   ENDED UP IN THIS OTHER GROUP WITH JACK DUNN IN A POSITION THAT

12   SHE DIDN'T WANT TO TAKE AND WAS BASICALLY TOLD THIS IS THE ONLY

13   ONE FOR YOU AND YOU'VE GOT TO GO.  AND THEN --

14          THE COURT:  WELL --

15          MR. LEBOWITZ:  AND THAT WAS DECEMBER -- THAT ENDED

16   UP --

17          THE COURT:  THAT'S NOT -- GETTING A JOB IS NOT AN

18   ADVERSE ACTION.  FAILING TO GET A JOB IS AN ADVERSE ACTION.  SO

19   IF YOU WANT TO SAY SHE FAILED TO GET A CERTAIN JOB BECAUSE OF

20   SOMETHING MITCHELL DID AND YOU HAVE EVIDENCE OF THAT, I'D LIKE

21   TO HEAR THAT.  BUT FAILING TO GET A JOB -- I MEAN, GETTING A

22   JOB --

23          MR. LEBOWITZ:  YOUR HONOR, I BELIEVE UNDER THE PATTON

24   VS. GRANT UNIFIED SCHOOL DISTRICT CASE, CALIFORNIA COURT OF

25   APPEAL CASE THAT CAME DOWN AFTER YANOWITZ, IN FACT, THE

                                                          13

1    PLAINTIFF THERE CLAIMED THAT SHE GOT A JOB.  YOU KNOW, THE

2    EVIDENCE THERE WAS THAT SHE GOT A JOB, BUT SHE CLAIMED THAT THE

3    JOB SHE GOT WAS AN ADVERSE ACTION BECAUSE OF THE NATURE OF THE

4    JOB AND THE CONTEXT OF THAT JOB.  SHE WAS A PRINCIPAL AT A

5    MIDDLE SCHOOL AND WAS TRANSFERRED TO ANOTHER PRINCIPAL AT A

6    MIDDLE SCHOOL --

7           THE COURT:  SO SHE GOT THE SOUTH AFRICA JOB BECAUSE

8    MITCHELL MADE HER GET THE SOUTH AFRICA JOB.
                         Page 10

041.Pande MSJ Hearing Transcript.txt

 9              MR. LEBOWITZ:  THAT MITCHELL'S INFLUENCE ON THE

10    PROCESS IS WHAT PUT HER INTO THIS JOB THAT SHE DIDN'T WANT AND

11    WAS A -- IN FACT, A CAREER -- A BACKWARDS STEP BY MORE THAN TEN

12    YEARS --

13              THE COURT:  BUT WHAT I NEED IS SPECIFIC THINGS THAT

14    YOU HAVE EVIDENCE OF THAT MITCHELL DID.

15              MR. LEBOWITZ:  WELL, WHAT WE HAVE -- THE ONLY THING

16    WE HAVE EVIDENCE OF IS THROUGH THE CONGO GROUP.  AND THAT IS --

17    YOU KNOW, THIS IS ALL SECRETIVE BEHIND CLOSED DOORS.  THE ONLY

18    THING WE'RE GOING TO BE ABLE TO GET IS SOMETHING LIKE THIS EMAIL

19    THAT WE HAVE FROM TIM MAGNER.

20              AND SO THE ONLY WAY WE'RE EVER GOING TO BE ABLE TO

21    GET ANY EVIDENCE OF WHAT GOES ON BEHIND THESE CLOSED DOOR

22    MEETINGS IS THROUGH INDEPENDENT EVIDENCE THAT'S UNSOLICITED.

23    AND WHEN YOU SOLICIT THE TESTIMONY OF THESE PEOPLE, THEY'RE

24    NEVER GOING TO ADMIT TO IT.

25              THE COURT:  WELL, THAT'S A DIFFICULTY IN OUR SYSTEM
                                                                    14

 1    OF LAW, BUT I CAN'T DO ANYTHING ABOUT THAT.

 2              WHAT ELSE IS THERE?

 3                    (SIMULTANEOUS COLLOQUY.)

