1  Michele Ballard Miller (SBN 104198)
   Janine S. Simerly (SBN 102361)
2  Lisa C. Hamasaki (SBN 197628)
   MILLER LAW GROUP
3  A Professional Corporation
   60 E. Sir Francis Drake Blvd., Ste. 302
4  Larkspur, CA 94939
   Tel. (415) 464-4300
5  Fax (415) 464-4336

6  Attorneys for Defendants CHEVRON INTERNATIONAL
   EXPLORATION AND PRODUCTION (formerly known
7  as CHEVRONTEXACO OVERSEAS PETROLEUM and
   improperly sued as CHEVRONTEXACO OVERSEAS
8  PETROLEUM PACIFIC COMPANY) AND CHEVRON
   CORPORATION (formerly known as CHEVRONTEXACO
9  CORPORATION)

10
                    UNITED STATES DISTRICT COURT
11
                   NORTHERN DISTRICT OF CALIFORNIA
12

13 | KIRAN PANDE,                              | Case No. C 04-5107 JCS
14 |                                           |
15 |            Plaintiff,                     | **DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**
   | v.                                        |
16 |                                           | Trial Date:   October 9, 2007
17 | CHEVRON CORPORATION (f/k/a                | Time:         8:30 a.m.
   | CHEVRONTEXACO CORPORATION), a             | Place:        Courtroom D, 15th Fl.
18 | Delaware corporation, and CHEVRON         |
   | INTERNATIONAL EXPLORATION and             | Complaint filed:  December 2, 2004
19 | PRODUCTION (f/k/a CHEVRONTEXACO           |
   | OVERSEAS PETROLEUM COMPANY), a            | Honorable Joseph C. Spero
20 | division of Chevron U.S.A. Inc.           |
21 |                                           |
   |            Defendants.                    |
22 |                                           |

---

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**
**Case No. C 04-5107 JCS**

# TABLE OF CONTENTS

I  PRELIMINARY STATEMENT .................................................................................. 1

II  LEGAL ANALYSIS ................................................................................................... 2

    A. PANDE HAS NOT PRESENTED SUFFICIENT EVIDENCE TO ESTABLISH RETALIATION IN VIOLATION OF THE FEHA [Fifth Causes of Action] .............. 2

        1. Pande's Retaliation Claim Is Barred By the Statute of Limitations Because She Failed to File Her DFEH Charge Until December 8, 2003. ...................... 2

        2. Pande Has Presented No Evidence of Retaliatory Animus. .......................... 5

        3. Chevron's Unconditional Offers of Employment to Pande – both in December 2002 and in June 2003 – Cut Off Any Damages On Pande's Retaliation Claim. ............................................................................................ 6

    B. PANDE CANNOT ESTABLISH A VIOLATION OF EITHER FMLA OR CFRA [First and Second Causes of Action] ................................................................... 7

        1. Pande's Termination Did Not Violate Either FMLA Or CFRA As The Termination Decision Was Made in June 2003 And Had Nothing To Do With Pande's Medical Leave. ........................................................................ 7

        2. Pande Presented No Evidence That Dunn Negatively Influenced Her Ability To Find Alternative Employment After Requesting Medical Leave. ............. 9

        3. Pande's Claim That Dunn Offered Her Continued Employment Through 2004 Is Unsupported By The Evidence. ........................................................ 10

        4. Pande Suffered No Harm Because She Could Not Return To Work Prior To Expiration of Her FMLA/CFRA Leave. ........................................................ 11

    C. PANDE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SHOW THAT PUNITIVE DAMAGES ARE WARRANTED. ....................................................... 13

III  CONCLUSION ........................................................................................................ 15

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

# TABLE OF AUTHORITIES

**Cases**

*Boehm v. American Broadcasting, Co.,* 929 F.2d 482 (9th Cir. 1991) .................................. 6

*Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775 (6th Cir. 1998) .............. 13

*Colburn v. Parker Hannifi/Nichols Portland Div.,* 429 F.3d 325 (1st Cir. 2005) .................... 13

*Flait v. North American Watch Corp.*, 3 Cal. App. 4th 467 (1992) .......................................... 5

*Guz v. Bechtel Nat'l, Inc.,* 24 Cal. App. 4th 467 (1992) ........................................................... 5

