1   KEKER & VAN NEST, LLP
    SUSAN J. HARRIMAN - #111703
2   CHRISTA M. ANDERSON - #184325
    710 Sansome Street
3   San Francisco, CA  94111-1704
    Telephone:  (415) 391-5400
4   Facsimile:  (415) 397-7188

5   Attorneys for Plaintiff
    KIRAN PANDE

6

7

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12   KIRAN PANDE,                          Case No. 04-5107 JCS

13                        Plaintiff,       **KIRAN PANDE'S OPPOSITION TO
                                           DEFENDANTS' MOTION FOR
14         v.                              JUDGMENT AS A MATTER OF LAW**

15   CHEVRON CORPORATION (f/k/a
     CHEVRONTEXACO CORPORATION), a         Judge:          Hon. Joseph C. Spero
16   Delaware corporation,
     CHEVRON INTERNATIONAL                 Date Comp. Filed:   December 2, 2004
17   EXPLORATION & PRODUCTION (f/k/a
     CHEVRONTEXACO OVERSEAS                Trial Date:        October 9, 2007
18   PETROLEUM COMPANY),
     a division of Chevron U.S.A., Inc.,
19
                         Defendants.
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ...................................................................................................... 1

  A.   Ms. Pande's FEHA retaliation claim must go to the jury. ...................... 1

    1.   Ms. Pande has presented evidence supporting all elements of
         her FEHA retaliation claim. ........................................................ 1

    2.   Chevron's arguments regarding Ms. Pande's retaliation claim
         lack legal merit and are not supported by the record. ................ 4

      a.   Ms. Pande's retaliation claim is a question of fact for
           the jury. ............................................................................ 4

      b.   Ms. Pande has presented substantial evidence of
           retaliatory animus, which the jury should be allowed to
           weigh and evaluate. ......................................................... 6

      c.   Ms. Pande was still employed at Chevron in both
           December 2002 and June 2003, so Chevron could not
           "cut off" its liability for its retaliatory actions by
           allowing her to remain employed. .................................. 7

  B.   Ms. Pande's FMLA and CFRA claims must go to the jury. ................... 7

    1.   Ms. Pande has presented evidence supporting all elements of
         her FMLA and CFRA claims. ...................................................... 7

    2.   Chevron's arguments against Ms. Pande's FMLA and CFRA
         claims disregard the evidence presented at trial and ask the
         Court to usurp the jury's role. ................................................... 10

      a.   Chevron improperly asks the Court to weigh the
           evidence in its favor to conclude that Ms. Pande's
           termination was final and inevitable in June 2003,
           although Ms. Pande has presented significant evidence
           that this is untrue. ......................................................... 10

      b.   Chevron improperly asks the Court to weigh and reject
           Ms. Pande's evidence that Jack Dunn disparaged her to
           Zuwa Omoregie, and the inference that he did the same
           to other Chevron job owners who otherwise would have
           hired her. ........................................................................ 11

      c.   Chevron improperly asks the Court to reject Ms.
           Pande's sworn testimony that Jack Dunn offered her
           continued work through 2004, and accept Jack Dunn's
           contrary testimony .......................................................... 11

      d.   The Court should also reject Chevron's repeated

i

KIRAN PANDE'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 04-5107 JCS

# TABLE OF CONTENTS
### (cont'd)

                                                                           **Page**

attempt to escape the Court's prior ruling that Ms.
Pande can present evidence to the jury, and the jury
should decide, whether (if Chevron had not unlawfully
fired her) Ms. Pande could have returned to work
within her twelve weeks protected leave. ...................................... 12

C.     Ms. Pande's claim for wrongful termination in violation of public
       policy must go to the jury. ........................................................................ 13

D.     Ms. Pande's claim for punitive damages must go to the jury. ............................. 14

       1.     Ms. Pande has clearly shown malice, oppression, or fraud by
              Chevron. .................................................................................................. 14

       2.     Chevron's wrongful conduct was committed and approved by
              the company's managing agents. ........................................................... 15

III.   CONCLUSION ............................................................................................. 18

405007.01

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

Boehm v. Am. Broadcasting Co.,
    929 F.2d 482 (9th Cir. 1991) ................................................................. 7

Cruz v. Homebase,
    83 Cal. App. 4th 160 (2000) ................................................................ 18

Desert Palace, Inc. v. Costa,
    539 U.S. 90 (2003) ......................................................................... 3, 6

Hill v. Underwood Memorial Hospital,
    365 F. Supp. 2d 602 (D.N.J. 2006) ......................................................... 12

Morgan v. Regents of Univ. of Calif.,
    88 Cal. App. 4th 52 (2000) ................................................................ 3, 6

Ragsdale v. Wolverine World Wide,
    535 U.S. 81 (2002) .......................................................................... 12

Reeves v. Sanderson Plumbing Prods.,
    530 U.S. 133 (2000) ................................................................... 1, 7, 10

Richards v. CH2M Hill, Inc.,
    26 Cal. 4th 798, 823 (2001) .............................................................. 5, 6

White v. Ultramar,
    21 Cal. 4th 563 (1999) ............................................................ 15, 16, 17

Yanowitz v. L'Oreal USA, Inc.,
    36 Cal. 4th 1028 (2005) ...................................................................... 3

### Statutes

California Civil Code § 3294 ................................................................. 14

iii

405007.01

# I.    INTRODUCTION

The Court should deny Chevron's motion for judgment as a matter of law, as to all of the issues raised. Ms. Pande has presented more than sufficient evidence for each of her claims to go to the jury, as outlined below. Chevron's motion ignores that evidence, however, and instead seeks to have the Court substitute its weighing of the evidence and its credibility determinations for those of the jury, and ignore reasonable conclusions the jury may reach from the evidence presented. This would improperly usurp the jury's role as fact-finder. The motion should be denied in its entirety.

