1  Michele Ballard Miller (SBN 104198)
   Janine S. Simerly (SBN 102361)
2  Lisa C. Hamasaki (SBN 197628)
   MILLER LAW GROUP
3  A Professional Corporation
   60 E. Sir Francis Drake Blvd., Ste. 302
4  Larkspur, CA 94939
   Tel. (415) 464-4300
5  Fax (415) 464-4336

6  Attorneys for Defendants CHEVRON INTERNATIONAL
   EXPLORATION AND PRODUCTION (formerly known
7  as CHEVRONTEXACO OVERSEAS PETROLEUM and
   improperly sued as CHEVRONTEXACO OVERSEAS
8  PETROLEUM PACIFIC COMPANY) AND CHEVRON
   CORPORATION (formerly known as CHEVRONTEXACO
9  CORPORATION)

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12

13  KIRAN PANDE,                          Case No. C 04-5107 JCS

14          Plaintiff,

15  v.                                    **DEFENDANTS' NOTICE OF MOTION
                                          AND MOTION FOR JUDGMENT AS A
16                                        MATTER OF LAW OR, IN THE
                                          ALTERNATIVE, MOTION FOR A NEW
17  CHEVRON CORPORATION (f/k/a            TRIAL; MEMORANDUM OF POINTS AND
    CHEVRONTEXACO CORPORATION), a         AUTHORITIES**
18  Delaware corporation, and CHEVRON
    INTERNATIONAL EXPLORATION and         Hearing Date:   December 21, 2007
19  PRODUCTION (f/k/a CHEVRONTEXACO       Time:           9:30 a.m.
    OVERSEAS PETROLEUM COMPANY), a        Place:          Courtroom A, 15th Fl.
20  division of Chevron U.S.A. Inc.
                                          Complaint filed:  December 2, 2004
21          Defendants.
                                          Honorable Joseph C. Spero
22

23

24

25

26

27

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ...................................................................................2

II. LEGAL ANALYSIS ...............................................................................................4

    A.   THERE IS INSUFFICIENT EVIDENCE TO SUPPORT AN AWARD OF PUNITIVE
        DAMAGES ..................................................................................................4

        1.  There Is No "Clear And Convincing" Evidence Of Malice, Fraud Or Oppression 5

        2.  Pande Presented No Evidence That Mitchell Was A "Managing Agent" ............8

    B.   PANDE HAS NOT PRESENTED SUFFICIENT EVIDENCE TO ESTABLISH
        RETALIATION IN VIOLATION OF THE FEHA ......................................................10

        1.  Pande's Retaliation Claim Is Barred By the Statute of Limitations Because
            She Failed to File Her DFEH Charge Until December 8, 2003 .......................11

        2.  There Is Insufficient Evidence To Support A Finding Of Retaliation..................14

    C.   PERMITTING PANDE TO TESTIFY IN DETAIL ABOUT HER MEDICAL
        CONDITION AND MEDICAL HISTORY WAS UNDULY PREJUDICIAL TO
        THIS TRIAL AND CONSTITUTES GROUNDS FOR A NEW TRIAL ....................19

    D.   THE EVIDENCE DOES NOT SUPPORT THE SUBSTANIAL COMPENSATORY
        DAMAGE AWARD BECAUSE PANDE FAILED TO MITIGATE DAMAGES AND
        REFUSED CHEVRON'S OFFER OF A COMPARABLE POSITION IN
        HOUSTON ...............................................................................................20

        1.  Pande Failed To Fulfill Her Duty To Seek Comparable Employment................21

        2.  Pande's Voluntary Withdrawal From The Job Market Is Further Evidence
            Of Her Failure to Mitigate Damages.................................................................24

III. CONCLUSION ...................................................................................................25

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

# TABLE OF AUTHORITIES

**Cases**

*Barton v. Alexander Hamilton Life Ins. Co. of America,* 110 Cal. App. 4th 1640 (2003) ........8

*Boehm v. American Broadcasting Co.*, 929 F.2d 482 (9th Cir. 1991) ....................20, 21, 24

*California School Employees Assn.,* 30 Cal. App. 3d 241 (1973) ........................................20

*Cowen v. Standard Brands*, 572 F.Supp. 1576 (N.D. Ala. 1983) ........................................23

*Currieri v. City of Roseville,* 50 Cal. App. 3d 499 (1975) ......................................................21

*First Union Nat'l Bank v. Benham*, 423 F.3d 855 (8th Cir. 2005) ........................................11

*Flait v. North American Watch Corp.* 3 Cal. App. 4th 467 (1992)..................................14, 15

*Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317 (2000) ................................................................14

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001)......................................4

*Hopkins v. Price Waterhouse,* 737 F.Supp. 1202 (D. D.C. 1990) ................................22, 24

*In re Angelia P.*, 28 Cal.3d 908 (1981) ..................................................................................4

*Kelly-Zurian v. Wohl Shoe Co.,* 22 Cal. App. 4th 397 (1994) ............................................8, 9

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 127 S. Ct. 2162 (2007)..............................13

*Mato v. Baldauf*, 267 F.3d 444 (5th Cir. 2001) ....................................................................14

*McClelland v. Climax Hosiery Mills,* 252 N.Y. 347 (1930) ....................................................20

*Molski v. M.J. Cable, Inc.,* 481 F.3d 724 (9th Cir. 2007) ....................................................11

*Morgan v. The Regents of the University of California,* 88 Cal. App. 4th 52 (2000) .............11

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)...................................12

*National Steel Corp. v. Golden Eagles Ins. Corp.*, 121 F.3d 496 (9th Cir. 1997) ................19

*Parker v. Twentieth Century-Fox Film Corp.*, 3 Cal.3d 176 (1970) ......................................21

*Pugh v. See's Candies, Inc.,* 203 Cal. App. 3d 743 (1988) ................................................19

*Real v. The Continental Group,* 627 F.Supp. 434 (N.D. Cal. 1986) ....................................23

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Richards v. CH2M Hill, Inc.,* 26 Cal.4th 798 (2001) .......................................................... 12, 14

*Sangster v. United Air Lines, Inc.* 633 F.3d 864 (9th Cir. 1980) ......................................... 21

*Smith et al v. Riceland Foods, Inc.*, 151 F.3d 813 (8th Cir. 1998) ...................................... 14

*Steckl v. Motorola, Inc.*, 703 F.2d 392 (9th Cir. 1981) ....................................................... 14

*Taylor v. Superior Court*, 24 Cal.3d 890 (1979) ................................................................. 6

*Warner v. Southern Pacific Co.,* 113 Cal. 105 (1896) ........................................................ 4

*Weeks v. Baker & McKenzie,* 63 Cal. App. 4th 1128 (1998) ............................................... 5

*West v. Bechtel,* 96 Cal. App. 4th 966 (2002) ................................................................... 23

*White v. Ultramar, Inc.,* 21 Cal.4th 563 (1999) ........................................................... 4, 8, 9

*Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028 (2005) ..................................................... 14

*Yartzoff v. Thomas*, 809 F.2d 1371 (9th Cir. 1987) .......................................................... 15

**Statutes**

Cal. Civ. Code § 3294(a) ................................................................................................ 4, 5, 8

Cal. Civ. Code § 3294(b) ............................................................................................... 5, 8, 9

Cal. Civ. Code § 3294(c) ...................................................................................................... 5

Fed. Rule Civ. Proc. 59(a)) ............................................................................................... 10

M‌ILLER L‌AW G‌ROUP
A P‌ROFESSIONAL C‌ORPORATION
L‌ARKSPUR, C‌ALIFORNIA

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, MOTION FOR A NEW TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. C 04-5107 JCS**

## MOTION AND NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on Friday, December 21, 2007, at 9:30 a.m., or as soon thereafter as the matter may be heard, on the 15th Floor, Courtroom A of this Court, located at 450 Golden Gate Ave., San Francisco, CA 94102, Defendants will, and hereby do, move this Court for an order granting judgment as a matter of law in favor of Defendants on Plaintiff Kiran Pande's ("Pande") causes of action for retaliation and wrongful termination in violation of public policy as well as judgment as a matter of law in favor of Defendants on Plaintiff's claims for punitive damages. Alternatively, Defendants move for a new trial on the causes of action for retaliation and wrongful termination in violation of public policy, as well as a new trial on the issue of damages.

