1  KEKER & VAN NEST, LLP
   SUSAN J. HARRIMAN - #111703
2  CHRISTA M. ANDERSON - #184325
   710 Sansome Street
3  San Francisco, CA  94111-1704
   Telephone:  (415) 391-5400
4  Facsimile:  (415) 397-7188

5  Attorneys for Plaintiff
   KIRAN PANDE

6

7

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12  KIRAN PANDE,                          Case No. 04-5107 JCS

13                        Plaintiff,      **KIRAN PANDE'S MEMORANDUM OF
                                          POINTS AND AUTHORITIES IN
14       v.                               OPPOSITION TO DEFENDANTS'
                                          MOTION FOR JUDGMENT AS A
15  CHEVRON CORPORATION (f/k/a            MATTER OF LAW OR FOR A NEW
    CHEVRONTEXACO CORPORATION), a         TRIAL**
16  Delaware corporation,
    CHEVRON INTERNATIONAL
17  EXPLORATION & PRODUCTION (f/k/a       Date:          December 21, 2007
    CHEVRONTEXACO OVERSEAS               Time:          9:30 a.m.
18  PETROLEUM COMPANY),                   Judge:         Hon. Joseph C. Spero
    a division of Chevron U.S.A., Inc.,
19                                        Date Comp. Filed:   December 2, 2004
                          Defendants.
20                                        Judgment Entered:   October 29, 2007

21

22

23

24

25

26

27

28

---

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

I.    INTRODUCTION ................................................................................................1

II.   ARGUMENT ......................................................................................................1

      A.    Chevron is not entitled to judgment as a matter of law. ...........................1

            1.    The evidence supports the jury's finding that Chevron
                  retaliated against Pande..................................................................1

            2.    Chevron's arguments against Pande's retaliation claim have no
                  legal merit or support in the record..................................................7

                  a.    The statute of limitations was a question of fact for the
                        jury. .....................................................................................7

                  b.    Pande proved Chevron's retaliatory animus, supporting
                        the jury's verdict against Chevron. ....................................9

                  c.    Pande still worked at Chevron in both December 2002
                        and June 2003, so Chevron could not "cut off" its
                        liability for its retaliatory actions by allowing her to
                        remain employed..................................................................10

            3.    The evidence supports the jury's award of punitive damages
                  against Chevron. .............................................................................10

                  a.    Chevron acted with malice and oppression. .......................11

                  b.    Chevron's managing agents committed and approved
                        the company's malicious and oppressive conduct. ............12

            4.    The evidence supports the jury's damages award against
                  Chevron...........................................................................................15

      B.    No new trial is warranted. ........................................................................17

            1.    Pande's testimony about her medical condition was not unduly
                  prejudicial and does not support granting a new trial. ...............17

            2.    The jury's verdict must stand, because it is reasonable and the
                  evidence supports it........................................................................19

III.  CONCLUSION..................................................................................................20

i

406757.02

# TABLE OF AUTHORITIES

## FEDERAL CASES

Boehm v. America Broadcasting Co.,
929 F.2d 482 (9th Cir. 1991) ....................................................................................10

City Solutions Inc. v. Clear Channel Committees, Inc.,
365 F.3d 835 (9th Cir. 2004) .....................................................................................19

Desert Palace, Inc. v. Costa,
539 U.S. 90 (2003)........................................................................................................2

Johnson v. Paradise Valley Unified Sch. District,
251 F.3d 1222 (9th Cir. 2001) .......................................................................2, 4, 6, 16

McEuin v. Crown Equipment Corp.,
328 F.3d 1028 (9th Cir. 2003) ...................................................................................19

Price v. Kramer,
200 F.3d 1237 (9th Cir. 2000) ...................................................................................17

Reeves v. Sanderson Plumbing Products,
530 U.S. 133 (2000)...................................................................................................1, 2

Ruvalcaba v City of Los Angeles,
64 F.3d 1323 (9th Cir. 1995) .....................................................................................18

Union Oil Co. of Cal. v. Terrible Herbst, Inc.,
331 F.3d 735 (9th Cir. 2003) .....................................................................................19

United States v. Khan,
993 F.2d 1368 (9th Cir. 1993) ...................................................................................17

White v. Ford Motor Co.,
312 F.3d 998 (9th Cir. 2002) .......................................................................................1

Winarto v. Toshiba America Electronics Components, Inc.,
274 F.3d 1276 (9th Cir. 2001) .......................................................................2, 10, 11

## STATE CASES

Cruz v. Homebase,
83 Cal. App. 4th 160 (2000) .......................................................................................12

Richards v. CH2M Hill, Inc.,
26 Cal. 4th 798 (2001) ........................................................................................7, 8, 9

White v. Ultramar,
21 Cal. 4th 563 (1999) .................................................................................12, 13, 15

Yanowitz v. L'Oreal USA, Inc.,
36 Cal. 4th 1028 (2005) .................................................................................1, 2, 4, 7, 8

ii

406757.02

**TABLE OF AUTHORITIES**
(cont'd)

**FEDERAL STATUTES**

Fed. R. Evid. 403 ...........................................................................................17, 18

**STATE STATUTES**

Cal. Civ. Code § 3294...................................................................................11, 12

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

## I.   INTRODUCTION

Chevron once again asks the Court to blindly accept Chevron's version of history, which the jury heard and rejected. The jury awarded Kiran Pande ("Pande") $5.57 million at trial because it believed her honest account of Chevron's unlawful acts, and because it did not believe Chevron's witnesses, Chevron's attacks on Pande's character, and Chevron's implausible excuses for its destruction of Pande's career. Chevron does not and cannot offer any legitimate reason for the Court to disturb any part of the verdict the jury reached based on its sound credibility determinations and weighing of the evidence.

## II.   ARGUMENT

**A.   Chevron is not entitled to judgment as a matter of law.**

Chevron asks the Court to disregard the plain evidence and inferences supporting the jury's verdict for Pande. Judgment as a matter of law is proper only where "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." White v. Ford Motor Co., 312 F.3d 998, 1010 (9th Cir. 2002). Thus, in deciding a motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150-51 (2000) (citations and quotation omitted). Chevron cannot escape its failure to persuade the jury by asking the Court to second-guess the jury's decision.

