# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE, JUDGE

| | | |
|---|---|---|
| KIRAN PANDE, | ) | **JURY TRIAL** |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. C 04-5107JCS |
| | ) | |
| CHEVRON CORPORATION (F/K/A | ) | |
| CHEVRONTEXACO CORPORATION) | ) | **VOLUME 1** |
| EXPLORATION & PRODUCTION | ) | **PAGES 1 - 189** |
| (F/K/A CHEVRONTEXACO | ) | |
| OVERSEAS PETROLEUM), A | ) | |
| DIVISION OF CHEVRON U.S.A. | ) | |
| INC., | ) | SAN FRANCISCO, CALIFORNIA |
| | ) | TUESDAY, OCTOBER 9, 2007 |
| DEFENDANTS. | ) | |

Certified Copy

TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF:              KEKER & VAN NEST
                           710 SANSOME STREET
                           SAN FRANCISCO, CALIFORNIA  94111-1704
                    BY:  CHRISTA M. ANDERSON,
                           SUSAN J. HARRIMAN, ATTORNEYS AT LAW


FOR DEFENDANTS:            MILLER LAW GROUP, PC
                           500 SANSOME STREET, SUITE 400
                           SAN FRANCISCO, CALIFORNIA  94111
                    BY:  LISA HAMASAKI,
                           MICHELE BALLARD MILLER
                           JANINE S. SIMERLY, ATTORNEYS AT LAW


REPORTED BY:              RAYNEE H. MERCADO, CSR NO. 8258

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404*

1   FROM OR THEY INVOLVED A GREAT DEAL OF TRAVEL, AND SHE DIDN'T

2   WANT TO SPEND A LOT OF TIME TRAVELING.   AND YOU'RE GOING TO HEAR

3   EVIDENCE AND YOU'RE GOING TO SEE DOCUMENTS TO THAT EFFECT.

4            NOW, THE DECISIONS THAT WERE MADE IN THE FALL PDC --

5   KEEP IN MIND, THE EVIDENCE WILL SHOW THAT THEY HAPPENED BEFORE

6   SHE EVER ANNOUNCED HER MEDICAL LEAVE, SO THE MEDICAL LEAVE HAD

7   NOTHING TO DO WITH THAT.

8            BUT MORE IMPORTANTLY, WHAT YOU'RE GOING TO LEARN IS

9   THAT NONE OF THE FALL PDC DECISION MAKERS SPOKE TO REX MITCHELL

10  AT ALL.   NONE OF THE FALL PDC DECISION MAKERS HAD ANY INPUT FROM

11  REX MITCHELL IN REACHING THEIR DECISIONS.

12           AND THERE'S ALEX.   HE DID IT AGAIN.

13           NONE OF THE PDC DECISION MAKERS SPOKE TO REX MITCHELL

14  IN MAKING THEIR DECISIONS.   AND YOU'RE GOING TO HEAR FROM A

15  NUMBER OF WITNESSES WHO WERE ON THE SELECTION COMMITTEES IN

16  THESE PDC MEETINGS.

17           AND WHAT YOU'RE GOING TO HEAR IS THAT IN EACH AND

18  EVERY INSTANCE, THE REASON THAT KIRAN WASN'T SELECTED WAS EITHER

19  BECAUSE SHE WAS APPLYING FOR POSITIONS ABOVE HER LEVEL -- YOU'RE

20  GOING TO HEAR THAT IN ONE POSITION SHE APPLIED FOR A POSITION

21  THAT IT WAS AT THE SAME LEVEL AS JACK DUNN.   JACK DUNN WAS

22  APPLYING FOR THEIR POSITION.   ANOTHER FORMER MANAGER, JEAN CAMY,

23  WAS APPLYING FOR THAT POSITION.   SO IN THAT CASE, THE OTHER

24  CANDIDATES HAD OTHER QUALIFICATIONS, AND THEY WERE SELECTED.

25  NONE OF THESE DECISIONS HAD ANYTHING TO DO WITH REX MITCHELL.

OPENING STATEMENT \ SIMERLY

1      SO THERE'S SIMPLY NO EVIDENCE IN THE NEXT TWO WEEKS

2   THAT YOU'RE GOING TO HEAR THAT REX MITCHELL'S INPUT AFFECTED

3   THOSE NOVEMBER PDC SELECTIONS.  THE RESULTS WERE BECAUSE OF

4   KIRAN PANDE'S CHOICES, HER INSISTENCE ON BUSINESS POSITIONS THAT

5   SHE WASN'T AS WELL QUALIFIED FOR, OR POSITIONS IN SAN RAMON,

6   WHICH WERE VERY FEW AND FAR BETWEEN, OR POSITIONS IN LONDON,

7   WHICH WERE REALLY SOUGHT AFTER.

8           TARYN SHAWSTAD --

9           COULD WE HAVE TARYN'S PHOTO?

10               (EXHIBIT PUBLISHED TO JURY.)

11      **MS. SIMERLY:**  AND KELLY HARTSHORN, THESE ARE ALL --

12   BOTH CHEVRON EMPLOYEES WHO ARE GOING TO BE TESTIFYING FOR US --

13   WILL TESTIFY THAT THERE WERE LOTS OF PETROLEUM ENGINEERING

14   POSITIONS IN THAT FALL 2003 PDC, BUT THE JOBS MISS PANDE WAS

15   INTERESTED IN, THE JOBS THAT SHE INSISTED SHE WAS QUALIFIED FOR,

16   SHE WASN'T THE BEST-QUALIFIED CANDIDATE, AND THE DECISION HAD

17   NOTHING TO DO WITH REX MITCHELL, IT HAD NOTHING TO DO WITH HER

18   MEDICAL LEAVE.

19      OKAY.  SO AFTER THE OCTOBER 2003 PDC DECISIONS ARE

20   MADE, WHAT'S HAPPENING?  THE CLOCK'S TICKING.  SHE KNOWS THAT

21   COME DECEMBER OF 2003, SASBU, BLOCK 14 IS MOVING TO HOUSTON.

22   AND SHE KNOWS THAT IF SHE DOESN'T HAVE ANOTHER JOB AND THE FALL

23   PDC IS OVER AND THERE WERE NO POSITIONS, SHE IS NOT GOING TO

24   HAVE A JOB.  AND IT'S AT THIS POINT THAT SHE DECIDES SHE'S GOING

25   TO ANNOUNCE THAT SHE NEEDS A MEDICAL LEAVE.

PANDE - DIRECT / HARRIMAN

1   PROJECT.  AND -- I MEAN THE AWARD BASICALLY SAYS THAT WE WERE

2   GIVEN AGGRESSIVE DEADLINES AND WE MET THEM WITH GREAT PERSONAL

3   SACRIFICE AND EXCESSIVE OVERTIME.

4   Q.  FOR HOW LONG DID YOU WORK FOR CHEVRON IN LA HABRA?

5   A.  I WORKED FOR CHEVRON IN LA HABRA FOR ABOUT SIX YEARS.

6   Q.  AND WHAT WAS YOUR NEXT JOB AT CHEVRON?

7   A.  MY NEXT JOB AT CHEVRON WAS -- I WAS TRANSFERRED TO

8   SAN RAMON, CALIFORNIA, TO WORK IN THE INTERNATIONAL UPSTREAM,

9   AND IT WAS SET UP AS A TEMPORARY ASSIGNMENT.

10  Q.  AND WHEN DID YOU RECEIVE THAT TRANSFER?

11  A.  I STARTED THAT ON JANUARY OF 1995.

12  Q.  AND WHAT WAS YOUR POSITION?

13  A.  THE TITLE FOR THAT POSITION WAS SENIOR RESERVOIR ENGINEER.

14          **MS. HARRIMAN:**  ADD THIS NEXT BLOCK.

15  Q.  DID YOU APPLY FOR THIS TEMPORARY ASSIGNMENT IN SAN RAMON?

16  A.  NO, I DIDN'T.

17  Q.  HOW DID YOU HAPPEN TO GET THAT JOB?

18  A.  I RECEIVED A PHONE CALL FROM MY SUPERVISOR AT THE TIME,

19  TOM MCMILLEN, AND HE TOLD ME ABOUT THE OPPORTUNITY AND ASKED ME

20  WHETHER I'D BE INTERESTED, AND I SAID, "YES."

21  Q.  OKAY.  HOW LONG WAS THIS TEMPORARY ASSIGNMENT IN SAN RAMON

22  DUE TO LAST?

23  A.  IT WAS SET UP TO BE BETWEEN NINE MONTHS AND A YEAR.

24  Q.  AND WHAT HAPPENED AT THE END OF YOUR TEMPORARY ASSIGNMENT?

25  A.  TOWARDS THE END OF IT, MY SUPERVISOR IN SAN RAMON ON THAT

PANDE - DIRECT / HARRIMAN

1  A.  WHEN I FINISHED UP IN PT. NOIRE, I WENT BACK TO PAU, FRANCE

2  AND CONTINUED TO WORK ON THE PROJECT DOING RESERVOIR SIMULATION,

3  RESERVOIR MODELING WORK THERE.

4  Q.  AND DID YOU RECEIVE ANY PROMOTIONS DURING THIS TIME?

5  A.  YES.  I GOT A CALL FROM MY SUPERVISOR ALI MOSHIRI TELLING ME

6  THAT I WAS PROMOTED ON APRIL 1ST OF '97 TO THE POSITION OF,

7  BELIEVE IT WAS ADVISOR RESERVOIR ENGINEERING.

8  Q.  AND WHEN DID YOU FINISH YOUR TIME IN -- IN FRANCE,

9  MS. PANDE?

10  A.  I MOVED BACK TO -- TRANSFERRED BACK TO SAN RAMON IN ABOUT

11  MIDDLE OF OCTOBER OF 1997.

12        MS. HARRIMAN:  YOU'VE GOT ME GETTING MY EXERCISE

13  TODAY.  IT'S GOOD (INDICATING).

14  Q.  AND WHAT DID YOU TRANSFER BACK INTO?  WHAT WAS YOUR NEXT

15  POSITION?

16  A.  I THINK MY TITLE WHEN I TRANSFERRED BACK WAS ADVISOR

17  PETROLEUM ENGINEERING, AND I WAS ESSENTIALLY WORKING IN THE SAME

18  GROUP I HAD BEEN BEFORE I TRANSFERRED TO FRANCE.  IT WAS --

19  THINK AT THE TIME CALLED THE "ENGINEERING SERVICES GROUP."

20  Q.  OKAY.  DID YOU HAVE TO APPLY FOR YOUR TRANSFER BACK TO

21  SAN RAMON?

22  A.  NO, I DIDN'T.

23  Q.  AND WHO WAS -- WHO WERE YOUR SUPERVISORS -- OR WHO WAS YOUR

24  SUPERVISOR WHEN YOU GOT BACK TO SAN RAMON, CALIFORNIA IN 1997?

25  A.  WHEN I GOT BACK IN OCTOBER OF 1997, ALI MOSHIRI HAD JUST

PANDE - DIRECT / HARRIMAN

1  TRANSFERRED OUT, AND MY SUPERVISOR WAS MARY CAO.  AND THEN

2  PROBABLY ABOUT TWO MONTHS LATER, EITHER IN DECEMBER OF '97 OR

3  JANUARY OF 1998, THEY REPLACED MARY CAO WITH JEAN CAMY.

4  Q.  AND FOR HOW LONG WAS MR. CAMY YOUR SUPERVISOR?

5  A.  AND THEN I THINK JEAN CAMY WAS THE SUPERVISOR IN THE GROUP

6  UNTIL PROBABLY ABOUT JUNE OF 1999 AND -- AND THEN MARY CAO AGAIN

7  WAS THE SUPERVISOR OF THE GROUP, AND THEN THEY BROUGHT IN A NEW

8  SUPERVISOR, DAVID KENNEDY, TO REPLACE HER LATER IN 1999.

9  Q.  AND TELL US, DURING THIS -- I BELIEVE YOU SAID DURING THIS

10  TIME YOU WERE A PETROLEUM ENGINEERING ADVISOR?

11  A.  YES.

12  Q.  WHAT WAS THAT?

13  A.  PETROLEUM ENGINEERING ADVISOR, ESSENTIALLY IT'S A BROADER

14  SCOPE.  SO RESERVOIR ENGINEERS, WHAT WE DO -- A LOT OF WHAT WE

15  DO IS KIND OF -- IT'S ALMOST LIKE PLAYING DETECTIVE WORK WITH

16  THE RESERVOIR, WHICH IS THE ROCK.  AND LOOK -- LISTENING TO THE

17  CLUES IT'S TELLING YOU AND TRYING TO FIGURE OUT, WELL, HOW MANY

18  WELLS TO PUT IN, WHERE TO PUT THEM IN.  PETROLEUM ENGINEERING

19  ADVISOR HAS A BROADER SCOPE THAN THAT SO IT GETS INVOLVED WITH

20  INTERFACING WITH DRILLING AND ECONOMICS AND OTHER ASPECTS AS

21  WELL.

22  Q.  OKAY.  WHILE YOU WERE AT CHEVRON, DID YOU RECEIVE ANNUAL

23  PERFORMANCE REVIEWS?

24  A.  YES, I DID.

25  Q.  CAN YOU EXPLAIN THAT PROCESS, PLEASE?

PANDE - DIRECT / HARRIMAN

1  PAGE, MS. PANDE?

2  A.  YES, THOSE ARE MY INITIALS DATED JANUARY 26TH, 2000.

3  Q.  OKAY.  AND WHOSE SIGNATURE IS THAT BELOW YOURS IN SECTION 7?

4  A.  THAT'S SIGNED BY MY SUPERVISOR, DAVID KENNEDY, ON

5  FEBRUARY 11TH, 2000.

6  Q.  OKAY.  AND WOULD YOU TURN, PLEASE, TO THE SECTION CALLED --

7  PAGE 3, WHICH HAS THE COMMENTS.

8  A.  (REVIEWING DOCUMENTS.)

9           (EXHIBIT PUBLISHED TO JURY.)

10           MS. HARRIMAN:  AND CAN WE BLOW THOSE UP JUST A LITTLE

11  BIT?  BETTER.

12           IS THAT AS GOOD AS IT GETS?  MUCH BETTER.  THANKS.

13           ALL RIGHT.

14  Q.  SO CAN YOU READ WHAT IT SAYS AT THE TOP FOR "STRENGTHS"?

15  A.  ON MANAGING PERFORMANCE, IT SAYS, "STRENGTHS.  CLEARLY

16  UNDERSTANDS CHEVRON'S BUSINESS PLAN AND BUSINESS DRIVERS AS THEY

17  PERTAIN TO HER AND DIRECTS HER ACTIVITIES ACCORDINGLY.  KEEPS

18  SUPERVISORS INFORMED OF PROJECT DEVELOPMENTS TO ENSURE

19  ALIGNMENT."

20  Q.  AND CAN YOU READ WHAT IT SAYS UNDER THAT ON DEVELOPMENT

21  NEEDS?

22  A.  ON DEVELOPMENT NEEDS, IT SAYS, "KIRAN AND I BOTH NEED TO

23  MAKE AN EFFORT TO HAVE MORE FREQUENT COMMUNICATIONS REGARDING

24  PROJECT STATUS TO ENSURE WORKLOADS IN THE GROUP ARE BALANCED."

25  Q.  AND DID YOU AGREE WITH THAT SUGGESTION?

PANDE - DIRECT / HARRIMAN

1    A.    YES, I DID.

2    Q.    OKAY.  WOULD YOU READ THE NEXT COLUMN UNDER "STRENGTHS"?

3    A.    THE NEXT ONE IS ON THE LEADERSHIP DIMENSION ON STRENGTHS.

4    IT SAYS, "SHE IS NOT IN AN OFFICIAL LEADERSHIP ROLE, BUT SHE HAS

5    DONE A VERY GOOD JOB IN MENTORING A NEW ENGINEER.  THIS

6    INVESTMENT IN TIME HELPED GREATLY IN DEVELOPING THAT ENGINEER

7    AND IN INCREASING JOB SATISFACTION AND PRODUCTIVITY.  SHE IS

8    ALSO RECOGNIZED AS A TECHNICAL LEADER IN THE GROUP.  I RELY ON

9    HER FOR TECHNICAL GUIDANCE FROM TIME TO TIME AS DO HER OTHER

10   COWORKERS."

11   Q.    BY THE WAY, MS. PANDE, WHO FILLED IN THESE COMMENTS?

12   A.    THESE WERE FILLED IN BY DAVID KENNEDY.

13   Q.    OKAY.  WOULD YOU READ THE NEXT COMMENT UNDER "STRENGTHS"?

14   A.    THE NEXT COMMENT IS ON TEAMWORK AND ON STRENGTHS, IT SAYS,

15   "SHE GETS HIGH MARKS FOR HER TEAMWORK FOR -- FROM THOSE WHO HAVE

16   WORKED WITH HER THIS PAST YEAR.  SHE IS CONSIDERATE OF OTHER

17   TEAM MEMBERS AND TAKES HER INDIVIDUAL RESPONSIBILITIES VERY

18   SERIOUSLY.  VOLUNTARILY MENTORED A NEW ENGINEER IN THE GROUP

19   THIS PAST YEAR, AND HAS HAD A VERY POSITIVE IMPACT IN DOING SO."

20   Q.    OKAY.

21              MS. HARRIMAN:  AND CAN YOU SCAN UP THE NEXT FEW,

22   PLEASE, CANDI.

23              THANKS.

24              (EXHIBIT PUBLISHED TO JURY.)

25

PANDE - DIRECT / HARRIMAN

1  Q.  LET ME PAUSE YOU 'CAUSE I DON'T WANT TO LOSE TRACK OF

2  KEEPING MY CHRON IN ORDER.  LET ME JUST PUT THAT THERE

3  (INDICATING).

4           NOW I WANT TO GO BACK AND TELL US WHEN YOU DEVELOPED

5  YOUR HEALTH PROBLEMS.

6  A.  I REALIZED I WAS SEVERELY ANEMIC IN JULY OF 2001.

7  Q.  AND HOW DID YOU REALIZE THAT?

8  A.  I REALIZED IT 'CAUSE I FINALLY WENT IN TO SEE MY PRIMARY

9  CARE DOCTOR, AND WHEN SHE GOT THE BLOOD TEST RESULTS BACK, SHE

10 SAID, "YOU NEED TO GET TO THE EMERGENCY ROOM AS" --

11           MS. SIMERLY:  OBJECTION, YOUR HONOR, HEARSAY.

12           THE COURT:  SUSTAINED.

13           THE WITNESS:  SORRY.

14           MS. HARRIMAN:  I DON'T THINK THERE WAS ANYTHING ABOUT

15 WHAT SHE SAID, YOUR HONOR -- SHE SAID TO ME.

16           THE COURT:  SHE WAS --

17           MS. HARRIMAN:  THERE WAS NOTHING ABOUT --

18           THE COURT:  WELL, ALL RIGHT.  BUT SHE'S ANSWERED THE

19 QUESTION.  SHE SENT HER TO THE EMERGENCY ROOM.

20 BY MS. HARRIMAN:

21 Q.  SO --

22 A.  I WENT TO THE EMERGENCY ROOM TO GET A BLOOD TRANSFUSION.

23 Q.  AND WHEN DID YOU GET THAT BLOOD TRANSFUSION?

24 A.  IT WAS IN JULY OF 2001.

25 Q.  AND WHY WAS IT THAT YOU NEEDED THE BLOOD TRANSFUSION?

PANDE - DIRECT / HARRIMAN

1          **MS. SIMERLY:**  OBJECTION, YOUR HONOR, CALLS FOR A

2     MEDICAL OPINION, EXPERT OPINION.

3          **THE COURT:**  OVERRULED.

4          WHAT WAS YOUR UNDERSTANDING OF WHY YOU NEEDED A BLOOD

5     TRANSFUSION?

6          **THE WITNESS:**  MY UNDERSTANDING OF WHY I NEEDED A

7     BLOOD TRANSFUSION WAS BECAUSE MY RED BLOOD CELL COUNT HAD

8     DROPPED TO VERY LOW LEVELS.  AND I WAS AT RISK FOR A POTENTIAL

9     HEART ATTACK IF I DIDN'T HAVE A BLOOD TRANSFUSION.

10    **BY MS. HARRIMAN:**

11    Q.  AND WHAT WAS THE CAUSE OF YOUR BEING -- HAVING THESE LOW RED

12    BLOOD CELLS, MS. PANDE, AS YOU UNDERSTOOD IT?

13         **MS. SIMERLY:**  OBJECTION, YOUR HONOR, CALLS FOR A

14    MEDICAL OPINION.

15         **THE COURT:**  OVERRULED.

16         YOU CAN ANSWER THAT QUESTION.

17         **THE WITNESS:**  WHILE I WAS AT THE EMERGENCY ROOM, I

18    FOUND OUT THROUGH TESTS THAT I HAD A VERY LARGE TUMOR IN MY

19    UTERUS.  IT'S CALLED A FIBROID.  AND BECAUSE OF THAT, I HAD BEEN

20    LOSING A LOT OF BLOOD DURING MY MENSTRUAL CYCLE AND THAT HAD

21    CAUSED THE ANEMIA.

22    **BY MS. HARRIMAN:**

23    Q.  OKAY.  DID THE BLOOD TRANSFUSION SOLVE YOUR MEDICAL

24    PROBLEMS?

25         **MS. SIMERLY:**  OBJECTION.  CALLS FOR A MEDICAL

PANDE - DIRECT / HARRIMAN

1    OPINION.

2         **THE COURT:** WHY DON'T YOU REPHRASE THE QUESTION.

