Michele Ballard Miller (SBN 104198)
Janine S. Simerly (SBN 102361)
Kerry McInerney Freeman (SBN184764)
Lisa C. Hamasaki (SBN 197628)
MILLER LAW GROUP
A Professional Corporation
60 E. Sir Francis Drake Blvd., Ste. 302
Larkspur, CA 94939
Tel. (415) 464-4300
Fax (415) 464-4336

Attorneys for Defendants CHEVRON CORPORATION (f/k/a ChevronTexaco Corporation) and CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a ChevronTexaco Overseas Petroleum), a division of Chevron U.S.A. Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRAN PANDE,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>CHEVRON CORPORATION (f/k/a ChevronTexaco Corporation) and CHEVRON INTERNATIONAL EXPLORATION & PRODUCTION (f/k/a ChevronTexaco Overseas Petroleum), a division of Chevron U.S.A. Inc.<br><br>　　　　　Defendants. | Case No. C 04-5107 JCS<br><br>**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**<br><br>Hearing Date:　December 21, 2007<br>Time:　　　　　9:30 a.m.<br>Place:　　　　Courtroom A, 15th Fl.<br><br>Complaint filed:　December 2, 2004 |

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................... 1

II. LEGAL ANALYSIS ...................................................................................................... 1

   A.   THE PUNITIVE DAMAGES AWARD SHOULD BE VACATED ................................. 1

      1.  Pande Failed To Meet Her Heightened Burden Of Proof ........................................... 1

      2.  Pande Failed To Establish Malice Or Oppression By A "Managing Agent." ............. 2

   B.   THERE IS INSUFFICIENT EVIDENCE OF RETALIATION TO SUPPORT THE VERDICT ........................................................................................................................ 6

      1.  Pande Failed To Present The Requisite *Substantial* Evidence Of A Causal Link Between Her Protected Activity And Her Termination ................................................. 7

      2.  Pande's Efforts To Reach Back In Time To Bolster Her Deficient Evidence Fail As A Matter Of Law ..................................................................................................... 11

   C.   PANDE'S FAILURE TO MITIGATE HER DAMAGES REQUIRES THAT THE COMPENSATORY DAMAGES AWARD BE VACATED ........................................... 13

   D.   EVIDENCE OF PANDE'S MEDICAL CONDITION INFLAMED THE JURY ............. 15

III. CONCLUSION .............................................................................................................. 15

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

i

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

# TABLE OF AUTHORITIES

**Cases**

*Champion International Corp. v. Wideman*, 733 So.2d 559 (F.D. Fla. 1999) ...................... 14

*College Hospital, Inc. v. Superior Court (Crowell),* 8 Cal.4th 704 (1994) .............................. 4

*Cowen v. Standard Brands, Inc.*, 572 F. Supp. 1576 (N.D. Ala. 1983) ............................... 14

*Cruz v. HomeBase,* 83 Cal. App. 4th 160 (2000) ................................................................. 4

*Douglas v. State of Alabama*, 380 U.S. 415 (1965) ............................................................ 15

*Fenton v. HiSAN, Inc.,* 174 F.3d 827 (6th Cir. 1999) ............................................................ 9

*Maynard v. City of San Jose*, 37 F.3d 1396, 1402 (9th Cir. 1994) ................................... 6, 8

*McRae v. Department of Corrections & Rehabilitation*, 142 Cal. App. 4th 377 (2006) ..... 6, 11

*Morgan v. The Regents of the University of California,* 88 Cal. App. 4th 52 (2000) ............. 12

*Mulhall v. Ashcroft,* 287 F.3d 543 (6th Cir. 2002) ............................................................ 9, 11

*Smith v. Riceland Foods*, Inc., 151 F.3d 813 (8th Cir. 1998) ...................................... 6, 8, 10

*Taylor v. Superior Court*, 24 Cal.3d 890 (1979) ................................................................ 1, 2

*United States v. Greenwood*, 974 F.2d 1449 (5th Cir. 1992) ............................................. 15

*United States v. Marshall*, 762 F.2d 419 (5th Cir. 1985) .................................................... 15

*United States v. Mendiola*, 42 F.3d 259 (5th Cir. 1994) .................................................... 15

*White v. Ultramar Inc.*, 21 Cal.4th 563 (1999) ................................................................. 3, 4

*Winarto v. Toshiba America Electronics Components, Inc.,* 274 F. 3d 1276
   (9th Cir. 2001) ............................................................................................................ 2, 12

**Statutes**

Cal. Civ. Code §3294(b) ........................................................................................................ 2

Civ. Code §3294(a) ............................................................................................................... 1

**Other Authorities**

Black's Law Dictionary 416 (6th Ed. 1990) ........................................................................... 4

ii

## I. INTRODUCTION

Substantial evidence, not unsupported speculation and suspicion, is required to support the verdict. Pande offers no such evidence – there is nothing to support a finding that Mitchell was a managing agent as required to impose punitive damages against Chevron. There is also no evidence of any causal connection between Pande's complaint against Mitchell and her failure to be selected for any position. At best, all Pande has shown is that things did not go as she would have liked when she left the planning group and, rather than engage in self-reflection, she points the finger at Mitchell. The jury was swayed by this story, the Court should not be. When the record is reviewed, it is clear that there is no evidence, much less substantial evidence, to support the verdict. Chevron's request for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial, should be granted.

