**EXHIBIT A (Part 1 of 2)**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE, JUDGE

| | | |
|---|---|---|
| KIRAN PANDE, | ) | |
| | ) | **JURY TRIAL** |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. C 04-5107JCS |
| | ) | |
| CHEVRON CORPORATION (F/K/A | ) | |
| CHEVRONTEXACO CORPORATION) | ) | **VOLUME 1** |
| EXPLORATION & PRODUCTION | ) | **PAGES 1 - 189** |
| (F/K/A CHEVRONTEXACO | ) | |
| OVERSEAS PETROLEUM), A | ) | |
| DIVISION OF CHEVRON U.S.A. | ) | |
| INC., | ) | SAN FRANCISCO, CALIFORNIA |
| | ) | TUESDAY, OCTOBER 9, 2007 |
| DEFENDANTS. | ) | |
| | ) | |

Certified Copy

TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF:         KEKER & VAN NEST
                       710 SANSOME STREET
                       SAN FRANCISCO, CALIFORNIA  94111-1704
                BY:    CHRISTA M. ANDERSON,
                       SUSAN J. HARRIMAN, ATTORNEYS AT LAW


FOR DEFENDANTS:        MILLER LAW GROUP, PC
                       500 SANSOME STREET, SUITE 400
                       SAN FRANCISCO, CALIFORNIA  94111
                BY:    LISA HAMASAKI,
                       MICHELE BALLARD MILLER
                       JANINE S. SIMERLY, ATTORNEYS AT LAW


REPORTED BY:           RAYNEE H. MERCADO, CSR NO. 8258

## CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C04-5107JSC, PANDE V. CHEVRON, ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

WEDNESDAY, OCTOBER 10, 2007

1   WANT MS. MEITNER ON THIS JURY?

2           PROSPECTIVE JUROR:  YES.

3           MS. SIMERLY:  OKAY.

4           MS. JENSEN, YOU'RE NEXT.  AND THERE WAS A BIG

5   HESITATION WHEN YOU ANSWERED THOSE QUESTIONS AS WELL.  YOU

6   HESITATED.  AND AGAIN, NO ONE WANTS TO SAY, "I CAN'T BE FAIR."

7   YOU KNOW, I MEAN MY GOSH, YOU KNOW, YOU'RE A U.S. CITIZEN.  OF

8   COURSE YOU CAN BE FAIR.  BUT WHAT'S REALLY IMPORTANT HERE IS NOT

9   TO SAY WHAT YOU THINK THE ANSWER IS SUPPOSED TO BE.  IT'S TO SAY

10  WHETHER YOU REALLY BELIEVE THAT THE PARTIES START OUT EVEN IN

11  THIS CASE, LEVEL PLAYING FIELD, THAT'S ALL WE'RE ASKING FOR.

12          SO MY QUESTION TO YOU, IF YOU WERE STANDING WHERE I'M

13  STANDING REPRESENTING CHEVRON, WOULD YOU WANT MS. JENSEN ON THIS

14  JURY?

15          PROSPECTIVE JUROR:  YES.

16          MS. SIMERLY:  NOW, I THINK, MS. CARDOSO, YOU RAISED

17  YOUR HAND INITIALLY ON THE QUESTION ABOUT BIG BAD OIL COMPANIES

18  AND THEN YOU DIDN'T RAISE IT AGAIN, DIDN'T YOU?

19          PROSPECTIVE JUROR:  NO.

20          MS. SIMERLY:  IS THAT KIND OF TRUE?

21          PROSPECTIVE JUROR:  YEAH.  NO, THAT'S TRUE.  AND

22  INITIALLY I RAISED MY HAND BECAUSE OF ALL THE COVERAGE ABOUT GAS

23  PRICES AND THINGS, BUT COMES DOWN TO IT HAS NOTHING TO DO WITH

24  EMPLOYMENT ISSUES.  AND I HAVEN'T HEARD ANYONE COMPLAIN ABOUT

25  BEING EMPLOYED BY CHEVRON OR ANYTHING OR ANY TYPE OF OIL COMPANY

```
 1  TO DO WITH THIS CASE, BUT SHE WASN'T TALKING ABOUT --

 2          THE COURT:  ONE AT A TIME.

 3          MS. HARRIMAN:  SHE DIDN'T SAY SHE WAS ANTI-OIL

 4  COMPANY.  SHE DIDN'T SAY ANYTHING ABOUT THAT.  SHE SAID THE ONE

 5  CONCERN SHE HAS IS ABOUT LOBBYING AND MONEY AFFECTING INFLUENCE,

 6  AND I DIDN'T THINK THAT THAT HAD ANYTHING TO DO WITH THIS CASE

 7  OR ANYTHING THAT'S GOING TO BE BEFORE HER.

 8          MS. SIMERLY:  SO IN OTHER WORDS, IF AT THE END OF THE

 9  DAY, CHEVRON CAN LAWFULLY TERMINATE MS. PANDE BECAUSE YOU ONLY

10  GET 12 WEEKS OF FMLA LEAVE, BUT CHEVRON, THIS BIG, POWERFUL,

11  RICH COMPANY LOBBIES THE LEGISLATORS TO LIMIT IT TO 12 WEEKS.

12  THAT'S EXACTLY WHAT WE'RE TALKING ABOUT IN THE SITUATION, YOUR

13  HONOR.

14          THE COURT:  WELL, THERE WON'T BE ANY EVIDENCE THAT --

15          MS. HARRIMAN:  THAT'S NEWS TO US.

16          THE COURT:  -- THAT'S A LOBBY OF THAT.  AND I'M

17  NOT -- OKAY.  ANYTHING ELSE ON FOR CAUSE?

18          MS. SIMERLY:  NO.

19          THE COURT:  ALL RIGHT.  I'M GOING TO -- I'M GOING

20  TO -- LET'S SEE, WE'RE GOING THROUGH THIS.

21          DELLA-PORTA, I'M GOING TO EXCUSE FOR CAUSE.  I THINK

22  HE SHOWED A CLEAR BIAS, AND EVEN THOUGH HE'D OVERCOME IT.

23          AND I'M GOING TO EXCUSE EDGERTON FOR CAUSE.  PART OF

24  IT IS SHE REALLY DIDN'T WANT TO BE ON THE JURY AND WAS TRYING TO

25  FIGURE OUT SOME WAY TO MANUFACTURE A REASON, BUT I THINK SHE
```

1    PROMISED HER THAT SHE COULD CONTINUE WORKING ON PROJECTS FOR HIS

2    GROUP FROM SAN RAMON THROUGH 2004.    AFTER KIRAN DECIDED TO TAKE

3    A MEDICAL LEAVE, JACK DUNN DENIED EVER MAKING THAT PROMISE.

4              OKAY.    THAT NOW TAKES US UP TO THE SECOND POINT I

5    WANT TO TALK TO YOU ABOUT, WHICH IS KIRAN'S ILLNESS AND HER

6    MEDICAL LEAVE.

7              STARTING BACK IN JULY OF 2001, KIRAN PANDE HAD BEEN

8    EXPERIENCING SEVERE ANEMIA.    ANEMIA IS A CONDITION WHERE THE

9    BLOOD IS LACKING RED BLOOD CELLS.    KIRAN'S ANEMIA STEMMED FROM

10   HAVING FIBROIDS OR TUMORS ON HER UTERUS.    IN JULY OF 2001, KIRAN

11   HAD TO GO TO STANFORD HOSPITAL FOR AN EMERGENCY BLOOD

12   TRANSFUSION.    SHE RETURNED TO WORK WITHOUT TAKING ANY TIME OFF.

13             THROUGHOUT LATE 2002 AND 2003, HER MEDICAL PROBLEMS

14   BECAME WORSE AND WORSE.

15             IN THE FIRST HALF OF 2003, SHE WAS TRAVELING A LOT ON

16   BUSINESS.    AND BECAUSE OF THE TUMORS OR FIBROIDS ON HER UTERUS,

17   KIRAN WAS EXPERIENCING VERY HEAVY BLEEDING DURING HER MENSTRUAL

18   CYCLES.    THAT AND BEING WEAK MADE TRAVELING VERY DIFFICULT.    SHE

19   TRIED WITH IRON SUPPLEMENTS TO -- TO IMPROVE HER RED BLOOD CELL

20   COUNT, BUT SHE WASN'T GETTING BETTER.    HER DOCTOR RECOMMENDED

21   THAT SHE HAVE SURGERY TO REMOVE THE FIBROIDS.    KIRAN, THEREFORE,

22   APPLIED FOR MEDICAL LEAVE SO SHE COULD HAVE THAT SURGERY.

23             AND CHEVRON HAD A VERY GENEROUS DISABILITY POLICY.

24   ON ITS WEBSITE, CHEVRON EXPLAINED THE PROGRAM TO ITS EMPLOYEES.

25             (EXHIBIT PUBLISHED TO JURY.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE, JUDGE

| | |
|---|---|
| KIRAN PANDE, | ) |
| | ) **JURY TRIAL** |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) NO. C 04-5107JCS |
| | ) |
| CHEVRON CORPORATION (F/K/A | ) |
| CHEVRONTEXACO CORPORATION) | ) |
| EXPLORATION & PRODUCTION | ) **VOLUME 2** |
| (F/K/A CHEVRONTEXACO | ) **PAGES 190 - 395** |
| OVERSEAS PETROLEUM), A | ) |
| DIVISION OF CHEVRON U.S.A. | ) |
| INC., | ) SAN FRANCISCO, CALIFORNIA |
| | ) WEDNESDAY, OCTOBER 10, 2007 |
| DEFENDANTS. | ) |

Certified Copy

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:          KEKER & VAN NEST
                        710 SANSOME STREET
                        SAN FRANCISCO, CALIFORNIA  94111-1704
                  BY:   CHRISTA M. ANDERSON,
                        SUSAN J. HARRIMAN, ATTORNEYS AT LAW


FOR DEFENDANTS:         MILLER LAW GROUP, PC
                        500 SANSOME STREET, SUITE 400
                        SAN FRANCISCO, CALIFORNIA  94111
                  BY:   LISA HAMASAKI,
                        MICHELE BALLARD MILLER
                        JANINE S. SIMERLY, ATTORNEYS AT LAW


REPORTED BY:            RAYNEE H. MERCADO, CSR NO. 8258

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404*

## CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C04-5107JSC, PANDE V. CHEVRON, ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

*Raynee H Mercado*

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

THURSDAY, OCTOBER 11, 2007

1    UNDERSTANDS SHE IS NOT TO VOLUNTEER OR MAKE ANY REFERENCE TO

2    COMPLAINTS OF VICKI THOMAS (SIC) OR ANY OTHER WOMAN WITH

3    REFERENCE TO REX MITCHELL.   I ASSUME THAT THAT'S BEEN MADE VERY

4    CLEAR TO HER.

5             **THE COURT:**  I ASSUME THIS TOO.

6             ANY OBJECTION TO THE CHARACTERIZATION OF WHAT'S

7    SUPPOSED TO HAPPEN?

8             **MS. HARRIMAN:**  YOUR HONOR, I LISTENED TO YOU

9    YESTERDAY.   I HEARD EXACTLY WHAT YOU HAD TO SAY.   I KNOW WHAT

10   I'M SUPPOSED TO DO AND SO DOES MS. PANDE.

11            **MS. SIMERLY:**  THANK YOU.

12            UM, NEXT, YOUR HONOR, I NEED A LITTLE BIT OF

13   CLARIFICATION AND GUIDANCE FROM THE COURT.   MS. HARRIMAN DID GO

14   INTO SOME DETAIL IN HER OPENING ABOUT THE NATURE OF MS. PANDE'S

15   MEDICAL CONDITION, AND I JUST WANT TO BE SURE THAT WE DON'T

16   CROSS OVER THE LINE WHERE MS. PANDE IS TESTIFYING TO HEARSAY

17   STATEMENTS ABOUT HER DOCTORS' OPINIONS, HER DOCTORS'

18   RECOMMENDATIONS, HER DOCTORS' ADVICE.

19            NONE OF HER PHYSICIANS HAVE BEEN DISCLOSED AS A

20   WITNESS IN THIS CASE.   WE DIDN'T TAKE THEIR DEPOSITIONS.   AND I

21   REALIZE SHE CAN, OF COURSE, TALK ABOUT, "I HAD FIBROIDS; I WAS

22   BLEEDING."   BUT IF WE GET INTO, "THE DOCTOR TOLD ME I COULD

23   SCHEDULE THE SURGERY AT MY ELECTION," THAT'S HEARSAY.   AND WE

24   HAVEN'T DISCLOSED THAT DOCTOR BECAUSE THEY DIDN'T DISCLOSE THAT

25   DOCTOR.

1          **THE COURT:** I MEAN, IS THAT THE FOCUS OF THE ISSUE?

2          **MS. SIMERLY:** WELL, I'M AFRAID THAT IT MIGHT BE. I

3   DON'T REALLY KNOW WHAT THE FOCUS OF THE ISSUE IS, YOUR HONOR. I

4   HAVE THE ROAD MAP, BUT I -- I --

5          **THE COURT:** NO, FOR YOU --

6          **MS. SIMERLY:** OH, FOR ME.

7          **THE COURT:** -- IS THAT THE FOCUS OF THE ISSUE, THAT

8   YOU'RE WORRIED SHE'S GOING TO SAY, "THE DOCTOR SAID I COULD" --

9          **MS. SIMERLY:** VERY MUCH SO, YES.

10                 (SIMULTANEOUS COLLOQUY.)

11         **THE COURT:** -- "SCHEDULE THE SURGERY WHENEVER I

12  WANTED"?

13         **MS. SIMERLY:** YES.

14         **MS. HARRIMAN:** SHE GETS TO TALK ABOUT HER

15  UNDERSTANDING OF HER MEDICAL CONDITION, YOUR HONOR?

16         **THE COURT:** RIGHT. SO WHY IS THAT? "IT'S MY

17  UNDERSTANDING THAT I COULD SCHEDULE THE SURGERY AT MY ELECTION,"

18  SHE CAN TESTIFY TO THAT.

19         **MS. SIMERLY:** YOUR HONOR, CAN I LET -- MS. HAMASAKI

20  IS MORE FAMILIAR WITH THE BACKGROUND OF THIS --

21         **THE COURT:** FABULOUS.

22         MS. HAMASAKI, CAN SHE TESTIFY THAT IT WAS HER

23  UNDERSTANDING THAT SHE COULD SCHEDULE THE SURGERY AT HER

24  ELECTION?

25         **MS. HAMASAKI:** YOUR HONOR, THE ISSUE IS THAT WHEN SHE

1    REQUESTED THE LEAVE -- THE DOCUMENTS WILL SHOW THAT SHE

2    REQUESTED IT OUT UNTIL -- SHE SUBMITTED DOCUMENTATION OUT UNTIL

3    MAY.

4              THE ISSUE -- THE REASON THIS BECOMES AN ISSUE IS

5    BECAUSE FMLA, TO PROTECT --

6              **THE COURT:**  I UNDERSTAND WHY IT'S AN ISSUE.  MY

7    QUESTION IS ABOUT THE HEARSAY.

8              **MS. HAMASAKI:**  WELL, YOUR HONOR --

9              **THE COURT:**  THE OBJECTION IS THAT IT'S HEARSAY TO

10   SAY, "MY DOCTOR TOLD ME."  CAN'T SHE SAY, "MY UNDERSTANDING WAS

11   THAT I COULD SCHEDULE IT AT MY ELECTION"?

12             **MS. HAMASAKI:**  WELL, YOUR HONOR --

13             **THE COURT:**  "I'VE BEEN GOING THROUGH THIS FOR MANY

14   YEARS AND I'VE DONE THE BLAH, BLAH, BLAH, AND MY UNDERSTANDING

15   IS I COULD"?

16             **MS. HAMASAKI:**  YOUR HONOR, THIS WAS ADDRESSED, I

17   BELIEVE, AT LENGTH IN THE MAY PRETRIAL CONFERENCE WITH

18   JUDGE WILKEN BEFORE THIS CASE TRANSFERRED.  AND THE ISSUE OF

19   WHETHER OR NOT THE DOCTOR SHOULD APPEAR WAS -- OR SHOULD BE

20   DESIGNATED WAS ADDRESSED.

21             AND MS. HARRIMAN OR -- OR MS. ANDERSON -- I DON'T

22   RECALL WHO -- BASICALLY TESTIFIED THAT SHE WOULD NOT BE TRYING

23   TO STEP INTO THE SHOES OF A DOCTOR.  SHE WOULD NOT BE TESTIFYING

24   ABOUT MEDICAL ISSUES.  THEY UNDERSTOOD THAT SHE WAS NOT A DOCTOR

25   AND THE ISSUE WAS DROPPED AT THAT POINT.

1          **THE COURT:**  WELL, I DON'T KNOW WHAT THAT MEANS,

2     BUT --

3          **MS. HARRIMAN:**  IT'S --

4          **THE COURT:**  -- IT DOESN'T ANSWER MY QUESTION.

5     YOU STILL HAVE TO ANSWER MY QUESTION.

6          **MS. HAMASAKI:**  OKAY.

7          **THE COURT:**  CAN SHE TESTIFY THAT IT WAS HER

8     UNDERSTANDING THAT -- OF HER CONDITION -- "MY UNDERSTANDING WAS

9     X.  I HAD THIS CONDITION, I HAD THAT CONDITION.  IT HAD THESE

10    CONSEQUENCES FOR ME, IT HAD THOSE CONSEQUENCES FOR ME, AND MY

11    UNDERSTANDING WAS THAT I SHOULD HAVE SURGERY.  AND MY

12    UNDERSTANDING WAS THAT I DIDN'T HAVE TO HAVE THE SURGERY ON THIS

13    DATE AND THEN I COULD POSTPONE IT"?

14         **MS. SIMERLY:**  MAY I INTERJECT, YOUR HONOR?  IF THAT'S

15    THE RULING, THEN I THINK THAT WE SHOULD BE ALLOWED TO -- TO

16    AMEND OUR WITNESS DISCLOSURE, TO LIST THE TREATING DOCTOR SO

17    THAT WE CAN CALL THAT DOCTOR IN TO FIND OUT IF IN FACT THAT --

18         **THE COURT:**  BUT I DON'T UNDERSTAND THAT.  YOU HAVE

19    KNOWN SINCE THE BEGINNING OF TIME THAT -- IN THIS CASE THAT THE

20    ALLEGATION IS THAT -- AND IT'S CLEAR AS DAY ON SEVERAL MOTIONS

21    IN LIMINE AND ON SUMMARY JUDGMENT -- THAT THE ALLEGATION IS THAT

22    SHE COULD SCHEDULE THE SURGERY FOR A TIME OTHER THAN THE TIME

23    THAT SHE HAD, THAT THERE WAS FLEXIBILITY AND THAT'S WHY --

24    THAT'S WHY THE JUDGE DENIED YOUR -- JUDGE WILKEN DENIED YOUR

25    MOTION IN LIMINE NO. 1.  I DON'T UNDERSTAND WHY SHE -- AND

```
 1   YOU'VE KNOWN THAT SINCE THE BEGINNING OF TIME.  I'M NOT ALLOWING

 2   ANY AMENDMENT OF ANY WITNESS LIST.  I'M NOT.  AND NO ONE'S GOING

 3   TO ADD WITNESSES.

 4            MS. SIMERLY:  AND WE'RE NOT.

 5            THE COURT:  THE ONLY QUESTION IS, IS IT HEARSAY FOR A

 6   PERSON TO SAY, "IT IS MY UNDERSTANDING THAT I COULD SCHEDULE

 7   THIS AT SUCH AND SUCH A TIME"?  IT'S HER CONDITION.  IT'S HER

 8   DECISION.  WHY CAN'T SHE TESTIFY TO THAT?

 9            MS. SIMERLY:  BECAUSE IT IS A BACKDOOR WAY OF GETTING

10   THAT HEARSAY STATEMENT BEFORE THE JURY.

11            THE COURT:  WELL, SHE'S NOT GOING TO SAY, AND SHE

12   WON'T BE PERMITTED TO SAY, "MY DOCTOR TOLD ME."  AND I DON'T

13   THINK MS. HARRIMAN'S GOING TO ASK, "WHAT DID YOUR DOCTOR TELL

14   YOU?" AND WON'T ALLOW HER CLIENT TO SAY, "MY DOCTOR TOLD ME."

15   OF COURSE YOU COULD CROSS-EXAMINE ON THAT, BUT SHE'S NOT GOING

16   TO SAY, "MY DOCTOR TOLD ME."  SHE'S GOING TO SAY, "MY

17   UNDERSTANDING WAS ..."  AND WE HAVE -- ISN'T HER UNDERSTANDING

18   OF WHEN SHE'S SUPPOSED TO HAVE THAT SURGERY RELEVANT?

19            MS. SIMERLY:  ONLY IF SHE SHARES THAT WITH -- WITH MY

20   CLIENT, CHEVRON.  AND THERE'S NO EVIDENCE THAT SHE EVER SHARED

21   THAT UNTIL THIS LITIGATION.  THE ONLY INFORMATION THEY EVER HAD

22   WAS THAT THE END DATE WAS MAY 2004.  I MEAN, SO WHAT -- HOW IS

23   HER UNDERSTANDING RELEVANT IF IN FACT THE INFORMATION SHE

24   PROVIDES THROUGH UNUMPROVIDENT TO CHEVRON --

25            THE COURT:  ISN'T IT RELEVANT TO THE QUESTION OF
```

