**EXHIBIT A (Part 2 of 2)**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

| | |
|---|---|
| KIRAN PANDE, ) | |
| ) | **JURY TRIAL** |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | NO. C 04-5107JCS |
| ) | |
| CHEVRON CORPORATION (F/K/A ) | |
| CHEVRONTEXACO CORPORATION) ) | **VOLUME 6** |
| EXPLORATION & PRODUCTION ) | **PAGES 1045 - 1244** |
| (F/K/A CHEVRONTEXACO ) | Certified Copy |
| OVERSEAS PETROLEUM), A ) | |
| DIVISION OF CHEVRON U.S.A. ) | |
| INC., ) | SAN FRANCISCO, CALIFORNIA |
| ) | WEDNESDAY, OCTOBER 17, 2007 |
| DEFENDANTS. ) | |
| _____ ) | |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR PLAINTIFF:          KEKER & VAN NEST
                        710 SANSOME STREET
                        SAN FRANCISCO, CALIFORNIA  94111-1704
                BY:  CHRISTA M. ANDERSON,
                        SUSAN J. HARRIMAN, ATTORNEYS AT LAW


FOR DEFENDANTS:         MILLER LAW GROUP, PC
                        500 SANSOME STREET, SUITE 400
                        SAN FRANCISCO, CALIFORNIA  94111
                BY:  LISA HAMASAKI,
                        JANINE S. SIMERLY, ATTORNEYS AT LAW


REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258

## CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C04-5107JSC, PANDE V. CHEVRON, ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_Raynee H. Mercado_

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

THURSDAY, OCTOBER 18, 2007

1    A.   IT WAS EARLY IN 2002, AROUND FEBRUARY.

2    Q.   HAD THE CHEVRONTEXACO MERGER ALREADY TAKEN PLACE?

3    A.   YES.

4    Q.   WHEN YOU CAME ON BOARD, WHERE WAS THAT OFFICE LOCATED?

5    A.   OUR OFFICE IN SAN RAMON, CALIFORNIA.

6    Q.   OKAY.  AND WHEN YOU -- WHEN YOU CAME ON BOARD IN

7    APPROXIMATELY FEBRUARY OF 2002, COULD YOU CHARACTERIZE THE

8    WORKLOAD OF THAT UNIT, THE BUSINESS DEVELOPMENT AND PLANNING

9    GROUP AT THE TIME YOU JOINED?

10   A.   WELL, THE GROUP'S ALWAYS PRETTY BUSY.  WE'D FINISHED THE

11   MERGER, SO A LOT OF THE MERGER WORK WAS BEHIND US AT THAT POINT

12   IN TIME.  SO THE MAIN FOCUS WAS ON PORTFOLIO OPTIMIZATION,

13   LOOKING AT THE PORTFOLIO THAT WE MAINTAIN WORLDWIDE IN

14   INTEGRATING THE TWO MAIN COMPANIES AS WELL AS PREPARING FOR THE

15   UPCOMING BUSINESS PLANNING PERIOD.

16   Q.   COULD YOU GIVE THE JURY AN IDEA JUST BRIEFLY WHAT YOUR

17   RESPONSIBILITIES WERE IN YOUR POSITION AS THE GENERAL MANAGER OF

18   THIS GROUP?

19   A.   MY MAIN ROLE WAS AS AN ADVISER TO THE PRESIDENT OF THE

20   OPERATING COMPANY ON -- ON BUSINESS PORTFOLIO ISSUES, BUSINESS

21   PLANNING ISSUES.  I ALSO SUPERVISED THE THREE GROUPS.  ONE WAS

22   THE PLANNING GROUP.  ONE WAS THE BUSINESS OPPORTUNITY ASSESSMENT

23   GROUP AND ONE WAS THE DECISION ANALYSIS GROUP.  AND WE HANDLED

24   ALL OF THE EXCON (PHONETIC) REPORTING ITEMS THAT WOULD COME

25   THROUGH FROM THE VARIOUS BUSINESS UNITS AROUND THE WORLD.

JOHNSON - DIRECT / SIMERLY

1   Q.   SO THOSE THREE GROUPS IN TOTAL, ABOUT HOW MANY EMPLOYEES DID

2   YOU HAVE ACTUALLY HAVE SUPERVISORY AUTHORITY OVER?

3   A.   THAT I DIRECTLY SUPERVISED WAS ABOUT FOUR.

4   Q.   AND THEN BELOW THOSE FOUR, WERE THERE OTHER EMPLOYEES

5   REPORTING TO THEM?

6   A.   THAT'S CORRECT.

7   Q.   SO IF YOU DID THE TOTAL OF THE --

8   A.   OF THE WHOLE GROUP?

9   Q.   -- OF THE WHOLE GROUP?

10   A.   I'D SAY PROBABLY 20 TO 25, SOMEWHERE IN THAT RANGE.

11   Q.   ALL RIGHT.  WAS REX MITCHELL ONE OF YOUR DIRECT REPORTS AT

12   THIS TIME?

13   A.   YES, HE WAS.

14   Q.   WAS HE ALREADY THERE WHEN YOU JOINED THE GROUP?

15   A.   YES.

16   Q.   ONCE YOU JOINED IN FEBRUARY OF 2002, DID YOU COME TO KNOW

17   KIRAN PANDE?

18   A.   YES.

19   Q.   WAS SHE PART OF THE GROUP WHEN YOU JOINED?

20   A.   SHE WAS IN REX MITCHELL'S GROUP, YES.

21   Q.   SO DID YOU HAVE ANY SUPERVISORY AUTHORITY OVER MS. PANDE?

22   A.   I DID AS A SECOND-LEVEL SUPERVISOR, BUT NOT DIRECT

23   SUPERVISION.

24   Q.   OKAY.  AND WHAT DOES THAT MEAN, "A SECOND-LEVEL SUPERVISOR"?

25   A.   IT MEANS SHE REALLY TOOK WORK DIRECTION, WORK ASSIGNMENTS,

1    A.    WELL, THERE WERE A LOT OF MEETINGS THAT OCCURRED.  WE

2    PROBABLY MET -- I CAN'T EVEN TELL YOU HOW MANY TIMES, BUT IT WAS

3    A SERIES OF MEETINGS OVER SEVERAL MONTHS.  BUT THE -- THE

4    FUNDAMENTAL ISSUE WAS HER RELATIONSHIP WITH REX MITCHELL AND

5    THE -- HER PERFORMANCE IN THAT GROUP.

6    Q.    OKAY.  THE -- CAN YOU FOCUS ON THE FIRST MEETING?  CAN YOU

7    TEASE OUT THE FIRST MEETING AND SPECIFICALLY WHAT WAS SAID IN

8    THE FIRST MEETING?

9    A.    THE FIRST MEETING WAS KIRAN BELIEVED THAT SHE WASN'T BEING

10   RECOGNIZED FOR HER PERFORMANCE AND SHE WAS HAVING RELATIONSHIP

11   ISSUES WITH HER MANAGER -- OR SUPERVISOR REX MITCHELL.

12   Q.    IN THIS FIRST MEETING, DID SHE SAY ANYTHING AT ALL ABOUT

13   DISCRIMINATION OR HARASSMENT?

14   A.    NO.  THIS MEETING WAS ABOUT THE PERFORMANCE ISSUE AND A

15   RELATIONSHIP ISSUE BETWEEN HER AND REX MITCHELL.

16   Q.    CAN YOU GIVE US ANY MORE DETAILS ABOUT WHAT SHE SAID ABOUT

17   HER RELATIONSHIP WITH REX MITCHELL?

18   A.    WELL, IT'S FOUR AND A HALF YEARS AGO SO REMEMBERING SPECIFIC

19   CONVERSATION, I REMEMBER DEFINITELY WE TALKED ABOUT THE FACT

20   THAT SHE FELT SHE HAD NOT BEEN RECOGNIZED FOR HER PERFORMANCE

21   OVER THE PREVIOUS YEAR, IN PARTICULAR SOME OF THE WORK SHE DID

22   FOR THE MERGER.  AND SHE FELT IT WAS INAPPROPRIATE THAT SHE WAS

23   GETTING A 2 RATING, WHICH IS A FULLY MEETS RATING, FOR HER

24   PERFORMANCE IN THE PREVIOUS YEAR.  AND THAT SHE FELT SHE WASN'T

25   BEING TREATED FAIRLY BY REX.

JOHNSON - DIRECT / SIMERLY

1  Q.  SO IS IT YOUR RECOLLECTION THAT SHE BROUGHT UP THIS 2 RATING

2  IN THE VERY FIRST MEETING?

3  A.  AS BEST I RECALL, YES.

4  Q.  CAN YOU SAY WITH CERTAINTY THAT THE 2 RATING WAS DISCUSSED

5  IN THE FIRST MEETING -- WELL, FIRST OF ALL, HOW MANY MEETINGS

6  TOTAL?

7  A.  YOU KNOW, I CAN'T EVEN REMEMBER, BUT IT WAS PROBABLY -- OVER

8  THE COURSE OF THE NEXT FEW MONTHS PROBABLY AT LEAST HALF A DOZEN

9  TO A DOZEN MEETINGS WITH KIRAN.

10 Q.  WAS THERE A MEETING WITH YOU, MS. PANDE, AND MR. MITCHELL?

11 A.  YES, THERE WAS.  THAT WAS SUBSEQUENT TO THE FIRST MEETING

12 BETWEEN KIRAN AND MYSELF.

13 Q.  WAS THERE A MEETING WITH YOU, MS. PANDE, AND GARY YAMASHITA,

14 THE OMBUDSPERSON?

15 A.  YES, THERE WAS.

16 Q.  AND THEN WERE THERE OTHER INDIVIDUAL MEETINGS WITH

17 MS. PANDE?

18 A.  YES, THERE WERE.

19 Q.  SO ARE YOU -- CAN YOU SAY WITH ABSOLUTE CERTAINTY THAT THE

20 2 RANKING CAME UP IN THE FIRST MEETING?

21 A.  I CAN'T SAY WITH CERTAINTY IT CAME UP IN THE FIRST MEETING.

22 IT CERTAINLY CAME UP AS PART OF THIS OVERALL DISCUSSION ABOUT

23 HER PERFORMANCE.

24 Q.  DID YOU SIGN A DECLARATION EARLIER IN THIS CASE IN

25 CONNECTION WITH THIS LITIGATION?

1    A.   YES, I DID.

2    Q.   AND AT THAT TIME, WHAT WAS YOUR BELIEF OF WHEN THE 2-RANKING

3    CAME UP?

4    A.   AS BEST I RECALL, IT WAS EARLY IN THE DISCUSSIONS AND IN

5    THAT INITIAL MEETING.

6    Q.   BUT -- OKAY.

7    A.   BUT I JUST CAN'T REMEMBER EXACTLY WHEN -- WHEN IT DID COME

8    UP.  BECAUSE THIS WHOLE SERIES OF DISCUSSIONS THAT TOOK PLACE

9    WERE EVOLVING OVER SOME TIME.

10   Q.   OKAY.  TELL ME THIS.  WHEN -- HOW DID IT COME ABOUT THAT YOU

11   HAD THE FIRST MEETING WITH MS. PANDE?  AND BY THAT I MEAN, DID

12   SHE SEND YOU AN EMAIL?  DID SHE CATCH YOU IN THE HALL?  DID SHE

13   CALL YOUR ADMIN?  WHAT'S YOUR RECOLLECTION OF HOW THAT FIRST

14   MEETING CAME ABOUT?

15   A.   SHE SCHEDULED AN APPOINTMENT WITH MY ADMIN ASSISTANT.

16   Q.   AND BEFORE THAT APPOINTMENT HAPPENED, DID YOU TRY TO FIND

17   OUT WHAT HER ISSUE WAS?

18   A.   YES.  I MEAN, IT'S NORMAL PRACTICE FOR ME, I DON'T LIKE TO

19   GO INTO A MEETING WITHOUT KNOWING WHAT IT'S ABOUT.  SO I ASKED

20   THE ADMIN WHAT THE ISSUE WAS, AND SHE SAID THAT, "KIRAN HAS SOME

21   PROBLEMS WITH HER SUPERVISOR."

22   Q.   REX MITCHELL?

23   A.   WITH REX MITCHELL.

24   Q.   AND WHO WAS THE ADMIN THAT --

25   A.   IRIS OWENS.

1  Q.  AND SO FAR AS YOU KNOW, DO YOU HAVE ANY IDEA WHAT HAPPENED

2  AFTER THAT UNTIL THIS LAWSUIT?

3  A.  NO.  I LEFT IN MARCH OF 2003 TO MOVE TO PERTH AND TAKE UP A

4  NEW ASSIGNMENT, SO I REALLY LOST TRACK OF WHAT WAS GOING ON WITH

5  THE ISSUES AT THAT TIME.  I THOUGHT AT THAT POINT IT WAS ALL

6  RESOLVED.

7  Q.  IN ADDITION TO THE OMBUDS OFFICE WHERE EMPLOYEES HAVE A

8  PROBLEM WITH A MANAGER OR A SUPERVISOR, ARE THERE OTHER ROUTES

9  THAT THEY CAN, YOU KNOW, BRING THEIR CONCERNS TO BESIDES TALKING

10  TO THE SUPERVISOR DIRECTLY OR GOING TO THE SECOND-LEVEL MANAGER?

11  A.  ABSOLUTELY.  THEY CAN GO TO HUMAN RESOURCES AND THEY CAN GO

12  TO A HOTLINE, BOTH OF WHICH ARE AVAILABLE.  AND THEN THERE'S A

13  THIRD PROGRAM CALLED STEPS WHICH IS SPECIFICALLY DESIGNED TO

14  RESOLVE EMPLOYEE DISPUTES IF THEY DON'T FEEL LIKE THEY'VE BEEN

15  TREATED FAIRLY.

16  Q.  AND AT LEAST YOUR INFORMATION FROM HUMAN RESOURCES, WERE YOU

17  EVER ADVISED THAT MS. PANDE HAD GONE TO HUMAN RESOURCES WITH ANY

18  OF HER ISSUES ABOUT REX MITCHELL?

19  A.  NO.

20  Q.  AS HIS MANAGER, WOULD YOU EXPECT TO KNOW IF SHE HAD GONE TO

21  HUMAN RESOURCES ABOUT REX MITCHELL?

22  A.  YES, IT WOULD BE CUSTOMARY FOR THEM TO ADVISE ME.

23  Q.  AND WHAT ABOUT THE HOTLINE?  AS THE MANAGER, IF A COMPLAINT

24  HAD BEEN MADE ABOUT REX MITCHELL BY MS. PANDE, AS HIS MANAGER,

25  WOULD YOU TYPICALLY HEAR ABOUT THAT?

JOHNSON - CROSS / HARRIMAN

1       THE COURT:  THAT OBJECTION'S SUSTAINED.

2       MS. HARRIMAN:  STILL COMING UP, I TAKE IT, YOUR

3  HONOR.

4       MS. SIMERLY:  WHAT'S THAT?

5       MS. HARRIMAN:  WELL --

6       THE COURT:  I MEAN, IT'S NOT HEARSAY.  IT'S A PARTY

7  ADMISSION.

8       MS. HARRIMAN:  YEAH.

9       THE COURT:  WHY CAN'T SHE -- PUT IT UP.

10       MS. SIMERLY:  OKAY.

11       THE COURT:  GOOD.  PARAGRAPH 3?

12            (EXHIBIT PUBLISHED TO JURY.)

13  BY MS. HARRIMAN:

14  Q.  AND WHEN YOU WROTE YOUR DECLARATION UNDER PENALTY OF

15  PERJURY, MR. JOHNSON, WHAT YOU SAID, THAT IS, "IN EARLY MARCH,

16  2002, MS. PANDE APPROACHED ME AND INDICATED THAT SHE WAS HAVING

17  PROBLEMS WITH HER SUPERVISOR, REX MITCHELL.  AT THE TIME, SHE

18  ADVISED SHE WAS RANKED A 2 IN PERFORMANCE AND BELIEVED SHE

19  SHOULD HAVE BEEN DESIGNATED A 1, TOP-LEVEL PERFORMANCE."  THAT

20  STATEMENT IS FALSE, ISN'T IT?

21  A.  NO, THAT STATEMENT'S TRUE.  AS BEST I RECALL, SHE WAS VERY

22  CONCERNED 'CAUSE SHE HAD NOT BEEN RATED A 1 IN PERFORMANCE.

23  Q.  SO YOUR TESTIMONY IS IN THE VERY FIRST MEETING WITH

24  MS. PANDE, SHE CAME IN TO COMPLAIN ABOUT HER RATING; THAT'S YOUR

25  TESTIMONY?

1    A.   YEAH.

2    Q.   OKAY.   I'M GOING TO SHOW YOU WHAT'S BEEN MARKED AS

3    EXHIBIT 98.

4                    (PAUSE IN THE PROCEEDINGS.)

5              MS. HARRIMAN:   CAN WE PUT THAT UP, PLEASE, CANDI?

6                    (EXHIBIT PUBLISHED TO JURY.)

7    BY MS. HARRIMAN:

8    Q.   I WANT YOU TO LOOK AT --

9              MS. HARRIMAN:   CAN WE BLOW UP THE VERY -- ACTUALLY,

10   LET'S BLOW UP THE EMAIL, THE VERY BOTTOM OF THE NEXT PAGE, IF

11   YOU CAN, CANDI.

12                   (EXHIBIT PUBLISHED TO JURY.)

13             MS. HARRIMAN:   THAT'S GOOD.

14   Q.   AND, MR. JOHNSON, YOU SEE THAT ON MARCH 27, KIRAN PANDE SENT

15   REX MITCHELL HER PMP FORM FOR 2001.   YOU SEE THAT?

16   A.   UH-HUH.

17   Q.   YOU HAVE TO ANSWER AUDIBLY.

18   A.   OH, SORRY.   YES.

19   Q.   AND YOU WOULD AGREE WITH ME, WOULDN'T YOU, THAT MARCH 27 IS

20   NOT EARLY MARCH?

21   A.   OKAY.

22   Q.   DO YOU AGREE?

23   A.   YES.   YES.

24             MS. HARRIMAN:   LET'S LOOK AT THE NEXT EMAIL IN THE

25   STRING.

JOHNSON - CROSS / HARRIMAN

1    (EXHIBIT PUBLISHED TO JURY.)

2  **BY MS. HARRIMAN:**

3  **Q.**  AND YOU SEE THAT ON APRIL 12, KIRAN PANDE HAS WRITTEN TO REX

4  MITCHELL SAYING, "BASED ON OUR 2001 PMP DISCUSSION ON APRIL 1ST,

5  MY UNDERSTANDING OF THE FORWARD PLAN ON CLOSING OUT MY 2001 PMP

6  IS AS FOLLOWS:  YOU WOULD COMPLETE SECTION 7 AND 8.  AFTER

7  RECEIVING THE FORM WITH YOUR COMMENTS ON SECTION 7 AND 8, I

8  WOULD COMPLETE SECTION 9, AND WE BOTH WOULD COMPLETE SECTION 10,

9  CLOSE OUT THE DOCUMENT AND PROVIDE TO JAY FOR HIS REVIEW,

10  SIGNATURE."

11          YOU SEE THAT?

12  **A.**  YES.

13  **Q.**  AND SO AS OF APRIL 12TH, 2002, SECTIONS 7 AND 8 WERE NOT YET

14  COMPLETED, WERE THEY?

15  **A.**  DOESN'T LOOK LIKE IT IS.  I CAN'T SAY FOR SURE.