 4              MR. LEBOWITZ:  -- WE BULLET-POINT, AND SO

 5    DECEMBER 9TH IS THE DATE WE USE, WHICH IS THE DATE SHE BEGAN IN

 6    THE SOUTH AFRICA --

 7              THE COURT:  YOU'RE STILL GIVING ME BULLET POINTS OF

 8    YOUR CLAIMED ADVERSE ACTIONS BY MITCHELL.  AND WHAT'S THE NEXT

 9    ONE AFTER --

10              EXCUSE ME.

11                    (SIMULTANEOUS COLLOQUY.)

12              THE COURT:  YOU NEED TO STOP WHEN I TRY TO INTERRUPT

13    YOU --

14                    (SIMULTANEOUS COLLOQUY.)
                            Page 11

041.Pande MSJ Hearing Transcript.txt

15          THE COURT:  -- TO GET MORE CLARITY, BECAUSE SHE CAN'T

16    TAKE DOWN BOTH OF US AT ONCE.

17          OKAY.  SO SO FAR WE'VE GOT THE SPRING EVALUATION AND

18    LACK OF PAY INCREASE.  YOU WANT TO ADD THE CONGO GROUP COMMENTS,

19    BUT THAT'S HEARSAY.  SO WE'RE BACK TO THE SPRING.

20          WHAT ELSE THERE?

21          MR. LEBOWITZ:  THERE'S -- WELL, THERE'S THE --

22    THERE'S THE CONGO GROUP.  THEN THERE'S THE MOVE INTO THE

23    SOUTH AFRICA GROUP.  THAT'S SAME TIME PERIOD, FALL OF '02.  AND

24    THEN APRIL '03 IS THE NEGATIVE SALARY ACTION --

25          THE COURT:  SO THAT'S THE NEXT --
                                                              15

 1          MR. LEBOWITZ:  -- WHEN SHE'S MOVED INTO THE

 2    SOUTH AFRICA GROUP.

 3          THE COURT:  HMM.  WELL, PROXIMITY IN TIME CAN BE

 4    EVIDENCE OF CAUSATION, BUT THE -- IT'S GETTING A LITTLE BIT

 5    ATTENUATED FROM THE SUMMER OF '02 UP UNTIL APRIL OF '03 FOR THAT

 6    PROXIMITY TO REALLY WORK.

 7          WHAT DO THE CASES SAY?  SEEMS TO BE ABOUT 90 DAYS.

 8          MR. LEBOWITZ:  YANOWITZ, ACTUALLY WHEN WE TALK ABOUT

 9    THE CALIFORNIA LAW ON RETALIATION AND WE TALK ABOUT YANOWITZ,

10    THE -- YANOWITZ IS REALLY FOCUSED ON THIS ACCUMULATION OF

11    EVENTS.  THERE'S NOT ONE SWIFT BLOW, YOU KNOW, QUOTE FROM

12    YANOWITZ WHERE IT CAN BE SOMETHING THAT BUILDS OVER TIME AND

13    BUILDS OVER TIME AND CAN ALL BE -- WHEN YOU LOOK BACK ON IN

14    HINDSIGHT CAN SEE IT WAS ALL PART OF A PATTERN OF BEHAVIOR.

15          AND WHEN YOU LOOK TO THE APRIL '03 NEGATIVE SALARY

16    ACTION, WHAT YOU'RE LOOKING AT IS MR. MITCHELL'S FINAL BLOW TO

17    MS. PANDE.  AND THAT'S ALL BASED ON MISS PANDE'S INTERACTIONS

18    WITH MR. MITCHELL THROUGH THE YEAR 2002.  THAT'S WHAT THE '03

19    PAY ACTION IS ALL ABOUT.

20          THE COURT:  OKAY.  OKAY.  I GUESS THAT'S IT, THEN.

041.Pande MSJ Hearing Transcript.txt

10          OKAY.

11          MS. MILLER:   THANK YOU.

12          MR. LEBOWITZ:   THANK YOU VERY MUCH, YOUR HONOR.

13          MS. HAMASAKI:   THANK YOU, YOUR HONOR.

14          (PROCEEDINGS WERE CONCLUDED AT 10:43 A.M.)

15                          --oOo--

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

        I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED

STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY

THAT THE FOREGOING PROCEEDINGS IN C04-5107CW, PANDE V. CHEVRON,

ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER,

AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO

TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE

RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF

FILING.

        THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

COURT FILE.

Page 24

041.Pande MSJ Hearing Transcript.txt

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

FRIDAY, APRIL 27, 2007

**EXHIBIT C**

1

ORIGINAL
FILED

JUN - 1 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1          UNITED STATES DISTRICT COURT

2       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3     OAKLAND, CALIFORNIA DEPARTMENT 2, CLAUDIA WILKEN, JUDGE

4                          -OOO-

5    PANDE,                        ) C-04-5107CW

6                      PLAINTIFF,) PRETRIAL CONFERENCE

7    V.                           ) TUESDAY, MAY 22, 2007

8    CHEVRON TEXACO              ) DEFENDANTS' MOTIONS IN

9                      DEFENDANT.) LIMINE

10   _____)

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS

12   APPEARANCES:

13   FOR THE PLAINTIFF:

14   KEKER & VAN NEST, LLP
     BY:  SUSAN J. HARRIMAN,
15        CHRISTA MARTINE ANDERSON,
     ATTORNEYS AT LAW
16   710 SANSOME STREET
     SAN FRANCISCO, CALIFORNIA  94111-1704
17   TEL (415) 391-5400
     FAX (415) 397-7188, WWW.KVN.COM, CMA@KVN.COM,
18   SHARRIMAN@KVN.COM

19   FOR THE DEFENDANT:

20   MILLER LAW GROUP, PROFESSIONAL CORPORATION
     BY:  MICHELE MILLER
21        LISA C. HAMASAKI,
     ATTORNEYS AT LAW
22   EMPLOYMENT LAW AND LITIGATION WOOD ISLAND CENTER
     60 E. SIR FRANCIS DRAKE BLVD., SUITE 302
23   LARKSPUR, CA  94939
     TEL (415) 464-4300 FAX (4R15) 464-4336
24   LCH@MLLERLAWGROUP.COM

25   REPORTED BY:  STARR A. WILSON, CSR 2462

```
 1   BEYOND THAT THAT WE WOULD CHOOSE TO -- I'M NOT SURE HOW MUCH

 2   MORE DETAIL WE'D WANT TO -- THIS CASE ISN'T ABOUT VICKI

 3   THOMPSON.  I DON'T WANT THE JURY FOCUSED ON VICKI THOMPSON.

 4   SO I'M NOT SURE HOW MUCH MORE DETAIL IS GOING TO BE.

 5           THE COURT:  SO IF YOU'RE JUST HAPPY WITH JUST

 6   THOSE SKELETAL FACTS, THAT'S FINE.  THEN YOU DON'T HAVE TO

 7   TELL ME WHY VICKI THOMPSON IS UNHAPPY.  IF YOU WANT TO TELL

 8   US -- IF YOU WANT TO HAVE HER TELL US WHY SHE IS UNHAPPY,

 9   YOU'RE GOING TO HAVE TO TELL ME IN ADVANCE SO I CAN DECIDE

10   WHETHER OR NOT TO ALLOW IT.

11           MS. HARRIMAN:  OKAY.  THAT'S GOOD ENOUGH.

12           THE COURT:  SO, THEN WE HAVE, UM, EXCLUDE

13   CHARACTER EVIDENCE REGARDING DUNN AND MITCHELL.  I THINK

14   WE'RE DEALING WITH SEMANTICS HERE.  CHARACTER EVIDENCE IN

15   THE 404(A) SENSE WILL NOT BE ALLOWED.  THEY WON'T BE ABLE TO

16   COME IN AND SAY DUNN IS LAZY; MITCHELL IS UNCHASTE OR

17   WHATEVER.  BUT THEY WILL BE ABLE TO SAY THAT THEY DID BAD

18   THINGS IF THOSE THINGS ARE RELEVANT TO THE CASE EVEN THOUGH

19   ONE MIGHT THINK THAT REFLECTED ON THEIR CHARACTER.  THE

20   EVIDENCE OF WHAT THEY DID WILL COME IN IF IT'S RELEVANT.  SO

21   THAT'S ABOUT AS FAR AS I CAN GO ON THAT.

22           UM, EMOTIONAL DISTRESS AND EMOTIONAL HEALTH.  UM,

23   I THINK, GENERALLY SHE HAS WITHDRAWN HER CLAIMS OF EMOTIONAL

24   DISTRESS.  I DON'T THINK SHE CAN TESTIFY THAT HER EMOTIONAL

25   ISSUES AFFECTED HER PHYSICAL ISSUES.  IT WOULD ONLY BE A
```