*Hill v. Underwood Memorial Hospital, et al,* 365 F. Supp. 2d 602 (D.N.J. 2005) ............ 12, 13

*Kelso v. Corning Cable Systems Int'l Corp.,* 225 F. Supp. 2d 1052 (W.D.N.C. 2002) .......... 13

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 218 S.Ct. 2162 (2007) ................................. 4

*Martin v. Lockheed Missles and Space Co., Inc.,* 29 Cal. App. 4th 1718 (1994) ................ 2, 4

*Morgan v. The Regents of the University of California*, 88 Cal. App. 4th 52 (2000) ............... 2

*National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) ...................................... 3

*National Steel Corp. v. Golden Eagles Ins. Corp.,* 121 F.3d 496 (9th Cir. 1997) .................... 6

*Nisendorf v. Levi Strauss and Co.,* 143 Cal. App. 4th 509 (2006) ........................................... 8

*Pugh v. Sees Candies, Inc.,* 203 Cal. App. 3d 743 (1988) ....................................................... 6

*Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81 (2002) ......................................... 11, 12

*Richards v. CH2M Hill, Inc.,* 26 Cal.4th 798 (2001) ................................................................ 3

*Steckl v. Motorola, Inc.,* 703 F.2d 392 (9th Cir. 1981) ............................................................. 5

*Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972 (8th cir. 2005) ........................ 8

*Tomlinson v. Qualcomm, Inc.,* 97 cal. App. 4th 934 (2002) ................................................ 7, 8

*White v. Ultramar*, 21 Cal.4th 563 (1999) .............................................................................. 14

*Yanowitz v. L'Oreal USA, Inc.,* 36 Cal.4th 1028 (2005) .......................................................... 5

*Yashenko v. Harrah's NC Casino Company, LLC,* 446 F.3d 541 (5th Cir. 2006) .................. 8

**Statutes**

California Civil Code section 3294 .................................................................................................. 13, 14

2 California Code of Regulations section 7297.2(c) ....................................................................... 7

California Unemployment Insurance Code section 2626 ........................................................ 12

29 Code of Federal Regulations section 825.216(a) .................................................................... 7

29 United States Code section 2614(a)(3)(B) ............................................................................... 7

29 United States Code section 2617(a)(1) .................................................................................... 12

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

# I    PRELIMINARY STATEMENT

In May 2003, Defendants Chevron[1] announced that their entire Southern African Strategic Business Unit ("SASBU") would relocate to Houston, Texas. All SASBU employees, including Plaintiff Kiran Pande, were offered positions in Houston. Pande declined to move. When she was unable to find another position during the Fall 2003 PDC, Pande requested medical leave. Although she applied for two positions while on leave, Jean Camy, one of Pande's former supervisors and a member of the selection team, voiced opposition to her selection – he had found her "toxic" and did not want her working with his group. Pande was not selected for these positions and, in keeping with the deadline imposed, was terminated effective December 31, 2003. Pande produced no evidence that her medical leave was a negative factor in Chevron's decision to terminate her employment or in her nonselection for the two positions she applied for after she requested leave.

Pande also alleges that she suffered retaliation after she complained about discrimination and harassment. There is also no evidence to support this claim. First, all of the 2002 selection decisions are barred by the statute of limitations. In addition, Pande admitted at trial that she has no idea who made the selection decisions she claims were retaliatory. She also admits that does not know if anyone on any selection committees were aware of her prior complaints or even spoke to Rex Mitchell. Pande simply has not produced any evidence to support her retaliation claim. Finally, Pande's remaining claim for wrongful termination in violation of public policy fails as well.

---

[1] The Defendants in this action are Chevron International Exploration and Production Company, a division of Chevron U.S.A. Inc. and Chevron Corporation (the parent of non-party Chevron U.S.A. Inc.). Although Pande has presented no evidence to suggest that she was employed by Chevron Corporation, the parties have agreed that the two defendant entities should be referred to as "Chevron" for purposes of this trial.