# II.    ARGUMENT

## A.    Ms. Pande's FEHA retaliation claim must go to the jury.

### 1.    Ms. Pande has presented evidence supporting all elements of her FEHA retaliation claim.

Ms. Pande has offered evidence supporting each element of her FEHA retaliation claim, as set forth in Jury Instruction No. 16. The weight and credibility of that evidence is for the jury, not the Court, to evaluate, and the Court must make all reasonable inferences in Ms. Pande's favor. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150-51 (2000). If the jury accepts the evidence outlined below (even setting aside other, additional evidence that also supports this claim), it may find that Chevron unlawfully retaliated against her.

First, Ms. Pande complained about discrimination: Ms. Pande testified that she complained to Jay Johnson and Gary Yamashita about discrimination and harassment by Rex Mitchell. Ms. Pande testified that she set up her initial meeting with Jay Johnson on February 27, 2002, by speaking to the group's administrative assistant, Iris Owens, and telling her why she wanted to speak to Mr. Johnson. (Tr. 255:1-11.) The meetings then followed commencing in early March 2002. (Tr. 255-56.)

Second, the jury could reasonably find based on the evidence presented that Chevron subjected Ms. Pande to adverse employment actions. Ms. Pande has offered evidence that almost immediately after she brought forward her complaints, Mr. Mitchell and other Chevron representatives began retaliating against her, including but not limited to the following:

1

KIRAN PANDE'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 04-5107 JCS

1.  In response to learning of Ms. Pande's complaints of his sexist behavior, Mr. Mitchell assembled trumped up "evidence" of purported performance lapses (Exh. 251; Tr. 259-60 (Pande));

2.  Instead of taking Ms. Pande's complaints of sexism by Mr. Mitchell seriously, Jay Johnson told Ms. Pande that she had three choices: get along with Mr. Mitchell, find another position, or leave the company (Tr. 257 (Pande));

3.  Gary Yamashita, an ombudsman responsible for Chevron's response to complaints that employees are not comfortable raising through other channels, did nothing to assist Ms. Pande, but went along with Mr. Mitchell's (and Mr. Johnson's) unlawful actions (Ex. 286; Tr. 271-72);

4.  Mr. Mitchell gave her a lowered performance ranking inconsistent with his own prior evaluation of her work and with her record throughout her entire previous career at Chevron (Exh. 19; Tr. at 266-67 (Pande); Tr. at 898-900 (Mitchell));

5.  Mr. Mitchell denied her a promotion he had promised her (Tr. 503-04 (Pande));

6.  Even though Ms. Pande's performance was exceptional and deserved a "1" ranking, Mr. Mitchell told Kelly Hartshorn in 2003 that Ms. Pande's overall 2002 performance deserved a "2" ranking (Tr. 282-83 (Pande), Tr. 1387-88, 1392 (Hartshorn));

7.  As a result of Mr. Mitchell's unfair assessment, Ms. Pande did not receive the merit increase she deserved in 2003 (Tr. 283; Tr. 1392); and

8.  Mr. Mitchell disparaged her work performance to other supervisors at Chevron, including Jay Johnson almost immediately (Exh. 251), and others continuing into late 2003 (Exh. 67 (Brian Smith email reporting that Ms. Pande was rated low for teamwork based on comments about her time in planning, when she worked for Mr. Mitchell)). That disparagement was suddenly echoed by supervisors like David Kennedy, who had previously raved about Ms. Pande's performance but changed their tune once Ms. Pande made her protected complaints to Mr. Johnson (Exhs. 13, 250; Tr. 231 (Pande)).

KIRAN PANDE'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 04-5107 JCS

1    Even if any one of these acts alone would not constitute an adverse employment action (a

2  point Ms. Pande does <u>not</u> concede), Ms. Pande could still recover for retaliation because the

3  series of acts, taken together, materially affected the terms, conditions, and privileges of her

4  employment.  <u>See</u> <u>Yanowitz v. L'Oreal USA, Inc.</u>, 36 Cal. 4th 1028, 1050-52 (2005).

5    Third, Ms. Pande has offered sufficient evidence that her complaints were a motivating

6  reason for the adverse actions taken against her.  All of the evidence of the adverse actions taken

7  by Chevron representatives, described above, also supports this element.  The timing of her

8  complaint and these adverse actions alone adequately supports the logical inference that Ms.

9  Pande's complaint was the motivating reason for these actions.  <u>See</u> <u>Morgan v. Regents of Univ.</u>

10  <u>of Calif.</u>, 88 Cal. App. 4th 52, 69 (2000).  Also, the record contains ample evidence of Ms.

11  Pande's previous stellar career at Chevron, her skills as a great team player, and her later

12  excellent work for Mr. Dunn, further supporting the conclusion that the manufactured complaints

13  about her were trumped up and retaliatory.  More direct evidence of this causal link is not

14  required, as courts have frequently recognized, because unlawful actors rarely state their reasons

15  openly.  <u>See</u> <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 99-100 (2003).  Moreover, this conclusion

16  is particularly warranted given the testimony by Chevron representatives like Mr. Mitchell and

17  Mr. Johnson that was contradicted during cross-examination by these witnesses' prior testimony

18  or by other documents in evidence.

19    Fourth, Ms. Pande has clearly shown that she was harmed.  If the jury accepts Ms.

20  Pande's account of the evidence, the above-described retaliatory actions deprived her of a

21  promotion she deserved, which would have carried higher pay and furthered her advancement

22  within Chevron; deprived her of a fair merit increase in 2003; and deprived her of the goodwill

23  and good opinion of Chevron supervisors, harming her job prospects within the company in both

24  2002 and 2003 and thereby preventing her from obtaining alternative positions available at the

25  company (which, according to Mr. Burkes and Ms. Hartshorn, had an ongoing need for people

26  with Ms. Pande's qualifications (Tr. 634-36 (Burkes); Tr. 1368 (Hartshorn))).  Any one of these

27  would be adequate harm.