This Motion will be made on the ground that judgment as a matter of law is proper because the evidence fails, as a matter of law, to support the jury verdict and there is no evidence, much less clear and convincing evidence, to support a punitive damages award. Alternatively, a new trial is proper because the jury's verdict in Pande's favor (including the amount of damages awarded) is against the clear weight of the evidence and because of the erroneous admission of prejudicial evidence. This motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the papers on file in this action, and on such further evidence as may be presented prior to or at the hearing on this Motion.

Dated: November 13, 2007

MILLER LAW GROUP
A Professional Corporation


By: _____/S/_____
Michele Ballard Miller
Attorneys for Defendants
CHEVRON CORPORATION (f/k/a
ChevronTexaco Corporation) and
CHEVRON INTERNATIONAL
EXPLORATION & PRODUCTION (f/k/a
ChevronTexaco Overseas Petroleum), a
division of Chevron U.S.A. Inc.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.    PRELIMINARY STATEMENT

Plaintiff Kiran Pande's employment ended when she declined to move to Houston with Block 14 of the SASBU and was unable to find another position within Chevron. Notwithstanding, Pande claimed at trial that the real reason for her termination was her decision to take a medical leave in November 2003.  The jury rejected this claim.  However, Pande did succeed in convincing the jury that there was factual support for her suspicions that her failure to find a new position was due to the malicious acts of her former supervisor, Rex Mitchell.    Pande failed, however, to present any *actual evidence* that Mitchell sabotaged her efforts to find another job or, for that matter, did anything else that would support a finding of retaliation.  On the contrary, even a cursory review of the evidence establishes that Mitchell did not retaliate against Pande.

For example, Pande suspects, without any supporting evidence, that Mitchell prevented her from obtaining other positions in retaliation for her complaint of discrimination – a complaint made some 18 months prior to her termination.  However, the *actual evidence* establishes that after she complained (1) she was given a "plum" job in SASBU; and (2) Chevron demonstrated its continued desire to retain her by offering a transfer with her unit to Houston.  Although she now claims the SASBU job was a "step down," the evidence (including Pande's own written words expressing gratitude and enthusiasm about her placement) establishes that it was a desirable position.  In any event, as Judge Wilken stated: "getting a job is not an adverse action."  Meanwhile, Pande presented no evidence to link her complaint against Mitchell to her failure to obtain any position – no evidence that any selected candidate was less suited to the job than she was; no evidence that any of the decision-makers knew about her complaint; and no evidence that any of Mitchell's *post-complaint* assessments of her prevented her from obtaining a position.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

To the contrary, the *actual evidence* demonstrates Chevron's commitment to making a place for Pande within the organization.  Rather than accept the SASBU move as a stepping stone to a more attractive non-technical job, Pande chose to gamble – she chose not to move with her group to Houston and then apply for highly competitive positions in coveted geographical locations despite knowing full well that her employment would be terminated if she did not find something.  Pande gambled and lost – her poor decisions simply do not entitle her to the jackpot the jury awarded, particularly given the fact that Pande produced ***absolutely no evidence*** that Mitchell had anything to do with the selection decisions in question.  Pande's failure to challenge the actual evidence with anything other than unsubstantiated suspicions entitles Chevron to judgment in its favor.

Moreover, even if Chevron was properly found liable for retaliating against Plaintiff (which it was not), her damages must, as a matter of law, be reduced to reflect Pande's decisions to (1) turn down a "sure" job in Houston, (2) geographically limit her post-Chevron job search in what even she admits is a "hot" job market for people with her educational background and work experience, and (3) remove herself from the market and instead follow her entrepreneurial desire to start up her own consulting firm.  Once the court weighs the evidence for itself it will become readily apparent that a new trial should be ordered due to Pande's failure to establish retaliation and the jury's failure to consider her lack of effort to mitigate her damages.

Finally, because any award of punitive damages depends on a finding of retaliation, Pande's failure to substantiate this allegation also entitles Chevron to judgment in its favor on Pande's claim for punitive damages.  Even if Pande had established that a *preponderance of the evidence* supports her retaliation and public policy claims, she did not, as a matter of law, meet the *heightened* standard of showing by *clear and convincing evidence* that an *officer, director or managing agent* committed acts of *oppression, fraud or malice* against her, which is required to support a claim for punitive damages.  Indeed, having failed to present any *actual evidence* proving that Chevron did anything but hire

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1    other qualified candidates for certain jobs in the fall of 2003, Pande certainly cannot

2    establish that the selection decisions at issue warrant an award of punitive damages.

3        In short, the Court should enter judgment as a matter of law in Chevron's favor on all

4    of Pande's claims.  Alternatively, the Court should exercise its power to grant a new trial on

5    the ground that the verdict, even if supported by *some* evidence, is contrary to the clear

6    weight of the evidence.  Nor is there the requisite clear and convincing evidence to support

7    the punitive damage award.  Accordingly, the jury verdict should be reversed.

8

9    ## II.    LEGAL ANALYSIS

10

11   ## A.    THERE IS INSUFFICIENT EVIDENCE TO SUPPORT AN AWARD OF PUNITIVE DAMAGES.

12

13       Punitive damages are recoverable only when a plaintiff proves "by clear and

14   convincing evidence that the defendant has been guilty of oppression, fraud, or malice."

15   Cal. Civ. Code § 3294(a). To be clear and convincing, the evidence must be "sufficiently

16   strong to command the unhesitating assent of every reasonable mind."  *In re Angelia P.*, 28

17   Cal.3d 908, 919 (1981) (internal quotation marks omitted).  This requirement presents "a

18   heavy burden, far in excess of the preponderance sufficient for most civil litigation."

19   *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186-87 (9th Cir. 2001) (internal

20   quotation marks omitted).  Punitive damages are not designed to compensate a tort victim,

21   but rather to punish persons "'guilty of recklessness or wickedness.'"  *White v. Ultramar,*

22   *Inc.,* 21 Cal.4th 563, 569 (1999) (quoting *Warner v. Southern Pacific Co.,* 113 Cal. 105, 112

23   (1896)).

24       Because "[c]orporations are legal entities which do not have minds capable of

25   recklessness, wickedness, or intent to injure or deceive" an award of punitive damages

26   against a corporation – like Chevron – "must rest on the malice of the corporation's

27   employees."  *Cruz v. HomeBase,* 83 Cal. App. 4th 160, 167 (2000).  However, a corporation

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

cannot be legally responsible for the actions of all its employees.  Rather, the law requires proof of malice by "corporate leaders," that is, the corporate "officer[s], director[s], or managing agent[s]."  *Id.*  Thus, to support an award of punitive damages, Pande bore the burden of proving **by clear and convincing evidence** that an **officer, director, or managing agent** of Chevron was guilty of **oppression, fraud or malice**.  Cal. Civ. Code § 3294(b) (emphasis added).  She utterly failed to meet this burden.