**1.   The evidence supports the jury's finding that Chevron retaliated against Pande.**

Pande proved that Chevron took adverse employment action against her in retaliation for her complaints about discrimination and that Chevron's unlawful acts caused her harm, thus satisfying each element of her FEHA retaliation claim. See Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005) (explaining elements of FEHA retaliation claim); Jury Instruction

1

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1   No. 16, Docket No. 174 (same).[1]  In particular, Pande amply proved both that Chevron took

2   adverse employment actions against her and Chevron's retaliatory motives.  An action or series

3   of actions constitute adverse employment action if one or more of those actions, individually or

4   collectively, "materially affect[s] the terms, conditions or privileges of employment, . . . tak[ing]

5   into account the unique circumstances of the affected employee as well as the workplace context

6   of the claim." Yanowitz, 36 Cal. 4th at 1052. "[T]here is no requirement that an employer's

7   retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries,"

8   because such a requirement would "subvert the purpose and intent of [FEHA]." Id.  Despite

9   Chevron's bluster to the contrary, for example, even an average performance rating can be

10  adverse employment action if it is retaliatory and undeserved.  See Winarto v. Toshiba America

11  Electronics Components, Inc., 274 F.3d 1276, 1285-86 & n.7 (9th Cir. 2001) (finding, in a

12  FEHA case, that performance ratings need not be sub-average to constitute adverse employment

13  action, and prior positive evaluations as an excellent team player supported an inference of

14  pretext and retaliatory motive).

15       Similarly, the law does not require direct proof of retaliatory motive, because most bad

16  actors do not admit their unlawful motives.  See Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-

17  100 (2003) (recognizing the value of circumstantial proof of unlawful actors' motives); Winarto,

18  274 F.3d at 1285-86 & n.7 (employee's past good record supported inference of retaliatory

19  motive); Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1228-29 & n.6 (9th Cir.

20  2001) (holding jury could infer pretext and retaliatory motive from timing of alleged problems

21  and FEHA plaintiff's past positive history with employer).  The law also permitted the jury to

22  "consider a party's dishonesty about a material fact as affirmative evidence of guilt"—in other

23  words, to conclude that liars lie because they know they are guilty.  Johnson, 251 F.3d at 1228-

24  29; Reeves, 530 U.S. at 147 (explaining that "[i]n appropriate circumstances, the trier of fact can

25  reasonably infer from the falsity of [an] explanation that the employer is dissembling to cover up

26  [an unlawful] purpose.").  The jury thus properly relied on circumstantial evidence, including the

27

28
_____

[1] Chevron's motion does not dispute these basic elements or contend that any of the Court's instructions were improper.

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

1  timing of Chevron's retaliatory actions against Pande, Pande's stellar thirteen year record at the

2  company before her complaints, and Chevron's lies.  Even setting aside additional evidence in

3  the record that also supports Pande's claim, the evidence outlined below amply supports the

4  jury's finding that Chevron unlawfully retaliated against Pande.[2]

5      First, Pande complained to Jay Johnson and Gary Yamashita about discrimination and

6  harassment by Rex Mitchell.  Pande testified that she set up her initial meeting with Jay Johnson

7  on February 27, 2002, by speaking to the group's administrative assistant, Iris Owens, and telling

8  her why she wanted to speak to Mr. Johnson.  Tr. 255:1-11.[3]  The meetings then followed,

9  commencing March 4, 2002.  Tr. 255:1-256:2.

10     Second, the jury reasonably found that Chevron subjected Pande to adverse employment

11  actions after her complaints.  Pande proved that almost immediately after she brought forward

12  her complaints, Mitchell and other Chevron representatives began retaliating against her,

13  including but not limited to the following:

14      1.    In response to learning of Pande's complaints of his sexist behavior, Mitchell
                    assembled trumped up "evidence" of purported performance lapses (Exh. 251; Tr.

15                      259:3-260:6 (Pande));

16      2.    Instead of taking Pande's complaints of sexism by Mitchell seriously, Johnson
                    told Pande that she had three choices: get along with Mitchell, find another

17                      position, or leave the company (Tr. 257:19-25 (Pande));

18      3.    Gary Yamashita, an ombudsman responsible for Chevron's response to
                    complaints that employees are not comfortable raising through other channels, did

19                      nothing to assist  Pande, but went along with Mitchell's (and Johnson's) unlawful
                    actions (Exh. 286; Tr. 271:24-272:13);

20

21      4.    Mitchell gave Pande a lowered performance ranking inconsistent with his own
                    prior evaluation of her work and with her record throughout her entire previous

22                      career at Chevron, and lower than the ratings Mitchell gave to almost everyone
                    else he supervised (Exhs. 19, 103-111; Tr. 266:20-267:4 (Pande); Tr. 898:11-

23                      900:17, 1465:5-1471:9; (Mitchell));

24      5.    Mitchell denied Pande a promotion he had promised her, and that she deserved
                    (Tr. 503:24-504:22 (Pande));

25

26  [2] The same evidence also supports the jury's verdict for Pande on her wrongful termination
claim.  Chevron devotes no substantial argument to this claim.  Based on the same evidence that

27  supports her FEHA retaliation claim, Pande has also proved her wrongful termination claim, as
set forth in Jury Instruction No. 19.

28  [3] All cited portions of the trial transcript are attached hereto as Exhibit A.

3

406757.02

6.      Even though Pande's performance was exceptional and deserved a "1" ranking, Mitchell told Kelly Hartshorn in 2003 that Pande's overall 2002 performance deserved a "2" ranking (Tr. 283:5-14 (Pande), Tr. 1387:12-1388:11, 1392:1-4 (Hartshorn));

7.      As a result of Mr. Mitchell's unfair assessment, Pande did not receive the merit increase she deserved in 2003 (Tr. 283:5-14; Tr. 1392:1-4);

8.      Mitchell disparaged Pande's work performance to other supervisors at Chevron, including Johnson almost immediately (Exh. 251), and others continuing into late 2003 (Exh. 67 (Brian Smith email reporting that Pande was rated low for teamwork based on comments about her time in planning, when she worked for Mitchell)); and

9.      Supervisors like David Kennedy, who had previously raved about Pande's performance, also changed their tune to echo Mitchell's complaints in retaliation for Pande's protected complaints to Johnson (Exhs. 13, 250; Tr. 231:3-5 (Pande)).

Any one of these acts alone would have supported Pande's retaliation claim. Taken together, Chevron's wholesale sabotage of Pande's career amply supported the jury's finding that Chevron took "adverse employment action" against her, under the Yanowitz test set forth above. See Yanowitz, 36 Cal. 4th at 1050-52 .