3    **BY MS. HARRIMAN:**

4    Q.   UPON RECEIVING THE BLOOD TRANSFUSION, MS. PANDE, HOW -- HOW

5    DID THAT AFFECT YOUR HEALTH?  HOW DID YOU FEEL?

6    A.   THE BLOOD TRANSFUSION HELPED IN TERMS OF GETTING MY RED

7    BLOOD CELL COUNT UP.  SO I WASN'T FEELING AS COMPLETELY TIRED

8    AND EXHAUSTED AND OUT OF BREATH AS I HAD BEFORE THE BLOOD

9    TRANSFUSION, BUT I WAS ACTUALLY STILL VERY ANEMIC EVEN AFTER THE

10   BLOOD TRANSFUSION.  AND IT HELPED IN TERMS OF THE RED BLOOD CELL

11   COUNT, BUT IT DIDN'T HELP IN TERMS OF THE UNDERLYING PROBLEM OF

12   THE TUMOR THAT I HAD AND THE IMPACT THAT IT HAD ON LOSING A LOT

13   OF BLOOD MONTHLY.

14   Q.   AND WHAT WAS YOUR UNDERSTANDING OF HOW YOU COULD SOLVE THE

15   UNDERLYING PROBLEM OF HAVING THESE TUMORS ON YOUR UTERUS?

16   A.   MY UNDERSTANDING WAS THE RECOMMENDED OPTION WAS TO HAVE A

17   HYSTERECTOMY RIGHT THEN.

18   Q.   AND DID YOU CHOOSE TO DO THAT?

19   A.   NO, I DID NOT.

20   Q.   WHY NOT?

21   A.   I WAS SURPRISED BY THE DIAGNOSIS.  I HADN'T REALIZED I HAD

22   THIS PROBLEM.  I WANTED TO PRESERVE THE ABILITY TO HAVE CHILDREN

23   IN THE FUTURE, AND I JUST WAS NOT READY TO JUMP IN AND DO A

24   MAJOR SURGERY LIKE THAT RIGHT AT THAT INSTANT.

25   Q.   OKAY.  WERE YOU WORKING FOR REX MITCHELL DURING THIS TIME?

PANDE - DIRECT / HARRIMAN

1    Q.   WHEN DID YOU SET UP A MEETING WITH MR. JOHNSON?

2    A.   ON FEBRUARY 27TH OF 2002 --

3    Q.   AND --

4    A.   -- I SET UP A MEETING WITH HIM.

5    Q.   WITH WHOM DID YOU SET UP THAT -- HOW DID YOU SCHEDULE THAT

6    MEETING?

7    A.   I SCHEDULED THE MEETING THROUGH IRIS OWENS WHO WAS THE

8    ADMINISTRATIVE ASSISTANT WORKING WITH THE GROUP.

9    Q.   DID YOU TELL MS. OWENS WHY IT WAS YOU WANTED TO SPEAK TO

10   MR. JOHNSON?

11   A.   YES, I DID.

12   Q.   AND WHEN WAS THE MEETING WITH MR. JOHNSON SET FOR WHEN YOU

13   SPOKE WITH MS. OWENS?

14   A.   IT WAS SET FOR FRIDAY, MARCH 1ST.

15   Q.   DID IT OCCUR ON FRIDAY, MARCH 4 -- MARCH 1ST?

16   A.   NO, IT DID NOT.

17   Q.   WHY NOT?

18           MS. SIMERLY:   OBJECTION, YOUR HONOR.   LACKS

19   FOUNDATION AS PHRASED.

20           THE COURT:   CAN YOU REPHRASE THE QUESTION, PLEASE?

21   BY MS. HARRIMAN:

22   Q.   WAS IT RESCHEDULED, MS. PANDE?

23   A.   YES, IT WAS.

24   Q.   TO WHAT DATE?

25   A.   IT WAS RESCHEDULED BY JAY TO MARCH 4TH.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404*

PANDE - DIRECT / HARRIMAN

1   Q.   AND DID YOU MEET WITH MR. JOHNSON ON MARCH 4TH OF 2002?

2   A.   YES, I DID.

3   Q.   WHY WAS IT THAT YOU DIDN'T COMPLAIN DIRECTLY TO

4   MR. MITCHELL?

5   A.   I HAD TRIED TO TALK TO REX SEVERAL TIMES AND I FELT THAT HE

6   WASN'T LISTENING TO ME, HE WASN'T CONNECTING WITH ME.   AND EVERY

7   TIME I TRIED TO TALK TO HIM, I FELT LIKE I CAME OUT FEELING

8   WORSE THAN BEFORE.   AND I ALSO FOUND THAT EVERY TIME I TRIED TO

9   TALK TO HIM, HE STARTED PILING ON MORE WORK THAT WAS NOT REALLY

10  PART OF MY JOB DESCRIPTION.   IT WAS MORE SECRETARIAL WORK.

11  Q.   AND TELL US WHAT HAPPENED IN THE MEETING THAT YOU HAD WITH

12  MR. JOHNSON ON MARCH 4, 2002?

13  A.   I WENT IN TO TALK TO JAY JOHNSON, AND I TOLD HIM THAT, YOU

14  KNOW, I FELT THAT SOMEHOW MY RELATIONSHIP WITH REX HAD GOTTEN

15  OFF TRACK.   AND I HAD CONCERNS THAT REX WAS TREATING ME IN A

16  DIFFERENT WAY BECAUSE I WAS A WOMAN.   AND I TOLD HIM HOW THAT

17  MADE ME FEEL, THAT IT FELT THAT HE WAS BELITTLING ME, TALKING

18  DOWN TO ME AND IT WAS MAKING IT VERY DIFFICULT FOR ME TO GET MY

19  JOB DONE.   AND I SPECIFICALLY TOLD HIM ABOUT AN INSTANCE ON

20  FEBRUARY 27TH, WHICH WAS REALLY WHAT -- KIND OF THE STRAW THAT

21  BROKE THINGS LOOSE TO -- TO GO AND TALK TO HIM, WHERE --

22  Q.   OKAY.   WITHOUT GOING INTO DETAIL, TELL ME WHAT MR. JOHNSON

23  SAID IN RESPONSE.

24  A.   MR. JOHNSON'S RESPONSE WAS THAT REX WAS UNDER A LOT OF

25  PRESSURE AND HE WAS UNDER A LOT OF STRESS, AND THAT WHEN

PANDE - DIRECT / HARRIMAN

1    MR. JOHNSON SAW THAT I HAD SCHEDULED A MEETING FOR -- TO MEET

2    INDIVIDUALLY WITH MR. JOHNSON, THAT HE HAD ASKED IRIS OWENS THE

3    PURPOSE OF THE MEETING, AND SUBSEQUENTLY TALKED TO REX MITCHELL.

4    Q.   IS THIS WHAT MR. JOHNSON TOLD YOU?

5    A.   YES, THAT'S WHAT HE TOLD ME.

6    Q.   SO HE TOLD YOU THAT HE HAD SPOKEN TO MR. MITCHELL BEFORE HE

7    EVEN HEARD WHAT YOUR CONCERNS WERE?

8    A.   YES.

9            MS. SIMERLY:  OBJECTION.  LEADING.

10           THE COURT:  OVERRULED.

11   BY MS. HARRIMAN:

12   Q.   AND WHAT ELSE DID HE TELL YOU?

13   A.   HE TOLD ME THAT UPON TALKING TO REX MITCHELL, THAT REX

14   MITCHELL TOLD HIM THAT I WAS THE POOREST PERFORMER IN THE GROUP

15   AND HE HAD VERY SIGNIFICANT PERFORMANCE ISSUES WITH ME.

16   Q.   HAD MR. MITCHELL EVER TOLD YOU THAT HE HAD ANY PERFORMANCE

17   ISSUES WITH YOU?

18   A.   NO.

19   Q.   DID MR. JOHNSON SAY ANYTHING ELSE IN THIS MEETING ON

20   MARCH 4TH, 2002?

21   A.   MR. JOHNSON SAID THAT, "SINCE YOU'RE NOT GETTING ALONG WITH

22   REX, YOU HAVE THREE OPTIONS.  YOU CAN EITHER STAY IN THE GROUP

23   AND GET ALONG WITH REX.  YOU CAN LEAVE THE GROUP AND FIND A JOB

24   ELSEWHERE IN THE COMPANY.  OR YOU CAN JUST GO AHEAD AND LEAVE

25   THE COMPANY."

PANDE - DIRECT / HARRIMAN

1   ISSUES WERE?

2   A.   YES, HE DID.

3   Q.   AND TELL US WHAT YOU RECALL HE SAID.

4   A.   HE MADE SOME STATEMENTS ABOUT -- HE SAID THAT I HAD NOT DONE

5   ANY WORK AT ALL IN THE FOURTH QUARTER OF 2002, THAT I HAD SAT

6   AROUND AND NOT DONE ANY WORK, NOT PARTICIPATED IN THE BUSINESS

7   PLANNING PROCESS.  HE HAD A STACK OF EMAILS THAT HE WENT THROUGH

8   VERY RAPIDLY, AND I INTERRUPTED TO TRY AND UNDERSTAND WHAT THOSE

9   SPECIFIC EMAILS WERE.  AND MR. JOHNSON TOLD ME THAT I WAS NOT

10  SUPPOSED TO SPEAK.  I WAS SUPPOSED TO JUST LISTEN TO REX.  THIS

11  WASN'T A DISCUSSION OF MY PERFORMANCE ISSUES.  IT WAS JUST REX

12  TELLING ME WHAT MY PERFORMANCE ISSUES WERE.

13  Q.   OKAY.  DID -- WERE YOU SHOWN THE EMAILS?

14  A.   NO, I WASN'T.

15  Q.   AND DID -- DID YOU MAKE A DECISION DURING THIS MEETING AS TO

16  WHICH OF THOSE THREE OPTIONS YOU WERE GOING TO TAKE?

17  A.   YES.  I TOLD JAY THAT I FELT THAT REX WAS PAINTING A VERY

18  BIASED PORTRAYAL OF WHAT I HAD ACTUALLY DONE IN THE FOURTH

19  QUARTER AND ALL THE WAY THROUGH -- MIDDLE -- MIDDLE OF MARCH OF

20  2002, AND GIVEN THAT I FOUND IT WOULD BE VERY DIFFICULT TO

21  CONTINUE WORKING IN THE GROUP WITH REX, AND I DID NOT WANT TO

22  LEAVE THE COMPANY, SO I TOLD HIM THAT I WOULD CHOOSE THE SECOND

23  OPTION OF LEAVING THE GROUP AND GETTING A JOB SOMEWHERE ELSE.

24  Q.   OKAY.  AND DID MR. -- DID MR. JOHNSON GIVE YOU ANY

25  OPPORTUNITY DURING THIS MEETING TO EXPLAIN WHY YOU BELIEVED

PANDE - DIRECT / HARRIMAN

1    MR. MITCHELL'S COMMENTS WERE UNFAIR?

2    A.  NO, HE DID NOT.

3    Q.  DID YOU HAVE ANY FEELING AT THE END OF THESE TWO MEETINGS,

4    MS. PANDE, THAT YOUR CONCERNS WERE BEING ADDRESSED?

5    A.  NO.  IN FACT, I FELT THAT I WAS BEING RETALIATED AGAINST FOR

6    HAVING COMPLAINED IN THE FIRST PLACE.

7    Q.  AND HOW DID -- HOW WERE THINGS LEFT AT THE END OF THIS

8    MEETING?  YOU GAVE MR. JOHNSON YOUR CHOICE.  HOW WAS IT LEFT

9    AMONG YOU, MR. MITCHELL AND MR. JOHNSON?

10   A.  MR. JOHNSON ASKED REX AND I TO SIT DOWN AND CLOSE OUT THE

11   PERFORMANCE REVIEW PROCESS FOR THE PREVIOUS YEAR FOR 2001.  AND

12   HE ALSO INSTRUCTED REX THAT IT WAS SUPPOSED TO REFLECT NOT JUST

13   THE FOURTH QUARTER OF 2002 BUT THE ENTIRE YEAR.  AND HE ALSO

14   TOLD REX THAT HE EXPECTED REX TO WORK WITH ME TO TRY AND HELP ME

15   FIND ANOTHER JOB WITHIN THE COMPANY.

16   Q.  OKAY.  HAD YOU BEGUN THE PERFORMANCE REVIEW PROCESS BEFORE

17   EITHER OF THE TWO MEETINGS THAT YOU HAD?

18   A.  NO, I HAD NOT.

19   Q.  HAD YOU EVEN BEGUN FILLING OUT THE FORM?

20   A.  I ONLY DOWNLOADED THE FORM AND I HAD NOT STARTED FILLING OUT

21   THE FORM.

22          MS. HARRIMAN:  OKAY.  LET ME JUST ADD THE MARCH 14TH

23   MEETING HERE (INDICATING).

24   Q.  SO WHEN DID YOU BEGIN THE PROCESS OF FILLING IN THE FORM FOR

25   THE 2002 PERFORMANCE REVIEW?

PANDE - DIRECT / HARRIMAN

1   Q.   DID YOU AGREE WITH THOSE COMMENTS?

2   A.   FOR THE MOST PART.  THE ONLY PART OF THAT THAT I DIDN'T

3   AGREE WITH WAS THE CHARACTERIZATION THAT I HAD ONLY DONE THE

4   PLANNING PART OF THE JOB THROUGH THE FIRST NINE MONTHS OF THE

5   YEAR, 'CAUSE I'D ACTUALLY DONE IT THROUGH THE WHOLE YEAR.

6   Q.   AND THEN THERE'S A CHECKMARK UNDER NUMBER 2.  IT SAYS,

7   "FULLY MEETS PERFORMANCE EXPECTATIONS."

8               WHEN DID YOU LEARN THAT THAT WAS THE RATING THAT

9   MR. MITCHELL WAS GIVING YOU?

10  A.   WHEN I RECEIVED THIS FORM BY EMAIL FROM REX MITCHELL ON

11  APRIL 19TH OF 2002.

12  Q.   WHEN YOU MET WITH HIM ON APRIL 1ST OF 2002, DID HE TELL YOU

13  THAT HE WAS GOING TO RATE YOU AS -- GIVE YOU A RATING OF TWO?

14  A.   NO, HE DID NOT.

15  Q.   DID YOU DISCUSS YOUR RATING AT ALL?

16  A.   NO, WE DID NOT.

17          MS. HARRIMAN:   OKAY.  LET ME JUST PUT THIS UP.

18  Q.   WHAT WAS YOUR REACTION, MS. PANDE, WHEN YOU SAW YOUR

19  PERFORMANCE RATING?

20  A.   GENERALLY A PERFORMANCE RATING OF TWO, I THINK IS A

21  PERFECTLY ACCEPTABLE RATING IN A NORMAL YEAR.  THIS HAD NOT BEEN

22  A NORMAL YEAR IN TERMS OF THE AMOUNT OF EFFORT THAT I HAD PUT

23  IN.  IT WAS NOT CONSISTENT WITH WHAT REX HAD TOLD ME BOTH IN

24  SEPTEMBER AND OCTOBER OF 2001 WHEN HE TOLD ME THAT HE VIEWED ME

25  AS THE MOST CAPABLE PERSON IN THE GROUP, THE HIGHEST PERFORMER

1    IN THE GROUP, THE HIGHEST POTENTIAL PERSON IN THE GROUP.   SO

2    WHEN I GOT THIS RATING, IT WAS NOT CONSISTENT WITH WHAT HE HAD

3    TOLD ME EARLIER.   AND I FELT THAT IT WAS FURTHER EVIDENCE OF

4    RETALIATION FOR COMPLAINING ABOUT HIM TO JAY JOHNSON.

5    Q.   AND SO TURN TO THE VERY NEXT PAGE OF THE DOCUMENT, PLEASE.

6    A.   (REVIEWING DOCUMENT.)

7                    (EXHIBIT PUBLISHED TO JURY.)

8    BY MS. HARRIMAN:

9    Q.   AND ARE THESE ADDITIONAL COMMENTS THAT YOU MADE, MS. PANDE?

10   A.   YES, THEY ARE.

11   Q.   AND WHEN DID YOU MAKE THEM?

12   A.   I MADE THEM PROBABLY ABOUT THE TIME THAT I SIGNED THIS

13   DOCUMENT ON APRIL 22ND, SO I MADE THEM AFTER I RECEIVED THEM --

14   AFTER I RECEIVED THE FORM AND THE RATING BACK FROM REX ON

15   APRIL 19TH.

16   Q.   AND WHY DID YOU MAKE THESE COMMENTS?

17   A.   I MADE THESE COMMENTS TO EXPLAIN WHY I THOUGHT THE

18   PERFORMANCE RATING WAS INCONSISTENT WITH THE FEEDBACK THAT I HAD

19   RECEIVED.   AND I WANTED TO BE CLEAR ABOUT THE CONVERSATIONS THAT

20   I HAD -- AND THE FEEDBACK I HAD RECEIVED FROM REX PREVIOUSLY ON

21   HOW HE VIEWED MY PERFORMANCE, WHAT HE HAD TOLD ME ABOUT MY

22   PERFORMANCE.

23            MS. HARRIMAN:   OKAY.   AND THE FOURTH PARAGRAPH DOWN.

24                    (EXHIBIT PUBLISHED TO JURY.)

25            MS. HARRIMAN:   CAN WE BRING THAT DOWN JUST A LITTLE

1    BIT.   THE PARAGRAPH THAT SAYS "DURING OUR 2001."  CAN YOU

2    HIGHLIGHT THAT A LITTLE BIT MORE, CANDI?  THERE YOU GO.  AND

3    BLOW THAT UP JUST A LITTLE BIT.

4    Q.   YOU WROTE, "DURING OUR 2001 PMP DISCUSSION ON APRIL 1ST,

5    2002, REX SAID THAT" -- I'M SORRY.  I MEANT TO SKIP SOMEWHERE

6    ELSE.  LET ME GO DOWN ONE PARAGRAPH.

7                    (EXHIBIT PUBLISHED TO JURY.)

8    BY MS. HARRIMAN:

9    Q.   "DURING OUR PMP DISCUSSION ON APRIL 1, 2002, REX ADMITTED

10   THAT HE HAD BEHAVED INAPPROPRIATELY SEVERAL TIMES IN HIS

11   INTERACTIONS WITH ME OVER THE PAST SEVERAL MONTHS.  HE

12   ATTRIBUTED HIS BEHAVIOR TO STRESS RELATED TO A MEETING HE HAD

13   WITH THE IMO IN THE FOURTH QUARTER THAT HAD NOT PROCEEDED WELL

14   AND HIS FRUSTRATION THAT PETER ROBERTSON HAD REQUESTED THAT HE

15   REWORK THE BUSINESS PLAN."

16          DOES THAT ACCURATELY REFLECT THINGS THAT MR. MITCHELL

17   HAD TOLD YOU WHEN YOU MET WITH HIM ON APRIL 1?

18   A.   YES, IT DOES.

19   Q.   SO -- AND I JUST WANT TO CONFIRM THE DATE.  WHEN DID YOU

20   ACTUALLY RECEIVE THIS -- THE RANKING OF TWO THAT'S ON THE BOTTOM

21   PART OF PAGE -- 1, 2, 3 -- 7 OF THE DOCUMENT?

22   A.   I'D RECEIVED THAT RANKING -- NOTIFICATION OF THAT RANKING IN

23   THAT BOX CHECKED WHEN I RECEIVED THIS DOCUMENT BY EMAIL FROM REX

24   MITCHELL ON APRIL 19TH.

25   Q.   OKAY.  AND I'M GOING TO CORRECT -- I'M GOING TO MAKE THIS

PANDE - DIRECT / HARRIMAN

1    A.   THE FOUR MAIN BULLET POINTS ARE "CTOP PLANNING CONSTITUTES A

2    HOSTILE WORK ENVIRONMENT THAT DOES NOT FOSTER PRODUCTIVITY OR

3    RESPECT AMONGST THE WORK GROUP.   PERFORMANCE EVALUATIONS ARE

4    PREFERENTIAL, BIASED," QUESTION MARK, "UNFAIR YARDSTICKS ARE

5    USED FOR PERFORMANCE CRITERIA.   RETALIATORY MEASURES ARE OF

6    IMMEDIATE CONCERN."

7    Q.   AND DID YOU SET A MEETING WITH MR. JOHNSON?

8    A.   YES, I DID.

9    Q.   AND WHO ATTENDED THAT MEETING?

10   A.   THAT MEETING WAS ATTENDED BY MYSELF, JAY JOHNSON, GARY

11   YAMASHITA, THE OMBUDS PERSON, AND VICKI THOMPSON, WHO'S A

12   RESERVES ANALYST IN THE GROUP.

13   Q.   AND MS. THOMPSON ALSO REPORTED TO MR. MITCHELL?

14   A.   YEAH, SHE DID.

15   Q.   HOW MANY OTHER PEOPLE REPORTED TO MR. MITCHELL BESIDES

16   YOURSELF AND VICKI THOMPSON?

17   A.   THERE ARE ABOUT FIVE OTHER PEOPLE THAT REPORTED TO REX

18   MITCHELL.

19   Q.   AND LET ME PUT THIS UP.   AND I'LL ASK -- WHEN DID THAT

20   MEETING OCCUR?

21   A.   THAT MEETING OCCURRED ON APRIL 24TH OF 2002.

22   Q.   AND TELL US WHAT HAPPENED IN THE MEETING WITH JAY JOHNSON ON

23   APRIL 24, 2002.

24   A.   ON APRIL 24TH OF 2002, GARY YAMASHITA, THE OMBUDS PERSON,

25   HAD A SHORT PREMEETING WITH JAY JOHNSON, AND THEN MYSELF AND

PANDE - DIRECT / HARRIMAN

1   VICKI WERE INVITED TO JOIN THEM.  AND THE MEETING DIDN'T PROCEED

2   AS I HAD PLANNED OR -- OR ANTICIPATED.  WE NEVER DISCUSSED ANY

3   OF THE ISSUES THAT ARE LISTED HERE.  THE MEETING REALLY FOCUSED

4   ON JAY JOHNSON'S PARROTING REX MITCHELL'S PERFORMANCE CONCERNS

5   ABOUT MY PERFORMANCE.

6   Q.  OKAY.  AND SO DID -- DID YOU HAVE ANY CHANCE TO TALK ABOUT

7   ANY OF THESE ISSUES THAT ARE ON THE SCREEN?

8   A.  NO, WE DID NOT.

9   Q.  WHAT WAS IT THAT MR. JOHNSON WAS TELLING YOU?

10  A.  MR. JOHNSON WAS TELLING ME THAT ANY PROBLEMS THAT I HAD WITH

11  REX WERE MY OWN FAULT.

12  Q.  DID MR. YAMASHITA DO ANYTHING TO REDIRECT THE CONVERSATION?

13  A.  NO.  HE WAS -- HE WAS BASICALLY A FLY ON THE WALL.

14  Q.  AND HOW DID THE MEETING END?

15  A.  THE MEETING ENDED AFTER SPENDING A LOT OF TIME TALKING ABOUT

16  REX'S PERFORMANCE ISSUES.  JAY -- I MEAN TOWARDS ME.  JAY

17  ASKED -- OR INFORMED VICKI THOMPSON THAT HE WOULD BE MOVING HER

18  INTO --

19         MS. SIMERLY:  OBJECTION, YOUR HONOR.

20         THE COURT:  JUST --

21         MS. HARRIMAN:  YEAH.

22  Q.  HOW DID YOU AND VICKI --

23         THE COURT:  SUSTAINED.

24  BY MS. HARRIMAN:

25  Q.  -- MS. PANDE?

PANDE - DIRECT / HARRIMAN

1    SO LET'S MAKE SURE NOT TO HAVE ANY REFERENCE, DIRECT OR

2    INDIRECT, TO HER COMPLAINTS.

3              **THE WITNESS:**  YES, YOUR HONOR.

4         **THE COURT:**  THANK YOU VERY MUCH.

5         ALL RIGHT.  ANYTHING BEFORE WE CALL THE JURY?

6         **MS. HARRIMAN:**  NO, YOUR HONOR.

7         **MS. SIMERLY:**  NO, THANK YOU, YOUR HONOR.

8         **THE COURT:**  OKAY.

9         KAREN, IF YOU WOULD BRING THE JURY IN.

10        (OFF-THE-RECORD DISCUSSION.)

11        (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE

12   OF THE JURY:)

13             **THE COURT:**  OKAY.  THE JURY IS BACK.  PLEASE HAVE A

14   SEAT.  EVERYONE HAVE A SEAT.

15        ALL RIGHT.

16        MS. HARRIMAN, GO AHEAD.

17        **MS. HARRIMAN:**  THANK YOU, YOUR HONOR.