## II. LEGAL ANALYSIS

### A. THE PUNITIVE DAMAGES AWARD SHOULD BE VACATED

#### 1. Pande Failed To Meet Her Heightened Burden Of Proof.

Pande claims that the punitive damage award should stand since she proved that "Chevron's managing agents deliberately retaliated against her for her protected complaints." (Opp. 11:18-21)[1] Pande clearly misunderstands her burden of proof. To support an award of punitive damages, there must be *clear and convincing evidence* of "oppression, fraud, or malice." Civ. Code §3294(a) (emphasis added). "Something more than the mere commission of a tort is always required for punitive damages." *Taylor v. Superior Court*, 24 Cal.3d 890, 895 (1979). There must be seriously aggravating or

---

[1] The following abbreviations shall be used throughout this brief. "Opp." refers to Kiran Pande's Memorandum of Points and Authorities in Opposition to Defendants' Motion For Judgment as a Matter of Law or for a New Trial. "JMOL" refers to Defendants' opening brief. "Tr." refers to the transcripts from the October 9, 2007 trial. Copies of all pages of the trial transcript cited in this reply brief and in Defendants' opening brief are attached to the Declaration of Michele Ballard Miller.

1
**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

1 outrageous facts such as "spite or 'malice' or a fraudulent or evil motive" or "such a
2 conscious and deliberate disregard" that the conduct may be called "willful or wanton." *Id*.
3 Thus, although the jury found by a ***preponderance of the evidence*** that Pande suffered
4 retaliation after she complained about Rex Mitchell, that finding alone does not satisfy the
5 ***heightened*** standard needed to support an award of punitive damages.

6 Although Pande asserts that Chevron acted with "malice and oppression," she fails to
7 cite to any evidence to support her claim. Instead, she offers sweeping pronouncements –
8 Chevron "punished" her for complaining, lied about "what they were doing," concocted
9 "devious schemes" to conceal the "unlawful and malicious nature of their conduct," and
10 otherwise engaged in "oppressive" conduct. (Opp. 11:22-12:9) Pande points to no
11 evidence, much less substantial evidence, to support her rhetoric. Accordingly, the punitive
12 damage award predicated on a finding of retaliation alone must be reversed.[2]

13 **2.  Pande Failed To Establish Malice Or Oppression By A "Managing Agent."**
14

15 Even if Pande had satisfied the demanding "clear and convincing" standard, which
16 she did not, she presented ***no evidence*** establishing that Mitchell was a "managing agent"
17 of Chevron. Cal. Civ. Code §3294(b). None of the "evidence" Pande points to in her
18 Opposition compels a different conclusion.

19 Although Pande claims that Mitchell "managed a significant group at Chevron" [Opp.
20 13:20], the only evidence establishes that during the relevant time period Mitchell's group
21 consisted of five to ten employees within a larger company of 15,000 employees. (Tr. 237:5-
22 7, 271:15-18, 431:21-432:8) A group that is less than 1% of the workforce can hardly be

---

[2] The Ninth Circuit's decision in *Winarto v. Toshiba America Electronics Components, Inc.,* 274 F. 3d 1276 (9th Cir. 2001) does not compel a different conclusion. In *Winarto*, the Court recognized that, upon review, there must be *substantial evidence* supporting the jury's determination of liability for punitive damages – a determination, in turn, that must be supported by *clear and convincing* evidence. Toshiba, like Chevron, argued that punitive damages were not recoverable against it unless an officer, director, or managing agent ratified or authorized the conduct. The Ninth Circuit remanded the issue of Toshiba's liability for punitive damages, holding that facts pertaining to Toshiba's anti-retaliation policy and the required findings to satisfy Civil Code section 3294 had not been developed before the district court.

28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

deemed "significant."[3]  Pande also claims that Mitchell wielded "broad general authority over his employees and the management of the group's work." (Opp. 13:20-21)  She asserts that "Mitchell's level of general authority over his reports, and his discretion in determining how to manage his group day-to-day" was sufficient to establish that Mitchell was a managing agent. (Opp. 13:21-23)  There is absolutely no evidence in the record to support Pande's claims.  On the contrary, what evidence there is shows that Mitchell's authority was extremely limited.  Although able to direct the work of his small group, Mitchell could not hire, transfer, promote or adjust salaries on his own.  Mitchell did not have the authority to transfer Pande into his group in 2000; nor did he have the authority to promote her. (Tr. 883:19-884:7, 897:16-898:7)  Rather, he needed approval from the Personnel Development Committee ("PDC"). (*Id.*)  Mitchell simply did not have the authority to independently affect his own work group, much less effect Company policy.