1  WHETHER OR NOT SHE HAD TO HAVE THE SURGERY ON THAT DATE?  SHE'S

2  THE ONE MAKING THE DECISION ABOUT THE SURGERY.

3          MS. SIMERLY:  NO, NO, NO.  BUT WHAT'S RELEVANT --

4          THE COURT:  SEE, HERE'S THE POINT:  YOU WANT TO SAY,

5  "SHE HAD TO HAVE THE SURGERY ON THAT DATE.  SHE HAD TO BE OUT

6  SIX MONTHS.  IT WAS BEYOND THE THREE MONTHS.  SHE GETS NO

7  DAMAGES."  I UNDERSTAND THAT.

8          THEIR RESPONSE IS, "NO, SHE DIDN'T HAVE TO HAVE IT ON

9  THAT DATE.  SHE HAD -- IT WAS ELECTIVE SURGERY.  SHE ELECTED TO

10 HAVE IT ON THAT DATE AND SHE COULD HAVE CHANGED THE DATE.  AND

11 SHE COULD HAVE POSTPONED IT.  SHE HAD WORKED WITH THE CONDITION

12 BEFORE."

13         ISN'T HER UNDERSTANDING ON THE SUBJECT OF WHEN SHE

14 HAD TO HAVE IT PROBATIVE OF WHETHER OR NOT THAT'S TRUE?

15         MS. SIMERLY:  WHY IS THAT RELEVANT IF IN FACT THE

16 ONLY INFORMATION PROVIDED TO CHEVRON IS THAT, "I WILL BE OUT

17 UNTIL MAY OF 2004"?  WHAT DIFFERENCE IS HER UNDERSTANDING IF

18 THAT'S ALL CHEVRON IS TOLD?  BECAUSE ALL CHEVRON CAN RELY ON IN

19 REACHING ITS DECISION --

20         THE COURT:  I KNOW.  BUT THAT'S A QUESTION OF FACT

21 THAT THE JUDGE REFUSED TO RESOLVE ON A COUPLE OF DIFFERENT

22 OCCASIONS, AND I'M NOT RESOLVING IT, SO IT'S GOING TO GO TO THE

23 JURY.

24         I CAN'T GO -- I'M NOT -- I ACTUALLY AM NOT GOING TO

25 RECONSIDER ANY OF JUDGE WILKEN'S RULINGS, AND THIS DOES SEEM

1    LIKE YOU'RE ATTEMPTING TO GET ME TO.

2            MS. SIMERLY:  I REALLY THINK WHAT WE'RE TRYING TO DO

3    IS GET A CLARIFICATION.  I KNOW IT MAY APPEAR THAT WE'RE TRYING

4    TO GET A --

5            THE COURT:  OKAY.  WELL, THE CLARIFICATION IS THAT

6    SHE CAN'T TESTIFY AS TO THE HEARSAY STATEMENTS BY HER DOCTOR ON

7    HER MEDICAL CONDITION UNLESS SOMEBODY POINTS TO ME AN EXCEPTION

8    TO THE HEARSAY RULE.  ON THE OTHER HAND, SHE CAN TESTIFY AS TO

9    HER UNDERSTANDING OF HER CONDITION AND -- AND HER UNDERSTANDING

10   OF WHEN SHE HAD TO HAVE THE SURGERY.

11           MS. HARRIMAN:  WELL, THERE IS -- I MEAN, IF THE

12   EXCEPTION TO HEARSAY RULE IS -- IT'S NOT REALLY BEING -- IT'S

13   NOT BEING ADMITTED FOR THE TRUTH OF THE MATTER.  IT DOESN'T

14   MATTER IF WHAT THE DOCTOR TOLD HER WAS TRUE.  ALL THAT MATTERS

15   IS THAT'S WHAT THEY UNDERSTOOD.

16           THE COURT:  WELL, NO.  SEE, I THINK THE ULTIMATE

17   ISSUE ACTUALLY IS A DAMAGES QUESTION, COULD SHE RESCHEDULE THE

18   SURGERY?  SO I THINK IT IS, AS REGARDS THIS PIECE.

19           MS. HARRIMAN:  THAT'S FINE.  'CAUSE I DON'T CARE,

20   YOUR HONOR.  I'M HAPPY TO --

21           THE COURT:  WELL, HER --

22           MS. HARRIMAN:  -- HER OWN UNDERSTANDING 'CAUSE I

23   DON'T WANT TO ARGUE SOMETHING YOU DON'T NEED TO RULE ON.

24           MS. SIMERLY:  OKAY.  YOUR HONOR, I KNOW YOU DON'T

25   LIKE SURPRISES.  AND I JUST WANT TO --

1    **MS. HARRIMAN:**  PUT THAT ONE UP (INDICATING).

2  Q.  AND WHERE WAS THIS NEW POSITION BASED, THIS PLANNING

3  ANALYST?

4  A.  THIS WAS ALSO BASED IN SAN RAMON, CALIFORNIA.

5  Q.  AND WHO WAS YOUR SUPERVISOR IN YOUR POSITION AS PLANNING

6  ANALYST?

7  A.  IT WAS REX MITCHELL.

8  Q.  HOW DID YOU GET THE JOB OF PLANNING ANALYST?  DID YOU FILL

9  OUT AN APPLICATION?

10  A.  NO, I DID NOT.

11  Q.  HOW DID IT COME ABOUT?

12  A.  I WAS ASKED TO INTERVIEW FOR AN OPENING IN THE GROUP, I

13  THINK, IN THE FIRST QUARTER OF 2000.  AND THEN LATER IN THE

14  YEAR, DAVID KENNEDY, MY SUPERVISOR, TOLD ME THAT THERE WAS AN

15  OPENING AND ASKED ME IF I WAS INTERESTED IN IT.

16  Q.  OKAY.  AND WHAT -- TELL US WHAT A PLANNING ANALYST IS.

17  A.  A PLANNING ANALYST WORKS ON THE CAPITAL BUDGETING PROCESS,

18  WHICH IS BASICALLY THE PROCESS OF TRYING TO FIGURE OUT HOW MANY

19  DOLLARS GO TO THE DIFFERENT BUSINESS UNITS TO INVEST IN

20  DIFFERENT PROJECTS TO DRILL WELLS OR FACILITIES, ET CETERA.  AND

21  THIS PLANNING ANALYST POSITION WAS WITH THE HEADQUARTERS GROUP

22  FOR THE INTERNATIONAL UPSTREAM.

23         SO THE BUSINESS UNITS ACTUALLY RUN THE BUSINESS AND

24  THE PLANNING ANALYST POSITION IN THE HEADQUARTERS WOULD BE

25  ASSIGNED TO BUSINESS UNITS TYPICALLY TO WORK WITH, AND YOU'D

PANDE - DIRECT / HARRIMAN

```
1    Q.  LET ME PAUSE YOU 'CAUSE I DON'T WANT TO LOSE TRACK OF

2    KEEPING MY CHRON IN ORDER.  LET ME JUST PUT THAT THERE

3    (INDICATING).

4               NOW I WANT TO GO BACK AND TELL US WHEN YOU DEVELOPED

5    YOUR HEALTH PROBLEMS.

6    A.  I REALIZED I WAS SEVERELY ANEMIC IN JULY OF 2001.

7    Q.  AND HOW DID YOU REALIZE THAT?

8    A.  I REALIZED IT 'CAUSE I FINALLY WENT IN TO SEE MY PRIMARY

9    CARE DOCTOR, AND WHEN SHE GOT THE BLOOD TEST RESULTS BACK, SHE

10   SAID, "YOU NEED TO GET TO THE EMERGENCY ROOM AS" --

11              MS. SIMERLY:  OBJECTION, YOUR HONOR, HEARSAY.

12              THE COURT:  SUSTAINED.

13              THE WITNESS:  SORRY.

14              MS. HARRIMAN:  I DON'T THINK THERE WAS ANYTHING ABOUT

15   WHAT SHE SAID, YOUR HONOR -- SHE SAID TO ME.

16              THE COURT:  SHE WAS --

17              MS. HARRIMAN:  THERE WAS NOTHING ABOUT --

18              THE COURT:  WELL, ALL RIGHT.  BUT SHE'S ANSWERED THE

19   QUESTION.  SHE SENT HER TO THE EMERGENCY ROOM.

20   BY MS. HARRIMAN:

21   Q.  SO --

22   A.  I WENT TO THE EMERGENCY ROOM TO GET A BLOOD TRANSFUSION.

23   Q.  AND WHEN DID YOU GET THAT BLOOD TRANSFUSION?

24   A.  IT WAS IN JULY OF 2001.

25   Q.  AND WHY WAS IT THAT YOU NEEDED THE BLOOD TRANSFUSION?
```

1          **MS. SIMERLY:**  OBJECTION, YOUR HONOR, CALLS FOR A

2   MEDICAL OPINION, EXPERT OPINION.

3          **THE COURT:**  OVERRULED.

4          WHAT WAS YOUR UNDERSTANDING OF WHY YOU NEEDED A BLOOD

5   TRANSFUSION?

6          **THE WITNESS:**  MY UNDERSTANDING OF WHY I NEEDED A

7   BLOOD TRANSFUSION WAS BECAUSE MY RED BLOOD CELL COUNT HAD

8   DROPPED TO VERY LOW LEVELS.  AND I WAS AT RISK FOR A POTENTIAL

9   HEART ATTACK IF I DIDN'T HAVE A BLOOD TRANSFUSION.

10  **BY MS. HARRIMAN:**

11  Q.  AND WHAT WAS THE CAUSE OF YOUR BEING -- HAVING THESE LOW RED

12  BLOOD CELLS, MS. PANDE, AS YOU UNDERSTOOD IT?

13         **MS. SIMERLY:**  OBJECTION, YOUR HONOR, CALLS FOR A

14  MEDICAL OPINION.

15         **THE COURT:**  OVERRULED.

16         YOU CAN ANSWER THAT QUESTION.

17         **THE WITNESS:**  WHILE I WAS AT THE EMERGENCY ROOM, I

18  FOUND OUT THROUGH TESTS THAT I HAD A VERY LARGE TUMOR IN MY

19  UTERUS.  IT'S CALLED A FIBROID.  AND BECAUSE OF THAT, I HAD BEEN

20  LOSING A LOT OF BLOOD DURING MY MENSTRUAL CYCLE AND THAT HAD

21  CAUSED THE ANEMIA.

22  **BY MS. HARRIMAN:**

23  Q.  OKAY.  DID THE BLOOD TRANSFUSION SOLVE YOUR MEDICAL

24  PROBLEMS?

25         **MS. SIMERLY:**  OBJECTION.  CALLS FOR A MEDICAL

PANDE - DIRECT / HARRIMAN

1    OPINION.

2            **THE COURT:** WHY DON'T YOU REPHRASE THE QUESTION.

3    **BY MS. HARRIMAN:**

4    Q.  UPON RECEIVING THE BLOOD TRANSFUSION, MS. PANDE, HOW -- HOW

5    DID THAT AFFECT YOUR HEALTH?  HOW DID YOU FEEL?

6    A.  THE BLOOD TRANSFUSION HELPED IN TERMS OF GETTING MY RED

7    BLOOD CELL COUNT UP.  SO I WASN'T FEELING AS COMPLETELY TIRED

8    AND EXHAUSTED AND OUT OF BREATH AS I HAD BEFORE THE BLOOD

9    TRANSFUSION, BUT I WAS ACTUALLY STILL VERY ANEMIC EVEN AFTER THE

10   BLOOD TRANSFUSION.  AND IT HELPED IN TERMS OF THE RED BLOOD CELL

11   COUNT, BUT IT DIDN'T HELP IN TERMS OF THE UNDERLYING PROBLEM OF

12   THE TUMOR THAT I HAD AND THE IMPACT THAT IT HAD ON LOSING A LOT

13   OF BLOOD MONTHLY.

14   Q.  AND WHAT WAS YOUR UNDERSTANDING OF HOW YOU COULD SOLVE THE

15   UNDERLYING PROBLEM OF HAVING THESE TUMORS ON YOUR UTERUS?

16   A.  MY UNDERSTANDING WAS THE RECOMMENDED OPTION WAS TO HAVE A

17   HYSTERECTOMY RIGHT THEN.

18   Q.  AND DID YOU CHOOSE TO DO THAT?

19   A.  NO, I DID NOT.

20   Q.  WHY NOT?

21   A.  I WAS SURPRISED BY THE DIAGNOSIS.  I HADN'T REALIZED I HAD

22   THIS PROBLEM.  I WANTED TO PRESERVE THE ABILITY TO HAVE CHILDREN

23   IN THE FUTURE, AND I JUST WAS NOT READY TO JUMP IN AND DO A

24   MAJOR SURGERY LIKE THAT RIGHT AT THAT INSTANT.

25   Q.  OKAY.  WERE YOU WORKING FOR REX MITCHELL DURING THIS TIME?

PANDE - DIRECT / HARRIMAN

1   A.   YES, I WAS.

2   Q.   HOW MANY DAYS' WORK DID YOU MISS IN CONNECTION WITH THIS

3   EMERGENCY BLOOD TRANSFUSION?

4   A.   I DIDN'T MISS ANY DAYS OF WORK.

5   Q.   AND AT THIS TIME, DID YOU TELL ANYONE AT CHEVRON ABOUT YOUR

6   MEDICAL PROBLEMS?

7   A.   NOT AT THAT TIME.

8   Q.   OKAY.

9        AT SOME POINT, DID YOU CHANGE JOBS WITHIN THE

10  BUSINESS PLANNING GROUP?

11  A.   YES, I DID.

12  Q.   AND WHEN DID YOU CHANGE JOBS WITHIN THE BUSINESS PLANNING

13  GROUP?

14  A.   I CHANGED JOBS AT THE END OF OCTOBER OF 2001.

15  Q.   TO WHAT POSITION DID YOU CHANGE TO?

16  A.   I CHANGED INTO A POSITION CALLED "PORTFOLIO ANALYST."

17  Q.   AND HOW DID THAT NEW ASSIGNMENT COME ABOUT, MS. PANDE?

18  A.   IN LATE SEPTEMBER, ON SEPTEMBER 27TH OF 2001, WHILE I WAS IN

19  HOUSTON WORKING WITH THE MERGER INTEGRATION, REX ASKED ME IF I'D

20  BE INTERESTED IN THIS NEW POSITION WITH THE -- WITH THE MERGED

21  COMPANY.

22  Q.   WHAT DID -- WHAT DID HE TELL YOU ABOUT THE NEW POSITION IN

23  THIS CONVERSATION THAT YOU HAD ON SEPTEMBER 27?

24  A.   HE TOLD ME THERE HE THOUGHT IT WAS A REALLY INTERESTING

25  POSITION AND IT COMBINED DIFFERENT ASPECTS OF DIFFERENT ROLES,

PANDE - DIRECT / HARRIMAN

1    BY MS. HARRIMAN:

2    Q.   DID YOU -- YOUR -- DID YOU BEGIN TO HAVE ANY DIFFICULTIES IN

3    YOUR INTERACTIONS WITH MR. MITCHELL?

4    A.   YES, I DID.

5    Q.   AND EXPLAIN THE NATURE OF THOSE DIFFICULTIES, MS. PANDE.

6    A.   I -- IN MY INTERACTIONS WITH REX MITCHELL, I FELT THE WAY

7    THAT HE WAS TALKING TO ME AND INTERACTING WITH ME WAS IN A WAY

8    WHERE HE WAS TALKING DOWN TO ME, TREATING ME -- I FELT HE WAS

9    TREATING ME DIFFERENTLY THAN THE MEN IN THE GROUP.  AND I FELT

10   THAT HE WAS BELITTLING ME.  HE WAS ATTRIBUTING, YOU KNOW,

11   ADVERSARIAL MOTIVES TO HOW I WAS DOING MY WORK AND INTERACTING

12   WITH HIM.

13   Q.   AND DID YOU COMPLAIN ABOUT MR. MITCHELL'S BEHAVIOR?

14   A.   YES, I DID.

15   Q.   AND TO WHOM DID YOU COMPLAIN?

16   A.   I COMPLAINED TO JAMES JOHNSON WHO WAS -- HAD JUST BECOME

17   MR. MITCHELL'S SUPERVISOR.

18   Q.   AND WHY DID YOU COMPLAIN TO JAY JOHNSON?

19   A.   I COMPLAINED TO JAY BECAUSE I THOUGHT THAT HE COULD HELP ME

20   GET BACK TO A CONSTRUCTIVE RELATIONSHIP WITH REX, AND I FELT I

21   NEEDED HELP FROM SOMEBODY TO SIT DOWN AND GET US BACK ON TRACK.

22   Q.   WHEN WAS IT THAT YOU COMPLAINED TO MR. JOHNSON?

23   A.   I COMPLAINED TO MR. JOHNSON ON MARCH 4TH OF 2002.

24   Q.   HAD YOU SET UP A MEETING WITH HIM PRIOR TO THAT TIME?

25   A.   YES.

PANDE - DIRECT / HARRIMAN

1   APRIL AND CORRECT THE DATE ON IT SINCE IT'S NOT ACCURATE.

2                (PAUSE IN THE PROCEEDINGS.)

3   BY MS. HARRIMAN:

4   Q.   AND AFTER THIS PROCESS WITH YOUR PERFORMANCE REVIEW, DID YOU

5   TAKE ANY FURTHER STEPS TO ADDRESS YOUR CONCERNS, MS. PANDE?

6   A.   YES, I DID.

7   Q.   WHAT DID YOU DO?

8   A.   I TALKED TO GARY YAMASHITA WHO IS A CHEVRON OMBUDSPERSON.

9   Q.   WHAT'S AN OMBUDSPERSON?

10  A.   AN OMBUDS IS A PERSON OR A PROCESS THAT CHEVRON HAS TO HELP

11  EMPLOYEES RESOLVE COMPLAINTS WITH THEIR SUPERVISORS.

12  Q.   AND WHAT WAS YOUR PURPOSE IN SPEAKING TO MR. YAMASHITA?

13  A.   MY PURPOSE IN SPEAKING TO GARY YAMASHITA WAS I DIDN'T FEEL

14  LIKE I WAS BEING LISTENED TO BY EITHER REX OR JAY, AND I WANTED

15  SOME HELP IN TRYING TO RESOLVE THIS AND MOVE FORWARD IN A

16  CONSTRUCTIVE MANNER.

17                I FELT THAT THIS PMP WAS ADDITIONAL EVIDENCE OF

18  RETALIATION AND I WANTED HIS HELP IN HAVING A CONSTRUCTIVE

19  DISCUSSION ABOUT THAT.

20  Q.   AND WHAT HAPPENED AS A RESULT OF MEETING WITH MR. YAMASHITA?

21  A.   WE SCHEDULED A MEETING WITH JAY JOHNSON FOR APRIL 24TH OF

22  2002.

23  Q.   WOULD YOU TAKE A LOOK AT EXHIBIT 20, PLEASE.

24  A.   (REVIEWING DOCUMENTS.)

25                YES.

1  A.  THE FOUR MAIN BULLET POINTS ARE "CTOP PLANNING CONSTITUTES A

2  HOSTILE WORK ENVIRONMENT THAT DOES NOT FOSTER PRODUCTIVITY OR

3  RESPECT AMONGST THE WORK GROUP.  PERFORMANCE EVALUATIONS ARE

4  PREFERENTIAL, BIASED," QUESTION MARK, "UNFAIR YARDSTICKS ARE

5  USED FOR PERFORMANCE CRITERIA.  RETALIATORY MEASURES ARE OF

6  IMMEDIATE CONCERN."

7  Q.  AND DID YOU SET A MEETING WITH MR. JOHNSON?

8  A.  YES, I DID.

9  Q.  AND WHO ATTENDED THAT MEETING?

10  A.  THAT MEETING WAS ATTENDED BY MYSELF, JAY JOHNSON, GARY

11  YAMASHITA, THE OMBUDS PERSON, AND VICKI THOMPSON, WHO'S A

12  RESERVES ANALYST IN THE GROUP.

13  Q.  AND MS. THOMPSON ALSO REPORTED TO MR. MITCHELL?

14  A.  YEAH, SHE DID.

15  Q.  HOW MANY OTHER PEOPLE REPORTED TO MR. MITCHELL BESIDES

16  YOURSELF AND VICKI THOMPSON?

17  A.  THERE ARE ABOUT FIVE OTHER PEOPLE THAT REPORTED TO REX

18  MITCHELL.

19  Q.  AND LET ME PUT THIS UP.  AND I'LL ASK -- WHEN DID THAT

20  MEETING OCCUR?

21  A.  THAT MEETING OCCURRED ON APRIL 24TH OF 2002.

22  Q.  AND TELL US WHAT HAPPENED IN THE MEETING WITH JAY JOHNSON ON

23  APRIL 24, 2002.

24  A.  ON APRIL 24TH OF 2002, GARY YAMASHITA, THE OMBUDS PERSON,

25  HAD A SHORT PREMEETING WITH JAY JOHNSON, AND THEN MYSELF AND

PANDE - DIRECT / HARRIMAN

1   VICKI WERE INVITED TO JOIN THEM.  AND THE MEETING DIDN'T PROCEED

2   AS I HAD PLANNED OR -- OR ANTICIPATED.  WE NEVER DISCUSSED ANY

3   OF THE ISSUES THAT ARE LISTED HERE.  THE MEETING REALLY FOCUSED

4   ON JAY JOHNSON'S PARROTING REX MITCHELL'S PERFORMANCE CONCERNS

5   ABOUT MY PERFORMANCE.

6   Q.   OKAY.  AND SO DID -- DID YOU HAVE ANY CHANCE TO TALK ABOUT

7   ANY OF THESE ISSUES THAT ARE ON THE SCREEN?

8   A.   NO, WE DID NOT.

9   Q.   WHAT WAS IT THAT MR. JOHNSON WAS TELLING YOU?

10  A.   MR. JOHNSON WAS TELLING ME THAT ANY PROBLEMS THAT I HAD WITH

11  REX WERE MY OWN FAULT.

12  Q.   DID MR. YAMASHITA DO ANYTHING TO REDIRECT THE CONVERSATION?

13  A.   NO.  HE WAS -- HE WAS BASICALLY A FLY ON THE WALL.

14  Q.   AND HOW DID THE MEETING END?

15  A.   THE MEETING ENDED AFTER SPENDING A LOT OF TIME TALKING ABOUT

16  REX'S PERFORMANCE ISSUES.  JAY -- I MEAN TOWARDS ME.  JAY

17  ASKED -- OR INFORMED VICKI THOMPSON THAT HE WOULD BE MOVING HER

18  INTO --

19         MS. SIMERLY:  OBJECTION, YOUR HONOR.

20         THE COURT:  JUST --

21         MS. HARRIMAN:  YEAH.

22  Q.   HOW DID YOU AND VICKI --

23         THE COURT:  SUSTAINED.

24  BY MS. HARRIMAN:

25  Q.   -- MS. PANDE?

1   SO LET'S MAKE SURE NOT TO HAVE ANY REFERENCE, DIRECT OR

2   INDIRECT, TO HER COMPLAINTS.

3            **THE WITNESS:**  YES, YOUR HONOR.