16  **Q.**  AND YOU KNOW THAT SECTION 7 AND 8 IS THE SECTION THAT HAS

17  THE SUPERVISOR'S RANKING, DON'T YOU?

18  **A.**  THE RANKING HAS TO BE DETERMINED WELL BEFORE THIS TIME.  THE

19  SUPERVISORS MEET IN A RANKING SESSION AND THAT IS WHEN THE

20  RANKING IS DETERMINED, BECAUSE IT'S A COMPETITIVE RANKING AMONG

21  PEERS.  SO THE PMP FORM MIGHT BE THE DOCUMENTATION OF IT FOR THE

22  RECORD, BUT IT WAS ALREADY DETERMINED BY THE MIDDLE OF MARCH OR

23  EARLIER.  IN AUSTRALIA, WE DO IT IN MID FEBRUARY IS WHEN THE

24  RANKING'S ACTUALLY DETERMINED, AND THEN IT'S LATER YOU CLOSE OUT

25  THE PMP FORMALLY JUST TO GO AHEAD AND RECORD WHAT THAT RANKING

1    IS.

2    Q.   MR. JOHNSON, ARE YOU TELLING THIS JURY THAT YOU KNOW FOR A

3    FACT THAT REX MITCHELL HAD TOLD KIRAN PANDE WHAT HER RANKING WAS

4    BEFORE YOU MET WITH HER IN EARLY MARCH?

5    A.   I DON'T KNOW HOW SHE UNDERSTOOD HER RANKING, BUT I'M TELLING

6    YOU IT'S VERY CONCEIVABLE SHE --

7    Q.   I'M ASKING YOU IF YOU'RE SAYING THAT YOU KNOW THAT REX

8    MITCHELL HAD TOLD KIRAN PANDE WHAT HER RANKING WAS AS OF EARLY

9    MARCH?

10   A.   I DON'T KNOW THAT.

11              MS. SIMERLY:  OBJECTION.  ASKED AND ANSWERED.

12              THE WITNESS:  HOW COULD I KNOW?

13              THE COURT:  GO AHEAD.

14   BY MS. HARRIMAN:

15   Q.   SO WHAT YOU'RE -- THE STORY THAT YOU'RE NOW TELLING THE JURY

16   IS WHAT?  YOU HAVE NO IDEA --

17              MS. SIMERLY:  OBJECTION, YOUR HONOR.

18              THE WITNESS:  I'M CONFUSED WHAT YOU'RE LOOKING FOR.

19              MS. SIMERLY:  ARGUMENTATIVE.

20   BY MS. HARRIMAN:

21   Q.   YOU DON'T KNOW --

22              THE COURT:  STOP, STOP, STOP.  LET'S HAVE A QUESTION.

23   GO AHEAD.

24   BY MS. HARRIMAN:

25   Q.   MR. JOHNSON, YOU KNOW FOR A FACT, DON'T YOU, THAT MS. PANDE

JOHNSON - CROSS / HARRIMAN

1   I'LL FINALIZE MY COMMENTS AND SEND IT TO YOU TODAY."

2            DO YOU HAVE ANY FACTUAL BASIS FOR BELIEVING THAT

3   MR. MITCHELL SAID ANYTHING ABOUT KIRAN PANDE'S RANKING BEFORE

4   THE DATE OF THIS EMAIL, APRIL 12TH, 2002?

5   A.   YEAH.

6            MS. SIMERLY:  OBJECTION.

7            THE WITNESS:  HER SALARY ACTION WOULD HAVE BEEN

8   EFFECTIVE APRIL 1ST AND A MATTER OF PAYROLL.  AND THAT SALARY

9   ACTUALLY IS DETERMINED BASED ON HER RANKING.

10  BY MS. HARRIMAN:

11  Q.   AND DO YOU HAVE ANY REASON TO BELIEVE THAT MR. MITCHELL TOLD

12  HER THAT?

13  A.   I DON'T KNOW THAT MR. MITCHELL TOLD HER.

14  Q.   YOU DON'T KNOW ONE WAY OR THE OTHER?

15  A.   I DON'T.  I DON'T KNOW WHAT MR. MITCHELL DID.

16  Q.   SO WHEN YOU PUT IN YOUR DECLARATION THAT KIRAN WAS

17  COMPLAINING ABOUT HER RANKING AS TO EARLY MARCH, WERE YOU JUST

18  GUESSING?

19  A.   NO.  SHE HAD TALKED TO ME THAT SHE DID NOT FEEL -- SHE WAS

20  GETTING A 2 AND SHE DIDN'T FEEL IT WAS APPROPRIATE.  IT'S

21  ENTIRELY REASONABLE THAT SHE WOULD UNDERSTAND WHAT HER RANKING

22  IS IN EARLY MARCH.

23  Q.   AND YOU DO -- SO LET ME MOVE ON IF WE CAN.

24            IN THAT FIRST MEETING -- AFTER THE FIRST MEETING WITH

25  KIRAN PANDE, YOU THEN MET WITH MR. MITCHELL AND WITH MS. PANDE?

ALAMEDA - DIRECT / HAMASAKI

1   A.   YES, I WAS.

2   Q.   AND WERE YOU THE PDR TO MS. PANDE AT ANY POINT IN TIME?

3   A.   YES, I WAS.

4   Q.   AND APPROXIMATELY WHAT TIME PERIOD WAS THAT?

5   A.   I BELIEVE IN THE 2002 TO 2003, '4 TIME FRAME.

6   Q.   OKAY.  AND WERE YOU THE PDR FOR ANY SPECIFIC DISCIPLINE?

7   A.   I COVER THE PETROLEUM ENGINEERING FUNCTION FOR THE -- FOR

8   THE COMPANY.

9   Q.   OKAY.  CAN YOU PLEASE DESCRIBE TO THE JURY WHAT YOUR

10  RESPONSIBILITIES AS THE PDR FOR THE PETROLEUM ENGINEERING

11  FUNCTION WERE.

12  A.   YEAH.  MY RESPONSIBILITIES WERE TO REPRESENT THE EMPLOYEES

13  IN OUR STRATEGIC BUSINESS UNIT, THOSE WITHIN THE PE FUNCTION,

14  PETROLEUM ENGINEERING FUNCTION, AT OUR PDC MEETINGS, THESE

15  COMMITTEE MEETINGS WHERE WE WORK ON SELECTING EMPLOYEES FOR NEW

16  ASSIGNMENTS.

17          AND IN THAT ROLE, YOU KNOW, THE EMPLOYEE PROVIDES

18  INFORMATION ABOUT THEIR SKILLS AND CAPABILITIES.  THEY POST FOR

19  JOBS THAT THEY'RE INTERESTED IN HAVING.  AND IT'S DURING

20  THOSE -- THOSE MEETINGS WHERE I REPRESENT THE EMPLOYEE AND HELP

21  THEM SORT OF BECOME -- ON THE SLATES, AND WE REVIEW THEIR

22  CAPABILITIES AND SO FORTH.

23  Q.   AND DID YOU REPRESENT MS. PANDE DURING THE FALL OF 2003 PDC?

24  A.   YES, I DID.

25  Q.   OKAY.  PRIOR TO THAT TIME, DID YOU HAVE DISCUSSIONS WITH

ALAMEDA - DIRECT / HAMASAKI

1   MS. PANDE ABOUT HER INTEREST IN -- IN FINDING JOBS?

2   A.  I DID, YES.

3   Q.  OKAY.  AND WHAT DO YOU RECALL ABOUT THOSE DISCUSSIONS?

4   A.  THE KEY FEATURE I THINK THAT I RECALL WAS MS. PANDE HAD

5   LIMITED THE LOCATIONS THAT SHE WAS ABLE TO -- TO WORK AT.  SHE

6   HAD TOLD US THAT -- OR TOLD ME THAT, YOU KNOW, IT WOULD BE

7   EITHER SAN RAMON OR SOME JOBS IN LONDON AND THAT OTHER LOCATIONS

8   LIKE HOUSTON OR BAKERSFIELD OR OTHER PLACES THAT WE MIGHT HAVE

9   HAD JOBS WERE NOT IN HER INTEREST LIST.

10  Q.  DID YOU ASK HER WHETHER SHE WOULD BE WILLING TO ACCEPT

11  POSITIONS IN HOUSTON?

12  A.  I BELIEVE I DID.  BUT I THINK SHE HAD INDICATED ON SOME

13  DOCUMENTATION THAT SHE PROVIDED, A FORM WE CALL THE CHDS WHERE

14  THE EMPLOYEE LISTS WHICH SITES THAT THEY DEFINITELY HAVE

15  INTEREST IN AND MAYBE SOME INTEREST OR NO INTEREST.

16  Q.  OKAY.

17  A.  SO I HAD THAT DOCUMENTATION.

18  Q.  OKAY.  AND JUST BY WAY OF EXPLANATION, HOW OFTEN DOES -- DO

19  PDC'S OCCUR?

20  A.  TWICE A YEAR.

21  Q.  OKAY AND ARE THEY WHAT TIME OF YEAR?

22  A.  USUALLY IN THE SPRING, MARCH, AND THEN AGAIN IN EARLY

23  OCTOBER.

24  Q.  AND WHO TYPICALLY ATTENDS THE PDC'S?

25  A.  PDC'S ARE ATTENDED BY THE PDR'S FOR THAT FUNCTION FROM THE

ALAMEDA - DIRECT / HAMASAKI

1    VARIOUS BUSINESS UNITS AROUND THE WORLD, PLUS ADDITIONAL

2    RESOURCES, OTHER MANAGERS WHO HAVE KNOWLEDGE OF PETROLEUM

3    ENGINEERING PERSONNEL THAT ARE GOING TO BE DISCUSSED AT THE

4    MEETINGS, AS WELL AS HR REPRESENTATIVES WHO MONITOR THE MEETING,

5    THE SPONSOR WHO FACILITATES THE MEETING.  SO THERE'S PROBABLY,

6    OH, 30 PEOPLE IN THE ROOM DURING ANY GIVEN SESSION.

7    Q.   OKAY.  YOU TESTIFIED A MINUTE AGO ABOUT YOUR COMMUNICATION

8    WITH MS. PANDE.  HOW WERE THOSE DONE?  WERE THEY BY TELEPHONE OR

9    IN PERSON?

10   A.   TELEPHONE.  AT THE TIME, I WAS LIVING AND WORKING IN ANGOLA

11   AND MS. PANDE WAS IN SAN RAMON, SO WE WOULD EXCHANGE EMAILS.

12   BUT I DO RECALL ONE OR MAYBE TWO TELEPHONE CONVERSATIONS WITH

13   HER.

14   Q.   OKAY.  AND THE DISCUSSION THAT YOU DESCRIBED BEFORE WAS

15   THAT -- YOUR RECOLLECTION OF THE TELEPHONE CONVERSATION?

16   A.   YES, UM-HMM.

17   Q.   IN YOUR OPINION AS HER PDR, DID HER GEOGRAPHIC PREFERENCES

18   LIMIT HER OPPORTUNITIES TO FIND OTHER EMPLOYMENT AT THAT FALL --

19   A.   MOST DEFINITELY.

20          MS. ANDERSON:  OBJECTION, FOUNDATION.

21          THE COURT:  YEAH.  WELL, LET'S LAY A FOUNDATION FOR

22   THAT.

23   BY MS. HAMASAKI:

24   Q.   HOW LONG HAVE YOU BEEN A PDR?

25   A.   FOR SEVEN YEARS.

ALAMEDA - DIRECT / HAMASAKI

1   Q.   AND YOU HAD AN UNDERSTANDING -- OR DO YOU HAVE AN

2   UNDERSTANDING OF THE WAY THE PROCESS WORKS?

3   A.   A DETAILED UNDERSTANDING.

4   Q.   DO YOU HAVE AN UNDERSTANDING OF -- OR TYPICALLY IN YOUR

5   ROLE, ARE -- DO GEOGRAPHIC LIMITATIONS, IF A PERSON INDICATES

6   THAT THEY'RE ONLY WILLINGLY ACCEPTING CERTAIN POSITIONS IN

7   CERTAIN LOCATIONS, DOES THAT HAVE AN IMPACT ON THEIR ABILITY TO

8   FIND OTHER POSITIONS?

9   A.   ALMOST --

10          MS. ANDERSON:  OBJECTION.  OBJECTION.  IT LACKS

11  FOUNDATION AND IS IN LARGE PART IRRELEVANT AS WELL.

12          THE COURT:  OVERRULED.  YOU CAN ANSWER THAT QUESTION.

13          THE WITNESS:  MOST DEFINITELY.  I'VE EXPERIENCED IT

14  MYSELF IN MY OWN CAREER.  OPPORTUNITIES IN THE COMPANY ARE

15  LOCATION-DEPENDENT.  YOU JUST CAN'T TELL WHEN THE RIGHT JOB IS

16  GOING TO COME UP IN ANY GIVEN LOCATION.  SO THE MORE FLEXIBLE

17  YOU ARE WITH YOUR ABILITY TO RELOCATE AND TAKE GOOD ASSIGNMENTS

18  WHEN THEY COME UP IS DIRECTLY DEPENDENT ON OR CONNECTED WITH

19  YOUR ABILITY TO RELOCATE.

20  BY MS. HAMASAKI:

21  Q.   OKAY.  SO GIVEN YOUR EXPERIENCE AND YOUR UNDERSTANDING, DID

22  YOU HAVE AN OPINION AS TO, AS MS. PANDE'S PDR, AS TO WHETHER HER

23  GEOGRAPHIC PREFERENCES LIMITED HER ABILITY TO FIND WORK IN THE

24  FALL OF 2003 PDC?

25  A.   MOST DEFINITELY.

ALAMEDA - DIRECT / HAMASAKI

1   Q.   DO YOU RECALL ANY SPECIFIC POSITIONS THAT YOU REPRESENTED

2   MS. PANDE FOR DURING THE FALL 2003 PDC?

3   A.   YES.   THERE WERE THREE TECHNICAL POSITIONS THAT WERE

4   ASSOCIATED WITH THE NEW GROUP IN LONDON THAT WAS INVOLVED IN

5   BUSINESS DEVELOPMENT.

6   Q.   AND HOW BIG WAS THAT NEW GROUP IN BUSINESS DEVELOPMENT?

7   A.   IT WAS A NEW GROUP, FAIRLY SMALL, MAYBE A DOZEN, 20 PEOPLE.

8   Q.   DO YOU RECALL WHAT THOSE POSITIONS WERE?

9   A.   THEY WERE PETROLEUM ENGINEERING-BASED POSITIONS.   I BELIEVE

10  THERE WAS PETROLEUM ENGINEER AND MAYBE TWO RESERVOIR ENGINEERS,

11  SOMETHING LIKE THAT, BUT THEY WERE DEFINITELY PE RELATED

12  TECHNICAL JOBS SUPPORTING BUSINESS DEVELOPMENT.

13  Q.   AND DO YOU KNOW WHETHER ALL THOSE POSITIONS WERE FILLED?

14  A.   NOT ALL THOSE JOBS WERE FILLED.

15  Q.   OKAY.   AND DID YOU REPRESENT MS. PANDE FOR EACH OF THOSE

16  THREE POSITIONS DURING THAT PDC?

17  A.   YES, I DID.

18  Q.   WHAT DO YOU RECALL OF THE DISCUSSIONS ABOUT MS. PANDE WITH

19  RESPECT TO THOSE THREE JOBS DURING THAT PDC?

20  A.   YEAH.   THE WAY -- THE WAY I WOULD REPRESENT MS. PANDE WAS WE

21  HAD CRITICAL CRITERIA THAT WE WOULD ASSESS EACH CANDIDATE

22  AGAINST, AND I WOULD PROPOSE TO THE GROUP WHAT I THOUGHT HER

23  PERFORMANCE OR CAPABILITY WAS AGAINST THOSE CRITICAL CRITERIA.

24          MS. ANDERSON:   OBJECTION, YOUR HONOR, THE WITNESS

25  DOESN'T APPEAR TO BE TESTIFYING FROM MEMORY BUT WHAT HE WOULD

1  HAVE DONE.  MOVE TO STRIKE.

2          **THE COURT:**  SUSTAINED.  THE ANSWER'S STRICKEN.

3          THE QUESTION IS WHAT YOU REMEMBER OF THE DISCUSSIONS

4  AT THE FALL '03 PDC.

5          **THE WITNESS:**  SURE.

6          AT THE TIME, WE EVALUATED, I BELIEVE, THREE OR MAYBE

7  FOUR CRITICAL CRITERIA.  ONE OF THOSE WAS TEAMWORK.  WHEN I

8  PROPOSED A RATING PERFORMANCE AGAINST THAT CRITERIA, I PROPOSED,

9  I BELIEVE IT WAS "PROFICIENT," AND I WAS SURPRISED BY THE

10  REACTION I GOT FROM OTHER MEMBERS OF THE COMMITTEE IN THE ROOM

11  WHO HAD KNOWLEDGE OF MS. PANDE WHO QUESTIONED WHETHER OR NOT

12  THAT WAS AN APPROPRIATE RATING.

13  **BY MS. HAMASAKI:**

14  Q.  DO YOU REMEMBER WHO THOSE INDIVIDUALS WERE?

15  A.  DIFFICULT TO REMEMBER.  THERE WERE TWO, THREE, MAYBE FOUR

16  INDIVIDUALS.  I BELIEVE TOM MCMILLEN WAS ONE OF THE INDIVIDUALS.

17  BUT I KNOW THERE WERE MORE THAN ONE, AND SEVERAL RAISED ISSUES

18  WITH THAT SUGGESTION AS A RATING.

19  Q.  WAS THERE ANYONE IN THE ROOM FROM BUSINESS PLANNING OR FROM

20  THE BUSINESS PLANNING OR BUSINESS DEVELOPMENT FUNCTION?

21  A.  NO.  NO.  IT WOULD HAVE BEEN A -- IT'S A PE FUNCTION.

22  Q.  WHEN YOU TALK ABOUT PEOPLE -- ABOUT THESE TEAMWORK COMMENTS,

23  WERE THOSE TEAMWORK COMMENTS DIRECTED SPECIFICALLY TOWARDS

24  TECHNICAL OR TOWARDS BUSINESS PLANNING?

25          **MS. ANDERSON:**  OBJECTION, LEADING, YOUR HONOR.

1      THE WITNESS:  NO.

2      THE COURT:  YOU CAN ANSWER THE QUESTION.

3      THE WITNESS:  THE MEETING WAS AROUND THE TECHNICAL

4  JOBS, SO THE COMMENTS THAT WERE BEING MADE ABOUT TEAMWORK

5  RELATED TO PRIOR TECHNICAL ASSIGNMENTS.

6  BY MS. HAMASAKI:

7  Q.  OKAY.  DO YOU RECALL ANY MENTION OF MS. PANDE'S TEAMWORK OR

8  PERFORMANCE IN HER -- IN A BUSINESS PLANNING OR BUSINESS

9  DEVELOPMENT FUNCTION?

10  A.  NO.  THESE WERE DISCUSSIONS FROM OTHER MANAGERS AND

11  SUPERVISORS WHO HAD INTERACTED WITH -- WITH MS. PANDE IN PRIOR

12  TECHNICAL ASSIGNMENTS.

13  Q.  NOW, WITH RESPECT TO THE THREE LONDON POSITIONS THAT YOU

14  TESTIFIED ABOUT, DO YOU RECALL HOW BIG THE SLATES WERE?

15  A.  UM, IT'S A POPULAR LOCATION.  WE HAD LOTS OF CANDIDATES, SO

16  FIFTEEN.

17  Q.  OKAY.  AND DO YOU RECALL WHO WAS SELECTED?

18  A.  NO.  I'D HAVE TO GO BACK AND SEE THE DOCUMENTS, BUT I DON'T

19  RECALL.

20  Q.  DO YOU HAVE AN OPINION AS TO WHY MS. PANDE WAS NOT SELECTED?

21      MS. ANDERSON:  OBJECTION, YOUR HONOR, FOUNDATION.

22      THE COURT:  YEAH, SUSTAINED.  AND I'M NOT ENTIRELY

23  SURE IT'S RELEVANT.

24  BY MS. HAMASAKI:

25  Q.  WERE YOU ON -- WERE YOU PART OF THE SELECTION COMMITTEE?

ALAMEDA - CROSS / ANDERSON

1   RIGHT?

2   A.   UM-HMM.

3   Q.   "P" FOR "PROFICIENT"?

4   A.   YES.

5   Q.   AND "SP" WHEN SOMEONE'S ONLY "SOMEWHAT PROFICIENT," RIGHT?

6   A.   YES.   THOSE ARE THE RATINGS THAT WE USED.

7   Q.   THOSE ARE THE THREE, CORRECT?

8   A.   THERE'S ALSO A FOURTH, "NOT DEMONSTRATED," WHEN THE

9   CANDIDATE HAS NOT DEMONSTRATED THE SKILL IN ANY SETTING.

10  Q.   COMPLETELY LACKING AT ALL?

11  A.   THAT'S CORRECT.

12  Q.   ALL RIGHT.   SO "SOMEWHAT PROFICIENT" IS NOT AS GOOD AS

13  "PROFICIENT," FAIR?

14  A.   YES.

15  Q.   AND IS SUBSTANTIALLY LESS GOOD THAN "VERY PROFICIENT,"

16  RIGHT?

17  A.   UH-HUH.

18  Q.   AND YOU REMEMBER THAT IN THE MEETING, THEY RANKED THE OTHER

19  CANDIDATES FOR THE RESERVOIR ENGINEERING JOBS AS BEING VERY

20  PROFICIENT AND RANKED MS. PANDE AS ONLY SOMEWHAT PROFICIENT; DO

21  YOU REMEMBER THAT?

22  A.   YEAH.   LET'S SEE.   THAT'S CORRECT.   IT'S THE WAY WE'VE

23  DOCUMENTED IT ON THE FORM.

24  Q.   OKAY.   AND IN FACT, YOU RECALL THAT THERE WAS DISCUSSION AT

25  THE MEETING ABOUT YOUR SUGGESTION THAT SHE SHOULD BE RANKED AS

ALAMEDA - CROSS / ANDERSON

1    PROFICIENT, REMEMBER?

2    A.   UH-HUH.

3    Q.   AND YOU SAID THAT YOU WERE SURPRISED BECAUSE EVERYONE

4    RESPONDED SO NEGATIVELY, BASICALLY, TO YOUR SUGGESTION THAT SHE

5    WAS PROFICIENT.  DO YOU REMEMBER THAT?

6    A.   YOU SAID "EVERYONE."  THERE WERE SEVERAL, NOT EVERYONE.

7    Q.   OKAY.  WHO WERE THEY?

8    A.   CERTAINLY THERE WAS I BELIEVE TOM MCMILLEN.  CLOSE MY EYES

9    AND TRY TO REMEMBER THE -- THE INDIVIDUALS.  I BELIEVE GARY

10   GREASER.  I CLOSED MY EYES AND TRIED TO PICTURE WHO WAS IN THE

11   ROOM.

12                (PAUSE IN THE PROCEEDINGS.)