1    DOCTOR WHO COULD TESTIFY TO THAT.  I'M NOT GOING TO SAY SHE

2    CAN'T SAY SHE CRIED AT THE MEETING.  OKAY.  SHE CAN SAY SHE

3    CRIED AT THE MEETING.  BUT I DON'T -- SHE CAN'T GO INTO ANY

4    DEPTH ABOUT HER EMOTIONAL DISTRESS BECAUSE THAT WOULD MAKE

5    RELEVANT HER MENTAL HEALTH PROVIDER WHO SHE DIDN'T WANT

6    DEPOSED SO --

7         MS. HARRIMAN:  BUT THAT, ALL THAT MEANS, YOUR

8    HONOR, IS THAT SHE CAN'T SAY SHE WENT TO A MENTAL HEALTH

9    PROVIDER.  SHE CAN'T SAY THAT SHE GOT TREATMENT.  SHE

10   CAN'T -- SHE CAN'T SAY WHAT THAT TREATMENT WAS OR WHAT KIND,

11   OR THE FACT THAT SHE WAS FORCED TO GO TO SOMEBODY BECAUSE OF

12   STRESS OR WHY.  BUT IT CERTAINLY SEEMS TO ME RELEVANT,

13   PARTICULARLY WHEN YOU CONSIDER THIS IS A CASE FOR PUNITIVE

14   DAMAGES IS WHERE MALICE IS THE STANDARD TO SAY THAT HER --

15   HER BOSS HAD SCREAMED AT HER IN A MEETING IN FRONT OF OTHER

16   PEOPLE.  THAT CAUSED HER EMOTIONAL DISTRESS KNOWING HE STILL

17   GOT ON THE TELEPHONE WITH HER AND THEN TERMINATED HER.  ALL

18   OF THAT ADDED TO STRESS.  THAT IS ALL RELEVANT TO ONE OF THE

19   THINGS SHE'S TOLD TO AVOID, WHICH IS STRESS.

20        THE COURT:  SHE CAN SAY THAT IN -- IN ABOUT AS

21   MUCH DETAIL AS YOU JUST SAID IT.  BUT I DON'T WANT TO COME

22   IN THROUGH THE BACK DOOR AN EFFORT TO GET ADDITIONAL DAMAGES

23   FOR EMOTIONAL DISTRESS WHEN THAT'S BEEN WAIVED AND ISN'T --

24   ISN'T BEING ALLOWED TO BE DEFENDED AGAINST.

25        MS. HARRIMAN:  WE'RE NOT CLAIMING DAMAGES FOR

```
 1   EMOTIONAL DISTRESS.

 2              THE COURT:  RIGHT.

 3              MS. HARRIMAN:  SO THERE IS NO QUESTION ABOUT THAT.

 4              THE COURT:  BUT I DON'T WANT YOU TO EMPHASIZE IT

 5   SO MUCH THAT YOU ARE REALLY ASKING FOR IT WITHOUT SAYING SO.

 6   SO WE WON'T TOTALLY WHITEWASH THE FACTS.  IF SHE CRIED, SHE

 7   CRIED.  IF SHE FELT BAD, SHE FELT BAD.  BUT I DON'T WANT

 8   THIS SORT OF TESTIMONY THAT ONE WOULD ELICIT FROM A VICTIM

 9   WHO ONE WAS TRYING TO GET DISTRESS DAMAGES FOR.  AND I DON'T

10   WANT TIES MADE TO PHYSICAL AILMENTS FROM A PERSON WHO IS

11   UNQUALIFIED TO MAKE THOSE TIES, WHICH IS TO SAY HER.

12              IN OTHER WORDS, SHE CAN'T SAY THAT BECAUSE OF MY

13   STRESS I THEN HAD MORE ENEMIA OR BECAUSE OF MY EMOTIONAL

14   DISTRESS I DIDN'T RECOVER FROM MY WHATEVER.

15              MS. HARRIMAN:  NO DOUBT ABOUT THAT.

16              THE COURT:  OKAY.

17              MS. HARRIMAN:  SO THAT SHOULDN'T BE ASKED.  BUT

18   SHE CAN SAY I WAS TRYING TO AVOID ADDITIONAL STRESS.

19              THE COURT:  YES.

20              MS. HARRIMAN:  BUT, YEAH, I AGREE.  SHE'S NOT --

21   SHE'S NOT A MEDICAL DOCTOR.  SHE IS NOT GOING TO TAKE THE

22   STAND AND PRETEND SHE IS.

23              THE COURT:  OKAY.  EXCLUDE EVIDENCE REGARDING

24   OCTOBER 30 AND NOVEMBER 4 MEETINGS.  UM, --

25              MS. MILLER:  YOUR HONOR, CAN I GO BACK TO THE
```