## II    LEGAL ANALYSIS

### A.    PANDE HAS NOT PRESENTED SUFFICIENT EVIDENCE TO ESTABLISH RETALIATION IN VIOLATION OF THE FEHA [Fifth Causes of Action]

Pande alleges that she was retaliated against in violation of the California Fair Employment and Housing Act ("FEHA") based on complaints she made about Rex Mitchell. (Second Amended Complaint ("SAC") ¶¶ 68-72).  She has produced no evidence to support this claim.

#### 1.    Pande's Retaliation Claim Is Barred By the Statute of Limitations Because She Failed to File Her DFEH Charge Until December 8, 2003.

Pande alleges that she first complained to Jay Johnson about Rex Mitchell on March 4, 2002. (Trial Transcript, 10/10/07, 254:2-23).  As a result of her complaints, Pande argues that she was subjected to adverse employment actions by Defendants.  Specifically, she alleges that she received a "2" (Fully Meets Performance Expectations) Performance Management Plan ("PMP") in April 2002 and a lower raise than warranted in April 2002.  Pande also asserts that she was "deliberately" excluded from work meetings, isolated from the group and otherwise impeded "in her ability to perform and advance within the company."  Finally, she suspects that Mitchell said negative things about her which impacted her ability to find a job at the Fall 2002 PDC.  As a result, she claims she was "forced" to take a "less desirable" SASBU job in December 2002.  All of Pande's pre-December 8, 2002 claims are barred as a matter of law.

Filing an administrative complaint within **one year** of the alleged unlawful conduct is a prerequisite to bringing a civil action for damages under the FEHA.  *Morgan v. The Regents of the University of California,* 88 Cal. App. 4th 52, 63 (2000) (citations omitted). Failure to satisfy this requirement is a jurisdictional defect.  *Martin v. Lockheed Missiles and Space Co., Inc.,* 29 Cal. App. 4th 1718, 1724 (1994).  Accordingly, Pande's

retaliation claim – and specifically all conduct that occurred more than one year before Pande filed her DFEH Complaints on December 8, 2003 (Trial Exhibit 276) – is barred as a matter of law.[2]

Reliance by Pande on the "continuing violation" doctrine does not save her claims. While this doctrine may operate to extend the statute of limitations in certain situations, it does not apply here. In *Richards v. CH2M Hill, Inc.,* 26 Cal.4th 798 (2001), the Court set forth the following three-part test to determine if the continuing violation doctrine applies: (1) the employer's actions are sufficiently similar in kind to the unlawful conduct within the limitations period; (2) the actions have occurred with reasonable frequency; and (3) the employer's actions have not acquired a "degree of permanence." *Id.* at 823. In these instances, the statute of limitations does not begin to run until either of the following occurs: (1) the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation; or (2) the employee is on notice that further efforts to end the unlawful conduct will be in vain. *See also National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Pande has not met this test. First, Mitchell's alleged conduct has nothing to do with the conduct she attributes to Dunn – interference with her FMLA/CFRA rights. Rather, each of the events Pande complains of is independent and unrelated. As such, Pande cannot show that Mitchell's conduct was similar to any later conduct.

Second, even if the conduct were similar, the situation had clearly acquired a "degree of permanence" sufficient to trigger the statute of limitations before December 8,

---

[2]  Pande has presented no evidence at trial (or otherwise) that Mitchell had any role in her ultimate termination decision, in her failure to obtain jobs in 2003, or in any other alleged adverse action after December 6, 2002 – Pande's last day of employment in Mitchell's group. Although Pande "suspects" that Mitchell impacted her 2003 salary action, the evidence at trial is contrary (*See* Hartshorn Testimony, Trial Transcript, 10/18/07, 1387:12-1388:11).

3

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**
**Case No. C 04-5107 JCS**

2002. Indeed, as Pande testified in trial, she met with Jay Johnson and the Ombuds on April 24, 2002, was not satisfied with the outcome of that meeting, but chose not to pursue other methods to address her perceived retaliation. (Trial Transcript, 10/11/07, 518:23-520:5). At that point "permanence" was reached. Even looking beyond this date, in October 2002, Pande was notified that she had been selected for the Block 14 SASBU position. When Pande was not selected for a Strategic Planning position, on December 3, 2002, she accepted the SASBU position. (Exhibit 272). Her last day in Planning – and the last day she reported to Mitchell – was December 6, 2002.[3] The situation had certainly reached a degree of permanence by that date. Pande filed her Charge of Discrimination on December 8, 2003, **one year and two days** after the last day she worked for Mitchell. All of her complaints, based on conduct that occurred more than one year before she filed her DFEH Complaint, are barred as a matter of law. *Martin,* 29 Cal. App. 4th at 1724.[4]