28    Finally, Ms. Pande has shown that Chevron's retaliatory conduct was a substantial factor

3

1   in causing her harm.  Before she challenged Mr. Mitchell's discriminatory conduct, Ms. Pande

2   had a thirteen year record of excellent performance, great teamwork ratings, and satisfied

3   supervisors at Chevron.  (Tr. 218, 221, 232; Exhs. 11, 13, 14.)  The jury can reasonably believe

4   her account of events, disbelieve Mr. Mitchell's trumped-up fault-finding, and find that the harm

5   Ms. Pande suffered resulted not from a sudden decline in her work performance or attitude, but

6   from Mr. Mitchell's retaliatory conduct which reverberated through Chevron's supervisory ranks

7   and rumor mill, thereby resulting in Ms. Pande first being blocked in her career and later

8   terminated altogether.

9       **2.    Chevron's arguments regarding Ms. Pande's retaliation claim lack legal
             merit and are not supported by the record.**

10  Chevron's three arguments regarding Ms. Pande's retaliation claim should be rejected.

11  First, Chevron argues that Ms. Pande has not satisfied the statute of limitations because she has

12  not shown retaliatory acts on or past December 8, 2002.  To the contrary, Ms. Pande has

13  presented evidence supporting reasonable inferences that such retaliatory acts occurred, and that

14  they were sufficiently linked to earlier acts to invoke the continuing violation doctrine.  Second,

15  Chevron contends that Ms. Pande has offered no evidence of retaliatory animus.  Again, this

16  argument disregards the conclusions the jury may reasonably reach based on the evidence that

17  Mr. Mitchell's retaliatory acts began immediately following Ms. Pande's complaints, and asks

18  the Court simply to credit Chevron's own account of events, improperly taking this issue away

19  from the jury.  Finally, and inexplicably, Chevron contends that Ms. Pande's damages were cut

20  off in both December 2002 and June 2003, when Chevron "offered" her employment.  This is

21  wrong.  The Court should deny Chevron's motion, and allow the jury to decide Ms. Pande's

22  retaliation claim.

23      **a.    Ms. Pande's retaliation claim is a question of fact for the jury.**

24  Judge Wilken has already rejected Chevron's statute of limitations argument, which was

25  presented to the Court in Chevron's summary judgment motion.  Based on the fact that "Mr.

26  Mitchell allegedly influenced whether Plaintiff would receive a merit pay bonus in April, 2003,"

27  a fact Ms. Pande has now offered strong evidence at trial to support (Tr. 282-83 (Pande); Tr.

28

---

4

1    1387-88 (Hartshorn)), the Court ruled as follows: "The Court denies summary judgment in favor

2    of Defendants on Plaintiff's . . . retaliation claims, finding that they are not time-barred as a

3    matter of law and, therefore, there are triable issues of fact concerning Plaintiff's FEHA claims."

4    Summary Judgment Order, January 17, 2007, at 22.

5        For the same reasons set forth in that order (and more), the Court should reject Chevron's

6    statute of limitations arguments. Ms. Pande has now presented at trial evidence of Chevron's

7    related retaliatory acts both within and outside the one-year statute of limitations. Both sets of

8    acts are similar in kind, reasonably frequent, and did not make clear to Ms. Pande before

9    December 8, 2002 that further efforts to stop the retaliation would be futile. If the jury accepts

10   this evidence, and so finds, Ms. Pande may recover for all of these retaliatory acts under the

11   continuing violation doctrine. See Richards v. CH2M Hill, Inc., 26 Cal. 4th 798, 823 (2001).

12   Specifically, Ms. Pande has presented evidence that, after giving her a retaliatory and

13   undeservedly poor review and low ranking, along with no promised promotion, Mr. Mitchell told

14   Kelly Hartshorn again in 2003 that Ms. Pande deserved a 2 ranking for her work in 2002. Mr.

15   Mitchell thereby again deprived Ms. Pande of a fair merit raise in 2003. (Tr. 282-83 (Pande); Tr.

16   at 1387-88 (Hartshorn).) Since this was Mr. Mitchell's next opportunity to provide input into

17   Ms. Pande's merit pay calculations, this was reasonably frequent for this type of action.

18       Also, Ms. Pande has presented evidence supporting the conclusion that Mr. Mitchell

19   disparaged her to others at Chevron in retaliation for her complaints, in 2002: notably, she did

20   not receive a job offer in 2002 from the two people Mr. Mitchell admits he spoke to, and Jack

21   Dunn, the one person at Chevron who did eventually offer her a job, had the distinction of not

22   speaking with Mr. Mitchell before doing so. (Tr. 1127 (Dunn).) She has also offered evidence

23   of Mr. Mitchell's retaliatory conduct later in 2003, when she next sought positions within

24   Chevron: Brian Smith's email telling Ms. Pande that she was rated relatively poorly in teamwork

25   (which George Alameda agreed was a critical factor, Tr. 1138) for positions she sought in 2003

26   (and for which she was otherwise extremely qualified), based on discussions of "relationship"

27   issues she had during her time "in planning" with Mr. Mitchell. (Exh. 67.) The jury may

28   conclude from this evidence that (however much he may deny it today) Mr. Mitchell in fact

1   continued to spread retaliatory rumors about Ms. Pande into late 2003, when she was terminated.

2   And, although Ms. Pande suffered immediate consequences from Mitchell's retaliatory acts in

3   2002, it was not clear to her at that time that she would not be able to overcome his toxic effect

4   on her career, or that he would continue to punish her for her initial complaints even after she

5   had left his group.  Thus, under Richards, the jury may find that the continuing violation doctrine

6   applies and Ms. Pande's retaliation claim is not time-barred.