### 1.    There Is No "Clear And Convincing" Evidence Of Malice, Fraud Or Oppression.

In non-contract employment law cases, punitive damages are available only "where it is proven by *clear and convincing evidence* that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code §3294(a) (emphasis added).  In the context of a corporate employer's liability for punitive damages, "California has traditionally allowed punitive damages to be assessed against an employer . . . for the acts of an employee . . . only where the circumstances indicate that [the employee] himself was guilty of fraud, oppression or malice."  *Weeks v. Baker & McKenzie,* 63 Cal. App. 4th 1128, 1154 (1998).

The punishable acts that constitute "oppression, fraud, or malice" are strictly defined by statute.  Cal. Civ. Code § 3294(c).  "'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  *Id.* at § 3294(c)(1).  "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  *Id.* at § 3294(c)(2).  "'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  *Id.* at § 3294(c)(3).

Although the jury found by a **preponderance of the evidence** that Pande's non-selection for other positions constituted retaliation for having complained about Rex Mitchell, that finding does not automatically ratchet up to satisfy the **heightened** standard of **clear**

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1    *and convincing evidence* of "**oppression, fraud, or malice**" required to award punitive

2    damages.[1]    Rather, liability under Section 3294 requires at least "conscious disregard," if

3    not deliberately despicable conduct: "Something more than the mere commission of a tort is

4    always required for punitive damages." *Taylor v. Superior Court*, 24 Cal.3d 890, 895 (1979).

5    Thus, to warrant such an award, there must be seriously aggravating or outrageous facts

6    such as "spite or 'malice' or a fraudulent or evil motive" or "such a conscious and deliberate

7    disregard" that the conduct may be called "willful or wanton." *Id.*

8        Pande failed to meet this heightened standard – she presented no evidence of

9    extreme, outrageous, or willful and deliberate acts by Mitchell.[2]    The undisputed evidence at

10   trial showed that Pande's employment ended when she declined the move to Houston with

11   Block 14 of SASBU and was unable to find another position with Chevron.[3]    Although

12   Pande suspects she was not selected for another position because she "dared" complain

13   about Mitchell, she offered no evidence that any decision-makers even knew about her

14   complaint.    Neither Pande nor any other witness testified that Mitchell knew of, or was

15   involved in any way with those selections.    There is simply *no* evidence in the record that

16   Mitchell ever communicated with anyone involved in the decision-making process during the

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

---

[1]    This standard is higher than that for proving retaliation and violation of public policy, and the jury was so instructed. *See, e.g.*, Jury Instructions 11 and 25.

[2]    In fact, when Chevron first moved for Judgment as a Matter of Law at the conclusion of the Plaintiff's case-in-chief, Pande never even alleged that Mitchell was a "managing agent" within the meaning of the statute.  Rather, counsel argued that it was Jack Dunn's conduct and ratification by others that warranted an award of punitive damages.  (Tr. 923:1-925:19)  Given the jury's verdict for Chevron on the only two causes of action that implicated Dunn, the award of punitive damages should be vacated.

[3]    Pande alleged at trial that the real reason her employment was terminated was because she elected to take a medical leave of absence.  The jury rejected this claim, finding in Chevron's favor on her first and second causes of action.

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES
Case No. C 04-5107 JCS**

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  Fall 2003 PDC, or that he made a deliberate effort to torpedo Pande's application.[4]  In fact,

2  there is no evidence that Mitchell had anything to do with Pande's future after Pande left

3  Mitchell's group on December 6, 2002, aside from merely confirming that *before* Pande

4  complained he had rated her performance as a "2" for "fully meets expectations" – conduct

5  that hardly qualifies as "wicked," "oppressive," "fraudulent," or "malicious."[5]

6      Without evidence that Mitchell (or anyone else who knew about Pande's

7  discrimination complaint) deliberately interfered with Pande's selection for these positions,

8  allowing the punitive damage award to stand turns the standard for punitive damages on its

9  head.  Certainly, it disregards the heightened evidentiary standard imposed by Section

10  3294(a).  More significantly, it places the burden on Defendants to prove affirmatively that

11  Mitchell had no hand in Pande's Fall 2003 PDC outcome, rather than properly leaving the

12  burden on Plaintiff to show that Mitchell, or someone else who knew about Pande's

13  complaint, took intentional and despicable actions that kept her from finding a new position

14  once she declined the move to Houston.

15      In short, because Pande failed to produce "clear and convincing" evidence of

16  oppression, fraud or malice, the punitive award of $2.5 million must be reversed.  Cal. Civ.

17

18  [4]  Although Pande tries to link Rex Mitchell to her non-selection for a London Reservoir
Engineering position by pointing to an e-mail by Brian Smith saying her perceived lack of teamwork

19  in planning (Mitchell's group) played a role in her non-selection, that e-mail simply does not link
Mitchell to the decision.  Indeed, the e-mail does *not even mention* Mitchell.  Even if it did, without

20  any evidence of what Mitchell allegedly said or when he said it, the link would be too attenuated to
qualify as "clear and convincing evidence" of the "malicious, oppressive or fraudulent" type of

21  conduct needed to establish punitive damages liability.  Its value is further diminished by the
testimony of George Alameda, Pande's Personnel Development Representative ("PDR") during the

22  Fall 2003 PDC, who was actually in the room when the selection discussions took place.  Alameda
testified that the only comments about Pande's teamwork were made by other *technical* (as opposed

23  to planning) employees and that no one from the Chevron planning function was even present at the
PDC. (Tr. 1123:18-1125:12; 1139:24-1141:24)

24

25  [5]  Pande has suggested that perhaps her "2" rating negatively affected her later applications within
Chevron.  She presented no evidence, however, that any of the persons involved in those later

26  decisions was aware of her "2" ranking, let alone that it played any role in the decision.  Nor is there
any evidence that a "2" rating (which is a fully satisfactory rating) would have been considered a

27  negative for any of the positions at issue, or that the other candidates for the positions had a higher
rating.

28

1    Code § 3294(a).

2

3        **2.      Pande Presented No Evidence That Mitchell Was A "Managing Agent".**

4

5        Even if Pande had satisfied the demanding "clear and convincing" standard to show

6    that Mitchell was guilty of malicious conduct, judgment in Chevron's favor would still be

7    required because Pande offered no evidence establishing that Mitchell was an "officer,

8    director or managing agent" of Chevron.  *See* Cal. Civ. Code § 3294(b); *Barton v. Alexander*

9    *Hamilton Life Ins. Co. of America,* 110 Cal. App. 4th 1640, 1644 (2003) (all findings under

10   Civil Code Section 3294 must meet the higher standard and "be made by clear and

11   convincing evidence.")  In the absence of such evidence, the award of punitive damages

12   must be reversed.

13       It is undisputed that Mitchell was not an officer, director or managing agent of

14   Chevron.  A "managing agent" includes "only those corporate employees who exercise

15   ***substantial*** independent authority and judgment in their corporate decision making so that

16   ***their decisions ultimately determine corporate policy*.**   *White v. Ultramar Inc.*, 21

17   Cal.4th 563, 566-67 (1999) (citing *Kelly-Zurian v. Wohl Shoe Co.,* 22 Cal. App. 4th 397, 421,

18   422 (1994) (emphasis added)).  "Corporate policy" refers to the "general principles which

19   guide a corporation" or the "rules that are intended to be followed consistently over time

20   within corporate operations.  "A 'managing agent' is one with *substantial authority* over

21   decisions that set these general principles and rules."  *Cruz,* 83 Cal. App. 4th at 167-68

22   (emphasis added).  Here, there is no evidence, much less ***clear and convincing*** evidence,

23   that Mitchell exercised *any* authority over "corporate principles or rules of general

24   application in the corporation."  *Id.* at 168.