Third, Pande proved that Chevron took action against her in retaliation for her complaints. All of the evidence of Chevron's adverse actions against Pande, described above, also proved Chevron's unlawful motives. The timing of Pande's complaint and Chevron's adverse actions alone proved that Pande's complaint was the motivating reason for Chevron's actions. See Johnson, 251 F.3d at 1228 (finding jury could infer pretext from timing of alleged problems and plaintiff's past positive history with employer). The record contained ample evidence of Pande's previous stellar career at Chevron, her skills as a great team player, and her later excellent work for Jack Dunn. E.g., Exhs. 11, 13, 14 (pre-retaliation reviews raving about Pande's performance and team work); Tr. 1156:19-1157:4, 1161:2-6 (Dunn testimony praising Pande's work in the first half of 2003). Pande needed no additional proof that Chevron's manufactured complaints about her were trumped up and retaliatory. See Johnson, 251 F.3d at 1228-29 & n.6 (acknowledging direct evidence of unlawful motive is often unavailable).

Although Pande needed no further proof of Chevron's motives, the damning lies of Chevron's own witnesses provided exactly that. Chevron representatives like Mitchell, Johnson, and Camy repeatedly contradicted both their own prior testimony and the documents in evidence.

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1   Before Chevron provided Pande the documents contradicting Mitchell's story, Mitchell testified

2   that in 2002 he rated no more than about 25 percent of his employees as "1", in keeping with

3   Chevron policy, and gave several "2" ratings. Tr. 950:5-25, 1039:19-25 (Mitchell); Tr. 1252:6-8

4   (discussion of re-opening Mitchell testimony based on newly-produced 2002 reviews).  Then,

5   when confronted with documents revealing that in fact he rated everyone but Victoria Thompson

6   and Pande as "1", Mitchell changed his tune and invented new excuses. Tr. 1465:5-1471:9

7   (Mitchell); Exhs. 103-111 (actual ratings by Mitchell).

8          Similarly, Johnson invented a false story that Pande complained to him about her "2"

9   rating at her very first meeting with him, on March 4, 2002), (Tr. 1059:18-1060:3, 1092:14-

10   1093:1), when in fact Pande never received that retaliatory "2" rating until a month and a half

11   later, and even Hartshorn testified that Chevron did not release ratings or discuss them with

12   employees until April 1. Tr. 268:19-24 (Pande); Tr. 1386:15-1387:5 (Hartshorn).  Also, Camy,

13   Pande's former supervisor, accused Pande of giving him "the . . . silent treatment" because of a

14   minor comment he claimed he made in 1998 (Tr. 1306:6-7), and claimed that she became

15   "corrosive" and a "toxic element" after that, so that he could barely speak to her and was

16   unwilling even to consider working with her more than five years later (Tr. 1311:16-17).  But

17   Camy's own testimony revealed this story for the lie that it was: Camy also admitted that he

18   dropped by for a social chat with Pande in her office in the spring of 2003 (Tr. 1316:2-4), that he

19   nominated Pande for a Chevron Management Leadership Forum (Tr. 1318:21-1320:14), and that

20   he praised her as an excellent performer in his only written evaluation of her work (Tr. 1321:18-

21   1322:13; Exh. 11 (performance review Camy signed)).  And Pande's performance review for

22   1998 and 1999, after Camy claimed Pande began giving him the silent treatment, contained no

23   trace of his toxic criticism. Exh. 13; Tr. 1324:8-14.  The jury correctly rejected Camy's

24   implausible tale that he was unable to document his purported problems with Pande in any way

25   because (he claimed) she would not work with him to complete her performance review.  Tr.

26   1328:13-1329:5. Finally, and tellingly, one Chevron witness was silent at trial: David Kennedy,

27   who joined in sabotaging Pande's prospects at Chevron by spreading trumped up complaints

28   about her performance as soon as he learned she had complained about discrimination, chose not

5

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1    to perjure himself at trial by claiming his complaints were justified. See Exh. 250 (Kennedy's

2    reaction to Mitchell's report of Pande's protected complaints).

3         The jury concluded that Chevron's witnesses lied about their actions, based on both the

4    contradictions in their testimony and the witnesses' unconvincing demeanor at trial. The jury

5    then inferred from that dishonesty that Chevron's managers were lying to conceal their true,

6    unlawful motivations. As explained above, Chevron's dismay at this result does not make the

7    jury's reasoning impermissible. See Johnson, 251 F.3d at 1228-29 ("[T]he factfinder is entitled

8    to consider a party's dishonesty about a material fact as affirmative evidence of guilt.").

9         Finally, Pande proved that Chevron's retaliation against her caused her harm. Chevron's

10   retaliation deprived Pande of a promotion she deserved, which would have carried higher pay

11   and furthered her advancement within Chevron. Chevron's retaliation deprived Pande of a fair

12   merit increase in 2003. Chevron's retaliation deprived Pande of the goodwill and good opinion

13   of Chevron supervisors, harming her job prospects within the company in both 2002 and 2003

14   and preventing her from obtaining alternative positions available at the company (which,

15   according to both Mr. Burkes and Hartshorn, had an ongoing need for people with Pande's

16   qualifications (Tr. 634:22-635:4, 635:19-636:5 (Burkes); Tr. 1368:8-18 (Hartshorn))).

17        Pande never resigned from Chevron, and the jury rejected Chevron's implausible story

18   that she did. Tr. 345:5-8. Chevron never said that it would fire Pande for declining the Houston

19   move (until Jack Dunn called her in November 2003), and no amount of Chevron doubletalk can

20   change the language of Exhibit 39. Mr. Burkes—the only witness besides Pande with no reason

21   to fear retaliation from Chevron for honest testimony—testified that other SASBU employees

22   declined the Houston move but remained working at Chevron, including Jalal Afifi, Graham

23   Housen, Susanna Wong, Natalie Talbert, Tom Millette, Mike Clark, Martin Seto, and Steve

24   Zalan. Tr. 633:3-634:3. Mr. Burkes also testified that (based on Chevron's standard practices

25   and based on the statements in the move announcements) he did not believe declining the move

26   would result in termination, and that he himself continued working on his prior assignments

27   through August 2004. Tr. 632:19-633:2, 652:24-654:10. Given all of this evidence, the jury

28   found that Pande would have been able to continue working at Chevron.

6

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1    Before she challenged Mitchell's discrimination against her, Pande had a thirteen year

2    record of excellent performance, great teamwork ratings, and satisfied supervisors at Chevron.