18   Q.  OKAY.  MS. PANDE.  I THINK WE'VE ACTUALLY MOVED FORWARD IN

19   TIME TO 2003.  AND JUST TO PUT US BACK WHERE WE WERE, TELL US

20   WHERE YOU WERE WORKING IN 2003.

21   A.  SO IN 2003, I WAS NOW WORKING IN THE SOUTHERN AFRICA

22   BUSINESS UNIT IN SAN RAMON, CALIFORNIA.

23   Q.  AND WHO WAS YOUR SUPERVISOR?

24   A.  MY NEW SUPERVISOR WAS JACK DUNN.

25   Q.  AND IN THE FIRST QUARTER OF 2003, DID YOU HAVE ANY

PANDE - DIRECT / HARRIMAN

1   DISCUSSIONS WITH MR. DUNN ABOUT YOUR ANNUAL SALARY TREATMENT?

2   A.   YES, I DID.

3   Q.   AND WHEN DID YOU?

4   A.   ON APRIL 1ST OF 2003.

5   Q.   AND TELL US ABOUT THE CONVERSATION THAT YOU HAD ON APRIL 1ST

6   OF 2003 WITH MR. DUNN.

7   A.   MR. DUNN SAID THAT I WAS NOT GOING TO BE RECEIVING A MERIT

8   PAY INCREASE THAT YEAR BASED ON INPUT THAT HE HAD RECEIVED FROM

9   THE TIME THAT I HAD BEEN IN THE PLANNING -- BUSINESS PLANNING

10  GROUP.

11  Q.   SO DID HE TELL YOU WHOM HE HAD RECEIVED THE INPUT FROM?

12  A.   YES, HE SAID THAT HE HAD TRIED TO GET INPUT FROM REX

13  MITCHELL AND HAD NOT BEEN SUCCESSFUL, SO HE HAD GOTTEN THE INPUT

14  FROM KELLY HARTSHORN.

15  Q.   AND FOR WHAT -- FOR WHAT -- TELL US FIRST WHAT A SALARY

16  MERIT INCREASE IS.

17  A.   SO THE SALARY PROGRAM AT CHEVRON GENERALLY HAS A STRUCTURAL

18  INCREASE THAT HAS MORE TO DO WITH INFLATION AND THEN A MERIT

19  COMPONENT THAT IS INDICATION OF HOW WELL YOU'VE DONE THAT YEAR,

20  TO REWARD YOU.

21  Q.   OKAY.   AND IN 2002, HAD YOU WORKED AT ALL FOR MR. DUNN?

22  A.   JUST FOR A FEW WEEKS.   I TRANSFERRED IN ON DECEMBER 9TH, SO

23  BETWEEN THAT AND THE HOLIDAYS, REALLY HARDLY AT ALL.

24  Q.   OKAY.   AND HAD THERE BEEN A TIME PREVIOUSLY WHEN YOU DIDN'T

25  RECEIVE A MERIT RAISE?

PANDE - DIRECT / HARRIMAN

1          MS. HARRIMAN:  THANKS, CANDI.

2     Q.    SO WE NOW ARE APPROACHING THE END OF OCTOBER 2003.  DID YOU

3     MAKE DECISIONS IN LATE OCTOBER 2003 CONCERNING YOUR HEALTH

4     CONDITION, MS. PANDE?

5     A.    YES, I DID.

6     Q.    AND WHAT DID YOU DECIDE?

7     A.    I DECIDED THAT I WOULD GO AHEAD AND HAVE A SURGERY CALLED

8     MYOMECTOMY.

9     Q.    WHAT WAS THE POINT OF THE SURGERY?

10    A.    THE SURGERY WOULD REMOVE THE -- THE FIBROID TUMOR THAT I HAD

11    IN MY UTERUS.

12    Q.    AND WHY DID YOU DECIDE TO GO AHEAD AND HAVE THE SURGERY?

13    A.    I HAD BEEN WRESTLING WITH THIS DECISION, YOU KNOW, FOR

14    SEVERAL YEARS NOW, AND I HAD BEEN HOPING THAT, YOU KNOW, BY

15    TAKING IRON SUPPLEMENTS OR LOSING WEIGHT THAT I COULD SOMEHOW,

16    YOU KNOW, HAVE LESS BLEEDING, I WOULDN'T BE SO ANEMIC.  AND OVER

17    THE SUMMER OF 2003, I HAD BEEN TRYING TO DO THOSE THINGS, AND I

18    WAS HAVING MY BLOOD WORK CHECKED REGULARLY, AND IT JUST WASN'T

19    WORKING AND I WAS FEELING RUN DOWN.  I WAS GETTING REALLY BAD

20    HEADACHES THAT WOULDN'T GO AWAY VERY EASILY.

21          AND I JUST -- EVEN THOUGH IT WAS SOMETHING I WAS NOT

22    REALLY LOOKING FORWARD TO DO, HAD BEEN REALLY AFRAID TO DO IT

23    FOR A LONG TIME, I THOUGHT I'D BETTER GO AHEAD AND DO IT BEFORE

24    I START TRAVELING AGAIN NEXT YEAR AND TAKING THESE LONG

25    INTERNATIONAL TRIPS 'CAUSE I JUST DIDN'T THINK I'D BE ABLE TO

PANDE - DIRECT / HARRIMAN

1  SUSTAIN THAT INTO 2004.

2  Q.  SO WHAT WERE -- WHAT WAS YOUR UNDERSTANDING OF WHAT YOUR

3  MEDICAL OPTIONS WERE IN LATE OCTOBER?

4  A.  MY UNDERSTANDING WAS THAT I COULD DO WHAT I HAD BEEN DOING

5  FOR A LONG TIME, WHICH WAS JUST LIVING WITH THE ANEMIA AND KIND

6  OF ALL THE SYMPTOMS ASSOCIATED WITH THE FIBROIDS AND THE ANEMIA.

7  I COULD GO AHEAD AND HAVE THE SURGERY, THE MYOMECTOMY.  AND WITH

8  THAT SURGERY, I COULD EITHER HAVE IT RIGHT AWAY OR HAVE A

9  TREATMENT THAT INVOLVED LUPRON INJECTIONS WHICH ARE DESIGNED TO

10 STOP YOUR MENSTRUAL CYCLE TO ENABLE YOUR RED BLOOD CELL COUNT TO

11 COME UP, AND TO SEE HOW THAT WORKED, AND THEN DECIDE WHEN TO

12 HAVE THE SURGERY BASED ON -- ON HOW THAT WAS WORKING.

13         AND THE MAIN REASON FOR THAT WAS IF I HAD THE SURGERY

14 IMMEDIATELY, BASED ON THE RED BLOOD CELL COUNTS I HAD AT THE

15 TIME, I WAS LIKELY GOING TO HAVE ANOTHER BLOOD TRANSFUSION

16 DURING SURGERY, AND I WANTED TO AVOID THAT IF POSSIBLE.

17 Q.  SO OF THOSE VARIOUS OPTIONS, WHAT DID YOU DECIDE -- OR HAD

18 YOU DECIDED BEFORE YOU STARTED YOUR MEDICAL LEAVE AS TO WHICH

19 OPTION YOU WERE GOING TO TAKE?

20 A.  ON NOVEMBER 7TH, I MET WITH THE SURGEON AND WE --

21 Q.  WITHOUT --

22 A.  I'M SORRY.  AND BASED ON MY UNDERSTANDING OF THE OPTIONS, I

23 DECIDED TO GO AHEAD WITH LUPRON INJECTIONS AND SEE HOW MY RED

24 BLOOD CELL COUNT, HOW MY HEMATOCRIT RESPONDED AND HOW EFFECTIVE

25 THE LUPRON INJECTIONS WERE IN TERMS OF STOPPING MY MENSTRUAL

PANDE - DIRECT / HARRIMAN

1    FEDERAL LAW THAT PROVIDES QUALIFIED EMPLOYEES WITH JOB

2    PROTECTION FOR CERTAIN FAMILY AND MEDICAL REASONS.  JOB

3    PROTECTION MEANS THAT WHEN YOU RETURN FROM AN ABSENCE COVERED

4    UNDER FMLA, YOU MUST BE RESTORED TO YOUR ORIGINAL JOB OR TO AN

5    EQUIVALENT JOB WITH EQUIVALENT PAY AND BENEFITS.

6    Q.  MS. PANDE, WHEN YOU DECIDED TO TAKE YOUR LEAVE, DID YOU KNOW

7    HOW LONG YOUR LEAVE WOULD LAST?

8    A.  NO, I DID NOT.

9    Q.  WHY DIDN'T YOU?

10   A.  I -- WHEN I MADE THE DECISION TO TAKE MY LEAVE, THAT WAS AT

11   THE END OF OCTOBER OF 2003, I HADN'T MET WITH MY SURGEON.  AND

12   WHEN I MET WITH MY SURGEON, MY UNDERSTANDING OF MY OPTIONS WERE

13   THAT I WOULD BE ABLE TO HAVE SOME FLEXIBILITY IN WHEN I DECIDED

14   TO HAVE THE SURGERY BASED ON WHETHER I WAS WILLING TO RISK

15   HAVING A BLOOD TRANSFUSION TO HAVE THE SURGERY EARLIER AND ALSO

16   HOW I ACTUALLY RESPONDED TO THE LUPRON TREATMENT AND HOW MY RED

17   BLOOD CELL COUNT RESPONDED TO THAT.

18   Q.  AND DID YOU -- WELL, LET'S TAKE A LOOK AT EXHIBIT 52,

19   PLEASE.

20   A.  (REVIEWING DOCUMENTS.)

21   Q.  IS IT -- EXHIBIT 52 A LETTER THAT YOU RECEIVED FROM

22   UNUMPROVIDENT?

23   A.  YES, IT IS.

24        MS. HARRIMAN:  YOUR HONOR, MOVE EXHIBIT 52 INTO

25   EVIDENCE.

1    CHEVRONTEXACO OVERSEAS PETROLEUM IN HOUSTON, TEXAS.  YOU DID NOT

2    ACCEPT THE OFFER, AND BY TURNING DOWN THIS JOB, YOU HAVE, IN

3    EFFECT, RESIGNED FROM THE COMPANY."

4                HAD YOU RESIGNED FROM CHEVRON?

5    A.  NO, I HAD NEVER RESIGNED FROM CHEVRON.

6    Q.  WERE YOU EVER TOLD THAT BY DECLINING THE MOVE TO HOUSTON, IT

7    WOULD BE CONSIDERED A RESIGNATION?

8    A.  NO, I WAS NEVER TOLD THAT.

9    Q.  IN THE NEXT PARAGRAPH, IT SAYS, "AT THE TIME YOU CHOSE NOT

10   ACCEPT THE RELOCATION OFFER, YOU WERE INFORMED THAT AS LONG AS

11   THERE WAS USEFUL WORK FOR YOU, THAT YOUR EMPLOYMENT WITH THE

12   COMPANY COULD CONTINUE UNTIL YEAR-END 2003."

13               WERE YOU EVER TOLD THAT YOUR EMPLOYMENT WITH THE

14   COMPANY COULD CONTINUE ONLY UNTIL YEAR-END 2003?

15   A.  NO.  I WAS NEVER TOLD THAT.

16   Q.  DID YOU -- HAD ANYONE EVER TALKED TO YOU ABOUT THE CONCEPT

17   OF "USEFUL WORK"?

18   A.  I'D NEVER HEARD THAT TERM UNTIL I SAW IT IN THIS LETTER.

19   Q.  DO YOU KNOW WHAT IT MEANS?

20   A.  NOT REALLY.

21   Q.  DID YOU RESPOND TO THIS LETTER WHEN YOU RECEIVED IT?

22   A.  YES, I DID.

23   Q.  OKAY.  ACTUALLY, LET'S TAKE A LOOK AT EXHIBIT 65, FIRST,

24   PLEASE.

25   A.  (REVIEWING DOCUMENT.)

PANDE - DIRECT / HARRIMAN

1    THE INDUSTRY. AND I TALKED TO THE PROFESSOR THAT I CO-TEACH

2    WITH AND -- WHO HAD BEEN A CONSULTANT FOR A LONG TIME. AND

3    ASKED HIM IF HE COULD PASS ME CONSULTING PROJECTS THAT WE COULD

4    WORK ON TOGETHER OR THAT I COULD HELP OUT WITH.

5             I ALSO ACTIVELY LOOKED AT JOBS THAT WERE POSTED, AND

6    I APPLIED TO JOBS.

7    Q.  DID YOU KEEP A LOG OF YOUR EFFORTS?

8    A.  YES, I DID.

9    Q.  AND HOW DID YOU KEEP THAT LOG?

10   A.  I KEPT IT ON KIND OF LIKE AN EXCEL SPREADSHEET OR WORD

11   DOCUMENT ON THE COMPUTER. AND EVERY COUPLE OF WEEKS, I WOULD

12   UPDATE THE LOG AND KIND OF GIVE AN IDEA OF SOME OF THE ACTIVITY

13   I HAD FOR EACH WEEK OF THE MONTH IN LOOKING FOR A JOB.

14   Q.  DOES THAT -- THAT YOUR LOG SHOW AT LEAST MOST OF THE EFFORTS

15   THAT YOU MADE TO SEEK -- TO FIND NEW WORK?

16   A.  YES, A LOT OF IT.

17   Q.  DID YOU WORK WITH ANY SEARCH FIRMS?

18   A.  YES, I DID.

19   Q.  AND WHAT DID YOU DO WITH THOSE SEARCH FIRMS?

20   A.  I TALKED TO THEM ON THE TELEPHONE, AND I SUBMITTED MY C.V.

21   TO THEM. AND I INDICATED THAT I WAS INTERESTED IN BOTH

22   CONSULTING OPPORTUNITIES AND EVEN ANY SHORT-TERM CONSULTING

23   WORK, AS WELL AS LONGER-TERM EMPLOYMENT OPPORTUNITIES.

24   Q.  AND DID YOU SUBMIT ANY JOB APPLICATIONS?

25   A.  YES, I DID.

PANDE - DIRECT / HARRIMAN

1    Q.   AND HOW MANY JOB APPLICATIONS DID YOU SUBMIT?

2    A.   ABOUT 20.

3    Q.   DID YOU HAVE ANY JOB INTERVIEWS?

4    A.   YES, I DID.

5    Q.   AND HOW MANY JOB INTERVIEWS DID YOU HAVE?

6    A.   I HAD ONE JOB INTERVIEW.

7    Q.   DID YOU GET THE JOB THAT YOU INTERVIEWED FOR?

8    A.   NO, I DID NOT.

9    Q.   WERE YOU TOLD WHY YOU DIDN'T?

10   A.   YES.

11   Q.   WHAT WERE YOU TOLD?

12          MS. SIMERLY:  OBJECTION, YOUR HONOR, HEARSAY.

13          THE COURT:  SUSTAINED.

14   BY MS. HARRIMAN:

15   Q.   WHAT WAS YOUR UNDERSTANDING, MS. PANDE, OF WHY YOU DIDN'T

16   GET THE JOB THAT YOU APPLIED FOR.

17          MS. SIMERLY:  OBJECTION, YOUR HONOR, HEARSAY.

18          THE COURT:  SUSTAINED UNLESS YOU CAN LAY A FOUNDATION

19   OTHERWISE.

20   BY MS. HARRIMAN:

21   Q.   MS. PANDE, WHAT WAS THE JOB THAT YOU INTERVIEWED FOR?

22   A.   I INTERVIEWED FOR A JOB WITH ANADARKO THAT WAS A 28/28

23   ROTATIONAL OPPORTUNITY IN ALGERIA.

24   Q.   AND DID YOU LACK ANY OF SKILLS THAT YOU NEEDED FOR THAT JOB?

25   A.   YES, I DID.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404*

PANDE - DIRECT / HARRIMAN

1    BEGINNING, AND I FINALLY LANDED MY FIRST CLIENT AND INCORPORATED

2    A COMPANY IN JUNE OF 2005 TO START DOING CONSULTING WORK.

3    Q.    WHAT WAS THE NAME OF THE COMPANY THAT YOU INCORPORATED?

4    A.    PETROASSETS, INC.

5    Q.    AND WITH WHOM DID YOU SET UP THIS COMPANY?

6    A.    I SET UP THIS COMPANY WITH MY YOUNGER BROTHER RAVI.

7    Q.    AND WHY DID YOU SET IT UP WITH -- WITH RAVI?

8    A.    MY -- I HAVE A LOT OF ENERGY INDUSTRY EXPERIENCE, AND RAVI

9    HAS A LOT OF EXPERIENCE WITH TECHNOLOGY AND SOFTWARE.  AND OUR

10   VISION FOR THE COMPANY IS TO HAVE OFFERINGS IN BOTH SERVICES,

11   WHICH IS CONSULTING, AND THEN SOFTWARE AS WELL SO THAT WE HAVE A

12   MORE STABLE REVENUE STREAM.

13   Q.    OKAY.  AND WHAT KIND OF WORK HAVE YOU BEEN DOING AS A

14   CONSULTANT FOR PETROASSETS?

15   A.    IN -- OVER THE LAST TWO AND A HALF YEARS, MOST OF THE WORK

16   THAT I'VE BEEN DOING HAS BEEN INTERNATIONAL.  AND I'VE WORKED IN

17   MEXICO -- IN VILLA HERMOSA, MEXICO, AND ALSO IN VENEZUELA IN

18   PUERTO LA CRUZ.  AND MOST OF THAT WORK HAS BEEN WITH NATIONAL

19   OIL COMPANIES.

20             AND THIS YEAR, I WORKED IN INDIA IN ASSAM, INDIA, FOR

21   ABOUT A MONTH WITH THE NATIONAL OIL COMPANY IN INDIA.  AND I

22   JUST WAS IN VENEZUELA AGAIN IN SEPTEMBER.

23   Q.    WOULD YOU TAKE A LOOK, PLEASE, AT EXHIBIT 88.

24   A.    (REVIEWING DOCUMENTS.)

25             YES.

PANDE - CROSS (RESUMED) / SIMERLY

1   Q.   AND YOU RECOGNIZED THAT IT WAS AN INTERESTING POSITION AND A

2   GOOD CAREER DEVELOPMENT OPPORTUNITY, RIGHT?

3   A.   YES.

4   Q.   AND YOU ALSO THOUGHT, "YOU KNOW, I HAVE BEEN WORKING REALLY

5   HARD, REX, I'M ONLY A PAY GRADE 24, IT DESERVES A PROMOTION,"

6   RIGHT?

7   A.   I ASKED REX IF IT CAME WITH A PROMOTION AND HE SAID "NO,"

8   AND HE EXPLAINED WHY.

9   Q.   BUT YOU FELT IT CERTAINLY DESERVED A PROMOTION, RIGHT?

10   A.   IT WAS LISTED A GRADE LEVEL 24 AND 25, AND HE TOLD ME THAT

11   HE WOULD PROMOTE ME AT THE NEXT PAY CYCLE IN APRIL.  AND I WAS

12   VERY HAPPY WITH THAT.

13   Q.   BUT MY QUESTION'S REALLY A LITTLE BIT DIFFERENT.  I MEAN,

14   YOU REALLY BELIEVED THAT YOU DESERVED A PROMOTION, RIGHT?

15   A.   I BELIEVE THAT GIVEN THE ROLES AND RESPONSIBILITIES IN THAT

16   POSITION AND GIVEN THE FACT THAT IT COMBINED THREE JOBS OF WHICH

17   TWO OF THE PEOPLE THAT HAD PERFORMED THOSE JOBS WERE A GRADE

18   LEVEL 26 PRIOR TO THE MERGER, THAT IT MADE SENSE THAT THE JOB

19   CLASSIFICATION WOULD REFLECT THAT.

20   Q.   I JUST WANT TO KNOW, DID YOU BELIEVE, BASED ON HOW HARD

21   YOU'D BEEN WORKING, THE FACT THAT HE HAD OVERLOADED YOU, THAT HE

22   WAS REALLY HAPPY WITH YOU, DID YOU BELIEVE YOU DESERVED A

23   PROMOTION?

24   A.   I BELIEVED I DESERVED A PROMOTION, YES.

25   Q.   OKAY.  AND YOU -- YOU WERE DISAPPOINTED WHEN YOU FOUND OUT

1  THAT THERE WAS A POLICY THAT BECAUSE OF MERGER, THERE WEREN'T

2  GOING TO BE ANY PROMOTIONS, TRUE?

3  A.  NO, I WAS NOT.

4  Q.  YOU WEREN'T EVEN A LITTLE BIT DISAPPOINTED THAT ALL OF THAT

5  HARD WORK FOR A POSITION THAT WAS RATED 24/25, YOU WEREN'T GOING

6  TO BE RECOGNIZED AND GIVEN THAT 25 IN OCTOBER OF 2001 AFTER ALL

7  THOSE 18-HOUR DAYS?

8  A.  NO, I WAS NOT.  IF THERE'S A POLICY WHERE NOBODY IS BEING

9  PROMOTED DURING THE MERGER -- YOU KNOW, THERE ARE A LOT OF

10  PEOPLE THAT WORKED HARD DURING THE MERGER, I WASN'T THE ONLY ONE

11  AND IF THAT'S THE POLICY, I DON'T BELIEVE I SHOULD HAVE BEEN ANY

12  SPECIAL EXCEPTION.  AND WHEN HE TOLD ME I'D BE PROMOTED IN APRIL

13  OF 2002, THAT WAS A COUPLE MONTHS LATER, IT WAS NO BIG DEAL.

14  Q.  AND WHEN HE TOLD YOU YOU'D BE PROMOTED, WHAT HE SAID WAS,

15  "KIRAN, YOU'VE BEEN DOING GREAT.  KEEP UP THAT WORK, AND I'LL DO

16  EVERYTHING I CAN TO GET YOU A PROMOTION," RIGHT?

17  A.  NO.  HE STATED THAT HE WOULD PROMOTE ME AT THE NEXT SALARY

18  CYCLE IN APRIL OF 2002.

19  Q.  AND IS IT YOUR UNDERSTANDING THAT A SUPERVISOR LIKE REX

20  MITCHELL HAS THE AUTHORITY TO MAKE THAT DECISION, THAT HE CAN

21  PROMISE SOMEONE A PROMOTION IN THE NEXT SALARY CYCLE?

22  A.  THAT'S MY UNDERSTANDING, YES.

23  Q.  HAVE YOU EVER SEEN ANYTHING, ANY CHEVRON DOCUMENT THAT

24  SUPPORTS THAT UNDERSTANDING, MS. PANDE?

25  A.  NO, IT DOESN'T.  BUT IT REFLECTS MY UNDERSTANDING BASED ON

PANDE - CROSS (RESUMED) / SIMERLY

1   THE FACT THAT I WAS PROMOTED BASED ON MY SUPERVISOR'S

2   RECOMMENDING A PROMOTION WITHOUT EVER ASKING FOR ONE.

3   Q.  WELL, OF COURSE IN PRACTICE, YOU KNOW THAT USUALLY WHEN A

4   SUPERVISOR RECOMMENDS SOMEONE FOR A PROMOTION, THEY GET THAT

5   PROMOTION, RIGHT?

6   A.  THAT'S -- THAT'S MY UNDERSTANDING, YES.

7   Q.  SURE.  SO IT'S NOT THAT A SUPERVISOR CAN GUARANTEE A

8   PROMOTION, BUT AS A PRACTICAL MATTER, TYPICALLY IF A SUPERVISOR

9   RECOMMENDS A PROMOTION, IT'S GOING TO HAPPEN, RIGHT?

10  A.  THAT'S MY UNDERSTANDING, YES.

11  Q.  NOW, YOU CERTAINLY DIDN'T EXPECT A PROMOTION IF YOU STOPPED

12  GOING TO WORK, DID YOU?

13  A.  NO.

14  Q.  AND YOU DIDN'T EXPECT A PROMOTION IF SUDDENLY YOUR -- YOUR

15  PRODUCT FELL OFF AND THERE WERE MISTAKES IN WHAT YOU WERE DOING?

16  A.  NO.  IF MY WORK PERFORMANCE WAS REALLY BAD, I -- I WOULDN'T

17  EXPECT TO BE PROMOTED IN -- IN 2002.

18  Q.  RIGHT.  SO -- BUT LET'S TAKE IT A STEP FURTHER.  NOT ONLY IF

19  YOUR WORK PERFORMANCE WAS BAD WOULD YOU NOT EXPECT TO BE

20  PROMOTED, BUT IF YOUR WORK PERFORMANCE DIDN'T CONTINUE AT THE

21  LEVEL THAT PROMPTED MR. MITCHELL TO SAY YOU DESERVED THE

22  PROMOTION, YOU WOULDN'T HAVE EXPECTED A PROMOTION EITHER, WOULD

23  YOU?

24  A.  I WOULDN'T EXPECT THAT IT WOULD BE A NORMAL EXPECTATION THAT

25  I WOULD BE REQUIRED TO WORK 18-HOUR DAYS AND WEEKENDS AS A

1   LESS MONEY HERE IN THE BAY AREA THAN GOING AND MAKING MORE MONEY

2   WITH A BIGGER COMPANY WITH ALL OF THOSE BENEFITS IN HOUSTON,

3   TRUE?

4   A.   I HAVE NOT BEEN OFFERED A JOB IN HOUSTON.   I HAVE SUBMITTED

5   JOB APPLICATIONS.

6   Q.   WELL, YOU HAVEN'T APPLIED FOR ANY JOB WITH EXXON MOBIL OR

7   WITH BP?

8              MS. HARRIMAN:   OBJECTION --

9   BY MS. SIMERLY:

10   Q.   YOU JUST SAID THAT.

11              MS. HARRIMAN:   -- ASKED AND ANSWERED.

12              THE WITNESS:   THAT'S CORRECT.

13   BY MS. SIMERLY:

14   Q.   OKAY.

15              AND SO YOU MADE A CONSCIOUS DECISION.   I WOULD RATHER

16   HAVE MY CONSULTING JOB HERE IN THE BAY AREA MAKING LESS MONEY

17   THAN GO TO WORK FOR EXXON MOBIL OR FOR BP IN HOUSTON.   THAT WAS

18   YOUR CHOICE?

19   A.   NO, THAT'S NOT THE CHOICE I MADE.

20   Q.   SO THERE'S SOME OTHER REASON YOU HAVEN'T GONE TO WORK FOR --

21   OR TRIED TO GET A JOB WITH EXXON MOBIL OR BP?

22   A.   I HAVEN'T APPLIED FOR JOBS WITH EXXON MOBIL AND BP BASED ON

23   MY UNDERSTANDING THAT IT'S REALLY HARD TO COME INTO THOSE

24   COMPANIES AT THE AGE OF 45 YEARS OLD AND HAVE MUCH OF A CAREER

25   TRACK IN THOSE COMPANIES, THAT THEY'RE LOOKING FOR FRESH TALENT

PANDE - REDIRECT / HARRIMAN

1    Q.  OKAY.

2         AND THOSE TAX -- AND SO THE INCOME THAT'S IN YOUR

3    INTERROGATORIES IS THE FULL AMOUNT THAT PETROASSETS RECEIVED

4    DURING THAT TIME -- IS IT THE FULL AMOUNT THAT PETROASSETS

5    RECEIVED FROM THOSE TWO ENTITIES DURING THAT TIME FRAME?

6    A.  YES, IT IS.

7    Q.  AND THEN WERE THERE EXPENSES THAT PETROASSETS HAD AS WELL?

8    A.  YES, THERE WERE.

9    Q.  AND ONCE -- WHAT HAPPENED ONCE YOU LOOK AT THE -- THE AMOUNT

10   OF MONEY YOU RECEIVED AND THE EXPENSES, WHAT DID THAT LEAD TO?

11   A.  IT LEADS TO NET PROFIT.

12   Q.  AND THEN WHAT WAS DONE WITH THE NET PROFIT?

13   A.  IT WAS DIVIDED BY 50 PERCENT, BECAUSE IT'S SHARED BETWEEN ME

14   AND MY BUSINESS PARTNER RAVI.

15   Q.  OKAY.  THANK YOU.

16        MS. PANDE, BETWEEN THE TIME THAT YOU ACTUALLY STARTED

17   YOUR CONSULTING BUSINESS AND WHEN CHEVRON FIRED YOU, DID YOU

18   MAKE EFFORTS TO FIND ANOTHER JOB?

19   A.  YES, I DID.

20   Q.  AND DID YOU -- DESCRIBE, IF YOU WOULD, BRIEFLY FOR THE JURY

21   THE TYPES OF EFFORTS THAT YOU MADE.

22        MS. SIMERLY:  OBJECTION, YOUR HONOR, BEYOND THE SCOPE

23   OF CROSS, I BELIEVE.

24        THE COURT:  OVERRULED.

25        THE WITNESS:  I DID -- YEAH, I -- I -- WHAT I FOUND

PANDE - REDIRECT / HARRIMAN

1   WAS IN APPLYING THROUGH SOME OF THE INDUSTRY JOB BOARDS, THAT I

2   WASN'T GETTING A VERY GOOD RESPONSE TO MY C.V.  AND, YOU KNOW,

3   PEOPLE SAY I HAVE, LIKE, MORE DEGREES THAN A THERMOMETER, SO I

4   WAS, YOU KNOW, SURPRISED.

5          AND WHAT I FOUND TO BE THE MOST EFFECTIVE WAS

6   NETWORKING, AND THAT'S A BIG PART OF WHAT I'VE SPENT MY TIME

7   DOING, AND USED CONTACTS THAT I HAVE THROUGH THE HAAS SCHOOL OF

8   BUSINESS, THROUGH MY FELLOW FACULTY AT STANFORD, FORMER

9   SUPERVISORS, FORMER COLLEAGUES THAT HAVE RETIRED FROM CHEVRON TO

10  GIVE ME LEADS, AND ALSO JUST FELLOW GRADUATE STUDENTS FROM WHEN

11  I WAS AT STANFORD 20 -- 20-PLUS YEARS AGO.  THAT'S WHAT I FOUND

12  TO BE THE MOST EFFECTIVE.

13  Q.  OKAY.  ONE MORE QUESTION FOR YOU.  HAS CHEVRON EVER OFFERED

14  YOU A JOB SINCE FIRING YOU?

15  A.  NO, THEY HAVE NOT.

16          MS. SIMERLY:  NOTHING FURTHER, YOUR HONOR.

17                  RECROSS-EXAMINATION

18  BY MS. SIMERLY:

19  Q.  MS. PANDE, YOU HAVE AN MBA FROM UC HAAS SCHOOL OF BUSINESS,

20  RIGHT?

21  A.  YES, I DO.

22  Q.  INTERROGATORY NO. 17 READS, "IDENTIFY ALL PERSONS FROM WHOM

23  YOU" KIRAN PANDE, NOT PETROASSETS, KIRAN PANDE, "HAVE RECEIVED

24  INCOME FROM JANUARY 1ST, 2004 THROUGH THE PRESENT."

25          WAS THERE ANYTHING UNCLEAR ABOUT THAT INTERROGATORY,

1   YOU WERE DOING BEGINNING AT THE BEGINNING OF 2004 LEADING

2   THROUGH AUGUST OF 2004?

3         MS. SIMERLY:  OBJECTION.  LACKS FOUNDATION, YOUR

4   HONOR.

5         THE COURT:  I'M NOT REALLY SURE WHAT IT MEANS.

6         MS. ANDERSON:  I CAN REPHRASE, YOUR HONOR.

7         THE COURT:  YEAH, THAT WOULD BE GREAT.

8   BY MS. ANDERSON:

9   Q.  WERE YOU PERFORMING THE SAME WORK FOR SASBU AFTER

10  DECEMBER 31ST, 2003?

11        MS. SIMERLY:  OBJECTION, YOUR HONOR.  AGAIN, LACKS

12  FOUNDATION.

13        THE COURT:  YEAH, WHY DON'T YOU LAY A FOUNDATION.

14  BY MS. ANDERSON:

15  Q.  WHAT KIND OF WORK WERE YOU PERFORMING, MR. BURKES, IN

16  DECEMBER OF 2003 FOR SASBU?

17  A.  YES.  DURING -- DURING THAT TIME, I WAS WORKING ON A OIL

18  DEVELOPMENT PROJECT IN BLOCK ZERO CALLED MAFUMEIRA.

19  Q.  DID YOU CONTINUE PERFORMING THAT WORK AFTER DECEMBER 31ST,

20  2003?