Pande does not dispute this conclusion.  Instead, she claims that Mitchell acted as a "*de facto*" policymaker for Chevron. (Opp. 13:28-15:7) This argument also gets her nowhere. In order to establish managing agent status, a plaintiff must show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business. *White v. Ultramar Inc.*, 21 Cal.4th 563, 577 (1999) (managing agent exercised "substantial discretionary authority over vital aspects of Ultramar's business that included managing numerous stores on a daily basis and making significant decisions affecting both store and company policy.")  Here, there is no evidence, much less **clear and convincing** evidence, that Mitchell actually exercised *any* authority over "corporate principles or rules of general application in the corporation." *Cruz v. HomeBase,* 83 Cal.

---

[3] Pande's claims that Mitchell's group was prestigious is similarly unavailing.  Indeed, the testimony cited by Pande in support of this proposition says nothing about "prestige."  In fact, as Hartshorn stated, the positions in Mitchell's group were coveted because they are visible to "high level managers" – in other words, the people who undoubtedly would be considered managing agents under section 3294 (b). (Opp. 13:26-28, citing Tr. 1377:12-1378:3)

1  App. 4th 160, 168 (2000).  *De facto* authority is insufficient – the authority must be valid and
2  real, not imagined or nonexistent.[4]

3  Evidence of Mitchell's subsequent position is similarly irrelevant.  Corporate liability
4  predicated on the wrongful conduct of a managing agent "assumes that such individual was
5  acting in a corporate or employment capacity when the conduct giving rise to the punitive
6  damages claim against the employer occurred."  *College Hospital, Inc. v. Superior Court*
7  *(Crowell),* 8 Cal.4th 704, 723 (1994) (citations omitted).  Mitchell's current position cannot
8  support a punitive damage award against Chevron.

9  In short, supervisory authority, without more, does not make one a managing agent.
10 *White*, 21 Cal.4th at 954 ("a rule defining managing agent as any supervisor who can hire or
11 fire employees, but who does not have substantial authority over decisions that ultimately
12 determine corporate policy, effectively allows punitive damage liability without proof of
13 anything more than simple tort liability, which we have long recognized is insufficient.")
14 Pande apparently recognizes this, and argues in her Opposition that Mitchell "acted in
15 concert" with other managing agents who approved his malicious actions and also acted
16 with malice and oppression.  This argument fails for two reasons.

17 First, there is no evidence that Johnson, Kennedy or Camy were themselves
18 managing agents during the time period in question. *White,* 21 Cal.4th at 576 (for punitive
19 damages liability to attach to a corporation, the *individual employee* accused of the alleged
20 wrongful conduct must be found to be an "officer, director or managing agent" of the
21 corporation with "substantial authority over decisions that ultimately determine corporate
22 policy.")  Although Pande argues that Johnson supervised three "high-level groups like
23 Mitchell's" [Opp. 14:17-20], the record only shows that Johnson directly supervised
24 approximately four employees and his entire group consisted of only 20-25 employees.  In

---

[4] Indeed, there is no California authority addressing "*de facto* policymakers." According to the dictionary, however, "An officer . . . *de facto* is one who is in actual possession of the office . . . but by usurpation, or without lawful title." Black's Law Dictionary 416 (6th Ed. 1990). In other words, Pande argues that Mitchell was a policymaker-in-fact who had no corporate authority to make those policies.

4

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

an organization with over 15,000 employees, this group is hardly "significant." (Tr. 431:21-432:8, 1056:16-1057:10) Similarly, although Pande argues that Camy and Kennedy were managing agents – alleging that both served as manager of an "important technical group of roughly a dozen employees" [Opp. 15:7-10], the evidence says nothing of the sort. Instead, the only evidence in the record is that Camy managed a "technical support group" called "TAPS" which consisted of about eight to 12 people, and that Kennedy succeeded Camy in that position. (Tr. 1304:18-1305:7, 1315:2)  Pande's characterization of TAPS as "important," is not evidence, merely wishful thinking.

Second, there is no evidence that Johnson, Kennedy or Camy ever conspired with Mitchell or did anything more than disagree with Pande's assessment of her performance. In order to fit the facts into her story, Pande plays fast and loose with the sequence of events. First, she claims that Camy "praised [Pande] as an excellent performer" in her 1997 performance review. (Opp. 5:20) She leaves out, however, that Camy was *not* yet Pande's supervisor during the time period covered by the PMP and did *not* prepare it. (Tr. 1323:1-5, Ex. 11) Pande similarly distorts Camy's later testimony about the 1999 PMP. Although she argues that the 1999 PMP contained none of Camy's criticisms, she strategically fails to mention that the 1999 PMP was prepared by Kennedy (*not* Camy), that Camy had not seen the PMP prior to trial, and that Camy had *no* input into that PMP. (Tr. 1324:5-1328:12) More importantly, Pande has no evidence that Camy and Mitchell ever discussed Pande, much less conspired against her. The record regarding Kennedy's conduct is similarly thin. In fact, the only evidence is one email which shows that Kennedy had issues with Pande's attitude and informed Hartshorn of those issues *before* learning of any problems between Mitchell and Pande.[5] (Ex. 250) Given the record, it is impossible for any reasonable trier of fact to determine that Johnson, Kennedy, or Camy retaliated against Pande, much less

---

[5] Pande's suspicion that Kennedy "chose not to perjure himself at trial by claiming his complaints were justified" [Opp. 5:28-6:1] is just that – suspicion not evidence.