4            **THE COURT:**  THANK YOU VERY MUCH.

5            ALL RIGHT.  ANYTHING BEFORE WE CALL THE JURY?

6            **MS. HARRIMAN:**  NO, YOUR HONOR.

7            **MS. SIMERLY:**  NO, THANK YOU, YOUR HONOR.

8            **THE COURT:**  OKAY.

9            KAREN, IF YOU WOULD BRING THE JURY IN.

10           (OFF-THE-RECORD DISCUSSION.)

11           (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE

12  OF THE JURY:)

13           **THE COURT:**  OKAY.  THE JURY IS BACK.  PLEASE HAVE A

14  SEAT.  EVERYONE HAVE A SEAT.

15           ALL RIGHT.

16           MS. HARRIMAN, GO AHEAD.

17           **MS. HARRIMAN:**  THANK YOU, YOUR HONOR.

18  Q.  OKAY.  MS. PANDE.  I THINK WE'VE ACTUALLY MOVED FORWARD IN

19  TIME TO 2003.  AND JUST TO PUT US BACK WHERE WE WERE, TELL US

20  WHERE YOU WERE WORKING IN 2003.

21  A.  SO IN 2003, I WAS NOW WORKING IN THE SOUTHERN AFRICA

22  BUSINESS UNIT IN SAN RAMON, CALIFORNIA.

23  Q.  AND WHO WAS YOUR SUPERVISOR?

24  A.  MY NEW SUPERVISOR WAS JACK DUNN.

25  Q.  AND IN THE FIRST QUARTER OF 2003, DID YOU HAVE ANY

PANDE - DIRECT / HARRIMAN

1    DISCUSSIONS WITH MR. DUNN ABOUT YOUR ANNUAL SALARY TREATMENT?

2    A.   YES, I DID.

3    Q.   AND WHEN DID YOU?

4    A.   ON APRIL 1ST OF 2003.

5    Q.   AND TELL US ABOUT THE CONVERSATION THAT YOU HAD ON APRIL 1ST

6    OF 2003 WITH MR. DUNN.

7    A.   MR. DUNN SAID THAT I WAS NOT GOING TO BE RECEIVING A MERIT

8    PAY INCREASE THAT YEAR BASED ON INPUT THAT HE HAD RECEIVED FROM

9    THE TIME THAT I HAD BEEN IN THE PLANNING -- BUSINESS PLANNING

10   GROUP.

11   Q.   SO DID HE TELL YOU WHOM HE HAD RECEIVED THE INPUT FROM?

12   A.   YES, HE SAID THAT HE HAD TRIED TO GET INPUT FROM REX

13   MITCHELL AND HAD NOT BEEN SUCCESSFUL, SO HE HAD GOTTEN THE INPUT

14   FROM KELLY HARTSHORN.

15   Q.   AND FOR WHAT -- FOR WHAT -- TELL US FIRST WHAT A SALARY

16   MERIT INCREASE IS.

17   A.   SO THE SALARY PROGRAM AT CHEVRON GENERALLY HAS A STRUCTURAL

18   INCREASE THAT HAS MORE TO DO WITH INFLATION AND THEN A MERIT

19   COMPONENT THAT IS INDICATION OF HOW WELL YOU'VE DONE THAT YEAR,

20   TO REWARD YOU.

21   Q.   OKAY.  AND IN 2002, HAD YOU WORKED AT ALL FOR MR. DUNN?

22   A.   JUST FOR A FEW WEEKS.  I TRANSFERRED IN ON DECEMBER 9TH, SO

23   BETWEEN THAT AND THE HOLIDAYS, REALLY HARDLY AT ALL.

24   Q.   OKAY.  AND HAD THERE BEEN A TIME PREVIOUSLY WHEN YOU DIDN'T

25   RECEIVE A MERIT RAISE?

PANDE - DIRECT / HARRIMAN

1   MOVE HE'S REFERRING TO?

2   A.   I THINK HE WAS REFERRING TO THE FACT THAT IF I WAS OFFERED A

3   POSITION THROUGH THE PDC PROCESS, THAT I MAY MOVE INTO THAT

4   GROUP BEFORE THE END OF THE YEAR.

5           **MS. HARRIMAN:**   THANKS, CANDI.

6   Q.   DID YOU CONTINUE TO SEARCH FOR OTHER POSITIONS WITHIN

7   CHEVRON?

8   A.   YES, I DID.

9   Q.   AND WHY DID YOU CONTINUE TO SEARCH AFTER YOU HAD THE OFFER

10  TO WORK FROM SAN RAMON FOR ANOTHER YEAR?

11  A.   THE OFFER THAT I HAD FROM JACK WAS TO CONTINUE TO WORK FROM

12  SAN RAMON THROUGH THE END OF 2004, BUT IT WAS TEMPORARY.   AND I

13  WAS -- HAD ALREADY STARTED THE PROCESS OF APPLYING, AND I WANTED

14  TO KEEP APPLYING TO JOBS THAT HAD A LONGER DURATION THAN -- THAN

15  JUST A YEAR.

16  Q.   AND BY OCTOBER OF 2003, WERE YOU STARTING TO HEAR BACK FROM

17  SOME OF THE POSITIONS THAT YOU HAD APPLIED FOR?

18  A.   YES, I HAD.

19  Q.   AND WHAT WERE YOU HEARING?

20  A.   THERE -- ON THE TWO JOBS THAT I'D APPLIED FOR -- WELL, THERE

21  WERE SEVERAL JOBS THAT I HAD APPLIED FOR THAT WERE A STRETCH,

22  THAT WERE PROBABLY TWO -- TWO OR MAYBE EVEN THREE GRADE LEVELS

23  HIGHER THAN I WAS WHERE I DIDN'T REALLY THINK I HAD ANY

24  REALISTIC CHANCE OF GETTING THEM, I HAD GOTTEN REJECTIONS ON

25  THOSE.

PANDE - DIRECT / HARRIMAN

```
1   Q.  AND HAD YOU RECEIVED REJECTIONS FOR ANY OF THE JOBS THAT YOU

2   THOUGHT YOU WERE WELL QUALIFIED FOR?

3   A.  I THINK SO.  I THINK I HAD RECEIVED REJECTIONS FOR THE

4   TECHNICAL JOBS THAT WERE IN LONDON, THE RESERVOIR ENGINEERING

5   AND PETROLEUM ENGINEERING JOBS.

6   Q.  OKAY.  WOULD YOU TAKE A LOOK AT EXHIBIT 51.

7   A.  (REVIEWING DOCUMENTS.)

8           YES.

9   Q.  AND IS THIS AN EMAIL EXCHANGE THAT YOU HAD WITH MR. DUNN IN

10  LATE OCTOBER OF 2003?

11  A.  YES, IT IS.

12          MS. HARRIMAN:  YOUR HONOR, I MOVE EXHIBIT 51 INTO

13  EVIDENCE.

14          MS. SIMERLY:  NO OBJECTION, YOUR HONOR.

15          THE COURT:  IT'S ADMITTED.

16                  (PLAINTIFF'S EXHIBIT 51

17                  RECEIVED IN EVIDENCE.)

18          MS. HARRIMAN:  AND CAN WE BLOW UP THE BOTTOM EMAIL

19  FIRST, CANDI.

20              (EXHIBIT PUBLISHED TO JURY.)

21  BY MS. HARRIMAN:

22  Q.  YOU WROTE TO MR. DUNN -- FIRST OF ALL, WHAT'S THE DATE OF

23  THE EMAIL, MS. PANDE?

24  A.  IT'S DATED THURSDAY, OCTOBER 23RD, 2003.

25  Q.  OKAY.  YOU WROTE TO MR. DUNN, "THANKS FOR YOUR PHONE
```

PANDE - DIRECT / HARRIMAN

1   MESSAGE.  I AM STILL WAITING TO HEAR ON SEVERAL JOBS.  I DID

2   HEAR FROM IAN PARTRIDGE THAT I WAS NOT SELECTED FOR ANY OF THE

3   JOBS ON THE CROSS FUNCTIONAL PDC."

4          ARE THOSE THE JOBS THAT YOU EXPECTED TO GET?

5   A.  NO.  THOSE WERE THE JOBS THAT I WAS SAYING WERE PROBABLY

6   LIKE A ONE PERCENT POSSIBILITY OF GETTING.

7   Q.  AND YOU SAY, "I ALSO GOT A NOTE FROM GEORGE ALAMEDA THAT I

8   DID NOT GET SELECTED FOR THE LONDON PE OR," IS THAT "RESERVOIR

9   ENGINEER"?

10  A.  YES.

11  Q.  IT'S PE, PETROLEUM ENGINEER?

12  A.  YES, IT IS.

13  Q.  "FOR THE LONDON PE OR RESERVOIR ENGINEERING POSITIONS.  I AM

14  REALLY QUITE SURPRISED BY THIS OUTCOME."

15         WHY WERE YOU SURPRISED?

16  A.  I WAS SURPRISED BECAUSE I THOUGHT I WAS A GOOD CANDIDATE FOR

17  THOSE JOBS, AND I ALSO KNEW THE, YOU KNOW, SOME OF THE

18  MANAGEMENT IN THAT -- IN THAT GROUP.  I HAD WORKED WITH THEM

19  VERY CLOSELY PREVIOUSLY WHEN I HAD WORKED IN '96 AND '97 AND

20  ALSO IN THE BUSINESS PLANNING GROUP.

21  Q.  OKAY.  AND THEN YOU SAID, "I AM APPLYING TO A COUPLE MORE

22  JOBS THAT ARE CLOSING THIS WEEK."

23         DID YOU APPLY FOR THE THREE POSITIONS THAT ARE LISTED

24  THERE?

25  A.  YES, I DID.

1    **MS. HARRIMAN:**  THANKS, CANDI.

2    Q.  SO WE NOW ARE APPROACHING THE END OF OCTOBER 2003.  DID YOU

3    MAKE DECISIONS IN LATE OCTOBER 2003 CONCERNING YOUR HEALTH

4    CONDITION, MS. PANDE?

5    A.  YES, I DID.

6    Q.  AND WHAT DID YOU DECIDE?

7    A.  I DECIDED THAT I WOULD GO AHEAD AND HAVE A SURGERY CALLED

8    MYOMECTOMY.

9    Q.  WHAT WAS THE POINT OF THE SURGERY?

10    A.  THE SURGERY WOULD REMOVE THE -- THE FIBROID TUMOR THAT I HAD

11    IN MY UTERUS.

12    Q.  AND WHY DID YOU DECIDE TO GO AHEAD AND HAVE THE SURGERY?

13    A.  I HAD BEEN WRESTLING WITH THIS DECISION, YOU KNOW, FOR

14    SEVERAL YEARS NOW, AND I HAD BEEN HOPING THAT, YOU KNOW, BY

15    TAKING IRON SUPPLEMENTS OR LOSING WEIGHT THAT I COULD SOMEHOW,

16    YOU KNOW, HAVE LESS BLEEDING, I WOULDN'T BE SO ANEMIC.  AND OVER

17    THE SUMMER OF 2003, I HAD BEEN TRYING TO DO THOSE THINGS, AND I

18    WAS HAVING MY BLOOD WORK CHECKED REGULARLY, AND IT JUST WASN'T

19    WORKING AND I WAS FEELING RUN DOWN.  I WAS GETTING REALLY BAD

20    HEADACHES THAT WOULDN'T GO AWAY VERY EASILY.

21            AND I JUST -- EVEN THOUGH IT WAS SOMETHING I WAS NOT

22    REALLY LOOKING FORWARD TO DO, HAD BEEN REALLY AFRAID TO DO IT

23    FOR A LONG TIME, I THOUGHT I'D BETTER GO AHEAD AND DO IT BEFORE

24    I START TRAVELING AGAIN NEXT YEAR AND TAKING THESE LONG

25    INTERNATIONAL TRIPS 'CAUSE I JUST DIDN'T THINK I'D BE ABLE TO

PANDE - DIRECT / HARRIMAN

1   SUSTAIN THAT INTO 2004.

2   Q.   SO WHAT WERE -- WHAT WAS YOUR UNDERSTANDING OF WHAT YOUR

3   MEDICAL OPTIONS WERE IN LATE OCTOBER?

4   A.   MY UNDERSTANDING WAS THAT I COULD DO WHAT I HAD BEEN DOING

5   FOR A LONG TIME, WHICH WAS JUST LIVING WITH THE ANEMIA AND KIND

6   OF ALL THE SYMPTOMS ASSOCIATED WITH THE FIBROIDS AND THE ANEMIA.

7   I COULD GO AHEAD AND HAVE THE SURGERY, THE MYOMECTOMY.  AND WITH

8   THAT SURGERY, I COULD EITHER HAVE IT RIGHT AWAY OR HAVE A

9   TREATMENT THAT INVOLVED LUPRON INJECTIONS WHICH ARE DESIGNED TO

10  STOP YOUR MENSTRUAL CYCLE TO ENABLE YOUR RED BLOOD CELL COUNT TO

11  COME UP, AND TO SEE HOW THAT WORKED, AND THEN DECIDE WHEN TO

12  HAVE THE SURGERY BASED ON -- ON HOW THAT WAS WORKING.

13            AND THE MAIN REASON FOR THAT WAS IF I HAD THE SURGERY

14  IMMEDIATELY, BASED ON THE RED BLOOD CELL COUNTS I HAD AT THE

15  TIME, I WAS LIKELY GOING TO HAVE ANOTHER BLOOD TRANSFUSION

16  DURING SURGERY, AND I WANTED TO AVOID THAT IF POSSIBLE.

17  Q.   SO OF THOSE VARIOUS OPTIONS, WHAT DID YOU DECIDE -- OR HAD

18  YOU DECIDED BEFORE YOU STARTED YOUR MEDICAL LEAVE AS TO WHICH

19  OPTION YOU WERE GOING TO TAKE?

20  A.   ON NOVEMBER 7TH, I MET WITH THE SURGEON AND WE --

21  Q.   WITHOUT --

22  A.   I'M SORRY.  AND BASED ON MY UNDERSTANDING OF THE OPTIONS, I

23  DECIDED TO GO AHEAD WITH LUPRON INJECTIONS AND SEE HOW MY RED

24  BLOOD CELL COUNT, HOW MY HEMATOCRIT RESPONDED AND HOW EFFECTIVE

25  THE LUPRON INJECTIONS WERE IN TERMS OF STOPPING MY MENSTRUAL

PANDE - DIRECT / HARRIMAN

1  FEDERAL LAW THAT PROVIDES QUALIFIED EMPLOYEES WITH JOB

2  PROTECTION FOR CERTAIN FAMILY AND MEDICAL REASONS.  JOB

3  PROTECTION MEANS THAT WHEN YOU RETURN FROM AN ABSENCE COVERED

4  UNDER FMLA, YOU MUST BE RESTORED TO YOUR ORIGINAL JOB OR TO AN

5  EQUIVALENT JOB WITH EQUIVALENT PAY AND BENEFITS.

6  Q.  MS. PANDE, WHEN YOU DECIDED TO TAKE YOUR LEAVE, DID YOU KNOW

7  HOW LONG YOUR LEAVE WOULD LAST?

8  A.  NO, I DID NOT.

9  Q.  WHY DIDN'T YOU?

10  A.  I -- WHEN I MADE THE DECISION TO TAKE MY LEAVE, THAT WAS AT

11  THE END OF OCTOBER OF 2003, I HADN'T MET WITH MY SURGEON.  AND

12  WHEN I MET WITH MY SURGEON, MY UNDERSTANDING OF MY OPTIONS WERE

13  THAT I WOULD BE ABLE TO HAVE SOME FLEXIBILITY IN WHEN I DECIDED

14  TO HAVE THE SURGERY BASED ON WHETHER I WAS WILLING TO RISK

15  HAVING A BLOOD TRANSFUSION TO HAVE THE SURGERY EARLIER AND ALSO

16  HOW I ACTUALLY RESPONDED TO THE LUPRON TREATMENT AND HOW MY RED

17  BLOOD CELL COUNT RESPONDED TO THAT.

18  Q.  AND DID YOU -- WELL, LET'S TAKE A LOOK AT EXHIBIT 52,

19  PLEASE.

20  A.  (REVIEWING DOCUMENTS.)

21  Q.  IS IT -- EXHIBIT 52 A LETTER THAT YOU RECEIVED FROM

22  UNUMPROVIDENT?

23  A.  YES, IT IS.

24       MS. HARRIMAN:  YOUR HONOR, MOVE EXHIBIT 52 INTO

25  EVIDENCE.

PANDE - DIRECT / HARRIMAN

1   Q.  AND HOW MANY JOB APPLICATIONS DID YOU SUBMIT?

2   A.  ABOUT 20.

3   Q.  DID YOU HAVE ANY JOB INTERVIEWS?

4   A.  YES, I DID.

5   Q.  AND HOW MANY JOB INTERVIEWS DID YOU HAVE?

6   A.  I HAD ONE JOB INTERVIEW.

7   Q.  DID YOU GET THE JOB THAT YOU INTERVIEWED FOR?

8   A.  NO, I DID NOT.

9   Q.  WERE YOU TOLD WHY YOU DIDN'T?

10  A.  YES.

11  Q.  WHAT WERE YOU TOLD?

12          MS. SIMERLY:  OBJECTION, YOUR HONOR, HEARSAY.

13          THE COURT:  SUSTAINED.

14  BY MS. HARRIMAN:

15  Q.  WHAT WAS YOUR UNDERSTANDING, MS. PANDE, OF WHY YOU DIDN'T

16  GET THE JOB THAT YOU APPLIED FOR.

17          MS. SIMERLY:  OBJECTION, YOUR HONOR, HEARSAY.

18          THE COURT:  SUSTAINED UNLESS YOU CAN LAY A FOUNDATION

19  OTHERWISE.

20  BY MS. HARRIMAN:

21  Q.  MS. PANDE, WHAT WAS THE JOB THAT YOU INTERVIEWED FOR?

22  A.  I INTERVIEWED FOR A JOB WITH ANADARKO THAT WAS A 28/28

23  ROTATIONAL OPPORTUNITY IN ALGERIA.

24  Q.  AND DID YOU LACK ANY OF SKILLS THAT YOU NEEDED FOR THAT JOB?

25  A.  YES, I DID.

PANDE - DIRECT / HARRIMAN

```
1              THERE'S PROBABLY ABOUT 30 -- 30 OR 40 -- 30 OR 40

2    ENTRIES.

3    Q.  AND THE -- AND THE LOG -- OR ARE YOU LOOKING AT A PARTICULAR

4    PAGE?

5              MS. SIMERLY:  OBJECTION, LEADING.

6              THE COURT:  SUSTAINED.  WHY DON'T YOU REPHRASE IT.

7    BY MS. HARRIMAN:

8    Q.  HOW MANY ENTRIES DO YOU -- HOW MANY PAGES DOES YOUR LOG

9    CONSIST OF, MS. PANDE?

10   A.  (REVIEWING DOCUMENT.)

11              SIX.

12   Q.  AND JUST LOOKING AT THE FIRST PAGE ALONE, HOW MANY ENTRIES

13   DO YOU HAVE ON THAT PAGE?

14              MS. SIMERLY:  OBJECTION, YOUR HONOR.  SOME OF THE

15   ENTRIES ARE NO ACTIVITY.

16              THE COURT:  YOU CAN CROSS-EXAMINE.

17              THE WITNESS:  IT'S ABOUT 21.

18   BY MS. HARRIMAN:

19   Q.  AND DO YOU HAVE A SIMILAR NUMBER OF ENTRIES ON ALL SIX PAGES

20   OF YOUR LOG?

21   A.  YES, ABOUT THE SAME.

22   Q.  DID YOU EVENTUALLY SET UP YOUR OWN CONSULTING BUSINESS?

23   A.  YES, I DID.

24   Q.  WHY DID YOU SET UP YOUR OWN CONSULTING BUSINESS?

25   A.  I HAD BEEN TRYING TO GET CONSULTING WORK FROM THE VERY
```