13           THE WITNESS:  I'M SORRY.  I CAN'T NAME ANY OTHERS.

14   BY MS. ANDERSON:

15   Q.   OKAY.  WITH RESPECT TO MR. GREASER, DO YOU HAVE ANY

16   KNOWLEDGE WHETHER MR. GREASER EVER WORKED WITH MS. PANDE AT ALL?

17   A.   NOT DIRECTLY, NO.

18   Q.   YOU DON'T HAVE ANY INFORMATION THAT WOULD LEAD YOU TO

19   BELIEVE THAT MR. GREASER EVER HAD ANY PERSONAL OBSERVATIONS

20   ABOUT MS. PANDE'S TEAMWORK SKILLS, RIGHT?

21   A.   NO, NO DIRECT KNOWLEDGE MYSELF.

22   Q.   AND IN FACT, ISN'T IT THE CASE THAT THE DISCUSSIONS THAT

23   SURROUNDED MS. PANDE'S SUPPOSED LACK OF TEAMWORK SKILLS ACTUALLY

24   AROSE IN A DISCUSSION OF THE WORK SHE DID WHEN SHE WAS IN

25   PLANNING?

ALAMEDA - CROSS / ANDERSON

1   A.  NO, I DON'T THINK SO.  I MEAN, THE JOB -- THE JOBS WERE --

2   WERE RELATED TO THESE TECHNICAL JOBS IN LONDON.  AND IF I -- IF

3   I JUST MAY ADD TO THAT --

4   Q.  SIR, JUST ANSWER THE QUESTION.

5   A.  THE -- THE INDIVIDUALS IN THE ROOM WERE -- ARE TRAINED TO BE

6   SPECIFIC ABOUT THE INFORMATION THAT'S RELEVANT TO --

7           MS. ANDERSON:  YOUR HONOR, MOVE TO STRIKE AS

8   NON-RESPONSIVE.

9           THE COURT:  OVERRULED.  YOU CAN FINISH YOUR ANSWER.

10          THE WITNESS:  YEAH.  THE INDIVIDUALS IN THE ROOM TAKE

11  GREAT PRIDE IN BEING FAIR AND ACCURATE.  THAT'S -- THAT'S THE

12  CHEVRON WAY.

13          MS. ANDERSON:  YOUR HONOR, LACKS FOUNDATION, CALLS

14  FOR SPECULATION.  MOVE TO STRIKE.

15          THE COURT:  I'LL STRIKE IT.

16          LET'S HAVE A QUESTION.  I DON'T WANT TO -- THIS ISN'T

17  THE TIME FOR US TO GO ON.

18  BY MS. ANDERSON:

19  Q.  ARE YOU CERTAIN, AS YOU SIT HERE TODAY, THAT THE DISCUSSIONS

20  CONCERNING MS. PANDE'S SUPPOSED LACK OF TEAMWORK HAD NOTHING TO

21  DO WITH THE TIME THAT SHE SPENT IN PLANNING?

22  A.  I'M AS CERTAIN AS I CAN BE FOUR YEARS LATER THAT WE WERE

23  DISCUSSING MS. PANDE'S ROLE IN A TECHNICAL -- IN A TECHNICAL

24  TEAM ENVIRONMENT.

25  Q.  SO YOU'RE PRESUMING THAT BECAUSE THE JOB WAS SUPPOSED TO BE

DUNN - DIRECT / SIMERLY

1    TO EXIST IN SAN RAMON.

2    Q.   DID YOU, IN THIS TIME PERIOD AFTER THE MOVE WAS ANNOUNCED,

3    JUNE, JULY, AUGUST, AT ANY TIME, TELL MS. PANDE THAT SHE COULD

4    CONTINUE WORKING -- THERE WAS PLENTY OF WORK TO DO AND SHE COULD

5    CONTINUE WORKING AFTER THE END OF THE YEAR FROM SAN RAMON?

6    A.   I WANT TO BE VERY CLEAR ON THIS.  THAT IS ABSOLUTELY UNTRUE.

7    NEVER DID I ONCE MENTION THAT ANYBODY, NOT JUST KIRAN, BUT

8    ANYBODY IN MY GROUP COULD STAY WORKING IN BLOCK 14 AFTER

9    DECEMBER 31ST, 2003.

10   Q.   WERE THERE OTHER EMPLOYEES IN YOUR GROUP WHO WERE UNHAPPY

11   WITH THE MOVE?

12   A.   ABSOLUTELY.

13   Q.   WERE THERE OTHER EMPLOYEES IN THE GROUP WHO ASKED IF THEY

14   COULD CONTINUE WORKING AFTER THE GROUP HAD MOVED?

15   A.   YES, THERE WERE.

16   Q.   WHO?

17   A.   TAYO FEYIJIMI, FOR ONE, WANTED TO STAY FOR ANOTHER SIX WEEKS

18   'CAUSE HE HAD SOME DENTAL WORK AND HE WANTED TO KEEP HIS SAME

19   DENTIST.  AND I TOLD HIM, "NO, THERE'RE DENTISTS IN HOUSTON.

20   YOU CAN -- YOU CAN GET THAT WORK DONE THERE."

21           MS. ANDERSON:  OBJECT, YOUR HONOR.  MOVE TO STRIKE

22   THE HEARSAY PORTION OF THE ANSWER.

23           THE COURT:  OVERRULED.

24           THE WITNESS:  AND --

25

DUNN - DIRECT / SIMERLY

1  AWARE OF THE JOB SITUATION.  WE HAVE JOINT MEETINGS WITH THE

2  EARTH SCIENCE AND PD COMMITTEE.

3  Q.  IT'S OCTOBER.  WHEN WAS THE LAST PDC FOR TECHNICAL POSITIONS

4  IN CHEVRON?

5  A.  WE HAD OUR LAST PDC A WEEK BEFORE THIS TRIAL BEGAN, FIRST

6  WEEK OF OCTOBER.

7  Q.  AND IN THAT PDC, FROM YOUR POSITION AS SPONSOR, DO YOU KNOW

8  HOW MANY OPEN POSITIONS THERE WERE FOR PETROLEUM ENGINEERS?

9  A.  I DO.

10  Q.  HOW MANY?

11  A.  ONE HUNDRED.

12  Q.  HOW MANY WERE FILLED?

13  A.  FORTY-FIVE.

14  Q.  WHAT'S GOING TO HAPPEN WITH THE OTHER 55?

15        MS. ANDERSON:  OBJECTION.  CALLS FOR SPECULATION.

16        THE COURT:  IF YOU KNOW.

17        THE WITNESS:  THE OTHER 55, SOME WILL BE POSTED

18  EXTERNALLY.  SOMETIMES WORK WILL BE MOVED AROUND TO KIND OF GET

19  RID OF THE JOB.  AND SOME WILL BE FILLED WITH NEW HIRES, MEANING

20  COLLEGE RECRUITS.

21  BY MS. SIMERLY:

22  Q.  OKAY.  AND ARE YOU FAMILIAR, FROM YOUR POSITION AS A SPONSOR

23  ON THE PDC, WITH THE SITUATION AT THE MAJOR COMPETITOR OIL

24  COMPANIES, EXXON MOBIL, SHELL, BP?

25  A.  YES.  IT'S NOT A -- IT'S NOT A SPECIFIC ASPECT OF MY JOB.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

KIRAN PANDE,                        )
                                    )           **JURY TRIAL**
          PLAINTIFF,                )
                                    )
   VS.                              )           NO. C 04-5107JCS
                                    )
CHEVRON CORPORATION (F/K/A          )
CHEVRONTEXACO CORPORATION)          )
EXPLORATION & PRODUCTION            )           **VOLUME 7**
(F/K/A CHEVRONTEXACO                )           **PAGES 1245 - 1441**
OVERSEAS PETROLEUM), A              )
DIVISION OF CHEVRON U.S.A.          )
INC.,                               )           SAN FRANCISCO, CALIFORNIA
                                    )           THURSDAY, OCTOBER 18, 2007
          DEFENDANTS.               )
_____)

# Certified Copy

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF:              KEKER & VAN NEST
                            710 SANSOME STREET
                            SAN FRANCISCO, CALIFORNIA  94111-1704
                  BY:   CHRISTA M. ANDERSON,
                        SUSAN J. HARRIMAN, ATTORNEYS AT LAW


FOR DEFENDANTS:             MILLER LAW GROUP, PC
                            500 SANSOME STREET, SUITE 400
                            SAN FRANCISCO, CALIFORNIA  94111
                  BY:   LISA HAMASAKI,
                        MICHELE BALLARD MILLER
                        JANINE S. SIMERLY, ATTORNEYS AT LAW


REPORTED BY:       RAYNEE H. MERCADO, CSR NO. 8258

### CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C04-5107JSC, PANDE V. CHEVRON, ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

FRIDAY, OCTOBER 19, 2007

JUDAH - DIRECT / MILLER

1    ENGINEERING, I ALSO HAVE AN MBA AND I ALSO HAVE A LAW DEGREE.

2    **Q.**   THAT'S ALL?

3    **A.**   THAT'S IT.

4                          (LAUGHTER.)

5    **BY MS. MILLER:**

6    **Q.**   AND YOU'RE DONE, RIGHT?

7    **A.**   I'M DONE.  NO MORE SCHOOL.

8    **Q.**   ALL RIGHT.  AND DURING THE NINE YEARS YOU'VE BEEN EITHER

9    WITH CHEVRONTEXACO, WHERE HAVE YOU WORKED?

10   **A.**   I'VE WORKED IN -- I WORKED IN MIDLAND -- MIDLAND, TEXAS, IN

11   MY EARLY CAREER.  AT THE TIME OF THE CHEVRONTEXACO MERGER I WAS

12   WORKING IN NEW YORK, AND I'VE ALSO WORKED MOSTLY IN HOUSTON.

13   AND I JUST TRANSFERRED OUT HERE TO CALIFORNIA THIS SUMMER.

14   **Q.**   AND I'M GOING TO TAKE YOU BACK TO THE FALL OF 2003, ALL

15   RIGHT?

16   **A.**   OKAY.

17   **Q.**   AND WHAT WAS YOUR POSITION AT THAT TIME WITH CHEVRON?

18   **A.**   UP UNTIL NOVEMBER 1ST OF 2003, I WAS THE TECHNICAL SUPPORT

19   MANAGER FOR THE LATIN AMERICA BUSINESS UNIT.  AND THEN AS OF

20   NOVEMBER 1ST, 2003, I BECAME THE GENERAL MANAGER OF PLANNING,

21   BUSINESS PLANNING FOR CHEVRON ENERGY TECHNOLOGY COMPANY.

22   **Q.**   OKAY.  AND THAT'S ALSO KNOWN AS ETC?

23   **A.**   ETC IS THE ABBREVIATION.

24   **Q.**   THERE'S LOTS OF ABBREVIATIONS HERE.

25   **A.**   YES, BIG COMPANY.

JUDAH - DIRECT / MILLER

1  Q.  OKAY.  SO ETC.  WAS ETC -- THAT -- YOU SAID YOU WERE ON A

2  WORK GROUP OR A PLANNING GROUP?

3  A.  ETC WAS FORMED IN LATE 2003 FROM WHAT HAD BEEN THE UPSTREAM

4  TECHNOLOGY COMPANY, WHICH WAS CALLED EPTC, AND THEN THE

5  DOWNSTREAM TECHNOLOGY COMPANY, WHICH WAS CALLED ERTC.  EPTC, THE

6  UPSTREAM GROUP, WAS BASED PRIMARILY IN HOUSTON.  ERTC, THE

7  DOWNSTREAM GROUP, WAS BASED PRIMARILY IN RICHMOND, CALIFORNIA,

8  ALTHOUGH BOTH GROUPS HAD STAFF IN OUR OFFICE IN SAN RAMON AS

9  WELL.

10  Q.  OKAY.  SO YOU DROPPED A FEW LETTERS AND BECAME ETC?

11  A.  ETC.  AND CONSOLIDATED BOTH OF THOSE ORGANIZATIONS INTO ONE.

12  Q.  OKAY.  SO I WANT TO -- I'M GOING TO TAKE -- WHEN YOU SAID

13  BEFORE YOU WERE ON A WORK TEAM, WERE YOU INVOLVED IN SOME

14  SELECTIONS FOR --

15  A.  I WAS ON THE WORK TEAM THAT HELPED SET THE ORGANIZATION FOR

16  THE COMBINED GROUP.  AND THEN I WAS ALSO INVOLVED IN MANY

17  SELECTIONS THAT TOOK PART DURING THAT FALL OF 2003.

18  Q.  OKAY.  I WANT TO TAKE A LOOK OR JUST TALK ABOUT FOUR

19  PARTICULAR POSITIONS.  OKAY?

20        LET ME START WITH THE FOCUS AREA MANAGEMENT POSITION.

21  A.  FOCUS AREA MANAGER FOR RESERVOIR MANAGEMENT.

22  Q.  RIGHT.  AND WERE YOU ON THE SELECTION COMMITTEE FOR THAT

23  POSITION?

24  A.  YES, I WAS.

25  Q.  AND HOW MANY -- AND I KNOW THERE ARE A LOT OF DIFFERENT

1    Q.   THIS IS MS. PANDE AT THE END OF TABLE.

2    A.   OKAY.

3    Q.   HAVE YOU EVER MET HER PRIOR TO TODAY?

4    A.   I HAVE NEVER MET HER PRIOR TO TODAY.

5    Q.   YOU KNOW THAT SHE WAS -- SHE WAS CONSIDERED FOR SOME OF

6    THESE POSITIONS?

7    A.   YES, I KNOW HER NAME FROM -- AND I'VE SEEN HER RESUME OR I

8    HAD AT THAT TIME SEEN HER RESUME FOR SOME OF THESE POSITIONS,

9    BUT I'VE NEVER MET HER PERSONALLY.

10   Q.   OKAY.  AND IN THIS SELECTION, LET'S TALK ABOUT JUST THE

11   FOCUS AREA MANAGER OF RESERVOIR MANAGEMENT POSITION.  SORRY.

12            DID YOU INTERVIEW INDIVIDUALS FOR THAT POSITION?

13   A.   NO, WE DID NOT.  WE WENT OFF THE PAPERWORK THAT THEY HAD

14   SUBMITTED FOR THE JOBS.

15   Q.   DID YOU INTERVIEW SUPERVISORS OF THE INDIVIDUALS THAT HAD

16   POSTED OR WERE NOMINATED FOR THE JOBS?

17   A.   NO, WE DID NOT.

18   Q.   AND DO YOU KNOW WHO ACTUALLY WAS SELECTED FOR THE FOCUS AREA

19   MANAGER OF RESERVOIR MANAGEMENT POSITION?

20   A.   IT WAS A GENTLEMAN NAMED SCOT SOULEE.

21   Q.   PLEASE TELL ME THAT SOMETIME THAT JOB NAME GOT REDUCED TO

22   SOMETHING.

23   A.   ACTUALLY, NO, IT'S STILL THE SAME.  BUT TO MAKE IT CLEAR,

24   THERE'S FOCUS AREA MANAGERS FOR DIFFERENT OTHER TECHNICAL AREAS

25   LIKE EXPLORATION AND FACILITIES MANAGEMENT AND OTHER PARTS OF

1    THE TECHNICAL AREAS.

2    Q.   OKAY.  AND IN MAKING THIS SELECTION, DID ANYONE ON THE

3    COMMITTEE RAISE ANY CONCERNS ABOUT KIRAN PANDE?

4    A.   NO, NOT TO MY RECOLLECTION.

5    Q.   WAS THERE ANY DISCUSSION AT THE SELECTION DECISION ABOUT ANY

6    ISSUES MS. PANDE MIGHT HAVE HAD WITH EITHER JACK DUNN OR REX

7    MITCHELL?

8    A.   NO.

9    Q.   LET ME TAKE A LOOK AT TWO OTHER JOBS.  THESE ARE -- THESE

10   ARE ACTUALLY MUCH SMALLER NAMES.  ONE IS BUSINESS PLANNING

11   COORDINATOR.

12   A.   OKAY.

13   Q.   AND I KNOW THAT WAS A -- A POSITION WHERE THERE WERE A

14   NUMBER OF DIFFERENT JOBS THAT WERE POSTED, RIGHT?

15   A.   THERE WERE THREE IDENTICAL JOBS THAT WERE POSTED THE SAME

16   TIME.

17   Q.   AND WHAT WERE THE LOCATIONS OF THE THREE JOBS?

18   A.   THEY WERE DUAL POSTED FOR HOUSTON AND FOR SAN RAMON, AND

19   THEN WE SELECTED TWO PEOPLE IN HOUSTON AND ONE IN SAN RAMON.

20   Q.   OKAY.  AND YOU KNOW THAT MS. PANDE APPLIED FOR THAT

21   POSITION, TOO?

22   A.   BUT JUST -- AS I RECALL, JUST THE SAN RAMON POSITION.

23   Q.   OKAY.

24   A.   OR JUST TO BE CONSIDERED FOR A SAN RAMON POSITION.

25   Q.   AND DO YOU RECALL, IS THAT SOMETHING THAT, DURING THE

JUDAH - DIRECT / MILLER

1   SELECTION PROCESS, THAT THAT WAS SOMETHING THAT WAS DISCUSSED?

2   **A.**   THAT SHE WAS ONLY ELIGIBLE -- OR ONLY WANTED TO BE

3   CONSIDERED FOR A SAN RAMON POSITION, YES, THAT DID COME UP IN

4   THE DISCUSSION.

5   **Q.**   AND SHE WAS CONSIDERED, RIGHT?

6   **A.**   YES, SHE WAS.

7   **Q.**   AND.  AND IN ANY OF THE CONVERSATIONS THAT YOU HAD ABOUT

8   THAT SELECTION, DID EITHER MR. DUNN OR MR. MITCHELL'S NAME COME

9   UP?

10  **A.**   NO, IT DID NOT.

11  **Q.**   WAS THERE ANY DISCUSSION ABOUT MS. PANDE'S, I GUESS, PRIOR

12  RELATIONSHIP AS A -- WITH EITHER MR. DUNN OR MR. MITCHELL?

13  **A.**   IT DID NOT COME UP IN THE SELECTION, NO.

14  **Q.**   AND DO YOU RECALL WHO ACTUALLY GOT THE POSITION IN

15  SAN RAMON?

16  **A.**   A WOMAN NAMED ANNE MARIE JOHNSON.

17  **Q.**   OKAY.

18          ONE MORE POSITION, BUSINESS DEVELOPMENT COORDINATOR.

19  WAS THAT A POSITION THAT WAS IN HOUSTON OR SAN RAMON?

20  **A.**   THE PERSON WHO WAS SELECTED WAS IN HOUSTON AND ALL THE WORK

21  FOR THAT JOB TURNED OUT TO BE IN HOUSTON.  BUT I THINK THE

22  POSTING PAPERWORK HAD BOTH HOUSTON OR BAY AREA ON IT.

23  **Q.**   OKAY.  DO YOU KNOW IF MS. PANDE WAS CONSIDERED FOR THAT JOB?

24  **A.**   I DON'T BELIEVE SHE WAS.  AND IT WASN'T IN THE PAPERWORK

25  THAT SHE WAS ON THE LIST FOR THAT POSITION.

JUDAH - DIRECT / MILLER

1  Q.  OKAY.  AND THAT POSITION ULTIMATELY BECAME A HOUSTON-BASED

2  POSITION?

3  A.  IT WAS A HOUSTON-BASED POSITION AND THE WOMAN WHO WAS

4  SELECTED WAS IN HOUSTON.

5  Q.  OKAY.  AND WHO WAS THE WOMAN WHO WAS SELECTED?

6  A.  JANE SEBERDING (PHONETIC) WAS SELECTED FOR THAT POSITION.

7  Q.  OKAY.  AND DO YOU RECALL WHAT THE GRADE LEVEL WAS FOR THE

8  INDIVIDUALS FOR THIS PARTICULAR JOB?

9  A.  THIS ONE, BEING A NEW POSITION, WASN'T -- DIDN'T HAVE A SET

10  GRADE, BUT JANE WAS A GRADE 26.

11  Q.  AND DO YOU KNOW WHAT GRADE MS. PANDE WAS?

12  A.  MS. PANDE WAS AT THAT TIME?  I THINK IT WAS 24.

13  Q.  OKAY.  AND IN THE DISCUSSIONS FOR THE BUSINESS DEVELOPMENT

14  COORDINATOR POSITION, WERE THERE ANY DISCUSSIONS AT ALL ABOUT

15  MS. PANDE'S RELATIONSHIP WITH EITHER MR. REX MITCHELL OR

16  MR. JACK DUNN?

17  A.  NO, THERE WERE NOT.

18  Q.  WERE THERE ANY -- IN ANY OF THE THREE COMMITTEES THAT YOU

19  WERE ON FOR THE NEW POSITIONS IN ETC, DO YOU RECALL ANY

20  DISCUSSIONS WHATSOEVER OF ANY ISSUES MS. PANDE HAD HAD IN THE

21  PAST WITH ANY SUPERVISOR?

22  A.  NO, I DON'T RECALL ANY OF THAT.

23          MS. MILLER:  I DON'T HAVE ANY FURTHER QUESTIONS.

24  THANK YOU.

25          THE WITNESS:  OKAY.

1          **MS. HARRIMAN:**  EXCUSE ME, YOUR HONOR.  OBJECTION,

2    IRRELEVANT.

3              **THE COURT:**  OVERRULED.

4              **THE WITNESS:**  WELL, I THINK AS A SUPERVISOR, IF I SAW

5    APPLICATION LIKE THIS, IT TENDS TO SAY SOMETHING ABOUT THE

6    INDIVIDUAL.  AND THAT'S JUST NOT THE KIND OF IMPRESSION I WANT

7    TO CONVEY WHEN I APPLY FOR A JOB.  AND PLUS I REALLY DON'T THINK

8    I'M TEN IN ALL THESE DIMENSIONS.

9    **BY MS. SIMERLY:**

10   **Q.**  THANK YOU.