1                    COURT REPORTER'S CERTIFICATE

2          I, STARR A. WILSON, CSR NO. 2462, UNITED STATES

3    DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, DO HEREBY

4    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

5    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

6          I CERTIFY THAT THE TRANSCRIPT FEES AND FORMAT

7    COMPLY WITH THOSE PRESCRIBED BY THE COURT AND JUDICIAL

8    CONFERENCE OF THE UNITED STATES.

9                              _____

10                             STARR A. WILSON, CSR NO. 2462

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT D**

October 29, 2003

1-925-462-9712

Unum Life Insurance Company of America
PO Box 12030
Chattanooga TN 37401-3030
Telephone: 1-800-825-5347
Fax: 1 423-755-3009

DR JULIANNA WONG

RE:  KIRAN PANDE
     Claim Number:    987540          SSN:      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
     Short Term Disability

Dear Dr Wong:

We are currently reviewing disability benefits for Kiran Pande. We would appreciate your assistance in providing information.

Based on Kiran Pande's current condition, please provide the information requested below, answering the questions as completely as possible.

1    Original Date of Service   7/2/3,  9/11/03
                                 11/13/03

2    Dates of treatment since disability claim (include hospitalization, office visit, and diagnostic testing dates)

                        11/13/03

3.   Diagnosis

        Anemia, Iron deficiency, uterine fibroids
                        menorrhagia

4    What are the objective findings

        low hemoglobin, fibroid uterus on exam

5    Testing performed and results, lab and diagnostic
        pelvic ultrasound
        CBC - Hg - 9.0.

6    Please list medications
        Depo lupron injection
        IRON

7    Current treatment plan
        Medication to help to Menorrhagia and
        Anemia; plan for surgery

8.   Factors complicating recovery (including psychosocial issues)

        None

9.   Please provide specific restrictions/limitations

        Off work  11/10/03 - May '04

Claimant Name:  KIRAN K PANDE     Claim #:  987540

CHEVRON/PANDE02495

3 OF 4

19/12/04 11-13-2003 From (19258312564) Delivered to Worklist CCWLCCFMAIN31

10.    When do you anticipate these restrictions and limitations will be changed? Please provide date_____ .

no

11.    When do you anticipate this patient to return to work?

May 2004

12.    Part time (please provide date)          Full time (please provide date)

13.    When is the next office visit: 1/04

14.    Have you referred this patient to any other MD's  X  yes _____ no

Dr Sherri Task, ob/gyne

15    If yes please provide names and phone numbers  510 - 785 - 5000

If you wish, you may respond directly on this letter, but please sign and date in the space provided below.

_____                    11/13/03
Signature                                   Date

Please respond by 11/12/03 as further consideration of benefits is dependant upon your reply. If possible, please fax this information to the toll-free fax number indicated above.

Thank you for your time and cooperation. If you have any questions regarding this request, our Customer Care Call Center is staffed with experienced representatives and can be contacted at the above toll-free number. Please have your patient's social security number available.

Sincerely,

Natalie Kern

Natalie Kern
Customer Care Specialist

NK/nk

4 OF 4

19:42:04 11-13-2003 From (1925831256d) Delivered to Worklist CCW1.CC:FMAIN31

CHEVRON/PANDE02496