---

[3] Although Pande emphasized the date Monday, October 9, 2002 as her first day of employment in Dunn's group, for purposes of determining the statute of limitations the applicable date is her last day in Mitchell's group, not her first day in Dunn's. (*See* Transcript of Proceedings from Defendants' Motion For Summary Judgment, 01/05/2007, 5:9-14 "Mr. Lebowitz: Well, first of all, December 9th is the date that Miss Pande began working in the other unit, so that's the date that we use. The Court: I don't think so. I think the date is the last date that she worked for Mitchell unless he was over [sic] her house at the weekend doing something." Exhibit A to Miller Dec.).

[4] To the extent Pande argues that Mitchell's mention of the "2" ranking as part of the 2003 salary process constituted retaliation, *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 127 S.Ct. 2162 (2007) is instructive. In *Ledbetter,* the Supreme Court held that the statute of limitations runs from the date of the discrete discriminatory act – in that case, several discriminatory performance evaluations and the associated pay decisions, all of which occurred outside the statutory period. The Supreme Court rejected Ledbetter's arguments that because she continued to receive less money than she would otherwise have received and because her subsequent pay decisions were impacted by those earlier evaluations, these later occurrences gave present effect to the past discrimination. Rather, the Court held that "current effects alone cannot breathe life into prior, uncharged discrimination." *Id.* at 2169. This case is similar. Here, Pande received no PMP in 2003, and the "2" presumably referred to her 2002 PMP. Accordingly, even if the "2" impacted Pande's April 2003 salary determination, the limitations period began to run from the date the "2" was received in early 2002, and was not revived in April 2003.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1    **2.    Pande Has Presented No Evidence of Retaliatory Animus.**

Even if the statute of limitations did not bar her claims (which is not the case), Pande still can not meet her burden of showing "specific, substantial" evidence to support her retaliation claim. *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1981); *Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317, 356 (2000). Rather, she utterly failed to prove any causal connection between her complaints about Mitchell and any adverse employment action. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1044 (2005); *Flait v. North American Watch Corp.* 3 Cal. App. 4th 467, 476 (1992).[5] On the contrary, the evidence at trial showed that Pande did receive a Chevron position after working with Mitchell – the SASBU Block 14 position[6] – and that Pande's termination and failure to obtain alternate positions in 2003 were caused by her refusal to relocate to Houston, her unwillingness to leave the Bay Area, and her unproductive attitude with supervisors and colleagues – both before and after her time in Mitchell's group.

In fact, all Pande has offered in support of her retaliation claim is her own conclusory allegations devoid of any factual support. By way of example, Pande alleges that she received a "2" ranking on her April 2002 performance evaluation – presumably as a result of her complaints about Mitchell. The evidence, however, showed not only that the majority of Chevron employees received the same "2" ranking, but also that the ranking of "2" was determined no later than March 2002 – before Pande ever complained. (*See* Trial Transcript, 10/17/07, 1092:14-1095:1, 1097:7-9 (Johnson Testimony); 10/18/07, 1386:10-1387:11 (Hartshorn Testimony)). Similarly, although Pande complains of not being

---

[5] To establish a *prima facie* case of retaliation under the FEHA, the plaintiff must show (1) she was engaged in a protected activity; (2) the employer subjected her to an adverse employment action; and (3) there was a causal link between the protected activity and the employer's action. *Flait,* 3 Cal. App. 4th at 476.

[6] During the hearing on Defendants' Motion For Summary Judgment, the Court clearly noted that being given the SASBU, Block 14 position does not constitute an adverse action. Judge WIlken stated: "getting a job is not an adverse action." (*See* Miller Dec. Exhibit A, Transcript, 1/5/07, 12:17).