7   **b.  Ms. Pande has presented substantial evidence of retaliatory animus, which the jury should be allowed to weigh and evaluate.**

8

9   As discussed above, the sequence and timing of Ms. Pande's complaints and Mr.

10  Mitchell's actions against her is enough to support an inference that Mr. Mitchell and other

11  Chevron representatives acted with a retaliatory motive.  Morgan, 88 Cal. App. 4th at 69.  The

12  courts have often acknowledged the utility of circumstantial evidence in retaliation cases, for the

13  simple reason that reasonably clever retaliators will never state their retaliatory motives directly.

14  Circumstantial evidence is more than adequate in such cases.  See Desert Palace, 539 U.S. at 99-

15  100.

16  Chevron's argument ignores Ms. Pande's account of events, and all testimony and

17  documentary evidence supporting it, asking the Court simply to accept Chevron's explanation of

18  events and of its witnesses' testimony.  For example, Chevron asserts that "the majority" of

19  Chevron employees received a two ranking, and that the ranking was decided "no later than

20  March 2002 - before Pande ever complained."  Chevron Motion at 5.  However, the jury may

21  reasonably draw a different conclusion, based on the evidence presented to it: it may reasonably

22  conclude that whatever Chevron's ranking policy may have been, Rex Mitchell in fact gave 1

23  ratings to all the men he rated, lied about those ratings under oath (see Exhs. 103-111), gave Ms.

24  Pande a 2 only after he found out she had set up a meeting with Mr. Johnson to complain about

25  him (which Ms. Pande did with Iris Owens, in late February 2002, Tr. at 255), and then lied

26  about that as well.  This is more than adequate proof of retaliatory animus.  And that animus also

27  is evidenced in the actions of Jay Johnson and Gary Yamashita who not only failed to respond

28  properly to Ms. Pande's complaints of discrimination, but who sanctioned Mr. Mitchell's

KIRAN PANDE'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 04-5107 JCS

1  attempts to turn the matter into an indictment of Ms. Pande on trumped up allegations of work

2  performance problems.

3        **c.    Ms. Pande was still employed at Chevron in both December 2002 and**
          **June 2003, so Chevron could not "cut off" its liability for its**
4         **retaliatory actions by allowing her to remain employed.**

5        Chevron contends that by offering Ms. Pande employment in December 2002 with

6  SASBU, and in June 2003 with SASBU in Houston, it has cut off any potential damages on Ms.

7  Pande's retaliation claim.  This argument does not fit the facts of Ms. Pande's claim, as the law

8  makes clear.

9        Ms. Pande had not been terminated as of either December 2002 or June 2003.  At those

10  junctures, Chevron's actions had resulted in more subtle wrongs: loss of pay, loss of a

11  promotion, loss of more desirable alternative positions, etc.  Now, Chevron argues in essence

12  that Ms. Pande has suffered no damages from retaliation because (despite Chevron's retaliatory

13  acts) Chevron did not immediately fire her outright, but chose to offer her continued employment

14  for some period before (to paraphrase Chevron witness Jay Johnson) "managing" her completely

15  out of the company.  Chevron's argument makes no sense, and Chevron offers no authority

16  suggesting otherwise.  Chevron relies instead on authority that, where an employee has actually

17  been fired for an unlawful reason, an employer may cut off its damages by offering to return the

18  employee to an equivalent position, in good faith.  See Boehm v. Am. Broadcasting Co., 929

19  F.2d 482, 485-87 (9th Cir. 1991).  There are no facts presented in this case that would make the

20  Boehm analysis applicable, and the mere fact that Chevron at first did not opt for outright

21  termination as its method for retaliation does nothing to remedy its retaliatory acts.

22  **B.    Ms. Pande's FMLA and CFRA claims must go to the jury.**

23        **1.    Ms. Pande has presented evidence supporting all elements of her FMLA and**
                  **CFRA claims.**
24
          Ms. Pande has offered evidence supporting each element of her FMLA and CFRA
25
      claims, as set forth in Jury Instruction No. 14.  Again, the weight and credibility of that evidence
26
      is for the jury, not the Court, to evaluate, and the Court must make all reasonable inferences in
27
      Ms. Pande's favor.  See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150-51 (2000).  If
28

                                        7

405007.01

1   the jury accepts the evidence outlined below (even setting aside other, additional evidence that

2   also supports this claim), it may find that Chevron unlawfully interfered with Ms. Pande's

3   FMLA and CFRA rights.

4        First, Chevron does not dispute the first three elements of this claim: that Ms. Pande was

5   eligible for medical leave, that she requested and took medical leave for her own serious health

6   condition, and that she provided reasonable notice to Chevron of her need for medical leave,

7   including its expected timing and length.

8        Second, Ms. Pande has presented ample evidence for the jury to find that her taking of

9   medical leave was a negative factor in Chevron's decisions to terminate her and/or not to hire her

10  for alternative positions, satisfying the fourth element of this claim.  Ms. Pande's evidence

11  strongly supports an inference that Jack Dunn was outraged by Ms. Pande's taking of medical

12  leave, and that her leave was the cause for his severely adverse actions against her.  Mr. Dunn

13  found out about Ms. Pande's medical leave on October 29, 2003.  (Exh. 57.)  Just a few days

14  later, he yelled and pointed at her in a group meeting, berating her about how her work would get

15  done while she was on leave.  (Tr. 329 (Pande Testimony); Tr. 720-21 (Mabe Testimony); Tr.

16  636-37 (Burkes Testimony).)  He also began to blame her for the first time for delays in the

17  group's work.  (Tr. 332; Exh. 46.)  He also reneged on his promise to Ms. Pande that she could

18  continue working for him from San Ramon through 2004.  (Tr. 343.)  Mr. Dunn's denial of this

19  promise and his conflicting account of his other actions are of no account on this motion: the

20  truth is for the jury to decide.