25       In fact, there is no evidence at all regarding Mitchell's authority when the alleged

26   "malicious acts" occurred, namely when he was the Planning Manager for International

27   Upstream Planning, a group of five to ten employees within a larger overseas upstream

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  company of 15,000 employees. (Tr. 237:5-7 & 271:15-18; 431:21-432:8)  Although able to

2  direct the work of his small group, it is undisputed that Mitchell did not have the authority to

3  hire, transfer, promote or adjust salaries on his own.    While he could make

4  recommendations, he needed approval from others before any such actions were

5  implemented.  For example, Mitchell testified that while he sought out Pande for his group in

6  2000, he did not have the authority to simply transfer her into his group.  (Tr. 883:19-884:7)

7  Nor did he have the authority to promote her.  (Tr. 897:16-898:7)  Rather, he had to seek

8  approval from the Personnel Development Committee ("PDC").  (*Id.*)    As the evidence

9  showed, Mitchell did not have authority to independently affect Pande's employment, much

10  less to determine corporate policy.  (Tr. 897:16-898:7)

11        At best, Pande established that Mitchell was her supervisor.  However, supervisory

12  status alone does not make one a managing agent.  To hold otherwise would effectively

13  abolish the distinction that the Legislature clearly intended when it enacted Section 3294(b).

14  "A rule defining managing agent as any supervisor who can hire or fire employees, but who

15  does not have substantial authority over decisions that ultimately determine corporate

16  policy, effectively allows punitive damage liability without proof of anything more than simple

17  tort liability, which we have long recognized is insufficient."  *White*, 21 Cal.4th at 954; *see*

18  *also Kelly-Zurian,* 21 Cal.4th 397 (1994).

19        Lacking any evidence that Mitchell's position at the time made him a managing

20  agent, Pande has in the past pointed to Mitchell's *current* position as Chief Compliance

21  Officer for Chevron Corporation to bolster her argument.  This gets her nowhere, particularly

22  since Mitchell did not move into this position until *two and a half years after* Pande's

23  termination.  (Tr. 1035:20-1038:8)  Evidence regarding Mitchell's current position cannot

24  retroactively transform his former position as the Planning Manager with Chevron Overseas

25  Petroleum into that of a managing agent for Defendants.  Because the analysis of whether

26  an employee is a "managing agent" turns on a fact specific review of the employee's

27  authority over "corporate policies or rules of general conduct," that analysis must examine

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

the authority in the context of the employee's position with the corporation *when the alleged wrongful conduct occurred*. What authority Mitchell may have had years later is irrelevant. The only question is whether there is sufficient evidence to support a finding that Mitchell was a managing agent during Pande's employment. The answer is no.

In short, Pande produced no evidence, much less clear and convincing evidence, to support an award of punitive damages against Chevron. While "every corporate employee's reckless or malicious conduct has the potential to cause serious injury . . . [w]hether the corporation will be liable for punitive damages depends, not on the nature of the consequences, but rather on whether the malicious employee belongs to the leadership group of 'officers, directors and managing agents.'" *Cruz,* 83 Cal. App. 4th at 168. Absent any evidence that Mitchell was in this leadership group, the punitive damage award cannot stand.[6]

## B.  PANDE HAS NOT PRESENTED SUFFICIENT EVIDENCE TO ESTABLISH RETALIATION IN VIOLATION OF THE FEHA.

Pande alleges that she was retaliated against in violation of the California Fair Employment and Housing Act ("FEHA") based on complaints she made about Rex Mitchell. (Second Amended Complaint ("SAC") ¶¶ 68-72)  She offered no proof of retaliatory animus, only her own suspicion.  Absent such proof, the jury's award of $5,571,435.50 should be

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

---

[6] To the extent Pande argues that Chevron's corporate officers, directors and/or managing agents ratified Mitchell's alleged retaliatory acts, the record is devoid of any evidence to support this theory. Pande produced no evidence, much less clear and convincing evidence, that any officer, director or managing agent had actual knowledge of Mitchell's alleged malicious conduct or its outrageous character.  *Cruz,* 83 Cal. App. 4th at 168.

1   vacated and judgment entered for Chevron.[7]  *First Union Nat'l Bank v. Benham*, 423 F.3d

2   855, 863 (8th Cir. 2005) (a JMOL is proper "when the record contains no proof beyond

3   speculation to support a verdict.")

4

5   ### 1.    Pande's Retaliation Claim Is Barred By the Statute of Limitations Because She Failed to File Her DFEH Charge Until December 8, 2003.

6

7   Pande alleges that she first complained to Jay Johnson about Rex Mitchell on March

8   4, 2002.  (Tr. 254:2-23)    As a result of her complaints, Pande argues that she was

9   subjected to adverse employment actions by Defendants.  Specifically, she alleges that she

10  received a "2" (Fully Meets Performance Expectations) in her April 2002 Performance

11  Management Plan ("PMP"), was "deliberately" excluded from Planning Group work

12  meetings, isolated from the planning group and otherwise impeded "in her ability to perform

13  and advance within the company."  Finally, she suspects that Mitchell said negative things

14  about her which impacted her ability to find a job at the Fall 2002 PDC.  As a result, she

15  claims she was "forced" to take a "less desirable" SASBU job in December 2002.  All of

16  Pande's pre-December 8, 2002 claims are barred as a matter of law.

17  Filing an administrative complaint within ***one year*** of the alleged unlawful conduct is

18  a prerequisite to bringing a civil action for damages under the FEHA.    *Morgan v. The*

19  *Regents of the University of California,* 88 Cal. App. 4th 52, 63 (2000) (citations omitted).

20  Failure to satisfy this requirement is a jurisdictional defect.  *Martin v. Lockheed Missiles and*

21  *Space Co., Inc.,* 29 Cal. App. 4th 1718, 1724 (1994).  Accordingly, Pande's retaliation claim

22

23  ───────────────

    [7] Alternatively, even if the Court finds there was evidence sufficient to defeat Chevron's Motion for

24  Judgment as a Matter of Law (which is not the case), the Court may still order a new trial. Fed. Rule
    Civ. Proc. 59(a); *see Molski v. M.J. Cable, Inc.,* 481 F.3d 724, 729 (9th Cir. 2007) (reaffirming the

25  court's duty to set aside the verdict where it runs contrary to the clear weight of the evidence).  The
    Court also has the power to reduce an excessive verdict to an amount it believes the jury could

26  reasonably have found based on the evidence.  Here, given Pande's failure to mitigate, the
    undisputed evidence that there are, and have been, comparable jobs available and Pande's own

27  acknowledgement that the job market is "hot", there is no question that Pande could have replaced
    her income within a few months.  A remittitur is clearly warranted.