3    Exhs. 11, 13, 14; Tr. 218:6-20, 221:4-22, 232:2-19.  The jury reasonably believed her account of

4    events, disbelieved Chevron's trumped-up fault-finding, and found that the harm Pande suffered

5    resulted not from a sudden decline in her work performance or attitude, or from SASBU's move

6    to Houston, but from Chevron's retaliatory conduct.  That conduct, which Mitchell initiated,

7    reverberated through Chevron's supervisory ranks and rumor mill, first stalling Pande's career at

8    Chevron and then ending it altogether.

9    **2.    Chevron's arguments against Pande's retaliation claim have no legal merit or support in the record.**

10

11    **a.    The statute of limitations was a question of fact for the jury.**

12    The Court properly instructed the jury that "Ms. Pande [could] recover for retaliatory

13    actions that occurred more than one year before she filed her charge of discrimination with the

14    California Department of Fair Employment and Housing only if those actions [we]re sufficiently

15    related to actions that occurred within one year before her filing."  Jury Instruction No. 18,

16    Docket No. 174; Yanowitz, 36 Cal. 4th at 1057-58 & n.18 (explaining this standard and applying

17    it to retaliation claims); Richards v. CH2M Hill, Inc., 26 Cal. 4th 798, 823 (2001) (explaining

18    standard).  As the Court instructed, Chevron's retaliatory "[a]ctions [we]re sufficiently related if

19    they [we]re similar in kind, occurred with reasonable frequency, and it was not clear at the time

20    of the actions that occurred more than one year before the filing that further efforts to stop the

21    retaliatory actions would be futile."  Jury Instruction No. 18, Docket No. 174; Yanowitz, 36 Cal.

22    4th at 1057-58 & n. 18; Richards, 26 Cal. 4th at 823.  Chevron now asks the Court to ignore the

23    jury's conclusion that Chevron's destruction of Pande's career over time was a continuing

24    violation under this legal standard.

25    Judge Wilken has already rejected Chevron's statute of limitations argument, which

26    Chevron presented to the Court in its summary judgment motion.  Based on the fact that "Mr.

27    Mitchell allegedly influenced whether Plaintiff would receive a merit pay bonus in April,

28    2003"—just one of the facts Pande proved at trial (Tr. 282-83 (Pande); Tr. 1387-88

7

1  (Hartshorn))—the Court "denie[d] summary judgment in favor of Defendants on Plaintiff's . . .

2  retaliation claims, finding that they [we]re not time-barred as a matter of law and, therefore, there

3  [we]re triable issues of fact concerning Plaintiff's FEHA claims." Summary Judgment Order,

4  January 17, 2007, at 22.

5      Chevron's statute of limitations argument has even less value today than when Judge

6  Wilken rejected it. Pande proved at trial Chevron's interrelated retaliatory acts both within and

7  outside the one-year statute of limitations. As the Yanowitz and Richards standard above

8  requires, all of Chevron's retaliatory acts were similar in kind, reasonably frequent, and did not

9  make clear to Pande before December 8, 2002 that further efforts to stop the retaliation would be

10  futile. The jury accepted this evidence, and so found, in allowing Pande to recover for all of

11  Chevron's retaliatory acts under the continuing violation doctrine. See Richards , 26 Cal. 4th at

12  823 (explaining standard as set forth above). First, after giving Pande a retaliatory and

13  undeservedly poor review and low ranking in 2002, along with no promised promotion, Mitchell

14  told Hartshorn again in 2003 that Pande deserved a "2" ranking for her work in 2002. This

15  exchange addressed not only the work Pande did before her evaluation in early 2002, but

16  Mitchell's views of her work throughout that year, including after that evaluation. Thus, the jury

17  found that Mitchell's comments to Hartshorn did not merely repeat his earlier rating (which,

18  after all, Hartshorn could find in Pande's personnel file), but increased and expanded upon his

19  earlier retaliatory conduct. In other words, Mitchell took every chance he got to deprive Pande

20  of fair merit raises and promotion, in 2003 as well as 2002. Tr. 282:25-283:14 (Pande); Tr.

21  1387:12-1388:11, 1392:1-4 (Hartshorn).

22      Also, Pande proved that Chevron's good old boy network repeatedly sabotaged her

23  efforts to find new work at Chevron, in retaliation for her complaints. In 2002, Pande did not

24  receive a job offer from the two people with whom Mitchell admits he spoke. Tr. 1028:13-23,

25  1030:2-17 (Mitchell). In revealing contrast, Jack Dunn, the one person at Chevron who did

26  eventually offer her a job, had the distinction of not speaking with Mitchell before doing so. Tr.

27  1030:10-11 (Mitchell's admission he did not speak to Dunn); Tr. 1227:8-11 (Dunn). The jury

28  reasonably concluded that Mitchell deliberately ruined Pande's chances of getting the jobs she

8

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1   wanted.  In 2003, when Pande next sought a new position at Chevron, the sabotage continued:

2   Brian Smith told Pande that she received a poor rating on teamwork (which George Alameda

3   agreed was a critical factor (Tr. 1138:3-23) for positions she sought in 2003, and for which she

4   was otherwise extremely qualified, because of discussions of "relationship" issues she had

5   during her time "in planning" with Mitchell.  Exh. 67.  Kennedy and Camy also helped sabotage

6   Pande's career by spreading retaliatory complaints about her.  As Zuwa Omoregie testified,

7   Kennedy and Camy prevented him from offering Pande two jobs she should have received, by

8   telling him—falsely—that she had a bad attitude.  Designated Deposition Testimony of Zuwa

9   Omoregie at 30:6-32:21 (Tr. 1430:12; Docket No. 159); Tr.  1311:10-1312:1 (Camy).  The jury

10  reasonably concluded from this evidence that (however much Chevron may deny it) the good old

11  boy network at Chevron—including Mitchell, Kennedy, and Camy—continued to spread

12  retaliatory rumors about Pande into late 2003, when Chevron fired her, just as it had done in

13  2002.

14         Thus, under <u>Richards</u>, Pande proved to the jury that the continuing violation doctrine

15  applied and her retaliation claim was timely.  Chevron cannot re-try this issue to the Court just

16  because it does not like the jury's decision against it.

17                     b.      **Pande proved Chevron's retaliatory animus, supporting the jury's**
                               **verdict against Chevron.**
18

19         As set out above, the nature and timing of Pande's complaints and Chevron's actions

20  against her amply proved Chevron's retaliatory motive.  Chevron's argument to the contrary

21  ignores Pande's account of events (which the jury believed), and all testimony and documentary

22  evidence supporting it, asking the Court simply to accept Chevron's explanation of events and of

23  its witnesses' testimony.  For example, Chevron asserts that a "2" ranking was perfectly ordinary

24  and satisfactory, and that Pande's ranking was decided before she complained about Mitchell.