21  A.  YES, EVEN THOUGH I -- I WAS TRANSFERRED TO ETC, I WAS STILL

22  MORE OR LESS LOANED OUT AS -- AS A HIRED GUN OR WHATEVER, BUT I

23  STILL CONTINUED TO DO EXACTLY THE SAME JOB DUTIES THAT I HAD ON

24  THE MAFUMEIRA PROJECT.

25  Q.  AND THROUGH WHAT MONTH OF THE 2004 DID YOU CONTINUE TO DO

1    THAT SAME WORK?

2    A.    I CONTINUED TO WORK ON THAT PROJECT UNTIL AUGUST OF 2004.

3    Q.    ARE YOU AWARE OF ANY OTHER EMPLOYEES WITHIN SASBU WHO

4    DECLINED THE MOVE TO HOUSTON?

5    A.    YES.    THERE WAS -- THERE WAS A HANDFUL OF PEOPLE.

6    Q.    CAN YOU NAME THE PEOPLE THAT YOU RECALL THAT DECLINED THE

7    MOVE TO HOUSTON WITH SASBU?

8    A.    WELL, OF COURSE, KIRAN.    THERE WAS JALAL AFIFI.    THERE WAS

9    GRAHAM HOUSEN, SUSANNA WONG, NATALIE TALBERT, TOM MILLETTE, MIKE

10   CLARK.    DID I SAY GRAHAM HOUSEN?

11   Q.    YES.

12   A.    OKAY.

13   Q.    HOW ABOUT MR. SETO?

14   A.    YES, THERE WAS -- AN ACCOUNTANT NAMED MARTIN SETO, HE

15   DECLINED THE OFFER.

16   Q.    AND MR. ZALAN, DID HE DECLINE?

17   A.    YES, STEVE ZALAN ALSO DID.

18   Q.    ARE YOU AWARE OF ANY OTHER SUPPORT STAFF THAT YOU CAN RECALL

19   THAT DECLINED THE MOVE TO HOUSTON?

20   A.    NOT AT THIS TIME.

21   Q.    DID YOU OBSERVE ANY OF THOSE PEOPLE CONTINUING TO WORK FOR

22   CHEVRON OUT OF THE SAN RAMON OFFICE AFTER THE END OF 2003?

23   A.    YES.

24   Q.    HOW MANY OF THOSE PEOPLE DID YOU OBSERVE CONTINUING TO WORK

25   OUT OF SAN RAMON AFTER 2003?

BURKES - DIRECT / ANDERSON

1    A.  WELL, MIKE CLARK TRANSFERRED TO LONDON SO HE WASN'T IN

2    SAN RAMON ANYMORE.  BUT OF THAT LIST, ONLY KIRAN WEREN'T WORKING

3    AT SAN RAMON.

4    Q.  YOU DIDN'T SEE -- YOU DIDN'T OBSERVE MS. PANDE WORKING THERE

5    ANYMORE; IS THAT RIGHT?

6    A.  I DID NOT.

7    Q.  IN PERFORMING YOUR JOB RESPONSIBILITIES AT CHEVRON, AFTER

8    DECEMBER 31ST, 2003, BUT DURING THE YEAR OF 2004, DID YOU

9    OBSERVE ANY WORK THAT NEEDED TO BE PERFORMED BY PETROLEUM

10   ENGINEERS LIKE MS. PANDE WITHIN THE CHEVRON ORGANIZATION?

11          MS. SIMERLY:  OBJECTION, YOUR HONOR.  RELEVANCE

12   UNLESS IT'S DIRECTED TO BLOCK 14.

13          THE COURT:  OVERRULED.

14          THE WITNESS:  THE GENERAL FEELING WAS THAT THERE

15   WAS -- TALKING TO MY COLLEAGUES LIKE GRAHAM AND JALAL WAS THAT

16   THERE WAS --

17          MS. SIMERLY:  OBJECTION, YOUR HONOR.  THIS IS NOW

18   HEARSAY.

19          THE COURT:  SUSTAINED.  WHY DON'T YOU REPHRASE THE

20   QUESTION SO YOU DON'T GET A HEARSAY ANSWER.

21          MS. ANDERSON:  CERTAINLY, YOUR HONOR.

22   Q.  DID YOU MAKE ANY OBSERVATIONS WHILE WORKING AT CHEVRON IN

23   2004 THAT LED YOU TO CONCLUDE THAT THERE WAS WORK AVAILABLE FOR

24   A PETROLEUM ENGINEER LIKE MS. PANDE DURING THAT YEAR?

25   A.  YES.

BURKES - DIRECT / ANDERSON

1    Q.   WHAT KINDS OF OBSERVATIONS DID YOU MAKE?

2    A.   THERE WERE -- THERE WERE JOBS FOR PETROLEUM ENGINEERS

3    THAT -- THAT WERE POSTED IN THE -- THE JOBS POSTINGS THAT --

4    THAT ANY -- ANY EMPLOYEE CAN SEE.

5    Q.   DID YOU HEAR ANY CHEVRON SUPERVISORS COMMENT ABOUT THE NEED

6    FOR MORE PETROLEUM ENGINEERS AT CHEVRON IN 2004?

7                MS. SIMERLY:   OBJECTION, YOUR HONOR.   HEARSAY.

8                THE COURT:   WELL, THIS -- SUSTAINED.

9                MS. ANDERSON:   ADMISSIBLE, YOUR HONOR.

10               THE COURT:   WHAT?

11               MS. ANDERSON:   IT'S AN ADMISSION IF IT'S A

12   SUPERVISOR, YOUR HONOR.

13               THE COURT:   WELL, LAY -- GO SLOWLY.

14               MS. ANDERSON:   OKAY.

15               THE COURT:   I'LL OVERRULE THE OBJECTION.   IT'S A

16   "YES" OR "NO" ANSWER, AND THEN YOU'RE GOING TO HAVE TO GET INTO

17   IT IN SOME MORE DETAIL.

18   BY MS. ANDERSON:

19   Q.   I'D LIKE A "YES" OR "NO" TO THE FOLLOWING QUESTION.   DID YOU

20   HEAR ANY CHEVRON SUPERVISORS COMMENT ABOUT THE NEED FOR MORE

21   PETROLEUM ENGINEERS AT CHEVRON IN 2004?

22   A.   OH, YES.

23   Q.   OKAY.   WHO DID YOU HEAR MAKE THOSE COMMENTS?

24   A.   TWO DIFFERENT SUPERVISORS.

25   Q.   WHO WERE THEY?

BURKES - DIRECT / ANDERSON

1   A.  ZUWA -- ZUWA OMOREGIE.  HE WAS MY BOSS.  AND THEN ALSO CHRIS

2   RICCOBONO WHO HAD BEEN MY PREVIOUS BOSS WHEN I WORKED FOR SASBU.

3   Q.  AND DID YOU HEAR THEM MAKE SUCH COMMENTS ON MORE THAN ONE

4   OCCASION?

5   A.  YES.

6   Q.  MR. BURKES, DID YOU EVER OBSERVE MS. PANDE CRY AT ANY POINT

7   IN TIME?

8   A.  YES, I DID.

9   Q.  HOW MANY OCCASIONS?

10  A.  ONLY ONCE.

11  Q.  WHEN DID YOU OBSERVE HER CRYING?

12  A.  I THINK IT WAS IN NOVEMBER OF 2003.

13  Q.  WHERE DID YOU MAKE THIS OBSERVATION?

14  A.  I WAS IN MY OFFICE AND SHE CAME INTO MY OFFICE SOBBING AND

15  TEARS IN HER FACE.

16  Q.  DID SHE EXPLAIN TO YOU WHY SHE WAS CRYING?

17  A.  YES, HE DID.

18  Q.  AND WHAT DID SHE SAY?

19  A.  SHE EXPLAINED THAT SHE HAD JUST COME OUT OF A -- OF A BLOCK

20  14 PLANNING MEETING, AND THAT IN THE COURSE OF DESCRIBING AND

21  HANDING OUT JOB ASSIGNMENTS, THAT SHE HAD BEEN YELLED AT AND

22  SPOKEN TO RUDELY BY -- BY HER SUPERVISOR.

23  Q.  DID SHE TELL YOU ANYTHING REGARDING WHAT MR. DUNN SAID TO

24  HER ABOUT COMPLETING HER WORK DURING THAT MEETING?

25  A.  THE GIST OF THE CONVERSATION, AS I RECALL IT, WAS THAT --

1   Q.   AND YOUR SPONSOR WOULD HELP YOU TRY TO FIND ANOTHER JOB,

2   RIGHT?

3   A.   YES.

4   Q.   NOT YOUR SUPERVISOR, YOUR SPONSOR, RIGHT?

5   A.   WELL, YOU KNOW, IT WAS -- IT WAS PHRASED "WE" WHEN -- WHEN

6   THEY SPOKE TO US, IT WAS -- IT WAS PHRASED "WE," NOT -- AND

7   CERTAINLY IN MY CASE, MY -- MY SUPERVISOR DEFINITELY STRONGLY

8   ASSISTED ME IN TRYING TO FIND ANOTHER JOB.

9   Q.   OKAY.  THAT'S FINE.  BUT IN ANY EVENT, THE SECOND OPTION WAS

10  YOU COULD TRY TO FIND ANOTHER JOB WITHIN CHEVRON, RIGHT?

11  A.   YES.

12  Q.   AND YOU KNEW THAT IF YOU DIDN'T FIND ANOTHER JOB WHEN YOUR

13  WORK ENDED IN SAN RAMON, YOU WOULD BE TERMINATED, RIGHT?

14          MS. ANDERSON:  LACKS FOUNDATION, YOUR HONOR.

15          THE COURT:  OVERRULED.

16          THE WITNESS:  IT WASN'T --

17          THE COURT:  YEAH, YOU CAN ANSWER THAT.

18          THE WITNESS:  OH, I DO ANSWER, YES.  SORRY.

19          THE COURT:  WHEN I SAY OVERRULED, THAT MEANS OKAY.

20          THE WITNESS:  GREEN LIGHT, RED LIGHT.

21          THE COURT:  RIGHT.  I SHOULD DO THAT.  I SHOULD JUST

22  SAY GREEN LIGHT, RED LIGHT.

23          (LAUGHTER.)

24          THE WITNESS:  IT WASN'T CLEAR TO ME EXACTLY WHAT

25  WOULD HAPPEN, IF THERE WAS NO JOB -- YOU DID NOT ACCEPT THE JOB

BURKES - CROSS / SIMERLY

1    IN HOUSTON AND YOU DID NOT FIND ANOTHER JOB WITHIN CHEVRON.  IT

2    WAS -- IT'S -- THERE SEEMED TO BE TWO POSSIBILITIES THAT YOU

3    MIGHT BE DECLARED SURPLUS OR YOU MIGHT BE DECLARED -- OR YOU

4    MIGHT BE TERMINATED.

5    BY MS. SIMERLY:

6    Q.   OKAY.   IN EITHER EVENT, WHETHER YOU WERE DECLARED SURPLUS OR

7    TERMINATED, YOU KNEW YOU WERE NO LONGER GOING TO HAVE A JOB AT

8    CHEVRON, RIGHT?

9    A.   NO.   BECAUSE CHEVRON HAS -- HAS THIS PROGRAM CALLED THE

10   SERFU (PHONETIC) -- I CAN'T REMEMBER ALL THE -- THE ACRONYM, BUT

11   IT -- IT'S SURPLUS EMPLOYEE PROGRAM, AND THE FIRST THING THAT

12   HAPPENS TO YOU WHEN YOU GO INTO THE SURPLUS EMPLOYEE PROGRAM

13   IS -- IS YOU GO INTO REDEPLOYMENT.   AND WHEN YOU'RE IN

14   REDEPLOYMENT, THEY DON'T -- THEY BROADEN THE POTENTIAL JOBS THAT

15   YOU CAN LOOK FOR.   IN OTHER WORDS, THEY -- YOU'RE BEING

16   CONSIDERED FOR A BROADER RANGE OF JOBS THAN YOU WOULD BE IF

17   YOU'RE NOT IN REDEPLOYMENT.   I --

18   Q.   BUT AGAIN --

19   A.   DOES THAT EXPLAIN THAT?

20   Q.   WELL --

21   A.   SO -- SO IT'S NOT -- SO ONCE YOU GO IN REDEPLOYMENT, SAY --

22   SAY IS THAT, YOU KNOW, I'M AN ENGINEER, I GO INTO REDEPLOYMENT

23   AND THEY FIND A JOB FOR ME IN ENVIRONMENTAL MANAGEMENT OR

24   SOMETHING, AND IT'S SOMETHING THAT I HAVEN'T EXACTLY DONE BUT

25   SOMETHING MY TRAINING WOULD PREPARE ME FOR, SO IN REDEPLOYMENT

1    THEY LOOK AT A BROADER RANGE OF THINGS.  SO IT'S NOT CLEAR THAT

2    YOU DON'T HAVE A JOB IF YOU'RE A SURPLUS EMPLOYEE.

3    Q.   BUT THAT WAS YOUR UNDERSTANDING AT THE BEGINNING OF THIS

4    PROCESS, THAT IF YOU DIDN'T ACCEPT THE JOB IN HOUSTON AND IF YOU

5    DIDN'T FIND ANOTHER JOB, YOU WERE GOING TO BE TERMINATED,

6    WHETHER YOU MIGHT BE DECLARED SURPLUS AND QUALIFY FOR SEVERANCE,

7    THAT WAS ANOTHER MATTER.  BUT YOU UNDERSTOOD THAT IF YOU DIDN'T

8    ACCEPT THE MOVE AND YOU COULDN'T FIND ANOTHER JOB, YOU WERE

9    GOING TO BE TERMINATED, RIGHT?

10   A.   I NEVER -- I NEVER ACCEPTED THAT AS A UNDERSTANDING AT ALL.

11   Q.   WELL, CERTAINLY IN JANUARY OF 2004, YOU REALIZED THAT WAS

12   THE UNDERSTANDING BECAUSE YOU GOT A LETTER FROM CHEVRON'S HR

13   DEPARTMENT WHICH BASICALLY SAID, QUOTE, "YOU DID NOT ACCEPT OUR

14   LAST OFFER TO MOVE TO HOUSTON.  IF YOU'VE NOT FOUND A NEW JOB,

15   YOU WILL BE TERMINATED AS OF FEBRUARY 6TH, 2004."  YOU REMEMBER

16   THAT LETTER, DON'T YOU, MR. BURKES?

17   A.   I REMEMBER IT.

18   Q.   AND THAT'S WHAT THAT LETTER SAID.  YOU GOT A LETTER FROM

19   CHEVRON SAYING, "DEAR BOB BURKES, YOU DID NOT ACCEPT OUR LAST

20   OFFER OF THE MOVE TO HOUSTON.  IF YOU'VE NOT FOUND ANOTHER JOB,

21   YOU ARE TERMINATED AS OF FEBRUARY 6TH, 2004."  RIGHT?

22   A.   THAT'S RIGHT.

23   Q.   OKAY.

24   A.   BUT I GOT A JOB ON JANUARY THE 20TH.

25   Q.   THAT'S RIGHT.  YOU APPLIED FOR A JOB WITH ZUWA OMOREGIE,

MAHLA - DIRECT / HARRIMAN

BY MS. HARRIMAN:

1  Q.  AND YOU'VE TALKED ABOUT HER BUT-FOR EARNINGS AT CHEVRON AND

2  HER ACTUAL EARNINGS AS A CONSULTANT.  WHAT DO "LOST EARNINGS AND

3  BENEFITS" DEPICT?

4  A.  THAT'S -- AGAIN, THAT'S THE DIFFERENCE.  YOU'LL SEE THERE'S

5  THREE SECTIONS, A, B, AND C.  SECTION C IS ESSENTIALLY A MINUS

6  B.  AND SO BY TAKING THE DIFFERENCE BETWEEN HER EXPECTED

7  EARNINGS AT CHEVRON AND HER EXPECTED EARNINGS AS A CONSULTANT,

8  THE DIFFERENCE IS, FROM A WORKLIFE PERSPECTIVE, 3,706,389, WHICH

9  IS THE FIRST ENTRY ON THAT BOTTOM SECTION.

10 Q.  SO IF WHAT YOU'RE SAYING IS IT TAKES HER ENTIRE WORKLIFE TO

11 CATCH UP, TO HAVE HER CONSULTING BUSINESS CATCH UP TO CHEVRON,

12 WHAT DO YOU CALCULATE HER TOTAL LOSSES TO BE?

13 A.  IT WOULD BE UNDER -- UNDER THE WORKLIFE PORTION, IT WOULD BE

14 THE 3.7 MILLION, 3,706,389.  BUT IN ADDITION TO THAT, SHE IS --

15 SHE WOULD LOSE THE 1., THE $1,123,893 IN EXPECTED PENSION

16 BENEFITS FOR A TOTAL OF 4,830,282.

17 Q.  AND WHAT DOES C2, DEPICT?

18 A.  C2 DEPICTS ESSENTIALLY THE LOST -- THE LOSSES TO MS. PANDE

19 IF SHE WERE TO ESSENTIALLY GROW HER BUSINESS OVER A 15-YEAR

20 PERIOD SUCH THAT HER -- HER EARNINGS FROM THAT BUSINESS WOULD

21 ESSENTIALLY DUPLICATE THE EARNINGS THAT SHE WOULD HAVE EARNED AT

22 CHEVRON.

23 Q.  AND WHAT DOES C3 DEPICT?

24 A.  THIS IS A THIRD SCENARIO WHERE IT WOULD TAKE TEN YEARS OF

1    NUMBER OF $3,923,832.

2                WHAT DOES THAT REPRESENT?

3    A.   THAT'S THE DIFFERENCE BETWEEN THOSE TWO.   THAT'S THE NET

4    LOSS TO MS. PANDE OVER THIS 15-YEAR MITIGATION PERIOD.

5    Q.   OKAY.

6                CAN WE GO TO THE THIRD BOX, PLEASE.

7                   (EXHIBIT PUBLISHED TO JURY.)

8    BY MS. HARRIMAN:

9    Q.   SO NEXT TO "BUT-FOR EARNINGS AND RETIRED," YOU HAVE TOTAL

10   EARNINGS OF $4,357,839.

11               WHAT DOES THAT REPRESENT?

12   A.   THAT'S THE NET PRESENT VALUE TO MS. PANDE OVER A TEN-YEAR

13   PERIOD FROM HER EARNINGS AT CHEVRON OVER THAT PERIOD.

14   Q.   OKAY.   AND THEN YOU HAVE ACTUAL EARNINGS, $1,257,546.   CAN

15   YOU TELL US WHAT THAT REPRESENTS?

16   A.   THAT'S THE NET PRESENT VALUE OF MS. PANDE'S EARNINGS FROM

17   HER CONSULTING PRACTICE OVER THAT SAME TEN-YEAR PERIOD.

18   Q.   AND WHAT DOES THE 37 PERCENT GROWTH RATE INDICATE?

19   A.   THAT'S THE ANNUAL GROWTH RATE THAT MS. PANDE'S PRACTICE

20   WOULD NEED TO -- HER EARNINGS WOULD HAVE TO GROW AT IN ORDER TO

21   CATCH HER EARNINGS AT CHEVRON IN A TEN-YEAR PERIOD.

22   Q.   AND THEN LOST EARNINGS AND BENEFITS OF $3,100,293.   CAN YOU

23   TELL US WHAT THAT REPRESENTS?

24   A.   THAT'S ESSENTIALLY THE DIFFERENCE.   THAT WAS THE NET PRESENT

25   VALUE LOSS TO MS. PANDE OVER A TEN-YEAR MITIGATION PERIOD.

1                    DIRECT EXAMINATION

2    BY MS. SIMERLY:

3    Q.   GOOD MORNING, MR. MITCHELL.

4    A.   GOOD MORNING.

5    Q.   I'D LIKE YOU TO TELL THE JURY A LITTLE BIT ABOUT YOURSELF.

6              FIRST OF ALL, WHO DO YOU WORK FOR?

7    A.   I CURRENTLY WORK FOR PETER ROBERTSON.  HE'S THE VICE

8    CHAIRMAN OF CHEVRON CORPORATION.

9    Q.   AND HOW LONG HAVE YOU WORKED FOR CHEVRON -- CAN YOU SEE

10   AROUND THAT BOARD?  IF I CAN --

11   A.   YEAH, I'M FINE.

12   Q.   YOU'RE OKAY?

13              (OFF-THE-RECORD DISCUSSION.)

14   BY MS. SIMERLY:

15   Q.   AND HOW LONG HAVE YOU WORKED FOR CHEVRON?

16   A.   TWENTY-SIX YEARS.

17   Q.   WHAT IS YOUR CURRENT POSITION?

18   A.   I'M CURRENTLY THE CHIEF COMPLIANCE OFFICER FOR THE

19   CORPORATION.

20   Q.   WHAT DOES THAT MEAN?

21   A.   THE CHIEF COMPLIANCE OFFICER LOOKS AFTER THE COMPLIANCE AND

22   ETHICS PROGRAM FOR THE COMPANY.  I OVERSEE THINGS LIKE

23   INVESTIGATIONS INTO -- INTO MISCONDUCT THAT OCCURS WITHIN THE

24   COMPANY AS WELL AS OVERSEE THE COMPANY'S HOTLINE FOR EMPLOYEES

25   THAT COMPLAIN IN TO THE COMPANY ABOUT MISBEHAVIOR --

MITCHELL - DIRECT / SIMERLY

1  A.  PRIOR TO THAT, I WAS THE PLANNING MANAGER FOR INTERNATIONAL

2  UPSTREAM PLANNING.

3  Q.  WAS IT --

4  A.  IT CHANGED SEVERAL NAMES -- SEVERAL TIMES OVER THE YEARS THE

5  NAME CHANGED FOR THAT GROUP.

6  Q.  WAS THAT SOMETIMES CALLED MANAGER OF BUSINESS AND STRATEGIC

7  PLANNING FOR CHEVRONTEXACO OVERSEAS PETROLEUM?

8  A.  YES, THAT'S CORRECT.

9  Q.  AND IS THAT SOMETIMES CALLED CTOP, CHEVRONTEXACO OVERSEAS

10  PETROLEUM?

11  A.  YES.

12  Q.  ALL RIGHT.

13      AND WAS IT WHEN YOU WERE THE MANAGER OF BUSINESS AND

14  STRATEGIC PLANNING FOR CTOP THAT YOU FIRST MET KIRAN PANDE?

15  A.  YES.

16  Q.  AND HOW IS IT THAT YOU CAME TO MAKE THE ACQUAINTANCE OF

17  MS. PANDE?

18  A.  MY RECOLLECTION IS I HAD A POSITION OPENING IN LATE 1999 AND

19  I HAD SOME CANDIDATES THAT HAD BEEN NOMINATED FOR THAT OPEN

20  POSITION.  I DON'T RECALL EXACTLY HOW THEY -- HOW THEY WERE

21  NOMINATED.  BUT KIRAN WAS ONE OF THE CANDIDATES THAT WERE

22  NOMINATED FOR THAT OPEN POSITION, AND I INTERVIEWED KIRAN ALONG

23  WITH TWO OTHERS FOR THAT -- FOR THAT ROLE.

24  Q.  AND WHAT WAS YOUR IMPRESSION OF MS. PANDE BASED ON THAT

25  INTERVIEW IN LATE 1999?

1    THROUGH TO GET APPROVAL FOR THESE TRANSACTIONS.

2    Q.    SLOW DOWN.

3          OKAY.    COULD YOU JUST EXPLAIN IN BASIC TERMS WHAT

4    YOUR GROUP'S ROLE WAS IN TERMS OF THE MONTHS LEADING UP TO THIS

5    MERGER IN MID-OCTOBER OF 2001?

6    A.    WELL, IN THE MONTHS LEADING UP TO THE MERGER, I HAD -- WE

7    HAD RESPONSIBILITY FOR TRYING TO TAKE A LOOK AT THE COMBINED

8    PORTFOLIOS OF THE TWO COMPANIES WITH RESPECT TO OUR

9    INTERNATIONAL UPSTREAM OPERATIONS.    AND I HAD A FELLOW ON MY

10   STAFF THAT WAS SPECIFICALLY ASSIGNED TO WORK ON THAT PROJECT,

11   AND AS A RESULT OF THAT -- OF THAT ASSIGNMENT, HE HAD TO

12   PHYSICALLY REMOVE HIMSELF FROM OUR OFFICES IN SAN RAMON AND GO

13   INTO WHAT WAS DEEMED TO BE, QUOTE-UNQUOTE, A CLEAN ENVIRONMENT

14   WHERE WE WERE STILL WORKING IN A PERIOD PRIOR TO THE APPROVAL OF

15   THE MERGER, AND THIS FELLOW WAS WORKING WITH A COUNTERPART IN

16   TEXACO LOOKING AT WHAT THE COMBINED PORTFOLIOS OF OUR TWO

17   COMPANIES WOULD ULTIMATELY LOOK LIKE AND HOW IT WOULD PERFORM

18   GOING FORWARD.

19   Q.    AND WHO WAS THAT WHO ACTUALLY PHYSICALLY HAD TO LEAVE

20   SAN RAMON AND GO TO HOUSTON TO THIS CLEAN ENVIRONMENT TO DO THIS

21   ANALYSIS?

22   A.    IT WAS BRIAN PUTT.

23   Q.    NOW IN ADDITION TO MR. PUTT'S WORK, WAS THE REST OF YOUR

24   GROUP BUSY WORKING ON THIS MERGER?

25   A.    YEAH.    THE GROUP WAS IMPACTED PRETTY SEVERELY BY THE MERGER.

1    NON-PETROLEUM ENGINEERING ROLE, HER CAREER LADDER PROMOTION NOT

2    ONLY HAD TO BE APPROVED BY THE BUSINESS AND COMMERCIAL PDC,

3    WHICH IS THE ONE THAT I SAT ON, BUT IT ALSO WOULD HAVE HAD TO GO

4    TO HER PETROLEUM ENGINEERING PDC WHICH REALLY OWNED HER CAREER

5    FROM A CAREER MANAGEMENT STANDPOINT.  SO TWO COMMITTEES WOULD

6    HAVE HAD TO PASS ON HER PROMOTION IN ORDER FOR IT TO BE -- TO BE

7    EFFECTIVE.

8    Q.  AND HAVE YOU EVER PROMISED AN EMPLOYEE A PROMOTION?

9    A.  NO.  I DON'T MAKE PROMISES THAT I DON'T BELIEVE THAT I CAN

10   KEEP.

11   Q.  UP UNTIL THIS POINT, HAD YOU BEEN PLEASED WITH KIRAN PANDE'S

12   PERFORMANCE?

13   A.  YES, VERY MUCH SO.  KIRAN WAS -- WAS -- WAS A TOP PERFORMER

14   IN THE GROUP.  IT WAS THE SKILL SET AND APTITUDE THAT SHE HAD

15   DEMONSTRATED FOR THE PORTFOLIO WORK ITSELF THAT SORT OF PUT IN

16   MY MIND, YOU KNOW, THE -- THE NEED AND DESIRE TO CHAMPION FOR

17   HER FOR THAT ROLE, AND I WAS VERY PLEASED WITH HER PERFORMANCE.

18   Q.  NOW SHE JOINED YOUR GROUP IN THE FALL OF 2000, SO SHE WOULD

19   HAVE HAD A PMP IN THE SPRING OF 2001 BEFORE THIS ROLLUP TO

20   THE -- TO THE MERGER WORK, RIGHT?

21   A.  YES, THAT'S CORRECT.

22   Q.  AND AT THE TIME OF HER SPRING PMP AND SHE WAS IN YOUR GROUP,

23   WERE YOU INVOLVED IN THAT SPRING PMP, SPRING 2001?

24   A.  YES, I WAS.

25          MS. SIMERLY:  LET'S BRING UP EXHIBIT 14, ALEX, AND

1    THE FIRST PAGE WHICH I THINK IS AN EMAIL.

2              COULD WE BLOW UP THE TEXT OF THAT EMAIL?

3              (EXHIBIT PUBLISHED TO JURY.)

4    BY MS. SIMERLY:

5    Q.  IS THAT AN EMAIL THAT YOU SENT TO KIRAN WHEN YOU FORWARDED

6    HER PMP FOR THE YEAR 2000?

7    A.  YES, IT LOOKS TO BE.

8    Q.  SO THIS IS SOMETHING THAT YOU SENT OUT IN THE SPRING OF

9    2001 -- 2000 -- LET'S GO UP ABOVE THAT.  YOU SENT IT TO KIRAN IN

10   THE SPRING OF 2001?

11   A.  OR EARLY 2001.

12   Q.  EARLY 2001.  JANUARY 2001?

13   A.  RIGHT.

14   Q.  OKAY.

15              AND BASICALLY, THIS SAYS, "I'VE ADDED A FEW COMMENTS

16   IN THE SUPERVISOR SUMMARY SECTION RELATING TO YOUR FIRST FEW

17   MONTHS IN PLANNING.  KEEP UP THE GREAT EFFORT.  I LOOK FORWARD

18   TO INCREASING CONTRIBUTIONS TO OUR TEAM," ET CETERA, ET CETERA.

19              DOES THIS ACCURATELY REFLECT HOW YOU FELT ABOUT KIRAN

20   PANDE IN JANUARY OF 2001?

21   A.  YES, IT DOES.

22   Q.  OKAY.  LET'S GO TO THOSE SUPERVISOR COMMENTS THAT YOU ADDED,

23   WHICH IS THE LAST PAGE?

24              MS. SIMERLY:  BATES NUMBER 21, ALEX, OF EXHIBIT 14.

25              AND CAN WE BLOW UP --

1      (EXHIBIT PUBLISHED TO JURY.)