5
**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

engaged in the sort of conduct necessary to support punitive damages. Accordingly, the punitive damage award cannot stand.

## B. THERE IS INSUFFICIENT EVIDENCE OF RETALIATION TO SUPPORT THE VERDICT

Although Pande does her best to obscure the issue, whether an employment plaintiff seeks to base her claim on direct evidence or circumstantial evidence, the evidence must be "*substantial*" in order to support a plaintiff's verdict. *Maynard v. City of San Jose*, 37 F.3d 1396, 1402, 1404 (9th Cir. 1994) (reversing plaintiff's jury verdict where she lacked substantial evidence to establish unlawfully retaliatory animus); *see also McRae v. Department of Corrections & Rehabilitation*, 142 Cal. App. 4th 377, 398 (2006) (reversing plaintiff's jury's verdict where she failed to produce substantial evidence to support her belief that she was retaliated against). In other words, even circumstantial evidence must be "specific" and "substantial" to support a plaintiff's verdict. *Winarto*, 274 F.3d at 1284. "Complete speculation" unsupported by evidence connecting the adverse employment action with protected conduct does not suffice. *Smith v. Riceland Foods*, Inc., 151 F.3d 813, 818-19 (8th Cir. 1998) (reversing denial of JMOL where plaintiff's jury's verdict of retaliation under Title VII was based on "complete speculation" and plaintiff produced insufficient evidence that the decision-makers knew of prior protected activity). Opinions have "no probative value absent a showing that the opinion is based on fact." *McRae*, 142 Cal. App. 4th at 394. Similarly, "personal beliefs or concerns are not evidence." *Id.* at 396.

Pande failed to present substantial evidence connecting the dots between her protected conduct and any of the allegedly retaliatory adverse employment actions. Because Pande's unsupported speculation does not add up to substantial evidence sufficient to support the jury's verdict on retaliation, the verdict must be overturned.

6
**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

### 1. Pande Failed To Present The Requisite *Substantial* Evidence Of A Causal Link Between Her Protected Activity And Her Termination.

Pande claims she was terminated in retaliation for complaining about Mitchell. The evidence presented to the jury establishes that Pande's employment ended when she turned down an offer to stay with SASBU and then was not selected for another position. Indeed, all of the economic damages Pande sought and was awarded at trial stem from the termination of her employment rather than any prior retaliatory acts. (Tr. 780:2-4 (Mahla – Pande's expert – analyzed only the "economic impact on Ms. Pande resulting from her termination from Chevron.") It therefore follows that in order for the jury's verdict and economic damages award to stand, Pande needed to present substantial evidence of a causal link between her complaint against Mitchell and the subsequent decisions: (1) not to select her for another job after she chose not to relocate, and (2) to terminate her employment at the end of 2003 for failing to find another job. Pande cannot establish the requisite link between the events.

Pande's Opposition only specifically identifies two jobs she did not receive: two positions "owned" by Zuwa Omoregie, both of which served the same client, Jean Camy. (Opp. 9:6-9) Try as she may, Pande cannot establish any causal connection between Camy's decision not to select her for this position and her complaints 18 months earlier about Mitchell. There is absolutely no evidence in the record that Camy even knew about Pande's complaints much less that he denied her the Omoregie jobs because of these complaints. On the contrary, the only evidence is that Camy made the decision not to hire Pande based on *his own unsatisfactory experience* working with her long before she ever complained. (Tr. 1307:16-1313:25) Lacking facts to refute this testimony, Pande simply calls Camy a liar. However, no evidence supports such a conclusion.

For example, Pande claims Camy fabricated performance and personality clashes to cover up his retaliatory motive for not selecting her for the Omoregie jobs. (Opp. 5:12-26) However, as previously explained, there is no evidence that Camy even knew of Pande's complaint. Pande argues that Camy's positive affirmations about her performance –

7
**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

namely, nominating Pande for the Chevron Management Leadership forum and signing off on a positive review by Pande's direct supervisor, Mary Cao,[6] after she reportedly gave him "the silent treatment" – justify the jury disregarding Camy's testimony about any alleged negative feelings he had about her. Pande's argument, however, is not based on the evidence. As the record makes clear, Camy's positive affirmations *came first*, *before* Pande gave him the "silent treatment."[7] Having failed to present any evidence showing Camy knew of Pande's complaints, and thus failing to present any evidence of causation, Pande's credibility challenge provides no support for her retaliation claim. *Mulhall*, 287 F.3d at 551-52.