PANDE - DIRECT / HARRIMAN

1   BEGINNING, AND I FINALLY LANDED MY FIRST CLIENT AND INCORPORATED

2   A COMPANY IN JUNE OF 2005 TO START DOING CONSULTING WORK.

3   Q.   WHAT WAS THE NAME OF THE COMPANY THAT YOU INCORPORATED?

4   A.   PETROASSETS, INC.

5   Q.   AND WITH WHOM DID YOU SET UP THIS COMPANY?

6   A.   I SET UP THIS COMPANY WITH MY YOUNGER BROTHER RAVI.

7   Q.   AND WHY DID YOU SET IT UP WITH -- WITH RAVI?

8   A.   MY -- I HAVE A LOT OF ENERGY INDUSTRY EXPERIENCE, AND RAVI

9   HAS A LOT OF EXPERIENCE WITH TECHNOLOGY AND SOFTWARE.  AND OUR

10  VISION FOR THE COMPANY IS TO HAVE OFFERINGS IN BOTH SERVICES,

11  WHICH IS CONSULTING, AND THEN SOFTWARE AS WELL SO THAT WE HAVE A

12  MORE STABLE REVENUE STREAM.

13  Q.   OKAY.  AND WHAT KIND OF WORK HAVE YOU BEEN DOING AS A

14  CONSULTANT FOR PETROASSETS?

15  A.   IN -- OVER THE LAST TWO AND A HALF YEARS, MOST OF THE WORK

16  THAT I'VE BEEN DOING HAS BEEN INTERNATIONAL.  AND I'VE WORKED IN

17  MEXICO -- IN VILLA HERMOSA, MEXICO, AND ALSO IN VENEZUELA IN

18  PUERTO LA CRUZ.  AND MOST OF THAT WORK HAS BEEN WITH NATIONAL

19  OIL COMPANIES.

20          AND THIS YEAR, I WORKED IN INDIA IN ASSAM, INDIA, FOR

21  ABOUT A MONTH WITH THE NATIONAL OIL COMPANY IN INDIA.  AND I

22  JUST WAS IN VENEZUELA AGAIN IN SEPTEMBER.

23  Q.   WOULD YOU TAKE A LOOK, PLEASE, AT EXHIBIT 88.

24  A.   (REVIEWING DOCUMENTS.)

25          YES.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

| | | |
|---|---|---|
| KIRAN PANDE, | ) | |
| | ) | **JURY TRIAL** |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. C 04-5107JCS |
| | ) | |
| CHEVRON CORPORATION (F/K/A | ) | |
| CHEVRONTEXACO CORPORATION) | ) | **VOLUME 3** |
| EXPLORATION & PRODUCTION | ) | **PAGES 396 - 604** |
| (F/K/A CHEVRONTEXACO | ) | |
| OVERSEAS PETROLEUM), A | ) | |
| DIVISION OF CHEVRON U.S.A. | ) | |
| INC., | ) | SAN FRANCISCO, CALIFORNIA |
| | ) | THURSDAY, OCTOBER 11, 2007 |
| DEFENDANTS. | ) | |
| ——————————————————— | ) | |

CERTIFIED COPY

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR PLAINTIFF:        KEKER & VAN NEST
                      710 SANSOME STREET
                      SAN FRANCISCO, CALIFORNIA  94111-1704
                 BY:  CHRISTA M. ANDERSON,
                      SUSAN J. HARRIMAN, ATTORNEYS AT LAW


FOR DEFENDANTS:       MILLER LAW GROUP, PC
                      500 SANSOME STREET, SUITE 400
                      SAN FRANCISCO, CALIFORNIA  94111
                 BY:  LISA HAMASAKI,
                      MICHELE BALLARD MILLER
                      JANINE S. SIMERLY, ATTORNEYS AT LAW


REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258

## CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C04-5107JSC, PANDE V. CHEVRON, ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

*Raynee H. Mercado*

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

FRIDAY, OCTOBER 12, 2007

SHAWSTAD - DIRECT / HARRIMAN

1    ANYBODY ELSE AROUND THIS SPECIFIC MOVE.

2         MS. HARRIMAN:  OKAY.  YOUR HONOR, I HAVE NO FURTHER

3    QUESTIONS.

4         THE COURT:  CROSS-EXAMINATION?

5              (PAUSE IN THE PROCEEDINGS.)

6              (OFF-THE-RECORD DISCUSSION.)

7                   CROSS-EXAMINATION

8    BY MS. MILLER:

9    Q.  GOOD MORNING.  GOOD MORNING, MS. SHAWSTAD.

10   A.  HI.

11        MS. MILLER:  YOUR HONOR, I HAVE SOME EXHIBITS FOR THE

12   WITNESS.  MAY I GIVE HER A BINDER?

13        THE COURT:  SURE.

14        MS. MILLER:  THANK YOU.

15        MS. HARRIMAN:  EXCUSE ME, YOUR HONOR, I'LL MOVE OUR

16   BINDER OUT OF THE WAY.  SORRY ABOUT THAT.

17        MS. MILLER:  TOO MANY BINDERS.

18        THE COURT:  IT'S AN OCCUPATIONAL HAZARD.

19        MS. HARRIMAN:  IT IS.

20   BY MS. MILLER:

21   Q.  OKAY.  I JUST HAVE A FEW QUESTIONS FOR YOU, MS. SHAWSTAD.

22        YOU SAID IN PASSING THAT YOU HAD A NUMBER OF PEOPLE

23   THAT YOU'RE RESPONSIBLE FOR.  HOW MANY?

24   A.  AT THAT TIME, IT WAS ABOUT 15,000.

25   Q.  AND IN -- WAS THAT ALL IN THE UNITED STATES?

SHAWSTAD - CROSS / MILLER

1    A.   THE BULK OF THEM WERE OUTSIDE THE UNITED STATES.  WE WERE

2    BASED IN ABOUT 30 COUNTRIES -- 25, 30 COUNTRIES AT THAT TIME.

3    Q.   OKAY.  AND WITHIN THE -- IF YOU HAD TO GIVE A ROUGH

4    ESTIMATE, HOW MANY WITHIN AND HOW MANY OUTSIDE?

5    A.   WITHIN THE UNITED STATES IN 2003, MAYBE 7-, 800 PEOPLE.

6    Q.   OKAY.  AND WITHIN THE UNITED STATES, ANY PARTICULAR

7    LOCATIONS?

8    A.   THEY WERE IN SAN RAMON AND HOUSTON.

9    Q.   SO LET'S TAKE A LOOK AT -- YOU KNOW WHEN THE CHEVRONTEXACO

10   MERGER WAS?

11   A.   IN 2001.

12   Q.   OKAY.  AND IN 2001, APPROXIMATELY HOW MANY EMPLOYEES WERE IN

13   THE SAN RAMON LOCATION?

14   A.   BALLPARK KIND OF A 80/20.  SO 80 PERCENT WERE IN SAN RAMON

15   AND ABOUT 20 PERCENT IN HOUSTON.

16   Q.   AND AS WE SIT HERE TODAY, WHAT'S THE ESTIMATE BETWEEN

17   HOUSTON AND SAN RAMON?

18   A.   IT'S FLIPPED, AND IT'S ABOUT 20/80, 20 IN SAN RAMON,

19   80 PERCENT IN HOUSTON.

20   Q.   OKAY.  THANK YOU.

21            THERE WERE SOME OTHER TERMS.  I KNOW CHEVRON HAS MANY

22   TERMS AND INITIALS THAT MEAN THINGS.  ONE OF THE THINGS WE KEEP

23   HEARING ABOUT IS "SURPLUS," TO BE "DECLARED SURPLUS."  WHAT DOES

24   THAT MEAN IN CHEVRON LANGUAGE?

25   A.   "SURPLUS" IS A TERM THAT COMES OUT LIKE IF YOU'RE DOING A

PANDE - CROSS (RESUMED) / SIMERLY

1   THE FACT THAT I WAS PROMOTED BASED ON MY SUPERVISOR'S

2   RECOMMENDING A PROMOTION WITHOUT EVER ASKING FOR ONE.

3   **Q.**   WELL, OF COURSE IN PRACTICE, YOU KNOW THAT USUALLY WHEN A

4   SUPERVISOR RECOMMENDS SOMEONE FOR A PROMOTION, THEY GET THAT

5   PROMOTION, RIGHT?

6   **A.**   THAT'S -- THAT'S MY UNDERSTANDING, YES.

7   **Q.**   SURE.  SO IT'S NOT THAT A SUPERVISOR CAN GUARANTEE A

8   PROMOTION, BUT AS A PRACTICAL MATTER, TYPICALLY IF A SUPERVISOR

9   RECOMMENDS A PROMOTION, IT'S GOING TO HAPPEN, RIGHT?

10  **A.**   THAT'S MY UNDERSTANDING, YES.

11  **Q.**   NOW, YOU CERTAINLY DIDN'T EXPECT A PROMOTION IF YOU STOPPED

12  GOING TO WORK, DID YOU?

13  **A.**   NO.

14  **Q.**   AND YOU DIDN'T EXPECT A PROMOTION IF SUDDENLY YOUR -- YOUR

15  PRODUCT FELL OFF AND THERE WERE MISTAKES IN WHAT YOU WERE DOING?

16  **A.**   NO.  IF MY WORK PERFORMANCE WAS REALLY BAD, I -- I WOULDN'T

17  EXPECT TO BE PROMOTED IN -- IN 2002.

18  **Q.**   RIGHT.  SO -- BUT LET'S TAKE IT A STEP FURTHER.  NOT ONLY IF

19  YOUR WORK PERFORMANCE WAS BAD WOULD YOU NOT EXPECT TO BE

20  PROMOTED, BUT IF YOUR WORK PERFORMANCE DIDN'T CONTINUE AT THE

21  LEVEL THAT PROMPTED MR. MITCHELL TO SAY YOU DESERVED THE

22  PROMOTION, YOU WOULDN'T HAVE EXPECTED A PROMOTION EITHER, WOULD

23  YOU?

24  **A.**   I WOULDN'T EXPECT THAT IT WOULD BE A NORMAL EXPECTATION THAT

25  I WOULD BE REQUIRED TO WORK 18-HOUR DAYS AND WEEKENDS AS A

1    **Q.**  OKAY.

2    **A.**  IT MIGHT NOT BE EXACTLY THE SAME THING I HAD READ BEFORE.

3            **MS. SIMERLY:**  YOUR HONOR, WE WOULD OFFER EXHIBIT 286,

4    PLEASE.  THERE WAS NO OBJECTION TO IT FOR AUTHENTICITY.

5            **MS. HARRIMAN:**  THE QUESTION IS WHETHER OR NOT IT'S

6    ADMISSIBLE.  I HAVE NO OBJECTION TO IT, YOUR HONOR.  IT HAS

7    NOTHING TO DO WITH AUTHENTICITY, BUT I HAVE NO OBJECTION TO IT.

8            **THE COURT:**  OKAY.  IT'S ADMITTED.

9                    (DEFENDANTS' EXHIBIT 286

10                   RECEIVED IN EVIDENCE.)

11           **MS. SIMERLY:**  LET'S GO TO THE SECOND PAGE, ALEX, OF

12   286.  I GUESS WE NEED TO ROTATE IT.

13                   (EXHIBIT PUBLISHED TO JURY.)

14           **MS. SIMERLY:**  AND COULD YOU HIGHLIGHT IN THE MIDDLE

15   COLUMN, THE LOWER PART, WHICH READS, "EMPLOYEES CONTINUE TO HAVE

16   ACCESS TO EXISTING SUPPORT AND COMPLAINT RESOLUTION CHANNELS

17   SUCH AS SUPERVISORS AND MANAGERS, HUMAN RESOURCES, THE CHEVRON

18   HOTLINE, THE EMPLOYEE ASSISTANCE PROGRAM, THE STEPS, STEPS TO

19   EMPLOYEE PROBLEM SOLVING PROCESS.  HOWEVER, IF YOU ARE UNABLE TO

20   RESOLVE A CONCERN OR YOU HAVE AN ISSUE THAT FOR SOME REASON YOU

21   PREFER NOT TO RAISE THROUGH THESE CHANNELS, CONSIDER CONTACTING

22   THE OMBUDS MANAGER."

23   **Q.**  SO WHEN YOU WERE -- YOU WEREN'T VERY HAPPY WITH THE OUTCOME

24   OF YOUR COMPLAINT TO GARY YAMASHITA, WERE YOU, MS. PANDE?

25   **A.**  I DIDN'T THINK THAT GARY WAS VERY EFFECTIVE AT RESOLVING THE

1    PROBLEMS WE HAD, NO.

2    **Q.**  AND YOU KNEW THAT YOU STILL HAD HAD EITHER RECOURSE AT

3    CHEVRON, THAT YOU COULD GO TO HR, RIGHT?

4    **A.**  YES.

5    **Q.**  THAT YOU COULD CALL THE HOTLINE, RIGHT?

6    **A.**  I DON'T -- I DON'T KNOW IF I REMEMBER THE HOTLINE THING, BUT

7    I KNOW THERE IS NOW A HOTLINE.  I DON'T KNOW IF THERE WAS THEN.

8    **Q.**  YOU KNEW THAT THERE WAS THE STEPS PROGRAM, THOUGH, THAT YOU

9    COULD -- IN FACT, YOU COULD HAVE APPEALED THAT 2 RANKING IN REX

10   MITCHELL'S 2002 PMP, RIGHT?

11   **A.**  YES, I KNEW ABOUT THE STEPS PROGRAM.  AND GARY YAMASHITA DID

12   NOT RECOMMEND USING IT.

13   **Q.**  YOU COULD HAVE, WHEN YOU WERE NOT HAPPY WITH MR. YAMASHITA,

14   PURSUED THE STEPS PROGRAM, RIGHT?

15   **A.**  IT EXISTED AND I COULD HAVE USED IT, YES.

16   **Q.**  AND -- BUT YOU CHOSE NOT TO.

17   **A.**  THAT'S CORRECT.

18   **Q.**  INSTEAD YOU DECIDED THAT YOU WOULD SIMPLY LOOK FOR ANOTHER

19   POSITION, RIGHT?

20   **A.**  BASED ON THE THREE OPTIONS THAT WERE PROVIDED, THAT WAS THE

21   OPTION THAT I CHOSE.  AND JAY JOHNSON'S INSTRUCTIONS WERE THAT

22   REX WOULD HELP ME DO THAT.

23   **Q.**  WELL, IN ADDITION TO THE THREE OPTIONS THAT JAY JOHNSON TOLD

24   YOU, YOU ALSO KNEW THESE OTHER OPTIONS, YOU COULD GO TO HR, YOU

25   COULD GO USE THE STEPS PROGRAM, YOU COULD GO TO THE EMPLOYEE

PANDE - CROSS (RESUMED) / SIMERLY

1    ASSISTANCE PROGRAM.  SO THAT'S ACTUALLY SIX OPTIONS, BUT YOU

2    ELECTED TO JUST GO AHEAD AND SEE IF YOU COULD FIND ANOTHER JOB,

3    RIGHT?

4    A.  MY UNDERSTANDING WAS THAT JAY JOHNSON AND REX MITCHELL WOULD

5    HELP ME FIND ANOTHER JOB, YES.

6    Q.  BUT THAT'S REALLY NOT MY QUESTION, MS. PANDE.  I REALLY --

7    A.  I'M SORRY, COUNSELOR.  SO YOUR -- I'M SORRY FOR NOT

8    ANSWERING YOUR QUESTION PROPERLY.

9    Q.  IT'S OKAY.  I JUST --

10   A.  I THINK -- YES, THERE WERE -- THERE ARE THESE OTHER OPTIONS

11   AS YOU'VE OUTLINED THEM, YES.

12   Q.  BUT YOU ELECTED SIMPLY TO MOVE ON.  I MEAN, PEOPLE SOMETIMES

13   DON'T GET ALONG WITH THEIR SUPERVISORS.  IT WAS TIME FOR YOU TO

14   LEAVE PLANNING ANYWAY, WASN'T IT?

15   A.  NO, IT WASN'T.

16   Q.  DIDN'T JAY JOHNSON TELL YOU THAT ONE REASON YOU NEEDED TO

17   MOVE ON IN THE FALL PDC WAS BECAUSE YOU HAD ALREADY SPENT TWO

18   YEARS IN PLANNING?

19   A.  GENERALLY THE PLANNING ANALYST POSITIONS ARE TWO-YEAR

20   POSITIONS.  THE POSITION THAT I WAS OFFERED AT THE MERGER WAS

21   PORTFOLIO ANALYST.  EACH OF THE PEOPLE THAT HAD PERFORMED THAT

22   ROLE WERE DOMAIN EXPERTS GENERALLY SPENDING FOUR TO SIX YEARS IN

23   THAT POSITION.

24   Q.  MS. PANDE, MY QUESTION WAS DIFFERENT.  ISN'T IT TRUE THAT

25   JAY JOHNSON TOLD YOU IN THIS PERIOD THAT ONE REASON YOU NEEDED

```
 1   TO MOVE AT THE FALL PDC WAS BECAUSE YOU HAD ALREADY SPENT TWO

 2   YEARS IN PLANNING?

 3   A.   THAT WAS ONE OF THE REASONS.  AND THE OTHER THING WAS THAT

 4   BECAUSE I WASN'T GETTING ALONG WITH REX, AS HE PUT IT.

 5   Q.   SO INDEED, JAY JOHNSON TOLD YOU ONE OF THE REASONS THAT YOU

 6   WOULD NEED TO MOVE ANYWAY IN THE FALL PDC WAS BECAUSE YOU'D

 7   ALREADY BEEN TWO YEARS IN PLANNING?

 8   A.   YES.

 9   Q.   NOW, YOU TESTIFIED THAT YOU APPLIED FOR THREE JOBS IN THE

10   FALL 2000 PDC; IS THAT CORRECT?

11   A.   DID YOU SAY THREE OR SIX?

12   Q.   I SAID THREE.

13   A.   THREE?  I FILLED OUT APPLICATIONS -- I'M -- I'M GOING TO

14   JUST KIND OF TRY AND REFRESH MY MEMORY.  SO I THINK I FILLED OUT

15   WRITTEN APPLICATIONS FOR TWO JOBS IN THE INTERNATIONAL GAS GROUP

16   THAT WERE WRITTEN.  AND AT SOME POINT I FILLED OUT A WRITTEN

17   APPLICATION FOR A CORPORATE PLANNING POSITION THAT WAS WRITTEN.

18   I THINK THAT WAS AFTER THE PDC PROCESS.  AND THEN I BELIEVE I

19   WAS CONSIDERED ON THE SLATE FOR PROBABLY ABOUT FOUR OTHER

20   POSITIONS.  BUT I THINK IN TERMS OF ACTUAL APPLICATIONS THAT I

21   FILLED OUT, IT WAS PROBABLY JUST THREE.

22   Q.   OKAY.  AND YOU JUST SAID TWO OF THOSE POSITIONS WERE IN THE

23   INTERNATIONAL GAS GROUP, RIGHT?

24   A.   THAT'S CORRECT.

25   Q.   AND THOSE WERE POSITIONS IN AUDIE SETTERS' GROUP, RIGHT?
```

 1    **A.**  THAT'S CORRECT.

 2    **Q.**  AND YOU KNEW THAT THAT WAS A LONG SHOT BECAUSE YOU DIDN'T

 3    HAVE ANY GAS EXPERIENCE, RIGHT?

 4    **A.**  NO, I DID NOT KNOW THAT.

 5    **Q.**  WELL, LET'S TAKE A LOOK AT WHAT YOU SAID IN YOUR DEPOSITION,

 6    PAGE 294, LINE 16 THROUGH 20.

 7              AGAIN, YOUR HONOR, VOLUME 2.

 8                   (PAUSE IN THE PROCEEDINGS.)

 9         **MS. HARRIMAN:**  YOUR HONOR, I HAVE TO OBJECT TO

10    COUNSEL ASKING A TWO-PART COMPOUND QUESTION AND THEN PRETENDING

11    THAT THERE'S A CONTRADICTION BY COMING BACK TO SOMETHING THAT

12    ADDRESSES ONLY ONE PART OF IT.

13         **THE COURT:**  WELL, I DON'T --

14         **MS. SIMERLY:**  YOUR HONOR, AND I OBJECT TO THE

15    SPEAKING OBJECTIONS.

16         **THE COURT:**  YEAH, I DON'T LIKE SPEAKING OBJECTIONS.

17    BUT I'LL SUSTAIN THE OBJECTION THAT IT'S NOT INCONSISTENT, BUT

18    YOU CAN READ IT IN THIS CASE.

19         **MS. SIMERLY:**  OF COURSE.