11              LET'S GO BACK TO -- YOU SAID YOU ACTUALLY WORKED WITH

12   KIRAN PANDE.  DO YOU RECALL APPROXIMATELY WHEN THAT WAS?

13   **A.**  YEAH.  I WAS HER SUPERVISOR FROM JANUARY '98 UNTIL THE

14   MIDDLE OF '99 WHEN I MOVED TO A DIFFERENT JOB.

15   **Q.**  AND WHERE WAS THAT THAT YOU WERE SUPERVISING MS. PANDE FROM

16   JANUARY OF '98 TO THE MIDDLE OF '99?

17   **A.**  I WAS IN SAN RAMON, CALIFORNIA.

18   **Q.**  AND WHAT WAS THE GROUP THAT YOU WERE SUPERVISING HER IN?

19   **A.**  IT WAS A TECHNICAL SUPPORT GROUP IN WHAT WAS CALLED A TAPS

20   (PHONETIC) ORGANIZATION, PART OF THE CHEVRON OVERSEAS --

21   COORDINATION ON OVERSEAS PETROLEUM.  SO WE WERE PROVIDING

22   TECHNICAL SUPPORT FOR SUBSURFACE AND A LITTLE BIT OF SURFACE

23   ALSO SUPPORT.  WE LOOKED AT NEW PROJECTS, NEW OPPORTUNITIES FOR

24   CHEVRON TO GROW INTO.

25   **Q.**  WERE YOU HER DIRECT SUPERVISOR?

1    **A.**   THAT'S CORRECT.

2    **Q.**   IMMEDIATE SUPERVISOR?

3    **A.**   UH-HUH.

4    **Q.**   AND WAS SHE PART OF A TEAM OF OTHER EMPLOYEES IN YOUR GROUP

5    THAT YOU SUPERVISED --

6    **A.**   THAT WAS A GROUP OF ABOUT -- I FORGOT -- IT WAS A GROUP OF

7    ABOUT EIGHT TO 12 PEOPLES.  THAT'S ABOUT THE SIZE OF IT.

8    **Q.**   OKAY.  NOW, WHILE YOU WERE WORKING AS MS. PANDE'S SUPERVISOR

9    IN THIS TIME FRAME, DID YOU PERSONALLY NOTICE ANY PROBLEMS WITH

10   MS. PANDE'S PERFORMANCE?

11   **A.**   NOT INITIALLY, NO.  BUT TOWARDS THE LATTER PART OF 1999 --

12   1998, AND WHEN I WAS STILL THERE IN 1999, I BELIEVE THERE WAS AN

13   ISSUE, YES.

14   **Q.**   AND COULD YOU TELL THE JURY WHAT THAT ISSUE WAS THAT -- THAT

15   YOU HAD WITH MS. PANDE.

16   **A.**   WELL, WE HAD SOME MEETING IN -- IN PARIS ON A PROJECT THAT

17   HAD TO DO WITH THE NEW VENTURES IN ALGERIA.  AND WE HAD A SERIES

18   OF MEETINGS, I BELIEVE IT WAS IN LATE '98.  AND I -- MY

19   PERCEPTION WAS THAT THE WORK THAT SHE HAD DONE THAT SHE WAS

20   WORKING ON, IT COULD HAVE -- THE WORK COULD HAVE BEEN MORE

21   COMPLETE.  I DON'T THINK IT WAS REALLY -- THE DELIVERABLES WERE

22   NOT ALL THERE.

23          SO I -- SOMETIME TOWARDS I BELIEVE THE -- THIS WAS

24   NINE YEARS AGO -- TOWARDS THE END OF '98, I REMEMBER AT ONE TIME

25   WE SAT DOWN AND I ASK HER, YOU KNOW, WHETHER THE FACT THAT

1    Q.   AND AFTER --

2    A.   I MEAN IT'S --

3    Q.   -- AFTER THIS CONVERSATION, DID YOU NOTICE ANYTHING

4    DIFFERENT THERE?

5    A.   WELL, THE ONLY THING -- AS I SAID, IT'S EIGHT, GOING ON NINE

6    YEARS AGO.  WHAT I REMEMBER IS THE DEFINITE SILENT TREATMENT.

7    FROM THAT POINT ONWARDS, UNLESS WE ABSOLUTELY HAD TO TALK, IT

8    WAS JUST STRICTLY PROFESSIONAL DISCUSSION.  BUT THERE WAS NO --

9    IT WAS STRAINED.  I'LL PUT THAT.

10   Q.   WAS THAT PLEASANT FOR YOU AS HER SUPERVISOR?

11   A.   NO, IT WAS NOT, UH-UH.

12   Q.   IS THAT YOUR MANAGEMENT STYLE, TO BE JUST PURELY VERY

13   PROFESSIONAL AND --

14            MS. HARRIMAN:  OBJECTION, IRRELEVANT.

15            THE COURT:  SUSTAINED.

16            MS. SIMERLY:  OKAY.  I'LL MOVE ON, YOUR HONOR.

17   Q.   I WANT TO MOVE NOW, MR. CAMY, TO SOME POSITIONS IN 2004,

18   JANUARY OF 2004, POSITIONS THAT I BELIEVE WERE OWNED BY -- I

19   THINK THAT'S THE CHEVRON TERM -- ZUMA (SIC) OMOREGIE.

20   A.   ZUWA OMOREGIE.

21   Q.   I'M SORRY, ZUWA OMOREGIE.

22            AND WERE THESE TECHNICAL PETROLEUM ENGINEERING

23   POSITIONS?

24   A.   YES -- YES, UM-HMM.

25   Q.   AND WHAT WAS THE LOCATION OF THESE -- WERE THERE TWO OF

CAMY - DIRECT / SIMERLY

1   THEM?

2   **A.**  I BELIEVE SO, YES, UH-HUH.

3   **Q.**  AND WHAT WAS THE LOCATION OF THESE TWO TECHNICAL PETROLEUM

4   ENGINEERING POSITIONS?

5   **A.**  THEY WERE IN ZUWA'S GROUP IN SAN RAMON TEAM.  ZUWA HAD A

6   TEAM SPLIT IN TWO PLACES, AND THIS -- THESE ONES I BELIEVE WERE

7   IN SAN RAMON TEAM.

8   **Q.**  ALL RIGHT.  AND DID YOU HAVE ANY INVOLVEMENT AT ALL IN

9   SELECTING THE SUCCESSFUL CANDIDATES FOR THESE TWO POSITIONS IN

10  ZUWA OMOREGIE'S GROUP?

11  **A.**  YES, I WAS PART OF THE SELECTION COMMITTEE.

12  **Q.**  OKAY.  AND AT CHEVRON -- THIS WASN'T PART OF THE PDC

13  PROCESS, RIGHT?

14  **A.**  NO.

15  **Q.**  ALL RIGHT.  SO IT DIDN'T WORK THAT WAY.  COULD YOU JUST

16  EXPLAIN BRIEFLY TO THE JURY HOW IT WORKS WHEN YOU'RE -- WHEN YOU

17  WERE PART OF THE SELECTION COMMITTEE FOR THESE POSITIONS IN ZUWA

18  OMOREGIE'S GROUP --

19  **A.**  WELL, ESSENTIALLY TO DUPLICATE OF THE PDC PROCESS EXCEPT

20  IT'S OFF CYCLE.  THE PDC CYCLE TAKES PLACE TWICE A YEAR, USUALLY

21  IN THE SPRING AND IN THE FALL.  THIS POSITION WERE POSTED BUT

22  AFTER THE FALL PDC.  SO WE HAVE THIS -- WE REPEAT ESSENTIALLY

23  THIS PROCESS BUT OFF CYCLE WHERE WE DON'T HAVE ALL THE PDC

24  MEMBERS PRESENT.  THE JOBS ARE POSTED, PEOPLE APPLY, AND THEN

25  PEOPLE MEET EITHER IN PERSON OR THROUGH TELEPHONE CONFERENCE

1    CALL BECAUSE THEY WORK IN DIFFERENT PARTS OF THE WORLD.  AND BUT

2    WE FOLLOW EXACTLY THE SAME PROCESS.

3              IN OTHER WORDS, WE HAVE THIS FORM CALLED A OJ1 THAT

4    HAS THE JOBS CRITERIA, WHAT ARE THE SKILLS REQUIRED TO DO THE

5    JOB, THE NAME OF THE CANDIDATES IN THE COLUMN.  AND THEN EACH OF

6    THE PEOPLE WHO ARE KNOWLEDGEABLE ABOUT THE CANDIDATES, WE ALL

7    DISCUSS WHAT RANKING THESE PEOPLE SHOULD BE GIVEN FOR THIS

8    PARTICULAR SKILL SET.

9    Q.  OKAY.  AND DO YOU RECALL HOW MANY PEOPLE WERE ON THE

10   SELECTION COMMITTEE FOR THESE TWO JOBS?

11   A.  NO, I WOULDN'T REMEMBER.  FOR ONE THING, I WAS ON THE PHONE

12   SO I KNOW THE OTHER PEOPLE WERE ON THE PHONE AND SOME OF THEM

13   WERE TOGETHER IN A ROOM IN SAN RAMON, BUT I DON'T RECALL THE

14   NUMBER.

15   Q.  CAN YOU JUST GIVE THE JURY AN ESTIMATE WHAT YOU BELIEVE THE

16   NUMBER --

17   A.  WELL, TYPICALLY WE GOT ANYWHERE FROM FOUR TO SIX, SEVEN

18   PEOPLE, IF WE DO THAT OVER THE PHONE.

19   Q.  AND IS THERE A CONFERENCE CALL AMONG THE MEMBERS OF THE

20   SELECTION COMMITTEE?

21   A.  CORRECT.

22   Q.  ALL RIGHT.  BEFORE THE CONFERENCE CALL, DO THE MEMBERS OF

23   THE SELECTION COMMITTEE GET THE PAPERS THAT WERE SUBMITTED BY

24   EACH OF THE APPLICANTS?  IN OTHER WORDS, THEIR SELF-EVALUATIONS

25   AND RESUMES AND SO FORTH?

1    A.    I DON'T -- USUALLY, THEY DO.    IF THE PEOPLE -- THE PAPERWORK

2    THAT HAS BEEN SUBMITTED IS BEING SENT AS A PREVIEWING MATERIAL

3    AS WELL AS THE FORM THAT WE CALL CHDS AND THE GO400 WHICH

4    ESSENTIALLY IS THE SUMMARY OF THE PEOPLE'S CAREER, WHAT THEY

5    HAVE DONE ACROSS THEIR CAREER.

6    Q.    DO YOU RECALL THAT MS. PANDE IN FACT RATED HERSELF TEN, TEN,

7    TEN, TEN, TEN?

8              MS. HARRIMAN:    EXCUSE ME, YOUR HONOR.    OBJECTION,

9    LEADING.

10             THE COURT:    SUSTAINED.

11   BY MS. SIMERLY:

12   Q.    DO YOU KNOW HOW MS. PANDE RATED HERSELF?

13             MS. HARRIMAN:    WELL, YOUR HONOR, NOW THAT THE

14   ANSWER'S BEEN SUGGESTED, I THINK THE QUESTION'S IMPROPER.

15             THE COURT:    WELL, YEAH.    I THINK YOU GET TO ASK IF HE

16   HAS AN ACTUAL RECOLLECTION, NOT BASED ON WHAT YOU SUGGESTED --

17             MS. SIMERLY:    OF COURSE.

18             THE COURT:    -- ABOUT HOW SHE RATED HERSELF.

19   BY MS. SIMERLY:

20   Q.    MR. CAMY, DO YOU HAVE ANY ACTUAL RECOLLECTION BEYOND WHAT I

21   HAVE SUGGESTED AS TO KIRAN PANDE'S ACTUAL --

22   A.    NO.    NO.    I WOULD -- AS I SAY, LONG TIME AGO.

23   Q.    OKAY.    DO YOU RECALL THIS CONFERENCE CALL IN WHICH THE

24   CANDIDATES WERE DISCUSSED, INCLUDING KIRAN PANDE?

25   A.    YES.    NOT ALL THE DETAILS, BUT I REMEMBER SOME SALIENT

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404*

CAMY - DIRECT / SIMERLY

1   POINTS, YES, UM-HMM.

2   Q.  OKAY.  DIDN'T -- WAS MS. PANDE SELECTED FOR EITHER OF THESE

3   POSITIONS?

4   A.  NO.

5   Q.  WHO WERE THE SUCCESSFUL CANDIDATES, IF YOU RECALL?

6   A.  I BELIEVE ONE WAS JALAL AFIFI, AND THE OTHER -- I FORGOT THE

7   NAME OF THE OTHER.

8   Q.  GRAHAM HOUSEN?

9   A.  YEAH, GRAHAM HOUSEN.

10  Q.  OKAY.  DID YOU, IN THE COURSE OF THIS MEETING, SAY ANYTHING

11  TO THE OTHER MEMBERS OF THE SELECTION COMMITTEE ABOUT YOUR

12  PERSONAL EXPERIENCE WORKING WITH MS. PANDE --

13  A.  YES.

14  Q.  -- AS HER SUPERVISOR?

15  A.  YES, I DID.  UH-HUH.

16  Q.  AND WHAT DID YOU TELL THE OTHER MEMBERS OF THE SELECTION

17  COMMITTEE ABOUT YOUR PERSONAL EXPERIENCE WORKING WITH MS. PANDE

18  AS HER SUPERVISOR?

19  A.  WELL, I TOLD HER THAT IN THE LAST PART OF WHEN SHE WAS

20  WORKING FOR ME, MY LAST EXPERIENCE WITH HER WAS THAT SHE, IN

21  TERMS OF THE PERFORMANCE AND THE CORROSIVE ASPECT OF THE

22  RELATIONSHIP THAT WE HAD, AND I BELIEVE THAT ALSO TRANSPIRED ON

23  OTHER PEOPLE IN THE GROUP, A CERTAIN TOXIC ELEMENT, IF YOU WILL,

24  IN THE RELATIONSHIP IN THE GROUP THAT I JUST THOUGHT THAT -- YOU

25  KNOW, I WOULD NOT WANT TO HAVE THE PEOPLE IN MY NEW GROUP IN

CAMY - DIRECT / SIMERLY

1  LONDON, NEW GROUP, I WOULDN'T WANT TO HAVE HER WORK WITH US.  SO

2  IF SHE WAS -- YOU KNOW, WE WOULD DEAL WITH PEOPLE IN ETC BUT WE

3  WOULDN'T WANT TO DEAL WITH HER.

4  Q.  OKAY.  WELL, WHY WOULD YOUR GROUP IN LONDON HAVE TO DEAL

5  WITH MS. PANDE IN ZUWA OMOREGIE'S GROUP IN SAN RAMON?

6  A.  WELL, THE GROUP IN LONDON IS A SMALLISH GROUP, TECHNICAL

7  GROUP.  IT'S ABOUT TEN, 12 PEOPLE.  AND DEPENDING ON THE PROJECT

8  LOADS, IF WE HAVE MANY PROJECTS AND WE NEED MORE TECHNICAL

9  RESOURCES, AND ZUWA'S GROUP WAS AT THE TIME AND -- WAS EXPECTED

10  TO BE AT THE TIME AND CERTAINLY STILL IS TODAY A FLYWHEEL, IF

11  YOU WILL.  IT'S A RESOURCE, A POOL OF RESOURCES THAT WE DRAW

12  FROM AS WE NEED TECHNICAL PEOPLE.

13  Q.  LET ME SEE IF I UNDERSTAND.  ARE YOU SAYING IF YOU'VE GOT

14  TOO MUCH WORK FOR YOUR GROUP?

15          MS. ANDERSON:  EXCUSE ME, YOUR HONOR, LEADING.

16          THE COURT:  SUSTAINED.

17          THE WITNESS:  SO THAT'S --

18          THE COURT:  GO AHEAD.  LET HER ASK A QUESTION.

19          MS. SIMERLY:  YEAH, LET ME TRY TO GET A QUESTION OUT,

20  MR. CAMY.

21  Q.  COULD YOU TELL THE JURY WHETHER IN FACT IN YOUR EXPERIENCE

22  PEOPLE FROM OTHER GROUPS HAVE COME TO LONDON TO HELP YOU OUT?

23  A.  YEAH.

24  Q.  AND WHOSE -- IS THERE A PARTICULAR GROUP THAT YOU DRAW FROM

25  WHEN YOU NEED HELP IN LONDON?

1          MS. HARRIMAN:  OBJECTION, YOUR HONOR --

2          THE WITNESS:  WE DRAW FROM A VARIETY --

3          MS. HARRIMAN:  -- IRRELEVANT.

4          THE COURT:  OVERRULED.

5          THE WITNESS:  WE DRAW FROM A --

6          MS. HARRIMAN:  AND, YOUR HONOR, OBJECTION VAGUE AS TO

7    TIME.

8    BY MS. SIMERLY:

9    Q.  WAS YOUR ANTICIPATION, MR. CAMY, AT THE TIME THIS SELECTION

10   WAS BEING MADE, THAT IN THE UPCOMING YEAR OR TWO, THERE WOULD BE

11   ANY PARTICULAR GROUP THAT YOU WOULD LOOK TO IF YOU NEEDED HELP

12   IN LONDON?

13         MS. HARRIMAN:  OBJECTION --

14         THE WITNESS:  WELL, THAT'S PART OF THE BUSINESS

15   MODEL --

16              (SIMULTANEOUS COLLOQUY.)

17         MS. HARRIMAN:  -- SPECULATION AS PHRASED, YOUR HONOR.

18         THE COURT:  OVERRULED.

19   BY MS. SIMERLY:

20   Q.  AND I THINK HE SAID THAT WAS PART OF THE BUSINESS MODEL?

21   A.  THAT WAS WHY I WAS ON THE SELECTION COMMITTEE, BECAUSE IT

22   WAS PERFECTLY CLEAR TO EVERYBODY THAT MY GROUP WAS GOING TO BE

23   USING RESOURCES IN ZUWA'S GROUP, AMONG OTHERS, AND THAT WAS WHY

24   ZUWA, IN EARLY JANUARY, ASKED ME TO BE ON THE SELECTION

25   COMMITTEE.

1    Q.   WHO WAS THAT?

2    A.   DAVE KENNEDY.  HE SUCCEEDED ME IN THE JOB IN COPI.

3    Q.   AND WHAT DID YOU SHARE WITH THE COMMITTEE ABOUT WHAT

4    MR. KENNEDY HAD TOLD YOU HIS EXPERIENCE HAD BEEN WITH MS. PANDE?

5    A.   THAT IT WAS VERY MUCH IN LINE WITH MY OBSERVATION OF THE

6    LATTER PART -- OF THE LATTER PART THAT SHE WAS WORKING FOR ME.

7    Q.   YES.  OKAY.

8            MS. SIMERLY:  YOUR HONOR, AGAIN I THINK I'M DONE, BUT

9    I WANT TO MAKE SURE I'VE NOT FORGOTTEN ANYTHING.

10           THE COURT:  OKAY.

11           MS. SIMERLY:  THAT'S ALL I HAVE.  THANKS, MR. CAMY.

12           THE WITNESS:  THANK YOU.

13                     **CROSS-EXAMINATION**

14   BY MS. HARRIMAN:

15   Q.   GOOD MORNING, MR. CAMY.

16   A.   GOOD MORNING.

17   Q.   WHAT WAS MR. AFIFI'S RANKING?

18   A.   MR. WHO?

19   Q.   AFIFI?

20   A.   I HAVE NO IDEA.  EIGHT YEARS AGO.  I WOULDN'T REMEMBER IT.

21   Q.   DO YOU REMEMBER WHAT MR. HOUSEN'S RANKING WAS?

22   A.   NO.  I JUST KNOW THEY WERE CONSIDERED THE BEST CANDIDATES OF

23   THE LOT.

24   Q.   AND, MR. CAMY, IN THE SPRING OF 2003, YOU KNEW THAT KIRAN

25   PANDE WAS WORKING FOR JACK DUNN, RIGHT?

1    A.   NO, I WAS NOT.

2    Q.   WERE YOU EVER A MEMBER OF THE PETROLEUM ENGINEER --

3    A.   SURE.

4    Q.   -- PDC?

5             FOR WHAT YEARS?

6    A.   I BELIEVE IT WAS FROM '98 UNTIL THE END OF 2000 -- I'M

7    SORRY.  YEAH, '98 UNTIL THE END OF 2001, AND THEN FROM 2004

8    ONWARD.

9    Q.   OKAY.

10             AND IF I UNDERSTAND -- WELL, IS IT YOUR TESTIMONY YOU

11   NEVER SPOKE TO MR. OMOREGIE BEFORE THE ACTUAL CONFERENCE CALL

12   THAT YOU PARTICIPATED IN ABOUT MS. PANDE?

13   A.   I HAVE NO RECOLLECTION THAT I DID, IF I DID, NO.  AGAIN, I

14   THINK I WAS ASKED TO PARTICIPATE IN THAT -- IN THAT SELECTION, I

15   BELIEVE IT WAS EARLY JANUARY.  VERY -- WITHIN DAYS OF MY

16   ARRIVING AT THE JOB.

17   Q.   SO YOU DON'T RECALL SPEAKING AT ALL TO MR. OMOREGIE EXCEPT

18   THIS ONE CONVERSATION WHICH YOU PARTICIPATED IN BY CONFERENCE

19   CALL FROM LONDON?

20   A.   THAT'S CORRECT, YES.

21   Q.   NOW, YOU'RE FAMILIAR WITH THE CHEVRON MANAGEMENT LEADERSHIP

22   FORUM, AREN'T YOU, MR. CAMY?

23             MS. SIMERLY:  OBJECTION, YOUR HONOR, BEYOND THE

24   SCOPE.

25             THE COURT:  I DON'T KNOW WHERE SHE'S GOING WITH THIS,

CAMY - CROSS / HARRIMAN

1    BUT --

2              THE WITNESS:  CHEVRON HAD A LEADERSHIP PROGRAM, YES,

3    UH-HUH.  I DON'T KNOW.  WE HAVE SO MANY LEADERSHIP PROGRAM.

4    YES.

5    BY MS. HARRIMAN:

6    Q.   HAVE YOU HEARD OF THE CMLF?

7    A.   CMLF, UH-HUH.

8    Q.   IT'S A FORUM FOR DEVELOPING MANAGERS IN THE COMPANY, ISN'T

9    IT?

10   A.   WELL, IT'S A FORUM.  THAT'S NOT A FORUM THAT I'M -- CMLF IS

11   A FORUM.  IT'S NOT A FORM.

12   Q.   IT'S A FORUM --

13   A.   CORRECT.

14   Q.   -- FOR DEVELOPING MANAGERS WITHIN THE COMPANY; ISN'T THAT

15   RIGHT?

16   A.   CORRECT.

17             MS. SIMERLY:  OBJECTION, YOUR HONOR, EXCEEDS THE

18   SCOPE.

19   BY MS. HARRIMAN:

20   Q.   AND --

21             THE COURT:  CAN WE FIND OUT WHAT THIS IS ABOUT BEFORE

22   WE GET TOO FAR INTO IT?  OR MAYBE YOU DON'T, BUT I DON'T.

23   BY MS. ANDERSON:

24             MS. HARRIMAN:  AND IT'S --

25             THE COURT:  PLEASE TIE IT UP TO SOMETHING.

CAMY - CROSS / HARRIMAN

1          **MS. HARRIMAN:**  I WILL.