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

promoted in the Spring of 2002, she acknowledged that she would not expect a promotion if her work declined markedly and there is significant evidence of such decline. And, although Pande speculates that Mitchell interfered with her ability to find subsequent Chevron employment – both in 2002 and in 2003 – there is no evidence to support this claim. Rather, the only evidence is that Mitchell promoted Pande to Des King during the Fall 2002 selection process, that Pande actually received a "plum" job in SASBU in the Fall 2002, and that Mitchell played no role in any of the job selection decisions at issue in 2003. In short, the "evidence" submitted by Pande is grossly insufficient to meet her burden. *National Steel Corp. v. Golden Eagles Ins. Corp.*, 121 F.3d 496, 502 (9th Cir. 1997) ("[a] plaintiff's belief that a defendant acted from an unlawful motive, without evidence to support that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive.") [7]

### 3. Chevron's Unconditional Offers of Employment to Pande – both in December 2002 and in June 2003 – Cut Off Any Damages On Pande's Retaliation Claim.

A plaintiff's rejection of an employer's unconditional offer of employment terminates any back pay period if the employer can show: (1) that the employment offered, even if not precisely identical to the prior job, was sufficiently comparable or substantially equivalent to it, and (2) that the offer was unconditional. *See Boehm v. American Broadcasting, Co.,* 929 F.2d 482, 485-87 (9th Cir. 1991). In this case, it is undisputed that Chevron offered Pande the SASBU Block 14 position in October 2002 – a position which she ultimately accepted on December 3, 2002 – and another position in Houston on June 2, 2003. Both of these job offers were substantially similar to the position Pande held in

---

[7] Pande's sixth cause of action for wrongful termination in violation of public policy simply incorporates allegations from Pande's first, second and fifth causes of action. Accordingly, it fails – the burden of proof is the same whether a claim for discrimination arises as a statutory claim or as a tort claim for violation of public policy. *Pugh v. See's Candies, Inc.,* 203 Cal. App. 3d 743, 752 (1988).

Mitchell's group – both offered the same (or an increased) salary, the same benefits, and the same opportunities for promotion. And the record is clear that neither offer was conditional upon Pande waiving any legal claims. Given these offers – one of which Pande accepted and the other which she declined – any damages for Pande's retaliation claim cut off no later than June 2, 2003.

### B.   PANDE CANNOT ESTABLISH A VIOLATION OF EITHER FMLA OR CFRA [First and Second Causes of Action]

Pande alleges that Defendants unlawfully violated both the Family Medical Leave Act ("FMLA") and California's Family Rights Act ("CFRA") by failing to grant her the full extent of her eligible leave, by terminating her employment while on leave, and by failing to select her for other positions within Chevron. (SAC at ¶¶ 40, 53). Pande failed to present evidence to prove either claim.

#### 1.   Pande's Termination Did Not Violate Either FMLA Or CFRA As The Termination Decision Was Made in June 2003 And Had Nothing To Do With Pande's Medical Leave.

Pande predicates her FMLA/CFRA claims on the erroneous belief that she could not be terminated while on a protected medical leave. However, neither statute provides such immunity. On the contrary, both make clear that employees are not entitled to "job security" simply because they are on leave. 29 U.S.C. §2614(a)(3)(B); 2 Cal. Code Regs. §7297.2(c)(1). ***"An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA [or CFRA] leave period."*** 29 C.F.R. §825.216(a); 2 Cal. Code Regs. §7297.2(c)(1). Thus, an employee on protected leave may be terminated during that leave provided – as here – the termination decision is unrelated to leave status. [8]

---

[8]   See, e.g., *Tomlinson v. Qualcomm, Inc.,* 97 Cal. App. 4th 934, 939-43 (2002) (the court held that CFRA does not immunize employees from layoff as part of a company-wide workforce reduction
*continued*

7

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**
**Case No. C 04-5107 JCS**

The evidence at trial has shown that Pande's termination had nothing to do with her leave. Indeed, the timing alone dispels any such inference. The decision to relocate the SASBU Group to Houston was made in the Spring of 2003 – **five months before Pande requested leave.** In May, all SASBU employees, including Pande, were told the relocation would occur on or before December 31, 2003. Employees, including Pande, were given relocation job offers on June 2, 2003 and had seven days to either accept or decline the offer. (*See* Exhibit 40). And Pande indisputably rejected that offer. (*See* Trial Transcript, 10/10/07, 295:17-21).