21       Next, after Ms. Pande began her leave, Mr. Dunn called to terminate her.  He told her that

22  (1) the termination process had been put in motion after she left on her leave, and (2) Chevron

23  lawyers had cleared the termination by agreeing to claim that Ms. Pande had been terminated

24  months before, when Ms. Pande declined to move to Houston.  (Tr. 342.)  Ms. Pande disputes

25  that she had ever resigned or been terminated before that conversation with Mr. Dunn (Tr. 345),

26  and Chevron's documents about the Houston move certainly are not clearly contrary.  (Exh. 39.)

27  Indeed, Bob Burkes testified that other SASBU employees remained working in San Ramon

28  after their groups moved to Houston, that (based on Chevron's standard practices and based on

8

1    the statements in the move announcements) he did not believe a decline of the move would result

2    in termination, and that he himself continued working on his prior assignments through August

3    2004. (Tr. 633-34, 652-53, 632.) The jury can reasonably choose to reject Chevron's conflicting

4    account of Ms. Pande's termination, and to accept Ms. Pande's account.

5        In addition, Ms. Pande testified that she was still waiting to hear about several jobs when

6    Mr. Dunn called to terminate her on November 17, 2003, long before she even applied for the

7    Omoregie jobs in late December. (Tr. 343.) However, Mr. Dunn ensured Ms. Pande did not get

8    those jobs by disparaging Ms. Pande's performance. For example, Mr. Dunn disparaged Ms.

9    Pande's performance to Mr. Omoregie, failing to tell Mr. Omoregie that his view of Ms. Pande

10   as "less focused" was actually something that he considered to be "only natural" given the move.

11   (Tr. 1215, 1270-73.) The jury may infer that he did so, because of Ms. Pande's leave, and that

12   his actions resulted in Mr. Omoregie's failure to hire her. Chevron urges a different view of the

13   evidence, but the jury can choose to believe Ms. Pande.

14       Ms. Pande has also presented adequate evidence for the jury to find that she was harmed,

15   satisfying element number 5 of her FMLA/CFRA claims. If the jury accepts her account of the

16   evidence, and finds that Ms. Pande lost her job at Chevron (and found no alternative position)

17   because of taking a medical leave, the harm she suffered is clear: she lost her job, her salary, and

18   all her benefits. (Tr. 368.) Had she remained at Chevron, she would not have suffered these

19   financial harms.

20       Finally, Ms. Pande has presented sufficient evidence for the jury to find that Chevron's

21   conduct was a substantial factor in Ms. Pande's harm, satisfying the final element of her

22   FMLA/CFRA claims. Chevron contends that Ms. Pande brought her harms upon herself by

23   limiting the jobs she applied for within the company, by declining the move to Houston, and by

24   demonstrating an alleged bad attitude in her work with Jack Dunn and others. The merit of these

25   claims, however, is a question for the jury to decide. As described above for element number

26   four (and especially in light of the credibility issues raised with respect to Mr. Dunn on cross-

27   examination), the jury may choose to credit Ms. Pande's account of her experiences. In

28   particular, the jury may credit Ms. Pande's account of Mr. Dunn's statements to her about her

1   termination, and the additional support for that account provided by Mr. Burkes' testimony and

2   the confusing documents Chevron provided its employees about the Houston move.  The jury

3   may also accept Ms. Pande's evidence about Mr. Dunn's meeting with Mr. Omoregie, about Ms.

4   Pande's qualifications and previous experience at Chevron, and about her efforts to find work at

5   Chevron.  If the jury does so, it may reject Chevron's alternative theories for the cause of Ms.

6   Pande's harm along with Chevron's theories that Ms. Pande's leave was not a negative factor in

7   its decisions to terminate her and not to hire her for alternative positions.

8           **2.    Chevron's arguments against Ms. Pande's FMLA and CFRA claims
                disregard the evidence presented at trial and ask the Court to usurp the
9               jury's role.**

10          As with Ms. Pande's retaliation claim, Chevron asks the Court to usurp the jury's role as

11  fact-finder by assessing the credibility and weight of the evidence regarding Ms. Pande's

12  FMLA/CFRA claims, and by ignoring reasonable inferences in Ms. Pande's favor.  As with Ms.

13  Pande's retaliation claim, that approach is wholly improper: the weight and credibility of the

14  evidence is for the jury, not the Court, to evaluate, and the Court must make all reasonable

15  inferences in Ms. Pande's favor.  See Reeves, 530 U.S. at 150-51.  Chevron also essentially asks

16  the Court once again to reconsider its ruling on Chevron's Motion in Limine Number One,

17  regarding Ms. Pande's ability to return to work in less than twelve weeks; the ruling was correct,

18  and the Court should not disturb it now.

19          **a.    Chevron improperly asks the Court to weigh the evidence in its favor
                to conclude that Ms. Pande's termination was final and inevitable in
20              June 2003, although Ms. Pande has presented significant evidence
                that this is untrue.**

21          As outlined above, Ms. Pande has presented evidence that Chevron decided to terminate

22  her only after she began her medical leave.  Chevron claims that Ms. Pande seeks to recover on

23  the theory that she could not be terminated while on medical leave, even for unrelated reasons.

24  Chevron Motion at 7.  Nonsense.  Ms. Pande actually contends that, although Chevron now

25  claims to have terminated her long before, the decision was in fact made and enforced only after

26  she offended Mr. Dunn and Chevron by taking medical leave.  Among the evidence she has

27  offered on this point is her own testimony about what Mr. Dunn told her (including his offer of

28

10

KIRAN PANDE'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 04-5107 JCS

1   employment through 2004 and later reneging on that offer only after she requested her leave),

2   Mr. Burkes's testimony about employees who remained at Chevron after the move, and

3   Chevron's own documents about the move.  The weight and credibility of the evidence on this

4   point are for the jury to evaluate.