28  ───────────────

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1   – and specifically all conduct that occurred more than one year before Pande filed her

2   DFEH Complaints on December 8, 2003 (Trial Exhibit 276) – is barred as a matter of law.[8]

3          The "continuing violation" doctrine does not save Pande's claims.  In *Richards v.*

4   *CH2M Hill, Inc.,* 26 Cal.4th 798 (2001), the Court set forth the following three-part test to

5   determine application of the continuing violation doctrine:  (1) the employer's actions are

6   sufficiently similar in kind to the unlawful conduct within the limitations period; (2) the actions

7   have occurred with reasonable frequency; and (3) the employer's actions have not acquired

8   a "degree of permanence." *Id.* at 823.  In these instances, the statute of limitations does not

9   begin to run until either of the following occurs: (1) the course of conduct is brought to an

10  end, as by the employer's cessation of such conduct or by the employee's resignation; or (2)

11  the employee is on notice that further efforts to end the unlawful conduct will be in vain.  *Id.;*

12  *see also National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

13         Pande has not met this test.  First, each of the events Pande complains of is

14  independent and unrelated.  As such, Pande cannot show that Mitchell's conduct was

15  similar to any later conduct.  Second, even if the conduct were similar, the situation had

16  clearly acquired a "degree of permanence" sufficient to trigger the statute of limitations

17  before December 8, 2002.  Indeed, as Pande testified in trial, she met with Jay Johnson

18  and the Ombuds on April 24, 2002, was not satisfied with the outcome of that meeting, but

19  chose not to pursue other methods to address her perceived retaliation.  (Tr. 269:4-22;

20  518:23-520:5)  At that point "permanence" was reached.  Even looking beyond that date, in

21  October 2002, Pande was notified that she had been selected for the Block 14 SASBU

22  position.  When Pande was not selected for a Strategic Planning position, on December 3,

23  2002, she accepted the SASBU position. (Exhibit 272)  Her last day in Planning – and the

24  _____

25  [8]  Pande has presented no evidence that Mitchell had any role in the ultimate termination decision,
    her failure to obtain jobs in 2003, or in any other alleged adverse action after December 6, 2002 –

26  her last day in Mitchell's group.  Although Pande "suspects" that Mitchell impacted her 2003 salary
    action, the evidence at trial is contrary (Tr. 1387:12-1388:11) Even Pande testified that she was

27  informed by Dunn that Mitchell had not provided input to him regarding her past job performance.
    (Tr. 282:25-283:14)

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1   last day she reported to Mitchell – was December 6, 2002.[9]   The situation had certainly

2   reached a degree of permanence by that date.  Pande filed her Charge of Discrimination on

3   December 8, 2003, **one year and two days** after the last day she worked for Mitchell.  All

4   of her complaints, based on conduct that occurred more than one year before she filed her

5   DFEH Complaint, are barred as a matter of law.  *Martin,* 29 Cal. App. 4th at 1724.

6       Chevron anticipates that Pande will argue that two "actions" by Mitchell in 2003 allow

7   her to extend the statute of limitations, namely, the 2003 salary action and Mitchell's

8   alleged interference with various selection decisions in the Fall 2003. Neither supports

9   disregarding the statute of limitations.  First, as set forth *infra* at pages 14-19, there is no

10  evidence that Mitchell had any involvement in the 2003 selection process.  While Pande

11  argues that Mitchell's mention of the "2" ranking as part of the 2003 salary process

12  constituted retaliation, *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 127 S.Ct. 2162

13  (2007) is instructive.  In *Ledbetter,* the Supreme Court held that the statute of limitations

14  runs from the date of the discrete discriminatory act – in that case, several discriminatory

15  performance evaluations and the associated pay decisions, all of which occurred outside

16  the statutory period.  The Supreme Court rejected Ledbetter's arguments that because she

17  continued to receive less money than she would otherwise have received and because

18  subsequent pay decisions were impacted by those earlier evaluations, these later

19  occurrences gave present effect to the past discrimination.  Rather, the Court held that

20  "current effects alone cannot breathe life into prior, uncharged discrimination." *Id.* at 2169.

21      Here, Pande received no PMP for 2002, and the "2" presumably referred to her 2001

22  PMP.  Accordingly, even if the "2" impacted Pande's April 2003 salary determination, the

23  limitations period began to run from the date the "2" was received in early 2002, and was

_____

[9]  Although Pande emphasized the date Monday, December 9, 2002 as her first day of employment
in Dunn's group, for purposes of determining the statute of limitations the applicable date is her last
day in Mitchell's group, not her first day in Dunn's. (*See* Transcript of Proceedings from Defendants'
Motion For Summary Judgment, 01/05/2007, 5:9-14 "Mr. Lebowitz: Well, first of all, December 9th is
the date that Miss Pande began working in the other unit, so that's the date that we use.  The Court:
I don't think so.  I think the date is the last date that she worked for Mitchell unless he was over [sic]
her house at the weekend doing something." Exhibit A to Miller Dec.)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  not revived in April 2003.  In short, there is no evidence in the record sufficient to allow

2  Pande to extend the statute of limitations or otherwise avoid the holding in *Richards v.*

3  *CH2M Hill, Inc.,* 26 Cal.4th 798 (2001).  As such, the jury's finding that Chevron retaliated

4  against Pande should be reversed.

**2.    There Is Insufficient Evidence To Support A Finding Of Retaliation.**

7  Even if the statute of limitations did not bar her claims (which is not the case), Pande

8  still can not meet her burden of showing "specific, substantial" evidence to support her

9  retaliation claim.  *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1981); *Guz v. Bechtel*

10  *Nat'l, Inc.,* 24 Cal.4th 317, 356 (2000).  Rather, she utterly failed to prove any causal

11  connection between her complaints about Mitchell and any adverse employment action.

12  *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1044 (2005); *Flait v. North American*

13  *Watch Corp.* 3 Cal. App. 4th 467, 476 (1992).[10]  Indeed, the evidence at trial showed that

14  Pande did receive a Chevron position after working with Mitchell – the SASBU Block 14

15  position[11] – and that Pande's termination and failure to obtain alternate positions in 2003

16  had nothing whatsoever to do with Mitchell.  Where, as here, a plaintiff fails to present any

17  evidence of causation linking her protected activity to any allegedly adverse action,

18  judgment as a matter of law is appropriate. [12]

[10]  To establish a *prima facie* case of retaliation under the FEHA, the plaintiff must show (1) she had engaged in a protected activity; (2) the employer subjected her to an adverse employment action; and (3) there was a causal link between the protected activity and the employer's action.  *Flait,* 3 Cal. App. 4th at 476.

[11]  During the hearing on Defendants' Motion For Summary Judgment, the Court recognized that being given the SASBU, Block 14 position is  not  an adverse action.  Judge Wilken stated: "getting a job is not an adverse action."  (*See* Miller Dec. Exhibit A, Transcript, 1/5/07, 12:17)

[12]  *See, e.g., Smith et al v. Riceland Foods, Inc.*, 151 F.3d 813, 818-19 (8th Cir. 1998) (jury's finding of retaliation under Title VII was based on "complete speculation" and judgment as a matter of law granted where plaintiff introduced insufficient evidence that managers knew of prior protected activity); *c.f., Mato v. Baldauf*, 267 F.3d 444, 451 (5th Cir. 2001) (JMOL granted, in part, because mere involvement of a supervisor in the managerial process that ultimately resulted in employee's termination was insufficient to establish causation of retaliation under Title VII).

All Pande offered in support of her retaliation claim were her own conclusory allegations devoid of any factual support.[13]  By way of example, Pande alleges that she received a "2" ranking on her April 2002 performance evaluation – allegedly as a result of her complaints about Mitchell.  The evidence, however, showed that the ranking of "2" was determined before Pande ever complained about discrimination or harassment.  (See Tr. 1092:14-1095:1, 1097:7-9 (Johnson Testimony); 1386:10-1387:11 (Hartshorn Testimony)) Nor is there any evidence that the 2 rating had any negative impact on her employment. Plus, common sense dictates that the obviously positive assessment of "fully meets expectations" does not constitute an adverse employment action.  Pande's disagreement as to Mitchell's assessment of her performance does not convert what is obviously a positive rating into an actionable wrong.[14]  Similarly, although Pande complains of not being promoted in the Spring of 2002, she acknowledged that she would not expect a promotion if her work declined markedly and there is significant evidence of such decline.  (Tr. 505:11-17)  And, although Pande speculates that Mitchell interfered with her ability to find a position in 2002, there is also no evidence to support this claim.