25  Chevron Motion at 7.  That argument was nonsense, and the jury recognized it as such.

26  Whatever Chevron's ranking policy may have been, Mitchell in fact gave "1" ratings to all the

27  men he rated, lied about those ratings under oath (see Tr. 950:12-25, Tr. 1465:5-1471:9; Exhs.

28  103-111), gave Pande a "2" only after he found out she had set up a meeting with Johnson to

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1    complain about him (which Pande did with Iris Owens, in late February 2002 (Tr. 255:1-11)),

2    and then lied about that as well (Tr. 950:5-11). It would be hard to find better proof of

3    retaliatory animus. See Winarto, 274 F.3d at 1285-86 & n.7 (finding, under FEHA, that

4    performance ratings need not be sub-average to constitute adverse employment action, and prior

5    positive evaluations as an excellent team player supported inferences of pretext and retaliatory

6    motive). All of Chevron's other actions—through Mitchell, Johnson, Kennedy, and Camy—also

7    amply support the jury's finding that Chevron responded to Pande's complaints of discrimination

8    by attacking her undeservedly and destroying her career. The jury rightly condemned this

9    despicable behavior.

10           c.    **Pande still worked at Chevron in both December 2002 and June 2003,
                   so Chevron could not "cut off" its liability for its retaliatory actions by**
11                 **allowing her to remain employed.**

12           Chevron contends that by "offering" Pande employment in December 2002 with SASBU,

13    and in June 2003 in Houston, it cut off its liability for retaliating against her. The jury

14    recognized this argument as absurd and rejected it. Chevron had not yet fired Pande as of either

15    December 2002 or June 2003. At those junctures, Chevron's actions had resulted in more subtle

16    wrongs: loss of pay, loss of a promotion, loss of more desirable alternative positions, etc. Now,

17    Chevron argues in essence that Pande suffered no damages from its retaliation against her

18    because Chevron did not fire her outright immediately, but chose to allow her continued

19    employment for some time before (to paraphrase Chevron witness Jay Johnson) "managing" her

20    completely out of the company. Chevron's argument makes no sense, and Chevron offers no

21    authority suggesting otherwise. Chevron relies instead on authority that, where an employer has

22    fired an employee unlawfully, the employer may cut off its damages by offering to return the

23    employee to an equivalent position, in good faith. See Boehm v. Am. Broadcasting Co., 929

24    F.2d 482, 485-87 (9th Cir. 1991). After firing Pande, Chevron never offered to return her to her

25    job. Tr. 596. Therefore, the Boehm analysis does not apply.

26           3.    **The evidence supports the jury's award of punitive damages against
                   Chevron.**
27

28           The Court properly instructed that jury that it could award Pande punitive damages based

10

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1   on clear and convincing evidence (1) that Chevron engaged in its unlawful conduct with malice,

2   oppression, or fraud, and (2) that this conduct was (a) committed, (b) authorized, or (c) adopted

3   or approved by an officer, director, or managing agent of Chevron.  Jury Instruction No. 25,

4   Docket No. 174; Cal. Civ. Code § 3294 (establishing this standard).  As the Court further

5   instructed the jury, malice "means that Chevron acted with intent to cause injury or that

6   Chevron's conduct was despicable and was done with a willful and knowing disregard of the

7   rights or safety of another. A person acts with knowing disregard when he or she is aware of the

8   probable dangerous consequences of his or her conduct and deliberately fails to avoid those

9   consequences." Jury Instruction No. 25, Docket No. 174.  Likewise, oppression "means that

10  Chevron's conduct was despicable and subjected Ms. Pande to cruel and unjust hardship in

11  knowing disregard of her rights." Id.  Chevron asks the Court to apply the "clear and

12  convincing" standard itself, in the jury's place, but the proper standard for this Court's review of

13  the jury's punitive damages decision is the same as for the other issues in the case: the "jury's

14  finding that the evidence supports a punitive damages award should be affirmed if it is supported

15  by substantial evidence." Winarto, 274 F.3d at 1291 (emphasis added) (finding substantial

16  evidence supported jury's conclusion that "defendants acted with sufficient culpability to expose

17  themselves to punitive damages," in FEHA retaliation case with similar facts to those before the

18  Court here).  Under any standard, Pande more than carried her burden: she proved that

19  Chevron's managing agents deliberately retaliated against her for her protected complaints,

20  deprived her of her livelihood through a campaign of calculated and vicious lies, and continued

21  to lie about their unlawful actions even at trial.

22              a.        **Chevron acted with malice and oppression.**

23          Pande proved Chevron's malice and oppression to the jury, and Chevron's continued

24  protestations of innocence cannot make its witnesses more credible or its story more convincing

25  than they were at trial.  Pande proved that Chevron's management—including Mitchell, Johnson,

26  Kennedy and Camy, as well as the Chevron Ombuds—punished her for making protected

27  complaints about discrimination, and then deliberately lied to her and others about what they

28  were doing (continuing their deception even at trial, under oath), concocting devious schemes to

11

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

1   conceal the unlawful and malicious nature of their conduct.  These Chevron actors plotted

2   against Pande although they knew retaliation was against the law (Exh. 277), they knew Pande

3   was economically vulnerable as an employee of the company, and they knew at least in late 2003

4   that she was also physically ill and vulnerable, and on medical leave.  This conduct was

5   despicable.  As its deliberate lies made clear at trial, Chevron also intended to cause injury and

6   acted with a willful and knowing disregard of Pande's rights and safety.  This conduct

7   demonstrated malice.  Likewise, Chevron's despicable conduct also subjected Pande to the cruel

8   and unjust hardship of losing her job, and Chevron's lies were intentional and designed to harm

9   Pande.  This conduct was oppressive.

10          Although the verdict form does not spell out exactly what forms of malice and oppression

11  Chevron displayed towards Pande, Pande provided ample support for the jury's finding that

12  Chevron acted with malice, oppression or fraud.  Chevron may not like the result the jury

13  reached, but the jury didn't like Chevron's conduct.