2   BY MS. SIMERLY:

3   Q.   AND THERE'S A SUMMARY THERE AND A SIGNATURE AT THE BOTTOM,

4   REX MITCHELL.  DO YOU SEE THAT?

5   A.   YES.

6   Q.   AND WERE THOSE YOUR COMMENTS ABOUT MS. PANDE'S PERFORMANCE

7   IN THE LAST THREE MONTHS OF 2000 AFTER SHE HAD JOINED YOUR

8   GROUP?

9   A.   YES, IT WAS.

10  Q.   AND AGAIN, THIS IS VERY POSITIVE, RIGHT?

11  A.   YEAH.  SHE WAS OFF TO A GREAT START IN THE GROUP, AND I

12  WAS -- I WAS THRILLED WITH THE -- WITH HOW QUICKLY SHE WAS

13  PICKING UP THE WORK AND SOME OF THE EARLY CONTRIBUTIONS SHE'D

14  MADE TO THE TEAM.

15  Q.   AND SO DOES THIS SUMMARY HERE ACCURATELY STATE YOUR FEELINGS

16  ABOUT HER AT THIS TIME?

17  A.   YES, IT DOES.

18  Q.   ALL RIGHT.  NOW, AT SOME POINT AFTER THE MERGER, DID YOU

19  NOTICE ANYTHING ABOUT MS. PANDE'S JOB PERFORMANCE?

20  A.   AFTER THE MERGER WITH TEXACO?

21  Q.   YES, AFTER THE MERGER WITH TEXACO.

22  A.   YOU KNOW, I WAS -- EVERYBODY HAD BEEN WORKING PRETTY LONG

23  HOURS AND THEY WERE PRETTY WORN OUT FROM THE TIME LEADING UP TO

24  THE MERGER, AND I -- I DID NOTICE SORT OF AFTER -- AFTER THE

25  MERGER THAT THERE WAS A DROPOFF IN HER PERFORMANCE, PARTICULARLY

MITCHELL - DIRECT / SIMERLY

1    A.  I DON'T RECALL A SPECIFIC KUMBAYA MOMENT, BUT I DO RECALL

2    THAT WE HAD SORT OF AGREED TO COMPLETE HER PMP FOR 2001, AND

3    THAT WE WOULD BE MOVING FORWARD ON A POSITIVE PATH THEREAFTER.

4    Q.  OKAY.  SO LET'S NOW GO INTO THAT PMP FOR 2001.

5              BY THE TIME YOU HAD THIS MEETING WITH KIRAN, WHILE

6    YOU HADN'T HAD THE MEETING TO DISCUSS HER PMP, HAD YOU ALREADY

7    RANKED THE PEOPLE IN YOUR GROUP FOR THE COMING YEAR'S SALARY

8    PURPOSES?

9    A.  YES, THAT WAS -- THAT WAS REQUIRED.  THE PROCESS REQUIRES US

10   TO COMPLETE OUR RANKINGS OF OUR EMPLOYEES AND DETERMINE THEIR

11   SALARY ACTIONS BY NO LATER THAN THE MIDDLE OF MARCH.

12   Q.  OKAY.  AND IN TERMS OF YOUR RANKING OF THE PEOPLE IN YOUR

13   GROUP, WAS THAT IN CONFORMITY WITH THE GENERAL CHEVRON POLICY AS

14   TO HOW PEOPLE'S EMPLOYEES ARE RANKED WITHIN A GIVEN GROUP?

15   A.  YES.

16   Q.  AND WHAT'S -- WHAT'S THE -- WHAT'S THE RANGE?  WHAT'S THE --

17   WHAT'S THE SCALE, THE METRIC?

18   A.  WELL, TYPICALLY, YOU'RE -- YOU'RE INSTRUCTED THAT NO MORE

19   THAN ABOUT 25 PERCENT OF YOUR EMPLOYEES SHOULD BE RANKED AS --

20   AS CATEGORY 1, WHICH IS EXCEPTIONAL PERFORMANCE.  AND THAT

21   TWO-THIRDS OF EMPLOYEES RANK AS -- AS WHAT WE CALL FULLY MEETING

22   EXPECTATIONS AND THEN THE REMAINING 50 --

23   Q.  AND A WHAT, A 2?

24   A.  A 2.  AND THEN THE REMAINING TEN TO 15 PERCENT ARE RANKED AS

25   CATEGORY 3, MEANING NOT FULLY MEETING EXPECTATIONS.

1    JOB, DID HE?

2    A.   NO, HE DIDN'T.

3    Q.   AND HE DIDN'T SAY ANYTHING IN THAT CONVERSATION IN THE FALL

4    OF 2000 THAT YOU INTERPRETED AS AN NEGATIVE COMMENT ABOUT

5    MS. PANDE'S WORK HABITS OR HER WORKABILITY, CORRECT?

6    A.   NO.

7    Q.   YOU TESTIFIED THAT YOU FELT KIRAN PANDE WAS DISAPPOINTED

8    THAT THE PORTFOLIO ANALYST POSITION DIDN'T COME WITH A

9    PROMOTION?

10   A.   YES.

11   Q.   WERE YOU TRYING TO GET A PROMOTION AT THAT SAME TIME,

12   MR. MITCHELL?

13   A.   NO, I WASN'T.

14           MS. SIMERLY:  OBJECTION, YOUR HONOR, RELEVANCE.

15           THE COURT:  I'LL ALLOW IT.

16   BY MS. HARRIMAN:

17   Q.   DID YOU APPLY FOR THE POSITION OF GENERAL MANAGER BUSINESS

18   DEVELOPMENT AND PLANNING?

19   A.   NO, I DIDN'T.

20   Q.   DID YOU HAVE YOUR NAME IN THE RING FOR ANY OTHER POSITIONS

21   DURING THAT TIME FRAME IN CONNECTION WITH THE MERGER?

22   A.   NO, I HAD BEEN SELECTED INTO THE JOB THAT I WAS HOLDING

23   PRIOR TO THE MERGER, AND I WAS SELECTED INTO THAT ROLE PRIOR TO

24   THE -- TO THE ACTUAL MERGER SELECTION PROCESS.

25   Q.   WHEN HAD YOU STARTED IN YOUR JOB, MR. MITCHELL?

MITCHELL - CROSS / HARRIMAN

1    A.    PROBABLY IT WAS 1998 OR SO.

2    Q.    SO -- AND THE MERGER WAS IN 2001?

3    A.    YES.

4    Q.    SO YOU'D BEEN IN THE JOB FOR THREE YEARS?

5    A.    ROUGHLY, YEAH.

6    Q.    AND YOU DIDN'T APPLY FOR ANY OTHER JOBS AROUND THE TIME OF

7    THE MERGER?

8    A.    NO.  I WAS PRESELECTED AS -- AS THE PLANNING MANAGER IN THE

9    GO-FORWARD ORGANIZATION, AND THAT DECISION WAS MADE PRIOR TO THE

10    MERGER.

11    Q.    OKAY.

12          LET'S TALK ABOUT THE MEETING THAT YOU TESTIFIED ABOUT

13    THIS MORNING THAT YOU, JAY JOHNSON, AND MS. PANDE HAD IN EARLY

14    TO MID-MARCH OF 2002.

15          RECALL TESTIFYING ABOUT THAT?

16    A.    YES, I DO.

17    Q.    AND I'D LIKE YOU TO LOOK AT EXHIBIT 251 AND TELL ME IF YOU

18    HAVE IT IN FRONT OF YOU.  IF NOT, I'LL GO FIND IT FOR YOU.

19    A.    I'VE GOT IT.

20          MS. HARRIMAN:  FLIP THROUGH A FEW PAGES.

21          THE COURT:  WAIT.  WAIT.  251 --

22          TAKE IT OFF THE SCREEN FOR A SECOND.

23          MS. HARRIMAN:  JUST TAKE IT OFF AND JUST GO RIGHT TO

24    THE FIRST EMAIL.

25          THE WITNESS:  MY 251 IS NOT AN EMAIL.

MITCHELL - CROSS / HARRIMAN

1  A.  NO, HE DIDN'T.

2  Q.  HE DIDN'T TELL YOU THAT?

3  A.  NO.

4  Q.  AND YOU DIDN'T ASK HIM, DID YOU?

5  A.  I DON'T RECALL WHETHER I DID OR NOT.

6  Q.  LET'S LOOK AT THE NEXT EMAIL.

7            (EXHIBIT PUBLISHED TO JURY.)

8  BY MS. HARRIMAN:

9  Q.  THIS WAS A REQUEST TO MS. PANDE TO LOOK AT A WEBSITE.

10  A.  THIS WAS A REQUEST TO HER TO LOOK AT A NEW TOOL THAT WE WERE

11  TRYING TO INTEGRATE INTO OUR STRATEGIC PLANNING PROCESS USING

12  WEB TECHNOLOGY.

13  Q.  AND IF I UNDERSTOOD YOUR TESTIMONY CORRECTLY, YOU ASKED IRIS

14  OWENS TO DO THAT?

15  A.  AFTER THERE WAS NO RESPONSE TO THE REQUEST I MADE OF KIRAN,

16  IT WAS APPARENT TO ME THAT SHE WASN'T GOING TO FOLLOW UP ON IT,

17  AND SO I ASKED IRIS AND SASHA CHMATOK, ANOTHER ANALYST IN MY

18  GROUP, TO UNDERTAKE THE EVALUATION.

19  Q.  AND IRIS OWENS WAS AN ADMINISTRATIVE ASSISTANT WITHIN THE

20  GROUP?

21  A.  YES.

22  Q.  SO THIS WAS WORK THAT WAS PERFECTLY CAPABLE OF BEING DONE BY

23  AN ADMINISTRATIVE ASSISTANT IN THE GROUP?

24  A.  NO, IT WASN'T.  THE OTHER FELLOW THAT IT WAS ASSIGNED TO WAS

25  SASHA CHMATOK.  SASHA WAS ONE OF THE OTHER BUSINESS ANALYSTS IN

MITCHELL - CROSS / HARRIMAN

1    BUSINESS PLANNING ASSIGNMENT.  AND HE THOUGHT THAT KIRAN WOULD

2    BE A GOOD SWAP CANDIDATE IF I WAS INTERESTED IN PURSUING THAT

3    DISCUSSION.

4    Q.  AND MR. GAGGINO WAS THE HEAD OF THE BUSINESS UNIT WORKING IN

5    THE CONGO?

6    A.  HE WAS HEAD OF A LOCAL GROUP IN SAN RAMON THAT WAS --

7    TECHNICAL GROUP THAT WAS SUPPORTING THE BUSINESS.  HE WASN'T THE

8    MANAGING DIRECTOR, AS YOU DESCRIBE.  HE WAS HEAD OF A TECHNICAL

9    GROUP IN SAN RAMON SUPPORTING OUR DISTANT BUSINESS UNIT.

10    Q.  AND YOU AND HE SPOKE FOR ABOUT 45 MINUTES ABOUT MS. PANDE?

11    A.  I DON'T RECALL THE EXACT TIME THAT WE SPOKE.  IT WAS, YOU

12    KNOW, 30 -- 20, 30 MINUTES, MY RECOLLECTION.

13    Q.  AND YOU TOLD HIM THAT KIRAN PANDE HAD HAD SOME RECENT

14    PERFORMANCE LAPSES, DIDN'T YOU?

15    A.  YES, I DESCRIBED FOR HIM SOME OF RECENT PERFORMANCE LAPSES

16    THAT WE'D SEEN.  I'D ALSO DESCRIBED THAT I THOUGHT SHE WOULD BE

17    A GOOD FIT FOR A TECHNICAL LEADER ROLE THAT SHE WAS -- THAT HE

18    WAS WANTING TO PLACE HER IN.

19    Q.  AND AFTER TELLING MS. GAGGINO (SIC) THAT MS. PANDE HAD HAD

20    SOME RECENT PERFORMANCE LAPSE, SHE NEVER DID GET OFFERED THAT

21    JOB WITH MR. GAGGINO'S BUSINESS UNIT, DID SHE?

22    A.  NO, SHE DIDN'T, BECAUSE WHEN I APPROACHED KIRAN ABOUT THE

23    JOB, SHE WASN'T INTERESTED.  AND I COMMUNICATED THAT BACK TO

24    FERNANDO, THAT KIRAN WAS NOT INTERESTED IN MOVING INTO HIS GROUP

25    ON A SWAP.

MITCHELL - CROSS / HARRIMAN

1    BY MS. HARRIMAN:

2    Q.   DIDN'T KELLY HARTSHORN TELL YOU THAT SHE HAD ADVISED KIRAN

3    PANDE TO WITHDRAW HER NAME FROM CONSIDERATION FROM MR. GAGGINO'S

4    GROUP?

5    A.   NOT THAT I RECALL, NO.

6    Q.   YOU ALSO SPOKE TO DES KING ABOUT A POSITION; IS THAT RIGHT?

7    A.   YES, I DID.

8    Q.   AND MS. PANDE WASN'T OFFERED THAT POSITION EITHER, WAS SHE?

9    A.   NO, SHE WASN'T.

10   Q.   YOU DIDN'T TALK TO JACK DUNN, DID YOU?

11   A.   NO, I DID NOT.

12   Q.   AND MS. PANDE DID GET THAT JOB, DIDN'T SHE?

13   A.   MS. PANDE WAS SELECTED FOR THE ROLE AS A PART OF -- PART OF

14   A PDC PROCESS.

15   Q.   ALL RIGHT.  SO YOU HAD NO CONVERSATIONS WITH MR. DUNN, BUT

16   THAT WAS THE JOB THAT MS. PANDE WAS OFFERED?

17   A.   YES.

18   Q.   REPORTING TO HIM, CORRECT?

19   A.   THAT'S CORRECT.

20   Q.   YOU ALSO TESTIFIED THIS MORNING THAT YOU PARTICIPATED IN THE

21   FALL 2002 PDC FOR BUSINESS AND COMMERCIAL; IS THAT RIGHT?

22   A.   THAT'S MY RECOLLECTION, YES.

23   Q.   YOU ACTUALLY SAT ON THIS COMMITTEE?

24   A.   YEAH, I WAS IN THE COMMITTEE.

25   Q.   WERE YOU ALSO ON THAT SAME COMMITTEE IN 2003?

1    2001.

2    Q.   SO DID ANYONE IN YOUR GROUP GET ONE RANKING?

3    A.   YES.

4    Q.   DO YOU RECALL INDEPENDENTLY -- THESE WERE YOUR PEOPLE -- WHO

5    GOT ONE RANKINGS?

6    A.   I RECALL A FEW OF THEM, YEAH, THAT WERE -- THEY PLAYED KEY

7    ROLES ON THE MERGER INTEGRATION TEAM.

8    Q.   OKAY.  WHO DO YOU RECALL GOT A ONE?

9    A.   BRIAN PUTT GOT A ONE FOR THE WORK THAT HE WAS DOING IN THE

10   CLEAN TEAM AND MOVED TO HOUSTON.  KEMAL ANBARCI GOT A ONE FOR

11   THE WORK THAT HE DID THROUGHOUT 2001 IN TRACKING ALL OF OUR

12   MERGER SYNERGY SAVINGS, AND THEN HE CONTINUED ON WITH THAT WORK

13   THROUGH THE FOURTH QUARTER 2001 AND CONTINUED ON THROUGHOUT

14   2002.

15            AND I BELIEVE MATT PALMER MAY HAVE GOT A ONE FOR THE

16   WORK THAT HE WAS DOING IN COORDINATING THE -- THE MERGER

17   INTEGRATION PLAN FOR ALL OF OUR INTERNATIONAL UPSTREAM

18   ORGANIZATION.

19   Q.   SO WHICH MEMBERS OF YOUR GROUP GOT TWO'S BESIDES MS. PANDE?

20   A.   SASHA CHMATOK WOULD HAVE GOTTEN THE TWO.  DAN WALLEM WOULD

21   HAVE RECEIVED A TWO.  ERASTUS LEOPOLDO, I BELIEVE.

22   Q.   I'M SORRY.

23   A.   ERASTUS LEOPOLDO -- HE WAS OUR ADMIN ASSISTANT AT THE

24   TIME -- RECEIVED A TWO.  AND I THINK VICKI THOMPSON, WHO WAS

25   ALSO REPORTING TO ME, RECEIVED A TWO.  AND TONY KENCK.  EXCUSE

JOHNSON - DIRECT / SIMERLY

1    A.   IT WAS EARLY IN 2002, AROUND FEBRUARY.

2    Q.   HAD THE CHEVRONTEXACO MERGER ALREADY TAKEN PLACE?

3    A.   YES.

4    Q.   WHEN YOU CAME ON BOARD, WHERE WAS THAT OFFICE LOCATED?

5    A.   OUR OFFICE IN SAN RAMON, CALIFORNIA.

6    Q.   OKAY.  AND WHEN YOU -- WHEN YOU CAME ON BOARD IN

7    APPROXIMATELY FEBRUARY OF 2002, COULD YOU CHARACTERIZE THE

8    WORKLOAD OF THAT UNIT, THE BUSINESS DEVELOPMENT AND PLANNING

9    GROUP AT THE TIME YOU JOINED?

10   A.   WELL, THE GROUP'S ALWAYS PRETTY BUSY.  WE'D FINISHED THE

11   MERGER, SO A LOT OF THE MERGER WORK WAS BEHIND US AT THAT POINT

12   IN TIME.  SO THE MAIN FOCUS WAS ON PORTFOLIO OPTIMIZATION,

13   LOOKING AT THE PORTFOLIO THAT WE MAINTAIN WORLDWIDE IN

14   INTEGRATING THE TWO MAIN COMPANIES AS WELL AS PREPARING FOR THE

15   UPCOMING BUSINESS PLANNING PERIOD.

16   Q.   COULD YOU GIVE THE JURY AN IDEA JUST BRIEFLY WHAT YOUR

17   RESPONSIBILITIES WERE IN YOUR POSITION AS THE GENERAL MANAGER OF

18   THIS GROUP?

19   A.   MY MAIN ROLE WAS AS AN ADVISER TO THE PRESIDENT OF THE

20   OPERATING COMPANY ON -- ON BUSINESS PORTFOLIO ISSUES, BUSINESS

21   PLANNING ISSUES.  I ALSO SUPERVISED THE THREE GROUPS.  ONE WAS

22   THE PLANNING GROUP.  ONE WAS THE BUSINESS OPPORTUNITY ASSESSMENT

23   GROUP AND ONE WAS THE DECISION ANALYSIS GROUP.  AND WE HANDLED

24   ALL OF THE EXCON (PHONETIC) REPORTING ITEMS THAT WOULD COME

25   THROUGH FROM THE VARIOUS BUSINESS UNITS AROUND THE WORLD.

JOHNSON - DIRECT / SIMERLY

1  Q.  SO THOSE THREE GROUPS IN TOTAL, ABOUT HOW MANY EMPLOYEES DID

2  YOU HAVE ACTUALLY HAVE SUPERVISORY AUTHORITY OVER?

3  A.  THAT I DIRECTLY SUPERVISED WAS ABOUT FOUR.

4  Q.  AND THEN BELOW THOSE FOUR, WERE THERE OTHER EMPLOYEES

5  REPORTING TO THEM?

6  A.  THAT'S CORRECT.

7  Q.  SO IF YOU DID THE TOTAL OF THE --

8  A.  OF THE WHOLE GROUP?

9  Q.  -- OF THE WHOLE GROUP?

10  A.  I'D SAY PROBABLY 20 TO 25, SOMEWHERE IN THAT RANGE.

11  Q.  ALL RIGHT.  WAS REX MITCHELL ONE OF YOUR DIRECT REPORTS AT

12  THIS TIME?

13  A.  YES, HE WAS.

14  Q.  WAS HE ALREADY THERE WHEN YOU JOINED THE GROUP?

15  A.  YES.

16  Q.  ONCE YOU JOINED IN FEBRUARY OF 2002, DID YOU COME TO KNOW

17  KIRAN PANDE?

18  A.  YES.

19  Q.  WAS SHE PART OF THE GROUP WHEN YOU JOINED?

20  A.  SHE WAS IN REX MITCHELL'S GROUP, YES.

21  Q.  SO DID YOU HAVE ANY SUPERVISORY AUTHORITY OVER MS. PANDE?

22  A.  I DID AS A SECOND-LEVEL SUPERVISOR, BUT NOT DIRECT

23  SUPERVISION.

24  Q.  OKAY.  AND WHAT DOES THAT MEAN, "A SECOND-LEVEL SUPERVISOR"?

25  A.  IT MEANS SHE REALLY TOOK WORK DIRECTION, WORK ASSIGNMENTS,

JOHNSON - DIRECT / SIMERLY

1    A.   WELL, THERE WERE A LOT OF MEETINGS THAT OCCURRED.   WE

2    PROBABLY MET -- I CAN'T EVEN TELL YOU HOW MANY TIMES, BUT IT WAS

3    A SERIES OF MEETINGS OVER SEVERAL MONTHS.   BUT THE -- THE

4    FUNDAMENTAL ISSUE WAS HER RELATIONSHIP WITH REX MITCHELL AND

5    THE -- HER PERFORMANCE IN THAT GROUP.

6    Q.   OKAY.   THE -- CAN YOU FOCUS ON THE FIRST MEETING?   CAN YOU

7    TEASE OUT THE FIRST MEETING AND SPECIFICALLY WHAT WAS SAID IN

8    THE FIRST MEETING?

9    A.   THE FIRST MEETING WAS KIRAN BELIEVED THAT SHE WASN'T BEING

10   RECOGNIZED FOR HER PERFORMANCE AND SHE WAS HAVING RELATIONSHIP

11   ISSUES WITH HER MANAGER -- OR SUPERVISOR REX MITCHELL.

12   Q.   IN THIS FIRST MEETING, DID SHE SAY ANYTHING AT ALL ABOUT

13   DISCRIMINATION OR HARASSMENT?

14   A.   NO.   THIS MEETING WAS ABOUT THE PERFORMANCE ISSUE AND A

15   RELATIONSHIP ISSUE BETWEEN HER AND REX MITCHELL.

16   Q.   CAN YOU GIVE US ANY MORE DETAILS ABOUT WHAT SHE SAID ABOUT

17   HER RELATIONSHIP WITH REX MITCHELL?

18   A.   WELL, IT'S FOUR AND A HALF YEARS AGO SO REMEMBERING SPECIFIC

19   CONVERSATION, I REMEMBER DEFINITELY WE TALKED ABOUT THE FACT

20   THAT SHE FELT SHE HAD NOT BEEN RECOGNIZED FOR HER PERFORMANCE

21   OVER THE PREVIOUS YEAR, IN PARTICULAR SOME OF THE WORK SHE DID

22   FOR THE MERGER.   AND SHE FELT IT WAS INAPPROPRIATE THAT SHE WAS

23   GETTING A 2 RATING, WHICH IS A FULLY MEETS RATING, FOR HER

24   PERFORMANCE IN THE PREVIOUS YEAR.   AND THAT SHE FELT SHE WASN'T

25   BEING TREATED FAIRLY BY REX.

1  Q.  SO IS IT YOUR RECOLLECTION THAT SHE BROUGHT UP THIS 2 RATING

2  IN THE VERY FIRST MEETING?

3  A.  AS BEST I RECALL, YES.

4  Q.  CAN YOU SAY WITH CERTAINTY THAT THE 2 RATING WAS DISCUSSED

5  IN THE FIRST MEETING -- WELL, FIRST OF ALL, HOW MANY MEETINGS

6  TOTAL?

7  A.  YOU KNOW, I CAN'T EVEN REMEMBER, BUT IT WAS PROBABLY -- OVER

8  THE COURSE OF THE NEXT FEW MONTHS PROBABLY AT LEAST HALF A DOZEN

9  TO A DOZEN MEETINGS WITH KIRAN.

10  Q.  WAS THERE A MEETING WITH YOU, MS. PANDE, AND MR. MITCHELL?

11  A.  YES, THERE WAS.  THAT WAS SUBSEQUENT TO THE FIRST MEETING

12  BETWEEN KIRAN AND MYSELF.

13  Q.  WAS THERE A MEETING WITH YOU, MS. PANDE, AND GARY YAMASHITA,

14  THE OMBUDSPERSON?

15  A.  YES, THERE WAS.

16  Q.  AND THEN WERE THERE OTHER INDIVIDUAL MEETINGS WITH

17  MS. PANDE?

18  A.  YES, THERE WERE.

19  Q.  SO ARE YOU -- CAN YOU SAY WITH ABSOLUTE CERTAINTY THAT THE

20  2 RANKING CAME UP IN THE FIRST MEETING?

21  A.  I CAN'T SAY WITH CERTAINTY IT CAME UP IN THE FIRST MEETING.

22  IT CERTAINLY CAME UP AS PART OF THIS OVERALL DISCUSSION ABOUT

23  HER PERFORMANCE.

24  Q.  DID YOU SIGN A DECLARATION EARLIER IN THIS CASE IN

25  CONNECTION WITH THIS LITIGATION?

1    YOUR -- THE QUESTION WHICH YOU THINK WE OUGHT TO TALK AND THEN

2    WE'LL TALK AT THE BREAK.

3              MS. HARRIMAN:   OKAY.  I'LL LAY THE FOUNDATION AND

4    THEN WE CAN MOVE FROM THERE.

5              THE COURT:   FINE.

6                        CROSS-EXAMINATION

7    BY MS. HARRIMAN:

8    Q.   GOOD MORNING, MR. JOHNSON.

9    A.   GOOD MORNING.

10   Q.   MR. JOHNSON, YOU SAID THAT YOU STARTED AS THE GENERAL

11   MANAGER OF THE BUSINESS DEVELOPMENT AND PLANNING IN

12   FEBRUARY 2002?

13   A.   YES.

14   Q.   SO THAT WAS APPROXIMATELY ONE MONTH BEFORE MS. PANDE FIRST

15   COMPLAINED TO YOU ABOUT MR. MITCHELL?

16   A.   AS BEST -- YEAH, SOMEWHERE IN THAT TIME PERIOD.  IT WAS

17   MARCH/APRIL FRAME.

18   Q.   WELL, YOU KNOW SHE FIRST COMPLAINED TO YOU IN EARLY MARCH,

19   DON'T YOU?

20   A.   YEAH, IT WAS IN EARLY MARCH WHEN THEY FIRST BROUGHT UP THE

21   ISSUE OF PERFORMANCE.

22   Q.   SO THAT WAS ABOUT A MONTH AFTER YOU STARTED?

23   A.   THEREABOUTS, YEAH.

24   Q.   AND SO YOU WERE BRAND NEW ON THE JOB WHEN MS. PANDE FIRST

25   CAME TO YOU WITH HER COMPLAINTS ABOUT MR. MITCHELL?

1    MEETING MR. MITCHELL WHEN MS. PANDE FIRST MADE THESE COMPLAINTS?

2    A.  YES.

3    Q.  AND IF I UNDERSTOOD YOU RIGHT, YOU WENT AND TALKED TO MR. --

4    YOU'D FOUND OUT FROM IRIS OWENS THAT KIRAN PANDE WANTED TO SPEAK

5    TO YOU ABOUT REX MITCHELL AND YOU SPOKE TO MR. MITCHELL BEFORE

6    YOU SPOKE TO KIRAN PANDE, CORRECT?

7    A.  THAT'S CORRECT.

8    Q.  AND THEN YOU MET WITH MS. PANDE IN EARLY MARCH --

9    A.  YES.

10    Q.  -- RIGHT?

11            AND I BELIEVE YOU JUST TESTIFIED THAT IN THAT FIRST

12    MEETING, YOU LAID OUT THREE OPTIONS FOR HER, CORRECT?

13    A.  WELL, I DIDN'T LAY THEM OUT.  WE TALKED ABOUT WHAT THOSE

14    OPTIONS WERE AS WE MOVED FORWARD WITH THE RESOLUTION.

15    Q.  OKAY.  YOU DISCUSSED THREE OPTIONS WITH HER IN THAT FIRST

16    MEETING?

17    A.  IT WAS EITHER IN THAT MEETING OR IT WAS IN THE MEETING WITH

18    REX AND MYSELF AND KIRAN.

19    Q.  WELL, YOU DISCUSSED THEM IN BOTH MEETINGS, DIDN'T YOU?

20    A.  COULD WELL HAVE.

21    Q.  AND YOU JUST TESTIFIED, MR. JOHNSON, THAT KIRAN PANDE DIDN'T

22    MAKE ANY COMPLAINTS ABOUT DISCRIMINATION IN THAT FIRST MEETING.

23    A.  NO.

24    Q.  THAT'S NOT TRUE, IS IT?

25    A.  IT IS TRUE.  I DON'T RECALL ANY ALLEGATION THAT SHE WAS

1          THE COURT:  THAT OBJECTION'S SUSTAINED.

2              MS. HARRIMAN:  STILL COMING UP, I TAKE IT, YOUR

3      HONOR.

4          MS. SIMERLY:  WHAT'S THAT?

5          MS. HARRIMAN:  WELL --

6          THE COURT:  I MEAN, IT'S NOT HEARSAY.  IT'S A PARTY

7      ADMISSION.

8          MS. HARRIMAN:  YEAH.

9          THE COURT:  WHY CAN'T SHE -- PUT IT UP.

10         MS. SIMERLY:  OKAY.

11         THE COURT:  GOOD.  PARAGRAPH 3?

12             (EXHIBIT PUBLISHED TO JURY.)