To prove retaliation, Pande must show a causal connection between her non-selection and her earlier complaint – "conspiratorial theories" are not sufficient. *Mulhall,* 287 F.3d at 551-52. In other words, she must, at a minimum, show that the decision-makers knew of her prior complaint. *Maynard*, 37 F.3d at 1404; *Smith,* 151 F.3d at 818-19 (unsupported speculation that the decision-makers knew of prior protected activity found insufficient to prove retaliation); *Mulhall,* 287 F.3d at 551-52 (affirming employer's summary judgment on retaliation claim, finding that plaintiff's credibility challenges were insufficient

---

[6] Although Pande claims Camy "praised her as an excellent performer in his only written evaluation of her work" [Ex. 11], the evidence demonstrates that Camy did not prepare that evaluation and it addressed Pande's performance *before* Camy began working with her. (Tr. 1323:1-5, Ex. 11)

[7] Although Pande claims Camy prepared positive performance evaluations for her in 1998 and 1999 (after "the silent treatment" in the Fall 1998) [Opp. 5:21-23], the evidence demonstrates: (1) Camy never prepared an evaluation of Pande; (2) the one positive performance evaluation Camy signed for her was prepared by Mary Cao for 1997 (*before* the "silent treatment"); (3) there was no performance evaluation prepared for Pande in 1998; and (4) Camy did not participate in preparing Pande's 1999 performance evaluation, which was prepared after Pande moved under Kennedy's supervision, and without any input from Camy. (Tr. 1323:1-5, 1324:5-1329:5, Exs. 11, 13) Similarly, the evidence shows that Camy recommended Pande for the Chevron Management Leadership Forum in the early part of her assignment – before the "silent treatment." (Tr. 1318:21-1320:14)

8

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

where he presented no evidence that the decision-makers knew of the protected conduct).[8] Pande presented no such evidence. Pande failed to present any evidence, much less substantial evidence, of the requisite connection. For example, although Pande claims Mitchell looked for every opportunity to thwart her chances of obtaining another job [Opp. 8:16-21], she cites no evidence connecting Mitchell to any of the selections in question. This is not surprising since the unrefuted evidence shows Mitchell had virtually nothing to do with Pande's career after she left his group. (Tr. 993:10-21 (Mitchell); 1293:18-24, 1295:10-1298:21 (Judah); 1123:1-17, 1124:3-1125:12 (Alameda)). Although Pande insists that Mitchell was behind every decision, she has absolutely no evidence that anyone on the various selection committees (approximately 30 different people) even knew about her complaint, much less that they decided not to select Pande because of her complaint. Absent such evidence, the verdict cannot stand. *Mulhall v. Ashcroft,* 287 F.3d 543, 551-52 (6th Cir. 2002) (citing *Fenton v. HiSAN, Inc.,* 174 F.3d 827 (6th Cir. 1999) for the proposition that a plaintiff must produce evidence sufficient to establish that the individuals charged with taking adverse employment action knew of the protected activity.)

The only evidence linking Mitchell to Pande after she left his group is his response to Hartshorn's inquiry in early 2003 regarding Pande's performance. Although Pande says Mitchell "told Kelly Hartshorn in 2003 that Pande's overall 2002 performance [including Pande's performance after she left Mitchell's supervision] deserved a '2' ranking" [Opp. 4:1-3, 8:12-16], her argument is unsupported by the evidence. There is no mention of "deserving" or of any 2002 performance in the testimony cited by Pande. Rather, the only evidence is that Mitchell told Hartshorn that Pande was a "2 rank performer" and asked

---

[8] As discussed herein, although Pande seeks to obscure her lack of evidence of retaliatory termination by arguing a "wholesale sabotage of Pande's career" [Opp. 4:11], her conspiracy theory does not support a verdict in her favor because (1) her speculative belief that she was retaliated against is unsupported by evidence [*see* section II.B.1], (2) most of the allegedly retaliatory acts occurred outside the statute of limitations and are therefore untimely [*see* section II.B.2], and (3) the untimely retaliatory acts are not sufficiently related to timely actions to be considered a "continuing violation." (*Id.*) Moreover, Pande did not present any evidence that economic damages flowed from those decisions.