20              "Q.  YOU AGREE THAT YOU REALLY DID HAVE A

21              LACK OF GAS EXPERIENCE AS ONE OF THE REASONS YOU

22              WERE NOT SELECTED?

23              "A.  YES, I AGREE.  I DID NOT HAVE

24              EXPERIENCE IN THE COMMERCIAL SIDE OF THE

25              BUSINESS."

1    Q.    AND THE -- WHO WAS SELECTED FOR THOSE --

2            MS. HARRIMAN:  EXCUSE ME.  FOR THE RECORD, YOUR

3    HONOR, I'D LIKE THAT -- IT SAYS, "IN THE COMMERCIAL SIDE OF THE

4    GAS BUSINESS."

5            THE COURT:  OKAY.

6    BY MS. SIMERLY:

7    Q.    SO WHO WERE THE TWO CANDIDATES WHO WERE SELECTED, MS. PANDE?

8    A.    I DON'T KNOW WHO THEY WERE.

9    Q.    SO YOU DON'T KNOW IF THEY DID HAVE EXPERIENCE IN THE

10   COMMERCIAL SIDE OF THE GAS BUSINESS, RIGHT?

11   A.    I DON'T KNOW.

12   Q.    YOU HAVE NO IDEA IF THEY WERE FAR BETTER QUALIFIED THAN YOU

13   WERE, RIGHT?

14   A.    I HAVE NO IDEA, NO.

15   Q.    YOU DO KNOW THAT AUDIE SETTERS IS SOMEONE THAT YOU

16   RESPECTED, RIGHT?

17   A.    I DIDN'T KNOW AUDIE SETTERS VERY WELL.  HE HAD JUST

18   TRANSFERRED IN AS PART OF THE TEXACO MERGER AND I TALKED TO HIM

19   ONCE OR TWICE, YES.

20   Q.    YOU HAD NO REASON TO THINK THAT AUDI SETTERS HAD SOME AGENDA

21   IN SELECTING SOMEONE OVER YOU FOR THESE TWO POSITIONS, DID YOU,

22   MS. PANDE?

23   A.    NO, I DID NOT.

24            MS. SIMERLY:  LET'S GO AHEAD AND TAKE A LOOK AT

25   EXHIBIT 27.

1    THERE WE GO.  LET'S BLOW THAT UP.

2                    (EXHIBIT PUBLISHED TO JURY.)

3    **BY MS. SIMERLY:**

4    **Q.**  AND THIS IS -- MS. PANDE, THIS IS YOUR EMAIL TO AUDIE

5    SETTERS ON OCTOBER 3RD, 2002, RIGHT?

6                    AND AT THAT TIME, YOU WROTE, "AUDIE, I APPRECIATE THE

7    TIME YOU SPENT LAST WEEK TALKING ABOUT POSSIBLE JOBS IN THE

8    IGG," AND THAT'S THE INTERNATIONAL GAS GROUP, RIGHT?

9    **A.**  THAT'S CORRECT.

10   **Q.**  "I GOT A NOTE FROM NICOLA LETTING ME KNOW THAT I WASN'T

11   SELECTED FOR THE SINGAPORE OR SAN RAMON JOB DUE TO 'LACK OF GAS

12   EXPERIENCE.'"

13                   DO YOU SEE THAT?

14   **A.**  YES, I DO.

15   **Q.**  SO YOU DID KNOW AT THE TIME THAT AT LEAST SOMEONE TOLD YOU

16   THAT THE REASON YOU HADN'T BEEN SELECTED FOR THESE TWO JOBS WAS

17   LACK OF GAS EXPERIENCE, RIGHT?

18   **A.**  YES, I DID.

19   **Q.**  OKAY.  AND YOU WENT ON TO SAY TO MR. SETTERS, "I'M STILL

20   INTERESTED IN A POSITION IN THE IGG, AND BASED ON OUR

21   DISCUSSION, I UNDERSTAND THAT THERE WILL LIKELY BE GROWTH IN THE

22   GROUP, PROVIDED THE CORP APPROVES THE BUSINESS PLAN.  HENCE, I

23   WOULD APPRECIATE ANY CANDID FEEDBACK THAT YOU CAN PROVIDE ME ON

24   THIS AVENUE.  IN PARTICULAR, IF THERE ARE ANY AREAS OF SPECIFIC

25   CONCERN.  I SEE THE 'GAS EXPERIENCE ISSUE' AS SOMEWHAT OF A

1    CATCH-22.  I WOULD WELCOME ANY OPPORTUNITY TO WORK WITH FOLKS IN

2    YOUR GROUP ON ANY SPECIAL STUDIES OR ANY COMPETITOR ANALYSIS

3    ISSUES SINCE COMPETITOR ANALYSIS IS ONE OF MY CURRENT KEY JOB

4    RESPONSIBILITIES.

5            "THAT WOULD PROVIDE AN OPPORTUNITY TO GAIN SOME 'GAS

6    EXPERIENCE' IN THE INTERIM.  I WOULD REALLY APPRECIATE ANY

7    FEEDBACK/ADVICE YOU CAN PROVIDE.  I'M STILL VERY INTERESTED IN

8    FUTURE JOB OPPORTUNITIES IN THE IGG GROUP."

9            AND MR. SETTERS RESPONDED, RIGHT, MS. PANDE?

10   A.   YES, HE DID.

11   Q.   OKAY.  LET'S GO TO HIS RESPONSE ON OCTOBER 7TH.  YOUR EMAIL

12   WAS ON THURSDAY, OCTOBER 3RD AT 6:00 P.M., AND HE RESPONDED THE

13   NEXT MONDAY AT 6:00 O'CLOCK IN THE MORNING, RIGHT?  6:57?

14   A.   THAT'S THE TIME STAMP, YES.

15   Q.   OKAY.  SO LET'S GO AHEAD AND --

16            (EXHIBIT PUBLISHED TO JURY.)

17        **MS. SIMERLY:**  THAT'S FINE.  LET'S BLOW UP THE TEXT

18   THERE, ALEX.

19   Q.   AND THIS IS WHAT MR. SETTERS RESPONDED.

20            "HI, KIRAN.  THANKS FOR YOUR NOTE.  DON'T GET

21   DISCOURAGED.  THE JOBS YOU APPLIED FOR WERE 'HIT THE GROUND

22   RUNNING' JOBS REQUIRING SOME LEVEL OF PREVIOUS GAS EXPERIENCE."

23            SO YOU UNDERSTOOD THERE THAT YOU JUST DIDN'T HAVE THE

24   KIND OF HIT-THE-GROUND-RUNNING GAS EXPERIENCE THAT HE WAS

25   LOOKING FOR, RIGHT?

PANDE - CROSS (RESUMED) / SIMERLY

1  A.  THAT'S MY UNDERSTANDING.  AND THE PERSON THAT WAS PERFORMING

2  THE JOB IN SINGAPORE WAS SOMEONE I HAD WORKED WITH BEFORE, AND

3  HE HAD ENCOURAGED ME -- ENCOURAGED ME TO APPLY AND SAID THAT I'D

4  BE ABLE TO FIGURE IT OUT.

5         MS. SIMERLY:  YOUR HONOR, MOVE TO STRIKE THE LATTER

6  PART OF THAT RESPONSE AS NON-RESPONSIVE AND HEARSAY.

7         THE COURT:  SUSTAINED.  MOTION'S GRANTED.  IT'S

8  STRICKEN.

9         MS. SIMERLY:  THANK YOU.

10  Q.  OKAY.  SO MR. SETTERS TOLD YOU YOU JUST DIDN'T HAVE THE

11  EXPERIENCE THAT WAS NEEDED FOR THAT JOB, RIGHT?

12  A.  THAT'S CORRECT.

13  Q.  AND HE WENT ON TO GIVE YOU ANOTHER REASON.  HE SAID, "WE HAD

14  A VERY LARGE CANDIDATE SLATE FOR BOTH OF THE JOBS YOU APPLIED

15  FOR.  THE PEOPLE SELECTED HAD A FAIR AMOUNT OF GAS EXPERIENCE.

16  THEY WERE ALSO PRETTY MOBILE, EITHER IN TERMS OF RELOCATING

17  AND/OR SIGNIFICANT TRAVEL FROM THE HOME BASE.  THAT'S THE ONE

18  THING YOU NEED TO THINK ABOUT, KIRAN, BECAUSE I DID SENSE FROM

19  OUR DISCUSSION THAT THE ONEROUS TRAVEL REQUIREMENTS FOR MANY OF

20  THE JOBS IN IGG COULD BE A PROBLEM FOR YOU.  I TRAVEL ABOUT

21  75 PERCENT OF THE TIME.  BOTH OF THE JOBS YOU APPLIED FOR ARE

22  WORKING OUT SIMILARLY, ESPECIALLY SINGAPORE."

23         SO YOU HAD, IN THIS CONVERSATION WITH AUDIE SETTERS,

24  TOLD HIM YOU WERE REALLY LOOKING FOR A JOB BUT YOU WEREN'T THAT

25  MOBILE, RIGHT?

PANDE - CROSS (RESUMED) / SIMERLY

1  A.  I TOLD HIM THAT SINGAPORE WAS A LOCATION THAT I WOULD REALLY

2  BE INTERESTED IN WORKING IN.  AND I TOLD HIM THAT MY IDEAL JOB

3  WOULD NOT HAVE MORE THAN 50 PERCENT TRAVEL, YES.

4  Q.  OKAY.  HE GOES ON TO SAY, "THE OTHER CONCERN I HAD STEMMING

5  FROM OUR DISCUSSION IS THAT YOUR LONGER-TERM CAREER ASPIRATIONS

6  REALLY DON'T LAY IN COMMERCIAL AND IGG.  I GOT THE IMPRESSION IT

7  WAS SOMETHING TO DO FOR A COUPLE OF YEARS BEFORE MOVING TO A JOB

8  IN CORPORATE.  AND THERE'S NOTHING WRONG WITH THAT.  WE DO WANT

9  TO MAKE JOBS AVAILABLE FOR DEVELOPMENT ASSIGNMENTS.  BUT RIGHT

10 NOW OUR PRIORITY IS TO BUILD UP THE GROUP'S LONG-TERM COMMERCIAL

11 CAPABILITIES, AND THE JOBS YOU APPLIED FOR ARE CRITICAL TO THAT

12 GOAL."

13      SO HE TOLD YOU THERE WAS EVEN A THIRD REASON THAT HE

14 FELT YOU WEREN'T THE BEST CANDIDATE FOR THESE TWO POSITIONS.

15 NUMBER ONE, YOU HAD NO HIT-THE-GROUND-RUNNING GAS EXPERIENCE.

16 NUMBER TWO, THERE WAS A VERY LARGE CANDIDATE POOL.  NUMBER

17 THREE -- ACTUALLY, THAT'S THE SAME THING.  NUMBER 2, SIGNIFICANT

18 TRAVEL, YOU DIDN'T WANT TO TRAVEL MORE THAN 50 PERCENT OF THE

19 TIME.  AND NUMBER 3, HE HAD THE IMPRESSION THIS WASN'T YOUR

20 LONG-TERM CAREER ASPIRATION, YOU WERE LOOKING FOR A DEVELOPMENT

21 OPPORTUNITY, AND AT THAT POINT HE NEEDED LONG-TERM CAREER PEOPLE

22 IN THAT GROUP.

23      SO HE TOLD YOU THREE REASONS THAT YOU WEREN'T

24 SELECTED THAT HAD NOTHING WHATSOEVER TO DO WITH YOUR EXPERIENCE

25 WITH REX MITCHELL, RIGHT?

1  **A.**  THAT'S RIGHT.

2  **Q.**  OKAY.  NOW YOU RESPONDED TO MR. SETTERS' EMAIL.  AND LET'S

3  GO TO THE VERY TOP THERE, TO MS. PANDE'S RESPONSE.  AND YOU

4  RESPONDED THE SAME DAY LATER THAT MORNING.

5          **MS. SIMERLY:**  AND IF WE COULD BLOW UP THE RESPONSE

6  AND HIGHLIGHT IT AS I READ, ALEX.

7          "AUDIE, I APPRECIATE YOUR CANDID FEEDBACK AND WORDS

8  OF ENCOURAGEMENT.  I THINK YOUR INSIGHTS FROM OUR DISCUSSION IN

9  TERMS OF MY LONGER-TERM CAREER INTERESTS AND ALSO LEVEL OF

10 TRAVEL ARE RIGHT ON THE MARK.  IF I WERE TEN YEARS YOUNGER, I

11 THINK I WOULD HAVE MORE STAMINA FOR THAT LEVEL OF TRAVEL,

12 ESPECIALLY OVER A SUSTAINED PERIOD OF TIME.  I'M ENCOURAGED BY

13 YOUR VIEW THAT IGG JOBS MAY COME AVAILABLE IN THE FUTURE THAT

14 ARE A BETTER FIT.  I WILL ALSO TOUCH BASE WITH ANDRE TO EXPLORE

15 OPPORTUNITIES TO COLLABORATE.  THANKS AGAIN FOR YOUR FEEDBACK.

16 IT'S VERY USEFUL INPUT."

17          AND THEN MR. SETTERS FORWARDED THAT ON TO REX

18 MITCHELL TO, QUOTE, KEEP HIM IN THE LOOP.

19          LET'S GO AHEAD TO THE TOP AND SHOW THAT.

20              (EXHIBIT PUBLISHED TO JURY.)

21 **BY MS. SIMERLY:**

22 **Q.**  NOW, YOU DON'T THINK THERE'S ANYTHING INAPPROPRIATE ABOUT

23 AUDIE SETTERS' FORWARDING THIS EMAIL ON TO REX MITCHELL WHO WAS

24 YOUR THEN SUPERVISOR, DO YOU?

25 **A.**  NO, I DO NOT.

PANDE - CROSS (RESUMED) / SIMERLY

1    WITH HIM?

2    **A.**  I HAD ACTUALLY NEVER WORKED FOR DON PAUL.

3    **Q.**  SO YOU DIDN'T LIST EITHER DAVID KENNEDY OR JEAN CAMY, YOUR

4    MORE RECENT MANAGERS, DID YOU?

5    **A.**  NO, I DIDN'T.

6    **Q.**  AND THAT WASN'T BECAUSE OF ANY FEAR OF RETALIATION.  YOU

7    DIDN'T HAVE ANY PROBLEMS WITH JEAN CAMY OR -- OR DAVID KENNEDY,

8    DID YOU?

9    **A.**  NO, I DIDN'T.

10   **Q.**  SO IS THERE A REASON YOU LISTED EARLIER MANAGERS RATHER THAN

11   MORE RECENT MANAGERS?

12   **A.**  YES, THERE IS.

13   **Q.**  BECAUSE THEY WERE BIGGER FANS OF YOURS, RIGHT?

14   **A.**  THEY WERE SOME OF MY MENTORS IN THE COMPANY, YES.

15   **Q.**  OKAY.  SO THE SECOND POSITION THAT YOU APPLIED FOR IN THE

16   FALL 2003 PDC WAS A RESERVOIR ENGINEER.  AND, ACTUALLY, I THINK

17   IT MIGHT HAVE BEEN TWO POSITIONS.

18              DO YOU RECALL THAT?

19   **A.**  COULD YOU JUST BE A LITTLE BIT MORE SPECIFIC, PLEASE?

20   **Q.**  SURE.  THE LOCATION WAS LONDON.

21   **A.**  OH, OKAY.  YOU'RE STILL TALKING ABOUT THAT.

22   **Q.**  I'M STILL TALKING ABOUT -- YOU HAD THREE POSITIONS YOU

23   APPLIED FOR IN LONDON AT THAT TIME, TWO OR THREE?

24   **A.**  THAT SOUNDS ABOUT RIGHT.

25   **Q.**  SOUND RIGHT?

PANDE - CROSS (RESUMED) / SIMERLY

1          OKAY.  AND THERE WAS A RESERVOIR ENGINEER POSITION IN

2    LONDON, PART -- PART OF THE SAME NEW BUSINESS DEVELOPMENT GROUP,

3    RIGHT?

4    A.  YES.

5    Q.  OKAY.  AND ARE YOU AWARE THAT THERE WERE FIVE CANDIDATES,

6    THREE ON THE SHORT LIST?

7    A.  I WAS NOT AWARE OF THAT AT THE TIME, NO.

8    Q.  ARE YOU AWARE THAT, ACCORDING TO TOM MCMILLEN, THERE WERE

9    MORE QUALIFIED CANDIDATES THAN YOU AND THAT'S WHY YOU DIDN'T

10   RECEIVE THAT JOB?

11   A.  I'M NOT AWARE OF THAT, NO.

12   Q.  DO YOU KNOW THAT DOMINIQUE FRIZELLE GOT THAT POSITION?

13   A.  IN LOOKING AT THE SELECTION RECORDS PROVIDED, THAT -- THAT

14   SOUNDS FAMILIAR, YES.

15   Q.  AND YOU DON'T KNOW HOW YOUR QUALIFICATIONS STACK UP AGAINST

16   DOMINIQUE FRIZELLE'S, DO YOU?

17   A.  NO, I DON'T.

18   Q.  AND YOU DON'T KNOW WHO MADE THE DECISION WITH REFERENCE TO

19   THE RESERVOIR ENGINEER POSITION IN LONDON, DO YOU?

20   A.  NO, I DON'T.

21   Q.  AND YOU DON'T KNOW WHETHER WHOEVER MADE THE DECISION HAD ANY

22   CONTACT WHATSOEVER WITH REX MITCHELL?

23   A.  NO, I DON'T.

24   Q.  OR JACK DUNN?

25   A.  NO, I DON'T.

1        YES, I DID.

2   **Q.**  AND YOU THOUGHT THAT BY PUTTING DOWN -- YOU KNEW THAT THE

3   FORM SAID THAT BY PUTTING DOWN A TEN, THAT MEANT THAT YOU WERE

4   THE MOST QUALIFIED FOR THAT POSITION, RIGHT?

5   **A.**  NO.

6   **Q.**  WELL, WHAT WAS YOUR UNDERSTANDING OF WHAT THE TEN MEANT

7   ACCORDING TO THE FORM?

8   **A.**  AS I SAID, THE TEN WAS A SELF -- A SELF-ASSESSMENT THAT MY

9   UNDERSTANDING WAS THAT IT WASN'T EVEN USED.

10  **Q.**  NOW, MS. PANDE, SINCE LEAVING CHEVRON IN -- ON

11  DECEMBER 31ST, 2003, IN TERMS OF YOUR JOB SEARCH, YOU HAVEN'T

12  APPLIED WITH ANY OTHER MAJOR OIL COMPANIES, HAVE YOU?

13  **A.**  IF YOU'RE TALKING ABOUT THE SUPER MAJORS, THAT'S TRUE.  BUT

14  I HAVE APPLIED TO ANADARKO, BUT I THINK IT'S CONSIDERED A

15  INDEPENDENT BECAUSE IT DOESN'T HAVE A DOWNSTREAM PART OF THE

16  ORGANIZATION.

17  **Q.**  WELL, CHEVRON IS CONSIDERED A SUPER MAJOR, RIGHT?

18  **A.**  IT'S -- IT'S A LARGE OIL COMPANY, YES.  IT'S A MAJOR.

19  **Q.**  OKAY.  A MAJOR.  SO YOU HAVEN'T APPLIED TO ANY OIL COMPANIES

20  THAT WOULD BE COMPETITORS OF CHEVRON, HAVE YOU?

21  **A.**  NO, I HAVE NOT.

22  **Q.**  I MEAN, YOU HAVEN'T APPLIED TO EXXON; YOU HAVEN'T APPLIED TO

23  BP, RIGHT?

24  **A.**  THAT'S CORRECT.

25  **Q.**  AND YOU ARE AWARE THAT IT'S A REAL HOT MARKET RIGHT NOW OUT

1   THERE IN THE OIL INDUSTRY?

2   A.   YES, AT $80 A BARREL, IT IS.

3   Q.   PRETTY HOT.

4        AND, IN FACT, YOU HAVE A BROTHER WHO WORKS FOR

5   ANADARKO IN HOUSTON, RIGHT?

6   A.   YES, I DO.

7   Q.   AND, IN FACT, AT ONE TIME YOU TOLD JACK DUNN THAT YOU

8   WEREN'T BEING PAID ENOUGH 'CAUSE YOU KNEW YOUR BROTHER WAS

9   MAKING MORE A LOT MORE MONEY THAN YOU WERE IN ANADARKO, RIGHT?

10   A.   I MAY HAVE SAID THAT, YES.

11   Q.   OKAY.  SO THAT WAS THEN 2003, AND THIS IS NOW 2007, AND THE

12   MARKET AS ONLY GOTTEN HOTTER, RIGHT?

13   A.   I THINK THE JOB MARKET HAS BECOME A LOT TIGHTER FOR

14   PETROLEUM ENGINEER FIRST-LINE SKILL SETS.

15   Q.   AND YOU HAVE GREAT FIRST-LINE SKILL SETS AS A PETROLEUM

16   ENGINEER, RIGHT?  I MEAN, A PH.D. IS NOT TOO SHABBY.

17   A.   I THINK I HAVE GOOD SKILL SETS, YES, I DO.

18   Q.   OKAY.  BUT THE BOTTOM LINE IS THAT IF YOU WANTED TO FIND A

19   JOB THAT WOULD REPLACE YOUR VACATION, AND 401K CONTRIBUTIONS,

20   AND DISABILITY INSURANCE, AND HEALTH INSURANCE, AND DENTAL

21   INSURANCE, AND 4-0 -- I THINK I ALREADY SAID 401K PLANS -- AND

22   STOCK OPTIONS, AND ANYTHING ELSE.

23        THERE ARE THOSE JOB OPPORTUNITIES OUT THERE, AREN'T

24   THERE?

25   A.   CURRENTLY, THERE ARE.

PANDE - CROSS (RESUMED) / SIMERLY

1    Q.  LOTS.

2    A.  YES.

3    Q.  IN FACT, PEOPLE ARE GETTING SIGNING BONUSES, AREN'T THEY?

4    A.  I DON'T KNOW.

5    Q.  WOULDN'T SURPRISE YOU, THOUGH, WOULD IT?

6    A.  IT WOULDN'T SURPRISE ME.

7    Q.  BUT YOU'VE CHOSEN, INSTEAD, TO DO THIS CONSULTING WORK WITH

8    YOUR BROTHER; IS THAT CORRECT?

9    A.  I MADE THAT DECISION IN -- IN 2005 WHEN I WASN'T ABLE TO

10   FIND A REGULAR JOB, YES.

11   Q.  OKAY.  SO -- I MEAN, IT WAS -- FOR YOU, IT WAS THE CHOICE.

12   YOU COULD GET A JOB LIKE THAT, LIKELY IN HOUSTON, RIGHT?  THAT'S

13   WHERE THE JOBS ARE, RIGHT?

14           MS. HARRIMAN:  YOUR HONOR, I'M GOING TO OBJECT TO

15   THESE QUESTIONS BEING WITHOUT A TIME FRAME.  WE'RE JUMPING TIME

16   FRAMES, SO IT'S MAKING THE TESTIMONY CONFUSING AND MISLEADING.

17           THE COURT:  I'LL SUSTAIN.  LET'S JUST TALK ABOUT A

18   TIME FRAME.  WHEN.

19           MS. SIMERLY:  SURE.

20   Q.  I'M TALKING ABOUT AFTER YOU HAD GOTTEN OVER YOUR SURGERY --

21   A.  YES.

22   Q.  -- AND RETURNED -- WERE ABLE TO RETURN TO WORK IN MAY OF

23   2004.  HOW'S THAT?