2     **Q.**  AND SUPERVISORS NOMINATE PEOPLE TO ATTEND THOSE FORUMS --

3     **A.**  UH-HUH.

4     **Q.**  -- DON'T THEY, MR. CAMY?

5     **A.**  YES, UM-HMM.

6     **Q.**  AND IT'S AN HONOR TO BE NOMINATED TO THE CMLF, ISN'T IT?

7     **A.**  WELL, I MEAN, IT'S -- YEAH, IT'S A GOOD SIGN FOR SURE.

8     **Q.**  AND AS A SUPERVISOR, YOU ONLY NOMINATED PEOPLE WHO HAD

9     LEADERSHIP QUALITIES AND WHO FIT THE CHEVRON WAY, RIGHT?

10    **A.**  UM-HMM.  THAT'S WHAT WE DO.

11    **Q.**  AND YOU NOMINATED KIRAN PANDE, DIDN'T YOU, TO PARTICIPATE IN

12    A CMLF?

13    **A.**  IN THE EARLY PART OF HER ASSIGNMENT WITH ME, I CERTAINLY

14    WOULD AND DID RECOMMEND HER FOR THAT, ABSOLUTELY.

15    **Q.**  OKAY.  DO YOU ALSO -- DO YOU KNOW WHO -- WELL, LET ME ASK

16    YOU THIS.  MR. CAMY, YOU'RE A STANFORD GRAD; IS THAT RIGHT?

17    **A.**  THAT IS CORRECT.

18    **Q.**  AND YOU KNOW WHO FRANKLIN ORR IS?

19    **A.**  I KNOW OF HIM.

20    **Q.**  YOU KNOW THAT HE IS THE DEAN OF EARTH SCIENCES AT STANFORD?

21    **A.**  OKAY.  THAT'S -- THAT'S NOT SOMETHING I KEEP UP WITH, BUT I

22    TAKE YOUR WORD FOR IT.

23    **Q.**  DO YOU RECALL HAVING A CONVERSATION WITH DEAN ORR ABOUT

24    KIRAN PANDE?

25    **A.**  NO.

1  A.  -- THIS WAS IN MARCH 1998.  I ARRIVED TO THAT JOB IN

2  JANUARY 1998.  I HAD TWO MONTHS OF EXPERIENCE OF HER WORKING IN

3  A GROUP.  THIS IS -- THIS APPRAISAL WAS WRITTEN BY MARY CAO WHO

4  WAS SITTING IN AS AN INTERIM FOR THE MANAGER'S JOB.  AND SHE

5  WROTE THAT.  AND BASED ON WHAT I'D SEEN OVER THE FIRST TWO

6  MONTHS OF 1998, I COULDN'T DISAGREE AT ALL.  AS A MATTER OF

7  FACT, IF THAT HAD BEEN PROBABLY IN THE MIDDLE, JULY OR AUGUST OF

8  THAT YEAR I PROBABLY WOULD HAVE AGREED, TOO.  BUT IF IT HAD BEEN

9  AT THE END OF THE 1998, I WOULD HAVE STRONGLY DISAGREED.

10  Q.  NOW, IN 1998, THERE WAS A SHORTAGE OF WORK IN YOUR GROUP,

11  WASN'T THERE, MR. CAMY?

12  A.  I GUESS SO.  I DON'T REMEMBER THE SPECIFICS, BUT THIS IS THE

13  TYPE OF WORK WHERE YOU HAVE -- IT'S FEAST AND FAMINE.

14  Q.  REMEMBER THAT OIL WAS ONLY $10 A BARREL IN 1998?

15  A.  IT WAS -- IT WAS -- YEAH, LATE '98, EARLY '99.  UH-HUH.

16  Q.  AND DO YOU REMEMBER THAT A LOT OF PEOPLE IN YOUR GROUP WERE

17  SITTING AROUND WITHOUT ENOUGH WORK TO DO IN 1998?

18  A.  I DON'T KNOW ABOUT A LOT, BUT THAT'S -- THAT DOES HAPPEN.

19  Q.  IN FACT, THERE WEREN'T ANY MERIT PAY INCREASES BASED ON WORK

20  IN 1998 BECAUSE OF PROBLEMS IN THE OIL INDUSTRY, RIGHT?

21          MS. SIMERLY:  OBJECTION, YOUR HONOR, EXCEEDS THE

22  SCOPE OF DIRECT.

23          THE COURT:  OVERRULED.

24          THE WITNESS:  WELL, IT WAS A CORPORATE DECISION TO

25  HAVE NO -- I DON'T KNOW IF IT WAS NO MERIT INCREASE OR WHETHER

CAMY - CROSS / HARRIMAN

1  IT WAS GOING TO BE A SIMPLE STRAIGHT FLAT PERCENTAGE.  I FORGOT.

2  BUT IT WAS NOT THE NORMAL PROCESS WHERE WE GIVE PEOPLE RAISES ON

3  THE BASIS OF SPECIFIC PERFORMANCE.

4  **BY MS. HARRIMAN:**

5  **Q.**  OKAY.  LET'S LOOK AT EXHIBIT 13.  AND CAN YOU JUST FLIP TO

6  THERE, MR. CAMY.

7  **A.**  (REVIEWING DOCUMENTS.)

8  **Q.**  AND IF YOU LOOK AT THE FIRST PAGE OF EXHIBIT 13, YOU'LL SEE

9  THAT THIS IS MS. PANDE'S PERFORMANCE REVIEW COVERING THE PERIOD

10  JANUARY 1, 1999 TO DECEMBER 31ST, 1999, CORRECT?

11  **A.**  THAT'S WHAT IT SAYS.

12  **Q.**  AND THIS IS THE PERIOD THAT COVERS THE TIME WHEN YOU SAID

13  KIRAN PANDE WAS GIVING YOU THE SILENT TREATMENT, RIGHT?

14  **A.**  THAT IS CORRECT.

15  **Q.**  AND IF YOU GO TO THE LAST PAGE OF EXHIBIT 13 --

16  **A.**  UM-HMM.

17  **Q.**  -- DO YOU SEE MR. KENNEDY'S SIGNATURE AT THE BOTTOM OF THAT

18  PAGE?

19  **A.**  THAT'S CORRECT.

20  **Q.**  AND MR. KENNEDY WAS THE PERSON WHO REPLACED YOU AS KIRAN

21  PANDE'S SUPERVISOR.

22  **A.**  CORRECT.

23  **Q.**  AND YOU SAID THAT YOU SHARED MR. KENNEDY'S VIEW WITH THE

24  MEMBERS OF THE SELECTION COMMITTEE; IS THAT RIGHT?

25  **A.**  CORRECT.

CAMY - CROSS / HARRIMAN

```
1    Q.  DID YOU SHARE --
2              MS. HARRIMAN:  CAN WE BLOW UP THE PART ABOVE, PLEASE.
3              (EXHIBIT PUBLISHED TO JURY.)
4              THE WITNESS:  I'D NEVER SEEN THAT BEFORE.
5    BY MS. HARRIMAN:
6    Q.  SO --
7    A.  BEFORE I LEFT TO MY NEW ASSIGNMENT IN JUNE 1999, I SENT A
8    NOTE TO ALL OF MY REPORTS ASKING THEM TO --
9    Q.  EXCUSE ME, MR. CAMY.  THERE'S NO QUESTION PENDING.
10             MS. SIMERLY:  YOUR HONOR, COULD HE FINISH --
11   BY MS. HARRIMAN:
12   Q.  WE GO BY QUESTION AND ANSWER.
13             THE COURT:  YES, THERE IS NO QUESTION PENDING.
14   BY MS. HARRIMAN:
15   Q.  WHEN YOU TALKED TO THE SELECTION COMMITTEE AND YOU SHARED
16   MR. KENNEDY'S VIEWS, DID YOU SHARE THE VIEW THAT KIRAN HAS HAD A
17   VERY SOLID YEAR, HIGHLIGHTED BY SEVERAL HIGH-PROFILE NEW VENTURE
18   EVALUATIONS FOR THE EURASIA AND NEW VENTURES SBU'S AND A VERY
19   WELL DONE AND WELL RECEIVED RESERVOIR SIMULATION STUDY FOR CACT?
20   DID YOU SHARE THAT VIEW?
21   A.  I HADN'T SEEN THAT SO HOW COULD I HAVE SHARED IT?  NO.
22   Q.  DID YOU SHARE THE VIEW THAT KIRAN HAS DEMONSTRATED A HIGH
23   LEVEL OF TECHNICAL PROFICIENCY?
24   A.  I HAVEN'T SEEN THAT.
25   Q.  SO YOU DIDN'T SHARE THAT VIEW EITHER?
```

1  A.  CORRECT.

2  Q.  HOW WHERE IT SAYS, "HER COMMUNICATION SKILLS ARE EXCELLENT."

3  DID YOU SHARE THAT VIEW?

4  A.  NO.

5  Q.  AND WHERE IT SAYS KIRAN HAD --

6  A.  'CAUSE I WOULDN'T HAVE WRITTEN IT SO I COULDN'T HAVE SHARED

7  IT.

8  Q.  WHERE IT SAYS, "KIRAN HAD A VERY POSITIVE IMPACT ON A GROUP

9  THIS YEAR BY TAKING AN INTEREST AND MENTORING A NEW ENGINEER IN

10  THE GROUP."  DID YOU SHARE THAT VIEW?

11  A.  I WOULDN'T HAVE SHARED IT.

12  Q.  OKAY.  LET'S FLIP BACK A COUPLE OF PAGES TO A PAGE THAT'S --

13  THE NUMBERS AT THE BOTTOM ARE 1923.

14  A.  (REVIEWING DOCUMENTS.)

15      MS. HARRIMAN:  AND CAN YOU BLOW UP THE TEAMWORK

16  SECTION, PLEASE, CANDI.

17          (EXHIBIT PUBLISHED TO JURY.)

18  BY MS. HARRIMAN:

19  Q.  MR. KENNEDY WROTE, "SHE GETS HIGH MARKS FOR HER TEAMWORK

20  FROM THOSE WHO HAVE WORKED WITH HER THIS PAST YEAR."

21      YOU WERE ONE OF THOSE WHO HAD WORKED WITH MS. PANDE

22  IN 1999, RIGHT?

23  A.  UM-HMM.  THAT WAS DONE WITHOUT MY INPUT, BY THE WAY, THIS

24  STATEMENT.  IT MAY BE WITH SOME OF THE PEOPLE WHO WORKED WITH

25  HER IN THE PAST YEAR, BUT IT WASN'T ME INCLUDED.  I WAS NEVER

1  CONSULTED ON THIS.

2  **Q.**  AND IT SAYS, "SHE IS CONSIDERATE OF OTHER TEAM MEMBERS AND

3  TAKES HER INDIVIDUAL RESPONSIBILITIES VERY SERIOUSLY,

4  VOLUNTARILY MENTORED A NEW ENGINEER IN THE GROUP THIS PAST YEAR

5  AND HAD A VERY POSITIVE IMPACT IN DOING SO."

6          YOU DID KNOW ABOUT THE FACT THAT MS. PANDE HAD

7  MENTORED ONE OF THE NEW ENGINEERS IN THE GROUP UNDER YOUR

8  SUPERVISION, DIDN'T YOU, MR. CAMY?

9  **A.**  SHE WAS WORKING WITH OTHER ENGINEERS, YES, UM-HMM.

10  **Q.**  SHE WAS WORKING WITH ANNAMET DITLEVSON; IS THAT RIGHT?

11  **A.**  YEAH, I BELIEVE THAT'S CORRECT, YES, UM-HMM.

12  **Q.**  AND YOU KNEW SHE HAD DONE A VERY GOOD JOB MENTORING

13  MS. DITLEVSON, DIDN'T YOU?

14  **A.**  WELL, I KNEW SHE WAS WORKING WITH HER, BUT SINCE I HAD

15  RATHER LIMITED CONTACT WITH KIRAN, IT WAS A LITTLE DIFFICULT FOR

16  ME TO KNOW REALLY HER SIDE OF THE STORY OF HOW GOOD THE

17  MENTORING WAS GOING.

18  **Q.**  MR. CAMY, DIDN'T MS. DITLEVSON WORK WITH YOU AFTER YOU LEFT

19  THIS GROUP BEING MS. PANDE'S SUPERVISOR?

20  **A.**  I DON'T RECALL.  IT'S POSSIBLE.  I DON'T RECALL WHEN THAT

21  WOULD HAVE BEEN.

22  **Q.**  YOU DO RECALL, THOUGH, DON'T YOU, THAT MS. DITLEVSON TOLD

23  YOU ON MANY OCCASIONS THAT KIRAN PANDE HAD BEEN A GREAT MENTOR

24  TO HER?

25  **A.**  I DON'T DENY THAT.  I -- I DON'T RECALL IT SPECIFICALLY, BUT

1    I BELIEVE THAT THEY HAD A GOOD PERSONAL RELATIONSHIP, SO I'M

2    SURE THAT THEY HAD A GOOD WORKING RELATIONSHIP TOGETHER.

3              **MS. HARRIMAN:**  I HAVE NOTHING FURTHER, YOUR HONOR.

4              **THE COURT:**  REDIRECT?

5              **MS. SIMERLY:**  YES.

6              LET'S BRING UP EXHIBIT 13, THE SIGNATURE PAGE.

7              LET'S BLOW UP THE SIGNATURE LINE.

8                   (EXHIBIT PUBLISHED TO JURY.)

9                   **REDIRECT EXAMINATION**

10   **BY MS. SIMERLY:**

11   **Q.**  DID YOU SIGN THAT ANYWHERE, MR. CAMY?

12   **A.**  NO, I NEVER -- THIS IS THE FIRST TIME I SEE IT.

13   **Q.**  HAVE YOU EVER SIGNED ANY PMP FOR MS. PANDE THAT INCLUDE --

14   INCLUDED SUCH GLOWING REMARKS ABOUT HER AFTER YOU NOTICED THE

15   DECLINE IN HER ATTITUDE AFTER YOU CRITICIZED HER DELIVERABLES IN

16   PARIS?

17   **A.**  NO.  I TRIED TO GET ONE DONE BEFORE I LEFT BUT --

18   **Q.**  AND WHAT HAPPENED WHEN YOU TRIED TO DO A PMP BEFORE YOU LEFT

19   HER GROUP THAT WOULD HAVE REFLECTED THAT FACT?

20   **A.**  WELL, I GOT TO NEW JOB IN JAN -- IN JUNE OF 1999.  AND AS

21   SOON AS I HEARD ABOUT THAT -- I GUESS IT WAS IN APRIL OR MAY --

22   I SENT A NOTE TO ALL THE PEOPLE WHO WERE WORKING FOR ME TO DO A

23   PMP, A CLOSEOUT PMP BEFORE WE GO TO THE NEXT JOB.

24              AND ALL OF THEM DID EXCEPT VERY FEW, AND KIRAN WAS

25   ONE OF THEM WHO NEVER REPLIED AND NEVER SUBMITTED A PMP.  I DID

1    SEND -- I DON'T KNOW HOW MANY, BUT IT WASN'T VERY MANY, BUT, YOU

2    KNOW, REMINDERS SAYING, "WE NEED TO DO A PMP CLOSEOUT BEFORE I

3    MOVE ON TO THE NEW JOB SO THAT WE CAN CAPTURE THE PERFORMANCE

4    OVER THE LAST YEAR AND A HALF WHERE I WAS THE SUPERVISOR OF

5    THESE PEOPLE," AND SHE NEVER SUBMITTED A PMP.

6              **MS. SIMERLY:**  OBJECTION, YOUR HONOR.  I WOULD LIKE TO

7    MOVE TO STRIKE THAT TESTIMONY UNDER THE BEST EVIDENCE RULE.

8    WE'VE NEVER SEEN THESE PMP'S.  THEY'VE NEVER BEEN PRODUCED.

9              **THE WITNESS:**  IT DIDN'T EXIST.

10                   (SIMULTANEOUS COLLOQUY.)

11          **THE COURT:**  WHOA, WHOA, STOP.  OVERRULED.

12          **THE WITNESS:**  KIRAN'S --

13                   (SIMULTANEOUS COLLOQUY.)

14          **THE COURT:**  THERE'S NO QUESTION PENDING.

15          **MS. SIMERLY:**  THERE'S NO QUESTION.  IT'S OKAY.

16          NO FURTHER QUESTIONS, YOUR HONOR.

17          **MS. HARRIMAN:**  NO QUESTIONS, YOUR HONOR.

18          **THE COURT:**  THANK YOU.  YOU'RE EXCUSED.

19          NEXT?

20          **MS. SIMERLY:**  KELLY HARTSHORN, YOUR HONOR.  WE NEED

21   TO GO GRAB HER.

22          **THE COURT:**  GO AHEAD.

23                   (PAUSE IN THE PROCEEDINGS.)