Although Pande now argues that she was unaware that declining the Houston relocation could result in termination of employment, the evidence is overwhelmingly contrary.[9] Indeed, the offer letter – which was admitted into evidence during Plaintiff's direct examination – indicates that employees who chose not to accept the assignment might not be placed into another assignment and might be subject to termination of employment. (Exhibit 40). Even the "FAQ's" (Frequently Asked Questions) pertaining to the Houston

---

while on a CFRA-protected leave); *Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972, 979 (8th Cir. 2005) ("[a]s long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."); *Nisendorf v. Levi Strauss and Co.,* 143 Cal. App. 4th 509, 519 (2006) ("even though [the plaintiff] took CFRA leave, [she] had no greater protection against her employment being terminated for reasons not related to her CFRA request than any other employee.")*; Yashenko v. Harrah's NC Casino Company, LLC*, 446 F.3d 541, 547-50 (4th Cir. 2006) (holding that FMLA does not require employer to restore employee to prior job after FMLA leave if he would have been discharged had he not taken the leave).

[9]  Pande's own admitted actions also belie her argument that she was terminated for taking medical leave. On October 16, 2003 – twelve days before she requested medical leave – Pande sent Taryn Shawstad an email, inquiring about severance benefits. In that email – now admitted as Exhibit 50 – Pande states that she had turned down the relocation offer and if she is not successful in finding another position ***"will likely be forced to leave the Company."*** (Exhibit 50, emphasis added). She goes on to ask whether vacation could be used to extend the severance date into 2004 since the SASBU move would be completed by January 1. *(Id.)* This is hardly the request one would expect from someone who claims to be shocked by her December 31 termination, or someone who had allegedly accepted an offer to work for Dunn through 2004. Rather, this email conclusively demonstrates what Chevron has maintained throughout this litigation – that the decision to terminate Plaintiff's employment was made long before Pande requested leave.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

relocation clearly indicated that failure to accept the relocation could result in termination of employment. (Exhibit 213). Those FAQ's stated:

> Q. What will happen if an employee declines the offer to move?
> A. Staff who decline the offer to move will be expected to work with their sponsor to find alternative employment. There is no guarantee that such alternative employment will be found. (Exhibit 213).

Similarly, the Power Point presentation provided to employees impacted by the Houston relocation also stated: "For US $ employees, if no alternative employment can be found, employees may be eligible for a separation payment under the surplus employee program in place and will be advised of their eligibility at the time of termination." (Exhibit 39). In short, as of May 2003 – five months before Pande requested leave – the decision was made that employees who rejected the Houston offer would be terminated from employment unless they were able to find other positions within the Company. This May 2003 decision is the termination decision at issue in this case. It – and it alone – resulted in Pande's termination from Chevron.

### 2. Pande Presented No Evidence That Dunn Negatively Influenced Her Ability To Find Alternative Employment After Requesting Medical Leave.

Perhaps recognizing she cannot show that Defendants terminated her because of the leave, Pande argues that after Dunn learned of her leave, he "negatively influenced" her candidacy for two positions she applied for – two reservoir engineer positions in Zuwa Omoregie's ETC group.[10]

Once again, there is no evidence to support this assertion. Although Dunn spoke with Omoregie about Pande, there is nothing to suggest either that Dunn's comments

---

[10] As the evidence has shown these are the only two positions that Pande was denied after requesting leave on October 28, 2007. All of the other jobs for which Pande applied and was not selected, occurred prior to October 28 and therefore cannot have been influenced by Pande's request for leave. Tellingly, these positions are outside the scope of Pande's Second Amended Complaint – which makes no mention of any unlawful conduct in 2004.

were motivated by Pande's leave or that Dunn's comments resulted in Pande's non-selection. To the contrary, Omoregie spoke to a number of Pande's former supervisors including David Kennedy and Jean Camy, both of whom made negative comments about Pande, her attitude and her teamwork.[11] Indeed, Camy, who was part of the selection committee for those two positions, testified that he told the members of the selection committee about the "corrosive aspect" of his working relationship with Pande, that Pande had been a "toxic element" on his team, and that he would not want Pande to work with his group in London. (Trial Transcript, 10/18/07, 1311:10-12). There is not a scintilla of evidence suggesting that any of these comments had anything to do Pande's medical condition or medical leave. Indeed, there is no evidence suggesting that either Camy or Kennedy knew of Pande's medical condition or her leave.