5          **b.**    **Chevron improperly asks the Court to weigh and reject Ms. Pande's evidence that Jack Dunn disparaged her to Zuwa Omoregie, and the**

6                    **inference that he did the same to other Chevron job owners who otherwise would have hired her.**

7

8          Chevron claims that Ms. Pande has offered no evidence that Mr. Dunn negatively

9   influenced her ability to find alternative employment at Chevron, because even before she

10   announced her medical leave, Ms. Pande allegedly had already been rejected for all jobs she

11   applied for at Chevron except the two with Mr. Omoregie, and she allegedly did not get those

12   last two jobs because she had a bad attitude.  Chevron Motion at 9 n.10.  In fact, however, Ms.

13   Pande testified that she was still waiting to hear about several jobs when Mr. Dunn called to

14   terminate her on November 17, 2003, long before she even applied for the Omoregie jobs in late

15   December. (Tr. 343.)  As outlined above, Ms. Pande has offered ample evidence that Mr. Dunn

16   disparaged her to Mr. Omoregie.  The jury may reasonably infer that he did the same to other

17   Chevron job owners, and that his actions prevented Ms. Pande from obtaining a new position

18   within Chevron.  Although Chevron contends that Jean Camy and David Kennedy also made

19   negative comments about Ms. Pande, the jury could reasonably reject Mr. Camy's testimony

20   offered on this point (in light of his earlier praise of Ms. Pande), and find that both Mr. Dunn's

21   unlawful actions and Mr. Kennedy's parroting of Mr. Mitchell's retaliatory complaints were

22   substantial factors in Ms. Pande's rejection for the Omoregie jobs.

23          **c.**    **Chevron improperly asks the Court to reject Ms. Pande's sworn testimony that Jack Dunn offered her continued work through 2004, and accept Jack Dunn's contrary testimony.**

24

25          Chevron claims that Ms. Pande has offered "no proof" that Mr. Dunn promised her work

26   through 2004.  First, even if it were true (which it is not), this would not defeat Ms. Pande's

27   claims that Mr. Dunn prevented her from getting an alternative position with other Chevron job

28   owners.  Second, and more importantly, Ms. Pande testified under oath that Mr. Dunn made this

11

1  promise. (Tr. 343.) Her sworn testimony is not "unsupported insistence," as Chevron argues,

2  but is direct evidence of Mr. Dunn's promise that the jury may choose to credit instead of Mr.

3  Dunn's denial. Also, Guadalupe DeJong testified to a conversation that the jury may find

4  supports Ms. Pande's account. (Tr. 771-72.) The jury may also reject Chevron's argument that

5  Ms. Pande did not react to Mr. Dunn's promise as Chevron claims she should have. This is a

6  classic credibility fight, the very type of dispute that juries exist to resolve. Like the rest of Ms.

7  Pande's case, it must go to the jury.

8        **d.**    **The Court should also reject Chevron's repeated attempt to escape the Court's prior ruling that Ms. Pande can present evidence to the**

9                 **jury, and the jury should decide, whether (if Chevron had not unlawfully fired her) Ms. Pande could have returned to work within**

10                 **her twelve weeks protected leave.**

11        Finally, Chevron offers once more the stale argument it made in its Motion in Limine

12  Number One, and again at the beginning of trial, that Ms. Pande "suffered no harm because she

13  could not return to work prior to expiration of her FMLA/CFRA leave." Chevron Motion at 11.

14  The Court should reject that argument, for the reasons already extensively briefed and discussed

15  in the briefing on the Motion in Limine and at the Pre-trial Conference before Judge Wilken, and

16  decided in Judge Wilken's Order on the subject. As Judge Wilken put it, Ms. Pande "was fired

17  shortly after she began her medical leave, making it impossible to determine whether Defendants

18  ultimately would have been entitled to terminate her for failure to return from leave." Order

19  Denying Defendants' First Motion In Limine, September 9, 2007, at 3. This case is thus

20  distinguishable from Ragsdale v. Wolverine World Wide, 535 U.S. 81 (2002), and Hill v.

21  Underwood Memorial Hospital, 365 F. Supp. 2d 602, 610 (D.N.J. 2006), in which the plaintiffs

22  were terminated only after their protected leave had expired. Motion In Limine Order at 3.

23        Although the Court found that Ms. Pande "told Defendants that she expected to be out

24  until May, 2004," it also found that she had presented evidence that "she had some degree of

25  control over her disability." Id. The Court explained: "The precise date of her surgery was

26  flexible, and Plaintiff maintains that if she had elected to undergo the surgery earlier, she could

27  have returned to work before May. In addition, Plaintiff had worked in the past while suffering

28  from her medical troubles. Had she been faced with the decision of either returning to work after

12

1    twelve weeks or facing termination, she may well have chosen the former." Id. Ms. Pande has

2    now offered testimony at trial confirming all of the above, including the flexibility of her medical

3    care, and the impact of her termination on her decisions. Specifically, Ms. Pande testified that in

4    late October 2003, she understood that she "could do what [she] had been doing for a long time,

5    which was just living with the anemia and kind of all the symptoms associated with the fibroids

6    and the anemia," or she "could go ahead and have the surgery, the myomectomy. (Tr. 320. See

7    Tr. 244-45 (testimony that she did not miss any days of work or tell anyone at Chevron about her

8    medical problems after her emergency blood transfusion in 2001).) If she chose the latter option,

9    she understood that she "could either have it right away or have a treatment that involved Lupron

10   injections . . . and see how that worked, and then decide when to have the surgery based on – on

11   how that was working." (Tr. 320.) Ms. Pande testified that after Chevron terminated her

12   employment (and did not offer her alternative positions) at the end of 2003, "[s]ince [she] didn't

13   have to be back at work right away because there was no job waiting for [her], [she] decided to

14   postpone the surgery." (Tr. 356.) Ms. Pande's testimony at trial confirms the factual scenario

15   that Judge Wilken considered in ruling on Chevron's Motion In Limine on this point.