Pande applied for three positions in the Fall of 2002.  (Tr. 521:9-21)  Two of these positions were in the International Gas Group.  Pande was not selected for either job due to her lack of experience in the commercial side of the gas business. (Tr. 521:22-523:5) Pande does not know who was selected, what their experience was or whether they were better qualified.  (Tr. 523:7-14)  She also has no reason to believe that the job owner did not

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

[13] Further, insofar as the jury disregarded the ample evidence of legitimate, non-retaliatory reasons for Pande's non-selection for various jobs, it did so again without any evidentiary basis.  As noted in Flait, an employer need only articulate reasons "sufficient to permit a trier of fact to conclude that its employment decision may not have been motivated by animus."  Flait, 3 Cal. App. 4th at 479 (citing Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987)).  As detailed through this part, Chevron more than met this threshold.  At that point, the burden shifted back to Pande to show pretext, which she utterly failed to do.

[14] Although Pande objected to Mitchell's assessment of her performance in 200, believing she should have been rated a "1" instead of the "2" she received, she presented absolutely no evidence about her performance in 2002.  In fact, she never argued that she deserved a "1," or did anything else to rebut Hartshorn's testimony on this point.

15

1    select her for any reason other than the one stated – lack of gas experience -- and offered

2    *no evidence* whatsoever that Mitchell somehow influenced this decision. (Tr. 523:15-23;

3    526:4-530:25; Exh. 27)

4         The facts surrounding the selection for the third position – corporate planning position

5    – are similarly insufficient to support the jury's verdict.  Indeed, Pande produced *absolutely*

6    *no facts* from which the jury could reasonably conclude that Mitchell sabotaged her

7    application for this position.  Pande's "evidence" was nothing more than her belief that since

8    she did not get the job Mitchell somehow was involved.  Such evidence is wholly insufficient

9    to support a verdict.   The jury completely ignored the only evidence in the record, namely,

10   that Mitchell advocated for Pande to Des King. (Tr. 973:21-975:25)[15]

11        The evidence shows that in addition to the three jobs she applied for, Pande was also

12   considered for several other positions, and ultimately received a "plum" job in SASBU during

13   the Fall 2002 PE PDC.  (Tr. 521:9-21; 1367:7-1370:6)  Indeed, given Pande's demand – a

14   position in San Ramon – it can hardly be retaliatory when the PDC offers her the *only open*

15   *position* that met her specific request.  Although Pande would clearly have liked something

16   else, she presented *no evidence* that there was any other vacant position, much less that

17   Mitchell adversely impacted her selection for that illusory other vacant job.   Absent such

18   evidence, the jury's finding of a "causal connection" between Pande's non-selection and

19   Mitchell's actions is clearly wrong.

20        There was also no evidence that Mitchell interfered with Pande's employment after

21   she left his group in early December 2002.   Pande complains that she did not receive a

22   merit increase in 2003.  Once again, although Pande does not know how this decision was

23   made, she suspects Mitchell is the culprit.   The record, however, shows otherwise.

24

25

26   [15] Even if the jury did not believe that Mitchell spoke with Des King, Pande was still required to
     produce something that would connect Mitchell to her failure to be selected for this position.  She
27   produced nothing other than her suspicions – she produced no witness or document from which the
     jury could reasonably have concluded that retaliation was the reason Pande did not get this job.

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  Although Mitchell confirmed that he *had* rated Pande as a "2 performer,"[16] this rating was for

2  Pande's performance in 2001 – Mitchell never did a PMP for 2002.  It was Hartshorn who

3  determined what percent of competitive objective ("CO") she should receive.  That decision,

4  in turn, resulted in the merit raise Pande erroneously attributes to Mitchell.  Hartshorn simply

5  did the math – since Pande was at 98.5% of CO, with a three year assignment, she would

6  get a .5% merit raise such that by the end of three years she would be at 100% of CO.  (Tr.

7  1387:12-1388:11)

8       The record also lacks any evidence linking Mitchell – or his "2/Fully Meets

9  Expectations" rating – to any of the job selection decisions at issue in 2003.  Pande did not

10  produce one witness to corroborate her suspicion that Mitchell was somehow responsible

11  for her non-selection.  On the contrary, there was no evidence showing the decision-makers

12  even knew of Pande's "2" rating, much less that it factored into their selection.  Moreover,

13  even Pande admitted that several of the jobs she applied for were "a stretch," and she did

14  not think that she had a realistic chance of being selected for any of them.  (Tr. 314:16-25)

15  In fact, for the jobs on the cross-functional PDC, Pande testified that she thought she had "a

16  one percent possibility" of being selected. (Tr. 315:22-316:6)

17       Pande's testimony regarding other positions also lacks any evidence tying Mitchell to

18  the selection decisions.  For example, she cites two positions in the Energy Technology

19  Company ("ETC").  Although Pande has no idea who made these selection decisions, she

20  again suspects Mitchell.  The uncontroverted evidence, however, shows that Mitchell had

21  nothing to do with these selections.   Janeen Judah, who became the General Manager for

22  ETC and was on the selection committee for these jobs, stated that Pande was considered

23  for both jobs but other women were selected instead.  (Tr. 1292:17-21; 1293:12-17; 1295:1-

24  1298:22)  There was no discussion at the selection committee meetings about any issues

25

26

27  ───────────────
   [16] As stated previously, *infra* at footnote 14, Pande presented absolutely no evidence about her performance in 2002, and never rebutted Hartshorn's testimony on this point.

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  Pande might have had with Mitchell. (*Id.*)   In fact, Mitchell's name never came up during the

2  selection process for these two jobs or the other selection Judah testified about.[17]  (*Id.*)

3       Likewise, although Pande felt herself qualified for the International Business Unit

4  Manager position, she presented no evidence linking Mitchell to her non-selection.   John

5  Ladd, a member of the selection committee, testified that although Pande had excellent

6  references, there was another candidate who had more relevant experience in business

7  development and a background in downstream, which the committee deemed important.

8  (Tr. 1416:3-1419:22)   Pande simply was not viewed as the strongest candidate.   (Tr.

9  1419:21 -1420:3)  Mitchell had nothing to do with this decision and there is no evidence to

10  suggest anything different.

11       Pande also believes that the PE PDC's failure to select her for the London petroleum

12  engineer positions had something to do with Mitchell.  As Pande testified, she was surprised

13  she was not selected – she thought she was a good candidate, knew some of the

14  management in that group and had worked with them previously.  (Tr. 316:7-20)  According

15  to George Alameda, who was Pande's PDR at the PDC, when he proposed a "proficient"

16  rating for teamwork, others on the committee who had worked with Pande "questioned

17  whether or not it was an appropriate rating."  (Tr. 124:3-12)  Although Pande suspects

18  Mitchell was to blame for raising questions about her teamwork, the only testimony on the

19  subject established that those concerns were raised only by people who had worked with

20  Pande on prior technical assignments, not by Mitchell and not by others in the planning

21  group.  (Tr. 1124:19-1125:12)

22       Although Pande made much at trial about an email Brian Smith sent her, in which he

23  said there was some mention at the PDC of her time in planning and some of the

24  relationships when she was in that group, this email gets her nowhere.   First, Pande

[17]  Judah was also on the selection committee for the Focus Area Manager of Reservoir Management position.  As with the ETC positions, Judah testified that no one interviewed either the candidates or their supervisors – the committee "went off the paperwork."  There was no discussion about any issues Pande might have had with Mitchell.  (Tr. 1295:10-1296:8)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

18

1  conceded that she did not know who actually made the decision in question or whether the

2  person selected was more qualified than her.  (Tr. 558:22-559:22)  She also admitted that

3  she did not know if anyone on the selection committee had ever spoken to Mitchell.