14                 **b.      Chevron's managing agents committed and approved the company's
                            malicious and oppressive conduct.**

15          Pande also proved that Chevron's managing agents, including Mitchell, Johnson, and

16  Kennedy, committed and approved the company's malicious and oppressive conduct, further

17  supporting the jury's award of punitive damages.  See Cal. Civ. Code § 3294.  A managing agent

18  is an employee who "exercise[s] substantial independent authority and judgment in [his]

19  corporate decisionmaking so that [his] decisions ultimately determine corporate policy."  White

20  v. Ultramar, 21 Cal. 4th 563, 566-67 (1999).  White does not require that managing agents be

21  high-level policymakers, or officially tasked with determining corporate policy.  Rather, in

22  explaining the rule, the White court noted that "[t]he scope of a corporate employee's discretion

23  and authority . . . is . . . a question of fact for decision on a case-by-case basis."  Id. at 567.  Thus,

24  White does not require that "managing agents" be officers or directors, or official policy-makers

25  for their employers, although managers with extremely limited authority may not qualify.  See

26  Cruz v. Homebase, 83 Cal. App. 4th 160 (2000) (holding that a "loss manager" responsible only

27  for the narrow duty of controlling shoplifting at a single store was not a managing agent for

28

12

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1   purposes of punitive damages, in a case involving claims of battery and false imprisonment by a

2   customer). A stricter rule would ignore the Code's clear direction that managing agents, not just

3   officer and directors, can incur corporate liability for punitive damages.

4           In White, the court upheld an award of punitive damages in a retaliation case where a

5   manager fired a convenience store employee for testifying at another employee's unemployment

6   insurance hearing, on the pretext that the firing was for violation of company policy about free

7   soft drinks for employees. Id. at 567. The manager in White was a "zone manager" responsible

8   for eight stores (within a larger chain of convenience stores) and roughly 65 employees. Id. at

9   577. The court found that the manager "exercised substantial discretionary authority over vital

10  aspects of [the employer's] business" by "managing numerous stores on a daily basis and making

11  significant decisions affecting both store and company policy." Id. However, the manager in

12  question was not a high-level policymaker for the company: she managed only eight stores, in a

13  large chain, and she reported to department heads in the retail management department,

14  suggesting several levels of management existed above her. Id. at 577. She also consulted with

15  human resources personnel before firing the employee, although she had authority to fire him

16  herself. Id. The court also did not specify any particular management acts by which the

17  manager affected company policy. Also, the court found that in firing the plaintiff for improper

18  reasons, the manager "exercised substantial discretionary authority over decisions that ultimately

19  determined corporate policy in a most crucial aspect of [defendant's] business." Id.

20          Here, Mitchell managed a significant group at Chevron, wielding broad general authority

21  over his employees and the management of the group's work. Mitchell's level of general

22  authority over his reports, and his discretion in determining how to manage his group day-to-day,

23  is similar to the authority found sufficient in White. Mitchell was general manager of business

24  and strategic planning, a prestigious group. Tr. 881:1-15, 885:3-9, 996:25-997:10. A manager in

25  charge of planning necessarily shapes company policy more than a manager with a narrow focus,

26  and Mitchell's group had a high profile. Hartshorn testified that jobs like Pande's under Mitchell

27  were "coveted jobs" because they were in the headquarters of Chevron's upstream international

28  unit and visible to "high-level managers." Tr. 1377:21-1378:3. Pande proved that Mitchell

13

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1   controlled her ranking, and thus her salary, and had the power to promote her. Tr. 504:19-505:2.

2   He also controlled day-to-day work in his group, and testified that he took assignments away

3   from Pande because of her alleged performance lapses. Tr. 1005:15-18. (Chevron attempted to

4   downplay Mitchell's authority, claiming he needed others' approval for many routine acts, but

5   the jury was not required to accept Chevron's self-serving arguments.) In all of these acts, as

6   well as in his decisions about how to respond to Pande's complaints of discrimination, at a

7   minimum he was a de facto policymaker for the company. Also, Mitchell is now Chevron's

8   Chief Compliance Officer, obviously an important policymaker. Tr. 876:17-19. Given

9   Chevron's argument that Pande was arrogant for seeking any advancement within the company

10  (see Tr. 179:17-19), the jury could have inferred that progress up the Chevron ranks is not

11  ordinarily rapid, and thus have inferred from Mitchell's current position that his position in 2002

12  must also have been one of substantial weight and policy-making authority.

13          Even if Mitchell had not been not independently a managing agent of Chevron (which he

14  was), he acted in concert with other managing agents who approved or adopted his malicious and

15  otherwise despicable actions, as well as acting with malice and oppression themselves. Those

16  managing agents included Jay Johnson, who was Chevron's General Manager of Business

17  Development and Planning (Tr. 1086:10-13) and Mitchell's supervisor. Johnson admitted his

18  role as an important "adviser to the president of the operating company on business portfolio

19  issues [and] business planning issues" and admitted that he supervised three high-level groups

20  like Mitchell's and a total of at least 20 to 25 employees. Tr. 1056:16-1057:10. Johnson

21  sanctioned and ratified Mitchell's retaliation against Pande by giving her three unreasonable

22  choices and endorsing Mitchell's trumped-up performance complaints knowing they were false.

23  Tr. 257:13-25, 1088:11-20. Johnson must have seen (and the jury could have concluded he did)

24  that Mitchell's complaints lacked substance, and it was malicious and oppressive for Johnson to

25  endorse them as he did. Johnson's lies at trial about his actions further proved that he acted

26  maliciously in joining in and approving Mitchell's malicious and oppressive retaliation against

27  Pande. As explained above, Johnson deliberately lied about when Pande received Mitchell's

28  retaliatory "2" rating. Tr. 1059:18-1060:3, 1092:14-1093:1 (Johnson); Tr. 268:19-24 (Pande); Tr.

14

1    1386:15-1387:5 (Hartshorn). The jury correctly inferred from this and Johnson's other self-

2    serving testimony that Johnson acted with malice and oppression himself, and that he approved

3    Mitchell's malicious and oppressive conduct.

4        Like Johnson and Mitchell, Kennedy also rushed to sabotage Pande's career at Chevron

5    as soon as he learned of her complaints about discrimination. Exh. 250. Kennedy thus acted

6    with malice and oppression himself (like Johnson), and also approved and ratified Mitchell's

7    malicious and oppressive acts. Kennedy was also a Chevron managing agent, succeeding Camy

8    as manager of an important technical group of roughly a dozen employees that provided

9    technical support for Chevron operations and evaluated new opportunities for the company. Tr.