13     BY MS. HARRIMAN:

14     Q.  AND WHEN YOU WROTE YOUR DECLARATION UNDER PENALTY OF

15     PERJURY, MR. JOHNSON, WHAT YOU SAID, THAT IS, "IN EARLY MARCH,

16     2002, MS. PANDE APPROACHED ME AND INDICATED THAT SHE WAS HAVING

17     PROBLEMS WITH HER SUPERVISOR, REX MITCHELL.  AT THE TIME, SHE

18     ADVISED SHE WAS RANKED A 2 IN PERFORMANCE AND BELIEVED SHE

19     SHOULD HAVE BEEN DESIGNATED A 1, TOP-LEVEL PERFORMANCE."  THAT

20     STATEMENT IS FALSE, ISN'T IT?

21     A.  NO, THAT STATEMENT'S TRUE.  AS BEST I RECALL, SHE WAS VERY

22     CONCERNED 'CAUSE SHE HAD NOT BEEN RATED A 1 IN PERFORMANCE.

23     Q.  SO YOUR TESTIMONY IS IN THE VERY FIRST MEETING WITH

24     MS. PANDE, SHE CAME IN TO COMPLAIN ABOUT HER RATING; THAT'S YOUR

25     TESTIMONY?

1    A.   YEAH.

2    Q.   OKAY.  I'M GOING TO SHOW YOU WHAT'S BEEN MARKED AS

3    EXHIBIT 98.

4              (PAUSE IN THE PROCEEDINGS.)

5          MS. HARRIMAN:   CAN WE PUT THAT UP, PLEASE, CANDI?

6              (EXHIBIT PUBLISHED TO JURY.)

7    BY MS. HARRIMAN:

8    Q.   I WANT YOU TO LOOK AT --

9          MS. HARRIMAN:   CAN WE BLOW UP THE VERY -- ACTUALLY,

10   LET'S BLOW UP THE EMAIL, THE VERY BOTTOM OF THE NEXT PAGE, IF

11   YOU CAN, CANDI.

12             (EXHIBIT PUBLISHED TO JURY.)

13         MS. HARRIMAN:   THAT'S GOOD.

14   Q.   AND, MR. JOHNSON, YOU SEE THAT ON MARCH 27, KIRAN PANDE SENT

15   REX MITCHELL HER PMP FORM FOR 2001.  YOU SEE THAT?

16   A.   UH-HUH.

17   Q.   YOU HAVE TO ANSWER AUDIBLY.

18   A.   OH, SORRY.  YES.

19   Q.   AND YOU WOULD AGREE WITH ME, WOULDN'T YOU, THAT MARCH 27 IS

20   NOT EARLY MARCH?

21   A.   OKAY.

22   Q.   DO YOU AGREE?

23   A.   YES.  YES.

24         MS. HARRIMAN:   LET'S LOOK AT THE NEXT EMAIL IN THE

25   STRING.

ALAMEDA - CROSS / ANDERSON

1  DISCUSSIONS AT THAT PDC MEETING?

2  A.  YES, I DO.

3  Q.  DO YOU RECALL THAT WITH RESPECT TO DISCUSSIONS THAT WENT ON

4  AT THE PDC CONCERNING THESE LONDON JOBS THERE WAS MUCH

5  DISCUSSION ABOUT WHETHER OR NOT MS. PANDE DEMONSTRATED

6  SUFFICIENT TEAM AND INTERPERSONAL SKILLS?

7  A.  RIGHT.

8  Q.  DO YOU RECALL THAT?

9  A.  YES, I DO.

10  Q.  AND THAT'S ONE OF THE RATINGS THAT IS GIVEN TO THE

11  CANDIDATES THAT WERE SHORT-LISTED FOR THESE LONDON JOBS; DO YOU

12  RECALL THAT?

13  A.  YES, THAT'S ONE OF THE CRITICAL SKILLS.

14  Q.  AND TEAMWORK IS IMPORTANT SKILL FROM CHEVRON'S PERSPECTIVE;

15  IS THAT FAIR?

16  A.  MOST CERTAINLY.

17  Q.  ALL RIGHT.  AND IN FACT, IT'S CONSIDERED PART OF THE CHEVRON

18  WAY TO HAVE GOOD TEAMWORK SKILLS, RIGHT?

19  A.  YEP, ABSOLUTELY.

20  Q.  AND SO IF SOMEONE IS CATEGORIZED AS NOT HAVING GOOD TEAMWORK

21  SKILLS, THAT'S A PROBLEM IF YOU'RE A CANDIDATE FOR A NEW JOB; IS

22  THAT FAIR?

23  A.  ON MOST OCCASIONS, YES.

24  Q.  OKAY.  AND AS FAR AS THE RANKINGS THAT WERE AVAILABLE FOR

25  TEAMWORK AT THE TIME, THEY INCLUDED "VP" FOR "VERY PROFICIENT,"

DUNN - DIRECT / SIMERLY

1          **MS. ANDERSON:**  OBJECTION, LEADING, YOUR HONOR.

2          **THE COURT:**  SUSTAINED.

3          **MS. ANDERSON:**  MOVE TO STRIKE THE ANSWER.

4          **THE WITNESS:**  THE ANSWER IS STRICKEN.

5    BY MS. SIMERLY:

6    Q.  WAS THERE A SECOND PIECE, OTHER THAN HER CHOOSING NOT TO

7    RELOCATE, MR. DUNN?

8    A.  YES.  SHE HAD -- BETWEEN THE TIME SHE HAD ELECTED NOT TO

9    RELOCATE AND THE END OF YEAR, SHE WAS UNABLE TO GET ANOTHER JOB

10   WITHIN CHEVRON.

11   Q.  OKAY.  NOW LET'S GO BACK TO THE BEGINNING OF YOUR WORKING

12   WITH KIRAN PANDE.

13          WHEN SHE JOINED YOUR GROUP, WHAT WAS HER POSITION?

14   A.  SIMULATION ENGINEER, PETROLEUM ENGINEER WITH A SPECIALTY IN

15   SIMULATION.

16   Q.  AND IS THAT THE SAME THING AS A RESERVOIR SIMULATION

17   ENGINEER?

18   A.  YES.

19   Q.  SO LET'S TALK ABOUT THE FIRST FIVE OR SIX MONTHS OF KIRAN

20   PANDE WORKING IN YOUR GROUP IN SASBU IN SAN RAMON.

21          WHAT WAS YOUR IMPRESSION OF HER?

22   A.  SHE DID A GREAT JOB.  SHE STARTED OFF WORKING VERY HARD,

23   VERY DILIGENTLY ON HER SIMULATION WORK.  SHE HAD ONE OF THE MORE

24   IMPORTANT PARTS OF THIS OIL FIELD ACCUMULATION.  IT'S CALLED THE

25   F1 CHANNEL.  IT WAS THE LARGEST -- LARGEST CHANNEL.  AND SHE

DUNN - DIRECT / SIMERLY

1    WORKED VERY DILIGENTLY.  SHE WAS KIND OF RELEARNING HER SKILLS

2    IN RESERVOIR SIMULATION, AND EXCELLENT WORK.

3    Q.   WERE YOU HAPPY WITH HER PERFORMANCE?

4    A.   ABSOLUTELY.

5    Q.   HAD YOU EVER WORKED WITH KIRAN PANDE BEFORE SHE JOINED YOUR

6    GROUP IN EARLY DECEMBER, 2002?

7    A.   YEAH, I HADN'T REALLY WORKED WITH KIRAN, BUT I HAD MET HER

8    BEFORE.  I WAS -- IN ONE OF MY PREVIOUS JOBS, I WAS A

9    FACILITATOR FOR A PROJECT MANAGEMENT PROCESS, AND I HAD MET

10   KIRAN PROBABLY SEVERAL YEARS BEFORE IN ONE OF THESE MEETINGS.

11   WE HAD CORDIAL RELATIONSHIP.  I WAS IMPRESSED BY HER.  I LIKED

12   HER.

13   Q.   SO DID YOU KNOW SHE WAS UNDER CONSIDERATION FOR THE POSITION

14   IN YOUR GROUP PRIOR TO HER GETTING THAT JOB?

15   A.   I KNEW AFTER THE FALL PDC.  IN THE OCTOBER TIMEFRAME, I GOT

16   A CALL FROM KELLY HARTSHORN SAYING SHE'D BEEN SELECTED.

17   Q.   AND WHEN KELLY HARTSHORN NOTIFIED YOU -- WHO IS KELLY

18   HARTSHORN?

19   A.   KELLY HARTSHORN WAS KIRAN'S PDR AT THE TIME.  SO KELLY WAS

20   KIRAN'S PERSONNEL DEVELOPMENT REPRESENTATIVE.

21   Q.   AND WHEN KELLY HARTSHORN NOTIFIED YOU THAT SHE HAD BEEN

22   SELECTED FOR A POSITION IN YOUR GROUP, WHAT WAS YOUR REACTION?

23   A.   I WAS PLEASED BECAUSE I HAD KNOWN KIRAN BEFORE.  I HAD HAD A

24   POSITIVE VIEWPOINT OF HER, AND I KNEW SHE WAS BRIGHT AND

25   CAPABLE, AND KELLY SPOKE HIGHLY OF HER.  SO I HAD -- I WAS -- IT

DUNN - DIRECT / SIMERLY

1   BY MS. SIMERLY:

2   Q.   SO ONCE MS. PANDE JOINED YOUR GROUP, WAS THERE ANY -- DID

3   YOU HAVE ANY CRITICISM OF HER JOB PERFORMANCE, LET'S SAY UNTIL

4   MAY OF 2003?

5   A.   NO.   BEING QUITE THE OPPOSITE.   SHE DID A -- SHE DID A GREAT

6   JOB FOR THE FIRST HALF OF THE YEAR.

7   Q.   LET'S FAST-FORWARD TO MAY OF 2003.   WHAT HAPPENED IN MAY OF

8   2003 IN TERMS OF WHERE SASBU WAS GOING TO BE IN THE FUTURE?

9   A.   YOU KNOW, ON MAY 13TH, THERE WAS A TOWN HALL RELATED TO

10  THIS -- OUR RELOCATION TO HOUSTON.

11          THE COURT:   AND WE'LL GET INTO THAT AFTER LUNCH.

12          SO, LADIES AND GENTLEMEN, WE'RE GOING TO BREAK FOR

13  LUNCH.   WE'RE GOING TO TAKE 45 MINUTES.   I KNOW I PROMISED YOU

14  AN HOUR, BUT I WANT TO SEE IF WE CAN GET AS MUCH TESTIMONY AS

15  POSSIBLE IN TODAY.

16          REMEMBER THE ADMONITIONS.   DON'T DISCUSS THE CASE

17  WITH ANYONE.   DON'T LET ANYONE DISCUSS THE CASE WITH YOU.

18          THANK YOU VERY MUCH.

19          THAT WILL BE 1:30 WE'LL RECONVENE.

20          (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

21  PRESENCE OF THE JURY:)

22          THE COURT:   ALL RIGHT.   ANYTHING?

23          MS. HARRIMAN:   YES, YOUR HONOR.   THESE PMP'S.

24          THE COURT:   OH, LET'S DISCUSS THE PMP'S.   WHAT'S THE

25  LATEST ON THE PMP'S?

DUNN - CROSS / ANDERSON

1  THE SELECTION PROCESS, RIGHT?

2  A.  IN HER BEING SELECTED FOR THIS JOB?

3  Q.  RIGHT.

4  A.  THAT'S CORRECT.

5  Q.  AND THAT MEANS YOU DIDN'T REVIEW HER WORK HISTORY IN ADVANCE

6  OF HER GETTING THAT OFFER, RIGHT?

7  A.  THAT'S CORRECT.

8  Q.  AND YOU NEVER DISCUSSED THE SUBJECT OF MS. PANDE WITH

9  MR. REX MITCHELL IN ADVANCE OF HER ACCEPTING THE JOB WITH YOUR

10  GROUP, RIGHT?

11  A.  THAT IS CORRECT.

12  Q.  INDEED THE FIRST TIME THAT YOU EVER TALKED WITH ANYBODY

13  ABOUT MS. PANDE JOINING YOUR GROUP WAS WHEN KELLY HARTSHORN

14  FIRST CONTACTED YOU, RIGHT?

15  A.  THAT'S MY RECOLLECTION.

16  Q.  NOW, DURING THE TIME OF THE 2003 PERIOD WHEN MS. PANDE WAS

17  REPORTING TO YOU, THERE WERE ABOUT TEN TO 15 PEOPLE REPORTING TO

18  YOU AS WELL, RIGHT?

19  A.  MORE OR LESS.

20  Q.  AND THAT INCLUDED MS. PANDE, TRUE?

21  A.  YES.

22  Q.  AND AS YOU MAY HAVE TESTIFIED, PART OF YOUR DUTIES AS BEING

23  A SUPERVISOR WERE TO PROVIDE REVIEWS FOR YOUR EMPLOYEES, RIGHT?

24  A.  CERTAINLY I REVIEWED THE WORK, I REVIEWED THE WORK PLANS, I

25  REVIEWED WHERE WE WERE IN TERMS OF DELIVERABLES AND ACTIVITIES,

1          **MS. HARRIMAN:** SO IF HE COMES BACK, THOUGH, YOUR

2    HONOR, IT'S REOPENING CROSS. HE DOESN'T COME BACK ON DIRECT.

3          **MS. SIMERLY:** WELL, EXCEPT THAT WE GET TO GO BACK AND

4    QUESTION HIM ON THE LIMITED AREA OF CROSS.

5          **MS. HARRIMAN:** OF COURSE, THAT'S REDIRECT.

6          **THE COURT:** OF COURSE. WE'LL REOPEN MR. MITCHELL'S

7    CROSS. AND YOU CAN EXAMINE HIM ON THE PMP'S AND WHAT FOLLOWS

8    FROM THE PMP'S THAT HAVE BEEN PRODUCED.

9          **MS. HARRIMAN:** RIGHT.

10          **THE COURT:** AND YOU CAN DO WHATEVER THAT YOU CALL IT

11    AFTER CROSS, REDIRECT FOLLOWING THAT. AND WE'LL GET -- AND WHEN

12    DO YOU WANT TO DO THIS?

13          **MS. SIMERLY:** MONDAY. HE'S -- HE'S AROUND TO BE

14    AVAILABLE MONDAY.

15          **THE COURT:** WELL, DURING YOUR CASE.

16          **MS. SIMERLY:** YES.

17          **THE COURT:** FINE.

18          **MS. HARRIMAN:** YEAH. HE'S THEIR WITNESS.

19          **THE COURT:** FINE. THAT'S FINE.

20          **MS. HARRIMAN:** THAT'S FINE.

21          **THE COURT:** OKAY. GREAT. WE'LL DO THAT.

22          **MS. SIMERLY:** ALL RIGHT?

23                (RECESS TAKEN AT 8:14 A.M.)

24             (PROCEEDINGS RESUMED AT 8:47 A.M.)

25             (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE

1      **MS. HARRIMAN:**  EXCUSE ME, YOUR HONOR.  OBJECTION,

2   IRRELEVANT.

3          **THE COURT:**  OVERRULED.

4          **THE WITNESS:**  WELL, I THINK AS A SUPERVISOR, IF I SAW

5   APPLICATION LIKE THIS, IT TENDS TO SAY SOMETHING ABOUT THE

6   INDIVIDUAL.  AND THAT'S JUST NOT THE KIND OF IMPRESSION I WANT

7   TO CONVEY WHEN I APPLY FOR A JOB.  AND PLUS I REALLY DON'T THINK

8   I'M TEN IN ALL THESE DIMENSIONS.

9   BY MS. SIMERLY:

10  **Q.**  THANK YOU.

11         LET'S GO BACK TO -- YOU SAID YOU ACTUALLY WORKED WITH

12  KIRAN PANDE.  DO YOU RECALL APPROXIMATELY WHEN THAT WAS?

13  **A.**  YEAH.  I WAS HER SUPERVISOR FROM JANUARY '98 UNTIL THE

14  MIDDLE OF '99 WHEN I MOVED TO A DIFFERENT JOB.

15  **Q.**  AND WHERE WAS THAT THAT YOU WERE SUPERVISING MS. PANDE FROM

16  JANUARY OF '98 TO THE MIDDLE OF '99?

17  **A.**  I WAS IN SAN RAMON, CALIFORNIA.

18  **Q.**  AND WHAT WAS THE GROUP THAT YOU WERE SUPERVISING HER IN?

19  **A.**  IT WAS A TECHNICAL SUPPORT GROUP IN WHAT WAS CALLED A TAPS

20  (PHONETIC) ORGANIZATION, PART OF THE CHEVRON OVERSEAS --

21  COORDINATION ON OVERSEAS PETROLEUM.  SO WE WERE PROVIDING

22  TECHNICAL SUPPORT FOR SUBSURFACE AND A LITTLE BIT OF SURFACE

23  ALSO SUPPORT.  WE LOOKED AT NEW PROJECTS, NEW OPPORTUNITIES FOR

24  CHEVRON TO GROW INTO.

25  **Q.**  WERE YOU HER DIRECT SUPERVISOR?

1    A.    THAT'S CORRECT.

2    Q.    IMMEDIATE SUPERVISOR?

3    A.    UH-HUH.

4    Q.    AND WAS SHE PART OF A TEAM OF OTHER EMPLOYEES IN YOUR GROUP

5    THAT YOU SUPERVISED --

6    A.    THAT WAS A GROUP OF ABOUT -- I FORGOT -- IT WAS A GROUP OF

7    ABOUT EIGHT TO 12 PEOPLES.    THAT'S ABOUT THE SIZE OF IT.

8    Q.    OKAY.    NOW, WHILE YOU WERE WORKING AS MS. PANDE'S SUPERVISOR

9    IN THIS TIME FRAME, DID YOU PERSONALLY NOTICE ANY PROBLEMS WITH

10    MS. PANDE'S PERFORMANCE?

11    A.    NOT INITIALLY, NO.    BUT TOWARDS THE LATTER PART OF 1999 --

12    1998, AND WHEN I WAS STILL THERE IN 1999, I BELIEVE THERE WAS AN

13    ISSUE, YES.

14    Q.    AND COULD YOU TELL THE JURY WHAT THAT ISSUE WAS THAT -- THAT

15    YOU HAD WITH MS. PANDE.

16    A.    WELL, WE HAD SOME MEETING IN -- IN PARIS ON A PROJECT THAT

17    HAD TO DO WITH THE NEW VENTURES IN ALGERIA.    AND WE HAD A SERIES

18    OF MEETINGS, I BELIEVE IT WAS IN LATE '98.    AND I -- MY

19    PERCEPTION WAS THAT THE WORK THAT SHE HAD DONE THAT SHE WAS

20    WORKING ON, IT COULD HAVE -- THE WORK COULD HAVE BEEN MORE

21    COMPLETE.    I DON'T THINK IT WAS REALLY -- THE DELIVERABLES WERE

22    NOT ALL THERE.

23            SO I -- SOMETIME TOWARDS I BELIEVE THE -- THIS WAS

24    NINE YEARS AGO -- TOWARDS THE END OF '98, I REMEMBER AT ONE TIME

25    WE SAT DOWN AND I ASK HER, YOU KNOW, WHETHER THE FACT THAT

CAMY - DIRECT / SIMERLY

1    SHE -- I KNEW SHE WAS WORKING ON AN MBA, WHETHER THAT WAS

2    ACTUALLY AN ISSUE THAT WAS PREVENTING HER FROM MEETING THOSE

3    DELIVERABLES FOR THOSE MEETINGS.

4    Q.   AND WHAT WAS HER RESPONSE WHEN YOU ASKED HER THAT QUESTION?

5    A.   NO, THAT IT WAS NOT AN ISSUE.

6    Q.   AND THEN AFTER THAT CONVERSATION, WHAT HAPPENED?

7    A.   THERE WAS A VERY SIGNIFICANT CHANGE OF ATTITUDE BETWEEN --

8    FROM HER TO ME.

9    Q.   AND WHAT DO YOU MEAN WHEN YOU SAY THERE WAS A VERY

10   SIGNIFICANT CHANGE OF ATTITUDE?  CAN YOU GIVE THE JURY SOME

11   SPECIFICS OF WHAT YOU INTERPRETED TO BE A VERY DRAMATIC CHANGE

12   IN ATTITUDE?

13   A.   WELL, I THINK PRIOR TO THAT WE HAD A VERY CIVIL

14   RELATIONSHIP.  I MEAN WE TALKED AND JOKED AND -- AND BUT AFTER I

15   MADE THAT COMMENT, ASKING WHETHER THAT -- YOU KNOW, WHETHER

16   THERE WAS AN ISSUE THAT WOULD -- TOOK A LOT OF HER TIME AND NOT

17   WORK ON THIS, I -- SHE COMPLETELY WITHDREW FROM CONTACTS WITH

18   MYSELF.  IT WAS ESSENTIALLY LIKE SILENT TREATMENT.  I MEAN I --

19   I GET THAT AT HOME ONCE IN A WHILE, AND I -- BELIEVE ME, ONCE --

20   ONCE YOU SEE IT, YOU KNOW WHAT IT IS.  AND IT WAS JUST

21   AVOIDANCE, EVEN MEETING IN THE HALLWAY OR, YOU KNOW, NOT EVEN

22   SAY HELLO, JUST LOOK THE OTHER WAY.

23   Q.   BUT BEFORE THIS CONVERSATION, DID MS. PANDE KEEP HER DOOR

24   OPEN AT -- AT THE OFFICES IN SAN RAMON?

25   A.   I BELIEVE SO.

1    POINTS, YES, UM-HMM.

2    Q.   OKAY.  DIDN'T -- WAS MS. PANDE SELECTED FOR EITHER OF THESE

3    POSITIONS?

4    A.   NO.

5    Q.   WHO WERE THE SUCCESSFUL CANDIDATES, IF YOU RECALL?

6    A.   I BELIEVE ONE WAS JALAL AFIFI, AND THE OTHER -- I FORGOT THE

7    NAME OF THE OTHER.

8    Q.   GRAHAM HOUSEN?

9    A.   YEAH, GRAHAM HOUSEN.

10   Q.   OKAY.  DID YOU, IN THE COURSE OF THIS MEETING, SAY ANYTHING

11   TO THE OTHER MEMBERS OF THE SELECTION COMMITTEE ABOUT YOUR

12   PERSONAL EXPERIENCE WORKING WITH MS. PANDE --

13   A.   YES.

14   Q.   -- AS HER SUPERVISOR?

15   A.   YES, I DID.  UH-HUH.

16   Q.   AND WHAT DID YOU TELL THE OTHER MEMBERS OF THE SELECTION

17   COMMITTEE ABOUT YOUR PERSONAL EXPERIENCE WORKING WITH MS. PANDE

18   AS HER SUPERVISOR?

19   A.   WELL, I TOLD HER THAT IN THE LAST PART OF WHEN SHE WAS

20   WORKING FOR ME, MY LAST EXPERIENCE WITH HER WAS THAT SHE, IN

21   TERMS OF THE PERFORMANCE AND THE CORROSIVE ASPECT OF THE

22   RELATIONSHIP THAT WE HAD, AND I BELIEVE THAT ALSO TRANSPIRED ON

23   OTHER PEOPLE IN THE GROUP, A CERTAIN TOXIC ELEMENT, IF YOU WILL,

24   IN THE RELATIONSHIP IN THE GROUP THAT I JUST THOUGHT THAT -- YOU

25   KNOW, I WOULD NOT WANT TO HAVE THE PEOPLE IN MY NEW GROUP IN

CAMY - DIRECT / SIMERLY

```
1   LONDON, NEW GROUP, I WOULDN'T WANT TO HAVE HER WORK WITH US.  SO

2   IF SHE WAS -- YOU KNOW, WE WOULD DEAL WITH PEOPLE IN ETC BUT WE

3   WOULDN'T WANT TO DEAL WITH HER.

4   Q.  OKAY.  WELL, WHY WOULD YOUR GROUP IN LONDON HAVE TO DEAL

5   WITH MS. PANDE IN ZUWA OMOREGIE'S GROUP IN SAN RAMON?

6   A.  WELL, THE GROUP IN LONDON IS A SMALLISH GROUP, TECHNICAL

7   GROUP.  IT'S ABOUT TEN, 12 PEOPLE.  AND DEPENDING ON THE PROJECT

8   LOADS, IF WE HAVE MANY PROJECTS AND WE NEED MORE TECHNICAL

9   RESOURCES, AND ZUWA'S GROUP WAS AT THE TIME AND -- WAS EXPECTED

10  TO BE AT THE TIME AND CERTAINLY STILL IS TODAY A FLYWHEEL, IF

11  YOU WILL.  IT'S A RESOURCE, A POOL OF RESOURCES THAT WE DRAW

12  FROM AS WE NEED TECHNICAL PEOPLE.

13  Q.  LET ME SEE IF I UNDERSTAND.  ARE YOU SAYING IF YOU'VE GOT

14  TOO MUCH WORK FOR YOUR GROUP?

15          MS. ANDERSON:  EXCUSE ME, YOUR HONOR, LEADING.

16          THE COURT:  SUSTAINED.

17          THE WITNESS:  SO THAT'S --

18          THE COURT:  GO AHEAD.  LET HER ASK A QUESTION.

19          MS. SIMERLY:  YEAH, LET ME TRY TO GET A QUESTION OUT,

20  MR. CAMY.

21  Q.  COULD YOU TELL THE JURY WHETHER IN FACT IN YOUR EXPERIENCE

22  PEOPLE FROM OTHER GROUPS HAVE COME TO LONDON TO HELP YOU OUT?

23  A.  YEAH.

24  Q.  AND WHOSE -- IS THERE A PARTICULAR GROUP THAT YOU DRAW FROM

25  WHEN YOU NEED HELP IN LONDON?
```