1  Hartshorn to handle any salary decisions. (Tr. 1388:1-11)  Pande's attempt to recharacterize
2  the evidence to suggest continued involvement by Mitchell after December 2002 – when
3  Pande moved to SASBU – is pure speculation, not fact.[9]  (*see* JMOL, discussion at section
4  II.B.2) Likewise, Pande's speculation that Mitchell "disparaged [her] work performance to
5  other supervisors at Chevron … into late 2003" and that these negative comments led to her
6  not being selected for other positions and her ultimate termination is unavailing.  The cited
7  "evidence" does not support Pande's suspicions or establish a link between Mitchell and
8  anything that happened to Pande after December 2002. (*see* JMOL 6:15-7:14, fn. 4 & 5 (re
9  Brian Smith e-mail))

10  Additionally, although Pande argues that Johnson "invented a false story" [Opp. 5:8-
11  12] and that Kennedy only criticized her performance after he learned of her complaints
12  [Opp. 4:8-9, 5:26-6:2], the evidence shows otherwise.  Johnson testified consistently that
13  Pande complained about her "2" rating in his initial meeting with her in March 2002.  (Tr.
14  1059:6-1061:5; 1092:14-1093:1)  Although Pande contends that she did not receive the "2"
15  rating until April – relying on the fact that she only emailed her draft PMP to Mitchell on
16  March 27, 2006 – Johnson explained that the rating itself was determined prior to
17  completing the PMP process because the rating had to be finalized well in advance of April
18  1st – the effective date for salary actions.  (Tr. 1094:18-23, 1097:2-22; *see also* Tr. 1386:10-
19  20 (Hartshorn explaining that salary rankings have to occur in the January/February time
20  frame); 1472:11-1473:22 (Mitchell)).  Likewise, before Kennedy was told of Pande's
21  complaint, he prepared an e-mail at Hartshorn's request, describing both positive and
22  negative performance issues he had with Pande.  (Ex. 250)  No retaliation can be inferred
23  from either Johnson's testimony or Kennedy's comments.

---

[9] Although Pande argues that Mitchell "invented new excuses" upon learning that he testified incorrectly about ratings that he gave to subordinates in 2002 [Opp. 5:1-7], Pande's claims are grossly exaggerated.  Mitchell acknowledged that he made a mistake with regard to the rating given to Dan Wallem – explaining that in years past, he had rated Wallem a "2." (Tr. 1465:5-15, 1473:23-1474:11)  With regard to his mistake in the ranking of Hardy Leopando, Mitchell also simply acknowledged his mistake, adding that Leopando's prior supervisor rated him in 2001. (Tr. 1468:24-1469:3)

10
**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

Pande's speculation that the other alleged "bad actors" – Jay Johnson and Gary Yamashita – somehow adversely influenced the selections or Pande's ultimate termination because of some misguided allegiance to Mitchell is simply ridiculous. First, even Pande does not believe her own story – she testified that Yamashita was only a "fly on the wall." (Tr. 272:12-13) She didn't even speculate as to his involvement in any future job-selection decisions. Nor did Pande testify at trial as to Johnson's involvement in events after she left Mitchell's group – not surprising since Johnson had no involvement with Pande after she joined SASBU. (Tr. 1084:1-6)

Pande's belated conspiracy theory is just that – a theory that has no factual support and a ruse to draw attention away from Pande's failure to prove a causal connection between Pande's complaints against Mitchell and her failure to be selected for any job in 2003. [10] In short, they are nothing more than "conspiratorial theories" and "beliefs," and not the "specific facts" required to support a claim for retaliation. *Mulhall,* 287 F.3d at 551-52; *McRae*, 142 Cal. App. 4th at 396.

### 2. Pande's Efforts To Reach Back In Time To Bolster Her Deficient Evidence Fail As A Matter Of Law.

Pande tries to compensate for the lack of evidence tying her 2003 non-selections and

---

[10] In addition to failing to present any evidence establishing the 2003 non-selections were retaliatory, Pande failed to submit any evidence that the decision to terminate her employment for failing to find another position was retaliatory. On the contrary, the evidence shows that all SASBU employees were informed that their positions were in jeopardy if they chose to decline the relocation offer [Exs. 39, 40] and that no SASBU Block 14 employees were permitted to continue working in San Ramon after December 2003 [Tr. 1174:2-9]. Although Pande relies on Burkes' claim that he "did not believe declining the move would result in termination" as "evidence" that the Chevron's termination of Pande was retaliatory, Burkes' belief is meaningless in light of his own testimony that he received a letter telling him he would be terminated if he did not accept his transfer offer or find another job [Tr. 654:11-22] and his admission that he believed that if he did not accept the relocation and did not find another job he would either be declared surplus or be terminated [Tr. 652:12-653:4]. Similarly, although Pande complains that other SASBU employees rejected the Houston relocation but found alternate positions [Opp. 6:20-24], she presented no evidence that any of these individuals were similarly situated to her. Indeed, the undisputed evidence shows that Gordon Seto and Tom Millette were accountants [Tr. 662:8-19, 663:1-7], Natalie Talbert was an engineering assistant who did not work in Pande's unit [Tr. 662:20-24], Steve Zalen was a geologist [Tr. 663:17-20], neither Jalal Afifi nor Graham Housen worked in Pande's unit [Tr. 663:8-16], and Mike Clark had moved to London before the end of 2003 [Tr. 633:24-634:2].