24   A.  THAT'S FINE.

25   Q.  THROUGH TODAY.  OKAY?

PANDE - CROSS (RESUMED) / SIMERLY

1   **A.**   OKAY.

2   **Q.**   AT NO TIME SINCE YOU WERE ABLE TO RETURN TO WORK IN MAY OF

3   2004 UNTIL TODAY HAVE YOU APPLIED FOR A POSITION WITH ANY MAJOR

4   OIL COMPANY IN HOUSTON, RIGHT?

5   **A.**   I HAVE SUBMITTED APPLICATIONS --

6              **MS. HARRIMAN:**   EXCUSE ME.   YOUR HONOR, I JUST WANT TO

7   OBJECT FOR THE RECORD ON GROUNDS OF RELEVANCE FOR THE REASONS

8   STATED EARLIER.   ANY JOBS OUTSIDE CALIFORNIA, IRRELEVANT.

9              **THE COURT:**   OVERRULED.

10             **THE WITNESS:**   I THINK I LOST MY TRAIN OF THOUGHT.

11   I'M SORRY.

12             **MS. SIMERLY:**   LET ME TRY AGAIN.

13   **Q.**   SINCE APPROXIMATELY MAY OF 2004 UNTIL TODAY, YOU HAVEN'T

14   APPLIED FOR ANY JOBS WITH -- I DON'T KNOW EXXON'S NEW NAME, BUT

15   WHATEVER EXXON'S NEW NAME IS AND BP, RIGHT?

16   **A.**   EXXON MOBIL.   I HAVE NOT APPLIED TO EXXON MOBIL AND BP;

17   THAT'S CORRECT.

18   **Q.**   AND THERE ARE LOTS OF JOBS THAT YOU COULD APPLY FOR IF YOU

19   WERE INTERESTED, RIGHT?

20   **A.**   TODAY, YES, THERE ARE.

21   **Q.**   AND THERE WERE A YEAR AGO, RIGHT?

22   **A.**   I -- I MEAN, I CAN'T SAY.   YOU KNOW, I'M NOT WORKING FOR

23   THOSE COMPANIES.   I DON'T KNOW EXACTLY WHAT THEY'RE LOOKING FOR.

24   **Q.**   BUT BASICALLY SINCE MAY OF 2004, YOU HAVE MADE A CHOICE:

25   YOU HAVE PREFERRED TO WORK WITH YOUR CONSULTING COMPANY MAKING

1  RIGHT OUT OF SCHOOL.

2  Q.  BUT YOU HAVEN'T EVEN TRIED.

3  A.  I HAVEN'T APPLIED TO THOSE COMPANIES; THAT'S CORRECT.

4  Q.  NOW, ON PETROASSETS, I THINK YOU SAID HAS ONE CLIENT; IS

5  THAT RIGHT?

6  A.  ACTUALLY, TWO.

7  Q.  LANDMARK GRAPHICS, A SUBSIDIARY OF HALLIBURTON, IS THE

8  CLIENT?

9  A.  LANDMARK GRAPHICS COMPANY, YES.

10  Q.  YESTERDAY ON DIRECT, YOU SAID THERE WAS ONE CLIENT, LANDMARK

11  GRAPHICS, RIGHT?

12  A.  IT'S LANDMARK GRAPHICS COMPANY, AND IT'S ALSO SGF GLOBAL.

13  Q.  NOW, WHILE YOU WERE WORKING WITH YOUR COMPANY PETROASSETS,

14  YOU'VE ACTUALLY SPENT SEVERAL MONTHS WORKING AS A CONSULTANT AT

15  CHEVRON'S HOUSTON CAMPUS, RIGHT?

16  A.  THAT'S TRUE.

17  Q.  HOW MANY MONTHS WERE YOU AT CHEVRON'S HOUSTON'S CAMPUS?

18  A.  THINK THE PROJECT STARTED PROBABLY IN JUNE OF 2005.  AND IT

19  PROBABLY FINISHED IN MAYBE AROUND JANUARY OR FEBRUARY OF 2006,

20  BUT I WASN'T WORKING AT THE HOUSTON CAMPUS THAT ENTIRE TIME.

21  Q.  YOU -- BUT MOST OF THE WORK WAS AT THE HOUSTON CAMPUS,

22  RIGHT?

23  A.  NO.

24  Q.  HALF OF IT?

25  A.  PROBABLY NOT HALF OF IT.  MAYBE ABOUT A THIRD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

KIRAN PANDE,                    )
                                )        **JURY TRIAL**
            PLAINTIFF,           )
                                )
  VS.                           )        NO. C 04-5107JCS
                                )
CHEVRON CORPORATION (F/K/A      )
CHEVRONTEXACO CORPORATION)      )        **VOLUME 4**
EXPLORATION & PRODUCTION        )        **PAGES 605 - 806**
(F/K/A CHEVRONTEXACO            )
OVERSEAS PETROLEUM), A          )
DIVISION OF CHEVRON U.S.A.      )
INC.,                           )        SAN FRANCISCO, CALIFORNIA
                                )        MONDAY, OCTOBER 15, 2007
            DEFENDANTS.         )
_____)

# CERTIFIED COPY

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF:            KEKER & VAN NEST
                         710 SANSOME STREET
                         SAN FRANCISCO, CALIFORNIA  94111-1704
                  BY:    CHRISTA M. ANDERSON,
                         SUSAN J. HARRIMAN, ATTORNEYS AT LAW


FOR DEFENDANTS:          MILLER LAW GROUP, PC
                         500 SANSOME STREET, SUITE 400
                         SAN FRANCISCO, CALIFORNIA  94111
                  BY:    LISA HAMASAKI,
                         MICHELE BALLARD MILLER
                         JANINE S. SIMERLY, ATTORNEYS AT LAW


REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258

## CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C04-5107JSC, PANDE V. CHEVRON, ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

*Raynee H. Mercado*

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

FRIDAY, OCTOBER 19, 2007

1    THAT SAME WORK?

2    A.   I CONTINUED TO WORK ON THAT PROJECT UNTIL AUGUST OF 2004.

3    Q.   ARE YOU AWARE OF ANY OTHER EMPLOYEES WITHIN SASBU WHO

4    DECLINED THE MOVE TO HOUSTON?

5    A.   YES.   THERE WAS -- THERE WAS A HANDFUL OF PEOPLE.

6    Q.   CAN YOU NAME THE PEOPLE THAT YOU RECALL THAT DECLINED THE

7    MOVE TO HOUSTON WITH SASBU?

8    A.   WELL, OF COURSE, KIRAN.   THERE WAS JALAL AFIFI.   THERE WAS

9    GRAHAM HOUSEN, SUSANNA WONG, NATALIE TALBERT, TOM MILLETTE, MIKE

10   CLARK.   DID I SAY GRAHAM HOUSEN?

11   Q.   YES.

12   A.   OKAY.

13   Q.   HOW ABOUT MR. SETO?

14   A.   YES, THERE WAS -- AN ACCOUNTANT NAMED MARTIN SETO, HE

15   DECLINED THE OFFER.

16   Q.   AND MR. ZALAN, DID HE DECLINE?

17   A.   YES, STEVE ZALAN ALSO DID.

18   Q.   ARE YOU AWARE OF ANY OTHER SUPPORT STAFF THAT YOU CAN RECALL

19   THAT DECLINED THE MOVE TO HOUSTON?

20   A.   NOT AT THIS TIME.

21   Q.   DID YOU OBSERVE ANY OF THOSE PEOPLE CONTINUING TO WORK FOR

22   CHEVRON OUT OF THE SAN RAMON OFFICE AFTER THE END OF 2003?

23   A.   YES.

24   Q.   HOW MANY OF THOSE PEOPLE DID YOU OBSERVE CONTINUING TO WORK

25   OUT OF SAN RAMON AFTER 2003?

1    A.  WELL, MIKE CLARK TRANSFERRED TO LONDON SO HE WASN'T IN

2    SAN RAMON ANYMORE.  BUT OF THAT LIST, ONLY KIRAN WEREN'T WORKING

3    AT SAN RAMON.

4    Q.  YOU DIDN'T SEE -- YOU DIDN'T OBSERVE MS. PANDE WORKING THERE

5    ANYMORE; IS THAT RIGHT?

6    A.  I DID NOT.

7    Q.  IN PERFORMING YOUR JOB RESPONSIBILITIES AT CHEVRON, AFTER

8    DECEMBER 31ST, 2003, BUT DURING THE YEAR OF 2004, DID YOU

9    OBSERVE ANY WORK THAT NEEDED TO BE PERFORMED BY PETROLEUM

10   ENGINEERS LIKE MS. PANDE WITHIN THE CHEVRON ORGANIZATION?

11           MS. SIMERLY:  OBJECTION, YOUR HONOR.  RELEVANCE

12   UNLESS IT'S DIRECTED TO BLOCK 14.

13           THE COURT:  OVERRULED.

14           THE WITNESS:  THE GENERAL FEELING WAS THAT THERE

15   WAS -- TALKING TO MY COLLEAGUES LIKE GRAHAM AND JALAL WAS THAT

16   THERE WAS --

17           MS. SIMERLY:  OBJECTION, YOUR HONOR.  THIS IS NOW

18   HEARSAY.

19           THE COURT:  SUSTAINED.  WHY DON'T YOU REPHRASE THE

20   QUESTION SO YOU DON'T GET A HEARSAY ANSWER.

21           MS. ANDERSON:  CERTAINLY, YOUR HONOR.

22   Q.  DID YOU MAKE ANY OBSERVATIONS WHILE WORKING AT CHEVRON IN

23   2004 THAT LED YOU TO CONCLUDE THAT THERE WAS WORK AVAILABLE FOR

24   A PETROLEUM ENGINEER LIKE MS. PANDE DURING THAT YEAR?

25   A.  YES.

BURKES - CROSS / SIMERLY

1    Q.   AND YOUR SPONSOR WOULD HELP YOU TRY TO FIND ANOTHER JOB,

2    RIGHT?

3    A.   YES.

4    Q.   NOT YOUR SUPERVISOR, YOUR SPONSOR, RIGHT?

5    A.   WELL, YOU KNOW, IT WAS -- IT WAS PHRASED "WE" WHEN -- WHEN

6    THEY SPOKE TO US, IT WAS -- IT WAS PHRASED "WE," NOT -- AND

7    CERTAINLY IN MY CASE, MY -- MY SUPERVISOR DEFINITELY STRONGLY

8    ASSISTED ME IN TRYING TO FIND ANOTHER JOB.

9    Q.   OKAY.  THAT'S FINE.  BUT IN ANY EVENT, THE SECOND OPTION WAS

10   YOU COULD TRY TO FIND ANOTHER JOB WITHIN CHEVRON, RIGHT?

11   A.   YES.

12   Q.   AND YOU KNEW THAT IF YOU DIDN'T FIND ANOTHER JOB WHEN YOUR

13   WORK ENDED IN SAN RAMON, YOU WOULD BE TERMINATED, RIGHT?

14             MS. ANDERSON:  LACKS FOUNDATION, YOUR HONOR.

15             THE COURT:  OVERRULED.

16             THE WITNESS:  IT WASN'T --

17             THE COURT:  YEAH, YOU CAN ANSWER THAT.

18             THE WITNESS:  OH, I DO ANSWER, YES.  SORRY.

19             THE COURT:  WHEN I SAY OVERRULED, THAT MEANS OKAY.

20             THE WITNESS:  GREEN LIGHT, RED LIGHT.

21             THE COURT:  RIGHT.  I SHOULD DO THAT.  I SHOULD JUST

22   SAY GREEN LIGHT, RED LIGHT.

23             (LAUGHTER.)

24             THE WITNESS:  IT WASN'T CLEAR TO ME EXACTLY WHAT

25   WOULD HAPPEN, IF THERE WAS NO JOB -- YOU DID NOT ACCEPT THE JOB

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404*

BURKES - CROSS / SIMERLY

1   IN HOUSTON AND YOU DID NOT FIND ANOTHER JOB WITHIN CHEVRON.  IT

2   WAS -- IT'S -- THERE SEEMED TO BE TWO POSSIBILITIES THAT YOU

3   MIGHT BE DECLARED SURPLUS OR YOU MIGHT BE DECLARED -- OR YOU

4   MIGHT BE TERMINATED.

5   BY MS. SIMERLY:

6   Q.  OKAY.  IN EITHER EVENT, WHETHER YOU WERE DECLARED SURPLUS OR

7   TERMINATED, YOU KNEW YOU WERE NO LONGER GOING TO HAVE A JOB AT

8   CHEVRON, RIGHT?

9   A.  NO.  BECAUSE CHEVRON HAS -- HAS THIS PROGRAM CALLED THE

10  SERFU (PHONETIC) -- I CAN'T REMEMBER ALL THE -- THE ACRONYM, BUT

11  IT -- IT'S SURPLUS EMPLOYEE PROGRAM, AND THE FIRST THING THAT

12  HAPPENS TO YOU WHEN YOU GO INTO THE SURPLUS EMPLOYEE PROGRAM

13  IS -- IS YOU GO INTO REDEPLOYMENT.  AND WHEN YOU'RE IN

14  REDEPLOYMENT, THEY DON'T -- THEY BROADEN THE POTENTIAL JOBS THAT

15  YOU CAN LOOK FOR.  IN OTHER WORDS, THEY -- YOU'RE BEING

16  CONSIDERED FOR A BROADER RANGE OF JOBS THAN YOU WOULD BE IF

17  YOU'RE NOT IN REDEPLOYMENT.  I --

18  Q.  BUT AGAIN --

19  A.  DOES THAT EXPLAIN THAT?

20  Q.  WELL --

21  A.  SO -- SO IT'S NOT -- SO ONCE YOU GO IN REDEPLOYMENT, SAY --

22  SAY IS THAT, YOU KNOW, I'M AN ENGINEER, I GO INTO REDEPLOYMENT

23  AND THEY FIND A JOB FOR ME IN ENVIRONMENTAL MANAGEMENT OR

24  SOMETHING, AND IT'S SOMETHING THAT I HAVEN'T EXACTLY DONE BUT

25  SOMETHING MY TRAINING WOULD PREPARE ME FOR, SO IN REDEPLOYMENT

BURKES - CROSS / SIMERLY

1    THEY LOOK AT A BROADER RANGE OF THINGS.  SO IT'S NOT CLEAR THAT

2    YOU DON'T HAVE A JOB IF YOU'RE A SURPLUS EMPLOYEE.

3    Q.  BUT THAT WAS YOUR UNDERSTANDING AT THE BEGINNING OF THIS

4    PROCESS, THAT IF YOU DIDN'T ACCEPT THE JOB IN HOUSTON AND IF YOU

5    DIDN'T FIND ANOTHER JOB, YOU WERE GOING TO BE TERMINATED,

6    WHETHER YOU MIGHT BE DECLARED SURPLUS AND QUALIFY FOR SEVERANCE,

7    THAT WAS ANOTHER MATTER.  BUT YOU UNDERSTOOD THAT IF YOU DIDN'T

8    ACCEPT THE MOVE AND YOU COULDN'T FIND ANOTHER JOB, YOU WERE

9    GOING TO BE TERMINATED, RIGHT?

10   A.  I NEVER -- I NEVER ACCEPTED THAT AS A UNDERSTANDING AT ALL.

11   Q.  WELL, CERTAINLY IN JANUARY OF 2004, YOU REALIZED THAT WAS

12   THE UNDERSTANDING BECAUSE YOU GOT A LETTER FROM CHEVRON'S HR

13   DEPARTMENT WHICH BASICALLY SAID, QUOTE, "YOU DID NOT ACCEPT OUR

14   LAST OFFER TO MOVE TO HOUSTON.  IF YOU'VE NOT FOUND A NEW JOB,

15   YOU WILL BE TERMINATED AS OF FEBRUARY 6TH, 2004."  YOU REMEMBER

16   THAT LETTER, DON'T YOU, MR. BURKES?

17   A.  I REMEMBER IT.

18   Q.  AND THAT'S WHAT THAT LETTER SAID.  YOU GOT A LETTER FROM

19   CHEVRON SAYING, "DEAR BOB BURKES, YOU DID NOT ACCEPT OUR LAST

20   OFFER OF THE MOVE TO HOUSTON.  IF YOU'VE NOT FOUND ANOTHER JOB,

21   YOU ARE TERMINATED AS OF FEBRUARY 6TH, 2004."  RIGHT?

22   A.  THAT'S RIGHT.

23   Q.  OKAY.

24   A.  BUT I GOT A JOB ON JANUARY THE 20TH.

25   Q.  THAT'S RIGHT.  YOU APPLIED FOR A JOB WITH ZUWA OMOREGIE,

BURKES - CROSS / SIMERLY

1    Q.   I JUST WANT TO --

2    A.   SO -- AND I DIDN'T KNOW WHAT -- WHAT CLAIMS, IF ANY, SHE HAD

3    MADE.

4    Q.   BUT SHE NEVER ASKED YOU IF YOU WOULD HELP HER OUT OR TESTIFY

5    IN THIS CASE OR ANYTHING?

6    A.   NO.

7    Q.   OKAY.

8            NOW, YOU MENTIONED THAT TO YOUR KNOWLEDGE, A NUMBER

9    OF PEOPLE STAYED IN SAN RAMON AFTER SASBU MOVED TO HOUSTON, AND

10   I JUST WANT TO SEE HOW MANY OF THESE PEOPLE THAT YOU NAMED WERE

11   IN FACT BLOCK 14 EMPLOYEES TO THE BEST OF YOUR KNOWLEDGE.

12           GORDON SETO?

13   A.   I'M NOT SURE.  HE WAS -- HE WAS AN ACCOUNTANT, AND I WOULD

14   ASSUME THAT -- THAT HIS ACTIVITIES COVERED ALL OF SASBU.  SO

15   BLOCK ZERO, BLOCK 14, PERHAPS CONGO AS WELL.

16   Q.   BUT YOU DON'T REALLY KNOW ONE WAY OR THE OTHER?

17   A.   NO, I DON'T.

18   Q.   HE WAS AN ACCOUNTANT, HE WASN'T AN ENGINEER?

19   A.   THAT'S RIGHT.

20   Q.   OKAY.  NATALIE TALBERT.  WHAT WAS HER POSITION?  WAS SHE AN

21   ENGINEER?

22   A.   NO.  SHE WAS AN ENGINEERING ASSISTANT.

23   Q.   AND WAS SHE WITH BLOCK 14 OR BLOCK ZERO?

24   A.   BLOCK ZERO.

25   Q.   OKAY, SO SHE WAS NOT BLOCK 14.

BURKES - CROSS / SIMERLY

1              TOM MILLETTE, WAS HE -- WHAT WAS HIS POSITION?

2   A.   HE WAS SIMILAR TO MARTIN, AND HE COVERED BOTH BLOCK ZERO AND

3   BLOCK 14.

4   Q.   MEANING HE WAS AN ACCOUNTANT?

5   A.   YES.  OR FINANCIAL ANALYST, YEAH.

6   Q.   HE WAS NOT AN ENGINEER, RIGHT?

7   A.   THAT'S RIGHT.

8   Q.   OKAY.  JALAL ALFIFI (PHONETIC), WAS HE BLOCK ZERO OR BLOCK

9   14?