24          **THE CLERK:**  BEFORE YOU HAVE A SEAT, LET ME HAVE YOU

25   RAISE YOUR RIGHT HAND -- BEFORE YOU HAVE -- STAND UP.  THANK

HARTSHORN - DIRECT / SIMERLY

1    UNDERSTANDING IS SHE WAS NOT SELECTED FOR THOSE JOBS BECAUSE OF

2    MAINLY LACK OF GAS EXPERIENCE AND NOT REALLY A GOOD FIT TO THE

3    JOBS.

4    Q.  ALL RIGHT.  NOW, WITH REFERENCE TO THE TECHNICAL JOBS IN

5    SAN RAMON --

6    A.  UM-HMM.

7    Q.  -- ULTIMATELY, WAS A JOB FOUND FOR HER IN SAN RAMON THAT FIT

8    HER PARTICULAR SKILLS AND ABILITIES?

9    A.  YEAH.  THE JOB -- ONE OF THE JOBS THAT SHE HAD AGREED TO --

10   TO POST FOR WAS A SOUTHERN AFRICA BUSINESS UNIT SUPPORT JOB

11   IN -- IN OUR BLOCK 14 ASSET, ANGOLA BLOCK 14 ASSET THAT SHE WAS

12   SELECTED FOR.

13   Q.  AND WAS THAT THE JOB THAT JACK DUNN WAS THE JOB -- WAS HE

14   THE JOB OWNER --

15   A.  YEAH.

16   Q.  -- OF THAT JOB?

17   A.  HE WOULD HAVE BEEN THE JOB OWNER OF THAT JOB, RIGHT.

18   Q.  WHY DON'T YOU JUST TELL THE JURY WHAT IS A JOB OWNER?  HOW

19   DO YOU OWN A JOB?

20   A.  SO THE JOB OWNER IS BASICALLY THE PERSON WHO IS RAISING THAT

21   JOB BECAUSE IT'S GOING TO BE WORKING IN THEIR GROUP, THEY'LL BE

22   RESPONSIBLE FOR THAT -- FOR THAT JOB.

23   Q.  IT'S ACTUALLY EXHIBIT 257 THAT DEALS WITH THE AUDIE SETTERS'

24   JOB --

25   A.  OKAY.

1  Q.  WE DON'T NEED TO GO THERE.  LET'S JUST MOVE ON.

2  A.  OKAY.

3  Q.  SO WHY DID YOU THINK THE BLOCK 14 POSITION UNDER JACK DUNN

4  IN SASBU WOULD BE A GOOD FIT FOR KIRAN PANDE?

5        MS. ANDERSON:  OBJECTION, FOUNDATION, YOUR HONOR.

6  AND ALSO LEADING.

7        THE COURT:  OVERRULED.  GO AHEAD.

8        THE WITNESS:  KIRAN HAD A LOT OF EXPERIENCE AND SHE

9  WAS PRETTY -- I WOULD SAY VERY WELL RESPECTED IN THE COMPANY FOR

10  HER RESERVOIR ENGINEERING SKILL SET.  SHE HAD A LOT OF

11  BACKGROUND IN A WATER FLOOD MANAGEMENT, WHICH IS WHERE WE TRY TO

12  PUT WATER IN THE GROUND TO HELP THE OIL COME OUT.  AND BASICALLY

13  SHE -- SHE HAD THE SKILLS TO RUN THE MODELS SO THAT WE CAN

14  UNDERSTAND HOW TO DEVELOP THIS OIL FIELD THAT WE WERE LOOKING AT

15  DEVELOPING.

16        THIS IS A PRETTY RARE SKILL SET IN THE COMPANY.  WE

17  DON'T -- WE STILL DON'T HAVE ENOUGH PEOPLE WHO DO THIS

18  PARTICULAR WORK.  IT'S KIND OF A

19  HIGH-END-TECHNICAL-EXPERTISE-TYPE AREA.  AND SO SHE BROUGHT ALL

20  THE SKILLS TO DO THIS PARTICULAR JOB, AND IT WAS A GOOD FIT AND

21  IT WAS AN IMPORTANT ASSET.

22  BY MS. SIMERLY:

23  Q.  AND WHEN YOU SAY, "IT WAS AN IMPORTANT ASSET," WHY DOES THAT

24  MATTER?

25  A.  WELL, OBVIOUSLY, WE -- WE HAVE PEOPLE WE TRY TO FIT THEM TO

1    JOBS THAT ARE GOING TO MAKE A DIFFERENCE TO THE COMPANY.  JUST

2    LIKE WE TALKED ABOUT TAHITI A MINUTE AGO, BLOCK 14 WAS -- IS A

3    BLOCK IN ANGOLA THAT WHERE WE HAD HAD NUMEROUS REALLY NICE

4    DISCOVERIES OF OIL AND GAS.

5         AND WE WERE GOING TO BE INVESTING A LOT OF MONEY TO

6    DEVELOP THESE SO THAT WE COULD START PRODUCING OIL AND GAS.  AND

7    THIS PARTICULAR FIELD, TOMBUA LANDANA, IS ONE THAT IS CURRENTLY

8    A $3.6 BILLION INVESTMENT PROJECT, SO IT WAS A BIG ONE.  AND WE

9    NEEDED PEOPLE WHO WERE GOOD PEOPLE TO TRY TO HELP US DEVELOP

10   HOW -- YOU KNOW, TRY TO HELP DEVELOP THE CONCEPT FOR HOW WE'D

11   GET THIS OIL AND GAS OUT OF THE GROUND.

12   Q.  AS A PDR LOOKING AT POSITIONS, WHY IS THAT THE LIKELY

13   CAPITAL INVESTMENT ON AN ASSET SOMETHING THAT -- THAT MATTERS?

14   WHAT DOES IT MATTER IF YOU'RE WORKING ON A 100-MILLION-DOLLAR

15   PROJECT OR A 3-BILLION-DOLLAR PROJECT?

16   A.  WELL, I THINK LIKE EVERYONE -- EVERYTHING ELSE, IT'S, YOU

17   KNOW, IT'S -- IT'S A CAREER CHALLENGE, YOU'RE WORKING ON

18   SOMETHING THAT'S GOING TO HAVE A LOT OF VISIBILITY.  YOU'LL BE

19   WORKING ON SOMETHING THAT -- THAT MAKES YOU TAKE PRIDE IN YOUR

20   WORK.  YOU'RE DEVELOPING SOMETHING -- ONE OF THE BETTER

21   PROJECTS.  YOU'RE GOING TO HAVE MORE RESOURCES ATTACHED TO IT.

22   SO THAT YOU'LL HAVE OPPORTUNITIES PROBABLY TO -- TO NOT ONLY

23   HAVE A STRONGER SKILL SET, BUT EVERYBODY ELSE IN THE COMPANY

24   HEARS ABOUT THESE PROJECTS, AND IT GOES ON YOUR RESUME LIKE --

25   RESUME AS VERY POSITIVE THING.

 1              LATER WHEN YOU'RE LOOKING FOR JOBS, IF YOU SAY, "OH,

 2    SHE WORKED" -- OR, YOU KNOW, OR, "HE WORKED," OR "I WORKED ON,"

 3    YOU KNOW, IF YOU'VE BEEN WORKING ON TOP-TIER PROJECTS, PEOPLE

 4    SAY, "WOW, THIS PERSON'S GOT" -- YOU KNOW, YOU'RE BUILDING A

 5    STRONGER RESUME.  SO IT'S ALWAYS ATTRACTIVE AND PEOPLE ALWAYS

 6 •  WANT TO WORK FOR THE EXCITING, BIG DYNAMIC PROJECTS.

 7    Q.  ALL RIGHT.  NOW, IF MS. PANDE HAD BEEN WILLING TO LOOK AT

 8    POSITIONS OUTSIDE OF SAN RAMON, WOULD THERE HAVE BEEN OTHER

 9    OPTIONS IN THE FALL 2002 PDC?

10    A.  YEAH.  WE BRING JOBS FROM ALL OVER THE WORLD.  AND WE HAVE

11    JOBS IN, YOU KNOW, PLACES THAT ARE HIGHLY FAVORED, JOBS IN

12    PLACES THAT ARE NOT SO HIGHLY FAVORED AND JOBS IN HOUSTON, LOTS

13    OF JOBS IN HOUSTON AND JOBS IN SAN RAMON.  SO WE HAVE -- BRING

14    THEM FROM ALL OVER.

15    Q.  HOW DOES TAHITI FIGURE IN WHETHER IT'S A FAVORED LOCATION?

16    PUTTING ASIDE THE FACT THAT IT WAS A BIG PROJECT, JUST IN TERMS

17    OF GEOGRAPHY, HOW DOES TAHITI STACK UP?

18    A.  WELL, IT'S HOUSTON, SO IT DEPENDS IF YOU LIKE HOUSTON OR

19    NOT.

20    Q.  OH.  I THOUGHT YOU MEANT THE JOB WAS IN TAHITI.

21    A.  NO, NO.  NO, NO, NO, NO.  NO.  THE JOB WAS HOUSTON.

22    TAHITI'S THE NAME OF THE FIELD.  SO A LOT OF PEOPLE DON'T LIKE

23    TO GO TO HOUSTON.  BUT HOUSTON IS A PRETTY FAVORED LOCATION,

24    IT'S HERE IN THE U.S. SO ...

25    Q.  ALL RIGHT.  OKAY.  NOW, DID YOU, IN FACT, OFFER MS. PANDE

HARTSHORN - DIRECT / SIMERLY

1    FOR THE CANDIDATE, AND THE WAY THAT'S GOING TO MAKE THE COMPANY

2    WORK MORE EFFICIENTLY.

3    Q.   FROM YOUR EXPERIENCE IN GENERAL OR -- ARE THERE AS MANY

4    CORPORATE PLANNING JOBS OPENING UP AT THESE PDC'S AS THERE ARE

5    TECHNICAL JOBS?

6    A.   OH, NO.  NO WAY.  THE CORPORATE PLANNING IS A SMALL STAFF.

7    BASICALLY IS KIND OF LIKE IN OUR -- IN OUR HEADQUARTERS.  AND SO

8    THESE ARE JOBS THAT ARE USUALLY HELD BY EITHER SENIOR OR VERY --

9    VERY HIGH POTENTIAL OR STRONG PERFORMERS.  BECAUSE IT'S LIKE

10   WORKING -- YOU KNOW, YOU'RE WORKING IN THE SAME OFFICE AS OUR

11   CHAIRMAN AND YOU'RE WORKING AT THE HIGHEST -- I WOULD SAY THE

12   HIGHEST-VISIBILITY-TYPE JOBS.

13            THESE ARE -- THESE ARE -- VISIBILITY, YOU KNOW, LIKE

14   ANYTHING, IF THE HIGH -- IF THE IMPORTANT PEOPLE IN THE COMPANY

15   SEE YOU WORKING AND YOU DO WELL, YOU OFTEN HAVE OTHER

16   OPPORTUNITIES OPEN UP.  THEY CAN PROVIDE RECOMMENDATIONS FOR

17   YOU.  IT'S JUST PART OF YOUR RESUME.  AGAIN, IT'S LIKE WORKING

18   IN THE WHITE HOUSE AS A -- AS A CLERK INSTEAD OF WORKING, YOU

19   KNOW, IN A LIBRARY AS A CLERK.  YOU HAVE A DIFFERENT VISIBILITY.

20   AND SO CORP PLANNING WERE FEW AND COVETED JOBS.

21   Q.   BUT WASN'T SHE IN A PLANNING JOB AT THE TIME WITH REX

22   MITCHELL?

23   A.   YES, ABSOLUTELY.  AND THOSE ARE ALSO COVETED JOBS.  BECAUSE

24   THAT'S THE HEADQUARTER OF OUR UPSTREAM UNIT AS OPPOSED TO OUR

25   CORPORATE PARENT COMPANY.  AND THOSE JOBS ARE ALSO RESERVED FOR

HARTSHORN - DIRECT / SIMERLY

1  PEOPLE WHO ARE CONSIDERED TO BE VERY STRONG PERFORMERS AND COME

2  IN FOR A YEAR OR TWO AND ARE VISIBLE BY OUR -- OUR UPSTREAM

3  INTERNATIONAL PRESIDENT AND SOME OF THE HIGH-LEVEL MANAGERS.

4  Q.  FROM YOUR EXPERIENCE AS A PDR, IS IT UNUSUAL FOR SOMEONE TO

5  COME FROM THE TECHNICAL SIDE, SERVE A COUPLE OF YEARS IN THE

6  PLANNING FUNCTION AND THEN GO BACK TO DO MORE TECHNICAL WORK?

7  A.  NO, THAT'S -- TYPICALLY THAT'S THE MOST TYPICAL CAREER PATH.

8  WE -- WE HAVE EXPERTS IN CERTAIN FUNCTIONS, BUT WE DON'T LIKE

9  THEM TO ONLY DO THAT THEIR WHOLE CAREER UNLESS THEY'RE GOING TO

10 BE LIKE IN RESEARCH OR IN THE TECHNICAL COMPANY.

11        WE NEED PEOPLE TO UNDERSTAND THE BUSINESS, TO GET A

12 LITTLE BIT OF THE BROADENING.  AND SO A PLANNING JOB IS -- IS A

13 VERY GOOD BROADENING JOB THAT WE ASK A LOT OF OUR STRONGER

14 EMPLOYEES TO -- TO COME THROUGH, THEY GET TO SEE THE BIGGER

15 BUSINESS AND THEN MOVE BACK INTO THEIR FUNCTION.

16 Q.  OKAY.  WE'RE TALKING AGAIN ABOUT THOSE CORPORATE PLANNING

17 JOBS, YOU TALKED ABOUT SOME JOBS HAVE MORE INTEREST BY -- AND

18 HAVE LARGER SLATES OF CANDIDATES THAN OTHER JOBS?

19 A.  RIGHT.

20 Q.  DO YOU HAVE AN UNDERSTANDING FROM YOUR EXPERIENCE AS A PDR

21 WHERE THE CORPORATE JOBS FALL IN TERMS OF THE LEVEL OF INTEREST

22 AND THE SIZE OF THE SLATE OF CANDIDATES AS COMPARED TO TECHNICAL

23 JOBS?

24 A.  YEAH.  IT DEPENDS ON THE YEAR AND THE TIMING.  BUT IN

25 GENERAL, IT'S A -- IT'S A VERY HIGHLY VISIBLE JOB.  IT WAS ALSO

HARTSHORN - DIRECT / SIMERLY

1    PDC, CORRECT?

2    A.   RIGHT.

3    Q.   AND THEN DID -- WAS THERE CONSIDERATION OF HER SALARY AFTER

4    SHE MOVED TO THIS NEW POSITION WITH JACK DUNN IN SASBU?

5    A.   WELL, OUR -- OUR SALARY CYCLE WHERE -- WE CALL OUR SALARY

6    ACTION IS AN ANNUAL PROCESS, AND THAT'S ALSO SEPARATE FROM THESE

7    KINDS OF JOBS.  SO THE PDC WAS TO GET THE JOB, AND THEN WE HAVE

8    AN ANNUAL SALARY CYCLE WHERE WE LOOKED AT INCREASES.  THERE WAS

9    FOLLOW-UP ON SALARY, BUT NOT ATTACHED TO -- TO THE JOB MOVEMENT.

10   Q.   OKAY.  WHEN WAS THIS FOLLOW-UP ON MS. PANDE'S SALARY IN THIS

11   NEW RESERVOIR SIMULATION ENGINEER POSITION?

12   A.   OUR SALARY CYCLE BASICALLY STARTS AT THE CLOSE OF THE YEAR.

13   SO BY THE END OF ONE YEAR, WE EVALUATE PERFORMANCE OF THE

14   EMPLOYEE OVER THE PAST YEAR.  SO OUR SALARY'S BASED ON JUST THE

15   PAST YEAR'S PERFORMANCE.  AND WE -- WE HAVE OUR PMP OR OUR

16   EVALUATION CYCLES, AND WE ESTABLISH WHAT KIND OF PERFORMANCE

17   RANKING A PERSON HAS.  AND WE DETERMINE WHAT KIND OF SALARY,

18   THEN, THEY WILL GET.  AND THAT ALL HAS TO HAPPEN IN THE FIRST --

19   SORT OF JANUARY/FEBRUARY TIME FRAME, AND THEN APRIL 1ST IS WHEN

20   THE SALARIES ARE PRESENTED TO THE EMPLOYEES.

21   Q.   OKAY.  WHAT IF THE SUPERVISOR HASN'T ACTUALLY MET WITH THE

22   EMPLOYEE TO GO THROUGH THE PMP PROCESS?

23            HOW DO -- HOW CAN YOU DO THE SALARY RANKING IF THE

24   RANKING HASN'T BEEN GIVEN TO THE EMPLOYEE AS PART OF THE PMP?

25   A.   WELL, THE -- THE DIALOGUE WITH THE EMPLOYEE IS ABOUT HOW

1    THEY CONDUCTED THEIR -- THEIR JOB OVER THE PAST YEAR, AND THAT'S

2    A CLOSEOUT WE HAVE TO DO EVERY YEAR.  IT USUALLY TAKES MULTIPLE

3    STEPS.  YOU HAVE A DIALOGUE AND -- AND AT SOME POINT, IT GETS

4    CLOSED OUT AND SIGNED OFF AND SENT TO OUR HR FILES.

5         THE SALARY ACTION IS NOT DISCUSSED WITH THE EMPLOYEE.

6    WHAT HAPPENS IS WE MEET, AS SUPERVISORS OR MANAGERS OF THE WORK

7    GROUP, AND TALK ABOUT ALL OF OUR EMPLOYEES, WHAT THEIR RANKING

8    WAS FROM THE SUPERVISORS' PERSPECTIVE.  AND WE LOOK AT HOW WE

9    WOULD -- WHAT THE RECOMMENDATION IS FOR -- FOR THE SALARY

10   ACTION.  AND THEN THAT'S -- THAT CLOSES OUT WITH THE SALARY

11   PROGRAM FOR THE YEAR.

12   Q.  OKAY.  WERE YOU INVOLVED IN THE SALARY DISCUSSIONS

13   SURROUNDING KIRAN PANDE IN THE -- EARLY 2003 AFTER SHE JOINED

14   JACK DUNN'S GROUP AT THE END OF 2002?

15   A.  YEAH.  WHAT HAPPENED THERE IS -- IS IT'S -- USUALLY IF A JOB

16   MOVE FROM ONE GROUP TO ANOTHER IS MADE IN THE MIDDLE OF THE

17   YEAR, I WOULD NEVER HAVE ANY REASON TO GET INVOLVED.  AND IN

18   THIS CASE, BECAUSE SHE MOVED TO A NEW JOB AT THE VERY END OF THE

19   YEAR, SO SHE CLOSED OUT HER PERFORMANCE WITH REX, BUT THEN SHE

20   WAS -- THE SALARY PROGRAM WAS BEING ADMINISTERED BY HER NEW JOB

21   OWNER, WHO WAS JACK AND SOUTHERN AFRICA.

22        AND SO BECAUSE IT'S BASED ON LAST YEAR'S PERFORMANCE,

23   BASICALLY THERE'S A RECOMMENDATION FROM THE OLD GROUP, AND THE

24   NEW GROUP IMPLEMENTS IT.  SO I WAS KIND OF A GO-BETWEEN JUST

25   BECAUSE OF THE TIMING OF WHEN SHE MADE THE JOB MOVE.

1  **Q.**   OKAY.  SO WERE YOU -- DID YOU ACTUALLY HAVE DISCUSSIONS WITH

2  REX MITCHELL ABOUT KIRAN PANDE'S SALARY, WHAT WOULD HAPPEN TO

3  IT, IN THE SPRING OF 2003?

4  **A.**   YEAH, I -- I THINK WHAT HAPPENED WHAT I RECOLLECT IS JACK

5  WAS LOOKING FOR A RECOMMENDATION, WHICH IS OUR STANDARD PROCESS

6  FOR WHAT -- WHAT THE SALARY RECOMMENDATION WOULD BE FOR KIRAN

7  FROM HER PRIOR YEAR'S PERFORMANCE.

8         AND I SPOKE TO REX ABOUT WHAT THE RECOMMENDATION WAS,

9  WHAT THEY HAD COME UP WITH.  AND HE BASICALLY SAID, JUST -- YOU

10  KNOW, SHE'S -- SHE'S A 2 RANK PERFORMER, AND YOU -- YOU PLEASE

11  HANDLE THAT.

12  **Q.**   OKAY.  SO -- AND IN TERMS OF SALARIES AND WHAT HAPPENS TO

13  SOMEONE'S SALARY FROM YEAR TO YEAR AT CHEVRON IN THIS TIME

14  FRAME, OBVIOUSLY, MS. HARTSHORN, ARE THERE MORE THAN ONE ASPECT

15  TO SALARY INCREASES FOR AN EMPLOYEE SUCH AS MS. PANDE?

16  **A.**   WELL, FOR EVERYONE.  WE HAVE -- WE HAVE A SALARY STRUCTURE

17  THAT'S DIVIDED INTO TWO PIECES.  ONE IS WHAT WE CALL STRUCTURE,

18  WHICH IS ESSENTIALLY -- THEY DO SALARY SURVEYS AROUND THE

19  INDUSTRY AND TRY TO SEE WHAT DO RESERVOIR ENGINEERS GET PAID,

20  WHAT DO GEOLOGISTS GET PAID, WHAT'S A COMPETITIVE SALARY FOR

21  THIS EXPERTISE AND THIS LEVEL PERSON AND COST OF LIVING AND

22  OTHER FACTORS.  THAT'S CALLED THE STRUCTURE, AND IT'S KIND OF

23  LIKE A BASE RAISE THAT MOST PEOPLE WOULD GET.  SOME YEARS, IT'S

24  BIG; SOME YEARS, IT'S VERY SMALL, DEPENDS ON THE COMPETITIVE

25  OUTLOOK EXTERNALLY.

LADD - DIRECT / MILLER

1    A.   GOOD AFTERNOON.

2    Q.   VERY SHORT.  FEW QUESTIONS.

3            YOU WERE ON A SELECTION COMMITTEE FOR A JOB THAT WAS

4    CALLED THE INTERNATIONAL BUSINESS UNIT MANAGER IN THE FALL OF

5    2003.