### 3. Pande's Claim That Dunn Offered Her Continued Employment Through 2004 Is Unsupported By The Evidence.

Pande's claim that Dunn "promised" her a position in San Ramon through 2004 and reneged on this promise is likewise unsupported by evidence. It fails for at least two reasons.

First, Dunn denies ever making such a promise and Pande has offered no proof to the contrary, merely her own unsupported insistence. Despite testifying repeatedly that Dunn made this offer to her on Friday, October 10, 2003 while Pande was sitting in Guadalupe DeJong's office (and in DeJong's presence), the evidence belies this claim. DeJong was not at work on October 10, 2003. Moreover, although DeJong recalls Dunn

---

[11] Specifically, Omoregie's testified (by deposition) that Camy made comments that Pande had been a "disruptive element in his team when she was there" and that Kennedy commented that when Pande was not given a promotion (or the promotion and ranking was not what she expected), her attitude changed for the worse. Omoregie's recollection of Dunn's comments – that Pande had strong technical skills, that she couldn't or didn't want to move to Houston when the team was being moved, that her performance suffered after the Houston move was announced, and that there was a job in Houston for her if she wanted to move – can hardly be described as negative.

1 asking Pande to do work on "a project" at some point in October, she did not know what the
2 project was or any other pertinent details.  In fact, when asked "So you don't know if it was a
3 one-day project or a one-week project?" DeJong responded "No, that, I don't know." (Trial
4 Transcript, 10/15/07, 774:18:20).  As it is clearly not unusual for a supervisor to ask a
5 subordinate to work on a project – and indeed Dunn testified that he talked to Pande about
6 a number of projects in the October timeframe (Trial Transcript, 10/18/07, 1287:16-1288:1)
7 – DeJong's testimony offers no support for Pande's claims.

9 Second, and most telling, Pande's own actions speak otherwise.  Pande told
10 no one – not even her closest friends, her Personnel Development Representative ("PDR"),
11 or her Sponsor – of this alleged offer of continued employment.  Instead, she continued to
12 look for other positions.  If, as she now claims, she accepted Dunn's "promise" of continued
13 employment on October 10, why would she post for additional positions and why would she
14 have sent the October 16, 2002 email to Human Resources expressing concern about the
15 possibility of termination?  (*See* Exhibit 50).  The answer is obvious – Dunn never made
16 such a promise nor reneged on such a promise.  Pande's "explanation" for the October 16th
17 email –  that "I wanted to understand how the package worked if, in the worst-case scenario,
18 you know, I ever had to take a termination package" – simply makes no sense.[12]  (*See* Trial
19 Transcript, 10/10/07, 352: 5-13).

21 **4.   Pande Suffered No Harm Because She Could Not Return To Work Prior To Expiration of Her FMLA/CFRA Leave.**

23 Even if Pande had demonstrated that Defendants terminated her employment
24 because of her request for medical leave (which she has not), to recover any damages she
25 must also show that she was prejudiced by Defendants' violation.  *See Ragsdale v.*

---

[12] Pande's later explanation that she wrote that statement because she "did not fully trust Jack" (*see* Trial Transcript, 10/1/0/07, 394:2-13) also makes no sense.  Surely, if Pande did not trust Dunn at the time he made this alleged offer, she would have either memorialized the offer or told someone – anyone – about Jack's "offer."  This she did not do.

*Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). An aggrieved employee may only recover for actual harm suffered. As explained by the United States Supreme Court in *Ragsdale*:

> The employer is liable only for compensation and benefits lost "by reason of the violation," [29 U.S.C.] § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment reinstatement, and promotion, § 2617(a)(1)(B). The remedy is tailored to the harm suffered. *Id.*

Where an employee does not suffer damages as a result of the employer's violation of those statutes, the employee may not recover on her FMLA/CFRA claim.