16   Accordingly, as Judge Wilken found then, "[t]his is an issue of fact for the jury to decide."

17   Motion In Limine Order at 3.

18   **C.     Ms. Pande's claim for wrongful termination in violation of public policy must go to**
         **the jury.**
19

20          Chevron devotes no substantial argument to Ms. Pande's claim for wrongful termination

21   in violation of public policy. Based on the same evidence that supports both her FEHA

22   retaliation claim and her FMLA/CFRA claims, Ms. Pande has also presented adequate evidence

23   to support her wrongful termination claim, as set forth in Jury Instruction No. 19. First, no one

24   disputes that Ms. Pande was employed by Chevron. Second, as set forth above, Ms. Pande has

25   offered adequate evidence for the jury to conclude that Chevron terminated her. Third, as set

26   forth above, Ms. Pande has offered adequate evidence for the jury to conclude that her medical

27   leave and/or complaints of discrimination and harassment were motivating reasons for her

28   termination. Finally, as set forth above, Ms. Pande has shown ample evidence that the discharge

1  caused her harm.

2  **D.     Ms. Pande's claim for punitive damages must go to the jury.**

3       Ms. Pande has also offered evidence supporting an award of punitive damages on each of

4  her claims.  As set forth in Jury Instruction No. 25, the jury may award Ms. Pande punitive

5  damages if she shows by clear and convincing evidence (1) that Chevron engaged in its unlawful

6  conduct with malice, oppression, or fraud, and (2) that this conduct was (a) committed, (b)

7  authorized, or (c) adopted or approved by an officer, director, or managing agent of Chevron.

8  See Cal. Civ. Code § 3294.  The jury could reasonably find on the evidence presented at trial that

9  Ms. Pande has carried this burden, if it credits her account of Chevron's unlawful conduct.  Only

10  the jury may properly assess credibility and weigh the evidence, and decide whether punitive

11  damages are warranted in this matter.

12       **1.     Ms. Pande has clearly shown malice, oppression, or fraud by Chevron.**

13       Ms. Pande has offered evidence at trial that her supervisors—acting in concert with an

14  even more senior supervisor, the Chevron Ombuds, Chevron's Human Resources Manager, and

15  Chevron's legal department—punished her for making protected complaints about

16  discrimination and taking protected medical leave, and then deliberately lied to her and others

17  about what they were doing (continuing their deception even at trial, under oath), concocting

18  devious schemes to conceal the unlawful and malicious nature of their conduct.  The jury can

19  reasonably find that this was indeed the case, based on the evidence outlined above and all the

20  other evidence presented at trial.  The jury can find that these Chevron actors plotted against Ms.

21  Pande although they knew she was economically vulnerable as an employee of the company, and

22  although they knew at least in late 2003 that she was also physically ill and vulnerable, and on

23  medical leave.  This is despicable conduct.  It was done both with an intent to cause injury and

24  with a willful and knowing disregard of Ms. Pande's rights and safety, and amounts to malice.

25  The jury could also find that Chevron's despicable conduct subjected Ms. Pande to the cruel and

26  unjust hardship of losing her job, or that Chevron's lies were intentional and intended to harm

27  Ms. Pande.  Whether it does will depend on its assessment of the credibility and weight of the

28  evidence presented: if the jury believes Ms. Pande's version of events, she has clearly satisfied

1    this element of the punitive damages standard.  The Court should not take this assessment out of

2    the jury's hands.

3         **2.**     **Chevron's wrongful conduct was committed and approved by the company's managing agents.**

4

5         Ms. Pande has also offered evidence that the conduct described above was committed and

6    approved by Chevron's managing agents, and has satisfied the second factor of the test for

7    punitive damages.

8         Both Mr. Mitchell and Mr. Dunn were managers of significant groups at Chevron,

9    wielding broad general authority over their employees and the management of the group's work.

10   Like the manager found to be a managing agent in White v. Ultramar, 21 Cal. 4th 563 (1999),

11   they "exercise substantial independent authority and judgment in their corporate decisionmaking

12   so that their decisions ultimately determine corporate policy." Id. at 566-67.  White does not

13   require that they be high-level policymakers, or officially tasked with determining corporate

14   policy.  Rather, in explaining its test, the White court noted that "[t]he scope of a corporate

15   employee's discretion and authority . . . is therefore a question of fact for decision on a case-by-

16   case basis." Id. at 567.  The manager in White was a "zone manager" responsible for eight stores

17   (within a larger chain of convenience stores) and roughly 65 employees. Id. at 577.  The court

18   found that the manager "exercised substantial discretionary authority over vital aspects of [the

19   employer's] business" by "managing numerous stores on a daily basis and making significant

20   decisions affecting both store and company policy." Id.  However, it is clear that the manager in

21   question was not a high-level policymaker for the company: she managed only eight stores, in a

22   chain of unspecified size, and she reported to department heads in the retail management

23   department, suggesting several levels of management existed above her. Id. at 577.  The court

24   also did not specify any particular management acts by which the manager affected company

25   policy.  Also, the court found that in firing the plaintiff for improper reasons, the manager

26   "exercised substantial discretionary authority over decisions that ultimately determined corporate

27   policy in a most crucial aspect of [defendant's] business." Id.