4  (Tr. 559:18-22)  She produced no evidence that Mitchell had spoken to anyone about her

5  application, much less said anything negative.  Pande also did not call any witness to rebut

6  Alameda's testimony that the comments about her teamwork at the PDC were made by

7  managers who had previously worked with her on technical assignments **not** planning

8  assignments.  Instead, Pande merely stated that it was her "understanding" that such

9  comments were made and, without more, suspects that the comments came from Mitchell

10  and were related to the complaint she made some 16 months earlier.  Such unsupported

11  speculation falls far short of the evidentiary burden required to support a verdict.  *National*

12  *Steel Corp. v. Golden Eagles Ins. Corp.*, 121 F.3d 496, 502 (9th Cir. 1997) ("[a] plaintiff's

13  belief that a defendant acted from an unlawful motive, without evidence to support that

14  belief, is no more than speculation or unfounded accusation about whether the defendant

15  really did act from an unlawful motive.")

16       In the end, all Pande could show is that she applied for a number of positions but was

17  not selected for any.  She produced **no evidence** from which the jury could reasonably

18  conclude that her complaints about Mitchell were the reason she was not selected.  Absent

19  such evidence, the jury's finding that Chevron intentionally retaliated against Pande must be

20  reversed.[18]

21

22  **C.  PERMITTING PANDE TO TESTIFY IN DETAIL ABOUT HER MEDICAL
CONDITION AND MEDICAL HISTORY WAS UNDULY PREJUDICIAL TO THIS
23  TRIAL AND CONSTITUTES GROUNDS FOR A NEW TRIAL.**

24       Prior to trial, Chevron raised concerns about the extent and scope of the medical

25

26  [18]    Pande's cause of action for wrongful termination in violation of public policy incorporates
allegations from Pande's retaliation claim.  Accordingly, it fails – the burden of proof is the same
27  whether a claim for discrimination arises as a statutory claim or as a tort claim for violation of public
policy.  *Pugh v. See's Candies, Inc.,* 203 Cal. App. 3d 743, 752 (1988).

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

19

1  evidence Pande intended to introduce at trial.  It raised its concerns during the Pre-Trial

2  Conference, in its Motions in Limine and finally during trial itself, as Pande continued to

3  elaborate on her medical problems.  (*See, e.g.,* Tr. 151:4-22; 242:4-245:7; 319:2-320:16;

4  323:6-17)  Specifically, after Opening Arguments, when opposing counsel went on at length

5  about the medical issues Pande allegedly suffered during her last few years with Chevron –

6  issues that she never disclosed to anyone at the company – counsel for Chevron objected

7  and sought yet another ruling limiting Pande from testifying about this issue.  (Tr. 195:12 -

8  201:10)  Once again, the Court rejected Chevron's request and Pande was allowed to

9  testify at length about medical problems, *even though she never shared this information*

10  *with anyone at Chevron.*  This evidence clearly inflamed the jury, lacked any probative value

11  and should have been excluded to avoid the clear prejudice to Chevron.  The Court's failure

12  to do so warrants a new trial.

13

14  **D.    THE EVIDENCE DOES NOT SUPPORT THE SUBSTANIAL COMPENSATORY DAMAGE AWARD BECAUSE PANDE FAILED TO MITIGATE DAMAGES AND REFUSED CHEVRON'S OFFER OF A COMPARABLE POSITION IN HOUSTON.**

15

16        As the Ninth Circuit recognizes, "[u]nder California law, an employee who has been

17  wrongfully terminated has a duty to mitigate damages through reasonable efforts to achieve

18  other employment."  *Boehm v. American Broadcasting Co.*, 929 F.2d 482, 485 (9th Cir.

19  1991).  The rationale for this "duty," as explained by Judge Cardozo, is that:

20        The servant is free to accept employment or reject it according to his

21  uncensored pleasure.  What is meant by the supposed duty is merely this: That if he unreasonably reject, he will not be heard to say that the loss of wages

22  from then on shall be deemed the jural consequence of the earlier discharge. He has broken the chain of causation, and loss resulting to him thereafter is

23  suffered through his own act.

24  *McClelland v. Climax Hosiery Mills,* 252 N.Y. 347, 359 (1930), *quoted in California School*

25  *Employees Assn.,* 30 Cal. App. 3d 241, 249 (1973).  The "general rule" "is that the measure

26  of recovery by a wrongfully discharged employee is the amount of salary agreed upon for

27  the period of service, less the amount which the employer affirmatively proves the employee

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  has earned or with reasonable effort might have earned from other employment." *Boehm,*

2  929 F.2d at 485, citing *Parker v. Twentieth Century-Fox Film Corp.*, 3 Cal.3d 176, 181

3  (1970).  Because this obligation to seek comparable employment is a continuing duty,

4  withdrawal from the labor market likewise precludes economic damages.  *See Currieri v.*

5  *City of Roseville,* 50 Cal. App. 3d 499, 506-07 (1975) (withdrawal from the labor market to

6  attend school full-time cuts off economic damages).

7       In other words, liability ends when there is a willful loss of earnings – such as

8  withdrawing from the labor market, refusing to accept substantially equivalent employment,

9  failing to diligently search for alternative work, or voluntarily quitting alternative employment

10  without good reason.  *See Sangster v. United Air Lines, Inc.*  633 F.3d 864, 867-68 (9th Cir.

11  1980) (back pay precluded in Title VII case where the plaintiff failed to mitigate damages).

12  Pande failed to mitigate damages and is therefore not entitled to the compensatory

13  damages awarded.

14       **1.    Pande Failed To Fulfill Her Duty To Seek Comparable Employment.**

15

16       The evidence clearly demonstrates that Pande did not fulfill her duty to mitigate

17  damages.  The uncontroverted evidence at trial was that comparable jobs were not only

18  available, but were plentiful in the years subsequent to her termination, and that Pande

19  chose not to pursue those opportunities.  Pande herself testified that that the job market is

20  "hot" and there are lots of jobs she could apply for if she were interested.  (Tr. 577:25-

21  580:20)  Kathy Mabe testified that she is involved in hiring reservoir simulation engineers,

22  that such individuals earn between $1000 and $1500 per day, and that both Chevron and

23  other oil companies are actively searching for such people.  (Tr. 755:4-23)  Similarly,

24  Defendants' expert, Andrew O'Brien testified, based upon his research and his discussions

25  with a recruiter in the petroleum industry, that the job market during the relative time period

26  was "excellent."  (Tr. 1506:16-1507:21) In fact, O'Brien searched for reservoir engineering

27  positions just before preparing his report and found approximately 20 available positions at

28

**MILLER LAW GROUP**
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1  that time alone.  (Tr. 1507:5-1508:17)  He even testified that Gladney Darroah, a petroleum

2  industry recruiter, had a position in April 2006 in which he could have immediately placed

3  Pande.  (Tr. 1509:23-25; 1510:10-20)  Pande did not refute this testimony.

4      The undisputed evidence also showed that Pande placed geographic limitations on

5  her job search efforts which significantly hampered her ability to find alternative employment

6  both prior to and after her termination.  By way of example, Mabe testified that Pande

7  wanted to work in only the Bay Area or London even though Chevron International

8  employees know full well that to succeed in their chosen profession they need to be "global

9  mobile."[19]  (Tr. 753:4-24)  Similarly, Alameda testified that Pande was interested only in

10  accepting positions in either the Bay Area or London, and would not consider Houston or

11  Bakersfield jobs.  (Tr. 112:3-17)  He further explained that Pande's geographic limitations

12  "most definitely" limited her opportunities to find alternative employment in the Fall of 2003.