10   1304:18-1305:7, 1315:2 (Camy); Tr. 222:4-8 (Pande).[4]

11       Like all policy-makers at Chevron, each one of the bad actors in this case knew that

12   under the law and Chevron's own policies they should not retaliate against Pande for

13   complaining about discrimination—but they did it anyway. See Exh. 277. And like the manager

14   in White, each of the Chevron bad actors had general management authority and significant

15   responsibilities that necessarily required at least de facto policy-making for the company. Thus,

16   Pande amply proved that each one of the bad actors at Chevron was a managing agent, and

17   Chevron cannot brush aside the jury's conclusion that they were.

18       **4.    The evidence supports the jury's damages award against Chevron.**

19       Chevron contends that the jury's damages award was improper because Pande failed to

20   mitigate her damages, willfully ignoring the jury's well-supported finding that Pande mitigated

21   her damages.

22       First, as explained above, Chevron cannot cut off its liability for damages by claiming

23   that it offered Pande continued employment in December 2002 and June 2003, and that she

24   _____

25   [4] In addition to Mitchell, Johnson, and Kennedy, the jury could have concluded that Gary
     Yamashita was a Chevron managing agent and approved Mitchell and Johnson's malicious and
26   oppressive behavior towards Pande, by allowing them to hijack the complaint process and use it
     to attack Pande. Yamashita was a Chevron ombudsman, and was responsible for Chevron's
27   response to complaints that employees are not comfortable raising through other channels—a
     significant area of company policy-making—and had discretion in how he handled such
28   complaints. Tr. 271:24-272:13; Exh. 286 (The Ombuds is "Independent [and] reports directly to
     senior management" and is "authorized to respond to, informally investigate, and facilitate

15

406757.02

1   failed to mitigate by declining the June 2003 offer.  Pande's retaliation claims relied in part on

2   Chevron's continued actions against her, even after she declined the Houston move, to prevent

3   her from gaining another job at Chevron.  She proved that (at the very least) Chevron's

4   retaliation (by Mitchell, Johnson, and Kennedy) prevented her from getting technical positions in

5   London, and in San Ramon under Mr. Omoregie, for which she was extremely qualified.  See

6   e.g., Exh. 67.  The jury could also have inferred Chevron's continued wrongful actions from the

7   Chevron witnesses' unconvincing denials.  See Johnson, 251 F.3d at 1228-29 ("[T]he factfinder

8   is entitled to consider a party's dishonesty about a material fact as affirmative evidence of

9   guilt.").  Even if these were the only jobs Pande could have hoped to receive absent Chevron's

10  retaliation (which they were not), Chevron's retaliatory interference with her applications for

11  those jobs amply supports the jury's verdict.  Chevron cannot excuse its retaliation by claiming

12  that the retaliation would not have caused any problems if Pande had simply moved to Houston,

13  especially in the face of the evidence that other employees declined the move and were not

14  terminated, and that Pande would have received another job but for Chevron's continued

15  retaliation.

16          The rest of Chevron's non-mitigation argument depends on Chevron's distortion of the

17  evidence about Pande's mitigation efforts after her termination from Chevron.  Chevron claims

18  that Pande unreasonably limited her job search to the Bay Area and "chose not to pursue"

19  comparable jobs.  Motion at 21.  This is not true, and the jury reasonably rejected Chevron's

20  arguments on this point.  In fact, the evidence at trial was that Pande pursued jobs outside of the

21  Bay Area and did not remove herself from the job market voluntarily.  She submitted numerous

22  job applications, including for positions outside the Bay Area.  Tr. 372:1-2 (20 job applications);

23  581:4-5 (Pande testimony that "I have not been offered a job in Houston.  I have submitted job

24  applications.").  She also worked with search firms and applied for jobs through industry job

25  boards.  Tr. 371:17-23; Tr. 595:25-596:12.  Chevron's own expert, Mr. O'Brien, admitted that

26  Pande used a reasonable list of resources in her job search.  Tr. 1513:21-25.  Mr. O'Brien also

27  admitted that working with job search firms would expose Pande to potential employers who

28

resolution of employee complaints and concerns.").

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

1  used the search firms to find employees, even when Pande did not directly submit an application

2  to those employers. Tr. 1514:7-1515:12. Despite all her efforts, the one interview Pande was

3  able to obtain was for a job with Anadarko in Algeria (definitely not part of the Bay Area), and

4  she did not get that job.[5] Tr. 372:5-23. When she was unable to find a permanent job, Pande

5  turned to consulting. However, most of the work Pande has done as a consultant has also been

6  international work, further undermining Chevron's false claim that Pande has limited her career

7  focus to the Bay Area. Tr. 375:13-22. The evidence showed that Pande in fact sought

8  employment outside the Bay Area, and made reasonable efforts to find work.[6] Chevron failed to

9  persuade the jury that Pande failed to mitigate her damages, because all the evidence at trial

10  belied its arguments that Pande's mitigation efforts were anything but reasonable.[7]

11  **B.    No new trial is warranted.**

12       **1.    Pande's testimony about her medical condition was not unduly prejudicial
               and does not support granting a new trial.**

13

14       Chevron cannot seek a new trial based on Pande's testimony about her medical condition,

15  because Chevron waived its objections to this testimony by failing to object to it while Pande

16  was on the stand. See Price v. Kramer, 200 F.3d 1237, 1252 & n.16 (9th Cir. 2000) (finding

17  objection to lay opinion testimony waived where defendants failed to object on that basis at trial,

18  although defendants objected to same testimony for lack of relevance); United States v. Khan,

19  993 F.2d 1368, 1377 (9th Cir. 1993) (finding Rule 403 objection waived where party made no

20  objection during testimony, although he had moved in limine to exclude the testimony as

21  prejudicial). Chevron made no objection at all to any of Pande's testimony about her treatment

22  [5] Chevron implies that Pande voluntarily limited her job interviews, but Pande's testimony
23  makes clear that the one formal interview she participated in was the only one offered to her.
    See Motion at 23 ("Pande testified that she interviewed for only one position."); Tr. 372:5-23
24  (Pande).

    [6] Although Pande argued that she had no obligation to seek non-Bay Area work at all, the Court
25  did not so instruct the jury, and the record reflects that Pande in fact sought such work. Thus,
    Chevron's arguments about the legal merit of Ms. Pande's position on this point are moot. See
26  Motion at 23 (noting that the Court "denied Plaintiff's Motion for Mitigation Instruction").