1    Q.    WHO WAS THAT?

2    A.    DAVE KENNEDY.  HE SUCCEEDED ME IN THE JOB IN COPI.

3    Q.    AND WHAT DID YOU SHARE WITH THE COMMITTEE ABOUT WHAT

4    MR. KENNEDY HAD TOLD YOU HIS EXPERIENCE HAD BEEN WITH MS. PANDE?

5    A.    THAT IT WAS VERY MUCH IN LINE WITH MY OBSERVATION OF THE

6    LATTER PART -- OF THE LATTER PART THAT SHE WAS WORKING FOR ME.

7    Q.    YES.  OKAY.

8         MS. SIMERLY:  YOUR HONOR, AGAIN I THINK I'M DONE, BUT

9    I WANT TO MAKE SURE I'VE NOT FORGOTTEN ANYTHING.

10        THE COURT:  OKAY.

11        MS. SIMERLY:  THAT'S ALL I HAVE.  THANKS, MR. CAMY.

12        THE WITNESS:  THANK YOU.

13                    CROSS-EXAMINATION

14   BY MS. HARRIMAN:

15   Q.    GOOD MORNING, MR. CAMY.

16   A.    GOOD MORNING.

17   Q.    WHAT WAS MR. AFIFI'S RANKING?

18   A.    MR. WHO?

19   Q.    AFIFI?

20   A.    I HAVE NO IDEA.  EIGHT YEARS AGO.  I WOULDN'T REMEMBER IT.

21   Q.    DO YOU REMEMBER WHAT MR. HOUSEN'S RANKING WAS?

22   A.    NO.  I JUST KNOW THEY WERE CONSIDERED THE BEST CANDIDATES OF

23   THE LOT.

24   Q.    AND, MR. CAMY, IN THE SPRING OF 2003, YOU KNEW THAT KIRAN

25   PANDE WAS WORKING FOR JACK DUNN, RIGHT?

CAMY - CROSS / HARRIMAN

1    A.   SHE WAS WORKING FOR HIM, CORRECT.

2    Q.   AND IN FACT, DIDN'T YOU DROP BY AND CHAT WITH HER IN HER

3    OFFICE IN THE SPRING OF 2003?

4    A.   YES, UM-HMM.

5    Q.   AND LET'S MOVE BACK TO 1996.  YOU WERE IN THE CONGO THEN; IS

6    THAT RIGHT?

7    A.   IN '96, YES, I WAS.

8    Q.   YOU WERE A COUNTRY MANAGER?

9    A.   UH-HUH.

10   Q.   YOU HAVE TO ANSWER AUDIBLY.

11   A.   I'M SORRY?

12   Q.   YOU HAVE TO ANSWER AUDIBLY SO THE COURT REPORTER --

13   A.   YES.

14   Q.   AND YOU INTERACTED WITH MS. PANDE DURING THE SUMMER OF 1996,

15   DIDN'T YOU?

16   A.   THAT IS CORRECT.

17   Q.   IN FACT, YOU INVITED HER TO YOUR HOME?

18   A.   THAT IS CORRECT.

19   Q.   AND DID YOU FIND HER TO BE A DIFFICULT PERSON IN 1996?

20   A.   NO, SHE WAS NOT.  NOT TO MY KNOWLEDGE.

21   Q.   OKAY.

22   A.   NOT WITH ME, ANYHOW.

23   Q.   AND ON THIS SELECTION COMMITTEE THAT YOU'RE ON, MS. PANDE

24   WAS GOING TO BE WORKING FOR ZUWA OMOREGIE'S GROUP; IS THAT

25   RIGHT?

CAMY - CROSS / HARRIMAN

1    A.    NO, I WAS NOT.

2    Q.    WERE YOU EVER A MEMBER OF THE PETROLEUM ENGINEER --

3    A.    SURE.

4    Q.    -- PDC?

5              FOR WHAT YEARS?

6    A.    I BELIEVE IT WAS FROM '98 UNTIL THE END OF 2000 -- I'M

7    SORRY.  YEAH, '98 UNTIL THE END OF 2001, AND THEN FROM 2004

8    ONWARD.

9    Q.    OKAY.

10             AND IF I UNDERSTAND -- WELL, IS IT YOUR TESTIMONY YOU

11   NEVER SPOKE TO MR. OMOREGIE BEFORE THE ACTUAL CONFERENCE CALL

12   THAT YOU PARTICIPATED IN ABOUT MS. PANDE?

13   A.    I HAVE NO RECOLLECTION THAT I DID, IF I DID, NO.  AGAIN, I

14   THINK I WAS ASKED TO PARTICIPATE IN THAT -- IN THAT SELECTION, I

15   BELIEVE IT WAS EARLY JANUARY.  VERY -- WITHIN DAYS OF MY

16   ARRIVING AT THE JOB.

17   Q.    SO YOU DON'T RECALL SPEAKING AT ALL TO MR. OMOREGIE EXCEPT

18   THIS ONE CONVERSATION WHICH YOU PARTICIPATED IN BY CONFERENCE

19   CALL FROM LONDON?

20   A.    THAT'S CORRECT, YES.

21   Q.    NOW, YOU'RE FAMILIAR WITH THE CHEVRON MANAGEMENT LEADERSHIP

22   FORUM, AREN'T YOU, MR. CAMY?

23             MS. SIMERLY:  OBJECTION, YOUR HONOR, BEYOND THE

24   SCOPE.

25             THE COURT:  I DON'T KNOW WHERE SHE'S GOING WITH THIS,

```
 1   BUT --
 2              THE WITNESS:  CHEVRON HAD A LEADERSHIP PROGRAM, YES,
 3   UH-HUH.  I DON'T KNOW.  WE HAVE SO MANY LEADERSHIP PROGRAM.
 4   YES.
 5   BY MS. HARRIMAN:
 6   Q.  HAVE YOU HEARD OF THE CMLF?
 7   A.  CMLF, UH-HUH.
 8   Q.  IT'S A FORUM FOR DEVELOPING MANAGERS IN THE COMPANY, ISN'T
 9   IT?
10   A.  WELL, IT'S A FORUM.  THAT'S NOT A FORUM THAT I'M -- CMLF IS
11   A FORUM.  IT'S NOT A FORM.
12   Q.  IT'S A FORUM --
13   A.  CORRECT.
14   Q.  -- FOR DEVELOPING MANAGERS WITHIN THE COMPANY; ISN'T THAT
15   RIGHT?
16   A.  CORRECT.
17              MS. SIMERLY:  OBJECTION, YOUR HONOR, EXCEEDS THE
18   SCOPE.
19   BY MS. HARRIMAN:
20   Q.  AND --
21              THE COURT:  CAN WE FIND OUT WHAT THIS IS ABOUT BEFORE
22   WE GET TOO FAR INTO IT?  OR MAYBE YOU DON'T, BUT I DON'T.
23   BY MS. ANDERSON:
24              MS. HARRIMAN:  AND IT'S --
25              THE COURT:  PLEASE TIE IT UP TO SOMETHING.
```

1    MS. HARRIMAN:  I WILL.

2    Q.  AND SUPERVISORS NOMINATE PEOPLE TO ATTEND THOSE FORUMS --

3    A.  UH-HUH.

4    Q.  -- DON'T THEY, MR. CAMY?

5    A.  YES, UM-HMM.

6    Q.  AND IT'S AN HONOR TO BE NOMINATED TO THE CMLF, ISN'T IT?

7    A.  WELL, I MEAN, IT'S -- YEAH, IT'S A GOOD SIGN FOR SURE.

8    Q.  AND AS A SUPERVISOR, YOU ONLY NOMINATED PEOPLE WHO HAD

9    LEADERSHIP QUALITIES AND WHO FIT THE CHEVRON WAY, RIGHT?

10   A.  UM-HMM.  THAT'S WHAT WE DO.

11   Q.  AND YOU NOMINATED KIRAN PANDE, DIDN'T YOU, TO PARTICIPATE IN

12   A CMLF?

13   A.  IN THE EARLY PART OF HER ASSIGNMENT WITH ME, I CERTAINLY

14   WOULD AND DID RECOMMEND HER FOR THAT, ABSOLUTELY.

15   Q.  OKAY.  DO YOU ALSO -- DO YOU KNOW WHO -- WELL, LET ME ASK

16   YOU THIS.  MR. CAMY, YOU'RE A STANFORD GRAD; IS THAT RIGHT?

17   A.  THAT IS CORRECT.

18   Q.  AND YOU KNOW WHO FRANKLIN ORR IS?

19   A.  I KNOW OF HIM.

20   Q.  YOU KNOW THAT HE IS THE DEAN OF EARTH SCIENCES AT STANFORD?

21   A.  OKAY.  THAT'S -- THAT'S NOT SOMETHING I KEEP UP WITH, BUT I

22   TAKE YOUR WORD FOR IT.

23   Q.  DO YOU RECALL HAVING A CONVERSATION WITH DEAN ORR ABOUT

24   KIRAN PANDE?

25   A.  NO.

1    Q.   DO YOU RECALL SITTING ON AN AIRPLANE AND HAVING THE DEAN OF

2    EARTH SCIENCES BESIDE YOU ON THE PLANE AND YOU TALKED ABOUT

3    KIRAN PANDE DURING THAT FLIGHT?  DO YOU RECALL THAT?

4    A.   NO, I DON'T.

5    Q.   DO YOU RECALL TELLING MS. PANDE THAT YOU HAD HAD A

6    CONVERSATION WITH DEAN ORR ABOUT HER?

7    A.   NO.  I DON'T DENY I DID.  I JUST DON'T RECALL IT.

8    Q.   ALL RIGHT.  LET'S TAKE A LOOK AT EXHIBIT 11, AND LET ME HAND

9    YOU THAT.

10                    (PAUSE IN THE PROCEEDINGS.)

11          MS. HARRIMAN:  LET ME MAKE IT EASIER FOR YOU,

12   MR. CAMY.  IT'S RIGHT HERE.

13                    (EXHIBIT PUBLISHED TO JURY.)

14          MS. HARRIMAN:  CAN WE GO TO THE LAST PAGE, PLEASE,

15   CANDI.

16   Q.   AND, MR. CAMY, CAN YOU GO TO THE LAST PAGE, PLEASE.

17   A.   (REVIEWING DOCUMENT.)

18   Q.   AND, MR. CAMY, IF YOU LOOK DOWN AT THE BOTTOM SECTION, WHERE

19   IT SAYS SECTION SEVEN, IS THAT YOUR SIGNATURE ON THIS

20   PERFORMANCE REVIEW?

21   A.   YES, THAT IS CORRECT.

22   Q.   AND YOU -- YOU READ THE REVIEW BEFORE YOU SIGNED IT, DIDN'T

23   YOU?

24   A.   OF COURSE, YES.

25   Q.   AND SO IF WE TURN TO PAGE 3 OF THE PERFORMANCE REVIEW.

CAMY - CROSS / HARRIMAN

1      **MS. HARRIMAN:**  CAN YOU BLOW UP THE COMMENTS SECTION,

2      PLEASE.

3                **THE WITNESS:**  UM-HMM.

4                      (EXHIBIT PUBLISHED TO JURY.)

5      **BY MS. HARRIMAN:**

6      **Q.**  THESE WERE COMMENTS THAT YOU READ BEFORE YOU SIGNED THE

7      PERFORMANCE REVIEW --

8      **A.**  UM-HMM.

9      **Q.**  -- RIGHT, MR. CAMY?

10     **A.**  YEAH.

11     **Q.**  AND FOR EXAMPLE, YOU READ, "KIRAN IS AN EXCELLENT

12     PERFORMER," RIGHT?

13     **A.**  UH-HUH.

14     **Q.**  THAT WAS SOMETHING THAT YOU READ AND THEN YOU SIGNED?

15     **A.**  AS I SAID EARLIER, TO SAVE PEOPLE'S TIME, UNTIL I GOT THE

16     SILENT TREATMENT ONWARDS, HER PERFORMANCE WAS ABSOLUTELY FINE.

17     **Q.**  SO YOU --

18     **A.**  UNTIL THE FEW -- THE FEW MEETINGS IN PARIS IN THE FALL OF

19     1998 WHERE THINGS WERE NOT UP TO PAR.  AND THEN AFTER THAT, IT

20     JUST WENT COMPLETELY DOWNHILL.  BUT UNTIL THE FALL OF 1998, HER

21     PERFORMANCE WAS VERY FINE.  AND THIS IS WHAT THIS REFLECTS.

22     **Q.**  SO YOU AGREE THAT SHE WAS AN EXCELLENT PERFORMER AND A GREAT

23     TEAM PLAYER ALL THE WAY UP TO THE FALL OF --

24     **A.**  WELL --

25     **Q.**  -- 1998?

1    IT WAS GOING TO BE A SIMPLE STRAIGHT FLAT PERCENTAGE.  I FORGOT.

2    BUT IT WAS NOT THE NORMAL PROCESS WHERE WE GIVE PEOPLE RAISES ON

3    THE BASIS OF SPECIFIC PERFORMANCE.

4    **BY MS. HARRIMAN:**

5    **Q.**  OKAY.  LET'S LOOK AT EXHIBIT 13.  AND CAN YOU JUST FLIP TO

6    THERE, MR. CAMY.

7    **A.**  (REVIEWING DOCUMENTS.)

8    **Q.**  AND IF YOU LOOK AT THE FIRST PAGE OF EXHIBIT 13, YOU'LL SEE

9    THAT THIS IS MS. PANDE'S PERFORMANCE REVIEW COVERING THE PERIOD

10   JANUARY 1, 1999 TO DECEMBER 31ST, 1999, CORRECT?

11   **A.**  THAT'S WHAT IT SAYS.

12   **Q.**  AND THIS IS THE PERIOD THAT COVERS THE TIME WHEN YOU SAID

13   KIRAN PANDE WAS GIVING YOU THE SILENT TREATMENT, RIGHT?

14   **A.**  THAT IS CORRECT.

15   **Q.**  AND IF YOU GO TO THE LAST PAGE OF EXHIBIT 13 --

16   **A.**  UM-HMM.

17   **Q.**  -- DO YOU SEE MR. KENNEDY'S SIGNATURE AT THE BOTTOM OF THAT

18   PAGE?

19   **A.**  THAT'S CORRECT.

20   **Q.**  AND MR. KENNEDY WAS THE PERSON WHO REPLACED YOU AS KIRAN

21   PANDE'S SUPERVISOR.

22   **A.**  CORRECT.

23   **Q.**  AND YOU SAID THAT YOU SHARED MR. KENNEDY'S VIEW WITH THE

24   MEMBERS OF THE SELECTION COMMITTEE; IS THAT RIGHT?

25   **A.**  CORRECT.

1    I BELIEVE THAT THEY HAD A GOOD PERSONAL RELATIONSHIP, SO I'M

2    SURE THAT THEY HAD A GOOD WORKING RELATIONSHIP TOGETHER.

3              MS. HARRIMAN:  I HAVE NOTHING FURTHER, YOUR HONOR.

4              THE COURT:  REDIRECT?

5              MS. SIMERLY:  YES.

6              LET'S BRING UP EXHIBIT 13, THE SIGNATURE PAGE.

7              LET'S BLOW UP THE SIGNATURE LINE.

8                   (EXHIBIT PUBLISHED TO JURY.)

9                   REDIRECT EXAMINATION

10   BY MS. SIMERLY:

11   Q.  DID YOU SIGN THAT ANYWHERE, MR. CAMY?

12   A.  NO, I NEVER -- THIS IS THE FIRST TIME I SEE IT.

13   Q.  HAVE YOU EVER SIGNED ANY PMP FOR MS. PANDE THAT INCLUDE --

14   INCLUDED SUCH GLOWING REMARKS ABOUT HER AFTER YOU NOTICED THE

15   DECLINE IN HER ATTITUDE AFTER YOU CRITICIZED HER DELIVERABLES IN

16   PARIS?

17   A.  NO.  I TRIED TO GET ONE DONE BEFORE I LEFT BUT --

18   Q.  AND WHAT HAPPENED WHEN YOU TRIED TO DO A PMP BEFORE YOU LEFT

19   HER GROUP THAT WOULD HAVE REFLECTED THAT FACT?

20   A.  WELL, I GOT TO NEW JOB IN JAN -- IN JUNE OF 1999.  AND AS

21   SOON AS I HEARD ABOUT THAT -- I GUESS IT WAS IN APRIL OR MAY --

22   I SENT A NOTE TO ALL THE PEOPLE WHO WERE WORKING FOR ME TO DO A

23   PMP, A CLOSEOUT PMP BEFORE WE GO TO THE NEXT JOB.

24              AND ALL OF THEM DID EXCEPT VERY FEW, AND KIRAN WAS

25   ONE OF THEM WHO NEVER REPLIED AND NEVER SUBMITTED A PMP.  I DID

1    SEND -- I DON'T KNOW HOW MANY, BUT IT WASN'T VERY MANY, BUT, YOU

2    KNOW, REMINDERS SAYING, "WE NEED TO DO A PMP CLOSEOUT BEFORE I

3    MOVE ON TO THE NEW JOB SO THAT WE CAN CAPTURE THE PERFORMANCE

4    OVER THE LAST YEAR AND A HALF WHERE I WAS THE SUPERVISOR OF

5    THESE PEOPLE," AND SHE NEVER SUBMITTED A PMP.

6           **MS. SIMERLY:**  OBJECTION, YOUR HONOR.  I WOULD LIKE TO

7    MOVE TO STRIKE THAT TESTIMONY UNDER THE BEST EVIDENCE RULE.

8    WE'VE NEVER SEEN THESE PMP'S.  THEY'VE NEVER BEEN PRODUCED.

9           **THE WITNESS:**  IT DIDN'T EXIST.

10                  (SIMULTANEOUS COLLOQUY.)

11          **THE COURT:**  WHOA, WHOA, STOP.  OVERRULED.

12          **THE WITNESS:**  KIRAN'S --

13                  (SIMULTANEOUS COLLOQUY.)

14          **THE COURT:**  THERE'S NO QUESTION PENDING.

15          **MS. SIMERLY:**  THERE'S NO QUESTION.  IT'S OKAY.

16    NO FURTHER QUESTIONS, YOUR HONOR.

17          **MS. HARRIMAN:**  NO QUESTIONS, YOUR HONOR.

18          **THE COURT:**  THANK YOU.  YOU'RE EXCUSED.

19    NEXT?

20          **MS. SIMERLY:**  KELLY HARTSHORN, YOUR HONOR.  WE NEED

21    TO GO GRAB HER.

22          **THE COURT:**  GO AHEAD.

23                  (PAUSE IN THE PROCEEDINGS.)