11

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

termination to her complaint by claiming she was also retaliated against in 2002, pointing specifically to her "2/Fully Meets Expectations" performance rating for 2001 and the related salary action for 2002, the promotion Mitchell allegedly denied her, the 2002 non-selection for jobs she now claims were more desirable than the "plum" job she ultimately landed. None of these actions bolster her claim of retaliatory termination.  Indeed, all but her termination and the non-selection decisions in the year leading up to her termination are time-barred.[11]  Plus, there is no evidence that those acts were retaliatory,[12] much less that there were any damages stemming from them.[13]  Indeed, the unrefuted evidence shows: (1) the performance rating was determined *before* Pande complained, (2) the performance rating *did not* represent any departure from her prior reviews,[14] (3) the salary action was

---

[11] Only employment actions taken in the year before her administrative charges are actionable. *Morgan v. The Regents of the University of California,* 88 Cal. App. 4th 52, 63 (2000) (citations omitted).  Therefore anything before December 8, 2002 is untimely.  (See JMOL discussion at section II.B.1)

[12] While Pande relies repeatedly on *Winarto v. Toshiba* to support her claim that her 2002 "2/Fully Meets Expectations" performance evaluation constitutes actionable retaliation, *Winarto* actually demonstrates the weakness of Pande's claim:  in *Winarto*, the plaintiff's performance ratings made a dramatic decline after the plaintiff complained, whereas here Pande's 2002 rating was determined before she complained and did not represent any decline from her prior ratings.  Whereas the adverse employment action at issue in *Winarto* was based on the allegedly retaliatory performance ratings, Pande presented no evidence that the decision-makers at issue even knew of her "2" rating or performance evaluation when deciding not to hire her. *Winarto,* 274 F.3d at 1281-82, 1284-86.

[13] Although Pande speculates that the untimely acts prevented her advancement in 2002 [Opp. 9-16], the evidence establishes that was not the case – after Pande complained she landed a "plum" job in SASBU, and then was offered the opportunity to remain in her job after her unit moved to Houston, thereby preventing any damages.

[14] On the contrary, like her prior PMPs, Pande's PMP for work performed in 2001 contains both high praise and constructive feedback. (Ex. 19)  By way of example, the section entitled "Performance Feedback to Employee" states that "In 2002, Kiran carried an intensive workload compensating for other staff members who were assigned full time to merger integration work or special projects," "Kiran coordinated a mid-year update of the legacy Chevron long-term portfolio that was critical input to support the Upstream Clean Team (merger integration effort)," and "Kiran played a key role in helping with the deployment of the business plan consolidation work done within the Clean Team to the newly merged SBUs, which was critical to developing CTOP's 2002 business plans for our newly merged entities." (*Id.*)  Moreover, none of the prior performance evaluations admitted into evidence contained a "1" ranking or an "exceptional" evaluation.  (*See* Exs. 11, 13, 14 – none of which include a ranking section and all of which contain both positive and constructive feedback.)  In short, Pande's 2001 performance evaluation was not negative, nor was it more negative than prior years.
*continued*

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

determined by a formula based on that pre-complaint performance rating, and (4) Pande presents no evidence to support her speculation that the decision-makers for those 2002 selections failed to select her because of her complaint.

Moreover, those untimely allegedly retaliatory acts cannot be considered part of a "continuing violation" to bolster Pande's anemic evidence of retaliatory termination. Indeed, in order to constitute a "continuing violation," untimely events must be "sufficiently related," "similar in kind, [having] occurred with reasonable frequency" to events within the statutory period. (Opp. 7:13-21) Pande made no such showing. Just as Pande failed to present any evidence tying her 2002 complaint to the allegedly retaliatory employment actions in 2002, she also failed to present any evidence linking those untimely 2002 actions to the 2003 non-selections that resulted in her termination. [15] Accordingly, since those stale events do not compensate for the lack of "specific" and "substantial" evidence, the jury's verdict must be reversed.[16]

## C. PANDE'S FAILURE TO MITIGATE HER DAMAGES REQUIRES THAT THE COMPENSATORY DAMAGES AWARD BE VACATED.

Pande argues that Chevron's unconditional offers of employment in December 2002 and June 2003 would not cut off damages because she was still employed at the time of those offers, and that she adequately mitigated damages. Neither argument is supported

---

[15] Pande also failed to present any evidence to support her speculation that the decision-makers for those 2003 selections failed to select her because of her complaint, or because of the 2002 employment actions – i.e., no evidence the 2003 decision-makers knew about Pande's 2002 complaint, no evidence the 2003 decision-makers knew about Pande's 2002 "2" rating or reviewed her 2002 performance evaluation, no evidence the decision-makers knew about Pande's 2002 salary action (meaning the percentage increase), no evidence that the decision-makers in 2002 were involved in the 2003 decisions, *and* no evidence that Pande was more qualified than the selected candidates.