10  A.   I THINK HE WAS CONGO.

11  Q.   CONGO, THE THIRD CHOICE, OKAY.

12           SO HE WAS NOT BLOCK 14, CORRECT?

13  A.   I DON'T KNOW IF HE'D DONE ANYTHING FOR BLOCK 14 OR NOT, BUT

14  I KNOW HIS PRIMARY RESPONSIBILITY HAD BEEN CONGO.

15  Q.   AND GRAHAM HOUSEN, WAS HE BLOCK 14 OR BLOCK ZERO OR CONGO?

16  A.   BLOCK ZERO.

17  Q.   AND STEVE ZALAN, WAS HE BLOCK ZERO OR BLOCK 14 OR CONGO?

18  A.   I'M NOT SURE.

19  Q.   AND THEN OBVIOUSLY --

20  A.   HE WAS A GEOLOGIST.

21  Q.   -- KIRAN PANDE WAS BLOCK 14; IS THAT CORRECT?

22  A.   YES.

23           MS. SIMERLY:  I DON'T HAVE ANY FURTHER QUESTIONS,

24  MR. BURKES.  THANKS VERY MUCH.

25           THE COURT:  THANK YOU.

1    IT'S RELEVANT.  CAN YOU LAY A FOUNDATION THAT WILL SUGGEST THAT

2    IT'S RELEVANT.

3            MS. SIMERLY:  WELL, I'M JUST TRYING TO SHOW THE --

4    THE RELATIONSHIP BETWEEN THE TWO OF THEM, THE KIND OF THINGS

5    THAT WOULD BE SHARED.

6            THE COURT:  OKAY.  I THINK YOU JUST DID.  YOU DON'T

7    HAVE TO GO INTO THE DETAILS.

8            MS. SIMERLY:  ALL RIGHT.

9    Q.  MS. MABE, IN YOUR CAREER AT CHEVRON, IS MOBILITY IMPORTANT?

10   A.  VERY IMPORTANT.

11           MS. HARRIMAN:  OBJECTION, IRRELEVANT.

12           THE COURT:  OVERRULED.

13   BY MS. SIMERLY:

14   Q.  DID YOU SAY "VERY IMPORTANT"?

15   A.  IT'S VERY IMPORTANT.

16   Q.  AND WHAT DO YOU MEAN WHEN YOU SAY MOBILITY IS IMPORTANT AT

17   CHEVRON?

18   A.  WE'RE AN INTERNATIONAL OIL COMPANY, AND WE HAVE OFFICES ALL

19   OVER THE WORLD.  AND LIKE I'M INVOLVED IN THE HIRING OF NEW

20   HIRES FOR PETROLEUM ENGINEERING, AND ONE OF THE THINGS THAT,

21   WHEN WE HIRE PEOPLE, WE WANT THEM TO BE GLOBAL MOBILE, MEANING

22   THAT THEY'LL GO ANYWHERE.  BECAUSE I MEAN A LOT OF TIMES, THE

23   OIL IS NOT IN NICE LOCATIONS LIKE CALIFORNIA.  IT'S IN LUWANDA,

24   ANGOLA OR LAGOS, NIGERIA, AND THEY WANT PEOPLE TO GO THERE THAT

25   ARE TECHNICALLY SMART.  AND SO YOU -- YOU KNOW, YOU'RE ASKED TO

MABE - CROSS / SIMERLY

1    FILL THAT OUT ON A FORM THAT WHEN THEY POST FOR JOBS IN THE

2    COMPANY, YOU -- YOU HAVE TO INDICATE EVERY LOCATION THAT YOU ARE

3    WILLING TO WORK IN.

4    Q.   GOING BACK TO THE TIME THAT THE MOVE WAS ANNOUNCED AND THE

5    CONVERSATIONS THAT YOU HAD WITH KIRAN PANDE ABOUT HER NOT

6    WANTING TO MOVE TO HOUSTON, DID SHE INDICATE TO YOU WHERE SHE

7    WANTED TO WORK?

8    A.   I KNOW SHE WANTED TO STAY IN THE BAY AREA.

9             MS. HARRIMAN:  EXCUSE ME, YOUR HONOR.  THAT WAS A

10   "YES" OR "NO" QUESTION.

11            THE COURT:  OKAY.

12            THE WITNESS:  YES.

13   BY MS. SIMERLY:

14   Q.   DID -- AND WHAT DID SHE TELL YOU IN TERMS OF THE LOCATIONS

15   SHE WANTED TO WORK?

16   A.   SHE WANTED TO STAY IN THE BAY AREA, AND SHE ALSO APPLIED FOR

17   A JOB IN LONDON.

18   Q.   TO THE BEST OF YOUR KNOWLEDGE, ARE THOSE THE ONLY POSITIONS

19   SHE TOLD YOU SHE WAS INTERESTED IN, THE BAY AREA OR LONDON?

20   A.   AS FAR AS I REMEMBER, YES.

21   Q.   DID YOU GIVE MS. PANDE ANY ADVICE DURING THIS PERIOD BETWEEN

22   THE TIME SHE HAD DECIDED NOT TO ACCEPT THE MOVE TO HOUSTON AND

23   THE TIME THAT SHE WAS TERMINATED AT THE END OF DECEMBER, 2003?

24   A.   YES.

25            MS. HARRIMAN:  OBJECTION, CALLS FOR HEARSAY.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404**

MABE - CROSS / SIMERLY

1   CONTRACTORS DOING WORK AT CHEVRON NOW, PETROLEUM ENGINEERS,

2   RESERVOIR SIMULATION ENGINEERS?

3   A.  YES.

4   Q.  HAVE YOU YOURSELF HIRED SOME RESERVOIR SIMULATION ENGINEERS

5   TO WORK AT CHEVRON?

6           MS. HARRIMAN:  OBJECTION, IRRELEVANT.

7           THE COURT:  OVERRULED.

8           THE WITNESS:  YES.

9   BY MS. SIMERLY:

10  Q.  AND WHAT'S THE GOING RATE FOR A GOOD RESERVOIR SIMULATION

11  ENGINEER WHO DOES CONSULTING WORK AT CHEVRON?

12          MS. HARRIMAN:  OBJECTION, IRRELEVANT.

13          THE COURT:  OVERRULED.

14          THE WITNESS:  THE -- THE MINIMUM WOULD BE A THOUSAND

15  DOLLARS A DAY, AND YOU -- YOU CAN ALSO PAY 1,500.  WE'VE PAID

16  1,600 BEFORE, A DAY.  IT'S -- IT'S EXPENSIVE.

17  BY MS. SIMERLY:

18  Q.  BUT I GATHER THAT THERE'S NOT A LOT OF THAT KIND OF WORK OUT

19  THERE.  I MEAN, IF SOMEONE WANTED TO WORK TEN MONTHS OUT OF THE

20  YEAR AT $1,500 A DAY, DOES CHEVRON HAVE THAT KIND OF WORK THAT

21  THEY'RE CONTRACTING OUT?

22  A.  NOT JUST CHEVRON.  THERE'S A LOT OF COMPANIES THAT ARE

23  HIRING RIGHT NOW.

24          MS. HARRIMAN:  OBJECTION, YOUR HONOR, MOVE TO STRIKE,

25  NON-RESPONSIVE.

1    BY MS. HARRIMAN:

2    Q.   DID YOU ANALYZE THE ECONOMIC IMPACT ON MS. PANDE RESULTING

3    FROM HER TERMINATION FROM CHEVRON?

4    A.   I DID.

5    Q.   AND DID YOU SUMMARIZE YOUR -- THE ANALYSIS THAT YOU DID,

6    DR. MAHLA?

7    A.   I DID.  I HAVE A DEMONSTRATIVE EXHIBIT THAT DISPLAYS THAT.

8              MS. HARRIMAN:  CAN WE SEE 1A, PLEASE.

9                   (EXHIBIT PUBLISHED TO JURY.)

10   BY MS. HARRIMAN:

11   Q.   AND, DR. MAHLA, WOULD YOU DESCRIBE GENERALLY WHAT THIS

12   DEMONSTRATIVE DEPICTS.

13   A.   BELIEVE IT OR NOT, THIS IS A SUMMARY DOCUMENT.  IT IS A --

14   IT IS A OVERALL GRAPHIC DEMONSTRATING THE ESTIMATED LOSSES TO

15   MS. PANDE UNDER A NUMBER OF DIFFERENT SCENARIOS.

16              THE BOTTOM LINE FIGURES IN THAT ANALYSIS ARE

17   CONTAINED IN THE BOXED ENTRY AT THE BOTTOM RIGHT-HAND CORNER OF

18   THE EXHIBIT.  BUT GENERALLY, THE EXHIBIT SHOWS TWO -- THREE

19   SECTIONS, ONE DEMONSTRATING THE EARNINGS THAT MS. PANDE WOULD

20   HAVE -- WOULD HAVE EARNED BUT FOR HER TERMINATION FROM -- FROM

21   CHEVRON, WHICH IS THAT TOP SECTION.

22   Q.   SO WHEN YOU SAY THE TOP SECTION TALKS ABOUT WHAT MS. PANDE

23   WOULD HAVE EARNED BUT FOR HER EARNINGS, BUT FOR HER TERMINATION,

24   TO WHAT ARE YOU REFERRING?

25   A.   I'M REFERRING TO THIS TOP SECTION UP HERE (INDICATING)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

KIRAN PANDE,                          )
                                      )        **JURY TRIAL**
              PLAINTIFF,              )
                                      )
   VS.                                )        NO. C 04-5107JCS
                                      )
CHEVRON CORPORATION (F/K/A            )
CHEVRONTEXACO CORPORATION)            )        **VOLUME 5**
EXPLORATION & PRODUCTION              )        **PAGES 807 - 1044**
(F/K/A CHEVRONTEXACO                  )        Certified Copy
OVERSEAS PETROLEUM), A                )
DIVISION OF CHEVRON U.S.A.            )
INC.,                                 )        SAN FRANCISCO, CALIFORNIA
                                      )        TUESDAY, OCTOBER 16, 2007
              DEFENDANTS.             )
                                      )

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

FOR PLAINTIFF:          KEKER & VAN NEST
                        710 SANSOME STREET
                        SAN FRANCISCO, CALIFORNIA  94111-1704
                   BY:  CHRISTA M. ANDERSON,
                        SUSAN J. HARRIMAN, ATTORNEYS AT LAW


FOR DEFENDANTS:         MILLER LAW GROUP, PC
                        500 SANSOME STREET, SUITE 400
                        SAN FRANCISCO, CALIFORNIA  94111
                   BY:  LISA HAMASAKI,
                        MICHELE BALLARD MILLER
                        JANINE S. SIMERLY, ATTORNEYS AT LAW


REPORTED BY:            RAYNEE H. MERCADO, CSR NO. 8258

### CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C04-5107JSC, PANDE V. CHEVRON, ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

WEDNESDAY, OCTOBER 17, 2007

MITCHELL - DIRECT / SIMERLY

1    A.    YEAH.    TYPICALLY -- TYPICALLY THE ASSIGNMENTS FOR

2    INTERNATIONAL EXPATRIATES LAST FOR ABOUT FOUR YEARS, AND AT THE

3    END OF THAT FOUR YEARS, THERE'S AN EXPECTATION THAT THEY WOULD

4    MOVE ON INTO A NEW ROLE.

5    Q.    SO ARE YOU SAYING THAT BECAUSE HE NEEDED TO BE MOVED, YOU

6    DIDN'T REALLY HAVE THE OPTION OF SELECTING THE PERSON FOR THIS

7    OPENING IN MID-2000?

8    A.    YEAH, EXACTLY RIGHT.    IT WAS A DEVELOPMENTAL MOVE FOR MATT.

9    HE WAS -- HE WAS DEEMED TO BE A HIGH POTENTIAL EMPLOYEE IN THE

10   ORGANIZATION, AND HIS TIME DURATION HAD REALLY COME TO AN END IN

11   HIS CURRENT ASSIGNMENT AND SO THEY MOVED HIM BACK INTO MY SHOP.

12   Q.    SO -- AND THEN DID ANOTHER OPENING COME UP IN THE FALL OF

13   2000?

14   A.    YES.

15   Q.    AND WHAT POSITION WAS THAT?

16   A.    IT WAS ONE OF MY BUSINESS PLANNING ANALYST POSITIONS WHICH

17   IS SIMILAR TO THE TWO PREVIOUS POSITIONS THAT OPENED IN THE YEAR

18   2000 AS WELL.

19   Q.    AND WHEN YOU REALIZED IN THE FALL OF 2000 THAT YOU HAD THIS

20   BUSINESS ANALYST POSITION OPENING UP, WHAT DID YOU DO?

21   A.    WELL, I TALKED TO KIRAN'S SUPERVISOR AT THAT POINT IN TIME,

22   DAVID KENNEDY, TO DETERMINE WHETHER SHE WAS STILL INTERESTED IN

23   COMING OVER.    AND THEN ONCE HE CONFIRMED THAT IN FACT SHE WAS

24   SORT OF EAGER TO JOIN THE GROUP AND LOOKING FORWARD TO THE

25   OPPORTUNITY, I CONTACTED OUR PERSONNEL DEVELOPMENT COMMITTEE

1    SPONSOR, A FELLOW BY THE NAME OF JACK JONES, AND DISCUSSED THE

2    PLAN OF BRINGING KIRAN INTO THE GROUP AT THAT POINT IN TIME

3    WITHOUT GOING THROUGH A FORMAL SELECTION PROCESS.

4    Q.   SO DID YOU BASICALLY CHERRY-PICK HER FOR THIS POSITION?

5    A.   ESSENTIALLY, YES.   I'D SEEN HER IN THE EARLIER INTERVIEW AND

6    WAS IMPRESSED WITH HER AND I THOUGHT SHE'D BE A GOOD FIT FOR THE

7    TEAM.

8    Q.   OKAY.   AND DO YOU KNOW WHEN SHE JOINED YOUR GROUP?

9    A.   MY RECOLLECTION, IT WAS SOMETIME IN THE FOURTH QUARTER OF

10   2000.   I DON'T HAVE AN EXACT DATE.

11   Q.   SO WE'RE TALKING SEPTEMBER, OCTOBER?

12   A.   PROBABLY IN THAT TIME FRAME.

13   Q.   ALL RIGHT.   AND -- WAS THIS THE YEAR BEFORE THE

14   CHEVRONTEXACO MERGER?

15   A.   YES, IT WAS.

16   Q.   WHEN WAS THE ACTUAL MERGER ITSELF?

17   A.   WELL, THE EFFECTIVE DATE OF THE MERGER I BELIEVE WAS

18   SOMETIME AROUND MID-OCTOBER 2001.   I THINK WE HAD ANNOUNCED OUR

19   INTENT TO MERGE WITH TEXACO SOMETIME IN LATE -- LATE 2000,

20   EARLY -- VERY EARLY 2001.

21   Q.   AND IS A MERGER SOMETHING THAT JUST HAPPENS, OR ARE THERE --

22   IS THERE LOTS OF ROLLUP TO A MERGER?

23   A.   WELL, NATURALLY FOR A MERGER OF THIS SIZE, THERE'S AN AWFUL

24   LOT OF WORK LEADING UP TO THE POINT OF THE MERGER.   THERE'S ALSO

25   A FAIRLY RIGOROUS REGULATORY PROCESS THAT COMPANIES NEED TO GO

MITCHELL - DIRECT / SIMERLY

1    REVIEWED IN THE SPRING OF 2002?

2    A.   NO, I DIDN'T PROMISE ANYTHING TO KIRAN AT THAT POINT IN

3    TIME.

4    Q.   DID YOU HAVE A CONVERSATION WITH HER ABOUT WHETHER SHE WOULD

5    BE CONSIDERED FOR A PROMOTION IN THE SPRING OF 2002?

6    A.   I'D ENCOURAGED KIRAN THAT I DEEMED THE ROLE TO BE -- TO BE A

7    VERY SIGNIFICANT ROLE AND WOULD BE A, YOU KNOW, SIGNIFICANT

8    CONTRIBUTOR TO THE GROUP GOING FORWARD.  AND I TOLD HER THAT IF

9    SHE CONTINUED TO DEVELOP SOME OF THE SKILLS THAT I SAW HER

10   DISPLAY AS SUPPORTING THE CLEAN TEAM IN THIS NEW ROLE, THAT I

11   WOULD BE PREPARED TO GO INTO THE -- TO THE SPRING PDC, SOMETIME

12   IN THE SPRING 2002, AND ADVOCATE FOR A PROMOTION, BUT I NEEDED

13   TO SEE HER DEVELOP SOME OF THE ANALYTICAL SKILL SET THAT WAS

14   ALSO REQUIRED FOR THAT ROLE, NOT JUST THE DATA MANAGEMENT SKILL

15   SET WHICH SHE'D VERY CLEARLY DEMONSTRATED.

16   Q.   NOW, WITHIN CHEVRON POLICY AND PROCEDURES IN 2003, COULD A

17   SUPERVISOR PROMISE AN EMPLOYEE A PROMOTION?

18   A.   IN 2003?

19   Q.   RIGHT.  I'M SORRY.  2002.

20   A.   NO.  IN 2002, THE WAY THE PROCESS WOULD WORK FOR CAREER

21   LADDER PROMOTIONS IS THAT THE MANAGER WOULD NEED TO TAKE THE

22   RECOMMENDATION INTO THE -- INTO THE PERSONNEL DEVELOPMENT

23   COMMITTEE AND GET THE CONCURRENCE OF THE PERSONNEL DEVELOPMENT

24   COMMITTEE TO ELEVATE THE EMPLOYEE TO THE NEXT HIGHER GRADE.

25         BECAUSE KIRAN WAS A PETROLEUM ENGINEER WORKING IN A

1    NON-PETROLEUM ENGINEERING ROLE, HER CAREER LADDER PROMOTION NOT

2    ONLY HAD TO BE APPROVED BY THE BUSINESS AND COMMERCIAL PDC,

3    WHICH IS THE ONE THAT I SAT ON, BUT IT ALSO WOULD HAVE HAD TO GO

4    TO HER PETROLEUM ENGINEERING PDC WHICH REALLY OWNED HER CAREER

5    FROM A CAREER MANAGEMENT STANDPOINT.  SO TWO COMMITTEES WOULD

6    HAVE HAD TO PASS ON HER PROMOTION IN ORDER FOR IT TO BE -- TO BE

7    EFFECTIVE.

8    Q.  AND HAVE YOU EVER PROMISED AN EMPLOYEE A PROMOTION?

9    A.  NO.  I DON'T MAKE PROMISES THAT I DON'T BELIEVE THAT I CAN

10   KEEP.

11   Q.  UP UNTIL THIS POINT, HAD YOU BEEN PLEASED WITH KIRAN PANDE'S

12   PERFORMANCE?

13   A.  YES, VERY MUCH SO.  KIRAN WAS -- WAS -- WAS A TOP PERFORMER

14   IN THE GROUP.  IT WAS THE SKILL SET AND APTITUDE THAT SHE HAD

15   DEMONSTRATED FOR THE PORTFOLIO WORK ITSELF THAT SORT OF PUT IN

16   MY MIND, YOU KNOW, THE -- THE NEED AND DESIRE TO CHAMPION FOR

17   HER FOR THAT ROLE, AND I WAS VERY PLEASED WITH HER PERFORMANCE.

18   Q.  NOW SHE JOINED YOUR GROUP IN THE FALL OF 2000, SO SHE WOULD

19   HAVE HAD A PMP IN THE SPRING OF 2001 BEFORE THIS ROLLUP TO

20   THE -- TO THE MERGER WORK, RIGHT?

21   A.  YES, THAT'S CORRECT.

22   Q.  AND AT THE TIME OF HER SPRING PMP AND SHE WAS IN YOUR GROUP,

23   WERE YOU INVOLVED IN THAT SPRING PMP, SPRING 2001?

24   A.  YES, I WAS.

25          MS. SIMERLY:  LET'S BRING UP EXHIBIT 14, ALEX, AND

1              YES, WHAT IS YOUR MOTION?

2              **MS. SIMERLY:**  YOUR HONOR, MOTION FOR JUDGMENT AS A

3    MATTER OF LAW, JMOL UNDER RULE 50.  AND AS I UNDERSTAND IT, AT

4    THIS POINT, JUDGE WILKEN'S ORDER CONTEMPLATES THE COURT

5    ASSESSING WHETHER THE PLAINTIFFS HAVE PRODUCED SUFFICIENT

6    EVIDENCE TO GO TO THE JURY ON THE ISSUE OF PUNITIVE DAMAGES.

7              WE WOULD ALSO AT THIS POINT MOVE FOR A JUDGMENT AS A

8    MATTER OF LAW ON OTHER CLAIMS, BUT I THINK WE SHOULD FIRST OF

9    ALL ADDRESS --

10             **THE COURT:**  FINE.

11             **MS. SIMERLY:**  -- THE PUNITIVE DAMAGE ISSUE.