6            DO YOU REMEMBER THAT SELECTION?

7    A.   YES.  YES, I DO.

8    Q.   AND TELL ME A LITTLE BIT ABOUT THIS POSITION.  WAS THIS A

9    NEW POSITION, OR WERE YOU LOOKING TO FILL A POSITION 'CAUSE

10   SOMEBODY HAD MOVED ON?

11   A.   IT WAS A NEW POSITION.  THE COMPANY EMC, THE ENVIRONMENT

12   MANAGEMENT COMPANY, HAD BEEN WORKING IN THE UNITED STATES ONLY,

13   AND WE WERE LOOKING TO EXPAND OUR SERVICES TO OTHER CHEVRON

14   COMPANIES AND THROUGHOUT THE WORLD.  SO WE'RE AN INTERNAL

15   SERVICE COMPANY.

16   Q.   OKAY.  DO YOU WANT TO PULL THE MIKE A LITTLE CLOSER?  THE

17   COURT REPORTER IS HAVING A LITTLE DIFFICULTY.

18            OKAY.  THIS WAS A NEW POSITION, RIGHT?

19   A.   IT WAS A NEW POSITION, CORRECT.

20   Q.   AND WHAT WAS THE POSITION GOING TO DO?  WHAT WAS THE PURPOSE

21   OF THE POSITION OR THE DUTIES OF THE POSITION?

22   A.   WELL, INITIALLY, THE PRIMARY DUTIES OF THE POSITION WERE TO

23   DEVELOP THE BUSINESS TO UNDER -- TO WORK WITH THE OPERATING

24   COMPANIES IN CHEVRON TO UNDERSTAND HOW WE COULD TAKE THE

25   SERVICES WE PROVIDED INTERNAL TO THE UNITED STATES TO THOSE THAT

LADD - DIRECT / MILLER

1    OPERATED OUTSIDE OF THE UNITED STATES.  SO IT'S WHAT I WOULD

2    CALL BUSINESS DEVELOPMENT.

3    Q.  OKAY.  AND I ACTUALLY DIDN'T ASK YOU, DO YOU KNOW KIRAN

4    PANDE?

5    A.  I'M NOT SURE I DO.  I DON'T BELIEVE I'VE MET HER BEFORE.

6    Q.  OKAY.  AND ON YOUR SELECTION COMMITTEE, HOW MANY OTHER

7    PEOPLE WERE ON THE COMMITTEE?

8    A.  FOUR OR FIVE.

9    Q.  ALL RIGHT.  AND FOR THIS PARTICULAR SELECTION, IT WAS A NEW

10   POSITION.  WERE THERE A NUMBER OF CANDIDATES?

11   A.  I THINK WE HAD FIVE OR SIX.  I DON'T REMEMBER THE EXACT

12   NUMBER.

13   Q.  WAS THAT --

14   A.  WE POSTED IT INTERNAL TO CHEVRON SO WE ONLY HAD CHEVRON

15   EMPLOYEES APPLY.

16   Q.  OKAY.  THAT IS THE FIVE OR SIX WERE ON THE SHORT LIST, OR

17   WERE THERE MORE THAT APPLIED THAT YOU CULLED OUT?

18   A.  YOU KNOW, I ONLY REMEMBER FIVE OR SIX.

19   Q.  OKAY.  DO YOU REMEMBER THAT MS. PANDE WAS ONE OF THE

20   INDIVIDUALS THAT WAS -- THAT WERE -- HAD POSTED AND WAS

21   CONSIDERED FOR THIS JOB?

22   A.  YES, I DO.

23   Q.  OKAY.  DO YOU REMEMBER ANY OF OTHER INDIVIDUALS WHO POSTED

24   AND WERE CONSIDERED FOR THE JOB?

25   A.  WELL, I REMEMBER THE PERSON THAT WAS SELECTED THAT WAS ALEX

LADD - DIRECT / MILLER

1    YOON.  AND I REMEMBER ONE OF THE OTHER CANDIDATES, BOB NOCCO,

2    AND I REMEMBERED -- SO THOSE ARE THE OTHER TWO I REMEMBER.

3    Q.   OKAY.  AND WHAT WAS YOUR RESPONSIBILITY IN TERMS OF

4    MS. PANDE'S APPLICATION FOR THE JOB?

5    A.   WELL, THE SELECTION TEAM MET ONCE, AND WE AGREED THAT WE

6    WOULD CHECK THE REFERENCES OF ALL THE CANDIDATES, AND I HAD -- I

7    AGREED TO CHECK MS. PANDE'S REFERENCES FOR THE TEAM AND THEN

8    BRING THAT BACK TO THE TEAM.  SO WE DIVIDED UP CHECKING THE

9    REFERENCES.

10   Q.   AND DO YOU REMEMBER WHO ANY OF THOSE REFERENCES WERE?

11   A.   WELL, I REMEMBER DON PAUL AND PETER ROBERTSON, AND -- THOSE

12   ARE PROBABLY THE MOST MEMORABLE.  THE VICE CHAIRMAN OF THE

13   COMPANY AND HEAD OF THE TECHNOLOGY COMPANY, SO VERY SENIOR

14   PEOPLE.

15   Q.   AND I KNOW THAT THERE'S BEEN EVIDENCE THAT YOU ACTUALLY SENT

16   AN EMAIL TO MR. PAUL, CORRECT?

17   A.   THAT'S CORRECT.

18   Q.   DID YOU ALSO SEND AN EMAIL TO ANY OF THE OTHER REFERENCES?

19   A.   I BELIEVE I SENT AN EMAIL TO EVERY ONE OF THE REFERENCES

20   BEFORE I CALLED.

21   Q.   AND DID YOU ALSO CHECK WITH MS. PANDE'S CURRENT SUPERVISOR,

22   JACK DUNN?

23   A.   I BELIEVE I DID, YES.

24   Q.   OKAY.  DO YOU KNOW JACK DUNN?

25   A.   WE'VE MET BEFORE.  I DON'T KNOW HIM WELL.

LADD - DIRECT / MILLER

1    Q.   OKAY.

2              AND WHAT -- WHEN YOU'RE LOOKING AT THESE THREE,

3    MS. PANDE, MR. NOCCO AND MR. YOON, AND WHAT WERE THE -- WERE

4    THEY ALL GOOD CANDIDATES?  WERE THEY ALL QUALIFIED CANDIDATES?

5    A.   WHAT I REMEMBER WAS THEY WERE ALL THREE STRONG CANDIDATES,

6    AND THE SELECTION TEAM REALLY SPENT TIME FOCUSING ON THOSE THREE

7    OF ALL OF THE CANDIDATES AND TRYING TO DECIDE WHICH OF THE THREE

8    WOULD BE THE BEST FOR THE JOB.

9    Q.   OKAY.  AND, ULTIMATELY, WHO WAS ACTUALLY SELECTED?

10   A.   ALEX YOON WAS ACTUALLY -- WAS SELECTED FOR THE JOB.

11   Q.   AND WHAT -- I GUESS WHAT WAS THE -- WAS THE TIPPING POINT,

12   THE FACTORS THAT GAVE THE JOB TO ALEX YOON AS OPPOSED TO

13   MS. PANDE OR MR. NOCCO?

14   A.   I GUESS THE -- THE DECIDING FACTORS WERE THAT ALEX HAD

15   EXPERIENCE IN BUSINESS DEVELOPMENT.  HE HAD WORKED IN OUR

16   TECHNOLOGY MARKETING GROUP THAT LICENSED REFINERY TECHNOLOGY

17   WORLDWIDE SO HE HAD EXTENSIVE OR EXPERIENCE IN MARKETING.  AND

18   SO THAT WAS ONE.  HE ALSO HAD LIVED INTERNATIONALLY, HAD WORKED

19   IN THE DOWNSTREAM PART OF THE COMPANY, SO THAT'S REFINING,

20   MARKETING.  AND WE THOUGHT THAT'S WHERE THE FIRST BUSINESS

21   BREAKTHROUGHS WOULD BE.  SO HIS DOWNSTREAM EXPERIENCE WAS A

22   PLUS, AS WELL AS HIS MARKETING EXPERIENCE.

23   Q.   OKAY.  AND IN CHECKING WITH MS. PANDE'S REFERENCES AND EVEN

24   SPEAKING TO MR. DUNN, DID ANYBODY TELL YOU ANYTHING ABOUT

25   MS. PANDE THAT NEGATIVELY IMPACTED HER APPLICATION?

LADD - DIRECT / MILLER

1    A.    NO.  AS I REMEMBER, SHE HAD VERY POSITIVE REFERENCES, AND

2    THAT'S WHAT LED TO HER BEING ONE OF THE FINAL THREE WE WERE

3    DISCUSSING IN THE SELECTION PROCESS.

4    Q.    AND DO YOU RECALL WHAT WAS THE -- I GUESS, THE PAY GRADE FOR

5    THIS NEW POSITION?

6    A.    THE NEW POSITION WAS A PAY GRADE 25.

7    Q.    AND WHAT WAS MR. YOON'S PAY GRADE WHEN HE APPLIED?

8    A.    I BELIEVE MR. YOON WAS A 25 AT THE TIME.

9    Q.    OKAY.

10            **MS. MILLER:**  I HAVE NO FURTHER QUESTIONS.

11            **THE COURT:**  CROSS-EXAMINATION.

12                    **CROSS-EXAMINATION**

13    BY MS. ANDERSON:

14    Q.    VERY BRIEFLY, SIR.

15    A.    OKAY.

16    Q.    JUST GET MY BINDERS.

17                    (PAUSE IN THE PROCEEDINGS.)

18    BY MS. ANDERSON:

19    Q.    MR. LADD, GOOD AFTERNOON.

20    A.    GOOD AFTERNOON.

21    Q.    YOU TESTIFIED THAT ONE OF THE INDIVIDUALS YOU CONTACTED FOR

22    A REFERENCE FOR MS. PANDE WAS MR. DON PAUL.  DO YOU REMEMBER

23    THAT?

24    A.    THAT'S CORRECT.

25    Q.    CANDI, CAN YOU PUT UP EXHIBIT 56, PLEASE, WHICH I UNDERSTAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

KIRAN PANDE,                     )
                                 )     **JURY TRIAL** COPY
          PLAINTIFF,             )
                                 )
  VS.                            )     NO. C 04-5107JCS
                                 )
CHEVRON CORPORATION (F/K/A       )
CHEVRONTEXACO CORPORATION)       )     **VOLUME 8**
EXPLORATION & PRODUCTION         )     **PAGES 1442 - 1602**
(F/K/A CHEVRONTEXACO             )
OVERSEAS PETROLEUM), A           )
DIVISION OF CHEVRON U.S.A.       )
INC.,                            )     SAN FRANCISCO, CALIFORNIA
                                 )     MONDAY, OCTOBER 22, 2007
          DEFENDANTS.            )
_____  )


### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF:          KEKER & VAN NEST
                        710 SANSOME STREET
                        SAN FRANCISCO, CALIFORNIA  94111-1704
                   BY:  CHRISTA M. ANDERSON,
                        SUSAN J. HARRIMAN, ATTORNEYS AT LAW




FOR DEFENDANTS:         MILLER LAW GROUP, PC
                        500 SANSOME STREET, SUITE 400
                        SAN FRANCISCO, CALIFORNIA  94111
                   BY:  LISA HAMASAKI,
                        MICHELE BALLARD MILLER
                        JANINE S. SIMERLY, ATTORNEYS AT LAW




REPORTED BY:            DIANE SKILLMAN, CSR NO. 4909
                        KATHY WYATT, CSR NO. 9866

### CERTIFICATE OF REPORTER

WE, DIANE E. SKILLMAN AND KATHY WYATT, OFFICIAL COURT
REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF
CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN
C-04-5107 JCS, PANDE V. CHEVRON CORPORATION, ET AL., PAGES 1442
THROUGH 1602, WERE REPORTED BY US, CERTIFIED SHORTHAND
REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION
INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND
TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF
FILING.

THE VALIDITY OF THE REPORTERS' CERTIFICATION OF
SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL
FROM THE COURT FILE.

_____

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

_____

KATHY WYATT, CSR 9866, RMR

MITCHELL – DIRECT / MS. HARRIMAN

```
 1                         DIRECT EXAMINATION

 2    BY MS. HARRIMAN:

 3    Q.    GOOD MORNING, MR. MITCHELL.

 4    A.    GOOD MORNING.

 5    Q.    LET'S SEE.  YOU TESTIFIED LAST WEEK THAT DAN WALLEM AND

 6    HARRY LEOPANDO RECEIVED RANKINGS OF 2, CORRECT?

 7    A.    THAT'S CORRECT.

 8    Q.    AND THAT WAS WRONG, WASN'T IT?

 9    A.    YES.

10    Q.    AND IF YOU LOOK AT EXHIBIT 104 THAT YOU HAVE BEFORE YOU?

11    A.    YES.

12    Q.    IS THAT THE RANKING OF MR. WALLEM?

13    A.    YES, IT IS.

14    Q.    AND IT SHOWS THAT HE HAD A RANKING OF 1?

15    A.    THAT'S CORRECT.

16            MS. HARRIMAN:  YOUR HONOR, I MOVE EXHIBIT 104 INTO

17    EVIDENCE?

18            MS. SIMERLY:  NO OBJECTION, YOUR HONOR.

19            THE COURT:  IT IS ADMITTED.

20                    (PLAINTIFF'S EXHIBIT 104 RECEIVED IN

21                     EVIDENCE)

22    BY MS. HARRIMAN:

23    Q.    AND DAN WALLEM WAS A CHEVRON LEGACY EMPLOYEE, WASN'T HE?

24    A.    THAT'S CORRECT.

25    Q.    LET'S MAKE A LIST.
```

MITCHELL - DIRECT / MS. HARRIMAN

1    RIGHT?

2    **A.**    THAT'S CORRECT.

3            **MS. HARRIMAN:**  YOUR HONOR, I MOVE EXHIBIT 107 INTO

4    EVIDENCE.

5            **MS. SIMERLY:**  NO OBJECTION, YOUR HONOR.

6            **THE COURT:**  IT IS ADMITTED.

7                    (PLAINTIFF'S EXHIBIT 107 RECEIVED IN

8                    EVIDENCE)

9    **BY MS. HARRIMAN:**

10   **Q.**    AND WHAT WAS IRIS OWENS' RANKING?

11   **A.**    EXCEPTIONAL.

12   **Q.**    OR A 1, CORRECT?

13   **A.**    YES.

14   **Q.**    AND WOULD YOU LOOK AT EXHIBIT 108?

15            IS THAT THE RANKING FOR HARRY LEOPANDO (PHONETIC)?

16   **A.**    YES, IT IS.

17   **Q.**    WHO IS HARRY LEOPANDO, MR. MITCHELL?

18   **A.**    HARRY WAS AN ADMINISTRATIVE ASSISTANT THAT JOINED MY GROUP

19   IN LATE 2001.

20   **Q.**    LAST WEEK YOU TALKED ABOUT OR ERASMUS LEOPOLDO.  IS THAT

21   THE SAME PERSON AS HARRY LEOPANDO?

22   **A.**    YEAH.  HIS FORMAL NAME IS ERASMUS.  I HAD HIS LAST NAME

23   WRONG.  IT'S LEOPANDO RATHER THAN LEOPOLDO.

24   **Q.**    AND YOU ALSO TOLD US THAT HE RECEIVED A 2 RANKING, DIDN'T

25   YOU?

MITCHELL – DIRECT / MS. HARRIMAN

1   **A.**   THAT WAS MY RECOLLECTION, YES.

2   **Q.**   LOOKING AT EXHIBIT 108, WHAT RANKING DID MR. LEOPANDO

3   RECEIVE?

4   **A.**   HIS FORMER SUPERVISOR RATED HIM A 1.

5          **MS. HARRIMAN:**  YOUR HONOR, I WOULD MOVE EXHIBIT 108

6   INTO EVIDENCE.

7          **THE COURT:**  IT IS ADMITTED.

8              (PLAINTIFF'S EXHIBIT 108 RECEIVED IN

9              EVIDENCE)

10  **BY MS. HARRIMAN:**

11  **Q.**   AND MR. LEOPANDO ALSO GOT A 1.

12          WAS HE A CHEVRON LEGACY EMPLOYEE?

13  **A.**   YES, HE WAS.

14  **Q.**   WOULD YOU TAKE A LOOK AT EXHIBIT 109, PLEASE?

15          IS THAT THE RANKING FOR ROBERT JOHN?

16  **A.**   YES, IT IS.

17          **MS. HARRIMAN:**  YOUR HONOR, I MOVE EXHIBIT 109 INTO

18  EVIDENCE.

19          **MS. SIMERLY:**  NO OBJECTION, YOUR HONOR.

20          **THE COURT:**  IT IS ADMITTED.

21              (PLAINTIFF'S EXHIBIT 109 RECEIVED IN

22              EVIDENCE)

23  **BY MS. HARRIMAN:**

24  **Q.**   WAS MR. JOHN ALSO A CHEVRON LEGACY EMPLOYEE?

25  **A.**   YES.

MITCHELL - CROSS / MS. SIMERLY

1           WHAT'S THE DATE ON EXHIBIT 106?

2    **A.**    IT'S DATED MARCH 12TH, 2002.

3    **Q.**    AND TAKE A LOOK AT IRIS OWENS' PMP.  COULD YOU TELL ME THE

4    DATE OF THAT?

5    **A.**    MARCH 5TH, 2002.

6    **Q.**    NOW, THE DATE ON THE PMP, IS THAT THE DATE AFTER THE

7    MEETINGS OCCUR AND THE SUPERVISOR AND THE EMPLOYEE MEET AND

8    THEY -- THE WHOLE FORM IS COMPLETED?

9    **A.**    THAT'S CORRECT.

10   **Q.**    OKAY.

11           SO COULD YOU EXPLAIN FOR ME OR TO THE JURY, PLEASE,

12   WHEN WAS IT THAT YOU DECIDED TO GIVE ALL OF THESE PEOPLE 1'S,

13   EXCEPT FOR VICKI THOMPSON AND KIRAN PANDE?

14   **A.**    OUR RANKINGS NEEDED TO BE IN TIME FOR OUR SALARY

15   DETERMINATION PROCESS, WHICH IS ESSENTIALLY RIGHT AROUND THE

16   1ST OF MARCH.  SO, THE 1ST OF MARCH, I HAD TO HAVE ALL MY

17   RANKINGS AND PAY DETERMINATION NUMBERS IN FOR MY STAFF.

18           SO AS OF THE 1ST OF MARCH, I HAD TO HAVE ALL OF

19   THESE RANKINGS INTO THE SYSTEM.

20   **Q.**    YOU HAD TO, BUT DID YOU IN THIS CASE?

21           IN OTHER WORDS, IN THE FEBRUARY 2002 TIME FRAME, DID

22   YOU ASSIGN RANKINGS TO EACH AND EVERY ONE OF YOUR EMPLOYEES?

23   **A.**    YES, I DID.

24   **Q.**    AND THAT WOULD INCLUDE DAN WALLEM, BRIAN PUTT, MATT

25   PALMER, KEMAL ANBARCI, IRIS OWENS, HARRY LEOPANDO, ROBERT JOHN,

1  KEVIN CONNELLY, VICKI THOMPSON AND KIRAN PANDE; IS THAT

2  CORRECT?

3  **A.**    THAT'S CORRECT.

4  **Q.**    WAS KIRAN PANDE'S NOT DONE BY MARCH 1ST?

5  **A.**    NO, IT WASN'T.

6  **Q.**    IT WAS DONE BY MARCH 1ST?

7  **A.**    NO, IT WAS NOT DONE MARCH 1ST.  IT WASN'T UNTIL THE END OF

8  APRIL THAT KIRAN HAD SUBMITTED HER PMP FORM TO ME.

9  **Q.**    THE RATING, HAD YOU DECIDED THE RATING BY MARCH 1ST OR DID

10  YOU DELAY UNTIL YOU MET WITH KIRAN PANDE?

11  **A.**    NO, I COULDN'T DELAY.  THE RATINGS AND THE PAY NUMBERS HAD

12  TO BE INTO THE SYSTEM BY THE 1ST OF MARCH.  SO AS OF THE 1ST OF

13  MARCH, I HAD THE RANKINGS DETERMINED FOR ALL OF MY STAFF.

14  **Q.**    SO ALTHOUGH YOU HADN'T MET WITH MS. PANDE AND SHARED IT,

15  THE DECISION, HAD THAT ALREADY BEEN MADE?

16  **A.**    YES.

17  **Q.**    HER RANKING?

18  **A.**    YES, IT WAS.

19  **Q.**    AND BY MARCH 1ST, WHEN THAT DECISION WAS MADE, DID YOU

20  KNOW ANYTHING ABOUT MS. PANDE HAVING MADE ANY KIND OF COMPLAINT

21  ABOUT YOU TO REX MITCHELL -- TO JAY JOHNSON?

22  **A.**    NO, I DIDN'T.

23  **Q.**    WHEN YOU TESTIFIED BEFORE ABOUT HAVING GIVEN DAN WALLEM A

24  2 RATHER THAN A 1 --

25  **A.**    YES.

MITCHELL - CROSS / MS. SIMERLY

1    Q.    -- DID YOU HAVE THE DOCUMENT IN FRONT OF YOU --

2    A.    NO, I DIDN'T.  I WAS JUST GOING FROM MEMORY.

3    Q.    AND HAVING GONE BACK AND REVIEWED IT, DO YOU HAVE AN

4    EXPLANATION FOR WHY YOU THOUGHT YOU HAD GIVEN HIM A 2 WHEN, IN

5    FACT, YOU HAD GIVEN HIM A 1?

6    A.    YEAH, I BELIEVE SO.  I HAD DAN WALLEM AS A STAFF MEMBER

7    SINCE 1998, FOR THE TWO PRECEDING YEARS.  DAN HAD GOTTEN A 2 IN

8    HIS PMP AND I THOUGHT THAT FOR CALENDAR YEAR 2001 THAT I ALSO

9    HAD GIVEN HIM A 2.

10          AFTER REFRESHING MY MEMORY AND LOOKING AT HIS PMP

11   FORM, I REALIZED I ACTUALLY -- HE WAS AWARDED A 1 FOR 2001.

12   Q.    AND HAVING REVIEWED THAT PMP, DO YOU BELIEVE THAT THAT WAS

13   A JUSTIFIED RANKING, THE EXCEPTIONAL 1 RATING FOR DAN WALLEM?

14   A.    YES, I DO.  DAN WAS HANDLING A NEW PROCESS FOR CHEVRON

15   THAT THE CHAIRMAN HAD IMPLEMENTED IN 2001, AND IT HAD A LOT OF

16   HIGH PROFILE WORK AND EXPOSURE TO OUR SENIOR LEVEL EXECUTIVES

17   CALLED THE BUSINESS PERFORMANCE REVIEW PROCESS.  DAN, BECAUSE

18   OF THE OTHER STAFF MEMBERS WERE COMMITTED TO THE MERGER

19   ACTIVITY, DAN HAD TO ESSENTIALLY COORDINATE ALL OF THAT WORK

20   HIMSELF ON BEHALF OF THE PLANNING TEAM.

21   Q.    NOW, IN FACT, ARE THERE OTHER PEOPLE WHO WERE SLOTTED IN

22   AS 2'S FOR SALARY PURPOSES EVEN THOUGH THEY MAY HAVE GOTTEN 1

23   RANKINGS ON THEIR PMP'S?

24   A.    YES.

25   Q.    HOW COULD THAT WORK?

1          I THINK INITIALLY, I DETERMINED THAT MS. PANDE WAS

2    EXTREMELY QUALIFIED AND ABLE TO BE VERY COMPETITIVE IN TERMS OF

3    SEARCHING FOR WORK AS EITHER A RESERVOIR OR RESERVOIR

4    SIMULATION ENGINEER.

5          **MS. ANDERSON:**  OBJECTION, YOUR HONOR, AGAIN.  MOVE

6    TO STRIKE.  THIS IS NOT WITHIN THE EXPERT'S REPORT, VIOLATION

7    OF FEDERAL RULES.

8          **MS. SIMERLY:**  YOUR HONOR, IT'S THE FIRST OPINION IN

9    HIS REPORT.  IT'S LIST ORDER PAGE 2.

10          I DON'T KNOW WHAT --

11          **THE COURT:**  GIVE ME THE REPORT.