In this case, it is undisputed that Pande began an FMLA/CFRA leave on November 10, 2003. Accordingly, any 12-week leave entitlement ended no later than February 2, 2004. The evidence, however, shows that Pande was not able to return to work at that time. Indeed, Exhibit 219 – a February 24, 2004 letter written by Pande to State Disability Insurance – indicates unequivocally that ***"I am still unable to work due to this continuing disability. I am scheduled for surgery on March 15, 2004 and will continue to be unable to work until I recover from this surgery."*** Based upon Pande's representations to State Disability Insurance as well as her receipt of disability benefits through May 2005, Pande should be estopped from arguing that she could have returned to work prior to February 2, 2004.[13]

Accordingly Plaintiff has not and cannot show that she was damaged or prejudiced as a result of any alleged violation of those laws. *See Hill v. Underwood Memorial Hospital, et al*, 365 F. Supp. 2d 602, 610 (D.N.J. 2005) (plaintiff could not recover under the FMLA where the evidence showed that she "still would not or could not, have

---

[13] Pursuant to the California Unemployment Insurance Code, an individual is deemed eligible to receive state disability benefits ***only if*** the individual is "deemed disabled," meaning that "because of his or her physical or mental condition, he or she is unable to perform his or her regular or customary work." Cal. Unemployment Ins. Code § 2626.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

returned to work within [the FMLA] twelve week period."); *Kelso v. Corning Cable Systems Int'l Corp.*, 224 F. Supp. 2d 1052, 1057 (W.D.N.C. 2002) (even if the employer made an error in calculating FMLA benefits, the plaintiff suffered no loss because his FMLA leave was uncompensated and he was unable to return to work when his FMLA leave should have ended); *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 784-85 (6th Cir. 1998) (employee could not state an FMLA claim because she was unable to return to work within the period provided by the FMLA); *Colburn v. Parker Hannifi/Nichols Portland Div.*, 429 F.3d 325, 332 (1st Cir. 2005) (plaintiff could not recover on an FMLA interference claim because the employer was under no obligation to reinstate him since he was not able to return to work until after the expiration of his FMLA leave).

## C. PANDE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SHOW THAT PUNITIVE DAMAGES ARE WARRANTED.

In addition to failing to prove her first, second, fifth or sixth causes of action, Pande has also failed to produce clear and convincing evidence that punitive damages are warranted. Accordingly, Defendants again move for Judgment as a Matter of Law on the issue of punitive damages.

California law is clear—in non-contract employment law cases, punitive damages are available only "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code §3294(a). Furthermore, an employer is only liable for such conduct where it "had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." Cal. Civ. Code §3294(b). Plaintiff has presented no evidence on this issue and has not satisfied this heightened evidentiary standard. Accordingly, her claim for punitive damages should be dismissed as a matter of law.

Furthermore, in order for corporate defendants such as Chevron to be liable for punitive damages, Plaintiff must prove that "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an **officer, director, or managing agent** of the corporation." *Id.* (emphasis added). Again, Plaintiff has not – and cannot – satisfy this burden.

Under *White v. Ultramar*, 21 Cal.4th 563, 566-67 (1999), a "managing agent" includes "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that **their decisions ultimately determine corporate policy**." (emphasis added). A corporate employee does not become a "managing agent" merely by supervising the individual plaintiff or possessing the ability to terminate that person. *Id.* at 577. In this case, there is no evidence that either Dunn or Mitchell (or any other individual mentioned during this trial) had the ability to determine Chevron corporate policy.[14]  Plaintiff's claim for punitive damages fails for this reason as well.

---

[14] To the extent Pande argued that Human Resources ratified any wrongful conduct, there is simply no evidence of that fact. Rather, the evidence elicited at trial shows that if Human Resources ratified any decision – it ratified the decision made in Spring 2003 that if an employee chose not to accept the relocation offer and failed to find alternative employment within Chevron, that employee would be terminated. Such ratification clearly could not give rise to punitive damages.

14
**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**
**Case No. C 04-5107 JCS**

### III     CONCLUSION

Plaintiff has not, as a matter of law, established any of her claims at trial and therefore her Complaint should be dismissed as a matter of law.

Dated:  October 21, 2007

MILLER LAW GROUP
A Professional Corporation


By:  _____/S/_____
Michele Ballard Miller
Attorneys for Defendants CHEVRON CORPORATION (f/k/a ChevronTexaco Corporation) and CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a ChevronTexaco Overseas Petroleum), a division of Chevron U.S.A. Inc.