28        Mr. Mitchell and Mr. Dunn's level of general authority over their reports, and their

15

1  discretion in determining how to manage their groups day-to-day, is similar to the authority

2  found sufficient in <u>White</u>. Mr. Mitchell was general manager of business development and

3  planning, a group that Mr. Mitchell described as a prestigious one. (Tr. 881, 885, 996-97.) A

4  manager in charge of planning necessarily shapes company policy more than a manager with a

5  narrow focus. Ms. Pande has offered evidence that Mr. Mitchell controlled her ranking, and thus

6  her salary, and had the power to promote her (Tr. 504-05); he also controlled day-to-day work in

7  his group, and testified that he took assignments away from Ms. Pande because of her alleged

8  performance lapses (Tr. 1005). In all of these acts, as well as in his decisions about how to

9  respond to Ms. Pande's complaints of discrimination, he was at least a *de facto* policymaker for

10  the company. Also, Mr. Mitchell is now Chevron's Chief Compliance Officer, obviously an

11  important policymaker. (Tr. 876.) Given Chevron's argument that Ms. Pande was arrogant for

12  seeking any advancement within the company (<u>see</u> Tr. 179), the jury may also infer that progress

13  up the Chevron ranks is not ordinarily rapid, and thus infer from Mr. Mitchell's current position

14  that his position in 2002 was also one of substantial weight and policy-making authority. Like

15  Mr. Mitchell, Mr. Dunn had broad managerial authority, and controlled the day to day work of

16  his group without substantial oversight. For example, he promised Ms. Pande work through

17  2004, apparently without seeking any approval or authority to do so. (Tr. 343.) His project was

18  a $4 billion investment for Chevron. (Tr. 740.) Mr. Burkes testified that Mr. Dunn was part of

19  the management team responsible for decisions about the Houston move. (Tr. 643.)

20       Even if Mr. Mitchell and Mr. Dunn were not independently managing agents of Chevron

21  (which they are), they both acted in concert with higher-level decision-makers who approved or

22  adopted their malicious and otherwise despicable actions. Mr. Mitchell's own supervisor—one

23  level higher in the Chevron hierarchy of management, and even more clearly a managing

24  agent—sanctioned Mr. Mitchell's actions towards Ms. Pande by giving her three unreasonable

25  choices and endorsing Mr. Mitchell's trumped-up performance complaints. (Tr. 257.) Similarly,

26  Gary Yamashita was an ombudsman, and was responsible for Chevron's response to complaints

27  that employees are not comfortable raising through other channels, a significant area of company

28  policy-making—and had discretion in how he handled such complaints. (Ex. 286 (The Ombuds

16

1  is "Independent [and] reports directly to senior management" and is "authorized to respond to,

2  informally investigate, and facilitate resolution of employee complaints and concerns.").)  By

3  failing to fulfill his duty to facilitate the complaint process, and to assist Ms. Pande, Mr.

4  Yamashita approved Mr. Mitchell's (and Mr. Johnson's) unlawful actions.  (Tr. 271-72.)

5       Likewise, Mr. Dunn's actions were endorsed and approved both by Taryn Shawstad and

6  Chevron's legal department.  Ms. Shawstad was Chevron's General Manager of Human

7  Resources (Tr. 406), and was responsible for 15,000 employees, all over the world (Tr. 427).

8  She was clearly a policy-maker and managing agent.  Despite her supposed lapses of memory at

9  trial, she was clearly involved in and approved Mr. Dunn's scheme to pretend Ms. Pande had

10  resigned in June 2003:  she signed the termination letter, and thereby approved its falsehoods.

11  (Exh. 64.)  Ms. Shawstad also testified that she consulted with Chevron's legal department,

12  specifically David Cover, over the scheme regarding Ms. Pande.  (Tr. 408-09.)  Mr. Dunn also

13  confirmed to Ms. Pande that Chevron's legal department was involved, and had approved the

14  scheme to "claim" that Ms. Pande had resigned in June 2003.  (Tr. 342.)  Like all policy-makers

15  at Chevron, each one of the bad actors in this case knew that under the law and Chevron's own

16  policies they were not supposed to interfere with protected medical leave or retaliate against

17  employees for complaining about discrimination—but they did it anyway.  (See Exh. 277.)

18       White does not require that "managing agents" be officers or directors, or official policy-

19  makers for their employers.  To do so would ignore the Code's clear direction that managing

20  agents, not just officer and directors, can incur corporate liability for punitive damages.  The

21  Chevron actors in this case, like the manager in White itself, had general management authority,

22  and significant responsibilities that necessarily required at least de facto policy-making for the

23  company.  In White, the court upheld an award of punitive damages in a retaliation case where a

24  manager fired a convenience store employee for testifying at another employee's unemployment

25  insurance hearing, on the pretext that the firing was for violation of company policy about free

26  soft drinks for employees.  Id. at 567.  The manager consulted with human resources personnel

27  before firing the employee, although she had authority to fire him herself.  Id.  The managing

28  agents who acted for Chevron here are much more like the manager in White than like the types

KIRAN PANDE'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 04-5107 JCS

1    of employees the courts have found not to be managing agents.  See, e.g., Cruz v. Homebase, 83

2    Cal. App. 4th 160 (2000) (holding that a "loss manager" responsible only for the narrow duty of

3    controlling shoplifting at a single store was not a managing agent for purposes of punitive

4    damages, in a case involving claims of battery and false imprisonment by a customer).  The jury

5    could find that each of the Chevron actors was a managing agent, and should be allowed to make

6    that decision.

### III.    CONCLUSION

8         For all the foregoing reasons, Ms. Pande respectfully requests that the Court deny

9    Chevron's motion for judgment as a matter of law in its entirety.

10                                                  Respectfully submitted,

11   Dated:  October 22, 2007                       KEKER & VAN NEST, LLP

13                                        By:    /s/ Christa M. Anderson
14                                               SUSAN J. HARRIMAN
15                                               CHRISTA M. ANDERSON
                                                 Attorneys for Plaintiff
16                                               KIRAN PANDE

18

KIRAN PANDE'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 04-5107 JCS