13  (Tr. 1121:17-19 and 1122:4-25)[20]  In a global industry such as the upstream petroleum

14  industry, such geographic limitations are tantamount to withdrawal from the job market.  *See*

15  *e.g., Hopkins v. Price Waterhouse,* 737 F.Supp. 1202, 1213-14 (D. D.C. 1990) (because

16  plaintiff worked in an industry where partners were expected to move between locations,

17  plaintiff's duty to mitigate had to include a willingness to consider jobs outside of her area).

18      Rather than explain Pande's failure to find other employment, her counsel sought to

19  dilute the issue by arguing that Pande was not required to seek employment outside of the

20  Bay Area and by alluding that Pande – as a result of filing her claims against Chevron – was

21  [19] When asked about the importance of "mobility" at Chevron International, Kathy Mabe explained
22  that mobility is "very important."  She further explained "We're an international oil company, and we
    have offices all over the world.  And like I'm involved in the hiring of new hires for petroleum
23  engineering, and one of the things that, when we hire people, we want them to be global mobile,
    meaning that they'll go anywhere. Because I mean a lot of times, the oil is not in nice locations like
24  California.  It's in Luanda, Angola or Lagos, Nigeria, and they want people to go there that are
    technically smart." (Tr. 752:9-25)

25  [20] Although Pande testified that she was willing to move out of the Bay Area for work, the undisputed
26  evidence is that the only jobs she applied for in 2003 were in the Bay Area and London.
    Accordingly, what Pande was "willing" to do is immaterial given that she did not apply for positions
27  outside of these geographic limitations and told George Alameda, her PDR, that she was unwilling to
    relocate.  (Tr. 1119:9-1120:9)

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1   somehow blacklisted from working for any other oil company.  Both arguments are red

2   herrings.  First, Pande and her counsel misread the case law to provide an absolute rule

3   that "work that requires relocation from an employee's place of residence is inferior

4   employment as a matter of law."  There is no such absolute rule, and the Court has already

5   denied Plaintiff's Motion for Mitigation Instruction.[21]  (Tr. 1585:15-1586:3)

6          Second, as to the issue of "blacklisting" there is simply ***no*** evidence that Pande was

7   ever blacklisted from working for other oil companies or even that other companies were

8   aware Pande filed a complaint against Chevron.  To the contrary, Pande testified that she

9   interviewed for only one position and that position was not given to her because she was

10  not familiar with the reservoir engineering software package used by Anadarko.  (Tr. 372:3-

11  7)   The only statements in the record which even suggest such blacklisting are the

12  questions of counsel and Pande's closing argument.  (*See e.g.,* Tr. 1591:2-1522:1 and

13  1640:21-23)   Since questions and statements of counsel are not evidence they must be

14  ignored and Pande's alleged fear of being blacklisted is not – as a matter of law – sufficient

15  to excuse mitigation.  *See West v. Bechtel,* 96 Cal. App. 4th 966, 985 (2002) (vacating the

16  plaintiff's damages verdict, holding that the fear of further discrimination or wrongful

17  treatment does not excuse plaintiff's failure to mitigate and recognizing that "[i]f those

18  excuses were sufficient to spare an employee from making *any* effort to resume work, the

19  duty to mitigate damages would be wholly illusory.")   Accordingly, the compensatory

20  damages awarded to Pande should be vacated or, at a minimum, substantially reduced as a

21  result of her failure to mitigate.

22

23  _____

24  [21] Although there are some circumstances where plaintiffs are not required to consider relocation in
    order to satisfy their duty to mitigate, there are other circumstances — like the circumstances here

25  — where courts have held that a plaintiff's failure to consider relocation is unreasonable and limits
    the damages to which the plaintiff is entitled.  *See Real v. The Continental Group,* 627 F.Supp. 434,

26  448 (N.D. Cal. 1986) (rejecting plaintiff's claim that he reasonably turned down a job because it was
    located a great distance from his California home); *Cowen v. Standard Brands,* 572 F.Supp. 1576,

27  1581-82 (N.D. Ala. 1983) (plaintiff's refusal to accept an alternative job terminated his entitlement to
    back pay or front pay notwithstanding the fact that the job would have required relocation).

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

2.    **Pande's Voluntary Withdrawal From The Job Market Is Further Evidence Of Her Failure to Mitigate Damages.**

In addition to establishing that Pande's efforts to find alternative employment were severely deficient, the evidence also showed that Pande voluntarily withdrew from the job market by pursuing her own consulting business.    As explained in *Hopkins v. Price Waterhouse,* an employer cannot be held fully responsible for lost back pay that accumulated as a result of the plaintiff's "personal decision to assume the risks and benefits of a solo business."    *Price Waterhouse,* 737 F.Supp. at 1215.    Pande candidly admitted that she had been trying to set up her own consulting business "from the very beginning" and that she finally landed a client and started doing consulting work in June 2005.    (Tr. 374:22-375:5).    Similarly, O'Brien testified that:

> My impression of reading her deposition transcript and looking at the interrogatories, she wasn't particularly committed to finding a position as either a reservoir or reservoir simulation engineer.   […] I believe she indicates in her deposition as well as in her interrogatory responses that she's focusing on consulting and is limiting any search to work to the Bay Area.    (Tr. 1505:24-1506:5 and 1509:10-25).

Chevron is not responsible for Pande's decision to focus her efforts on starting a consulting business rather than pursuing employment opportunities.    In sum, because Pande voluntarily withdrew from the labor market and had no explanation for her failure to look for available employment opportunities, it cannot be legitimately disputed that Chevron established its affirmative defense that Pande failed to mitigate.    Accordingly, the jury's award of economic damages to Pande should be  overturned  or substantially reduced.[22]

---

[22]   Chevron's unconditional job offers – both in December 2002 and in June 2003 – also effectively cut off any damages on Pande's retaliation claim.    A plaintiff's rejection of an employer's unconditional offer terminates any back pay period if the employer can show: (1) that the employment offered, even if not precisely identical to the prior job, was sufficiently comparable or substantially equivalent to it, and (2) that the offer was unconditional.    *See Boehm,* 929 F.2d at 485-87.    In this case, it is undisputed that Chevron offered Pande the SASBU Block 14 position in October 2002 – a position which she ultimately accepted on December 3, 2002 – and another position in Houston on June 2, 2003.    Both of these job offers were substantially similar to the position Pande held in Mitchell's group and neither offer was conditional upon Pande waiving any
*continued*

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

1

### III.     CONCLUSION

2

3      Pande has not, as a matter of law, established any of her claims at trial.  As such,

4  Defendants are entitled to judgment in their favor as a matter of law.  Alternatively, for the

5  reasons set forth above, a new trial should be ordered.

6

7  Dated:  November 13, 2007                    MILLER LAW GROUP
                                                A Professional Corporation

8

9                                              By:  _____/S/_____
                                                    Michele Ballard Miller
10                                                  Attorneys for Defendants CHEVRON
                                                    CORPORATION (f/k/a ChevronTexaco
11                                                  Corporation) and CHEVRON
                                                    INTERNATIONAL EXPLORATION &
12                                                  PRODUCTION (f/k/a ChevronTexaco
                                                    Overseas Petroleum), a division of
13                                                  Chevron U.S.A. Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26  _____

legal claims.  Given these offers – one of which Pande accepted and the other which she declined –
27  any damages for Pande's retaliation claim cut off no later than June 2, 2003.

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

25