27  [7] Chevron even dares to imply that Pande should have sought permanent work at Chevron,
    Motion at 21, although Chevron had rejected Pande for 18 different positions before firing her,
28  and has never offered her a job since. Tr. 596:13-15. The jury rightly rejected this absurd
    position.

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

1    choices in October 2003.  Tr. 319:2-320:16, 323:6-17.  During the rest of the testimony it now

2    challenges, Chevron offered a total of only four objections: one hearsay objection (which the

3    Court sustained), Tr. 242:11-12, and three objections that questions "call[ed] for a medical

4    opinion" (one which the Court sustained, so that counsel rephrased the question, and two that the

5    Court overruled).  Tr. 243:1-3, 243:13-15, 243:25-244:2.  Because Chevron never objected to

6    any of the testimony on grounds of prejudice, it waived this objection and cannot seek a new trial

7    on this ground.

8         Even if the Court considers Chevron's two unsuccessful objections for "medical opinion"

9    as objections for prejudice under Federal Rule of Evidence 403 (apparently the ground for

10   Chevron's new trial motion), Chevron has no right to a new trial.  Not only were the Court's

11   rulings proper, but Chevron cannot show that the answers to those two questions "substantially

12   prejudiced" Chevron, as required to justify a new trial based on improper evidentiary rulings.

13   Ruvalcaba v City of Los Angeles, 64 F.3d 1323, 1328 (9th Cir. 1995) (emphasis added)

14   (explaining that substantial prejudice is required to support granting a new trial).  Chevron

15   unsuccessfully objected to questions about Pande's understanding of (1) the cause of her having

16   low red blood cells and (2) why she needed a blood transfusion.  Tr. 243:4-5, 243:11-15.  This

17   information had significant probative value, both to help rebut Chevron's insinuations that Pande

18   took her medical leave only because she allegedly knew she would be terminated at the end of

19   2003 (Tr. 180:19-25) and to help establish that her work performance had not declined in spite of

20   her medical problems (showing that her termination was due to Chevron's unlawful acts, not her

21   medical condition or her performance).   Pande did not testify in any detail about her physical

22   suffering, and did not testify about any related emotional distress.  The testimony she gave was

23   necessary to establish her claims, and was not inflammatory or prejudicial to Chevron in any

24   way.  See Fed. R. Evid. 403.  Here, the Court properly exercised its discretion in permitting

25   Pande's testimony.  Since that decision was entirely proper, and no prejudice—let alone

26   substantial prejudice—resulted from it, a new trial is not warranted.

27

28

KIRAN PANDE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
CASE NO. 04-5107 JCS

406757.02

**2.      The jury's verdict must stand, because it is reasonable and the evidence supports it.**

In a footnote, Chevron also asks the Court to grant a new trial on the theory that the verdict and the damages award were against the clear weight of the evidence.  Motion at 11 n.7.  A new trial is proper only if the jury's decision is "against the clear weight of the evidence," Union Oil Co. of Cal. v. Terrible Herbst, Inc., 331 F.3d 735, 742 (9th Cir. 2003), so that "the verdict results in the miscarriage of justice," City Solutions Inc. v. Clear Channel Comms., Inc., 365 F.3d 835, 843 (9th Cir. 2004), not simply because a court or another jury might conceivably have reached a different result.  McEuin v. Crown Equipment Corp., 328 F.3d 1028, 1037 (9th Cir. 2003) ("The district court may not reject the jury's verdict simply because another appears preferable.").  Even in applying this test, which is slightly more rigorous than the standard for judgment as a matter of law, "it is not the courts' place to substitute [their] evaluations for those of the jurors." Union Oil, 331 F.3d at 743.

As detailed above, this case hinged on classic credibility disputes, the very type of dispute that juries are best suited to resolve.  Pande's account of events, which the jury accepted, was straightforward and consistent both internally and externally: she enjoyed a smoothly ascending career at Chevron until she complained about Mitchell and he brought her down, with a little help from his friends.  Even if Chevron offered some plausible evidence consistent with its alternative account of events, the "clear weight" of the evidence was in Pande's favor—not against her, as required for Chevron to obtain a new trial.  Chevron's key witnesses, including Mitchell, Camy, and Johnson, contradicted themselves repeatedly and presented a story at odds with common sense, Pande's character and demeanor at trial, and their own written records.  The jury sensibly rejected Chevron's self-serving attempts to paint Pande as an arrogant, "prideful" woman who cycled inexplicably between periods of diligent, excellent work (as reflected in Chevron's files, the testimony of less interested witnesses, and even Jack Dunn's testimony, Tr. 1156:19-1157:4) and undocumented bouts of "toxic" bad attitude (as alleged by Mitchell and his unconvincing cronies).  The Court should not set aside the jury's decision to grant Chevron a new trial.

19

1    The evidence, including Dr. Mahla's expert testimony, also amply supported the jury's

2  damages award, so that granting a new trial would be improper.  The jury reasonably rejected

3  Chevron's contention that Pande failed to mitigate her damages, for all the reasons set forth

4  above.  Pande proved (and the jury found) that after she was unable to get a new permanent job

5  (despite the "hot" market and her excellent qualifications), she reasonably took the next best

6  option available to her and sought consulting work in her field.  The record at trial included Dr.

7  Mahla's expert testimony that, depending on how long it took Pande to replace her lost Chevron

8  income through her consulting work, her damages could be up to $4.8 million.  Tr. 799:11-17.  If

9  Pande was able to replace her Chevron salary after ten years, Dr. Mahla testified, her losses

10  would instead be just over $3.1 million.  Tr. 802:22-25.  The jury also heard and considered

11  Chevron's own evidence on damages, and its cross-examination of Dr. Mahla, but nothing

12  required the jury to accept that evidence over the evidence Pande offered.  The jury discounted

13  Dr. Mahla's figures slightly, by about $30,000.  The jury's award of just under $3.1 million, plus

14  $2.5 million in punitive damages, was reasonable and was fully supported by the evidence.  The

15  Court should not overturn the jury's award to grant a new trial.

16                          **III.    CONCLUSION**

17        For all the foregoing reasons, Chevron's motion for judgment as a matter of law or for a

18  new trial should be denied in its entirety, and the jury's verdict for Pande should stand.

19                                          Respectfully submitted,

20

21  Dated:  November 30, 2007              KEKER & VAN NEST, LLP

22

23

                                      By:  /s/ Susan J. Harriman
24                                          SUSAN J. HARRIMAN
                                          CHRISTA M. ANDERSON
25                                          Attorneys for Plaintiff
                                          KIRAN PANDE
26

27

28

406757.02