24          **THE CLERK:**  BEFORE YOU HAVE A SEAT, LET ME HAVE YOU

25    RAISE YOUR RIGHT HAND -- BEFORE YOU HAVE -- STAND UP.  THANK

1  Q.  WE DON'T NEED TO GO THERE.  LET'S JUST MOVE ON.

2  A.  OKAY.

3  Q.  SO WHY DID YOU THINK THE BLOCK 14 POSITION UNDER JACK DUNN

4  IN SASBU WOULD BE A GOOD FIT FOR KIRAN PANDE?

5          MS. ANDERSON:  OBJECTION, FOUNDATION, YOUR HONOR.

6  AND ALSO LEADING.

7          THE COURT:  OVERRULED.  GO AHEAD.

8          THE WITNESS:  KIRAN HAD A LOT OF EXPERIENCE AND SHE

9  WAS PRETTY -- I WOULD SAY VERY WELL RESPECTED IN THE COMPANY FOR

10  HER RESERVOIR ENGINEERING SKILL SET.  SHE HAD A LOT OF

11  BACKGROUND IN A WATER FLOOD MANAGEMENT, WHICH IS WHERE WE TRY TO

12  PUT WATER IN THE GROUND TO HELP THE OIL COME OUT.  AND BASICALLY

13  SHE -- SHE HAD THE SKILLS TO RUN THE MODELS SO THAT WE CAN

14  UNDERSTAND HOW TO DEVELOP THIS OIL FIELD THAT WE WERE LOOKING AT

15  DEVELOPING.

16          THIS IS A PRETTY RARE SKILL SET IN THE COMPANY.  WE

17  DON'T -- WE STILL DON'T HAVE ENOUGH PEOPLE WHO DO THIS

18  PARTICULAR WORK.  IT'S KIND OF A

19  HIGH-END-TECHNICAL-EXPERTISE-TYPE AREA.  AND SO SHE BROUGHT ALL

20  THE SKILLS TO DO THIS PARTICULAR JOB, AND IT WAS A GOOD FIT AND

21  IT WAS AN IMPORTANT ASSET.

22  BY MS. SIMERLY:

23  Q.  AND WHEN YOU SAY, "IT WAS AN IMPORTANT ASSET," WHY DOES THAT

24  MATTER?

25  A.  WELL, OBVIOUSLY, WE -- WE HAVE PEOPLE WE TRY TO FIT THEM TO

HARTSHORN - DIRECT / SIMERLY

1  FOR THE CANDIDATE, AND THE WAY THAT'S GOING TO MAKE THE COMPANY

2  WORK MORE EFFICIENTLY.

3  Q.  FROM YOUR EXPERIENCE IN GENERAL OR -- ARE THERE AS MANY

4  CORPORATE PLANNING JOBS OPENING UP AT THESE PDC'S AS THERE ARE

5  TECHNICAL JOBS?

6  A.  OH, NO.  NO WAY.  THE CORPORATE PLANNING IS A SMALL STAFF.

7  BASICALLY IS KIND OF LIKE IN OUR -- IN OUR HEADQUARTERS.  AND SO

8  THESE ARE JOBS THAT ARE USUALLY HELD BY EITHER SENIOR OR VERY --

9  VERY HIGH POTENTIAL OR STRONG PERFORMERS.  BECAUSE IT'S LIKE

10  WORKING -- YOU KNOW, YOU'RE WORKING IN THE SAME OFFICE AS OUR

11  CHAIRMAN AND YOU'RE WORKING AT THE HIGHEST -- I WOULD SAY THE

12  HIGHEST-VISIBILITY-TYPE JOBS.

13         THESE ARE -- THESE ARE -- VISIBILITY, YOU KNOW, LIKE

14  ANYTHING, IF THE HIGH -- IF THE IMPORTANT PEOPLE IN THE COMPANY

15  SEE YOU WORKING AND YOU DO WELL, YOU OFTEN HAVE OTHER

16  OPPORTUNITIES OPEN UP.  THEY CAN PROVIDE RECOMMENDATIONS FOR

17  YOU.  IT'S JUST PART OF YOUR RESUME.  AGAIN, IT'S LIKE WORKING

18  IN THE WHITE HOUSE AS A -- AS A CLERK INSTEAD OF WORKING, YOU

19  KNOW, IN A LIBRARY AS A CLERK.  YOU HAVE A DIFFERENT VISIBILITY.

20  AND SO CORP PLANNING WERE FEW AND COVETED JOBS.

21  Q.  BUT WASN'T SHE IN A PLANNING JOB AT THE TIME WITH REX

22  MITCHELL?

23  A.  YES, ABSOLUTELY.  AND THOSE ARE ALSO COVETED JOBS.  BECAUSE

24  THAT'S THE HEADQUARTER OF OUR UPSTREAM UNIT AS OPPOSED TO OUR

25  CORPORATE PARENT COMPANY.  AND THOSE JOBS ARE ALSO RESERVED FOR

1    PEOPLE WHO ARE CONSIDERED TO BE VERY STRONG PERFORMERS AND COME

2    IN FOR A YEAR OR TWO AND ARE VISIBLE BY OUR -- OUR UPSTREAM

3    INTERNATIONAL PRESIDENT AND SOME OF THE HIGH-LEVEL MANAGERS.

4    Q.   FROM YOUR EXPERIENCE AS A PDR, IS IT UNUSUAL FOR SOMEONE TO

5    COME FROM THE TECHNICAL SIDE, SERVE A COUPLE OF YEARS IN THE

6    PLANNING FUNCTION AND THEN GO BACK TO DO MORE TECHNICAL WORK?

7    A.   NO, THAT'S -- TYPICALLY THAT'S THE MOST TYPICAL CAREER PATH.

8    WE -- WE HAVE EXPERTS IN CERTAIN FUNCTIONS, BUT WE DON'T LIKE

9    THEM TO ONLY DO THAT THEIR WHOLE CAREER UNLESS THEY'RE GOING TO

10   BE LIKE IN RESEARCH OR IN THE TECHNICAL COMPANY.

11        WE NEED PEOPLE TO UNDERSTAND THE BUSINESS, TO GET A

12   LITTLE BIT OF THE BROADENING.  AND SO A PLANNING JOB IS -- IS A

13   VERY GOOD BROADENING JOB THAT WE ASK A LOT OF OUR STRONGER

14   EMPLOYEES TO -- TO COME THROUGH, THEY GET TO SEE THE BIGGER

15   BUSINESS AND THEN MOVE BACK INTO THEIR FUNCTION.

16   Q.   OKAY.  WE'RE TALKING AGAIN ABOUT THOSE CORPORATE PLANNING

17   JOBS, YOU TALKED ABOUT SOME JOBS HAVE MORE INTEREST BY -- AND

18   HAVE LARGER SLATES OF CANDIDATES THAN OTHER JOBS?

19   A.   RIGHT.

20   Q.   DO YOU HAVE AN UNDERSTANDING FROM YOUR EXPERIENCE AS A PDR

21   WHERE THE CORPORATE JOBS FALL IN TERMS OF THE LEVEL OF INTEREST

22   AND THE SIZE OF THE SLATE OF CANDIDATES AS COMPARED TO TECHNICAL

23   JOBS?

24   A.   YEAH.  IT DEPENDS ON THE YEAR AND THE TIMING.  BUT IN

25   GENERAL, IT'S A -- IT'S A VERY HIGHLY VISIBLE JOB.  IT WAS ALSO

1  PDC, CORRECT?

2  A.  RIGHT.

3  Q.  AND THEN DID -- WAS THERE CONSIDERATION OF HER SALARY AFTER

4  SHE MOVED TO THIS NEW POSITION WITH JACK DUNN IN SASBU?

5  A.  WELL, OUR -- OUR SALARY CYCLE WHERE -- WE CALL OUR SALARY

6  ACTION IS AN ANNUAL PROCESS, AND THAT'S ALSO SEPARATE FROM THESE

7  KINDS OF JOBS.  SO THE PDC WAS TO GET THE JOB, AND THEN WE HAVE

8  AN ANNUAL SALARY CYCLE WHERE WE LOOKED AT INCREASES.  THERE WAS

9  FOLLOW-UP ON SALARY, BUT NOT ATTACHED TO -- TO THE JOB MOVEMENT.

10  Q.  OKAY.  WHEN WAS THIS FOLLOW-UP ON MS. PANDE'S SALARY IN THIS

11  NEW RESERVOIR SIMULATION ENGINEER POSITION?

12  A.  OUR SALARY CYCLE BASICALLY STARTS AT THE CLOSE OF THE YEAR.

13  SO BY THE END OF ONE YEAR, WE EVALUATE PERFORMANCE OF THE

14  EMPLOYEE OVER THE PAST YEAR.  SO OUR SALARY'S BASED ON JUST THE

15  PAST YEAR'S PERFORMANCE.  AND WE -- WE HAVE OUR PMP OR OUR

16  EVALUATION CYCLES, AND WE ESTABLISH WHAT KIND OF PERFORMANCE

17  RANKING A PERSON HAS.  AND WE DETERMINE WHAT KIND OF SALARY,

18  THEN, THEY WILL GET.  AND THAT ALL HAS TO HAPPEN IN THE FIRST --

19  SORT OF JANUARY/FEBRUARY TIME FRAME, AND THEN APRIL 1ST IS WHEN

20  THE SALARIES ARE PRESENTED TO THE EMPLOYEES.

21  Q.  OKAY.  WHAT IF THE SUPERVISOR HASN'T ACTUALLY MET WITH THE

22  EMPLOYEE TO GO THROUGH THE PMP PROCESS?

23          HOW DO -- HOW CAN YOU DO THE SALARY RANKING IF THE

24  RANKING HASN'T BEEN GIVEN TO THE EMPLOYEE AS PART OF THE PMP?

25  A.  WELL, THE -- THE DIALOGUE WITH THE EMPLOYEE IS ABOUT HOW

1    THEY CONDUCTED THEIR -- THEIR JOB OVER THE PAST YEAR, AND THAT'S

2    A CLOSEOUT WE HAVE TO DO EVERY YEAR.  IT USUALLY TAKES MULTIPLE

3    STEPS.  YOU HAVE A DIALOGUE AND -- AND AT SOME POINT, IT GETS

4    CLOSED OUT AND SIGNED OFF AND SENT TO OUR HR FILES.

5             THE SALARY ACTION IS NOT DISCUSSED WITH THE EMPLOYEE.

6    WHAT HAPPENS IS WE MEET, AS SUPERVISORS OR MANAGERS OF THE WORK

7    GROUP, AND TALK ABOUT ALL OF OUR EMPLOYEES, WHAT THEIR RANKING

8    WAS FROM THE SUPERVISORS' PERSPECTIVE.  AND WE LOOK AT HOW WE

9    WOULD -- WHAT THE RECOMMENDATION IS FOR -- FOR THE SALARY

10   ACTION.  AND THEN THAT'S -- THAT CLOSES OUT WITH THE SALARY

11   PROGRAM FOR THE YEAR.

12   Q.  OKAY.  WERE YOU INVOLVED IN THE SALARY DISCUSSIONS

13   SURROUNDING KIRAN PANDE IN THE -- EARLY 2003 AFTER SHE JOINED

14   JACK DUNN'S GROUP AT THE END OF 2002?

15   A.  YEAH.  WHAT HAPPENED THERE IS -- IS IT'S -- USUALLY IF A JOB

16   MOVE FROM ONE GROUP TO ANOTHER IS MADE IN THE MIDDLE OF THE

17   YEAR, I WOULD NEVER HAVE ANY REASON TO GET INVOLVED.  AND IN

18   THIS CASE, BECAUSE SHE MOVED TO A NEW JOB AT THE VERY END OF THE

19   YEAR, SO SHE CLOSED OUT HER PERFORMANCE WITH REX, BUT THEN SHE

20   WAS -- THE SALARY PROGRAM WAS BEING ADMINISTERED BY HER NEW JOB

21   OWNER, WHO WAS JACK AND SOUTHERN AFRICA.

22             AND SO BECAUSE IT'S BASED ON LAST YEAR'S PERFORMANCE,

23   BASICALLY THERE'S A RECOMMENDATION FROM THE OLD GROUP, AND THE

24   NEW GROUP IMPLEMENTS IT.  SO I WAS KIND OF A GO-BETWEEN JUST

25   BECAUSE OF THE TIMING OF WHEN SHE MADE THE JOB MOVE.

1  Q.  OKAY.  SO WERE YOU -- DID YOU ACTUALLY HAVE DISCUSSIONS WITH

2  REX MITCHELL ABOUT KIRAN PANDE'S SALARY, WHAT WOULD HAPPEN TO

3  IT, IN THE SPRING OF 2003?

4  A.  YEAH, I -- I THINK WHAT HAPPENED WHAT I RECOLLECT IS JACK

5  WAS LOOKING FOR A RECOMMENDATION, WHICH IS OUR STANDARD PROCESS

6  FOR WHAT -- WHAT THE SALARY RECOMMENDATION WOULD BE FOR KIRAN

7  FROM HER PRIOR YEAR'S PERFORMANCE.

8          AND I SPOKE TO REX ABOUT WHAT THE RECOMMENDATION WAS,

9  WHAT THEY HAD COME UP WITH.  AND HE BASICALLY SAID, JUST -- YOU

10 KNOW, SHE'S -- SHE'S A 2 RANK PERFORMER, AND YOU -- YOU PLEASE

11 HANDLE THAT.

12 Q.  OKAY.  SO -- AND IN TERMS OF SALARIES AND WHAT HAPPENS TO

13 SOMEONE'S SALARY FROM YEAR TO YEAR AT CHEVRON IN THIS TIME

14 FRAME, OBVIOUSLY, MS. HARTSHORN, ARE THERE MORE THAN ONE ASPECT

15 TO SALARY INCREASES FOR AN EMPLOYEE SUCH AS MS. PANDE?

16 A.  WELL, FOR EVERYONE.  WE HAVE -- WE HAVE A SALARY STRUCTURE

17 THAT'S DIVIDED INTO TWO PIECES.  ONE IS WHAT WE CALL STRUCTURE,

18 WHICH IS ESSENTIALLY -- THEY DO SALARY SURVEYS AROUND THE

19 INDUSTRY AND TRY TO SEE WHAT DO RESERVOIR ENGINEERS GET PAID,

20 WHAT DO GEOLOGISTS GET PAID, WHAT'S A COMPETITIVE SALARY FOR

21 THIS EXPERTISE AND THIS LEVEL PERSON AND COST OF LIVING AND

22 OTHER FACTORS.  THAT'S CALLED THE STRUCTURE, AND IT'S KIND OF

23 LIKE A BASE RAISE THAT MOST PEOPLE WOULD GET.  SOME YEARS, IT'S

24 BIG; SOME YEARS, IT'S VERY SMALL, DEPENDS ON THE COMPETITIVE

25 OUTLOOK EXTERNALLY.

HARTSHORN – DIRECT / SIMERLY

1   Q.   SO DID YOU, IN FACT, DETERMINE THE SALARY INCREASE FOR KIRAN

2   PANDE IN THE SPRING OF 2003?

3   A.   YES.  SO I DID -- I DID DO HER SALARY RAISE THAT YEAR BASED

4   ON THE INPUT I GOT FROM REX.

5   Q.   SO IS -- WAS YOUR RECOMMENDATION THE ONE THAT WAS MADE AT

6   THIS SALARY RANKING CONFERENCE?

7           WERE YOU ACTUALLY AT THE SALARY RANKING CONFERENCE,

8   OR WAS THIS SOMETHING -- WELL, EXPLAIN TO THE JURY HOW THAT

9   COMES ABOUT.

10  A.   YEAH.  WE -- WE HAVE INDIVIDUAL GROUPS.  WE USUALLY DO THE

11  SALARY DETERMINATION FOR OUR EMPLOYEES, SO I HAD MY OWN

12  EMPLOYEES I WAS DOING SALARY DETERMINATION FOR AND -- AS WAS

13  REX.  AND WE ALL WORKED FOR A COMMON MANAGER, JAY JOHNSON, AND

14  SO WE WOULD ALL DO OUR SALARIES.

15          JAY HAD THE RESPONSIBILITY AT THE END TO MAKE SURE

16  THAT EVERYTHING BALANCED.  SO, AGAIN, HE'S ACCOUNTABLE TO MAKE

17  SURE WE ALL BALANCED TO A HUNDRED PERCENT COMPETITIVE OBJECTIVE

18  SO THAT WE'RE NOT, AGAIN, OVERPAYING OR UNDERPAYING.

19  Q.   LET'S TAKE A LOOK AT EXHIBIT 30 --

20  A.   UM-HMM.

21  Q.   -- WHICH IS IN EVIDENCE.

22          DO YOU HAVE THAT BINDER?

23  A.   YEAH.

24  Q.   YOU DO.  OKAY.

25          AND IF WE COULD PUT THAT UP ON THE SCREEN, ALEX.

LADD - REDIRECT / MILLER

1    JUST WANTED TO BE CLEAR.

2              **THE COURT:**  OKAY.  GO AHEAD.

3              **MS. SIMERLY:**  AND COULD WE PUT MR. OMOREGIE'S PICTURE

4    UP, ALEX?

5              STILL LOOKING FOR IT.

6              **THE COURT:**  HE'S WORKING ON IT.

7                   (EXHIBIT PUBLISHED TO JURY.)

8              **MS. SIMERLY:**  STRONG RESEMBLANCE.

9              (LAUGHTER.)

10             **THE COURT:**  IT'S NON-RESPONSIVE.  LET'S GET A

11    QUESTION.

12                   (READING OF THE DEPOSITION OF ZUWA OMOREGIE.)

13             **THE COURT:**  YOU'RE EXCUSED.

14             **MS. SIMERLY:**  THANK YOU, YOUR HONOR.

15             (LAUGHTER.)

16             **THE COURT:**  AND SO ARE YOU.

17             SO I THINK THAT'S THE END OF OUR DAY.  WE'LL

18    RECONVENE -- OH, IT'S THURSDAY, RIGHT?

19             **MS. SIMERLY:**  IT IS.  MONDAY.

20             **THE COURT:**  MONDAY.  MONDAY.  PLEASE BE HERE BY

21    8:15 ON MONDAY MORNING.  UNTIL THEN, DON'T TALK TO ANYONE ABOUT

22    THE CASE, AND DON'T LET ANYONE TALK TO YOU ABOUT THE CASE.

23    DON'T FORM OR EXPRESS ANY OPINIONS ABOUT THE CASE.  AND HAVE A

24    NICE WEEKEND.

25                   (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

1                    DIRECT EXAMINATION

2    BY MS. HARRIMAN:

3    Q.    GOOD MORNING, MR. MITCHELL.

4    A.    GOOD MORNING.

5    Q.    LET'S SEE.  YOU TESTIFIED LAST WEEK THAT DAN WALLEM AND

6    HARRY LEOPANDO RECEIVED RANKINGS OF 2, CORRECT?

7    A.    THAT'S CORRECT.

8    Q.    AND THAT WAS WRONG, WASN'T IT?

9    A.    YES.

10   Q.    AND IF YOU LOOK AT EXHIBIT 104 THAT YOU HAVE BEFORE YOU?

11   A.    YES.

12   Q.    IS THAT THE RANKING OF MR. WALLEM?

13   A.    YES, IT IS.

14   Q.    AND IT SHOWS THAT HE HAD A RANKING OF 1?

15   A.    THAT'S CORRECT.

16           MS. HARRIMAN:  YOUR HONOR, I MOVE EXHIBIT 104 INTO

17   EVIDENCE?

18           MS. SIMERLY:  NO OBJECTION, YOUR HONOR.

19           THE COURT:  IT IS ADMITTED.

20                  (PLAINTIFF'S EXHIBIT 104 RECEIVED IN

21                  EVIDENCE)

22   BY MS. HARRIMAN:

23   Q.    AND DAN WALLEM WAS A CHEVRON LEGACY EMPLOYEE, WASN'T HE?

24   A.    THAT'S CORRECT.

25   Q.    LET'S MAKE A LIST.

1           CHEVRON LEGACY.

2           HOW DO YOU SPELL MR. WALLEM'S LAST NAME?

3   A.   W-A-L-L-E-M.

4   Q.   TAKE A LOOK AT EXHIBIT 103.  AND IS THAT THE RANKING FOR

5   BRIAN PUTT?

6   A.   YES, IT IS.

7           MS. HARRIMAN:  YOUR HONOR, I MOVE EXHIBIT 103 INTO

8   EVIDENCE.

9           MS. SIMERLY:  NO OBJECTION, YOUR HONOR.

10          THE COURT:  IT IS ADMITTED.

11               (PLAINTIFF'S EXHIBIT 103 RECEIVED IN

12               EVIDENCE)

13          MS. HARRIMAN:  CAN WE PUT UP 103, PLEASE, CONNIE?

14          (EXHIBIT DISPLAYED ON SCREEN.)

15  BY MS. HARRIMAN:

16  Q.   WHAT WAS MR. PUTT'S RANKING?

17  A.   HE WAS RATED EXCEPTIONAL.

18  Q.   WHICH IS A 1, CORRECT?

19  A.   YES.

20  Q.   IF YOU WOULD, TAKE A LOOK AT EXHIBIT 105.

21          IS THAT MATTHEW PALMER'S RANKING?

22  A.   YES.

23  Q.   AND MR. PALMER WAS RANKED A 1, WASN'T HE?

24  A.   THAT'S CORRECT.

25          MS. HARRIMAN:  YOUR HONOR, I MOVE EXHIBIT 105 INTO

MITCHELL – DIRECT / MS. HARRIMAN

1    EVIDENCE.

2              **MS. SIMERLY:**  NO OBJECTION, YOUR HONOR.

3              **THE COURT:**  IT IS ADMITTED.

4                        (PLAINTIFF'S EXHIBIT 105 RECEIVED IN

5                        EVIDENCE)

6    **BY MS. HARRIMAN:**

7    **Q.**  AND IF YOU WOULD TAKE A LOOK AT EXHIBIT 106.  IS THAT THE

8    RANKING FOR KEMAL ANBARCI?

9    **A.**  YES.  IT'S A PMP FORM.

10             **MS. HARRIMAN:**  CAN WE GO TO THAT, CONNIE?

11             I AM SORRY, NEXT QUESTION.

12             I WOULD LIKE TO MOVE 106 INTO EVIDENCE.

13             **MS. SIMERLY:**  NO OBJECTION, YOUR HONOR.

14             **THE COURT:**  ADMITTED.

15                        (PLAINTIFF'S EXHIBIT 106 RECEIVED IN

16                        EVIDENCE)

17             **MS. HARRIMAN:**  NOW CAN WE GO THAT AND GO TO PAGE 2.

18             (EXHIBIT DISPLAYED ON SCREEN.)

19   **BY MS. HARRIMAN:**

20   **Q.**  AND WHAT WAS KEMAL ANBARCI'S RANKING?

21   **A.**  EXCEPTIONAL.

22   **Q.**  WHICH IS A 1?

23   **A.**  CORRECT.

24   **Q.**  LET'S GO TO EXHIBIT 107.

25             AND THAT SHOWS THE RANKING FOR IRIS OWENS; IS THAT

1   RIGHT?

2   **A.**   THAT'S CORRECT.

3           **MS. HARRIMAN:**   YOUR HONOR, I MOVE EXHIBIT 107 INTO

4   EVIDENCE.

5           **MS. SIMERLY:**   NO OBJECTION, YOUR HONOR.

6           **THE COURT:**   IT IS ADMITTED.

7                   (PLAINTIFF'S EXHIBIT 107 RECEIVED IN

8                   EVIDENCE)

9   **BY MS. HARRIMAN:**

10  **Q.**   AND WHAT WAS IRIS OWENS' RANKING?

11  **A.**   EXCEPTIONAL.

12  **Q.**   OR A 1, CORRECT?

13  **A.**   YES.

14  **Q.**   AND WOULD YOU LOOK AT EXHIBIT 108?

15          IS THAT THE RANKING FOR HARRY LEOPANDO (PHONETIC)?

16  **A.**   YES, IT IS.

17  **Q.**   WHO IS HARRY LEOPANDO, MR. MITCHELL?

18  **A.**   HARRY WAS AN ADMINISTRATIVE ASSISTANT THAT JOINED MY GROUP

19  IN LATE 2001.

20  **Q.**   LAST WEEK YOU TALKED ABOUT OR ERASMUS LEOPOLDO.  IS THAT

21  THE SAME PERSON AS HARRY LEOPANDO?

22  **A.**   YEAH.  HIS FORMAL NAME IS ERASMUS.  I HAD HIS LAST NAME

23  WRONG.  IT'S LEOPANDO RATHER THAN LEOPOLDO.

24  **Q.**   AND YOU ALSO TOLD US THAT HE RECEIVED A 2 RANKING, DIDN'T

25  YOU?

1    A.    THAT WAS MY RECOLLECTION, YES.

2    Q.    LOOKING AT EXHIBIT 108, WHAT RANKING DID MR. LEOPANDO

3    RECEIVE?

4    A.    HIS FORMER SUPERVISOR RATED HIM A 1.

5            MS. HARRIMAN:    YOUR HONOR, I WOULD MOVE EXHIBIT 108

6    INTO EVIDENCE.

7            THE COURT:    IT IS ADMITTED.

8                    (PLAINTIFF'S EXHIBIT 108 RECEIVED IN

9                    EVIDENCE)

10   BY MS. HARRIMAN:

11   Q.    AND MR. LEOPANDO ALSO GOT A 1.

12            WAS HE A CHEVRON LEGACY EMPLOYEE?

13   A.    YES, HE WAS.

14   Q.    WOULD YOU TAKE A LOOK AT EXHIBIT 109, PLEASE?

15            IS THAT THE RANKING FOR ROBERT JOHN?

16   A.    YES, IT IS.

17            MS. HARRIMAN:    YOUR HONOR, I MOVE EXHIBIT 109 INTO

18   EVIDENCE.

19            MS. SIMERLY:    NO OBJECTION, YOUR HONOR.

20            THE COURT:    IT IS ADMITTED.

21                    (PLAINTIFF'S EXHIBIT 109 RECEIVED IN

22                    EVIDENCE)

23   BY MS. HARRIMAN:

24   Q.    WAS MR. JOHN ALSO A CHEVRON LEGACY EMPLOYEE?

25   A.    YES.

1  Q.  AND HIS RANKING WAS A 1 AS WELL, WASN'T IT?

2  A.  YES, IT WAS.

3  Q.  AND WOULD YOU LOOK AT EXHIBIT 110, MR. MITCHELL?

4       AND DOES THAT SHOW THE RANKING FOR KEVIN CONNELLY?

5  A.  YES, IT DOES.

6  Q.  MR. CONNELLY WAS ALSO A CHEVRON LEGACY EMPLOYEE?

7  A.  YES.

8  Q.  AND HIS RANKING WAS ALSO 1, WASN'T IT?

9  A.  YES.  HIS PREVIOUS SUPERVISOR GAVE HIM A 1 FOR THE YEAR.

10  Q.  AND WOULD YOU TAKE A LOOK AT EXHIBIT 111?

11  A.  YES.

12  Q.  IS THAT THE RANKING FOR VICKI THOMPSON?

13  A.  YES, IT IS.

14  Q.  AND SHE WAS A CHEVRON LEGACY EMPLOYEE?

15  A.  YES.

16  Q.  AND YOU RANKED HER AS A 2, CORRECT?

17  A.  CORRECT.

18  Q.  SO, MR. MITCHELL, I WANT TO MAKE SURE I HAVE THIS RIGHT.

19       OF ALL THESE PEOPLE WHO RECEIVED 1'S, TWO, YOU SAY,

20  WERE NOT RANKED BY YOU, CORRECT?

21  A.  THAT'S CORRECT.

22  Q.  AND THAT WAS KEVIN CONNELLY?

23  A.  RIGHT.

24  Q.  PUT "NOT RM."

25       AND WHO IS THE OTHER THAT WASN'T RANKED BY YOU?

1   **A.**   HARRY LEOPANDO.

2   **Q.**   I THOUGHT YOU TOLD US LAST WEEK THAT HE WAS RANKED BY YOU.

3   **A.**   I THOUGHT THAT HE WAS BECAUSE HE JOINED THE GROUP SOMETIME

4   IN 2001, AND I THOUGHT THAT HE WAS RANKED ME.  HE WAS ACTUALLY

5   RANKED BY HIS FORMER SUPERVISOR WHO HAD HIM FOR 11 MONTHS.

6   **Q.**   SO, IN FACT, MR. MITCHELL, OF THE PERSONS YOU RANKED IN

7   2002 FOR THEIR 2001 PERFORMANCE, YOU GAVE EVERYBODY THE RANKING

8   OF 1 EXCEPT VICKI THOMPSON AND KIRAN PANDE; ISN'T THAT RIGHT?

9   **A.**   THAT'S CORRECT.

10          **MS. HARRIMAN:**  I HAVE NOTHING FURTHER, YOUR HONOR.

11          **THE COURT:**  REDIRECT?

12          **MS. SIMERLY:**  YOUR HONOR, FIRST OF ALL, WE WOULD

13   MOVE EXHIBIT 111 INTO EVIDENCE.

14          **THE COURT:**  YOU MEAN 110?

15          **MS. SIMERLY:**  I'M SORRY?

16          **THE COURT:**  110 AND 111 DIDN'T GET ADMITTED.

17          **MS. SIMERLY:**  I THOUGHT 110 HAD BEEN ADMITTED.  ALL

18   OF THEM SHOULD BE ADMITTED.

19          **THE COURT:**  110 AND 111 ARE ADMITTED.

20                  (PLAINTIFF'S EXHIBITS 110 AND 111 RECEIVED

21                  IN EVIDENCE)

22                  **CROSS-EXAMINATION**

23   BY MS. SIMERLY:

24   **Q.**   MR. MITCHELL, TAKE A LOOK AT KEMAL ANBARCI'S PMP.  THAT

25   WOULD BE EXHIBIT 106.

1    LONG AS YOU ARE ABOUT TO START.

2            **MS. ANDERSON:**  THANK YOU.

3            **THE COURT:**  THANKS.

4               (RECESS TAKEN AT 9:38 A.M.)

5              (PROCEEDINGS RESUMED AT 9:48 A.M.)

6          (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

7            **THE COURT:**  ALL RIGHT.  PLEASE PROCEED.

8    **BY MS. ANDERSON:**

9    **Q.**   GOOD MORNING, AGAIN, MR. O'BRIEN.

10   **A.**   GOOD MORNING.

11   **Q.**   YOU TESTIFIED THAT AS PART OF THE WORK YOU DID IN

12   PREPARING YOUR REPORT, THAT YOU REVIEWED MS. PANDE'S

13   INTERROGATORY RESPONSES.

14           DO YOU RECALL THAT?

15   **A.**   YES.

16   **Q.**   AND YOU RECALL THAT THE SUBJECT MATTER OF SOME OF THOSE

17   RESPONSES WAS DESCRIPTION OF WHAT MS. PANDE DID IN TERMS OF

18   LOOKING FOR OTHER JOBS.

19           DO YOU RECALL THAT?

20   **A.**   YES.

21   **Q.**   AND ONE OF THE THINGS THAT YOU CONCLUDED IN YOUR OWN

22   EXPERT OPINION WAS THAT THE LIST OF THE RESOURCES THAT

23   MS. PANDE TURNED TO TO TRY TO FIND A NEW JOB WAS, IN AND OF

24   ITSELF, A REASONABLE LIST; IS THAT RIGHT?

25   **A.**   YES.

O'BRIEN - CROSS / MS. ANDERSON

1   Q.   AND YOU REMEMBER FROM REVIEWING THE DOCUMENTS THAT YOU DID

2   REVIEW, THAT SOME OF THE THINGS THAT MS. PANDE DID INVOLVED

3   SUBMITTING HER QUALIFICATIONS TO JOB SEARCH FIRMS.

4        DO YOU RECALL THAT?

5   A.   I BELIEVE THERE WERE A COUPLE OF FIRMS ON THE LIST, YES.

6   Q.   RIGHT.

7        AND YOU UNDERSTAND THAT THE WAY JOB SEARCH FIRMS

8   WORK GENERALLY IS THAT A CANDIDATE SUBMITS THEIR RESUMÉ TO THE

9   JOB SEARCH FIRM, RIGHT?

10  A.   YES -- WELL, ACTUALLY IN THE HIGHER END, OFTENTIMES THE

11  RECRUITERS ARE ALMOST MORE HEADHUNTERS THAN THEY ARE PLACEMENT

12  SERVICES.  SO, OFTEN SOMETIMES THEY ARE EITHER ACTIVELY

13  RECRUITING PEOPLE WHO ARE CURRENTLY EMPLOYED IN THE FIRM OR

14  THEY DO, IN FACT, ENTERTAIN RESUMÉS.

15  Q.   ONE WAY OR ANOTHER, ONE OF THE THINGS THAT HAS TO HAPPEN

16  IS THE CANDIDATE'S QUALIFICATIONS HAVE TO GET TO THE SEARCH

17  FIRM SO THEY KNOW WHAT CANDIDATES THEY HAVE IN THE MIX, RIGHT?

18  A.   WELL, YEAH.  THAT'S SORT OF AN OVERSIMPLIFICATION BECAUSE

19  THE SEARCH FIRM'S CLIENT ARE THE EMPLOYERS.  SO WHAT THEY ARE

20  TRYING TO DO IS THEY TAKE THOSE POSITIONS AND MATCH THEM WITH

21  KNOWN CANDIDATES.

22  Q.   THAT'S RIGHT.

23        SO MS. PANDE'S SUBMISSION OF HER QUALIFICATIONS TO

24  SEARCH FIRMS ENABLES HER TO POTENTIALLY CONTACT EMPLOYERS THAT

25  ARE USING THE SEARCH FIRM THEMSELVES, RIGHT?

O'BRIEN – CROSS / MS. ANDERSON

1    **A.**    THERE WOULD BE A CONTACT FACILITATED BY THE RECRUITER,

2    YES.

3    **Q.**    RIGHT.

4            AND THERE'S SOME EFFICIENCY GAINED BY THAT PROCESS,

5    RIGHT?

6    **A.**    I AM NOT SURE I KNOW WHAT YOU MEAN.

7    **Q.**    WELL, WOULDN'T YOU AGREE, SIR, THAT SEARCH FIRMS THAT HAVE

8    KNOWLEDGE AND INFORMATION ABOUT WHAT EMPLOYERS, DIFFERENT

9    EMPLOYERS ARE LOOKING FOR IN CANDIDATES, CAN HOPEFULLY MATCH AN

10   APPLICANT TO THE RIGHT EMPLOYER AND, THEREFORE, FULFILL THAT

11   EMPLOYER'S JOB REQUIREMENTS, RIGHT?

12   **A.**    SURE.

13   **Q.**    AND SO, FOR EXAMPLE, IF A BIG OIL COMPANY, LIKE EXXON OR

14   MOBILE, IS IN CONTACT WITH A SEARCH FIRM, AND THAT SEARCH FIRM

15   ALSO HAS A GOOD RESUMÉ FOR A GREAT CANDIDATE FOR THOSE

16   COMPANIES, HOPEFULLY THOSE TWO MIGHT MEET UP, AND EXXON OR

17   MOBILE MIGHT HIRE THAT CANDIDATE IN THAT WAY, RIGHT?

18            **MS. SIMERLY:**  OBJECTION, YOUR HONOR, LACKS

19   FOUNDATION AS PHRASED.

20            **THE COURT:**  OVERRULED.

21            **THE WITNESS:**  WELL, ULTIMATELY THE PURPOSE OF USING

22   A RECRUITER IS PRIMARILY FOR THE EMPLOYER.  AND THAT -- THE

23   NUMBER OF JOBS COMING, THERE ARE USUALLY MORE EMPLOYERS THAN

24   THERE ARE CANDIDATES.  SO YOU, NORMALLY SPEAKING, AS I

25   UNDERSTAND THE MARKETPLACE, CANDIDATES ARE GETTING OFFERS FROM

## CERTIFICATE OF REPORTERS

WE, THE UNDERSIGNED OFFICIAL REPORTERS FOR THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C-04-5107 JCS, KIRAN PANDE V. CHEVRON CORPORATION, ET AL.,, PAGES NUMBERED 1603 THROUGH 1723, INCLUSIVE, WERE REPORTED BY US, CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTERS' CERTIFICATIONS OF SAID TRANSCRIPTS MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

DIANE E. SKILLMAN, CSR NO. 4909

KATHERIN WYATT, CSR NO. 9866

KATHERINE WYATT, OFFICIAL COURT REPORTER, USDC