[16] Contrary to Pande's assertion, Judge Wilken did not close the door on the statute of limitations defense. All she held was that there were triable issues of fact that precluded summary judgment at that point in the proceedings. Order, January 17, 2007 at 21-22. Neither did Hartshorn's testimony close the door on this defense. All Hartshorn stated was that Mitchell told her Pande had been rated a "2." Granted, this testimony took place within the limitations period; however, it was simply a confirmation of the act that had occurred long before the one year period had run. It provides no basis for extending the limitations period.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
LARKSPUR, CALIFORNIA

by the evidence or the law. Contrary to Pande's argument, an offer of a comparable position while a plaintiff is still employed *is* an absolute defense to back wages. In *Cowen v. Standard Brands*, the employer offered Cowen a transfer to a comparable job at the same salary in a different location before suit was filed and while Cowen's salary was being continued. *Cowen v. Standard Brands, Inc.*, 572 F. Supp. 1576, 1581 (N.D. Ala. 1983). In setting aside the jury verdict for back wages, the Court held that Cowen relinquished any claim to back wages when he refused the employer's unconditional offer. *Id.* at 1582. Similarly, in *Champion International Corp. v. Wideman* the Court held that the plaintiff's entitlement to back pay terminated when he rejected his then-employer's unconditional job offer. *Champion International Corp. v. Wideman*, 733 So.2d 559, 562 (F.D. Fla. 1999). As set forth in Chevron's opening brief and consistent with case law on the subject, any potential liability ended – at the latest – when Pande refused to accept the June 2003 offer of substantially equivalent employment in Houston. *See Cowen*, 572 F. Supp. at 1582.

Moreover, by her own words and actions, Pande has demonstrated a deliberate choice not to mitigate her damages. Pande's argument that she did not limit her job search geographically rings hollow as her termination resulted from her refusal to relocate. (Ex. 64) And although Pande calls "absurd" the notion that she should have sought permanent work at Chevron [Opp. 17, fn. 7], the undisputed record shows that Pande actually worked for Chevron in Houston as a consultant after her termination. (Tr. 582:13-20) Given this, and the fact that 55 of Chevron's 100 technical positions went unfilled at the October PDC [Tr. 1211:3-13], Pande has no excuse for her refusal to seek employment with Chevron. The fact is that after rejecting a job offer from Chevron to work in Houston, Pande decided that she no longer wanted to work for a "supermajor" oil company, as indicated by the fact that she never applied for a job at one of Chevron's major competitors. (Tr. 577:10-24) Instead, as Pande admits, she "had been trying to get consulting work from the very beginning." (Tr. 374:25-375:1) In short, the undisputed evidence shows that Pande rejected Chevron's offer of continued employment in Houston, then made no efforts to find comparable employment

14

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**
Case No. C 04-5107 JCS

1 after her December 2003 termination, and all the while sought to build a consulting practice.
2 To hold Chevron liable for Pande's poor choices would be a miscarriage of justice.

**D.   EVIDENCE OF PANDE'S MEDICAL CONDITION INFLAMED THE JURY**

Contrary to Pande's claims, Chevron did not waive its objections to her testimony about her medical condition when it failed to object while Pande was on the stand. It is well established that the fact that an objection to a particular line of evidence has been overruled preserves the point for appellate review without the need for repeated objections to later questions during trial.[17] Accordingly, since Chevron twice sought rulings limiting Pande from testifying about her medical condition and was twice overruled, there was no waiver on this issue. (*See* Transcript from May 22, 2006 Pre-trial Conference 36:22-38:22 (Docket No. 117); Tr. 195:12-201:10) Accordingly, the prejudice caused by Pande's testimony on this subject constitutes grounds for a new trial.

### III.   CONCLUSION

Pande has not, as a matter of law, established any of her claims at trial and nothing in her Opposition compels a different conclusion. As such, Defendants are entitled to judgment in their favor as a matter of law. Alternatively, for the reasons set forth above, a new trial should be ordered.

Dated: December 7, 2007                    MILLER LAW GROUP
                                           A Professional Corporation

                                           By: _____/S/_____
                                               Michele Ballard Miller
                                               Attorneys for Defendants

---

[17] *See United States v. Greenwood*, 974 F.2d 1449, fn. 23 (5th Cir. 1992) (where district court had already ruled on identical issue, further objection would have been futile and thus was not required); *Douglas v. State of Alabama*, 380 U.S. 415, 421-23 (1965); *United States v. Marshall*, 762 F.2d 419, 425 (5th Cir. 1985) (overruling of timely specific objection amounted to continuing objection, thereby preserving error for "subsequent evidence admitted within the scope of the ruling") (internal citations omitted)). The rationale behind this rule is that the right to appellate review is preserved after the trial court clearly rules *once* on a subject. Repeated objections would only delay trial and embarrass counsel in front of the jury. *See United States v. Mendiola*, 42 F.3d 259, 260, fn. 2 (5th Cir. 1994).