12             AND OBVIOUSLY THE COURT IS AWARE -- AND I DON'T KNOW

13   THE CIVIL CODE NUMBER -- BUT THE STANDARD FOR PUNITIVE DAMAGES

14   UNDER CALIFORNIA LAW IS OF COURSE THAT THERE MUST BE A SHOWING

15   OF BY CLEAR AND CONVINCING EVIDENCE, NOT MERELY A PREPONDERANCE

16   OF THE EVIDENCE, OF TWO THINGS:  FIRST OF ALL, OF THE

17   APPROPRIATE CONDUCT, WHICH AS WE KNOW IS OPPRESSION, MALICE OR

18   FRAUD IN SOME ORDER OR ANOTHER; AND THEN THE SECOND PRONG IS

19   THAT THERE MUST BE A DEMONSTRATION THAT THAT CONDUCT WAS ON THE

20   PART OF AN OFFICER, DIRECTOR OR MANAGING AGENT.

21             AND UNDER THE CALIFORNIA SUPREME COURT LAW ON THE

22   SUBJECT, WHITE V. ULTRAMAR, THE -- THE STANDARD FOR WHAT

23   CONSTITUTES A MANAGING AGENT IS SOMEONE WHO ULTIMATELY

24   DETERMINES CORPORATE POLICY.

25             AND I WOULD SUGGEST TO THE COURT THAT THERE IS

1    CERTAINLY NO CLEAR AND CONVINCING EVIDENCE AT THIS STAGE UPON

2    THE PLAINTIFF'S RESTING THEIR CASE THAT ANY OFFICER, DIRECTOR,

3    OR MANAGING AGENT OF CHEVRON ENGAGED IN CONDUCT THAT RISES TO

4    THE LEVEL OF OPPRESSION, FRAUD OR MALICE WITH REFERENCE TO THE

5    ISSUES IN THIS CASE.

6         OBVIOUSLY -- I DIDN'T STATE IT -- RATIFICATION OF

7    COURSE WOULD BE ANOTHER WAY OF ESTABLISHING THE REQUISITE

8    CORPORATE CONDUCT.  BUT I'M NOT GOING TO BELABOR THE POINT, YOUR

9    HONOR.  I THINK THE COURT IS WELL AWARE OF THE LEGAL STANDARD.

10   AND I DO THINK IT'S APPROPRIATE AT THIS TIME FOR THE COURT TO

11   ENTER A JUDGMENT AS A MATTER OF LAW ON THE PUNITIVE DAMAGE

12   ISSUE.

13        THE COURT:  OKAY.  RESPONSE?

14        MS. ANDERSON:  YOUR HONOR, WE ABSOLUTELY MET THE

15   STANDARD UNDER THE MANAGING AGENT TEST IN REGARD TO PUNITIVES.

16   THE WHITE CASE THAT CHEVRON'S COUNSEL HAS CITED, THAT CASE

17   SUPPORTS THE FACT THAT MR. DUNN ACTED AS A MANAGING AGENT AND

18   HIS ACTIVITIES WERE CLEARLY SANCTIONED BY HR AND LEGAL, WHICH

19   HAS BEEN BROUGHT IN THROUGH THE TESTIMONY OF NUMEROUS WITNESSES

20   IN PLAINTIFF'S CASE.

21        MR. DUNN MADE THE DECISION APPARENTLY WITH THE

22   APPROVAL OF LEGAL AND HR TO TERMINATE MS. PANDE AFTER SHE TOOK

23   MEDICAL LEAVE, FULLY KNOWING ABOUT THE REQUIREMENTS OF FMLA, AND

24   CONCOCTED A SCHEME TO TRY TO CLAIM THAT SHE SOMEHOW COULD

25   LAWFULLY BE TERMINATED DURING THAT PROTECTED MEDICAL LEAVE.

 1          AND IT'S UNDISPUTED THAT MS. SHAWSTAD, HR

 2   REPRESENTATIVE, RAN THIS STUFF THROUGH LEGAL, THAT MR. DUNN HAD

 3   MANAGING AGENT AUTHORITY HIMSELF.  HE IS -- HE IS THE MANAGER OF

 4   BLOCK 14, WHICH ACCORDING TO ONE OF CHEVRON'S OWN WITNESSES, IS

 5   A VERY SIGNIFICANT ASSET AT THE TIME, WORTH APPROXIMATELY

 6   $4 BILLION, I BELIEVE WAS HER TESTIMONY.

 7          **THE COURT:**  I THINK THAT WAS THE INVESTMENT.

 8          **MS. ANDERSON:**  THE PROJECT --

 9          **THE COURT:**  THE INVESTMENT.

10          **MS. ANDERSON:**  -- YES.

11          EACH OF THE THINGS THAT WERE BEING CONSTRUCTED

12   PURSUANT TO HIS MANAGING AUTHORITY WERE IN THE HUNDREDS OF

13   MILLIONS OF DOLLARS.  AND ACCORDING TO CHEVRON'S OWN WITNESSES,

14   IT WAS A VERY IMPORTANT PROJECT THAT HE WAS RUNNING AND HAD

15   SUPERVISORY AUTHORITY OVER EVERYONE WITHIN HIS CONTROL.

16          SO BETWEEN MR. DUNN'S OWN AUTHORITY, WHICH WAS

17   RATIFIED AND APPROVED IN ADVANCE BY HR AND LEGAL, THERE'S NO

18   QUESTION THAT THIS FALLS WITHIN THE MANAGING AGENT REQUIREMENTS

19   UNDER THE PUNITIVE DAMAGES CLAIM AND STATUTE.

20          **THE COURT:**  BRIEF RESPONSE.

21          **MS. SIMERLY:**  WELL, YOUR HONOR, SUPERVISORY AUTHORITY

22   IS NOT SUFFICIENT UNDER WHITE V. ULTRAMAR.  IT IS SOMEONE WHO

23   DETERMINES ULTIMATE CORPORATE POLICY.  AND THERE IS NO EVIDENCE

24   THAT JACK DUNN, AS THE MANAGER OF BLOCK 14, ULTIMATE -- YOU

25   KNOW, DETERMINED ANY ULTIMATE CHEVRON CORPORATE POLICY.  THERE'S

MITCHELL - DIRECT / SIMERLY

1   STRING OF EMAILS BETWEEN MR. SETTERS AND MS. PANDE THAT WERE

2   FORWARDED TO YOU; IS THAT CORRECT?

3   A.  YES.

4          MS. SIMERLY:  ALL RIGHT.  LET'S BLOW UP THE TOP PART.

5   AND THE MESSAGE.  THERE YOU GO.  THAT'S FINE.  THAT'S FINE.

6          (EXHIBIT PUBLISHED TO JURY.)

7   BY MS. SIMERLY:

8   Q.  AND DO YOU RECALL, LOOKING AT THIS DOCUMENT, ARE THESE

9   EMAILS DEALING WITH THOSE POSITIONS IN AUDIE SETTERS'

10  INTERNATIONAL GAS GROUP?

11  A.  MY RECOLLECTION, THIS -- THIS IS AN EMAIL STRING THAT

12  RELATED TO A MEETING THAT KIRAN HAD SET UP WITH AUDIE SETTERS TO

13  EXPLORE OPPORTUNITIES THAT MIGHT EXIST IN HIS GROUP, BUT IT WAS

14  NOT IN RESPONSE TO ANY PARTICULAR POSITION AT THAT POINT IN

15  TIME.

16  Q.  OKAY.  BUT HE HAD SENT -- AUDIE HAD SENT YOU A COPY OF THIS;

17  IS THAT CORRECT?

18  A.  YES.  AS HIS -- AS HER SUPERVISOR, HE KNEW WHAT -- I KNEW

19  THAT THEY WERE MEETING, AND HE JUST FOLLOWED UP WITH ME ABOUT

20  THE CONVERSATION THEY HAD.

21  Q.  OKAY.  NOW, DID YOU BECOME AWARE IN THE FALL OF 2002 OF

22  ANOTHER POSITION ON THE BUSINESS SIDE THAT WAS OPENING UP THAT

23  WASN'T ACTUALLY PART OF THE PDC PROCESS?

24  A.  YES.

25  Q.  OKAY.  AND COULD YOU EXPLAIN TO THE JURY WHAT THAT POSITION

MITCHELL - DIRECT / SIMERLY

1    WAS AND HOW IT IS THAT IT WASN'T PART OF THE FALL PDC?

2    A.    SURE.   THE POSITION THAT WAS -- THAT WAS POSTED OPENLY

3    FOR -- FOR SOLICITATION OF CANDIDATES WAS A POSITION OF OUR

4    CORPORATE PLANNING STAFF.   AND THAT POSITION DOES NOT FALL INTO

5    THE -- INTO OUR PDC 'CAUSE ESSENTIALLY WE WERE FILLING POSITIONS

6    IN OUR INTERNATIONAL UPSTREAM AND INTERNATIONAL GLOBAL GAS

7    GROUP.   SO THIS WAS A POSITION THAT WAS OUTSIDE OF THE PDC SCOPE

8    THAT I WAS PARTICIPATING ON, AND IT WAS OPEN AND POSTED BY THE

9    MANAGER OF STRATEGIC -- OR OF CORPORATE PLANNING.

10   Q.    SO WHO WAS IT POSTED BY?

11   A.    DESMOND KING.

12   Q.    AND WHERE WAS HE LOCATED?

13   A.    HE WAS IN SAN RAMON.

14   Q.    AND DID YOU BECOME AWARE IF ANY OF THE PEOPLE IN YOUR GROUP

15   HAD APPLIED FOR OR POSTED FOR THIS OPEN POSITION?

16   A.    YES.   I HAD TWO EMPLOYEES THAT HAD POSTED FOR THE OPEN.

17   Q.    AND WHO WERE THOSE TWO EMPLOYEES?

18   A.    KEMAL ANBARCI AND KIRAN PANDE.

19   Q.    AND DID YOU LEARN WHAT -- WELL, FIRST OF ALL, AS -- DO YOU

20   HAVE AN UNDERSTANDING OF HOW THAT POSTING AND APPLICATION

21   PROCESS WAS PROCEEDING?   IN OTHER WORDS, IF ALL APPLICANTS WERE

22   INTERVIEWED OR IF ONLY A -- A SMALLER SUBSET OF APPLICANTS WERE

23   INTERVIEWED?

24   A.    MY RECOLLECTION -- I THINK THEY HAD A FAIRLY STRONG RESPONSE

25   TO THE POSTING.

MITCHELL - DIRECT / SIMERLY

1   Q.  MEANING A LOT OF APPLICANTS?

2   A.  A LOT OF APPLICANTS.  AND THEY WERE ONLY PLANNING TO

3   INTERVIEW, YOU KNOW, FOUR OR FIVE PEOPLE FOR THE JOB.

4   Q.  AND IS THAT WHAT'S, AT CHEVRON, REFERRED TO AS "A SHORT

5   LIST"?

6   A.  YES.  YES.

7   Q.  OKAY.  AND DID YOU COME TO FIND OUT FROM SOME SOURCE,

8   WHETHER MR. ANBARCI OR MS. KIRAN -- MS. PANDE HAD MADE THE SHORT

9   LIST?

10  A.  YES.  DES KING HAD CALLED ME A FEW WEEKS INTO THE POSTING

11  PROCESS WHEN THEY WERE PREPARING FOR INTERVIEWS TO ARRANGE AN

12  INTERVIEW WITH KEMAL ANBARCI ON MY -- ON MY TEAM.  AND SO I

13  ASKED HIM WHETHER HE'S PLANNING TO INTERVIEW KIRAN PANDE, AND HE

14  INDICATED THAT HE WAS NOT, THAT SHE DID NOT MAKE THE SHORT LIST.

15  Q.  AND WHAT WAS YOUR RESPONSE WHEN YOU LEARNED THAT FROM

16  MR. KING?

17  A.  WELL, I WAS SURPRISED.  I TOLD DES AT THAT POINT IN TIME, I

18  SAYS, "LOOK, I REALLY CONSIDERED THEM BOTH TO BE VERY STRONG

19  CANDIDATES FOR YOUR OPEN POSITION.  THEY BOTH BRING DIFFERENT

20  STRENGTHS.  AND I THINK BASED ON MY UNDERSTANDING OF YOUR ROLE,

21  I THINK YOU'D BE WELL SERVED TO INTERVIEW BOTH KIRAN AND KEMAL

22  FOR IT."

23  Q.  AND DID YOU LEARN IF IN FACT DES KING INTERVIEWED KIRAN FOR

24  THAT POSITION?

25  A.  YES, HE DID.

MITCHELL - DIRECT / SIMERLY

1    BY MS. SIMERLY:

2    Q.   AND THAT SAYS, "I WILL NOT LET KIRAN KNOW ABOUT THIS

3    SELECTION UNTIL THE PDC IS OVER AS NOTHING IS FINAL UNTIL THEN.

4    HOWEVER, GIVEN HER COMMENT EARLIER ABOUT WANTING THE JOB ONLY

5    WITH A PROMOTION I EXPECT THERE MAY BE SOME PUSHBACK, SO I

6    WANTED TO ALERT YOU TO THE CURRENT STATUS SO YOU WERE AWARE THAT

7    SHE ONLY WANTED THAT POSITION WITH A PROMOTION."

8    A.   YES, I HEARD THAT SHE WAS INTERESTED IN MOVING OVER THERE IF

9    THE JOB INCLUDED PROMOTION.

10   Q.   NOW, MR. MITCHELL, WERE YOU INVOLVED IN ANY WAY IN THE FALL

11   2003 PDC'S IN WHICH MS. PANDE WAS BEING CONSIDERED FOR POSITIONS

12   OUTSIDE OF SASBU AFTER SASBU'S MOVE WAS ANNOUNCED TO HOUSTON?

13   A.   NO, I WASN'T.

14   Q.   DID ANYONE FROM ANY OF THOSE PDC'S CALL YOU FOR ANY INPUT

15   ABOUT YOUR EXPERIENCE WORKING WITH KIRAN PANDE IN YOUR PLANNING

16   GROUP?

17   A.   NO.

18   Q.   NOW, MS. PANDE'S EMPLOYMENT WAS TERMINATED EFFECTIVE

19   DECEMBER 31ST, 2003.  MR. MITCHELL, DID YOU HAVE ANY ROLE

20   WHATSOEVER IN THE DECISION TO TERMINATE MS. PANDE?

21   A.   NO, I DIDN'T.

22            MS. SIMERLY:  LET ME CHECK WITH MS. HAMASAKI,

23   COUNSEL -- YOUR HONOR, BUT I THINK I'M DONE.

24            (PAUSE IN THE PROCEEDINGS.)

25            MS. SIMERLY:  THAT'S ALL I HAVE AT THIS TIME FOR THE

1   THAT THIS AGENDA ITEM IS GOING TO BE COVERED BY TONY KENCK."

2           RECALL HER SAYING THAT?

3   A.  I DO NOT RECALL HER SAYING THAT, NO.

4   Q.  WELL, DO YOU RECALL SAYING TO HER IN RESPONSE, "I CAN'T

5   REMEMBER EVERY IRRELEVANT TWO-MINUTE CONVERSATION THAT I HAVE

6   WITH YOU"?

7   A.  NO.  I DON'T RECALL SAYING THAT TO HER, NO.

8   Q.  BUT THAT IS THE KIND OF THING YOU WOULD SAY TO HER, ISN'T

9   IT, MR. MITCHELL?

10  A.  NO, IT'S NOT.

11  Q.  MR. MITCHELL, I WANT TO SHOW YOU ANOTHER DOCUMENT IN A

12  DIFFERENT BINDER, SO LET ME MOVE THESE OUT OF THE WAY.

13          (PAUSE IN THE PROCEEDINGS.)

14      MS. HARRIMAN:  LET'S SEE.

15      277, NANCY.

16          (PAUSE IN THE PROCEEDINGS.)

17      MS. HARRIMAN:  LET'S PUT THAT THERE FOR A MOMENT.

18  Q.  MR. MITCHELL, YOU'RE NOW THE COMPANY'S CHIEF COMPLIANCE

19  OFFICER; IS THAT RIGHT?

20  A.  YES, THAT'S CORRECT.

21  Q.  AND YOU ENFORCE THE COMPANY'S CODE OF ETHICS?

22  A.  YES.

23  Q.  AND YOU'RE THE ONE WHO'S RESPONSIBLE FOR THE HOTLINE, RIGHT?

24  A.  THAT'S RIGHT.

25  Q.  SO WHEN EMPLOYEES HAVE A COMPLAINT ABOUT ANYONE, THEY CALL,

MITCHELL - CROSS / HARRIMAN

1    AND THAT FALLS UNDER YOUR SUPERVISION?

2    A.   THAT'S RIGHT.

3    Q.   SO IS EXHIBIT 277 ONE OF THOSE POLICIES THAT YOU WOULD

4    ENFORCE, EITHER THROUGH THE HOTLINE OR AS A -- THE CHIEF

5    COMPLIANCE OFFICER, GENERALLY?

6    A.   WE TYPICALLY GET REPORTS OF HARASSMENT IN THE WORKPLACE, AND

7    OUR STANDARD PROCEDURE FOR HANDLING THOSE IS WE TURN THEM OVER

8    TO THE HUMAN RESOURCES GROUP FOR INVESTIGATION.

9    Q.   BUT YOU DO GET COMPLAINTS ABOUT HARASSMENT IN THE WORK

10   FORCE?

11   A.   SURE.

12   Q.   AND YOU'RE FAMILIAR GENERALLY WITH CHEVRON'S POLICY ON THAT?

13   A.   YES.

14        MS. HARRIMAN:   YOUR HONOR, I MOVE EXHIBIT 277 INTO

15   EVIDENCE.

16        MS. SIMERLY:   NO OBJECTION, YOUR HONOR.

17        THE COURT:   IT'S ADMITTED.

18                     (PLAINTIFF'S EXHIBIT 277

19                      RECEIVED IN EVIDENCE)

20        MS. HARRIMAN:   CAN WE GO TO WHAT'S NUMBERED AS

21   PAGE 5?

22                (EXHIBIT PUBLISHED TO JURY.)

23        MS. HARRIMAN:   CAN YOU BLOW UP "A" THERE, PLEASE.

24                (EXHIBIT PUBLISHED TO JURY.)

25

MITCHELL - CROSS / HARRIMAN

1   BY MS. HARRIMAN:

2   Q.   AND CHEVRON'S POLICY, MR. MITCHELL?

3            MS. SIMERLY:  OBJECTION, YOUR HONOR, RELEVANCE,

4   SECTION 403.  THIS HAS TO DO WITH INVESTIGATIONS.

5            THE COURT:  HANG ON A SECOND.

6                 (PAUSE IN THE PROCEEDINGS.)

7            THE COURT:  WELL --

8            MS. HARRIMAN:  I'M GOING --

9            THE COURT:  -- THE DOCUMENT'S ADMITTED INTO EVIDENCE,

10  SO YOU CAN READ A.  AND THEN -- I DON'T KNOW WHAT YOUR

11  QUESTION'S GOING TO BE, SO --

12            YOU CAN PROCEED.

13  BY MS. HARRIMAN:

14  Q.   MR. MITCHELL, BELOW THE BULLET POINTS, IT SAYS, "CARE SHOULD

15  BE TAKEN TO AVOID THE APPEARANCE OF TAKING ADVERSE ACTION

16  AGAINST THE ALLEGED VICTIM OR PERSON REPORTING THE COMPLAINT."

17            THAT'S ONE OF CHEVRON'S POLICIES, RIGHT?

18  A.   THAT'S CORRECT.

19  Q.   AND YOU WOULD AGREE WITH THAT, WOULDN'T YOU?

20  A.   SURE.

21  Q.   IN FACT, YOU WOULD ENFORCE THAT POLICY, WOULDN'T YOU?

22  A.   IF NEED BE, YES.

23            MS. HARRIMAN:  YOUR HONOR, I HAVE NOTHING FURTHER.

24

25

MITCHELL - REDIRECT / SIMERLY

| 1 | <div align="center">**REDIRECT EXAMINATION**</div> |
|---|---|
| 2 | BY MS. SIMERLY: |
| 3 | Q.  MR. MITCHELL, IS IT YOUR UNDERSTANDING THAT THAT POLICY IS |
| 4 | NOT ONLY TO AVOID THE APPEARANCE OF TAKING ADVERSE ACTION |
| 5 | AGAINST SOMEONE WHO COMPLAINS OF HARASSMENT BUT ALSO TO AVOID |
| 6 | THE TAKING OF ADVERSE ACTION AGAINST SOMEONE WHO REPORTS |
| 7 | HARASSMENT? |
| 8 | A.  YES.  OBVIOUSLY. |
| 9 | Q.  DID YOU TAKE ANY ADVERSE ACTION WHATSOEVER AGAINST KIRAN |
| 10 | PANDE BECAUSE SHE HAD MADE A COMPLAINT ABOUT YOU TO JAY JOHNSON? |
| 11 | A.  NO, I DID NOT. |
| 12 | Q.  DID THAT HAVE ANYTHING TO DO WITH THE TWO RANKING THAT YOU |
| 13 | GAVE HER IN HER MARCH 2002 PMP? |
| 14 | MS. HARRIMAN:  OBJECTION, LEADING. |
| 15 | THE COURT:  THAT'S A FAIR OBJECTION.  WHY DON'T YOU |
| 16 | REPHRASE. |
| 17 | BY MS. SIMERLY: |
| 18 | Q.  THAT MARCH 2002 PMP, THE TWO RANKING, WAS KIRAN PANDE THE |
| 19 | ONLY PERSON IN YOUR GROUP WHO GOT A TWO RANKING? |
| 20 | A.  NO, SHE WASN'T. |
| 21 | Q.  WERE THERE OTHER MALES IN THE GROUP WHO GOT TWO RANKINGS? |
| 22 | A.  YES. |
| 23 | Q.  WERE THERE MALES IN THE GROUP WHO WORKED VERY LONG HOURS IN |
| 24 | THE RUN-UP TO THE MERGER WHO GOT TWO RANKINGS? |
| 25 | A.  SURE.  YES.  ALL OF THE GROUP WAS WORKING VERY LONG HOURS IN |