12          **MS. ANDERSON:**  EXHIBIT 308.

13          **THE COURT:**  OVERRULED.

14          CONTINUE.

15   **BY MS. SIMERLY:**

16   **Q.**   DESCRIBING YOUR FIRST OPINION WAS MS. PANDE WAS AN

17   EXCELLENT CANDIDATE FOR EMPLOYMENT AS A PETROLEUM ENGINEER IN

18   THE SUMMER OF 2004?

19   **A.**   YES.

20   **Q.**   AND DID YOU FORM AN OPINION AS TO WHETHER SHE WAS

21   QUALIFIED TO FIND EMPLOYMENT IN THAT AREA, PETROLEUM

22   ENGINEERING, RESERVOIR SIMULATION ENGINEERING?

23   **A.**   YES.

24   **Q.**   WHAT WAS THAT OPINION, SIR?

25   **A.**   THAT SHE CLEARLY IS VERY QUALIFIED GIVEN HER EDUCATION,

1    HER EXPERIENCE, HER DESCRIPTION OF -- HER OWN DESCRIPTION OF

2    HER SKILL SET AND EXPERTISE.  THE FACT SHE DESCRIBES HERSELF AS

3    AN INDUSTRY-WIDE EXPERT.  I FOUND HER, BASED ON THAT

4    INFORMATION ALONE, PLUS HER WORK EXPERIENCE, TO BE EXTREMELY

5    QUALIFIED.

6    **Q.**    WHAT ABOUT THE FACT THAT SHE HAD PH.D. IN PETROLEUM

7    ENGINEERING, WAS THAT SOMETHING THAT WAS SIGNIFICANT TO YOU?

8    **A.**    OH, SURE.  I MEAN THE COMBINATION OF HER BACHELOR'S DEGREE

9    IN CHEMICAL ENGINEERING, HER MASTER'S AND PH.D. IN PETROLEUM

10   ENGINEERING, AND HER MBA FROM BERKELEY, I THOUGHT MADE HER

11   EXTREMELY COMPETITIVE.

12           **MS. ANDERSON:**  OBJECTION, YOUR HONOR, MOVE TO STRIKE

13   AGAIN.  THAT IS NOT WITHIN THE EXPERT'S REPORT.

14           **THE COURT:**  IT'S DENIED.

15   **BY MS. SIMERLY:**

16   **Q.**    SECOND -- NEXT QUESTION, MR. O'BRIEN, DID YOU -- WERE YOU

17   ASKED TO FORM AN OPINION ABOUT THE LABOR MARKET IN THE AREA OF

18   PETROLEUM ENGINEERING AND RESERVOIR SIMULATION ENGINEERING

19   SINCE THE SUMMER OF 2004 THROUGH THE DATE OF YOUR REPORT, WHICH

20   WAS, I BELIEVE, APRIL 9TH, 2007.

21   **A.**    YES, I DID.

22   **Q.**    DID YOU FORM AN OPINION ABOUT THE LABOR MARKET IN THE AREA

23   OF PETROLEUM ENGINEERING AND RESERVOIR SIMULATION ENGINEERING

24   SINCE THE SUMMER OF 2004 TO THE DATE OF YOUR REPORT, APRIL OF

25   2007?

O'BRIEN - DIRECT / MS. SIMERLY

1    **A.**    YES.

2    **Q.**    AND WHAT WAS THAT OPINION, SIR?

3    **A.**    BASED ON MY CONTACT WITH THE RECRUITER AND THE INFORMATION

4    I REVIEWED, I FOUND THE LABOR MARKET TO BE EXCELLENT.

5    **Q.**    ALL RIGHT.

6              AND SO, I MEAN, GIVE THE JURY AN UNDERSTANDING,

7    PLEASE, OF WHAT YOU MEAN WHEN YOU SAY THE LABOR MARKET WAS

8    EXCELLENT?

9              **MS. ANDERSON:**    OBJECTION, YOUR HONOR.

10             **THE COURT:**    OVERRULED.

11             **THE WITNESS:**    WELL, IT -- IN TERMS OF -- FIRST OF

12   ALL, IN TERMS OF LOOKING AT, THEY'RE CONSIDERING THE

13   INFORMATION PROVIDED TO ME BY MR. DARROH OF PIPER MORGAN, HE

14   INDICATED THAT NUMEROUS JOBS THAT HAD HE FILLED THROUGH HIS

15   RECRUITING AGENCY DURING THAT TIME PERIOD.

16             AND THEN ADDITIONALLY, I DID A BRIEF SEARCH PRIOR

17   TO, FOR THE TIME PERIOD IMMEDIATELY PRIOR TO THE DATE OF MY

18   REPORT, AND IN THAT SHORT OF TIME PERIOD, I FOUND, I BELIEVE,

19   APPROXIMATELY 20 POSITIONS FOR RESERVOIR ENGINEERS AND

20   RESERVOIR SIMULATION ENGINEERS IN A VARIETY OF LOCATIONS

21   THROUGHOUT THE U.S. AS WELL AS WORLDWIDE.

22             **MS. ANDERSON:**    OBJECTION --

23   **BY MS. SIMERLY:**

24   **Q.**    WHAT LOCATIONS --

25             **THE COURT:**    LET HER FINISH HER OBJECTIONS.

O'BRIEN – DIRECT / MS. SIMERLY

1    **MS. ANDERSON:**  YOUR HONOR, I MOVE TO STRIKE THE

2    ANSWER AS BEYOND THE SCOPE OF THE REPORT.

3            **THE COURT:**  DENIED.

4            PROCEED.

5    **BY MS. SIMERLY:**

6    **Q.**   AND YOU SAID YOU FOUND ABOUT 20 POSITIONS IN NUMEROUS

7    LOCATIONS, BOTH INSIDE THE U.S. AND OUTSIDE.

8            DO YOU RECALL WHERE THESE LOCATIONS WERE THAT YOU

9    FOUND JUST IN YOUR SEARCH RIGHT BEFORE YOUR REPORT?

10   **A.**   YES.

11           **MS. ANDERSON:**  SAME OBJECTIONS, YOUR HONOR.

12           **THE COURT:**  SAME RULING.

13           **THE WITNESS:**  I FOUND A NUMBER OF POSITIONS IN

14   HOUSTON, TEXAS.  TWO -- EXCUSE ME, SIX POSITIONS, I BELIEVE, IN

15   MALAYSIA, FIVE IN LONG BEACH, AND A COUPLE, I BELIEVE, IN THE

16   NETHERLANDS.

17   **BY MS. SIMERLY:**

18   **Q.**   DID YOU LOOK TO SEE IF CHEVRON HAD ANY POSITIONS IN THE

19   COURSE OF YOUR SEARCH?

20   **A.**   NO.  I EXCLUDED POSITIONS WITH CHEVRON ON THE ASSUMPTION

21   THAT GIVEN THE CIRCUMSTANCES, NEITHER MS. PANDE NOR CHEVRON

22   WOULD BE INTERESTED IN SOME KIND OF RECONCILIATION.

23           BUT CERTAINLY CHEVRON HAD POSITIONS AVAILABLE DURING

24   THAT TIME PERIOD; SIMPLY DID NOT INCLUDE THEM IN FORMULATING MY

25   OPINIONS.

1        **MS. ANDERSON:** OBJECTION, YOUR HONOR. AGAIN, MOVE

2  TO STRIKE. AGAIN, BEYOND THE WITNESS' --

3        **THE COURT:** I WILL STRIKE THE TESTIMONY ABOUT WHAT

4  WASN'T OR WHAT WAS AVAILABLE AT CHEVRON. OTHERWISE I WILL

5  OVERRULE THE OBJECTION.

6  **BY MS. SIMERLY:**

7  **Q.** MR. O'BRIEN, DID YOU ALSO FORM AN OPINION WITH REFERENCE

8  TO THE REASONABLENESS OF MS. PANDE'S ALLEGED JOB SEARCH?

9  **A.** YES.

10 **Q.** AND WHAT OPINION DID YOU FORM WITH REFERENCE TO WHAT YOU

11 UNDERSTOOD FROM HER DEPOSITION AND INTERROGATORY RESPONSES

12 ABOUT HER EFFORTS TO FIND COMPARABLE EMPLOYMENT AFTER HER

13 EMPLOYMENT WITH CHEVRON TERMINATED?

14 **A.** WELL, MY IMPRESSION OF READING HER DEPOSITION TRANSCRIPT

15 AND LOOKING AT THE INTERROGATORIES, SHE WASN'T PARTICULARLY

16 COMMITTED TO FINDING A POSITION AS EITHER A RESERVOIR OR

17 RESERVOIR SIMULATION ENGINEER.

18        IT SEEMED TO ME THAT HAD SHE IN EARNEST WORKED WITH

19 THE CONTACT SHE IDENTIFIED, THAT GIVEN HER BACKGROUND,

20 EXPERIENCE, AND EXPERTISE, AND WHAT I KNOW ABOUT THE LABOR

21 MARKET, I BELIEVE SHE WOULD HAVE FOUND A POSITION IN ONE OF

22 THOSE TWO CLASSIFICATIONS.

23        AND, IN FACT, IN TALKING WITH THE RECRUITER THAT I

24 RELIED UPON, HE HAD A POSITION HE FELT HE COULD IMMEDIATELY

25 PLACE HER IN.

1        **MS. ANDERSON:**  OBJECTION, YOUR HONOR.  MOVE TO

2   STRIKE THE INITIAL PORTION OF THE EXPERT'S TESTIMONY, WHICH IS

3   NOT ONLY BEYOND THE SCOPE OF THE EXPERT REPORT, BUT IS IMPROPER

4   EXPERT TESTIMONY.

5        **THE COURT:**  I WILL STRIKE THE PORTION OF THE

6   TESTIMONY REGARDING THE IMPRESSIONS OF MS. PANDE'S COMMITMENT

7   OR THE OTHER REFERENCES THAT HE MADE.  THE LAST SENTENCE ABOUT

8   CONTACT WITH THE RECRUITER, THAT IS ALLOWED.

9   **BY MS. SIMERLY:**

10  **Q.**   DID YOU ASK MR. DARROH FOR DETAILS ABOUT THIS POSITION

11  THAT HE BELIEVED HE COULD PLACE HER IN RIGHT THEN, LIKE WHERE

12  IT WAS, WHO IT WAS, WHAT THE PAY WAS, ANYTHING LIKE THAT?

13       **MS. ANDERSON:**  OBJECTION, YOUR HONOR, BEYOND THE

14  REPORT.  IT IS NOT CONTAINED WITHIN IT.

15       **THE COURT:**  OVERRULED.

16       **THE WITNESS:**  IT'S KUALA LUMPUR AS A RESERVOIR

17  SIMULATION ENGINEER.  I BELIEVE HE QUOTED A SALARY IN THE

18  NEIGHBORHOOD OF 170,000, PLUS SIGNING BONUS, ANNUAL BONUSES

19  DEPENDING ON COMPANY PERFORMANCE, AS WELL AS A COMPREHENSIVE

20  BENEFITS PACKAGE.  THE POSITION WAS WITH MURPHY OIL.

21  **BY MS. SIMERLY:**

22  **Q.**   AND DO YOU HAVE AN OPINION AS TO WHY IT IS THAT MS. PANDE

23  HAS NOT BEEN ABLE TO SECURE FULL-TIME EMPLOYMENT, MR. O'BRIEN?

24  **A.**   BASED ON MY REVIEW OF THE RECORD, YES.

25  **Q.**   WHAT'S THAT, SIR?

1    OCTOBER 22, 2007                            1:00 O'CLOCK P.M.

2

3                  P R O C E E D I N G S

4        **THE CLERK:**  COURT RESUMES ACTION IN C-04-5107, KARIN

5    PANDE VERSUS CHEVRONTEXACO.

6            COUNSEL, PLEASE STATE YOUR APPEARANCES.

7        **MS. ANDERSON:**  GOOD AFTERNOON.  CHRISTA ANDERSON FOR

8    PLAINTIFF KARIN PANDE.

9            **THE COURT:**  WELCOME.

10           **MS. MILLER:**  MICHELE MILLER FOR DEFENDANT CHEVRON.

11           **THE COURT:**  WELCOME.

12           **MS. SIMERLY:**  AND COMPANY FOR DEFENDANTS.

13           **THE COURT:**  AND COMPANY.

14           **MS. MILLER:**  AND COMPANY.

15           **THE COURT:**  OKAY.  WHAT I PROPOSE TO DO IS TO GO

16   THROUGH THE TWO MOTIONS THAT REGARD INSTRUCTIONS FIRST, AND

17   GIVE YOU RULINGS ON THOSE, AND THEN WE CAN HAVE A VERY SHORT

18   DISCUSSION OF THE REMAINING DISCUSSIONS, BECAUSE I'M SURE

19   YOU'LL HAVE NO OBJECTIONS TO ANY OF THEM.

20           AND THAT WILL BE OUR AGENDA.  SO THERE ARE TWO

21   MOTIONS, ONE FOR A MITIGATION INSTRUCTION, ONE FOR AN ADVERSE

22   INFERENCE INSTRUCTION.  BOTH OF THOSE ARE DENIED.

23           JUST TO MAKE IT CLEAR ON THE RECORD, THE REASON FOR

24   MY DENIAL OF BOTH OF THOSE I THINK THE LAW CONTAINED IN THE

25   MOTION FOR MITIGATION INSTRUCTION OVERSTATES THE LAW.  AND YOU

1    CAN ARGUE FROM THE EXISTING INSTRUCTION REGARDING

2    REASONABLENESS OR OTHER CONDITIONS OF EMPLOYMENT, SUCH AS

3    LOCATION.

4         WITH RESPECT TO THE ADVERSE INFERENCE INSTRUCTION, I

5    THINK YOU MADE YOUR CHOICE A COUPLE OF TIMES NOT TO PURSUE

6    THESE DOCUMENTS.  ONE:  DURING THE COURSE OF THE LITIGATION.

7    SECOND: WHEN YOU RELIEVED THE DEPONENT FROM PRODUCING THE

8    DOCUMENTS AT TRIAL.

9         SO, THE MOTION FOR AN ADVERSE INFERENCE INSTRUCTION

10   IS DENIED.

11        NOW, ANY OBJECTIONS TO THE COURT'S PROPOSED JURY

12   INSTRUCTIONS?

13        **MS. SIMERLY:**  YOUR HONOR, WE DO HAVE A COUPLE OF

14   ISSUES.

15        **THE COURT:**  WELL, LET'S GO FROM THE PLAINTIFF.

16   PLAINTIFF FIRST.

17        **MS. ANDERSON:**  YOUR HONOR, WOULD YOU LIKE US TO

18   STAND UP THERE OR IS IT ALL RIGHT TO STAY HERE?

19        **THE COURT:**  WHATEVER THE COURT REPORTER SAYS.  SHE

20   WOULD PROBABLY LIKE YOU CLOSER.

21        THE COURT REPORTER:  YES, PLEASE.

22        **MS. ANDERSON:**  YOUR HONOR, THE PRINCIPAL ISSUE THAT

23   WE WANTED TO RAISE WITH THE COURT WAS IN RELATION TO THE

24   RETALIATION INSTRUCTION, JURY INSTRUCTION NUMBER 16.

25        **THE COURT:**  OKAY. LET ME GET THAT.

1    **MS. SIMERLY:**  I KNOW, BUT "CONTRIBUTED TO THE HARM,"

2    WHAT DOES THAT MEAN?  I MEAN, IF IT WAS OUT THERE, DID THAT

3    CONTRIBUTE?  IF THE VERY FACT THAT IT WAS OUT THERE AND SOMEONE

4    CONSIDERED IT, DID THAT CONTRIBUTE?

5        IT HAS TO MAKE A DIFFERENCE.  AND I THINK THE

6    COURT'S LANGUAGE IS CORRECT:

7            "CONDUCT IS NOT A SUBSTANTIAL FACTOR IN CAUSING

8        HARM IF THE SAME HARM WOULD HAVE OCCURRED WITHOUT

9    THE

10       CONDUCT."

11   **THE COURT:**  WELL, I DON'T KNOW THAT THAT'S -- SEE,

12   THAT IS THE QUESTION, IS THAT LAST LITTLE BIT GETS INTO A MIXED

13   MOTIVE QUESTION, WHICH I'M NOT SURE I INTENDED TO GET INTO THE

14   SUBSTANTIAL FACTOR QUESTION.

15   **MS. MILLER:**  YOUR HONOR, MIXED MOTIVE WAS NEVER PLED

16   IN THIS CASE.

17   **MS. ANDERSON:**  IN THAT CASE IT'S CLEARLY NOT PROPER,

18   YOUR HONOR.

19   **THE COURT:**  THEN YOU SHOULDN'T HAVE ANYTHING LIKE

20   THIS.

21   **MS. ANDERSON:**  WE SHOULD JUST TAKE IT OUT.

22   **MS. MILLER:**  YOUR HONOR --

23   **MS. SIMERLY:**  YOUR HONOR, BUT WE'RE BACK TO THE SAME

24   PROBLEM. THE PROBLEM IS THERE IS A CONTINUUM OF SCENARIOS HERE.

25   **THE COURT:**  RIGHT.

1    **MS. SIMERLY:** ONE IS -- YES, NO PROBLEM. IT

2    ADDRESSES REMOTE OR TRIVIAL. THAT'S EASY. OKAY?

3    THE OTHER IS IT ADDRESSES IT DOESN'T HAVE TO BE THE

4    ONLY CAUSE OF THE HARM. NO PROBLEM.

5    BUT BETWEEN THOSE TWO THE JURY NEEDS TO KNOW THAT IN

6    DETERMINING WHETHER IT CONTRIBUTED TO THE HARM WE EITHER NEED

7    TO DEFINE "CONTRIBUTED TO THE HARM" OR HAVE THE STATEMENT THAT

8    THE COURT CHOSE.

9    IF THE COURT IS CONVINCED NOW THAT THAT LAST

10   STATEMENT DOESN'T BELONG, OKAY, THEN LET'S FIND ANOTHER WAY TO

11   TELL THE JURY WHAT "CONTRIBUTED TO THE HARM" MEANS.

12   AND WHAT I'M GETTING AT IS THE JURY HAS TO

13   UNDERSTAND THAT IT HAD TO MAKE A DIFFERENCE. IF IT DIDN'T MAKE

14   A DIFFERENCE IN THE ULTIMATE DECISION, IT DIDN'T, AS A MATTER

15   OF LAW, CONTRIBUTE TO THE HARM.

16   **THE COURT:** OKAY.

17   **MS. ANDERSON:** THAT --

18   **THE COURT:** WELL, THAT IS --

19   **MS. SIMERLY:** SOME DEFINITION OF WHAT IT IS --

20   **THE COURT:** OKAY. I UNDERSTAND. I'M DELETING THAT

21   SENTENCE.

22   NEXT.

23   **MS. ANDERSON:** I THINK THAT'S IT SINCE THE OTHER

24   ISSUES I WAS GOING TO RAISE RELATED TO THE MITIGATION

25   INSTRUCTION.

CLOSING ARGUMENT - MS. HARRIMAN

1     SO, IF WE GO TO THE VERDICT FORM.  WHEN YOU ARE

2   ASKED:  DID CHEVRON DISCHARGE MS. PANDE FROM EMPLOYMENT FOR

3   REASONS THAT VIOLATE PUBLIC POLICY, AGAIN, WE BELIEVE THAT WE

4   HAVE PROVED THE ANSWER IS YES.

5     I WANT TO TURN TO MY LAST TOPIC FOR THE DAY, WHICH

6   IS KIRAN PANDE'S DAMAGES.  KIRAN WORKED LONG AND HARD TO FIND

7   ANOTHER JOB WHEN SHE LEFT CHEVRON.  CHEVRON HAS ALREADY TOLD

8   YOU THAT KIRAN IS A WOMAN WITH A LOT OF PRIDE.  AND YOU HAVE

9   SEEN THAT THROUGHOUT HER TIME AT CHEVRON, SHE WAS AN

10  EXTRAORDINARILY HARD WORKING EMPLOYEE.  SHE NEVER TOOK A

11  VACATION DAY IN 2003.  AND, YET, SOMEHOW CHEVRON WOULD HAVE YOU

12  BELIEVE THAT KIRAN DIDN'T WORK HARD AT TRYING TO FIND ANOTHER

13  JOB.

14     TO THE CONTRARY.  AS KIRAN TESTIFIED, SHE KEPT A

15  LONG AND DETAILED LOG OF ALL OF HER EFFORTS TO FIND OTHER WORK.

16  SHE USED ALL OF HER NETWORKING EFFORTS TO TALK TO PEOPLE.  SHE

17  RETAINED SEARCH FIRMS, AND SHE WORKED THROUGH THEM.  AND SHE

18  SENT IN JOB APPLICATIONS.  SHE WAS A 45-YEAR-OLD INDIAN WOMAN

19  WHO WAS SUING HER PREVIOUS EMPLOYER, AND SHE JUST WASN'T

20  HIREABLE.

21     IT'S NOT FOR A MOMENT BELIEVABLE THAT ANY OF THE

22  LARGE OIL COMPANIES WOULD HIRE SOMEONE WHO IS SUING ONE OF

23  THEIR OWN.  KIRAN DIDN'T JUST SIT AROUND, SHE DIDN'T JUST DO

24  NOTHING WHEN SHE GOT NO'S FOR HER JOB SEARCHES.  INSTEAD, SHE

25  STARTED FINDING CONSULTING WORK.